IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MARYBETH FARRELL,          )
                                   )
               Plaintiff,     )
                                   )
             v.           )    C.A. No.04-285-KAJ
                                   )
ASTRAZENECA PHARMACEUTICALS, )
LP,                          )
                                   )
               Defendant.   )

## DEFENDANT'S OPENING BRIEF
## IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Sheldon N. Sandler, Esquire (No. 245)
Teresa A. Cheek, Esquire (No. 2657)
The Brandywine Building, 17th Floor
1000 West Street
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6673
Facsimile: (302) 576-3330
Attorneys for Defendant

Dated: May 2, 2005

## TABLE OF CONTENTS

Page

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................... ii

NATURE AND STAGE OF THE PROCEEDINGS ...............................................................1

SUMMARY OF ARGUMENT .............................................................................................2

FACTUAL BACKGROUND .................................................................................................3

ARGUMENT .....................................................................................................................23

I.    ASTRAZENECA IS ENTITLED TO SUMMARY
      JUDGMENT ON PLAINTIFF'S FMLA RETALIATION
      CLAIMS. ...............................................................................................................23

      A.    Summary Judgment Standard ...................................................................23

      B.    Analytical Framework for FMLA Retaliation Claims.................................23

      C.    Plaintiff's Documented Performance Deficiencies
            Predated Her FMLA Leave........................................................................25

      D.    The Passage of Time Destroys The Claim of a Causal
            Link .........................................................................................................26

II.   AZ IS ENTITLED TO SUMMARY JUDGMENT ON
      PLAINTIFF'S IMPLIED COVENANT CLAIMS.......................................................35

III.  AZ IS ENTITLED TO SUMMARY JUDGMENT ON
      PLAINTIFF'S COBRA CLAIM. ..............................................................................37

CONCLUSION..................................................................................................................40

WP3:1095897.1                                                                          057159.1004

# TABLE OF AUTHORITIES

Page

## Federal Cases

*Billet v. CIGNA Corp.*,
940 F.2d 812 (3d Cir. 1991) ................................................. 33

*Campbell v. Emery World Wide*,
1994; U.S. Dist. LEXIS 13447
E.D. Pa. 1994) ................................................................. 38

*Carter v. Enterprise Rent-A-Car Co.*,
2002 U.S. Dist. LEXIS 13865 (N.D. Ill. 2002) ................. 30

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ................................................. 23, 25

*Chandler v. Specialty Tires of America (Tennessee), Inc.*,
283 F.3d 818 (6th Cir. 2002) ................................. 28, 35

*Clark Co. Sch. Dist. v. Breeden*,
522 U.S. 268 (2001) ......................................................... 27

*Clover v. Total Sys. Servs., Inc.*,
176 F.3d 1346 (11th Cir. 1999) ...................................... 30

*Conery v. Bath Associates*,
803 F. Supp. 1388 (N.D. Ind. 1992) ............................... 38

*Conner v. Schnuck Markets, Inc.*,
121 F.3d 1390 (10th Cir. 1997) ...................................... 27

*Conoshenti v. Public Svce. Electric & Gas Co.*,
364 F.3d 135 (3d Cir. 2004) ............................................ 24

*D'Amico v. Compass Group USA, Inc.*,
198 F. Supp. 2d 18 (D. Mass. 2002) ............................... 28

*DiFederico v. Rolm Co.*,
201 F.3d 200 (3d Cir. 2000) ............................................ 24

*DiSabatino v. DiSabatino Brothers, Inc.*,
894 F. Supp. 810 (D. Del. 1995) ..................................... 38

*Duvall v. Polymer Corp.*,
1995 U.S. Dist. LEXIS 14413
 (E.D. Pa. 1995) .............................................................. 33

WP3:1095897.1                                                                                        057159.1004

*E.I. DuPont de Nemours & Co. v. Pressman*,
   679 A.2d 436 (Del. 1996) ........................................................................... 35

*Ebert v. Office of Info. Sys.*,
   No. 97-530-SLR, 1998 U.S. Dist. LEXIS 9100
   (D. Del. June 12, 1998) .............................................................................. 25

*Ezold v. Wolf, Block, Schorr & Solis-Cohen*,
   983 F.2d 509 (3d Cir. 1992) ...................................................................... 33

*Fuentes v. Perskie*,
   32 F.3d 759 (3d Cir. 1994) ........................................................................ 24

*Gearhart v. Sears, Roebuck & Co., Inc.*,
   27 F. Supp. 2d 1263 (D. Kan. 1998) .......................................................... 27

*Harris v. SmithKline Beecham*,
   27 F. Supp. 2d 569 (E.D. Pa. 1998)
   *aff'd* 203 F.3d 816 (3d Cir. 1999) ............................................................. 26

*Hawkins v PepsiCo Inc*,
   203 F.3d 274 (4th Cir. 2000) ..................................................................... 33

*Horowitz v. Fed. Kemper Life Assurance Co.*,
   57 F.3d 300 (3d Cir. 1995 .......................................................................... 23

*Kachmar v. Shurgard Data Sys., Inc.*,
   109 F.3d 173 (3d Cir. 1997) ...................................................................... 26

*Keeshan v. Home Depot*,
   U.S.A., Inc., C.A. No. 00-529
   2001 U.S. Dist. LEXIS 3607 (E.D. Pa. March 27, 2001) .............................. 27

*Keller v. Orix Credit Alliance, Inc.*,
   130 F.3d 1101 (3d Cir. 1997) ............................................................... 24, 28

*Krouse v. American Sterilizer Co.*,
   126 F.3d 494 (3d Cir. 1997) ...................................................................... 27

*Lepore v. LanVision Sys.*,
   113 Fed. Appx. 449 (3d Cir. 2004) ............................................................ 24

*Lewis v. State of Delaware Dept. of Public Instruction*,
   948 F. Supp. 352 (D. Del. 1996) ................................................................ 27

*Lloyd v. Wyoming Valley Health Care*,
   994 F. Supp. 288 (M.D. Pa. 1998) ............................................................. 22

iii

*Marsaglia v. L. Beinhauer & Son, Co.*,
   987 F. Supp. 425 (W.D. Pa. 1997) ................................................................. 38

*Martin v. Health Care & Ret. Corp.*,
   67 Fed. Appx. 109, 113 (3d Cir. 2003) ........................................................... 32

*McDonnell Douglas Corp. v. Green*,
   411 U.S. 792, 36 L. Ed. 2d 668,
   93 S. Ct. 1817 (1973) ................................................................................ 24, 31

*Mills v. First Fed'l Sav. & Loan of Belvidere*,
   83 F.3d 833 (7th Cir. 1996) ............................................................................ 31

*Pamintuan v. Nanticoke Mem'l Hosp.*,
   No. 96-233-SLR, 1998 U.S. Dist. LEXIS 16764
   (D. Del. Oct. 15, 1998 ................................................................................... 25

*Panto v. Palmer Dialysis Center/Total Renal Care*,
   2003 U.S. Dist. LEXIS 5663
   (E.D. Pa. 2003) ............................................................................................. 26

*Patten v. Zeneca, Inc.*,
   1996 Del. Super. LEXIS 86
   C.A. No. 94C-07-180-WTQ (Feb. 13, 1996) .................................................. 36

*Phillips v. DaimlerChrysler Corp.*,
   C.A. No. 01-247-JJF,
   2003 U.S. Dist. LEXIS 23941
   (D. Del. March 27, 2003) ............................................................................... 29

*Quiroga v. Hasbro, Inc.*,
   934 F.2d 497 (3d Cir. 1991) ........................................................................... 25

*Richards v. City of Wilmington*,
   No. 03-106-SLR, 2004 U.S. Dist. LEXIS 4987
   (D. Del. Mar. 24 2004) .................................................................................. 23

*Richmond v. Oreok*,
   12 F.3d 205 (10th Cir. 1997) .......................................................................... 27

*Schoch v. First Fidelity Bancorporation*,
   912 F.2d 654 (3d Cir. 1990) ........................................................................... 25

*Smith v. Mem'l Hosp. Corp.*,
   302 F.3d 827 (8th Cir. 2002) .......................................................................... 28

*St. Mary's Honor Ctr. v. Hicks*,
   509 U.S. 502 (1993) ....................................................................................... 24

WP3:1095897.1                                                                                        057159.1004

*Stinson v. Del. River Port Auth.*,
   935 F. Supp. 531 (D.N.J. 1996) ...................................................................... 25

*Thomas v. Town of Hammonton*,
   351 F.3d 108 (3d Cir. 2003) ........................................................................ 30

*Torre v. Casio*,
   42 F.3d 825 (3d Cir. 1994)( ........................................................................ 24

*Van Slyke v. Northrop Grumman Corp.*,
   115 F. Supp. 2d 587 (D. Md. 2000)
   aff'd, 17 Fed. App. 154, 2001 U.S. App. LEXIS 19279
   (4th Cir. Aug. 27, 2001) ........................................................................... 33

*Williams v. Cerberonics, Inc.*,
   871 F.2d 452 (4th Cir. 1989) ....................................................................... 33

Zawadowicz v. CVS Corp.,
   99 F. Supp. 2d 518 ............................................................................... 22

## Other Authorities

29 U.S.C. § 2612(b) ............................................................................... 24

29 U.S.C. § 2615(a)(2) ........................................................................... 31

Fed. R. Civ. P. 56(c) ............................................................................ 24

## NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff Marybeth Farrell worked for Defendant or its predecessor, Zeneca, Inc., from February 4, 1994 until January 23, 2004. Plaintiff filed this action, alleging retaliation under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq*., and other related claims, against Defendant AstraZeneca Pharmaceuticals, LP ("AZ") on May 5, 2004. In addition to her retaliation claim, Plaintiff alleges that AZ violated the provision of the Consolidated Omnibus Budget Reconciliation Act ("COBRA") that requires employee medical insurance benefit plan administrators to issue a COBRA election notice to allow the recipient an opportunity to continue coverage under the plan. 29 C.F.R. § 2590.606-4. Finally, Plaintiff claims that AZ breached the implied covenant of good faith and fair dealing ("the covenant") by falsifying and manipulating its records regarding Plaintiff's employment in order to create fictitious grounds to terminate her. In the alternative, Plaintiff argues that AZ breached the covenant by terminating her employment in violation of public policy.

AZ filed an Answer asserting that the actions it took against Plaintiff were due to her performance deficiencies and were completely unrelated to her FMLA leave, and that it mailed a timely COBRA notice to her last known address. The parties took discovery, and on May 2, 2003, AZ filed a motion for summary judgment. This is AZ's opening brief in support of its motion for summary judgment.

## SUMMARY OF ARGUMENT

I.     Defendant AZ is entitled to summary judgment on Plaintiff's FMLA retaliation claims because Plaintiff has insufficient evidence for any reasonable juror to find a causal connection between the alleged adverse employment actions and any protected activity in which she may have engaged.

II.     Defendant AZ is entitled to summary judgment on Plaintiff's FMLA retaliation claims because Plaintiff has insufficient evidence for any reasonable juror to find that AZ denied Plaintiff a promotion she sought, placed her on an Action Plan and a Performance Improvement Plan, and terminated her employment for any reason other than her poor performance.

III.     Defendant AZ is entitled to summary judgment on Plaintiff's claim that AZ violated the implied covenant of good faith and fair dealing because Plaintiff has no evidence that AZ or any of its employees falsified any of the many documents that show that Plaintiff was performing poorly.

IV.     Because Plaintiff has insufficient evidence to prove that AZ violated the FMLA anti-retaliation provision, Plaintiff has insufficient evidence to prove that her termination was a violation of public policy and, for that reason, a breach of the implied covenant of good faith and fair dealing has not been established.

V.     Defendant AZ is entitled to summary judgment on Plaintiff's COBRA claim because Plaintiff has no evidence to rebut AZ's showing that it mailed Plaintiff a timely COBRA notification in the regular course of business.

## FACTUAL BACKGROUND

Zeneca, Inc. hired Plaintiff Marybeth Farrell ("Plaintiff") in February 1994 for the position of Writer/Editor in the Professional Relations Department.  A1. In November 1999, after the formation of AstraZeneca Pharmaceuticals, LP ("AZ"), Plaintiff accepted the position of Professional Relations and Education Program ("PREP") Manager in AZ's GI Therapeutic Area. A3.  In 2000, she was "redeployed" to a Senior Field PREP Partner position, reporting to Amy Renk (now Haines), A5, after having performance problems in her previous position. A363-64.  The reassignment was a lateral transfer. Later, Plaintiff posted for a position as a PREP Manager for the Exanta Team and in April 2002 she began working in that position. A240.

Plaintiff's job as an Exanta Team PREP Manager was to work with medical professionals to develop and implement educational programs that supported the Exanta marketing team, which was in the process of launching Exanta, an important new blood thinner. A60. Plaintiff had to adhere to legal and regulatory guidelines and meet the needs of the internal and external customers. A60. She was to help build relationships with national professional societies, medical associations and influential individuals in the relevant medical community (sometimes referred to as "KOLs," an acronym for key opinion leaders). *Id*., A293-94.  One of her primary responsibilities was planning and conducting advisory board meetings[1] of KOLs. A60. Planning advisory board meetings required Plaintiff, among other things:

- To be the interface with investigators and customers

---

[1] Advisory board meetings are important market research tools used to find out more about physicians' thoughts and attitudes about a drug. Usually a physician who has done some clinical trials with the drug in question will make a presentation and then ask the audience of other physicians what they think, and they will then discuss it. AZ marketing employees attend the meetings to learn more about the KOL's concerns, which helps them better market the product. Most AZ marketing groups keep a database of physician profiles to help them in planning advisory board meetings. A319-22.

3

- To understand the therapeutic area and the clinical trial data regarding Exanta

- To understand the strategic focus and the direction for the marketing of Exanta

- To have a speaking and a working level knowledge of relevant publications

- To collaboratively create lists of KOLs to be invited to the meetings

- To organize and drive the meetings

- To develop relationships with KOLs

A284; 323-26, 329-33. Planning advisory board and similar meetings required Plaintiff to work closely with several outside vendors[2] that had contracts with AZ to provide assistance with the development and planning of advisory board and other meetings.

Plaintiff's immediate supervisor when she joined the Exanta team in April 2002 was Jane Hellen. A240. In June 2002, Brian Martin became the Exanta Brand Promotions Leader and Plaintiff's first-level supervisor. A240-41. He reported to Jane Hellen. A279. There were two Senior PREP managers on the Exanta team: Louise Colburn, who was in charge of marketing to professional congresses and associations, and Susan Broadway,[3] who was in charge of marketing to anticoagulation clinics. A243-44. Plaintiff marketed to internists and cardiologists. *Id.*

### Plaintiff's Performance Problems Before Joining the Exanta Team

AZ provides formal performance reviews to its employees on an annual basis in the first quarter of each calendar year for their performance in the previous calendar year. A362. AZ uses a "360-degree" performance management process that requires managers to obtain feedback from those with whom employees interact. A291, 298-99. In late 2001, Plaintiff's

---

[2] The vendors working with the Exanta marketing team included The GMR Group ("GMR"), Q.E.D. Communications ("QED"), Discovery International ("Discovery"), IMPACT Communications, Inc. ("IMPACT"), Simpson Healthcare ("Simpson") and TG Worldwide Meetings and Incentives ("TGWW").

[3] Ms. Broadway was using her maiden name at the time ("Pritchard"), but will be referred to by her married name throughout this brief.

manager at the time, Amy Renk,[4] obtained performance feedback from Plaintiff's peers and others who worked with her, such as vendors, indicating that Plaintiff needed to increase her substantive knowledge, improve her ability to move matters for which she was responsible promptly, and most notably, correct her failure to listen, understand and communicate. A20; 365.  One commenter wrote that Plaintiff should "listen to what is being discussed and not being [sic] redundant with questions that have already been answered or solutions that have already been identified." A9.  Another said she made so many communication errors that "I started to wait a few days to forward on her communications to the RSD team, so that I could be sure I was sending the final version." A19.  Another opined that as she "gains tenure she may be more inclined to make decisions more rapidly or provide information in a more timely manner." A11. Another remarked, "I have this feeling that we are not realizing the full potential of her position." A13. Yet another stated "she could be more effective with a broader understanding of the sales organization." A16. In Plaintiff's 2001 Performance Evaluation (A20-23), Ms. Renk recommended that Plaintiff:

> should also focus on listening more intently to ensure that she thoroughly understands what is being said or discussed. At times she hears what is said, but is not actively listening to understand. She should also focus on ensuring that communications are accurate before they are sent . . . Marybeth has very high expectations, sometimes higher than others can realistically meet, based on her individual desires. She should . . . try to understand those reasons when possible. (ex. Why she cannot have her own assistant).

A22.  And see A363-65.  All of the performance deficiencies that were identified in 2001 surfaced again after Plaintiff joined the Exanta team.

### Farrell's Performance Problems on the Exanta Team

---

[4] Ms. Renk's married name is Haines, but will be referred to by her maiden name, which was used while she was Plaintiff's manager.

After joining the Exanta team in April 2002, Plaintiff began planning and, later in the year, conducting advisory board meetings. Plaintiff's supervisor, Brian Martin, attended meetings for which she was responsible, which were run poorly, and on November 25, 2002 he had a discussion with Plaintiff about the advisory board strategy for 2003. A25; 366-67. He followed up the meeting by sending Plaintiff an email message instructing her to prepare a template or standard operating procedure for advisory board meetings, "to ensure that all are of the highest in quality." A25. He wrote that it was very important that she complete the template before dealing with any other advisory board issues, and that, "as a priority," it should be complete, or nearly complete. *Id*. He referred to the advisory board meetings that he had attended that year, and wrote, "many questions come from these meetings regarding the teams [sic] preparation for them, strategy, objectives, agenda etc. These processes you are creating will answer most of the questions." *Id.* He suggested a number of "unanswered questions" that should be covered in her template. *Id.*

Mr. Martin imposed the template requirement on Plaintiff because she had not adequately prepared the advisory board meetings he had attended. A367. The areas he described for inclusion in the template were all items in which Plaintiff's performance had been deficient. *Id*. He was trying to be tactful and was hopeful that once Plaintiff developed the template, future advisory boards would run smoothly. *Id.*  Mr. Martin was also aware that after one of the advisory board meetings, Plaintiff had insulted and angered one of AZ's physicians, Sunita Sheth, whom Plaintiff had asked to speak at the last minute. Later, Plaintiff had sent an email criticizing Dr. Sheth for not attending a pre-meeting session. Dr. Sheth was livid and Plaintiff did not seem to understand why her email had provoked that response. A367-68.  Mr. Martin had also received complaints that Plaintiff was using excessive emails to communicate with physicians and her co-workers and vendors.  A367-68. Vendors had

6

complained that Plaintiff was sending out confusing and contradictory emails and not responding promptly to questions. *Id.*

In late 2002, Deborah Brangman, Plaintiff's "functional" manager and Mr. Martin, her "deployed" manager, A277-78, collected written feedback about Plaintiff's performance for her annual review. Pharmacist Brian Katona wrote presciently: "more timely communication is something we all struggle with. This will become even more important as more things need to be done, with no increase in personnel. **We will run into scheduling conflicts**." (emphasis added). A35. Mr. Martin wrote that Plaintiff could be more effective by "providing clear, concise, and focused communications at all times (i.e. e-mail) with customers both internally and externally." A36. He also commented that she needed to increase her knowledge of the brand and therapeutic area. A36-37. These criticisms echoed those made by many others the previous year when Plaintiff was working in another position. Ms. Hellen, Plaintiff's former direct supervisor, also provided input for the evaluation that included many suggestions for improvement (A31); she did not feel that Plaintiff's performance was as good as it should be but since Plaintiff had only been in the position for six or seven months and she recognized that there was a learning curve involved, Ms. Hellen gave her the benefit of the doubt. A300-01.

Ms. Brangman and Mr. Martin prepared Plaintiff's 2002 review, giving her an overall rating of "Good." A43. This rating was second from the bottom ("Unacceptable") and two levels below the best rating ("Distinguished," which was followed by "Excellent"). A43. Mr. Martin and Ms. Brangman identified the following areas of improvement in the performance evaluation (A38):

- Continue to expand understanding of therapeutic area and clinical trial data

- Increase strategic focus and knowledge of key brand messages

7

- Expand understanding of other marketing disciplines including publications, PDS activities and strategists' roles

- Take courses in strategic planning, leadership skills, and public speaking.

On November 25, 2002, Plaintiff had sent an email to Mr. Martin and Ms. Hellen requesting a promotion from her position as PREP Manager, in which her classification level was Band IV, to a Band V Senior PREP Manager position.[5] A24. She claimed that her former functional supervisor, Renee Valles (Ms. Brangman's predecessor), had promised her a Band V position within six months. *Id*. The Exanta group was to move to a new building in February 2003 and while Band IV employees were not entitled to offices, Band V employees were, if office space was available. A336-38; 353-55; 245-47. Nevertheless, Ms. Hellen had arranged for Plaintiff to have an office in the new building initially, since space was available at that time, although Plaintiff was the only Exanta Band IV manager in an office rather than a cubicle. A353-55.

At first, Ms. Hellen supported Plaintiff's promotion request, but in late 2002 she began to have reservations because of concerns about Plaintiff's performance. A289-90; 292. Plaintiff had been responsible for organizing an advisory board meeting in Chicago in late 2002 that Ms. Hellen had attended. Ms. Hellen was dissatisfied with the meeting, which she felt was "very loosely managed." A289-90. By January 2003, Brian Martin had also become concerned about Plaintiff's performance and expressed his concerns to Ms. Brangman. A339-40. On February 12, 2003, Ms. Hellen wrote to Ms. Brangman that she felt the promotion would send a "terrible mixed message" to Plaintiff and the rest of the Exanta Team. A46; 303-05. She suggested that, instead, they talk to Plaintiff about the need for her to show

---

[5] When she joined the Exanta team in the spring of 2002, Plaintiff was a Band IV PREP manager. The difference between the positions of PREP Manager and Senior PREP Manager is the level of competency.   PREP Managers can be either Band IV or Band V, but the Senior PREP Manager position is always Band V.  A345-46.

improvement in her performance. A46. After discussing the situation with Ms. Hellen, Ms.

Brangman, who was also aware of the increasing concerns about Plaintiff's performance,

agreed. A341. On February 14, 2003, Ms. Hellen suggested that one of them contact Human

Resources and plan some meetings to discuss Plaintiff's performance problems. A47.

On March 5, 2003, Ms. Hellen sent a series of emails to other managers about the

"significant deficiency" with Plaintiff's work. A50-56. Plaintiff had been responsible for

meeting a deadline of January 31, 2003 for updating the list of invitees for an upcoming

Cardiology advisory board. A54-56. Plaintiff had not updated the list, with the result that, as

Ms. Hellen wrote to Ms. Brangman: "We are at risk for the advisory board schedule and she is

sitting on information or not moving to meet deadlines." A50. Ms. Hellen asked Ms.

Brangman for help with "moving Plaintiff along" or putting her on a "formal performance

plan asap." *Id.*

On March 10, 2003, Ms. Brangman met with Plaintiff to review her 2002 Performance

Evaluation, A38-44, which had been prepared based on information collected in late 2002.

A33-37. Because of the lapse of time between the evaluation's preparation and its

administration, the evaluation did not describe the performance problems that had begun to

surface in mid-December 2002. A341-42. However, Ms. Brangman made a point to review

with Plaintiff her recent performance issues. A327-28; 341-42. Plaintiff acknowledged via an

email message to Ms. Brangman the following day that Ms. Brangman had made

"recommendations" for her "2003 development goals" and she requested permission to take

AZ internal training classes in "Thought Leader and Publication Planning Development" and

"Public Presentations for the Professional." A48. Ms. Hellen was sufficiently concerned about

the situation that she emailed Ms. Brangman to ask how the meeting went. A49. Ms.

Brangman replied that she had told Plaintiff about the performance issues but Plaintiff "was

9

not taking accountability for her actions." A306. Instead, Plaintiff was "blaming everyone else for everything that went wrong." *Id.*

On March 14, 2003, the Exanta marketing staff met to discuss faculty nominations and selections for advisory Boards. A57. They decided the Cardiology advisory board that had been scheduled for April would have to be cancelled because Plaintiff had not assembled the list of attendees in time for the invitations to be sent out. A282-83; 311; 50-56.

Because of Plaintiff's refusal to acknowledge her performance issues, Ms. Brangman scheduled meetings with her second level supervisor, Scott Bolenbaugh, and Ms. Hellen, Mr. Martin, and Deborah Kauffman of Human Resources, to discuss the "evolving situation with Marybeth Farrell." A58; 369. On March 17, 2003, they discussed Plaintiff's performance and considered all options, including immediately placing her on an Action Plan (the first formal step in attempting to improve performance) or waiting until mid-year to see if her performance improved. A306-07. Shortly thereafter, AZ restructured the department and in the beginning of April, Mr. Martin moved to another Brand team. A307-09; 366. During the transition, there was a delay in addressing Plaintiff's problems. *Id.*

In early April 2003, Susan Broadway (one of two Senior PREP Managers on the Exanta team) was promoted to Mr. Martin's position and became Plaintiff's immediate supervisor. A308-09. On Friday, April 4, 2003, Ms. Kauffman emailed Ms. Hellen about Plaintiff's situation, saying that she had discussed it with Ms. Broadway and that they both agreed it was urgent. A59. On April 7, 2003, after a staff meeting announcing Ms. Broadway's promotion, Plaintiff went to Ms. Hellen's office and told Ms. Hellen she thought she should have been promoted rather than Ms. Broadway. A309. Ms. Hellen, who had to attend another meeting, told Plaintiff in no uncertain terms that before she could be considered for promotion, she needed to improve her performance in her present position, and briefly discussed

10

Plaintiff's performance deficiencies with her.  A309-10. On the same day, Ms. Hellen sent Plaintiff an email asking about her progress on a list of action items, which she had assigned to Plaintiff during the March 14, 2003 staff meeting in order to avoid other advisory board cancellations or delays. A62; A311-12. Ms. Hellen suggested that Plaintiff handle several of the action items directly instead of delegating them, since one of Plaintiff's problems was trying to delegate her responsibilities to other team members or vendors, and then refusing to accept responsibility when things went wrong. A289, 312, 316; 74; 78; 104.

Plaintiff then sent an email to Christine Lutze of Discovery, telling her that the Exanta team would want a weekly report on the status of meeting plans. A63. Ms. Hellen, who had been copied on the email, wrote to Plaintiff that she "was thinking of more depth."  A63; A64.

On April 11, 2003, Plaintiff sent Ms. Broadway the original set of her 2003 objectives, which had resulted from conversations with her then-managers Mr. Martin and Ms. Brangman. A66. Plaintiff told Ms. Broadway that she would revise the objectives in accordance with their discussion that morning, to include "accountability and leadership" in connection with advisory board planning and "responsibility for total project management for the advisory boards including directly obtaining the necessary inputs from team members such as medical directors, and other issues we discussed." Plaintiff welcomed "assuming a greater degree of autonomy, responsibility and accountability for managing the ad boards & investigators that you discussed." *Id.*

On April 14, 2003, Ms. Hellen forwarded to Ms. Broadway the email messages regarding her request for more information about the status of Plaintiff's advisory board plans. A67. Ms. Hellen asked Ms. Broadway to follow up with Plaintiff as she felt necessary. *Id.* Ms. Hellen also stated that she was waiting for Brian Martin's comments on Plaintiff's performance. *Id.*; A312-13. Ms. Hellen was about to go on vacation and wrote that, although

11

she hated to do so, they would have to wait until she returned to address the issue. A67; 313. The next day, Louise Colburn, a Senior PREP Manager on the Exanta team, forwarded a series of emails to Ms. Broadway and expressed frustration with Plaintiff for not accepting accountability for her responsibilities (Ms. Colburn commented "We go 'round and 'round!"). A68; 313-14. On April 16, 2003, Plaintiff sent an email stating that she was working a half-day from home and would begin vacation that afternoon, continuing through Monday, April 21, 2003.  A69.

In late April,[6] Plaintiff requested a medical leave from AZ's Health Services Department, which notified her on May 1, 2003 that she had been granted leave from May 9 until approximately June 20, 2003. A79. Plaintiff claims that when she told Ms. Hellen about her need for leave, Ms. Hellen responded, "six weeks is a long time" and asked if Plaintiff would be out for the whole six weeks. Complaint ¶ 33. In fact Ms. Hellen, who at the time was not aware of the nature of the medical procedure for which Plaintiff had requested leave, simply expressed concern for Plaintiff's health. A280-81. Ms. Hellen knew that Plaintiff's treating physician, Plaintiff and AZ's health department would decide the length of the leave. A281. Plaintiff later talked to Ms. Hellen again about her surgery, volunteered details and said she was quite upset about it.[7] Ms. Hellen urged her to focus on recovery and not to worry about her work.[8] A285.

On April 28, Deborah Kauffman, the Human Resources Manager who had been monitoring the situation, contacted Susan Broadway to express concern that no action was

---

[6] Farrell claims she told AZ about her leave request on April 22, but has no documentation of that date. AZ's first document on the issue is dated April 26, 2003. A70.

[7] As a result of the surgery, Plaintiff would be unable to bear children. A235-36.

[8] In her complaint, Plaintiff tries to paint a picture of Ms. Hellen as sarcastic, hostile and unfeeling. That picture is in sharp contrast to an email Plaintiff sent Ms. Hellen on May 19, while she was out on leave, saying it had been wonderful to talk to her that morning and thanking her for her "words of encouragement." A90; 286.

12

occurring in connection with Plaintiff's performance problems. A73; 370. On the same day, Ms. Kauffman spoke to Ms. Broadway and learned that Plaintiff had just informed her that she would be "out a few weeks for a medical." A71; 370. Ms. Kauffman and Ms. Broadway reviewed the issues and decided that any detailed discussion of performance would have to wait until after Plaintiff's leave ended. A72; 370.

On April 29, 2003, Ms. Broadway asked Plaintiff to develop a transition plan so that the other PREP managers could handle her projects while she was on FMLA leave. A347-50. Plaintiff now contends that this was an unreasonable work requirement. Complaint ¶¶ 38, 39. At the time, Plaintiff told Ms. Kauffman she thought it was standard and reasonable. A88; 370.

Ms. Broadway met with Plaintiff on the morning of May 1 and reviewed performance issues with her. A77. Plaintiff responded by blaming other people: her former supervisor, Mr. Martin, and her co-worker, Louise Colburn. *Id.* Early that morning, Ms. Hellen had emailed Ms. Broadway to confirm that she had reviewed performance issues with Plaintiff on March 14 (the day the Cardiology Ad Board was cancelled), and again on April 7, the day Ms. Broadway's promotion was announced to the staff. A78; 315-16. Ms. Hellen asked to be present for future performance discussions with Plaintiff so she could "keep her focused on her work, not the 'competency' of others." A78.

After her meeting with Ms. Broadway, Plaintiff emailed Ms. Hellen about the performance discussion, concluding: "Susan will email me a listing of these issues, for each of which we will develop both a short-term and a long-term improvement plan. I am confident these issues can be addressed and all actions requiring additional attention and improvements will certainly be made." A77. Plaintiff also emailed Ms. Kauffman with her "spin" on her meeting with Ms. Broadway (again blaming Mr. Martin and Ms. Colburn for

cancellation of the Cardiology ad board), and concluding, "[t]hese actions for improvement I was advised are different from a formal HR performance improvement plan." A80.

On Monday, May 5, 2003, both Ms. Hellen and Ms. Broadway met with Plaintiff and gave her a list of short-term and long-term action items to complete. A82-86. On May 6, Plaintiff emailed Ms. Hellen the first of numerous emails and memoranda attempting to justify her performance deficiencies, pointing to her 2002 performance review as inconsistent with what she was now being told about her shortcomings. A83-86. Ms. Hellen replied that the performance issues had arisen during the first and second quarters of 2003. A82-83. Plaintiff responded by quarrelling with some of Ms. Hellen's comments and repeating her attempts to shift the blame to others. A82.

On May 8, Plaintiff met with Ms. Kauffman to review the situation. A87-89; 370. She noted that Plaintiff "felt her short term objectives were appropriate - what you would give to anyone who would be out on leave or out of the office." A88.

Plaintiff's FMLA leave was approved from May 9, 2003 through June 20, 2003. A81. On May 19, while on leave, Plaintiff called Ms. Hellen, said she felt better and was bored, and offered to make calls, send emails, and draft letters or materials at home. A90. Ms. Hellen declined Plaintiff's offer nicely since she felt it would not be appropriate to have Plaintiff working while on leave. A286. On May 27, Plaintiff sent Ms. Hellen an email proposing that she return to work with part-time hours beginning on June 3 and full-time on June 23. A91-92. Her physician, Dr. Susan Gorondy, approved Plaintiff's proposed schedule, A93, and it was cleared by AZ Health Services. A94. During her leave Plaintiff did not communicate with her direct supervisor, Ms. Broadway, choosing instead to contact Ms. Hellen frequently. A91. This unusual behavior was the subject of an email exchange between Ms. Kauffman and Ms. Broadway. Id.

14

On Thursday, June 12, the last day of Plaintiff's second week of part-time work, she

met with Ms. Broadway to discuss her new responsibilities under the reorganized Exanta

team structure. A95. Plaintiff's next day of work was June 16; she worked for part of the day

but began to experience back pain and stayed home on June 17, 18 and 19. A206-07; 249.

She came back to work full-time on June 20, 2003. A250. Plaintiff claims she felt pressured

to return early from her leave and that her surgeon did not approve of her not taking six

weeks of bed rest. A242. However, her physician, Dr. Gorondy, wrote in her May 29, 2003

Return to Work Statement that Plaintiff could return to work part-time on June 3, 2003 and

could resume her full-time schedule on June 23, 2003. A93. No further restrictions were

listed. *Id.*

On June 30, after her return to work, Plaintiff claimed that while she was at home, she

had received a package in the mail promoting her from her Band IV PREP Manager position

to a Band V Senior PREP Manager position. A96; 98; 351-52. She left a voicemail for her

functional manager, Rachel Bevis (who had replaced Ms. Brangman), telling her she had

received a packet of documents in June promoting her and asking Ms. Bevis for

confirmation. A98. Plaintiff's managers were completely unaware of the purported

promotion and asked her to bring in the documents she mentioned. A351-52. Plaintiff never

brought in the papers and admitted at her deposition that she had misread them. A251.[9]

When Plaintiff's performance deficiencies continued after her return, Ms. Broadway

began taking steps to place Plaintiff on an Action Plan. A99; 100. On August 18, 2003, over

three months after her FMLA leave had begun, Ms. Broadway put Plaintiff on a formal

Action Plan designed to assist her to improve her performance.  A200; 101. Plaintiff's

reaction to Ms. Broadway when she presented the plan was hostile and she refused to sign it.

---

[9] Since Plaintiff failed to produce the documents in this case, there has been no opportunity to assess
how far off the mark her "misreading" was, or whether she simply fabricated the whole thing.

A100; 101-03; 253-54. Plaintiff met with Ms. Kauffman on August 21 and Ms. Kauffman reviewed the Action Plan process with Plaintiff thoroughly. A107; 370. As she often did, Plaintiff misunderstood and asked the same questions repeatedly. A108.

On September 9 and 10, Ms. Broadway sought feedback from vendors and others on Plaintiff's performance. The vendors responded that they were having difficulty working with Plaintiff because she had to consult with others before responding to requests and questions, resulting in lengthy delays; was at times defensive and hostile; did not seem to understand important policies; was not good at providing strategic direction; seemed unprepared, confused and overwhelmed; and did not manage meetings well, sometimes canceling them. A114-15. .

When Plaintiff and Ms. Broadway met on September 12 to discuss Plaintiff's progress on the Action Plan, Plaintiff kept insisting that the Action Plan requirements were not appropriate for a Band IV PREP manager[10] rather than listening to the feedback Ms. Broadway had gathered. A116-18. Ms. Broadway perceived Plaintiff as very bitter and hostile and said so, which Plaintiff denied. *Id*. Plaintiff raised her voice and afterwards Louise Colburn, who was nearby, asked Ms. Broadway who had been yelling at her. *Id.* Ms. Broadway found the meeting draining and Plaintiff's behavior unprofessional and unacceptable and told her so. *Id*.

On September 17, 2003, Plaintiff made an internal complaint of retaliation for taking FMLA leave. A124; 272-73. She also claimed she was being retaliated against because in 1995, she had complained that she was being sexually harassed after breaking off a

---

[10] Plaintiff repeatedly insisted that AZ was expecting her to perform Band V rather than Band IV responsibilities. See, e.g., A125-27.

consensual affair with a co-worker.[11] Keith Black of AZ's Human Resources Department investigated the FMLA complaint but found no evidence of retaliation. D139. Plaintiff would not provide any further explanation of the basis for her sexual harassment retaliation complaint so Mr. Black could not investigate that complaint. *Id.*

In mid-September, because Ms. Kauffman was going to be away during a portion of the Plan's implementation, the Human Resources responsibility for working with Plaintiff's managers on her Action Plan was assigned to Georgina Austin-Jones, who had arrived recently from AZ's facility in the UK. A270-71. Although the final day of the Action Plan was to have been September 30, 2003, Ms. Broadway delayed the meeting to close the Action Plan until after the investigation into Plaintiff's retaliation claims was completed. A146-49; 140; 274-75. Plaintiff's poor performance continued. A128-31; 134; 138. On October 27, 2003, Ms. Broadway gave Plaintiff a Performance Improvement Plan ("PIP"), the next step in the formal performance process. A141-45. Ms. Broadway informed Plaintiff that failure to meet the requirements of a PIP could result in termination. A146-49.

As Ms. Broadway continued to meet with Plaintiff while she was on the PIP, Plaintiff's attitude became increasingly uncooperative, hostile and negative to the point, at times, of belligerence, and her performance worsened. A138; 193; 197; 287-89; 301-02. Plaintiff repeatedly distorted and misinterpreted statements made during meetings, A301; 113, and ignored Ms. Broadway's suggestions that she focus on the PIP. A135; 150; 168; 169; 196. Instead, Plaintiff divided her time between work, job hunting,[12] vacation[13] and

---

[11] This belated allegation may have been an effort to bring Plaintiff's suit under Title VII, which provides broader damages than the FMLA. However, she did not make this claim when she filed her lawsuit.

[12] A259-60; 164; 165.

[13] In 2003, Plaintiff took vacation or other non-medical paid time off on January 23, 24; March 19; April 16 (a half day), 17, 18, and 21; September 10 and 16 (a half day); October 1, 2, 3, 6, 7, 15, 16,

17

writing memoranda and email messages denying that she had any performance problems, blaming others when her work was late or incorrect, and accusing her supervisor, Ms. Broadway, as well as Ms. Austin-Jones and Ms. Hellen, of unfairness, lack of ethics, slander and making false statements about her performance.[14] In late October, Plaintiff, an exempt salaried employee, began to try to get more paid time off by claiming that AZ owed her "comp time." A156-57. .

To assess Plaintiff's performance, Ms. Broadway relied on both her own observations and interactions with Plaintiff and on feedback from the other AZ employees and vendors who worked with Plaintiff, all of whom reported that Plaintiff was performing poorly. A170-71; 175; 178-80; 193-95; 198; 302-03. Brand managers Faye Morin and Cindi Hassrick reported to Ms. Broadway in late November 2003 that Plaintiff did not know how to enter data into AZ's budget management program (known as "Delta") correctly.[15] A176-77. 173-74.Both also criticized Plaintiff for being unresponsive to their requests, not understanding, and being unwilling to handle her responsibilities, and showing poor initiative and leadership skills. *Id.* Ms. Hassrick had also come to Ms. Broadway after two of the vendors Plaintiff worked with (Discovery International and TG Worldwide) complained to Ms. Hassrick that Plaintiff had responded to their requests for information about AZ policies and procedures by saying she did not know the answers, and referring them to others. A172. Plaintiff should have been able to provide the answers herself. A172.

Ms. Broadway also sought performance feedback about Plaintiff directly from the vendors. Discovery International provided written feedback (A181-83) saying, among other

---

and 17; November 24, 25, and 26; and December 22, 23 and 24. A69; 208-210; 255-59. In 2004, Plaintiff took January 7 and 8 off. A213.

[14]A111-12; 119-21; 122-23;  132-33; 151-55; 158-63; 166-67; 199-201; 211-12.

[15] The entire Exanta team had been scheduled to attend mandatory Delta training on September 9, 2003, but Plaintiff did not attend. A114.

things, that Plaintiff did not seem to understand that program changes, multiple rounds of review and delays in responses affected the number of hours required to plan and implement programs, and therefore the ultimate cost. Also, Plaintiff had often failed to respond promptly to voice mail and email messages, sometimes for as long as a month, and when she responded, she sometimes responded to a message that had been superseded by subsequent messages and consequently, had forwarded incorrect versions of files to other AZ team members. None of the Discovery team members had ever been able to reach Plaintiff by cell phone. She had sometimes scheduled meetings without conferring with Discovery in advance and had changed meeting and call times without Discovery's knowledge. At times she had not advised Discovery that she was going to be out of the office and unavailable to respond to inquiries and action items. Plaintiff had not provided any written performance feedback to Discovery at any time in 2003. Plaintiff often asked for work to be completed within a few hours when Discovery had been asking for feedback for up to a month. Plaintiff had abruptly ended phone calls with Discovery team members. Plaintiff tended to focus on logistics of meeting planning rather than on core strategy. In conference calls with key opinion leaders, she tended to defer to brand managers for final decisions and program direction.

IMPACT provided similar written feedback (A184-85):

> Typically, Marybeth defers to Denise [Barrett-Quigley] on issues related to invoicing, and she does not seem well acquainted with the budget details or invoicing deadlines. . . . Response time for emails/voicemails has been lagging for all associates who have been working on projects with Marybeth even on pressing issues. Additionally, Marybeth has scheduled several conference calls with us and then not been available, without any prior notification. Notification of time off/out of the office has been fine. . . . We are generally not provided with adequate/thorough direction. In direct communication with us, there is often confusion and repeated questions that have already been addressed. . . . Marybeth has not partnered with us to make herself available for significant KOL interactions, either pre-meeting or on site, and does not demonstrate the ability to recommend faculty for projects without reliance on a brand manager or PREP colleague.

19

The written feedback Ms. Broadway received from QED Communications (A186-88) stated, among other things, that Plaintiff responded to inquiries in a timely way if she could answer the question herself, but if she needed to consult with others at AZ, the follow-up dropped off. She had not shown strong evidence of knowledge of brand strategy and tactical execution. Although they had set up weekly conference calls to discuss project status, Plaintiff had missed the last two. QED provided weekly status email messages to Plaintiff, copying Faye Morin, and Ms. Morin was the person who responded to outstanding issues.

The GMR Group ("GMR") also reported major issues with Plaintiff (A189-92). GMR had many problems trying to communicate with Plaintiff. She often failed to open and respond to email messages and to return telephone calls. GMR had been forced to try to find someone else to answer urgent questions. Plaintiff told Mike Zilligen of GMR at the beginning of their relationship that she did not know much about the managed markets segment so Mr. Zilligen gave her background information and encouraged her to call with questions, but she asked for help only once and still had little understanding of the managed market segment. Plaintiff always gave GMR 24 hours or less to respond to her requests, including requests for major items such as advisory board discussion guides and slide presentations, resulting in "numerous unnecessary 'fire drills.'" At weekly scheduled project management meetings, it was clear to Mr. Zilligen that Plaintiff had not prepared for the meeting or reviewed the weekly status report that GMR had provided, at Plaintiff's request, the day before the meeting. On two occasions, when GMR called to confirm a weekly meeting, GMR learned that Plaintiff would be out of town and unable to attend the meeting, although Plaintiff had not contacted GMR to cancel it. Once, when GMR arrived at AZ for an in-person meeting, Plaintiff met with them for only a few minutes and then said she really

did not have time for the meeting because it was budget time. Mr. Zilligen did not think

Plaintiff had any leadership ability because she did not take initiative to make decisions but

instead deferred to others within AZ. Mr. Zilligen concluded that Plaintiff's lack of

knowledge of managed markets and of AZ policies and her lack of organization had had a

negative effect on the entire team.

In mid-December, Plaintiff's co-worker, Louise Colburn, provided written feedback

that was also very critical of Plaintiff's performance. A202-03. Ms. Colburn wrote that

Plaintiff was uncooperative, uncommunicative, blamed others for her shortcomings, lacked

the skills and abilities needed to do her job and was compromising the work of the team. *Id*.

Another co-worker, Denise Barrett-Quigley, who had joined the Exanta team in mid-2003,

provided written feedback (A204-05) saying that Plaintiff was not a team player and often

missed meetings or brought work to meetings, giving the impression she was not interested

in what was going on. Plaintiff was often unprepared at meetings and could not answer

questions or would miss the point of what she was supposed to be presenting, and then would

become defensive, making everyone uncomfortable and wasting the time of the other group

members. Plaintiff did not seem to understand the budget process and seemed happy to have

Ms. Barrett-Quigley handle it for her. She did not seem interested in the success of the team

or other team members. She did not communicate important budget information and missed

the deadline for submitting her plans for 2004 consultant meetings. Ms. Barrett-Quigley did

not think Plaintiff was a good fit for the team.

By mid-December, Plaintiff was attempting to tape record her PIP review meetings.

A214. She also attempted to decline attendance at the final PIP review meeting. A210. Ms.

Broadway advised her that she was not permitted to tape record performance review

meetings and that her attendance at the final review meeting was not optional, to which

21

Plaintiff responded: "This is not acceptable; we will need to discuss." A214. On Monday, January 12, 2004, Plaintiff sent an email to Ms. Broadway telling her that Plaintiff would be bringing her lawyer with her to the meeting scheduled for Friday, January 16, 2004 and that Ms. Broadway should book a larger room. A220.

On January 16, 2004, after the conclusion of the 12-week PIP, Ms. Broadway, Ms. Hellen and Ms. Austin-Jones met with Plaintiff to give her feedback on her performance under the plan. A215-19; 295-97. Given the overwhelming evidence and consensus that Plaintiff's performance had worsened rather than improved, Ms. Broadway decided to terminate Plaintiff's employment. A356-60.

On February 4, 2004, eight business days after her termination, Burson Marsteller Public Relations ("BMPR") made a formal offer of employment to Plaintiff.[16] A221-25. The offer letter specified that she was to begin no later than March 1, 2004. A222. On Monday, March 1, 2004, Plaintiff began working for BMPR in New York City as Director of the Health Care Practice. A237. Her salary there was $165,000 per year (compared to $94,000 per year at AZ). A237-38. She worked at Burson Marsteller Public Relations until June 2004, when she began working for GlaxoSmithKline in King-of-Prussia, Pennsylvania as Director of Global Public Relations-Cardiovascular. A238. Her salary at GlaxoSmithKline is $135,000 per year. A237. Her employment benefits at GlaxoSmithKline are similar to her benefits at AZ, as was the case at Burson Marsteller Public Relations.[17] A239.

---

[16] Oddly, Plaintiff testified that during the month of February she was looking for a job. A263.

[17] Plaintiff's motives (other than continued hostility toward AZ) for filing this case are puzzling, since her earnings since she left AZ have obviously exceeded by far what she earned at AZ, and only monetary damages such as lost wages and benefits, as opposed to damages for emotional distress, are available under the FMLA. 29 C.F.R. § 2617(a); *Lloyd v. Wyoming Valley Health Care*, 994 F. Supp. 288, 292-293 (M.D. Pa. 1998) (FMLA does not provide for damages for emotional distress, embarrassment or humiliation, only for lost pay and benefits); *Zawadowicz v. CVS Corp.*, 99 F. Supp. 2d 518, 540 (same). It seems clear beyond any doubt that Plaintiff will not be able to prove damages at trial, should there be one.

## ARGUMENT

I.  **ASTRAZENECA IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S FMLA RETALIATION CLAIMS.**

    **A.**    **Summary Judgment Standard**

Summary judgment shall be granted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Facts are "material," and disputes "genuine," only if "'evidence exists from which a rational person could conclude that the position of the person with the burden of proof is correct.'" *Richards v. City of Wilmington*, No. 03-106-SLR, 2004 U.S. Dist. LEXIS 4987, at *8 (D. Del. Mar. 24 2004) (quoting *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995)).

    **B.**    **Analytical Framework for FMLA Retaliation Claims**

In Counts I-III of her Complaint, Plaintiff claims AZ gave her negative performance evaluations and otherwise retaliated against her (Count III), denied her a previously promised promotion (Count II) and terminated her (Count I) in February 2004 in retaliation for taking medical leave under the Family and Medical Leave Act in May and June 2003 or for complaining in September 2003 about retaliation for exercising her FMLA rights.[18] AZ agrees that Plaintiff was entitled to and did properly exercise her right to leave under the FMLA. However, AZ denies that any of the actions about which Plaintiff is complaining were motivated by retaliatory animus.

---

[18] Under the FMLA, "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period for one or more of the following: . . . (D) Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612. The FMLA also provides for "intermittent" leave, which allows an employee to take such leave intermittently when medically necessary. 29 U.S.C. § 2612(b).

To establish a *prima facie* case of retaliation under the FMLA, a plaintiff must show: (1) she took an FMLA leave, (2) she suffered an adverse employment action, and (3) a causal relationship between her leave and the adverse action. *Lepore v. LanVision Sys.*, 113 Fed. Appx. 449, 503 (3d Cir. 2004); *Conoshenti v. Public Svce. Electric & Gas Co.*, 364 F.3d 135 (3d Cir. 2004). If a plaintiff establishes a *prima facie* case, the burden-shifting analysis described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973), provides the framework for the summary judgment decision. *Lepore*, 113 Fed. Appx. at 503. Under *McDonnell Douglas*, the burden shifts to the defendant employer, which must then articulate a legitimate, non-retaliatory reason for the adverse action. *Keller v. Orix Credit Alliance, Inc.,* 130 F.3d 1101, 1008 (3d Cir. 1997) (*en banc*) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993)). The employer's burden is "relatively light" because it is a burden of producing an explanation, not persuasion that the explanation is true. *Fuentes v. Perskie,* 32 F.3d 759, 763 (3d Cir. 1994); *see also Clancy v. Preston Trucking Co., Inc.*, 967 F. Supp. 806, 810 (D. Del. 1997) (the employer "need not 'persuade' the fact finder that the reason offered was its true reason; it must merely 'articulate' such a reason."); *St. Mary's Honor Ctr.*, 509 U.S. at 507.

Once the employer articulates a nonretaliatory reason for the termination, the plaintiff can survive summary judgment only by submitting evidence from which a fact finder could either reasonably (i) disbelieve the articulated reason; or (ii) believe that retaliation was more likely than not the real reason for the termination. *Torre v. Casio*, 42 F.3d 825 (3d Cir. 1994)(citing *Fuentes*, 32 F.2d at 764); *DiFederico v. Rolm Co.*, 201 F.3d 200, 206, n.3 (3d Cir. 2000) ("[w]hile our opinions . . . do sometimes use terms like 'a motivating factor' . . . it is preferable, in a pretext case analysis, to speak either in terms of 'determinative' . . . or 'real reason'"); *Pamintuan v. Nanticoke Mem'l Hosp.*, No. 96-233-SLR, 1998 U.S. Dist. LEXIS

24

16764, at *41 (D. Del. Oct. 15, 1998) (citing *Stinson v. Del. River Port Auth.*, 935 F. Supp.

531, 539 (D.N.J. 1996)). If the non-moving party fails to sufficiently establish an essential

element of her case with respect to which she bears the burden of proof, summary judgment

shall be granted in favor of the moving party. *See Ebert v. Office of Info. Sys.*, No. 97-530-

SLR, 1998 U.S. Dist. LEXIS 9100, at *9 (D. Del. June 12, 1998) (citing *Celotex*, 477 U.S. at

322). The non-movant may not "rest upon mere allegations, general denials, or . . . vague

statements." *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir. 1991); *Schoch v. First*

*Fidelity Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990) ("unsupported allegations in [a

non-movant's] memorandum and pleadings are insufficient to repel summary judgment").

**C.    Plaintiff's Documented Performance Deficiencies Predated
       Her FMLA Leave**

Plaintiff cannot satisfy the third leg of her *prima facie* case, evidence showing a causal

relationship between an adverse employment action and her FMLA leave. There is

overwhelming evidence proving that AZ had significant concerns with Plaintiff's performance

long before she requested FMLA leave in late April 2003. Brian Martin and Jane Hellen were

unhappy with Ad Boards that Plaintiff conducted in late 2002. Persons who worked with her

complained that Plaintiff did not listen carefully and understand what they told her, which

echoed Amy Renk Haines' comment in Plaintiff's 2001 evaluation. Concerns reached Jane

Hellen early in 2003 that Plaintiff was creating a bottleneck by not acting promptly on Ad

Board issues, and instead was delegating many items and sitting on responses. By February

12, 2003, any thought of promoting Plaintiff had been set aside. A46; 340; 303-05. Indeed, by

February and March 2003, Plaintiff's performance failures had escalated to the point where

AZ was forced to cancel a Cardiology advisory board meeting for which she was responsible

and other advisory board meetings were in jeopardy. Supervisors' meetings were convened in

March to address Plaintiff's performance issues. When Deborah Brangman met with her in

March to administer Plaintiff's 2002 evaluation, which, itself, was only one level above "unacceptable," Ms. Brangman was sufficiently alarmed about the dip in Plaintiff's performance that she reviewed with Plaintiff her concerns about her performance to date in 2003. And not only was the promotion Plaintiff had sought earlier rejected in February 2003, but also in early April 2003, when a supervisory position became available Plaintiff was not selected. Instead one of her peers, Susan Broadway, was chosen, and when Plaintiff complained, she was told by Ms. Hellen that she needed to perform better in her current position. Clearly, AZ's significant concerns with Plaintiff's performance predated her FMLA leave request, and had already reached an urgent stage when she first informed AZ that she needed an FMLA leave.

> **D.**   **The Passage of Time Destroys The Claim of a Causal Link**

In determining whether a plaintiff has demonstrated retaliation under the FMLA, courts will examine the temporal proximity between the employee's protected activity and the adverse employment action because a correlation between the two is an obvious method by which the plaintiff can demonstrate circumstantially, or inferentially, that the "protected activity was the likely reason for the adverse action." *Kachmar v. Shurgard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997) (temporal proximity can create inference of retaliation); *Panto v. Palmer Dialysis Center/Total Renal Care*, 2003 U.S. Dist. LEXIS 5663, *22 (E.D. Pa. 2003) ("'[a] causal connection between an employee's protected activity and an adverse employment action by her employer may be inferred if the events occurred close in temporal proximity to each other'" but seven months is too long a time to create inference) (quoting *Harris v. SmithKline Beecham*, 27 F. Supp. 2d 569, 580 (E.D. Pa. 1998), *aff'd* 203 F.3d 816 (3d Cir. 1999)).

To create such an inference, it is not enough that the events at issue are proximate in time to one another. Instead, their timing must be "unusually suggestive of a retaliatory motive before a causal link will be inferred." *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 503-504 (3d Cir. 1997) (19 month span between protected activity and adverse employment action, "absent evidence of intervening antagonism or retaliatory animus," defeats any causal inference of retaliation as a matter of law); *see also Lewis v. State of Delaware Dept. of Public Instruction*, 948 F. Supp. 352, 364 (D. Del. 1996) (two years is too long for causation to be inferred)); *Keeshan v. Home Depot*, U.S.A., Inc., C.A. No. 00-529, 2001 U.S. Dist. LEXIS 3607 (E.D. Pa. March 27, 2001) (temporal proximity not established where four month gap separated protected activity and adverse action and "no evidence of discriminatory conduct or animus by the [d]efendants" existed); *Richmond v. Oreok*, 12 F.3d 205, 209 (10th Cir. 1997) (3-month period insufficient to suggest causation).

The temporal proximity between an employer's knowledge of the protected activity and the claimed adverse action must be "very close" to suggest causation. *See Clark Co. Sch. Dist. v. Breeden*, 522 U.S. 268, 273 (2001); *Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1395 (10th Cir. 1997) ("Unless the termination is very closely connected in time to the protected conduct, the plaintiff will need to rely on additional evidence beyond mere temporal proximity to establish causation."). In *Kachmar*, the court observed that "it is causation, not temporal proximity itself, that is an element of plaintiff's *prima facie* case, and temporal proximity merely provides an evidentiary basis from which an inference can be drawn," and that "causation… is highly context-specific." 109 F.3d at 178.

It is also important to distinguish between the use of temporal proximity to establish a causal inference at the *prima facie* and pretext stages of analysis. *See e.g. Gearhart v. Sears, Roebuck & Co., Inc.*, 27 F. Supp. 2d 1263, 1276 (D. Kan. 1998) (temporal proximity sufficient

to create inference of retaliation at *prima facie* stage insufficient to create inference of pretext); *Chandler v. Specialty Tires of America (Tennessee), Inc.*, 283 F.3d 818, 826 (6th Cir. 2002) (holding that while "[p]roximity in time can raise a *prima facie* case of retaliatory discharge… proximity alone may not survive summary judgment"); *Smith v. Mem'l Hosp. Corp.*, 302 F.3d 827, 834 (8th Cir. 2002) (holding that while temporal proximity between FMLA leave and discharge was sufficient for *prima facie* case of retaliation, it did not support an inference of pretext because the employer's performance problems/concerns were communicated to employee prior to any protected activity under the FMLA). At the pretext stage of the inquiry, courts have been unwilling to infer retaliatory animus even in situations where an employee's descent into performance problems began in close proximity to his request and/or use of FMLA leave, absent other evidence of retaliation. *See D'Amico v. Compass Group USA, Inc.*, 198 F. Supp. 2d 18 (D. Mass. 2002) (plaintiff did not establish pretext where plaintiff had received over 13 years of positive employment evaluations and promotions, began receiving poor performance evaluations within weeks of returning from a two-week FMLA leave, and resigned after a salary reduction twelve months after returning from leave).

For example, in *D'Amico*, the court specifically found that while the plaintiff "might understandably perceive his fall as precipitous, given his long, and until 1998, generally successful career …, the year separating his taking of FMLA leave and his resignation, without more, is simply too extended a time to establish a causal connection between the two events." 198 F. Supp. 2d at 24; *see also Keeler*, 238 F.3d at 10. In addition, "evidence that the employer had been concerned about a problem before the employee engaged in the protected activity undercuts the significance of the temporal proximity" between the protected activity and an adverse employment action. *Memorial Hosp.*, 302 F.3d at 834. Finally, the District of

Delaware has specifically stated that a plaintiff may not rely solely on temporal proximity at the pretext stage of the analysis. *Phillips v. DaimlerChrysler Corp.*, C.A. No. 01-247-JJF, 2003 U.S. Dist. LEXIS 23941 at *23-34 (D. Del. March 27, 2003)("Plaintiff relies solely on the temporal proximity between his application and the transfer, which is insufficient to establish a causal connection.").

Here, there is strong evidence of previous concerns about Plaintiff's performance, a documented series of problems during the five months before she asked for FMLA leave and a glaring disconnect between her managers' repeatedly expressed concerns with various aspects of her performance (all of which had surfaced previously, A363-64), and Plaintiff's ostrich-like denials. And there is no evidence that her FMLA leave request was viewed with anything other than sympathy and caring concern. Indeed, the building attempts to address Plaintiff's performance problems came to a screeching halt when she asked for FMLA leave.

Plaintiff has tried to suggest that she was placed on an Action Plan within days after she requested FMLA leave. However, the evidence shows clearly that Ms. Broadway simply asked Plaintiff to help with the transition of her work to her colleagues so they could continue her work while she was on leave. There is no evidence that AZ put Plaintiff on a formal "Action Plan" after she advised Ms. Hellen and Ms. Broadway that she was going on a medical leave. On the contrary, plans to address her preexisting performance issues were shelved until her health problems were resolved.

Plaintiff can point to no pattern of antipathy toward FMLA leaves in general or leave-related hostility directed toward her. Her managers had all taken leaves themselves and they all recognized the importance AZ placed on allowing people to take approved leaves without negative ramifications. Her claim is based on nothing more than her own apparent inability to honestly acknowledge her performance problems. In fact, at her deposition, Plaintiff conceded

that if the various email documents she was shown had the correct dates on them, her problems predated her request for FMLA leave and destroyed her claim. A261-62. However, she insisted blindly that the documents must have been postdated or otherwise made up, refusing to admit any performance problems on her part, just as she did when her managers tried to convince her to work to improve her performance. A248, 261-62.

Plaintiff is unable to meet her burden of proving a prima facie case. When Plaintiff was placed on FMLA leave, it can be assumed she was engaging in a protected activity. *See Carter v. Enterprise Rent-A-Car Co.*, 2002 U.S. Dist. LEXIS 13865 (N.D. Ill. 2002). Plaintiff's being placed on an Action Plan and a PIP and subsequently terminated can be considered an adverse employment action. 29 U.S.C. § 2615(a)(2). However, because the protected activity and the adverse employment action are wholly unrelated, no causal connection can be established and Plaintiff has failed to carry her burden. *Thomas v. Town of Hammonton*, 351 F.3d 108, 115 (3d Cir. 2003) (the timing must be "unusually suggestive of retaliatory motive before a causal link will be inferred"). *See also, Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1354 (11th Cir. 1999). The record shows that Ms. Hellen and other managers had discussed placing Plaintiff on a formal Performance Improvement or Action Plan as early as February 2003 (two months before Plaintiff announced she was taking FMLA leave). Plaintiff was not placed on a formal Action Plan until three months after her leave began and she was not terminated until January 23, 2004, nine months later. Her supervisors continually attempted to work with Plaintiff to improve her performance, but were met with hostility and baseless accusations rather than cooperation.

Assuming, *arguendo*, that Plaintiff were able to establish a *prima facie* case, AZ is easily able to provide a legitimate non-retaliatory reason for Plaintiff's termination. AZ's documented proof that Plaintiff's supervisors, peers and vendors had complained about her

performance, and that placing her on a PIP had been discussed before she requested FMLA leave, satisfies the second prong of the *McDonnell-Douglas* test. 411 U.S. 792.

Finally, Plaintiff is unable to point to any facts to support her claim that her termination was a pretext for retaliation. *See Mills v. First Fed'l Sav. & Loan of Belvidere*, 83 F.3d 833, 845 (7th Cir. 1996). Plaintiff admits that she was responsible for Cardiology advisory boards, and there is no dispute that in January 2003, the vendor with which she was working asked Plaintiff for the list of invitees and Plaintiff did not provide the list in time for the invitations to be sent out. Holding Cardiology advisory boards was one of Plaintiff's primary responsibilities. Because of her negligence and dilatoriness, the April Cardiology advisory board had to be cancelled. Not surprisingly, Plaintiff's managers were very disturbed by the cancellation of the April Cardiology advisory board and placed the blame squarely on her shoulders. Plaintiff's failure in this aspect of her work was worse than her sloppy management of the 2002 advisory boards, which Mr. Martin had hoped to correct by requiring Plaintiff to create a template of the tasks she needed to complete for every advisory board.

When, in the face of numerous cogent documents to the contrary, Plaintiff was pressed to explain the basis for her claim that no one was concerned about her performance until after she requested FMLA leave, she cited a February 12, 2003 email from Ms. Hellen congratulating her ("Good job!") for making progress on one of her projects.[19] A45; 264-66. Apart from that misplaced response, Plaintiff cites only performance reviews from past years, including years when she was performing other jobs with other groups, as evidence that any concerns about her performance in early 2003 could not have been genuine. A266-68. Because her managers' concerns were prompted by events that occurred in 2003, and because her 2002 performance evaluation addressed her performance in 2002 and gave her

---

[19] Ironically, the project she pointed to was the April 25-27 Cardiology advisory board meeting that was cancelled a month later, on March 14, because of Plaintiff's failure to compile the invitees' list.

the benefit of the doubt since she was still learning her new job, what her managers thought about her in 2002 is irrelevant. In *Martin v. Health Care & Ret. Corp.*, 67 Fed. Appx. 109, 113 (3d Cir. 2003), the Third Circuit rejected the same argument:

> Martin points out that she had "above average" performance reviews prior to her accusation to Tinz that he was a racist, after which she was only rated as "average." However, HCR did not assert Martin's September review as a reason for her termination, but relied on the two incidents that occurred in October and November. Her September review is, therefore, not even relevant to our pretext analysis.

Plaintiff's performance issues surfaced in January and early February 2003, when Ms. Hellen and Ms. Brangman decided they could not support a promotion for Plaintiff. The problems became even more pronounced in March, when the Cardiology advisory board was cancelled, and her managers met to discuss the "urgent" problem of Plaintiff's deteriorating performance. All these things occurred before Plaintiff's notice to AZ that she needed to take FMLA leave. Even Plaintiff's 2002 performance evaluation which she relies on did not indicate that she was a star performer. Her rank was only one level above unacceptable.

Plaintiff's own email correspondence with Ms. Broadway, Ms. Hellen, Ms. Austin-Jones and Ms. Kauffman clearly demonstrates her refusal to accept reality and illustrates her insubordinate and increasingly obnoxious responses to their efforts to help her improve.

In evaluating Plaintiff's performance during 2003, Ms. Broadway used AZ's standard 360-degree review process. She obtained information from many sources, including Plaintiff's co-workers and the vendors that interacted with Plaintiff. Uniformly, they were critical of Plaintiff's performance.

Plaintiff's case amounts to nothing more than her own denials, repeated at length in her correspondence, in her deposition, and in her Complaint, that she had performance problems, and her continual claims that if anything went wrong, it was the fault of other people. Her managers and co-workers thought otherwise. Plaintiff's mere disagreement with the opinions

of her managers regarding her poor performance is not, as a matter of law, enough for a reasonable jury to find that AZ's decisions regarding Plaintiff were motivated by a desire for retaliation. *See Fuentes*, 32 F.3d at 765 ("To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent); *Ezold v. Wolf, Block, Schorr & Solis-Cohen,* 983 F.2d 509, 527 (3d Cir. 1992) ("'barring discrimination, a company has the right to make business judgments on employee status, particularly when the decision involves subjective factors deemed essential to certain positions'") (quoting *Billet v. CIGNA Corp.*, 940 F.2d 812, 825 (3d Cir. 1991); *Van Slyke v. Northrop Grumman Corp*., 115 F. Supp. 2d 587 (D. Md. 2000), aff'd, 17 Fed. App. 154, 2001 U.S. App. LEXIS 19279 (4th Cir. Aug. 27, 2001) (plaintiff's and her husband's opinions regarding her qualifications were insufficient to establish pretext); *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 (4th Cir. 1989) ("plaintiff's own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate nondiscriminatory reasons for an adverse employment action"); *Hawkins v PepsiCo Inc*, 203 F.3d 274, 281 (4th Cir. 2000) ("no court sits to arbitrate mere differences of opinion between employees and their supervisors"); *Duvall v. Polymer Corp.*, 1995 U.S. Dist. LEXIS 14413, *19 (E.D. Pa. 1995) (in summary judgment context, "plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is not whether the employer was wise, but whether discrimination motivated the employer's actions").

Plaintiff's termination, and the events leading up to it, were motivated only by her deficient performance and by her unwillingness to acknowledge and try to correct those performance problems. There is no evidence on which a reasonable juror could rely to decide

33

that AZ's stated explanation for Plaintiff's termination was false and pretextual. Plaintiff had performance problems even before coming to the Exanta team, which were consistent with those identified by her Exanta managers. Amy Renk Haines has pointed out that Farrell's knowledge base and basic skills were deficient, A364, and she was incapable of planning a project from beginning to end and carrying it out. Id. Plaintiff also had an unwarranted high opinion of her performance, which was carried over in spades to the Exanta team. And most notable of all, Haines and those from whom she had obtained feedback had observed that Plaintiff often did not listen and understand what was said. In meetings she would take copious notes but then be unable to discuss the matter being addressed. A365.

The complaints made about her by her peers, the vendors that had to work with her, and her managers began to surface in late 2002 and by February 2003 were so significant that any thought of a promotion was put aside in favor of an effort to get Plaintiff to focus on improving her performance deficiencies. Jane Hellen, Deborah Brangman and Brian Martin discussed and documented their concerns repeatedly among themselves, with Ms. Kauffman of HR, and with Plaintiff, as did Susan Broadway when she became her manager. The record is replete with documents and other evidence that Plaintiff's performance issues predated her request for FMLA leave.

Plaintiff's almost pathological denials and efforts to shift blame are readily apparent from her documents, but when she requested FMLA leave, AstraZeneca, in accordance with its policy and culture, put aside her performance issues and encouraged her to attend to her medical problems. It was not until months after she returned from FMLA leave that renewed efforts were made to get her to improve her performance. These obviously sincere and well-intentioned efforts were met with nothing but more denials and an increasingly uncooperative

34

attitude. Plaintiff's FMLA leave was completely unrelated to her termination, and AZ is

entitled to summary judgment on Counts I through III of Plaintiff's Complaint.

## II.    AZ IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S IMPLIED COVENANT CLAIMS.

In *Lord v. Souder*, 748 A.2d 393 (Del. 2000), the Delaware Supreme Court explained

that Delaware law recognizes four types of claims for breach of the implied covenant of good

faith and fair dealing:

> (i) where the termination violated public policy;
>
> (ii) where the employer misrepresented an important fact and the employee relied "thereon either to accept a new position or remain in a present one";
>
> (iii) where the employer used its superior bargaining power to deprive an employee of clearly identifiable compensation relating to the employee's past service; and
>
> (iv) where the employer falsified or manipulated employment records to create fictitious grounds for termination.

748 A.2d at 400-01. Plaintiff claims that her termination violated public policy and

that it was the result of the creation of false records to create fictitious grounds for

termination.

Plaintiff's "false-records" implied covenant claim must fail because there is

overwhelming proof that AZ did not make up records to create a fictitious reason to

terminate her. Plaintiff's claim is modeled on *E.I. DuPont de Nemours & Co. v. Pressman*,

679 A.2d 436 (Del. 1996), in which the Delaware Supreme Court held that the implied

covenant covered employment terminations. Pressman claimed that his immediate

supervisor, one Pensak, out of a desire for revenge after Pressman questioned him about a

possible conflict of interest, had intentionally and falsely led Pensak's superiors to believe

35

that Pressman was a poor performer so that they would agree to terminate Pressman. The

court explained the standard for liability as follows:

> [I]f . . . Pensak, not having authority unilaterally to fire Pressman, maliciously
> employed deceit and subterfuge to manufacture grounds for Pressman's
> dismissal at the hands of Pensak's superiors, Pensak went beyond the broad,
> permissible scope of the Doctrine [of employment at will] and crossed into the
> limited zone of the Covenant.

679 A.2d at 444. In a similar case, *Patten v. Zeneca, Inc.*, 1996 Del. Super. LEXIS 86, C.A.

No. 94C-07-180-WTQ (Feb. 13, 1996), Patten claimed that his employer's explanation for

his termination was false and deceptive and that his termination therefore violated the

implied covenant. He explained at deposition that he was told that he had been fired because

of inappropriate behavior at a meeting, but he did not agree that his behavior at the meeting

had been inappropriate. The Superior Court held that an employee's subjective disagreement

with his employer's perception of and opinions about his conduct did not provide an

adequate factual predicate for a claim of breach of the covenant. *Id.*, 1996 Del. Super. LEXIS

86 at *6-7.

These two cases highlight the flaws in Plaintiff's false-records implied covenant claim.

First, Plaintiff cannot establish that any of the documents or discussions about Plaintiff's poor

performance were false or fraudulent. As they have testified, and as their email

correspondence shows, Plaintiff's managers did in fact have concerns about Plaintiff's

performance problems in the first quarter of 2003 as well as throughout the remainder of the

year. There is no evidence that Ms. Broadway manufactured the records that document

Plaintiff poor performance. Many individuals provided documented criticism of Plaintiff,

including Faye Morin, Louise Colburn, Cindi Hassrick, Denise Barrett-Quigley, Jane Hellen,

Brian Martin, Mike Zilligen of GMR, Denise Walters of QED, Christina Lutze, Fran King and

MaryPat Howard of Discovery, and Robbin Moisa of IMPACT. None of them have testified

that any of the performance feedback documents are false or fabricated. None of these individuals have confirmed Plaintiff's speculation that Ms. Broadway invented criticisms of her performance. Indeed, Ms. Hellen and Ms. Brangman both testified that the dates on the email correspondence discussing concerns about Plaintiff's performance were accurate and not manipulated in any way. A317; 343.

Second, Plaintiff cannot prove that Ms. Broadway needed to manufacture false evidence to convince higher-level managers to terminate her, as in *Pressman*. Ms. Broadway herself had the authority to terminate Plaintiff. 358-59. Ms. Broadway terminated Plaintiff only after months of diligent efforts to help Plaintiff, a job she at times found "draining" because of Plaintiff's hostility. A116-18. Ms. Broadway enlisted the assistance of other managers and the Human Resources department to help her deal with Plaintiff. Ms. Broadway decided at the end of the PIP that Plaintiff's performance had not improved. That decision set into motion the AZ process for termination.

Plaintiff's alternative argument is that AZ violated the implied covenant by terminating her employment in violation of public policy, the public policy in question being the FMLA. Assuming *arguendo* that Plaintiff's public policy claim is cognizable, it fails because, for the reasons stated above, Plaintiff's termination had nothing to do with the FMLA.

## III.    AZ IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S COBRA CLAIM.

Plaintiff has included in her Complaint a cause of action claiming that she never received a COBRA notification and that, consequently, she incurred certain medical expenses for a few months before she obtained other employment and equivalent health insurance coverage. AZ, through Benefit Concepts, Inc., the vendor responsible for administering AZ's health insurance plan, followed its regular policy, A384-85, and sent

37

Plaintiff a COBRA notice at her last known address on February 2, 2004. Id. When no response was received within the 105 days encompassing the 60 day enrollment period and the additional 45 days during which a check for COBRA coverage is supposed to be submitted, Benefit Concepts, again in accordance with its regular policy, sent a second letter to the same address, notifying Plaintiff that she was no longer eligible for COBRA coverage. A385. Plaintiff received that second letter at the address to which it was sent, and she responded. A385; 228; 229.

This Court has pointed out that a good faith effort that is reasonably calculated to reach the employee, not proof of actual receipt, satisfies COBRA's notice requirement. *DiSabatino v. DiSabatino Brothers, Inc.*, 894 F. Supp. 810, 817 (D. Del. 1995). *Accord*, *Marsaglia v. L. Beinhauer & Son, Co.*, 987 F. Supp. 425 (W.D. Pa. 1997); *Campbell v. Emery World Wide*, 1994; U.S. Dist. LEXIS 13447, *15-*16 (E.D. Pa. 1994)(mailing notice within prescribed time period to last known address satisfies COBRA notice requirement); *Conery v. Bath Associates*, 803 F. Supp. 1388, 1398 (N.D. Ind. 1992)(same).

AZ has submitted an affidavit attesting that the initial COBRA letter was mailed to Plaintiff in accordance with its regular practice. A383-85. It is undisputed that Plaintiff received other letters sent to her at the same address, not only the second letter from Benefit Concepts but also a letter concerning another AZ benefit plan. A226.

Moreover, based on prior episodes in which Plaintiff has made equally unfounded representations, a far more likely scenario is that Plaintiff threw away, misread or misplaced the first COBRA letter. Her strange voicemail message to Rachel Bevis about the promotion package she supposedly received at home, A227, illustrates how Plaintiff could misread correspondence. And a letter she wrote to her psychologist, Dr. Jonathan Lewis, demonstrates that she was quite capable of losing or misplacing other correspondence. She

wrote him to ask that he send her an inventory of her therapy sessions (at the same address which AZ had on record as her last known address), 233, and in that letter, mentioned that she had "found" his invoice, explained she was "misplacing and forgetting things," and blamed it on the fact that "recent weeks have been very stressful." If she was under stress in July 2004, when she had already found a job earning far more than what she was making at AZ, it is certain that she was feeling even more stress in February 2004 when she had recently been terminated and was unemployed. Defendant has demonstrated that the COBRA notice was mailed to Plaintiff in accordance with its regular policy, and Defendant should be granted summary judgment on Plaintiff's COBRA claim.

**CONCLUSION**

Plaintiff relies solely on her claim that her performance was good. The evidence to the contrary is overwhelming. Co-workers, managers, and the outside vendors with whom she worked all said her performance was deficient, and by the time she reached the bottom of her downward performance spiral, some expressed the view that her continued presence on the team was hurting its ability to achieve its goals. Ms. Broadway honestly believed Plaintiff's performance was unacceptable, and she did not improve despite the coaching provided. And there is no evidence that AZ resisted the granting of FMLA leave. To the contrary, Plaintiff's managers had virtually all taken leaves, and Susan Broadway is on a maternity leave currently. Plaintiff's claims of breach of the implied covenant of good faith and fair dealing and her COBRA claim are similarly without support. AZ's motion for summary judgment should be granted in its entirety, and the case dismissed.

Respectfully submitted,

YOUNG CONAWAY STARGATT & TAYLOR, LLP

  /s/ Sheldon N . Sandler_____
Sheldon N. Sandler, Esquire (No. 245)
Teresa A. Cheek, Esquire (No. 2657)
The Brandywine Building, 17th Floor
1000 West Street, P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6673
Facsimile: (302) 576-3330
Attorneys for Defendant

Dated: May 2, 2005

## CERTIFICATE OF SERVICE

I hereby certify that on May 2, 2005, I electronically filed a true and correct copy of the

foregoing **Defendant's Opening Brief in Support of Its Motion For Summary Judgment**

with the Clerk of the Court using CM/ECF, which will send notification that such filing is

available for viewing and downloading to the following counsel of record:

Thomas S. Neuberger, Esquire                John M. LaRosa, Esquire
The Neuberger Firm                          Law Office of John M. LaRosa
Two East Seventh Street, Suite 302          Two East 7th Street, Suite 302
Wilmington, DE 19801-3707                   Wilmington, DE 19801-3707

I further certify that on May 2, 2005, I caused a copy of the foregoing **Defendant's**

**Opening Brief in Support of Its Motion For Summary Judgment** to be served by hand-

delivery on the following counsel of record:

Thomas S. Neuberger, Esquire                John M. LaRosa, Esquire
The Neuberger Firm                          Law Office of John M. LaRosa
Two East Seventh Street, Suite 302          Two East 7th Street, Suite 302
Wilmington, DE 19801-3707                   Wilmington, DE 19801-3707

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ Sheldon N. Sandler
Sheldon N. Sandler, Esquire (No. 245)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email: ssandler@ycst.com
Attorneys for Defendant

Dated: May 2, 2005