Get a Document - by Citation - 1994 U.S. Dist. LEXIS 13447
Case 1:01-cv-00285-KAJ    Document 38-2    Filed 05/03/2005    Page 1 of 25
Page 1 of 8

Service: **Get by LEXSEE®**
Citation: **1994 U.S. Dist. LEXIS 13447**

*1994 U.S. Dist. LEXIS 13447, \**

ARTHUR AND JENNIFER CAMPBELL v. EMERY WORLD WIDE, et al.

CIVIL ACTION NO. 93-6568

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

1994 U.S. Dist. LEXIS 13447

September 21, 1994, Decided
September 22, 1994, Filed; September 23, 1994, Entered

**CORE TERMS:** notice, summary judgment, employee benefit plan, preempted, common law, preemption, extra-contractual, compensatory damages, failure to provide, punitive damages, self-insured, punitive, coverage, deemer, last known, exempt, Pennsylvania Casualty Insurance Law, compensatory, continuance, mail, entitled to summary judgment, principal place of business, administrative remedies, exhaustion, termination, complied, insurer, insurance law, infliction of emotional distress, administrative procedures

**COUNSEL:** **[\*1]** For ARTHUR CAMPBELL, JENNIFER CAMPBELL, PLAINTIFFS: GLORIA M. GILMAN, PHILA, PA.

For EMERY AIR FREIGHT CORPORATION d/b/a EMERY WORLDWIDE, A CF COMPANY, DEFENDANT: MARTIN WALD, SCHNADER, HARRISON, SEGAL & LEWIS, PHILA, PA. BRUCE W. KAUFMANN, VIRGINIA L. FLICK, DILWORTH, PAXSON, KALISH & KAUFFMAN, PHILA, PA. DAVID A. GRANT, BAKER AND HOSTETLER, WASHINGTON, DC. For TEAMSTERS LOCAL UNION NO. 470, AFFILIATED WITH THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS, DEFENDANT: REGINA C. HERTZIG, FREEDMAN AND LORRY, P.C., PHILA, PA. For TEAMSTERS HEALTH AND WELFARE FUND, DEFENDANT: FRANK C. SABATINO, SCHNADER, HARRISON, SEGAL & LEWIS, PHILA, PA.

**JUDGES:** KELLY

**OPINIONBY:** JAMES McGIRR KELLY

**OPINION: MEMORANDUM**

**J. M. KELLY, J.**

Presently before the court are the Alternative Motions of Defendant Teamsters Health and Welfare Fund of Philadelphia & Vicinity ("Fund"): (1) to Dismiss the Complaint for a Failure to State a Claim upon which Relief can be Granted pursuant to Fed. R. Civ. P. 12(b)(6) ; (2) for Summary Judgment pursuant to Fed. R. Civ. P. 56 and (3) to Strike the demands for punitive and certain compensatory damages pursuant to Fed. R. Civ. P. 12(f). For the reasons set forth below, the Defendant's motions will **[\*2]** be granted in part and denied in part.

**BACKGROUND**

Plaintiff Arthur Campbell is an African-American male. Plaintiff Jennifer Campbell is the spouse of Arthur Campbell. Defendant Emery World Wide ("Emery") is a corporation with its principal place of business in Philadelphia, Pennsylvania. Defendant Teamsters Local Union No. 470 ("Local 470") is a labor union with its principal place of business in Philadelphia, Pennsylvania.

Get a Document - by Citation - 1994 U.S. Dist. LEXIS 13447    Page 2 of 8

Case 1:04-cv-00285-KAJ    Document 38-2    Filed 05/03/2005    Page 2 of 25

Defendant Fund is a health and welfare fund with its principal place of business in Philadelphia, Pennsylvania.

Plaintiff Arthur Campbell was hired by Emery as a truck driver in 1978. In February of 1992, defendant Emery notified Mr. Campbell that he was not permitted to continue working as an Emery truck driver because he allegedly suffered from hypertension. As a result, Mr. Campbell filed a grievance with Local 470, contending that Emery was denying him employment due to his race and perceived handicap.

Defendant Fund is an employee benefit plan established pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 et seq. and was responsible for the administration of certain medical **[*3]** benefits related to Mr. Campbell's employment with Emery. Mr. Campbell's medical benefits from his position at Emery terminated in June of 1992.

Plaintiffs Arthur and Jennifer Campbell filed a complaint on December 8, 1993 in the United States District Court for the Eastern District of Pennsylvania, naming Emery and Local 470 as defendants. In the complaint, Plaintiffs alleged violations of a variety of federal laws including the Civil Rights Act of 1964 ("Title VII"), the Americans with Disabilities Act of 1990 ("ADA"), and ERISA, as amended by the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), among many others.

On March 28, 1994, the court granted Plaintiffs' Motion to Amend and Supplement the Complaint to join the Fund as additional defendant. In the Amended and Supplementary Complaint ("Amended Complaint"), Plaintiffs make the following allegations against the Fund: (1) that Mr. Campbell never received notice of his rights to continue medical coverage for himself and his family or a Summary Health Plan Description as required by COBRA and ERISA; (2) that the Fund's actions constitute a violation of the Pennsylvania Casualty Insurance Law, specifically Pa. **[*4]** Stat. Ann. tit. 40, § 756.2 (1992) and (3) that the Fund's actions constitute intentional and negligent infliction of emotional distress and gross negligence, causing physical and emotional suffering to Plaintiffs Arthur and Jennifer Campbell and loss of consortium to Jennifer Campbell (Amended Complaint PP 31,49,60). Plaintiffs seek a permanent injunction requiring all defendants to comply with ERISA and COBRA, fines, penalties and compensatory and punitive damages.

In its Alternative Motions, Defendant Fund argues that: (1) the Campbells' state and common law claims are preempted by ERISA and COBRA; (2) the Campbells' claims under ERISA and COBRA should be rejected for failure to exhaust administrative remedies; (3) that the Fund complied with its obligations under COBRA and (4) that extra-contractual compensatory damages and punitive damages are not permitted under ERISA. Each of these issues will be discussed separately.

## DISCUSSION

### A. Motion for Summary Judgment

Under Fed. R. Civ. P. 56(c), summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show **[*5]** that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." This court is required, in resolving a motion for summary judgment pursuant to Rule 56, to determine whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). In making this determination, the evidence of the nonmoving party is to be believed, and the district court must draw all reasonable inferences in the nonmovant's favor. See id. at 255. Furthermore, while the movant bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact,

Get a Document - by Citation - 1994 U.S. Dist. LEXIS 13447

Case 1:04-cv-00285-KAJ    Document 38-2    Filed 05/03/2005    Page 3 of 25    Page 3 of 8

Rule 56(c) requires the entry of summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which **[*6]** that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).

## B. Plaintiffs' Common Law Claims

Defendant Fund argues that the plaintiffs' common law claims of intentional and negligent infliction of emotional distress, gross negligence and loss of consortium are preempted by ERISA. The relevant law of supersedure is found in 29 U.S.C. § 1144 (1985). n1

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n1 Section 1144 reads in relevant part:

### (a) Supersedure; effective date

Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title. This section shall take effect on January 1, 1975.

### (b) Construction and application

**(1)** This section shall not apply with respect to any cause of action which arose, or any act or omission which occurred, before January 1, 1975.

**(2)(A)** Except as provided in subparagraph (B), nothing in this subchapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance, banking, or securities.

**(B)** Neither an employee benefit plan described in section 1003(a) of this title, which is not exempt under section 1003(b) of this title . . . nor any trust established under such a plan, shall be deemed to be an insurance company or other insurer, bank, trust company, or investment company or to be engaged in the business of insurance or banking for purposes of any law of any State purporting to regulate insurance companies, insurance contracts, banks trust companies, or investment companies.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - **[*7]**

The United States Supreme Court addressed the issue of ERISA preemption in Pilot Life Insurance Co. v. Dedeaux, 481 U.S. 41, 95 L. Ed. 2d 39, 107 S. Ct. 1549 (1987). In Pilot Life, an employee sued his employer's insurer, claiming tortious breach of contract, breach of fiduciary duties and fraud in the inducement in relation to the employee welfare benefit plan. Id. at 43. The defendant claimed that ERISA preempted the plaintiff's common law claims. Id. at 44.

The Court stated that the question of preemption by federal law is one of congressional intent. Id. at 45. The Court noted that the "express preemption provisions of ERISA are deliberately

expansive, and designed to 'establish pension plan regulation as exclusively a federal concern.'" Id. at 46, citing Alessi v. Raybestos-Manhattan, Inc., 451 U.S. 504, 523, 68 L. Ed. 2d 402, 101 S. Ct. 1895 (1981). **[*8]** Specifically, the Court stated that the phrase "relate to any employee benefit plan" in 29 U.S.C. § 1144(a) was to be given a broad meaning, so that a common law cause of action having a "connection with or reference to such a plan" would be preempted. The Court held that "the common law causes of action . . . each based on alleged improper processing of a claim for benefits under an employee benefit plan, undoubtedly meet the criteria for preemption". Id. at 48.

The instant case and Pilot Life are very similar. Plaintiffs claim that Defendant Fund violated provisions of ERISA and COBRA, resulting in the termination Plaintiffs' medical benefits. The Pilot Life plaintiff claimed that the defendant improperly terminated his benefits under an employment benefit plan. The Supreme Court found that the plaintiff's common law claims were "related to" an employee benefit plan and that they were preempted by ERISA. Id. at 48.

The Court of Appeals for the Third Circuit has followed the Supreme Court in broadly interpreting the language of ERISA preemption. In Pane v. RCA Corp., 868 F.2d 631 (3d Cir. 1989), the **[*9]** plaintiff claimed that his employer's refusal to grant benefits constituted intentional infliction of emotional distress, as Plaintiffs in the instant case allege. Id. at 635. The Third Circuit held that "state law claims of emotional distress arising out of the administration of an ERISA employee benefit plan are also preempted." Id. Thus, under Pilot Life and Pane, Plaintiffs' common law claims are preempted.

## C. Claims under Pa. Stat. Ann. tit. 40, § 756.2

In their Amended Complaint, Plaintiffs' claim that Mr. Campbell was never given notice of his right to continued medical coverage for himself and his family following his termination. Plaintiffs allege that this failure by the Fund is a violation not only of COBRA and ERISA but also the Pennsylvania Casualty Insurance Law, specifically Pa. Stat. Ann. tit. 40, § 756.2. That section requires insurers to furnish summary statements of accident and sickness insurance to the employer policyholders for delivery to the covered employees. Pa. Stat. Ann. tit. 40, § 756.2(b) (2). The statute also entitles covered employees to continued health insurance following termination (a converted **[*10]** policy) under certain conditions. Pa. Stat. Ann. tit. 40, § 756.2 (d).

Defendant Fund argues that Plaintiffs' claims under the Pennsylvania statute, like their common law claims, are preempted by ERISA. The same argument was made in Drexelbrook Engineering Co. v. Travelers Ins. Co., 710 F. Supp. 590 (E.D. Pa.) aff'd mem., 891 F.2d 280 (3d Cir. 1989), where the plaintiff alleged that the defendant violated § 756.2 by not notifying plaintiff of his rights to a converted policy. Id. at 593.

In Drexelbrook, the court analyzed the Pennsylvania statute in light of the "savings clause" of ERISA, 29 U.S.C. § 1144(b)(2)(A), which exempts state insurance law from ERISA preemption, and the "deemer clause", 29 U.S.C. § 1144(2)(B), which states that an employee benefit plan is not to be considered an insurance company for purposes of state insurance laws.

In its analysis, the Drexelbrook court distinguished between employee benefit plans that are "self-insured" and "insured". Id. at 594. The **[*11]** court stated that "state laws that regulate the insurance industry directly apply to plans that are underwritten by insurance companies while ERISA preempts such state laws where plans are self-insured." Id., citing Metropolitan Life Ins. Co. v. Massachusetts, 471 U.S. 724, 732, 85 L. Ed. 2d 728, 105 S. Ct. 2380 (1985).

The Drexelbrook court found that even if the Pennsylvania statute were assumed to be a state insurance law described in the "savings clause", the "deemer clause" resulted in the preemption of the claim under Section 756.2. Drexelbrook, 710 F. Supp. at 597; see also Travitz v. Northeast Dept. ILGWU H & W Fund, 13 F.3d 704, 710 (3d Cir. 1994) (even if a state law is

saved because it regulates insurance it has no effect on self-insured ERISA plans by virtue of the deemer clause).

In Drexelbrook, the defendant Travelers Insurance Company administered the employee benefit plan in question. Id. at 596. Despite the fact that Travelers was an insurance company, the court found that Travelers was not engaged in the business with respect **[*12]** to the administration of the plan. Id. at 597. The relationship of the employee benefit plan with Travelers Insurance did not destroy its status as an employee benefit plan, and the claims under the Pennsylvania statute were preempted by ERISA. Id. at 597-98.

In the present case, Defendant Fund states that it is funded by employer and individual contributions and investment income. (Einhorn Decl. P3). Thus, the Fund is not underwritten by an insurance company or "insured" under Drexelbrook, but "self-insured." Moreover, there is no close relationship between the Fund and an insurance company that challenges the status of Defendant Fund as an "employee benefit plan". Under the deemer clause in ERISA and the language of Drexelbrook, this court concludes that Plaintiffs' claims under the Pennsylvania Casualty Insurance Law are preempted.

## D. Defendant Fund's Exhaustion Argument

Defendant Fund argues that summary judgment is warranted on the claims under ERISA and COBRA because Plaintiffs have not exhausted their administrative remedies. Defendant cites several cases requiring exhaustion of administrative procedures prior to seeking relief in court under ERISA, **[*13]** including Weldon v. Kraft, Inc., 896 F.2d 793 (3d Cir. 1990) and Tomczyscyn v. Teamsters Local 115 Health & Welfare Fund, 590 F. Supp. 211 (E.D. Pa. 1984).

The cases cited by Defendant, however, are not applicable to the present case. The Weldon and Tomczyscyn courts found that the plaintiffs in those cases had failed to exhaust administrative procedures after their applications for benefits were denied. Weldon, 896 F.2d at 800; Tomczyscyn, 590 F. Supp. at 217. In the present case, Plaintiffs did not apply for benefits nor had a claim denied by the Fund. (Campbell Decl. PP 7-8). Plaintiffs argue that the present case is distinguishable because they are alleging that Defendant Fund violated federal statutes by not giving Plaintiffs notice of their rights, rather than wrongfully denying an application for benefits.

Plaintiffs argue that the present case is controlled by Zipf v. AT&T, 799 F.2d 889 (3d Cir. 1986) and Cohen v. Gross, Sklar & Metzger, 703 F. Supp. 388 (E.D. Pa. 1989). The Zipf **[*14]** and Cohen courts held that when plaintiffs allege purely statutory violations of ERISA, exhaustion of internal remedies is not required. Zipf, 799 F.2d at 893; Cohen, 703 F. Supp. at 390. The Cohen case dealt with one of the violations alleged in this case, the failure to provide summary plan descriptions. Id. at 389. As Plaintiffs in the present case only allege statutory violations, administrative exhaustion is not a basis for summary judgment in favor of Defendant Fund. See also Gavalik v. Continental Can Co., 812 F.2d 834, 850 (3d Cir.), cert. denied 484 U.S. 979, 98 L. Ed. 2d 492, 108 S. Ct. 495 (1987) (employees charging statutory violations of ERISA were not required to exhaust administrative remedies).

## E. Defendant Fund's Compliance with COBRA and ERISA

Plaintiffs allege two separate violations by Defendant Fund. Plaintiffs claim that Defendant failed to provide a summary plan description and notice of the right to continued coverage once Mr. Campbell ceased working as an Emery **[*15]** driver. See 29 U.S.C. § 1021(a); 29 U.S.C. § 1166(a).

With respect to the notice of continued coverage, Defendant Fund claims that it has complied with COBRA by mailing the notice within the prescribed time period to the Campbells' last known address. Defendant Fund argues that as Plaintiffs only contend that they never received notice and cannot dispute that the Defendant sent the notice, Defendant is entitled to summary

judgment.

Federal courts have held that mailing the required COBRA notice fulfills the obligations of the employee benefit fund. In **Conery v. Bath Assoc., 803 F. Supp. 1388 (N.D. Ill. 1992)**, the plaintiff claimed that the defendant failed to provide notice of the right to continued coverage pursuant to 29 U.S.C. § 1166, the same notice in question in the instant case. **Id. at 1398.** The defendant in Conery, like Defendant Fund, claimed that notice was promptly sent and presented a file copy of the letter sent. Id. The Conery court followed others in stating that only a "good **[*16]** faith attempt to comply" with § 1166 is required and that sending notice by first class mail to the employee's last known address is sufficient. Id. See also Jachim v. KUTV Inc., 783 F. Supp. 1328, 1333-34 (D. Utah 1992)(employer who prepared notice letter and placed letter in internal mail bin fulfilled notice requirement of 29 U.S.C. § 1166); Truesdale v. Pacific Holding Co., 778 F. Supp. 77, 81 (D.D.C. 1991)(employer who sends notice by mail to employee's last known address deemed to be in good faith compliance).

Defendant Fund states that it mailed the notice letter within the required time period by mail to Mr. Campbell's last known address in Sicklerville, New Jersey and provides a file copy. As there is no dispute to the fact that Defendant Fund sent the required notice, Defendant Fund is entitled to summary judgment with respect to the claims based on 29 U.S.C. § 1166.

Plaintiffs, however, allege another violation of ERISA and COBRA, namely a failure to provide Mr. Campbell with a summary health plan description. Under 29 U.S.C. § 1021 **[*17]** (a), the administrator of an employee benefit plan must furnish a summary plan description. Section 1022(b) outlines the extensive information that must be included in the summary. While Defendant Fund has shown that there is no question that it complied with Section 1166, Defendant has not shown that it furnished a summary pursuant to Section 1021. As there remains a question of fact, Defendant is not entitled to summary judgment as to the claim based on 29 U.S.C. § 1021.

## F. Extra-Contractual Compensatory and Punitive Damages

In its motion, Defendant Fund claims that Plaintiffs' claims for extra-contractual compensatory and punitive damages should be stricken as such damages are impermissible under ERISA. In their Reply Brief, Plaintiffs state that such damages are not being sought with respect to Defendant Fund. As these claims are not pertinent to the litigation between Plaintiffs and Defendant Fund, they will be stricken pursuant to Fed. R. Civ. P. 12(f).

For the reasons given above, the Motions of Defendant Fund for Summary Judgment with respect to claims under 29 U.S.C. § 1166, Pa. Stat. Ann. **[*18]** tit. 40, § 756.2 and common law, and to Strike the demands for punitive and extra-contractual compensatory damages will be granted. Defendant Fund's Motion for Summary Judgment with respect to claims under 29 U.S.C. 1021 will be denied. n2

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n2 In Plaintiffs' Brief in Opposition to Defendant's Motions, counsel for Plaintiffs requests a continuance of Defendant's Motions pending further discovery pursuant to Fed. R. Civ. P. 56(f). (Plaintiffs' Brief at 9). Plaintiffs' counsel states that information is required from the Fund's books, records and files. (Gilman Decl. P3). Such a continuance is proper when the requesting party provides "an affidavit specifying . . . what particular information is sought; how, if uncovered, it would preclude summary judgment; and why it has not previously been obtained." Dowling v. City of Philadelphia, 855 F.2d 136, 140 (3d Cir. 1988). As Plaintiffs have not submitted an affidavit meeting those requirements, a continuance is not appropriate.

Get a Document - by Citation - 1994 U.S. Dist. LEXIS 13447    Page 7 of 25

Case 1:04-cv-00285-JGJ    Document 38-2    Filed 05/03/2005    Page 7 of 8

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[\*19]**

An appropriate Order follows.

**O R D E R**

AND NOW, this 21st day of September, 1994, in consideration of the Alternative Motions of Defendant Teamsters Health and Welfare Fund of Philadelphia & Vicinity ("Fund") to Dismiss for Failure to State a Claim upon which Relief can be Granted, to grant Summary Judgment, and to Strike the Demands for Punitive and Certain Compensatory Damages, the Response of Plaintiffs Arthur and Jennifer Campbell, and all supplemental replies thereto, and for the reasons set forth in the foregoing Memorandum, it is hereby ORDERED that:

1. Defendant Fund's Motion for Summary Judgment is GRANTED for the state tort claims in Count VIII of the Amended and Supplemental Complaint ("Amended Complaint").

2. Defendant Fund's Motion for Summary Judgment is GRANTED for that part of Count IV of the Amended Complaint based on Pa. Stat. Ann. tit. 40, § 756.2.

3. Defendant Fund's Motion for Summary Judgment is GRANTED for that part of Count IV of the Amended Complaint based on the Plaintiffs' claim of failure to provide notice of continuing coverage pursuant to 29 U.S.C. § 1166.

4. Defendant Fund's Motion for Summary Judgment **[\*20]** is DENIED for that part of Count IV of the Amended Complaint based on the Plaintiffs' claim of failure to provide a Summary Health Plan Description pursuant to 29 U.S.C. § 1021.

5. Defendant Fund's Motion to Strike Plaintiffs' Demands for Punitive and Extra-Contractual Compensatory Damages from Defendant Fund is GRANTED pursuant to Fed. R. Civ. P. 12(f).

BY THE COURT:

JAMES McGIRR KELLY, J.

Service:   **Get by LEXSEE®**
Citation:   **1994 U.S. Dist. LEXIS 13447**
View:   Full
Date/Time:   Wednesday, April 27, 2005 - 2:09 PM EDT

\* Signal Legend:
☻ -   Warning: Negative treatment is indicated
Q -   Questioned: Validity questioned by citing refs
⚠ -   Caution: Possible negative treatment
◈ -   Positive treatment is indicated
Ⓐ -   Citing Refs. With Analysis Available
ⓘ -   Citation information available
\* Click on any *Shepard's* signal to *Shepardize®* that case.

Copyright © 2005 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

Get a Document - by Citation - 1994 U.S. Dist. LEXIS 13447    Page 8 of 25

Case 1:04-cv-00285-KAJ    Document 38-2    Filed 05/03/2005    Page 8 of 8

Service: **Get by LEXSEE®**
Citation: **2002 us dist lexis 13865**

*2002 U.S. Dist. LEXIS 13865, *; 147 Lab. Cas. (CCH) P34,593;*
*7 Wage & Hour Cas. 2d (BNA) 1816*

Lawanda Carter, Plaintiffs, v. Enterprise Rent-A-Car Company a/k/a Enterprise Rent-A-Car Company-Midwest, Charlie Petrolia, and Sarah Ruiz, Defendants.

No. 01 CV 4494

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

2002 U.S. Dist. LEXIS 13865; 147 Lab. Cas. (CCH) P34,593; 7 Wage & Hour Cas. 2d (BNA) 1816

July 24, 2002, Decided
July 29, 2002, Docketed

**DISPOSITION:** [*1] Defendant's motion for summary judgement DENIED.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff former employee sued defendant employer, alleging retaliatory discharge under the Family and Medical Leave Act (FMLA), 29 U.S.C.S. § 2601 et seq. The employer moved for summary judgment.

**OVERVIEW:** The employer argued that the employee could not establish a prima facie case of retaliation under the FMLA. Specifically, the employer argued that the employee could not establish a causal connection between her request for FMLA leave and her termination. The court, however, found that a genuine issue of material fact existed as to whether the employee had established a prima facie case of retaliatory discrimination. The employee had alleged that she was subject to an internal investigation for fraudulent gas card usage and termination only subsequent to her request for leave. She was, in fact, terminated only six days after submitting the completed FMLA documentation. Further, the employee alleged that her manager threatened her when she initially requested a two month leave. The employee had sufficiently supported an inference that her manager's animus may have informed and/or tainted the decision to investigate and terminate her. Thus, there was a viable inference that the investigation and termination occurred in retaliation to the request for FMLA leave.

**OUTCOME:** The employer's motion was denied.

**CORE TERMS:** card, discriminatory, animus, termination, pretextual, protected activity, causal connection, customer, summary judgment, supervisor, retaliatory discharge, prima facie case, fraudulent, paperwork, pretext, decisionmaker, retaliation, favorable, branch manager, genuine issue of material fact, manager, discrepancies, terminated, gasoline, misuse, admits, intentional discrimination, nondiscriminatory reason, decision to terminate, sex discrimination

### LexisNexis(R) Headnotes ♦ Hide Headnotes

Civil Procedure > Summary Judgment > Summary Judgment Standard 🖫
*HN1*⚓Summary judgment may only be granted when no material question of fact is in dispute. More Like This Headnote

Civil Procedure > Summary Judgment > Burdens of Production & Proof 🗎

*HN2*⚓The party moving for summary judgment bears the burden of identifying the evidence that demonstrates the absence of a disputed material issue of fact and establishes that the moving party is entitled to judgment as a matter of law. The evidence must be viewed in the light most favorable to the party opposing the motion, with doubts resolved and all reasonable inferences drawn in favor of the nonmoving party. Further, the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial level on the merits. In employment discrimination cases, this standard is applied with added rigor before granting summary judgment. More Like This Headnote

Labor & Employment Law > Discrimination > Retaliation 🗎
Labor & Employment Law > Leaves of Absence > Family & Medical Leave 🗎

*HN3*⚓While the Family and Medical Leave Act (FMLA), 29 U.S.C.S. § 2601 et seq., provides certain substantive guarantees, the FMLA also affords employees protection in the event they are discriminated against for exercising their rights under the FMLA. In a case where an employee is alleging discrimination based on the FMLA, the issue becomes whether the employer's actions were motivated by an impermissible retaliatory or discriminatory animus. More Like This Headnote

Labor & Employment Law > Discrimination > Retaliation 🗎
Labor & Employment Law > Leaves of Absence > Family & Medical Leave 🗎

*HN4*⚓Where a plaintiff alleges retaliatory discharge under the Family and Medical Leave Act, 29 U.S.C.S. § 2601 et seq., she must establish that the parties involved engaged in intentional discrimination. More Like This Headnote

Labor & Employment Law > Discrimination > Retaliation 🗎
Labor & Employment Law > Leaves of Absence > Family & Medical Leave 🗎

*HN5*⚓To prove a prima facie case of retaliatory discharge under the Family and Medical Leave Act, 29 U.S.C.S. § 2601 et seq., a plaintiff must show that: (1) she engaged in a protected activity; (2) she suffered an adverse employment action; and (3) there is a causal connection between her protected activity and the defendant's' adverse employment action. If she makes that showing, the burden of producing a legitimate, nondiscriminatory reason for her discharge shifts to the employer, and once it does so, the plaintiff bears the burden of showing that the employer's proffered reasons are pretextual and that its actual reason was discriminatory. More Like This Headnote

Labor & Employment Law > Discrimination > Retaliation 🗎

*HN6*⚓Generally, in the context of a retaliation action, a plaintiff may establish such a link through evidence that the discharge took place on the heels of protected activity. However, there can be no causal link between protected activity and an adverse employment action if the employer remained unaware of the protected activity. More Like This Headnote

Labor & Employment Law > Discrimination > Title VII 🗎

*HN7*⚓A Title VII plaintiff may rely on circumstantial evidence to establish her employer's awareness of protected expression. More Like This Headnote

Labor & Employment Law > Discrimination > Retaliation 🗎

*HN8*⚓A plaintiff need not prove by a preponderance of the evidence at the summary judgment stage that her supervisor was aware of her request for leave under the Family and Medical Leave Act, 29 U.S.C.S. § 2601 et seq.; she must only produce evidence that would support an inference that he was so aware. More Like This Headnote

Civil Procedure > Summary Judgment > Burdens of Production & Proof 🔖

*HN9* Summary judgment generally is improper where the plaintiff can show that an employee with discriminatory animus provided factual information or other input that may have affected the adverse employment action. More Like This Headnote

Labor & Employment Law > Discrimination > Disparate Treatment > Burden Shifting Analysis 🔖

*HN10* Where a plaintiff has established a prima facie case of retaliation, under the McDonnell-Douglas test, the defendant must produce a legitimate, nondiscriminatory reason for the plaintiff's discharge; if it does so the plaintiff bears the burden of showing that the defendant's proffered reasons are pretextual and that its actual reason was discriminatory. More Like This Headnote

Labor & Employment Law > Discrimination > Disparate Treatment > Burden Shifting Analysis 🔖

*HN11* For purposes of the McDonnell Douglas framework, a plaintiff may establish that her employer's non-discriminatory reason for the adverse employment actions is pretextual by showing that the reason (1) had no basis in fact, (2) did not actually motivate her discharge, or (3) was insufficient to motivate the discharge. Moreover, because a fact-finder may infer intentional discrimination from an employer's untruthfulness, evidence that calls truthfulness into summary judgement can act to preclude summary judgement. Pretext, however, means more than an unusual act; it means something worse than a business error: pretext means deceit used to cover one's tracks. More Like This Headnote

**COUNSEL:** For LAWANDA CARTER, plaintiff: Andrew Jay Cohen, Law Offices of Andrew J. Cohen, Marshall J. Burt, Law Offices of Marshall J. Burt, Chicago, IL.

For ENTERPRISE RENT-A-CAR COMPANY, CHARLIE PETROLIA, SARAH RUIZ, defendants: Ellen E. McLaughlin, Christopher James DeGroff, Seyfarth Shaw, Chicago, IL.

**JUDGES:** David H. Coar, United States District Judge.

**OPINIONBY:** David H. Coar

**OPINION: MEMORANDUM OPINION AND ORDER**

Before this court is defendant's, Enterprise Rent-A-Car Company a/k/a Enterprise Rent-A-Car Company-Midwest ("Enterprise"), motion for summary judgement, pursuant to Fed. R. Civ. P. 56., against plaintiff's, Lawanda Carter ("Carter"), complaint containing allegations of discriminatory retaliation under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq. For the following reasons the defendant's motion is DENIED.*

*Statement of Facts*

*Carter was employed by Enterprise which rents automobiles to individuals and businesses through its various branches in the Chicagoland area. Enterprise's rental branches are small, ordinarily employing between three and five individuals.*

*In 2001,* **[*2]** *Carter was an Assistant Manager at Enterprise's South Shore branch, located on 75th Street in Chicago. As Assistant Manager, Carter was responsible for, in part, general operation of the South Shore branch, including servicing customer, completing financial paperwork, making sales calls and training more junior employees.*

*The South Shore branch employed three other employees: Rubin Vasquez (car porter)*

("Vasquez"), Eric McAtee (Management Trainee) ("McAtee"), and Stacey Cole (Branch Manager) ("Cole").

Carter reported directly to Branch Manager Cole. Cole, in turn, reported to the South Chicago area Manager Jason Roof ("Roof"). Roof supervised three branches in the South Chicago area. Roof reported to Regional Vice President Charlie Petrolia ("Petrolia"). Petrolia oversaw all of the branches in the South Chicagoland Region, including the South Shore branch. Human Resources Generalist Manager Sarah Ruiz ("Ruiz") supported the South Chicagoland Region in 2001. Ruiz reported directly to Petrolia.

Responsibilities shared by all branch employees included putting gas in a customer's car or in the car being used the branch manager. To facilitate this process, Enterprise enlists an outside **[*3]** vendor, Wright Express, to issue gasoline cards to Enterprise's branches. These cards allow branch employees to use these gas cards to purchase fuel at local filling stations. Wright Express then collects the charge data from the various filling stations and collectively bills Enterprise for the gasoline. The South Shore facility was issued two gas cards: one assigned to Cole and one for general branch use. Enterprise issues a personal identification number ("PIN") to each employee using a gas card in order to identify when and where an employee used the gas card.

Cole was permitted to use a company car to get her home and back to the office. Employees generally, including Cole, were not allowed to put gas in a car for their personal benefit,. Roof admits that prior to the investigation incriminating Carter he knew that several employees were taking gas cards home. Roof states that he believed that the repeateded disappearance of the South Shore gas card was a cause for concern. And Cole admits that she sometimes would put in half a tank so that she could pick up and drop off her daughter.

In late 2000 or early 2001, Carter informed Cole that she would need to take two months leave **[*4]** in order to care of her ill son. According to Carter, Cole allowed Carter one or two days of leave but no more. Soon thereafter, Carter spoke to Ruiz who was visiting the South Shore Branch. Ruiz agreed to send Carter FMLA forms to fill out and submit. A week later, Carter had not yet received the forms so she called Ruiz again. Carter advised Cole that she would be submitting the FMLA application.

According to Carter, she sent the completed FMLA paperwork to Ruiz on February 16, 2001, via inter-office mail. The paperwork requested leave from March 16, 2001 to May 31, 2001. Ruiz testifies, however, that she never received Carter's completed FMLA paperwork.

On February 15, 2001, for the first time in Carter's employment, Cole sent Carter home for the day. The next morning, February 16th, Carter was sent to Hobart, Indiana to respond to questions by Ruiz and Petrolia who were conducting an investigation about an employee's misuse of a gas card. According to Carter, this was the first investigation of this type ever conducted in the South Chicagoland Region. In the meeting that occurred on February 16, both Petrolia and Ruiz asked Carter general questions about Carter's use of the company **[*5]** gas card on February 13, 2001 after closing. Carter told Petrolia that she left work on February 13, 2001 between 6:30 and 6:45 p.m. Carter does not deny that she used the gas card at 6:31 pm on February 13. Carter told Petrolia that on that day, she used the gas card to fuel a company car while taking customers to their destinations. Carter also confirmed Ruiz's receipt and completion of the FMLA documents. When the meeting concluded, Carter was sent home for the second day in a row.

On February 21st, six days after filing her FMLA claim, Petrolia, Ruiz and Carter met at the Enterprise's Chicago Heights Branch. Petrolia asked Carter further questions about her use of the gas card on February 13th, including whether she could identify the customers she helped after closing that day. According the Petrolia, in that meeting Carter was unable to provide any other information that supported her previous statements that she was assisting customers. Petrolia testifies that based on this investigation, he concluded that Carter's 6:31 gas charge was for

personal use and a terminable work rule violation. Petrolia and Ruiz signed Carter's termination memorandum and presented it to Carter at **[*6]** the meeting.

Enterprise moves for summary judgement against Carter's complaint of retaliatory discharge.

### Standard of Review

**HN1**⚓Summary judgment may only be granted when no material question of fact is in dispute. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-252, 106 S. Ct. 2505, 2511-12, 91 L. Ed. 2d 202 (1986). **HN2**⚓The party moving for summary judgment bears the burden of identifying the evidence that demonstrates the absence of a disputed material issue of fact and establishes that the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552-53, 91 L. Ed. 2d 265 (1986). The evidence must be viewed in the light most favorable to the party opposing the motion, with doubts resolved and all reasonable inferences drawn in favor of the nonmoving party. Anderson, 477 U.S. at 253. Further, "the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial level on the merits." Anderson, 477 U.S. at 252. In employment discrimination **[*7]** cases, this standard is applied with "added rigor" before granting summary judgment. Sarsha v. Sears, Roebuck & Co., 3 F.3d 1035, 1038 (7th Cir.1993).

### Analysis

Defendant argues that plaintiff is unable to establish prima facie case of retaliation under the FMLA. This court disagrees.

**HN3**⚓While the FMLA provides certain substantive guarantees, "the FMLA also affords employees protection in the event they are discriminated against for exercising their rights under the Act." King v. Preferred Technical Group, 166 F.3d 887, 891 (7th Cir.1999).

In a case where an employee is alleging discrimination based on the FMLA, "the issue becomes whether the employer's actions were motivated by an impermissible retaliatory or discriminatory animus." Id.; see also Horwitz v. Board of Educ. of Avoca School Dist. No. 37, 260 F.3d 602, 616 (7th 2001 ).

**HN4**⚓Because Carter alleges retaliatory discharge under the FMLA, she must establish that the parties involved engaged in intentional discrimination. Horwitz, 260 F.3d at 616. Since Carter has not provided this court with any direct evidence of discrimination, we will apply the **[*8]** McDonnell Douglas burden-shifting framework to her claim.

**HN5**⚓To prove a prima facie case of retaliatory discharge under the FMLA, Carter must show that: (1) she engaged in a protected activity; (2) she suffered an adverse employment action; and (3) there is a causal connection between her protected activity and the defendant's' adverse employment action. Id.

If she makes that showing, the burden of producing a legitimate, nondiscriminatory reason for her discharge shifts to Enterprise, and once it does so, Carter bears the burden of showing that Enterprise's proffered reasons are pretextual and that its actual reason was discriminatory. See, e.g., McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973); Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981); Dey v. Colt Construction & Development Co., 28 F.3d 1446, 1458 (7th Cir. ??); Johnson v. Sullivan, 945 F.2d 976, 980 (7th Cir.1991); Holland v. Jefferson Nat'l Life Ins. Co., 883 F.2d 1307, 1313.

Defendant argues that Carter is unable to establish a prima facie case of retaliatory discharge

because **[*9]** she cannot establish a causal connection between her request for FMLA leave and her termination. Carter argues that she has established the requisite causal connection.

*HN6* Generally, a plaintiff may establish such a link through evidence that the discharge took place on the heels of protected activity. See <u>Dey, 28 F.3d at 1458.</u> The Appellate Courts agree, however, that there can be no causal link between protected activity and an adverse employment action if the employer remained unaware of the protected activity. See, e.g., <u>Dey, 28 F.3d at 1458; Goldsmith v. City of Atmore, 996 F.2d 1155, 1163 (11th Cir.1993); Williams v. Rice, 983 F.2d 177, 181 (10th Cir.1993); EEOC v. Crown Zellerbach Corp., 720 F.2d 1008, 1012 n. 1 (9th Cir.1983).</u>

In this case, viewing the evidence in a light most favorable to the plaintiff, a genuine issue of material fact exists as to whether Carter has established a prima facie case of retaliatory discrimination. According to Carter, she was subject to an internal investigation and termination only subsequent to her request for leave under the FMLA. She, in fact, was terminated **[*10]** only six days after she submitted the completed FMLA documentation. Enterprise contends that a causal connection is impossible to establish because Carter cannot prove that Petrolia had knowledge that Carter had requested FMLA leave prior to launching an investigation of Carter's alleged fraudulent use of the Enterprise gas card.

Carter, however, is not required to demonstrate by direct evidence that Roof and Petrolia were aware of her request for FMLA leave. *HN7* A Title VII plaintiff may rely on circumstantial evidence to establish her employer's awareness of protected expression. <u>Dey, 28 F.3d at 1458.</u> Moreover, *HN8* Carter need not prove by a preponderance of the evidence at the summary judgment stage that Petrolia was aware of her request for leave under the FMLA; she must only produce evidence that would support an inference that he was so aware. Id.

*HN9* Summary judgment generally is improper where the plaintiff can show that an employee with discriminatory animus provided factual information or other input that may have affected the adverse employment action. See <u>Shager v. Upjohn Co., 913 F.2d 398, 405 (7th Cir.1990)</u> (even where the plaintiff's supervisor **[*11]** may not have passed along discriminatory animus to the ultimate decisionmaker, that animus tainted his assessment of the plaintiff's performance, on which the decisionmaker did rely); <u>Jardien v. Winston Network, Inc., 888 F.2d 1151, 1155 (7th Cir.1989)</u> (relevant to jury's determination in age discrimination case that decisionmaker accepted input from supervisor who had discriminatory motive); see also <u>Robinson v. PPG Indus., Inc., 23 F.3d 1159, 1165-66 (7th Cir.1994)</u> (summary judgment improper where supervisor who allegedly made age- related remarks participated in ranking the performance of company employees and in the eventual decision to terminate the plaintiff's employment); <u>Gusman v. Unisys Corp., 986 F.2d 1146, 1147 (7th Cir.1993)</u> (reasonable jurors could conclude that a supervisor intent on purging the workforce of older employees lied to his superiors about the quality of the plaintiff's job skills); <u>Stacks v. Southwestern Bell Yellow Pages, Inc., 27 F.3d 1316 (8th Cir.1994)</u> (employers cannot escape responsibility for sex discrimination "when the facts on which the reviewers rely have been filtered by a manager **[*12]** determined to purge the labor force of women."); <u>Kientzy v. McDonnell Douglas Corp., 990 F.2d 1051, 1057-60 (8th Cir.1993)</u> (evidence sufficient to support sex discrimination claim where superior's discriminatory animus was reflected in the information he provided to ultimate decision makers); cf. <u>Wilson v. Stroh Cos., 952 F.2d 942, 945-46 (6th Cir.1992)</u> (Title VII plaintiff failed to show that lower level employee with discriminatory animus infected superiors' independent decision to terminate plaintiff's employment).

Accepting Carter's facts as true for the purposes of this summary judgement motion, Carter has sufficiently supported an inference that Cole's animus may have informed and/or "tainted" Petrolia's decision to investigate and terminate Carter. For example, according to Carter, Cole threatened her when she requested initially requested a two month leave. In addition, Carter's assertions are supported by the fact that Cole had never reported anyone for taking a gas card

Get a Document - by Citation - 2004 U.S. Dist. LEXIS 24,592      Page 15 of 25      Page 7 of 8

Case 1:04-cv-00285-KAJ   Document 38-24   Filed 05/03/2005   Page 15 of 25

home, and only reported Carter after Carter had asked Cole for leave under the FMLA. Finally, according to Carte and Cole, Cole spoke to Petrolia and discussed Cole's belief **[\*13]** that Carter had taken the gas card, again, only after Carter had mentioned that she wanted an extended leave.

This court finds that the above creates a viable inference that the investigation of Carter's fraudulent gas card usage and her subsequent termination occurred in retaliation to her request for FMLA leave. Enterprise disagrees with this inference, arguing that the investigation itself, as well as its consequences, were independent decisions made by Petrolia. This, therefore, is a genuine issue of material fact.

Viewing the evidence in a light most favorable to the plaintiff, this court then assumes for the purposes of this summary judgement motion that Carter has established the requisite causal connection. *HN10*Under the McDonnel-Douglas test, Enterprise must now produce a legitimate, nondiscriminatory reason for Carter's discharge; if it does so Carter bears the burden of showing that Enterprise's proffered reasons are pretextual and that its actual reason was discriminatory. See, e.g., McDonnell Douglas Corp. v. Green, 411 U.S. 792, 793, 36 L. Ed. 2d 668, 93 S. Ct. 1817 In this court's opinion, there is a genuine issue of material fact with respect whether **[\*14]** Enterprise's proffered reason is pretextual and that its actual reason was discriminatory.

Enterprise contends that Carter was terminated due to her misuse of a company gas card. Carter argues that Carter's reason for terminating is pretextual because Enterprise only became concerned about the fraudulent use of the gas card around the time that Carter requested leave under the FMLA, and further, that Carter was alone punished for her usage of the card despite the fact that others were found to have engaged in the same behavior.

*HN11*A plaintiff may establish that her employer's non-discriminatory reason for the adverse employment actions is pretextual by showing that the reason "(1) had no basis in fact, (2) did not actually motivate [her] discharge, or (3) [was] insufficient to motivate the discharge." McClendon v. Indiana Sugars, Inc., 108 F.3d 789 (citing Collier v. Budd Co., 66 F.3d 886, 892 (7th Cir. 1995). Moreover, because a fact-finder may infer intentional discrimination from an employer's untruthfulness, evidence that calls truthfulness into summary judgement can act to preclude summary judgement. Perdomo v. Browner, 67 F.3d 140, 145 (7th Cir. 1995). **[\*15]** Pretext, however, "means more than an unusual act; it means something worse than a business error: 'pretext' means deceit used to cover one's tracks." Clay v. Holy Cross Hosp., 253 F.3d 1000, 1005 (7th Cir. 2001).

The plaintiff supports her contention of pretext primarily by demonstrating that discrepancies in testimony exist between those who propagated the gas card investigation, and subsequently Carter's termination, and other employees of Enterprise. For example, Area Manager Roof's concern for misuse of the South Shore gas card as well as his conversations with Cole and McAtee with respect to the gas card are not corroborated by other employees at Enterprise or even testimony by Cole or McAtee. In addition, Roof admits that prior to the investigation implicating Carter he knew that several employees had taken a gas card home. The record does not indicate, however, that Roof believed it was a matter of concern. Carter further supports her assertions by demonstrating the possibility that the investigation of fraudulent gas card use began the day before she submitted her FMLA claim and throughout the investigation she was singled out for disparate treatment. For **[\*16]** the three month period from Cole's arrival as manager in November 2000 until Carter termination, there were twenty-five after-hours gasoline purchases for the branch. Of these purchases, 13 were by Cole, 7 were by Junea Buford (car porter) and the remaining 5 were by Carter. In fact, there are two instances in which Cole made two gas purchases within five minutes of one another, and no investigation was conducted in those instances.

Enterprise contends that no reasonable fact-finder could find in favor of chain of events as

construed by Carter. Enterprise does not, however, provide evidence to contradict the discrepancies pointed out by Carter. Instead, it argues that those discrepancies are irrelevant. This court disagrees.

Ultimately the question for the trier of fact is whether the reason why Carter was terminated was her invocation of the FMLA. A this point, this court cannot answer that question as a matter of law. Consequently, Enterprise's motion for summary judgement is denied.

## CONCLUSION

For the foregoing reasons, the defendant's motion for summary judgement is DENIED.

**Enter:**

**David H. Coar**

**United States District Judge**

**Dated:** 7/24/02

Service: **Get by LEXSEE®**
Citation: **2002 us dist lexis 13865**
View: Full
Date/Time: Monday, May 2, 2005 - 8:13 PM EDT

* Signal Legend:
&#9737; -   Warning: Negative treatment is indicated
&#9410; -   Questioned: Validity questioned by citing refs
&#9651; -   Caution: Possible negative treatment
&#10070; -   Positive treatment is indicated
&#9398; -   Citing Refs. With Analysis Available
&#9432; -   Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case

About LexisNexis | Terms and Conditions

Copyright © 2005 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

Service: **Get by LEXSEE®**
Citation: **1995 us dist lexis 14413**

*1995 U.S. Dist. LEXIS 14413, \**

CHARLES D. DUVALL, Plaintiff vs. THE POLYMER CORPORATION, NAAMLOZE VANNOOTSCHAP DSM and JERRY THURSTON, Defendants

CIVIL ACTION No. 93-CV-3801

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

1995 U.S. Dist. LEXIS 14413

September 28, 1995, Decided
October 2, 1995, FILED, ENTERED

**CORE TERMS:** termination, prima facie case, summary judgment, terminated, pension, age discrimination, vesting, eliminated, determinative, at-will, deposition, salary, discharged, downsizing, hardship, protected class, retirement, younger, pension benefits, hired, duty, proffered, interpersonal, burden of production, specific intent, salaried employees, skills, nondiscriminatory reason, employment contract, nonmoving party

**COUNSEL: [\*1]** For CHARLES D. DUVALL, PLAINTIFF: JOHN W. ROLAND, ANDREW NEWMAN HOWE, ROLAND AND SCHLEGEL, READING, PA.

For THE POLYMER CORPORATION, NAAMLOZE VENNOOTSCHAP DSM, JERRY THURSTON, DEFENDANTS: G. THOMPSON BELL, III, LINDA A. MC KAY, JAY R. WAGNER, STEVENS & LEE, READING, PA.

**JUDGES:** JUDGE E. MAC TROUTMAN

**OPINIONBY:** E. MAC TROUTMAN

**OPINION: MEMORANDUM**

The above captioned matter is now before the Court on the motion of Defendants Polymer Corporation, Naamloze Vennootschap DSM and Jerry Thurston for Summary Judgment. This action arises from the termination of the Plaintiff, Charles Duvall, from his employment at the Polymer Corporation, Reading, in February of 1993. Plaintiff's complaint, filed on or about July 15, 1993, against the Polymer Corporation, DSM, (Polymer's parent corporation), and Jerry Thurston, head of the Reading Division, states four separate and distinct claims: (1) violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621, ("ADEA"); (2) violation of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq.; (3) breach of an implied employment contract and (4) promissory estoppel. This Court has jurisdiction pursuant to 28 U.S.C. **[\*2]** § 1331. For the reasons which follow, we will grant the motion for summary judgment on all four counts.

## I. BACKGROUND

In April of 1989, Plaintiff Charles Duvall (hereinafter "Duvall") was hired by the Polymer Corporation, a subsidiary of Naamloze Vennootschap DSM (hereinafter "DSM"), as Vice President of Finance. He was 49 years old at the time of hiring. In accepting the position, plaintiff and his wife were obligated to move from Texas to Berks County, Pennsylvania. Duvall's three children remained in Texas. His starting salary was $ 90,000.

During his tenure at Polymer, Duvall was praised for his work ethic and strong character. His responsibilities were broad including, inter alia, overseeing business planning for the entire corporation, supervising accounting, and forecasting expenditure impact on product lines and manufacturing. In fulfilling his responsibilities, Duvall supervised the work of numerous subordinates.

Despite Duvall's overall reputation as goal oriented and diligent, he was plagued by difficulties in his relationships with co-workers. n1 Within his first year at Polymer, tensions surfaced between himself and Len de Romph, the then Vice President **[*3]** of Polymer. In October of 1989, Duvall received a memo from de Romph regarding what de Romph perceived as an attitude problem on Duvall's part. n2 Despite the acrimonious nature of the memo, it sparked considerable improvement in Duvall and de Romph's working relationship. n3

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n1 Former Vice President of Human Resources at Polymer, Larry Shoe testified that Mr. Duvall " is not going to win any personality awards as far as getting along with people." (Shoe Deposition, p. 46). "Chuck could be abrasive, you know, no doubt about it." (Shoe Deposition, p. 50).

n2 The memo states:

I resent your way of advising me and others. I do not accept a lack of respect for others to buy in on the idea. You have to learn to be a team player and accept that you are not in charge. This is your biggest problem area and needs immediate correction. (Duvall Exhibit 5).

n3 "...the most remarkable change I have probably ever seen in my life in the relationship between those two people." (Deposition of Larry Shoe, pg. 77)

"We got to a point where the working relationship improved considerably." (Deposition of Len de Romph, pg. 24).

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*4]**

In February of 1990, Duvall alleges he received an offer of employment from Dell Computer Corporation, a relatively young corporation in Austin, Texas. (Deposition of Duvall ("Duvall Dep." at 78-79). Acceptance of the offer would have allowed Duvall to return to Texas with his family. The Dell Computer offer included a salary of $ 105,000, plus a bonus, a 401K Plan, and a significant stock option for Dell stock. (Duvall Dep. at 89.) In view of such an attractive offer, along with his desire to return to Texas, Duvall elected to accept the offer and submitted a letter of resignation to Polymer on or about March 29, 1990. The overall reaction to Duvall's resignation was disappointment. As a result, strong efforts were made to retain Duvall n4 . On April 3, 1990, Mr. Jerry Thurston, the President of Polymer, met with Duvall and outlined a proposal for Mr. Duvall to remain at Polymer. The proposal contained the following inducements:

1. Promotion to Senior Vice President and Chief Financial Officer;

2. An additional $ 10,000 raise in addition to the $ 15,000 raise Mr. Duvall had already been promised at that time;

3. An additional $ 7000 bonus;

4. Eligibility to participate in an **[*5]** anticipated bonus plan to be installed by Mr.Thurston;

5. An additional one week vacation.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -


n4 Subsequent to Duvall's letter of resignation, Larry Shoe, Vice President of Human Resources at that time, had several discussions with Mr. Duvall, at Mr. Duvall's home, inquiring about the possibility of Mr. Duvall staying at Polymer. (Duvall Dep. pp. 106-107). Mr. Shoe had learned that Mr. Duvall was disappointed that Dell did not offer a retirement plan. (Shoe Dep. pp 74-76). Mr. Shoe, in turn told Mr. Thurston that in his opinion, Polymer's pension plan would be a major factor in Mr. Duvall's decision. (Thurston Dep. pp.94-95; Shoe Dep. pp. 88-90).

Furthermore, following Duvall's decision to remain with Polymer, Mr. Hillege sent this message to Duvall stating:

> Dear Chuck,
> I know that the last weeks have been very straining for you and your family.
> We did put a lot of pressure on you.
> But of course DSM does not want to loose her assets.
> I am very glad with the decision you took and I am sure that you will not regret.
>
> J.W. Hillege


(Duvall Dep. pp. 146-47; Duvall Dep. Exhibit 10; Hillege Dep. pp. 58-62).


- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*6]**

In addition to these strong incentives, Larry Shoe, at that time Vice President of Human Resources, had calculated for Mr. Duvall a valuation of Mr. Duvall's anticipated salary and pension benefits on an annual basis until Mr. Duvall's anticipated retirement. (Duvall Dep. at 123-125; Deposition of Larry Shoe "Shoe Dep." at 103-107). However, as alleged by both Shoe and Thurston, it was made clear to Mr. Duvall by Mr. Shoe that the projected valuation was based on assumptions about employment durations and salary increases, not guarantees. (Shoe Dep. at 107). (Thurston Dep. at 102). n5

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -


n5 "I told him [Shoe] he could make those calculations and be sure that Mr. Duvall understood that the assumptions based on service and salary were just those assumptions, and they were not commitments or guarantees." (Thurston Dep. at 102).


- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

The efforts to retain Duvall proved successful and Mr. Duvall, then age 50, accepted Polymer's offer and turned down the Dell Computer offer, believing that he would remain with DSM **[*7]** and Polymer until his retirement. n6 Despite Mr. Duvall's subjective belief that his alliance with DMS and Polymer was permanent, he concedes that no one explicitly guaranteed him

employment for a specific amount of time. (Duvall Dep. at 184-87). n7

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n6 I felt I had an implied agreement, that I had made my commitment, . . . I had a good, bona fide, hard offer in my hand, . . . It was one in which security is the issue and security is what's being thrown at you, there is    in my mind there was an implication that I had employment for   till I retired. And that's the commitment that I made in my mind to them. (Duvall Dep. at 127.)

n7 Upon questioning by counsel for Defendants, Duvall responded in the following manner:

Q. " Did you say to Mr. Thurston, I'm not going to stay unless you promise to me that I won't be terminated until I vest in the retirement plan and my normal retirement age at the year 2004?"

A. " No. I wish I had."

(Duvall Dep. at 186).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - -

Upon accepting the offer to remain **[\*8]**  at Polymer, Duvall took on the duties of Polymer's Chief Financial Officer ("CFO"). n8 In the fall of 1990, Duvall was appointed as Business Manager of its Custom Components and Hose business units. (Deposition of Thurston "Thurston Dep." at 146). n9 In December of 1991, Thurston evaluated Duvall's performance as CFO and Business Manager in Custom Components and Hose. Overall Duvall received a satisfactory review and received a merit increase in pay. The commentary section described Duvall as, "dependable, dedicated, committed manager." (Duvall Dep. Exhibit 11). Notwithstanding these positive comments, the evaluation contained strong criticism of Duvall's communication and interpersonal skills. n10

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n8 His responsibilities included overseeing: Polymer's financing needs; bookkeeping; internal reporting; tax requirements; insurance; external reporting; budgeting; and cash needs. (Thurston Dep. at 138-40; Duvall Dep. Ex. 15).

n9 Mr. Thurston stated that he appointed this position to Mr. Duvall because he felt Mr. Duvall was "someone who could take over that position and give it leadership." (Thurston Dep. p. 147). **[\*9]**

n10 The evaluation stated Duvall was

"intimidating and dictatorial with subordinates. Needs to change command and control approach. Needs to soften approach with own organization. Needs to make extra effort to welcome help from the rest of organization." (Duvall Dep. Exhibit 11; Thurston Dep. at 161-68).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

In late March of 1992, Polymer's corporate structure underwent major changes. Polymer decided to merge Custom Components with its Shapes unit. n11 As a result of the merger, Duvall's position as Business Manager of Custom Components was eliminated. Furthermore, by the fall of 1992, Duvall's role in the Finance Department had been significantly curtailed by Jerry Thurston due to problems in Duvall's interpersonal relationships with his co-workers. n12 As of late October 1992, Duvall no longer functioned as CFO. (Duvall Dep. at 169). Moreover, Duvall admits feeling that by mid-September 1992, his position as Business Manager of Hose seemed tenuous as well.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n11 The merger was part of Polymer's overall decision to restructure the company from a "business unit" dominated organization to a "classical functional organization." **[*10]**

n12 Mr. Thurston testified that,

> I told him [Duvall] that he had already alienated all his peers in middle management of the company by his dictatorial and intimidating, defensive, territorial approach; and that I was going to take him out of the mainstream of the company in order to try to let the dust settle so that hopefully we could put it back on the right track.

> I told him that eventually that the financial department would also have to be downsized; that I had not come to a final conclusion, but it was my opinion that with all the tasks that had been shifted out of the financial department, that it needed less people.

> And I told him that I was concerned about his position long-term, and that I was going to do everything I could to find him a position either in Polymer or DSM. But I was concerned about the long term validity of him as an employee of Polymer.

(Thurston Dep. at 177-78).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

By the end of 1992, Polymer decided to eliminate the Business Manager of Hose position. Although the Hose department was retained, all resources were now directed towards sales. (Hillege Dep. **[*11]** at 81-83). John Fisher, the Hose Sales Manager at the time, was appointed to head the sales unit. Mr. Hillege alleges that the job was offered to Mr. Fisher over Mr. Duvall because Mr. Duvall had no prior experience in sales, and Mr. Fisher already performed these functions in the unit. (Hillege Dep. at 81-83).

Moreover, further downsizing in the Finance Department resulted in the elimination of many

functions formerly allocated to the CFO. Not only was the CFO position eliminated, but the Controller function, held by one Mr. Hostetter, had been eliminated as well. The remaining tasks within the Finance Department were allocated to Mr. Carlson and Mr. Hums, who formerly had reported to Mr. Duvall. (Thurston Dep. at 185-87; Hillege Dep. at 84-86; Gremmen Dep. at 45-46, 56).

In late October 1992, Mr. Duvall was given notice that his employment with Polymer was terminated. As a result of the termination of his employment, Duvall asserts two claims arising under federal law, specifically, under the Age Discrimination in Employment Act, (ADEA), 29 U.S.C. § 621, (Count I) and under the Employees Retirement Income Security Act, (ERISA), 29 U.S.C. § 1001 (Count II). Furthermore, Duvall **[*12]** asserts two claims arising under the common law of Pennsylvania, breach of implied contract,(Count III) and estoppel (Count IV).

## II. STANDARDS FOR SUMMARY JUDGMENT

Summary judgment shall be granted when there are no genuine issues of material fact in dispute and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby Inc., 477 U.S. 242, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). In evaluating whether there are any disputed issues and whether they are both genuine and material, the Court must consider the facts in the light most favorable the party opposing summary judgment and all reasonable inferences must be drawn in favor of the nonmoving party. Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 637 (3d Cir. 1993); Gray v. York Newspapers , Inc., 957 F.2d 1070, 1077 (3d Cir. 1992).

In order to obtain summary judgment, the moving party must, on the basis of pleadings, depositions, answers to interrogatories, and admissions on file, demonstrate an absence of issues of material fact in dispute. **[*13]** Fed.R.Civ.P. 56(c). Once the moving party has satisfied this requirement, the burden shifts to the nonmoving party to present evidence that there is a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Furthermore, the nonmoving party is required to identify specifically the evidence upon which a verdict in its favor may be based. Childers v. Joseph, 842 F.2d 689 (3d Cir. 1987). Moreover, where the nonmoving party bears the burden of proof on an issue, it must identify evidence which suffices to establish every element essential to the claim. Celotex, 477 U.S. 317, 91 L. Ed. 2d 265, 106 S. Ct. 2548; Financial Services Corp., 812 F.2d 141 (3d Cir. 1987). When the record is such that it would not support a rational finding that an essential element of the nonmoving party's claim or defense exists, summary judgment must be entered for the moving party. Celotex, 477 U.S. at 322.

## III. AGE DISCRIMINATION CLAIMS

Under the ADEA it is unlawful for an employer to discriminate against an individual in hiring, discharge, compensation, terms, conditions, or privileges of employment on the basis of age. An age discrimination claim may be established **[*14]** by either direct or indirect evidence. Torre v. Casio, Inc., 42 F.3d 825 (3d Cir. 1994). Evidence is direct where, if believed by the trier of fact, proves the existence of the fact in issue without inference or presumption. Id.; Earley v. Champion Int'l Corp., 907 F.2d 1077, 1081 (11th Cir. 1990). Evidence is not direct, when the trier of fact must infer discrimination from actions and statements by the employer. Torres, 42 F.3d at 828. n13

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n13 When the evidence offered to prove the employer discriminated is direct, the shifting-burden analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), does not apply. Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 105 S. Ct. 613, 83

Get a Document - by Citation - 1995 U.S. Dist. LEXIS 14415

Case 1:04-cv-00285-KAJ    Document 38-2    Filed 05/03/2005    Page 23 of 25

Page 7 of 21

L. Ed. 2d 523 (1983); Gavalik v. Continental Can Co., 812 F.2d 834, 853 (3d Cir. 1987).

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

When attempting to establish an age discrimination claim by indirect evidence, a plaintiff's claim must be assessed using the shifting burden analysis developed for proof of [*15] discrimination claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq.. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973); McKenna v. Pacific Rail Service, 32 F.3d 820 (3d Cir. 1994). In order to make out a prima facie case under the shifting burden analysis, the plaintiff in an age discrimination case must show: (1) that he belongs to the protected class, i.e., is older than forty; (2) was qualified by training and experience for the position at issue; (3) was not hired or was dismissed despite his or her qualifications; (4) was ultimately replaced, or the position was filled, by a person sufficiently younger to permit an inference of age discrimination. Gray v. York Newspapers, Inc., 957 F.2d 1070 (3d Cir. 1992). Once the plaintiff proves a prima facie case, and thereby creates an inference of age discrimination, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse action. Id. n14 The defendant must set forth reasons for its actions, through introduction of admissible evidence, which would support a finding that unlawful discrimination [*16] was not the cause of the employment action. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 252-53, 101 S. Ct. 1089, 1093-94, 67 L. Ed. 2d 207 (1981); See Chipollini v. Spencer Gifts, Inc., 814 F.2d 893, 897-98 (3d Cir.) (in banc), cert. dismissed, 483 U.S. 1052, 108 S. Ct. 26, 97 L. Ed. 2d 815 (1987); Turner v. Schering-Plough Corp., 901 F.2d 335 (3d Cir. 1990). Defendant's burden is one of production only, not persuasion. " The employer need not prove that the tendered reason actually motivated its behavior, as . . . the ultimate burden of proving intentional discrimination rests with the plaintiff. Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994). If the employer successfully rebuts the prima facie case, the inference of age discrimination dissipates and drops from the case. The plaintiff then has the burden of proving, by a preponderance of the evidence, that the employer's proffered reason is pretextual and that unlawful discrimination was the reason underlying the adverse employment action. Gray, 957 F.2d 1070; Torre, 42 F.3d 825. It is essential to remember that the burden to persuade the trier of fact that age was a determinative factor [*17] in the termination decision remains with the plaintiff at all times. Turner, 901 F.2d at 342.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n14 Under the McDonnell Douglas scheme, "establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee." Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981). " To establish a presumption is to say that a finding of the predicate fact (here, the prima facie case) produces a conclusion in the absence of explanation". St. Mary's Honor Center v. Hicks, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993) (quoting 1 D. Louiselt & C. Mueller, Federal Evidence § 67, p. 536 (1977).

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

At trial, the plaintiff must convince the fact-finder "both that the reason was false, and that discrimination was the real reason." St. Mary's Honor Ctr. v. Hicks, 125 L. Ed. 2d 407, 113 S. Ct. 2742, 2752. The factfinder, however, may decide for the plaintiff if the employer's proffered legitimate, nondiscriminatory reason is rejected, since discrimination may then be inferred from [*18] the allegations of discrimination in plaintiff's prima facie case. Sempier v. Johnson & Higgins, 45 F.3d 724 (3d Cir. 1995).In order to prevail, it is not necessary that the plaintiff demonstrate that an illegitimate factor was the sole reason for the termination, but that it was a

"determinative factor." See, Hazen Paper Co. v. Biggins, 113 S. Ct. at 1706.

In order to successfully withstand a summary judgment motion, a plaintiff may either (i) discredit the proffered reasons, either circumstantial or directly, or (ii) adduce evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action. Sempier, 45 F.3d at 731 quoting Fuentes, 32 F.3d at 764. Thus, to defeat a summary judgment motion by discrediting a defendant's proffer of a nondiscriminatory reason, a plaintiff who has made a prima facie showing of discrimination need only present evidence establishing a reasonable inference that the employer's proffered explanation is unworthy of credence, thus raising an inference that the employer did not act for the asserted nondiscriminatory reasons. Fuentes v. Perskie, 32 F.3d 759 **[*19]** (3d Cir. 1994); Sempier v. Johnson & Higgins, 45 F.3d 724 (3d Cir. 1995). Moreover, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is not whether the employer was wise, but whether discrimination motivated the employer's actions. Fuentes, 32 F.3d at 765. A plaintiff may do so by showing evidence of inconsistencies and that could support an inference that the employer did not act for its stated reasons. Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 638 (3d Cir. 1993); Sempier, 45 F.3d 724.

The Third Circuit has stated that while this standard places a difficult burden on the plaintiff, "it arises from an inherent tension between the goal of all discrimination law and our society's commitment to free decision-making by the private sector in economic affairs." Fuentes, 32 F.3d at 765 quoting Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 531 (3d Cir. 1992).

This Court concludes that Duvall has not sufficently met his burden to overcome the motion for summary judgment on the ADEA claim. Although he has established a prima facie case, he has produced no real evidence to **[*20]** refute Defendants' legitimate reasons for his termination and produced insufficient evidence that discrimination was more likely than not a determinative cause of the adverse employment action.

A. The Prima Facie Case

Our initial focus is whether the Plaintiff has established a prima facie case. As stated previously, in order for a plaintiff to make out a prima facie case, a discharged employee must show the following elements: (1) that he belongs to a protected class, i.e., is older than forty; (2) was qualified by training and experience for the job from which he was discharged; and (3) was replaced by a person sufficiently younger to permit an inference of age discrimination. Turner v. Schering-Plough Corp., 901 F.3d 335, 342 (3d Cir. 1990) citing Sorba v. Pennsylvania Drilling Co., 821 F.2d 200, 202 (3rd Cir. 1987), cert denied, 484 U.S. 1019, 108 S. Ct. 730, 98 L. Ed. 2d 679 (1988). When the case involves a reduction in force, or plant closing, such that plaintiff's job is eliminated and, therefore, no replacement is required, the second and third elements of the prima facie case are merged and modified. Here the plaintiff must show: (1) membership in the protected **[*21]** class, and (2) discharge from a job in which plaintiff was qualified while other workers not in the protected were retained. Healy v. New York Ins. Co., 860 F.2d 1209, 1214 n.1 (3d Cir. 1988), cert denied 490 U.S. 1098, 104 L. Ed. 2d 1004, 109 S. Ct. 2449, (1989); Billet, 940 F.2d at 816 n.3; Capik v. E.R. Carpenter Co., Inc., 1991 U.S. Dist. LEXIS 18285, 1991 WL 269999 (E.D. Pa). Rather, in job elimination cases such as the one before us, the plaintiff must show that similarly situated younger employees were treated more favorably. Hill v. Bethlehem Steel Corp., 729 F. Supp. 1071, 1075 n.6 (E.D. Pa. 1989) aff'd 902 F.2d 1560 (3d Cir. 1990).

The Court concludes, for the purposes of the instant motion, that Duvall has established a prima facie case, and therefore, a presumption of age discrimination. Plaintiff was 52 at the time of his terminations and therefore a member of the ADEA protected class (over age forty). Duvall was terminated from an executive position, for which he was qualified. Two younger employees, not within the protected class, Mr. Carlson and Mr. Hums, who had previously reported to the Plaintiff, were retained in their financial positions, with Mr. Carlson **[*22]** receiving some of the

Get a Document - by Citation - 1995 U.S. Dist. LEXIS 14415

Case 1:04-cv-00285-KAJ    Document 38-2    Filed 05/03/2005    Page 25 of 25

Page 9 of 21

Plaintiff's former duties in finance. This assertion is sufficient to give rise to an inference of discrimination. " The prima facie case under the McDonnell Douglas- Burdine pretext framework is not intended to be onerous." Sempier, 45 F.3d at 728.

B. Defendant's Proffered Legitimate Nondiscriminatory Reason.

Having concluded that the Plaintiff has established the elements of a prima facie case, the burden of production now shifts to Defendants to articulate a legitimate, nondiscriminatory reason for dismissing Duvall. The Defendants' proffered reason for Duvall's termination are: (1) Polymer's corporate reorganization eliminated substantially all of his job functions; and (2) Duvall was not qualified to fill any management level position available following the reorganization.

As evidence of their first articulated reason, the Defendants have come forth with an abundance of deposition testimony which demonstrates that significant downsizing within Polymer occurring between late 1991 and early 1993 essentially eliminated most of Duvall's duties. n15 They assert that as a result of restructuring, there were not enough functions left in the Finance [*23] Department to justify a position at Duvall's level. Theodorus Gremmen, a chief executive for DSM stated, " I think what happened was that since the acquisition, the tasks within Polymer was substantially reduced because of restructuring, because of less figures, basically there was no need for a high financial officer. (Deposition of Theo Gremmen at 45). The remaining responsibilities within the Finance Department were allocated to existing staff members, Mr. Carlson and Mr. Hums. n16 Defendants correctly submit that they had no duty to terminate the younger employees within the department in order to preserve a position for the Plaintiff. See Capik v. E.R. Carpenter Company, Inc., 1991 U.S. Dist. LEXIS 18285, 1991 WL 269999 (E.D. Pa.); Naas v. Westinghouse Electric Corporation, 818 F. Supp. 874, 878 (W.D. Pa. 1993).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n15 Between late 1991 and early 1993, the following changes occurred in Polymer's Finance Department:

- Polymer transferred or sold all of its subsidiaries, which formerly reported to Polymer's CFO, to its divisional headquarters in Belgium.

- Polymer hired controllers to do accounting for other DSM companies, for which Polymer had provided accounting for in the past.

- A separate DSM company took over responsibility for treasury and cash management functions for all DSM companies in North America.

- DSM began to take care of all of Polymer's cash needs, eliminating need to deal directly with third parties for loans.

- At least one significant financial management initiative formerly under Duvall's control was fully implemented and integrated into the company, no longer requiring substantial attention. (Thurston Dep. at 185-187; Deposition of Jan Hillege at 84-86; Deposition of Theo Gremmen at 45-46). [*24]

n16 At the time of the downsizing, Mr. Carlson was age 40 and Mr. Hums was in his thirties.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -