support use of the continuing violation theory, the 300-day filing period is irrelevant. See id. Consequently, plaintiff may present evidence of the entire continuing violation. n11 See id.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n8 Although in the charge, plaintiff alleged the first and last dates of discrimination as being November 1981 and November 10, 1994, respectively, she also indicated that the discriminatory activity was continuing.

n9 Plaintiff filed the requisite EEOC charge on September 25, 1995. Consequently, the 300-day retrospective limitations period began to run on November 9, 1994.

n10 In many, if not most, of her allegations, plaintiff fails to specify the date of the purported discriminatory conduct. However, viewing the facts and all reasonable inferences therefrom in the light most favorable to the plaintiff, sufficient indicia exist for the court to discern a continuous pattern of allegedly discriminatory conduct.

n11 Since the court has already concluded that plaintiff's hostile work environment claim falls within the scope of the EEOC investigation, plaintiff also may present evidence of incidents of sexual harassment occurring subsequent to the filing of the charge. See Robinson v. Dalton,, 107 F.3d 1018 at 1025; Waiters, 729 F.2d at 235.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*26]**

## C. Plaintiff's Hostile Environment Claim

Defendant next contends that plaintiff has failed to produce sufficient evidence to establish a prima facie case of hostile work environment under Title VII. The Supreme Court has recognized that *HN12* Title VII is violated by a "work environment abusive to employees because of their race, gender, religion, or national origin." Harris v. Forklift Systems, Inc., 510 U.S. 17, 22, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993); see also Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 66, 91 L. Ed. 2d 49, 106 S. Ct. 2399 (1986) ("[A] plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment."). To be cognizable within the meaning of Title VII, the harassment "must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" Meritor Sav. Bank, FSB, 477 U.S. at 67 (quoting Henson v. Dundee, 682 F.2d 897, 904 (11th Cir. 1982). In order to establish a hostile work environment,

a plaintiff must establish "by the totality of the circumstances, the existence of a hostile **[*27]** or abusive working environment which is severe enough to affect the psychological stability of a minority employee."

Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir. 1990) (quoting Vance v. Southern Bell Tel. & Tel. Co., 863 F.2d 1503, 1510 (11th Cir. 1989). Specifically, *HN13* a plaintiff must demonstrate that:

Get a Document - by Citation - 1998 U.S. Dist. LEXIS 9100

Case 1:04-cv-00285-KAJ    Document 38-4    Filed 05/03/2005    Page 2 of 25
Page 15 of 16

(1) the employees suffered intentional discrimination because of their sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability.

Id.

Defendant argues that plaintiff has failed to make the specific allegations required to establish factors four and five of the Andrews test. n12 In addressing the objective standard of factor four, the Third Circuit noted:

> HN14
> To make out a case under Title VII it is "only necessary to show that gender is a substantial factor in the discrimination, and that if the plaintiff 'had been a man she would not have been treated in the same manner.'"

895 F.2d at 1485 (quoting [*28] Tomkins v. Public Serv. Elec. & Gas Co., 568 F.2d 1044, 1047 n.4 (3d Cir. 1977) (citation omitted)). The court went on to hold that "the pervasive use of derogatory and insulting terms relating to women generally and addressed to female employees personally may serve as evidence of a hostile environment." Id. Review of the record reveals that plaintiff has alleged incidents involving demeaning comments, inappropriate touching, pornographic material, and discriminatory conduct. Considered as a whole and in a light most favorable to plaintiff, the court concludes that a reasonable juror could conclude that these incidents "produce a work environment hostile and offensive to women of reasonable sensibilities." 895 F.2d at 1486.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n12 Defendant does not dispute that plaintiff has alleged sufficiently factors one, two, and three.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

In accord with the agency principles, HN15 to establish respondeat superior liability as required by the fifth factor, a plaintiff must demonstrate

> that management-level employees [*29] had actual or constructive knowledge about the existence of a sexually hostile environment and failed to take prompt and adequate remedial action.

Id. Defendant argues that by statute only Nold, the Executive Director of OIS, had sufficient authority so as to be an agent for Title VII purposes and that since plaintiff does not assert that

Get a Document - by Citation - 1998 U.S. Dist. LEXIS 9100

Case 1:04-cv-00285-KAJ    Document 38-4    Filed 05/03/2005    Page 3 of 25

Page 16 of 16

Nold knew of the alleged hostile environment, defendant has no liability under Title VII. The Third Circuit, however, has stated that, *HN16* under Title VII, "'the act of a supervisory employee or agent is imputed to the employer.'" Levendos v. Stern Entertainment, Inc., 909 F.2d 747, 751 (3d Cir. 1990) (quoting Meritor Sav. Sank, FSB, 477 U.S. at 75). In Levendos, the Third Circuit found that a person with the power to hire and fire, or influence hiring and firing decisions, is a supervisory agent of the employer. See 909 F.2d at 751-52; Antol, 82 F.3d at 1301 (finding that an employee's discriminatory acts may be imputed to the employer if the employee is within "'the chain of decision-makers who had the authority to hire and fire plaintiff'") (quoting Gomez v. Allegheny Health Services, Inc., 71 F.3d 1079, 1085 (3d Cir. [*30] 1995). Thus, even if Nold was the only individual with the authority to hire and fire and was without knowledge of the sexually hostile environment, respondeat superior liability could still be found as long as a supervisory employee in a position to affect plaintiff's work situation subjected her to sexual harassment, i.e, contributed to the hostile work environment. See Harris, 510 U.S. at 21-23.

Review of the record reveals that plaintiff has produced sufficient evidence to establish respondeat superior liability. Plaintiff has alleged that Iovino, her manager, not only acquiesced in, but also wilfully and intentionally participated in, the hostile work atmosphere. She also contends that she complained repeatedly to her supervisor as well as to Iovino of the discriminatory treatment but to no avail. A reasonable jury could conclude that Iovino, as well as plaintiff's supervisor, are middle-management employees whose actions are properly imputed to defendant. Accordingly, the court concludes that the five-part Andrews test has been satisfied and plaintiff's claim for hostile work environment should go forward.

## IV. CONCLUSION

For the reasons stated above, the [*31] court finds that there exist genuine issues of material fact relating to plaintiff's claims of hostile environment discrimination under Title VII. The court further finds that to the extent plaintiff alleges failure to promote or advance claims in Counts I, III, and V, they shall be dismissed for failure to exhaust administrative remedies. Therefore, defendant's motion to dismiss shall be denied in part and granted in part. An appropriate order shall issue.

Service: **Get by LEXSEE®**
Citation: **1998 U.S. Dist. LEXIS 9100**
View: Full
Date/Time: Monday, May 2, 2005 - 8:14 PM EDT

* Signal Legend:
🌑 - Warning: Negative treatment is indicated
Q - Questioned: Validity questioned by citing refs
⚠ - Caution: Possible negative treatment
❖ - Positive treatment is indicated
A - Citing Refs  With Analysis Available
i - Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case

About LexisNexis | Terms and Conditions

Copyright © 2005 LexisNexis, a division of Reed Elsevier Inc  All rights reserved.

Service: **Get by LEXSEE®**
Citation: **2001 U.S. Dist. LEXIS 3607**

*2001 U.S. Dist. LEXIS 3607, *; 143 Lab. Cas. (CCH) P34,248;*
*11 Am. Disabilities Cas. (BNA) 1509; 6 Wage & Hour Cas. 2d (BNA) 1621*

MICHAEL J. KEESHAN, Plaintiff, v. THE HOME DEPOT, U.S.A., INC., MICHAEL RIZK and GREGG SMITH, Defendants.

CIVIL ACTION NO. 00-529

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2001 U.S. Dist. LEXIS 3607; 143 Lab. Cas. (CCH) P34,248; 11 Am. Disabilities Cas. (BNA) 1509; 6 Wage & Hour Cas. 2d (BNA) 1621

March 27, 2001, Decided

**DISPOSITION:** [*1] Motion GRANTED.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Defendant former employer moved for summary judgment in plaintiff former employee's action alleging violation of the Americans with Disabilities Act, 42 U.S.C.S. § 12101 et seq., the Family and Medical Leave Act, 29 U.S.C.S. § 2601 et seq., the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. § 951 et seq., and state law defamation.

**OVERVIEW:** Plaintiff former employee brought an action against defendant former employer alleging violation of the Americans with Disabilities Act (ADA), 42 U.S.C.S. § 12101 et seq., the Family and Medical Leave Act (FMLA), 29 U.S.C.S. § 2601 et seq., the Pennsylvania Human Relations Act (PHRA), 43 Pa. Cons. Stat. § 951 et seq., and state law defamation, following his termination. Defendant moved for summary judgment, claiming that plaintiff failed to prove prima facie violations of the ADA, FMLA, PHRA, and that its allegedly defamatory statements were true. The court granted summary judgment for defendant, holding that plaintiff failed to establish his prima facie case of discrimination under the ADA due to his inability to prove a disability, and he failed to show defendant's reason for termination was pretextual. The court further held that plaintiff failed to show prima facie violations of the FMLA or PHRA, and that defendant's allegedly defamatory statements were true.

**OUTCOME:** Summary judgment was granted for defendant former employer because plaintiff former employee failed to prove prima facie violations of the Americans with Disabilities Act, the Family and Medical Leave Act, the Pennsylvania Human Relations Act, or state law defamation.

**CORE TERMS:** voucher, petty cash, termination, retaliation, store manager, summary judgment, prima facie case, terminated, fifty-five, work week, disability, defamation, pretext, reasonable accommodation, defamation claim, non-discriminatory, causal connection, theft, fraudulent act, full-time, accommodation, slander, defamatory, temporal proximity, defamatory statement, retaliatory, burden-shifting, discriminatory, preponderance, survive

**LexisNexis(R) Headnotes** ✦ Hide Headnotes

Civil Procedure > Summary Judgment > Summary Judgment Standard 

**HN1** Summary judgment is appropriate when, after considering the evidence in the light most favorable to the nonmoving party, no genuine issue of material fact remains in dispute and the moving party is entitled to judgment as a matter of law. The inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law. More Like This Headnote

Civil Procedure > Summary Judgment > Burdens of Production & Proof

**HN2** On a motion for summary judgment, the moving party carries the initial burden of demonstrating the absence of any genuine issues of material fact. Once the moving party has produced evidence in support of summary judgment, the nonmovant must go beyond the allegations set forth in its pleadings and counter with evidence that demonstrates there is a genuine issue of fact for trial. More Like This Headnote

Civil Procedure > Summary Judgment > Summary Judgment Standard

**HN3** Summary judgment must be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. More Like This Headnote

Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions

**HN4** The Americans with Disabilities Act, 42 U.S.C.S. § 12101 et seq., prohibits discrimination against qualified individuals with a disability by covered entities. 42 U.S.C.S. § 12112(a). More Like This Headnote

Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions

**HN5** In order to establish a prima facie case of discrimination under the Americans with Disabilities Act (ADA), 42 U.S.C.S. § 12101 et seq., a plaintiff must be able to establish that (1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination. More Like This Headnote

Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions

**HN6** See 42 U.S.C.S. § 12112.

Labor & Employment Law > Discrimination > Disability Discrimination > Other Laws

**HN7** The legal analysis for an Americans with Disabilities Act, 42 U.S.C.S. § 12101 et seq., claim is identical to that of a claim submitted under the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. § 951 et seq. More Like This Headnote

Labor & Employment Law > Discrimination > Disparate Treatment
Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions

**HN8** The McDonnell Douglas burden-shifting framework applies to disparate treatment and retaliation claims under the Americans with Disabilities Act, 42 U.S.C.S. § 12101 et seq. The McDonnell Douglas framework consists of three stages: the plaintiff must first establish a prima facie case of discrimination; then, once the prima facie case is established, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection. Finally, should the defendant carry this burden, the plaintiff then must have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. Although the burden of production may shift, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. More Like This Headnote

Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions

HN9 The Americans with Disabilities Act, 42 U.S.C.S. § 12101 et seq., defines disability as: (A) a physical or mental impairment that substantially limits one or more of the major life activities of an individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment. 42 U.S.C.S. § 12102(2); 29 C.F.R. § 1630.2 (g)(1999).  More Like This Headnote

Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions

HN10 The court is guided by the regulations issued by the Equal Employment Opportunity Commission to implement the Americans with Disabilities Act, 42 U.S.C.S. § 12101 et seq.  More Like This Headnote

Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions

HN11 A qualified individual, as defined by the Americans with Disabilities Act, 42 U.S.C.S. § 12101 et seq., is a person who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. 42 U.S.C.S. § 12111(8). The applicable regulations divide this inquiry into two prongs: (1) whether the individual has the requisite skill, experience, education and other job requirements of the position and (2) whether the individual, with or without reasonable accommodation can perform the essential functions of the position. 29 C.F.R. § 1630.2(m).  More Like This Headnote

Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions

HN12 The term "essential functions" is defined to include the fundamental job duties of a particular position. 29 C.F.R. § 1630.2(n)(1). The determination of whether a certain function is essential is factual and made on a case-by-case basis. 29 C.F.R. § 1630.2 (n). Some evidence which determines whether a job function is essential includes: the employer's judgment as to what functions of a job are essential; the amount of time spent on the job performing the particular function; the consequences of not requiring the job holder to perform the function; and the number of other employees available among whom the performance of a particular function may be distributed.  More Like This Headnote

Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions

HN13 Evidence of whether a particular function is essential includes the employer's judgment as to which functions are essential. 29 C.F.R. § 1630.2(n)(3) (i).  More Like This Headnote

Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions
Civil Procedure > Summary Judgment > Burdens of Production & Proof

HN14 In order to make a prima facie case of disability discrimination to defeat a motion for summary judgment, the plaintiff bears the burden of establishing that he can perform the essential functions of his position with reasonable accommodation. Reasonable accommodations does not mean eliminating an essential function of the job, or requiring an employer to restrict a person's job duties to those which the individual can perform.  More Like This Headnote

Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions

HN15 By requesting an employer to do away with the requirements of a job, the accommodation sought is an exception from the rule and deletion of an element of the job. The Americans with Disabilities Act, 42 U.S.C.S. § 12101 et seq., does not mandate that the employer create a light duty or new permanent position.  More Like This Headnote

Labor & Employment Law > Discrimination > Disparate Treatment
Civil Procedure > Summary Judgment > Summary Judgment Standard 🔁
HN16⬇ At the summary judgment stage, with regard to the third step of the McDonnell Douglas tripartite analysis, a plaintiff may defeat a motion for summary judgment by pointing to some evidence, direct or circumstantial, from which a factfinder would reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. More Like This Headnote

Labor & Employment Law > Discrimination > Disparate Treatment
HN17⬇ In order for a plaintiff to rebut a defendant's proffered reason, he cannot simply show that the employer's decision was wrong or mistaken. Rather, he must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the defendant's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the defendant did not act for the asserted non-discriminatory reasons. More Like This Headnote

Labor & Employment Law > Discrimination > Retaliation 🔁
Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions 🔁
HN18⬇ An individual who is adjudicated not to be a qualified individual with a disability may still pursue a retaliation claim under the Americans with Disabilities Act, 42 U.S.C.S. § 12101 et seq. More Like This Headnote

Labor & Employment Law > Discrimination > Retaliation 🔁
Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions 🔁
HN19⬇ In order to establish a prima facie case of retaliation under the Americans with Disabilities Act (ADA), 42 U.S.C.S. § 12101 et seq., a plaintiff must show (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action. Similar to claims of disparate treatment under the ADA, the McDonnell Douglas burden-shifting framework applies to ADA retaliation claims. More Like This Headnote

Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Enforcement 🔁
Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions 🔁
HN20⬇ A plaintiff must first file a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) and receive a right-to-sue letter in order to sue an employer under the Americans with Disabilities Act (ADA), 42 U.S.C.S. § 12101 et seq. The scope of the civil complaint is accordingly limited by the charge filed with the EEOC and the investigation which can reasonably be expected to grow out of that charge. In order to decipher whether a plaintiff is required to exhaust his administrative remedies, it must be determined whether the acts alleged in the subsequent suit are fairly within the scope of the prior EEOC complaint, or the investigation arising therefrom. More Like This Headnote

Labor & Employment Law > Leaves of Absence > Family & Medical Leave 🔁
HN21⬇ Under 29 U.S.C.S. § 2615(a)(2), it is unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter. The proper analysis for 29 U.S.C.S. § 2615(a)(2) claims is the McDonnell Douglas burden shifting approach. In order to prove a prima facie case of retaliation under the Family and Medical Leave Act (FMLA), 29 U.S.C.S. § 2601 et seq., a plaintiff must show: (1) he is protected under the FMLA, (2) he suffered an adverse employment action and (3) a causal connection exists between

the adverse decision and plaintiff's exercise of his or her FMLA
rights.  More Like This Headnote

Labor & Employment Law > Leaves of Absence > Family & Medical Leave 👯ALL
HN22⬇Pursuant to the Family and Medical Leave Act (FMLA), 29 U.S.C.S. § 2601 et seq., an
eligible employee shall be entitled to a total of 12 work weeks of leave during any 12-
month period because of a serious health condition that makes the employee unable
to perform the functions of the position of such employee. 29 U.S.C.S. § 2612(a)(1)
(D). Under the FMLA, an eligible employee is a person who has been employed for at
least 12 months by the employer with respect to whom leave is requested under
section 2612 of this title; and for at least 1,250 hours of service with such employer
during the previous 12-month period. An employee who takes FMLA leave shall be
entitled, on return from such leave, to be restored by the employer to the previous
position or to be restored to an equivalent position with equivalent employment
benefits, pay, and other terms and conditions of employment.  More Like This Headnote

Labor & Employment Law > Leaves of Absence > Family & Medical Leave 👯ALL
HN23⬇29 U.S.C.S. § 2615(a)(2) applies to claims of retaliation and discrimination under the
Family and Medical Leave Act, 29 U.S.C.S. § 2601 et seq. More Like This Headnote

Labor & Employment Law > Discrimination > Retaliation 👯ALL
HN24⬇It is established that a causal connection between an employee's protected activity
and an adverse action by his employer may be inferred if the events occurred close in
temporal proximity to each other. However, even if timing alone could ever be
sufficient to establish a causal link, the timing of the alleged retaliatory action must
be unusually suggestive of retaliatory motive before a causal link will be inferred. If
temporal proximity is lacking, the mere passage of time is not legally conclusive proof
against retaliation. In the case where temporal proximity is absent, a plaintiff can
establish a causal link if able to prove that the employer engaged in a pattern of
antagonism in the intervening period.  More Like This Headnote

Torts > Defamation & Invasion of Privacy > Defamation Actions 👯ALL
HN25⬇Defamation is fundamentally a state cause of action, even though a defamation suit
has profound U.S. Const. amend. I implications. Pennsylvania has a flexible approach
to choice of law which combines the "most significant relationship" analysis of
Restatement (Second) of Conflict of Laws with governmental interests
analysis.  More Like This Headnote

Torts > Defamation & Invasion of Privacy > Defamation Actions 👯ALL
HN26⬇A statement is defamatory if it tends so to harm the reputation of another as to lower
him in the estimation of the community or to deter third persons from associating or
dealing with him. In deciding whether a statement is defamatory, a court must
examine the meaning of the allegedly defamatory statement in context, and must
evaluate the effect it is fairly calculated to produce, the impression it would naturally
engender, in the minds of the average persons among whom it is intended to
circulate. In order to have a claim of defamation, a statement must be capable of a
defamatory meaning, it is not enough that a statement be embarrassing or
annoying.  More Like This Headnote

Torts > Defamation & Invasion of Privacy > Defamation Actions 👯ALL
HN27⬇Under Pennsylvania law, the elements of a prima facie case of defamation are: (1)
the defamatory character of the communication; (2) its publication by the defendant;
(3) its application to the plaintiff; (4) its understanding by the recipient of its
defamatory meaning; (5) the understanding by the recipient of it as intended to be

applied to the plaintiff; (6) special harm resulting to the plaintiff from its publication; and (7) abuse of a conditionally privileged occasion. When applicable to the defense, the defendant has the burden of proving: (1) the truth of the defamatory communication; (2) the privileged character of the occasion on which it was published; or (3) the character of the subject matter of defamatory comment as of public concern. More Like This Headnote

Torts > Damages
HN28₊ In Pennsylvania, the term "special damages" includes such actual and concrete damages capable of being estimated in money. More Like This Headnote

Torts > Defamation & Invasion of Privacy > Slander
HN29₊ In Pennsylvania, a plaintiff is not required to prove special harm in a claim for defamation where the spoken words constitute slander per se. Slander per se consists of four categories of words imputing: (1) criminal offense, (2) loathsome disease, (3) business misconduct, or (4) serious sexual misconduct. A statement constitutes slander per se as an accusation of criminality when it charges either directly or indirectly the commission of a specific offense punishable by imprisonment. More Like This Headnote

Torts > Defamation & Invasion of Privacy > Slander
HN30₊ A statement is per se slanderous as an accusation of business misconduct if one who publishes a slander that ascribes to another conduct, characteristics or a condition that would adversely affect his fitness for the proper conduct of his lawful business, trade or profession, or of his public or private office, is subject to liability without proof of special harm. More Like This Headnote

Torts > Defamation & Invasion of Privacy > Defamation Actions
HN31₊ It is for the court to determine whether the statement at issue is capable of a defamatory meaning. More Like This Headnote

Torts > Defamation & Invasion of Privacy > Defamation Actions
HN32₊ Truth is an absolute defense to defamation in Pennsylvania. The truth required to avoid liability for defamation is not complete truth, but rather substantial truth. Although there is no set formula for substantial truth, proof of substantial truth must go to the gist or sting of the alleged defamatory matter. In determining whether substantial truth is a defense to a defamation claim, the test is whether the alleged libel as published would have a different effect on the mind of the reader from which the pleaded truth would have produced. More Like This Headnote

**COUNSEL:** For MICHAEL J. KEESHAN, PLAINTIFF: DOLORES M. TROIANI, PAOLI, PA USA.

For THE HOME DEPOT U.S.A., INC., MICHAEL RIZK, GREGG SMITH, DEFENDANTS: MELISSA C. ANGELINE, MORGAN, LEWIS & BOCKIUS, PHILA, PA USA.

**JUDGES:** Robert F. Kelly, J.

**OPINIONBY:** Robert F. Kelly

**OPINION: MEMORANDUM**

ROBERT F. KELLY, J.

MARCH 27, 2001

Before this Court is the Motion for Summary Judgment filed by Defendants, the Home Depot, U.S.A., Inc. ("Home Depot"), Michael Rizk ("Mr. Rizk") and Gregg Smith ("Mr. Smith") (collectively referred to as "Defendants"). Michael Keeshan ("Mr. Keeshan") brought this action against the Defendants seeking relief under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq., the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951 et seq., and Pennsylvania law of Defamation. n1 For the reasons set forth below, the Motion is granted.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 The Court has jurisdiction over Mr. Keeshan's ADA and FMLA claims pursuant to 28 U.S.C. section 1331. The Court has supplemental jurisdiction over Mr. Keeshan's PHRA claim and defamation claim pursuant to 28 U.S.C. section 1367.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

[*2]

## I. BACKGROUND

The facts relevant to this discussion, and viewed in the light most favorable to Mr. Keeshan, are as follows. Mr. Keeshan began working as a salesperson for Home Depot in April, 1991. (Compl., P 10.) In 1993 Mr. Keeshan was promoted to the position of Assistant Store Manager. n2 (Id.) He remained an Associate Store Manager until his termination on June 16, 1998. (Id.) Beginning in 1996, Mr. Keeshan experienced difficulties with his back that restricted his movements at work. (Compl., P 11.) In 1997, these back difficulties cumulated into a medical diagnosis of a left posterior disc herniation and bilateral spondylolysis. (Id.) On November 7, 1997, Mr. Keeshan under went corrective surgery on his back. n3 (Id.)

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n2 There is a discrepancy regarding when Mr. Keeshan was promoted to Assistant Store Manager. Mr. Keeshan's Complaint states that "he was promoted to the position of Assistant Store Manager in 1993." (Compl., P 10.) Whereas in Mr. Keeshan's deposition and Defendants' Motion for Summary Judgment, it appears as if Mr. Keeshan was promoted to Assistant Store Manager in 1994. (Keeshan Dep. at 14-16; Defs.' Mot. for Summ. J., P 7.) The exact date that Mr. Keeshan was promoted to Assistant Store Manager is not in dispute and is immaterial, therefore, the Court will rely upon the 1993 date cited in Mr. Keeshan's Complaint. [*3]

n3 Specifically, Mr. Keeshan's back surgery included a laminectomy with excision of HNP and spinal fusion at L5-S1. (Compl., P 11.)

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

Prior to his surgery, on or about November 3, 1997, Mr. Keeshan applied for FMLA leave for the period between November 10, 1997 and February 15, 1998. (Defs.' Mot. for Summ. J., P 10.) Mr. Keeshan's request for FMLA leave was approved by Home Depot and such leave went into effect on November 10, 1997. (Id.) Even though Mr. Keeshan's FMLA was exhausted as of February 16, 1998, Home Depot extended Mr. Keeshan's leave by one week, whereby Home

Depot continued to pay Mr. Keeshan his full salary until his return on February 23, 1998. (Id. P 20.) Upon Mr. Keeshan's return to work, Mr. Keeshan's doctor restricted the number of hours he was permitted to work and prohibited him from lifting or stooping. (Compl., P 11.)

Initially, Mr. Keeshan worked on a part-time basis for several months. (Defs.' Mot. for Summ. J., P 23.) He was given reduced hours and was assigned to one department, in comparison to his normal two department assignment, and he was able to request [*4] assistance whenever he needed help lifting. (Id. PP 23, 24.) On or about May 11, 1998, Mr. Keeshan gave Rebecca Stauffer, a Loss Prevention Supervisor for Home Depot, a copy of a May 4, 1998 note from his doctor limiting the maximum hours Mr. Keeshan could work to forty hours and prohibiting Mr. Keeshan from any lifting. (Id. P 30.) Although the doctor's note restricted Mr. Keeshan's hours to a forty hour work week maximum, Home Depot scheduled him to work in excess of forty hours. n4 (Compl., P 12.)

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n4 The standard work week for an Assistant Store Manager is fifty-five hours per week. (Defs.' Mot for Summ. J., P 26; Keeshan Dep. at 127.) Mr. Rizk, Mr. Keeshan's supervisor, claims that he scheduled Mr. Keeshan for the standard fifty-five hour Assistant Store Manager work week because he did not see the doctor's note and because Mr. Keeshan had told him that he could work full-time, but with some lifting restrictions. (Id. P 30.) Mr. Rizk assumed that full-time meant the standard fifty-five hour full-time work week of an Assistant Store Manager. (Id.)

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - [*5]

During Mr. Keeshan's return to Home Depot, he was accused of violating company policy on three separate occasions. (Defs.' Mot. for Summ. J., PP 28, 29, 33-40.) The first incident occurred on March 7, 1998, when Mr. Keeshan stopped two customers and caused them to be searched for shoplifting. (Id. P 28.) As a result of this conduct, Home Depot was contacted by an attorney representing the two customers and Home Depot paid a cash settlement. (Id.) On March 16, 1998, Mr. Keeshan was given an Associate Performance Notice involving this shoplifting incident stating that he had violated a Home Depot policy and exposed Home Depot to potential liability. (Id. P 28.) Mr. Keeshan was given a second Associate Performance Notice for a March 21, 1998 incident, when he failed to open a Home Depot store on time. (Keeshan Dep. at 187.) On that date, Mr. Keeshan was scheduled to open the store at 4:45 a.m. (Id. at 188, 189.) Mr. Keeshan was unaware that he was scheduled to work on that date, and as a result the store was opened two hours late. (Id.; Defs.' Mot. for Summ. J., P 29.)

Lastly, on June 16, 1998, Home Depot terminated Mr. Keeshan's employment on the premise that he [*6] fraudulently submitted a petty cash voucher for travel expenses he did not incur and for which he lacked approval. n5 (Defs.' Mot. for Summ. J., P 40.) On June 1, 1998, Mr. Keeshan was temporarily assigned to the Home Depot store in Bethlehem, Pennsylvania. (Defs.' Mot. for Summ. J., P 33.) On his way to work, Mr. Keeshan mistakenly drove to the Reading, Pennsylvania store, and as a result, he drove additional miles than were necessary and incurred a toll that he would not normally incur during his regular commute. (Id.)

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n5 Mr. Keeshan provides the Court with very little factual detail about the petty cash voucher incident in his Complaint and in his Response to Defendants' Motion for Summary Judgment. Therefore, the Court has analyzed all of the evidence provided, in a light most favorable to the Plaintiff, in order to provide an accurate factual account of the petty cash voucher incident.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Once he reached the Bethlehem store, Mr. Keeshan obtained a petty cash voucher for reimbursement of the twenty-seven **[*7]** dollars he had expended and sought a signature of approval in order to receive his funds. n6 (Defs.' Mot. for Summ. J., PP 34-36.) At the time of this incident, Home Depot had a policy that only Store Managers could approve petty cash vouchers. n7 Mr. Keeshan requested a signature of approval on his petty cash voucher from Mark Boehm ("Mr. Boehm"), then Assistant Manager of the Bethlehem store. n8 (Boehm Dep. at 13, 14.) Mr. Boehm refused to sign the "approved by" line of Mr. Keeshan's voucher because he was an Assistant Store Manager and, according to Home Depot's policy, only Store Managers had authority to approve employee cash reimbursements. (Id. at 14.) However, Mr. Boehm agreed to sign the "issued by" line of the voucher, and explained to Mr. Keeshan that he did not approve the twenty-seven dollar reimbursement. (Id.)

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n6 Home Depot has a policy of reimbursing company-related travel expenses to its employees. (Defs.' Mot. for Summ. J., Ex. 7.) The policy states that "only mileage driven in excess of the associate's normal commuting to work is reimbursable." (Id.)

n7 Through the evidence presented to the Court, including depositions, incident reports written by Home Depot employees at the time of the petty cash voucher incident, and Associate Incident Reports written about the incident, the Court finds that the store manager approval policy was in place in this geographic area and that Mr. Keeshan was aware of the policy at the time of this incident. See Defs.' Mot. for Summ. J., Exs. 20, 21, 22, 23; Keeshan Dep. at 195-200; McAlister Dep. at 35-54; Boehm Dep. at 15-27; Belanger Dep. at 10-14; Smith Dep. at 37-49; Wernicki Dep. at 22; Dupreay Dep. at 17-19; and Rizk Dep. at 60-63. **[*8]**

n8 It is disputed whether Mr. Keeshan requested an approval signature for the petty cash voucher from Brian McAlister ("Mr. McAlister"), a District Manager. Mr. Keeshan denies that he requested Mr. McAlister's signature. (Keeshan Dep. at 195.) However, Mr. McAlister has testified that Mr. Keeshan requested his signature and he denied the request, explaining to Mr. Keeshan the policy that such voucher requires a Store Manager's approval. (McAlister Dep. at 45, 46.) Mr. McAlister further states that Mr. Keeshan told him that he was aware of the policy and when questioned about his knowledge, he reiterated back to Mr. McAlister that Store Managers had to sign petty cash vouchers. (Id.)

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Nonetheless, Mr. Keeshan presented the voucher to Richard Belanger ("Mr. Belanger"), who, at that time, worked in the store's bookkeeping department and had authority to issue reimbursement of properly authorized petty cash vouchers from the vault. (Belanger Dep. at 10.) The regular practice was once Mr. Belanger received a cash voucher with the "approved by" line signed by a store manager, he would sign or initial **[*9]** the "issued by" line of the voucher and pay the employee. (Id. at 10, 11.) In this case, Mr. Belanger assumed that Mr. Boehm had approved the voucher, but had signed the incorrect line, so he initialed the "approved by" line and paid Mr. Keeshan. (Id. at 11-14.)

Subsequently, Mr. Smith, then Regional Loss Prevention Supervisor, looked into Mr. Keeshan's June 1, 1998 petty cash voucher. (Defs.' Mot. for Summ. J., P 38.) Mr. Smith investigated the

circumstances of the petty cash voucher incident and determined that Mr. Keeshan had not obtained the proper approval for payment of the voucher. (Id. P 39.) Mr. Smith reported his findings to Mr. McAlister, Mr. Rizk and Amy Booe ("Ms. Booe"), a Human Resources Manager. (Id.) On June 16, 1998, Mr. Keeshan met with Mr. Smith and Mr. Rizk about the petty cash voucher. (Compl., P 14.) At this meeting, Mr. Keeshan explained his version of the events. (Defs.' Mot. for Summ. J., P 40.) In this same meeting, after Mr. Keeshan's explanation, Mr. Smith called Mr. McAlister and/or Ms. Booe and the parties decided to terminate Mr. Keeshan's employment for fraudulent submission of a petty cash voucher for travel expenses not incurred and **[*10]** for which he lacked approval. (Id.) As a result, Mr. Keeshan was immediately terminated on June 16, 1998. (Id.)

Also on or about June 16, 1998, Mr. Keeshan contacted Carol Freitag ("Ms. Freitag"), then Home Depot's Vice-President of Human Resources for the Northeast Region, about his termination. (Defs.' Mot. for Summ. J., P 42.) Ms. Freitag promptly investigated the facts surrounding Mr. Keeshan's termination and concurred with managements' decision to terminate Mr. Keeshan based on a fraudulent act involving the petty cash voucher. (Id. P 43.) On June 22, 1998, at the conclusion of her investigation, Ms. Freitag telephoned Mr. Keeshan and informed him of her conclusion. (Id. P 46.) Ms. Freitag then sent Mr. Keeshan a letter dated June 30, 1998, which outlined her reasons for supporting his termination. (Id.)

On or about September 1, 1998, Mr. Keeshan filed a charge of employment discrimination against Home Depot with the Pennsylvania Human Relations Commission ("PHRC"), which was dual filed with the Equal Employment Opportunity Commission ("EEOC"). n9 (Compl., PP 7,8.) After investigation, the EEOC dismissed Mr. Keeshan's claim, determining that he did not **[*11]** have a claim under the ADA. (Defs.' Mot. for Summ. J., P 52.) On November 4, 1999, the EEOC issued Mr. Keeshan a right-to-sue letter. (Compl., P 9.) Mr. Keeshan filed this lawsuit on January 28, 2000. (See Compl.) The Defendants filed this Motion for Summary Judgment on October 16, 2000.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n9 Defendants note that Mr. Keeshan did not contact the Equal Employment Opportunity Commission ("EEOC")at any time during his employment with Home Depot. (Defs.' Mot. for Summ. J., P 32.) Defendants further note that, prior to his termination, Mr. Keeshan did not contact anyone in Home Depot's human resources department or legal department to complain about unfair treatment or failure to accommodate his work restrictions. (Id. P 31.)

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

## II. STANDARD OF REVIEW

"HN1 Summary judgment is appropriate when, after considering the evidence in the light most favorable to the nonmoving party, no genuine issue of material fact remains in dispute and 'the moving party is entitled to judgment as a matter of law.'" Hines v. Consol. Rail Corp., 926 F.2d 262, 267 (3d Cir. 1991) **[*12]** (citations omitted). The inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-252, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). HN2 The moving party carries the initial burden of demonstrating the absence of any genuine issues of material fact. Big Apple BMW, Inc. v. BMW of North Am., Inc., 974 F.2d 1358, 1362 (3d Cir. 1992), cert. denied, 507 U.S. 912, 122 L. Ed. 2d 659, 113 S. Ct. 1262 (1993). Once the moving party has produced evidence in support of summary judgment, the nonmovant must go beyond the allegations set forth in its pleadings

and counter with evidence that demonstrates there is a genuine issue of fact for trial. 974 F.2d at 1362-63. *HN3*Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). [*13]

## III. DISCUSSION

### A. ADA and PHRA Claims

Mr. Keeshan's ADA and PHRA claims are based on his back surgery and the restrictions that resulted therefrom. (See Compl.) In his Complaint, Mr. Keeshan argues that his "disabilities and/or perceived disabilities were a determinative factor in connection with Defendants discharge of [Mr. Keeshan] from employment" and that such "actions of Defendants were discriminatory and violate the ADA." (Compl., PP 27, 28.) *HN4*The ADA prohibits discrimination against qualified individuals with a disability by covered entities. n10 Tedeschi v. Sysco Foods of Phila., Inc., 2000 U.S. Dist. LEXIS 12994, No 99-3170, 2000 WL 1281266, at *3 (E.D. Pa. Sept. 1, 2000) (citing 42 U.S.C. § 12112(a)). *HN5*In order to establish a prima facie case of discrimination under the ADA, a plaintiff must be able to establish that "(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination." n11 Shaner v. Synthes, 204 F.3d 494, 500 (3d Cir. 2000) [*14] (citing Gaul v. Lucent Techs., Inc., 134 F.3d 576, 580 (3d Cir. 1998); Deane v. Pocono Med. Ctr., 142 F.3d 138, 142 (3d Cir. 1998)).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n10 *HN6*The ADA reads, in pertinent part, as follows:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112.

n11 The Court's analysis of the ADA claim applies equally to Mr. Keeshan's PHRA claim because "*HN7*the legal analysis for an ADA claim is identical to that of a claim submitted under the PHRA." Tedeschi v. Sysco Foods of Phila., Inc., 2000 U.S. Dist. LEXIS 12994, No. 99-3170, 2000 WL 1281266, at *3 n.3 (E.D. Pa. Sept. 1, 2000)(citing Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996)).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

*HN8*The burden-shifting framework [*15] of McDonnell Douglas applies to disparate treatment and retaliation claims under the ADA. 204 F.3d at 500 (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973); See also Walton v. Mental Health Ass'n of Southeastern Pa., 168 F.3d 661, 667-68 (3d Cir. 1999)(citations omitted)). The McDonnell Douglas framework consists of three stages: the plaintiff must first establish a prima facie case

of discrimination; then, once the prima facie case is established, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Id. (quoting McDonnell Douglas, 411 U.S. at 802). "Finally, should the defendant carry this burden, the plaintiff then must have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." 204 F.3d at 500 (citing Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981)). Although "the burden of production may shift, 'the ultimate burden of [*16] persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" 204 F.3d at 500 (quoting Texas Dep't of Cmty. Affairs, 450 U.S. at 252-53).

## 1. Prima Facie Case Under the ADA

### a. Disability

The first element of Mr. Keeshan's prima facie case of discrimination under the ADA requires him to prove that he is disabled under the terms of the ADA. *HN9* The ADA defines disability as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2); 29 C.F.R. § 1630.2(g)(1999). n12 Mr. Keeshan argues that he meets all three requirements for being disabled under the ADA, while Defendants argue that Mr. Keeshan was not disabled. The evidence presented to the Court is not sufficient to either prove or disprove whether Mr. Keeshan is disabled under the ADA. However, this issue is not dispositive of the Defendants' Motion for Summary Judgment because Mr. Keeshan cannot establish his [*17] prima facie case of discrimination under the ADA due to his inability to prove that he was a qualified individual under the Act, and because he cannot produce sufficient evidence of pretext to rebut Defendants' legitimate non-discriminatory reason for his termination.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -



n12 Since the ADA fails to define many of the Act's pertinent terms, "*HN10* we are guided by the Regulations issued by the Equal Employment Opportunity Commission ("EEOC") to implement Title I of the Act." Taylor v. Phoenixville Sch. Dist., 113 F. Supp. 2d 770, 773 n.1 (E.D. Pa. Sept. 19, 2000)(quoting Deane, 142 F.3d at 143 n.4 (citing 42 U.S.C. § 12102(2) and 29 C.F.R. § 1630.2)).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

### b. Qualified Individual

Since factual issues exist pertaining to Mr. Keeshan's claim of disability under the ADA, the Court will examine whether Mr. Keeshan is a "qualified individual" under the ADA. *HN11* A qualified individual, as defined by the ADA, is a person "who, with or without reasonable [*18] accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C § 12111(8). "The applicable regulations divide this inquiry into two prongs: (1) whether the individual has the requisite skill, experience, education and other job requirements of the position and (2) whether the individual, with or without reasonable accommodation can perform the essential functions of the position." Taylor v. Phoenixville Sch. Dist., 113 F. Supp. 2d 770, 775 (E.D. Pa. Sept. 19, 2000)(citing 29 C.F.R. § 1630.2(m)). In this case, there is no dispute that Mr. Keeshan possesses the prerequisite skill and experience necessary for his position, therefore, the Court's analysis centers on whether Mr. Keeshan could perform the essential functions of his job, with or without reasonable accommodation, after he

returned to work following back surgery.

## 1. Essential Functions and Reasonable Accommodation

HN12⚡The term "essential functions" is "defined to include the 'fundamental job duties' of a particular position." Blackwell v. City of Phila., 2000 U.S. Dist. LEXIS 6420, No. 99-0015, 2000 WL 572706, **[\*19]** at \*3 (E.D. Pa. May 10, 2000)(citing 29 C.F.R. § 1630.2(n)(1)). The determination of whether a certain function is essential is factual and made on a case-by-case basis. Id. (citing 29 C.F.R. § 1630.2(n)). Some evidence which determines whether a job function is essential includes:

> the employer's judgment as to what functions of a job are essential; the amount of time spent on the job performing the particular function; the consequences of not requiring the job holder to perform the function; and the number of other employees available among whom the performance of a particular function may be distributed.

Id. at \*3 (citing 42 U.S.C. § 12111(8)(listing factors); 29 C.F.R. § 1630.2(n)(3)(same)).

Defendants contend that Mr. Keeshan is not a qualified individual under the ADA because his forty hour work restriction prohibits him from performing "an essential function of his job, i.e., working a 55-hour workweek, with or without reasonable accommodation." (Defs.' Mot. for Summ. J. at 36.) Specifically, Defendants argue that the job of an Assistant Store **[\*20]** Manager requires a fifty-five hour work week, twenty-four hour availability for emergencies, a flexible work schedule requiring availability for work any day of the week, daytime and evening availability, and working the hours necessary to complete projects given by the Store Manager. (Defs.' Mot. for Summ. J. at 36)(citing Keeshan Dep. at 127; Ex. 17 Job Profile for a Supervisor/Manager). From Home Depot's Job Profile, it appears that Assistant Store Managers have more responsibility and are expected to be more flexible and available than other lower level employees. n13 (Defs.' Mot. for Summ. J., Ex. 17.)

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n13 The Court is able to rely on Home Depot's Job Profile because "HN13⚡evidence of whether a particular function is essential includes . . . the employer's judgment as to which functions are essential." 29 C.F.R. section 1630.2(n)(3)(i).

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

Mr. Keeshan argues that a fifty-five hour work week is not an essential job function of an Assistant Store Manager. (Pl.'s Resp. Defs.' Mot. for Summ. **[\*21]** J. at 36.) Mr. Keeshan further argues that full-time employment is forty hours per week, that no evidence exists that he was unavailable for emergencies, and that the issue of whether a fifty-five hour work week is an essential job function of an Assistant Store Manager is a genuine issue of material fact which must be determined by the jury. n14 (Pl.'s Resp. Defs.' Mot. for Summ. J. at 36-37.) Although Mr. Keeshan argues that full-time is a forty hour work week, he admits that he was required to work fifty-four hour work weeks as an Assistant Store Manager. (Keeshan Dep. at 127.) In his deposition, when questioned about work hours, Mr. Keeshan stated that "there are no 8-hour days. . . . Home Depot is 11-hours. It's a 55-hour workweek." (Keeshan Dep. at 127, 13-16.) Moreover, in Mr. Keeshan's Response to Defendants' Motion for Summary Judgment he further admits "that the employees were forced to work a 55 hour week." (Pl.'s Resp. Defs.' Mot. for Summ. J., P 26.) In further support that fifty-five hour work weeks were required of Assistant

Store Managers, Mr. Keeshan also testified that he was asked to work more than forty hours because his reduced hours were putting additional strain **[\*22]** on other Assistant Store Managers who had to work seventy-to-ninety hours per week. (Keeshan Dep. at 120.) n15

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n14 Mr. Keeshan bases his argument that full time hours for Assistant Store Managers is forty hours on Home Depot's Job Profile. (Defs.' Mot. for Summ. J., Ex. 17.) This premise is flawed because the Profile indicates that full-time employee hours of forty hours applies to Department Supervisors, not Assistant Store Managers. Id.

n15 Mr. Keeshan testified that Mr. Rizk told him that two other Home Depot Assistant Store Managers were working between seventy-to-ninety hours per week and that "he needed me to work more hours." (Keeshan Dep. at 120-123.)

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

In addition to Mr. Keeshan's testimony, Mr. Rizk's testimony also lends support to the fifty-five hour work week requirement of Assistant Store Managers. In his deposition, Mr. Rizk, who scheduled Mr. Keeshan's work hours, expresses that Store Managers and Assistant Store Managers have a work week of fifty-five hours. (Rizk Dep. at 16-17.) In fact, **[\*23]** Mr. Rizk states that when Mr. Keeshan told him that he could return full-time, he assumed that full-time meant the fifty-five hours required of Assistant Store Managers, not forty hours. (Id. at 16-53.) Thus, Mr. Rizk's testimony supports the finding that fifty-five hour work weeks are an essential function of Mr. Keeshan's job as an Assistant Store Manager.

In Simmerman v. Hardee's Food Sys., Inc., the United States District Court for the Eastern District of Pennsylvania found that working a minimum of fifty hours a week was an essential function of the job of General Manager at Hardee's. 1996 U.S. Dist. LEXIS 3437, No. 94-6906, 1996 WL 131948, at *8 (E.D. Pa. Mar. 22, 1996), aff'd, 118 F.3d 1578 (3d Cir. 1997). In Simmerman, plaintiff took a leave of absence from his position as General Manager at a Roy Rogers Restaurant due to his clinical depression. n16 Id. at *1. Upon his return to work, plaintiff informed Hardee's that he required several accommodations because of his alleged disability. Id. Specifically, plaintiff's medical restrictions required that he work a maximum of forty hours a week, work only the day shift, and that he be assigned to a restaurant **[\*24]** outside of the Philadelphia area. Id. Hardee's terminated plaintiff on the premise that his physician's medical release did not permit him to fully resume his work duties. Id. Hardee's later told plaintiff to disregard the termination and they offered him a position as a Crew Supervisor, which plaintiff accepted. Id. Plaintiff filed suit against Hardee's on the basis that Hardee's discriminated against him because of his alleged disability by terminating him, by failing to accommodate his disability and by not reinstating him to his former position of General Manager. Id. In the end, the Court found that plaintiff was not a qualified individual under the ADA because "a minimum fifty-hour work week and the flexibility to work some nights constitute 'major parts' of the position; [and] their elimination is not a reasonable accommodation under the ADA." 1996 U.S. Dist. LEXIS 3437, *30, Id. at *9 (citing Rucker v. City of Phila., 1995 U.S. Dist. LEXIS 11104, No. 94-0364, 1995 WL 464312, at *3 (E.D. Pa. July 31, 1995), aff'd, 85 F.3d 612 (3d Cir. 1996)). In its opinion, the Court stated that "**HN14⚓**in order to make a prima facie case to defeat a motion for summary judgment, 'plaintiff bears the burden **[\*25]** of establishing that he can perform the essential functions of his position with reasonable accommodation.'" Id. at *8 (citing Rucker, 1995 WL 464312, at *2 (citation omitted)). The Court also stated that "'reasonable accommodations' does not mean eliminating an essential function of the job," Rucker, 1995 WL 464312 at *3, "or requiring an employer to restrict a person's job duties to those which the individual can perform." Id. at *8 (citing Russell v. Southeastern PA Transp. Auth., 1993 U.S.

Dist. LEXIS 12358, No. 91-5177, 1993 WL 346058, at *6 (E.D. Pa. Sept. 8, 1993)(citation omitted)). The Court went on to note "that the requirement that [plaintiff] work no more than forty hours a week and not work nights was 'entirely antithetical to the job' of General Manager," and "that if [plaintiff] were allowed to work only forty hours a week and not work nights, he would have been something other than a General Manager." 1993 U.S. Dist. LEXIS 12358, *20-22, Id. at *8-*9. Based on the above, the Court concluded "that working a minimum of fifty hours a week and maintaining scheduling flexibility to work some nights were essential functions of the job of General Manager at Hardee's." **[*26]** 1993 U.S. Dist. LEXIS 12358, *20, Id. at *8.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n16 Roy Roger Restaurants were purchased by Hardee's Food Systems, Inc. in April 1990. Simmerman v. Hardee's Food Sys., Inc., 1996 U.S. Dist. LEXIS 3437, No. 94-6906, 1996 WL 131948, at *1 n. 1 (E.D. Pa. Mar. 22, 1996).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

The Court went on to hold that plaintiff could not fulfill the essential functions of a General Manager no matter what Hardee's did if he could not spend fifty hours on the job and work nights. Id. The Court stated that **HN15**by requesting an employer to do away with the requirements of a job, "the accommodation sought is an exception from the creation and deletion of an element of the job." Id. Furthermore, the Court stated that "the ADA does not mandate that the employer create a 'light duty' or new permanent position." Id. at *9 (quoting Howell v. Michelin Tire Corp., 860 F. Supp. 1488, 1492 (M.D. Ala. 1994)). As a result, the Court granted summary judgment on plaintiff's claim in favor of Hardee's because plaintiff "was not capable of performing the essential functions **[*27]** of a General Manager, with or without reasonable accommodation." Id.

Likewise, Mr. Keeshan's claim is unable to survive Defendants' Motion for Summary Judgment because he is unable to prove that he was capable of performing the essential functions of an Assistant Store Manager, with or without reasonable accommodation. Similar to the Court's finding in Simmerman, a fifty-five hour work week and availability were essential functions of Mr. Keeshan's job of Assistant Store Manager. Simmerman, 1996 WL 131948. This decision is based on: (1) the testimony given by Mr. Keeshan that Assistant Store Manager work weeks are fifty-five hours and that his absence was putting a strain on fellow Assistant Store Managers; (2) Mr. Rizk's testimony about scheduling Assistant Store Managers for fifty-five hour work weeks; (3) Home Depot's Job Profile showing the heightened responsibilities and availability required of Assistant Store Managers; and (4) the ruling in Simmerman. Id. Therefore, the Court finds that fifty-five hour work weeks and availability are essential elements to being a Home Depot Assistant Store Manager.

In his Response to Defendants' Motion for **[*28]** Summary Judgment, Mr. Keeshan argues "that having told [Mr. Keeshan] that they would accommodate him . . . and having represented in writing that accommodations for part-time work would be made, Defendants are now estopped from asserting this defense." (Pl.'s Resp. Defs.' Mot. for Summ. J. at 37.) As in Simmerman, requiring Home Depot to schedule Mr. Keeshan for a forty hour maximum work week is not a reasonable accommodation when a fifty-five hour work week and availability are essential functions of the job of Assistant Store Manager. Simmerman, 1996 WL 131948. Thus, if Home Depot was required to give Mr. Keeshan a forty hour work week as a reasonable accommodation, then Home Depot would be forced to eliminate an essential function of the job of an Assistant Store Manager and would be forced to restrict Mr. Keeshan's job duties to those which he could perform. Under Simmerman, this result would be an undue burden on Home Depot and would be analogous to an unreasonable accommodation under the ADA because "the

accommodation sought is an exception from the rule and deletion of an element of the job." Id. at *8. Also, as noted in Simmerman, if Mr. Keeshan **[*29]** was scheduled for forty hour work weeks and allowed limited availability, he would be performing a job other than that of an Assistant Store Manager. Id. Because fifty-five hour work weeks and flexible availability are essential job functions of an Assistant Store Manager, and because Mr. Keeshan fails to prove his burden that he can perform these requisite job functions, with or without reasonable accommodation, he fails to prove that he is a qualified individual under the ADA. Therefore, Mr. Keeshan fails to prove a prima facie case of discrimination under the ADA and the Defendants' Motion for Summary Judgment on this Count is granted.

## 2. McDonnell Douglas Analysis

As noted earlier, the McDonnell Douglas burden-shifting analysis applies to discrimination claims under the ADA. In this case, such analysis further supports Defendants' Motion for Summary Judgment because even if Mr. Keeshan was able to prove his prima facie discrimination case under the ADA, his claim would still fail under the McDonnell Douglas framework. Mr. Keeshan fails to satisfy the third part of the McDonnell Douglas analysis because he does not prove, by a preponderance of the evidence, that the **[*30]** legitimate non-discriminatory reason offered by the Defendants for his termination is not the true reason for his termination, but is pretext for discrimination. *HN16* At the summary judgment stage, with regard to the third step of the McDonnell Douglas tripartite analysis,

> a plaintiff may defeat a motion for summary judgment . . . by pointing 'to some evidence, direct or circumstantial, from which a factfinder would reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'

Shaner, 204 F.3d at *501 (quoting Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994); Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1067 (3d Cir. 1996)).

The legitimate non-discriminatory reason offered by Defendants for Mr. Keeshan's termination is that he violated company policy by "deliberately and knowingly submitting a petty cash voucher for travel expenses which he had not incurred and for which he lacked proper approval." (Defs.' Mot. for Summ. J. at 39.) Specifically, Defendants argue **[*31]** the following: that the petty cash incident took place at the Bethlehem Home Depot Store and involved people whom had no dealings with Mr. Keeshan or his employment at the Reading Store; that Mr. Keeshan knowingly submitted a cash voucher without Store Manager approval that was signed by Mr. Boehm, an Assistant Store Manager, on the "issued by" line and not signed on the "approved by" line; and that Mr. Keeshan's termination was affirmed by Ms. Freitag after her investigation "because she honestly and reasonably believed that Mr. Keeshan deliberately submitted the voucher for payment while knowing that it was not authorized." (Id. at 41.) Although Mr. Keeshan did not provide the Court with much information regarding the petty cash incident, he argues that the "Defendants' proffered reason is purely pretextual . . . . The termination was pre-textual as the real reason for the termination . . . was [Mr. Keeshan's] inability to work longer hours and to lift heavier objects than he was capable of doing due to his back injury." (Pl.'s Resp. Defs.' Mot. for Summ. J. at 23.) Specifically, Mr. Keeshan argues that he did not overcharge Home Depot and there is no policy requiring that **[*32]** only a Store Manager can issue a petty cash voucher. (Id. at 24.)

HN17↑In order for Mr. Keeshan to rebut Defendants' proffered reason, he

> cannot simply show that the employer's decision was wrong or mistaken . . . Rather, [he] must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Home Depot's] proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that [Home Depot] did not act for the asserted non-discriminatory reasons.

Shaner, 204 F.3d at 501 (quoting Fuentes, 32 F.3d at 765). Mr. Keeshan's argument denying an overcharge is not determinative of pretext because, as noted above, the issue is not whether the employer was mistaken, but whether the employer's proffered reason was pretextual and motivated by discriminatory animus. To further support his pretext argument, Mr. Keeshan argues that there was no policy that only Store managers could issue petty cash vouchers. (Pl.'s Resp. Defs.' Mot. for Summ. J. at 23.) Mr. Keeshan also argues that substantial doubt exists whether there was such a **[*33]** policy existed, whether this alleged policy was posted, and whether the policy was consistently enforced. (Id. at 23-24.) From the incident reports written at the time of the questioning about the petty cash voucher incident and from the testimony of Mr. Keeshan, Mr. McAlister, Mr. Boehm, Mr. Belanger, Mr. Smith, Mr. Wernicki, Mr. Dupreay, and Mr. Rizk, it appears that the Store Manager approval policy was firmly in place and Mr. Keeshan knew the policy at the time of the incident. See supra, section I.n.7. Whether the Store Manager Authorization policy was posted or was consistently enforced is not determinative of pretext because the evidence shows that Mr. Keeshan was aware that the policy was in effect and being enforced at the time of his petty cash voucher incident.

Mr. Keeshan fails to provide the Court with evidence that would discredit the Defendants' legitimate non-discriminatory reason that they terminated his employment because they believed that Mr. Keeshan had violated company policy by fraudulently submitting an unauthorized petty cash voucher. Mr. Keeshan also fails to offer evidence that an invidious discriminatory reason was most likely a motivating cause **[*34]** of Mr. Keeshan's termination. Therefore, Mr. Keeshan fails to prove by a preponderance of the evidence that the Defendants' legitimate non-discriminatory reason for his termination was not its true reason, but was a pretext for discrimination. As such, Mr. Keeshan fails to satisfy the third element of the McDonnell Douglas analysis and cannot withstand Defendants' Motion for Summary Judgment.

## B. Retaliation Claim Under the ADA

### 1. Exhaustion of Administrative Remedies

Although Mr. Keeshan was found not to be a qualified individual under the ADA, the Court will address his ADA retaliation claim because "HN18↑an individual who is adjudicated not to be a 'qualified individual with a disability' may still pursue a retaliation claim under the ADA." Krouse v. American Sterilizer Co., 126 F.3d 494, 502 (3d Cir. 1997)(citing Soileau v. Guilford of Maine, Inc., 105 F.3d 12, 16 (1st Cir. 1997)). HN19↑In order to establish a prima facie case of retaliation under the ADA, "a plaintiff must show '(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection **[*35]** between the employee's protected activity and the employer's adverse action." Shaner, 204 F.3d at 500 (quoting Krouse, 126 F.3d at 500). Similar to claims of disparate treatment under the ADA, the McDonnell Douglas burden-shifting

framework applies to ADA retaliation claims. Id. at 500; See supra, section III.A.

*HN20* A plaintiff must first file a charge of discrimination with the EEOC and receive a right-to-sue letter in order to sue an employer under the ADA. Reddinger v. Hospital Central Services, Inc., 4 F. Supp. 2d 405, 409 (E.D. Pa. May 5, 1998)(citing Morton v. GTE North, Inc., 922 F. Supp. 1169, 1177 (N.D. Tex. 1996)(citation omitted); 42 U.S.C. § 12117(a)). "The scope of the civil complaint is accordingly limited by the charge filed with the EEOC and the investigation which can reasonably be expected to grow out of that charge." 4 F. Supp. 2d at 409 (citing Powers v. Grinnell Corp., 915 F.2d 34, 38 (1st Cir. 1990)). In order to decipher whether a plaintiff is required to exhaust her administrative remedies, it must be determined "whether the acts alleged **[*36]** in the subsequent . . . suit are fairly within the scope of the prior EEOC complaint, or the investigation arising therefrom." 4 F. Supp. 2d at 410 (citing Waiters v. Parsons, 729 F.2d 233, 237 (3d Cir. 1984); Antol v. Perry, 82 F.3d 1291, 1295 (3d Cir. 1996) (citations omitted)).

Mr. Keeshan's EEOC complaint does not contain a charge of retaliation under the ADA. Not only does Mr. Keeshan's EEOC complaint fail to charge retaliation under the ADA, it fails to set forth information that would constitute notice of such a claim. In his EEOC complaint, Mr. Keeshan failed to mark the box labeled retaliation as a cause of discrimination and failed to make any factual allegations of retaliatory conduct on the part of the Defendants. The factual allegations in Mr. Keeshan's EEOC complaint instead refer only to his alleged disability and Home Depot's alleged wrongful termination based on such disability. Nowhere in Mr. Keeshan's complaint does he allege that Defendants engaged in any retaliatory conduct. Therefore, Mr. Keeshan failed to exhaust his administrative remedies because his EEOC complaint failed to put the EEOC and the Defendants on notice that he alleged **[*37]** retaliation for making complaints about his alleged discrimination. Based on the above, the Court grants Defendants' Motion for Summary Judgment on Mr. Keeshan's ADA retaliation claim because Mr. Keeshan failed to exhaust his administrative remedies as required by the ADA.

## 2. McDonnell Douglas Analysis

Similar to his ADA discrimination claim, even if Mr. Keeshan was able to establish a prima facie case of retaliation under the ADA, he would not be able to satisfy the burden-shifting analysis under McDonnell Douglas. For the reasons stated in Section III.A.2. of this Opinion, Mr. Keeshan is unable to prove, by a preponderance of the evidence, that Dependants' legitimate non-discriminatory reason for terminating him because he violated company policy by fraudulently submitting a petty cash voucher was not its true reason, but was pretext for discrimination. Therefore, even if Mr. Keeshan was able to prove a prima facie case of retaliation under the ADA, his claim would not survive summary judgment due to his failure to satisfy the pretext element of the McDonnell Douglas analysis.

## C. Retaliation Claim Under the FMLA

Mr. Keeshan argues that his claim under the FMLA is **[*38]** one for retaliation because "he was terminated because he exercised his right to take FMLA leave." n17 (Pl.'s Resp. Defs.' Mot. for Summ. J. at 41.) *HN21* Under Section 105(a)(2) of the FMLA, 29 U.S.C section 2615(a)(2), it is unlawful "'for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.'" n18 Baltuskonis v. US Airways, Inc., 60 F. Supp. 2d 445, 448 (E.D Pa. Aug. 17, 1999)(citing FMLA § 105(a)(2) and 29 U.S.C. § 2615(a)(2)). "The proper analysis for FMLA section 105(a)(2) claims is the McDonnell Douglas burden shifting approach." Id. at 448 (citing Churchill v. Star Enters., 183 F.3d 184 (3d Cir. 1999)(citations omitted)). In order to prove a prima facie case of retaliation under the FMLA, Mr. Keeshan must show: "(1) he is protected under the FMLA, (2) he suffered an adverse employment action and (3) a causal connection exists between the adverse decision and plaintiff's exercise of his or her FMLA rights." Id. (citing Oswalt v. Sara Lee, 889 F. Supp. 253, 258-59 (N.D. Miss. 1995), **[*39]** aff'd, 74 F.3d 91 (5th Cir. 1996)).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n17 **HN22** ⊕ Pursuant to the FMLA, "an eligible employee shall be entitled to a total of 12 work weeks of leave during any 12-month period . . . because of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). Under the FMLA, an eligible employee is a person "who has been employed for at least 12 months by the employer with respect to whom leave is requested under section 2612 of this title; and for at least 1,250 hours of service with such employer during the previous 12-month period." Id. § 2611(a). An employee who takes FMLA leave "shall be entitled, on return from such leave, to be restored by the employer to the [previous] position . . . or to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." Id. § 2614(a)(1)(A) & (B).

n18 Although Mr. Keeshan did not specify the FMLA section on which he bases his claim of retaliation, the Court analyzed Mr. Keeshan's claim of retaliation under FMLA Section 105(a)(2), **HN23** ⊕ 29 U.S.C. section 2615(a)(2), which applies to claims of retaliation and discrimination under the FMLA. The Court did not analyze Mr. Keeshan's claim under FMLA Section 105(a)(1), 29 U.S.C. Section 2615(a)(1), which applies to claims of interference with a person's exercise of rights under the FMLA, because Mr. Keeshan has not alleged any interference with his exercise of rights under the FMLA. (Keeshan Dep. at 163.)

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*40]**

Defendants argue that they are entitled to summary judgment on Mr. Keeshan's claim of retaliation under the FMLA because he cannot establish a prima facie case of retaliation since he "cannot establish a causal link between his taking FMLA leave between November 1997 and February 1998, and his subsequent termination in June 1998." (Defs.' Mot. for Summ. J. at 43.) Defendants contend that "there is no conduct by anyone at Home Depot to which Mr. Keeshan can link to his taking of FMLA leave." (Defs.' Reply Mem. Law Supp. Mot. for Summ. J. at 22.) Because the third element of the prima facie case of retaliation under the FMLA is at issue, the Court will address whether Mr. Keeshan can prove that a causal connection exists between Home Depot's termination of him and the exercise of his FMLA rights.

Mr. Keeshan fails to offer any evidence that a causal connection exists between his termination and his exercise of rights under the FMLA. Mr. Keeshan does not allege any discriminatory conduct by the Defendants regarding his request and receipt of FMLA leave. (Keeshan Dep. at 163.) In fact, the evidence shows that Home Depot gave Mr. Keeshan an extra week of leave with full pay in addition **[*41]** to what was required under the FMLA. (Keeshan Dep. at 119, 165; Defs.' Mot. for Summ. J. at 9.) Instead, Mr. Keeshan bases his FMLA claim of retaliation on the ground that he was allegedly terminated for violation of an unwritten policy which contradicts Defendants' written policy. (Pl.'s Resp. Defs.' Mot. for Summ J. at 42.) When questioned about whether Mr. Keeshan believed that his termination was due to his taking FMLA leave, he replied,

> I don't know if it was a direct result, it may have been. Only the people who terminated me would know that fully. I believe that it must have had something to do with it, because I was an exceptional employee right up until the time I returned to work. And then the next thing you know, three months, boom, I'm out the door.

(Keeshan Dep. at 169.) Although Mr. Keeshan opines that his FMLA leave was a cause of his

termination, he fails to establish the requisite causal connection between his termination and his FMLA leave.

It appears that Mr. Keeshan attempts to prove a causal connection between his termination and his FMLA leave by noting the temporal proximity of the two events. *HN24*It is established that "[a] causal connection **[*42]** between an employee's protected activity and an adverse action by [his] employer may be inferred if the events occurred close in temporal proximity to each other." Harris v. SmithKline Beecham, 27 F. Supp. 2d 569, 580 (E.D. Pa. Dec. 8, 1998), aff'd, 203 F.3d 816 (3d Cir. 1999)(citing Kachmar v. SunGard Data Sys., Inc., 109 F.3d 173, 178 (3d Cir. 1997)(holding that there are no specific time parameters to raise an inference of causation)); Baltuskonis, 60 F. Supp. 2d 445 (finding that sheer proximity in time between FMLA leave and termination establishes causal connection where plaintiff returned to work on March 17, 1996 after FMLA leave and was terminated on March 21, 1996); Voorhees v. Time Warner Cable Nat'l Div., 1999 U.S. Dist. LEXIS 13227, No. 98-1460, 1999 WL 673062, at *6 (E.D. Pa. Aug. 30, 1999)(stating that plaintiff proved a causal connection because she presented evidence that the timing of the adverse employment action and her leaves of absence were contemporaneous). However, "even if timing alone could ever be sufficient to establish a causal link, . . . the timing of the alleged retaliatory action must be 'unusually **[*43]** suggestive' of retaliatory motive before a causal link will be inferred." Krouse, 126 F.3d at 503 (citing Robinson v. City of Pittsburgh, 120 F.3d 1286, 1302 (3d Cir. 1997)(citation omitted)). If temporal proximity is lacking, "'the mere passage of time is not legally conclusive proof against retaliation.'" Twyman v. Dilks, 2000 U.S. Dist. LEXIS 12942, No. 99-4378, 2000 WL 1277917, at *9 (E.D. Pa. Sept. 8, 2000)(quoting Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997)(citation omitted)). In the case where temporal proximity is absent, a plaintiff can establish a causal link if able to prove that "the employer engaged in a pattern of antagonism in the intervening period." Id. at *9 (citing Woodson, 109 F.3d at 920-21).

In this case, Mr. Keeshan neither proves close temporal proximity between his termination and his FMLA leave nor a pattern of antagonistic behavior by the Defendants regarding his FMLA leave. Mr. Keeshan's June 16, 1998 termination occurred approximately four months after his return from FMLA leave on February 23, 1998. Under the facts of this case, a time period of approximately four months with **[*44]** no evidence of discriminatory conduct or animus by the Defendants in connection with Mr. Keeshan's leave under the FMLA does not establish close temporal proximity. Further, a causal connection between the timing of Mr. Keeshan's FMLA leave and his termination cannot be inferred because Mr. Keeshan is unable to prove that the termination was "unusually suggestive" of retaliatory motive by the Defendants. Without providing some evidence of discriminatory or retaliatory action by the Defendants regarding his FMLA claim, Mr. Keeshan has not proven that a causal connection exists between his termination and the exercise of his rights under the FMLA. Therefore, Mr. Keeshan has not proven his prima facie case of retaliation under the FMLA and the Defendants' Motion for Summary Judgment on this claim is accordingly granted.

## 1. McDonnell Douglas Analysis

As noted above, the McDonnell Douglas burden-shifting analysis applies to FMLA retaliation claims. Similar to his ADA discrimination and retaliation claims, and for the same stated reasons, Mr. Keeshan's FMLA retaliation claim fails the McDonnell Douglas analysis. Therefore, even if Mr. Keeshan was able to prove his prima facie case **[*45]** of retaliation under the FMLA, his claim would not survive summary judgment because he is unable to prove, by a preponderance of the evidence, that Defendants' proffered legitimate non-discriminatory reason for his termination, that he violated company policy by fraudulent submission of a petty cash voucher, was not its true reason, but was pretext for discrimination.

## D. Defamation Claim

Mr. Keeshan's defamation claim is based on the premise that the Defendants spread the

defamatory statement that his employment was terminated because of theft from petty cash.
n19 (Pl.'s Resp. Defs.' Mot. for Summ. J. at 44.) Mr. Keeshan argues that this alleged
defamatory statement was maliciously and recklessly disseminated throughout various Home
Depot stores in the region by the Defendants. Id. He argues that the alleged defamatory
statement has "greatly hurt and injured his good name and reputation." (Compl., P 36.)
Defendants counter Mr. Keeshan's defamation claim with the defense that the "alleged
statements are substantially true." (Defs.' Reply Mem. Law Supp. Mot. for Summ. J. at 29.)
Defendants argue that they have an absolute defense to Mr. Keeshan's defamation claim
because [*46] all alleged statements made concerning Mr. Keeshan's termination were true.
(Defs.' Mot. for Summ. J. at 49.) Specifically, Defendants state that "Mr. Keeshan was
terminated, and his termination was upheld, for the sole reason that Home Depot believes that,
under its policies, he committed a 'fraudulent act' with regard to the petty cash voucher, which
encompasses theft of petty cash through submission of an unauthorized voucher for payment."
Id. at 49 (citing St. of Mat. Facts, PP 40, 46.)

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n19 Specifically, Mr. Keeshan argues that Mr. Rizk and Mr. Smith "were the source of the
slanderous statement that [Mr. Keeshan] stole from petty cash" because "they were the ones
who investigated and terminated [Mr. Keeshan]." (Pl.'s Resp. Defs.' Mot. for Summ. J. at 45.)
Mr. Keeshan argues that Home Depot is liable for defamation because "Home Depot by its
managers deliberately defamed [Mr. Keeshan]" since "when [Home Depot] acts through its
managerial staff, those who interact with those managers assume those managers to be acting
with the credibility of the corporation they represent." Id.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - [*47]

## 1. Defamation Law

HN25 Defamation is fundamentally a state cause of action, even though "a defamation suit has
profound First Amendment implications." Tucker v. Fischbein, 237 F.3d 275, 281 (3d Cir. 2001)
(quoting McDowell v. Paiewonsky, 769 F.2d 942, 945 (3d Cir. 1985)). Although not explicit, the
parties proceed on the premise that Pennsylvania law applies to Mr. Keeshan's defamation claim.
Pennsylvania has adopted a flexible approach to choice of law which combines the "most
significant relationship" analysis of Restatement (Second) of Conflict of Laws with governmental
interests analysis. Karl v. Donaldson, Lufkin & Jenrette Sec. Corp., 78 F. Supp. 2d 393, 396 n. 6
(E.D. Pa. Dec. 23, 1999)(citing Melville v. Am. Home Assur. Co., 584 F.2d 1306, 1311 (3d Cir.
1978)). The Court will apply Pennsylvania law to Mr. Keeshan's defamation claim because
Pennsylvania has the most significant relationship to the claim since Mr. Keeshan is a
Pennsylvania resident and the alleged defamatory remark was published in Pennsylvania about
an incident which allegedly took place in Pennsylvania. See Barrett v. Catacombs Press, 64 F.
Supp. 2d 440, 443 [*48] (E.D. Pa. Sept. 2, 1999)(citing Marcone v. Penthouse Int'l Magazine
for Men, 754 F.2d 1072 (3d Cir. 1985), cert. denied, 474 U.S. 864, 88 L. Ed. 2d 151, 106 S. Ct.
182 (1985)("Pennsylvania law applies to defamation actions in which plaintiffs reside in
Pennsylvania and any harm to their reputation that may have occurred as a result of the
challenged publication is largely centered in Pennsylvania.")

According to Pennsylvania law, "HN26 a statement is defamatory if 'it tends so to harm the
reputation of another as to lower him in the estimation of the community or to deter third
persons from associating or dealing with him.'" Tucker, 237 F.3d at 282 (quoting Corabi v. Curtis
Publ'g Co., 441 Pa. 432, 273 A.2d 899 (Pa. 1971) (citation omitted); Restatement (Second) of
Torts § 559). In deciding whether a statement is defamatory, "[a] court must examine the
meaning of the allegedly defamatory statement in context," Id. (citing Beckman v. Dunn, 276
Pa. Super. 527, 419 A.2d 583, 586 (Pa. Super. 1981)), and must evaluate 'the effect [it] is fairly

calculated to produce, the impression it would naturally **[*49]** engender, in the minds of the average persons among whom it is intended to circulate.'" Id. (quoting Corabi, 273 A.2d at 902). In order to have a claim of defamation, a statement must be capable of a defamatory meaning, "it is not enough that a statement be embarrassing or annoying." Id. (citing Bogash v. Elkins, 405 Pa. 437, 176 A.2d 677, 678 (Pa. 1962)).

HN27 Under Pennsylvania law, the elements of a prima facie case of defamation are:

(1) the defamatory character of the communication;

(2) its publication by the defendant;

(3) its application to the plaintiff;

(4) its understanding by the recipient of its defamatory meaning;

(5) the understanding by the recipient of it as intended to be applied to the plaintiff;

(6) special harm resulting to the plaintiff from its publication; and

(7) abuse of a conditionally privileged occasion.

Gilbert v. Bionetics Corp., 2000 U.S. Dist. LEXIS 8736, No. 98-2668, 2000 WL 807015, at *3 (E.D. Pa. June 6, 2000) (citing 42 Pa.C.S.A. § 8343(a); Elia v. Erie Ins. Exch., 430 Pa. Super. 384, 634 A.2d 657, 659 (Pa. Super. Ct. 1993)(citation omitted)). When applicable **[*50]** to the defense, the Defendant has the burden of proving: "(1) the truth of the defamatory communication; (2) the privileged character of the occasion on which it was published; or (3) the character of the subject matter of defamatory comment as of public concern." Id. (citing 42 Pa.C.S.A. § 8343(b); Elia, 634 A.2d at 660.) In this case, Mr. Keeshan is not required to prove special damages as part of his prima facie case because the alleged defamatory statement is slander per se. n20

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n20 HN28 In Pennsylvania, the term "special damages" includes "such 'actual and concrete damages capable of being estimated in money. . . .'" Clemente v. Espinosa, 749 F. Supp. 672, 680 (E.D. Pa. Sept. 27, 1990)(quoting Fogel v. Forbes, Inc., 500 F. Supp. 1081, 1086 (E.D. Pa. July 29, 1980)(citation omitted)).

- - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

HN29 In Pennsylvania, a plaintiff is not required to prove special harm in a claim for defamation "where the spoken words constitute slander per se." Clemente v. Espinosa, 749 F. Supp. 672, 677 **[*51]** (E.D. Pa. Sept. 27, 1990). Slander per se consists of four categories of words imputing: (1) criminal offense, (2) loathsome disease, (3) business misconduct, or (4) serious sexual misconduct. Id.; Restatement (Second) of Torts § 570 (1977). In this case, the Court finds that the alleged defamatory statement that Mr. Keeshan was terminated because of theft from petty cash is slander per se because it imputes a criminal offense of theft and business