misconduct. "A statement constitutes slander per se as an accusation of criminality when it charges either directly or indirectly the commission of a specific offense punishable by imprisonment." Clemente, 749 F. Supp. at 679 (citing Burns v. Supermarkets Gen. Corp., 615 F. Supp. 154, 157 (E.D. Pa. April 23, 1985); Restatement (Second) of Torts section 571 (1977)). Thus, the alleged defamatory statement accusing Mr. Keeshan of theft of petty funds is slander per se because it directly charges Mr. Keeshan with the commission of a crime punishable by imprisonment. Similarly, HN30  a statement is per se slanderous as an accusation of business misconduct if "one who publishes a slander that ascribes to another [*52] conduct, characteristics or a condition that would adversely affect his fitness for the proper conduct of his lawful business, trade or profession, or of his public or private office, . . . is subject to liability without proof of special harm." 749 F. Supp. at 678 (quoting Restatement (Second) of Torts § 573 (1977)). The Court finds that the allegedly defamatory statement that Mr. Keeshan was terminated because he stole money from petty cash imputes business misconduct and is therefore slanderous per se.

As for Mr. Keeshan's prima facie case of defamation, "HN31  it is for the court to determine whether the statement at issue is capable of a defamatory meaning." Id. (citing Corbi, 273 A.2d at 904.) The Court finds that this threshold element of Mr. Keeshan's defamation claim is met because the statement which leveled accusations against Mr. Keeshan for being terminated due to his theft of petty cash would tend to lower him in the estimation of the community, or deter third parties from associating with him. Therefore, the Court finds that the statement about Mr. Keeshan's termination because of theft is capable of defamatory meaning. As for the other elements of Mr. Keeshan's [*53] prima facie case of defamation, there is disagreement between the parties. However, because the Court finds that truth is a defense to Mr. Keeshan's defamation claim, we need not reach those elements.

## 2. Truth Defense

HN32  Truth is an absolute defense to defamation in Pennsylvania. Gilbert, 2000 WL 807015, at *3 (citing Bobb v. Kraybill, 354 Pa. Super. 361, 511 A.2d 1379, 1380 (Pa. Super. Ct. 1986) (citation omitted)). "The truth required to avoid liability for defamation is not complete truth, but rather substantial truth." Id. at *3 (citing Kilian v. Doubleday & Co., 367 Pa. 117, 79 A.2d 657, 660 (Pa. 1951)). Although there is no set formula for substantial truth, "Pennsylvania has determined proof of substantial truth must go to the 'gist' or 'sting' of the alleged defamatory matter." Id. (citing Dunlap v. Phila. Newspapers, Inc., 301 Pa. Super. 475, 448 A.2d 6, 15 (Pa. Super. Ct. 1982)). In determining whether substantial truth is a defense to a defamation claim, "the test is 'whether the [alleged] libel as published would have a different effect on the mind of the reader from which the pleaded truth [*54] would have produced.'" Id. (quoting Dunlap, 448 A.2d at 15 (citation omitted)).

As mentioned earlier, Defendants argue truth as their defense, relying on the fact that they terminated Mr. Keeshan's employment and that such termination was upheld because they believed that Mr. Keeshan violated company policy by committing a fraudulent act with regard to the petty cash voucher. (Defs.' Mot. for Summ. J. at 49.) The Defendants argue that "because all alleged statements made regarding [Mr. Keeshan's] termination are true, he was not 'defamed' under Pennsylvania law." Id. at 49. Mr. Keeshan counters Defendants' argument with the contentions that he did not commit a fraudulent act, he was owed the money and Defendants' witnesses have told inconsistent stories. (Pl.'s Resp. Defs.' Mot. for Summ. J. at 49.) Mr. Keeshan's argument against the defense of truth is misplaced because, in this context, the issue is not whether Mr. Keeshan committed a fraudulent act, but whether the Defendants honestly believed that Mr. Keeshan had committed a fraudulent act in violation of company policy and terminated him on that basis. After analyzing this case, the Court finds the [*55] Defendants' defense of substantial truth accurate because the Defendants' explanation and accompanying evidence show that Mr. Keeshan was terminated because of a fraudulent act regarding a petty cash voucher and Mr. Keeshan has not been able to disprove the Defendants' proffered reason.

As stated in section III.A.2., Mr. Keeshan fails to provide evidence that would discredit the Defendants' legitimate non-discriminatory reason that his employment was terminated because it was believed that he violated company policy by fraudulently submitting an unauthorized cash voucher. The Defendants have not only proven that there was a policy requiring Store Manager approval for petty cash voucher reimbursements, but have proven that Mr. Keeshan was aware of such policy and did not abide by it when he submitted his voucher. See supra, section III.A.2. The proof offered by the Defendants goes directly to the 'gist' of the alleged defamatory matter because it deals precisely with the alleged defamatory statements that Mr. Keeshan's termination was due to theft of petty cash. As for the test of whether the alleged defamation, as published, would have a different effect on the mind of the reader [*56] from that which the pleaded truth would have produced, the Court finds that the pleaded truth would not have a different effect on the mind of the reader than the published truth because both truths in this case are virtually identical. In this case, the pleaded truth that Mr. Keeshan was terminated because Home Depot believed that he committed a fraudulent act regarding the petty cash voucher, which encompasses theft of petty cash through submission of an unauthorized voucher for payment, would not have a different effect on the mind of the reader than the published truth that Mr. Keeshan was terminated because of theft of petty cash. Since the Defendants have proven their defense of truth, their Motion for Summary Judgment on Mr. Keeshan's defamation claim is granted.

## IV. CONCLUSION

Defendants' Motion for Summary Judgment is granted regarding Mr. Keeshan's discrimination claim under the ADA because Mr. Keeshan cannot prove his prima facie case since he is not a qualified individual under the ADA. Mr. Keeshan's discrimination claim under the ADA is also unable to survive summary judgment because he has not been able to prove that Defendants' legitimate non-discriminatory [*57] reason for his discharge was not their true reason, but was a pretext for discrimination. Defendants' Motion for Summary Judgment on Mr. Keeshan's retaliation claim under the ADA is also granted because Mr. Keeshan has failed to exhaust his administrative remedies as required by the ADA. Mr. Keeshan's retaliation claim under the ADA is also unable to survive summary judgment because he failed to prove that Defendants' legitimate non-discriminatory reason for his termination was not their true reason, but was pretext for discrimination. Defendants' Motion for Summary Judgment is granted regarding Mr. Keeshan's claim of retaliation under the FMLA because Mr Keeshan failed to prove a causal link between his leave under the FMLA and his termination, and thereby could not prove his prima facie case of retaliation under the FMLA. Similar to Mr. Keeshan's claims for discrimination and retaliation under the ADA, Mr. Keeshan's FMLA retaliation claim also fails because he is unable to show that Defendants' legitimate non-discriminatory reason for his termination was not their true reason, but was pretext for discrimination. Lastly, Defendants' Motion for Summary Judgment is granted regarding [*58] Mr. Keeshan's defamation claim because the Defendants' defense of truth precludes Mr. Keeshan from raising this claim.

An appropriate Order follows.

## ORDER

AND NOW, this 27th day of March, 2001, upon consideration of Defendants' Motion for Summary Judgment (Dkt. No. 27), and Plaintiff's Response thereto, it is hereby ORDERED that the Motion is GRANTED.

BY THE COURT:

Robert F. Kelly, J.

Service: **Get by LEXSEE®**
Citation: **2001 U.S. Dist. LEXIS 3607**
View: Full
Date/Time: Monday, May 2, 2005 - 8:15 PM EDT

\* Signal Legend:

- Warning: Negative treatment is indicated
- Questioned: Validity questioned by citing refs
- Caution: Possible negative treatment
- Positive treatment is indicated
- Citing Refs. With Analysis Available
- Citation information available

\* Click on any *Shepard's* signal to *Shepardize*® that case.

About LexisNexis | Terms and Conditions

Copyright © 2005 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

Case 1:04-cv-00285-KAJ   Document 38-5   Filed 05/03/2005   Page 4 of 25

Service: **Get by LEXSEE®**
Citation: **113 fed appx 449**

*113 Fed. Appx. 449, *; 2004 U.S. App. LEXIS 21742, ***

JANE LEPORE, Appellant v. LANVISION SYSTEMS, INC.

No. 03-3619

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

113 Fed. Appx. 449; 2004 U.S. App. LEXIS 21742

September 28, 2004, Submitted Under Third Circuit L.A.R. 34.1(a)
October 19, 2004, Filed

**NOTICE: [**1]** RULES OF THE THIRD CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** On Appeal from the United States District Court For the Eastern District of Pennsylvania. (Civ. No. 00-cv-04144). District Judge: Honorable Petrese B. Tucker. Lepore v. Lanvision Sys., 2003 U.S. Dist. LEXIS 15555 (E.D. Pa., July 31, 2003)

**DISPOSITION:** Affirmed.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff employee appealed a grant of summary judgment in favor of defendant employer by the United States District Court for the Eastern District of Pennsylvania on the employee's claims of sex and/or pregnancy discrimination.

**OVERVIEW:** Prior to the employee's maternity leave, she had a discussion with the national sales director about her upcoming childbirth and issues related to childcare. The employee admitted that the discussion was non-discriminatory, but was "dumbfounded" that the director discourage her from returning to work. While on leave, the employee was terminated as part of a company-wide downsizing. The appellate court held that the employee failed to make out a prima facie case of gender and pregnancy discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. 2000e et seq., the Family and Medical Leave Act, 29 U.S.C.S. 2601 et seq., and the Pennsylvania Human Relations Act, Pa. Stat. Ann. tit. 43, § 951 et seq. Neither of the two similarly-situated male specialists was retained. One of them transferred out of direct sales before the employee left for maternity leave and before the reduction in force and the other was laid off as part of the reduction in force. The employee offered no evidence that the reduction in force was pretextual.

**OUTCOME:** The grant of summary judgment was affirmed.

**CORE TERMS:** reduction in force, prima facie case, retaliation, protected class, summary judgment, transferred, childcare, maternity, prima facie, termination, motive, discriminatory, terminated, team, similarly situated, conversation, mixed, direct evidence, non-discriminatory, pregnancy, worksite, hurdle, prong, discrimination case, headquarters, undisputed, workforce, seniority, assigned, leader

## LexisNexis(R) Headnotes ✦ Hide Headnotes

Civil Procedure > Summary Judgment > Standards of Review

*HN1* ± Appellate courts exercise plenary review over a district court's grant of summary judgment and apply the same standard as the district court, i.e., whether there are any genuine issues of material fact such that a reasonable jury could return a verdict for the plaintiff. Fed. R. Civ. P. 56(c)  More Like This Headnote

Civil Procedure > Summary Judgment > Summary Judgment Standard

*HN2* ± One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupportable claims or defenses.  More Like This Headnote

Labor & Employment Law > Discrimination > Title VII
Evidence > Procedural Considerations > Burdens of Proof

*HN3* ± In order to make out a prima facie case of discrimination in a reduction in force case arising under Title VII, a plaintiff must show that (1) she is a member of a protected class, (2) she was qualified for the position in question, (3) she was terminated, and (4) individuals not within the protected class were retained. Once the prima facie case is successfully made, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for the plaintiff's termination. If the defendant meets this burden, the plaintiff must then prove that the defendant's reason was a pretext for a discriminatory motive.  More Like This Headnote

Labor & Employment Law > Discrimination > Title VII
Civil Procedure > Appeals > Standards of Review > Standards Generally

*HN4* ± Discrimination claims arising under the Pennsylvania Human Relations Act, Pa. Stat. Ann. tit. 43, § 951 et seq., are governed by the same legal standard as that applied to Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq.  More Like This Headnote

Labor & Employment Law > Discrimination > Title VII

*HN5* ± In a reduction in force case under Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq., persons outside the protected class are those employees who are "similarly situated," that is, they work in the same area in approximately the same position.  More Like This Headnote

Labor & Employment Law > Discrimination > Title VII
Evidence > Procedural Considerations > Burdens of Proof

*HN6* ± In a claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq., a plaintiff attempting to prove discrimination by direct evidence faces a "high hurdle." Specifically, the evidence must demonstrate that the decision makers placed substantial negative reliance on an illegitimate criterion in reaching their decision.  More Like This Headnote

Labor & Employment Law > Discrimination > Disparate Treatment > Burden Shifting Analysis
Labor & Employment Law > Leaves of Absence > Family & Medical Leave
Evidence > Procedural Considerations > Burdens of Proof

*HN7* ± To establish a prima facie case of retaliation under the Family and Medical Leave Act (FMLA), 29 U.S.C.S. § 2601 et seq., a plaintiff must show that (1) she took an FMLA leave, (2) she suffered an adverse employment decision, and (3) the adverse decision was causally related to her leave. Once a plaintiff makes out a prima facie case, the usual McDonnell Douglas burden shifting framework is implicated.  More Like This Headnote

Labor & Employment Law > Leaves of Absence > Family & Medical Leave 📑

*HN8* ⬆ Pursuant to 29 U.S.C.S. § 2611(2)(B)(ii), the Family and Medical Leave Act (FMLA), 29 U.S.C.S. § 2601 et seq., does not cover an employee who is employed at a worksite at which an employer employs less than 50 employees if the total number of employees working within 75 miles of that worksite is less than 50.  More Like This Headnote

**COUNSEL:** For JANE LEPORE, Appellant: Michael J. Wietrzychowski, Cureton Caplan, Delran, NJ.

For LANVISION SYS INC, Appellee: Alan J. Hartman, David W. Burleigh, Deters, Benzinger & Lavelle, Cincinnati, OH.

**JUDGES:** Before: ROTH, BARRY, and GARTH, Circuit Judges.

**OPINIONBY:** Garth

**OPINION:**

[*450] Garth, Circuit Judge:

Appellant Jane Lepore appeals from the District Court's grant of summary judgment in favor of Appellee LanVision Systems, Inc. ("LanVision") on Lepore's claims of sex and/or pregnancy discrimination and retaliation. The District Court had jurisdiction pursuant to 28 U.S.C. § 1331. We have jurisdiction pursuant to 28 U.S.C. § 1291. We will affirm.

I.

Because we write solely for the benefit of the parties, we recount the facts and procedural history only as they are relevant to the following discussion. [**2]

LanVision is a software developer with its headquarters located in Cincinnati, Ohio. Jane Lepore began working for LanVision at its headquarters on July 8, 1996, as a Project Manager. In February 1997, LanVision reorganized and Lepore was transferred to Indirect Sales as an Application Specialist. Several months later, Lepore assisted her supervisor, Paul Burke, in the search for two additional application specialists to join the Indirect Sales team . That search resulted in the hiring of Nick Jovings and Mark Zajicek.

As a result of a second reorganization, in April 1998, the Indirect Sales team was dissolved and Lepore, Jovings and Zajicek were transferred to Direct Sales. Lepore retained her position as Application Specialist and began reporting to Larry Smeage, the National Director of Sales. One [*451] month later, Jovings left Direct Sales and was assigned to Professional Services.

Lepore was pregnant and nearing her due date when she was transferred. Smeage assigned Lepore to work under Terry Costello, a Direct Sales team leader, for the interim period before her maternity leave was to commence. Prior to Lepore's leave, Smeage and Lepore had a discussion about Lepore's upcoming [**3] childbirth and issues related to childcare. Smeage conveyed his wife's difficulty with leaving her child and returning to work, and in particular their difficulties in finding childcare. According to Smeage, "basically [he] let her [Lepore] know that as far as childcare, and so on, that she may want to look into that . . . proactively, since she - you know, part of her job is to be on the road traveling." Smeage Dep. at 18. After Lepore told Smeage that she had already arranged for childcare, Smeage responded "I don't know, you might change your mind after having your first baby, you might not want to come back to work." *Id*. at 204-205. Lepore testified that she did not believe Smeage's raising the childcare issue was discriminatory, but that she "was dumbfounded that he would discourage [her] . . . ." *Id*. at 205-206.

Lepore went on medical leave on May 11, 1998. She gave birth on May 21, 1998, at which time her maternity leave officially began. During her leave, Lepore moved to Philadelphia, Pennsylvania with her husband and child. Lepore's statutorily-mandated 12-week maternity leave expired on July 21, 1998. Lepore informed Terry Costello that she did not intend to **[**4]** return to work until August 12, 1998, taking a combination of paid and unpaid leave for the remaining period.

Adopting a program of company-wide downsizing, between February 1, 1998 and January 31, 1999, LanVision reduced its workforce from 123 to 75 employees through terminations and resignations. In particular, management decided to keep only one Application Specialist in the Direct Sales group. Smeage chose to keep Terry Costello, the team leader. Lepore testified that Costello was the right person to retain because of her seniority and experience. *See* Lepore Dep. at 294. On August 6, 1998, Smeage informed Lepore that she had been terminated. LanVision laid off 12 percent of its workforce during that time. Zajicek transferred to Professional Services on the West Coast for one month until he too was laid off in September 1998.

## II.

The District Court granted summary judgment in favor of LanVision. First, it found that Lepore failed to make out a *prima facie* case of gender and pregnancy discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 **[**5]** *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951 *et seq.*, in connection with her termination by LanVision. The District Court determined that Lepore was terminated as part of a corporate reorganization that included a reduction in force, and that no similarly situated individuals outside the protected class were retained.

Second, the District Court rejected Lepore's FMLA claim for LanVision's failure to reinstate her upon her return from maternity leave, finding that Lepore failed to satisfy her evidentiary burden of demonstrating either discriminatory intent or retaliation.

*HN1* We exercise plenary review over the District Court's grant of summary judgment and apply the same standard as the District Court, i.e., whether there are any **[*452]** genuine issues of material fact such that a reasonable jury could return a verdict for the plaintiff. *Fed. R. Civ. P. 56 (c)*; *Debiec v. Cabot Corp.*, 352 F.3d 117, 128 n. 3 (3d Cir. 2003) (citation omitted). *HN2* "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupportable claims or defenses **[**6]** . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). Applying that standard here, we conclude that the District Court properly granted summary judgment in favor of LanVision.

## A. Title VII and PHRA

*HN3* In order to make out a *prima facie* case of discrimination in a reduction in force case arising under Title VII, a plaintiff must show that (1) she is a member of a protected class, (2) she was qualified for the position in question, (3) she was terminated, and (4) individuals not within the protected class were retained. *In re Carnegie Center Assocs.*, 129 F.3d 290, 294-95 (3d Cir. 1997) (citation omitted). Once the *prima facie* case is successfully made, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for the plaintiff's termination. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973). If the defendant meets this burden, the plaintiff must then prove that the defendant's reason was a pretext for a discriminatory **[**7]** motive. *Burdine*, 450 U.S. at 254. *HN4* Claims arising under the PHRA are governed by the same legal standard as that applied to Title VII. *See Gomez v. Allegheny Health Servs.*, 71 F.3d 1079, 1083-84 (3d Cir. 1995) (citations omitted).

The central issue here is whether Lepore satisfied the fourth prong of the *prima facie* case, that is, whether she demonstrated that individuals not within the protected class were retained. **HN5** In a reduction in force case, the persons outside the protected class are those employees who are "similarly situated," that is, they work in the same area in approximately the same position. *See Anderson v. CONRAIL, 297 F.3d 242, 249-50 (3d Cir. 2002)*.

Lepore points to Jovings and Zajicek as the retained individuals outside the protected class. She claims that these "two male peers with less seniority and experience . . . were retained" while she was terminated. Lepore Br. at 7. We agree with Lepore that the comparison to Jovings and Zajicek was proper. We conclude, however, that neither of those individuals was retained and therefore Lepore fails to make a successful *prima facie* case.

As **[**8]** to Jovings, it is undisputed that he transferred out of Direct Sales before Lepore left for maternity leave and before the August 1998 reduction in force. With respect to Zajicek, while it is true that he transferred to Professional Services for one month, it is undisputed that he was laid off in September 1998 as part of the same reduction in force that resulted in Lepore's termination. Because Lepore cannot point to any similarly situated employees outside of the protected class who were retained, the District Court correctly concluded that Lepore failed to establish a *prima facie* discrimination case.

In the alternative, Lepore argues that she has produced direct evidence of discrimination and that therefore we should also analyze her claim under the mixed motives analysis set forth in *Price Waterhouse v. Hopkins, 490 U.S. 228, 276, 104 L. Ed. 2d 268, 109 S. Ct. 1775 (1989)*. **HN6** A plaintiff attempting to prove discrimination by direct evidence faces a "high hurdle." *Connors v. Chrysler Financial Corp., 160 F.3d 971, 976 (3d Cir. 1998)*. Specifically, **[*453]** the evidence must demonstrate that the "decision makers placed substantial negative reliance on an illegitimate criterion **[**9]** in reaching their decision." *Id.* In putting forth her mixed motives claim, Lepore relies mainly on her childcare conversation with Smeage, a conversation she admitted was not discriminatory. Furthermore, Lepore offers no evidence that "addresses directly the reasons for implementing the [reduction in force]." *Anderson, 297 F.3d at 249*. Based on the foregoing, we find Lepore has not cleared the high evidentiary hurdle of *Price Waterhouse*. Her mixed motives claim was therefore properly rejected.

**B. FMLA**

**HN7** To establish a *prima facie* case of retaliation under the FMLA, a plaintiff must show that (1) she took an FMLA leave, (2) she suffered an adverse employment decision, and (3) the adverse decision was causally related to her leave. *Conoshenti v. Public Svce. Electric & Gas Co., 364 F.3d 135 (3d Cir. 2004)*. Once a plaintiff makes out a *prima facie* case, the usual *McDonnell Douglas*, see *supra*, burden shifting framework is implicated. *See Weston v. Pennsylvania, 251 F.3d 420, 432 (3d Cir. 2001)*.

The District Court found that Lepore successfully made out a *prima facie* case under the FMLA. However, **[**10]** in its analysis, it appears to have confused the requirements for a *prima facie* retaliation case with those for a *prima facie* discrimination case. Consequently, on appeal, the parties argue at length about whether the temporal proximity of Lepore's termination to the end of her maternity leave satisfies the causal connection prong of a *prima facie* retaliation case. We need not decide that here, however, because even assuming *arguendo* that Lepore made out a *prima facie* retaliation case, summary judgment was still proper.

In response to Lepore's claim of retaliation, LanVision proffers the reduction in force as its legitimate, non-discriminatory business reason for terminating her. Lepore offers no evidence that the reduction in force was pretextual. Indeed she offers no evidence that directly addresses the decision to implement the reduction in force in any way. Lepore's only evidence is her

conversation with Smeage which, as we noted above, Lepore herself admitted was not discriminatory. Consequently, Lepore fails to carry her burden of proof on her FMLA retaliation claim and summary judgment was properly awarded. n1

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 Like the District Court below, we need not address LanVision's contention that the FMLA is inapplicable *HN8* under 29 U.S.C. § 2611(2)(B)(ii) (FMLA does not cover an employee who is employed at a worksite at which the employer employs less than 50 employees if the total number of employees working within 75 miles of that worksite is less than 50) because Lepore's FMLA claim fails on the merits.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[**11]**

## III.

LanVision moved to impose costs and sanctions on Lepore, or, in the alternative, to dismiss Lepore's appeal, claiming that Lepore engaged in an undue pattern of delay. We will deny both motions.

## IV.

Accordingly, we will AFFIRM the judgment of the District Court.

Service:  **Get by LEXSEE®**
Citation:  **113 fed appx 449**
View:  Full
Date/Time:  Monday, May 2, 2005 - 8:15 PM EDT

* Signal Legend:
- Warning: Negative treatment is indicated
[Q] - Questioned: Validity questioned by citing refs
⚠ - Caution: Possible negative treatment
◈ - Positive treatment is indicated
Ⓐ - Citing Refs  With Analysis Available
Ⓘ - Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case.

About LexisNexis | Terms and Conditions

Copyright © 2005 LexisNexis, a division of Reed Elsevier Inc  All rights reserved

Service: **Get by LEXSEE®**
Citation: **67 Fed. Appx. 109**

*67 Fed. Appx. 109, \*; 2003 U.S. App. LEXIS 9876, \*\**

SANDRA MARTIN, Appellant v. HEALTH CARE & RETIREMENT CORPORATION

Case No: 02-3398

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

67 Fed. Appx. 109; 2003 U.S. App. LEXIS 9876

May 14, 2003, Submitted Under Third Circuit LAR 34.1(a)
May 20, 2003, Opinion Filed

**NOTICE: [\*\*1]** RULES OF THE THIRD CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** On Appeal From The United States District Court For The Western District of Pennsylvania. (Civ. A. No. 00-850). District Judge: The Honorable Donald Ziegler.

**DISPOSITION:** Affirmed.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff employee sued defendant employer under Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. 2000e et. seq., the Age Discrimination in Employment Act (ADEA), 29 U.S.C.S. § 621 et. seq., and the Pennsylvania Human Relations Act (PHRA), 43 Pa. Cons. Stat. Ann. § 951 et. seq. The United States District Court For The Western District of Pennsylvania granted summary judgment, Fed. R. Civ. P. 56, for the employer. The employee appealed.

**OVERVIEW:** The employee alleged she was fired because of her race and age. The parties agreed that she had established a prima facie case of discrimination in violation of Title VII, the ADEA, and the PHRA, and the employer offered evidence that the employee was fired because her supervisors believed she had mishandled client complaints. Thus, the dispositive issue was whether the employee had presented sufficient evidence that the employer's reason was pretext. The employee pointed to six pieces of evidence of pretext. That evidence was insufficient; thus, the district court properly granted summary judgment to the employer pursuant to Fed. R. Civ. P. 56. A disagreement among decision-makers about whether the employee's alleged misconduct resulted from a misunderstanding did not show pretext. Even if the decision-maker who was critical of the employee was wrong or mistaken about the employee's misconduct, that did not make his reason pretextual. The employee did not introduce any evidence suggesting that decision-maker did not believe the incidents relayed to her by others. A discrepancy about precisely what another employee reported to the supervisor also did not show pretext.

**OUTCOME:** The court affirmed the judgment of the district court.

**CORE TERMS:** pretext, decision-maker, termination, resident, summary judgment, pretextual, terminated, proffered reason, discriminatory, rating, rated, prima facie case, genuine issue, non-discriminatory, inconsistencies, progressively, disbelieve, factfinder, motivating, misconduct, co-worker, proffered, mistaken, relayed, prudent, disciplined, discrepancy, supervisor, hydration,

demoted

## LexisNexis(R) Headnotes ♦ Hide Headnotes

Civil Procedure > Summary Judgment > Standards of Review 🗄
*HN1*⤓ A federal appeals court exercises plenary review over an order of a district court granting summary judgment.  More Like This Headnote

Civil Procedure > Summary Judgment > Summary Judgment Standard 🗄
*HN2*⤓ Summary judgment must be granted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56 (c). A genuine issue of fact exists only if a reasonable jury, considering the evidence presented, could find for the non-moving party.  More Like This Headnote

Labor & Employment Law > Discrimination > Title VII 🗄
Labor & Employment Law > Discrimination > Disability Discrimination > Proof of Discrimination 🗄
*HN3*⤓ A claim of termination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq., and the Age Discrimination in Employment Act of 1967, 29 U.S.C.S. § 621 et seq., is analyzed under the McDonnell Douglas burden-shifting framework. The plaintiff must establish a prima facie case of discrimination, then the burden shifts to the employer to articulate a legitimate non-discriminatory reason for the termination and finally plaintiff must prove by a preponderance of the evidence that the employer's proffered reason was a pretext for discrimination.  More Like This Headnote

Labor & Employment Law > Discrimination > Title VII 🗄
Labor & Employment Law > Discrimination > Disability Discrimination > Proof of Discrimination 🗄
*HN4*⤓ In order to show pretext, a plaintiff suing under Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq., or the Age Discrimination in Employment Act of 1967, 29 U.S.C.S. § 621 et seq., must point to some evidence from which a reasonable factfinder could either disbelieve the defendant employer's articulated legitimate reason or believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the defendant's actions. To disbelieve the employer's proffered reason, the question is not whether the action was prudent, but whether appellant has shown such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence. Alternately, to show the discriminatory reason was more likely than not the motivating reason, a plaintiff can introduce evidence of the employer's past treatment of her, or evidence of the employer's general policy and practice with respect to minority employees.  More Like This Headnote

Labor & Employment Law > Discrimination > Title VII 🗄
Labor & Employment Law > Discrimination > Disability Discrimination > Proof of Discrimination 🗄
*HN5*⤓ In a discrimination case under Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq., or the Age Discrimination in Employment Act of 1967, 29 U.S.C.S. § 621 et seq., a disagreement among decision-makers does not show pretext. Additionally, even if the decision-maker was wrong or mistaken in believing the plaintiff engaged in misconduct, this does not make his reason pretextual. The factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent.  More Like This Headnote

Labor & Employment Law > Discrimination > Title VII 🗄
Labor & Employment Law > Discrimination > Disability Discrimination > Proof of Discrimination 🗄



**HN6** In a discrimination lawsuit under Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq., or the Age Discrimination in Employment Act of 1967, 29 U.S.C.S. § 621 et seq., an employer's decision that an incident is serious enough to warrant termination rather than a less severe punishment does not show that the reason for termination is pretextual. More Like This Headnote

**COUNSEL:** For Sandra Martin, Appellant: Josel S. Sansone, Sansone & Associates, Pittsburgh, PA.

For Health Care Ret Corp, Appellee: Martin J. Saunders, Richard S. McAtee, Jackson Lewis, Pittsburgh, PA.

**JUDGES:** Before: RENDELL, SMITH and ALDISERT, Circuit Judges.

**OPINIONBY:** D. Brooks Smith

**OPINION:**

[*110] SMITH, Circuit Judge

I. FACTS

Sandra Martin is an African American woman who was born on January 10, 1944. Martin was employed by Health Care and Retirement Corporation ("HCR") at their Sky Vue Terrace facility in Pittsburgh, Pennsylvania.

In March of 1998, Martin was Director of Nursing. At that time the Pennsylvania Department of Health cited Sky Vue for failure to "provide each resident with sufficient fluid intake to maintain proper hydration and health." Nonetheless, Martin's [*111] individual performance was evaluated in April of 1998 as "above standard." In the intervening [**2] months, Gregory Tinz became the Home Administrator and Martin's supervisor. Tinz rated Martin "above standard" in August, 1998. However on September 25, 1998, Tinz met with Martin to discuss some problems with her job performance. At that meeting, Martin accused Tinz of being a racist. Subsequently, in his September evaluation of Martin, Tinz rated Martin's overall performance as "standard" and on October 1, Martin was temporarily suspended.

The Department of Health issued a second citation against Sky Vue for insufficient hydration of residents in October of 1998. After the second citation, Martin was demoted to the position of Director of Clinical Programs, an assistant Director of Nursing position. Donna Erdeljac became the new Director of Nursing.

On October 27, 1998, Mrs. Marchewka, the wife of a patient/resident, allegedly twice attempted to speak to Martin but was ignored. Mrs. Marchewka complained to Tinz about Martin.

Then, on November 2, 1998, Corine Wilson nee Twomey, the daughter of another patient/resident, approached Nurse Darrell Peters and told him that she saw urine under her mother's wheelchair cushion and wanted to speak to the Director of Nursing. Peters could [**3] not locate Erdeljac, so he told Martin about Twomey's complaint. Martin did not speak to Twomey or investigate the problem, but told Peters to speak with Twomey himself and leave a note for Erdeljac.

On November 5, 1998, Martin was terminated. Tinz told Martin the reason she was being terminated was because she failed to respond to resident family concerns.

II. PROCEDURAL POSTURE

Martin filed a complaint alleging that she was terminated in violation of Title VII of the Civil Rights Act of 1964, <u>42 U.S.C. 2000e <i>et. seq.</i></u>, the Age Discrimination in Employment Act ("ADEA"), <u>29 U.S.C. § 621 <i>et. seq.</i></u> and the Pennsylvania Human Relations Act ("PHRA"), <u>43 Pa. Stat. Ann. § 951 <i>et. seq.</i></u> HCR moved for summary judgment, and the District Court granted the motion by an order and opinion dated July 31, 2002.

## III. JURISDICTION

The District Court had jurisdiction over Martin's Title VII and ADEA claims pursuant to <u>28 U.S.C. § 1331</u>, and supplemental jurisdiction over her PHRA claim pursuant to <u>28 U.S.C. § 1367</u>. This Court has jurisdiction over the appeal from summary judgment pursuant **[\*\*4]** to <u>28 U.S.C. § 1291</u>.

## IV. STANDARD OF REVIEW

*HN1* This Court exercises plenary review over an order of a district court granting summary judgment. *See <u>Bieregu v. Reno</u>, 59 F.3d 1445, 1449 (3d Cir. 1995).* *HN2* Summary judgment must be granted if "there is no genuine issue as to any material fact and [] the moving party is entitled to judgment as a matter of law." <u>Fed. R. Civ. P. 56(c)</u>. A genuine issue of fact exists "only if a reasonable jury, considering the evidence presented, could find for the non-moving party." <u>Childers v. Joseph</u>, 842 F.2d 689, 694 (3d Cir. 1988) (citing <u>Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)</u>).

## V. LEGAL ANALYSIS

*HN3* A claim of termination in violation of Title VII and the ADEA is analyzed under the *McDonnell Douglas* burden-shifting framework. *See <u>McDonnell Douglas</u>* **[\*112]** <u>*Corp. v. Green*, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973)</u>. The plaintiff must establish a prima facie case of discrimination, then the burden shifts to the employer to articulate a legitimate non-discriminatory reason for the termination and finally plaintiff **[\*\*5]** must prove by a preponderance of the evidence that the employer's proffered reason was a pretext for discrimination. *See id.* at 802.

Here, the parties agree that Martin made out a prima facie case under Title VII and the ADEA. HCR then proffered Martin's actions in the Twomey and Marchewka incidents as the legitimate, non-discriminatory reasons for her termination. Thus, the main issue is whether Martin has introduced sufficient evidence to permit a finder of fact to reasonably infer that these reasons were pretext.

*HN4* In order to show pretext, Martin must point to some evidence from which a reasonable factfinder could either disbelieve HCR's articulated legitimate reason or believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of HCR's actions. <u>Abramson v. William Paterson College of New Jersey</u>, 260 F.3d 265, 283 (3d Cir. 2001) (quoting <u>Fuentes v. Perskie</u>, 32 F.3d 759, 764 (3d Cir. 1994)); <u>Ezold v. Wolf, Block, Shorr & Solis-Cohen</u>, 983 F.2d 509, 523 (3d Cir. 1992). To disbelieve the employer's proffered reason, the question is not whether the action was prudent, **[\*\*6]** but whether appellant has shown "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence[.]" <u>Fuentes, 32 F.3d at 765</u> (internal quotation omitted). Alternately, to show the discriminatory reason was more likely than not the motivating reason, a plaintiff can introduce evidence of the employer's past treatment of her, or evidence of the employer's general policy and practice with respect to minority employees. <u>Ezold, 983 F.2d at 523-24</u>.

Martin points to six pieces of evidence which she claims could support a finding of pretext. First, she points out that Stephanie Russo, a Human Resources manager and someone Martin claims was a decision-maker n1, stated that the Marchewka incident might have been a misunderstanding. Even if Russo were a decision-maker, there were other decision-makers such as Tinz who believed the misconduct was intentional, and *HN5* a disagreement among decision-makers does not show pretext. See *Fuentes, 32 F.3d at 767*. Additionally, even if Tinz was wrong **[**7]** or mistaken in believing Martin's misconduct, this does not make his reason pretextual. See *Fuentes, 32 F.3d at 765* ("To discredit the employer's proffered reason, however, the plaintiff cannot show that the employer's decision was wrong or mistaken since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent."); *Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1109 (3d Cir. 1997)* (question is not whether employer made a sound employment decision, but whether the real reason for the decision was discrimination).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n1 Martin contends that the District Court erred in concluding that Russo was not a decision-maker. The District Court arrived at this conclusion based on Russo's testimony that she did not give any input into whether Martin should be terminated. However, Martin points out that HCR included Russo in the list of "persons who participated in the decision to terminate Martin." Even presuming Russo was a decision-maker, her testimony was insufficient to establish pretext for the reasons discussed in the main text.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[**8]**

Second, Martin says that pretext can be shown by the fact that Tinz never **[*113]** personally spoke with her or Peters regarding the two incidents, and that he did not give her an opportunity to defend herself. n2 Even if Tinz was remiss in relying upon the complaints brought to him by Ms. Marchewka and relayed to him by Erdeljac, rather than speaking with Martin or Peters directly, the question is whether Tinz actually believed the descriptions of the incidents to be accurate and relied upon them in Martin's termination. See *Fuentes, 32 F.3d at 766-67*. Tinz stated that he did not speak with Martin because she had a pattern of failing to respond to complaints and criticism and her credibility "was very low." Martin did not introduce any evidence suggesting that Tinz did not believe the incidents relayed by Marchewka and Erdeljac. Martin even admitted that she knew of no evidence showing that these reports were not Tinz's motivation for firing her. Her evidence only challenged the underlying truth of those reports. Therefore, Tinz's failure to give Martin a chance to tell her side of the story cannot support a finding of pretext.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n2 Erdeljac did discuss the incidents with Martin, however. **[**9]**

Third, Martin points to the inconsistencies between what Peters says he reported versus what Tinz, Russo and Erdeljac claim he said. Erdeljac, Russo and Tinz all testified that Peters asked Martin to speak with Twomey and she refused. However, Peters testified that he never asked Martin to speak to Twomey, only that he informed her of the situation. This discrepancy is not enough to establish pretext. First, as discussed *supra*, the truth of the reports conveyed to Tinz was immaterial as long as he reasonably believed the reports. In addition, viewing the facts in the light most favorable to Martin and assuming that Peters did not ask her to speak to Twomey, this still would not justify Martin's actions. Martin was not being disciplined because she ignored a subordinate's request that she speak to Twomey. Rather, the purported concern with Martin's actions was that she should have taken it upon herself to speak to Twomey once she heard

about Twomey's complaint. Twomey had previously called the Department of Health to complain, and part of Martin's job as a supervisor was to deal with family members. Therefore, this discrepancy does nothing to undermine the Twomey incident as a [**10] legitimate basis for Martin's termination.

Fourth, Martin points out that she had "above average" performance reviews prior to her accusation to Tinz that he was a racist, after which she was only rated as "average." However, HCR did not assert Martin's September review as a reason for her termination, but relied on the two incidents that occurred in October and November. Her September review is, therefore, not even relevant to our pretext analysis. Cf. _Colgan v. Fisher Scientific Co., 935 F.2d 1407, 1422 (3d Cir. 1992)_ (reversing summary judgment on ADEA where plaintiff's negative review, _which formed the basis for his discharge_, was given shortly after he refused to take early retirement and could be found pretextual).

Fifth, Martin points to HCR's alleged failure to progressively discipline her for the Marchewka and Twomey incidents as evidence of pretext. Since Martin was previously demoted, she was progressively disciplined. In addition, _HN6_ an employer's decision that an incident is serious enough to warrant termination rather than a less severe punishment does not show that the reason for termination is pretextual. Cf. _Fuentes, 32 F.3d at 765_ [**11] (an imprudent decision does not show pretext).

Finally, Martin points to testimony by Peters and Russo that she was a nice, cordial person, and that the incidents alleged are not consistent with her typical [*114] conduct and demeanor. Assuming _arguendo_ this testimony would be admissible, co-workers' opinions that Martin would not have rebuffed Marchewka and Twomey intentionally cannot show that Tinz and the other decision-makers were lying when they said that they thought she mishandled those incidents. See _Conkwright v. Westinghouse Elec. Corp., 933 F.2d 231, 235 (4th Cir. 1991)_ (co-worker's opinions that plaintiff did not deserve a negative rating or to be discharged could not establish that negative rating was pretextual where rating was not wildly out of line with other indicia of the plaintiff's performance). Moreover, as discussed _supra_, even if Russo were a decision-maker who thought well of Martin, "the fact that the relevant decision-makers disagree about the plaintiff's qualifications does not evidence discrimination." _Fuentes, 32 F.3d at 767_.

## VI. CONCLUSION

The District Court's grant of summary judgment should be affirmed.

/s/ D. [**12] Brooks Smith

Circuit Judge

Service: **Get by LEXSEE®**
Citation: **67 Fed. Appx. 109**
View: Full
Date/Time: Monday, May 2, 2005 - 8:16 PM EDT

* Signal Legend:
⊗ - Warning: Negative treatment is indicated
🇶 - Questioned: Validity questioned by citing refs
⚠ - Caution: Possible negative treatment
◆ - Positive treatment is indicated
Ⓐ - Citing Refs. With Analysis Available
🄸 - Citation information available
* Click on any _Shepard's_ signal to _Shepardize®_ that case.

Get a Document - by Citation - 67 Fed. Appx. 109

About LexisNexis | Terms and Conditions

Copyright © 2005 LexisNexis, a division of Reed Elsevier Inc  All rights reserved

Get a Document - by Citation - 1998 U.S. Dist. LEXIS 16764    Page 1 of 23

Case 1:04-cv-00285-KAJ    Document 38-5    Filed 05/03/2005    Page 17 of 25

Service: **Get by LEXSEE®**
Citation: **1998 us dist lexis 16764**

*1998 U.S. Dist. LEXIS 16764, \**

ELVIRA PAMINTUAN, M.D., Plaintiff, v. NANTICOKE MEMORIAL HOSPITAL, INC., a Delaware corporation, Defendant.

C.A. No. 96-233-SLR

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

1998 U.S. Dist. LEXIS 16764

October 15, 1998, Decided

**NOTICE:  [\*1]**   FOR ELECTRONIC PUBLICATION ONLY

**DISPOSITION:** Defendant's motion for summary judgment with respect to plaintiff's federal claim granted.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff physician instituted an action against defendant hospital alleging that the hospital improperly terminated her staff privileges on the basis of her ethnic origin in violation of 42 U.S.C.S. § 1981 and alleging state law claims for breach of the implied covenant of good faith and fair dealing and intentional infliction of emotional distress. The hospital filed a motion for summary judgment with respect to the federal claim.

**OVERVIEW:** After her staff privileges were suspended based on alleged performance deficiencies, the physician, who was of Filipino descent, filed an action alleging that the actions taken against her were more severe than the sanctions imposed on non-Filipino physicians with similar records in violation of § 1981. The court ruled that the physician failed to prove the second prong of her prima facie case under the McDonnell Douglas framework, that her privileges were terminated because she was of Filipino descent, because she did not present evidence that one or more similarly situated Caucasian physicians were treated more favorably than she by the hospital. The court found that the physician did not present evidence that Caucasian physicians were subjected to a different standard of quality assurance review or different peer review procedures and that the procedural fairness of the peer review process due to lack of a "comparative review" was not the issue. The court also found that there was no basis from which a reasonable factfinder could infer that the hospital's proferred reason was pretextual.

**OUTCOME:** The court granted the hospital's motion for summary judgment with respect to the physician's federal claim. The court dismissed the remaining state law claims on jurisdictional grounds.

**CORE TERMS:** patient, prima facie case, minutes, chart, emergency room, medical staff, summary judgment, factfinder, surgeon, state law, delinquent, charting, surgery, infer, gynecology, staff, disparate treatment, terminated, intentional discrimination, doctor, reappointment, termination, comparative, subjected, ethnicity, clinical, partner, protected class, response time, chairperson

### LexisNexis(R) Headnotes ♦ Hide Headnotes

Get a Document - by Citation - 1998 U.S. Dist. LEXIS 16764    Page 2 of 23

Case 1:04-cv-00285-KAJ    Document 38-5    Filed 05/03/2005    Page 18 of 25

Civil Procedure > Summary Judgment > Summary Judgment Standard

*HN1* A court shall grant summary judgment only when the admissible evidence fails to demonstrate a genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. The moving party bears the burden of proving that no genuine issue of material fact exists. Facts that could alter the outcome are "material," and disputes are "genuine" if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct. If the moving party has demonstrated an absence of material fact, the nonmoving party then must come forward with specific facts showing that there is a genuine issue for trial. The court will view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion. The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. More Like This Headnote

Civil Procedure > Summary Judgment > Summary Judgment Standard

*HN2* With respect to summary judgment in discrimination cases, the court's role is to determine whether, upon reviewing all the facts and inferences to be drawn therefrom in the light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff. More Like This Headnote

Constitutional Law > Civil Rights Enforcement > Civil Rights Generally

*HN3* 42 U.S.C.S. § 1981(a) provides that all persons within the jurisdiction of the United States shall have the same right in every state and territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other. More Like This Headnote

Constitutional Law > Civil Rights Enforcement > Civil Rights Generally

*HN4* The coverage of 42 U.S.C.S. § 1981(a) includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C.S. § 1981 (b). These rights are protected from encroachment by both private and state actors. More Like This Headnote

Constitutional Law > Civil Rights Enforcement > Civil Rights Generally

*HN5* Although 42 U.S.C.S. § 1981 does not explicitly use the word "race," it has been construed to prohibit "racial" discrimination in the making of private and public contracts. This prohibition on "racial" discrimination encompasses intentional discrimination on the basis of ancestry or ethnic characteristics. A distinctive physiognomy is not essential to qualify for § 1981 protection. If plaintiff can prove that he was subjected to intentional discrimination based on the fact that he was born an Arab, rather than solely on the place or nation of his origin, or his religion, he will have made out a case under § 1981. More Like This Headnote

Constitutional Law > Civil Rights Enforcement > Civil Rights Generally

*HN6* Claimants under 42 U.S.C.S. § 1981 are required to prove intentional racial discrimination under the same burden-shifting framework utilized in Title VII

Get a Document - by Citation - 1998 U.S. Dist. LEXIS 16764    Page 3 of 23

Case 1:04-cv-00285-KAJ    Document 38-5    Filed 05/03/2005    Page 19 of 25

discrimination cases. A plaintiff is first required to establish a prima facie case of discrimination by demonstrating that (1) she belongs to an "identifiable class of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics; (2) defendant intended to discriminate against her on that basis; and (3) defendant's racially discriminatory conduct abridged a contract or rights enumerated in 42 U.S.C.S. § 1981(a). If a prima facie case is established, the burden of production shifts to defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment decision. If the defendant is successful in meeting this burden, the plaintiff must produce evidence from which a reasonable factfinder could conclude either that the defendant's proffered justifications are not worthy of credence or that the true reason for the employer's act was discrimination.  More Like This Headnote

Constitutional Law > Civil Rights Enforcement > Civil Rights Generally
HN7 A defendant in a claim brought under 42 U.S.C.S. § 1981 is entitled to summary judgment only if it can demonstrate that: (1) the plaintiff is unable to establish a prima facie case of discrimination; or (2) if the plaintiff can establish a prima facie case, the plaintiff cannot produce sufficient evidence from which a factfinder reasonably could infer that the defendant's legitimate, nondiscriminatory reason for discharging plaintiff was pretext.  More Like This Headnote

Civil Procedure > Summary Judgment > Summary Judgment Standard
Constitutional Law > Civil Rights Enforcement > Civil Rights Generally
HN8 The court evaluates a defendant's summary judgment motion in a case brought under 42 U.S.C.S. § 1981 as follows: The district court must determine whether the plaintiff has cast sufficient doubt upon the employer's proffered reasons as to permit a reasonable factfinder to conclude that the reasons are incredible. The plaintiff can demonstrate that there is "sufficient doubt" by showing weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its actions such that a reasonable factfinder could rationally find them unworthy of credence.  More Like This Headnote

Constitutional Law > Civil Rights Enforcement > Civil Rights Generally
HN9 To establish the second prong of a prima facie case in a claim brought under 42 U.S.C.S. § 1981, a plaintiff must point to facts of record which, if proved, would establish that defendant's actions were racially motivated and intentionally discriminatory, or, at least, support an inference that defendants intentionally and purposefully discriminated against her on the basis of her race.  More Like This Headnote

Labor & Employment Law > Discrimination > Disparate Treatment
HN10 In determining whether similarly situated nonmembers of the protected class were treated more favorably than a member of the protected class, the focus is on the particular criteria or qualifications identified by the employer as the reason for the adverse action. The employee's positive performance in another category is not relevant, and neither is the employee's judgment as to the importance of the stated criterion. Furthermore, the court does not subjectively weigh factors it considers important. Rather, the plaintiff must point to evidence from which a factfinder could reasonably infer that the plaintiff satisfied the criterion identified by the employer or the employer did not actually rely upon the stated criterion.  More Like This Headnote

**COUNSEL:** For plaintiff: Leonard L. Williams, Esquire, Wilmington, Delaware.

For plaintiff: Brian J. Bartley, Esquire, Sullivan & Bartley, Wilmington, Delaware.

For Defendants: Richard G. Elliott, Jr., Esquire, Claudia A. DelGross, Esquire, Richards, Layton & Finger, Wilmington, Delaware.

**JUDGES:** Sue L. Robinson, District Judge.

**OPINIONBY:** Sue L. Robinson

**OPINION: MEMORANDUM OPINION**

Dated: October 15, 1998
Wilmington, Delaware

Sue L. Robinson

**ROBINSON, District Judge**

**I. INTRODUCTION**

Plaintiff Elvira Pamintuan, a physician specializing in obstetrics and gynecology, filed this action on May 3, 1996 against defendant Nanticoke Memorial Hospital, Inc. (D.I. 1) Defendant is a corporation of the State of Delaware and is licensed by the State of Delaware to provide health care services, operating a hospital in Seaford, Delaware. In her amended complaint, n1 plaintiff alleges that defendant improperly terminated her staff privileges on the basis of her ethnic origin, in violation of 42 U.S.C. § 1981. (D.I. 22) Plaintiff's amended complaint **[*2]** includes pendent state law claims for breach of the implied covenant of good faith and fair dealing and intentional infliction of emotional distress. (D.I. 22) Currently before the court is defendant's motion for summary judgment. n2 (D.I. 102)

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n1 In her original complaint, plaintiff asserted violations of Title VII, the Age Discrimination in Employment Act, and due process in addition to her § 1981 claim and pendent state law claims. (D.I. 1) On February 25, 1997, the court dismissed all of plaintiff's federal claims except her claim of discrimination under § 1981. (D.I. 21) Although the court found the factual allegations pertaining to the § 1981 claim insufficient, plaintiff was permitted to file an amended complaint curing these deficiencies. (D.I. 21) Plaintiff filed her amended complaint on March 17, 1997. (D.I. 22)

n2 On April 17, 1997, defendant moved to dismiss plaintiff's amended complaint on the grounds that it failed to meet the pleading requirements of Fed.R.Civ.P. 8(a) and to state a claim for relief under 42 U.S.C. § 1981. (D.I. 26) In addition, defendant sought the dismissal of the pendent state law claims. (D.I. 26) On August 28, 1997, the court granted defendant's motion to the extent that plaintiff sought money damages on her state law claims and denied it in all other respects. (D.I. 32)

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - **[*3]**

The court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a) (2) and (4). The court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

For the reasons stated below, defendant's motion for summary judgment shall be granted.

**II. BACKGROUND**

Plaintiff, who is of Filipino descent, has been licensed to practice medicine in the State of Delaware since 1971. (D.I. 22, PP 7,9) Since obtaining her license, plaintiff has been engaged in the practice of medicine in Sussex County, specializing in obstetrics and gynecology, a field in which she has been board-certified since 1975. (D.I. 22, PP 11-12) Throughout her time practicing in Sussex County, plaintiff has had staff privileges at defendant. (D.I. 22, P 15) These privileges have been renewed periodically, most recently in 1992 for a two-year period, n3 and include the privileges to admit, treat, and consult patients at defendant. (D.I. 22, PP 16-17; D.I. 115 at B1-2)

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n3 Plaintiff's reappointment, dated December 3, 1992, was recommended by the Chairman of the Department of Obstetrics and Gynecology, who indicated that plaintiff's skills were satisfactory and that she "meets the criteria for reappointment to the medical staff." (D.I. 115 at B1) The reappointment was approved by the Chairman of the Credentials Committee as well as the Chairman of the Medical Executive Committee. (D.I. 115 at B1)

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - [*4]

## A. Obstetrics and Gynecology Departmental Meetings

Beginning in December 1990, the minutes of the Department of Obstetrics and Gynecology ("OB/GYN Department") n4 monthly meetings began to reflect concern with plaintiff's performance. Most of these notations indicate plaintiff's failure to comply with hospital policy concerning response time and progress note completion. (D.I. 109 at A54-56, A64-65, A66-68, A69-71, A78-79, A109-10, A111-12) For example, the minutes from the December 1990 meeting reveal that the nursing supervisor filed a report documenting plaintiff's failure, in violation of hospital bylaws, to timely respond to a call regarding a cesarean section. n5 (D.I. 109 at A110) Minutes from the December 1991 and January 1992 meetings record plaintiff's failure to promptly enter a patient's progress notes; the OB/GYN Department sent plaintiff a memo regarding the need for timely charting. (D.I. 109 at A54, A111)

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n4 From 1990 through 1993, the OB/GYN Department consisted of five physicians: Drs. Cabrera (Hispanic), Rupp (Caucasian), DeJesus-Jiloca (Filipino), Tierno (Caucasian), and plaintiff (Filipino). (D.I. 108, P 14) [*5]

n5 The minutes indicate that further action on this matter was precluded because "the OB nurses did not follow the Hospital Communication Policy of beeping first or calling another physician." (D.I. 109 at A110)

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

Similar concerns regarding delinquent charting were raised at the September 1992 meeting:

This was a patient from the clinic admitted on 7/21/92 with acute pyelonephritis during pregnancy and stayed in the hospital for five days. Problem: no H&P, no progress notes and all orders were verbal except for admission and discharge. This

chart was incomplete for two months. Only two entries were made. This chart was needed for a second admission and no documentation was present to assist with the second admission.

(D.I. 109 at A67) As before, plaintiff was sent a memo concerning the incident. (D.I. 109 at A72) At the next meeting, the OB/GYN Department voted "'that the Department of OB feels that patient care was compromised in this case because of the lack of the medical staff practice in this institution and that this chart should be sent to the Q.A. Committee n6 for further **[\*6]** investigation.'" n7 (D.I. 109 at A69, A73)

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n6 Quality Assurance Committee.

n7 With respect to this incident, plaintiff admits that she left for vacation without completing the chart and, thus, the chart was incomplete at the time of the second admission. (D.I. 109 at A75) Plaintiff avers, however, that upon her return the chart remained incomplete because Dr. Rupp, OB/GYN Department Chairperson, had the file sequestered in his office. (D.I. 109 at A75)

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Concerns regarding plaintiff's timeliness and chart deficiencies, as well as other complaints concerning her conduct, continued to be documented at OB/GYN Department meetings throughout 1993. In January 1993, the Director of Maternal/Fetal Nursing complained about plaintiff's response time (3 hours) after being "beeped;" plaintiff contended that her beeper was defective and did not beep. (D.I. 109 at A78) In April 1993, the minutes reflect two complaints regarding plaintiff. The first, from the Vice President of Nursing and Administration, accuses plaintiff **[\*7]** of arranging for the admission of a patient while plaintiff was on the "sanctions list" for failure to keep her charts up-to-date. n8 (D.I. 109 at A81, A84) The second, from the Director of OR Nursing, accused plaintiff of unnecessarily keeping the on-call team in the operating room from 1:45 am to 5:15 am. (D.I. 109 at A82, A85-86) Plaintiff denied both incidents. (D.I. 109 at A81-82) Discussion of these incidents occurred at the May, June, July, and August 1993 meetings. (D.I. 109 at A89, A91, A92) Written statements were requested of all parties involved, including plaintiff. (D.I. 109 at A89, A91, A92) In addition, the July 1993 meeting minutes reflect an additional complaint, from the chairperson of the OB/GYN Department, regarding plaintiff's failure to answer her beeper, necessitating his coming in to cover the delivery. (D.I. 109 at A93) Again, written statements of all those involved were requested. (D.I. 109 at A93) All of these incidents were forwarded to the QA Committee for review. (D.I. 109 at A97) In addition, Dr. Rupp sent a letter to the QA Committee reviewing the discussion concerning plaintiff at the August OB/GYN Department meeting. (D.I. 109 at A98)

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n8 In this regard, plaintiff notes that the minutes of the June 6, 1990 OB/GYN Department meeting indicate that

concern was expressed at the Executive Committee of surgeons who schedule surgery for their partner who is on the suspension list but do not perform the surgery (partner on the list does the surgery). It was noted that the OB Department

has no partners, so this does not apply.


(D.I. 115 at B40)


- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*8]**

On March 24, 1994, at the request of the QA Committee, a special meeting of the OB/GYN Department was held to discuss plaintiff's handling of two cases. (D.I. 115 at B17) The first case involved a patient who, following a spontaneous delivery, experienced a right pneumothorax. (D.I. 115 at B17) The standard of care was deemed appropriate. (D.I. 115 at B17) The second case involved a threatened miscarriage. (D.I. 115 at B17-18) Since only two physicians other than those involved in the case were present at the meeting, discussion was tabled until the April meeting. (D.I. 115 at B18)

At the April meeting, n9

> it was unanimous department consensus that [plaintiff] should have performed a timely dilation and evacuation for the patient in question. Her failure to recognize and treat the apparent spontaneous miscarriage was not consistent with appropriate gynecological care. Action: A memo will be sent to the Quality Assurance Committee of the Board with this finding.


(D.I. 109 at A108) The report concluded:

> Administration has concern with the potential demonstration of inappropriate judgment for the above physician. Over the last 18 months there have been **[*9]** continued questions about her judgment and administration is concerned with safety of patients under this physician's care.


(D.I. 109 at A108) Also discussed at the meeting was a memo from the QA Committee regarding review of physicians' charts:

> If departments cannot perform their own Q.A. review successfully, then charts may need to be reviewed by an outside reviewer. If members of the Q.A. Committee do not have the specific expertise to review the concern, the chart may be sent to an outside reviewer. . . . When a circumstance requires immediate action, the concern can be referred to the Q.A. Committee without going through the Department at their next meeting.


(D.I. 109 at A107)

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -


n9 Like the March 24 meeting, only four of the five OB/GYN physicians were present. (D.I. 109 at A106) Edward Hancock, defendant's Chief Executive, also attended the meeting. (D.I. 109 at

A107)

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

Besides the cases mentioned above, other cases having complications and involving physicians other than plaintiff were **[*10]** presented for review at the OB/GYN Department meetings. Like plaintiff's, these cases were selected for review by the nurses. (D.I. 109 at A27) According to plaintiff, during the time period January 1, 1992 through September 1994, there were "at least" 24 cases with complications involving OB/GYN physicians other than herself presented for "Morbidity Quality Assurance Review." (D.I. 115 at B10-11, B77-78) Of these 24 cases, plaintiff now contends that "fifteen (15) involved morbidities that were more severe and reflected a lesser quality of care than were reflected in the two cases for which [she] was subjected to Professional Review Action by the Hospital Administration and its subordinate boards and committees." (D.I. 115 at B77-78) According to plaintiff, "nearly all of the morbidities resulted after care provided by the three (3) Caucasian physicians in the OB/GYN Department." (D.I. 115 at B78) The minutes of the OB/GYN Department meetings, however, do not indicate that either the OB/GYN Department or plaintiff (who was the reviewing physician in seven of the 24 cases) found there to be quality of care issues with respect to these cases at the time of review. The minutes state, **[*11]** for the most part, that the level of care administered was "appropriate," there was "no problem," or the "standard of care was met." (D.I. 109 at A54-56, A57-60, A61-63, A66-68, A76-77, A80-86, A90-91, A95-97, A100-102, A103-105, A106-108) According to the minutes, plaintiff was the only OB/GYN physician whose conduct warranted review by the QA Committee.

The minutes indicate, however, that plaintiff was not the only physician cited for lack of availability. The April and May 1992 minutes record an incident involving a physician who failed to respond to a delivery because he was in surgery. (D.I. 109 at A59) In response, the OB/GYN Department determined that "'it is the responsibility of the Obstetrician to be present for delivery or arrange for another Obstetrician to be present.'" (D.I. 109 at A62)

## B. The Review Process

### 1. QA Committee

In August 1993, upon the request of the OB/GYN Department, the QA Committee n10 undertook a review of plaintiff's cases over the past three years. As a result of the study, the QA Committee identified several areas of concern regarding plaintiff's patient care. (D.I. 106, P 4, Ex. 2) Subsequently, the QA Committee met with plaintiff **[*12]** to discuss its findings and proposed recommendations ("the Informal Intervention Agreement"). (D.I. 106, P 4, Ex. 2; D.I. 115 at B16) Although plaintiff initially agreed to a verbal commitment with respect to certain aspects of the Informal Intervention Agreement, she ultimately rejected the proposal, claiming that confidentiality had been breached. (D.I. 106, PP 5-6, Exs. 3-5; D.I. 115 at B29) As a result, the matter was referred to the Medical Executive Committee ("Executive Committee") for review and action.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n10 The QA Committee is responsible for, inter alia, "the duty to assure the safety of patients and that patient care and hospital services, including the medical care provided by physicians at the Hospital, are the most appropriate for the health of the patient and of highest quality possible." (D.I. 106, P 3)

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

Get a Document - by Citation - 1998 U.S. Dist. LEXIS 6764    Page 25 of 25    Page 9 of 23

Case 1:04-cv-00285-KAJ    Document 38-5    Filed 05/03/2005    Page 25 of 25

## 2. The Executive Committee n11

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n11 The Executive Committee is comprised of the officers of the medical staff, the chairpersons of each department, the ICU director, and the Emergency Department director. (D.I. 106, P 7)

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*13]**

On May 31, 1994, the Executive Committee, finding the QA Committee's recommendations unworkable, voted unanimously to suspend plaintiff's clinical privileges ("summary suspension") pending further investigation. (D.I. 106, PP 8-9, Ex. 6) Plaintiff was notified by letter of the Executive Committee's decision. (D.I. 106, P 8, Ex. 7)

In response to a "Request for Investigation Concerning Possible Professional Review Action" submitted by the QA Committee, the Executive Committee met with plaintiff to discuss the continuation of her summary suspension as well as the need for a formal investigation. (D.I. 106, PP 10-11, Exs. 8 and 10) At the meeting, the Executive Committee opted to reject plaintiff's proposal for an informal intervention and voted unanimously to continue plaintiff's suspension. (D.I. 106, P 11, Ex. 10) Plaintiff was notified of this decision by letter dated June 6, 1994. (D.I. 106, P 12, Ex. 12)

Rather than request a hearing, plaintiff offered, and defendant accepted, to take a six-month leave of absence beginning July 1, 1994, during which her summary suspension would be terminated and the formal investigation held in abeyance. (D.I. 107, P 3, Ex. 1)

## 3. Investigating **[*14]** Committee

On September 26, 1994, plaintiff requested, through her attorney, that the Executive Committee proceed with the pending formal investigation. (D.I. 107, P 4, Ex. 2) An Investigating Committee was formed to review plaintiff's patient care. (D.I. 107, P 5) The members of the Investigating Committee were selected, with the concurrence of the Executive Committee, by the president of the medical staff, who attempted to ensure broad representation of the medical staff with respect to gender, ethnicity, and medical practice, where possible requesting female and Filipino physician participation. (D.I. 106, PP 13-14) The Investigating Committee consisted of: Drs. Jarvie (Caucasian), Adiarte (Filipino), Cabrera (Hispanic), Olekszyk (Caucasian), and Wolfgang (Caucasian). (D.I. 104, Ex. 1)

The Investigating Committee was charged with reviewing six of plaintiff's cases, with each member assigned specifically to one case (Dr. Jarvie was assigned to two cases). (D.I. 104, Ex. 1) Of the six cases reviewed, the Investigating Committee found "quality issues" in four and was unable to reach a conclusion regarding a fifth because of insufficient documentation of the complications that had **[*15]** occurred. (D.I. 104, P 2, Ex. 4; D.I. 109 at A5) On November 30, 1994, the Investigating Committee reported its findings to the Executive Committee. (D.I. 104, P 3, Ex. 4)

Following a review of the findings of the Investigating Committee and the QA Committee, the Executive Committee recommended that the restoration of plaintiff's privileges be conditioned on her completion of either an OB/GYN residency retraining program or a review course and recertification. (D.I. 107, Ex. 3) Plaintiff was notified of the Executive Committee's decision by letter, which also documented the Committee's findings with respect to the deficiencies in plaintiff's performance. (D.I. 107, Ex. 3)