## 4. Judicial Review Committee

On January 13, 1995, plaintiff invoked her rights and requested a hearing. (D.I. 107, P 9, Ex. 4; D.I. 109 at A9-10) A Judicial Review Committee n12 and hearing officer were appointed. (D.I. 106, P 13; D.I. 107, P 9) The Judicial Review Committee consisted of: Drs. Boytim (Caucasian), Diedrich (Caucasian), DiMarco (Caucasian), Jiloca (Filipino), Lubkeman (Caucasian), and Mitchell (Caucasian). (D.I. 108, P 16). The hearing officer was Victor F. Battaglia, Esquire. (D.I. 107, P **[*16]** 9) Hearings took place over several days in April and May 1995, during which plaintiff was present and represented by counsel. (D.I. 105, PP 4-6)

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n12 Like the Investigating Committee, the six members of the Judicial Review Committee were selected by the president of the medical staff and an attempt was made to include medical staff who had not previously evaluated plaintiff and who were not in direct economic competition with her. (D.I. 105, P 2) Because of this latter provision, however, none of the physicians who evaluated her performance specialized in obstetrics and gynecology.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

On August 30, 1995, the Judicial Review Committee issued its decision, finding appropriate the Executive Committee's recommendation that plaintiff undertake one of two retraining options as a condition of reinstatement. (D.I. 105, P 8, Ex. 1) The Judicial Review Committee based its decision on a detailed and extensive review of the record, which led it to conclude that plaintiff had "exhibited a pattern of inadequate record-keeping; **[*17]** unacceptable delays in providing necessary treatments; exposing patients to unacceptable risks; poor medical judgment[;] and[] disregard of hospital policies." (D.I. 105, P 8, Ex. 1) The Judicial Review Committee also stated:

> If this decision is appealed, we urge the appellate panel to consider requesting the Peer Review Committee of the American College of Obstetrics and Gynecology evaluate an appropriate number of the Doctor's medical records to include those presented at these hearings and reviewed by the Investigating Committee, and advise whether the educational and training requirements imposed by the Professional Review Action can be modified to better accomplish their purpose of improving the practice modalities of the Doctor.

(D.I. 105, Ex. 1)

## 5. Appeal Board

Plaintiff appealed the Judicial Review Committee decision before the Appeal Board of defendant. (D.I. 107, P 11) Following briefing and oral argument, the Appeal Board affirmed the decision of the Judicial Review Committee. (D.I. 107, PP 11-12, Ex. 7) On January 29, 1996, the defendant's governing body adopted the opinion of the Appeal Board. (D.I. 107, P 13) In addition, an adverse action **[*18]** report was filed with the Delaware Medical Practice Board on or about February 13, 1996. n13 (D.I. 107, P 13, Ex. 8)

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n13 For a more detailed recitation of the review action, see <u>Pamintuan v. Nanticoke Memorial</u>

Get a Document - by Citation - 1998 U.S. Dist. LEXIS 16764    Page 2 of 25

Case 1:04-cv-00285-KAJ    Document 88-6    Filed 05/03/2005    Page 11 of 23

Hosp., Inc., 1997 U.S. Dist. LEXIS 3300, C.A. No. 96-233, 1997 WL 129338 (D. Del. Feb. 24, 1997).

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

## C. Plaintiff's Contentions and Evidentiary Support

### 1. Disparate Treatment

Plaintiff contends that defendant used the alleged deficiencies in her performance as a pretext for discrimination based on ethnicity. She alleges that the actions taken against her were more severe than the sanctions imposed on non-Filipino physicians with similar records. Specifically, plaintiff points to disparate treatment with respect to charting, response time, and clinical review.

Regarding charting, plaintiff contends that record-keeping problems at defendant were long-standing and involved many physicians, not just plaintiff. As early as March 1990, Executive Committee meeting notes indicate that there existed physicians delinquent in [*19] their record keeping, with two (neither of them plaintiff) on the delinquent chart list for several months. (D.I. 115 at B58) According to the minutes, these latter physicians' charting delinquencies were severe enough to jeopardize their reappointment. (D.I. 115 at B58) According to plaintiff, during the last two weeks of her summary suspension, thirty percent of the hospital's medical staff was delinquent in completing charts, including Dr. Rupp. (D.I. 115 at B41-42)

Plaintiff contends that since her termination the defendant has indicated a "willingness to positively respond to other physicians" concerning delinquent charting. (D.I. 114 at 11) Specifically, plaintiff points to the following language in a memorandum dated May 23, 1996 from the Medical Records Department:

> First, thank you for the tremendous effort made in reducing the number of delinquent charts. Many of you have made a huge difference with moving towards the goal of total delinquencies to be under 888.

(D.I. 115 at B45) In June 1996, the president of the medical staff issued the following warning:

> We are now reaching a very critical point with our ongoing medical record delinquency problem. [*20] We have not reached our desired goal of fewer than 880 delinquent charts for April or May. If our monthly average is not under that number (or twice the number of monthly discharges) for the twelve months preceding our JCAHO inspection, the hospital will fail this inspection either getting a conditional grade or being non-accredited. Since inspection results can and will be published, this will cause serious public relations harm to the hospital and its medical staff. In addition, we could be denied the opportunity to care for certain categories of patients. I cannot overemphasize the severity of this issue.

(D.I. 115 at B43) Physicians who had not completed their delinquent records by July 15, 1996 were to be prohibited from (1) performing surgical procedures; (2) performing non-invasive procedures; (3) requesting ancillary services for patients other than those already admitted; (4) admitting patients; and (5) requesting or performing consulting. (D.I. 115 at B53)

Like the charting problem, plaintiff contends that response time has been a long-standing concern at defendant. In this regard, plaintiff points to the February 12, 1990 minutes of the OB/GYN Department meeting, **[*21]** which record that "the OB nursing staff has concerns in regard to having difficulty reaching some OB physicians by beeper and/or phone." (D.I. 115 at B59) In response, the OD/GYN Department adopted a policy whereby detailed records were to be kept regarding each physician's response time and availability, such that the Department would be able to review cases and correct any problems. (D.I. 115 at B60-61)

Plaintiff argues with respect to clinical evaluations that defendant failed to perform a valid comparative review of her performance with that of her colleagues. According to plaintiff, the only way defendant can establish that she was "in fact" subject to the same standard of quality review as other physicians would be by a comparative review analysis. In support of her argument, plaintiff proffers the testimony of two physicians, Dr. Andrew J. Stiber n14 and Dr. Thomas E. Dyer, n15 both of whom testified at the Judicial Review Committee hearings. According to Dr. Dyer,

> in fairness I think that you have to review twenty-five consecutive cases of any practitioner, and also compare him to other people doing the same work. . . . If the quality assurance is questioned, the statistical **[*22]** consort that you could make a valid judgment on is twenty-five consecutive cases. And then of course the standard of care is what you're comparing it to, so you want to find out what another practitioner or other practitioners do with the same kind of case. I think that anecdotes are a problem.

(D.I. 115 at B66-67) Dr. Stiber, who provided a written review of plaintiff's performance in the four cases before the Judicial Review Committee, found plaintiff's care in all instances to have been appropriate. (D.I. 115 at B75-76) He concluded by stating:

> Finally, after reviewing all four cases, I am very concerned that the issues here are not quality assurance, but the issues of denying a doctor the right to practice medicine.

(D.I. 115 at B76)

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n14 Dr. Stilber is a clinical Associate Professor at New York University Medical Center and former Chairperson, Section 1, District II, of the American College of Obstetrics and Gynecology. (D.I. 114 at 15)

n15 At the time of plaintiff's review action, Dr. Dyer had been a practicing OG/GYN for nearly 30 years and Chairperson of the OB/GYN Committee at Milford Memorial Hospital for more than 25 years. (D.I. 126, P 3)

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*23]**

To further substantiate her claim of disparate treatment, plaintiff points to the following excerpt

from the Executive Committee's January 19, 1994, meeting minutes:

> QUALITY ASSURANCE: A representative from the Quality Assurance Committee reported a problem with a provider that caused a focus review on the provider's care. Some timely action must be taken to move forward and protect patients. A memo is being drafted to outline steps to prevent professional review action and allow this person to practice in an unencumbered fashion. This type of intervention has worked in the past. By the next Executive Committee meeting, hopefully a volunteer program will be developed. The concerns are: (1) 30% complication rate, (2) 30-40% mortality rate post-op, and (3) 20-25% curative infection rate. The trend will be sent to the Department of Surgery. A process group with all involved will be scheduled with a consensus standard developed. The suggestion of a "Pre-Op Conference" could be helpful.

(D.I. 115 at B79; D.I. 119, P 3, Ex. 1) Plaintiff alleges that the aforementioned physician is Caucasian. (D.I. 114 at 16-17; D.I. 126, P 14) Defendant, however, contends that all but **[*24]** the last three sentences of the excerpt refer to plaintiff, with the last three referring to a study on thoracotomy. (D.I. 119, PP 5-6)

## 2. Historical and Anecdotal Evidence of Discrimination and Intimidation

To further buttress her allegations of intentional discrimination, plaintiff points to instances in the past involving alleged discrimination on the part of defendant. First, plaintiff proffers the testimony of Stacia D. Girley, a hospital employee in the 1950's and 1960's. According to Ms. Girley, defendant segregated African-American and Caucasian patients until the early 1960's. n16 (D.I. 115 at B220-225) Second, plaintiff claims that a study prepared in 1979 reported "community concern that there were too many foreign physicians in the Emergency Room." n17 (D.I. 114 at 18; D.I. 115 at B88-89, B91-90, B99-101) Finally, plaintiff contends that in response to the aforementioned survey, defendant discriminatorily removed all of the non-Filipino physicians from its emergency room. n18 (D.I. 114 at B19) Plaintiff also proffers the testimony of Dr. Filomena T. Viloria, the Chairman of the Department of Medicine at Milford Hospital and a pulmonary specialist, to establish the **[*25]** cultural inclination of Filipino physicians to be deferential in the face of racial discrimination. n19 (D.I. 115 at B226-46)

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n16 Because of the temporal remoteness of the segregation and the absence of any connection between the individuals involved in it and those involved in the review of plaintiff's performance, this evidence would not be admissible at trial.

n17 Plaintiff has not submitted a copy of this community survey, and defendant contests its existence. Since the survey is temporally removed from the issues at bar and its existence has not been proved, this evidence would not be admissible at trial.

n18 The record indicates that the emergency room physicians were offered the opportunity to continue their employment on the condition that they give up their private practices. (D.I. 122, Ex. J at 5) This change ostensibly was made in order to avoid conflicts of interest, and the policy persists to this day. (D.I. 122, Ex. J at 6) All of the emergency room physicians ultimately declined to accept the restriction, and an outside service was hired. (D.I. 122, Ex. J at 5-7)

Dr. Roberto Villasenor, who testified regarding this matter, also claimed that defendant's Assistant Administrator offered to continue his employment as director of the emergency room if he would get rid of two Filipino physicians in his group and hire in their stead two Americans. (D.I. 115 at B100) At the time this offer purportedly was made, the emergency room physicians already had determined that they did not want to sign the new contract. **[*26]**

n19 Because the deposition of Dr. Viloria revealed no qualifications to render him an expert on Filipino culture, his personal observations on this issue will not assist the trier of fact evaluate the evidence in this case and, therefore, this evidence would not be admissible at trial.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

Plaintiff also provides anecdotal "evidence" of events which she contends substantiate her claim that defendant discriminates against and intimidates not only minority physicians but also minority patients.

Dr. Mario Rosales. Dr. Rosales, a Filipino general surgeon with privileges at defendant, testified that in 1992-1993 the Credential Committee, motivated by Caucasian surgeons Drs. Toy and Smoot, n20 terminated his privileges in thoracic and vascular surgery, leaving him privileges in general surgery only. (D.I. 115 at B110-11, B118-19, B133)

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n20 At the time relevant, there were six general surgeons. Three of these, Drs. Toy, Smoot, and Carey, all of whom are Caucasian, worked together in a group practice. (D.I. 115 at B117-18) The other three general surgeons, Drs. Rosales, Penserga, and Yatco, were Filipino. (D.I. 115 at B117-18) Both Drs. Yatco and Rosales were sole practitioners. (D.I. 115 at B117-18)

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*27]**

Based on concerns for his practice, Dr. Rosales attempted to recruit a partner, however, he met with opposition from defendant as well as Drs. Toy, Smoot, and Carey, whom he claimed informed him they would no longer provide surgical coverage for him should he obtain a partner. (D.I. 115 at B108, B123; D.I. 122, Ex. I at 34-35) According to Dr. Rosales, defendant refused to endorse his recruitment of a partner, claiming his practice could not support one, even though defendant had previously supported the recruitment of a gastroenterologist despite concerns regarding need. (D.I. 115 at B109-10, B116-17, B123)

Dr. Rosales testified that, because he had no other explanation for his treatment, it was his personal belief that he was the victim of preferential treatment, the preference being the Caucasian general surgeons. (D.I. 115 at B103, B109, B111-12, B113-14) ("If I feel that way, it's my personal feeling like maybe I'm different. But I'm not--I didn't verbalize that because I'm a Filipino, that's why these things are happening. All I'm saying is there is an obvious difference of treatment. . . Between me and the other guys . . . . The other general surgeons.") Dr. Rosales acknowledged **[*28]** that economics probably played a role in these incidents, but felt there was more to it than that, although he had no "factual" basis for believing such. (D.I. 122, Ex. I at 20)

Dr. Eduardo Yatco. Dr. Yatco, a Filipino general surgeon, testified that (like Dr. Rosales) his privileges at defendant were curtailed, that he was allowed vascular and thoracic privileges but denied general surgery privileges. (D.I. 115 at B133, B135-36) Both Dr. Yatco and Dr. Rosales

retained counsel to contest the curtailment, but a hearing was not held as a compromise was reached. (D.I. 115 at B137-38) Although the Caucasian members of the general surgical group were able to practice without restriction, Dr. Yatco felt the reason his and Dr. Rosales' privileges had been curtailed was purely economic. (D.I. 115 at B140-41)

Dr. Yatco also testified that in 1985 he was asked to resign as chief of surgery and surrender his privileges because of his failure to comply with the hospital's residency requirement. (D.I. 115 at B142-44, B151-52; D.I. 120, P 3) Dr. Yatco retained counsel and, although he resigned as chief, he retained his privileges. n21 (D.I. 115 at B143-57; D.I. 120, P 3) According to Dr. Yatco, **[*29]** he did not feel he was harassed because he is Filipino but that there were others who wanted his position. (D.I. 115 at B142-43)

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n21 The residency requirement, adopted in or about 1983, dictated that physicians who had primary emergency privileges live and work within 30 minutes of the hospital. (D.I. 120, P 3) Physicians were given 18 months to comply with the requirement; however, Dr. Yatco ostensibly continued to live with his family in Dover although he reported living in an apartment above his Seaford office. (D.I. 120, P 3) The hospital's board of directors looked into Dr. Yatco's compliance with the policy and determined that its criteria (e.g., primary mailing address, voter registration, physical proximity to the hospital while on call) had been met. (D.I. 120, P 3)

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Dr. Shahla V. Mousavi. Dr. Mousavi, who is a neurologist of Iranian descent, testified that in 1990 she had heard "here and there" that foreign doctors at defendant were treated differently than were Caucasian physicians, particularly **[*30]** with regard to privileges. (D.I. 115 at B158-59, B163-67)

Dr. Mousavi claimed that as a minority female, she was discriminated against in 1990 when defendant hired a second neurologist. (D.I. 115 at B158, B160) Prior to this she had been the defendant's sole neurologist. With the hiring of a second neurologist, Dr. Mousavi lost patients as they now had a choice of whom to see. (D.I. 115 at B160-61) Dr. Mousavi claimed that emergency room staff intentionally referred patients away from here by telling them she was out-of-town when she was not. (D.I. 115 at B161-62) She did not recall a specific case where this happened nor did she ever file a complaint. (D.I. 115 at B162)

Dr. Salvador Penserga. Dr. Penserga, a Filipino general surgeon, testified that in 1991 and 1992 he was involved in two separate lawsuits premised on surgeries he had performed. (D.I. 115 at B173-74) Defendant did not investigate either incident. In 1992, however, some staff physicians, including Dr. Toy, raised questions about Dr. Penserga's skills. (D.I. 115 at B172) An ad-hoc QA Committee was formed to review two of Dr. Penserga's cases (not those sued upon). (D.I. 115 at B172-73) It was the committee's recommendation **[*31]** that Dr. Penserga attend a trauma course. (D.I. 115 at B176) Dr. Penserga did not accept the recommendation as he "was planning to give up surgery then and just go to general practice; because again, [malpractice insurance] was a big cost and [he] didn't have too many patients." (D.I. 118, Ex. G at 11) Dr. Penserga let his malpractice insurance lapse in December 1993, and he subsequently lost his privileges. (D.I. 115 at B175)

Although he was subject to formal review with respect to only three cases in six years, Dr. Penserga felt his cases were subject to constant informal review by Dr. Toy. (D.I. 115 at B183-84) Dr. Penserga testified that he felt his cases underwent greater scrutiny than did those of non-foreign physicians although he had no idea how many other physicians' cases were reviewed by the QA Committee. (D.I. 115 at B184-86, B187, B190-91)

Sarah Escaro, R.N. Ms. Escaro, who has not worked at defendant since 1977, testified, based on her years of experience working in hospitals and office practice, that plaintiff would not have been treated as she was had she been a "white American doctor." (D.I. 115 at B192) She also felt that other foreign physicians at defendant, **[*32]** including her husband and Dr. Penserga, had been "mistreated." (D.I. 115 at B195-96)

Ms. Escaro testified that, in approximately 1993, Jack Hamilton, a physical therapist at defendant, told her he did not like Haitian patients because

> they were a problem to him. They didn't speak English. He didn't feel they were cooperative. He felt like they were just there to get something out of the system which they didn't deserve. And they were victims of accidents and they were trying to get money out of insurance companies and they really weren't injured. They're just there to see what they can get for free.

(D.I. 115 at B207) Ms. Escaro informed defendant of the conversation. (D.I. 115 at B212) According to Ms. Escaro, she was advised by defendant that, "for now it probably would be better if [she] sent [her] patients someplace else." (D.I. 115 at B213) Within a couple of days, Mr. Hamilton apologized to Ms. Escaro for his remarks. (D.I. 115 at B214-15)

Dr. Romeo A. Escaro. Dr. Escaro testified that his Haitian patients complained about treatment in physical therapy and the emergency room at defendant. (D.I. 115 at B201) He also testified that several years ago Mr. **[*33]** Hamilton had referred to Haitian patients in derogatory terms. (D.I. 115 at B200)

## D. Defendant's Rebuttal Evidence

According to defendant, between 1990 and 1996, six physicians other than plaintiff were the subject of quality review that resulted in some form of action (voluntary or otherwise). (D.I. 108, P 10)

> a. Dr. A (Filipino). n22 In 1992, while being investigated in connection with major trauma cases, the physician agreed to a voluntary reduction of clinical privileges. Eventually the physician allowed his hospital privileges to lapse when the physician's malpractice insurance expired in 1996. A report was submitted to the National Practitioner Data Bank for the action in 1992.

> b. Dr. B (Caucasian). In 1994, the physician's privileges were terminated after it was discovered that the physician had failed to advise the hospital he was engaged in a serious dispute with another state regarding the physician's license. Once the hospital learned that the other state had denied the physician a license, the hospital revoked the physician's privileges. A report was sent to the National Practitioner Data Bank.

> c. Dr. C (Caucasian). In 1991, questions **[*34]** arose as to the competency of this emergency room physician. A request for summary suspense of privileges was made. An investigation was commenced. The physician withdrew his application for permanent privileges and the physician's temporary privileges were terminated. A report was sent to the National Practitioner Data Bank.

> d. Dr. D (Caucasian). In 1990, questions arose regarding this long-standing physician's ability to continue to appropriately care for a certain category of patients

in the hospital. After meeting with the QA committee, the physician voluntarily changed his membership status from active staff to courtesy staff and noted his intent to no longer admit patients.

e. Dr. E (Caucasian). In 1991, this physician was arrested for alleged drug trafficking. The physician was suspended until he voluntarily entered and satisfactorily completed a substance abuse rehabilitation. The physician subsequently committed suicide. A report was sent to the National Practitioner Data Bank.

f. Dr. F (Caucasian). In 1996, this physician began working in the emergency room. Concerns were voiced regarding the physicians's ability to practice in the emergency room. **[*35]** The physician was told additional training in emergency room practice was needed to continue to practice in the hospital emergency room. After additional training at another hospital, the Caucasian chairperson of the emergency room determined the physician still did not have the ability to serve as an emergency room doctor at [the] hospital. The physician voluntarily resigned from [the] Medical Staff.

(D.I. 108, P10) Plaintiff contends that none of these physicians or situations is comparable to the case at bar.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n22 The names of the physicians were redacted.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Defendant also proffers its history of Filipino leadership in the medical staff. Between 1972 and 1994, the period when plaintiff had privileges at the hospital, six Filipinos, including Dr. Rosales, and five Caucasians served as president of the medical staff. (D.I. 108, P 12) Persons elected to be president serve a two-year term as president-elect and a two-year term as president. (D.I. 108, P 12) The president-elect and president also serve **[*36]** on the board of directors of defendant. (D.I. 108, P 13)

### III. STANDARD OF REVIEW

*HN1* A court shall grant summary judgment only "when the **admissible** evidence fails to demonstrate a genuine issue of material fact, and the moving party is entitled to judgment as a matter of law." Wetzel v. Tucker, 139 F.3d 380, 383 n.2 (3d Cir. 1998) (citing Fed.R.Civ.P. 56 (c)) (emphasis added). The moving party bears the burden of proving that no genuine issue of material fact exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." Horowitz v. Federal Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita at 587 (quoting Fed.R.Civ.P. 56(e)). The **[*37]** court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." Pennsylvania Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence

to enable a jury reasonably to find for the nonmoving party on that issue. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).

HN2⚓With respect to summary judgment in discrimination cases, the court's role is "'to determine whether, upon reviewing all the facts and inferences to be drawn therefrom in the light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally **[\*38]** discriminated against the plaintiff.'" Revis v. Slocomb Indus., Inc., 814 F. Supp. 1209, 1215 (D. Del. 1993) (quoting Hankins v. Temple Univ., 829 F.2d 437, 440 (3d Cir. 1987)).

## IV. DISCUSSION

In moving for summary judgment, defendant contends that plaintiff has failed to establish a prima facie case of "racial" discrimination under § 1981. Moreover, defendant asserts that, even if plaintiff could establish a prima facie case, she has not rebutted defendant's legitimate, nondiscriminatory reason for her termination. In response, plaintiff argues that genuine issues of material fact exist concerning the establishment of a prima facie case and that she has set forth evidence from which a factfinder could infer that ethnicity, not deficiency in performance, was a motivating factor in defendant's decision to terminate her privileges.

### A. Analytical Framework

HN3⚓Section 1981, as amended by the Civil Rights Act of 1991, provides that

> all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of **[\*39]** all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licences, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a). HN4⚓The coverage of the statute "includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." Id. § 1981(b). These rights are protected from encroachment by both private and state actors. See id. § 1981(c).

HN5⚓Although § 1981 does not explicitly use the word "race," it has been construed to prohibit "racial" discrimination in the making of private and public contracts. See St. Francis College v. Al-Khazraji, 481 U.S. 604, 609, 95 L. Ed. 2d 582, 107 S. Ct. 2022 (1987). This prohibition on "racial" discrimination encompasses intentional discrimination on the basis of ancestry or ethnic characteristics. See id. at 613. ("[A] distinctive physiognomy is not essential to qualify for § 1981 protection. If [plaintiff] can prove that he was subjected to intentional discrimination based on the fact that he was **[\*40]** born an Arab, rather than solely on the place or nation of his origin, or his religion, he will have made out a case under § 1981.").

HN6⚓Section 1981 claimants are required to prove intentional racial discrimination under the same burden-shifting framework utilized in Title VII discrimination cases. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973); Stewart v. Rutgers, The State University, 120 F.3d 426, 432 (3d Cir. 1997); Lewis v. J.C. Penney, Co., 948 F. Supp. 367,

371 (D. Del. 1996). Therefore, plaintiff is first required to establish a prima facie case of discrimination by demonstrating that (1) she belongs to an "identifiable class[] of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics," St. Francis College, 481 U.S. at 613; (2) defendant intended to discriminate against her on that basis; and (3) defendant's racially discriminatory conduct abridged a contract or rights enumerated in § 1981(a). See Lewis, 948 F. Supp. at 371; see also Croker v. Boeing Co., 662 F.2d 975, 989 (3d Cir. 1981) (holding that a § 1981 claim requires proof of intentional **[*41]** discrimination). If a prima facie case is established, the burden of production shifts to defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment decision. See McDonnell Douglas, 411 at 802; Geraci v. Moody-Tottrup, Int'l, Inc., 82 F.3d 578, 580 (3d Cir. 1996). If the defendant is successful in meeting this burden, "the plaintiff must produce evidence from which a reasonable factfinder could conclude either that the defendant's proffered justifications are not worthy of credence or that the true reason for the employer's act was discrimination." Bray v. Marriott Hotels, 110 F.3d 986, 990 (3d Cir. 1997) (citations omitted).

HN7⌖A defendant, therefore, is entitled to summary judgment only if it can demonstrate that: (1) the plaintiff is unable to establish a prima facie case of discrimination; or (2) if the plaintiff can establish a prima facie case, the plaintiff cannot produce sufficient evidence from which a factfinder reasonably could infer that the defendant's legitimate, nondiscriminatory reason for discharging plaintiff was pretext. See Stinson v. Delaware River Port Authority, 935 F. Supp. 531, 539 (D.N.J. 1996). HN8⌖The **[*42]** court evaluates defendant's summary judgment motion as follows:

> The district court must determine whether the plaintiff has cast sufficient doubt upon the employer's proffered reasons as to permit a reasonable factfinder to conclude that the reasons are incredible . . . .

Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1072 (3d Cir. 1996) (en banc); see also Smith v. Borough of Wilkinsburg, 147 F.3d 272, 280 (3d Cir. 1998) ("The jurors must be instructed that they are entitled to infer, but need not, that the plaintiff's ultimate burden of demonstrating intentional discrimination by a preponderance of the evidence can be met if they find that the facts needed to make up the prima facie case have been established and they disbelieve the employer's explanation for its decision."). The plaintiff can demonstrate that there is "sufficient doubt" by showing "'weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its actions [such] that a reasonable factfinder **could** rationally find them 'unworthy of credence.'"" Sheridan, 100 F.3d at 1072 (quoting Fuentes v. Perskie, **[*43]** 32 F.3d 759, 765 (3d Cir. 1994) (citations omitted)) (emphasis in original).

## B. The Prima Facie Case

Defendant concedes that plaintiff is a member of a racially cognizable group and does not contest that the alleged discrimination interferes with a right protected by § 1981. Thus, the first and third prongs of the prima facie case are established. Defendant argues, however, that plaintiff has failed to prove the second prong, i.e., that her privileges were terminated because she is of Filipino descent.

HN9⌖To establish the second element, plaintiff "must point to facts of record which, if proved, would 'establish that [defendant's] actions were racially motivated and intentionally

Get a Document - by Citation - 1998 U.S. Dist. LEXIS 6764    Page 20 of 23

Case 1:04-cv-00285-KAJ    Document 38-6    Filed 05/03/2005    Page 11 of 25

discriminatory,' or, at least, 'support an inference that defendants intentionally and purposefully discriminated' against [her] on the basis of [her] race." Ackaa v. Tommy Hilfiger Co., 1998 U.S. Dist. LEXIS 3570, Civ. A. No. 96-8262, 1998 WL 136522 (E.D. Pa. Mar. 24, 1998) (citations omitted). Here, plaintiff attempts to demonstrate discriminatory intent on the part of defendant through a showing of disparate treatment. n23 Consequently, under the McDonnell Douglas framework, she must establish that one **[*44]** or more similarly- situated, Caucasian physicians were treated more favorably than she by defendant. n24 See Blackshear v. City of Wilmington, 15 F. Supp. 2d 417, 1998 U.S. Dist. LEXIS 12042, 1998 WL 458636 (D. Del. 1998) (citing Simpson v. Kay Jewelers, 142 F.3d 639, 646 (3d Cir. 1998)). Following an extensive review of the record, the court finds that plaintiff has not met her burden.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -


n23 Although plaintiff proffers historical and anecdotal evidence of discrimination and intimidation by defendant, her answering brief focuses on her alleged disparate treatment in establishing discriminatory intent for purposes of establishing a prima facie case.


n24 Under McDonnell-Douglas, to establish an entitlement to relief under a theory of disparate treatment, a plaintiff must first demonstrate: (1) that she is a member of a protected class; (2) that she was qualified for the job but was nevertheless rejected for the position; and (3) that nonmembers of the protected class were treated more favorably. See Stewart, 120 F.3d at 432; Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 522 (3d Cir. 1992).


- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*45]**

Plaintiff has failed to present any evidence that defendant afforded better or different treatment with respect to the peer review process to similarly situated, Caucasian physicians than it did to her. She has not offered any evidence indicating that other physicians were subjected to either a different standard of quality assurance review or different peer review procedures. Instead, plaintiff argues that the peer review process was procedurally unfair because it did not entail a "comparative review." However, the procedural fairness of the review process is not the issue at hand, particularly given the absence of any evidence indicating that other physicians were subjected to a different form of review. n25 In fact, the record shows that between 1990 and 1996, five Caucasian physicians were the subject of quality assurance review resulting in some form of action. Thus, plaintiff has failed to satisfy the second prong of her prima facie case. n26 This conclusion is buttressed by plaintiff's apparent admission in her response to defendant's motion in limine that she has failed to establish a comparator:

> The lack of a single comparator who mirrors the alleged clinical **[*46]** and administrative problems of Dr. Pamintuan in no way minimizes the Plaintiff's case. On the contrary[,] it highlights the overt and deliberate action of the Hospital by its failure to conduct the appropriate comparative analysis/study involving Dr. Pamintuan and other OB/GYN physicians at Nanticoke.


(D.I. 127 at 2) Accordingly, the court shall grant summary judgment in favor of the hospital on plaintiff's § 1981 claim.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

Get a Document - by Citation - 1998 U.S. Dist. LEXIS 16764    Page 21 of 23

Case 1:04-cv-00285-KAJ    Document 38-6    Filed 05/03/2005    Page 12 of 25

n25 As noted above, although plaintiff contends that 15 morbidity cases in the OB/GYN Department reflected a lesser standard of care (1998 U.S. Dist. LEXIS 16764 at *10-11), she fails to identify the ethnicity of the treating physician or explain why she did not identify quality of care issues at the time the cases were peer reviewed.

n26 The fact that other physicians had charting and timeliness problems during the relevant time period is not persuasive where, as in plaintiff's case, other quality of care issues were identified by defendant.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

## C. Evidence of Pretext

Even assuming, arguendo, **[*47]** that plaintiff could establish a prima facie case, defendant has set forth evidence of a legitimate, nondiscriminatory reason for the termination of plaintiff's privileges, and plaintiff has not offered sufficient rebuttal evidence. See Simpson, 142 F.3d at 646 (noting that "at the pretext stage . . . the factual inquiry into the alleged discriminatory motives of the employer has risen to a new level of specificity."). In her attempt to show that defendant's enunciated reason was pretextual, plaintiff relies on defendant's failure to conduct a comparative review. In this regard, the Third Circuit has noted that,

> HN10🔁
>
> in determining whether similarly situated nonmembers of the protected class were treated more favorably than a member of the protected class, the focus is on the particular criteria or qualifications identified by the employer as the reason for the adverse action. The employee's positive performance in another category is not relevant, and neither is the employee's judgment as to the importance of the stated criterion. Furthermore, the court does not subjectively weigh factors it considers important. Rather, the plaintiff must point to evidence from which a **[*48]** factfinder could reasonably infer that the plaintiff satisfied the criterion identified by the employer or the employer did not actually rely upon the stated criterion.

Id. at 647 (internal citations omitted). In the absence of evidence that nonmembers of the protected class were reviewed differently than plaintiff, a reasonable factfinder could not infer that the hospital's proffered reason was pretextual based upon plaintiff's subjective belief that a comparative review process was warranted. The lack of such evidence is especially noteworthy given the ethnic make-up of the OB/GYN Department--two Caucasians, one Hispanic, and one Filipino other than plaintiff. Plaintiff also contends that her 1992 reappointment leads to an inference of discrimination with respect to the termination of her privileges in 1996. Given the extensive documentation indicating that concerns over plaintiff's conduct escalated through 1993 and 1994, her 1992 reappointment is not a sufficient basis from which to infer discriminatory intent.

Plaintiff points to defendant's alleged history of discrimination and intimidation toward minority physicians and patients to bolster her allegation of pretext. **[*49]** The admissible evidence tendered in this regard does not demonstrate that invidious discrimination more likely than not motivated the adverse action. The lack of temporal proximity and the different decisionmakers involved make these contentions an insufficient basis from which to infer discriminatory intent.

Get a Document - by Citation - 1998 U.S. Dist. LEXIS 16764

Case 1:04-cv-00285-KAJ   Document 38-6   Filed 05/03/2005   Page 13 of 25   Page 22 of 23

The anecdotal evidence of discriminatory events presented by plaintiff also do not warrant a finding that defendant's proffered reason was pretextual. Neither plaintiff nor the deponents offered any evidence showing that the "adverse actions" to which they were subjected were motivated in any way by an anti-foreign physician bias, much less an anti-Filipino bias. In fact, Dr. Yatco did not feel that his ethnicity played any role in the events to which he testified. Rather, for the most part the factual underpinnings of these events implicate economic and competitive motivations. Moreover, despite their feelings of disparate treatment or discrimination, not one of these deponents filed a complaint with the administration. Thus, even if the court were to credit plaintiff's anecdotal evidence, a reasonable factfinder could not infer from it that defendant's decision regarding plaintiff [*50] was motivated by ethnicity. n27 Consequently, even if plaintiff had established a prima facie case, summary judgment in favor of defendant is proper because there is no basis from which a rational factfinder could infer that defendant's proffered reason is not worthy of credence.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n27 Since the court finds this evidence insufficient to rebut defendant's proffered nondiscriminatory motive for the termination of plaintiff's privileges, it stands to reason that it would not be acceptable to establish the second prong of plaintiff's prima facie case since that burden is less onerous. See Simpson, 142 F.3d at 646.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

## IV. CONCLUSION

For the reasons stated above, the court concludes that there are no genuine issues of material fact relating to plaintiff's § 1981 claim. Therefore, defendant's motion for summary judgment with respect to plaintiff's federal claim shall be granted.

The remainder of plaintiff's claims are grounded on state law. Since plaintiff's § 1981 claim was the only claim raised in [*51] the amended complaint over which the court had original jurisdiction, and since the court "may decline to exercise supplemental jurisdiction" over state law claims if the court "has dismissed all claims over which it has original jurisdiction," the remaining state law claims are properly dismissed on jurisdictional grounds. 28 U.S.C. § 1367(c) (3). An appropriate order shall issue.

Service:  **Get by LEXSEE®**
Citation:  **1998 us dist lexis 16764**
View:  Full
Date/Time:  Monday, May 2, 2005 - 8:17 PM EDT

* Signal Legend:
- Warning: Negative treatment is indicated
Q - Questioned: Validity questioned by citing refs
⚠ - Caution: Possible negative treatment
◆ - Positive treatment is indicated
A - Citing Refs. With Analysis Available
i - Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case

Get a Document - by Citation - 1998 U.S. Dist. LEXIS 16764

Case 1:04-cv-00285-KAJ    Document 38-6    Filed 05/03/2005    Page 14 of 25    Page 23 of 23

About LexisNexis | Terms and Conditions

Copyright © 2005 LexisNexis, a division of Reed Elsevier Inc  All rights reserved

Service: **Get by LEXSEE®**
Citation: **2003 U.S. Dist. LEXIS 5663**

*2003 U.S. Dist. LEXIS 5663, \*; 148 Lab. Cas. (CCH) P34,718;*
*84 Empl. Prac. Dec. (CCH) P41,433; 14 Am. Disabilities Cas. (BNA) 522*

KIMMBERLY A. PANTO, Plaintiff, v. PALMER DIALYSIS CENTER/TOTAL RENAL CARE, Defendant.

CIVIL ACTION NO. 01-6013

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2003 U.S. Dist. LEXIS 5663; 148 Lab. Cas. (CCH) P34,718; 84 Empl. Prac. Dec. (CCH) P41,433;
14 Am. Disabilities Cas. (BNA) 522; 8 Wage & Hour Cas. 2d (BNA) 1072

April 7, 2003, Decided
April 7, 2003, Filed

**DISPOSITION:** Motion for summary judgment granted in part and denied in part.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff employee filed an action against defendant employer and alleged violations of the Americans with Disabilities Act (ADA), 42 U.S.C.S. § 12101 et seq., the Family and Medical Leave Act (FMLA), 29 U.S.C.S. § 2601 et seq., and the Pennsylvania Human Relations Act (PHRA), 43 Pa. Cons. Stat. § 951 et seq. The employer filed a motion for summary judgment.

**OVERVIEW:** The employee suffered from lupus and rheumatoid arthritis when she was hired. Thereafter, she was also seen for anxiety and depression. After being given many warnings, the employee was terminated based on her excessive absences. She then filed this discrimination action. The court denied the employer's motion for summary judgment regarding the employee's claims under the PHRA and under 42 U.S.C.S. § 12115(a) and (b) (5)(A) of the ADA. The employee presented sufficient evidence that a reasonable jury could have found that she was disabled within the meaning of the ADA and that she was a "qualified individual." Fact issues existed regarding whether the employer discriminated against the employee based on her disability. Because the employee was not eligible for FMLA leave at the time her employment was terminated, she failed to establish her claim under 29 U.S.C.S. § 2612(a)(1). Furthermore, because there was no causal connection between when the employee took her FMLA leave and when she was terminated, she failed to establish a prima facie case of retaliation under 29 U.S.C.S. § 2615(a)(2). Thus, the employer was granted summary judgment on the employee's FMLA claim.

**OUTCOME:** The court granted the employer's summary judgment motion regarding the employee's FMLA claim. The court denied the motion regarding the employee's ADA and PHRA claims.

**CORE TERMS:** summary judgment, disability, accommodation, termination, eligible, leave of absence, absenteeism, reasonable accommodation, prima facie case, retaliation, probationary period, causal connection, terminated, excessive, month period, return to work, attendance, warned, lupus, Medical Leave Act, temporal proximity, protected activity, undue hardship, warning, discriminated, preponderance, accommodate, interactive, prior approval, immune system

### LexisNexis(R) Headnotes ✦ Hide Headnotes

Civil Procedure > Summary Judgment > Summary Judgment Standard 🖰

HN1⚡A motion for summary judgment will be granted where all of the evidence
    demonstrates that there is no genuine issue as to any material fact and that the
    moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A
    dispute about a material fact is genuine if the evidence is such that a reasonable jury
    could return a verdict for the nonmoving party. Since a grant of summary judgment
    will deny a party its chance in court, all inferences must be drawn in the light most
    favorable to the party opposing the motion. The ultimate question in determining
    whether a motion for summary judgment should be granted is whether reasonable
    minds may differ as to the verdict. Only disputes over facts that might affect the
    outcome of the suit under the governing law will properly preclude the entry of
    summary judgment.   More Like This Headnote

Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions 🖰

HN2⚡The Americans with Disabilities Act, 42 U.S.C.S. § 12101 et seq., prohibits
    employment discrimination against a qualified individual with a disability because of
    the disability of such individual. 42 U.S.C.S. § 12112(a). Employers are prohibited
    from discriminating against such individuals with regard to job application procedures,
    the hiring, advancement, or discharge of employees, employee compensation, job
    training, and other terms, conditions, and privileges of employment. The term
    "discriminate" includes not making reasonable accommodations to the known physical
    or mental limitations of an otherwise qualified individual with a disability who is an
    applicant or employee, unless such covered entity can demonstrate that the
    accommodation would impose an undue hardship on the operation of the business of
    such covered entity. 42 U.S.C.S. § 12112(b)(5)(A).   More Like This Headnote

Labor & Employment Law > Discrimination > Disability Discrimination > Other Laws 🖰
Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions 🖰

HN3⚡Pennsylvania courts have interpreted the Pennsylvania Human Relations Act, 43 Pa.
    Cons. Stat. § 951 et seq., using the same legal standards as the Americans with
    Disabilities Act, 42 U.S.C.S. § 12101 et seq.   More Like This Headnote

Labor & Employment Law > Discrimination > Disability Discrimination > Proof of Discrimination 🖰

HN4⚡The court follows the burden-shifting framework when analyzing claims under the
    Americans with Disabilities Act, 42 U.S.C.S. § 12101 et seq. Under this framework,
    plaintiff/employee must show, by a preponderance of the evidence, a prima facie case
    of discrimination. If the employee is able to do this, the burden shifts to the employer
    to articulate some legitimate, nondiscriminatory reason for its actions against the
    employee. If the employer can meet this burden, then the burden shifts back to the
    employee to prove, by a preponderance of the evidence, that the reasons articulated
    by the defendant were actually pretext for discriminatory practices. Although the
    burden of production may shift, the ultimate burden of persuading the trier of fact that
    the defendant intentionally discriminated against the plaintiff remains at all times with
    the plaintiff.   More Like This Headnote

Labor & Employment Law > Discrimination > Disability Discrimination > Proof of Discrimination 🖰

HN5⚡To establish a prima facie case of discrimination under the Americans with Disabilities
    Act (ADA), 42 U.S.C.S. § 12101 et seq., a plaintiff must demonstrate that: (1) she is a
    disabled person within the meaning of the ADA; (2) she is otherwise qualified to
    perform the essential functions of the job, with or without reasonable accommodations
    by the employer; and (3) she has suffered an adverse employment action because of
    that disability.   More Like This Headnote

Labor & Employment Law > Discrimination > Disability Discrimination > Employment Practices

*HN6* An employer who fails to provide reasonable accommodation to the known physical or mental limitations of a qualified individual with a disability commits unlawful discrimination unless the accommodation can be shown to impose undue hardship. See 42 U.S.C.S. § 12112(b)(5)(A). The term "reasonable accommodation" may include (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities. 42 U.S.C.S. § 12111 (9).   More Like This Headnote

Labor & Employment Law > Discrimination > Disability Discrimination > Proof of Discrimination

*HN7* To establish a prima facie case of failure to accommodate under the Americans with Disabilities Act (ADA), 42 U.S.C.S. § 12101 et seq., plaintiff must show that: (1) the defendant is a covered employer; (2) she is disabled within the meaning of the statute; (3) she can perform the essential functions of the job with or without reasonable accommodation; and (4) the defendant knew of her disability and failed to provide her with a reasonable accommodation. The employer's duty to provide reasonable accommodations does not extend, however, to accommodations that would impose an undue hardship on the operation of the business. 42 U.S.C.S. § 12112(b) (5)(A).   More Like This Headnote

Labor & Employment Law > Discrimination > Disability Discrimination > Proof of Discrimination
Labor & Employment Law > Discrimination > Disability Discrimination > Employment Practices

*HN8* To determine the appropriate reasonable accommodation it may be necessary for the employer to initiate an informal, interactive process with the employee with a disability in need of accommodation. 29 C.F.R. § 1630.2(o)(3) (2002). This process should identify the precise limitations resulting from the disability and the potential reasonable accommodations that could overcome those limitations. In turn, both parties have a duty to assist in the search for appropriate reasonable accommodation and to act in good faith. To show that an employer failed to participate in the interactive process, an employee must demonstrate: (1) the employer knew about the employee's disability; (2) the employee requested reasonable accommodations or assistance for her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith.   More Like This Headnote

Labor & Employment Law > Leaves of Absence > Family & Medical Leave

*HN9* The Family and Medical Leave Act (FMLA) entitles employees to take reasonable leave for medical reasons, for the birth or adoption of a child, and for the care of a child, spouse, or parent who has a serious health condition. 29 U.S.C.S. § 2601(b)(2). The FMLA contains two distinct types of rights. The first type, labeled as prescriptive or substantive rights, relates to the ability to take 12 weeks of unpaid leave. The second type, called proscriptive rights, includes protection in the event that an employee is discriminated against for exercising the prescriptive rights as set forth in the statute.   More Like This Headnote

Labor & Employment Law > Leaves of Absence > Family & Medical Leave

*HN10* The Family Medical Leave Act, 29 U.S.C.S. § 2601 et seq., entitles "eligible employees" to a total of 12 workweeks of leave during any 12-month period for certain, specified reasons set forth in the Act. 29 U.S.C.S. § 2612(a)(1). The

employer, however, is permitted to choose the method for determining the "12-month period" in which the 12 weeks of leave entitlement occurs. 29 C.F.R. § 825.200(b).  More Like This Headnote

Labor & Employment Law > Leaves of Absence > Family & Medical Leave
HN11⯑The term "eligible employee" for purposes of the Family Medical Leave Act, 29 U.S.C.S. § 2601 et seq., means an employee who has been employed (i) for at least 12 months by the employer with respect to whom leave is requested under 29 U.S.C.S. § 2612; and (ii) for at least 1,250 hours of service with such employer during the previous 12-month period. 29 U.S.C.S. § 2611(2)(A).  More Like This Headnote

Labor & Employment Law > Leaves of Absence > Family & Medical Leave
HN12⯑The Family Medical Leave Act (FMLA), 29 U.S.C.S. § 2601 et seq., does not create a federal cause of action to enforce the voluntary employer policies of providing benefits that exceed those required by the FMLA.  More Like This Headnote

Labor & Employment Law > Leaves of Absence > Family & Medical Leave
HN13⯑See 29 C.F.R. § 825.700(a) (2002).

Labor & Employment Law > Leaves of Absence > Family & Medical Leave
HN14⯑The Family Medical Leave Act (FMLA), 29 U.S.C.S. § 2601 et seq., makes it unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by the subchapter. 29 U.S.C.S. § 2615(a)(2). This portion of the FMLA prohibits retaliation by an employer for the employee's exercise of rights under the FMLA. As with other retaliation claims, the court utilizes the burden-shifting framework in analyzing such a claim under the FMLA.  More Like This Headnote

Labor & Employment Law > Leaves of Absence > Family & Medical Leave
HN15⯑To establish a prima facie case of retaliation under the Family Medical Leave Act (FMLA), 29 U.S.C.S. § 2601 et seq., a plaintiff must show that: (1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment action; and (3) a causal connection exists between the adverse action and the plaintiff's exercise of her FMLA rights. It is established that a causal connection between an employee's protected activity and an adverse action by her employer may be inferred if the events occurred close in temporal proximity to each other.  More Like This Headnote

**COUNSEL:** [*1] For Kimberly A Panto, PLAINTIFF: Donald P Russo, Attorney at Law, Bethlehem, PA USA. Vanessa M Nenni, Bethlehem, PA USA.

For Renal Treatment Center Northeast, Inc, DEFENDANT: Joseph J Centeno, Obermayer, Rebmann, Maxwell & Hippel, LLP, Philadelphia, PA USA. Lori E Halber, Obermayer Rebmann Maxwell & Hippel, LLP, Philadelphia, PA USA.

**JUDGES:** RONALD L. BUCKWALTER, J.

**OPINIONBY:** RONALD L. BUCKWALTER

**OPINION: MEMORANDUM**

BUCKWALTER, J.

April 7, 2003

Presently before the Court is Defendant Palmer Dialysis Center/Total Renal Care's Motion for Summary Judgment, Plaintiff Kimmberly A. Panto's Response, and Defendant's Reply. For the reasons stated below, Defendant's Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part.

## I. BACKGROUND

Kimmberly A. Panto (hereinafter referred to as "Panto" or "Plaintiff") was diagnosed with rheumatoid arthritis in 1988 and systemic lupus erythmatosis ("lupus") n1 in 1990. See Pl.'s Resp.-Ex. I, Panto Dep. (hereinafter referred to as "Panto Dep.") at 36-37.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 Plaintiff's lupus affects her immune system. Plaintiff stated that "my immune system does not shut down after a cold or a virus. What happens is my immune system still produces antibodies, and these antibodies attack my soft tissue organs like my joints, my liver, my spleen . . . ." Panto Dep. at 36.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*2]**

In March 1997, Defendant Renal Treatment Center Northeast, Inc. d/b/a Palmer Dialysis Center n2 (hereinafter referred to as "Defendant" or "Palmer Dialysis" or the "Company") hired Panto to serve as a dialysis technician. As with other companies, Palmer Dialysis had policies regarding leave under the <u>Family and Medical Leave Act</u> ("FMLA"), Paid Time Off ("PTO") leave n3, and extended illness leave. See Pl.'s Mot. Summ. J.-Ex. E, Mary Baker Dep. (hereinafter referred to as "Baker Dep.") at 9-10. Palmer Dialysis' Director of Nursing, Barbara Danko ("Danko"), felt Panto "deserved a chance," even though she had been terminated from her prior employer for excessive absenteeism. Defendant knew upon hiring Panto that she was diagnosed with lupus. n4 See Def.'s Mot. Summ. J.-Ex. B, Verbal Warning Report.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n2 Defendant was misnamed in the Complaint as Palmer Dialysis Center/Total Renal Care. Palmer Dialysis is a renal treatment clinic located in Easton, Pennsylvania.

n3 The PTO policy is based on time worked. If an employee works the requisite number of hours, it is possible for the employee to accrue a maximum of 176 hours of PTO in the first year, 192 hours in the second year, and 200 hours in the third year. See Pl.'s Mot. Summ. J.-Ex. F, Susan Wright Dep. (hereinafter referred to as "Wright Dep.") at 11-12. **[*3]**

n4 During her employment with Palmer Dialysis, Panto was also treated for anxiety, depression, irritable bowl, and asthma. See Pl.'s Mot. Summ. J.-Ex. H, Zoe Caruso Dep. (hereinafter referred to as "Caruso Dep.") at 49-50.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Panto generally performed well at work, though the effects of her ailments often caused her to miss work. This was particularly true when her illness would "flare-up," confining Panto to her

couch for two or three days a month solely to rest. See Panto Dep. at 41. All of Panto's absences were noted in her personnel file, see Baker Dep. at 13, and Danko testified that she did not question whether or not Panto was out due to real health problems. See Danko Dep. at 16.

Within the first ninety days of Panto's employment with Palmer Dialysis, on May 12, 1997, Panto received a verbal warning for frequent absenteeism. Def.'s Mot. Summ. J.-Ex. B, Verbal Warning Report. Panto received an "Unsatisfactory" rating with respect to "Availability" on her Introductory Period Performance Appraisal. Danko warned Panto that continued absences could result in termination. See **[*4]** Danko Dep. at 19.

A year after her hire, Panto continued to perform unsatisfactorily with regard to meeting the Company's attendance standards. On March 31, 1998, Danko issued Panto an Employee Performance Planning and Review. Panto received a 2 rating--"performance needs improvement"--under the section "Personal Development and Professionalism," which includes, among other things, the extent to which the employee meets attendance standards.

In the spring of 1998, Total Renal Care bought Palmer Dialysis. Total Renal Care's handbook, which it distributed to all employees including Panto, stressed the importance of attendance: "Regular attendance is a necessary condition of employment. Frequent absences or lateness disrupts patient care, puts a burden on other employees and affects departmental performance." See Panto Dep. at 108.

The record indicates multiple absences in late 1998 and early 1999. Specifically, Panto was absent from work on October 21, 22 and December 28, 1998, and January 15, 16, and February 2, 1999. On February 3, 1999, Panto's supervisor, Mary Baker ("Baker"), who became the Director of Nursing at Palmer Dialysis after Danko left, issued Panto a verbal warning **[*5]** for excessive absenteeism. Baker informed Panto that her excessive absences were creating a hardship on the unit.

On May 18, 1999, Panto took FMLA leave for her pregnancy and subsequent birth of her daughter. The Company's FMLA policy provided twelve weeks leave in a 12-month period. Panto's FMLA leave expired on August 10, 1999, but Panto could not return to work because she was still restricted from working by her physician. Total Renal Care granted Panto additional leave.

When Panto's physician cleared her to return to work on September 13, 1999, Total Renal Care reinstated Panto as a dialysis technician with the same hours and same shifts at the same rate of pay. Id. at 25. The only change in Panto's employment was that she floated through three Total Renal Care dialysis clinics rather than reporting to one.

When Panto returned from leave, or shortly thereafter, Zoe Caruso ("Caruso") replaced Baker as the Director of Nursing at Palmer Dialysis. Panto recorded additional absences on October 1, 21, November 12, 13, 14, 15, and 17, 1999.

Recognizing that her absenteeism was a problem, Panto wrote a letter to the administrator's at Total Renal Care's Whitehouse Dialysis Unit **[*6]** on November 18, 1999. In the letter, Panto wrote: "I realize I have been absent from your unit too much. I am working to correct the problem and will." Id. at 83-84. Panto wrote that she did not "see any other absences in the future." Id. at 84

Caruso placed Panto on a Performance Management Plan on November 24, 1999. The Performance Management Plan provided for a ninety-day probationary period, from November 24, 1999 to February 21, 2000. Panto was warned that two absences during the probationary period would result in a three-day suspension.

Despite her assurances that she would correct the problem, Panto was absent on December 4,

1999, for which she received another warning, and on January 10, 2000, for which she received the suspension set forth in the Performance Management Plan. After Panto's January 10, 2000 absence, Caruso warned Panto that if she were absent again during the probationary period, her employment would be terminated.

Panto's probation expired on February 21, 2000. Just four days later, on February 25, 2000, Panto was absent from work once again. In accordance with Total Renal Care's progressive discipline policy, Caruso suspended Panto for three days **[*7]** without pay.

On February 29, 2000, Caruso placed Panto on another Performance Management Plan. The terms of the plan provided for a six-month probationary period and warned that Panto's first absence during the probationary period would result in the termination of her employment.

The following day, on March 1, 2000, Panto requested a leave of absence from March 4, 2000 to March 28, 2000, because her doctor wanted Panto to adjust to the medications for her anxiety and depression. Caruso granted Panto's request for leave of absence.

As a condition to Panto's leave of absence, Panto agreed that upon her return to work, she would begin the six-month probationary period set forth in the February 29, 2000 Performance Management Plan. Panto agreed to the terms of the plan, which included that "any infraction of the probation would result in termination."

Panto returned to work from her leave of absence on or about March 27, 2000. Upon her return to work, Panto requested that she be put on a thirty hours per week work schedule. Caruso granted Panto's request to be placed on a thirty hours per week work schedule.

Panto never had the opportunity to work thirty hours per week because, **[*8]** on April 13, 2000, she was absent once again. Panto's absence on this day was an infraction of the terms of the February Performance Management Plan, and, as a result, Total Renal Care terminated Panto. It is not known whether Panto had any PTO available at the time of termination. See Wright Dep. at 21.

Panto filed the instant action alleging violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq., the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq., and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. § 951 et seq. Palmer Dialysis filed a motion for summary judgment, to which Panto responds.

## II. STANDARD OF REVIEW

*HN1* A motion for summary judgment will be granted where all of the evidence demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). **[*9]** Since a grant of summary judgment will deny a party its chance in court, all inferences must be drawn in the light most favorable to the party opposing the motion. U.S. v. Diebold, Inc., 369 U.S. 654, 655, 8 L. Ed. 2d 176, 82 S. Ct. 993 (1962).

The ultimate question in determining whether a motion for summary judgment should be granted is "whether reasonable minds may differ as to the verdict." Schoonejongen v. Curtiss-Wright Corp., 143 F.3d 120, 129 (3d Cir. 1998). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248.

## III. DISCUSSION

## A. ADA/PHRA

*HN2* The ADA n5 prohibits employment discrimination "against a qualified individual with a disability because of the disability of such individual . . . ." 42 U.S.C. § 12112(a). Employers are prohibited from discriminating against such individuals with regard to "job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment. **[\*10]** " Id. The term "discriminate" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n5 It is well-established that the *HN3* Pennsylvania courts have interpreted the PHRA using the same legal standards as the ADA. Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996); Alifano v. Merck & Co., 175 F. Supp. 2d 792, 796 (E.D. Pa. 2001). Therefore, the Court's analysis of the ADA claim applies equally to Panto's PHRA claim.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

*HN4* The Court follows the burden-shifting framework first set forth by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973), when analyzing claims under the ADA. Shaner v. Synthes, 204 F.3d 494, 500 (3d Cir. 2000). **[\*11]** Under this framework, Plaintiff/employee must show, by a preponderance of the evidence, a prima facie case of discrimination. McDonnell Douglas, 411 U.S. at 802. If the employee is able to do this, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for its actions against the employee. Id. If the employer can meet this burden, then the burden shifts back to the employee to prove, by a preponderance of the evidence, that the reasons articulated by the defendant were actually pretext for discriminatory practices. Id. 411 U.S. 792 at 804, 36 L. Ed. 2d 668, 93 S. Ct. 1817. Although "the burden of production may shift, 'the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" Shaner, 204 F.3d at 500-01 (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981)).

*HN5* To establish a prima facie case of discrimination under the ADA, a plaintiff must demonstrate that: (1) she is a disabled person within the meaning of the ADA; (2) she is otherwise qualified to perform the **[\*12]** essential functions of the job, with or without reasonable accommodations by the employer; and (3) she has suffered an adverse employment action because of that disability. See Deane v. Pocono Med. Ctr., 142 F.3d 138, 142 (3d Cir. 1998). In the present case, Panto has presented sufficient evidence that a reasonable jury could find that she is disabled within the meaning of the ADA and that she is a "qualified individual." As such, Plaintiff may be able to prove, by a preponderance of the evidence, a prima facie case of disability discrimination.

Defendant, however, presents a legitimate, non-discriminatory reason for Panto's termination-- excessive absenteeism. In support of her argument that Defendant's reason is merely a pretext for discrimination, Panto simply states that "where an employer asserts excessive absenteeism as a non-discriminatory justification for an employee's termination, that justification cannot analytically be considered apart from the alleged disability causing the absenteeism." Barnett v. Revere Smelting & Ref. Corp., 67 F. Supp. 2d 378, 392 (S.D.N.Y. 1999). The Court finds this argument persuasive and reserves the issue for **[\*13]** a jury to decide whether Defendant's

proffered motive was pretextual.

Plaintiff also alleges that Defendant violated the ADA by failing to provide her with reasonable accommodations. *HN6* An employer who fails to provide reasonable accommodation to the known physical or mental limitations of a qualified individual with a disability commits unlawful discrimination unless the accommodation can be shown to impose undue hardship. See 42 U.S.C. § 12112(b)(5)(A). The term "reasonable accommodation" may include-

> (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

> (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities. 42 U.S.C. § 12111(9).

*HN7* To establish a prima facie case of failure to accommodate under the ADA, Plaintiff must show that: (1) the defendant is a **[*14]** covered employer; (2) she is disabled within the meaning of the statute; (3) she can perform the essential functions of the job with or without reasonable accommodation; and (4) the defendant knew of her disability and failed to provide her with a reasonable accommodation. See Kralik v. Durbin, 130 F.3d 76, 78 (3d Cir. 1997). The employer's duty to provide reasonable accommodations does not extend, however, to accommodations that "would impose an undue hardship on the operation of the business." 42 U.S.C. § 12112(b)(5)(A).

Additionally, *HN8* "to determine the appropriate reasonable accommodation it may be necessary for the [employer] to initiate an informal, interactive process with the [employee] with a disability in need of accommodation." 29 C.F.R. § 1630.2(o)(3) (2002). "This process should identify the precise limitations resulting from the disability and the potential reasonable accommodations that could overcome those limitations." Id. In turn, "both parties have a duty to assist in the search for appropriate reasonable accommodation and to act in good faith." Mengine v. Runyon, 114 F.3d 415, 419-20 (3d Cir. 1997). **[*15]**

To show that an employer failed to participate in the interactive process, an employee must demonstrate: (1) the employer knew about the employee's disability; (2) the employee requested reasonable accommodations or assistance for her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith. Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 319-20 (3d Cir. 1999).

Plaintiff argues that Defendant did not earnestly engage in the interactive process as required by the ADA. Specifically, Panto argues that Defendant did not accommodate her when it placed her on a six month probationary program where she would be terminated as soon as she missed one day of work. In light of the Court's finding that there are genuine issues of material fact as to whether Defendant discriminated against her based on her disability, the Court also reserves to a jury the issue of whether Defendant failed to reasonably accommodate Panto.

Accordingly, Defendant's motion for summary judgment as to Plaintiff's ADA and PHRA claims is denied. **[*16]**

**B. FMLA**

*HN9* The Family and Medical Leave Act ("FMLA") entitles "employees to take reasonable leave for medical reasons, for the birth or adoption of a child, and for the care of a child, spouse, or parent who has a serious health condition." 29 U.S.C. § 2601(b)(2).

The FMLA contains two distinct types of rights. See Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 159 (1st Cir. 1998). The first type, labeled as prescriptive or substantive rights, relates to the ability to take twelve weeks of unpaid leave. Id. The second type, called proscriptive rights, includes protection in the event that an employee is discriminated against for exercising the prescriptive rights as set forth in the statute. Id. 144 F.3d 151 at 159-60.

Plaintiff contends that Defendant violated both her substantive and proscriptive rights under the FMLA. The Court will address each argument in turn.

1. Prescriptive/Substantive Rights

*HN10* The FMLA entitles "eligible employees" n6 "to a total of 12 workweeks of leave during any 12-month period" for certain, specified reasons set forth in the act. 29 U.S.C. § 2612(a)(1). The employer, however, **[*17]** is permitted to choose the method for determining the "12-month period" in which the 12 weeks of leave entitlement occurs. See 29 C.F.R. § 825.200(b).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -



n6 *HN11* The term "eligible employee" means an employee who has been employed "(i) for at least 12 months by the employer with respect to whom leave is requested under section 2612 of this title; and (ii) for at least 1,250 hours of service with such employer during the previous 12-month period." 29 U.S.C. § 2611(2)(A). Defendant contends that Panto is not an "eligible employee" under the FMLA because she did not work the requisite 1,250 hours. See Def.'s Mot. Summ. J. at 8. Panto, however, contends that Defendant erroneously calculated her eligibility time, and, as such, that she is an "eligible employee." See Pl.'s Resp. at 28. Drawing all inferences in the light most favorable to Plaintiff, the Court will assume, for purposes of the present Motion for Summary Judgment, that Plaintiff is an "eligible employee." The Court can then address the arguments based on the amount of leave Plaintiff actually took from work.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*18]**

It is undisputed that Panto was not entitled to FMLA leave at the time of her termination from employment on April 13, 2000. Panto admits that she was not eligible for leave under the FMLA on March 1, 2000 because she had already used 12 weeks of FMLA leave during the summer of 1999. See Def.'s Mot. Summ. J.-Tab 1, Pl.'s Answers to Def.'s Req. for Admis. at 65; Panto Dep. at 94. Under Total Renal Care's policy, in accordance with 29 C.F.R. § 825.200(d), "the 12-month period is measured backward from the date an employee requests an FMLA leave." Panto had already used all her FMLA leave from May 18, 1999 to August 10, 1999. Accordingly, Panto did not begin to reacquire FMLA leave time until after May 18, 2000.

Plaintiff argues, however, that Defendant is estopped from asserting that Panto's leave was confined to twelve weeks because Defendant's Employee Policy allowed for up to six months medical leave under the FMLA. See Pl.'s Resp. at 30. The Company's policy states:

The Company recognizes there may be times when you are required to be away from your job an extended period of time. Leaves of absence will be administered in compliance with the Family and Medical Leave **[*19]** Act "FMLA". . . Additionally, a qualified leave of absence, upon prior approval, may be extended for an additional three (3) months (not to exceed a total of six months).

Id. at Ex. C-Def.'s Extended Illness Leave Policy.

Despite the existence of additional leave in the policy, the Court finds that Defendant correctly asserted the affirmative defense that Panto exhausted her twelve weeks of FMLA leave to which she was entitled. Defendant's policy provides a more generous benefit, but it does not convert this leave to an entitlement under the FMLA. Defendant's FMLA policy clearly provides only twelve weeks leave. See Def.'s Mot. Summ. J.-Ex. F, Family and Med. Leave of Absence. The Company's policy provides additional leave, but this grant of additional leave is within the discretion of the Company. See Pl.'s Resp.-Ex. C, Def.'s Extended Illness Leave Policy (stating that "a qualified leave of absence, upon prior approval, *may* be extended for an additional three months") (emphasis added). The employee must also obtain prior approval before being granted extended leave. Although Defendant's policy contemplates an additional three months "qualified leave of absence, **[\*20]** " *HN12*⚓the FMLA does not create a federal cause of action to enforce the voluntary employer policies of providing benefits that exceed those required by the FMLA. See Rich v. Delta Air Lines, Inc., 921 F. Supp. 767, 773 (N.D. Ga. 1996) (stating that "section 825.700 n7 does not, and could not, however, create a federal cause of action under the FMLA to enforce the voluntary employer policies of providing benefits that exceed those required by the FMLA").

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n7 Section 825.700 provides, in part, that *HN13*⚓"an employer must observe any employment benefit program or plan that provides greater family or medical leave rights to employees than the rights established by the FMLA." 29 C.F.R. § 825.700(a) (2002).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Because Panto was not eligible for FMLA leave at the time her employment was terminated, she cannot establish an interference claim under the FMLA. As such, Defendant Palmer Dialysis' Motion for Summary Judgment is granted.

2. Proscriptive Rights

*HN14*⚓The FMLA also makes it unlawful **[\*21]** "for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2). This portion of the FMLA prohibits retaliation by an employer for the employee's exercise of rights under the FMLA. As with other retaliation claims, the Court utilizes the burden-shifting framework set forth by the United States Supreme Court in McDonnell Douglas in analyzing such a claim under the FMLA. See Sherrod v. Philadelphia Gas Works, 209 F. Supp. 2d 443, 451 (E.D. Pa. 2002).

*HN15*⚓To establish a prima facie case of retaliation under the FMLA, Plaintiff must show that: (1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment action; and (3) a causal connection exists between the adverse action and Plaintiff's exercise of her FMLA rights. Alifano, 175 F. Supp. 2d at 795; Baltuskonis v. U.S. Airways, Inc., 60 F. Supp. 2d 445, 448 (E.D. Pa. 1999). Although Defendant concedes that Panto engaged in a statutorily protected activity and that her termination was an adverse employment action, see Def. **[\*22]** 's Mot. Summ. J. at 11, Defendant argues that Plaintiff cannot establish a causal connection between her discharge and her FMLA leave.

It is established that "[a] causal connection between an employee's protected activity and an adverse action by her employer may be inferred if the events occurred close in temporal