Project Management Meetings: MBF requested GMR provide weekly status reports which are created in a WORD document format. Reports are typically sent to MBF's attention the day prior to the scheduled weekly update meetings (conducted by phone or on-site). During these weekly scheduled meetings, it is clear that MBF is not prepared for the meeting nor has she reviewed the status report document (created at her request) in advance.

Professionalism: Aforementioned weekly meetings are scheduled in advance. On two (2) occasions when GMR contacted MBF the day prior to confirm weekly meeting, GMR discovered (once from MBF and once from MBF's admin) MBF would be out of town and unable to attend the meeting. GMR was not informed or updated of the meeting cancellation. In addition, upon arrival of GMR personnel for a weekly meeting in November, MBF stated she 'did not really have time for this' but reluctantly decided she would oblige GMR with a few minutes since already on site. Clearly, MBF's attitude implied she had more important items to tackle. MBF did apologize for her behavior at the conclusion of the meeting and stated she 'had a lot going on (budget time).' GMR kindly responded that we were there simply based upon MBF's request to provide an update on all GMR-related activities.

MBF has never provided an agenda for any meeting GMR has attended.

Providing clear and consistent direction on brand strategy and tactical execution: Based on GMR's experience to date, MBF appears to be disconnected from brand management. GMR does not rely on or contact MBF for insight on strategy, tactical ideas, recommendations, or AZ policy guidance. One may raise speculation pertaining to MBF's lack of comfort with a new market segment?

D. Communication Skills – GMR has not yet had the experience in observing MBF's capabilities pertaining to KOLs. However, GMR noted to be troublesome (during weekly MAP meeting with Michael Abens) MBF's attempt to rationale and/or articulate why she felt a specific tactic (in this

3

D1085

case 20–25 regional dinner meetings) should be executed. MBF's explanation regarding the need for this tactic did not make any sense. It seemed to validate MBF's lack of understanding for managed market stakeholders (in this case a managed care pharmacy director) in an open forum and demonstrated her rationale was in direct conflict with views of the brand managers.

*Experiences with weekly meetings and status reports outlined in Section (C) Vendor Management.*

E. <u>Team Leadership</u> – MBF demonstrates a complete lacking in team leadership qualities. On the contrary, it has been the experience of The GMR Group that MBF does not take initiative to make independent decisions rather she passes that task to other team members.  MBF appears to be extremely reliant on all other team members within the AZ organization (purchasing, commercial excellence, brand, other PREP, etc.)

In summary, GMR's experience with MBF has been one of disappointment. In retrospect, MBF could have grown effectively in her position and been of greater value to AZ in managed markets (a new segment for MBF) had MBF been able to take more advantage of GMR's personnel and experience. Learning new markets presents itself as a tremendous learning experience and certainly has its challenges. Nonetheless, MBF demonstrates a lack of principal knowledge on basic matters such as AZ corporate policy and guidelines.

Collectively, a lack of understanding in managed markets and basic AZ policy, a lack of organization coupled with inability to plan ahead and multi-task has negatively impacted the entire team (The GMR Group, Exanta brand team, TG Worldwide and others within AZ).

4

**D1086**

**A192**

**From:** Broadway, Susan P
**Sent:** Monday, December 01, 2003 12:39 PM
**To:** Black, Keith R (HR); Austin-Jones, Georgina
**Cc:** Hellen, Jane; Bevis, Rachel A
**Subject:** FW: Schedule

Keith / Georgina

Marybeth does not have the note from the dentist as we discussed for today(see below). She told me she could not have them fax it and will bring it tomorrow instead. She has said this numerous times now.

Also, I need to discuss with you a significant attitude change (for the worse) starting today. This brings us back to how Marybeth was acting prior to me addressing attitude as a cultural attribute and something we would not tolerate during this process. I am upset to see us back where we started.

Example: Marybeth left work today as soon as she got here (called at 7:30am to say she was here and was leaving to run an errand and would use her lunch hour time now for the errand. She said she'd be back for a 9am meeting. She came to the meeting at 9:35am. I went to her after and said, Marybeth, what happened this morning? She said, With what? I said, with the meeting to which you were 35 minutes late. She said "I was running late". I asked, You left at 7:30am and didn't come back till 9:30am. She said, "Whatever Susan. I was late."

I need to know how to address this breech of work hour agreements and attitude. It's a very difficult work arrangement for myself and the team.
Also, Marybeth has a very important meeting this week with customers so I'm especially concerned with the disdain and the attitude shift.

Susan

-----Original Message-----
**From:** Farrell, Marybeth
**Sent:** Friday, November 21, 2003 12:31 PM
**To:** Broadway, Susan P
**Subject:** RE: Schedule

Susan:

As discussed, I am happy to provide the dental visit notes from my emergency visit to my primary dentist in the morning and from the endodontist for the actual root canal that same afternoon. As this did, in fact, take up most of the day, I thought it was appropriate to take this time as a Personal Day, rather than a medical appt. away from the office

Note as well that the antibiotics which my dentist had phone in the night before to my pharmacy made me very nauseated. As they can attest, I arrived at the dental office in the morning having unfortunately become ill in my car. I did have to stop on the way back to clean up and change, so note this in your record as well.

Thanks.

Marybeth

-----Original Message-----
**From:** Broadway, Susan P
**Sent:** Friday, November 21, 2003 12:06 PM
**To:** Farrell, Marybeth
**Subject:** RE: Schedule
**Importance:** High

Marybeth
As you originally requested Oct 1st off as an emergency for the abyss tooth and emergency root canal and therefore it was not requested as time off in advance, I do need the doctor's note stating the date and time of visit. This is per policy. I will need it upon your return from Vacation on December 1st. thanks

D1101

Susan

-----Original Message-----
**From:** Farrell, Marybeth
**Sent:** Tuesday, November 04, 2003 1:04 PM
**To:** Broadway, Susan P
**Subject:** RE: Schedule
**Importance:** High

Susan:

As I stated in my previous email, I am taking October 1 as a personal day and therefore you do not need the notes from my medical appointments.

I find it unreasonable that you are unwilling to provide a single comp day occasionally for my weekends and evening hours required at brand programs. If you check with other brands and TAs, you will find this is standard AstraZeneca practice. It is also unreasonable to expect me to work nearly 200 extra hours and not be permitted time during work hours for necessary medical appointments.

As I noted to you in my voicemail today, I am leaving today at 4:30.

I would ask you to re-think Monday November 10 as a comp day to me, as I believe you are being unreasonable and unfair. You also have created a hostile work environment here for me on the team, manifested today in the PREP/Promo market development workstream meeting. Despite my repeated statements that the pharmacy workstream tactics are covered under both managed markets and coag clinic customer segments, as well as the discussions I have had with Denise Quigley about reaching pharmacy segments through her hospital grand rounds and CE speakers bureau programs, you denied that I had these tactics integrated into the 2004 plans

Marybeth

-----Original Message-----
**From:** Broadway, Susan P
**Sent:** Tuesday, November 04, 2003 12:39 PM
**To:** Farrell, Marybeth
**Subject:** RE: Schedule

Marybeth
Thank you for keeping the Self Service tracker up to date. Your AC should be kept aware of your calendar so having her maintain a record of your days off for vacation and personal holidays is a good back-up to the system

Also, as we discussed with Georgina on Oct. 27th, I am also still awaiting receipt of the letter from the dentist stating date and time of your emergency visit for the abyss. And regarding the comp time, again, we discussed last week, there is not an AZ policy granting comp time for travel as that is a job requirement. While on the PIP, I expect your work hours to remain 7:30am-4:45pm per our agreement unless vacation time has been approved.

Susan

-----Original Message-----
**From:** Farrell, Marybeth
**Sent:** Tuesday, November 04, 2003 8:32 AM
**To:** Broadway, Susan P
**Subject:** Schedule

Susan:

In followup to my voice message of this morning, I would like to have Monday, November 10, as a comp day for my working Thursday night, November 6, Friday night, November 7, and Saturday, November 8 As we have discussed, I have already worked 186 hours this year of my own personal time for AstraZeneca without any comp days or compensation I will add the time noted above to this pool

Additionally, I am noting October 1 as a Personal Day I also have twice entered my days off into the HR Vacation Tracker, only to have them not appear in the system at later reviews. Because of this recurring, apparent system error, I am sending my days off to Clarice Sapp today and asking her to re-enter all the dates I have been out of the office for vacation or personal days She will maintain these records. I will not

2

D1102

be asking her to enter the 186 hours I also have logged for AstraZeneca program work on my own personal time and without compensation, but you might want to think about adding this for accuracy in assessing one's actual time working.

Let me know about Monday please as soon as possible  Thank you

Marybeth


Marybeth Farrell
Professional Relations and Education Manager, EXANTA
AstraZeneca
1800 Concord Pike
PO Box 15437
Wilmington, DE  19850-5437
Phone: 302/885-1854
email:  marybeth.farrell2@astrazeneca.com

**D1103**

**A195**

**From:** Broadway, Susan P
**Sent:** Tuesday, December 02, 2003 6:41 PM
**To:** Farrell, Marybeth
**Subject:** Today's meeting

Marybeth
To summarize today's meeting, I again strongly encourage you to accept the PIP and work toward achieving the areas outlined for improvement
I was distressed at our meeting today with your attitude and behavior toward outlining your progress of the plan. I do hope you understand I am here to help you but can not do so when you do not give me updates on projects nor let me know when things are scheduled so we can ensure adequate team coverage. I need you to accept the plan and work toward achieving success with by taking accountability, ownership of projects and management of PREP activities

Susan

1

**A196**

**D1166**

 AstraZeneca

# MEMO

| FROM (Name) | DATE | PAGES |
|---|---|---|
| Georgina Austin-Jones | December 3, 2003 | 1(1) |

**DEPARTMENT AND LOCATION**
HR

**TO**
File

**SUBJECT** | **REFERENCE**
MaryBeth Farrell

## CONFIDENTIAL

Susan Broadway, Jane Hellen and I met with MaryBeth Farrell 4.00 pm December 2, 2003 to discuss progress towards achieving the objectives laid out in the Performance Improvement Plan. This was the second formal review meeting during the PIP period. At the beginning of the meeting when asked to comment on her progress towards the plan MaryBeth refused saying she was not prepared to talk through it at that time. When questioned about this she said that she had worked toward the plan, but was not prepared to discuss what she had done.

Susan Broadway raised concerns about behaviours and attitudes MaryBeth had been displaying. MaryBeth's attitude during the meeting could be considered hostile. I explained to MaryBeth that should she be unsuccessful in meeting the plan, she would only be entitled to a severance payment if she had made a good faith effort to achieve the plan. Displaying attitudes and behaviours witnessed during the meeting and before (by Susan), was not in line with a good faith effort. MaryBeth protested saying she was working toward the plan – she did not acknowledge what we were saying about unacceptable behaviours.

I explained that we needed to hear from MaryBeth what she was doing to address the specific areas outlined in the plan and that I was concerned that she was not prepared to do this at this meeting. I asked her to come prepared to talk to the progress she had made against the plan at the next meeting. She said she would prepare a full document and I explained that this was not necessary, she just needed to come with some notes to help her talk through progress against each of the areas within the plan.

These notes prepared the morning following the meeting.

*[signature]*

3 December 2003

**D1169**

**A197**

**From:** Broadway, Susan P
**Sent:** Wednesday, December 03, 2003 8:57 AM
**To:** Black, Keith R (HR)
**Cc:** Austin-Jones, Georgina; Hellen, Jane; Bevis, Rachel A
**Subject:** FW: Today's meeting

Keith
Georgina can fill you in further or feel free to call me. The behaviors & attitude of Marybeth are outside of AZ cultural attributes, lacking in commitment to the job and hard to deal with in keeping good morale on a team
Thanks
Susan

-----Original Message-----
**From:** Farrell, Marybeth
**Sent:** Wednesday, December 03, 2003 8:51 AM
**To:** Broadway, Susan P
**Cc:** Austin-Jones, Georgina
**Subject:** RE: Today's meeting

Susan:

As I stated in the meeting, I do fully embrace the PIP and have been working diligently toward its full completion  Again, however, as with the Action Plan, you and AstraZeneca Human Resources deliberately do not acknowledge the achievements which indicate I have in fact met the terms of both of these plans as well as falsified both claims and documents to support the false performance claims you are making against me

That said, I continue to follow the areas outlined in the PIP, with which I have complied fully  As I stated yesterday, I intend to prepare written summaries for these future update meetings so that you do not continue to wrongly ascribe misjudgments about my commitment, performance and behavior.

Marybeth

-----Original Message-----
**From:** Broadway, Susan P
**Sent:** Tuesday, December 02, 2003 6:41 PM
**To:** Farrell, Marybeth
**Subject:** Today's meeting

Marybeth
To summarize today's meeting, I again strongly encourage you to accept the PIP and work toward achieving the areas outlined for improvement.
I was distressed at our meeting today with your attitude and behavior toward outlining your progress of the plan.  I do hope you understand I am here to help you but can not do so when you do not give me updates on projects nor let me know when things are scheduled so we can ensure adequate team coverage  I need you to accept the plan and work toward achieving success with by taking accountability, ownership of projects and management of PREP activities.

Susan

Susan Pritchard Broadway
AstraZeneca - Hemostasis
Brand Communications Leader
tel 302.885.4430
fax 302.886.7586
susan.broadway@astrazeneca.com

**D1176**

AstraZeneca  **MEMO**

| FROM (Name) | DATE | PAGES |
|---|---|---|
| Marybeth Farrell | December 15, 2003 | 1(3) |

DEPARTMENT AND LOCATION
EXANTA PREP

TO
Georgina Austin-Jones
Susan Broadway
Jane Hellen

| SUBJECT | REFERENCE |
|---|---|
| M.Farrell Program Management Updates Dec. 15 | Program Updates |

Although it is abundantly clear that AstraZeneca is not conducting this process in a manner that is either ethical or fair, and that you continue to assert slanderous and false statements about me, I am nonetheless providing the below summary for our meeting today regarding achievements since and including December 2 updates.

<u>Evaluation of the Hematology/Oncology Advisory Board</u> by Faculty and Chair:
Overall Rating: 100% Excellent by all attendees
Achieved critical brand objectives with external thought leaders
-        Program on strategy and budget, extremely well organized, well run
Over 90% Excellent rating for overall organization
100% Excellent rating for staff level of knowledge, helpfulness, being well organized, and being friendly and courteous
Comments include it provided attendees the opportunity for "serious exchange of ideas," "very interactive" "open exchange of available data on Exanta clinical trials," others.

<u>Evaluation of the Managed Markets Retail Trade Advisory Board</u> by Faculty and Chair:
Overall Rating: 100% Good or Excellent Rating (4 Excellent, 7 Good)
Achieved critical brand objectives with external thought leaders and decision makers
-        Program on strategy and budget, extremely well organized, well run
Likelihood of attendees participating in similar future meeting: 100% Very Likely
Likelihood of attendees recommending program to colleagues: 100% Very Likely to Likely (9 Very Likely, 2 Likely)

D1290


**AstraZeneca**

| FROM (Name) | DATE | PAGES |
|---|---|---|
| Marybeth Farrell | December 15, 2003 | 2(3) |

How did program compare to other similar ones? 100% As Good as or Better
(10 with 4 rating level rating, One with level 5 rating)


<u>ASH, ASHP</u>
- Conference call with ASHP faculty to review slides on Nov. 20
- Reviewed/adjusted/commented on slides, agenda, meeting plans for Symposia
- KOL, EXANTA team suites planning, clarification
- Sponsorships – ASH Highlights, CD ROM
- Held meetings at congresses with KOLs, program planning
  - o ASH Gary Raskob
  - o NOCR
  - o ASH

<u>COAG CLINICS SPEAKERS BUREAU</u>
November 18 – Held Clinics Speakers Remote/Teleconference and Web
Training Program
- Edith Nutescu, Chair

November 18 – Attended/audited kickoff meeting of Coag Clinic Speaker's
Bureau Program in Philadelphia 6 pm – 8:30 pm
- Made subsequent recommendations for changes, improvements
  - o Discussed improvements, clarifications w/vendor, internal team
- Ongoing program management
- Enrollment above targets
- Planning, budgets on schedule

Hold weekly program update meetings and teleconferences

Management of DELTA programs, budgets, phasing

December 4 – 8: Responsible for ASH San Diego
600 attendees at symposium
Achieved critical brand objectives

December 8-9 to New Orleans to manage ASHP

REFERENCE: Program Updates

**D1291**



| FROM (Name) | DATE | PAGES |
|---|---|---|
| Marybeth Farrell | December 15, 2003 | 3(3) |

200 attendees at symposium
Achieved critical brand objectives

REFERENCE: Program Updates

<u>2003 Year-End Performance Feedback</u>

**Your Name: Louise Colburn**
**December 12, 2003**

**Date:**

**Feedback for: Marybeth Farrell**

1. Briefly describe any business contributions he/she performed which assisted you in meeting your goals and objectives:
    a. I cannot honestly say that can recall any contributions which assisted me in meeting any of my goals. Often, she doesn't seem to comprehend individual PREP roles and responsibilities as she has come to me with repeated questions on area I am not involved with. I clarify that my responsibilities are with cardiologists, but she repeatedly referred vendors to me regarding other activities. The only area she seems sure of is compliance and she has answered a couple of questions for me on that. However, rather than consult me for an account of any compliance matter I have dealt with, she goes directly to Tom Behan and then copies me on a message to him. I find this unprofessional and lacking in team cooperation. Unlike other team members, she has very little interactions except for meetings.

2. Briefly describe any competencies or skill sets where he/she demonstrated strengths (specific examples useful):

    As above, she seems focused mostly on compliance often to the exclusion of strategy, planning or team communications

3. Describe areas in which he/she could be more effective (specific examples useful):

    a. Interpersonal communications- is simplistic and not meaningful. Rather than asking for advice or clarification, she plans in isolation and other team members do not have any idea of what she is working on, other than what we hear at staff meetings. Even this information given is superficial and difficult to follow. She often seems confused in team meetings and is unable to verbalize basic information pertaining to activities.
    b. Relationship Building- doesn't seem to know KOLs by name or recall any history they have with AZ and our brand. Has repeatedly expressed confusion regarding pharmacists and their roles with respect to hospital formularies, retail sales and clinics.

D1261

c. Strategic direction-seems unable to verbalize and put into action any of the strategies or educational messages we have decided upon
d. Seems unable to take responsibility for her own actions; frequently blames others, many times, agencies

4. Describe ways in which he/she has demonstrated AZ cultural attributes:
   a. N/A

5. Please offer suggestions for professional growth or personal development: Marybeth seems to be ill prepared for this role. It is unfortunate that she has been placed in a position where she does not seem to possess the abilities, aptitudes and skills to function at a basic level of competence. I believe it is not simply a matter of development, as this implies an evolutionary process building upon skills and experience. I feel that the basic attributes and abilities and experience that qualify one for this position are lacking.

Additional Comments:
It seems unfair to Marybeth as well as to her team mates that she is in the compromising position of being unable to perform her job. This ultimately reflects on the entire PREP team and places all of us in a difficult position as well.

**Please return by e-mail to Susan Pritchard Broadway. Thank you.**

D1262

## 2003 Year-End Performance Feedback

**Your Name: Denise Barrett Quigley**          **Date: 12/15/2003**

**Feedback for:  Marybeth Farrell**

1. Briefly describe any business contributions he/she performed which assisted you in meeting your goals and objectives:

2. Briefly describe any competencies or skill sets where he/she demonstrated strengths (specific examples useful):

3. Describe areas in which he/she could be more effective (specific examples useful):

   a. My observation of Marybeth is that she operates outside of the team environment. She doesn't attend a significant number of team meetings and if she is in attendance, she always brings other work. This creates the perception that she is not interested in contributing or in the contributions of her team members.
   b. Marybeth is very often unprepared for workstream team/staff meetings. For example, in planning for 2004, she would miss the point of what she was supposed to be presenting and become defensive when probed for the correct information, claiming she did not have the most up-to-date information (this information, however, was readily available to the rest of the team via Email, team meetings, etc.).
      i. This would take time from other team members, lead to less collaboration due to time constraints, and create an extremely uncomfortable environment for the team.
         1. This shows an extraordinary disregard for the team process and individual team members.
   c. Marybeth does not seem to fully grasp AZ budget processes. An example of this is as follows: Marybeth managed a few projects that fell under my budget. I processed all of the grant paperwork for ASHP, a program she was managing, and several months later she had Clarice working on the grant paperwork for a program that was nearly completed. She had no idea of what was going on with the budgets for any of her projects that fell in my line. She was more than happy to have me deal with her work.
   d. There is little evidence to suggest that Marybeth is interested in the success of the team or individual team members.

D1293

      i.  She sneaked the housing fee for ASH into my budget after I clearly told her that there was no money for it (which led to more work to make sure my budget was on target).

     ii.  She was over-budget on ASH without communicating this information to me.

          1.  These are items for which I am ultimately responsible, and I feel she has no concern for this.

    iii.  She also failed to meet the deadline for submitting her planned consultants meetings for the 2004 team plan.

4. Describe ways in which he/she has demonstrated AZ cultural attributes:
   a. Marybeth seems genuinely enthusiastic about her customer segments.

5. Please offer suggestions for professional growth or personal development:
   a. Presentation skills
   b. Budget management
   c. Time management
   d. Team dynamics
   e. Grant processes

Additional Comments:

Marybeth is very nice but I'm not sure she is the best fit for such a busy team with little room for error. We all work very hard and need to feel we have an entire team that is considerate of our time, meets deadlines and contributes to the overall success, and I'm afraid Marybeth has not demonstrated her ability or commitment to meet these basic objectives.

**Please return by e-mail to Susan Pritchard Broadway.  Thank you.**

**D1294**

 **AstraZeneca**

# MEMO

| FROM (Name) | DATE | PAGES |
|---|---|---|
| Marybeth Farrell | December 16, 2003 | 1(2) |

DEPARTMENT AND LOCATION
PREP EXANTA

TO
Susan Broadway

SUBJECT
2003 Absence Tracker

REFERENCE

Susan:

The below accounting of my vacation and personal days for 2003 also will being entered into Absence Tracker.

| Date(s) | Type of Leave | # Days |
|---|---|---|
| January 23, 24 | Vacation | 2 |
| March 19 | Personal Day/Excused absence | 1 |
| April   16 | ½ Floating Religious Holiday | ½ |
| April 17, 18, 21 | Floating Religious Holiday | 3 |
| Sept 10 | Vacation | 1 |
| Sept 16 | ½ Day Floating Holiday | .5 |
| October 1,2,3,6,7,15,16,17 | Vacation | 8 |
| November 24,25,26 | Vacation | 3 |
| December 22,23,24 | Vacation | 3 |

Total Vacation scheduled through December 31st: 17 days
Total Floating Holiday: 4 days
Total Excused Absence:  1 day
**Days Remaining:   3 Vacation Days**
**                        4 Excused Absence Days**

Additionally:
1.)      I have worked 250 Hours this year to date of my personal time managing or attending weekend programs for AstraZeneca, evening and weekend travel, managing or attending weekend or evening events for the brand. No compensation time allowed since 3 hours granted in February 2003.

D1298

 AstraZeneca

| FROM (Name) | DATE | PAGES |
|---|---|---|
| Marybeth Farrell | December 16, 2003 | 2(2) |

2.)    Came into office the following hours during my FMLA/Short-Term Disability Leave time for major surgery.  No compensation time provided or permitted by AstraZeneca including requests denied for dental emergencies, medical emergency and a home urgent matter.

May 9-June 3              Out full days on FMLA/Short-Term Disability
June 3,4,5,9,10,11,12     ½ Days in office while on FMLA/STD
June 6,1,17,18,19         Out full days on FMLA/Short-Term Disability
June 16                   In office 3/4 day while on FMLA/STD
June 20                   Return Full Time from FMLA/STD Leave

Since I have 3 Vacation Days remaining in 2003, I would like to schedule these for December 29, 30 and 31.

**D1299**

 AstraZeneca

# MEMO

| FROM (Name) | DATE | PAGES |
|---|---|---|
| Marybeth Farrell | December 17, 2003 | 1(2) |

**DEPARTMENT AND LOCATION**
PREP EXANTA

**TO**
Susan Broadway

| SUBJECT | REFERENCE |
|---|---|
| **2003 Absence Tracker** | EXANTA Vacation 2003 |

<u>**REVISED December 17, 2003 Per Absence Tracker Accounting of my Entitled Leave**</u>

Susan:

This update replaces the Absence inventory I sent yesterday. After entering everything into Absence Tracker, it turns out I still have 7.5 days of vacation remaining, even counting the December 22, 23 and 24 vacation days approved. I obviously cannot take all 7.5 because we are at the end of the calendar year, but I want to use up all my remaining vacation days toward that balance. I am requesting approval of the below dates as soon as possible:

Vacation Request: for December 18 and 19
Vacation Request: for December 29, 30 and 31
**Total New Request:   5 Days.** If these are approved, I still have <u>**2.5 Vacation Days remaining for 2003**</u> <u>which I will carry over to 2004</u>.

Please note that I am attempting at this time to schedule a medical appointment for tomorrow or Friday of this week as my back is bothering me severely and I have been unable to take any time prior for medical appointments as compensation time for the 250 hours I have worked to date this year on my own personal time for AstraZeneca weekend and evening program management or attendance. I therefore urgently request that you approve the above vacation for 2003 as soon as possible so that I can schedule these appointments.

| Date(s) | Type of Leave | # Days |
|---|---|---|
| January 23, 24 | Vacation | 2 |
| March 19 | Personal Day/Excused absence | 1 |
| April   16 | ½ Floating Religious Holiday | ½ |
| April 17,18,21 | Floating Religious Holiday | 3 |

D1383

 AstraZeneca

| FROM (Name) | DATE | PAGES |
|---|---|---|
| Marybeth Farrell | December 17, 2003 | 2(2) |

**REVISED December 17, 2003 Per Absence Tracker Accounting of my Entitled**

| | | |
|---|---|---|
| Sept 10 | Vacation | 1 |
| Sept 16 | ½ Day Vacation | .5 |
| October 1,2,3,6,7,15,16,17 | Vacation | 8 |
| November 24,25,26 | Vacation | 3 |
| December 22,23,24 | Vacation | 3 |

**SUMMARY BY CATEGORY:**
**Total Vacation** scheduled through December 31st: 17.5 days
**Total Floating Holidays:** 3.5 days
**Total Excused Absence:** 1 day
**Summary of All Leave Remaining as of December 17, 2003:**
**7.5 Vacation Days**
**.5 Floating Holidays**
**4 Excused Absence Days**

Additionally:

1.)   I have worked 250 Hours this year to date of my personal time managing or attending weekend programs for AstraZeneca. Despite this, you have repeatedly denied me compensation time of any kind even for needed medical appointments and urgent home emergencies (e.g., rescheduled dental appointment, cat medical emergency/bleeding, home water pipe/hardware break, requests for medical appointments denied).

2.)   I came into office the following hours during my FMLA/Short-Term Disability Leave time for major surgery. No compensation time has been permitted despite my repeated requests even for urgent medical/dental emergencies, family/pet health and urgent urgent matter.

| | |
|---|---|
| May 9-June 2 | Out full days on FMLA/Short-Term Disability |
| June 3,4,5,9,10,11,12 | ½ Days in office while on FMLA/STD |
| June 6,13,17,18,19 | Out full days on FMLA/Short-Term Disability |
| June 16 | In office 3/4 day while on FMLA/STD |
| June 20 | Return Full Time from FMLA/STD Leave |

REFERENCE: EXANTA Vacation 2003

**D1384**

**From:**          Farrell, Marybeth
**Sent:**          Friday, December 19, 2003 11:39 AM
**To:**            Broadway, Susan P
**Subject:**       Declined: Review Meeting

Need clarification about bringing audio recorder first and then we can re-schedule.

**From:** Farrell, Marybeth
**Sent:** Friday, December 19, 2003 11:43 AM
**To:** Austin-Jones, Georgina
**Cc:** Broadway, Susan P
**Subject:** RE: Refresh on My Full Cooperation for Update Meetings

Georgina:

As I noted, this is fine. Also, please email me the time & location well in advance of our January 9th meeting so I can be sure to be prepared.

Many thanks. Happy Holidays!

Regards,

Marybeth

-----Original Message-----
**From:** Austin-Jones, Georgina
**Sent:** Friday, December 19, 2003 11:24 AM
**To:** Farrell, Marybeth
**Cc:** Broadway, Susan P
**Subject:** RE: Refresh on My Full Cooperation for Update Meetings

In response to your e-mails of December 17, we plan to cover any and all concerns that you might have at our next up date meeting on your performance. We have now scheduled that meeting for January 9th, 2004.

Georgina

-----Original Message-----
**From:** Farrell, Marybeth
**Sent:** Wednesday, December 17, 2003 12:08 PM
**To:** Austin-Jones, Georgina; Broadway, Susan P
**Subject:** Refresh on My Full Cooperation for Update Meetings

Georgina and Susan:

To assist you in recalling correctly whether I have or have not cooperated in the weekly and biweekly update meetings, I am re-sending you the below weekly or biweekly documents I prepared for udpate meetings. These are some of the outlines I have provided and discussed in detail during the update meetings regarding how I have worked in good faith to accomplish both the Action Plan and the PIP, despite that I disagree entirely with their premise and contents.

The only meetings for which I did not fully discuss the plans are: 1) Monday, September 22, 2003, since I received the requirement to attend only shortly before the actual meeting and after just returning on business travel for AstraZeneca/EXANTA the latter part of the preceding week. However, please recall that I did in fact discuss my programs and accomplishments toward the plan as best I could on September 22 without any prior notice nonetheless; and 2) December 2, 2003, when, at that time, I had been awaiting corrective action by AstraZeneca on its part for its failure to acknowledge the information supporting that I have made full progress on both the Action Plan and the PIP. When it was communicated by Georgina Austin-Jones in the December 2 meeting that this would not be provided and I must provide information during the update meetings nonetheless, I volunteered to provide a full accounting in a memorandum for that both that udpate period (i.e.,g the December 2 update meeting period) and for all future update meetings, and I offered to send these memos prior to all future update meetings. Georgina rejected this offer. Nonetheless I did provide a written memo to our meeting for the purpose of facilitating dialogue, and which summarized how I had met the terms of the PIP for those two time periods (the December 2 time period and the December 15 time period). Apparently you are disregarding this information as well, which is of course why I find it imperative to tape record all of our meetings to ensure fairness and accuracy in the summarization of my behavior during these meetings.
 << File: EXANTA PerfUpdate Sept22, 2003 meeting summary.doc >> << File: EXANTA Performance Plan Update Sept 5.doc >> << File: EXANTA Performance Plan Update Sept 5 Revised Per JH.doc >> << File:

1

D1463

A211

EXANTA Performance Plan Update Sept 12.doc >>  << File: EXANTA Performance Plan Sept. 12 Mtg summary.doc >>  << File: EXANTA Perf.UpdateSept30Overview to HR.doc >>

Marybeth Farrell
Professional Relations and Education Manager, EXANTA
AstraZeneca
1800 Concord Pike
PO Box 15437
Wilmington, DE  19850-5437
Phone: 302/885-1854
email:  marybeth.farrell2@astrazeneca.com

**D1464**

**A212**

**From:** Farrell, Marybeth
**Sent:** Monday, January 05, 2004 8:25 AM
**To:** Broadway, Susan P
**Subject:** 2 Days leave this week

**Importance:** High

Susan:

I need to take a personal day/excused absence this Wednesday, January 7, 2004, for medical tests in Pennsylvania. I have personal business on Thrusday, January 8, for which I will need to take a vacation day.

Please let me know if there is any problem with this. Thank you.

Marybeth Farrell
Professional Relations and Education Manager, EXANTA
AstraZeneca
1800 Concord Pike
PO Box 15437
Wilmington, DE  19850-5437
Phone: 302/885-1854
email:  marybeth.farrell2@astrazeneca.com

1

**D1486**

**A213**

**From:**      Farrell, Marybeth
**Sent:**      Monday, January 05, 2004 8:26 AM
**To:**        Broadway, Susan P
**Subject:**   RE: Review Meeting

Susan:

This is not acceptable; we will need to discuss.

Marybeth

> -----Original Message-----
> **From:**      Broadway, Susan P
> **Sent:**      Friday, December 19, 2003 3:40 PM
> **To:**        Farrell, Marybeth
> **Subject:**   RE: Review Meeting
>
> Marybeth
> The use of a recording device is not allowed as we discussed at our meeting last Monday.  This review meeting will be rescheduled for January 9th and your attendance at the meeting itself is not optional.
> Thanks
> Susan
>> -----Original Appointment-----
>> **From:**      Farrell, Marybeth
>> **Sent:**      Friday, December 19, 2003 11:39 AM
>> **To:**        Broadway, Susan P
>> **Subject:** Declined: Review Meeting
>> **When:**    Monday, January 05, 2004 11:00 AM-12:00 PM (GMT-05:00) Eastern Time (US & Canada).
>> **Where:**   Susan's office
>>
>> Need clarification about bringing audio recorder first and then we can re-schedule.

1

**D1487**

**A214**


AstraZeneca

**To: Marybeth Farrell**

**From: Susan P. Broadway**

**Re: PIP Feedback Discussion (PIP of October 21 to January 5)**

Marybeth – January 5, 2003 was the final day of the Performance Improvement Plan we began on October 21st 2003. I'd like to review your performance over those 6 weeks relative to plan objectives based on both my observations and peer feedback

The plan asked you to embrace PREP manager responsibilities of managing team communication on medical education programs; managing vendor performance and billing; cultivating thoughtleader relationships; and demonstrating an understanding of the brand's strategic direction, using our clinical data as a basis for discussions with KOL's, team member and vendors.

In addition, the plan required a basic performance level of administrative management and professional conduct.

You were advised that your failure to satisfactorily meet the requirements of the PIP would result in disciplinary action up to and including immediate discharge.

Specifically:

(1) <u>**Budget Management – the plan required an understanding of the budget and performance within budget using company tracking tools.**</u>

- Unable to discuss budget at team meeting titled 'budget update' and despite 2-3 reminders to bring budget spreadsheet, you were unprepared to do so and aggressively stated you did not know we were discussing budget.
- In November I was updated by finance that your input into DeLTA was incorrectly done and required meetings with finance, PREP and brand managers to correct the situation.
- Unable to provide Faye Morin and Coag Clinic Agency (QED) with financial updates for budget management. Did not have contract and billing cycle (therefore didn't review) until Faye requested contract was read.
- Hematology advisory board ran over budget due to increased number of hours required by agency on communications with yourself and AZ team for project without proactive highlight to BCL on budget overage.
- Unable to speak to 2004 budget plans at Dec 18th quarterly meeting ("if that's what the plan said.")

**AstraZeneca LP**
1800 Concord Pike  PO Box 15437  Wilmington DE 19850-5437

Tel    302 886 3000
www.astrazeneca-us.com

AZPH1001 (02/00)

(2) **Time management – the plan required set work hours, email response to meetings within a day of request receipt, communication of your contact information to brand managers when traveling, alerting BCL of schedule conflicts.**

- Unable to attend 2004 Planning meeting on December 15th due to need to prepare for afternoon meetings. No notification to BCL of inability to attend meeting. Canceled acceptance of meeting 5 minutes prior to start.
- Late for multiple update meetings for PIP discussions with HR and BCL
- Did not meet timelines for Viewpoint updates on managed market activities
- Over 2000 emails in inbox (unfiled); numerous emails needing response
- Canceled out of attending Nov 18th training meeting on 18th.
- Brand managers were not notified of project status prior to leaving on vacation in mid-Nov. Managers found out afterwards or through vendor

(3) **Vendor Management – the plan required clear and consistent communication with vendors to drive projects to completion on strategy. The plan required weekly calls with agendas and follow-up on action items as well as follow up to the brand managers and BCL.**

- Meetings with vendors were scheduled through the vendor. No agendas developed and no follow-up list on action items compiled. Feedback loop to BCL and/or brand managers was not closed.
- Vendor feedback was consistent across multiple agencies that clear and consistent communication was not given. Follow up with the brand managers was often needed to maintain project flow.

(4) **Communication Skills – the plan required adding value at meetings through active involvement and discussion as well as weekly meetings with the brand managers supported to review plans and actions. Also required was an ability to lead KOL discussions and drive meeting agendas for brand needs.**

- Call with Ken Bauer, MD in October went off strategy with your agreement to allow a presentation not approved by brand management resulting in a follow up call and work to get agenda altered.
- Preparation for call with Agnes Lee, MD was lacking and necessitated a subsequent call with David McNinch on the line to drive strategic direction.

(5) **Team Leadership – the plan required KOL interactions to be handled carefully, and project management to be driven from PREP vs Brand managers**

- Vendor feedback relies on brand manager direction to manage projects
- KOL interactions at ASH and ASHP were lacking in driving direction (eg. Did not attend symposium, went in and out of faculty slide review with absences over 30 minutes, did not engage in strategic discussions – merely attended)
- Incorrect forms for managed market ad board were used and required rework by brand manager and vendor
- KOL calls in October leading up to hematology advisory board were canceled and rescheduled multiple times due to lack of preparation and follow up on brand manager schedules (Bauer,Raskob, Lee).

(6) **Personal Accountability – the plan required engaging team in projects through regular updates and driving brand team involvement and buy-in. Also required offering solutions to problems, taking initiative and following through on meetings and action items.**

- Feedback from managers and agencies outlined multiple meetings canceled at the last minute
- Despite managing the ASH congress, you did not participate on the faculty conference call on Tues Dec 2nd. Meeting was not on any team members calendar including the necessary medics.  Your comments were that you would not work outside of set office hours and that I could handle it (yet I was not alerted to meeting and only found out about it through the agency).
- Often has technical issues preventing completion of an activity but alittle pre-work would have prevented delay (eg. Nov 21st: Unable to load consumer Module IV to complete on deadline but only loaded it the day it was due; unable to participate in conference call with global because MBF spent the morning looking for a conference room and working with facilities to find room without noticing meeting was a teleconference)
- Meetings to obtain updates on ASH and ASHP were set up by BCL vs by MBF. Requests to set up meetings with larger team and review slides by a deadline for ASH (Dec2nd) were not met.
- Multi-tasked on paperwork in multiple meetings throughout plan

Based on these examples of your performance, as well as on my additional observations of your conduct and feedback from your peers and vendors, it is apparent that you have failed to address the components of the Performance Improvement Plan.  Your performance has been below expectations for a PREP manager and you have failed to maintain your position with AstraZeneca.


Employee Comments:

Name: ___

| Performance Measures:<br>    -    Complete a class in Excel |
| --- |
| |
| Cascaded From:  Develop functionally in Marketing Communicationos (AZ or external course) |
| |
| **Objective:** |
| *Performance Measures:* |
| Notes: |
| Cascaded From |
| |
| |
| **Objective:** |
| *Performance Measures:* |
| Notes: |
| Cascaded From |

**COMPETENCIES**

**AstraZeneca U.S. Cultural Attributes**

| **Take the Lead and Make a Difference** |
| --- |
| • Think innovatively, create opportunities and seize them.<br>• Put your ideas into action.<br>• Do not be afraid to take unproved paths.<br>• Forgive mistakes.<br>• Reward for challenging the status quo.<br>• Look outside the industry.<br>• Innovatively enable work/home balance. |
| **Individual Notes**<br>- Drive PREP Program development and implementation<br>      -    Maximize PREP programs' reach and effectiveness<br>      -    Measurement: Evaluate programs' success through participants' questionnaires, program evaluations<br>- Research and integrate into plans and program new/innovative and creative approaches and solutions to projects and Market Development Workstream challenges |

P166

**A218**

Name: ___

**Help Others Succeed**
- Build strong relationships and have fun.
- Routinely seek out others to share information and create solutions.
- Take time to know and mentor others.
- Show respect for others.
- Give candid, constructive feedback.
- Care about how your behavior affects others.
- Share and celebrate success.

**Individual Notes:**

AstraZeneca U.S. Cultural Attributes

**Set Ambitious Goals and Exceed Them**
- Be passionate about winning and beating the competition.
- Be results-oriented.
- Accept accountability.
- Identify and focus on key priorities.
- Know the score.
- Win ethically.
- Enjoy and reward success.

**Individual Notes**

**Focus Relentlessly on Customer Excellence**
- Understand customer needs (often before they do).
- Exceed customer expectations.
- Address customer needs at all levels and in all functions.
- Deliver consistent, reliable service.
- Develop collaborative, cooperative relationships with customers.
- Measure customer service and respond to feedback.

**Individual Notes:**

**From:**      Farrell, Marybeth
**Sent:**      Monday, January 12, 2004 4:53 PM
**To:**        Broadway, Susan P; Austin-Jones, Georgina
**Subject:**   FW: Fnl Review Update



Fnl Review Update

      We will have an additional person at this Friday's final review meeting. My lawyer will be joining us. Please book a larger room.  Thank you.

Marybeth Farrell

**D1634**

# Burson·Marsteller

230 Park Avenue South
New York, NY 10003 1566
Tel 212.614.4141
Fax 212.598.6999
kay_fynmore@nyc bm com
www.bm.com

**Kay Fynmore**
Managing Director
Human Resources, US

February 4, 2004

Marybeth Farrell
7 Rockford Road J22
Wilmington, DE 19806

Dear Marybeth:

We are excited at the prospect of your joining us and I am pleased to set forth the terms and conditions of your employment with Burson-Marsteller, LLC (the "Company").

1.   **Duties and Responsibilities**

You will serve as a Director of the Healthcare Practice of the Company. In this capacity, you will perform such executive duties consistent with your position as may be assigned to you by the Chairman of the Healthcare Practice of the Company or her designee and such other executive duties customary to your office and as are reasonably necessary to the operations of the Company. You will (i) devote all of your business time and attention, your best efforts, and all of your skill and ability to promote the interests of the Company; (ii) carry out your duties in a competent and professional manner; (iii) work with other employees of the Company in a competent and professional manner; and (iv) generally promote the interests of the Company. You shall report to the Chairman of the Healthcare Practice or her designee.

2.   **Compensation**

(a)   Your base salary will be at the annual rate of $165,000. You will be paid in accordance with normal payroll practices and your base salary will be subject to review in accordance with the Company's salary review policy for similar executives then in effect.

(b)   In addition to your base salary, you will be eligible to participate in any bonus plan that the Company makes available to employees at comparable levels who are performing similar roles. Any award under such plan is payable to you so long as you are employed by the Company on the payment date, you have met your mutually agreed upon goals and the Company has met its financial goals.

3.   **Benefits**

You will be eligible to participate in all insurance, pension and other fringe benefits, subject to the provisions of the various benefit plans and programs in effect from time to time. You will be eligible for personal days and 3 weeks annual vacation, in each case, in accordance with the Company's policy as in effect from time to time and which shall be pro-rated based on your date of hire. Vacation time shall be non-cumulative.

4.   **Term**

The term of your employment will commence as of a mutually agreed upon start date, which date shall in no event be later than March 1, 2004, and will continue thereafter until terminated by either party. If we terminate this Agreement by notice to you (other than for "cause" as defined below or your disability or death), you will be entitled to continue to receive your base salary (in accordance with normal payroll practices) as bridging payments until the earlier of (a) your commencing employment with or rendering consulting services to another company or enterprise, and (b) six weeks after termination of your employment hereunder (unless such termination occurs as a result of job elimination only during your first year of employment, in which case you will be entitled to up to three months of bridging payments). All bridging payments pursuant to this paragraph 4 will be in lieu of any amount to which you would be entitled under the Company's severance policy in effect at the time of termination. These bridging payments are subject to your signing the Company's standard form of release in a form satisfactory to the Company. For the avoidance of doubt, you will receive no other payment upon termination including separation pay, notice, pay in lieu of notice, or however such additional payments might be called.

You shall have the right to terminate your employment for any reason so long as you provide the Company six weeks prior written notice of termination. The Company may, in its sole discretion, accept a shorter notice period.

5.   **Termination for Cause**

The Company will be entitled to discharge you for "Cause", and in such event, your right to receive any unearned, non-vested or non-accrued compensation hereunder shall then terminate. The term "Cause" shall be limited to the following grounds:

(a)   your repeated failure or refusal to perform your duties and responsibilities as set forth in paragraph 1 hereof, if such breach is not cured within 10 days after written notice thereof;

(b)   the willful misappropriation of the funds or property of the Company;

(c)   use of alcohol or use of illegal drugs, interfering with performance of your obligations under this Agreement, continuing after warning;

2

P480

**A222**

(d)    indictment, arrest or conviction in a court of law for, or the entering of a plea of guilty or no contest to, a felony or any crime involving moral turpitude, fraud, dishonesty or theft or engaging in any act which is a violation of any law or regulation protecting the rights of employees;

(e)    your commission of any willful or intentional act which injures or could reasonably be expected to injure the reputation, business or business relationships of the Company or yourself or other employees of the Company; and

(f)    any material breach (not covered by any of the clauses (a) through (e) above) of any provisions of this Agreement, if such breach is not cured, if curable, within 10 days after written notice thereof.

6.    **Disability**

In the event you are unable to perform your duties hereunder by virtue of illness or physical or mental incapacity or disability (from any cause or causes whatsoever) in substantially the manner and to the extent required hereunder prior to the commencement of such disability (all such causes being herein referred to as "disability") and you fail to perform such duties for periods aggregating 120 days, whether or not continuous, in any continuous period of 180 days, the Company shall have the right to terminate your employment hereunder as at the end of any calendar month upon 30 days prior written notice to you. In case of your death, this Agreement shall terminate as of the date of death.

7.    **Non-Competition and Confidentiality Obligations**

You agreed to abide by the non-competition and confidentiality agreements set forth in Schedule 1 of this Agreement.

8.    **Intellectual Property**

During the term of this Agreement, you will disclose to the Company all ideas, inventions and business plans developed by you during such period which relate directly or indirectly to the business of the Company, including without limitation, any process, operation, campaign, product or improvement which may be patentable or copyrightable. You agree that all patents, licenses, copyrights, tradenames, trademarks, service marks, campaigns and business plans developed or created by you in the course of your employment hereunder, either individually or in collaboration with others, will be deemed works for hire and the sole and absolute property of the Company. You agree, that at the Company's request and cost, you will take all steps necessary to secure the rights thereto to the Company by patent, copyright or otherwise.

3

9.    **Assignment**

This Agreement may not be transferred, assigned, pledged or hypothecated by any party hereto, other than by operation of law; provided, however, that Company shall be permitted to assign this Agreement to an affiliate in connection with a reorganization of the Company's business or assets for tax or financial planning purposes. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.

10.    **Modification**

This Agreement may not be orally canceled, changed, modified or amended, and no cancellation, change, modification or amendment shall be effective or binding, unless in writing and signed by the parties to this Agreement.

11.    **Severability; Survival**

In the event any provision or portion of this Agreement is determined to be invalid or unenforceable for any reason, in whole or in part, the remaining provisions of this Agreement shall nevertheless be binding upon the parties with the same effect as though the invalid or unenforceable part had been severed and deleted. The respective rights and obligations of the parties hereunder shall survive the termination of your employment to the extent necessary to the intended preservation of such rights and obligations.

12.    **No Conflict**

You represent and warrant that you are not subject to any agreement, instrument, obligations, order, judgment or decree of any kind, or any other restrictive agreement or obligation of any character, which would prevent you from entering into this Agreement or which would be breached by you upon the performance of your duties pursuant to this Agreement.

13.    **Governing Law**

This Agreement will be governed by and construed in accordance with the laws of the State of New York applicable to agreements made and to be performed entirely within New York.

14.    **Entire Agreement**

Except as provided herein, this Agreement (including the Schedule) constitutes the complete agreement between you and the Company and supersedes all prior agreements relating to the subject matter hereof.

15.    **Withholding**

4

The Company may withhold from any amounts payable under this Agreement such federal, state or local taxes as shall be required to be withheld pursuant to any applicable law or regulation.

16. **Counterparts**

This Agreement may be executed in counterparts, all of which taken together shall constitute one instrument.

If you agree with these terms, please sign the copy attached and return it to me, constituting it our agreement.

We are delighted that you will be joining the Company and I look forward to working with you.

Best regards,

Burson-Marsteller, LLC

By: _____
Kay Fynmore
Managing Director, HR US

Accepted and Agreed:

_____
Marybeth Farrell

_____
Date: February 5, 2004

cc: Ame Wadler

5

 AstraZeneca

PAGE 1

**ASTRAZENECA $AVINGS**
**& $ECURITY PLAN**

MG 74304 ASM        SSH
ENV0000403
MARYBETH FARRELL
7 ROCKFORD ROAD, #J22
WILMINGTON, DE  19806

ISSUE DATE:   04/24/2004

Dear Plan Participant,

Approximately sixty (60) days ago a letter was sent informing
you that a distribution representing your vested account
balance in the plan would be made to you.  Upon a subsequent
evaluation, it has been determined that your account is no
longer eligible for a distribution without your consent.

You still have the right to request a full distribution of your
account balance at any time.  You may also request a direct rollover
to another retirement plan on an IRA.  You may do this by
calling the Fidelity Retirement Benefits Line at 1-877-307-7662.

Thank You,
Plan Sponsor



**A226**


*P.1, #6*



$00.278
02 1A
0004325592    MAY 13 2004
MAILED FROM ZIP CODE 02914

UNITED STATES POSTAGE

FIRST CLASS
PRESORTED

# BENEFIT CONCEPTS
Employee Benefit Design and Administration

P.O. Box 246
Barrington, Rhode Island 02806-0246

IMPORTANT COBRA
INFORMATION ENCLOSED

7 Rockford Road, #J22
Wilmington, DE 19806

May 26, 2004

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**
Ms. Georgina Austin-Jones
Human Resources
AstraZeneca Pharmaceuticals LP
1800 Concord Pike
Wilmington, DE 19850

Dear Ms. Austin-Jones:

On May 17, 2004, I received in the mail a letter from Benefit Concepts dated May 10, 2004, claiming that it previously sent me a letter ("the un-received letter") that detailed my rights to continued health coverage under AstraZeneca's group health care plans. The letter further stated that since I did not reply to the un-received letter by the specified deadline, of which I was not made aware, my right to continued health care coverage as provided under the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA) was terminated for the following plans:

**BCBS PPO-80% OPTION (CORE PLAN),**
**METLIFE – COMPREHENSIVE OPTION, and**
**VISION COVERAGE.**

I called Benefit Concepts the morning of May 18, 2004, and advised the Customer Service representative that I had never received any prior correspondence or notification of any kind from Benefit Concepts, AstraZeneca or any agent of AstraZeneca regarding my rights to continued health care coverage per my previous employment by AstraZeneca, prior to Benefit Concepts' letter dated May 10, 2004. I requested that a note be placed in Benefit Concepts' records, indicating that I had called on May 18, 2004 and stated this information.

The Customer Service representative advised me that, because I did not reply to Benefit Concepts by the deadline in the un-received letter, my right to health care coverage indeed was terminated.

For the record, I wish to advise you that prior to my receiving on May 17, 2004, the Benefit Concepts letter dated May 10, 2004, I received no information from Benefit Concepts, AstraZeneca or any agent of AstraZeneca advising me of my rights to continued health care coverage under COBRA.

Sincerely,

Marybeth M. Farrell

P286

**A229**



**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| | |
|---|---|
| Postage | $ $0.37 |
| Certified Fee | $2.30 |
| Return Receipt Fee (Endorsement Required) | $1.75 |
| Restricted Delivery Fee (Endorsement Required) | $0.00 |
| Total Postage & Fees | $ $4.42 |

05/26/2004

Sent To *Astra Zeneca*

Street, Apt. No.; or PO Box No.

City, State, ZIP+4

PS Form 3800, June 2002                See Reverse for Instructions

---

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Ms. Georgina Austin-Jones
Human Resources
Astra Zeneca
1800 Concord Pike
Wilmington, DE 19850

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X                                    ☐ Agent
                                     ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery
D. Hilen                          5-28-04

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
☐ Certified Mail      ☐ Express Mail
☐ Registered          ☐ Return Receipt for Merchandise
☐ Insured Mail        ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
   (Transfer from service label)    7003 2260 0001 1281 6940

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

---





**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Ms. Georgina Austin-Jones
Human Resources
Astra Zeneca
1800 Concord Pike
Wilmington, DE 19850

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

B. Received by (Printed Name)    C. Date

D. Is delivery address different from item 1?
If YES, enter delivery address below:

3. Service Type
☒ Certified Mail    ☐ Express Mail
☐ Registered       ☐ Return Receipt for Merchandise
☐ Insured Mail     ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)

2. Article Number
(Transfer from service label)    7003 2260 0001 1281 6940

PS Form 3811, February 2004    Domestic Return Receipt    102595







**Certified Mail Provides:**
- A mailing receipt
- A unique identifier for your mailpiece
- A record of delivery kept by the Postal Service for two years

*Important Reminders:*
- Certified Mail may ONLY be combined with First-Class Mail® or Priority Mail®.
- Certified Mail is *not* available for any class of international mail.
- NO INSURANCE COVERAGE IS PROVIDED with Certified Mail. For valuables, please consider Insured or Registered Mail.
- For an additional fee, a *Return Receipt* may be requested to provide proof of delivery. To obtain Return Receipt service, please complete and attach a Return Receipt (PS Form 3811) to the article and add applicable postage to cover the fee. Endorse mailpiece "Return Receipt Requested". To receive a fee waiver for a duplicate return receipt, a USPS® postmark on your Certified Mail receipt is required.
- For an additional fee, delivery may be restricted to the addressee or addressee's authorized agent. Advise the clerk or mark the mailpiece with the endorsement *"Restricted Delivery".*
- If a postmark on the Certified Mail receipt is desired, please present the article at the post office for postmarking. If a postmark on the Certified Mail receipt is not needed, detach and affix label with postage and mail.

**IMPORTANT:** Save this receipt and present it when making an inquiry. Internet access to delivery information is not available on mail addressed to APOs and FPOs.

PS Form 3800, June 2002 (Reverse)

P289

August 18, 2004


Jonathan Lewis, PhD
Silverside Counseling Center, LLC
3526 Silverside Road, Suite 36
Wilmington, DE 19810

Dear Dr. Lewis:

Could you please mail me an inventory of my sessions?   If you could please
include any reimbursements from my previous employer AstraZeneca, I would be
most grateful.

Would it be possible to obtain this in the next week?  While you have my home
address, I will provide it below for convenience:

7 Rockford Road, J22
Wilmington, DE 19806

I found the July 10 invoice, my apologies.  I thought I threw this out inadvertently
last week with other documents that I meant to put in a carry bag.  Recent weeks
have been very stressful and I am finding I a misplacing and forgetting things. I
apologize for not being able to make the July 10 appointment, but I will
reschedule.

Thank you very much for your help to date as you have done so much to help me
get through this time.

Best Wishes,

Marybeth Farrell


**A233**

P519

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MARYBETH FARRELL,                    )
                                     )
              Plaintiff,             )
                                     )
v.                                   )    Civil Action No.
                                     )       04-285 KAJ
ASTRAZENECA PHARMACEUTICALS, LP,     )
                                     )
              Defendant.             )

         Deposition of MARYBETH FARRELL taken
pursuant to notice at the offices of Young Conaway
Stargatt & Taylor, LLP, The Brandywine Building, 17th
Floor, 1000 West Street, Wilmington, Delaware,
beginning at 9:30 a.m. on Thursday, December 9, 2004,
before Ann M. Calligan, Registered Merit Reporter and
Notary Public.

         WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
         (302) 655-0477


WILCOX & FETZER LTD

A234

1      Q.    What's your birth date?

2            MR. NEUBERGER:  Could we just give that to

3      you off the record?  I notice that the courts these

4      days are into keeping birth dates and Social Security

5      numbers.  We are just off the record.

6            (Discussion off the record.)

7      BY MR. SANDLER:

8      Q.    What's your marital state?

9      A.    Divorced.

10     Q.    When were you divorced, what year?

11     A.    I believe it was 1996.

12     Q.    Is Farrell your maiden name?

13     A.    Yes.

14     Q.    What was your married name?

15     A.    Marybeth Farrell Joe, J-o-e.

16     Q.    J-o-e?

17     A.    Mm-hmm.

18           (Discussion off the record.)

19     Q.    Do you have any children?

20     A.    No.

21     Q.    You had an operation in June of 2003, is that

22     right?

23     A.    It was in May, May 9.

24     Q.    Did that affect your ability to have children?

1    A.    Yes, it did, which was very traumatic for me.

2    Q.    Did you want to have children?

3    A.    Yes.

4    Q.    Am I correct you can't have children now?

5    A.    Correct.

6    Q.    Do you have any other dependents?

7    A.    Two cats.

8    Q.    Any parents?

9    A.    My mother is alive, yes.

10   Q.    But she's not a dependent?

11   A.    She's not a dependent.

12   Q.    How old is your mother?

13   A.    70.

14   Q.    Where do you live?

15   A.    Rockford Tower Condominiums in Wilmington.

16   Q.    How long have you lived there?

17   A.    Almost five years.

18   Q.    Did you ever have any problems receiving mail

19   there?

20   A.    Mail?

21   Q.    Yeah.

22   A.    Not that I'm aware of.

23   Q.    Are you employed at the present time?

24   A.    Yes, I am.

1    Q.    Where?

2    A.    GlaxoSmithKline.

3    Q.    Where is that located?

4    A.    I'm in the King of Prussia offices.

5    Q.    When did you obtain that employment?

6    A.    In June of '04, this year.

7    Q.    What's your job title?

8    A.    Director of global public relations for

9    cardiovascular.

10    Q.    After you left AstraZeneca did you have another

11    job before that job?

12    A.    Yes, I did.

13    Q.    What was that?

14    A.    Burson Marsteller public relations in New York.

15    Q.    What was your position there?

16    A.    Director of the health care practice.

17    Q.    When did you get that job?

18    A.    The offer was made to me, I believe, in early

19    February, and I started March 1.

20    Q.    When did you leave AstraZeneca?

21    A.    Toward the end of January '03.  I'm sorry.

22    '04.

23    Q.    What's your salary at Glaxo?

24    A.    135,000 annually.

1    Q.    What was it at Burson?

2    A.    165 annually.

3    Q.    How about at AstraZeneca?

4    A.    Was it 94 approximately plus bonus?

5           I also will get a bonus at Glaxo, but I

6    don't know what it will be.

7    Q.    What was it typically at AstraZeneca?

8    A.    I think my last one was $25,000, 22,000.

9    Q.    Is that the highest bonus you received?

10   A.    Yes.

11   Q.    Would you have gotten a bonus at Burson also?

12   A.    Yes.

13   Q.    Had you worked for Burson before?

14   A.    Yes.  I worked in their Washington, D.C.

15   office.

16   Q.    But not for Glaxo?

17   A.    No.

18   Q.    How did you obtain the Glaxo position?

19   A.    I got a call from head hunter, and that was how

20   I learned about it.

21   Q.    When was that call received?

22   A.    March or April I believe.

23   Q.    While you were working at Burson?

24   A.    Yes.

1    Q.    When you got to New York, how did you get to

2    your office?

3    A.    I took a cab.

4    Q.    Where was the office?

5    A.    On Park Avenue.

6    Q.    And what cross street?

7    A.    19th.

8    Q.    Were you going to Penn Station?

9    A.    Yes.

10   Q.    Are the benefits you're receiving currently at

11   Glaxo similar to the benefits you were receiving at

12   AstraZeneca?

13   A.    Yes.

14   Q.    Is that also true with Burson?

15   A.    Yes.

16   Q.    Was there any time when you were without health

17   insurance?

18   A.    Yes.

19   Q.    When?

20   A.    From cancellation of my AstraZeneca policy

21   after -- shortly after I left, I believe sometime in

22   February, it was cancelled until I went to Burson,

23   March -- March.  In May.  I'm sorry.  March.

24             I'm sorry.  No.  No.  It is May because

**W&F**

WILCOX & FETZER LTD

**A239**

1    A.    I started reporting to Amy Renk in 2001, and I

2    stopped reporting to her in April of 2002, I believe,

3    as well as I can recall right now.

4    Q.    Did you change jobs in April 2002, or did Amy

5    Renk leave the position she had?

6    A.    At that time I changed jobs and moved into

7    senior professional relations position with the Exanta

8    team.

9    Q.    Who did you report to there, immediately?

10   A.    I originally reported to Jane Helen, who was

11   the brand director.

12   Q.    How long did you report to Jane Helen?  How

13   long was she your immediate report?

14   A.    Five to six months.

15   Q.    Then what happened?

16   A.    Then a brand promotions leader was hired, Brian

17   Martin, to coordinate and pull together the

18   professional relations, medical education, promotions,

19   and publications teams because the work was expanding.

20   So Jane Helen had other things that she was working on

21   besides just -- just managing us, the medical

22   education, professional relations staff.

23   Q.    So tell me again when Brian Martin started to

24   the best of your recollection?



1    A.    It was August or September, 2002.

2    Q.    Had you known him before that?

3    A.    No.

4    Q.    Where does Debby Brangman fit into this?

5    A.    Debby Brangman succeeded Renee Valles in the

6    position as cardiovascular communications director or

7    some similar title.  So we were in the brand team, the

8    function -- which was called the functional group.

9    And then they had a skill center director in like a

10   central operations group.  And so Renee Valles and

11   then Debby Brangman sat in that position.

12   Q.    In the skill center?

13   A.    Yes.  So I reported directly to Jane Helen, of

14   course, and then Brian Martin, but then you also have

15   a dual reporting relationship with this person in the

16   skill center which was Renee Valles first and then

17   Debby Brangman.  So basically they serve as resources

18   for best practices in all the cardiovascular teams.

19   They are resources for staff.  If you have an issue,

20   you can go to them for help.  They sort of check on

21   the teams and see how things are going.

22   Q.    Did you more regularly work with Debby Brangman

23   or Brian Martin?

24   A.    Brian Martin.



**A241**

1        A.    No.

2        Q.    Did you drink during the day?

3        A.    No.

4        Q.    How long have you had a horse?

5        A.    You mean horse that I have now?

6        Q.    Let's start with that.

7        A.    Okay.  Let me think.  Almost four years.

8        Q.    That was one horse?

9        A.    It was one horse, Hot Song.

10       Q.    And what's your recreational activity with the

11    horse?

12       A.    It used to be taking a lesson one night a week

13    and riding three other nights of the week plus

14    Saturday and Sunday.  So I spent a great deal of time

15    with my horse before my back problem in 2003.

16       Q.    When did the back problem arise?

17       A.    When I went back to work at AstraZeneca early

18    after my third week of required bed rest.  I was

19    supposed to have six weeks.  My surgeon was very upset

20    with me and encouraged me to stay in bed, but I was so

21    worried about my job, losing my job because of things

22    they said to me before I left that I went back in.

23    And at the end of my first half day, I developed a

24    severe like a cutting pain in my back, in my lower

1    A.    Correct.

2    Q.    Although I understand that some of the

3    documents refer to her as Pritchard.

4    A.    Correct.

5    Q.    And what were your roles?  What did you do and

6    what did they do?  Were they parallel?  Tell me about

7    that.

8    A.    They were parallel positions.  We were peers.

9    The three roles were split up for individual

10    responsibility for targeted customer segments.  So

11    initially, I was responsible for cardiologists and

12    internists.  And Louise Colburn was in charge of the

13    congresses or the associations like the American Heart

14    Association, the American College of Cardiology,

15    planning what the brand presence would be on their

16    annual meeting.  Were we going to have symposia?  Were

17    we going to sponsor special events?  Would we have

18    banners or placards on buses?  Things like that.

19    Q.    So you focussed on the individual physicians in

20    certain specialties, and she was in charge of

21    associations?

22    A.    Louise Colburn, yes.

23         And then Susan Broadway had principal

24    responsibility for a customer segment called -- well,

**W&F**

**A243**

1    anti-coagulation clinics.  And this was a network of a

2    thousand targeted anti-coagulation clinics in the

3    country where our largest patient base of Warfarin

4    users existed.

5        Q.   What's that?

6        A.   That's a blood thinner.  Coumadin,

7    C-o-u-m-a-d-i-n.  It's a blood thinner, anticoagulant.

8    It was going to be the brand's target competition.

9        Q.   In dealing with these three segments, let's

10   call them, as you've identified, what was the goal?

11   What were you supposed to be doing?

12       A.   When I joined the team, we were at that time

13   providing medical grants upon request from external

14   sources like a university research system, an

15   investigator, medical investigator, strategic planning

16   for medical symposia, advisory boards, and other

17   communications and education.  We also -- the team did

18   not have at that early stage a database of what we

19   call key opinion leaders.  We refer to them as KOLs.

20   So that was a very big project, to build that

21   database, because that's who we would send the

22   invitations to, to advisory boards and special events

23   and whatnot.

24            And we also were working to standardize

1    company policy.

2              And I said, I was, you know, surprised to

3    see that Amy put that in my review because otherwise

4    it was excellent.  And she said, "Well, it's

5    inappropriate and it's against company policy for a

6    manager to surprise you in a performance review

7    without having given you prior notice, and for her to

8    put those statements in your review is inappropriate."

9    She said, "If I were you, I would submit a written

10   commentary on why you believe she submitted those

11   comments."  And she felt it was inappropriate.  That's

12   what that's referring to.

13     Q.   Did you do that?  Did you submit the comments?

14     A.   To be honest, at this moment, I cannot recall.

15   I may have.  I don't know right now.

16     Q.   Okay.

17     A.   It appears that I did from this.

18     Q.   In the same document, you discuss trying to get

19   upgraded to band 5 as a senior PREP manager, is that

20   right?

21     A.   Mm-hmm.

22     Q.   Yes?

23     A.   Yes.  That's correct.

24     Q.   What's band 5?

1    A.    It was the band -- a higher level than four.

2    Q.    But if I didn't know what that meant, what's

3    your understanding of the whole structure?  Is that a

4    classification system?

5    A.    Yes.

6    Q.    And what's the difference between band 4 and

7    band 5?

8    A.    At the band 5 level, at the time this memo was

9    written I believe that, or as best I can recall, you

10   would be eligible or employees would be eligible for

11   participation in stock options.

12   Q.    Anything else?

13   A.    It's a more senior level.

14   Q.    Do you get an enclosed office instead of a

15   cubicle?

16   A.    At the time that this memo was written, I don't

17   know.  I believe so.  I'm not sure about that.

18   Q.    Was that your primary motivation, in fact,

19   trying to get upgraded to level 5 so you could get an

20   enclosed office?

21   A.    No.  That was not my primary motivation.  The

22   primary motivation was to receive the job title that

23   had been promised to me along with the relevant

24   compensation.  Secondly, in terms of time, our team,

**W&F**

**A246**

1    the Exanta team was moving into a new building and

2    there were stratifications according to band about

3    where you were -- what kind of an office you would

4    have.  So in the new building, a band 4 would have a

5    cubicle and band 5 would have an inner office.  So it

6    shifted everything one level.  So in the building we

7    were in, a band 5 had a window office, a band 4 had an

8    interior office, and in the building it shifted that.

9    And I was not happy about that at all.

10       Q.   So in the old building you had an office?

11       A.   Yes.

12       Q.   And in the new building you would have a

13   cubicle --

14       A.   If they --

15       Q.   -- when you remained band 4?

16       A.   If they didn't follow through on their promise

17   to me to make me a band 5, yes.

18       Q.   Right.  If you remained at band 4?

19       A.   That's correct.

20       Q.   And who promised to make you a band 5?

21       A.   Renee Valles.

22       Q.   When did that promise occur?

23       A.   At the time of the job offer.

24       Q.   The job offer?  Which job offer?

1    Q.   And in that e-mail, Jane Helen says there was

2  a, quote, significant deficiency with your work,

3  unquote?

4    A.   She states that in this, right?

5           MR. NEUBERGER:  Did you see that?

6    A.   According to this, yes.

7    Q.   They said you are not moving to meet deadlines

8  and you are sitting on information, correct?

9    A.   Yes.

10   Q.   And in fact, she mentions the possibility of a

11 formal performance plan in the e-mail, doesn't she?

12   A.   Yes.

13          MR. NEUBERGER:  Wait a minute.  Maybe I'm

14 missing this.  I'm just confused.  Is this on

15 page 175?

16          THE WITNESS:  Yes.  Very first one Jane

17 Helen, March 5.

18          MR. SANDLER:  It starts, "Debby, this

19 string of..."

20          MR. NEUBERGER:  I got you.  I didn't see

21 that last sentence.

22 BY MR. SANDLER:

23   Q.   So do you have any explanation?  I mean, do you

24 think that that e-mail was sent on March 5?

1    Q.    So earlier on, you said you had told Jane

2    Helen, if you could return sooner than six weeks, you

3    would do that?

4    A.    Yes.

5    Q.    And then were you able to do that?

6    A.    I did return after the third week and, at the

7    end of the first day, began having spasms in my lower

8    back and considerable pain in my back.  And it

9    worsened.

10    Q.    So you went back out on leave?

11    A.    Yes.  I began working two half days the first

12    week back and then I tried three half days, I believe,

13    as far as I can recall, the next week.  And then one

14    half day into the following week, the pain had become

15    so bad, I told Susan I couldn't stay.  I was going to

16    have to go back out on full-time medical leave.

17    Q.    What did she say?

18    A.    Fine.

19    Q.    And so for how long were you out full time

20    again?

21    A.    That would be another week and a half.

22    Q.    What did you do during that time, stay home?

23    A.    Stayed home.

24    Q.    Was it in bed or just at the house?

1    specialist?

2              You testified before about the Rothman

3    Institute?

4    A.   After that I went to the Rothman Institute.

5    Q.   You hadn't been to them before, or had you?

6    A.   No.  No.

7    Q.   Did the back problem improve while you were at

8    home?

9    A.   Yes.

10   Q.   When did you return to work?

11   A.   June 20th.

12   Q.   Is that full time?

13   A.   Full time.

14   Q.   When did you start looking for the back

15   specialist?

16   A.   When the problems became very severe.

17   Q.   When was that?

18   A.   I don't recall the exact date.

19   Q.   Well, I'm not looking for an exact date.  Was

20   it during this period when you went in to work, worked

21   for a couple of half days, and then had to go home?

22   A.   No.  It was after that.  It was weeks after

23   that.  It wasn't until -- it might have been the fall.

24   Q.   Fall?

**W&F**

1    this is on a different subject -- that you received a

2    package last month at your home that your banding and

3    title upgrades have been approved, correct?

4        A.    That's correct.

5        Q.    Tell me about that.  What was that all about?

6        A.    I had received a package which -- it was

7    advising me of changes and stock availabilities or

8    something to that effect.  And I thought it was the

9    notice for the banding increase and title upgrades.

10   And it turned out that was incorrect, which is what I

11   later learned from Debby Brangman.

12       Q.    Were you asked to bring the package in to work?

13       A.    Susan might have asked me to bring it in.  She

14   wasn't familiar with it, or to recheck it and let her

15   know.

16       Q.    Did you bring it in?

17       A.    No.  I don't believe I did.

18       Q.    Do you still have it?

19       A.    I honestly don't know.  I would have to check.

20   It could be -- it could be there.

21       Q.    At home?

22       A.    Yes.  At home with my other files.

23       Q.    How did you learn that you were mistaken in

24   your interpretation of the document?

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MARYBETH FARRELL,                    :

                Plaintiff    :

        vs.                    :   C.A. No. 04-285 KAJ

ASTRAZENECA PHARMACEUTICALS, :
LP,

                Defendant

        Deposition of MARYBETH FARRELL taken
pursuant to notice at the law offices of Young,
Conaway, Stargatt & Taylor, LLP, The Brandywine
Building, 1000 West Street, 17th Floor, Wilmington,
Delaware, beginning at 9:47 a.m., on Tuesday, January
25, 2005, before Allen S. Blank, Registered Merit
Reporter and Notary Public.

                VOLUME II

APPEARANCES:

        JOHN M. LaROSA, ESQUIRE
        LAW OFFICE OF JOHN M. LaROSA
        Two East 7th Street, Suite 302
        Wilmington, DE 19801-3707

            For - Plaintiff

        SHELDON N. SANDLER, ESQUIRE
        YOUNG, CONAWAY, STARGATT & TAYLOR, LLP
        The Brandywine Building
        1000 West Street, 17th Floor
        Wilmington, DE 19899-0391

            For - Defendant

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

                WILCOX & FETZER, LTD.
        1330 King Street - Wilmington, DE 19801
                (302) 655-0477



MARYBETH FARRELL

1    But for that to advance to an action plan, as best I

2    can recall, I don't remember any advance warning about

3    this.

4        Q    What's your understanding of the purpose of

5    an action plan?

6        A    Well, my understanding of it is that it's

7    designed to help employees to improve their performance

8    to a level that is required by the position that they

9    are in or something to that effect.

10       Q    It's not a disciplinary activity, is it?

11       A    Well, can you explain what you mean by

12   disciplinary?  I mean I don't --

13       Q    Well, it related to conduct in response to

14   some conduct as opposed to simply an effort to improve

15   performance?

16       A    As best I understand it, it's not a -- it's

17   not for use as a discipline policy, nor is it a

18   discipline policy.  It's a performance assistance

19   program.

20       Q    Let me hand you Bates number D483 through

21   85, and which appears to be a memo to you from Susan

22   Pritchard Broadway.

23            Do you recall seeing that?

24       A    Yes.



MARYBETH FARRELL

1    Q    And was this an outline of what was going to

2    be in the action plan?

3    A    This outlines the terms of the action plan.

4    Q    Did you ever sign that action plan?

5    A    No.  I refused to sign it.

6    Q    Would it be accurate to characterize your

7    response to the action plan as hostile?

8    A    No, I wouldn't characterize it as hostile.

9    Q    How would you characterize it?

10   A    Confused, disappointed in AstraZeneca.

11   Dismayed that they had -- that they would do something

12   like that.

13   Q    You didn't think you had done anything

14   wrong, is that right?

15   A    I hadn't done anything wrong.  That's

16   correct.

17   Q    You felt other people had made mistakes and

18   you were paying for it?

19   A    I never presumed or stated that I was

20   perfect.  However, I also was not willing to accept

21   responsibility for others' poor management.

22   Q    I have handed you D486, which is a summary

23   of a meeting between you and Susan Pritchard Broadway

24   dated August 18th.  Could you just take your time and

**W&F**

**A254**

MARYBETH FARRELL

1    Q    By the way, how did you get along with Faye

2    Morin in general?

3    A    Fine.

4    Q    So this comment that we talked about before,

5    was that sort of an aberration, so far as you were

6    concerned?

7    A    I would say, yes.

8    Q    What's her position?

9    A    She was the leader for the coag clinic and

10   the consumer work streams.

11   Q    Was she a peer of Jane Hellen's at that

12   level?

13   A    No.  No, she reported for a time to David

14   McNinch.  And I'm not sure if that changed that she was

15   reporting in to Jane Hellen after that.

16   Q    Okay.  I hand you Bates number D674.  Is

17   that a response from Keith Black of human resources

18   about your retaliation complaints?

19   A    Yes.

20   Q    And he concluded that the concerns about

21   your performance had been expressed before you asked

22   for the FMLA leave, correct?

23   A    He states that.

24   Q    Now, we have talked a little bit already



**A255**

MARYBETH FARRELL

1    about the performance improvement plan.

2        A    Um-hmm.

3        Q    Were you given a plan to sign?

4        A    Yes, I was.

5        Q    And did you refuse to sign it?

6        A    I refused to sign it.

7        Q    Okay.  You didn't believe it was justified,

8    is that correct?

9        A    Correct.

10       Q    Can you honestly say that you made an effort

11   to meet the requirements of the plan despite your

12   misgivings about it?

13       A    Yes, I can.  I made every effort.

14       Q    While you were on the performance

15   improvement plan, did you miss a lot of time from work?

16       A    What do you mean by a lot of time?

17       Q    Say 20 days, workdays?

18       A    I had vacation that I was going to lose if I

19   didn't take it.  And it could have been 20 days.

20       Q    Did you have some illnesses?

21       A    Yes.

22       Q    What illnesses?

23       A    Well, I had an abscessed tooth that was an

24   emergency.  My doctor had to phone in antibiotics at

MARYBETH FARRELL

1    night and it took the next day. I was in two offices.

2    Her office in the morning and then I had to go to an

3    endodontist for the actual root canal and all that for

4    the latter part of the day.

5            I have chronic sinusitis. So typically I

6    get ear infections. I may have had a couple things

7    like that.

8        Q    Shortly after you went on the performance

9    improvement plan, did you ask for vacation?

10       A    I believe I did.

11       Q    And what did you plan to do while you were

12   on vacation?

13       A    I don't recall if I had specific plans.

14       Q    You were just concerned that you were going

15   to lose the time if you didn't take it, is that right?

16       A    Well, one, I was entitled to the time.

17       Q    Right.

18       A    Two, I was very stressed out about the way I

19   was being treated at work and had gone to see a

20   psychiatrist and a psychologist and I needed time -- I

21   needed to get out of that environment. So I think it

22   was just going to be to use my vacation to take some

23   days off.

24       Q    Did you ask for 17 days of vacation in the



MARYBETH FARRELL

1    last two months of the year?

2         A    Yes.

3         Q    And did Susan Broadway point out to you that

4    that's not a very good idea when you're trying to work

5    on a performance improvement?

6         A    Yes, she did.

7         Q    I take it you disagreed with that?

8         A    Yes, I did.

9         Q    Is the vacation system at AstraZeneca, is it

10   a sort of a use it or lose it system, if you don't take

11   the time, you can't roll it over?

12        A    You can only roll over a certain amount of

13   days.  I believe it's five.

14        Q    Okay.  So you could have kept five days?

15        A    I still did have extra days at the end of

16   the year.

17        Q    And you rolled those over?

18        A    I requested to roll them over, yes.  It was

19   2.5.

20        Q    In response to the concern that was

21   expressed about your taking all that vacation, did you

22   ask for compensatory time off?

23        A    Yes, I did.

24        Q    You had never asked for that time off



MARYBETH FARRELL

1    before, had you?

2        A    Do you mean specific to the Exanta team or

3    in general?

4        Q    During the time you worked for the Exanta

5    team.

6        A    No.

7        Q    Was it correct to say or is it correct to

8    say that you were expected to put in whatever time was

9    necessary in order to get the job done?

10       A    Yes.

11       Q    Did you also have what you called a pet

12   emergency during that time?

13       A    Yes, I did.

14       Q    What was that all about?

15       A    One of my cats was very ill.

16       Q    So did you lose a day or something?  Yes?

17       A    Yes.

18            Can we stop?

19            MR. SANDLER:  Sure.  Let's take another

20   break.

21            (A brief recess was taken.)

22   BY MR. SANDLER:

23       Q    During the last three months of 2003, were

24   you looking for other employment?

**W&F**

MARYBETH FARRELL

1      A      Yes, I was.

2      Q      Did you go on any job interviews?

3      A      As best I can recall, I did not, during that

4   time.  But I was sending out resumes', contacting

5   people.  I don't recall going out for interviews.

6      Q      And did you have periodic meetings during

7   the time when the performance improvement plan was in

8   place to talk about how you were doing?

9      A      Yes.

10     Q      And was Georgina Austin-Jones involved in

11  those meetings?

12     A      Yes, she was.

13     Q      I hand you D1169, which is her notes of a

14  meeting.

15     A      Okay.

16     Q      Of December 2nd.

17            Would you just look at that and tell me if

18  you agree whether the notes are accurate or not?

19     A      This is only partially accurate.

20     Q      What's not accurate?

21     A      Okay.  I would qualify that in the first

22  paragraph where she says at the beginning of the

23  meeting when asked to comment on her progress towards

24  the plan, Marybeth refused saying she was not prepared

**W&F**

MARYBETH FARRELL

1    A    Which documents are you referring to?

2    Q    Well, there is the February documents, the

3    e-mail exchange between Jane Hellen and Debbie Brangman

4    in which they both said that they are having second

5    thoughts about your promotion because of your

6    performance.  Do you remember that?

7    A    I do recall seeing that, yes.  You showed

8    that to me last time.

9    Q    And there were some other similar documents.

10   And I think when I asked you about them, you told me

11   you had some doubts that the dates on these documents

12   were correct?

13   A    Yes.

14   Q    All right.  Assuming for the moment that

15   those dates are correct, and I realize that you don't

16   think they are, but assuming for the moment that they

17   are, would you agree that there were concerns expressed

18   about your performance, if those dates were correct,

19   before the FMLA issue surfaced?

20            MR. LaROSA:  Objection.  It calls for

21   speculation.  But you can answer.

22            THE WITNESS:  I can answer?

23            MR. LaROSA:  Yes.

24            THE WITNESS:  I have serious doubt that



MARYBETH FARRELL

1    those e-mails are authentic.  But if we are to suspend

2    that, if they were, it would appear they would be true.

3    But I can't imagine what the ground would be for such

4    concerns.

5    BY MR. SANDLER:

6        Q    And why would you think people would make

7    that up?

8        A    Well, throughout the action plan process and

9    the performance improvement plan process and certainly

10   just the treatment of me after I announced I was going

11   out on six weeks medical leave, and as I stated in a

12   number of memos to Susan or Jane or Georgina

13   Austin-Smith, or Jones, and others, AstraZeneca was

14   operating in an untruthful and unethical manner.  So it

15   would not surprise me that, given what I have witnessed

16   there over that seven, eight months -- actually, it was

17   a little more than that.  That they would be capable of

18   creating fictitious documents.  Because, in fact, Susan

19   Broadway did falsify some documents.

20       Q    What documents did she falsify?

21       A    The budget reports.

22       Q    What budget reports?

23       A    For the Exanta team.  The monthly budget

24   reports.  She received my information.  She created an

MARYBETH FARRELL

1    A    At Glaxo, yes.  And this lawsuit.  I can't

2  remember exactly if I was trying to organize

3  information.  But that has been very stressful.

4         Yes.  I say here recent weeks.  I think

5  those would probably be the two big things.

6    Q    Were you under even more stress in February

7  and March of 2004 right after your termination, or at

8  least as much?

9    A    Not really.  Because I was at home all day.

10  I didn't have to work.  You know, I was looking for a

11  position.  So even though I was very stressed out from

12  my experience at AstraZeneca and the development of,

13  you know, the lawsuit against AstraZeneca, I was at

14  home.  I wasn't, you know, I mean at that time I

15  commuted to Glaxo.  I was going up 202.  It was taking

16  me, if I left in rush hour, about an hour and 40

17  minutes each way.  So just getting my routine down and

18  trying to get readjusted.

19    Q    When did you start at Burson Marsteller?

20    A    March.

21    Q    March 1st?

22    A    Um-hmm.

23    Q    But that wasn't stressful?

24    A    It was stressful, yes.



**A263**

MARYBETH FARRELL

1    Q    And I think we talked last time about

2    whatever costs you incurred during the time you were

3    uninsured.  Do you remember what the bottom line number

4    was?

5    A    We discussed approximately three thousand

6    dollars.

7    Q    Under count four, page 12 of the complaint.

8    I'm sorry, not page 12.  I'm wrong.  Page 14.

9    A    Okay.

10   Q    You make a claim based on something called

11   the Implied Covenant of Good Faith and Fair Dealing.

12   And it basically is an allegation that the company

13   manipulated your records in order to terminate you.

14   A    Um-hmm.

15   Q    Is your claim that the concerns expressed to

16   you in April and May of 2003 were inconsistent with

17   your previous performance reviews?

18   A    Yes.

19   Q    Now, we have talked about this already.  But

20   let me come back to it.

21        I have shown you some documents that were

22   dated before your FMLA request arose.  And, again,

23   assuming these dates are correct, I realize that you

24   dispute that, but assuming they are correct, would you

**W&F**

**A264**

MARYBETH FARRELL

1  agree that there are documents that show that your

2  performance was questionable before the FMLA arose?

3         A     I don't know how to answer that.  Because

4  those e-mails are -- I mean it's almost -- they are

5  incredible.  There are no specific things, deficiencies

6  cited.  Nothing was ever said to me.

7         Q     All right.  Let's start with -- and these

8  are -- we have already referred to these.  I'll hand

9  you one.  D170 and 171.  This is the thing we have

10  touched on before and where both Deb Brangman and Jane

11  Hellen expressed reconsideration about your proposed

12  promotion.  They are having reservations, they say.

13              Do you recall that?

14         A     I recall reading this, yes.

15         Q     And I take it you questioned the accuracy of

16  the date or the existence of this as a legitimate

17  e-mail; is that what you're saying?

18              MR. LaROSA:  Let me just clarify something.

19  She said I recall seeing this.  Are you saying you

20  recall seeing this at day one of the deposition?

21              THE WITNESS:  At day one of the deposition

22  the first time.

23              MR. LaROSA:  Just so the record is clear.

24              MR. SANDLER:  Do you want to read the



MARYBETH FARRELL

1    question back?

2              (The reporter read back the pending

3    question.)

4              MR. LaROSA:  You can answer that.

5              THE WITNESS:  Yes.

6    BY MR. SANDLER:

7        Q    And what's your basis for that?

8        A    Well, on February 12th, the date of Jane

9    Hellen's presumed e-mail letter to Debbie Brangman

10   about any performance issues, she sent me an e-mail

11   congratulating me, good job, exclamation point, on a

12   project that I was working on.

13       Q    So you think those two things are

14   inconsistent?

15       A    Yes.

16       Q    Anything else?

17       A    Anything else about what?

18       Q    Any other reason why you don't think that's

19   a legitimate, accurate date?

20       A    It doesn't make sense.  In light of the

21   activities -- first of all, in light of my performance

22   review of 2002.

23              Secondly, in light of what was actually

24   going on in January up to February 12th in particular,

**W&F**

MARYBETH FARRELL

1   for this e-mail.  If you look at the calendars for the

2   team and the activities, we were having cleanout days

3   to move into the new building in January and February.

4   The last week of January, I was traveling with Brian

5   Martin, Susan Broadway, Louise Colburn and Sherry

6   Kirkendall to obtain medical education programs for

7   self-development in Dallas, Texas.

8           What else was going on?  We were having

9   training on the PRISM System.  P-R-I-S-M.  There is

10  another recordkeeping program we got training on.  We

11  were working on trying to rescue the key opinion leader

12  data base development from Louise Colburn.  So this

13  doesn't make sense.

14      Q    Well, the last time we went over some

15  feedback forms from 2003.  I'm sorry, 2002.  And in

16  Brian Martin's, for example, he said he was looking for

17  more clear, concise and focused communications.  Brian

18  Catone said more timely communication and expressed --

19  I think we talked about this concern about scheduling

20  conflicts.  Jane Hellen said fewer e-mails and more

21  focused communications, better understanding.

22          There was a repeated expression of concern

23  about your focus and your communications.  Would you

24  agree with that?

**W&F**

MARYBETH FARRELL

1      A     No.

2      Q     You don't agree that those things were said

3   or you don't agree that they were accurate?

4      A     They were not communicated to me.

5      Q     Okay.  I thought you said that you saw some

6   of the feedback forms in 2002?

7      A     Some of them.

8      Q     You just don't remember those?

9      A     Well, if you read my performance review for

10  2002, I am specifically lauded for having excellent

11  communication skills.  I was given a rating of

12  excellent for my communication abilities.

13     Q     So that's what you're hanging your hat on,

14  is it?

15     A     Well, my performance review was an

16  accounting of how I was performing and, according to

17  that record, I was doing very, very well in these areas

18  and others.

19     Q     Look at Paragraph 94(ii) of the complaint.

20  It says, on May 6, 2003, you were issued a short term

21  improvement plan.  Do you see that?

22     A     I'm sorry, what page are you on?

23     Q     Page 14.  94(ii).

24     A     Oh, I see.  Okay.



IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MARYBETH FARRELL,                    )
                                     )
          Plaintiff,                 )
                                     )
v.                                   )     Civil Action No.
                                     )     04-285
ASTRAZENECA PHARMACEUTICALS, L.P.,)
                                     )
          Defendant.                 )


          Deposition of GEORGINA L. AUSTIN-JONES taken
pursuant to notice at the Law Offices of JOHN M.
LaROSA, 2 East 7th Street, Wilmington, Delaware,
beginning at 2:35 p.m. on Monday, February 14, 2005,
before Renee A. Meyers, Registered Professional
Reporter and Notary Public.


APPEARANCES:

          JOHN M. LaROSA, ESQ.
          LAW OFFICE OF JOHN M. LaROSA
            2 East 7th Street
            Wilmington, Delaware   19801
            for the Plaintiff,

          SHELDON SANDLER, ESQ.
          RICHARDS, LAYTON & FINGER
            One Rodney Square
            Wilmington, Delaware   19801
            for the Defendant.




          WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
          (302) 655-0477





1    A.    I was thinking I graduated ten years later than
2    I did.
3    Q.    How about any jobs in training, when was your
4    first job where you had experience in training?
5    A.    1991.
6    Q.    And who did you work for then?
7    A.    It was called, I think, Kathy Parker Training.
8    I can't be absolutely sure that that's the name.
9    Q.    Was that in Great Britain?
10    A.    Yes.  All of my work was prior to coming here.
11    Q.    When did you first meet Marybeth Farrell?
12    A.    September 2003.
13    Q.    At that time, was she the senior professional
14    relations and education program manager for the Exanta
15    team?
16    A.    I don't believe so.  She was just a PREP
17    manager.
18    Q.    A PREP manager?  But she was not working as
19    part of the Exanta team at that time?
20    A.    She was working with the Exanta team.
21    Q.    Was she a Band IV PREP manager?
22    A.    Yes.
23    Q.    And you were working at AstraZeneca at the time
24    Miss Farrell's employment ended in January of last



A270

1    year?

2        A.    Yes.

3        Q.    Do you remember what her role was at the time

4    her employment ended?

5        A.    The same.

6        Q.    PREP manager?

7        A.    Mm-hmm.  Sorry.  Yes.

8        Q.    And she was a Band IV at that time?

9        A.    Yes.

10       Q.    Do you recall her ever being a, Miss Farrell

11   ever being a PREP manager for AstraZeneca's marketing

12   group?

13       A.    I don't understand the question.  Sorry.

14       Q.    I think you told me that, at one time,

15   Miss Farrell was working as a PREP manager, Band IV,

16   for the Exanta team, and I am asking if she ever had a

17   PREP manager role in the marketing group at

18   AstraZeneca?

19       A.    So she was in the marketing group?

20       Q.    I am asking if you ever recall that?

21       A.    Yes.

22       Q.    Was her job as PREP manager for the Exanta team

23   part of the marketing group?

24       A.    Yes.

**W&F**

**A271**

1    A.    I arranged for Marybeth to meet with our

2    employment practices partner so he could investigate

3    her concerns.

4    Q.    Who was that?

5    A.    Keith Black.

6    Q.    Is an action plan a form of disciplinary action

7    at AstraZeneca?

8    A.    Not as I understand it to be.  Not really.

9    Q.    What do you understand an action plan to be?

10    A.    The formal process to start somebody to help

11    them improve their performance.

12    Q.    When Miss Farrell contacted you about this

13    complaint you mentioned earlier, how did that contact

14    take place?  Was it over the phone?  Was it an in

15    person meeting?

16    A.    As I recall, she actually contacted a

17    colleague, Deb Kauffman, and Deb was going to go on

18    holiday, so Deb and I both met with Marybeth and we

19    met face-to-face with her.

20    Q.    Do you recall what was said at that meeting?

21    A.    As I remember at the moment, Marybeth said she

22    was concerned that the action plan was a consequence

23    of her taking FMLA leave, and, also, she alleged there

24    was some link to a sexual harassment -- it wasn't a

1    formal complaint that she had made, but she had made a

2    -- she had had a discussion with her manager some

3    years previously about somebody else in the company

4    and she thought it was linked to that event as well.

5    Q.    So, there was two issues she was raising?

6    A.    Yes.

7    Q.    Was the second issue investigated?

8    A.    When Keith and I met with Marybeth so that he

9    could start the investigation, Marybeth did not want

10   to share who she felt was involved in the sexual

11   harassment part of her concerns, so she had implied

12   that she had had a consensual affair with somebody

13   years previously, this person had left the company,

14   but this person still had friends in the company.  But

15   she wouldn't share anymore information when we met

16   with Keith so he wasn't able to investigate.

17   Q.    So what was investigated, the FMLA retaliation

18   complaint?

19   A.    Yes.

20   Q.    Did you take part in the investigation or just

21   Keith Black?

22   A.    Keith did the investigation.

23   Q.    Nobody else?

24   A.    No.  Keith would keep me informed, but he did



1    the investigation.

2      Q.   And what was the outcome of that investigation?

3      A.   I believe it was that Keith found that there

4    was no link between the FMLA leave and the action

5    plan.

6      Q.   Do you remember approximately when that was,

7    the findings of this investigation came out?

8      A.   I believe it was in October.  That's what I

9    remember.

10     Q.   So was that a rather quick turnaround period

11   for an H.R. investigation, one month or so?

12     A.   I don't believe so, no.

13     Q.   Was that a rather long time for an

14   investigation?

15     A.   No.  I don't -- I don't think so.

16     Q.   How long would an H.R. investigation normally

17   last?

18     A.   It entirely depends on the circumstances and

19   what you are trying to investigate.

20     Q.   For a retaliation type of a matter?

21     A.   Well, I would say it would depend how many

22   people were involved who you needed to speak to in

23   order to investigate the complaint.

24     Q.   Were you aware that in October of 2003,

1   Miss Farrell was told that her execution of the

2   requirements of the action plan was unsatisfactory?

3       A.   Yes.

4       Q.   And that was after the human resources

5   investigation concluded; isn't that correct?

6       A.   I believe so.

7       Q.   Who was made aware of the findings of the

8   investigation other than Miss Farrell?

9       A.   I think Susan must have been made aware, Susan

10  Broadway, because she had been told not to take any

11  further action on the action plan until Keith had

12  concluded his investigation.

13      Q.   Who told her that?

14      A.   I am not sure.

15      Q.   Was it one of her managers or somebody in human

16  resources?

17      A.   Who told her?

18      Q.   Not to take any further action on the action

19  plan until the investigation was completed?

20      A.   It would have probably been Keith or I, but I

21  am not sure.

22      Q.   And why would someone in H.R. tell a manager

23  not to continue with an action plan while an

24  investigation was pending?

