IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


MARYBETH FARRELL                )
                                )   Civil Action No.
            Plaintiff,          )   04-285 KAJ
                                )
v.                              )
                                )   TRIAL BY JURY OF
ASTRAZENECA PHARMACEUTICALS LP,)   TWELVE DEMANDED
                                )
            Defendant.          )

            Deposition of JANE K. HELLEN taken
pursuant to notice at the LAW OFFICE of JOHN M.
LaROSA, 2 East 7th Street, Wilmington, Delaware,
beginning at 9:37 a.m. on Tuesday, February 15, 2005,
before Renee A. Meyers, Registered Professional
Reporter and Notary Public.

APPEARANCES:

            JOHN M. LaROSA, ESQ.
            LAW OFFICE OF JOHN M. LaROSA
              2 East 7th Street, Suite 302
              Wilmington, Delaware  19801
              for the Plaintiff,

            SHELDON N. SANDLER, ESQ.
            YOUNG CONAWAY STARGATT & TAYLOR LLP
              1000 West Street, 17th Floor
              Wilmington, Delaware  19899
              for the Defendant.

    ALSO PRESENT:  JOHN J. BOGAN, ESQ.




            WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801
              (302) 655-0477



1    Q.   So it's possible that somebody that met all

2    goals could receive a good rating?

3    A.   Yes.  For example, if somebody had received

4    excellent or exceeds expectations in all areas, both

5    goals and cultural attributes, they may receive

6    anywhere between an excellent and a distinguished

7    performance rating.

8    Q.   So are you saying you have to receive an

9    exceeded in all the categories to receive an overall

10   rating of excellent?

11   A.   Can you repeat the question?

12   Q.   Are you suggesting that you need to receive a

13   rating of exceeded in all the goals and all the

14   competencies in order to qualify for the overall

15   rating of excellent?

16   A.   I am not certain that that is the exact

17   definition.  I am giving you an example of what an

18   excellent or distinguished performance would look

19   like.  And there is some subjectivity to each of the

20   categories.

21   Q.   So, who completed this evaluation for

22   Miss Farrell?

23   A.   Who actually wrote it?  The deployed manager is

24   Brian Martin and the functional manager is Debbie

Jane K. Hellen
21

1    Brangman.

2       Q.    Did anybody else have any input into the

3    ratings on this evaluation?

4       A.    Yes.

5       Q.    Who?

6       A.    I had input, and there were four other 360

7    degree feedback inputs from Marybeth Farrell's

8    colleagues.

9       Q.    The 360 degree feedback, that would be from

10   peers?

11      A.    Yes.

12      Q.    And those would be suggestions or

13   recommendations?

14      A.    Yes.  Those were areas where the employee

15   excelled at their job, examples of where the employee

16   could have improved one's performance or done things

17   differently.

18      Q.    But those peers who were doing the 360 degree

19   feedback, I take it that's a separate form?

20      A.    Yes.

21      Q.    And their suggestions may or may not make it

22   into the performance evaluation?

23      A.    Correct.

24      Q.    And after all the ratings are done for the

Jane K. Hellen

1    Q.    How about Brian Martin?

2    A.    Brian Martin reported to me.

3    Q.    And is it fair to say that at the time

4  Miss Farrell received this review, she met or exceeded

5  expectations in all the areas of goals and

6  competencies?

7    A.    Yes.

8          MR. SANDLER:  Could you repeat that?

9          (The reporter read back as requested.)

10  BY  MR. LaROSA:

11    Q.    And is it fair to say that at the time she

12  received this evaluation, there were no concerns with

13  her performance?

14    A.    The overall evaluation section of the

15  performance review highlights a performance summary.

16  And in that section, there are areas that are

17  mentioned that Marybeth Farrell was given some

18  suggestions for improving or -- for improving her

19  performance.

20    Q.    Would you agree, as a very general principle,

21  nobody is perfect; would you agree with that

22  statement?

23    A.    Yes.

24    Q.    And would you agree that in any AstraZeneca

1    whether it was elective or non-elective.

2    Q.   And the surgery was scheduled for May 9th,

3    2003; is that correct?

4    A.   To the best of my knowledge, yes.  Yes.

5    Q.   And did Miss Farrell tell you that her doctor

6    advised her she would require six weeks of bedrest

7    after the surgery?

8    A.   Yes.

9    Q.   And isn't it true that you told her that six

10   weeks is a long time?

11   A.   I, in speaking with Marybeth, when she told me

12   she was going to go out on medical leave and she said

13   that it could be up to six weeks, I was surprised and

14   concerned because Marybeth seemed to be a very healthy

15   person, and without knowing the nature of her illness,

16   I may have said, Oh, that's a long time, out of

17   concern.

18   Q.   Out of concern as a manager for the Exanta team

19   and needing to have that work done; correct?

20   A.   Out of concern as another human being for a

21   person who is seemingly healthy, that she would have

22   to be off of work for six weeks, and as a manager with

23   Exanta.

24   Q.   And you are saying that she was seemingly



Jane K. Hellen                              29

1    healthy, so are you suggesting that you didn't believe

2    her?

3        A.   I believed her.  I just was concerned.

4        Q.   Did you also ask her if she would be out the

5    entire six weeks?

6        A.   We talked about possible scenarios for the time

7    that she would be off.  She wasn't sure it was going

8    to be six weeks but could be up to six weeks.  That

9    was entirely her and her physician and the health --

10   our health department's call.

11       Q.   What do you mean, "It was our health

12   department's call"?

13       A.   When an employee goes off on medical leave,

14   their leave is apparently reviewed with our physician

15   and approved.

16       Q.   And Miss Farrell eventually was approved for

17   the FMLA leave?

18       A.   Yes.

19       Q.   And she completed the proper paperwork for the

20   FMLA leave?

21       A.   Yes.  As far as I know.

22       Q.   On April 28th, 2003, you and Susan Broadway

23   expressed concerns to Miss Farrell about her

24   performance regarding projects in 2002; is that

**W&F**

1          Can you tell us what advisory board you

2    are referring to?

3        A.    It was a cardiology advisory board.   It was

4    scheduled to take place in April.

5        Q.    2003?

6        A.    Of 2003.  And in the beginning of two -- and in

7    January and February, when it should have been

8    planned, apparently, Marybeth was having difficulty

9    planning the meeting, and we found out, in March, that

10   the meeting would have to be cancelled because we did

11   not -- she did not give enough lead time to send the

12   invitations out to the physicians that were to be

13   invited.

14       Q.    Do you remember where this advisory board was

15   to take place?

16       A.    I don't recall.

17       Q.    And sending out the invitations to the

18   physicians, that was a function that was to be taken

19   care of by Brian Martin?

20       A.    No.   That was Marybeth's responsibility with

21   Discovery International.

22       Q.    The second thing you told us about was an

23   advisory board that was being delayed.

24            Do you remember, was that another



1    cardiology advisory board?

2        A.    There was a plan -- every year, we have a plan

3    that outlines the advisory boards that will take place

4    during the course of the year, and there are many of

5    them by specialty, cardiology, hematology, coagulation

6    clinic specialists, pharmacy, primary care, etcetera.

7        Q.    Do you remember which specialty this delayed

8    advisory board consisted of?

9        A.    The whole plan, the plan was delayed.  We

10   needed the plan for all of the meetings, and that was

11   not done in time.

12       Q.    For 2004 or for 2003?

13       A.    2003, which was Marybeth's responsibility.

14       Q.    What was the difficulty working with Discovery

15   International, as you understood it, at that time?

16       A.    As I understood it at the time, Marybeth was

17   not providing clear direction to the agency.  She

18   would send confusing and conflicting e-mail messages.

19   She would delay in getting responses back to them and

20   not provide answers to questions that they had in

21   order for them to conduct the business.  She was not

22   clear in the amount of money that she was spending.

23            She was not able to keep track of nor did

24   she have an understanding of the hours that she was

**W&F**

1    understanding of the therapeutic area and the clinical

2    trial data.  I -- it was explained that Marybeth

3    needed to increase her strategic focus and knowledge

4    of the brand messages; that she needed to understand

5    other marketing disciplines where she was working,

6    publications, the product development scientists, and

7    the strategist roles; and she needed courses in

8    strategic planning, leadership skills, and public

9    speaking.

10       Q.   But everything you have just read to us doesn't

11   sound like it's talking about planning and advisory

12   board meeting; is that accurate?

13       A.   These are some of the activities that go into

14   planning an advisory board meeting.  She is the

15   interface and a contact with many of our investigators

16   and our customers, and she needs to understand the

17   therapeutic area and the clinical trial data when she

18   is talking with these customers.  Somebody that is

19   planning advisory boards needs to understand the

20   strategic focus and the direction that the brand is

21   going.  Someone that is planning advisory boards needs

22   to have a speaking and a working level knowledge of

23   the publications that are being referred to.

24            So, much of the content and the discussion

**W&F**

**A284**

Jane K. Hellen                              52

1      A.    Am I saying that they are different?

2      Q.    Yes.

3      A.    They could be.

4      Q.    On May 7th, 2003, shortly before Miss Farrell

5    was to go out on FMLA leave, was, according to your

6    testimony, that would have been the day before she

7    went out on FMLA leave, isn't it true that you made a

8    comment to her to the effect of, Don't worry,

9    Marybeth, your job will be here when you get back,

10   really?

11     A.    Marybeth was in the office on the -- one of the

12   days leading up to her leave.  I was leaving for the

13   day and I stopped into her office to see how she was

14   doing.  Marybeth explained to me what kind of surgery

15   she was having and that she was quite upset.  And I

16   said to her, out of concern, that, "Don't worry about

17   the job, focus on getting better, on healing, on doing

18   what she needed to do in order to be healthy, and not

19   to worry about her work or the product or any of her

20   responsibilities because we would take care of it

21   while she was gone and she needed to focus her

22   energies on her recovery."

23          I wanted to reassure her, at the time

24   before she left, that we would be fine, "we" being

1    and why she was going out on leave.

2        Q.    And after her surgery, Miss Farrell attempted

3    to work at home in May of 2003; is that correct?

4        A.    Marybeth, while she was on leave, called me to

5    tell me, several days after the surgery, that it went

6    fine.  And then she subsequently called me and asked

7    if she could do -- she offered to do some work from

8    home, and I told her that that would not be necessary,

9    that we could not ask her to do any work while she was

10   off on leave, but Marybeth said she was bored and she

11   wanted to do some work.  She offered to help.  And I

12   declined the offer nicely.

13       Q.    And Miss Farrell returned to AstraZeneca to

14   work part time during the fourth week of her recovery;

15   is that correct?

16       A.    Marybeth -- I believe Marybeth returned to work

17   in June, mid June.

18       Q.    The first time she returned to work, it was to

19   try and work part time; right?  Not full days?

20       A.    That's what I understand, yes.

21       Q.    And you understand that that was at a time

22   period prior to the six weeks?

23       A.    That was Marybeth's decision to do that.

24       Q.    But I am not asking whose decision it was.  I

1   and L5 vertebrae and persisting back spasms, pinched

2   nerves, and tingling and numbness in her right leg,

3   foot, and arm now?

4       A.    I did not know that.  She did not make me aware

5   of that, no.

6       Q.    In July of 2003, Miss Broadway gave

7   Miss Farrell a midyear review for her performance; is

8   that correct?

9       A.    That would be standard procedure.  I don't know

10  the exact date.

11      Q.    But you recall she was given a midyear review

12  after coming back from surgery?

13      A.    I am not certain.

14      Q.    You don't recall if she got any midyear review

15  for 2003?

16      A.    I believe she did.  I just don't know the date.

17      Q.    And her 2003 midyear review was a negative

18  review; is that correct?

19      A.    I don't recall.

20      Q.    Do you recall her performance improving after

21  she returned from FMLA leave?

22      A.    I recall that Marybeth's performance was

23  sporadic.  She would make attempts to -- she would try

24  to improve and provide documentation of that

1    improvement, and I was also made aware that her

2    attitude was becoming increasingly negative.

3        Q.    And prior to this time, you had never had

4    experience with Miss Farrell having a negative

5    attitude at work; is that correct?

6        A.    Well, I had had a discussion with Marybeth in

7    April, and Marybeth was inquiring as to why she did

8    not receive the promotion that Susan Broadway

9    received.  And I told Marybeth that she needed to

10   demonstrate that she could perform at the level that

11   she was at before she'd be considered for a promotion

12   and that she currently wasn't working at that

13   capacity.  And Marybeth was surprised and subsequently

14   sent a note, an e-mail stating that she thought that

15   that was an inaccurate characterization -- or

16   inaccurate, and Marybeth frequently blamed other team

17   members for her lack of performance.

18              So, I would say that is negative, and, so,

19   I saw negative behaviors before she went out on leave

20   as well as when she returned.

21       Q.    And this negative attitude that you saw in her

22   before she went out on FMLA leave, can you show me

23   where that's reflected in her 2002 evaluation?

24       A.    It wasn't in her 2002 evaluation.  It was her

1    performance in 2003.

2        Q.    So her attitude was not a problem in 2002?

3        A.    No.

4        Q.    And this issue of her blaming other people for

5    her problems with her performance, that was not an

6    issue in 2002; is that correct?

7        A.    Well, there was an advisory board meeting that

8    Marybeth was responsible for in December in Chicago

9    and the meeting was very loosely managed.  And I

10   debriefed after the meeting with Marybeth and with

11   Brian Martin, her supervisor, and with Discovery

12   International, the vendor company, and with Brian

13   Katona, our scientist, that I wanted to see the

14   advisory boards run in a tighter, better fashion and

15   that they be more structured and that we prepare the

16   meetings and our presenters in a better way.  And

17   Marybeth took copious notes, and I had asked Marybeth

18   to develop a template for how -- for running advisory

19   boards so that she would learn how the meetings were

20   to be run.

21            And when I would -- when I expressed my

22   dissatisfaction with that meeting, Marybeth never

23   said, Yes, I am accountable for that.  It was usually

24   somebody else's fault.  And I, at the time, determined

Jane K. Hellen                    60

1    that she was inexperienced, she was still learning,

2    she needed more coaching and more direction, and, so,

3    I gave her the benefit of the doubt.

4        Q.    And that meeting was in 2002?

5        A.    Yes, in December.

6        Q.    And your message in that meeting is not

7    reflected in the performance evaluation for 2002; is

8    that correct?

9        A.    It's reflected in the overall evaluation

10   comments to the extent that she needed to have a

11   better understanding of the function of the PREP role

12   and the different marketing disciplines.

13       Q.    Are you reading from the overall evaluation on

14   page 6?

15       A.    Yeah.

16       Q.    Can you point out where you are reading?

17       A.    Third paragraph, "Work to increase her

18   strategic focus and knowledge of the key brand

19   messages. As a key function of the PREP role, she

20   should expand her understanding of other marketing

21   disciplines."

22       Q.    But you are not talking about a negative

23   attitude in the overall evaluation?

24       A.    No.  No.

1    Q.   And you are not talking about her blaming

2    others for her responsibilities there?

3    A.   No, I am not.  It was the -- it was -- that

4    particular meeting took place in December.  It was one

5    of the first, if not the first meeting that Marybeth

6    Farrell was responsible for, and this was written

7    prior to the December advisory board meeting.

8    Q.   So these evaluations are written prior to the

9    end of the year?

10   A.   Most of the evaluations are -- the evaluation

11   process begins in the end of the year, October,

12   November.  During that time, the 360 degree feedback

13   is obtained and usually the performance evaluations

14   are completed before the end of the year, before

15   people go out on break or leave.

16   Q.   And when are the evaluations usually shared

17   with the employee?

18   A.   Anywhere from -- anywhere within the first

19   quarter of the year, depending upon the schedule of

20   the deployed manager and the functional manager.  So,

21   for instance, with my direct reports, as well as my

22   own, the evaluations were shared in February and

23   March.

24   Q.   In July of 2003, you told Miss Farrell she

1    Q.    In terms of the sequence of events, do you

2    think it was somewhere in the summer of 2003?

3    A.    No.    I think it was earlier than that.    As part

4    of the performance review, one of the discussions that

5    the functional manager, Debbie Brangman, usually has

6    with the deployed management, that being Brian Martin

7    and myself, would be, Would this person be a candidate

8    for a promotion?

9              And I told Debbie Brangman, in December

10   and in January, that Marybeth, I had some concerns

11   about her performance and that I would be

12   uncomfortable promoting her to a Band V, that it would

13   send the wrong message to the team.    And I am not

14   certain that Debbie Brangman told Marybeth that when

15   she had her performance review with Marybeth in March.

16   Q.    Of 2003?

17   A.    Of 2003.    But I had discussions with Debbie

18   Brangman to that effect.    I had discussions with Brian

19   Martin to that effect.    And I also had discussions

20   with Debbie Kauffman, the H.R. representative, to that

21   effect in the first quarter of 2003.

22   Q.    Who had introduced Miss Farrell's name as a

23   possible candidate for a promotion?

24   A.    Miss Farrell.

1    strategy.

2        Q.    When you say, "A Band V position includes

3    developing strategy," are you talking about developing

4    brand strategy?

5        A.    Assisting, yes, the brand management team in

6    developing brand strategy as it relates to medical

7    education and professional relations.

8        Q.    And that's something that a Band V position

9    would be responsible for?

10       A.    Amongst other things, yes.

11       Q.    And that developing brand strategy is something

12   that a Band IV position would not be responsible for?

13       A.    Not developing the strategy, but being able to

14   execute the strategy that's been developed and

15   understanding it.

16       Q.    The action plan that Miss Farrell was placed on

17   contained criticism of her performance in the area of

18   ability to develop relationships with associations and

19   thought leaders; is that correct?

20       A.    I believe so.

21       Q.    What does that mean, "Ability to develop

22   relationships with associations and thought leaders"?

23       A.    The professional educations and education

24   managers interface with her customers, many of which

1    are physicians.  They are referred to frequently as

2    thought leaders or key opinion leaders.  They are

3    usually academicians in institutions that do clinical

4    trials, and they usually help to shape the opinion of

5    -- that investigators and that physicians have about

6    clinical data.

7          And in the case of Exanta, we had many key

8    thought leaders and opinion drivers in multiple

9    specialties as well as associations, the American

10   Heart Association, the American Academy of the ACC,

11   primary care associations, etcetera, and we conduct

12   meetings at these national conventions and

13   associations, and, so, it's important that our

14   professional education managers, our PREP managers,

15   know these physicians and customers and associations

16   so that they can do their job.

17   Q.    And that's a requirement for a Band V position?

18   A.    I believe that's a requirement for Band IV and

19   V.

20   Q.    And the action plan Miss Farrell was placed on

21   contained criticism of Miss Farrell's performance in

22   the area of budget management; is that correct?

23   A.    Yes.

24   Q.    Can you briefly explain what that means,

1    A.    Did I believe it or not?

2    Q.    Yes.

3    A.    I don't know if I believed it or not.

4    Q.    You had doubts about it; is that fair to say?

5    A.    I just wasn't sure.  So, yes, I had doubts.

6    Q.    And with regard to that incident or that

7    alleged incident, no investigation was done of that

8    incident; is that correct?

9    A.    I am not certain.

10   Q.    You are not aware of any investigation being

11   made?

12   A.    I am not, no.

13   Q.    And the PIP ended on January 5th, 2004; is that

14   correct?

15   A.    I believe it was that time frame, yes, in

16   January.  I don't recall the exact date.

17   Q.    And after the PIP ended, at some point in mid

18   January, did you and Miss Broadway provide

19   Miss Farrell with a memorandum regarding PIP feedback

20   discussion?

21   A.    The last meeting that I recall that we had with

22   Marybeth included Georgina, myself, Miss Broadway, and

23   Miss Farrell, and we were -- the objective of the

24   meeting was to provide Marybeth the feedback on her

Jane K. Hellen                           86

1    PIP.  And Marybeth was late to that meeting and

2    Marybeth wanted to -- she pulled out a recorder to

3    record the meeting.  And I asked -- I inquired as to

4    what that was.  She said she wanted to record it.  And

5    I said that I was uncomfortable with doing that.  And

6    Georgina had also reiterated that it was not something

7    that we do in a meeting and that we would prefer not

8    to record the meeting.  And that was the last meeting

9    that I had with Marybeth and with Miss Broadway and

10   Georgina.

11      Q.   I am not asking you about meetings.  I am

12   asking you about a memorandum being sent after that

13   meeting regarding PIP feedback.

14           Do you recall --

15      A.   There was a -- I understand there was a -- I

16   recall there is a memorandum that provides some

17   feedback.

18      Q.   Did you author that memorandum in whole or in

19   part?

20      A.   No.

21      Q.   Who did?

22      A.   Miss Broadway, and I believe she received some

23   assistance from Georgina, although I am not certain of

24   that.

1     Q.    Would it be fair to say, then, if there was a

2     memorandum that wasn't authored by you, your name

3     wouldn't be on it as somebody from whom the memorandum

4     was from?

5     A.    I would have to say if I had any input into it,

6     if I had looked at the document, then my name could

7     have been on it.  I just don't recall because

8     Miss Broadway was conducting the performance

9     improvement plan, it would be standard procedure for

10    her to author the updates, and she circulated them to

11    myself, Georgina, I believe she copied Deb Kauffman,

12    at times, and my name would have been on the document

13    then as having reviewed it and agreed with it.

14    Q.    In mid January of 2004, AstraZeneca placed

15    Miss Farrell on a one-week leave during which time she

16    was not to report to work; is that correct?

17    A.    That's my understanding.

18    Q.    Who made that decision to place Miss Farrell on

19    a one-week leave?

20    A.    I believe that was a decision that was

21    discussed with Susan Broadway, Georgina, and our legal

22    counsel.

23    Q.    But you did not participate in that decision?

24    A.    No.

Jane K. Hellen                                    103

1    when she was in Sweden in meetings?

2        A.    Yes.

3        Q.    Miss Farrell says that one time there was a

4    meeting in which she was participating, Christy

5    Hedstrom was participating by teleconference?

6        A.    Mm-hmm.

7        Q.    And you started the meeting by saying, quote,

8    "Does everyone have their blanky"?; do you remember

9    such a comment?

10       A.    I don't remember any comment like that.

11       Q.    Did you intend any such comment to be critical

12   of Miss Hedstrom for taking leave?

13                 MR. LaROSA:    Objection.

14                 MR. SANDLER:    You can answer.

15                 THE WITNESS:    No.

16   BY MR. SANDLER:

17       Q.    Let me go back to the latter part of 2002 and

18   the early part of 2003.

19                 Let me ask you, first of all, when does

20   the 2002 evaluation actually get prepared?

21       A.    We begin the preparation of the performance

22   plans towards the end of the year in the last quarter.

23   Usually, traditionally, it's in October and November

24   and December, and the reason why there is such a

1    period of time, long period of time is that we ask the

2    360 degree evaluation be done by other colleagues and

3    we ask the employee to provide the names of

4    individuals that they would like us to obtain feedback

5    from.  And in Marybeth's case, she wanted Brian

6    Katona, Jane Clark -- let's see, those two for sure,

7    to provide feedback.  I am missing the other one.  I

8    believe it was Denise.  And it generally takes some

9    time --

10       Q.   Denise who?

11       A.   Denise Barrett -- no.  I am sorry.  It wasn't

12   Denise because she wasn't even there yet.  It was

13   Brian and Jane Clark and I don't recall the other two

14   people, but there were four.

15       Q.   Okay.

16       A.   And it takes time to get those evaluations

17   back.

18       Q.   There was feedback from the vendors she worked

19   with?

20       A.   Yes.  I am sorry.  We also got feedback --

21   well, yes, we got feedback from Discovery

22   International, and I personally spoke with Christine

23   Lutze from Discovery International on several

24   occasions by telephone regarding Marybeth's

Jane K. Hellen                                    106

1    upon AstraZeneca.

2              So, at any rate, the period when we sought

3    feedback on the employees was during the October,

4    November, December time period.

5    Q.    And did you also give feedback as far as this

6    evaluation process?

7    A.    Yes.

8    Q.    And how would you characterize your approach to

9    the feedback of Marybeth Farrell at that time?

10   A.    Well, in my opinion at the time, and as is --

11   you can see reflected in the performance review, there

12   were certain areas where Marybeth did very well and I

13   actually held out hope that she would do well.  She

14   had -- she was only in the job for six months, seven

15   months.  It usually takes new team members about six

16   months in order to really learn.  And we were entering

17   a very critical pre-launch phase, so my evaluation of

18   Marybeth was, at the time, mixed.

19             And I felt, gave her the benefit of the

20   doubt that even though these -- the meeting in

21   November and some of the smaller behaviors weren't

22   exactly where I wanted to see it, I asked Brian

23   Martin, her then supervisor, to work closely with her.

24             And Marybeth quickly assimilated into the

Jane K. Hellen                    107

1    team, which is reflected in the performance review.

2    She worked very long hours.  She came in early.  She

3    stayed late.  She appeared to be putting in a

4    tremendous amount of effort.

5        Q.    Okay.

6        A.    And at the time, her attitude was very good,

7    very willing to learn, very open.  And, so, I held out

8    a lot of hope that Marybeth would do well and be

9    successful in her role.

10       Q.    Jumping forward for just a second, did her

11   attitude continue the same as you just observed or did

12   it change in the latter part of 2003?

13       A.    Absolutely changed in the latter part of 2003.

14   And I guess I would characterize it that Marybeth had

15   very little to no self-awareness that when you would

16   have a conversation with her, her take away and her

17   understanding would be very different from what you

18   either said or talked about with her.  And I had an

19   experience where Marybeth went to my supervisor to

20   talk about her performance difficulties, I believe it

21   was in April, and my supervisor even mentioned that,

22   you know, it's amazing how two people can have the

23   same conversation with completely different take

24   aways.

**W&F**

**A301**

1      Q.    That was her perception?

2      A.    That's Patty Torr's perception.

3      Q.    Is she the same person as Patty McDonald?

4      A.    Yes, Patty McDonald, I am sorry.  Patty was

5      married in the course of the year.

6              And Marybeth just refused to admit that

7      anything she was -- at least verbally, she refused to

8      admit that she was doing anything wrong.  But in some

9      of the follow-up memos and e-mails that went back and

10     forth, she said, "Yes, I will work on this and I am

11     committed improving this and so on," so it was a very

12     -- it was just odd, and especially towards the end,

13     her attitude became belligerent, I would say.

14     Q.    And you also mentioned that at the beginning,

15     she worked hard?

16     A.    Yes.

17     Q.    Did that continue at the end?

18     A.    No, it did not.  Susan had a great amount of

19     difficulty in, you know, even having Marybeth show up

20     to work.  We eventually decided to pull her entry and

21     exit reports from security to find out if she was even

22     in the office because Marybeth would not come in, she

23     would not call, she would show up late for meetings or

24     not at all.

Jane K. Hellen                          109

1          I received a phone call from Discovery

2    International, Marybeth was running one of the

3    teleconferences with a thought leader and she

4    literally jumped off the phone very abruptly and left

5    the building.

6      Q.   Let's go back to the beginning of the year.

7          Let me hand you what is bates numbered at

8    the bottom D171, and it's an e-mail from you to Debbie

9    Brangman.  Let me just read it.  It says, "Debbie, I

10   have been seriously reconsidering the proposed

11   promotion for Marybeth.  This sends a terrible mixed

12   message for her and the rest of the team.  Can we not

13   promote her and explain the reasons for needed

14   development?  I also think that H.R. would question

15   our justifying this."  Signed Jane.

16          Do you see that?

17     A.   Yes.

18     Q.   And there is a response from Debbie Brangman.

19   "Hi, after our conversation, I am having reservations

20   as well.  I haven't started any paperwork.  I will

21   give you a call."  Signed Debbie.  Those were the same

22   day, February 12th, 2003.

23          And then on the 14th, you responded, "Can

24   you please plan some meetings to discuss performance

1    with Marybeth ASAP?  I would like to get started with

2    this.  Do you contact H.R. or should I"?

3              Right?

4        A.    Correct.

5        Q.    Tell me about that.  What was taking place at

6    that time?

7        A.    Well, that was in the February time frame

8    before we had given -- before Debbie had given

9    Marybeth her 2002 performance evaluation.  And we

10   also, running parallel to this, was the office move

11   where we had the Band IV/Band V situation.

12              Marybeth let it be known that she wanted

13   to be promoted to a Band V and that when she was

14   interviewing for the position, the functional manager,

15   who was, at the time, Renee Valles, V-a-l-l-e-s, had,

16   apparently, told Marybeth that the job would be

17   changed from a Band IV to a Band V, without my knowing

18   about that and never discussed.

19              Marybeth, during this February time frame,

20   beginning of the year, had sent me a message and said,

21   By the way, we will be moving.  I was told I would be

22   able to be a Band V.  I'd like to be a Band V.  And at

23   that point, I had some reservations, which I noted in

24   the message, and I talked about them with Deb Brangman

1    in person in December or January at a cardiovascular

2    T.A. meeting at the Doubletree Hotel.

3              And after I talked with Deb, then she

4    agreed and Deb said that she thought that given the

5    performance evaluation, that Marybeth would be

6    reasonable.  And I -- I, at that time, said, "No, I

7    don't -- I don't agree with it."  The difficulty was

8    starting to emerge in January, February, and March,

9    and -- so I thought it sent a very bad mixed message

10   and I did not want to promote her at the time.

11       Q.   I am going to hand you again a series of bates

12   numbered documents, D175 to D181, and I am not going

13   to read it all, but just point to the last one, which

14   is -- it looks like the messages start in January,

15   January 30th, 2003, from Marypat Howard to Marybeth

16   Farrell, and on and on?

17       A.   Mm-hmm.

18       Q.   But the last one says, it's from you to Debbie

19   Brangman, and it says, "Debbie, this string of e-mails

20   highlights the significant deficiency we have with

21   Marybeth's work.  We are at risk for the advisory

22   board schedule and she is sitting on information or

23   not moving to meet deadlines.  Debbie, any help with

24   moving Marybeth along or formal performance plan ASAP.

1    "Where is Scott's office"?

2              What is that about?

3    A.    Well, at the time in speaking with Debbie, it

4    was not -- not progressing along with Marybeth, and in

5    speaking with Debbie, she had said that she had talked

6    with Marybeth but Marybeth was not taking

7    accountability for her actions.   And, so --

8    Q.    What was she doing?

9    A.    Blaming other people for everything that was

10   going wrong.

11   Q.    Okay.

12   A.    Beginning to again.   And so Debbie wanted to

13   seek some assistance from her boss, who is Scott

14   Bolenbaugh at the time, and so that was the request

15   for that meeting and I had asked Debbie where Scott's

16   office was.   I had not previously met Scott and -- so

17   that was that.

18   Q.    Was a meeting held?

19   A.    The meeting was held with Scott Bolenbaugh,

20   with Debbie Brangman, and with Brian Martin and myself

21   to discuss Marybeth's performance and what we should

22   do about it, which was a discussion of, you know,

23   perhaps we -- we considered all options, putting her

24   on an action plan and not, and just seeing how she did

1    for the first half of 2004.

2        Q.   And then what was the conclusion -- first half

3    of 2003?

4        A.   Excuse me, 2003.  2003.

5        Q.   What was the conclusion?

6        A.   And, unfortunately, during then that time or

7    soon thereafter, there was a reorganization with that

8    -- with Brian Martin's position, and we decided that

9    we would wait and help Marybeth as much as we could

10   and -- until the new brand communications leader came

11   into the role.  They had changed the requirements of

12   the job.

13            And that was the time period where Brian

14   Martin went to work on another brand in CNS and Susan

15   Broadway was promoted.

16       Q.   And I think you have already talked about what

17   happened the day Susan Broadway was promoted?

18       A.   Mm-hmm.

19       Q.   When was that?

20       A.   That was in April, April -- I believe it was

21   April 7th.

22       Q.   Then let's hold that thought, then.  This is

23   dated April 4th.  It's D209, and it's from Deborah

24   Kauffman to you.  And it says, "Jane, with the

1    transition of individuals in the BCD role" -- what's

2    BCD?

3        A.    Brand communications director.

4        Q.    So that's the Brian Martin to Susan Broadway?

5        A.    Correct.

6        Q.    "I wanted to touch base with you regarding the

7    employees relations issue that has been discussed with

8    me in the PREP/promotion area and gain your

9    perspective.  I did talk to Susan about it briefly

10   yesterday and we both agreed it was an urgent

11   situation and it would be a good idea for you and I to

12   talk about it also.  Thanks for accepting my meeting

13   request on Monday."  Signed Deb Kauffman.

14              Do you know what's being referred to

15   there?

16       A.    Yes.  During this time, they changed the brand

17   communications role, and Susan had interviewed, Brian

18   Martin had interviewed.  It was required that people

19   re-interview and that the decision as to which

20   individual got that role was with H.R. and myself and

21   Patty McDonald Torr, and, as well as other individuals

22   on the -- in Scott Bolenbaugh's group.  And I was

23   concerned that whoever got that position, and I had

24   spoken with Deb Kauffman about it, that whoever got

1   that position would have to deal with the situation

2   with Marybeth and that it was going to be -- it was

3   going to be difficult, that she was -- at the time,

4   she was not performing and not acknowledging her --

5   not having accountability for her actions and doing a

6   lot of blaming. And that was acknowledgment by Deb

7   Kauffman that the new director or leader would have to

8   deal with that.

9      Q.   And on the day that Susan Broadway's promotion

10  to that position was announced, what happened with

11  respect to Marybeth Farrell?

12     A.   Well, we -- I announced to the team that

13  Marybeth -- excuse me, that Susan was going to be

14  promoted and that Brian was going to be working on

15  another team and some of the changes in the role of

16  the brand communications director or leader, and that

17  went fine. And then after that meeting, after we

18  disbursed, I went to my office briefly to grab a file

19  because I had another meeting and Marybeth came into

20  my office and she said that she was surprised about

21  Susan being promoted and that she felt that she should

22  have been promoted to that position.

23              And I told her that before she would be

24  considered for a promotion, she needed to demonstrate

1    that she could execute the responsibilities at her

2    current position, within her current position, and

3    then she would be considered like any other team

4    member.  And that, currently, her name was not

5    included as a potential candidate for a promotion

6    because she was not showing that she could do her job

7    in her current capacity.

8              And that meeting, unfortunately, was very

9    brief because I had to go off to a meeting.  And

10   Marybeth said, "Well, okay."  And I said, "Well, we

11   need to talk about this some more and we need to work

12   with Susan Broadway now," and that was it.

13      Q.   Ms. Farrell acknowledged that she did go in and

14   complain, or she didn't say complain, she said she

15   expressed surprise about Susan Broadway being

16   promoted.

17      A.   Mm-hmm.

18      Q.   And she said that in response, that all you

19   said was, quote, Advisory boards are more than picking

20   out napkin colors, period, unquote.

21              First of all, do you recall saying that,

22   and, second of all, is that all you said?

23      A.   No.  I don't recall saying that at that

24   particular meeting.  I was very, very clear with

1   Marybeth that she had not demonstrated to me, in 2003,

2   that she could do the job that was outlined for her

3   and that she needed to do that, and she wasn't.

4       Q.   Let me show you D219 and D244.  One is a memo

5   from you to Marybeth Farrell dated April 7th, which

6   is, I guess, is about the same time as the promotion

7   was announced, asking her how she is progressing with

8   an action list.

9            Do you recall that?

10      A.   Yes.

11      Q.   And she responded, apparently, and I am not

12  going to go over all that, but then you responded to

13  her on April 10th, saying, "Marybeth, I was thinking

14  of more depth," etcetera.

15           Do you recall that exchange of e-mails?

16      A.   Yes.

17      Q.   What was that all about?

18      A.   The Cardiology Advisory Board had to be

19  cancelled because of Marybeth's inability to get the

20  meeting planned and execute it.  And we had had a

21  meeting about that.  And at the meeting, I asked

22  Marybeth to please take some notes and some take away

23  actions as to what we were going to do differently to,

24  No. 1, avoid this situation again in the future so we

Jane K. Hellen                    120

1    wouldn't have this happen again and secure the plans

2    for the rest of the advisory boards for the year.  So

3    Marybeth took some notes on that meeting.  And I asked

4    her to please follow-up by a certain date.

5              And in the meantime, I wanted to make sure

6    that she was tracking.  And, so, when I received this

7    e-mail, it appeared to me, again, from reading it and

8    from talking with Brian Martin, that Marybeth had

9    taken the action items but had delegated most if not

10   all of the action items to Discovery International.

11   She was not doing the work herself and did not seem to

12   grasp what needed to be done.  And so I was asking her

13   to please provide more depth and show me that she knew

14   what she was working -- instead of a to do list, which

15   included delegation, I wanted to know that -- where

16   she was.  I wanted more detail.

17   Q.    And showing you D257 and 8, which is the same

18   exchange you have just been testifying about, which

19   you have sent to Susan Pritchard, and you say, "Susan,

20   received from MB last week.  Please follow-up as you

21   see necessary.  I am waiting for Brian to give me the

22   specifics for performance.  I expect we will have to

23   handle this when I return.  Hate to delay any further,

24   but... Thanks, Jane"?

1    A.    Mm-hmm.

2    Q.    What was that about?

3    A.    Again, it relates back to the advisory boards

4    asking Marybeth for more in depth and specifics as to

5    how she was going to improve the planning in the

6    future.  And Marybeth responded back, she agreed that

7    it was important to track them.  And I was copying, at

8    the time, both Susan Pritchard, who is now Susan

9    Broadway, and Christine Lutze, from Discovery, so that

10   they all knew where things were.  And Marybeth had

11   sent me this responding e-mail, and I sent a note back

12   to Susan that we would need to follow-up and that we

13   would need to handle the situation.

14           I, unfortunately, had to leave on -- I was

15   on vacation April 14th through 19th, and Marybeth --

16   excuse me, Susan and Brian would need to continue to

17   follow-up with Marybeth.

18   Q.    I am going to show you D260, which is an e-mail

19   exchange between Marybeth Farrell and Louise Colburn,

20   and you are copied on it, among others, and the last

21   note is from Louise Colburn to Susan Pritchard dated

22   April 15th, and it says, "We go round and round."

23           Do you know what that means?

24   A.    Yes.  Again, this relates back to asking

Jane K. Hellen

1   Marybeth to put an action plan together around the

2   advisory boards and her not taking responsibility or

3   accountability for doing her work.   Louise was the

4   PREP manager that sat next to her, and Louise was

5   complaining that Marybeth was not understanding what

6   she had to do and that Marybeth would ask her frequent

7   questions that were the same questions that -- so,

8   frequently, Louise had to give Marybeth a lot of

9   lists.   And part of that was do so because Louise kind

10  of was to keeper, if you will, and she tried to manage

11  closely the advisory lists and our thought leader

12  lists, and instead of Marybeth just asking for this

13  list of thought leaders for an upcoming meeting, you

14  know, she sent more string of e-mails to Louise and

15  Louise is just getting fed up and we go round and

16  round.   Things don't get done.

17      Q.   All of the things we have just been talking

18  about, since I started asking you questions, relate to

19  times before you were even aware that Marybeth Farrell

20  was going out on FMLA leave; is that correct?

21      A.   That's correct.

22      Q.   Other than a couple things where we jumped

23  forward to later in the year?

24      A.   Correct.

Jane K. Hellen                    123

1    Q.    Here is D319, which is dated May 1, and it's an

2    e-mail from you to Susan Pritchard Broadway, and it

3    says, "Marybeth and I discussed the performance of her

4    work on advisory boards on March 14th.  This was the

5    date that we cancelled the Cardiology Advisory Board.

6    We also briefly discussed her performance and

7    development on the date of the quarterly team meeting,

8    March 29? after your promotion and flowers went out."

9              Was that the date, the 29th, or was it

10   another date that the announcement was made?

11   A.    March 14th was the date when we cancelled the

12   advisory board and Marybeth also and I discussed that

13   this was Susan's promotion.  I believe I was wrong on

14   the date.  I think that was April 7th.

15   Q.    But in any event, there were two discussions

16   that you are flagging?

17   A.    Yes.

18   Q.    In which performance problems with Marybeth

19   Farrell were discussed by you with her?

20   A.    By me with her.  And not including discussions

21   that Marybeth would have had with Brian Martin or

22   Debbie Brangman.

23   Q.    Then you go on and say, "I'd like to be present

24   when you," meaning, I guess, Susan Broadway, "have

Jane K. Hellen

124

1  your discussions with Marybeth in order to keep her

2  focused on her work, not the competency of others."

3          What did you mean by that?

4   A.   Well, as was alluded to in the previous memo

5  from Louise, Marybeth would frequently blame others

6  and -- for her inability to get her duties done and

7  her job done and she would deflect a lot and -- at

8  that point.  And, so, I wanted to be sure that when

9  Susan met with Marybeth, that -- and we talked about

10 her performance, that I be there because I just wanted

11 -- I just wanted to be there.

12          I just wanted to be careful that Susan was

13 clear and that Marybeth understood that we had

14 concerns over her performance, and it was not others,

15 but it was her, and that she had control over -- of

16 these aspects of her job and she -- she needed to take

17 action and to do her job.

18   Q.   And finally, D339, there is an e-mail from

19 Marybeth Farrell to Deborah Kauffman with a copy to

20 Patty McDonald, and then an e-mail the same date from

21 Patty McDonald.  Marybeth Farrell's e-mail talks about

22 her surprise at the issues Susan Pritchard Broadway

23 had raised and she says that they weren't consistent

24 with her performance issue.

Jane K. Hellen                          126

1    A.    I mean just understanding what she is competent

2  of doing and not competent at doing.  And if she

3  cannot do the job, ask for help.  And that's what I

4  meant by self-aware of her abilities and limitations.

5    Q.    Final question.  When I showed documents, these

6  documents, documents that had dates on them from

7  before the FMLA leave to Miss Farrell, she

8  acknowledged that, Well, if they were correct -- if

9  the dates were correct, then it does show that there

10 were concerns about her performance before the FMLA

11 leave.

12   A.    Mm-hmm.

13   Q.    But she said that she couldn't believe that

14 those dates were correct; they must have been, you

15 know, backdated or just falsely prepared.

16         Do you know of any of these e-mails or any

17 other e-mails or any other documents in this case that

18 were prepared and backdated or otherwise generated for

19 the purpose of simply creating a record?

20   A.    No.  The e-mail system is such that you can't

21 write an e-mail, send it, and then change the date.

22 They are actual e-mails.  I never changed any dates on

23 any e-mails.  And as I mentioned, I don't even think

24 it's possible to do so.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MARYBETH FARRELL,      )
                       )
    Plaintiff,      )
                       )
     v.            ) C.A. No. 04-285 KAJ
                       )
ASTRAZENECA           )
PHARMACEUTICALS, L.P.,  )
                       )
    Defendant.      )

          Deposition of DEBORAH J. BRANGMAN taken
pursuant to notice at the Law Office of John M. LaRosa,
2 East 7th Street, Suite 302, Wilmington, Delaware,
beginning at 9:30 a.m., on Thursday, March 24, 2005,
before Kimberly A. Hurley, Registered Merit Reporter and
Notary Public.

APPEARANCES:

        JOHN M. LaROSA, ESQUIRE
        LAW OFFICE OF JOHN M. LaROSA
          2 East 7th Street - Suite 302
          Wilmington, Delaware 19801
          for the Plaintiff

        SHELDON N. SANDLER, ESQUIRE
        YOUNG CONAWAY STARGATT & TAYLOR, LLP
          1000 West Street - 17th Floor
          Wilmington, Delaware 19801
          for the Defendant



Deborah J. Brangman                    15

1    Q.   Did you know that Ms. Farrell requested leave to
2   seek medical treatment on April 22nd, 2003?
3    A.   I didn't know at the time, no.  I mean, I heard
4   later that she was out on leave, but I didn't know prior
5   to her leaving.  I don't believe I knew.
6    Q.   So your recollection is you heard at some
7   point --
8    A.   She didn't report to me at that point.  If I got
9   an e-mail, I don't think I paid attention because they
10  were switching all of the systems in terms of routing
11  e-mails.
12   Q.   Did you know if the medical treatment she sought
13  was nonelective surgery?
14   A.   I have no idea.  Never asked.
15   Q.   Have you ever had to create any physician
16  profiles as part of your job duties?
17   A.   Have I?
18   Q.   Yes.
19   A.   I have managed people who have done it.
20   Q.   So folks working under you have had to create
21  physician profiles?
22   A.   Would you define "physician profiles."
23   Q.   I was going to ask you to define it.  My
24  understanding of it is is that it's a biography or some

W&F

Deborah J. Brangman                16

1    kind of a profile on a physician who might be speaking as

2    part of a program that's affiliated with AstraZeneca.

3         A.    It's a part of -- we have a database that lists

4    our speakers and maybe whether they were a good speaker,

5    a bad speaker, what their expertise is.  Some product

6    teams have that much more formalized than other product

7    teams.

8         Q.    These speakers speak at what's called advisory

9    boards?

10        A.    Yes.

11        Q.    Can you tell me what an advisory board is?

12        A.    In the pharmaceutical -- it's essentially

13   marketing research.  There are all kinds of marketing

14   research you can do.  You can do a traditional kind of

15   survey, but when you want to get it more -- some of the

16   more qualitative issues about why they would prescribe

17   something, sometimes it's emotional, there's a lot more

18   than just reading the package insert in terms of why

19   physicians would prescribe.

20             You also want to know like what they would

21   think about -- very often a product that's not on the

22   market, what would you think about a claim if we were to

23   word it this way versus if we worded it that way.  It's

24   to get at some of the softer issues.  And you spend

**W&F**

**A320**

1   usually a day with them, and there's usually about

2   10 people and you talk to their peers.  They talk amongst

3   themselves and you sort of listen and get a much better

4   deeper understanding of issues, whatever those issues

5   are.

6       Q.   At these advisory boards, these speakers, are

7   they usually physicians?

8       A.   They're usually physicians.  They can be -- they

9   can be AstraZeneca speakers, as well, but they are

10  generally practicing or academic physicians.

11      Q.   Are those people the ones that are generally

12  doing the advising at these ad boards?

13      A.   That's the whole purpose.  They're supposed to

14  speak and talk.  So there's usually a short presentation

15  and then a lot of discussion.

16      Q.   Who are the people that they are speaking to?

17  Who is their audience?

18      A.   Their audience are their peers.  What we really

19  want to do is very often it's the person who's done the

20  clinical trial will talk about the data because he's most

21  familiar with it.  So he will share some of the key data

22  points and then he will say to the audience what do you

23  think about this, do you believe this will be helpful

24  when you practice.  So there's generally a discussion

**W&F**

**A321**

1   around however many people are there.  If there are

2   20 doctors, you really want to understand what they all

3   think.  It's usually a moderator who helps that process

4   along.

5        Q.   As part of the audience, are AstraZeneca

6   employees there, also?

7        A.   We're there as observers usually unless you're a

8   physician or a clinician who's presenting some data, but

9   other than that, our job is just to watch.

10       Q.   Do some AstraZeneca employees put on or organize

11  the advisory boards?

12       A.   Yes.

13       Q.   You said you didn't organize advisory boards

14  yourself but you managed folks who did organize?

15       A.   I did.  In my last job and the job before that.

16       Q.   As part of promoting the advisory board, are

17  physician profiles created to let people know what

18  physicians will be at the advisory board or will be

19  speaking at the advisory board?

20       A.   No.  Profiles are really made to help -- it's

21  not so much -- profiles are really made to help you

22  understand if, say, a doctor specializes in -- like lots

23  of people are hypertension specialists, but maybe he

24  specializes in people with extremely high hypertension.

W&F

Deborah J. Brangman                          23

1    than -- I never said to anybody make a list of

2    50 profiles.  Doesn't really happen that way.  I guess

3    that's what I'm trying to say.

4        Q.    Let's put the ad board out of the equation,

5    because you said that they don't necessarily go

6    hand-in-hand.

7        A.    The way you were describing it isn't quite how I

8    would approach it.

9        Q.    Putting the ad boards aside, have you ever told

10   one of your PREP managers, "You need to create physician

11   profiles on over 50 physicians"?

12       A.    What we have done in the past, and we call

13   them -- we have identified what we call key opinion

14   leaders.  KOLs you hear a lot.  Most recently I worked on

15   the Iressa team and we were all new to the team,

16   everyone, and the PREP manager, as well as me, as well as

17   the brand director.  So we sat down and we said -- and

18   Katie, who was the lead on it, we got a list and we

19   worked and we developed a list of key opinion leaders

20   based on a lot of different things, based on input from

21   clinical, based on who we knew was a good speaker.

22                  So that's how the process generally works,

23   and Katie was responsible for making that happen.

24       Q.    If that's how the process worked, is it fair to

Deborah J. Brangman                    24

1   say that you've never told one of your subordinates, "You

2   need to create physician profiles on over 50 physicians"?

3   You have never done that; is that correct?

4       A.   We had over 50 -- if we're talking about the

5   same thing, this KOL list, perhaps, identifying a list of

6   KOLs, yes, we had 100 people on that list of KOLs.

7       Q.   You never told one of your PREP managers,

8   "Please create that list"?

9       A.   I told her to please direct the creation of that

10  list, yes.  That is the responsibility of the PREP

11  manager, to identify and cultivate KOL lists and who are

12  the key people in this industry, who would you identify.

13  Even if you come up with a list of 100 and it gets culled

14  down to 50, that's what a PREP manager does.

15      Q.   Helps to cultivate this KOL list or key opinion

16  leader list?

17      A.   Yes.  I have done that with Atacand where my

18  PREP manager had developed a list of these are our go-to

19  people for Atacand, these are the list of key people that

20  we need to be close to because they believe in this

21  product and they will support us and tell the public what

22  they believe really are the attributes of the product.

23  That's what every PREP manager does.

24      Q.   You never had one of your PREP managers create a

**W&F**

**A324**

Deborah J. Brangman                        25

1    profile on each of those key opinion leaders?

2              MR. SANDLER:  Objection.  I thought she

3    said she did.

4        A.    Yes.  By developing lists, by default you're

5    creating profiles.  You're saying this guy, the reason

6    he's key to me is that he's an excellent speaker, he

7    really knows the data.  Those are the things that are in

8    the profile.  He knows the data, he knows -- he's well

9    thought of in the community.  When I'm putting together

10   that list of key opinion leaders, that's what's defining

11   them, that's what the profile would be, and that's what a

12   PREP manager does.  We just don't call them -- or I

13   didn't call them profiles.  We call it developing key

14   opinion leaders.

15       Q.    You would have one of your PREP managers direct

16   that process or lead that process?

17       A.    That's what they all do.  Yes.

18       Q.    They wouldn't do it on their own; it was a

19   collaborative process you said?

20       A.    They would certainly direct it and they would

21   certainly be expected, I think, to come up with a base

22   case, here's the list that I think based on having talked

23   to people.  They would develop the fundamental primary

24   list.  But can I just add one thing?  Everything we do as

**W&F**

**A325**