Deborah J. Brangman

26

1    a team.  Everybody has to get input from other people and

2    other sources.  That's a primary function of that job.

3        Q.    But it's a job that there's teamwork with that

4    job?

5        A.    Yes.

6        Q.    Isn't it true that Ms. Farrell during the time

7    she was out on leave attempted to return to work during

8    her recovery period?

9        A.    I don't know about that.

10       Q.    Did you ever see her come back into the office

11   within a month after her surgery?

12       A.    I didn't even know when her surgery was.  I just

13   knew she was out and I saw her at some point when she was

14   back.

15       Q.    Do you remember when was the first time you saw

16   her after she was out?

17       A.    I think it was in the summer, but I remember

18   seeing her in the garage.

19       Q.    I'm sorry?

20       A.    I saw her in the garage.  I don't remember when

21   it was.  Just like, "Hi, how are you?"

22       Q.    Are you saying it's an employee parking garage?

23       A.    Yes.

24       Q.    Isn't it true that in late 2002 Ms. Farrell was

**W&F**

Deborah J. Brangman                           28

1      A.    Yes.

2      Q.    At that point in December 2002 it seemed like

3  she was ready to be promoted to band 5?

4      A.    Uh-huh.

5      Q.    I'm sorry?

6      A.    Yes.

7      Q.    Eventually, in the summer of 2003, Ms. Farrell

8  was told she would not be promoted to band 5; isn't that

9  correct?

10     A.    I don't know when she was told that.

11     Q.    But at some point she was told that?

12     A.    As far as I know, I would say yes.  I don't know

13  that.

14     Q.    You're not sure if she was ever told that?

15     A.    She moved on.  In the summer she didn't report

16  to me.

17     Q.    Isn't it true that you told her she would not be

18  promoted to band 5?

19     A.    To the best -- I don't remember -- are you

20  saying in the summer I told her?

21     Q.    I'm not asking you about the time frame now

22  because you said you're not sure about the time frame.

23     A.    During her review I shared with her that there

24  had been some performance issues since January that I had

1   heard that were expressed to me and that she needed to

2   address those issues. Then I was moving off, so I didn't

3   have a lot of discussion with her, but she was aware of

4   the performance issues, and I did share that there were

5   some concerns by the brand team which was in March.

6       Q.   This was during the midyear review?

7       A.   This was really the 2002 review, but I took that

8   opportunity to share with her that, while this was 2002,

9   there were concerns about her performance in the first

10  quarter.

11      Q.   When you met with her about the 2002 review, you

12  weren't discussing the band 5 promotion at all?

13      A.   No. We were talking about just her review.

14      Q.   But isn't it true that later in the year you as

15  a communications director told her she would not be

16  getting the promotion to band 5 because of performance

17  reasons? Do you recall that?

18      A.   No. Because once she didn't report to me, I

19  would have no reason -- I don't know why she would bring

20  it up with me even at that point.

21      Q.   I'm not suggesting that she brought it up. I'm

22  suggesting that you were the one that had to be the

23  messenger to say that "You're not going to be promoted to

24  band 5." I'm not suggesting it was your decision, but

**W&F**

1    a rule, but I think you can certainly put in writing if

2    you wanted to, you could put in writing that your

3    performance needs to be stepped up, but the action plan

4    is a very specific program to improve your performance.

5        Q.    So before you get to the action plan, you can

6    put something in writing to the employee to say you have

7    performance issues?

8        A.    You can.

9        Q.    You can direct that to the employee?

10       A.    You can.

11       Q.    Because the idea is for the employee to improve

12   their performance; it's not punishment?

13       A.    It's not punishment.  It's whatever the

14   deficiencies that have been identified, it's a plan to

15   help you improve those deficiencies.

16       Q.    So if the idea is to help the employee improve

17   their deficiencies, then, whether it's written or not,

18   the best thing is to direct that to the employee so they

19   know what they need to improve on.  Is that the idea?

20       A.    Yes.

21       Q.    Do you know if the action plan that Ms. Farrell

22   was placed on contained criticism of her performance in

23   the area of, quote, understanding the critical data?

24       A.    I don't know.  I never saw it.



Deborah J. Brangman                                    33

1    Q.    Do you know if understanding the critical data

2    is an area of performance that is covered in the PREP

3    manager's annual evaluation?

4    A.    It usually is.

5    Q.    You have Exhibit 1 in front of you which is one

6    of Ms. Farrell's performance evaluations.   So you can

7    refer to that, too.

8              Do you know if Ms. Farrell was criticized

9    on her action plan regarding her ability to drive

10   meetings and organize?

11   A.    I don't know.

12   Q.    Is the, quote, ability to drive meetings and

13   organize, end quote, an area of performance that is

14   contained in a PREP manager's performance evaluation?

15   A.    Yes.

16   Q.    I guess what you're telling me is you don't know

17   any of the details of the action plan she was placed on.

18   A.    That's correct.

19   Q.    But you have familiarity with these performance

20   evaluations because you've managed PREP managers and you

21   went over this one with Ms. Farrell.

22   A.    Yes.

23   Q.    Is the, quote, ability to act as a content

24   expert, is that an area that's usually covered in a

1   performance evaluation?

2       A.   Yes.  In one form or another, yes.

3       Q.   Is that a requirement for a band 5 position?

4       A.   Yes.  It should be almost for anyone doing the

5   job because you have to -- in order to do the job well,

6   you need to understand the data, the content.

7       Q.   Is understanding the data and being a content

8   expert the same thing?

9       A.   You need -- PREP managers need to really have a

10  deep understanding of the data.

11      Q.   Do they need to be experts?

12      A.   They're not physicians, but they need -- they

13  should have a very deep understanding of the data.  It

14  depends on how you define "expert."  I think you should

15  know all of the studies, I think you should understand

16  how -- you have to in order to do the job.  You have to

17  really delve deeply into the data.

18      Q.   And understand the critical data?

19      A.   Yes.

20      Q.   The physicians that speak at these advisory

21  boards, are they considered content experts?

22      A.   They should be, yes.

23      Q.   Is the, quote, ability to develop relationships

24  with associations and thought leaders, end quote, is that

Deborah J. Brangman                    35

1   an area that's covered in the PREP manager's annual

2   performance evaluation?

3       A.   Generally, yes.

4       Q.   Is that a requirement for a band 5 position?

5       A.   Is it a requirement for a band 5?

6       Q.   Yes.

7       A.   It's a requirement fundamental to the job, to be

8   honest.  I think you have to be able to do that to do it

9   at all.

10      Q.   Does a PREP manager's performance evaluation

11  cover the area of, quote, budget management?

12      A.   Yes.

13      Q.   Does a PREP manager's annual performance

14  evaluation cover the area of performance of, quote, brand

15  strategy, end quote?

16      A.   That's a big question.  Brand strategy,

17  development of brand strategy is led by -- used to be a

18  title called strategist for the brand, but certainly in

19  their role as a PREP manager and their close

20  relationships with KOLs, they are expected to provide

21  input into the development of the strategy based on their

22  understanding of the product and their role.  They are

23  not the strategist.  They don't develop -- obviously they

24  provide input into the development.  Their role

Deborah J. Brangman                                36

1    facilitates that development by the brand team.

2         Q.    Maybe somebody higher up in the hierarchy would

3    develop the brand strategy?

4         A.    Yes.

5         Q.    Who would that be normally?

6         A.    There used to be -- I think at that time there

7    was a brand strategist was the role, brand director, but

8    it's --

9         Q.    There are different positions than the PREP

10   manager?

11        A.    But it's all integral -- as I said, it's like

12   the PREP manager doesn't just -- what they do helps the

13   strategist develop strategies.  So they are certainly in

14   a consultant role to those people in providing insights

15   based on their job and that's just how the teams work.

16   That's how they all function.

17        Q.    So you're saying that the brand strategist

18   develops the brand strategy with input from the PREP

19   managers?

20        A.    Yes.

21        Q.    And PREP managers aren't solely responsible for

22   developing the brand strategies themselves?

23        A.    No.

24        Q.    Do you remember if Marybeth Farrell worked in an

Deborah J. Brangman                              37

1   office or a cubicle?

2       A.    When I met her, we were in the Delaware

3   Corporate Center and she was in an office there.  We

4   moved to where our current location is in -- what is it,

5   1800 Concord Pike, and she had an office there initially.

6   As far as I know.  When she worked for me, she had an

7   office.

8       Q.    You don't know if she ever was moved from the

9   office to a cubicle?

10      A.    I can't remember.

11      Q.    You don't remember any band 4 team members

12  moving to cubicles in 2003; is that correct?

13      A.    Actually it happened on another team.  Part of

14  2003 I was the brand director for Atacand before I moved

15  into marketing director and there was a decision made

16  that because there weren't enough offices, that anybody

17  who wasn't a band 5 had to give up their office.  So

18  people were batted out of offices.  And really the

19  decision could be made that if there was space you could

20  have an office, but there was no -- the company policy

21  was if you were a 4, you were not guaranteed an office.

22  And really if you were 5, there were 5s who were in

23  cubes, too.  It just depends on if you're on a team --

24  it's a big team and there's not a lot of space.  There

Deborah J. Brangman                                    38

1    were people who were 5s who didn't get cubes, didn't get

2    offices.

3        Q.    Do you remember anyone in the Exanta team being

4    moved to a cubicle in 2003?

5        A.    I don't know.  I know somebody on my team was.

6        Q.    Which team was that?

7        A.    The Atacand team.

8        Q.    This was the team that Ms. Farrell was not on?

9        A.    Correct.

10       Q.    Were you aware that Ms. Farrell filed a

11   complaint with Human Resources in the fall of 2003 that

12   she was being retaliated against for exercising her FMLA

13   rights?

14       A.    I didn't hear that.  I think I heard that more

15   recently.  2004 I heard it.

16       Q.    Did you hear that after her employment ended or

17   while she was still at AstraZeneca?

18       A.    I think I heard it after she left.

19       Q.    Who did you hear that from?

20       A.    I heard it at some point from Brian Martin,

21   because she had asked him to be a character witness and

22   she had called him.

23       Q.    Do you know what the outcome of Ms. Farrell's

24   action plan was?

W&F

Deborah J. Brangman                                    42

1      Q.    In addition to Ms. Farrell, were the others

2   band 5s?

3      A.    Ms. Farrell was band 4.

4      Q.    Right.

5      A.    And Susan Broadway was a 5, I believe, and I

6   believe Louise Colburn is a 5.

7      Q.    When did you first meet and work with

8   Marybeth Farrell?

9      A.    I met her -- she called me shortly after I got

10  the job as marketing director and she wanted to have

11  lunch and we met for lunch at the Macaroni Grill and we

12  talked and we met there.

13     Q.    What was the reason for the discussion?

14     A.    She wanted to talk about the fact that she had

15  been in the position -- moved in the position.  Renee had

16  intimated that she was going to be promoted she said and

17  she was very interested in being promoted and she wanted

18  to know -- she wanted me to be aware of the situation and

19  that she was very interested in being promoted to a

20  band 5 in this role, and I basically said I would find

21  out more about it.

22     Q.    Who's Renee?

23     A.    Renee Valles, V-a-l-l-e-s, who was her manager

24  prior to that.

**W&F**

**A336**

Deborah J. Brangman                    43

1    Q.    How long had Ms. Farrell been a band 4?

2    A.    She was a band 4, to the best of my knowledge,

3  when she was in the marketing operations position when

4  she worked for Amy Renk, R-e-n-k, and she was a band 4

5  when she worked on the Prilosec/Nexium team, N-e-x-i-u-m,

6  which was -- and I believe she was at least a year -- I

7  would say at least the prior three years.

8    Q.    Is that unusual for someone to be in a band 4

9  position for that length of time?

10   A.    Usually people are promoted within a year or so.

11 Year to 18 months they're promoted to a 5 if they do a

12 good job.  Especially back then.

13   Q.    What would the inference had been of someone who

14 was in the position of a band 4 for three years?

15            MR. LaROSA:  Objection.

16            MR. SANDLER:  You can answer.

17   A.    That she wasn't ready developmentally to be

18 moved to a 5.  Generally speaking, also, if someone's

19 moving to another role such as from marketing ops to the

20 role on the Exanta team, that's a very common opportunity

21 to promote someone, and generally it happens.  I did that

22 when the person who worked for me -- Katie worked for

23 Ceraphyl, moved to my team in the same role as a PREP

24 manager.  But it's an opportunity to promote someone

Deborah J. Brangman

1  generally if you're liking them enough to hire them and

2  they have experience.  Generally it's enough for them to

3  be promoted.  Or it's not generally, but it's very often.

4      Q.    You say that Ms. Farrell did come to you and say

5  she wanted to be promoted and sort of right off the bat

6  when you first met her?

7      A.    When I first met her.

8      Q.    Did you think that was unusual?

9      A.    I thought it was very unusual, but at the same

10  time it was important to her and she brought it up right

11  away, and I hadn't had anyone else do that, but that's

12  okay.

13      Q.    In December there was consideration given to

14  promoting her, correct?

15      A.    Yes, absolutely.  There was definite

16  consideration.

17      Q.    I think you've said that both you and

18  Jane Hellen at that time thought that she could be

19  promoted?

20      A.    Yes.

21      Q.    What was your basis for that?

22      A.    Jane had sent me a note -- one was the feedback

23  I got from Jane, as well as several other people.  But on

24  her performance review there's 360 feedback.

**W&F**

**A338**

Deborah J. Brangman                    47

1    A.    That she hadn't said -- that what she was saying

2    didn't really make any sense, and I don't remember what

3    it was.  I don't remember the exact comments, but I do

4    remember that both of us were struck by it and commented

5    on it.

6                 So that was when my first sense that I

7    had -- I saw directly that there was -- there was

8    something unusual going on, that something wasn't quite

9    right.

10   Q.    Had you already heard from Brian Martin that he

11   had also had concerns?

12   A.    Yes.  Concerns about behavior in meetings, just

13   concerns -- I don't think the concerns with the ad board

14   had quite risen up at that point, but I knew he did

15   express definite concerns about Marybeth at that point.

16   Verbally.

17   Q.    What about the ad board, what were the concerns

18   on the ad board?

19   A.    Well, as time progressed, I know Mary Ann was

20   working on an ad -- Marybeth was working on an ad board

21   and it wasn't progressing, and Brian had gone to the

22   point of developing for Marybeth a program with the

23   vendor, one of our vendors developed it, whereby it was

24   sort of ad board -- if you were just walking in and it

**W&F**

**A339**

Deborah J. Brangman

48

1    was like ad board step 1, step 2, step 3, and 12 weeks

2    out do this, 10 weeks do that. So if you just followed

3    this, even if you weren't the greatest PREP manager in

4    the world, you would get the program done.

5              He was like, "You know, I gave her this

6    thing and I keep telling her just make decisions and move

7    on and she kept saying" -- he said, "She kept telling me

8    she needed my input to move on." He said, "I told her,

9    'Marybeth, you have the authority. You have the

10   experience. It's your decision. Make the decision.

11   Send out an e-mail telling people what you have done and

12   move on. Just keep going.'" He said, "She couldn't

13   move."

14             So time kept moving on and on and nothing

15   was happening. So he expressed -- as we got into

16   February he was really worried about the ad board because

17   the ad board was in March. Even if you don't know who's

18   invited exactly, it's like a wedding, you have to pick a

19   place, you have to hire the caterer. There's a million

20   things. You have to reserve rooms in a hotel. You have

21   to do a lot of things regardless of whether or not you

22   have all of the details. You need to get that thing

23   moving. That wasn't happening. That was his big

24   concern, as well.

Deborah J. Brangman                            49

1    Q.    Did you also hear from Jane Hellen that she was

2  having concerns about promoting Marybeth?

3    A.    Yes.  We had a face-to-face conversation, I

4  don't remember exactly which, where she said Marybeth

5  wasn't performing the way she had in 2002.  And it was

6  such a dramatic change that she was having concerns in

7  general about her performance and she e-mailed me that

8  she was having concerns about do we promote her based

9  on -- because right now she wasn't performing at a level

10 that she deserved to be promoted.  That was in February.

11 Then she sent me an e-mail saying that -- to that effect.

12   Q.    I think you said you met with Ms. Farrell in

13 March to give her the 2002 evaluation?

14   A.    Uh-huh.

15   Q.    Yes?

16   A.    Yes.

17   Q.    Was there some concern about the fact that the

18 evaluation itself was a good evaluation, not an excellent

19 but a good, but, nevertheless, you didn't have the kinds

20 of concerns that you've just talked about?

21   A.    Yes.  And I looked at it.  I did wrestle with it

22 because -- but the reality is that was the feedback she

23 got for 2002.  This fairly reflected -- this Exhibit 1

24 fairly reflected the feedback that I was given about her

W&F

1    performance.

2                So it was fair for her to get this review;

3    however, in January her performance changed and that's

4    why I shared with her at the review -- when it was over,

5    I said, "This is a good review, but there are some

6    performance issues that you need to be aware of and that

7    you're going to have to address."  I did not bring up the

8    promotion during that discussion.

9         Q.    So if Ms. Farrell testified that you never did

10   tell her about performance issues, you would disagree

11   with that?

12        A.    I would disagree with that.

13        Q.    You did tell her during the review --

14        A.    I told her there were definite performance

15   issues.  I don't have exact dates, but I believe I told

16   her before this, as well, that there were performance

17   issues.  I was aware that the brand team had shared their

18   concerns prior to that, as well.  I believe that

19   Brian Martin had told her like "Keep moving, Marybeth.

20   You need to keep this project going."  That he wasn't

21   happy that it wasn't moving forward.

22        Q.    How many things did she have?

23        A.    I'm not aware of the exact number of things.  I

24   know that her workload probably, just from some of the

W&F

Deborah J. Brangman                    53

1   had apparently had expressed to her that he had concerns

2   about her performance before he moved off and she didn't

3   report to him anymore, and he was aware of all of the

4   issues with the ad board in particular and he was just

5   surprised that she would pick him.

6       Q.    You have seen various e-mail exchanges between

7   you and Jane Hellen and Susan Broadway and others about

8   the concerns with Marybeth Farrell's performance?

9       A.    Yes.

10      Q.    Can you think of any way the dates of those

11  e-mails could have been manipulated in some way?

12      A.    Absolutely not.  They're just printouts of

13  things that were in the computer.  I have no -- I can't

14  even begin to imagine how you would manipulate the dates.

15      Q.    From your recollection, were the dates of the

16  e-mails accurate?

17      A.    Yes.

18              MR. SANDLER:  I have nothing further.

19              MR. LaROSA:  I have nothing further.

20              (Deposition concluded at 10:55 a.m.)

21                  -   -   -   -   -

22

23

24

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MARYBETH FARRELL,        )
                          )
    Plaintiff,       )
                          )
     v.              )  C.A. No. 04-285 KAJ
                          )
ASTRAZENECA          )
PHARMACEUTICALS, L.P.,  )
                          )
    Defendant.      )

        Deposition of SUSAN P. BROADWAY taken
pursuant to notice at the Law Office of John M. LaRosa,
2 East 7th Street, Suite 302, Wilmington, Delaware,
beginning at 1:30 p.m., on Thursday, March 24, 2005,
before Kimberly A. Hurley, Registered Merit Reporter and
Notary Public.

APPEARANCES:

        JOHN M. LaROSA, ESQUIRE
        LAW OFFICE OF JOHN M. LaROSA
          2 East 7th Street - Suite 302
          Wilmington, Delaware 19801
          for the Plaintiff

        SHELDON N. SANDLER, ESQUIRE
        YOUNG CONAWAY STARGATT & TAYLOR, LLP
          1000 West Street - 17th Floor
          Wilmington, Delaware 19801
          for the Defendant



1      Q.    Were you on the Exanta team when

2    Marybeth Farrell began working on the Exanta team?

3      A.    Yes.

4      Q.    Was that in approximately May of 2002?

5      A.    Approximately, as I recall, yes.  Spring.

6      Q.    Was she a senior PREP manager band 4 for the

7    Exanta team?

8      A.    No.  She was a PREP manager band 4.

9      Q.    How does one get the designation of senior PREP

10   manager versus PREP manager?

11     A.    There are certain criteria for each role and

12   competencies that you would hold and that you would

13   exhibit on the job.

14     Q.    What types of competencies would a senior PREP

15   manager have that a PREP manager would not have?

16     A.    It's really the level of competency that you

17   would have.  So there are about 10 to 12 competencies for

18   PREP and senior PREP and then it just is your depth

19   within those that designates your job.

20               For instance, one competency is your

21   ability to share your knowledge and mentor others.  As a

22   band 4 that's not really a requirement.  As a band 5 and

23   a band 5 senior, you would need to be exhibiting the

24   ability to be helping others along in your same position,

**W&F**

**A345**

1    be a role model in your position, be able to mentor other

2    people.  So it's the same competency in your depth within

3    there.

4        Q.    I'm asking you not about the distinction between

5    band 4 and band 5 but the distinction between a senior

6    PREP manager and just a nonsenior PREP manager.

7        A.    Yes.  But that distinction goes together.

8    Band 4 is always PREP.  Band 5 can be either PREP or

9    senior PREP.

10        Q.    So you're saying nobody has the title of senior

11    PREP manager band 4?

12        A.    Correct.

13        Q.    Once you become a senior PREP manager, you

14    become a band 5; is that what you're saying?

15        A.    You can be promoted as a band 5 PREP manager and

16    then within band 5 you can also be promoted again to

17    senior PREP manager.  But a senior PREP manager is always

18    a band 5, yes; whereas, a PREP manager could be a band 5

19    or a band 4.

20        Q.    Do you know what her role was prior to being on

21    the Exanta team?

22        A.    Yes.

23        Q.    What was that?

24        A.    She was a field PREP manager.

1   not solely about 2002 that I was having with Marybeth in

2   April.  They would be regarding current performance, 2003

3   performance, and perhaps citing examples from late 2002.

4       Q.   Do you remember any comments to her about

5   there's a lot of work to be done?

6       A.   I did not.

7       Q.   In April of 2003, after you had this performance

8   discussion with her, did you ever ask Ms. Farrell if she

9   could return any earlier than six weeks?

10      A.   No.

11      Q.   On April 29th, 2003, did you give Ms. Farrell

12  the assignment of developing transition plans for her

13  colleagues to use to manage her programs while she was

14  out?

15      A.   In that general time period, yes.

16      Q.   That general time period being sometime in April

17  before she went out on leave?

18      A.   Yes.

19      Q.   Before she went out on leave, you gave her the

20  assignment of creating a profile on over 50 physicians;

21  is that correct?

22      A.   No.  I asked her to prepare a transition plan

23  for all of her projects that she was working on so

24  someone could understand where she had taken the project

1    to date and what they needed to pick up on in order to

2    complete it, one of which were advisory boards that were

3    coming up in June and July, and I had asked her to give

4    us the background on who is invited and why they were

5    invited, why a particular physician was invited so that

6    someone picking up the project one understand why that

7    group of doctors had been pulled together.

8              So when you say "profile," I would say no,

9    I did not ask her to come up with a profile of physicians

10   that would include an entire background.  I asked her to

11   come up with information on why certain doctors were

12   selected for advisory boards so that someone could pick

13   up the advisory board project and work it.

14        Q.   What type of information would explain why

15   certain doctors were selected for advisory boards?

16        A.   For instance, if it was a cardiology advisory

17   board, this cardiologist was invited because he has ran

18   the competitive trials, he could give us insights into

19   trial programs, things of that nature.

20        Q.   Did Ms. Farrell seek to use the assistance of

21   secretaries or secretarial support to do this project?

22        A.   I don't know how she went about starting the

23   project.

24        Q.   Did you tell her that she could not use

1  secretarial support for that project?

2      A.    The context of this is that there were --

3  Marybeth had been using agencies to do all of the legwork

4  and I had asked Marybeth to give her insights into why

5  she had invited those physicians.  Not to delegate that

6  to someone else to come up with, because we needed to

7  know why -- what her thoughts were so we could move on.

8  She was the one in charge of the advisory boards and then

9  she was the one that would be out.  I needed to know why

10 she selected those particular physicians.

11     Q.    So you told her she couldn't use the outside

12 research agency for that project?

13     A.    I told her that I needed her insights as to why

14 certain physicians were selected.

15     Q.    So she should use her insights but not use the

16 outside research agency?

17     A.    Right, yes.  Well, outside research agency?  Do

18 you mean outside medical education agency?

19     Q.    I thought you referred to something a few

20 moments ago about an outside agency.

21     A.    Yes, but you said "research."  It's medical

22 education agencies that we would be using.  I was

23 thinking -- when you say "research," I'm thinking market

24 research.  And, yes, Marybeth should have compiled the

Susan P. Broadway                                    21

1   information as to her insights on her own.  An agency

2   would not be needed for her insights.

3       Q.    You never gave this assignment to anyone else

4   before April of 2003; is that correct?

5       A.    No one outside of the transition plan, correct.

6       Q.    I guess we're talking about two different

7   things.  We're talking about a transition plan that you

8   had her prepare so that people could pick up the work

9   while she was gone and then I thought we were talking

10  about physician profiles that she was to give her own

11  input into why these physicians were speaking at the

12  advisory boards.

13      A.    That was in the context of transition.  It was

14  work that she had already completed, selecting physicians

15  for advisory boards that were coming up the very next

16  month in June.  I was just asking as part of the

17  transition plan please let us know why she selected

18  certain physicians and why they were coming so the person

19  who picked up that advisory board could run it

20  appropriately.  So it was not a separate project.  It was

21  part of the transition plan.

22      Q.    Do you recall those physician profiles, that one

23  component of what was her transition plan?

24      A.    Do I recall them being a part of the transition

Susan P. Broadway                    28

1  with her.  We worked together.  But I did have a few

2  performance areas discussions with her in April and May.

3  So feedback I had received, I had discussions with her on

4  performance-related areas.

5      Q.    That began in April of 2003?

6      A.    When I became her manager, yes.

7      Q.    In July of 2003 it was decided that she would

8  not be promoted to band 5; is that correct?

9      A.    No, there was no decision in July of 2003.

10  Marybeth came to me and told me she had received a packet

11  at home that had announced her promotion to band 5 and to

12  senior PREP manager, which would have been two increases

13  from a band 4 to a band 5 and then to a senior, and I

14  told her as her manager I had not -- I was not aware of

15  that, I did not have that promotion discussion with my

16  management, etcetera, and asked her to bring in any

17  paperwork she had.  It's not customary in how it's done.

18  You don't just receive paperwork for a promotion at home.

19              So that was the only discussion we had.

20  There was no real promotion -- what was in your question,

21  you said did you --

22      Q.    About promotion to band 5, about a decision that

23  she would not be promoted.

24      A.    So there was no decision because there was no

W&F

Susan P. Broadway                    29

1    discussion.  There was only Marybeth telling me -- there

2    was no discussion from management's perspective where we

3    were discussing and evaluating people and deciding on

4    promotions.  That never occurred.  The only occurrence in

5    July was that Marybeth told us she received paperwork and

6    we looked into the situation and told her that was not

7    paperwork for a promotion.

8        Q.   It was a mistake, the paperwork?

9        A.   It was Marybeth's mistake.  Apparently it was

10   paperwork regarding stock or something.  She never

11   produced the paperwork to me, so I can't comment on what

12   it was.  But she came back and clarified later that she

13   had misread the paperwork and that it was not what she

14   had originally thought in terms of a promotion.

15       Q.   This conversation you had with her about what

16   she thought was a promotion, was that in July of 2003?

17       A.   As best I can recall, yes, I believe it was in

18   July.

19       Q.   Was she later told by Deborah Brangman that she

20   would not be promoted to band 5?

21       A.   Not that she would not be promoted to band 5,

22   that she was not promoted at this time.  It was all part

23   of this discussion in that same time period.  She said to

24   us she got paperwork regarding a promotion.  I had to go

1    A.    It's specifically stated in the plan itself.

2    Q.    You didn't mention it to her at all that she

3 could be terminated?

4    A.    I can't recall specifically reading that or

5 mentioning that statement, but I know that it's in the

6 plan that I gave her a copy of, yes.

7    Q.    Isn't it true that in August of 2003 Ms. Farrell

8 asked you that the action plan be reconsidered to reflect

9 the fact that she held a band 4 position?

10   A.    Yes.  But the action plan was for a band 4

11 position.  It was for Marybeth's position.

12   Q.    In September of 2003 Ms. Farrell was removed

13 from her office; is that correct?

14   A.    I don't recall the exact date, but band 5 and

15 above have offices and as our team expanded more people

16 came on to the team at higher bands, acquiring office

17 space, and Marybeth was a band 4 in an office because one

18 was available when we were a small team and that was an

19 option for us.  And then as the team got larger and more

20 people came on at higher bands, we needed to give them an

21 office and Marybeth had to move to the cubicle.

22   Q.    But all band 5s get offices?

23   A.    Yes.  Well, all band 5s are eligible for an

24 office, pending space.  We do have a lot of band 5s that

Susan P. Broadway                                    41

1  are in cubes.  We have short space at AstraZeneca.

2     Q.   The space shortage, did this occur when you

3  moved into a new building?

4     A.   No.  When we first moved into the building, we

5  had a lot of space.  That's why Marybeth had originally

6  an office even though she was a band 4.  But as our team

7  grew, as we were getting closer to launch, the team was

8  growing, more people coming on, people came on at higher

9  bands, office space was required and at a band 4 in an

10 office we had to move her to a cube so that someone else

11 could have that office.  As a matter of fact, a band 6

12 has moved into it.

13    Q.   Who made that decision to move Marybeth Farrell

14 out of her office into a cubicle?  Did you make that

15 decision?

16    A.   No.

17    Q.   Did Jane Hellen make that decision?

18    A.   No.

19    Q.   Who made that decision?

20    A.   It was a decision between facilities and the

21 brand planning manager who allocates space.

22    Q.   Who's the brand planning manager?

23    A.   Ann Cobuzzi.

24    Q.   Can you spell her last name?

Susan P. Broadway

42

1    A.    C-o-b-u-z-z-i.  Ann is the one who came and told

2    me that they had looked at the space as they were getting

3    new people coming on and they needed to move Marybeth out

4    of the office for this band 6 that was coming on.

5        Q.    No other band 4 team members had to move to

6    cubicles in 2003; isn't that correct?

7        A.    There were no other band 4 people in an office.

8        Q.    So Marybeth was the only band 4 that was removed

9    from an office?

10       A.    She was the only band 4 in an office.

11       Q.    Right.   That's not my question.   I'm asking you

12   was she the only band 4 that was removed from an office

13   in 2003?

14       A.    She was the only band 4 that moved from an

15   office into a cubicle in 2003 that I'm aware of.  I'm

16   only focusing on my team.

17       Q.    When you say "my team," you mean the Exanta

18   team?

19       A.    The people who directly reported to me, the PREP

20   and promotions managers.

21       Q.    That part of the Exanta team?

22       A.    Yes.

23       Q.    Were you aware that Ms. Farrell filed a

24   complaint with Human Resources on September 17th, 2003,

Susan P. Broadway                                    45

1    specifically asked me to comment on the date and the

2    vandalization.  I can't comment on that because I was

3    only told by Marybeth something happened and she

4    contacted facilities and I'm not aware of anything around

5    that.

6        Q.    And the PIP ended on January 5th, 2004; is that

7    correct?

8        A.    In that time period.  I don't remember the exact

9    date.

10       Q.    Sometime around January 14th, 2004, you provided

11   Ms. Farrell with a memorandum regarding PIP feedback

12   discussion?

13       A.    Sometime in January we closed out the PIP.  I

14   don't remember the exact date.

15       Q.    When you say you closed out the PIP, what did

16   you do to close it out?

17       A.    At the end of the performance improvement

18   plan -- at the beginning of it you set a time period.  At

19   the end of the time period you have a discussion around

20   each component in terms of did she satisfactorily

21   complete improvement in those performance-related areas.

22   So that's closing out.  Either you did or you didn't.

23       Q.    After the PIP was closed out, Ms. Farrell was

24   placed on a one-week leave during which time she was not

Susan P. Broadway

1    to report to work; is that correct?

2        A.    Yes.    I don't recall the exact dates or time

3    frame if it was one week, but, yes, that was when really

4    John Bogan and others handled how that went.    I recall

5    when we finished the PIP she was on some sort of leave.

6        Q.    Who made the decision to place Ms. Farrell on

7    that one-week leave?

8        A.    I really don't recall.    At that point it's part

9    of a process.    More of HR.

10       Q.    Did you say John Bogan was a part of that?

11       A.    No.    I said more of an HR process.    Yes, at that

12   point I believe he had been contacted and come in, was

13   involved.

14       Q.    So AstraZeneca's in-house counsel made a

15   decision to put Mr. Farrell on one-week unpaid leave?

16       A.    No, I can't say that.    I don't know who made the

17   decision.    I was just stating that HR, legal process --

18       Q.    So it was a decision made by HR and legal?

19       A.    I don't know who made the decision.    I just know

20   it wasn't me.

21       Q.    Could it have been Jane Hellen?

22       A.    I doubt it.    If it had been Jane, I would have

23   been involved as her direct manager.    I doubt it.

24       Q.    So it wasn't made by anyone who was in the

1   direct chain of command with regard to Marybeth Farrell

2   in terms of her direct manager?

3        A.   Right.   I believe it's part of the PIP process.

4        Q.   It's part of the PIP process to get --

5        A.   PIP is a process.   So as her manager, I wasn't

6   making -- I didn't make a decision on leave.   I merely

7   worked through the PIP plan with her and provided her the

8   feedback and then worked with HR on how you go about the

9   PIP process.

10       Q.   Are you saying it's part of the PIP process that

11  at some point HR and legal will step in and make the

12  decision as to leave or no leave after the PIP is

13  completed?

14       A.   The management makes a decision on whether or

15  not the PIP was completed satisfactorily or

16  unsatisfactorily and then it's part of the HR process of

17  the termination date selected at this date or not that

18  date.   Yes, I guess that's what I'm saying.

19       Q.   As the manager, are you saying yourself made the

20  decision that the PIP was not completed satisfactorily?

21       A.   Yes.

22       Q.   And then you turned it over to HR who selects

23  the term date?

24       A.   No, I'm not saying they arbitrarily select it.

Susan P. Broadway

48

1    I'm saying that, yeah --

2       Q.   I'm not saying they arbitrarily select it,

3    either.

4       A.   I'm not sure I'm being very clear here.  What

5    I'm trying to say is we work through the PIP plan with HR

6    because it's a process of in terms of once someone has

7    not satisfactorily completed, I let HR know.  At that

8    point legal was already involved.  They were already

9    contacted from outside lawyers at that point.  They were

10   involved.  We worked through the PIP termination date was

11   this, and how it came to a week leave, I don't know who

12   made that decision.  I don't recall.

13      Q.   Do you get to make any input or recommendation

14   to HR as to what the next step should be as her direct

15   management?

16      A.   Yes.

17      Q.   What was your recommendation?

18      A.   Marybeth did not satisfactorily complete the

19   action plan, which led to the performance improvement

20   plan.  She did not satisfactorily complete the

21   performance improvement plan, which ends in termination.

22      Q.   So your recommendation was that her employment

23   should be terminated?

24      A.   My recommendation was that Marybeth was not

W&F

1   satisfactorily functioning as a PREP manager on the

2   Exanta team and did not complete the PIP plan which left

3   in terms of termination, yes.

4       Q.    You recommended her employment should be

5   terminated?

6       A.    Yes.

7       Q.    Do you do that before or after she was placed on

8   the one-week leave of absence?

9       A.    I really don't recall.

10      Q.    Who replaced Ms. Farrell as PREP manager band 4

11  for the Exanta team after her employment was terminated?

12      A.    There wasn't -- the team was expanding and I

13  hired a new PREP manager in January of 2004,

14  Susan Schaeffer.

15      Q.    You say you hired her.  Was she an external

16  candidate?

17      A.    No, internal.

18      Q.    She had been working at AstraZeneca?

19      A.    Yes.  A long time.

20      Q.    How long had she been --

21      A.    I don't recall.  A few years.

22      Q.    She wasn't hired after Ms. Farrell was

23  discharged?

24      A.    I'm sorry.  She wasn't or was?

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MARYBETH FARRELL,                    )
                                     )
            Plaintiff,               )
                                     )      Civil Action
v.                                   )   No. 04-285 KAJ
                                     )
ASTRAZENECA PHARMACEUTICALS,         )
L.P., a Delaware corporation,        )
                                     )
            Defendant.               )


          Deposition of RACHEL BEVIS taken pursuant
to notice at the law offices of The Neuberger Firm, P.A.,
Two East Seventh Street, Suite 302, Wilmington, Delaware,
beginning at 2:00 p.m. on Thursday, April 7, 2005, before
Kathleen White Palmer, Registered Merit Reporter and
Notary Public.


APPEARANCES:

        JOHN M. LaROSA, ESQUIRE
        LAW OFFICE OF JOHN M. LaROSA, ESQUIRE
          Two East Seventh Street - Suite 302
          Wilmington, Delaware  19801
          for the Plaintiff

        SHELDON N. SANDLER, ESQUIRE
        YOUNG, CONAWAY, STARGATT & TAYLOR
          1000 West Street
          The Brandywine Building - 17th Floor
          Wilmington, Delaware  19899-0391
          for the Defendant


        --------------------------------------------------
                        WILCOX & FETZER
        1330 King Street - Wilmington, Delaware 19801
                        (302) 655-0477



WILCOX & FETZER LTD.

A361

Rachel Bevis                    13

1    Q.    Do you know if Ms. Farrell received an annual

2    evaluation on March 10, 2003?

3    A.    Our general practice is we do annual

4    evaluations.  I was not witness to it.  We have

5    evaluations annually.  She should have received one.

6    Q.    You said "our general practice is we do annual

7    evaluations."  Do the annual evaluations coincide with

8    the calendar year such as 2002, or are they by year

9    anniversary date?

10    A.    We do evaluations annually.  The evaluation

11    dates vary from year to year, so I can't speak for 2003.

12    Generally evaluations, input is given towards the end of

13    the year.  Evaluations are written in January, salaries

14    are figured, and verbal evaluations are given in late

15    winter, early spring.  So that is consistent with our

16    normal process.

17    Q.    So if she received a written evaluation for 2002

18    on March 10, 2003, that wouldn't be unusual for

19    AstraZeneca; correct?

20    A.    That would be standard.

21    Q.    Do the annual evaluations have overall ratings?

22    A.    Yes, they do.

23    Q.    Are you familiar with the categories of overall

24    rating?

**W&F**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MARYBETH FARRELL,            )
                                    )
                Plaintiff,     )
                                    )
                v.            )   C.A. No.04-285-KAJ
                                    )
ASTRAZENECA PHARMACEUTICALS, )
LP,                               )
                                    )
                Defendant.  )
                                    )

## AFFIDAVIT OF AMY RENK HAINES

       I, AMY RENK HAINES, being duly sworn according to law, do hereby depose and say as follows:

       1.    I am a District Sales Manager for AstraZeneca Pharmaceuticals, LP. I moved to the Houston, Texas facility almost two years ago. In 2000 and 2001, I was the PREP Leader for Field PREP, and was managing nine people at AstraZeneca's Delaware site. I reported to John Doyle, whose title was Professional Relations Director. He reported to Scott Bolenbaugh. I was in that position from January 1997 to June 2003.

       2.    MaryBeth Farrell was placed in the Professional Relations area in the Gastrointestinal Division during the merger of Astra and Zeneca. John Doyle reassigned her to report to me as of November 2000. When she reported to me, her job was as a liaison between the Field and Brand teams. Her title was Senior Field Professional Education Partner (Band IV), commonly referred to as Field PREP Partner. The Partner title was later changed to "Manager," although Ms. Farrell referred to herself as a "Manager" even before the title change was official. Part of the reason she was reassigned by John Doyle was because she had performance problems in her previous

**A363**

position in the GI area. John Doyle wanted me to work with her to help her develop more regulatory knowledge and basic PREP skills and to improve her understanding of the medical education area and her management of key opinion leaders.

       3.    From working with her, I observed that when undertaking a particular project, MaryBeth Farrell was not able to see the big picture from beginning to end and to plan the points in between. She would not visualize the end of a project and create a plan to move toward that end. I tried to work with her and felt that she made some progress.

       4.    I was responsible for preparing MaryBeth Farrell's 2001 evaluation. In that evaluation, I mentioned a number of items that I believed she needed to work on. Although I gave her an overall rating of excellent, in retrospect, after rereading the evaluation, I probably should have graded her "good."

       5.    One comment that I made in the evaluation referred to Ms. Farrell's insistence that she should have an assistant. She said that because of her mistaken perception that she was working harder than the other persons who were her peers. I tried to explain to her that no one had an assistant and that the Administrative Coordinator had to be shared by several people.

       6.    I also talked with her about her claim that she was carrying a heavier workload than her peers. She had done a faulty analysis of her workload based on the number of sales people in the areas for which she was responsible, but this was not reflective of her actual work load. Each of her peers had a similar work load. Her job involved managing projects, and was not dependent on the number of people in a particular sales force, number of programs conducted, or dollars expended, which was what she was insisting. A project for one product would take the same amount of time no

**A364**

2

matter how many salespeople were assigned to that product. She was not involved in processing, conducting or administering the programs from which her statistics were derived. MaryBeth Farrell did not seem to understand or accept my explanation.

7.    My comment that MaryBeth Farrell needed to listen more intently and sometimes heard but did not understand was based on my own observations, the feedback forms I received from other people who worked with her, and my direct conversations with those people. Often in meetings, Ms. Farrell would listen and take copious notes but when asked to discuss the matter, was not able to do so. I understand she has testified that I used the phrase about hearing but not understanding in the evaluation because she had used it in a conversation with another employee that I supposedly overheard. I never heard Ms. Farrell make that comment and chose this phrase to reflect my own observations and the comments from the authors of the feedback forms.

8.    My reference in the evaluation to Ms. Farrell's overly high expectations also refers to her inaccurate assessment of her own performance. In fact, when I met with her to discuss her 2001 evaluation she commented that she was disappointed that she was not rated "distinguished." This was another example of her having higher expectations than were merited by the reality of her performance. I told her she did not meet the criteria for a distinguished rating but could work toward it the next year.

AMY RENK HAINES

Sworn to and subscribed before me this **30** day of **April**, **2005**
2005.

Notary Public


DIXIE D. ROWELL
MY COMMISSION EXPIRES
March 20, 2008

**A365**

3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MARYBETH FARRELL,                    )
                                     )
                 Plaintiff,          )
                                     )
         v.                          )   C.A. No.04-285-KAJ
                                     )
ASTRAZENECA PHARMACEUTICALS,         )
LP,                                  )
                                     )
                 Defendant.          )

## AFFIDAVIT OF BRIAN MARTIN

STATE OF DELAWARE                    )
                                     )   SS:
COUNTY OF NEW CASTLE                 )

I, Brian Martin, being duly sworn according to law, depose and say as follows:

1.    I am employed by Defendant AstraZeneca Pharmaceuticals, LP ("AZ").

2.    I make this affidavit based on my own personal knowledge.

3.    From June 2002 until the beginning of April 2003, I was the direct supervisor of Plaintiff Marybeth Farrell ("Plaintiff").

4.    One of Plaintiff's responsibilities as a PREP Manager was planning and conducting advisory board meetings. I attended two meetings in late 2002 for which Plaintiff was the responsible PREP Manager. As her supervisor, I received some negative feedback about Plaintiff's performance in connection with those meetings. One of the meetings was a Cardiology Ad Board meeting in Chicago that Jane Hellen, to whom I reported, attended. Ms. Hellen told me she was not happy with the way that meeting, for which Plaintiff was responsible, was conducted.

5.    On November 25, 2002, I had a discussion with Plaintiff about the advisory board strategy for 2003. I followed up on the meeting by sending Plaintiff an email message instructing

**A366**

her to prepare a template or standard operating procedure for advisory board meetings, which has been numbered D1863 in this litigation. A true and correct copy of the email is attached to this affidavit. I instructed Plaintiff to prepare a template that would provide her with step-by-step instructions and timelines for planning and implementing advisory board meetings.

      6.     I imposed the template requirement on Plaintiff because of concerns about her not adequately preparing for and conducting advisory board meetings. The areas I described for inclusion in the template were all items in which Plaintiff's performance had been deficient. I was trying to be tactful and I hoped that once Plaintiff developed the template, future advisory board meetings would run smoothly.

      7.     I also received complaints from persons who worked with Ms. Farrell that she did not listen carefully and did not understand what was said. Jane Clark, the Cardiology Strategist, told me she had long meetings with Ms. Farrell to inform her of developments and the next day, Ms. Farrell would ask the same questions that Ms. Clark had covered the previous day. Tom Gagnon, the Orthopedic Strategist, and Faye Morin, the Treatment Strategist, made similar complaints.

      8.     Ms. Farrell had problems in communicating clearly and in a way that both she and the other party understood. One time, Ms. Farrell blew up at Faye Morin due to a miscommunication by Ms. Farrell. Another time Plaintiff insulted and angered one of AZ's physicians, Sunita Sheth. Dr. Sheth, who was very busy, was asked by Plaintiff at the last minute to speak at an Ad Board, and agreed. Later, Ms. Farrell sent an email criticizing Dr. Sheth for not attending a pre-meeting session. Dr. Sheth was livid, and said she had agreed to help by speaking at the Ad Board but her schedule did not permit her attendance at the pre-meeting session. I had

to apologize to her and cautioned Plaintiff against sending emails of that nature. Plaintiff did not seem to understand why her email caused the reaction that it did.

9.    I had also received complaints that Plaintiff was using excessive emails to communicate with the physicians and her co-workers and vendors. Sometimes she would send copies of emails to people when it was not necessary. Vendors complained that Plaintiff had been sending out confusing and contradictory emails and not responding promptly to questions from them.

10.    By March 2003, discussions were taking place between Jane Hellen, Deborah Brangman and me, among others, about how to deal with Plaintiff's performance deficiencies, including her lack of clear communications, her failure to recall things that she was asked to do, her relying too much on vendors to do things that managers normally did, her failure to direct the vendors properly and her failure to complete tasks assigned to her on time or at all.

_____
Brian Martin

SWORN TO AND SUBSCRIBED before me, a Notary Public for the State and County aforesaid, this ___ day of April, 2005.

Notary Public:_____

My Commission Expires: __6 - 18 - 06_____

NOELLE M. CARR
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires June 18, 2006

From:       Martin, Brian
Sent:       Tuesday, December 03, 2002 2:48 PM
To:         Farrell, Marybeth
Subject:    2003 Advisory Board Template (Standard Operating Procedure)

As per our conversation, in my office on November 25th we have now finalized the area of focus and number of advisory board for 2003. As we all know we need to standardize our processes for operating these types of meetings to ensure that all are of the highest in quality. At this time in our 2003 planning it is very important Marybeth that you deliver this template prior to dealing with any other advisory board issues. This template needs to be complete or near completion before 2003 as a priority. Much of the work involving this template can be completed by your vendor of choice (Discovery or Simpson Healthcare) both have stated they have similar projects completed or on the way for other teams. Among other things, this template will facilitate a better line of communication with internal and external teams. I have attended a couple advisory boards this year and many questions come from these meetings regarding the teams preparation for them, strategy, objectives, agenda etc. These processes you are creating will answer most of the questions.

As with the rest of the PREP and Promo team you will be paired with a product strategist for each meeting i.e.: ( Tom for Ortho, Jane for Cardio, Faye for VTE etc). Each product strategist will be responsible to provide you with the overall strategy for each meeting, the objectives and assist with the formulation of the agenda. As mentioned above, a lot of the unanswered questions can be thought out and answered in your template. For example, are the biographies of moderators and chairperson enclosed in the participants binder? Have we identified the members of the commercial team who will represent the EXANTA team at the PRA review for advisory boards? At what point should we schedule a PRA review of an Ad board (three weeks, four weeks, five weeks prior to date of program) and what is to be reviewed at this meeting i.e. amenities, agenda, PRA advisory board template ? What commercial and or medical teams are needed to select chairpersons for the various Ad boards? Are debrief's scheduled on site or immediately following the meeting back in Wilmington and whom should be present? Should all presenters and moderators receive an on-site copy of both their presentations and the moderators guides in their welcome packets?

Some of the information you will need will come from other team members such as medical or publications and I would like to be the conduit for these communications. If I can help you in this process, please feel free to contact me !

Brian C. Martin
AstraZeneca LP
Brand Promotions Leader
CV TA Hemostasis Marketing
EXANTA
302-886-2148
302-886-7586 fax

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MARYBETH FARRELL,                          )
                                           )
                    Plaintiff,             )
                                           )
        v.                                 )    C.A. No.04-285-KAJ
                                           )
ASTRAZENECA PHARMACEUTICALS,   )
LP,                                        )
                                           )
                    Defendant.             )

**AFFIDAVIT OF DEBORAH KAUFFMAN**

STATE OF DELAWARE              )
                              )    SS:
COUNTY OF NEW CASTLE          )

I, Deborah Kauffman, being duly sworn according to law, do depose and say as follows:

1.      I am employed by Defendant AstraZeneca Pharmaceuticals, LP ("AZ").

2.      I make this affidavit based on my own personal knowledge.

3.      In 2003, I was working for AZ as a Human Resources Manager. On March 18,

2003, Deborah Brangman contacted me about performance concerns that she and others had

involving Plaintiff MaryBeth Farrell ("Plaintiff"). I spoke with Ms. Brangman and Brian Martin

in my office about Plaintiff's performance problems shortly thereafter.

4.      Shortly afterwards, on or about April 1, there was a reorganization and Brian

Martin, who had been Plaintiff's supervisor on the Exanta team, was transferred to another team,

Seroquel and Susan Broadway was promoted to replace him. I continued to monitor the situation,

and on April 3, shortly after she was promoted, I spoke to Susan Broadway briefly about the

situation, which we both agreed was urgent. On April 4, 2003, I sent an email to Jane Hellen

**A369**

inquiring about the status of the situation involving Plaintiff. That email, numbered D209 for purposes of this litigation, is attached as Exhibit A.

5. On April 28 I contacted Susan Broadway, to express concern that no action was occurring in connection with Plaintiff's performance problems. As is my usual practice, I prepared notes regarding my contact with Ms. Broadway. A true and correct copy of my notes is numbered D305 for purposes of this litigation, and is attached to this affidavit as Exhibit B. On the same day, I spoke to Ms. Broadway and learned that Plaintiff had just informed her that she would be out a few weeks for a medical leave. A true and correct copy of my notes from my conversation with Ms. Broadway is numbered D303-304 for purposes of this litigation, and is attached to this affidavit as Exhibit C. Ms. Broadway and I reviewed the issues and decided that any detailed discussion of Plaintiff's performance would have to wait until after Plaintiff's leave ended. Ms. Broadway did not react negatively to the fact that Plaintiff was taking FMLA leave.

6. On May 8, Plaintiff met with me to review her situation. A true and correct copy of my notes from my conversation with Plaintiff is numbered D379-381 for purposes of this litigation, and is attached to this affidavit as Exhibit D. Plaintiff told me and I noted that Plaintiff "felt her short term objectives were appropriate - what you would give to anyone who would be out on leave or out of the office."

7. I met with Plaintiff again on August 21 and I reviewed the Action Plan process with Plaintiff thoroughly. A true and correct copy of my notes from my conversation with Plaintiff is numbered D494-497 for purposes of this litigation, and is attached to this affidavit as Exhibit E. Plaintiff, as she often did, misunderstood what I told her and asked the same questions repeatedly.

Deborah Kauffman

**A370**

SWORN TO AND SUBSCRIBED before me, a Notary Public for the State and County aforesaid, this _2_ day of May, 2005.

Notary Public: _Kimberly Kapp_

My Commission Expires: _June 18, 2007_

KIMBERLY KAPP
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires June 18, 2007

**A371**

**Kauffman, Deborah**

| | |
|---|---|
| **From:** | Kauffman, Deborah |
| **Sent:** | Friday, April 04, 2003 9:33 AM |
| **To:** | Hellen, Jane |
| **Subject:** | ER Issues |

Jane,
With the transition of individuals in the BCD role I wanted to touch base with you regarding the employee relations issue that has been discussed with me in the prep/promo area and gain your perspective. I did talk to Susan about it briefly yesterday and we both agreed it was an urgent situation and it would be a good idea for you and I to talk about it also. Thanks for accepting my meeting request on Monday.
Deb Kauffman
Human Resources
AstraZeneca Pharmaceuticals
302-886-4309 office
302-561-4731 cell

Exhibit A

4/28
mtg Susan P.
Contacted Susan re my concern
that no action was occurring w/
Maybeth

Exhibit B

D305

A373

4/28

Susan - feedback

Uses Ad board template & does not work independently.

All her work is Ad boards & typical prep duties have been dispersed to other prep members.

Susan showed me numerous examples of Mary Beth's non responsiveness to email (from Jane Hellend) & lack of understanding and/or following directions.

Susan had just had her first staff mtg before I arrived — told all she would be meeting w/ everyone indiv to discuss goals, assignments + work load.

Mary beth just told Susan she would be out a few weeks for a medical. Susan therefore will meet w/ Maybeth at this point only to discuss work. In

**D303**

Exhibit C          A374

be completed /transitioned during
her medical leave.
Susan will hold the full
discussion until her return.
A detailed discussion will be
held regarding May Belt's
performance issues at the work
she will be assigned & the
work she should be assigned.
~~She w~~

• Since she is unable to
accomplish a reduced workload
as compared to ~~peers~~ Susan
will share what she is not
performing & the level she will
need to get to

Susan & I will work together
to draft/review this for May Belt

Work assignments/perf will also
be reviewed w/ other team members

D304

5/8/03

Deb + M.B Farrell-

She wanted to meet w/ me to touch
base on the situation.

She met w/ Jane yesterday.
feels good about the meeting
feels she understand Janes
expectations & the expectations +
scheduling issues she want
addressed are resonable

all M.B want is to be
treated fairly.
I assured her she would be

She feels the issues being
addressed w/ her are a problem
b/c Brian Martin did not do his
part

We both agreed w/ Brian in
a new role this should not
be an issue + she will have
a fresh start.

Exhibit D

**D379**

**A376**

She felt she met all of the
short term obj, she had been
given w/ the exception one was
returned 8:00am vs 8:00 deadline
I told her if the tardeness was
an isolated incident I am sure
it wasn't an issue.

She felt her short term objectives
were appropriate + what you
would give to anyone who would
be out on leave or out of the office

I told her she needed to focus on
her medical care now. She
said the situation has her being
v. emotional this week + she
wasn't sure she should be in
today.

I asked if she was caught up/
done + she said yes + she was
thinking of leaving early + I
encouraged her to do this

I stressed that it was my
understanding that Susan
was meeting/ w/ her entire

tran to assess work load /obj/ect
~~othat would~~
She agreed Susan was doing this

We reviewed what the HR action plan Pifeve
~~She~~
to I told her that it seemed
approp from my persp Susan
not provide her w/ new or
revised assigments (the process she
is doing w/ all) until MB
returns from leave. I also remind
M.B another prep person would
be hired + likely be here when
she returned.

I inquired about her relationship
w/ Susan how had it been as
a peer. M.B said good ~~some~~
~~reason~~

I told her when she reviews her
assigments /goals upon her next
return if she feels they aren—
fair to contact me

She again said she felt good now
about everything

**D381**

**A378**

Notes M.B. Fanell.          8/2//03
cited problems
Vendor at Fays mtg She believes
   this is the catalyst for Action
Plan — her opinion
Case study monitor diff of opinion

- asked me to read med
- She wants the Action plan
  redrafted against Band 4
  position (see her attached list)

  asked if possible I told her
  I had never seen this done but
  yes it was theoretically possible
  to make changes to an action
  plan CMgr mks changes) However
  I cautioned her even if this
  was done it is very possible
  sufficient areas of improvement
  would be needed for band 4 —

  Also cautioned her to ensure she
  has a correct understanding of
  duties of each band — She need
  to talk to Susan + Rachel
  if this

Exhibit E

D494

A379

She asked many + repeated questions re the standard perf imp sequence. I told her it was Action plan → PIP → term. I also stressed an Action Plan had prudently 3 out ones end of plan w/ improvement extension of plan move to a PIP. Termination could also occur as outlined in plan but usually just three outcomes occurred.

I cautioned her all of our employments were employer at will + expl this. Also cautioned her there are items any employee could get term for at any time whether or not they are on an Action Plan or PIP - misconduct ea.

I went over the 2 areas above again + again.

I stressed she needed to take full advantage of her weekly mtg w/ Susan Sweeney to gain a clear

D495

understanding of what
success would look like)
consist of.

I encouraged her to retain
a positive + professional
attitude during the process

She asked that a HR person
sit in on each of her
weekly mtgs w/ Susan b/c
she stated Susan told her
she was hostile when they last
spoke. I told M.B. HR did not
usually sit in for this type
of mtg. I also told her as I
was out for 3 weeks in Sept
I would have to give some
thought as to who could do this.

I told her although I would be
out of the office there would
be someone covering for me.
after discussing this a bit further
she seemed to rethink my involvement
or at least leave it unquesld

**D496**

**A381**

for now.

She left w/ her next action
to meet with Rachel B

She asked if she should send the
memo she should w/ me via
hard copy. I told her that
was her decision

D. Kauffman

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MARYBETH FARRELL,                        )
                                         )
                    Plaintiff,           )
                                         )
          v.                             )    C.A. No.04-285-KAJ
                                         )
ASTRAZENECA PHARMACEUTICALS,             )
LP,                                      )
                                         )
                    Defendant.           )
                                         )

## AFFIDAVIT OF DIANA ANDRADE

      I, DIANA ANDRADE, being duly sworn according to law, do hereby depose and say as follows:

      1.    I am employed as a Client Specialist with Benefit Concepts, Inc., which handles the administration of the health care plan of AstraZeneca Pharmaceuticals LP ("AstraZeneca"). Among the responsibilities of Benefit Concepts is to mail COBRA notices to AstraZeneca employees who leave the Company.

      2.    The procedure that is followed in all cases is that when an employee of AstraZeneca leaves the Company, Benefit Concepts is notified by AstraZeneca of the date of separation within 14 days and promptly mails a COBRA Notice and Election Form to the departing employee.

      3.    Upon the production of the COBRA Notice and Election Form to a departing employee, the Benefit Concept's Computer Tracking system automatically updates with a notation that a Notice and Election Form has been produced for the departing employee. The notation states the method of receipt of the information, the

type of notification produced and the date it was produced. The notice and election form is given to the mailroom. The mailroom mails the letter via first class mail.

4.    A former employee has 60 days from the date of the mailing of the Notice and Election form to elect to enroll in COBRA coverage and then an additional 45 days to submit the check for the initial COBRA premium. The total time elapsed between the mailing of the Notice and Election Form and the payment of the initial COBRA premium can be up to a total of 105 days.

5.    The procedure that is followed in all cases is that once the 60 day election period passes and the completed election form is not received; or if the completed election form is received but 105 days has passed and Benefit Concepts has not received the initial COBRA premium, Benefit Concepts sends a second letter to the departing employee informing the former employee that he or she is no longer eligible for COBRA coverage. The production of this second letter is also recorded in the Benefit Concepts computer tracking system. The letter is given to the mailroom, and the mailroom mails it via first class mail.

6.    On February 2, 2004, Benefit Concepts received notification from AstraZeneca that Marybeth Farrell had left the Company on January 23, 2004.

7.    On February 2, 2004, the same date that Benefits Concepts received the separation notice from AstraZeneca, the Benefit Administrator produced the Notice and Election form and the mailroom mailed by first class mail a Notice and Election Form to Ms. Farrell at her last known address, 7 Rockford Road, No. J22, Wilmington, DE 19806. A notation was made in Benefit Concepts' computer tracking system that the letter had been produced. That notification letter was never returned by the Post Office as undeliverable. A printout from the Benefit Concepts computer

**A384**

tracking system showing the entry of the production of the Notice and Election Form is attached hereto as Exhibit A.

8.    After the passing of the 60 day enrollment period and the additional 45 day period without the receipt of a check or other contact from Ms. Farrell, Benefit Concepts sent a follow up letter to the same address on May 10, 2004, informing Ms. Farrell that she was no longer eligible to elect COBRA coverage. That letter was not returned by the Post Office as undeliverable, and upon information and belief, Ms. Farrell received and responded to that second letter, which was sent to the same address as the COBRA notification letter. A copy of a print out from the Benefit Concept's computer tracking system showing the production of this second notice is attached hereto as Exhibit B.

9.    Ms. Farrell's response to the second letter, which was dated May 26, 2004, states that she received that second letter on May 17, 2004. Her response letter contained as a return address the same address to which the first letter was mailed.

10.   The procedures followed in Ms. Farrell's case were the usual and customary COBRA procedures regularly followed by Benefit Concepts on behalf of AstraZeneca.

_____
**DIANA ANDRADE**

Sworn to and subscribed before me this _2_ day of _MAY 2005_

2005.

_____
Notary Public

My commission expires: _3/31/07_

**MARYBETH FARRELL 221542032**

This participant was received on the COBRA transmission file on 2/2/04. The COBRA notification was sent on 2/2/04 with a due date of 4/2/04. The notification was sent to the address of: 7 Rockford Road, #J22, Wilmington, DE 19806 and was never returned from the post office as undeliverable.

# EXHIBIT A

**A386**

MARYBETH FARRELL   2215420321   AstraZeneca

| DATE | DESCRIPTION | AMOUNT | DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|------|-------------|--------|
| 02/02/2004 | DOWNLOADED INTO SYS | | | | |
| 02/02/2004 | BENAVAIL LETTER | | | | |
| 05/10/2004 | NOREPLY LETTER | | | | |
| 05/10/2004 | PENDING -> NOTACT | | | | |

(PgDn), (C)redit, (D)ebit, (P)lan Chg, (L)etters, (S)tatus Chg, SS(#) Chg

# EXHIBIT B

**A387**

## CERTIFICATE OF SERVICE

I hereby certify that on May 2, 2005, I electronically filed a true and correct copy of the

foregoing **Appendix to Defendant's Opening Brief in Support of Its Motion For Summary**

**Judgment** with the Clerk of the Court using CM/ECF, which will send notification that such

filing is available for viewing and downloading to the following counsel of record:

Thomas S. Neuberger, Esquire
The Neuberger Firm
Two East Seventh Street, Suite 302
Wilmington, DE 19801-3707

John M. LaRosa, Esquire
Law Office of John M. LaRosa
Two East 7th Street, Suite 302
Wilmington, DE 19801-3707

I further certify that on May 2, 2005, I caused a copy of the foregoing **Appendix to**

**Defendant's Opening Brief in Support of Its Motion For Summary Judgment** to be served

by hand-delivery on the following counsel of record:

Thomas S. Neuberger, Esquire
The Neuberger Firm
Two East Seventh Street, Suite 302
Wilmington, DE 19801-3707

John M. LaRosa, Esquire
Law Office of John M. LaRosa
Two East 7th Street, Suite 302
Wilmington, DE 19801-3707

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ Sheldon N. Sandler
Sheldon N. Sandler, Esquire (No. 245)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email: ssandler@ycst.com
Attorneys for Defendant

Dated: May 2, 2005