IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MARYBETH FARRELL,                    :
                                     :
        Plaintiff,                   :
                                     :
    v.                               :        C.A. No. 04-285-KAJ
                                     :
ASTRAZENECA PHARMACEUTICALS, LP,     :
                                     :
        Defendant.                   :


<u>APPENDIX TO  PLAINTIFF'S ANSWERING BRIEF IN
OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>


LAW OFFICE OF JOHN M. LAROSA         THE NEUBERGER FIRM, P.A.
JOHN LAROSA, ESQ. (#4275             THOMAS S. NEUBERGER, ESQ. (#243)
Two East Seventh Street, Suite 302   STEPHEN J. NEUBERGER, ESQ. (#4440)
Wilmington, Delaware 19801           Two East Seventh Street, Suite 302
(302) 888-1290                       Wilmington, Delaware 19801
                                     (302) 655-0582


Dated: May 17, 2005                  Attorneys for Plaintiff

**TABLE OF CONTENTS**

**Document**                                                            **Page**

Complaint...B001

Answer...B019

Deposition Day 1 of Marybeth Farrell, December 9, 2004...B028

Deposition Day 2 of Marybeth Farrell, January 25, 2005...B091

Deposition of Jane K. Hellen, February 15, 2005...B148

Deposition of Susan P. Broadway, March 24, 2005...B221

Deposition of Deborah J. Brangman, March 24, 2005...B243

Deposition of Georgina L. Austin-Jones, February 14, 2005...B272

Deposition of Rachel Bevis, April 7, 2005...B295

Letter from Jansson to Farrell, January 4, 2001, RE: Special Achievement Award...B331

Email from Pritchard to Farrell RE: "Meeting to discuss new team, roles, interests, ideas, etc.," April 11, 2003...B332

AstraZeneca Performance Evaluation for Marybeth Farrell, January 22, 2003...B333

AstraZeneca Performance Evaluation for Marybeth Farrell, January, 2002...B340

2001 Total Pay Statement for Maybeth Farrell...B344

Performance Plan for Marybeth Farrell, May 31, 2000...B345

Zeneca Pharmaceuticals Individual Performance Review for Marybeth Farrell, 2/1/99 - 1/1/00...B352

Zeneca Pharmaceuticals Individual Performance Review for Marybeth Farrell, 2/1/98 - 2/1/99...B356

Evaluation Summary, Anticoagulation Clinic Advisory Board Meeting, August 8-9, 2003...B361

Summary of Program Evaluations, Advancing into a New Era of Anticoagulant Therapy, September 19, 2003...B364

i

Program Evaluation, Exanta Advisory Board, October 24, 2003.............................................B366

Evaluation Summary, Hematology Advisory Board Meeting, November 6-8, 2003...............B368

Memo from Farrell to Austin-Jones, December 15, 2003, RE: Program Updates..................B370

Job Posting Requisition #404947 - PREP Manager / Sr PREP, 5/2/2002...............................B372

Banding Criteria Essential Skills Chart....................................................................................B373

Meeting Notice from Pritchard to Farrell, 5/1/2003, RE: Project list discussion...................B374

Email from Farrell to Pritchard, May 5, 2003, RE: Follow up from our meeting..................B375

Email from Broadway to Farrell, November 4, 2003, RE: Schedule......................................B379

AstraZeneca Return to Work Statement for Farrell, April 28, 2003........................................B381

Fax from Farrell to Kauffman and Austin-Jones, 22 September, 2003, RE: Summary of
       September 17, 2003 Meeting...................................................................................B382

Memo from Farrell to Pritchard, August 21, 2003, RE: Action Plan.....................................B383

Email from Farrell to Hellen, May 1, 2003, RE: Performance Discussion with
       Susan Pritchard.......................................................................................................B385

Email from Kauffman to Farrell, May 2, 2003, RE: Follow Up to Today's
       Telephone Conversation...........................................................................................B386

Email from Farrell to Pritchard, RE: FYI: Action Items.......................................................B387

Memo from Farrell to Pritchard, September, 16, 2003, RE: Action Plan...............................B391

Memo from Farrell to Austin-Jones, Broadway, Bevis, September 30, 2003, RE: Band V
       requirements of August 18, 2003 Action Plan and Present Banding per Successfully
       Completed Action Plan............................................................................................B393

Memo from Farrell to Broadway, October 26, 2003, RE: Action Plan Update of
       October 22, 2003.....................................................................................................B396

Email from Farrell to Broadway, October 27, 2003, RE: Dental appt tomorrow...................B401

Email from Farrell to Broadway, October 27, 2003, RE: Medical Appts. Time....................B402

Email from Farrell to Broadway, November 4, 2003, RE: Schedule......................................B403

ii

Memo from Farrell to Broadway, Austin-Jones, November 14, 2003, RE: Performance
    Improvement Plan Update Meeting Summary............................................................B405

Email from Farrell to Broadway, December 3, 2003, RE: Today's meeting...........................B407

Email from Farrell to Austin-Jones, December 17, 2003, RE: Terms of the PIP...................B408

April-May, 2003 Calendar print-outs....................................................................................B409

2000 Performance Evaluation of Farrell..............................................................................B411

Email from Farrell to Brangman, Martin, RE: AZ Courses Request.....................................B415

Email from Kauffman to Pritchard, August 14, 2003, RE: FW:Plan.....................................B416

Email from Farrell to Brangman, January 2, 2003, RE: 2002 Absence Tracker11.xls............B421

Email from Charles to Renk, January 17, 2002, RE: Feedback: Marybeth Farrell.................B423

Email from Adelman to Renk, January 25, 2002, RE: Performance Feedback for
    Marybeth Farrell...........................................................................................................B425

FILED
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE

2004 MAY -5  AM 10: 24

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

MARYBETH FARRELL,                        :
                                         :
    Plaintiff,                           :        CIVIL ACTION NO.
                                         :
        v.                           :        0 4 - 2 8 5
                                         :
ASTRAZENECA PHARMACEUTICALS LP,  :
a Delaware corporation,                  :        **TRIAL BY JURY DEMANDED**
                                         :
    Defendant.                           :

## COMPLAINT

1.     This is a civil action seeking compensatory and statutory liquidated damages and injunctive relief for an employee who survived abdominal and uterine tumors but was denied a previously promised promotion and eventually was discharged in retaliation for exercising her rights under the Family and Medical Leave Act.

## I.  THE PARTIES

2.     Plaintiff Marybeth Farrell is a citizen and resident of Wilmington, Delaware.  She was employed continuously by Defendant and its predecessor for over nine years.  Plaintiff is a white female age 44 who at all times was a diligent, loyal, and capable employee.

3.     AstraZeneca Pharmaceuticals LP ("AstraZeneca") is a Delaware corporation with its principal place of business located at 1800 Concord Pike, Wilmington, Delaware 19803. AstraZeneca is a pharmaceutical company with more than 500 employees.  Its registered agent for service of process is The Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware 19801.

B001

## II.  JURISDICTION AND VENUE

4.     The jurisdiction of this Court is invoked pursuant to the Family and Medical Leave Act of 1993, 29 U.S.C. § 2611 et seq. ("FMLA"), the Consolidated Omnibus Budget Reconciliation Act of 1986 ("COBRA"), Pub. L. No. 99-272, 100 Stat. 82 (1986), and 28 U.S.C. § 1331, since this action involves a question of the application of federal law.

5.     The causes of action in Counts I - III arise under the FMLA, 29 U.S.C. § 2611 et seq.

6.     The cause of action in Count V arises under COBRA, Pub. L. No. 99-272, 100 Stat. 82 (1986).

7.     The cause of action in Count IV arises under the common law of the State of Delaware.

8.     This Court has jurisdiction over the state law claim in Count IV pursuant to 28 U.S.C. § 1367, which provides for supplemental jurisdiction.

9.     Defendant operates and maintains a pharmaceutical business within the boundaries of the District of Delaware.

10.    The alleged wrongs and injuries occurred in New Castle County, Delaware.

11.    Venue is proper in this district because Defendant has significant contact with the district, plaintiff resides within this district, and the events that gave rise to the causes of action occurred in this district.

2

## III.  FACTS GIVING RISE TO THE ACTION

A.  **Excellent Employment Record**

12.    Marybeth Farrell is a 44 year old female who was employed by AstraZeneca and its predecessor for over nine years, from February 4, 1994 to approximately January 23, 2004, at its Concord Pike site in Wilmington, Delaware.

13.    Plaintiff worked in AstraZeneca's Marketing group as a Senior Professional Relations and Education Manager from approximately December of 2000 until January 23, 2004.

14.    In 2000, Ms. Farrell received a Distinguished Performance Award for her work in the Marketing group.

15.    In May of 2002, she was promoted to Senior Professional Relations and Education Program Manager Band IV for the EXANTA Team.

16.    In November or December of 2002, she was told that her promotion to Band V was approved by Brand Director Jane Hellen and Functional Group Marketing Communications Director Deborah Brangman and would be announced shortly.    Yes

17.    Plaintiff's annual evaluations ranged from "fully meets" to "exceeds expectations."

18.    Plaintiff received her most recent annual evaluation at her annual review on March 10, 2003.  It rated her as "exceeds expectations" in six of ten categories and "meets expectations" in the other four.  Her overall rating was "good".

19.    On March 10, 2003, there were no concerns with Ms. Farrell's performance.

3

B003

20.    On April 11, 2003, Brand Communications Leader Susan Broadway praised her work and solicited from her new ideas for customer segments for 2003. No concerns with Plaintiff's performance were expressed at this time.

21.    Prior to May 5, 2003, Plaintiff had never received any written disciplinary action in her more than nine year career with Defendant and its predecessor.

22.    Plaintiff also developed for Defendant a Managed Market Retail Trade Advisory Board Meeting, which was held from October 23rd to October 25th, 2003.

23.    Of the eleven attendees, seven rated Ms. Farrell's meeting good and four rated her meeting excellent.

24.    Plaintiff also developed for Defendant a Hematology/Oncology Advisory Board Meeting, which was held from November 6th to November 8th, 2003.

25.    The attendees of the meeting included professors from Harvard University and Dartmouth College. All nine attendees gave Ms. Farrell's meeting an overall rating of excellent.

**B.    Protected Activity Under the FMLA: Request for Leave**

26.    Prior to April of 2003, Plaintiff had never asked for one day of sick leave for the year that she had been part of the EXANTA Team.

27.    In April of 2003, Plaintiff suffered from three abdominal and uterine tumors ("three tumors"). The three tumors were a physical condition that involved inpatient care in a hospital.

28.    The three tumors constituted a serious health condition as defined by the Family and Medical Leave Act, 29 U.S.C. § 2611(11).

4

29.     This serious health condition interfered with Plaintiff's ability to perform her duties, and made it impossible for her to perform the functions of her position of employment at AstraZeneca.

30.     On April 22, 2003, Plaintiff orally requested from Ms. Hellen leave to seek medical treatment in the form of non-elective surgery on May 9, 2003, to remove the three abdominal and uterine tumors.

31.     Due to the nature of the medical condition, 30 days' notice for the requested leave was not practicable.

32.     Plaintiff also informed Ms. Hellen that her doctor advised her she would require six weeks of bed rest after the operation.

33.     In response, Ms. Hellen replied, "Six weeks is a long time; do you think you will be out all six weeks?"

**C.     Immediate Retaliation After Request for Leave:**
**Verbal Performance Concerns, Threat of Termination, Unreasonable Work**
**Requirements, and Pressure to Curtail Post-operative Recovery Period**

34.     Just six days after requesting leave, on April 28, 2003, Ms. Hellen and Brand Communications Leader Susan Broadway expressed concerns about Plaintiff's performance regarding projects in 2002 ("2002 projects").

35.     Plaintiff already had received ratings of good and excellent for the 2002 projects.

36.     That same day, Ms. Hellen advised Plaintiff that she was not sure if she would retain Plaintiff in 2004.

5

B005

37.     Later in April of 2003, Ms. Broadway told Plaintiff there was a lot of work to be done and asked if she could return from her non-elective surgery any earlier than six weeks.

38.     Again in retaliation, on or about April 29, 2003, Ms. Broadway began setting unreasonable work requirements for Plaintiff.

39.     Specifically, Broadway gave Plaintiff the tedious tasks of developing transition plans for her colleagues to use to manage her programs while she was out.

40.     Ms. Broadway also made Plaintiff create a profile on over 50 physicians, but she specifically forbid her to use the assistance of a secretary or an outside research agency to accomplish the task.

41.     Ms. Broadway and Ms. Hellen also continued to ask Plaintiff how long she would be out.

42.     In response to the unrelenting pressure, Ms. Farrell promised to return three weeks after the surgery despite the doctor's order for six weeks of bed rest.

**D.     <u>Initiation of Written Discipline</u>**

43.     Then just three days before she was scheduled to go out on short term disability leave for the surgery, both Ms. Broadway and Ms. Hellen told Plaintiff that she was being placed on a short term improvement plan.

44.     On May 6, 2003, Plaintiff received the improvement plan which contained various unfair and untrue criticisms, many of which are contradicted by the annual evaluation received less than two months earlier.

6

B006

45.    Finally, the next day as she prepared to leave for surgery, Ms. Hellen sarcastically remarked, "Don't worry, Marybeth, your job will be here when you get back. Really."

E.    **Approved Leave, Hastened Recovery Period, and Resultant Physical Injuries**

46.    On May 5, 2003, Winnie O'Neill of Corporate Health Services approved the six weeks of leave. The six weeks would count against the twelve week entitlement under Defendant's Family and Medical Leave Act Policy and the FMLA itself.

47.    On May 8, 2003, Plaintiff went out on short term disability leave for her non-elective surgery.

48.    On May 9, 2003, Plaintiff was admitted to the hospital for her non-elective surgery.

49.    On May 9, 2003, Plaintiff underwent the non-elective surgery.

50.    Having her performance questioned just days before her surgery and fearful of further threats to her long term employment, Plaintiff attempted to work at home after the surgery. Specifically, Plaintiff called Ms. Hellen during her first week of recovery to request work to do at home.

51.    She also tried to return to work after only two weeks of bed rest, but her doctor insisted that she remain bedridden for at least three of the recommended six weeks.

52.    Plaintiff attempted to return part-time during the fourth week after her surgery.

53.    She worked two half days but developed lower back muscle spasms and pinched nerves in her right leg from sitting upright in her office chair during the recommended bed rest period.

7

54.    As a result of her hastened return, Ms. Farrell has damaged L4 and L5 vertebrae and suffers frequent back spasms, occasional pinched nerves, and tingling and numbness in her right leg, foot, and arm, all which persist to this day.

**F.    Further Retaliation Upon Return to Work:**
**Negative Evaluation, Denied Promotion, and Escalated Disciplinary Action**

55.    Eventually on June 20, 2003, Plaintiff returned to work full-time.

56.    Next, on July 3, 2003, Ms. Broadway issued Plaintiff a negative mid-year performance review. It reiterated the unfair and untrue criticisms of the short term improvement plan.

57.    Also in July of 2003, Plaintiff was told by Functional Group Marketing Communications Director Deborah Brangman that a previously promised promotion to Band V was now denied with the vague explanation of "performance reasons."

58.    Then on August 18, 2003, Ms. Hellen placed Plaintiff on an Action Plan, a disciplinary measure reserved for incompetent employees.

59.    The Action Plan contained new areas of criticism not previously mentioned during the short term improvement plan, such as 1) brand strategy, 2) understanding clinical data, and 3) ability to drive meetings and organize ("three performance areas").

60.    Previously, Plaintiff received good to excellent ratings in these three performance areas less, than six months earlier in her annual review.

61.    The Plan also criticized Plaintiff's failure to meet requirements of a Band V position, in the areas of ability to act as content expert, ability to develop relationships with associations and thought leaders, brand strategy, and budget management.

8

62.    Plaintiff was told that her employment would be terminated on September 30, 2003, if her employment did not improve.

63.    In response, on August 21, 2003, Plaintiff asked Ms. Broadway that the Plan be reconsidered to reflect the fact that she held a Band IV position and not a Band V position.

64.    Then in mid-September of 2003, Plaintiff was removed from her office and placed in a cubicle.

**G.    Internal Complaints to Human Resources and Additional Retaliation**

65.    On September 17, 2003, Plaintiff met with Deborah Kauffman of Human Resources to file a complaint that she was being retaliated against for exercising her rights under the FMLA.

66.    As part of Defendant's inquiry into the matter, Plaintiff provided verbal and written testimony to Keith Black of Human Resources.

67.    After a cursory investigation, Mr. Black rejected Plaintiff's complaints on October 21, 2003.

68.    On or about October 22, 2003, Broadway told Plaintiff that her execution of the requirements of the Action Plan was unsatisfactory despite overwhelming documentation that she had met all of its areas.

69.    Nevertheless, on or about October 22, 2003, Defendant escalated its discipline against Plaintiff from an Action Plan to an eleven week Performance Improvement Plan ("PIP").

70.    In early January of 2004, Plaintiff's computer docking station at work was vandalized ("workplace vandalism").

9

71.     Though Plaintiff requested an investigation be done, Defendant did not investigate the workplace vandalism.

72.     On or about January 5, 2004, the PIP ended. On or about January 14, 2004, Ms. Hellen and Ms. Broadway provided Ms. Farrell with a memorandum regarding PIP Feedback Discussion.

73.     The memorandum falsified or manipulated Plaintiff's performance record to create fictitious grounds to terminate her.

74.     On or about January 16, 2004, Defendant placed Plaintiff on a one week leave during which time she was not to report to work.

**H.     Termination of Employment**

75.     After the conclusion of the twelve week PIP and the one week leave, Defendant discharged Plaintiff on January 23, 2004. Its stated reason for termination was her failure to succeed in the performance improvement plan and her other misconduct.

**I.     The Retaliatory Reason and Pretext**

76.     Because of her request for medical leave and/or absence from work for the purpose of seeking treatment for a serious medical condition, Defendant disciplined Plaintiff, gave her a negative performance evaluation, denied her a previously promised promotion to a Band V position, and eventually terminated her employment.

77.     Alternatively, as a result of Plaintiff's internal complaint on September 17, 2003, invoking her FMLA rights, Defendant disciplined Plaintiff, gave her a negative performance evaluation, denied her the previously promised promotion to a Band V position, and eventually terminated her employment, effective January 23, 2004.

10

78.    The reason for any difference in treatment between Plaintiff and her replacement is retaliation based upon her request for medical leave, her absence from work for the purpose of seeking treatment for a serious medical condition, and/or her internal complaint on September 17, 2003, invoking her FMLA rights, (collectively "FMLA protected activity ").

79.    Any alleged legitimate non-retaliatory reasons offered by Defendant for the difference in treatment of Plaintiff is a pretext for retaliation because of her protected activity under the FMLA.

80.    The natural probative force of the evidence demonstrates retaliation.  For example, the temporal proximity here is unusually close, and there was demonstrated antagonism manifested by supervision.  Alternatively, a reasonable fact finder could choose to disbelieve any non-retaliatory reasons offered by Defendant because Plaintiff can demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in Defendant's explanation that make it unworthy of belief.

**J.**    **Plaintiff's Injuries and Damages**

81.    As a direct and proximate result of the retaliatory actions of Defendant and its agents, as detailed herein, Plaintiff suffered and is suffering lost wages, salary, earnings, annual and long-term incentives; employment benefits including, but not limited to, reduced pension, lost 401(k) plan with employer matching, medical, dental, and vision insurance (collectively "health insurance"), and life insurance; other lost or denied compensation including, but not limited to, unpaid accrued vacation days and unreimbursed business expenses; and actual monetary losses sustained as a direct result of the FMLA violations including, but not limited to, doctor, psychiatrist, and psychologist visits and medications for which she otherwise would not

11

B011

have been required to pay. Plaintiff is still undergoing continuing medical treatment and psychiatric care requiring medication and therapy, and her physical and emotional injuries are permanent.

82.    As a result of both the denial of her previously promised promotion and her discharge by Defendant, Plaintiff suffered significant financial loss and loss of the benefits of her employment, including health insurance.

83.    As a result of the retaliation she experienced, Plaintiff since that time has had to see a clinical psychologist approximately once every two weeks, and a psychiatrist, approximately once every six to eight weeks.

84.    Plaintiff has been diagnosed with Anxiety and Depression.

## IV. ALLEGATIONS REGARDING DEFENDANT'S CONDUCT

85.    The reason for the difference in treatment between Ms. Farrell and employees who did not request medical leave or were not absent from work for the purpose of seeking treatment for a serious medical condition is retaliation because of protected activity under the FMLA.

86.    The actions of the Defendant were deliberately, intentionally, willfully, purposefully, and knowingly done in violation of federally protected rights. The Defendant either knew or showed a negligent or reckless disregard for the matter of whether its conduct violated federal rights. Its actions were outrageous and taken with evil or improper motive, in bad faith, out of personal animus, or motivated by bias and without any reasonable grounds to support them. Its actions were wanton and malicious or taken with reckless indifference to federally protected rights.

B012

## V. CLAIMS

### COUNT I
### (DISCHARGE - FMLA)

87.     Plaintiff repeats and realleges ¶¶ 1 - 86 set out above.

88.     The termination of Plaintiff's employment was a willful violation of the Family and Medical Leave Act of 1993, undertaken in retaliation for plaintiff's FMLA protected activity, and entitles plaintiff to recover damages as provided at 29 U.S.C. § 2617.

### COUNT II
### (DENIED PROMOTION - FMLA)

89.     Plaintiff repeats and realleges ¶¶ 1 - 88 set out above.

90.     The denial of Plaintiff's previously promised promotion to a Band V position was a willful violation of the Family and Medical Leave Act of 1993, undertaken in retaliation for plaintiff's FMLA protected activity, and entitles plaintiff to recover damages as provided in 29 U.S.C. § 2617.

### COUNT III
### (OTHER RETALIATION - FMLA)

91.     Plaintiff repeats and realleges ¶¶ 1 - 90 set out above.

92.     Defendant's other retaliatory acts including, but not limited to, unreasonable work requirements; verbal performance concerns; negative mid-year performance review; placement on the short term improvement plan, the Action Plan, the PIP, and the one week leave; removal from her office and placement in a cubicle; threats of termination; and pressure to curtail her post-operative recovery period; all were willful violations of the Family and Medical Leave Act of 1993, undertaken in retaliation for plaintiff's FMLA protected activity, and each violation

13

B013

entitles plaintiff to recover damages as provided at 29 U.S.C. § 2617.

## COUNT IV
## (BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)

93.     Plaintiff repeats and realleges ¶¶ 1 - 92 set out above.

94.     Defendant and its employees or agents falsified and manipulated Plaintiff's employment records to create fictitious grounds for the termination of her employment.

i.      Ms. Hellen and Ms. Broadway expressed concerns on April 28, 2003, about Plaintiff's performance regarding 2002 projects for which she already had received ratings of good and excellent.

ii.     On May 6, 2003, Defendant issued Plaintiff a short term improvement plan which contained various unfair and untrue criticisms, many of which are contradicted by the annual evaluation received less than two months earlier.

iii.    On July 3, 2003, Ms. Broadway issued Plaintiff a negative mid-year performance review which reiterated the unfair and untrue criticisms of the short term improvement plan.

iv.     Also in July of 2003, Defendant denied Plaintiff the previously promised promotion to a Band V position for the false "performance reasons".

v.      On August 18, 2003, Ms. Hellen placed Plaintiff on an Action Plan which contained new criticism never previously mentioned during the short term improvement plan and for which Plaintiff received good to excellent ratings less than six months earlier in her annual review.

14

B014

vi.    The Action Plan also criticized Plaintiff's failure to meet requirements of a Band V position despite the fact that she merely held a Band IV position.

vii.    On or about October 22, 2003, Ms. Broadway told Plaintiff that her execution of the requirements of the Action Plan was unsatisfactory despite overwhelming documentation that she had met all of its areas.

viii.    After the PIP ended on or about January 5, 2004, Ms. Hellen and Ms. Broadway provided Plaintiff with a PIP Feedback Discussion memorandum which, like the criticisms in ¶ 94.i through vii, contained falsification or manipulation of Plaintiff's performance record to create fictitious grounds to terminate her.

95.    Alternatively, the termination of Plaintiff's employment violated public policy.

96.    Defendant's actions breached the implied covenant of good faith and fair dealing.

97.    As a result, Plaintiff suffered the injuries listed in ¶¶ 81 - 84 above.

### COUNT V
### COBRA CLAIM

98.    Plaintiff repeats and re-alleges ¶¶ 1 - 97 set out above.

99.    At all times material hereto, Plaintiff was a participant of Defendant's group health plan ("the Plan").

100.    Commencing since approximately 1999, as part of the Plan, Defendant provided group health insurance through Blue Cross-Blue Shield of Delaware to Plaintiff.

101.    On January 23, 2004, Defendant terminated Plaintiff's employment.

15

102.    In approximately mid-February of 2004, Defendant canceled its health insurance coverage of Plaintiff. The termination of coverage was retroactive to January 23, 2004.

103.    As a result, Plaintiff had no health insurance coverage from January 23, 2004, to May 1, 2004.

104.    Defendant never notified Ms. Farrell that it was terminating her insurance.

105.    Ms. Farrell has large medical bills and many continuing medical needs because of the physical and emotional condition which resulted from the unlawful adverse actions taken against her by Defendant.

106.    After she was discharged on January 23, 2004, Defendant was required by federal law to provide Plaintiff with the option under COBRA to continue her health insurance at her expense.

107.    However, Defendant maliciously denied her her COBRA rights, thus depriving her of needed health insurance in violation of federal law.

108.    Any reason offered for the denial of such rights is false and a pretext for a malicious act by the Defendant.

109.    The Defendant has violated Ms. Farrell's rights under COBRA, Pub. L. No. 99-272, 100 Stat. 82.

**WHEREFORE,** Plaintiff prays that the Court:

(a)    Enter a declaratory judgment declaring the acts of the Defendant to be a violation of Plaintiff's statutory and common law rights.

16

B016

(b)     Under the FMLA, enter a judgment against Defendant for compensatory damages, including lost wages, salary, earnings, annual and long-term incentives, employment benefits including, but not limited to, reduced pension, lost 401(k) plan with employer matching, and medical, dental, vision, and life insurance coverage;

(c)     Under the FMLA, award plaintiff other lost or denied compensation including, but not limited to, unpaid accrued vacation days and unreimbursed business expenses; actual monetary losses sustained as a direct result of the FMLA violations including, but not limited to, doctor, psychiatrist, and psychologist visits and medications for which she otherwise would not have been required to pay;

(d)     Under the FMLA, award pre- and post-judgment interest on the amounts described in sub-sections (b) and (c) above at the prevailing rate;

(e)     Under the FMLA, enter a judgment against Defendant for statutory liquidated damages equal to the sum of the amount described in sub-sections (b), (c), and (d) above;

(f)     Under the Implied Covenant of Good Faith and Fair Dealing, award general, consequential, and incidental damages;

(g)     Issue a mandatory injunction directing the Defendant to reinstate plaintiff to the position of Senior Professional Relations and Education Manager or an equivalent position, or alternatively, issue a mandatory injunction directing the Defendant to place her in the position to which she would have normally progressed but for the illegal retaliation against her;

(h)     Issue a permanent injunction requiring the Defendant to:

(i)     Notify everyone who learned of Defendant's treatment of plaintiff that its conduct was illegal and

17

(ii)     Expunge plaintiff's personnel files of any derogatory information relating to this matter;

(i)     Award damages for the loss of COBRA benefits, including the right to health insurance benefits;

(j)     Award costs, pre- and post-judgment interest, reasonable expert witness fees, and reasonable attorneys' fees for this suit; and

(k)     Require such other and further relief as the Court deems just and proper under the circumstances.

THE NEUBERGER FIRM, P.A.

THOMAS S. NEUBERGER, ESQ.
Delaware Bar No. 243
Two East Seventh Street, Suite 302
Wilmington, Delaware 19801
(302) 655-0582

LAW OFFICE OF JOHN M. LaROSA

JOHN M. LaROSA, ESQ.
Delaware Bar No. 4275
Two East 7th Street, Suite 302
Wilmington, Delaware 19801-3707
(302) 888-1290

Dated: May 5, 2004                    Attorneys for Plaintiff

Attorney Files/John's Files/Client Files/Farrell/Pleadings/Complaint

18

B018

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MARYBETH FARRELL, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 04-285 KAJ |
| | ) | |
| v. | ) | |
| | ) | |
| ASTRAZENECA PHARMACEUTICALS LP, | ) | TRIAL BY JURY DEMANDED |
| | ) | |
| Defendant. | ) | |

### ANSWER

1.  No answer necessary.

2.  Denied that Plaintiff was at all times a diligent, loyal and capable employee.

Otherwise admitted.

3.  Admitted.

4.  Admitted.

5.  Admitted.

6.  Admitted.

7.  Admitted.

8.  Admitted, except that Defendant reserves the right to contend that the state

law claims are preempted by the federal claims Plaintiff asserts.

9.  Admitted.

10. Denied that any wrongs or injuries occurred.  Otherwise admitted.

11. Admitted.

12. Admitted.

13. Admitted.

RECEIVED
MAY 2 4 2004

WP3:1000923.1

057159.1004

14. Admitted.

15. Denied that this was a promotion. Otherwise admitted.

16. Denied.

17. Denied.

18. Admitted.

19. Denied.

20. Denied.

21. Denied.

22. Admitted that Plaintiff worked on putting together the said meeting with a number of other people, many of whom criticized her work on the project.

23. Denied that Plaintiff was "rated."

24. Admitted that Plaintiff worked on putting together the said meeting with a number of other people.

25. Denied that Plaintiff was "rated."

26. Defendant does not have sufficient information to admit or deny these averments. For a further answer, Plaintiff was out of the office frequently for personal reasons.

27. Admitted.

28. Admitted.

29. Admitted.

30. Denied.

31. Defendant does not have sufficient information to admit or deny this averment.

32. Denied.

2

33. Denied.

34. Admitted. For a further answer, Plaintiff had been informed of areas where improvement in her performance was needed previously. Both before and after Plaintiff requested leave, Ms. Hellen and Ms. Broadway expressed concern about Plaintiff's performance and sought to assist her in the improvement of her performance.

35. Denied. For a further answer, Plaintiff had been informed of areas where improvement in her performance was needed.

36. Denied.

37. Denied.

38. Denied.

39. Denied.

40. Denied.

41. Denied.

42. Denied.

43. Denied.

44. Denied.

45. Denied.

46. Admitted.

47. Admitted.

48. Admitted.

49. Admitted.

50. Admitted that Plaintiff offered to "help out however I can" since she was "feeling much better this week" and said she was bored. Otherwise denied.

3

51. Defendant does not have sufficient information to admit or deny this averment.

52. Defendant does not have sufficient information to admit or deny this averment.

53. Defendant does not have sufficient information to admit or deny this averment.

54. Defendant does not have sufficient information to admit or deny this averment.

55. Admitted.

56. Denied. For a further answer, Plaintiff's performance deficiencies were pointed out and discussed with her on or about July 3, 2003.

57. Denied, except admitted that Plaintiff was informed that she would not be promoted to Band V.

58. Admitted that Plaintiff was placed on an Action Plan on August 18, 2003. Otherwise denied.

59. Denied.

60. Denied.

61. Admitted that the said areas were mentioned as deficiencies. Otherwise denied.

62. Denied.

63. Admitted that this request was made. Denied that there was any legitimate basis for the request.

WP3:1000923.1                                                057159.1004

B022

64. Admitted. For a further answer, several Band IV team members had to move to cubicles due to office space constraints.

65. Admitted that Plaintiff complained about the said item and other issues.

66. Admitted that Plaintiff provided certain information to Defendant's Human Resources Office.

67. Denied that the investigation was cursory. Otherwise admitted.

68. Admitted that Plaintiff was told her execution of the Action Plan was unsatisfactory. Otherwise denied.

69. Admitted that Plaintiff was placed on a Performance Improvement Plan. Otherwise denied.

70. Defendant does not have sufficient information to admit or deny this averment.

71. Defendant does not have sufficient information to admit or deny this averment.

72. Admitted.

73. Denied.

74. Admitted.

75. Admitted.

76. Denied.

77. Denied.

78. Denied.

79. Denied.

80. Denied.

5

B023

81. Denied.

82. Denied.

83. Denied.

84. Defendant does not have sufficient information to admit or deny this averment.

85. Denied.

86. Denied.

87. Defendant repeats and realleges Paragraphs 1 through 86 of its answer.

88. Denied.

89. Defendant repeats and realleges Paragraphs 1 through 88 of its answer.

90. Denied.

91. Defendant repeats and realleges Paragraphs 1 through 90 of its answer.

92. Denied.

93. Defendant repeats and realleges Paragraphs 1 through 92 of its answer.

94. i–viii. Denied in its entirety.

95. Denied.

96. Denied.

97. Denied.

98. Defendant repeats and realleges Paragraphs 1 through 97 of its answer.

99. Admitted.

100.    Admitted.

101.    Admitted.

102.    Denied.

6

B024

103.    Defendant does not have sufficient information to admit or deny this

averment.

104.    Denied.  For a further answer, a COBRA notice was sent to Plaintiff on

February 2, 2004.

105.    Defendant does not have sufficient information to admit or deny this

averment.

106.    Admitted.

107.    Denied.

108.    Denied.

109.    Denied.

### AFFIRMATIVE DEFENSES

110.    Plaintiff has failed to state a claim upon which relief can be granted.

111.    The actions taken by Defendant were taken for legitimate business

reasons.

112.    Plaintiff has unclean hands.

7

B025

113.    Plaintiff's state law claims are preempted by her federal law claims.

WHEREFORE, Defendant demands that the Complaint be dismissed and that attorney's fees and costs be awarded against Plaintiff.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Sheldon N. Sandler, Esquire  ID # 245
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
(302) 571-6673
Attorneys for Defendant

DATED:   May 24, 2004

WP3:1000923.1

057159.1004

B026

## CERTIFICATE OF SERVICE

I, Sheldon N. Sandler, Esquire, hereby certify that on May 24, 2004, I caused two copies of the foregoing **Answer** to be served by hand delivery upon the following counsel of record:

> Thomas S. Neuberger,  Esquire
> The Neuberger Firm
> Two East Seventh Street, Suite 302
> Wilmington, DE 19801-3707

_____
SHELDON N. SANDLER

057159.1004

B027



**WILCOX & FETZER LTD.**

In the Matter Of:

# Farrell
## v.
# AstraZeneca Pharmaceuticals, LP

## C.A. # 04-285 KAJ

------------------------------------------------------------------------

Transcript of:

# Marybeth Farrell

December 9, 2004

------------------------------------------------------------------------

Wilcox & Fetzer, Ltd.
Phone:  302-655-0477
Fax:  302-655-0497
Email:  lhertzog@wilfet.com
Internet:  www.wilfet.com

B028

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MARYBETH FARRELL,                    )
                                     )
              Plaintiff,             )
                                     )
v.                                   )        Civil Action No.
                                     )          04-285 KAJ
ASTRAZENECA PHARMACEUTICALS, LP,     )
                                     )
              Defendant.             )

              Deposition of MARYBETH FARRELL taken
pursuant to notice at the offices of Young Conaway
Stargatt & Taylor, LLP, The Brandywine Building, 17th
Floor, 1000 West Street, Wilmington, Delaware,
beginning at 9:30 a.m. on Thursday, December 9, 2004,
before Ann M. Calligan, Registered Merit Reporter and
Notary Public.

              WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801
                  (302) 655-0477

Farrell                                    v.                AstraZeneca Pharmaceuticals, LP
Marybeth Farrell                      C.A. # 04-285 KAJ                      December 9, 2004

Page 2

APPEARANCES:
    THOMAS S. NEUBERGER, Esquire
    THE NEUBERGER FIRM
      Two East Seventh Street - Suite 302
      Wilmington, Delaware  19801-3707
    JOHN M. LaROSA, Esquire
    LAW OFFICE OF JOHN M. LaROSA
      Two East Seventh Street - Suite 302
      Wilmington, Delaware  19801-3707
      on behalf of the Plaintiff;
    SHELDON N. SANDLER, Esquire
    YOUNG CONAWAY STARGATT & TAYLOR, LLP
      The Brandywine Building - 17th Floor
      1000 West Street
      P.O. Box 391
      Wilmington, Delaware  19899-0391
    JOHN J. BROGAN, Esquire
    AstraZeneca Pharmaceuticals, LP
      Senior Counsel - Legal Department
      1800 Concord Pike
      PO Box 15437
      Wilmington, Delaware  19850-5437
      on behalf of the Defendant.

ALSO PRESENT:

    DEBORAH L. COLES, Paralegal
    Young Conaway Stargatt & Taylor, LLP

Page 3

1           MARYBETH FARRELL,
2    the witness herein, having first been
3    duly sworn on oath, was examined and
4    testified as follows:
5           EXAMINATION
6  BY MR. SANDLER:
7    Q.  State your name, please.
8    A.  Marybeth Farrell.
9    Q.  Ms. Farrell, my name is Sheldon Sandler, and I
10  represent AstraZeneca in this case.
11       Have you ever been involved in a lawsuit
12  before?
13    A.  Yes.  Years ago, when I was in high school, I
14  was with a friend in a car accident.  And so my
15  father, I guess, sued the insurance company because of
16  the medical bills.
17    Q.  Did you have your deposition taken in that
18  lawsuit?
19    A.  Yes.
20    Q.  Do you remember if it was in Delaware?
21    A.  It was in Delaware.
22    Q.  Do you remember who the attorneys were?
23    A.  Mr. Potter, Stephen Potter.  He was
24  representing me.

Page 4

1    Q.  And who represented the defendant?
2    A.  I don't know.
3    Q.  Did it to go trial?
4    A.  No, it didn't.
5    Q.  Any other lawsuits?
6    A.  No.
7    Q.  Probably, since you've had your deposition
8  taken, you might know these things, but let me go over
9  some preliminaries.  In order to let the court
10  reporter get everything down correctly, you should
11  answer out loud rather than shaking your head.  And I
12  understand some of these things are counter-intuitive
13  or at least a little bit difficult, but that's one of
14  the things.  If I ask you a question and you don't ask
15  me to clarify it, I'm going to assume that you
16  understand the question.  Is that clear?
17    A.  Yes.
18    Q.  If you need to take a break at any time say so;
19  we'll take a break.
20    A.  Okay.
21    Q.  Are you taking any medications today?
22    A.  Yes.
23    Q.  What medications?
24    A.  Lexapro and Xanax and Allegra for my allergies.

Page 5

1    Q.  What was the third one?
2    A.  Allegra for my allergies.
3    Q.  What's Lexapro for?
4    A.  Depression.
5    Q.  And Xanax?
6    A.  Anxiety.
7    Q.  Who prescribed those to you?
8    A.  Dr. Roberta Luft.
9    Q.  Is she a psychiatrist?
10    A.  Yes.
11    Q.  Are you able to testify today without any
12  limitations despite the fact that you're taking these
13  medications?
14    A.  Yes, I am.
15    Q.  Have you had any other medications prescribed
16  for you in the last three years.
17    A.  Nexium.  And also -- another sinus -- Aquacort.
18  It's AstraZeneca drug for rhinitis, sinuses.
19    Q.  Who prescribed those two?
20    A.  Dr. Manuel Amini, A-m-i-n-i.
21    Q.  What's his specialty?
22    A.  Primary care.
23    Q.  Have there been any changes in the dosage of
24  your medications in the last three years?

2 (Pages 2 to 5)

B030

Page 6

1    A.    No.
2    Q.    In preparing for this deposition have you
3    reviewed any documents?
4    A.    What do you mean by documents?
5    Q.    Papers. Anything in writing.
6    A.    Yes.
7    Q.    Or for that matter any audio tapes?
8    A.    I reviewed materials for this.
9    Q.    What have you reviewed?
10          MR. NEUBERGER: I object to that. I think
11   that's covered by the lawyer/client privilege.
12   Q.    Did you review them in the company of your
13   attorney?
14          MR. NEUBERGER: I gave her an audio tape I
15   give to all clients to look at about what a deposition
16   does, that kind of thing.
17   Q.    Aside from that. I'm not asking about that.
18   Anything that didn't come from your attorney that
19   either you had or that came from us to you, did you
20   review anything like that?
21   A.    I reviewed the complaint, the supporting
22   documents that we had provided at --
23          MR. NEUBERGER: Right. We gave you
24   documents to look at.

Page 7

1    A.    For the first set of inquiries, I guess they
2    were called.
3    Q.    Aside from the audiotape that Mr. Neuberger's
4    office gave you, there was another audio tape that was
5    produced fairly recently to us of some telephone
6    conversations that presumably you were involved in.
7    Do you know that what I'm referring to there?
8    A.    Yes, I do.
9    Q.    Did you listen to that?
10   A.    Yes, I did.
11   Q.    By the way, who's on those audiotapes?
12          MR. NEUBERGER: The phone calls, if you
13   recognize the voices.
14   A.    Yes. The first one is myself and Brian Martin
15   who was our brand promotions leader on the Exanta
16   team, and I was speaking with him. He went back to
17   the Seroquel team. And the second --
18   Q.    When was that first conversation?
19   A.    That was in December of '03, or November.
20   Somewhere around that time.
21   Q.    Second one?
22   A.    Was with Georgina Austin Jones from human
23   resources at AstraZeneca and myself.
24   Q.    When was that?

Page 8

1    A.    That was in December of '03.
2    Q.    So they were both about the same time?
3    A.    Yes. Well, the Brian Martin tape preceding
4    that one by about several weeks. So that may have
5    been in November.
6    Q.    In that first tape, the Brian Martin tape,
7    what's being discussed?
8          MR. NEUBERGER: Go ahead.
9    A.    I went down to talk to Brian to request his
10   assistance in helping me to find a new position, and
11   because Brian --
12   Q.    New position at AstraZeneca or outside of
13   AstraZeneca?
14   A.    Either at AstraZeneca or outside of
15   AstraZeneca. I specifically asked him if he might
16   have positions on his team or if he knew of any
17   openings externally. And so he discussed with me job
18   possibilities at Adventis where he knew someone who
19   worked in the thrombosis area, and he would be willing
20   to call her and try to help me out and also agreed to
21   serve as a reference for me. And then we discussed my
22   situation, and I explained to him the difficulties I
23   was having. And he understood because he had
24   experienced very similar circumstances.

Page 9

1          And we discussed the -- the team, Exanta
2    team within the company, from what he had heard, from
3    what I had heard, prior to taking our positions on the
4    team, had a reputation for being a difficult team to
5    work with, that the dynamics were not especially
6    pleasant in terms of your day-to-day work. And he
7    agreed with me that he had made the same mistake I
8    did, which was to overlook that and say to ourselves
9    that we felt we could overcome whatever the
10   personality issues were on that team because we were
11   very excited about the professional opportunities to
12   launch this very exciting drug. And so we both -- you
13   know, said, well, live and learn essentially.
14   Q.    Who told you that there were problems with the
15   Exanta team before you joined it?
16   A.    When I was interviewing for the Exanta team
17   Renee Valles was the cardiovascular communications
18   director in the skill set area. And she initially
19   screened me for the Exanta team interview, and she
20   also screened me for a similar opening on the Atacand
21   team, both in cardiovascular. Both were job
22   opportunities for me. And she said to me, "You'll
23   probably be happier going to the Exanta team." This
24   is after having gone through the interview process

B031

Page 10

1    with both teams.
2          She said, "Well, it's really a nice group
3    of people. I think you'll fit in well there, and the
4    Exanta team, you know, they've got issues over there
5    with the way they treat people."
6    Q.   Let me stop you for a second. You said before
7    that she said you'd probably be happier going to the
8    Exanta team?
9    A.   Atacand.
10   Q.   Did you mean to say Atacand?
11   A.   I meant to say Atacand if I didn't. Yes,
12   Atacand team.
13   Q.   Did she go into any more detail about what was
14   going on at the Exanta team that she characterized as
15   issues?
16   A.   Yes.
17   Q.   What did she say?
18          MR. NEUBERGER: Yeah. You have to answer.
19   A.   She said that she had been involved in
20   negotiating -- I don't know whether to call it
21   disciplinary action, but management behavior
22   improvement for members of that team, and it became so
23   serious it involved a member of senior management and
24   several members of the team came to her and complained

Page 11

1    about this individual who's no longer on the team.
2    And he was in a management position on the team. And
3    he created, I guess, an environment of non-civility
4    toward one another on the team. And she felt that the
5    team environment was unhealthy.
6    Q.   Did she identify who the person was about whom
7    the complaints were being made?
8    A.   Yes.
9    Q.   Who?
10   A.   David McNinch.
11   Q.   Did she identify the people who had come to her
12   and complained?
13   A.   No, she didn't.
14   Q.   Did she identify the senior management people
15   that were involved?
16   A.   Yes.
17   Q.   Who were they?
18   A.   Adele Gulfo who is the --
19   Q.   Spell that last name.
20   A.   G-o -- G-u-l-f-o or G-u-l-p-h-o.
21   Q.   Anybody else?
22   A.   That's only one that I can recall right now.
23   Q.   Did you speak to anybody else about the
24   situation at the Exanta team before you chose to join?

Page 12

1    A.   No, I didn't. I don't recall that I did right
2    now.
3    Q.   We'll maybe get back to some of that.
4          The second conversation you mentioned was
5    with Georgina Austin Jones. What was discussed during
6    that conversation?
7    A.   In that conversation, it was in December, it
8    was one of the weekly updates with Georgina. Susan
9    Broadway, and Jane Helen would sit in. In this
10   particular situation, Jane Helen did sit in. And I
11   had requested to bring a tape recorder to these
12   sessions because they were misrepresenting my -- my
13   attitude in the sessions, the substantive facts about
14   which we were discussing and my willingness to answer
15   questions. And after repeated experiences like this,
16   in these update meetings, I said, "This is not fair to
17   me because you're putting forward an inaccurate and
18   erroneous description or depiction of my participation
19   in the sessions, so I would like for the record to
20   have an accurate record here, a recording."
21          And I said -- and then, it's not on the
22   tape, but Jane Helen objected. And Georgina Austin
23   Jones said, "I also object." This is what she said on
24   the tape. "I also object. You can't record someone

Page 13

1    if they don't want you to record them."
2          And I said, "Well, if we are all committed
3    to fairness and accuracy and helping me here, I don't
4    understand why you would object to a recording of our
5    discussion." I didn't understand that.
6          And then Georgina grabbed the recorder
7    from me and turned it off.
8    Q.   So this was in a face-to-face meeting?
9    A.   Yes, it was.
10   Q.   You had the recorder there?
11   A.   I put it on the desk.
12   Q.   At the time what you recorded, then, was the
13   discussion about whether you could record the meeting
14   rather than the discussion that took place at the
15   meeting?
16   A.   That's correct, yes.
17   Q.   Let me move on to some other things. We may
18   get back to some of those.
19          Are you seeing any other medical doctors
20   or health care providers at the present time?
21   A.   Yes. Recently, I went back to Dr. Luft, my
22   psychiatrist, just to discuss how I was doing and so
23   she could check on how the medications were working.
24   And I also have been seeing Jonathan Lewis and --

4 (Pages 10 to 13)

B032

Farrell                                   v.                AstraZeneca Pharmaceuticals, LP
Marybeth Farrell                    C.A. # 04-285 KAJ              December 9, 2004

Page 14

1  Q.  Is he a psychologist?
2  A.  Yes.  Yes.  A psychologist, yes.
3  Q.  And who else?
4  A.  I just got a new primary care physician.  When
5  I went to see her for my allergies, I saw the
6  physician's assistant and I can't remember the
7  doctor's name.
8  Q.  Where is the doctor located?
9  A.  In Wilmington.
10  Q.  Where in Wilmington?
11  A.  Their offices are -- I believe they are off
12  Fouk Road.
13  Q.  How long have you been seeing Dr. Luft?  When
14  did you first start seeing Dr. Luft?
15  A.  I went to her in the fall of '03.  I believe it
16  may have been October.
17  Q.  And how about Dr. Lewis?
18  A.  I went to him about the same time.
19  Q.  How did you get to Dr. Luft?
20  A.  I was familiar with the practice, just that it
21  was a good network of psychiatrists, and so I called
22  her.
23  Q.  How about Dr. Lewis?
24  A.  He was recommended to me by a friend.

Page 15

1  Q.  Who's the friend?
2  A.  Anna Hamilton.
3  Q.  Is she a health care provider?
4  A.  No.  She's an investment manager.
5  Q.  Do you have any medical problems at present?
6  Obviously you have some allergies, I guess, but that
7  aside.
8  A.  Yes.  I have had considerable problems with my
9  back and nerve problems in my right leg in particular,
10  especially when I was commuting to New York.  I
11  started losing feeling in my right leg almost totally
12  which was very frightening.  It's improved now that
13  I'm not commuting back and forth to New York, but I
14  still have back discomfort.  I have to be careful
15  about what I do and I'm not able -- I'm not back at
16  sort of the level I was before I started having the
17  problems with my back.
18  Q.  Anything else?
19  A.  No.
20  Q.  Are you seeing a doctor for the back problems?
21  Is that somebody else other than the people we've
22  already mentioned?
23  A.  Yes.
24  Q.  Who are you seeing for the back problems?

Page 16

1  A.  Dr. Peter Vitanzo with the Rothman Institute
2  and I also went for physical therapy for several
3  months, Barley Mill Rehabilitation on Lancaster
4  Avenue.  So the last time I saw Dr. Vitanzo was about
5  maybe two months ago at most.  And he said, you know,
6  keep doing the physical therapy exercises because they
7  really do make a difference in keeping pain from
8  recurring, and there appears to be some kind of a
9  nerve problem.  So I do those almost every day.  And
10  he said, if you have any problem, you know, call me,
11  stay in touch, but just keep doing the physical
12  therapy exercises.  So that's what I've been doing.
13  Q.  Where is the Rothman Institute?
14  A.  It's -- well, they have several offices.
15  Q.  Where is his office?
16  A.  His office is in both Philadelphia, Vorhees,
17  New Jersey, and King of Prussia, so that he is in
18  three of their offices.
19  Q.  Where do you see him?
20  A.  Mostly in Philadelphia and once in King of
21  Prussia.
22  Q.  How did you get to him?
23  A.  I requested information on an orthopedic
24  specialist or a back specialist and --

Page 17

1  Q.  From whom did you request that?
2  A.  I asked information from I believe it was John.
3  Q.  John LaRosa?
4  A.  Yes.
5  Q.  So just to be clear on this, you were referred
6  to Dr. Vitanzo by your lawyers?
7  A.  No.  John actually recommended another
8  physician whose name I don't have.  I have it written
9  down.  I could certainly get it.  And when I called
10  them, that doctor was not taking any new patients.  So
11  I said, "I don't know anything about back problems,
12  but I have some kind of an issue."  I explained what
13  the problem was.  So the nurse or whoever answered the
14  phone at this other physician's office recommended
15  that I call the Rothman Institute.  There was no
16  doctor recommended.
17      So I called the Rothman Institute, and I
18  explained my problem.  And I said I would like to get
19  in to see someone as soon as possible.  And they said,
20  "Well, Peter Vitanzo has an opening."  So I went to
21  see him.
22  Q.  Let me get to the tough questions now.  How old
23  are you?
24  A.  45.

5 (Pages 14 to 17)

B033

Farrell                                    v.                    AstraZeneca Pharmaceuticals, LP
Marybeth Farrell                    C.A. # 04-285 KAJ                      December 9, 2004

Page 18

1    Q.   What's your birth date?
2         MR. NEUBERGER:  Could we just give that to
3    you off the record?  I notice that the courts these
4    days are into keeping birth dates and Social Security
5    numbers.  We are just off the record.
6         (Discussion off the record.)
7    BY MR. SANDLER:
8    Q.   What's your marital state?
9    A.   Divorced.
10   Q.   When were you divorced, what year?
11   A.   I believe it was 1996.
12   Q.   Is Farrell your maiden name?
13   A.   Yes.
14   Q.   What was your married name?
15   A.   Marybeth Farrell Joe, J-o-e.
16   Q.   J-o-e?
17   A.   Mm-hmm.
18        (Discussion off the record.)
19   Q.   Do you have any children?
20   A.   No.
21   Q.   You had an operation in June of 2003, is that
22   right?
23   A.   It was in May, May 9.
24   Q.   Did that affect your ability to have children?

Page 19

1    A.   Yes, it did, which was very traumatic for me.
2    Q.   Did you want to have children?
3    A.   Yes.
4    Q.   Am I correct you can't have children now?
5    A.   Correct.
6    Q.   Do you have any other dependents?
7    A.   Two cats.
8    Q.   Any parents?
9    A.   My mother is alive, yes.
10   Q.   But she's not a dependent?
11   A.   She's not a dependent.
12   Q.   How old is your mother?
13   A.   70.
14   Q.   Where do you live?
15   A.   Rockford Tower Condominiums in Wilmington.
16   Q.   How long have you lived there?
17   A.   Almost five years.
18   Q.   Did you ever have any problems receiving mail
19   there?
20   A.   Mail?
21   Q.   Yeah.
22   A.   Not that I'm aware of.
23   Q.   Are you employed at the present time?
24   A.   Yes, I am.

Page 20

1    Q.   Where?
2    A.   GlaxoSmithKline.
3    Q.   Where is that located?
4    A.   I'm in the King of Prussia offices.
5    Q.   When did you obtain that employment?
6    A.   In June of '04, this year.
7    Q.   What's your job title?
8    A.   Director of global public relations for
9    cardiovascular.
10   Q.   After you left AstraZeneca did you have another
11   job before that job?
12   A.   Yes, I did.
13   Q.   What was that?
14   A.   Burson Marsteller public relations in New York.
15   Q.   What was your position there?
16   A.   Director of the health care practice.
17   Q.   When did you get that job?
18   A.   The offer was made to me, I believe, in early
19   February, and I started March 1.
20   Q.   When did you leave AstraZeneca?
21   A.   Toward the end of January '03.  I'm sorry.
22   '04.
23   Q.   What's your salary at Glaxo?
24   A.   135,000 annually.

Page 21

1    Q.   What was it at Burson?
2    A.   165 annually.
3    Q.   How about at AstraZeneca?
4    A.   Was it 94 approximately plus bonus?
5         I also will get a bonus at Glaxo, but I
6    don't know what it will be.
7    Q.   What was it typically at AstraZeneca?
8    A.   I think my last one was $25,000, 22,000.
9    Q.   Is that the highest bonus you received?
10   A.   Yes.
11   Q.   Would you have gotten a bonus at Burson also?
12   A.   Yes.
13   Q.   Had you worked for Burson before?
14   A.   Yes.  I worked in their Washington, D.C.
15   office.
16   Q.   But not for Glaxo?
17   A.   No.
18   Q.   How did you obtain the Glaxo position?
19   A.   I got a call from head hunter, and that was how
20   I learned about it.
21   Q.   When was that call received?
22   A.   March or April I believe.
23   Q.   While you were working at Burson?
24   A.   Yes.

6 (Pages 18 to 21)

B034

Farrell                                    v.                 AstraZeneca Pharmaceuticals, LP
Marybeth Farrell                    C.A. # 04-285 KAJ                     December 9, 2004

Page 22

1    Q.   What caused you to leave Burson?
2    A.   I was commuting daily from Delaware to New York
3    and back again at night.  And the job had very long
4    hours, being an agency, and while I very much enjoyed
5    the work, I usually didn't get home until 11:00 p.m.
6    or 11:30 p.m., and I needed to be on the 6:10 a.m.
7    train.  So I was getting up at 4:00 a.m.  So I wasn't
8    getting a lot of sleep, and I had just no social life
9    at all.  So that was not working out for me, and plus
10   all those hours sitting were exacerbating my back
11   severely.  I just -- I started -- my physical
12   condition in my back went downhill unbelievably
13   quickly.  That was when I started losing feeling in my
14   leg.
15   Q.   How many days a week, by the way, did you work
16   at Burson?
17   A.   Five.
18   Q.   You didn't work Saturday or Sunday?
19   A.   Unless I brought work home, no.
20   Q.   So you weren't commuting to New York Saturday
21   or Sunday?
22   A.   No, I wasn't.
23   Q.   Why were you getting up at four for a six
24   o'clock train?

Page 23

1    A.   Well, because I have a routine in the morning.
2    I like to try to go out and do a little walking.  And
3    that was just the amount of time that I need.  Put the
4    coffee on.  Take a shower.  You know, it's just I
5    am -- everyone has their own morning routine.
6    Q.   How long did it take you to get to the train
7    station from where you lived?
8    A.   15 minutes or so approximately.
9    Q.   Would it be fair to say that, if you changed
10   your routine, you could have saved yourself some time
11   in the morning and didn't have to get up at four?
12   A.   What do you mean change my routine?
13   Q.   I mean, if you just got up, took a shower and
14   went to the train station, instead of doing these
15   other things.
16   A.   Well, I didn't walk every day.  That was one of
17   the issues of commuting.  I wasn't able to fit my
18   usual walk-out routines.  And, no, I wasn't going to
19   change my routine.
20   Q.   I understand that, but if you had changed it,
21   would you have been able to sleep later?
22   A.   Probably till 4:30.
23   Q.   Okay.
24   A.   Extra half hour.

Page 24

1    Q.   When you got to New York, how did you get to
2    your office?
3    A.   I took a cab.
4    Q.   Where was the office?
5    A.   On Park Avenue.
6    Q.   And what cross street?
7    A.   19th.
8    Q.   Were you going to Penn Station?
9    A.   Yes.
10   Q.   Are the benefits you're receiving currently at
11   Glaxo similar to the benefits you were receiving at
12   AstraZeneca?
13   A.   Yes.
14   Q.   Is that also true with Burson?
15   A.   Yes.
16   Q.   Was there any time when you were without health
17   insurance?
18   A.   Yes.
19   Q.   When?
20   A.   From cancellation of my AstraZeneca policy
21   after -- shortly after I left, I believe sometime in
22   February, it was cancelled until I went to Burson,
23   March -- March.  In May.  I'm sorry.  March.
24        I'm sorry.  No.  No.  It is May because

Page 25

1    you had to be with Burson Marsteller for two months.
2    They had a policy --
3    Q.   Waiting period?
4    A.   Waiting period.  So my health insurance with
5    them didn't activate until May.  So I was without
6    health insurance from February through May.
7    Q.   Did you sustain any expenses as a result of
8    that?
9    A.   Yes, I did.
10   Q.   What were they?
11   A.   I was attending physical therapy several times
12   a week.  I made one or two visits to Dr. Vitanzo.  I
13   was seeing my psychologist, and I had to pay for my
14   prescriptions myself.
15   Q.   Do you have a total of what the expenses, the
16   out-of-pocket costs were?
17   A.   For what?
18   Q.   That you had to pay yourself rather than being
19   covered by health insurance?
20   A.   For all combined or seeing the psychologist
21   visits, the --
22   Q.   Yeah.  The total?
23   A.   -- physical therapy, the prescriptions?
24        About $3,000.

7 (Pages 22 to 25)

B035

Page 26

1    Q.   How much, $3,000?
2    A.   $3,000.
3    Q.   Just to make sure I got this covered, did you
4    have any other employment other than what we've
5    already talked about from the time you left
6    AstraZeneca -- after the time you left AstraZeneca?
7    A.   No.
8    Q.   How about other income, did you do any
9    contracting, independent contracting?
10   A.   No.
11   Q.   What's your education?  What's the highest
12   level of education, the degree that you have?
13   A.   A master's degree.
14   Q.   What?
15   A.   Master of arts in public policy concentration,
16   Georgetown.
17   Q.   When was that?
18   A.   I got that in 1999.
19   Q.   And how about undergraduate?
20   A.   Bachelor of arts in communications,
21   concentration in journalism, University of Delaware,
22   1981.
23   Q.   Have you taken any continuing education
24   courses?

Page 27

1    A.   Yes.
2    Q.   Where?  When?
3    A.   Most recently at AstraZeneca for medical
4    education, regulatory compliance, which was offered
5    through AstraZeneca.  I completed that, and that was
6    considered continuing education.  And I also had
7    completed a program at George Washington University
8    which was publications specialist and publications
9    management.  That was when -- I think I probably
10   finished that in the late 1980s.
11   Q.   Going back for a second about the conversation
12   you had with Renee Valles about the Exanta team, did
13   she identify people within the Exanta team that were
14   particular problems?
15   A.   Other than David McNinch, no.
16   Q.   Did you ever deal with David McNinch when you
17   were on the Exanta team?
18   A.   Yes.  David and I knew each other from a mutual
19   friend at AstraZeneca, John Doyle.  And David and I
20   actually got along very well, and I thought very well
21   of him.
22   Q.   Did you ever have any problems getting along
23   with him when you joined the Exanta team?
24   A.   No.

Page 28

1    Q.   Now, my records indicate that you became
2    employed by AstraZeneca on February 4, 1994.  Does
3    that sound right?
4    A.   Yes.
5    Q.   And why don't you quickly go over where you
6    worked before that?  I know you worked at Burson
7    Marsteller.  Where else?
8    A.   Ketchum Public Relations in Washington, D.C.
9    Q.   Was that the job you held just before
10   AstraZeneca?
11   A.   Correct.
12   Q.   Were you employed there, actively employed,
13   when you accepted the AstraZeneca job?
14   A.   Yes.
15   Q.   So you weren't out of a job?
16   A.   No.
17   Q.   Where else?
18   A.   Tracking back, Ketchum.  Prior to that was
19   Burson Marsteller in Washington.  Prior to that was
20   States News, a wire service in Washington.  Prior to
21   that was the Daily Local News in Chester County.
22   Prior to that the Philadelphia Inquirer.  And then we
23   are going back to the years after I graduated college
24   and I had worked at the U.S. Catholic Conference for

Page 29

1    several years as project manager, and then I spent a
2    year on Capitol Hill as an administrative assistant.
3    Q.   Were your early years spent as a reporter?
4    A.   Yes.  In the sense that I was on the -- I wrote
5    for the review newspaper of the University of
6    Delaware.  When I graduated college, I went to
7    Washington, and I worked on Capitol Hill.  Then I
8    worked on the U.S. Catholic Conference, writing and
9    editing.
10          Then I specifically wanted to go to
11   journalism at that point.  At that point I went to the
12   Philadelphia Inquirer, then to the Daily Local News,
13   then to Washington to work for a wire service.
14   Q.   So were you functioning as a reporter in all
15   those jobs that you just mentioned?
16   A.   Yes.
17   Q.   And how about Burson Marsteller in Washington,
18   what did you do there?
19   A.   I was an account supervisor in the
20   environmental practice group reporting to the
21   executive vice-president and a vice-president.  And I
22   managed a variety of accounts, corporate accounts.
23   Q.   So that was a change from your previous jobs?
24   A.   That's a significant change.

8 (Pages 26 to 29)

B036

Farrell                                                    v.                    AstraZeneca Pharmaceuticals, LP
Marybeth Farrell                              C.A. # 04-285 KAJ                        December 9, 2004

Page 30

1   Q.   Describe the change.
2   A.   Well, when I was in college, I had worked for a
3   public relations agency that the University of
4   Delaware started, and so I was familiar with the
5   public relations agency environment, and I enjoyed it.
6   I liked it.
7        When I left journalism, I went from the
8   wire service to Burson Marsteller and the change --
9   can you define what you mean by "describe the change"?
10  I'm not clear on exactly what you are looking for.
11  Q.   Well, at least what I envision as being a
12  reporter is getting news and writing about it, and it
13  sounds like, if you're doing public relations, you're
14  doing something different.  So I was just curious.  I
15  mean, I want to make sure that I'm not
16  mischaracterizing the early jobs or the later jobs.  I
17  just want to understand what the differences were in
18  what you were doing.
19  A.   Okay.  Well, I had done promotions, public
20  relations, project management work at U.S. Catholic
21  Conference.
22  Q.   Okay.
23  A.   Before I went into journalism.  I went through
24  a career change because I desired to be a journalist.

Page 31

1   I was already familiar with project management and
2   campaigns, public relations campaigns, how to organize
3   and run those.  Because I was a writer, I did a lot of
4   writing for the clients that I was responsible for
5   essentially because I enjoyed writing.  And so they
6   had me do that in addition to the project management.
7   Q.   Was the work that you did at Ketchum similar to
8   what you did at Burson Marsteller?
9   A.   Yes.  Very similar.  It was a senior account
10  supervisor position, and I was responsible for helping
11  them to open and build their environmental practice.
12  That was a very attractive and exciting career
13  opportunity for me at the time.
14  Q.   How did you come to AstraZeneca?
15  A.   I got a call from a head hunter, and it was for
16  a position as a writer/editor, which, as I told the
17  vice-president of public affairs, Alan Milbauer who I
18  interviewed with, I wasn't very excited about the job.
19  So he said, because they were now -- after the merger,
20  they were looking to build a public policy practice,
21  and he saw me as leading that practice, linking it to
22  Washington because of my experience and that I would
23  have a lot of room to grow.  They were very
24  enthusiastic, and I liked the people.

Page 32

1        And at that time I was married.  And my
2   husband and I were going to start a family, have
3   children.  He was in graduate school in Washington.
4   My family is here.  Wesley was doing a lot research,
5   and he was doing post-graduate work.  So he is -- I
6   wanted to be around my mother.  If I had children, I
7   wanted to be around my mother and my sister.
8        So this, to me, was a very wonderful
9   opportunity to come back to Delaware, be around my
10  family, have a good career opportunity, but be able to
11  focus on starting a family.
12  Q.   When did you say you were divorced?
13  A.   '96.  I believe it was late '95.
14  Q.   So not too long after you became employed by
15  AstraZeneca and moved to Delaware?
16  A.   Correct.
17  Q.   Did your change of geographic location have
18  anything to do with your marital problems?
19  A.   Yes.
20  Q.   How so?
21  A.   Well, ideally, Wesley was going to commute back
22  and forth to Washington.  He was teaching at
23  Georgetown and doing his Ph.D.  So a lot of his work
24  and his research could be done at home.  But when that

Page 33

1   played out into day-to-day life, he was spending
2   almost all of his time in Washington by necessity.
3   And it did put a strain on our marriage.
4   Q.   Was there a time that I think you -- we'll get
5   into this more in detail later -- that you allege you
6   had some kind of a relationship with someone at
7   AstraZeneca?
8   A.   Yes.
9   Q.   When was that?
10  A.   That was shortly after I got divorced.
11  Q.   About what time, '97?
12  A.   I'm trying to think.  I -- probably sometime in
13  '96.
14  Q.   Did that contribute to your divorce?
15  A.   No.  I was already divorced.
16  Q.   Take me through the various jobs that you had
17  at AstraZeneca.  You said the first one was as a
18  writer?
19  A.   Mm-hmm.
20  Q.   Did you report to Alan Milbauer, or did you
21  report to someone through a chain to Alan Milbauer?
22  A.   I reported directly to Alan Milbauer and I
23  reported also in to Steve Lampert.
24        Now, the way it worked out was that I had

9 (Pages 30 to 33)

B037

Farrell                                                    v.                        AstraZeneca Pharmaceuticals, LP
Marybeth Farrell                              C.A. # 04-285 KAJ                                    December 9, 2004

Page 34

1    a direct line through Steve Lampert who was the
2    director of communications, but I also worked directly
3    with Alan about 75 percent of the time. I spent very
4    little time in my department, but for my reviews,
5    Steve Lampert would do my reviews and that was the
6    direct line of reporting relationship on paper.
7        Q.   How long did you stay in that job?
8        A.   That job was probably maybe about a year with
9    the title writer/editor, but I was already starting
10   working during that year on public policy work at the
11   same time.
12       Q.   Also working with Alan Milbauer?
13       A.   Yes.
14       Q.   And how long did you continue in that position?
15       A.   What position? The writer/editor or public
16   policy?
17       Q.   The what I guess evolved into a public policy
18   position.
19       A.   Five years.
20       Q.   So 1999 or so, 2000?
21       A.   Mm-hmm.
22       Q.   Which one?
23       A.   1999.
24       Q.   Then where did you go?

Page 35

1        A.   At the merger -- that was the time of the
2    merger, 1999, 2000 -- I moved to the Nexium team and
3    moved into marketing.
4        Q.   Had you not done marketing before?
5        A.   I worked directly with, and sat on a number of
6    marketing teams by virtue of the position I held at
7    Zeneca, but I had not been in the marketing team
8    before.
9        Q.   Who was your immediate supervisor on the Nexium
10   team?
11       A.   Lois Brothers.
12       Q.   To whom did she report?
13       A.   Lois reported to Lisa Schoenberg.
14       Q.   And how long did you remain on the Nexium team.
15       A.   One year.
16       Q.   Then where did you go?
17       A.   I went to the field professional relations in
18   education programs group.
19       Q.   Who was your immediate supervisor there?
20       A.   Amy Renk.
21       Q.   And who did you work with?
22       A.   Dave Ilconich, I-l-c-o-n-i-c-h.
23       Q.   And when did you start reporting to Amy Renk
24   and when did you stop reporting to Amy Renk?

Page 36

1        A.   I started reporting to Amy Renk in 2001, and I
2    stopped reporting to her in April of 2002, I believe,
3    as well as I can recall right now.
4        Q.   Did you change jobs in April 2002, or did Amy
5    Renk leave the position she had?
6        A.   At that time I changed jobs and moved into
7    senior professional relations position with the Exanta
8    team.
9        Q.   Who did you report to there, immediately?
10       A.   I originally reported to Jane Helen, who was
11   the brand director.
12       Q.   How long did you report to Jane Helen? How
13   long was she your immediate report?
14       A.   Five to six months.
15       Q.   Then what happened?
16       A.   Then a brand promotions leader was hired, Brian
17   Martin, to coordinate and pull together the
18   professional relations, medical education, promotions,
19   and publications teams because the work was expanding.
20   So Jane Helen had other things that she was working on
21   besides just -- just managing us, the medical
22   education, professional relations staff.
23       Q.   So tell me again when Brian Martin started to
24   the best of your recollection?

Page 37

1        A.   It was August or September, 2002.
2        Q.   Had you known him before that?
3        A.   No.
4        Q.   Where does Debby Brangman fit into this?
5        A.   Debby Brangman succeeded Renee Valles in the
6    position as cardiovascular communications director or
7    some similar title. So we were in the brand team, the
8    function -- which was called the functional group.
9    And then they had a skill center director in like a
10   central operations group. And so Renee Valles and
11   then Debby Brangman sat in that position.
12       Q.   In the skill center?
13       A.   Yes. So I reported directly to Jane Helen, of
14   course, and then Brian Martin, but then you also have
15   a dual reporting relationship with this person in the
16   skill center which was Renee Valles first and then
17   Debby Brangman. So basically they serve as resources
18   for best practices in all the cardiovascular teams.
19   They are resources for staff. If you have an issue,
20   you can go to them for help. They sort of check on
21   the teams and see how things are going.
22       Q.   Did you more regularly work with Debby Brangman
23   or Brian Martin?
24       A.   Brian Martin.

10 (Pages 34 to 37)

B038

Page 38

1   Q.  Did you also work more regularly with Jane
2   Helen when she was in the direct reporting situation
3   than with Debby Brangman or Renee Valles?
4     A.  Yes.  For the day-to-day operations and work of
5   the brand teams, we all worked together.  And the
6   individuals like Debby Brangman, Renee Valles, you
7   might see them once a month.  Once every two months
8   they might sit in on team meetings.  But there was no
9   day-to-day interaction there at all.
10    Q.  When did you first meet Jane Helen?  Did you
11  know her before you began reporting to her?
12    A.  No.
13    Q.  So is it correct that infers you met her first
14  when you started reporting to her?
15    A.  When I was interviewing, she and David McNinch
16  interviewed me and hired me.
17    Q.  Again, when was that approximately?
18    A.  I start in April -- I believe, as best I can
19  recall, that I started interviewing there in January
20  of '02.
21    Q.  During this chunk of five months or so when you
22  were directly reporting to Jane Helen, how did you get
23  along with her?
24    A.  Great.  I thought very highly of her.

Page 39

1   Q.  How about after she became a second level
2   report, did things change or did you still get along
3   with her?
4     A.  I still got along with her, but Brian Martin
5   was brought in for us to report in to directly.  So I
6   didn't see her as much.
7     Q.  Did you ever hear Jane Helen criticize people
8   because they took medical or family leave?
9     A.  She made a comment in a meeting teleconference
10  we were having --
11          MR. NEUBERGER:  Go ahead.
12    A.  -- with Christy Hedrickson who was on the
13  global Exanta team.  And Christy had just had a baby.
14  And when she came on the line, Jane rolled her eyes,
15  and said, "Oh, does everyone have their blankie?"
16  Very sarcastically.  And everyone started laughing.
17  And Christy seemed to be very embarrassed.  I couldn't
18  believe Jane said that, actually.
19    Q.  When was that?
20    A.  It was in early 2003 as best as I can recall
21  right now.
22    Q.  You say that this was during a telephone
23  conversation?
24    A.  Mm-hmm.

Page 40

1   Q.  Were you on the phone or were you there in
2   person?
3     A.  There were several of us in a conference room
4   around a table, and there was a speaker phone in the
5   middle of the table.
6     Q.  So tell me first who was there in the room.
7     A.  Obviously Jane Helen, myself.  Jane Clark might
8   have been there.  Susan Broadway was there.  David
9   McNinch might have been there.
10          That's all I can recall right now.
11    Q.  Who was on the telephone?
12    A.  Christy.
13    Q.  Any other remarks made by Jane Helen that
14  suggested to you that she was criticizing people for
15  taking medical or family leave?
16    A.  Not that I can recall right now.
17    Q.  When did you first meet Susan Broadway?
18    A.  After I started on the Exanta team.
19    Q.  Was she already on the team?
20    A.  She was already on the team.
21    Q.  You didn't know her before that?
22    A.  No.
23    Q.  And for a period of time you and Susan Broadway
24  were peers, is that correct?

Page 41

1     A.  That's correct.
2     Q.  What was her role?
3     A.  She was a senior public relations and education
4   manager, but since she had been there longer, she --
5   Susan would often direct meetings that we were having
6   as peers, as colleagues.
7     Q.  Did you resent that?
8     A.  I felt -- I didn't resent it.  I felt that
9   Susan -- let me just leave it at that.  I did not
10  resent it, no.
11    Q.  Well, you hesitated.  I was just curious as to
12  why.  What is it about it that you didn't like, if
13  anything?
14    A.  Susan didn't want to hear other people's ideas.
15  So whatever her ideas were, that was what, you know,
16  we would have to focus on.
17    Q.  Did you ever hear Susan Broadway criticize
18  anyone for taking medical or family leave?
19    A.  No.
20    Q.  How did you get along with Susan Broadway while
21  you were peers?
22    A.  Very well.
23    Q.  Did that change after she became your
24  supervisor?

11 (Pages 38 to 41)

B039

Farrell                                    v.                AstraZeneca Pharmaceuticals, LP
Marybeth Farrell                    C.A. # 04-285 KAJ                    December 9, 2004

Page 42

1   A.  No.
2   Q.  Continued to get along well, very well?
3   A.  Yes.  We got along well.
4   Q.  Was Susan Broadway someone who paid attention
5   to detail?
6   A.  What do you mean by that?
7   Q.  Well, there are some people who tend to be more
8   oriented towards the details of matters than others.
9   Some tend to have more of a removed approach.  As
10  between those two extremes, I'm trying to see if you
11  can tell me if she tended to pay attention to detail?
12  A.  No.
13  Q.  She didn't pay attention to detail?
14  A.  No more than anyone else on the team.
15  Q.  Did she take notes at meetings you attended?
16  A.  What meetings?
17  Q.  Any meeting.
18      Well, rather than say any meeting, was it
19  her general practice to take notes at meetings?
20  A.  Yes.  She took notes at meetings.  Everyone on
21  the team did.
22  Q.  When you were reporting to Brian Martin, did
23  you get along all right with him?
24  A.  Yes.

Page 43

1   Q.  And did you ever hear him criticize people for
2   taking medical or family leave?
3   A.  No.
4   Q.  Did you get mid-year reviews?
5   A.  In 2003, I did.
6   Q.  How about before that?
7   A.  No.  It did not happen in 2002.
8   Q.  And you say you did get one in 2003?
9   A.  Yes.
10  Q.  In writing?
11  A.  Yes.
12  Q.  It was actually called a mid-year review?
13  A.  Yes.
14  Q.  Who did the mid-year review in 2003?
15  A.  Susan Broadway.
16  Q.  When did that mid-year review -- when did you
17  see that mid-year review?
18  A.  It was July 3rd, 2003.  As best I can recall,
19  it was setting the -- updating 2003 objectives and
20  also serving as a mid-year review.
21  Q.  And in 2002 you said you didn't have a mid-year
22  review but you had a year-end review?
23  A.  Correct.
24  Q.  And did Brian Martin play a role in preparation

Page 44

1   of the year-end review for 2002?
2   A.  I don't honestly know the answer to that
3   question.  I think I would say yes because I was
4   directly reporting to him for a few months toward the
5   end of that year but had been reporting directly to
6   Jane Helen earlier.  So I think the two of them
7   together, yes, they developed the review.
8   Q.  Did Debby Brangman also have a role so far as
9   you know?
10  A.  Yes.
11  Q.  Before the year 2003, did you have any health
12  problems at AstraZeneca other than colds and such?
13  A.  No.  Not that I can think of.
14  Q.  Did you ever take Family Medical Leave Act
15  leave before 2003 at AstraZeneca?
16  A.  No.
17  Q.  Were there periods while you were working at
18  AstraZeneca when you had bulimia?
19  A.  While I was working at AstraZeneca?
20  Q.  Yes.
21  A.  Not that I can recall.
22  Q.  How about anorexia?
23  A.  No.
24  Q.  Was there some earlier period when you had

Page 45

1   anorexia?
2   A.  In college I had problems with that, yes.
3   Q.  How about bulimia?
4   A.  It was more bulimia than anorexia.  I don't
5   think I ever became anorexic, but it was one of
6   those -- which is a recurrent problem today with
7   thinness with -- especially, you know, young girls.
8   At that time in my life in college, I struggled with
9   that.
10  Q.  And just so we are clear, what was it that was
11  going on?  How would you characterize the symptoms?
12  A.  Of?
13  Q.  Of whatever it is that you had, if it wasn't
14  anorexia, if it was bulimia, what was the problem?
15  What was it that you were doing?
16  A.  I didn't want to eat, and if I did eat
17  anything, I purged it.
18  Q.  And did that manifest itself in any other time
19  in your life?
20  A.  After I graduated college, off and on for a
21  couple of years.
22  Q.  How about recently?
23  A.  No.  Not that I can recall.
24  Q.  Not while you were working for AstraZeneca?

12 (Pages 42 to 45)

B040

Farrell                                                    v.                          AstraZeneca Pharmaceuticals, LP
Marybeth Farrell                                   C.A. # 04-285 KAJ                                    December 9, 2004

Page 46

1     A.   Not that I can recall right now.
2     Q.   Were there periods while you were working for
3   AstraZeneca when you had a problem with alcohol?
4     A.   No.
5     Q.   Have there been other times when you've had a
6   problem with alcohol?
7     A.   Define what you mean by problem, please.
8     Q.   That you were drinking more than you thought
9   you should be drinking or situations where you
10  couldn't control your drinking or your drinking was
11  affecting your moods?
12    A.   I would say this past year, it's been
13  extraordinarily difficult emotionally and
14  psychologically and physically with the problems with
15  my back.
16         MR. NEUBERGER:  Wait a second.  Is the
17  question related to when you were working at
18  AstraZeneca?  Is that correct?
19         THE WITNESS:  Oh, correct.
20         MR. NEUBERGER:  I think he was asking
21  about while you were working at AstraZeneca.
22         MR. SANDLER:  She worked there sometime
23  this year, so I guess she's answering at least in part
24  that question.

Page 47

1         THE WITNESS:  It didn't pertain to --
2         MR. NEUBERGER:  Excuse me.  He's focussing
3   the question.  He's talking about while you were
4   working at AstraZeneca, and even if you worked there
5   at any time during this year he's asking you, if you
6   would identify a problems you had with drinking.  So
7   with that time period in mind, please give your
8   answer.
9     A.   No.  I wouldn't say problems with drinking.
10  BY MR. SANDLER:
11    Q.   When did the problems with drinking arise?
12    A.   After I left AstraZeneca.
13    Q.   How soon after?
14    A.   Well, there was a time in February when I was
15  taking Lexapro and Xanax, and I also had a very bad
16  cold.  So the cold medicine -- and then I went out to
17  a friend's house and several of us were going out and
18  I had some wine and the combination caused a -- my car
19  was in -- the emergency brake was on, and I didn't
20  realize it.  So my car veered off the curb into a fire
21  hydrant.
22    Q.   Any other?  Was that the only time when you had
23  a drinking problem or did you have drinking problems
24  other times?

Page 48

1     A.   Well, as I explained to Jonathan Lewis, I used
2   to sit on the boards of several organizations in
3   Delaware.  I would be at the gym every night, riding
4   my horse every night, and I didn't sit around and have
5   a glass of wine or two.  And the stress and anxiety
6   that I've experienced from what happened at
7   AstraZeneca, the emotional adjustments that I've been
8   struggling with to start and succeed in new positions,
9   new jobs, and then the anxiety associated with this
10  lawsuit, and my commute now from King of Prussia,
11  there are times when I get home at night and I'll have
12  one or two glasses of wine.  I'm not going to the gym.
13  I'm not riding my horse because I have actually not
14  been able to ride at the level that I was before I had
15  the back problems.  And I have not gotten reinvolved
16  in the community.
17         So to me, okay, I am not happy that this
18  is, you know, a part of my lifestyle now, but the more
19  stabilized my life becomes now with my current
20  position and feeling more secure in the job, I'm
21  finding that I'm re-establishing the routines and
22  habits that I had before I left AstraZeneca.
23    Q.   When you were drinking, first of all, what are
24  you drinking?

Page 49

1     A.   Wine.
2     Q.   And how often are you drinking the wine?
3     A.   Usually on Friday nights I meet friends for
4   happy hour.  Sunday evenings my mother and I go to
5   church and then we go to dinner and I usually have a
6   glass of wine or two at dinner with her and then
7   probably two nights a week sometime in there during
8   the week, if I don't get out to the barn to groom my
9   horse or decide to go to the gym or I have something
10  else to do, particularly if I bring work home, I'll
11  have a glass of wine or two to relax.
12    Q.   What's the most wine that you have glass-wise?
13    A.   Can you be more specific, please?  Are we
14  talking about in the last year?  Are we talking in the
15  last ten years?
16    Q.   Let's say in the last year.
17    A.   I don't know.  Four glasses of wine over the
18  course of an evening.
19    Q.   Do you drink anything else?
20    A.   No.  Very occasionally I might have a vodka
21  tonic, but very, very rarely, if I'm the out with
22  friends.
23    Q.   Did you ever miss time from work because you
24  drank too much?

Wilcox & Fetzer, Ltd.                    Professional Court Reporters                    (302)655-0477

B041

Farrell                                    v.                AstraZeneca Pharmaceuticals, LP
Marybeth Farrell                   C.A. # 04-285 KAJ                      December 9, 2004

Page 50

1    A.   No.
2    Q.   Did you drink during the day?
3    A.   No.
4    Q.   How long have you had a horse?
5    A.   You mean horse that I have now?
6    Q.   Let's start with that.
7    A.   Okay. Let me think. Almost four years.
8    Q.   That was one horse?
9    A.   It was one horse, Hot Song.
10   Q.   And what's your recreational activity with the
11   horse?
12   A.   It used to be taking a lesson one night a week
13   and riding three other nights of the week plus
14   Saturday and Sunday. So I spent a great deal of time
15   with my horse before my back problem in 2003.
16   Q.   When did the back problem arise?
17   A.   When I went back to work at AstraZeneca early
18   after my third week of required bed rest. I was
19   supposed to have six weeks. My surgeon was very upset
20   with me and encouraged me to stay in bed, but I was so
21   worried about my job, losing my job because of things
22   they said to me before I left that I went back in.
23   And at the end of my first half day, I developed a
24   severe like a cutting pain in my back, in my lower

Page 51

1    back, and it just continued from there.
2    Q.   Now, just for the record, what's your horse's
3    name?
4    A.   My horse's name is Hot Song. That was the name
5    he had originally.
6    Q.   Has the name changed?
7    A.   No. I wouldn't change his name.
8    Q.   The reason I asked, you said that's the name he
9    had originally.
10   A.   He was -- his original background is that he
11   was a racehorse, and then his owner sold him, and he
12   was on a farm in New Jersey for about a year and a
13   half and was severely abused. And the woman who
14   rescued him is Patty Downs, and she rehabilitated him
15   at the New Bolton Center, and he's just a very
16   intelligent, sweet animal.
17   Q.   How long have you been riding?
18   A.   Riding? I started riding after I graduated
19   college. So I've been riding for about 24 years.
20   Q.   Have you owned horses before?
21   A.   Well, I have an arrangement with Patty that's a
22   lease, sort of ownership arrangement. She -- because
23   of the money that she spent to rehabilitate him, we
24   sort of share him. But I've never owned -- had a

Page 52

1    stake in a horse like this, before, no.
2    Q.   Did you have some other arrangement before that
3    before the current arrangement with this horse? Did
4    you have some other arrangement with other horses?
5    A.   Yes. I have taken lessons since I was in my
6    twenties and then leased horses for various periods
7    over the last 20 years. So I've always ridden a lot.
8    I really love horses, and that's what I do.
9    Q.   Did you ever have any back problems from riding
10   a horse before?
11   A.   No. Uh-huh.
12   Q.   During your time in AstraZeneca, did you have a
13   copy of the AstraZeneca attendance policy?
14   A.   Yes, I did.
15   Q.   So you knew what you were supposed to do if you
16   were absent from work or late for work?
17   A.   Yes, I did.
18         MR. SANDLER:  Let's take a five-minute
19   break.
20         MR. NEUBERGER:  Yeah. Let's take a break.
21         (Recess taken.)
22   BY MR. SANDLER:
23   Q.   Let's go back to the Exanta project. Tell me
24   when you began working on the Exanta project again.

Page 53

1    A.   As best I can recall, it was, I believe, April
2    or May of 2002.
3    Q.   And what is Exanta?
4    A.   Exanta is a -- launched, according to the
5    original schedule, a first-in-class, oral, direct
6    thrombin inhibitor, anti-coagulant.
7    Q.   So for a layman like myself, it's a better
8    Coumadin; is that a fair way to put it?
9    A.   That's correct. That's correct. It's an
10   anticoagulant.
11   Q.   Meaning blood thinner?
12   A.   Correct.
13   Q.   And although you sort of talked about this, let
14   me just ask you directly. How did you end up joining
15   the Exanta team? How did you come to be interviewed
16   for that?
17   A.   I looked on the AstraZeneca website for job
18   postings and was interested in getting back into
19   direct marketing work. The position I was in under
20   Amy Renk in field PREP was that I worked with the
21   sales teams, I worked with the marketing teams and sat
22   on the marketing teams and served as a resource for
23   the cardiovascular and gastrointestinal sales forces
24   on AstraZeneca policies, regulations, federal

14 (Pages 50 to 53)

Page 54

1  regulations, and compliance for our promotion programs
2  and our medical education programs. So I developed
3  strategic plans for the GI and CV teams, for how they
4  would run in the field with their sales force and
5  trained sale -- sales force training.
6        But I enjoyed working on a marketing team.
7  So, rather than serving more of a hybrid role, I
8  wanted to get back on a marketing team. And I enjoyed
9  working on drug launch because I worked on Nexium.
10 When I heard of the Exanta opportunity, I was very
11 excited. So I sought that out on the website. Then I
12 applied and I was called for an interview.
13   Q.  To whom did you apply?
14   A.  I applied on line. I don't really know who it
15 went to, but I got a telephone call from -- I believe
16 it was Renee Valles first.
17   Q.  Did you meet with her first?
18   A.  Yes.
19   Q.  Anybody else present?
20   A.  No.
21   Q.  Is that when the conversation took place that
22 you described before?
23   A.  That didn't occur until the team made the
24 offer. Apparently there was an offer on the table

Page 55

1  also from the Atacand team, also in cardiovascular. I
2  think she was trying to provide me with some guidance
3  about my next career move.
4    Q.  So, from what I hear you saying, it was your
5  choice whether or not to join the Exanta team; it
6  wasn't something you were assigned to do by the
7  company?
8    A.  That's correct.
9    Q.  How long did the deliberation process take from
10 the time you first were contacted to the time that you
11 actually decided to join the Exanta team?
12   A.  Several months. Three months or so I believe.
13   Q.  After you joined the team, did you find that
14 there were the problems that you were told about, or
15 were you happy there?
16   A.  What do you mean by problems? Could you please
17 define that? I'm not really clear what you're asking
18 me.
19   Q.  I'm just trying to capture what you said you
20 were told. I think you said you were told by Renee
21 Valles that there was -- that there was some internal
22 problems or issues within the Exanta team that didn't
23 exist in the Atacand.
24   A.  Atacand, A-t-a-c-a-n-d.

Page 56

1    Q.  So I'm just asking if your experience when you
2  began at Exanta confirmed what you were told about
3  Exanta, or whether it didn't.
4    A.  It confirmed what I had been told.
5    Q.  What did you find was going on?
6    A.  I'm trying to find the words to try to describe
7  it.
8    Q.  Take your time.
9    A.  Not an especially close team. That could be by
10 virtue of the fact that it was relatively new. I don't
11 know. But intercompetitiveness, I would say, was very
12 dominant on that team.
13   Q.  Was there anyone in particular or any people in
14 particular that were part of that intercompetitiveness
15 or was it true across the board?
16   A.  From my experience, I found that Susan Broadway
17 seemed to -- she focussed very ardently on asserting
18 herself in meetings and taking charge when the PREP
19 managers were meeting. And she -- I will say that she
20 seemed a bit threatened by me in the first couple
21 months certainly.
22   Q.  How did you conclude that?
23   A.  When I would offer ideas in meetings for
24 strategic direction, tactics, she would flatly reject

Page 57

1  anything I said. This went on initially for months.
2  And I had launched two mega brand drugs at
3  AstraZeneca, Nexium and Crestor, and she had never
4  launched a drug, not at AstraZeneca. So her frame of
5  reference and her concepts were not bad, but there was
6  a whole other approach that the company took and
7  strategies that we would apply and audiences, and I
8  was trying to share those. And instead of accepting
9  the ideas for a contribution, she would reject them.
10   Q.  Was there anybody else that you felt was in
11 that competitive mode?
12   A.  Not -- no. Uh-huh.
13   Q.  How many people are on the team?
14   A.  Do you mean when I first started or when I
15 left?
16   Q.  Let's say when you first started and for the
17 first few months.
18   A.  Well, keep to the core commercial team, it
19 split into core commercial, and then you have the
20 medical which are also part of the commercial. So
21 what --
22   Q.  Let's start with the core commercial and then
23 deal with the others separately. How many people were
24 on the core commercial team or group?

B043

Farrell                                    v.                    AstraZeneca Pharmaceuticals, LP
Marybeth Farrell                      C.A. # 04-285 KAJ                     December 9, 2004

Page 58

1    A.   Ten to 12, I would say, as best I can recall.
2    Q.   Then there was a medical component you say?
3    A.   Yes.
4    Q.   When I say that, are we talking about people
5    who are physicians?
6    A.   Correct.
7    Q.   And how many were on that team or group?
8    A.   There were four physicians, a pharmacologist,
9    and a pharm-D.
10   Q.   The kinds of problems that you described, did
11   they also exist in the medical group?
12   A.   Not that I was ever aware of, no.
13   Q.   Who were the physicians and the pharmacologist?
14   What are their names, just so we know?
15   A.   Dr. Jay Horrow.
16   Q.   Right.
17   A.   Dr. Sunita Sheth, Dr. Scott Berkowitz, Dr. Troy
18   Sarich, Dr. Brian Katona.
19   Q.   Are they also physicians?
20   A.   No.  The physicians are Sunita Sheth, Jay
21   Horrow, Scott Berkowitz.  Troy Sarich is a
22   pharmacologist, and I think Brian Katona is a pharm-D.
23   Q.   What's a pharm-D?
24   A.   Pharmacist.

Page 59

1    Q.   Anybody else?
2    A.   I am thinking if there was another one.
3         At that time, no.  We ended up expanding
4    to four, but at that time there were those three
5    principally.
6    Q.   You've referred to an acronym, PREP?
7    A.   Mm-hmm.
8    Q.   What does that stand for?
9    A.   Professional relations and education programs.
10   Q.   Was that your position?
11   A.   Yes.
12   Q.   And how many other people were PREPs?
13   A.   On the Exanta team?
14   Q.   I'm sorry.  On the Exanta team.
15   A.   Two others.
16        You're talking about when I initially
17   started?
18   Q.   Yeah.  Let's start with that.
19   A.   Two.  Louise Colburn and Susan -- at that time
20   her name was Pritchard.
21   Q.   Susan Broadway?
22   A.   Sue Broadway.
23   Q.   Probably better to call her Broadway.  That is
24   her married name?

Page 60

1    A.   Correct.
2    Q.   Although I understand that some of the
3    documents refer to her as Pritchard.
4    A.   Correct.
5    Q.   And what were your roles?  What did you do and
6    what did they do?  Were they parallel?  Tell me about
7    that.
8    A.   They were parallel positions.  We were peers.
9    The three roles were split up for individual
10   responsibility for targeted customer segments.  So
11   initially, I was responsible for cardiologists and
12   internists.  And Louise Colburn was in charge of the
13   congresses or the associations like the American Heart
14   Association, the American College of Cardiology,
15   planning what the brand presence would be on their
16   annual meeting.  Were we going to have symposia?  Were
17   we going to sponsor special events?  Would we have
18   banners or placards on buses?  Things like that.
19   Q.   So you focussed on the individual physicians in
20   certain specialties, and she was in charge of
21   associations?
22   A.   Louise Colburn, yes.
23        And then Susan Broadway had principal
24   responsibility for a customer segment called -- well,

Page 61

1    anti-coagulation clinics.  And this was a network of a
2    thousand targeted anti-coagulation clinics in the
3    country where our largest patient base of Warfarin
4    users existed.
5    Q.   What's that?
6    A.   That's a blood thinner.  Coumadin,
7    C-o-u-m-a-d-i-n.  It's a blood thinner, anticoagulant.
8    It was going to be the brand's target competition.
9    Q.   In dealing with these three segments, let's
10   call them, as you've identified, what was the goal?
11   What were you supposed to be doing?
12   A.   When I joined the team, we were at that time
13   providing medical grants upon request from external
14   sources like a university research system, an
15   investigator, medical investigator, strategic planning
16   for medical symposia, advisory boards, and other
17   communications and education.  We also -- the team did
18   not have at that early stage a database of what we
19   call key opinion leaders.  We refer to them as KOLs.
20   So that was a very big project, to build that
21   database, because that's who we would send the
22   invitations to, to advisory boards and special events
23   and whatnot.
24        And we also were working to standardize

16 (Pages 58 to 61)

B044

Page 62

1  how advisory words were done because Susan did them
2  one way, Susan Broadway.  Louise Colburn did them one
3  way.  And then I had my own way of doing them, which
4  were all very similar, but there was inconsistency.
5  And then Brian Katona who was a pharmacist, with
6  his -- medical scientist, field scientist had another
7  way of doing them.  So basically after Brian Martin
8  joined the team, he said, "We've got to standardize
9  everything, and we've got to get everybody doing the
10 same thing here."
11        So that became something that I was
12 charged to work on, to develop this procedures guide,
13 to standardize how advisory boards were run.
14        And at that time I also was responsible
15 for the -- we had an elite group of advisors, medical
16 advisors, called the advisory and consultancy team,
17 and I was put in charge of that.  And so I planned an
18 advisory board with the group and team senior
19 management.
20 Q.  Was some person in particular in charge of
21 developing the key opinion leaders information?
22 A.  Yes.  Louise Colburn was put in charge of that
23 project.
24 Q.  And when were you asked to develop, let's call

Page 63

1  it, a template for the advisory board?
2  A.  Jane Helen and I had discussed it on several
3  occasions, and when Brian came on board, he and I had
4  discussed it.  And then in December, he sent me an
5  e-mail asking that I make this a priority and get this
6  written and drafted and provided to him and Jane.
7  Q.  Did you work with Brian Martin on that project?
8  A.  Yes.  We worked collaboratively, including Jane
9  Helen.
10 Q.  Was the Exanta project a very important one for
11 AstraZeneca?
12 A.  The Exanta brand team you mean?  You're talking
13 about --
14 Q.  Well, the whole notion of launching Exanta.
15 A.  Yes, it was.
16 Q.  Was it more important than the projects that
17 you worked on before?
18 A.  I'll need you to define time specific as
19 relates to that question.
20 Q.  Did you say you worked on Crestor and Nexium?
21 A.  Mm-hmm.
22 Q.  Was it more important?  Was Exanta regarded as
23 more significant than either of those two or not?
24 A.  I don't understand what you mean by more

Page 64

1  significant.
2  Q.  Well, did the company feel that economically or
3  otherwise that Exanta was, putting it in idiomatic
4  terms, a big deal?
5  A.  Yes.  The company would consider any, quote,
6  mega brand a big deal.  Very important to the bottom
7  line.  But in terms of overall revenues, Nexium was
8  much larger, and Exanta was not as large as Nexium,
9  that's for sure, or Crestor's potential.
10 Q.  How about Exanta's potential?
11 A.  Exanta had mega brand potential.
12 Q.  When you moved to the Exanta team, did you have
13 to learn about a new disease state?
14 A.  I came from cardiovascular.  I had worked on
15 Crestor.  So I was familiar with cardiovascular
16 cholesterol, but when I came to Exanta, I had to learn
17 about the area of thrombosis, anticoagulation, yes.
18 Q.  How did you go about doing that?
19 A.  Well, when I interviewed with Jane Helen, I
20 remember we had a discussion and she was very
21 interested in the skill set I would bring into the
22 PREP group from having launched two mega brands, and I
23 recall she said to me, it doesn't matter that you
24 don't know thrombosis.  You can learn the science, but

Page 65

1  we need to integrate that strategic approach into what
2  we do.
3        And so when I began on the team, she gave
4  me several binders of information, and I read them.
5  Some had CDs, learning modules that were created for
6  physicians.  And I also looked for educational
7  seminars that were sponsored by the team.  So I put in
8  requests for, I believe, three scientific seminars to
9  attend.  And they were being run in Sweden by the
10 global team.  And she rejected those requests and felt
11 that I should just keep reading.
12        A structured educational environment is an
13 optimum way to learn, and it -- you know, they were
14 organizing information from start to finish.
15 Q.  In Sweden?
16 A.  Yeah.  They were held in Sweden.
17        I also did request information on training
18 modules for our field scientists, and they didn't have
19 any.  They hadn't been developed.
20 Q.  Did you receive at least yearly performance
21 evaluations at AstraZeneca?
22 A.  Yes.  And performance reviews.
23 Q.  Is that what they are called, reviews as
24 opposed to evaluations?

17 (Pages 62 to 65)

B045

Page 66

1  A.  Performance reviews.
2  Q.  Just the same thing to me, but we'll call them
3  reviews.
4  A.  Yes.
5  Q.  Did Amy Renk do your review in 2000 or for the
6  year 2000?
7  A.  No.  For the year 2000, I was on the Nexium
8  team.  So that was done by John Doyle.  And then, for
9  year 2001, I was in field PREP, so Amy Renk did my
10  review for 2001.
11  Q.  Did she do two of your reviews or just one?
12  A.  One.
13  Q.  John Doyle did your review for 2000 or in the
14  year 2000?
15  A.  Correct.  John Doyle.
16  Q.  And Amy Renk in 2001.
17  A.  Mm-hmm.
18  Q.  And 2002 I think you said Brian Martin and
19  Debby Brangman and perhaps Jane Helen?
20  A.  And Jane Helen.
21  Q.  How did you get along with Debby Brangman?
22  A.  Very well.
23  Q.  In connection with your reviews, did you have a
24  face-to-face meeting as part of the review?

Page 67

1  A.  Yes.  All reviews that I participated in had
2  face-to-face meetings.
3  Q.  That's when you were presented with the review?
4  A.  Correct.
5  Q.  And it was reviewed with you?
6  A.  Yes.
7      MR. SANDLER:  I got a bunch of documents,
8  and so many that it occurred to me that, rather than
9  actually have them put into the transcript with the
10  deposition, I thought I would just refer to the Bates
11  numbers.
12      MR. NEUBERGER:  And just give copies as
13  you go through?
14      MR. SANDLER:  Right.
15  BY MR. SANDLER:
16  Q.  Well, let me hand you Bates numbered D 146 to
17  149 which looks like the 2001 review, and it says that
18  you need to listen more intently and that you hear --
19  this is on D 148.  You listen more intently, and that
20  you hear but don't understand.  Do you see that?
21  A.  Mm-hmm.
22  Q.  Do you recall that part of your review?
23  A.  Yes, I do.
24  Q.  Did you agree with those observations?

Page 68

1  A.  No, I did not.
2  Q.  Did you talk with Amy Renk about those
3  observations?
4  A.  Other than to say that I disagreed, no.
5  Q.  Did she respond to your disagreement?
6  A.  She said, "Well, that's what I think."
7  Q.  Did you talk about those observations with
8  anybody else other than Amy Renk?
9  A.  Yes, I did.
10  Q.  Who did you talk with?
11  A.  Carmella Placido.
12  Q.  Spell the last name.
13  A.  P-l-a-c-i-d-o.
14  Q.  A female?
15  A.  Yes.  Carmella.  She was the financial manager
16  for field PREP and had the office adjacent to Amy
17  Renk.
18  Q.  Was she at the same level as Amy Renk?
19  A.  She reported to Amy.
20  Q.  And then what was the discussion that you had
21  with her?
22  A.  As the 2001 year was ending, there were three
23  field PREP managers like myself.  And we had split up
24  the therapeutic areas of responsibility.  So I had GI

Page 69

1  and CV.  Another person had respiratory.  Another
2  person had oncology, for example.
3  Q.  GI is what, gastrointestinal?
4  A.  Gastrointestinal and cardiovascular.
5  Q.  What did you -- NCV?
6  A.  GI and CV.
7  Q.  Got you.
8  A.  So my work load was very, very intense.  And
9  the other two managers didn't seem to be very busy a
10  lot of the time.  So just based on sheer numbers, I
11  thought I had -- I felt like I needed an assistant in
12  terms of workload.  And so I ran an analysis in the
13  computers which categorized and segmented out all of
14  the field sales programs that each PREP manager was
15  responsible for supporting.  And that analysis showed
16  that, of the 60,000 programs that have been conducted
17  in 2001, I was supporting about 44,000 by myself.  And
18  that the balance of that, so, say, 16,000, was split
19  between James -- my peer,
20  Q.  James who?
21  A.  James Moux, Moux, and Karen Small, S-m-a-l-l.
22  So each of us handled about -- were responsible for
23  supporting 8,000 programs each.  And I thought, "Now I
24  understand why I feel so busy all the time."

18 (Pages 66 to 69)

B046