Farrell                                  v.                    AstraZeneca Pharmaceuticals, LP
Marybeth Farrell                    C.A. # 04-285 KAJ                        December 9, 2004

Page 70

1    And I went to Amy and requested either a
2 reapportionment of the work load or an assistant. And
3 her response was that it was impossible that I was
4 supporting that many programs, that the balance was so
5 unequal. I said, "Well, here. I'll show you the
6 analysis." It's right here. Computer did it.
7    And she was unaware of that distribution
8 of workload among her staff and seemed a bit
9 embarrassed about it. So I said, "I am just looking
10 for a way to, you know, make sure all the work is
11 getting done, and obviously there's a lot more that
12 I'm responsible here for and we need to reapportion."
13    But she had already done her plans for the
14 year and had already factored that in when she
15 presented to the department head. So I went to
16 Carmella Placido, explained this to her, and said,
17 "Amy refuses to hear what I'm saying because she's
18 already like done her plan for next year. So it was
19 like I'm telling her, and she's listening, but she's
20 not going to understand."
21    And it turns out that Amy had been in her
22 office while I was telling Carmella this and had
23 overheard me. That was the origin for that comment in
24 my opinion. And I felt very badly about it. I wasn't

Page 71

1 talking about Amy. I was seeking Carmella's help, but
2 Amy, I think, took exception. And it was interesting
3 that almost my words verbatim to Carmella are in my
4 review about me.
5    Q.   In the review she also says you should make
6 sure communications are accurate before they are sent.
7 Do you recall that comment?
8    A.   Yes.
9    Q.   And did you discuss that with her?
10    A.   Yes.
11    Q.   What was that about?
12    A.   I put together, at the request of the
13 vice-president for sales, a monthly report, and I
14 interviewed all the cardiovascular -- I went around to
15 all cardiovascular marketing teams, and he wanted to
16 know what everyone was doing because he had no way of
17 pulling this information together. So I would go out
18 and meet with everyone, set up appointments, get all
19 their information about what were they doing at the
20 American College of Cardiology, American Heart
21 Association, et cetera.
22    And I would segment it by product and list
23 all of their programs, all of their sponsorships, any
24 special events they were hosting, dinners. And

Page 72

1 information on this came in from a lot of people. It
2 was a huge amount of work. And I was and still am --
3 I was very exacting in my work. So I do not send
4 things out if they have errors in them, and Amy knew
5 that about me, that I was very much a perfectionist.
6 So I would re-edit and re-review and re-proofread that
7 list, that program every month before I would send it
8 out. And if I got a call from someone as I was, you
9 know, an hour away from sending it out, I would update
10 it with the most up-to-date information because that
11 was what I had been charged with.
12    So I think that -- why she said that, I
13 don't know other than she knew that that would not be
14 something that I would agree with.
15    Q.   Are you saying you thought she put it in there
16 because she didn't think you would agree with it?
17    A.   I don't know why she put it in. It doesn't
18 match the work that I did, nor the evaluations, as you
19 can see, throughout the evaluation itself.
20    Q.   Were you also told that some of your
21 communications were not accurate?
22    A.   No. Other than this.
23    Q.   You were also told in this review that you had
24 overly high expectations?

Page 73

1    A.   Uh-huh.
2    Q.   What does that mean so far as you know?
3    A.   Well, she puts as an example here, as you can
4 see, "example, why she can not have her own
5 assistant." I didn't consider my shouldering 44,000
6 or supporting 44,000 of 60,000 programs and requesting
7 an assistant to be an unrealistically high
8 expectation.
9    Q.   So you think that's what it refers to?
10    A.   Well, she says that it does. She has it as an
11 example.
12    Q.   Well, as an example, but does it refer to
13 anything else as an example?
14    A.   Not that I'm aware of at this time.
15    Q.   Did you discuss it with her?
16    A.   Yes. She did discuss it during the review, and
17 she explained it pretty much just like it's there.
18    Q.   While you were working on the Exanta team,
19 getting back to the Exanta team, were you told at any
20 time that you did too much delegating?
21    A.   Only after I returned from medical leave.
22 Susan Broadway -- actually, it was after I had
23 announced I was going on medical leave, and I have to
24 say the time -- it was after I said I was going out on

19 (Pages 70 to 73)

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

B047

Farrell                               v.                    AstraZeneca Pharmaceuticals, LP
Marybeth Farrell                 C.A. # 04-285 KAJ                    December 9, 2004

Page 74

1  medical leave.  We were developing plans for
2  projections for the next year.  And Susan said that I
3  was requesting information and assistance from my
4  medical education agency and that that was -- I should
5  be doing that myself.
6    Q.  Let's look at D 163 through D 169 which is the
7  evaluation that was done by Brian Martin and Debby
8  Brangman?
9    A.  Mm-hmm.
10   Q.  It mentions that you should expand your
11 knowledge of Exanta.  Do you remember being told that?
12   A.  Well, that was an ongoing objective in terms of
13 new clinical data coming out.  Being in a position
14 like that, working on a new drug launch in particular,
15 there are numerous clinical trial results that emerge,
16 and you have to be up on them.  You have to read them,
17 understand them.
18   Q.  It also says you should understand key brand
19 messages.  Do you know what that means?
20   A.  Where are you referring to?  I'm not -- is this
21 page 6?  Is that what you're referring to, the
22 write-up?
23   Q.  I think it's in there, yeah.
24   A.  Should continue to expand her understanding of

Page 75

1  therapeutic area and clinical trial data.  Yes.
2        She should also work to increase her
3  strategic focus and knowledge of key brand messages.
4    Q.  What does that mean?
5    A.  Well, I think it means exactly what it says,
6  that I was rated as excellent in strategic --
7    Q.  What do you think it -- you say it means what
8  it says.  Then what does it say?  I mean, what is the
9  strategic focus?  What does that mean?
10   A.  I think it's very clear.  I mean, we had --
11 there are strategists who sit on the team for the
12 express purpose of providing strategic direction for
13 messaging, for content development, presentation.
14   Q.  What does key brand messages refer to?
15   A.  This would be the key points that we would make
16 about the brand at any given point in time.
17   Q.  Was your overall rating for 2002 a good one?
18   A.  According to this evaluation and the two
19 face-to-face meetings I had, yes.
20   Q.  Was that rating lower than your rating the
21 previous year?
22   A.  The previous year I was rated excellent.
23   Q.  That's a higher rating than good, isn't it?
24   A.  Yes.

Page 76

1        But good is a very good rating.
2    Q.  It's not bad, right?
3    A.  No.  It's good.
4    Q.  And did you later submit some additions to your
5  2001 evaluation?  I understand we were just talking
6  about 2002, but did you at some point submit additions
7  to the previous evaluations?
8    A.  2001 or --
9    Q.  Yeah.
10   A.  -- or 2002?
11   Q.  I think it was 2001.
12   A.  Not that I can recall right now.
13   Q.  Do you remember submitting some additions to
14 the 2002 evaluations?
15   A.  No.
16   Q.  Let me give you D 153 which is an e-mail from
17 you dated November 25th, 2002, talking about the first
18 paragraph.
19   A.  Yes.  Okay.  I remember this.
20   Q.  What was that all about?
21   A.  I received a special achievement award from the
22 Nexium team for my efforts in launching the drug and
23 because of, you know, leaving the Nexium team and then
24 going to field PREP and very -- you know, job position

Page 77

1  and location moves, I never sent it onward to the
2  human resources department to put in my file.  And so
3  I was going to do that, and I advised them of that.
4        Let me read this.
5    Q.  It's also in the last sentence.  I believe you
6  said something about a brief commentary on 2001.
7        MR. NEUBERGER:  Marybeth, I think when he
8  put these things in front of you, you're going to have
9  to read them before you start answering.  We'll wait.
10 Just make sure you read them before you start
11 answering.
12 BY MR. SANDLER:
13   Q.  I'm talking about the first paragraph, and in
14 particular now the last sentence of the first
15 paragraph.
16        Do you remember what that refers to?
17   A.  Yes.  When I got my review in 2001 from Amy
18 Renk and she had those two comments in there, the one
19 about listening and not hearing and having the example
20 of the unreasonably high expectations, I discussed it
21 with Renee Valles who was the functional, you know,
22 skill center director.  Because that was her role, she
23 played a role in individual people's reviews and to
24 make sure they were being done in compliance with

20 (Pages 74 to 77)

Wilcox & Fetzer, Ltd.         Professional Court Reporters         (302)655-0477

B048

Page 78
1  company policy.
2       And I said, I was, you know, surprised to
3  see that Amy put that in my review because otherwise
4  it was excellent.  And she said, "Well, it's
5  inappropriate and it's against company policy for a
6  manager to surprise you in a performance review
7  without having given you prior notice, and for her to
8  put those statements in your review is inappropriate."
9  She said, "If I were you, I would submit a written
10 commentary on why you believe she submitted those
11 comments."  And she felt it was inappropriate.  That's
12 what that's referring to.
13    Q.  Did you do that?  Did you submit the comments?
14    A.  To be honest, at this moment, I cannot recall.
15 I may have.  I don't know right now.
16    Q.  Okay.
17    A.  It appears that I did from this.
18    Q.  In the same document, you discuss trying to get
19 upgraded to band 5 as a senior PREP manager, is that
20 right?
21    A.  Mm-hmm.
22    Q.  Yes?
23    A.  Yes.  That's correct.
24    Q.  What's band 5?

Page 79
1     A.  It was the band -- a higher level than four.
2     Q.  But if I didn't know what that meant, what's
3  your understanding of the whole structure?  Is that a
4  classification system?
5     A.  Yes.
6     Q.  And what's the difference between band 4 and
7  band 5?
8     A.  At the band 5 level, at the time this memo was
9  written I believe that, or as best I can recall, you
10 would be eligible or employees would be eligible for
11 participation in stock options.
12    Q.  Anything else?
13    A.  It's a more senior level.
14    Q.  Do you get an enclosed office instead of a
15 cubicle?
16    A.  At the time that this memo was written, I don't
17 know.  I believe so.  I'm not sure about that.
18    Q.  Was that your primary motivation, in fact,
19 trying to get upgraded to level 5 so you could get an
20 enclosed office?
21    A.  No.  That was not my primary motivation.  The
22 primary motivation was to receive the job title that
23 had been promised to me along with the relevant
24 compensation.  Secondly, in terms of time, our team,

Page 80
1  the Exanta team was moving into a new building and
2  there were stratifications according to band about
3  where you were -- what kind of an office you would
4  have.  So in the new building, a band 4 would have a
5  cubicle and band 5 would have an inner office.  So it
6  shifted everything one level.  So in the building we
7  were in, a band 5 had a window office, a band 4 had an
8  interior office, and in the building it shifted that.
9  And I was not happy about that at all.
10    Q.  So in the old building you had an office?
11    A.  Yes.
12    Q.  And in the new building you would have a
13 cubicle --
14    A.  If they --
15    Q.  -- when you remained band 4?
16    A.  If they didn't follow through on their promise
17 to me to make me a band 5, yes.
18    Q.  Right.  If you remained at band 4?
19    A.  That's correct.
20    Q.  And who promised to make you a band 5?
21    A.  Renee Valles.
22    Q.  When did that promise occur?
23    A.  At the time of the job offer.
24    Q.  The job offer?  Which job offer?

Page 81
1     A.  The job offer to go to the Exanta team.
2     Q.  Did that take place at the time you had the
3  discussion with her about the problems that existed in
4  the Exanta team or was it discussed before or after
5  that?
6     A.  As best I can recall, we had the discussion
7  about the problems on the team before I agreed to take
8  the offer, and then, once the offer was made and I
9  accepted, the terms were that I would be promoted to a
10 band 5 in six months.  And Renee wanted to offer the
11 position then at band 5, and she was the lead who was
12 responsible for determining individual skills and
13 their appropriateness for jobs.  And human resources
14 would not make it a band 5.
15    Q.  Was there a particular person in human
16 resources that said they wouldn't do that?
17    A.  Pat Foster is my understanding.
18    Q.  And you mentioned that there was, I guess, a
19 difference in compensation between band 4 and band 5,
20 is that correct?
21    A.  As I understand it, yes.
22    Q.  What was the difference as you understand it?
23    A.  At the band 5, as I recall, you would be
24 eligible for stock options, participation in the

B049

Page 82

1  company stock options.
2     Q.  You mentioned that before.  Did you find that
3  there will be an increase in salary as well, aside
4  from stock options or not?
5     A.  No.  The salary was going to be as offered.
6  That wouldn't be affected.
7     Q.  And you accepted the position, correct?
8     A.  Yes.
9     Q.  And what happened to Renee Valles?
10    A.  Well, this memo states Renee left her position
11 as the contact for the Exanta team or the director for
12 the basically skills center for the Exanta team and
13 went over to the Crestor team.  And so Debby Brangman
14 took her place.
15    Q.  And did Debby Brangman know about this promise
16 to make you a band 5 employee after six months?
17    A.  I raised it with Debby, and Debby said she
18 would talk to Renee.  Debby then came back to me and
19 said she would assist me in making that happen.
20    Q.  Did Jane Helen also support your efforts to
21 become a band 5 at that time?
22    A.  Yes.
23    Q.  And how about Brian Martin?
24    A.  He was not there.  Oh, wait.  Yes, he was.

Page 83

1         Yes, he did.  It was Jane Helen's
2  decision, but Brian agreed.
3     Q.  What ultimately did happen with respect to that
4  issue?
5     A.  After Debby went to Jane, she came back to me
6  and said Jane fully supported this.  So what I need to
7  do now is submit this to Scott Bolenbough.
8  B-o-l-e-n-b-o-u-g-h or something like that.  Scott was
9  the vice-president for that area.  I'm not positive
10 about his title.
11        But at any rate, Debby said to me, "As
12 long as the brand director Jane Helen supports you and
13 I support it, Scott will just sign off on it."  And
14 she said -- and I specifically remember, sitting in my
15 office, saying to me, you know, "I feel really badly
16 that this happened to you, and I think that
17 AstraZeneca needs to make you whole, so I'm going to
18 work to make sure you get the highest bonus that we
19 can give you, the company can give to someone."
20        I said, "Thank you.  That's very
21 generous."
22        And she took it to Scott Bolenbough and
23 she said, "You'll hear about it.  It will be announced
24 soon and I'll get back to you."  So I got a very

Page 84

1  generous bonus.  And I was just --
2     Q.  Did they make good on that promise about the
3  bonus?
4     A.  Yes.
5     Q.  And then what happened?
6     A.  As far as I know she did.
7     Q.  You were satisfied with the bonus?
8     A.  I was satisfied with the bonus, as far as I
9  know, yes.
10    Q.  Okay.
11    A.  And then I was waiting to hear back about the
12 increase to band 5.
13    Q.  And what did you learn?
14    A.  When I inquired about it after I got back from
15 medical leave -- I'm trying to think who told me.
16 Debby told me that I was not going to be promoted to
17 band 5 senior manager.
18    Q.  Were you told why?
19    A.  No.  She didn't articulate a reason.
20    Q.  Were you told it had something to do with your
21 performance?
22    A.  No.
23    Q.  I hand you D-170 and D-171.  Take a minute and
24 read that.  171, it's got the same e-mails and then

Page 85

1  one more at the top.
2     A.  What -- what is this?
3     Q.  That's what I was going to ask you.
4     A.  I would ask you to explain this to me.  I don't
5  understand what this is.
6     Q.  Well, they are e-mails.  Have you seen them
7  before or --
8     A.  No.
9     Q.  -- been told about them?
10    A.  No.
11    Q.  What do they look like?
12        MR. NEUBERGER:  You told us you never saw
13 them before.  He asked you what they look like.
14    A.  They look like e-mails.
15        MR. NEUBERGER:  Okay.  Let's go on.
16        MR. SANDLER:  Mr. Neuberger, I would
17 appreciate if you would not interrupt with things that
18 are inappropriate to be interrupting with.
19        MR. NEUBERGER:  She doesn't --
20        MR. SANDLER:  She's perfectly capable of
21 answering the question.  If she can't answer it, she
22 can tell me.  I'll rephrase it.
23        MR. NEUBERGER:  I think she did answer
24 your question.  She has no personal knowledge.  Now

B050

Page 86

1  with asking her a document which she has no personal
2  knowledge of, so I'm just trying to move this along
3  here.
4      A.  I'm not familiar with this at all.
5  BY MR. SANDLER:
6      Q.  All right.  You're not familiar with it, and
7  you didn't hear that there were concerns expressed in
8  February of 2003 about promoting you because there
9  were reservations about your performance?
10     A.  Not at all.
11     Q.  Did you work from home at any time while you
12 were employed at AstraZeneca?
13     A.  Can you be more specific about what time frame
14 you're referring to.
15     Q.  While you were on the Exanta team.
16         I don't mean for a long period, but just
17 occasionally did you work from home, or was that not a
18 practice of yours?
19     A.  I don't recall at this time.
20     Q.  You don't recall working from home or you don't
21 recall whether you did work from home?
22     A.  I may have worked from home very infrequently.
23 It's...
24     Q.  So if you did work from home it was not often,

Page 87

1  correct?
2      A.  Correct.
3      Q.  In connection with the preparation of the
4  year-end review, are you aware that people who work
5  with you were asked to give feedback?
6      A.  Yes.
7      Q.  And that's a general practice at AstraZeneca,
8  is that right?
9      A.  Yes.
10     Q.  Did you ever see any of the feedback forms?
11     A.  Yes.
12     Q.  Did you see the ones that were prepared --
13 well, when did you see them?  How would that work?
14 Were you given the forms at the time of your meetings
15 to discuss the reviews?
16     A.  I'm not sure what you're asking.
17     Q.  You answered that you did see the feedback
18 forms, correct?
19     A.  Do you mean completed feedback form or feedback
20 forms that others would fill out?
21     Q.  I meant the completed ones.
22     A.  Yes.  I saw some of the completed ones.
23     Q.  When would you see that?
24     A.  Usually individuals who would fill out

Page 88

1  evaluation for me would copy me on their evaluations.
2      Q.  So let's say, when you joined the Exanta team,
3  the evaluation or review that was prepared by Brian
4  Martin and Debby Brangman, the feedback forms for that
5  review, do you recall receiving copies of those?
6      A.  Yes.
7      Q.  And who sent you copies?
8      A.  I can't recall, but there were several team
9  members who sent me copies.
10     Q.  Who's Jane Clark?
11     A.  A strategist on the team.
12     Q.  Did she send you a feedback form?
13     A.  She may have.  I can't recall.
14     Q.  How about Jane Helen, did she?
15     A.  Jane was brand director.  It would be
16 inappropriate or not a common practice for her to send
17 a subordinate the review.  Her comments were the
18 review.
19     Q.  So if she did prepare a feedback form, she
20 wouldn't have sent it to you?
21     A.  No.  Uh-huh.
22     Q.  How about Brian Katona, did he send you a
23 feedback form?
24     A.  I can't recall.  He may have.

Page 89

1      Q.  I give you Bates number D 156 and 7, which
2  purports to be the feedback form prepared by Jane
3  Clark.
4          Finished?
5      A.  Yes.
6      Q.  Did you work with Jane Clark?
7      A.  Yes.
8      Q.  Looking at the areas under paragraph 2 where
9  she says you could be more effective, she says, "I
10 believe these have been discussed with her already."
11 Was that accurate?  Were certain things discussed with
12 you already?
13     A.  The strategist role is specifically to serve as
14 principal contact for development of advisory board
15 program strategy, overall program objectives, and
16 formulation of the agenda.  That is stated in the
17 Exanta advisory board guide, procedures guide.  At the
18 time that this memo was written that guy was in
19 development and previously strategists were not
20 included in development.  So Brian and Martin and I
21 were developing -- I believe it was the active
22 marketing board and looking forward to cardiovascular
23 advisory board, starting preliminary planning for
24 that.  And Jane wanted to make sure that she was

23 (Pages 86 to 89)

B051

Page 90

1  included, or Tom Gagnan, the other strategist, was
2  included. It was a process issue that was part of
3  this inconsistency -- inconsistency on the team that I
4  described earlier that led to the development of the
5  standardized procedures guide. So that's what that's
6  referring to.
7    Q.  Well, my question is, is she correct that these
8  were discussed with you before, this feedback form?
9    A.  She and Brian and Martin and I had discussed
10  the process and that we needed to have consistency in
11  having the strategist involved earlier in the
12  development of the project boards.
13    Q.  One of the things you mentioned is that you
14  should have the program details completed at least a
15  week or so ahead of the program so that everyone that
16  needs to participate in those know what their
17  responsibilities are. Is she saying by that that you
18  hadn't been doing that?
19    A.  I don't know.
20    Q.  During the conversation that you had, was that
21  mentioned?
22    A.  No.
23    Q.  I give you D 159. This is a feedback form from
24  Brian Katona who was the pharmacist you mentioned

Page 91

1  before, right?
2        MR. LaROSA: Could we have a copy of this?
3        MR. SANDLER: I'm sorry.
4        MR. NEUBERGER: Thank you.
5  BY MR. SANDLER:
6    Q.  Did he ever tell you that you needed to be more
7  timely in your communications?
8    A.  Not that I can recall.
9    Q.  Do you see under paragraph 3, he says, "More
10  timely communications, something we all struggle with.
11  It becomes even more important as more things need to
12  be done. With no increase with personnel, we will run
13  into scheduling conflicts."
14    A.  I have a copy of his comments, and I don't
15  recall that being in there.
16    Q.  Do you have a copy of his feedback form?
17    A.  Yes, I do.
18    Q.  And you say that this wasn't in here?
19    A.  That's correct, as far as I can recall right
20  now.
21    Q.  That's not something that's been produced, I
22  don't think, by your attorneys. I would be interested
23  in seeing that.
24        MR. NEUBERGER: I would admit that I

Page 92

1  would -- in fact, I want to look at all of this and
2  check this, question their authenticity or check their
3  authenticity.
4  BY MR. SANDLER:
5    Q.  In point of fact, there were scheduling
6  conflicts that occurred afterwards, isn't that right?
7    A.  What do you mean by after? After what?
8    Q.  After the end of 2002 and during 2003.
9    A.  What scheduling conflicts are you referring to?
10    Q.  Scheduling conflicts in connection with the
11  matters for which you were responsible?
12    A.  In what way?
13    Q.  I'm just asking you, were there scheduling
14  conflicts, for example, scheduling of advisory boards?
15    A.  Brian Martin was --
16    Q.  Yes or no?
17    A.  -- driving that process.
18    Q.  Let me ask you to say yes or no.
19    A.  Yes. Brian caused scheduling conflicts.
20    Q.  And you think it was Brian Martin who caused
21  the conflict?
22    A.  Yes.
23    Q.  Did you receive Brian Martin's feedback form in
24  2002?

Page 93

1    A.  I can't recall.
2    Q.  Let me hand you D 160 and 161 and ask you if
3  that refreshes your recollection.
4        Do you remember seeing that?
5    A.  I can't recall, to be honest.
6    Q.  Brian Martin mentions clarity, conciseness, and
7  the focus of your communications as an area that you
8  needed to improve on, correct? Number 3.
9    A.  That's what it states.
10    Q.  And he also, at the end, on 161 encourages you
11  to get more knowledge of Exanta in the therapeutic
12  area.
13    A.  Yes.
14    Q.  Looking at the 2002 evaluation, again, which is
15  Bates D 163 through 169, take a look at D 168 which is
16  page 6, third paragraph. Are those comments
17  consistent with the comments that were made in the
18  feedback forms?
19    A.  Mostly.
20    Q.  Are there things that are inconsistent with
21  what's in the feedback forms? I understand that there
22  are some things in the feedback forms that aren't in
23  there.
24    A.  Correct.

24 (Pages 90 to 93)

B052

Farrell                                                    v.                          AstraZeneca Pharmaceuticals, LP
Marybeth Farrell                                  C.A. # 04-285 KAJ                            December 9, 2004

Page 94

1   Q.  Is that what you meant by mostly?
2   A.  Yes, because I haven't seen Jane Helen's form,
3   and she was the one who advised that I take the
4   leadership skills to take the band 5 position or --
5   not the band 5.  The leader role.
6   Q.  Let me hand you D 154 and 5 which is Jane
7   Helen's feedback form.
8   A.  Mm-hmm.
9   Q.  Are those comments consistent with the comments
10  in the review?
11  A.  I -- as best I can tell, yes.
12  Q.  I see she mentions consolidated communications
13  with fewer e-mails.  Did she mention to you that she
14  thought you sent too many e-mails?
15  A.  As part of the process --
16  Q.  Yes or no?
17  A.  -- development --
18  Q.  First of all, yes or no?
19  A.  At that time, yes.
20  Q.  I don't want to interrupt you.  Go ahead.  You
21  had something else to say.
22  A.  There were multiple individuals on the
23  commercial team communicating with the medical
24  directors, the physicians, on advisory board content,

Page 95

1   questions about their schedules.  And they -- someone
2   said to Jane Helen -- I believe it was Sunita Sheth --
3   that they were getting too many e-mails from the
4   commercial team and that we needed to consolidate.  So
5   that was the context in which she spoke about it to
6   me.  It wasn't specific to me.
7   Q.  As a follow up to the review of 2002, did you
8   have a meeting with Debby Brangman and Brian Martin on
9   March 10, 2003, about some things you needed to work
10  on?
11  A.  No.
12  Q.  Did they make some suggestions at that meeting
13  on March 10, 2003, about some courses you should take?
14  A.  No.  Other than what was in my review.
15  Q.  I hand you D 173.  That's an e-mail from you to
16  Brian Martin and Debby Brangman, and you say, "Thank
17  you for our discussion yesterday and recommendations
18  you conveyed to me of my 2003 developmental
19  goals."  What are you referring to?
20  A.  Okay.  This was actually -- Brian was supposed
21  to be in a meeting on the 10th, and he wasn't.  And so
22  this more appropriately would have copied Brian
23  because he was not in that meeting.
24  Q.  What are the developmental goals that were

Page 96

1   discussed?
2   A.  Management leadership course, publications,
3   planning, and promotions.
4   Q.  Were those courses that you were taking or were
5   they subjects that were discussed?
6   A.  They were the subjects that were discussed.
7   Q.  What was said about these things?
8   A.  The rationale, as communicated to me by Jane
9   Helen, was so that I could -- that it would help me in
10  the position, the communications leader position that
11  he was going to promote me into, that the more
12  information I had about each segment of what the team
13  did, the better I would be able to manage it all.
14  Q.  Was she at the meeting on the 10th?
15  A.  This was communicated by her earlier, not on
16  the meeting on the 10th.
17  Q.  Was she at the meeting on the 10th?
18  A.  No.
19  Q.  So you mentioned three things that were
20  discussed that were the developmental goals.  Go over
21  them again.
22  A.  Okay.  I need to ask you to be more specific.
23  Are you referring specifically to the meeting on the
24  10th or are you --

Page 97

1   Q.  Yes.
2   A.  Are you referring to what's stated in my
3   evaluation that are my developmental goals?
4   Q.  I'm referring to this memo that you sent that
5   refers to "recommendations you conveyed to me or some
6   of my 2003 developmental goals."  And I'm asking you
7   what those developmental goals that you are talking
8   about were.
9   A.  She repeated what had been stated -- she
10  repeated what Jane Helen had already iterated to me.
11  Q.  I see.
12  A.  Nothing new.
13      It was consistent with what Jane Helen had
14  said.
15  Q.  So you asked to take two courses to follow up
16  on the developmental goals or to help you with them?
17  A.  Yes.
18  Q.  One of them was thought in leader and
19  publication and planning development?
20  A.  Yes.  Jane Helen specifically said publication
21  planning.
22  Q.  And the other one was one on presentations.  I
23  guess public speaking.  Is that what that refers to?
24  A.  Yes.  Management -- brand team typically goes

25 (Pages 94 to 97)

B053

Page 98

1  to senior management and presents their strategic
2  plans and whatnot. I have a very -- a lot of
3  experience and background in making presentations, but
4  I thought this would be a good skills refresher.
5     Q.  Did you say at the meeting on the 10th that you
6  wanted to take a course in statistics?
7     A.  I did take a course in statistics.
8     Q.  Was it before that?
9     A.  I don't recall when it was.
10    Q.  Did you say on the 10th that you wanted to take
11  a course in statistics?
12    A.  I don't recall.
13    Q.  What happened with those requests, those two
14  courses that you asked to take, did you take them?
15    A.  I submitted this request around the time that
16  Brian Martin was relieved of his responsibilities for
17  the team and returned to the Seroquel team. So there
18  was some -- there were transitions underway. And
19  after I received a notebook from Jane Helen in late
20  April that I should wait to enroll because of the
21  new -- because of the changes, and talked to Susan
22  Broadway about them.
23    Q.  Okay. Change the subject. Let me go on to
24  something else.

Page 99

1          What is an ad board?
2     A.  An advisory board?
3     Q.  Yeah.
4     A.  Advisory board is a specific forum in which --
5  I'll use the Exanta team as an example. The Exanta
6  team would identify experts in a particular
7  therapeutic area such as cardiology, hematology,
8  internal medicine, stroke, neurology. Invite them for
9  a one- to two-day session, for example. Present
10  clinical data to them and obtain their feedback on a
11  variety of areas. It could be on how they see perhaps
12  a new brand fitting into their therapeutic treatment,
13  recommendations from them about how -- messaging we
14  might run. Some positioning concepts by them for
15  feedback. Essentially we seek expert advice on brand
16  issues.
17    Q.  We talked before about the fact that there were
18  some inconsistency between how the various people that
19  were charged with putting together the advisory boards
20  were putting them together?
21    A.  Mm-hmm.
22    Q.  I think you said that you and Brian Martin
23  worked on getting a template or, I guess, a -- I've
24  seen the word "template." I think it was a way of

Page 100

1  making sure that everyone followed the same format in
2  putting the boards together. Is that a fair
3  description?
4     A.  Yes.
5     Q.  Was this on a computer? Was there some sort of
6  a form that you followed on the computer? Was that
7  the ultimate outcome of this effort?
8     A.  It was available in two formats, on CD and in
9  booklet form. It was distributed to everyone on the
10  team, key people involved in advisory boards, and --
11  yeah.
12    Q.  And you had been asked some time in 2002 to get
13  this thing pulled together, is that right?
14    A.  Yes.
15    Q.  I hand you D 243. Does that show when it was
16  ready?
17    A.  No. That's a different document. It's the
18  promotion regulatory affairs template which comes out
19  of our regulatory department. It's issued by the
20  regulatory group, and everyone in the company, all
21  brands, whoever conducts an advisory board, is
22  required to fill this out and submit it to the
23  regulatory department and legal department for review
24  and approval.

Page 101

1     Q.  So that's a different undertaking than the one
2  we are talking about?
3     A.  That's correct.
4     Q.  This one is more broadly distributed?
5     A.  It's company-wide from the regulatory
6  department.
7     Q.  And you're also responsible for putting that
8  together?
9     A.  Yes.
10    Q.  And you did that; you got it ready by April of
11  2003, is that right?
12    A.  Could you be more specific? Because I'm not
13  sure which -- what we are talking about here.
14    Q.  Well, I'm referring to the document that's
15  mentioned in that e-mail that I just gave you.
16    A.  Yes.
17    Q.  So that was completed in April 2003, correct?
18    A.  Completed in April? It says it was approved in
19  November.
20    Q.  Right.
21    A.  Now, at that time Brian Martin was leading the
22  development and completion of the Exanta PRA advisory
23  board template with a vendor. I assisted him on that.
24    Q.  Who was the vendor?

26 (Pages 98 to 101)

B054

Farrell                                          v.                    AstraZeneca Pharmaceuticals, LP
Marybeth Farrell                          C.A. # 04-285 KAJ                         December 9, 2004

Page 102

1   A.   Simpson Health Care.
2   Q.   Is that Kelly Simpson?
3   A.   Yes.
4   Q.   And getting back to this one, that was
5   something that was your responsibility, the one that's
6   mentioned in this e-mail?
7   A.   No.  At that time when the template was
8   developed Brian Martin was -- it was his
9   responsibility.
10  Q.   When did it become your responsibility?
11  A.   My responsibility as a PREP manager was to
12  insure that the program --
13  Q.   My question was when did this -- if it never
14  became your responsibility, say so.  But I took from
15  the e-mail that it was your responsibility to get that
16  job done.
17  A.   Brian and I worked on it collaboratively, but
18  he was the lead, and after it was developed, I took it
19  to the regulatory department because he didn't have
20  time or didn't want to.  And sat with them and
21  negotiated all the advisory board specifics that we
22  were seeking, and we had to negotiate how many people
23  we were going to invite, all kinds of things.
24  Q.   That was completed in April?

Page 103

1   A.   According to this, it was approved in November.
2   Q.   When was it completed?  Why was this e-mail
3   being issued?
4   A.   I don't recall specifically.  It may be that
5   Susan had not seen it.  And she may have asked me for
6   it.  It would appear so from this.
7         MR. SANDLER:  Why don't we stop here, take
8   a lunch break.
9         MR. NEUBERGER:  That will great.
10        (Luncheon recess taken.)
11        (Mr. Brogan not present.)
12  BY MR. SANDLER:
13  Q.   In the first quarter of 2003, were you working
14  on putting together a cardiology advisory board
15  meeting?
16  A.   Yes.  I was working jointly with Brian Martin.
17  Q.   When was it decided to cancel the cardiology
18  advisory board?
19  A.   In early March 2003.
20  Q.   Why was it cancelled?
21  A.   Because the list of KOLs had only been issued
22  the end of February for team review.  So there wasn't
23  sufficient time to invite the cardiologists for that
24  meeting.

Page 104

1   Q.   And is it correct that the cancellation was
2   discussed at a meeting on March 14, 2003, that Jane
3   Helen attended?
4   A.   As best I can recall, yes.
5   Q.   What was the reaction of the people at the
6   meeting to the cancellation?
7   A.   I don't recall at this time.
8   Q.   Did Jane Helen talk with you on the same day
9   that it was announced that the meeting was going to be
10  cancelled about the fact that it had been cancelled?
11  A.   She expressed her disappointment.
12  Q.   What did she say?
13  A.   I don't recall her exact words, but as best as
14  I can remember, she said, "I don't like to cancel
15  advisory boards."  And I said, "Neither do I."
16  Q.   Did you say anything more than that?
17  A.   As best I can recall the conversation, I said
18  to her, "It's a shame that the list of KOLs from which
19  we would draw the pool of advisors to invite wasn't
20  completed in December like it was supposed to be to
21  give us timely advance to plan the meeting."  But it
22  was issued the end of February.  That's an unrealistic
23  demand for an advisory board to be planned for the
24  invitees, for cardiologists.

Page 105

1   Q.   What was Brian Martin's response?
2   A.   It was a specific project under the management
3   of Louise Colburn, and Brian Martin also was involved.
4   Q.   My question is, did you tell Jane Helen?  Did
5   you basically say that, you know, it's not my fault;
6   it's Brian Martin's fault?
7   A.   I don't think I --
8   Q.   I don't mean in those words, but did you point
9   the finger at Brian Martin as the person who caused
10  the thing?
11  A.   Well, yes, because in December when it was
12  apparent that the list wasn't done or anywhere near
13  done, after I had talked to Louise and offered her my
14  help.  Several times I went to Brian, and I said, "We
15  are not going to be able to hold this cardiology board
16  in April if we don't get those invitations out in the
17  next two to three weeks."  And I said, "Louise doesn't
18  have any cardiologists for us to then vet out to the
19  team for input."  You always have to have team input
20  on the thought leaders.
21        I offered to Brian to develop a list of
22  leading cardiologists that I was familiar with, sent
23  them out to the key people in the team for review.  I
24  could cycle that back in a week and issue the

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

B055

Page 106

1   invitations. And he said, "No, you will not do that
2   because that's duplicating Louise's job." And I
3   reiterated to him time constraints we were facing and
4   the delay of many weeks that Louise anticipated in
5   issuing her list. And he said, "I'll work with her to
6   hurry up the issuance. But don't come up with your
7   separate list of cardiologists." So I thought I had
8   done everything I possibly could to make that meeting
9   occur.
10      Q.   When you explained that to Jane Helen, did she
11  say to you that it wasn't acceptable to try and blame
12  someone else for your mistakes?
13      A.   No.
14      Q.   Did she say something along those lines that
15  you were trying to blame someone else for things that
16  were your responsibility?
17      A.   No. Uh-huh.
18      Q.   Did anybody else tell you in the year 2003 that
19  you shouldn't blame other people for things that were
20  your responsibility?
21      A.   Only after I returned from medical leave.
22      Q.   Who is Debra Kaufman? Deb Kaufman?
23      A.   Oh, Deb Kaufman, she's a human resources
24  manager at AstraZeneca.

Page 107

1   Q.   Did you occasionally consult with her on
2   personnel issues?
3   A.   Yes, I did.
4   Q.   Did Deb Kaufman tell you that you need to stop
5   trying to blame other people and to take personal
6   responsibility?
7   A.   No.
8   Q.   Do you know somebody named Joel Tau?
9   A.   Yes.
10  Q.   Who is he?
11  A.   Joel Tau was the media relations manager at
12  Zeneca before the merger.
13  Q.   Did you work with him at some point?
14  A.   Yes, I did.
15  Q.   What was your relationship?
16  A.   Joel and I collaborated on his -- on bringing
17  to life his vision of developing an issues management
18  practice at Zeneca. And he was to hand the baton, so
19  to speak, to me because he was going to be retiring.
20  So for about a year I would say we were working to
21  develop that, and then I was put in charge of it, and
22  Joel was doing work -- like liaison to associations.
23  Q.   Did you have some problems with Joel Tau?
24  A.   Can you be more specific?

Page 108

1   Q.   Well, did you have some problems with him that
2   were sufficiently serious that it got into your
3   performance review or into written documents?
4   A.   Not that I recall.
5   Q.   I hand you D 114 and 115 and direct your
6   attention in particular to the last paragraph on 115.
7       In that paragraph, aren't you blaming Joel
8   Tau for some problems that you had?
9   A.   Joel Tau was in charge of issues management.
10  Q.   And you're blaming him for some problems there?
11  A.   I'm not blaming Joel for -- I mean this is so
12  long ago. It's hard for me to -- Joel was obstructing
13  progress with the issues management function after he
14  lost leadership of it, and I was put in charge of it.
15  I went to Alan Milbauer to ask his help, and he went
16  and talked to Joel. I mean, it was a difficult
17  situation. It was sort of -- Joel initially had been
18  in charge of it.
19  Q.   Was it viewed as an important occurrence when
20  the cardiology ad board to the Exanta project was
21  cancelled?
22  A.   Important occurrence relative to what?
23  Q.   Well, relative to anything. You've got the
24  whole launch that you're working on, and the

Page 109

1   cardiology ad board is cancelled. Is that regarded as
2   significant?
3   A.   Well, we had several additional cardiology ad
4   boards planned for later that year. So I would say it
5   was not insignificant.
6   Q.   Okay. Fair enough.
7       I'm going to hand you D 175 through D 181.
8   Take time to read them, a series of e-mails. I guess
9   they start January '03 and they run through March 5th
10  of '03.
11      Let me know when you're finished.
12  A.   Did you want me to read through the whole
13  thing?
14  Q.   It might be a good -- I mean unless you're
15  comfortable just answering --
16  A.   No. I wasn't sure what you were specifically
17  asking about.
18  Q.   Take your time.
19  A.   Mm-hmm.
20      Okay.
21  Q.   All right. The last e-mail in the group is
22  dated March 5th, '03, and it was from Jane Helen to
23  Debby Brangman, correct?
24  A.   Correct.

28 (Pages 106 to 109)

B056

Farrell                                    v.                    AstraZeneca Pharmaceuticals, LP
Marybeth Farrell                    C.A. # 04-285 KAJ                      December 9, 2004

Page 110

1    Q.   And in that e-mail, Jane Helen says there was
2  a, quote, significant deficiency with your work,
3  unquote?
4    A.   She states that in this, right?
5         MR. NEUBERGER:  Did you see that?
6    A.   According to this, yes.
7    Q.   They said you are not moving to meet deadlines
8  and you are sitting on information, correct?
9    A.   Yes.
10   Q.   And in fact, she mentions the possibility of a
11  formal performance plan in the e-mail, doesn't she?
12   A.   Yes.
13        MR. NEUBERGER:  Wait a minute.  Maybe I'm
14  missing this.  I'm just confused.  Is this on
15  page 175?
16        THE WITNESS:  Yes.  Very first one Jane
17  Helen, March 5.
18        MR. SANDLER:  It starts, "Debby, this
19  string of..."
20        MR. NEUBERGER:  I got you.  I didn't see
21  that last sentence.
22  BY MR. SANDLER:
23   Q.   So do you have any explanation?  I mean, do you
24  think that that e-mail was sent on March 5?

Page 111

1    A.   I doubt very much that e-mail was sent on
2  March 5.
3    Q.   If it was -- and let's assume for the moment
4  that it was -- would you agree that your supervisors
5  were concerned about your performance in early March?
6    A.   According to this, it appears that that would
7  be so.
8    Q.   And you say you doubt that it was sent.  Are
9  you saying that it was prepared afterwards or
10  something?
11   A.   Well, I'm surprised to see this because, when I
12  met with Debby Kaufman in August, to express my
13  concerns to her about work deficiencies raised with me
14  in April, end of April, she had no knowledge of any
15  problems with me and stated that to me.
16   Q.   Well, this was to Debby Brangman, not Debby
17  Kaufman.
18   A.   Well, Debby Brangman never indicated any
19  problems either, so...
20   Q.   Now, Susan Broadway's promotion was announced
21  on April 1, 2003, correct?
22   A.   As best I recall, yes.
23   Q.   And were you annoyed that she got the promotion
24  rather than you?

Page 112

1    A.   No.
2    Q.   Did you speak to Jane Helen that day about the
3  promotion?
4    A.   Yes.
5    Q.   And where did that conversation take place?
6    A.   In Jane's office.
7    Q.   And did you seek her out for the purpose of
8  having the conversation?
9    A.   Yes.
10   Q.   And what was said?
11   A.   As best I can recall, I told Jane that I was
12  surprised Susan was put in that position.  There were
13  others on the team who were much better qualified, had
14  much more experience than Susan.
15   Q.   You?
16   A.   Me among others.
17   Q.   Did Jane Helen tell you that you needed to
18  perform better in your current job before you could
19  expect to be promoted?
20   A.   As best I can recall, Jane was behind her desk
21  standing and sort of pacing about.  She seemed a bit
22  agitated and said some vague comment about, "Well,
23  advisory boards are more than picking out napkin
24  colors," which I didn't understand.  So I left her

Page 113

1  office.
2    Q.   Did she say that you needed to perform better
3  in your current job before you can expect to be
4  promoted?
5    A.   Not that I can recall.
6    Q.   Was the comment about advisory boards being
7  about doing more than -- say again what she said.
8    A.   Words to the effect of, "Well, advisory boards
9  are more than about picking out napkin colors."
10   Q.   Was that directed to you, to what you had been
11  doing?
12   A.   I don't know.
13   Q.   You were responsible for some advisory boards,
14  weren't you?
15   A.   Me and others on the team, yeah.
16   Q.   Before Susan Broadway's April 1st promotion,
17  had Jane Helen said anything to you about your
18  delegating workload?
19   A.   No.
20   Q.   She didn't tell you you should be doing things
21  yourself instead of delegating it to others?
22   A.   No.
23   Q.   What's Discovery International?
24   A.   They were our medical education agency for

29 (Pages 110 to 113)

B057

Page 114

1  Exanta.
2  Q.  Who in particular?  Was there a contact person
3  or contact people?
4  A.  I worked with Christine Lutze, L-u-t-z-e.  She
5  was vice-president.  And Mary Pat Howard who was a
6  program manager.  Those were my two principal
7  contacts.
8  Q.  What did the company do in connection with the
9  Exanta project?
10  A.  The advisory boards?
11  Q.  What did Discovery International do vis-a-vis
12  the Exanta project?
13  A.  We had contracted with them to develop -- help
14  us to develop and implement advisory boards.  That was
15  their -- one of their principal responsibilities.
16  Their other principal responsibility was to work with
17  Louise Colburn on the development of the KOL database,
18  which is this list of all these medical thought
19  leaders.
20  Q.  In connection with the first part of it that
21  you mentioned, the advisory boards, that was something
22  that you work with them on?
23  A.  Yes.
24  Q.  Did anyone else work with them on that part?

Page 115

1  A.  Yes.
2  Q.  Who?
3  A.  Louise Colburn, Denise Barrett, Susan Broadway.
4  Each of us had done advisory boards with Discovery.
5  Q.  Who is Denise Barrett?
6  A.  Denise Barrett was another PREP manager.  I
7  believe Denise ran advisory boards.  I'm not certain
8  about that.
9  Q.  Denise Barrett Quigley?
10  A.  Quigley, yes.  She got married.
11  Q.  Did you have any problems with Discovery
12  International?
13  A.  Yes.
14  Q.  What were the problems?
15  A.  In team meetings for the PREP team, we would
16  share frustrations with trying to manage Discovery.
17  They often went off and did their own thing.  They
18  wouldn't follow directions.  If they made a
19  recommendation and you disagreed with them, they just
20  would argue, almost incessantly.  It was very poor use
21  of our time.
22      I wasn't the only one.  Denise expressed
23  the same frustration as did Louise Colburn.
24  Q.  Were there some requests that you had made in

Page 116

1  March 2003 that you say that Discovery International
2  didn't respond to?
3  A.  Requests?  I'm not sure what you're talking
4  about.
5  Q.  Is there something going on in March 2003 in
6  which you were involved with Discovery International
7  in which you asked them to do something and they were
8  slow to respond?
9  A.  I can't recall at this time.
10  Q.  What's Co-Med?
11  A.  Co-Med is also a medical education agency.
12  Q.  Similar to Discovery?
13  A.  Similar to Discovery, yes.  They did similar
14  types of programs for the Exanta team before they were
15  fired by Susan Broadway.
16  Q.  And who did you work with at Co-Med?
17  A.  They were there a very short time when I first
18  joined the team, and I actually cannot recall specific
19  individuals right now.
20  Q.  Did you have problems with that?
21  A.  Yes.
22  Q.  What were the problems?
23  A.  Now, as best I can remember, they were
24  developing a CD slide set updated with new clinical

Page 117

1  data on one of Exanta's indications.  And I would send
2  the data to them.  We would discuss the slides, and I
3  wouldn't hear back from them.  And this went on for
4  weeks.  And they never actually delivered the final
5  slide deck.  Apparently had it duplicated or stored at
6  their offices.
7  Q.  In connection with your objectives for 2003,
8  were they written objectives?  I think we talked about
9  this already.
10  A.  Yes.
11  Q.  Was one of them that you were to be more
12  autonomous?
13  A.  One of my objectives?
14  Q.  Yeah.
15  A.  Would that be under --
16  Q.  I'm sorry.  After the actual objectives were
17  prepared, were there some changes made in the
18  objectives?
19  A.  Are you referring to the original 2003
20  objectives developed with Brian Martin?
21  Q.  No.  I'm talking about a couple sort of
22  amendments to those objectives that were developed
23  later I think maybe with Brian Martin and Amy Renk?
24  A.  Two sets of objectives were developed.  The

30 (Pages 114 to 117)

B058

Farrell
Marybeth Farrell

v.

C.A. # 04-285 KAJ

AstraZeneca Pharmaceuticals, LP
December 9, 2004

Page 118

1   first set was with Brian Martin, and then, when Susan
2   became the communications leader, I e-mailed her my
3   objectives because she had requested them for our
4   April 11 meeting. I believe it was for that meeting.
5   You know, the -- she invited me. She wanted my ideas.
6   Let's talk about how we can all be a happy team moving
7   forward and that sort of thing.
8          And then the group was reorganized. So
9   all the customer segments that had been stratified for
10  responsibility for each individual PREP manager were
11  changed. We weren't going to do it that way any more.
12  It was going -- instead of having one person
13  responsible, say, for just advisory boards, one person
14  just responsible for congresses, by indication -- and
15  by that I mean which indication for the drug. Okay.
16  Whether afib, DTE prevention, secondary prevention, we
17  were going to focus on specific sets of medical
18  specialists and bridge in all the things that went
19  under that one specialty.
20         So everything changed. So the
21  objective -- everyone's objective had to be redone,
22  and including mine. And they were.
23         July 3rd when I met with Susan, I believe
24  we reviewed the objectives.

Page 119

1   Q.  I was talking about before that, before Susan
2   Broadway became involved as a supervisor. My
3   understanding is that there were a couple of revisions
4   to your objectives, one of which was that you were
5   going to work on taking more responsibility for your
6   projects. Does that ring any bells?
7   A.  No.
8   Q.  The other was that you were to be more
9   autonomous. Does that ring a bell?
10  A.  No.
11  Q.  After Susan Broadway became a supervisor, you
12  say you had an April 11 meeting?
13  A.  Mm-hmm.
14  Q.  Yes?
15  A.  Yes. Sorry.
16  Q.  During that period, right after she became the
17  supervisor, did she hold a series of face-to-face
18  meetings with the people that she was replacing?
19  A.  Yes.
20  Q.  And did she also have groups together with her
21  to discuss various things?
22  A.  Yes.
23  Q.  Would it be fair to say that she was busy,
24  quite busy during that time period?

Page 120

1   A.  I can't really respond to that. I don't know.
2   Q.  You don't have an impression that she was busy?
3   A.  We were all busy. We were all busy, including
4   me.
5   Q.  You say there was a meeting, an individual
6   meeting on April 11. Were there other meetings,
7   individual meetings with Susan Broadway during April
8   between you and Susan Broadway?
9   A.  Not until after I announced medical leave.
10  Q.  At the meeting on April 11, did she make some
11  suggestions as to how you could improve your
12  performance?
13  A.  No.
14  Q.  Did she talk to you about what she perceived as
15  your deficiency?
16  A.  No.
17  Q.  When was the first time she did that?
18  A.  I believe, as best I can recall, it was May 1.
19  And that was when she came into my office and said,
20  "Jane Helen has already talked with you about
21  performance issues, and so I know that you're aware of
22  these. But I'm going to review them with you." That
23  was the first I had heard anything from Susan
24  negative.

Page 121

1   Q.  But not from Jane?
2   A.  No. Because Jane had come in on April 28th for
3   the first time and provided me with negative feedback
4   about my performance.
5   Q.  Was there a quarterly team meeting the same day
6   that Susan Broadway's promotion was announced?
7   A.  Quarterly team meeting? I honestly don't
8   recall.
9   Q.  Let me hand you D 319. This is an e-mail from
10  Jane Helen to Susan Pritchard Broadway. First
11  sentence says that Jane Helen talked with you about
12  the performance of your work on advisory boards on
13  March 14th, and she says that was the date we
14  cancelled the cardiology advisory board. Would you
15  agree that that's correct?
16  A.  No.
17  Q.  You didn't discuss your performance on advisory
18  boards that day?
19  A.  As best I can recall, Jane Helen did not blame
20  me for the advisory board being cancelled. She was
21  disappointed with the time line for the KOL list
22  development, the fact that we couldn't meet the
23  deadline. It was -- you know, just a general sort of
24  frustration.

31 (Pages 118 to 121)

B059

Page 122

1    Q.  Would you agree that, at least based on this
2  e-mail, she thinks she discussed your performance and
3  she thinks she blamed you on March 14?
4    A.  According to this document, yes.
5    Q.  And she also said that she briefly discussed
6  your performance and development basically the day
7  that Susan Broadway's promotion was announced.  I take
8  it that means when you spoke with her in her office.
9    A.  Okay.
10    Q.  Would you agree with that characterization?
11    A.  No.
12    Q.  And you testified before that you expressed
13  upset that you or another more experienced person
14  wasn't promoted rather than Susan Broadway and her
15  response was --
16    A.  I did not express upset.  I expressed surprise.
17    Q.  Okay.  Surprise.
18    A.  That someone of Susan's skill level would be
19  put in that position.
20    Q.  And Jane Helen's response was directed to the
21  fact that the -- I'm paraphrasing, but essentially
22  advisory boards are more complex than simply ordering
23  flowers or whatever it was?
24    A.  I specifically expressed surprise to Jane that

Page 123

1  Susan had been put in the position because there were
2  many others on the team that were much more qualified
3  for that position, and then she expressed the remark
4  about the napkin colors.
5    Q.  How did you get along with Louise Colburn?
6    A.  Fine.
7    Q.  Did you have any problems at all with her
8  before you went on medical leave?
9    A.  Not that I can recall.
10    Q.  Do you know of any reason why she would try to
11  harm you professionally?
12    A.  No.
13    Q.  Do you know that she complained about you in
14  April 2003?
15    A.  No.
16    Q.  Do you recall a series of e-mails about Jane
17  Helen's desire to have weekly status reports prepared
18  for the Exanta project?
19    A.  I would have to ask you to be more specific.
20  I'm not sure what you're talking about.
21    Q.  Weekly status reports that capture project
22  activities and status of action items?
23    A.  It could refer to any number of things because
24  Discovery had been asked by Brian Martin to initiate

Page 124

1  weekly reports of that nature.
2    Q.  Did you communicate that request to Discovery,
3  to Christina Lutze?
4    A.  I may have.  I don't recall.
5    Q.  And D 244, is that an e-mail you sent to the
6  contact at Discovery and then a response from Jane?  I
7  guess you copied Jane Helen on it, and Jane responded.
8    A.  These appear to be two unrelated e-mails, one
9  refers to communication with Discovery about weekly
10  status reports for all the work that they were
11  responsible for, which was quite considerable.  The
12  one above it, seems to reference an initial draft that
13  I created of the status of the advisory boards to
14  update the team.
15        And Jane had asked me, just draft
16  something and send it to her.  And she sent me
17  something back.  I was thinking a little more depth.
18  I wanted details on this.  They appear to be unrelated
19  from what I can recall.
20    Q.  Now, I think you said you met with Susan
21  Broadway.  It was on April 11?
22    A.  Yes.
23    Q.  Was Jane Helen there?
24    A.  No.

Page 125

1    Q.  Was it just the two of you?
2    A.  Yes.
3    Q.  Did Susan Broadway discuss her expectations for
4  your performance at that time?
5    A.  No.
6    Q.  When did you first mention to anybody that you
7  needed to take a leave for a medical procedure?
8    A.  As best I can recall, it was April 22nd.
9    Q.  And what happened on that day?
10    A.  I went into Jane Helen's office and I told her
11  that I had to have surgery, it was not elective, and
12  that my surgeon had told me I would require to be out
13  of the office for six weeks.
14    Q.  And when did you learn that you needed the
15  surgery?
16    A.  I'm not sure the exact date.  It was sometime
17  before that.  And I was investigating options not to
18  have the surgery because I did not want to have that
19  surgery.
20    Q.  So as result, you didn't make the decision that
21  you were going to have the surgery until April 22 or
22  thereabouts?
23    A.  That's true.
24    Q.  So you went into Jane Helen.  What did she say

32 (Pages 122 to 125)

B060

Farrell                                    v.                  AstraZeneca Pharmaceuticals, LP
Marybeth Farrell                      C.A. # 04-285 KAJ                    December 9, 2004

Page 126

1  in response?
2     A.  She looked surprised and said, "Oh, my gosh.
3  Six weeks."  Words to the effect, I mean, that's a
4  long time.  Are you sure you're going to be out the
5  whole six weeks?  You know, we are very busy.  I hope
6  you're okay.  Words to that effect.
7     Q.  What happened next after that with respect to
8  the leave issue?
9     A.  Well, in that conference with Jane Helen, I
10 said, "I realize the team is very busy.  I'm going to
11 do everything I can to come back earlier.  And I'll
12 keep you updated.  Surgery is May 9."
13    Q.  What did she say to that?
14    A.  Okay.
15    Q.  Had you already gotten authorization from the
16 health department at AstraZeneca for the surgery, or
17 the leave for the surgery, or did that come later?
18    A.  That came later.  I called that day to find out
19 what I needed to do to have the medical leave
20 approved.  And I think they called me back the next
21 day.  It was Amy Millhorn or Wini O'Neil.  And then
22 they had to send forms.
23    Q.  Did they send you the forms?
24    A.  Yes.

Page 127

1     Q.  After your authorization to take the leave, is
2  that when you notified Susan Broadway about the fact
3  that you were going to go on leave, or did that take
4  place before?
5     A.  After the authorization?
6     Q.  In other words, after you were told -- I think
7  you said you inquired from the health -- what's the --
8     A.  Health services.
9     Q.  Health services department?
10    A.  Yes.
11    Q.  You got information on what you needed to do to
12 get authorization for the leave, right?
13    A.  Yes.
14    Q.  And you did that, and the leave was authorized,
15 correct?
16    A.  Correct.
17    Q.  In that time frame, when did you let Susan
18 Broadway know, if you did, that you were going to be
19 taking a leave?
20    A.  I don't actually recall when.  Jane Helen might
21 have told Susan.
22    Q.  How do you know that?
23    A.  I can't recall, to be honest.
24    Q.  In early May of 2003, did Susan Broadway ask

Page 128

1  you to develop an advisory board plan?
2     A.  She asked me to develop an advisory board
3  transition plan.
4     Q.  Was Kelly Simpson somehow involved in that
5  development?
6     A.  There were two -- okay.  This is two projects,
7  and that may have been, as best I can recall, before I
8  went out on medical leave.  So I was developing the
9  advisory board transition plans, and at four o'clock
10 in the afternoon Susan sent a note to everyone in
11 professional education and promotions that we needed
12 to develop 2004 strategic plans by like 8:00 a.m. the
13 next morning because the request had come down the
14 last minute and there were budget issues with the
15 department.  And so we were all scrambling to try to
16 figure out what we were going to put together for our
17 next year projections.  And because I -- Brian Martin
18 and I had worked with Simpson and I had worked on
19 Crestor and they had done the Crestor launch and did
20 an excellent job, Brian and I had developed a template
21 bagged on the Crestor launch plan for Exanta.
22        So I called Kelly Simpson, told her, you
23 know, the situation.  And I said, you know, I want you
24 to take the template that we developed, that Brian had

Page 129

1  developed, and just pull that together and finish it
2  for Exanta for advisory boards for these customer
3  segments.
4         So based on my familiarity with launching
5  Crestor and Nexium, Kelly and I were very much in
6  sync.  And I asked her to get that back to me as soon
7  as possible.
8     Q.  And did she do that?
9     A.  Yes.  I believe so.  She did send me at least
10 part -- something partial.
11    Q.  And was there an internal meeting in which that
12 was reviewed?
13    A.  Not that I recall.  I e-mailed it to Susan.
14 And then -- I e-mailed it to Susan.
15    Q.  Were you criticized for having been in touch
16 with Kelly Simpson in developing this?
17    A.  Yes.
18    Q.  What was said?
19    A.  Susan Broadway said I was not supposed to use
20 agency resources to develop the PREP strategic plan,
21 although other PREP managers and promotion managers
22 were allowed and, in fact, did utilize agency
23 resources to develop strategic plans for the exact
24 same assignment.

33 (Pages 126 to 129)

B061

Page 130

1    Q.   I'm going to hand you D 498 and 99 and direct
2  your attention to the third paragraph on the first
3  page.  Starts, "One month later."
4    A.   Yes.  And I corrected that error in a
5  subsequent memo to Jane and Susan, Debra, and Rachel
6  indicating that I had erroneously written the date of
7  the April 11.  That was an error, and I have the
8  subsequent memo to that pointing that out to them.
9    Q.   Do you have that with you?
10    A.   Not today, but I do have it.
11    Q.   You did also say that Jane Helen didn't meet on
12  that day?
13    A.   I was referring to May -- the joint meeting
14  with those two might have been on May 2nd.  I'm not
15  sure of the exact date.  But it was not April 11.
16  That was the day I met with Susan.
17    Q.   I hand you D 321 which is a memo from Susan
18  Broadway describing the preparation of the advisory
19  board plan that we talked about before.
20    A.   Mm-hmm.
21    Q.   Do you agree with what is stated there?
22    A.   As a sequence of events, largely, I would say,
23  yes.
24    Q.   Did the events that she describes occur as

Page 131

1  stated?
2    A.   No.
3    Q.   What do you say didn't occur?
4    A.   "On Thursday, May 1, you turned in a plan you
5  could not speak to and could not answer questions on
6  how you arrived at the proposed number of ad boards
7  and budget.  In order to describe the plan, you
8  thought you needed to call Kelly Simpson who had,
9  quote, developed the plan."  That's inaccurate.
10  That's --
11    Q.   What's inaccurate about it?
12    A.   It's inaccurate to say that I could not speak
13  to the plan.
14    Q.   Okay.  Anything else?
15    A.   Well, she insinuates or intimates here that I
16  needed to call Kelly Simpson to describe the plan.
17  The purpose was to call Kelly Simpson to get -- to put
18  her on the phone to give the team additional
19  information.  There's a formula very commonly used to
20  target audiences and determine how many KOLs you have
21  to reach in order to achieve your -- you know, your
22  marketing objectives.  And that's what I had based
23  that plan on.
24       Susan was not familiar with that formula,

Page 132

1  and so she objected to its contents.  And she would
2  not accept my word.  So I said, "Let's get Kelly on
3  the phone."  Susan and I had different opinions on
4  certain things, based on my experience launching mega
5  brands, quite simple.
6    Q.   Now, whenever you met with Jane Helen and Susan
7  Broadway, whether it was in April or May, at some
8  point you were told about concerns they had about your
9  performance, correct?  You say it's in May?
10    A.   Are you saying when I met jointly with Susan
11  and Jane?
12    Q.   Right.
13    A.   Yes.  I believe it was May, as best I recall.
14    Q.   And were you told that they were concerned that
15  you didn't pay attention?
16    A.   Susan began a meeting with me by referencing my
17  performance review from the previous year with Amy
18  Renk and noting that Amy Renk had written whatever her
19  exact words were and would, in a very condescending
20  and sort of mocking tone, snap at me during meetings,
21  "Pay attention."  So I took great offense to that and
22  I told her that and I wrote a memo and said, "There's
23  no need for this."
24    Q.   Did they also tell you that you lack knowledge

Page 133

1  of content?
2    A.   There were unreasonable expectations or
3  whatever you want to call it -- outline for me -- not
4  expectations, but unreasonable requirements set for me
5  which included acting as a consultative scientific
6  expert, yes.
7    Q.   You say unreasonable?
8    A.   Unreasonable.
9    Q.   How so?
10    A.   Because the AstraZeneca job description for
11  PREP manager specifically states that the PREP
12  manager, either at a band 4 or band 5, is responsible
13  for building strategic relationships with PDSs, our
14  product development scientists, and other medical
15  directors to develop strategic plans and help to
16  develop scientific content.  So you're not supposed to
17  be a consultative expert.
18       And the later issued AstraZeneca job
19  requirements for band 4 and band 5 PREP managers
20  specifically indicates that, and specifically states
21  that a band 4 PREP manager is responsible for learning
22  the discipline to -- and knowledge of content.  And
23  the band 5 requirement specifically states, "act as
24  consultative content expert."  And I was a band 4.

34 (Pages 130 to 133)

B062

Page 134

1  That's why it was unreasonable.
2     Q.  Did they also criticize your strategic
3  thinking?
4     A.  Vague accusations about strategic lack of
5  knowledge for me.
6     Q.  I hand you D 205. The question is going to be,
7  did Susan Broadway go over these items with you, the
8  items mentioned?
9     A.  No. This is the first time I've seen this
10  memo.
11     Q.  I understand you haven't seen the memo before.
12  I'm just asking if the things listed in the memo were
13  discussed with you?
14        MR. NEUBERGER: Do you want to be more
15  specific? In May?
16     A.  Yes. Could you be specific? I'm not really
17  clear.
18        MR. NEUBERGER: May 2003?
19        MR. SANDLER: Sure. On May 1st, 2003.
20     A.  No. I have a separate list that does not
21  include many of the items on this list. It's a
22  different list.
23  BY MR. SANDLER:
24     Q.  Now, the memo refers to Jane's discussion on

Page 135

1  March 13 regarding performance. Does that, again,
2  suggest that there was a discussion earlier with Jane
3  Helen about your performance?
4     A.  This suggests that, but that discussion did not
5  occur.
6     Q.  She also says that Brian Martin made
7  suggestions to you in 2002 regarding taking ownership
8  of follow-up items and actively managing projects
9  outside of e-mail delegation, et cetera.
10        Do you remember Brian Martin having a
11  discussion with you along those lines in 2002.
12     A.  Not that I can recall, no.
13     Q.  I'm going to hand you D 309 through 311, which
14  is the same memo except it's got what purports to be
15  your reaction to the discussion. See if that
16  refreshes your recollection. It starts on 310 at the
17  bottom.
18     A.  Can I ask you a question? What am I supposed
19  to be reacting to? Because I've never seen any of
20  this --
21     Q.  I understand.
22     A.  -- on page 309.
23     Q.  This purports to be a document that Susan
24  Broadway prepared as a list of items that she

Page 136

1  discussed with you. So this was her reference point
2  for the meeting with you. And then she also has here
3  your comments in response to the conversation that she
4  had with you. And that's what Marybeth's reaction is,
5  I believe. I'm really looking to see if, reading the
6  Marybeth reaction part, whether you agree that, in
7  fact, you did say these things, or if you didn't.
8     A.  In response to the items listed on page 310?
9     Q.  Right. And 309.
10        MR. NEUBERGER: Are you asking her if it
11  jogs her memory of anything about it?
12        MR. SANDLER: Yeah.
13        MR. NEUBERGER: He's asking you if it jogs
14  your memory of anything you said or did at such a
15  meeting.
16        THE WITNESS: Okay. Thank you.
17        (Pause.)
18     A.  This is supposed to be my reaction when?
19     Q.  On May 1st.
20     A.  That's not my reaction. I don't know who's
21  reaction is she's referring to, but as I recall, I did
22  not react in that manner or state those things.
23     Q.  Did you say that improvements would be made?
24     A.  When presented with the short-term actions by

Page 137

1  Susan on May 1, which are listed on D 310, I said,
2  "Fine. I'll complete them before I leave."
3     Q.  D 315, which is an e-mail from you stating that
4  you met with Susan Broadway on May 1.
5     A.  Mm-hmm.
6     Q.  Correct?
7     A.  Correct.
8     Q.  And you say she raised several points regarding
9  your performance and you were surprised about it.
10     A.  Correct.
11     Q.  You said the issues that she raised were in
12  areas where Brian Martin had assumed key
13  responsibilities?
14     A.  Right.
15     Q.  And you said improvements will be made once
16  Susan Broadway gave you this information?
17     A.  I just said that here to Jane Helen, yes.
18     Q.  Did you speak with the personnel person that
19  you mentioned before, Deb Kaufman, about problems you
20  were having?
21     A.  As best I can recall, I approached Deb after I
22  returned from medical leave.
23     Q.  D 330, does that refresh your recollection
24  about when you approached Deb Kaufman?

35 (Pages 134 to 137)

B063

Page 138

1   A.  Yes.
2   Q.  It was before medical leave, wasn't it?
3   A.  Yes, it was.
4   Q.  And you say, "Thank you for your telephone call
5   of today," right?
6   A.  Yes.
7   Q.  What was that call about?
8   A.  It was regarding the issues which I had raised.
9   Q.  What were the issues?
10  A.  May 1.
11      I apparently contacted Deb Kaufman to seek
12  her assistance before I went on medical leave.
13  Q.  And do you remember anything else about your
14  communications with Deb Kaufman during that period?
15  A.  You mean before medical leave?
16  Q.  Yeah.
17  A.  As best I can recall, I told her that I was
18  very concerned about a sudden emergence of all kinds
19  of criticisms after I had just gotten a very good
20  performance review, and I was seeking her assistance
21  in that -- in that regard.
22  Q.  Did you also speak to somebody named Patty
23  McDonald about that?
24  A.  I did request an appointment with Patty, and --

Page 139

1   Q.  Who is she?
2   A.  She's the hemostasis leader. So she's the head
3   of the hemostasis area.
4   Q.  Is she Jane Helen's boss?
5   A.  Yes.
6   Q.  What happened with that?
7   A.  Patty told me to document what was happening
8   and to call human resources.
9   Q.  D 339, which is an e-mail from you to Deb
10  Kaufman with a copy to Patty McDonald, and then Patty
11  McDonald's response to Deb Kaufman. And Patty
12  McDonald disagrees with your claim that she told you
13  to keep records. Do you see that?
14  A.  She didn't recommend weekly record keeping.
15  She said, "Document what's going on and utilize human
16  resources."
17  Q.  She also says that she thought you were in over
18  your head in your role and that you're not aware of it
19  and that you are going to create paperwork to try to
20  hold your spot. Did she say anything like that to
21  you?
22  A.  Never.
23  Q.  I hand you D-367 to 71, which is a series of
24  e-mails.

Page 140

1   A.  Yes. I'm familiar with this.
2   Q.  Is that where you're documenting everything to
3   keep your spot?
4   A.  I don't understand the question.
5   Q.  Isn't that what you're doing there; you're just
6   trying to make a record so you can protect yourself?
7   A.  I need you to explain that. I'm not sure what
8   you are trying to imply.
9   Q.  I'm trying to imply that you are trying to take
10  some kind of action to protect yourself by documenting
11  various things in e-mail; you're putting in lengthy
12  e-mails into the record because you're concerned about
13  your status.
14  A.  I'm putting e-mails to the appropriate
15  individuals to clarify erroneous information and to
16  remind, in this case, Jane Helen that the core alleged
17  professional deficiencies, which she said was why she
18  was not going to keep me on staff in 2004, all were
19  areas where I had just received outstanding
20  performance evaluations by her a month before. I was
21  very confused. I thought it was important to remind
22  her of that.
23  Q.  Did you also try to blame Brian Martin for the
24  deficiencies?

Page 141

1   A.  I articulated the chain of command and
2   management responsibility for certain projects that he
3   was responsible for.
4   Q.  So were you trying to blame him for the things
5   that you were being blamed for?
6   A.  Was I -- I don't understand what you mean by
7   that question. Was I trying to blame him?
8   Q.  Were you trying to say it's not me that's
9   responsible for these deficiencies, it's really Brian
10  Martin's fault?
11  A.  Well, I do state that because, in these cases,
12  he was responsible.
13  Q.  By the way, what prompted you to go to Patty
14  McDonald?
15  A.  I felt the situation was unusual, the sudden
16  emergence of these criticisms, and wanted to seek her
17  advice.
18  Q.  Could you have gone to personnel?
19  A.  I did go to personnel.
20  Q.  She's not personnel, is she?
21  A.  No.
22  Q.  Who did you go to in personnel?
23  A.  Deb Kaufman.
24  Q.  Did you tell her that you were going to go to

36 (Pages 138 to 141)

Page 142

1 Patty McDonald?
2    A.   I believe, as best I can recall, I mentioned to
3 Debby Kaufman that I talked to Patty. I believe, as
4 best I can recall, I did say that to Deb.
5    Q.   Were you worried that people would be angry at
6 you for having gone to Patty McDonald?
7    A.   Could you explain that? What people?
8    Q.   Jane Helen. Susan Broadway.
9    A.   I don't think I was concerned with them being
10 angry with me at that point.
11    Q.   What were you concerned about?
12    A.   Their behaving unreasonably.
13    Q.   Were you concerned at any time about them being
14 angry with you for going to Patty McDonald?
15    A.   I don't recall.
16    Q.   But by going to Patty McDonald, weren't you
17 going outside the chain of the command. Susan
18 Broadway was your boss, and Jane Helen was her boss,
19 correct?
20    A.   Correct. And they were both being
21 unreasonable?
22    Q.   So you felt the next step was to go to Patty
23 McDonald?
24    A.   Yes.

Page 143

1    Q.   Did you say before you got along fine with Jane
2 Helen?
3    A.   Yes.
4    Q.   But in this particular instance, you felt she
5 was being unreasonable?
6    A.   Yes.
7    Q.   I hand you 347 and 8. First of all, do you
8 recognize the handwriting?
9    A.   No.
10    Q.   If I represent to you that it's Deb Kaufman's
11 handwriting, why don't you read it and see if it
12 refreshes your recollection about the conversation
13 that you had with Deb Kaufman?
14    A.   What's the date on this? There's no date.
15    Q.   I don't know. Just looking at the context, I
16 gather it's about the same time that we've been
17 discussing.
18    A.   She felt good about our meeting with Jane.
19 Without a date it's difficult to understand what is
20 going on in this memo.
21    Q.   Was there a time when you were asking Deb
22 Kaufman to talk to Jane Helen on your behalf?
23    A.   It's possible. I don't recall.
24    Q.   Have you take a look at 379 through 81, which

Page 144

1 is a handwritten memo dated May 8th. I'll represent
2 to you that, again, it's Deb Kaufman's handwriting.
3       Do you recall a discussion with Deb
4 Kaufman?
5    A.   At this moment, I don't recall all the
6 specifics in there.
7    Q.   What do you recall?
8    A.   I recall meeting with Deb, expressing my
9 concerns about the situation. Deb was very committed
10 to helping, you know, sort of negotiate the process
11 and insure that I was treated fairly, to keep her
12 apprised. Yes, in a general sense.
13       MR. NEUBERGER:   Do you want to take a
14 break?
15       THE WITNESS:   Could we?
16       MR. SANDLER:   Sure. Sure.
17       (Recess taken.)
18       (Mr. Neuberger not present.)
19 BY MR. SANDLER:
20    Q.   You mentioned Sunita Sheth. Is she a
21 physician?
22    A.   Yes.
23    Q.   What's her position in the company?
24    A.   She's the lead medical director for Exanta.

Page 145

1    Q.   What sort of things does she do?
2    A.   I'm not aware of all the specifics of her job
3 responsibilities, but for my interactions with her,
4 she is responsible for scientific updates, resources
5 for the commercial team.
6    Q.   Did she speak in an ad board that you had set
7 up?
8    A.   Yes.
9    Q.   And did she agree to speak at the last minute?
10    A.   There were two advisory boards that I can
11 recall, one she spoke at. And I'm not familiar with
12 the circumstances around the timing.
13    Q.   Did you invite her to speak?
14    A.   Well, what time are you referring to? Because
15 the answer depends on when you're asking.
16    Q.   I don't know. I'm asking you.
17    A.   Well, initially, before Brian Martin got there,
18 I would drive or lead all activities around the
19 advisory board. But when Brian came in, he took over
20 the responsibility of interacting with the medical
21 directors. So I was no longer allowed to correspond
22 with Sunita or Jay or Scott, any of the medical -- the
23 physicians on the team. I had to go through Brian.
24    Q.   Was there a situation where you had a problem

37 (Pages 142 to 145)

B065

Page 146

1   with Sunita Sheth; she was angry or upset at you for
2   an e-mail you sent to her?
3      A.  Could you be more specific?
4      Q.  Did you invite her to speak at an advisory
5   board late in the day, and did she agree to do it,
6   participate in the advisory board, and then did you
7   send her an e-mail after which she regarded as
8   insulting in a situation like that?
9      A.  It's possible.  I can't recall.
10         (Mr. Neuberger entered the room.)
11     Q.  Did Brian Martin speak to you about the fact
12  that Sunita Sheth was angry or upset at you?
13     A.  Referring to what I said earlier, the medical
14  directors, including Sunita, are receiving too many
15  e-mails from the Exanta team, and they were upset
16  about various demands by various team members and
17  requests. So Brian Martin and Jane Helen agreed that
18  Brian Martin would serve as the key liaison.
19         Now, I did interact with Sunita on various
20  things otherwise, including ad boards, but that was --
21  without a specific example I can't answer your
22  question.
23     Q.  Well, my specific example is the one I just
24  gave you that Sunita Sheth is supposedly upset with

Page 147

1   you for sending an e-mail in a situation where she had
2   agreed to help you out and speak at an advisory board
3   at the last minute and then you sent an e-mail in
4   which you were critical of her, or at least she
5   perceived that you were critical of her.
6          Are you drawing a blank on that?  You
7   don't remember that or...
8      A.  I can't -- I don't recall.
9      Q.  Now, let's go back to the operation that you
10  had.  Who is your doctor, Dr. Gorondy?
11     A.  Susan Gorondy.
12     Q.  Is she an OB/GYN?
13     A.  Yes.
14     Q.  And when did you first learn that you -- did
15  she recommend that you have an operation?
16     A.  She presented me with my options.  She
17  recommended the surgery, and I told her I wanted to
18  investigate other options.
19     Q.  What was entailed in the surgery?
20     A.  I had three large cysts on my uterus.
21     Q.  What did she recommend?  What was the surgery
22  going to be?
23     A.  Removing the cysts and then also my uterus.
24     Q.  And what did you do about checking out

Page 148

1   alternatives?
2      A.  I talked to friends.  I reviewed information
3   she had given me.  There was a procedure, freezing
4   called cryon.  I looked into several different -- I
5   may have done a web search.
6      Q.  And then you concluded what, that you needed
7   the surgery?
8      A.  Well, she felt I had to have the surgery.  I
9   did not want to have the surgery, so I was trying to
10  find other options.
11     Q.  But what did you finally conclude?
12     A.  I had the surgery.
13     Q.  So you there were no other options; you
14  concluded there were no other options?
15     A.  To the best of my knowledge, there were no
16  other options for me at that time.
17     Q.  Did you talk to any other physicians, get a
18  second opinion?
19     A.  Not subsequent to Dr. Gorondy.
20     Q.  How about before Dr. Gorondy?
21     A.  Yes.
22     Q.  Which doctor?
23     A.  She's in Trolley Square.  The name escapes me.
24  She's from Thailand or the Philippines.  I can't think

Page 149

1   of her name right now.  But it will come to me.
2      Q.  Dr. Duque-Salva?
3      A.  Pardon me?
4      Q.  Dr. Duque-Salva?
5      A.  Dr. Duque.  That's her, yes.
6      Q.  So you went to her first and then you went to
7   Dr. Gorondy?
8      A.  Correct.
9      Q.  What did Dr. Duque tell you, same thing as
10  Dr. Gorondy?
11     A.  She felt that surgery was going to be needed.
12     Q.  So once you concluded that there were no other
13  realistic options, who's the first person you told at
14  AstraZeneca?
15     A.  I believe it was Jane Helen.
16     Q.  And you contacted health services at some
17  point?
18     A.  Yes.
19     Q.  And you requested benefits under the short-term
20  disability policy, is that right?
21     A.  Yes.
22     Q.  Before you notified AstraZeneca, what period of
23  time are we talking about?  When did this thing first
24  manifest itself?  How did it come up?

38 (Pages 146 to 149)

B066

Page 150

1    A.  It might -- as best I can recall, I think it
2  was late February or early March with Dr. Duque and
3  then I scheduled an appointment subsequent to that
4  with Dr. Gorondy.
5    Q.  How did you go about contacting corporate
6  health services, did you call or did you send an
7  e-mail or did you go in person?
8    A.  I don't -- I don't recall specifically the
9  first mode of communication. I believe it was a phone
10  call. I think it was a fine call.
11    Q.  Do you recall who you spoke to?
12    A.  It was either Wini O'Neil or Amy Millhorn.
13    Q.  Here's D 294 which is, it looks like, a memo to
14  you from Wini O'Neil, April 26, 2003. Was that the
15  first written communication?
16    A.  This is from Wini to me.
17    Q.  Right.
18    A.  To the best of my recollection, yes. It's also
19  possible that Wini and I e-mailed each other once or
20  twice. I can't recall.
21    Q.  Here's D 332 which is an e-mail from Wini
22  O'Neil to you on April 28th. What is that?
23    A.  According to her memo, it's the e-links to the
24  policies and the forms that I would have to fill out.

Page 151

1    Q.  And did you fill them out?
2    A.  Yes.
3    Q.  And was your short-term disability approved on
4  May 5, 2003?
5    A.  Yes.
6    Q.  Is that something that was done in writing?
7    A.  Yes.
8    Q.  How was that received by you? Where did you
9  get that?
10    A.  It was in a memo format.
11    Q.  I hand you D-332. Is that what you received?
12    A.  Yes.
13    Q.  How did that come to you?
14    A.  This memo was sent to me.
15    Q.  How was it sent?
16    A.  I don't recall specifically. It could have
17  been e-mailed. I also spoke numerous times with Amy
18  Millhorn on the phone. So she may have advised me
19  verbally and then sent the note.
20    Q.  There's a name here, Ronald Pszalgowski?
21    A.  Mm-hmm.
22    Q.  Who is that?
23    A.  I can't recall who he is.
24    Q.  Were you having symptoms from this condition?

Page 152

1    A.  You mean before diagnosis or after?
2    Q.  Both. Let's start with before.
3    A.  I was having symptoms before, but I didn't know
4  what they were, and then after I was diagnosed --
5    Q.  What were the symptoms?
6    A.  Bloating.
7    Q.  And then after your diagnosis?
8    A.  Same.
9        (Discussion off the record.)
10  BY MR. SANDLER:
11    Q.  Now, you mentioned before that you had talked
12  to Jane Helen and she had basically, I guess, reacted
13  by saying, "Good luck. Anything we can do to help."
14  And then said something about six weeks being a long
15  time. Anything else you can recall her saying, or
16  does that more or less cover it?
17        MR. NEUBERGER: For the record I don't
18  know if that was an accurate characterization of her
19  testimony.
20        MR. SANDLER: Let's just have her say it
21  again, what you can recall her having said.
22    A.  I told Jane that I had to have surgery, it's
23  not elective, and that my surgeon told me it would
24  require me to be out for six weeks. And she responded

Page 153

1  with a look of surprise, I guess I could describe it
2  as, and said, "Six weeks, that's a long time. We are
3  very busy. Are you sure you'll be out the whole six
4  weeks?" I said, "I'll do everything I can to come
5  back sooner. And then she said, you know, "I hope
6  you're okay," and might have provided some directions
7  about how to get in touch with health services.
8    Q.  When was the surgery scheduled?
9    A.  May 9.
10    Q.  Between that meeting that you mentioned and
11  surgery, did you speak with Jane Helen?
12    A.  Between?
13    Q.  Between the first meeting in which you
14  discussed the need for surgery and the actual surgery,
15  did you see her in the course of your work?
16    A.  Certainly I saw her in the course of my work.
17    Q.  Was there any discussion about the leave during
18  any of those meetings, or about the surgery?
19    A.  No, because at that time I was not interested
20  in having the surgery, and I was seeking alternatives.
21    Q.  I misunderstood. I thought you met with Jane
22  Helen after you already decided to have the surgery?
23    A.  I'm confused about the time. What meeting are
24  you referring to in between that and May 9? That's

39 (Pages 150 to 153)

B067

Farrell                                    v.                          AstraZeneca Pharmaceuticals, LP
Marybeth Farrell                    C.A. # 04-285 KAJ                          December 9, 2004

Page 154

1  where I'm confused.
2      Q.  Let's start.  You just described what took
3  place at the meeting during which you had told Jane
4  Helen that you were going to need a leave for surgery,
5  right?
6      A.  April 22nd.
7      Q.  Okay.
8      A.  Correct.
9      Q.  Between that time and the time you actually
10  went out on the surgery, did you discuss either the
11  surgery or -- well, let's start with that.  Did you
12  discuss the surgery with Jane Helen again before you
13  went -- actually, you know, before you began your
14  leave?
15      A.  Yes.
16      Q.  What was said during those discussions?
17      A.  It might have been in an update meeting.  As
18  best I can recall, I said words to the effect that it
19  was very upsetting for me and that I would do
20  everything I could to return early and that it was my
21  expectation that I would be able to do that.
22      Q.  Who was present at the meeting?
23      A.  I believe it was just -- it was just Jane and
24  me.

Page 155

1      Q.  About when was that meeting relative to the
2  April 22nd meeting?
3      A.  I believe this occurred two days before I went
4  out.  She came into my office on her way out at the
5  end of the day from work.
6      Q.  For what reason?
7      A.  She was just passing by.
8      Q.  And when did you actually go out.
9      A.  The end of the day, May 8 was my last day, and
10  the surgery was May 9.
11      Q.  And how long were you in the hospital?
12      A.  Several days.
13      Q.  What hospital was that?
14      A.  Christiana.
15      Q.  And did you speak with Jane Helen while you
16  were out on the leave?
17      A.  Yes.
18      Q.  By what means was that communication?
19      A.  Telephone.
20      Q.  Did you call her or did she call you or both?
21      A.  I called her.
22      Q.  About how many times?
23      A.  Well, after my first week at home, I called her
24  to say hello.  I was very worried about my job because

Page 156

1  of the things she and Susan had said to me before I
2  left, and I told her that I was willing to work from
3  home until I could come into the office.  And she
4  responded that, on a leave of this nature, she wasn't
5  sure if I was allowed to do that, if I could do that.
6  And I think she said, "I'll keep it in mind if there's
7  anything I could send you," words to that effect.
8      Q.  Did she say anything about your condition?
9      A.  She asked me how I was doing.
10      Q.  Did she say anything reassuring?
11      A.  As best I can recall she said, you know, "I
12  hope you feel better," words to that effect.
13      Q.  Did you speak to her again while you were out
14  on the leave?
15      A.  Yes.  I called her a couple of times while I
16  was out.
17      Q.  For what purpose?
18      A.  To say hello, and to ask her if she would send
19  me some work to do, and to apprise her of my progress.
20      Q.  What did she say?
21      A.  She basically didn't -- there wasn't anything
22  at that time that she could e-mail to me, like to send
23  home for me to do.  And that's pretty much it.
24      Q.  Did you have access to e-mail at home?

Page 157

1      A.  Yes.
2      Q.  Did you send her any e-mails?
3      A.  Yes, I did.
4      Q.  How many?
5      A.  At least one.  Not a lot of e-mails.  I may
6  have sent her a couple of e-mails just to touch base.
7      Q.  Did she send you any e-mails?
8      A.  To be honest, I can't recall.
9      Q.  How about Susan Broadway, did you speak with
10  Susan Broadway while you were on leave?
11      A.  I don't believe so.
12      Q.  Hand you D 383.  Is that an e-mail that you
13  sent to Jane Helen while you were on leave?
14      A.  Yes.
15      Q.  You say, "Thank you very much for your words of
16  encouragement."  What words were you referring to?
17      A.  When she would say, you know, "I hope you feel
18  better," words to that effect.
19      Q.  You volunteered to help out, correct?
20      A.  Yes.
21      Q.  Before you went out on leave, did you make some
22  arrangements for the work that you had to be done --
23      A.  Yes.
24      Q.  -- while you were away?

40 (Pages 154 to 157)

B068

Farrell
Marybeth Farrell

v.

C.A. # 04-285 KAJ

AstraZeneca Pharmaceuticals, LP
December 9, 2004

Page 158

1    A.   Mm-hmm.
2    Q.   What was done?  What were the arrangements?
3    A.   I developed transition plans.  I met with
4  Discovery and Louise Colburn and, of course, Susan and
5  Jane and organized each program or project and wrote,
6  you know, status update, and what were the next steps
7  needed by which date, you know, who would you contact.
8  Basically I sort of walked through documents so anyone
9  who took that project could do it.
10    Q.   Was that a reasonable thing to do to make sure
11  that things kept moving while you were away?
12    A.   Yes.
13    Q.   Did you hear from anybody that there was some
14  changes planned while you were going to be on leave?
15    A.   I'm not sure what you're asking.
16    Q.   Did anybody tell you that there were going to
17  be some people added, for example, to the team while
18  you were away?
19    A.   It's possible.  I can't recall.
20    Q.   When you returned, were there any new people
21  there?
22    A.   We did hire an additional PREP manager.
23    Q.   Who was that?
24    A.   I can't recall her name, but it wasn't right

Page 159

1  after I came back from leave, I don't think.
2    Q.   Did you know any other female employees who had
3  taken leave at AstraZeneca?
4    A.   Well, Christy Hedrick when she had her baby.  I
5  can't think of any others at the moment.
6    Q.   Did other people have babies?
7    A.   I presume so.
8    Q.   And did they take -- I mean, were they out of
9  work when they had the baby?
10    A.   Yes.  But you're asking me if there's anyone
11  that I know.
12    Q.   You didn't know anybody that got pregnant and
13  had a baby other than Christy Hedrick?
14    A.   In the recent past, that's true.
15    Q.   I hand you -- I think you've already got it,
16  actually.  See if you can find D-379 through 81 and
17  take a look at 380.
18    A.   This is Deb Kaufman's.
19    Q.   Right.  Right.  Her notes indicate that she
20  reminded you or -- yeah.  It also says, "I also
21  reminded Marybeth, another PREP person would be here
22  and likely be here when she returned."  Does that
23  refresh your recollection?
24    A.   That seems right for about that time.

Page 160

1    Q.   Now, you were not placed on a performance
2  improvement plan during the time you were on FMLA
3  leave, were you?
4    A.   No.
5    Q.   Now, you say that you had communicated some
6  with Jane Helen while you were on leave?
7    A.   Mm-hmm.
8    Q.   And you didn't communicate with Susan Broadway,
9  correct?
10    A.   Mm-hmm.
11    Q.   Yes?
12    A.   Yes.  That's -- yes.  Sorry.  Yes.
13    Q.   Why was that?  Susan Broadway was your
14  immediate supervisor.  Wouldn't it have been
15  appropriate to communicate with her?
16    A.   Yes, it would have been appropriate to
17  communicate with Susan.  I was -- I knew Jane Helen
18  much better than I knew Susan.  Jane had hired me.  I
19  mean, I used to report directly to her.  So I called
20  her.
21    Q.   In your e-mail to her you said you felt much
22  better, you'd like to help out however you can.  Was
23  that a sincere offer?
24    A.   Yes.

Page 161

1    Q.   So earlier on, you said you had told Jane
2  Helen, if you could return sooner than six weeks, you
3  would do that?
4    A.   Yes.
5    Q.   And then were you able to do that?
6    A.   I did return after the third week and, at the
7  end of the first day, began having spasms in my lower
8  back and considerable pain in my back.  And it
9  worsened.
10    Q.   So you went back out on leave?
11    A.   Yes.  I began working two half days the first
12  week back and then I tried three half days, I believe,
13  as far as I can recall, the next week.  And then one
14  half day into the following week, the pain had become
15  so bad, I told Susan I couldn't stay.  I was going to
16  have to go back out on full-time medical leave.
17    Q.   What did she say?
18    A.   Fine.
19    Q.   And so for how long were you out full time
20  again?
21    A.   That would be another week and a half.
22    Q.   What did you do during that time, stay home?
23    A.   Stayed home.
24    Q.   Was it in bed or just at the house?

41 (Pages 158 to 161)

B069

Farrell                                    v.                      AstraZeneca Pharmaceuticals, LP
Marybeth Farrell              C.A. # 04-285 KAJ                        December 9, 2004

Page 162

1    A.   Partial bed rest, but staying at the house,
2    yeah.  Didn't really do much.
3    Q.   Did you consult a physician about the back
4    problem at that time?
5    A.   When I went back to Dr. Gorondy, I did tell her
6    about it, yes.
7    Q.   What did she say?
8    A.   She said that I should basically keep an eye on
9    it, and if it got worse, you know, either call her
10   or -- you know, I guess I was supposed to call her as
11   far as I can recall.
12   Q.   Did you?
13   A.   Yes.
14   Q.   What did you say?
15   A.   Well, after my follow-up visit and when I
16   called, I spoke with the nurse because Dr. Gorondy
17   wasn't available and I explained the pain I was having
18   and numbness that was going into my right leg.  And
19   she said, they didn't know, you know, what that could
20   be caused by.
21        And the nurse suggested, as I recall, that
22   I schedule a follow-up meeting or follow-up
23   appointment with a back specialist.
24   Q.   Is that when you went looking for a back

Page 163

1    specialist?
2         You testified before about the Rothman
3    Institute?
4    A.   After that I went to the Rothman Institute.
5    Q.   You hadn't been to them before, or had you?
6    A.   No.  No.
7    Q.   Did the back problem improve while you were at
8    home?
9    A.   Yes.
10   Q.   When did you return to work?
11   A.   June 20th.
12   Q.   Is that full time?
13   A.   Full time.
14   Q.   When did you start looking for the back
15   specialist?
16   A.   When the problems became very severe.
17   Q.   When was that?
18   A.   I don't recall the exact date.
19   Q.   Well, I'm not looking for an exact date.  Was
20   it during this period when you went in to work, worked
21   for a couple of half days, and then had to go home?
22   A.   No.  It was after that.  It was weeks after
23   that.  It wasn't until -- it might have been the fall.
24   Q.   Fall?

Page 164

1    A.   Mm-hmm.
2    Q.   Were you back to riding a horse by that time?
3    A.   No.
4    Q.   Did Susan Broadway ever say or do anything to
5    suggest that she had a problem with your taking this
6    second leave?
7    A.   What do you mean by a problem?
8    Q.   Well, that she was going to hold it against you
9    or that she would rather that you didn't take it?
10   A.   She made a comment that, "Oh, that's a long
11   time.  We're really busy," words to that effect.
12   Q.   Susan Broadway did?
13   A.   Yes.
14   Q.   She made the same comment that Jane Helen made?
15   A.   A similar comment, not the same comment, but
16   just to the effect that we are really busy.
17   Q.   When did she make that comment?
18   A.   Early May before I went on leave.
19   Q.   Did you respond to the comment?
20   A.   I said, "Well, I told Jane that I'm going to
21   try to come back as soon as possible.  I hope not to
22   be out for the whole six weeks.
23   Q.   I hand you D 384.  Down at the bottom, e-mail
24   from you.  Appears to be your proposal for your return

Page 165

1    from the leave?
2    A.   Mm-hmm.
3    Q.   And the other e-mail seemed to be forwarded to
4    various people for informational purposes.  The e-mail
5    from Deb Kaufman to Susan Pritchard Broadway, says,
6    "Susan, this is Amy's call."  Is that Amy Millhorn?
7    A.   Apparently so.  Since Amy is copied on the May
8    29.
9    Q.   And Amy Millhorn is in health services, is that
10   right?
11   A.   Yes.
12   Q.   Is she a nurse?
13   A.   I don't know for sure.  She might be.
14   Q.   I take it that your proposal was approved, the
15   way that you were going to return?
16   A.   I'm sorry?
17   Q.   The way that you were going to return.
18   A.   Yes, it was.  I'm not sure if that was the --
19   Tuesday, June 3, was the exact start date.  I believe
20   it was, yes.
21   Q.   Who he is Rachel Bevis?
22   A.   Rachel Bevis replaced Debby Brangman's role as
23   cardiovascular commercial director or -- some title
24   like that.  I'm not sure about the title.

42 (Pages 162 to 165)

Page 166

1  Q.  So you had a reporting relationship with her,
2  is that right?
3  A.  In the reorganized structure, Susan Broadway
4  had a reporting relationship with Rachel Bevis. I did
5  not have a direct reporting relationship/
6  Q.  You just reported to one person, Susan
7  Broadway, directly?
8  A.  In terms of direct reporting, yes. It was
9  different than under the previous structure. PREP
10  managers used to report in to, say, a Rachel Bevis.
11  Now we went to a leader.
12  Q.  By the way, was it Denise Barrett that was the
13  new PREP manager?
14  A.  Denise Barrett Quigley was the new PREP
15  manager, and then there was another one hired
16  subsequent to that.
17  Q.  I hand you D 421 and 2. It looks like the note
18  at the bottom from Susan Pritchard Broadway to various
19  people announces Denise Barrett's joining the Exanta
20  team on June 30th.
21  A.  Okay.
22  Q.  So is that when she joined the team?
23  A.  According to this memo, it was about that time.
24  Q.  And then the same day you reply -- and I guess

Page 167

1  this is on a different subject -- that you received a
2  package last month at your home that your banding and
3  title upgrades have been approved, correct?
4  A.  That's correct.
5  Q.  Tell me about that. What was that all about?
6  A.  I had received a package which -- it was
7  advising me of changes and stock availabilities or
8  something to that effect. And I thought it was the
9  notice for the banding increase and title upgrades.
10  And it turned out that was incorrect, which is what I
11  later learned from Debby Brangman.
12  Q.  Were you asked to bring the package in to work?
13  A.  Susan might have asked me to bring it in. She
14  wasn't familiar with it, or to recheck it and let her
15  know.
16  Q.  Did you bring it in?
17  A.  No. I don't believe I did.
18  Q.  Do you still have it?
19  A.  I honestly don't know. I would have to check.
20  It could be -- it could be there.
21  Q.  At home?
22  A.  Yes. At home with my other files.
23  Q.  How did you learn that you were mistaken in
24  your interpretation of the document?

Page 168

1  A.  Because Susan checked with Debby Brangman and
2  Debby didn't know anything about it, or she checked
3  with Rachel -- whoever her person was. Debby Kaufman.
4  Whoever she went to. Debby Kaufman. Okay. Then
5  Susan came back to me and said Debby doesn't know
6  anything about it. As far as they know, that hasn't
7  happened. And after that, I called Debby Brangman to
8  find out what had happened.
9  Q.  Did you call Rachel Bevis about it on July 3rd?
10  A.  I don't recall.
11  Q.  I hand you the transcription of a voice mail on
12  July 3rd. That's D 427. See if that refreshes your
13  recollection.
14  A.  I recall contacting Debby Brangman.
15  Q.  You don't recall calling Rachel Bevis?
16  A.  It's possible that I did. Susan may have
17  indicated to me to call her and check, and she checked
18  with Debby Kaufman.
19  Q.  You said that it was Debby Brangman that
20  finally notified you that you had not been promoted to
21  band 5?
22  A.  Well, it was a circuitous expedition because
23  Debby Brangman wasn't any longer in the role for
24  cardiovascular communications director. And as I

Page 169

1  recall she said, words to the effect of "I don't
2  believe that that was approved." And I said, "But you
3  told me in January it was approved and that Scott
4  Bolenbaugh would just rubber stamp it as long as you
5  and Jane Helen approved it." And she said, "Well, I'm
6  not sure. I'm not sure what happened with that." As
7  far as she knew, at that point, it had not been
8  approved or gone through.
9  Q.  When did you learn that?
10  A.  Well, it was in July I had my conference with
11  her as best I can recall.
12  Q.  Was your title during this time marketing
13  manager?
14  A.  Professional relations and education manager.
15  Q.  Is there something called a senior marketing
16  manager?
17  A.  Well, there's a senior professional relations
18  and education manager. There's a professional
19  relations and education manager. And I, for a time,
20  had the title of senior professional relations and
21  education manager.
22  Q.  When you were with the previous team?
23  A.  No. When I was on the Exanta team. If you
24  check the team distribution lists, calendars, there

43 (Pages 166 to 169)