Farrell
Marybeth Farrell

v.
C.A. # 04-285 KAJ

AstraZeneca Pharmaceuticals, LP
January 25, 2005

Page 192

1    A    Renee is something of an expert in the
2    company on professional relations and education
3    programs. A lot of people go to her for advice. She
4    developed the whole medical education and professional
5    plan for the launch of Crestor, which was hugely
6    successful despite whatever issues that drug has. It
7    was just a remarkably well done program.
8         So she had a very clear, good understanding
9    of the requirements for the different banding levels
10   for the PREP managers and was able to provide me with
11   some very valuable information and insights into those
12   banded criteria, you know, against what this action
13   plan was calling for.
14   Q    So was that in August that you met with her?
15   A    Yes.
16   Q    And what did she say about the criteria?
17   A    Well, you know, she referred me to distinct
18   resources, the job description. There was a banding --
19   a new banding grid that came out. And we walked
20   through that and identified the disconnects between
21   what was required in the action plan and the actual job
22   requirements that were required by the company for that
23   position at that band level. So it was essentially,
24   you know, very sloppy work by whoever wrote the action

Page 193

1    plan because they weren't -- they weren't familiar with
2    the banding criteria and they wrote a plan for me for
3    improvement that had, in most cases, nothing to do with
4    my actual position.
5    Q    Did Renee Valles say she was going to do
6    anything or talk to anybody about it?
7    A    No.
8    Q    How was it left?
9    A    She said, good luck. If you need any help,
10   let me know in terms of, you know, serving as a
11   resource. And that was pretty much it.
12   Q    Did you speak to her again before your
13   termination?
14   A    Yes. As best I can recall -- I'm trying to
15   think. As best I can recall, I did, yes.
16   Q    When?
17   A    Several months later, I believe. It was
18   several months later.
19   Q    How did that come up? What was said?
20   A    By that point, it had become very clear to
21   me that this -- that I was not -- I was not wanted on
22   the team, that I was not going to be retained on the
23   team. And so I went to Renee to ask for advice on
24   other job opportunities in the company, if she knew of

Page 194

1    anything outside the company. That sort of thing.
2    Q    What did she say?
3    A    At that time, she was not aware of any
4    openings that would be appropriate for me.
5    Q    What's a promotions manager?
6    A    The promotions manager essentially is
7    responsible for brand promotion. So for a compound
8    that is prelaunched or has not been approved by the
9    FDA, you know, technically, you can only plan
10   promotions for the future, for when that drug is
11   launched. So we'll take an example of an in-line or on
12   market drug. For Nexium, I did a lot of promotion
13   manager's work in that I would not only oversee the
14   medical education programs, but also promotional
15   sponsorships at national congresses or, you know,
16   annual meetings. So, you know, purchasing, you know,
17   banners to go on the sides of busses or put videos in
18   the busses that would take people to the conference
19   center, posters in the hotel lobbies, promoting the
20   brand, basically advertisements, you know, a
21   sponsorship of this new show that every day they would,
22   you know, do news about whatever it was that we were
23   working on and other things going on in the congress
24   and have commercials with our drug.

Page 195

1         And also the promotions manager orders --
2    I'm trying to think of the right word. Various
3    promotional gadgets, you know, pens that have the
4    drug's name, coffee mugs, tote bags. Anything like
5    that that is promotional or advertising the name.
6    Q    Had you been a promotions manager?
7    A    I technically did not have that title. But
8    I did, in fact, perform those responsibilities when I
9    was in the GI group.
10   Q    Did you talk to Renee Valles about getting a
11   promotions manager position at some point?
12   A    It's possible I did. As best I can recall
13   right now, I don't specifically remember a particular
14   promotion job.
15   Q    Okay. Now, going back for a second. You
16   said that when you met with Jane Hellen and she told
17   you that she wasn't going to keep you or she didn't
18   think she would keep you, what did that mean to you?
19   Did that mean that you would be fired from the company
20   or did it mean that you would move to another position
21   within the company?
22   A    The way that she stated her disposition was
23   that she was not going to retain me in 2004. She
24   didn't say that she wouldn't help or impede me in

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

B097

Page 196

1    trying to find something else. It is just essentially
2    that, you know, you're not going to be here, Marybeth,
3    on this team. So I was on my own to seek other --
4    another position within the company or outside the
5    company.
6         MR. SANDLER: Since there aren't Bates
7    numbers, maybe we better get this marked as an exhibit.
8         (Farrell Deposition Exhibit No. 1 was marked
9    for identification.)
10   BY MR. SANDLER:
11        Q    You have been handed Exhibit 1. Why don't
12   you tell me what you recall about that e-mail and the
13   purpose of it and what came of it, if anything?
14        A    I do recall this e-mail. And we did get
15   together and she did offer me advice.
16        Renee was like a mentor to a lot of people
17   in the company. And she had a view that more diversity
18   in your experience, which is generally true, is going
19   to help you have mobility, upward mobility in the
20   company, you know, to do different things.
21        So since I had professional relations and
22   education or medical education experience, she had
23   arranged for Tammi Gaskins, who was at that time on the
24   Atacand team, to do both medical education and

Page 197

1    promotion and had explained to me as what she thought
2    to be a very wise blend of skills for enhancing one's
3    own professional development.
4         Q    So it looks like you asked to meet with
5    Renee Valles in July to talk about your career path, so
6    to speak?
7         A    Um-hmm.
8         Q    Is that the primary discussion that you had
9    with her at that time?
10        A    Yes, essentially. As best I can recall, I
11   wanted to get her thoughts on a transition to a
12   promotion manager position to see if she knew of any
13   openings. And it's possible, you know, she might have
14   asked me and probably did ask me how is your current
15   job going. And I -- as best I can recall, I did convey
16   my concerns to her about what was happening and told
17   her some of the things that were going on.
18        Q    All right. Turning to the action plan. Did
19   you say, did the action plan begin on August 18th,
20   2003?
21        A    It was delivered to me August 18th.
22        Q    And that was about two months after you came
23   back to work from your FMLA leave, is that right?
24        A    Yes.

Page 198

1         Q    Did you discuss this action plan with
2    anybody before it started?
3         A    It never occurred to me that I would be
4    placed on an action plan.
5         Q    My question is, I guess the 18th is when it
6    actually began, right? That's when the action plan was
7    initiated?
8         A    Yes.
9         Q    Okay. Did anybody sit down before that with
10   you and say, here is what we are planning to do and
11   discuss it with you?
12        A    No.
13        Q    You were just given the plan and that was
14   it?
15        A    In the sense that there was a short term,
16   you know, improvement items that Jane Hellen and Susan
17   Broadway developed for me before I went out on medical
18   leave and told me I would have long term improvement
19   items for -- they would have them for me when I
20   returned.
21        So in terms of the some of the longer term
22   areas for improvement, you know, it was being --
23   understanding the science better, being a scientific
24   expert, you know, there were a number of criticisms.

Page 199

1    But for that to advance to an action plan, as best I
2    can recall, I don't remember any advance warning about
3    this.
4         Q    What's your understanding of the purpose of
5    an action plan?
6         A    Well, my understanding of it is that it's
7    designed to help employees to improve their performance
8    to a level that is required by the position that they
9    are in or something to that effect.
10        Q    It's not a disciplinary activity, is it?
11        A    Well, can you explain what you mean by
12   disciplinary? I mean I don't --
13        Q    Well, it related to conduct in response to
14   some conduct as opposed to simply an effort to improve
15   performance?
16        A    As best I understand it, it's not a -- it's
17   not for use as a discipline policy, nor is it a
18   discipline policy. It's a performance assistance
19   program.
20        Q    Let me hand you Bates number D483 through
21   85, and which appears to be a memo to you from Susan
22   Pritchard Broadway.
23        Do you recall seeing that?
24        A    Yes.

Page 200

1    Q    And was this an outline of what was going to
2    be in the action plan?
3    A    This outlines the terms of the action plan.
4    Q    Did you ever sign that action plan?
5    A    No.  I refused to sign it.
6    Q    Would it be accurate to characterize your
7    response to the action plan as hostile?
8    A    No, I wouldn't characterize it as hostile.
9    Q    How would you characterize it?
10   A    Confused, disappointed in AstraZeneca.
11   Dismayed that they had -- that they would do something
12   like that.
13   Q    You didn't think you had done anything
14   wrong, is that right?
15   A    I hadn't done anything wrong.  That's
16   correct.
17   Q    You felt other people had made mistakes and
18   you were paying for it?
19   A    I never presumed or stated that I was
20   perfect.  However, I also was not willing to accept
21   responsibility for others' poor management.
22   Q    I have handed you D486, which is a summary
23   of a meeting between you and Susan Pritchard Broadway
24   dated August 18th.  Could you just take your time and

Page 201

1    read it and tell me if that's an accurate summary of
2    what was discussed?
3    A    Some of this is accurate and other claims
4    that Susan makes here attributing to my responses are
5    untrue.
6    Q    Let's just call off the untrue ones and
7    assume everything else is accurate.  What part is
8    untrue?
9    A    Well, it's true that I felt the action
10   plan --
11   Q    I said what's untrue.
12   A    Oh, okay.  I don't recall asking what she
13   was doing about other PREP managers for improvement.
14   Q    Okay.  What else?
15   A    I don't recall Susan pointing out that the
16   advisory board, the Exanta advisory board manual was an
17   effort to template activity to keep me on track.  That
18   was not the purpose of it and I don't recall her
19   stating that that was so.
20   Q    What else?
21   A    I completely don't recall her telling me
22   that I should be able to customize tactics and not rely
23   on manuals for the checklist.
24   Q    Anything else?

Page 202

1    A    I can't understand the last sentence where
2    it says, this stems directly from feedback from our
3    colleagues that the ad board work she had done prior to
4    her leave was incomplete and not truly done to the
5    point she said she left it.
6         That's new to me.  She did not say that to
7    me.
8    Q    Okay.  Anything else that you disagree with?
9    A    I disagree with the statement, still
10   Marybeth has great difficulty accounting for her
11   dollars in our budget update meetings and as of last
12   Friday did not have her budget updated on our share
13   drive.
14   Q    Was your budget updated?
15   A    As best I can recall, yes.
16        This statement is untrue but I do recall her
17   saying this.  Calls well organized and she was unable
18   to discuss agenda content clearly due to lack of
19   strategic understanding.
20   Q    She said it but you don't agree with it?
21   A    Correct.
22   Q    Okay.
23   A    And I both disagree with and also do not
24   recall at all her saying that I said it was the

Page 203

1    agency's fault for not running the call.
2    Q    Okay.
3    A    That's not true.  It was my job to run the
4    call.
5    Q    Anything else?
6    A    I don't recall saying that I didn't see
7    anything more than a few typos and a misstapled ad
8    board packet all due to the agency.
9    Q    Okay.  Anything else?
10   A    In terms of things that were or were not
11   stated.  The other things were stated, although I
12   disagree with them as well.
13   Q    Okay.  Some of the things -- most of the
14   things that are listed here are things that she says
15   you said in responding to the various criticisms?
16   A    Um-hmm.
17   Q    You have identified a couple of instances
18   where you say you don't recall saying that.  But other
19   than those instances, I take it that you agree that she
20   is correct in putting down what you said in response to
21   the criticisms, is that correct?
22   A    I think largely from what I have just read
23   there -- if I could see that again.  The
24   characterizations -- most of the characterizations she

B099

Farrell                                    v.                    AstraZeneca Pharmaceuticals, LP
Marybeth Farrell                      C.A. # 04-285 KAJ                    January 25, 2005

Page 204

1  has in here about my response are inaccurate.
2      Q    Okay.  And we have touched on the ones that
3  are inaccurate already?
4      A    Yes.
5      Q    All right.  Did you speak to Deb Kauffman,
6  Deborah Kauffman, about the action plan in August?
7      A    As best I can recall, yes, I did.
8      Q    I hand you D494 through 497.  These are I'll
9  represent to you handwritten notes of Deborah Kauffman
10  about her discussions with you.  Do you want to look at
11  those and see if you think those are accurate?
12     A    I'm having trouble reading the bottom of
13  D496.  I told her although I would be out of the
14  office, there would be someone covering for me.  After
15  discussing this a bit further, she seemed to --
16     Q    Rethink?
17     A    Rethink --
18     Q    My involvement or at least leave it
19  unrequested, I guess.
20     A    Okay.
21     Q    That's my guess, anyway.
22     A    Okay.  That makes sense.
23     Q    Okay.
24     A    I would say that this is accurate.  The

Page 205

1  statement on D495 where she says, I went over 29 areas
2  above again and again.  I was asking for a lot of
3  detail time lines and those sort of things.  That's how
4  I would qualify that characterization.
5      Q    Let me hand you D498 and 99, which is your
6  response to Susan Pritchard Broadway about the action
7  plan.
8      A    I'm familiar with this document.  And in the
9  third paragraph, as we stated on the last deposition
10  day, it's an error.  I made an error in stating that on
11  April 11, Jane Hellen and Susan had met with me and
12  communicated that there were problems with my
13  performance.  That was corrected in a subsequent memo,
14  which I provided to you.
15     Q    And what was, in fact, the date that you
16  claim the meeting took place?
17     A    It was May 1.  I believe it was May 1.  It
18  was a Monday afternoon later in the day.
19     Q    Okay.  And did you talk to anybody else
20  about this memo before you prepared it?
21     A    Not specific to this memo exactly.  I had
22  met with Renee Valles for help in understanding the
23  action plan disconnects between the requirements laid
24  out for me versus the Band IV job requirements.

Page 206

1      Q    Okay.  Other than that, you prepared this on
2  your own?
3      A    Yes.
4      Q    Let me hand you D527 and 8.  And I guess
5  your memo is attached also after that.
6           Is that Susan Broadway's response to your
7  e-mail, your memo?
8      A    Yes.
9      Q    Towards the end of the second paragraph, is
10  she correct that she had supervised you at that time
11  for 16 weeks of full-time work, three weeks on leave
12  and three weeks of part-time work?
13     A    Give me a minute.  I need to calculate.
14     Q    Sure.
15     A    Three weeks in April, four weeks in May, one
16  week in June.  That's approximately correct.
17     Q    By the way, when did you first realize that
18  you had gotten this April 11th date wrong?
19     A    After I had sent the memo, I don't recall
20  exactly when.  Although I did correct it subsequently.
21     Q    Do you have any kind of a note that shows
22  when you actually had the meeting?  Anything in
23  writing?
24     A    The meeting with Jane Hellen and Susan to

Page 207

1  communicate concerns?
2      Q    Right.
3      A    I believe on my 2003 calendars, as best I
4  can recall, there is a note for a meeting in my office
5  with Jane Hellen and Susan.
6      Q    Do you still have that calendar?
7      A    Yes.
8           MR. SANDLER:  I guess we want to look at
9  that, too.
10          MR. LaROSA:  Okay.
11          THE WITNESS:  And that was the first time
12  that they had come in together to sit down and discuss
13  the concerns.
14  BY MR. SANDLER:
15     Q    Did Ms. Broadway talk about your budget with
16  you in August, some concerns that your budget wasn't
17  up-to-date?
18     A    Yes.  Susan repeatedly, over many months,
19  erroneously accused me or accused me erroneously of not
20  having entered the $1.55 million into the budget that
21  would cover my programs so that we would have an
22  accurate accounting of our expenditures.  And for
23  several months, I provided her with the e-mails, with
24  the attached budget submissions, that had been

9 (Pages 204 to 207)

Page 208

1  submitted consistently since February of 2003. The
2  first one was on February 21, 2003, to John Liano, who
3  at that time was managing our budget numbers and at
4  that point my budget allocation was 2.5 million and we
5  had some budget cuts and it was 1.5 million, which I
6  had sent to Brian Martin and then Susan. And for
7  reasons I do not understand, she consistently neglected
8  to include my budget updates to the finance department
9  and then would in meetings or in individual meetings
10 with me accuse me that I wasn't submitting the numbers for the
11 1.55 million and that I was causing the whole team to
12 be off budget.
13    Q    Were you, in fact, over budget?
14    A    Well, I'll need you to explain what you mean
15 by that. Are we talking about specific programs, the
16 year end tally? I mean some programs went over budget.
17    Q    I'm talking about in August and September of
18 2003. At that point, had you overspent your budget?
19    A    When I returned from medical leave --
20    Q    Give me a yes or a no first.
21    A    The budget was over, yes.
22    Q    Okay. Go ahead, if you want to explain, go
23 ahead.
24    A    There was a VTE advisory board in Boston

Page 209

1  that David McNinch was leading with Patty Torr and
2  Louise Colburn was the PREP manager who took that over
3  from me and that went -- it was on budget when I left.
4  But when I came back, whatever they did there, it was
5  way over budget. So that counted against my numbers
6  even though I wasn't there.
7     Q    Okay. It was your budget but you weren't
8  responsible for the going over part, correct?
9     A    For that program, that's correct.
10           MR. SANDLER: Let's take a short break.
11           (A brief recess was taken.)
12 BY MR. SANDLER:
13    Q    Did you use e-mail communications frequently
14 as part of your job?
15    A    Yes.
16    Q    And did you receive a lot of e-mails?
17    A    Yes.
18    Q    And did you leave a lot of them unread?
19    A    Well, e-mails of a business nature that came
20 to me from colleagues or vendors that had to do with my
21 responsibilities on the Exanta team, no, I did not
22 leave those unread. I read those.
23           I also -- subscribed to several on-line news
24 services. So if something came in from like an on-line

Page 210

1  news update that day. I can't really think at this
2  moment which ones I had. But I did not always open
3  those because I didn't have time.
4           And I often put read receipts on a lot of
5  e-mails I sent out. Particularly to vendors or for
6  internal reviews to the team because I needed to know
7  that people had opened the message because, if they
8  didn't, I would call them. Because everything that we
9  did often was on deadlines. So people had to respond
10 and turn things around.
11          So read receipts I didn't open. So it would
12 just say read receipt, so and so received it. The way
13 my computer was set up, I could read the contents of an
14 e-mail in box without actually having to open
15 it.
16    Q    It was indicated that as of October 1st,
17 2003, you had 211 unread e-mails in your box. Does
18 that sound right?
19    A    Yes.
20    Q    Did Ms. Broadway tell you at some point that
21 you ought to be reading and responding to your e-mails
22 in a timely fashion?
23    A    Yes, she did.
24    Q    And did she say that you weren't doing that?

Page 211

1     A    Yes, she did.
2     Q    And I take it you didn't agree with that?
3     A    That's correct.
4     Q    For the reasons you have just explained?
5     A    Largely, yes.
6     Q    Now, you said that you thought the action
7  plan treated you as a Band V employee rather a Band IV
8  employee, correct?
9     A    Yes.
10    Q    And I think you explained in writing your
11 reasonings why you thought that was the case, is that
12 right?
13    A    Yes.
14    Q    And were you told in response that the
15 company felt you were being treated as a Band IV
16 employee?
17    A    Can you clarify when you say was I told by
18 the company in response that they thought I was being
19 treated as a Band IV? Do you mean Susan Broadway,
20 Rachel Bevis, Georgina Austin-Jones, Deb Kauffman,
21 those individuals to whom I expressed my concerns about
22 the banding difference?
23    Q    Well, did anybody from the company explain
24 to you that you were being treated as a Band IV

B101

Page 212

1  employee?
2      A    Susan Broadway stated on several occasions
3  in response to my complaints about the action plan that
4  I was wrong about the banding discrepancy or problems.
5  But she was unable to ever provide specific examples or
6  reasons relative to job descriptions, banding criteria
7  grids for the positions, why she felt that way other
8  than it was her opinion.
9      Q    Okay.  Did you met with Rachel --
10         MR. LaROSA:  Did you want to say something
11  about one of the memos you talked about before?
12         MR. SANDLER:  Sure.
13         THE WITNESS:  Yes.  You had asked me did I
14  prepare my August 21, 2003 response to the action plan
15  by myself.
16  BY MR. SANDLER:
17      Q    Right.
18      A    And I said, yes, but I had also talked to
19  Renee Valles.
20         To be completely accurate, as best I can
21  recall, I called Renee Valles at home the evening
22  before I submitted this to ask for input from her in
23  terms of some of the wording.
24      Q    And when you say this, you're talking about

Page 213

1  D498 and 9?
2      A    Yes.
3      Q    Okay.  I hand you Bates number D502, and ask
4  you what that is?
5      A    Um-hmm.  This is a summary of a meeting that
6  I had on August 25 with Rachel Bevis, who was the
7  replacement for Debbie Brangman as the skills center
8  director.  And because of my complaints about the
9  errors in the action plan, Band IV versus Band V, as
10  best I recall, Susan Broadway said to me, I would need
11  to talk to Rachel Bevis because Rachel had been
12  involved apparently with that -- I can't say that she
13  said Rachel would be involved with the plan.
14         She said, I need to go talk to Rachel about
15  my concerns about Band IV versus Band V in the action
16  plan.  So I called Rachel and made an appointment and
17  reviewed with her the grid, the chart, as I state here,
18  for Band V and Band IV.  And despite that the grid
19  clearly states Band V requirements, which are in my
20  action plan, she refused to admit that it was a Band V
21  description in my action plan.  So I didn't get
22  anywhere in terms of having her be reasonable or
23  amenable to modifying the action plan to be accurate to
24  a Band IV.

Page 214

1         I also reviewed with her several, you know,
2  we had a general discussion about the action plan, my
3  disappointment that this had happened, my surprise with
4  it and reviewed some of the areas that had been
5  identified for improvement on my part.
6         And so in responding to her, for example,
7  that I was supposed to be a consultative scientific
8  expert, I had -- I updated her, as I state in this
9  memo, a leader for the scientist, the product develop
10  scientist, Deborah Walters, and outlined for her the
11  actions I initiated to improve my scientific expertise.
12         So it's basically a summary of that
13  discussion.
14      Q    Okay.  You seemed very focused on making the
15  distinction between Band IV and Band V.  That's my
16  observation from what you said.
17         Were you concerned that you would not be
18  able to perform at a Band V level if the action plan
19  was, in fact, a Band V action plan?
20      A    No.  In fact, at some point, I sent a memo,
21  I believe, as best I can recall, to Susan stating that
22  since I already was performing all of the
23  responsibilities of the Band V, that upon my successful
24  completion of the action plan, I should be reinstated

Page 215

1  to the Band V promotion that had been promised to me
2  and then mysteriously rescinded in July.
3      Q    So you felt that you could successfully
4  achieve a Band V action plan?
5      A    Yes.
6      Q    Did AstraZeneca conclude that you had not
7  succeeded in your action plan?
8      A    Yes, they did.
9      Q    And was that communicated to you on
10  September 30, 2003?  And if that doesn't sound right or
11  if you're not sure, just say that.
12      A    To be honest, I don't recall right at this
13  time if it was on September 30.  September 30 was the
14  end date and I had been told if I didn't dramatically
15  improve, I would be terminated on September 30.
16      Q    Who told you that?
17      A    As best I recall, it was Susan Broadway.
18      Q    When did she tell you that?
19      A    She was in my office one day and we were
20  talking about some of the items in the action plan and
21  the outside date, September 30.  I may have asked her a
22  question about that.  And her response was that the
23  plan allowed for termination, and if I didn't
24  dramatically improve, you know, essentially that's what

11 (Pages 212 to 215)

B102

Farrell                                          v.                    AstraZeneca Pharmaceuticals, LP
Marybeth Farrell                        C.A. # 04-285 KAJ                        January 25, 2005

Page 216

1   was going to happen to me.
2       Q    Well, in any event, were you placed on a
3   performance improvement plan at the end of the action
4   plan?
5       A    Yes, I was.
6       Q    And what's your understanding of the
7   difference between the two?
8       A    Well, a performance improvement plan is the
9   next step to, quote, assist, unquote, employees in
10  their performance if they fail the action plan.  So
11  there is a sequence of steps the company as a policy I
12  presume takes that includes first an action plan, then
13  the PIP and then likely termination as it was explained
14  to me by Deb Kauffman.  And it is in those handwritten
15  notes you showed me.
16      Q    Did you speak to Deborah Kauffman on
17  September 16th about your situation?
18      A    It's very possible I did.  I spoke with her
19  on a number of occasions.
20      Q    Let me hand you a note that purports to be
21  her note, which is D556, and ask you if that sounds
22  like an accurate summation of what was said?
23      A    Yeah, I would say, generally, as best I can
24  recall, I did contact her.

Page 217

1       Q    And did you meet with her shortly
2   thereafter?
3       A    I had several meetings with her.  So it's
4   possible that I did.
5       Q    Did you meet with her and Georgina
6   Austin-Jones together?
7       A    Yes.
8       Q    And do you recall what was discussed at that
9   meeting?
10      A    Yes.
11      Q    What was discussed?
12      A    Deb Kauffman told me that Georgina
13  Austin-Jones was being brought in to take over this
14  case file for human resources and that Deborah would no
15  longer be working on this matter.
16      Q    Did she say why?
17      A    As best I recall, words to the effect that
18  Georgina was very experienced in HR and would be able
19  to do a good job or words to that effect, as best I can
20  recall.
21      Q    Wasn't Deb Kauffman going to be out of town
22  or on vacation for a period of time?
23      A    She was going to be going on vacation.
24  That's true.

Page 218

1       Q    Did you ask Deb Kauffman to find you another
2   job in another department around that time?
3       A    I did ask her to assist me, yes.
4       Q    And did you also make a complaint about Faye
5   Morin at that time, around that time?
6       A    In September?
7       Q    Yes.
8       A    It's possible I did.
9       Q    How about Faye Morin criticizing you in
10  front of your colleagues?
11      A    Yes, that's correct.
12      Q    What was that about?
13      A    I was managing the coag clinic accredited
14  speaker bureau training program for faculty in
15  September.  And the dates I believe were September
16  16 -- I'm sorry, September 17, 18 and 19.  It was
17  either at that meeting or at the anti coag meeting in
18  August.  I believe it was the one in September.  I'm
19  pretty sure it's that one.  We brought in the
20  scientists, field scientists, to go over the data that
21  faculty would be trained on for our speaker bureau
22  program.  So it was September.
23           And I was explaining a component of the
24  program targeting and the rationale for who was

Page 219

1   involved as faculty.  I made reference to pharmacists.
2   The program was going out to different audiences,
3   different types of physicians.  And when I mentioned
4   pharmacists, Faye basically cut into my presentation
5   and very loudly and rudely said, that's inaccurate or
6   that's not true, that's not what this program is
7   focused on.  She misconstrued, because she didn't give
8   me an opportunity to fully explain what I was trying to
9   explain to them about the data base of faculty versus
10  who they would be going out to in the clinics.  And she
11  was very rude.  I was very embarrassed.  And after the
12  meeting, some of the scientists said they were -- they
13  thought that Faye was very rude in doing that to me.
14      Q    Who said that?
15      A    Two of the scientists.
16      Q    Who?
17      A    Emily Burton and Linda McCormick.  And also
18  Cecelia Schott.  She said we knew exactly what you were
19  saying.  They felt that she was misconstruing what I
20  was saying also.
21      Q    Let me hand you D567.  Is that a summary of
22  the complaints that you made at the meeting with
23  Deborah Kauffman and Georgina Austin-Jones?
24      A    Yes.

12 (Pages 216 to 219)

B103

Page 220

1    Q    And directing your attention to numbered
2  paragraph two, the complaint of sexual harassment. Did
3  you indicate that that had occurred in 1995 or 6, that
4  the actual sexual harassment had occurred in '95 or 6?
5    A    Yes.
6    Q    And did you say that there was a lingering
7  history from that harassment?
8    A    Yes.
9    Q    And what did you mean by that?
10    A    Well, I explained to them that the man --
11  one of the men that was my boss at the time, after I
12  complained to one of my managers, Steve Lampert, and
13  then raised it with Alan Milbauer subsequent to that,
14  Alan didn't want to talk about it and I saw a change in
15  the way he interacted with me, the amount of time that
16  I worked with him after that, that there were lingering
17  effects that had been adverse to me in my career for
18  having said anything and that he was still with the
19  company.
20    Q    So do you think that he was somehow
21  continuing to take adverse action against you because
22  of this complaint in the mid nineties?
23    A    I was harassed over a period of years after
24  that where I would receive things in the mail. Steve

Page 221

1  Lampert would leave notes on my chair for job openings
2  at other companies encouraging me to leave the company.
3  And I had tried to ask Alan to assist me with this and
4  he ignored me and refused to do anything. If anything,
5  it just seemed that he was sanctioning these behaviors.
6        So when this all happened with the Exanta
7  team, because it was so unexpected and so sudden, yes,
8  I had a concern of that because of Alan's power. He
9  was extremely powerful. He was the vice-president of
10  public affairs. He could, you know, he could
11  conceivably be involved.
12    Q    You haven't made any allegation in this
13  lawsuit that the sexual harassment was a reason for
14  retaliation against you, isn't that right?
15    A    That's correct.
16    Q    Do you still believe that this was a reason
17  for the retaliation?
18    A    I don't know. It appears from the actions
19  taken by Jane Hellen and Susan Broadway and the issues
20  communicated to me that stems from my having to be out
21  of the office for six weeks on medical leave.
22    Q    And not from the lingering sexual
23  harassment?
24    A    I don't know. I can't answer that question.

Page 222

1    Q    By the way, how did you get along with Faye
2  Morin in general?
3    A    Fine.
4    Q    So this comment that we talked about before,
5  was that sort of an aberration, so far as you were
6  concerned?
7    A    I would say, yes.
8    Q    What's her position?
9    A    She was the leader for the coag clinic and
10  the consumer work streams.
11    Q    Was she a peer of Jane Hellen's at that
12  level?
13    A    No. No, she reported for a time to David
14  McNinch. And I'm not sure if that changed that she was
15  reporting to Jane Hellen after that.
16    Q    Okay. I hand you Bates number D674. Is
17  that a response from Keith Black of human resources
18  about your retaliation complaints?
19    A    Yes.
20    Q    And he concluded that the concerns about
21  your performance had been expressed before you asked
22  for the FMLA leave, correct?
23    A    He states that.
24    Q    Now, we have talked a little bit already

Page 223

1  about the performance improvement plan.
2    A    Um-hmm.
3    Q    Were you given a plan to sign?
4    A    Yes, I was.
5    Q    And did you refuse to sign it?
6    A    I refused to sign it.
7    Q    Okay. You didn't believe it was justified,
8  is that correct?
9    A    Correct.
10    Q    Can you honestly say that you made an effort
11  to meet the requirements of the plan despite your
12  misgivings about it?
13    A    Yes, I can. I made every effort.
14    Q    While you were on the performance
15  improvement plan, did you miss a lot of time from work?
16    A    What do you mean by a lot of time?
17    Q    Say 20 days, workdays?
18    A    I had vacation that I was going to lose if I
19  didn't take it. And it could have been 20 days.
20    Q    Did you have some illnesses?
21    A    Yes.
22    Q    What illnesses?
23    A    Well, I had an abscessed tooth that was an
24  emergency. My doctor had to phone in antibiotics at

13 (Pages 220 to 223)

B104

Page 224

1   night and it took the next day.  I was in two offices.
2   Her office in the morning and then I had to go to an
3   endodontist for the actual root canal and all that for
4   the latter part of the day.
5          I have chronic sinusitis.  So typically I
6   get ear infections.  I may have had a couple things
7   like that.
8       Q     Shortly after you went on the performance
9   improvement plan, did you ask for vacation?
10      A     I believe I did.
11      Q     And what did you plan to do while you were
12  on vacation?
13      A     I don't recall if I had specific plans.
14      Q     You were just concerned that you were going
15  to lose the time if you didn't take it, is that right?
16      A     Well, one, I was entitled to the time.
17      Q     Right.
18      A     Two, I was very stressed out about the way I
19  was being treated at work and had gone to see a
20  psychiatrist and a psychologist and I needed time -- I
21  needed to get out of that environment.  So I think it
22  was just going to be to use my vacation to take some
23  days off.
24      Q     Did you ask for 17 days of vacation in the

Page 225

1   last two months of the year?
2       A     Yes.
3       Q     And did Susan Broadway point out to you that
4   that's not a very good idea when you're trying to work
5   on a performance improvement?
6       A     Yes, she did.
7       Q     I take it you disagreed with that?
8       A     Yes, I did.
9       Q     Is the vacation system at AstraZeneca, is it
10  a sort of a use it or lose it system, if you don't take
11  the time, you can't roll it over?
12      A     You can only roll over a certain amount of
13  days.  I believe it's five.
14      Q     Okay.  So you could have kept five days?
15      A     I still did have extra days at the end of
16  the year.
17      Q     And you rolled those over?
18      A     I requested to roll them over, yes.  It was
19  2.5.
20      Q     In response to the concern that was
21  expressed about your taking all that vacation, did you
22  ask for compensatory time off?
23      A     Yes, I did.
24      Q     You had never asked for that time off

Page 226

1   before, had you?
2       A     Do you mean specific to the Exanta team or
3   in general?
4       Q     During the time you worked for the Exanta
5   team.
6       A     No.
7       Q     Was it correct to say or is it correct to
8   say that you were expected to put in whatever time was
9   necessary in order to get the job done?
10      A     Yes.
11      Q     Did you also have what you called a pet
12  emergency during that time?
13      A     Yes, I did.
14      Q     What was that all about?
15      A     One of my cats was very ill.
16      Q     So did you lose a day or something?  Yes?
17      A     Yes.
18          Can we stop?
19          MR. SANDLER:  Sure.  Let's take another
20  break.
21          (A brief recess was taken.)
22  BY MR. SANDLER:
23      Q     During the last three months of 2003, were
24  you looking for other employment?

Page 227

1       A     Yes, I was.
2       Q     Did you go on any job interviews?
3       A     As best I can recall, I did not, during that
4   time.  But I was sending out resumes', contacting
5   people.  I don't recall going out for interviews.
6       Q     And did you have periodic meetings during
7   the time when the performance improvement plan was in
8   place to talk about how you were doing?
9       A     Yes.
10      Q     And was Georgina Austin-Jones involved in
11  those meetings?
12      A     Yes, she was.
13      Q     I hand you D1169, which is her notes of a
14  meeting.
15      A     Okay.
16      Q     Of December 2nd.
17          Would you just look at that and tell me if
18  you agree whether the notes are accurate or not?
19      A     This is only partially accurate.
20      Q     What's not accurate?
21      A     Okay.  I would qualify that in the first
22  paragraph where she says at the beginning of the
23  meeting when asked to comment on her progress towards
24  the plan, Marybeth refused saying she was not prepared

14 (Pages 224 to 227)

B105

Page 228

1  to talk through it at that time.
2         This meeting had been called, if I'm
3  recalling correctly, last minute and I just returned.
4  There wasn't advance notice for me to prepare for the
5  meeting.  That was why that happened.  It's completely
6  inaccurate to categorize my attitude during that
7  meeting or any other meeting as hostile.  It's untrue
8  that, in the second paragraph, it says, dismissing
9  attitudes and behaviors witnessed during the meeting
10 and before by Susan was not in line with a good faith
11 effort.
12        They claimed that but that is not true.
13 Otherwise, I would say it's pretty accurate.
14    Q    Let me hand you Bates number D1072 to 4,
15 which are notes prepared by Susan Broadway of events
16 that occurred during December 2003, or what she
17 represents occurred anyway.
18        Let me ask you about the first paragraph.
19 Did you miss a staff meeting?
20    A    As best I recall, I did arrive late, yes.
21    Q    And at the bottom of the first page, did you
22 accuse Susan Broadway of not doing her job?
23    A    At the bottom of the first page?
24    Q    Yeah.  The second sentence.

Page 229

1     A    That's correct.  She was responsible for
2  having -- for ensuring that the advisory boards will be
3  approved by the legal and regulatory groups for when
4  that was transitioned over in the reorganization.  And
5  it wasn't done.
6     Q    So you did accuse her of not doing her job?
7     A    Yes, I did.
8     Q    The second page, second paragraph, was it
9  correct that you had over 2,700 e-mails in your in box
10 and you couldn't send any responses?
11    A    Very possible, yes.
12    Q    Okay.  How come?
13    A    Largely because the process for filing down
14 e-mails and to saving them was several steps, very
15 time-consuming, and I would save things and then
16 categorize them within my in box and then move the
17 really critical ones when my mailbox was getting full.
18    Q    Okay.  As in the previous year, were
19 feedback forms prepared by various people for your
20 performance review?  Remember we talked before about
21 feedback forms?
22    A    Um-hmm.
23    Q    Did you see feedback forms towards the end
24 of 2003?

Page 230

1     A    I don't recall seeing any.
2     Q    Okay.  And are these forms prepared not just
3  by AstraZeneca employees, but also by vendors that work
4  with the various people?
5     A    They can be asked to fill those out, yes.
6     Q    Let me hand you D1075 to 77, which has
7  handwritten on it Discovery.  I'm assuming that's
8  a feedback form prepared by Discovery International?
9     A    Um-hmm.
10    Q    Can you just review it and make any
11 agreements or disagreements with it?
12    A    Okay.  I'm sorry.  What was the question?
13    Q    There are points of disagreement there?
14    A    Yeah.  This will take some time if you want
15 me to go through it.
16    Q    Well, I don't know how much time we need to
17 spend on it.  It's fair to say that there are what,
18 lots of areas that you disagree with the comments on?
19    A    Yes.
20    Q    All right.  Anything in particular about,
21 did you have any problems with Discovery International,
22 any reason why they would say this if it wasn't their
23 own perception, at least, of what was correct?
24    A    There were ongoing challenges for all of the

Page 231

1  PREP managers managing Discovery.  It's too much to get
2  into.
3     Q    I thought that we talked about this the last
4  time.  You said they would sort of do their own thing
5  even when they were directed to do certain things?
6     A    Yes.
7     Q    And who in particular at Discovery
8  International did you work with?
9     A    Two individuals primarily.  Christine Lutze
10 and Mary Pat Howard.
11    Q    Is there also a company called Impact?
12    A    Yes.
13    Q    What's that?
14    A    That's also a medical education company.
15    Q    And who did you work with there?
16    A    Robin -- I can't think of her last name
17 right now.  Moisa, M-o-i-s-a.  Something like that.
18    Q    Were there similar problems with Impact or
19 was Impact performing satisfactorily?
20    A    My previous experience, initial experience,
21 with Impact had always been terrific.  However, they
22 then developed problems in the sense that Robin would
23 call me up with ridiculous recommendations for strategy
24 and agenda for say an upcoming medical symposium.  So I

B106

Page 232
1  wasn't sure why she was doing this.  But I would have
2  to correct her.  I knew that she knew better.
3     Q     Had you worked with her before?
4     A     Yes, on the Nexium team.
5     Q     Let me hand you D1078 and 9, which is the
6  Impact feedback form.  Have you ever seen these forms,
7  by the way?
8     A     No, I haven't.
9     Q     I realize it's a little bit difficult to
10  read.  But I think it's legible.
11        The first comment, typically, Marybeth
12  defers to Denise on issues relating to invoicing and
13  she does not seem well acquainted with the budget
14  details of invoicing deadlines.
15     A     Because with those programs, Denise Quigley
16  was in charge of processing all their invoices.
17     Q     Okay.  They also say that your response time
18  was lagging in responding to e-mails and such and that
19  you weren't available for conference calls.
20        Any comment on that?
21     A     As best I can recall, there were some
22  occasions where we had scheduled calls.  But because of
23  other more pressing deadlines on other programs that
24  came up, I would have to reschedule.  I mean it's

Page 233
1  something that, you know, based on what the
2  immediate -- what's the most urgent matter that you,
3  know, has to be attended to and then, you know, yeah.
4  So certainly I would reschedule calls.
5     Q     Okay.  There is also a comment that in
6  direct communications with them, you were often
7  confused and you asked questions repeatedly that had
8  already been addressed?
9     A     I disagree with that.
10     Q     Okay.
11     A     I did disagree with that last statement
12  entirely also.
13     Q     That's on the second page?
14     A     Um-hmm.  Yes.
15     Q     Okay.
16     Q     What's QED?
17     A     That is a medical education agency.
18     Q     And who did you work with there?
19     A     Primarily Denise Walters.
20     Q     And how did QED perform?
21     A     In say the front end of the accredited
22  speaker bureau training -- or speaker bureau program
23  that we were contracted with QED with Johns-Hopkins
24  University.  Their work was, you know, I hate to say

Page 234
1  disastrous, but that's the only appropriate term.  And
2  there were several members of the team working on this,
3  this slide deck for that program.  And they -- it was
4  just a bad experience for everyone all around.  Until
5  we got to the point where they were booking the
6  programs and recruiting faculty.  Then they were
7  excellent.  We were above goal.  They were organized in
8  writing the programs.  So the logistical part worked
9  out very well but the -- they didn't have any expertise
10  in thrombosis.
11     Q     How about the GMR?  Did you work with a GMR
12  group?
13     A     Yes.
14     Q     Who in particular?
15     A     Michael Zilligen.
16     Q     And what do they do?
17     A     They are a managed market focused medical
18  education agency.
19     Q     And how did they perform?
20     A     Extremely well.
21     Q     I hand you D1083 to 86.  Why don't you go
22  over the comments and tell me if you agree or disagree?
23     A     Well, I completely disagree with the
24  statement that I still, on page two, after six months

Page 235
1  of trying to cultivate a working relationship with MBF,
2  it has become completely apparent that MBF has little
3  understanding of the managed market segment.
4        That's interesting because I oversaw,
5  developed and ran the Nexium managed market segment
6  education program.
7        So what is the question on this?
8     Q     Is there anything in particular that is
9  notably out of sync with your understanding?
10     A     Yes.  A number of items of particular note.
11  One I have already mentioned.
12        He also says I was not developing the
13  agendas or brand strategy.  Michael Abens, who was head
14  of managed markets, had already set up these programs,
15  developed the strategy, who would be invited.  All that
16  was already done when I got involved in this.  So I was
17  doing more facilitating making sure these were moving
18  forward.  So it's completely irrelevant to make that
19  claim about me.  It's not relevant to what we were
20  doing for those programs, what my responsibilities
21  were.  And he knows that.
22     Q     Why did he say it?
23     A     I don't know.
24        Team leadership.  I don't know why he would

Farrell                                    v.                    AstraZeneca Pharmaceuticals, LP
Marybeth Farrell                    C.A. # 04-285 KAJ                       January 25, 2005

Page 236

1   make a statement like that. MBF demonstrates a
2   complete lacking in team leadership qualities. I don't
3   know why he would say that.
4        Some of the document review areas that they
5   raise, in particular with the templates and being
6   within regulatory compliance, these programs had been
7   underway for months when I took this market segment
8   over and they had never been submitted to regulatory
9   legal for approval. So that's why I went to Susan to
10  say where is the regulatory and legal signoffs on these
11  programs. Because we have a template here that is not,
12  you know, an AstraZeneca approved template. And she
13  was completely unaware of it. She didn't know.
14       And so for me, it was like starting from
15  scratch now. I had to, you know, develop all the
16  objectives and summary of all the programs. It's a
17  very, very time-consuming, complicated process.
18       It is a fact that I didn't turn that right
19  around. And I explained that to them that that was not
20  going to get turned around right away.
21       Some of the other things where he is making
22  these allegations about not returning phone calls or
23  e-mails immediately, I always got back to them in a
24  timely manner.

Page 237

1   Q    Who is Cindy Hassrick?
2   A    Cindy Hassrick is the managed markets or was
3   the managed markets -- let's see. Michael was the
4   director or executive director. She was like the
5   manager for managed markets. So she reported in to
6   Mike Abens.
7   Q    She is an AstraZeneca employee?
8   A    Yes.
9   Q    Did she have any particular reason to
10  criticize you, that you know of?
11  A    We worked together on these programs. She
12  was in charge of the system in Delta, doing all the
13  budget. No, I would say -- no.
14  Q    How about Louise Colburn? You worked with
15  her? She was a peer, as I understand it?
16  A    Um-hmm.
17  Q    Did she have any particular problem with you
18  that you are aware of?
19  A    No, not that I am aware of.
20  Q    How about Gwen Farber Quigley? She was also
21  a peer. Any particular problem with her?
22  A    No.
23  Q    Who is Fran King?
24  A    Fran King. I think -- Fran. I believe she

Page 238

1   was at Discovery.
2   Q    I think that's right. Frances King.
3   A    Yes.
4   Q    I hand you Bates numbers D1234 and 5, which
5   is a series of e-mails between you and Francis King.
6   And she seems to be saying you were slow to send out
7   honoraria checks to the hematology faculty for a
8   program. I just wanted to see if you agree or disagree
9   with that?
10  A    There was some delay with this. This is
11  true. The spread sheet that would list all the
12  faculty, you have to have their tax ID information.
13  This is maintained by the agency usually. And then
14  sent to us. Because they get the information to get
15  the information verified on site with the faculty.
16       They sent the template. And my assistant,
17  administrative assistant, was Clarice Sapp. There was
18  a piece of information missing on one of the faculty.
19  And apparently she and Fran King at Discovery went back
20  and forth trying to get the information and so Clarice
21  held up payment for everybody to get this one piece of
22  information on one physician. So we decided that, in
23  the future, if we couldn't obtain information on
24  someone, submit everyone else for payment and the one

Page 239

1   that we have the problem with we would, you know,
2   handle that separately.
3   Q    Okay. I'm handing you D1385, an e-mail to
4   Sharon. The question is, who is Sharon?
5   A    All right. There is Sharon Rhine that I
6   worked with on the managed markets retail trade. This
7   might have been a friend of mine. At AOL.com. I think
8   this is a friend.
9   Q    And what was it about? What was being
10  referred to?
11  A    I don't recall what she is referencing here.
12  Q    I hand you --
13       MR. SANDLER: Why don't you mark this as
14  Exhibit 2.
15       (Farrell Deposition Exhibit No. 2 was marked
16  for identification.)
17  BY MR. SANDLER:
18  Q    This is the same e-mail and your reply to
19  it. Does that refresh your recollection?
20  A    I don't know if she had heard about a job
21  opening or what she is referring to here. If it's
22  regarding your friend's e-mail.
23  Q    That's your response, isn't it?
24  A    Yes, it is.

Wilcox & Fetzer, Ltd.              Professional Court Reporters              (302)655-0477

B108

Farrell                                          v.                    AstraZeneca Pharmaceuticals, LP
Marybeth Farrell                        C.A. # 04-285 KAJ                          January 25, 2005

Page 240

1          Okay.  I don't know.
2      Q     What's this person's name?
3      A     Do I have to tell him?
4          MR. LaROSA:  If you know, yes.
5          THE WITNESS:  I think it's Sharon Middleman.
6  BY MR. SANDLER:
7      Q     The reporter?
8      A     Yes.
9      Q     Do you recall why you were excited and happy
10  for her?
11     A     Yes.
12     Q     And why?
13     A     As best I recall, she had gotten a job in
14  New York with CBS Radio and was moving up there.
15     Q     And has that, in fact, taken place?
16     A     Yes.
17     Q     Do you know of anybody else at AstraZeneca
18  that was placed on an action plan?
19     A     No.  I had never even heard of it before I
20  went on it.  I was totally unaware that it existed.
21     Q     How about a performance improvement plan,
22  same thing?
23     A     Completely unaware of it.
24     Q     So you wouldn't know if there was any

Page 241

1  inconsistency between what was done in your case and
2  what was done in other cases?
3      A     That's correct.
4          MR. SANDLER:  Maybe this is a good time to
5  take a break.  Why don't we take a lunch break.
6          (Recessed for lunch at 12:17 p.m.)
7              AFTER NOON RECESS
8              1:23 p.m.
9  BY MR. SANDLER:
10     Q     I want to ask you some questions about the
11  complaint.  And I have copies here for you to look at.
12          Take a look at paragraph 19, pages three and
13  four.  I guess it's page three actually.
14          You say there that there were no concerns
15  about your performance, right?
16     A     Correct.
17     Q     Before the announcement of your planning to
18  take FMLA leave, right?
19     A     Yes.
20     Q     Now, you have been shown a number of
21  documents, which predated the time when you issued your
22  announcement that you were going to take FMLA leave in
23  which concerns were expressed about your performance.
24  Do you remember seeing those documents?

Page 242

1      A     Which documents are you referring to?
2      Q     Well, there is the February documents, the
3  e-mail exchange between Jane Hellen and Debbie Brangman
4  in which they both said that they are having second
5  thoughts about your promotion because of your
6  performance.  Do you remember that?
7      A     I do recall seeing that, yes.  You showed
8  that to me last time.
9      Q     And there were some other similar documents.
10  And I think when I asked you about them, you told me
11  you had some doubts that the dates on these documents
12  were correct?
13     A     Yes.
14     Q     All right.  Assuming for the moment that
15  those dates are correct, and I realize that you don't
16  think they are, but assuming for the moment that they
17  are, would you agree that there were concerns expressed
18  about your performance, if those dates were correct,
19  before the FMLA issue surfaced?
20          MR. LaROSA:  Objection.  It calls for
21  speculation.  But you can answer.
22          THE WITNESS:  I can answer?
23          MR. LaROSA:  Yes.
24          THE WITNESS:  I have serious doubt that

Page 243

1  those e-mails are authentic.  But if we are to suspend
2  that, if they were, it would appear they would be true.
3  But I can't imagine what the ground would be for such
4  concerns.
5  BY MR. SANDLER:
6      Q     And why would you think people would make
7  that up?
8      A     Well, throughout the action plan process and
9  the performance improvement plan process and certainly
10  just the treatment of me after I announced I was going
11  out on six weeks medical leave, and as I stated in a
12  number of memos to Susan or Jane or Georgina
13  Austin-Smith, or Jones, and others, AstraZeneca was
14  operating in an untruthful and unethical manner.  So it
15  would not surprise me that, given what I have witnessed
16  there over than seven, eight months -- actually, it was
17  a little more than that.  That they would be capable of
18  creating fictitious documents.  Because, in fact, Susan
19  Broadway did falsify some documents.
20     Q     What documents did she falsify?
21     A     The budget reports.
22     Q     What budget reports?
23     A     For the Exanta team.  The monthly budget
24  reports.  She received my information.  She created an

Page 244

1  updated document that excluded my updates and put it
2  forward as a truthful reflection of information and, in
3  fact, it is not.
4      Q    Did she falsify anything else?
5      A    Yes.
6      Q    What else?
7      A    Various concerns about my performance.
8      Q    The things we have already discussed, that
9  you disagree with?
10     A    Um-hmm.  Yes.
11     Q    All right.  Why do you think these two
12 individuals, Susan Broadway and Jane Hellen, took all
13 the actions that they did simply because you took a
14 short period of FMLA leave?  Was it that serious a
15 thing in their mind?
16     A    Well, in the comments made to me by both of
17 those individuals, and in particular Jane Hellen's
18 reaction when I told her I would be going out on six
19 weeks' medical leave, and her subsequent remark that
20 she would -- she was reviewing staffing for the next
21 year and didn't think she was going to retain me, it
22 appeared to me that, yes, they were -- their actions
23 and, in fact, my -- there were no concerns about my
24 performance expressed at all.  So it's very clear to me

Page 245

1  it was driven by my need to be out for six weeks.
2      Q    You saw the feedback forms from the previous
3  year, didn't you?
4      A    Some of them, yes.
5      Q    I mean we discussed them the last time.
6  There were some negative remarks in some of those
7  feedback forms, weren't there?
8      A    I guess areas for improvement were
9  recommendations.
10     Q    And that coupled with the concern in
11 February, assuming that those dates were correct, would
12 indicate that there were reasons totally unrelated to
13 your FMLA leave for viewing you as someone who is
14 having problems; isn't that a fair assumption?
15     A    No.  I disagree with that.  I disagree
16 because the comments --
17     Q    You're looking at your attorney.
18     A    Because I answered the question and now I'm
19 giving -- I am rambling on here.
20         I disagree because the recommendations for
21 areas for improvement, which everyone solicits at a
22 review time, were essentially washed clean in my
23 overall review that was presented to me for the year.
24 And anything considered significant was put in that

Page 246

1  plan, in that review plan.  And those areas are not in
2  there.
3      Q    We also went over the feedback forms or some
4  of the feedback forms for the subsequent year, the end
5  of 2003?
6      A    Um-hmm.
7      Q    And wouldn't you agree that there were some
8  significant complaints about your performance?  I
9  realize you don't agree with them.  But I mean would
10 you agree that if they are accurate or at least if they
11 are perceived to be accurate, there are significant
12 complaints about your performance?
13     A    I disagree with the characterization that
14 there were significant complaints.
15     Q    Do you think they were insignificant?
16     A    I think they were as they were stated, areas
17 that were being recommended in that review for
18 improvement, although I have explained that sequence of
19 events.  So I'm not going to get into that again.
20     Q    Do you think that those complaints or those
21 statements, however you characterize them, were
22 honestly stated by the people who stated them?
23     A    Because of the unique circumstances around
24 the areas for improvement, noted that previous year, I

Page 247

1  really can't comment on that question.  I don't know
2  how to respond to it.
3      Q    Do you have any evidence that they were
4  making up those complaints or concerns?
5      A    Well, they had never been discussed with me
6  prior to seeing them in my performance review.
7      Q    Okay.  I hand you D552 and 3.
8          This is a memo, I gather, that you sent to
9  various people?
10     A    Yes.
11     Q    In September?
12     A    Um-hmm.
13     Q    And you mentioned before that Susan Broadway
14 hadn't criticized you previously.  Look at the fourth
15 paragraph where they are starting, in April, various
16 issues that you listed are issues that you were
17 criticized about in April, correct?
18     A    Correct.
19     Q    Okay.  And your complaint, I gather, is that
20 you had gotten better ratings on those in your
21 evaluation; is that the inconsistency?
22     A    Correct.
23     Q    Look in the complaint again.  In Paragraph
24 39, you talk about that Susan Broadway gave you the,

19 (Pages 244 to 247)

B110

Farrell                                  v.                      AstraZeneca Pharmaceuticals, LP
Marybeth Farrell                   C.A. # 04-285 KAJ                        January 25, 2005

Page 248

1  quote, tedious tasks of developing transition plans for
2  her colleagues to use to manage her programs while she
3  was out. Period. Unquote. Do you see that?
4      A    Um-hmm.
5      Q    Would you agree that someone had to carry on
6  your work while you were out?
7      A    Yes.
8      Q    And were you the logical person to prepare
9  the transition plans?
10      A    Yes.
11      Q    So if it was tedious, would it be fair to
12  say that that just can't be helped?
13      A    No.
14      Q    How could it have been made less tedious?
15      A    The specifications communicated to me by
16  Susan Broadway for the transition plans were
17  unnecessarily onerous and created just an extraordinary
18  amount of work of a very tedious nature that I had to
19  do and she forbade me to use my administrative
20  assistant or the help of an outside agency to do these
21  plans.
22      Q    Why don't you elaborate and tell me what was
23  so onerous?
24      A    Well, the plans had to outline every

Page 249

1  advisory board that I had planned for the year, not
2  just the time I would be out, but all the advisory
3  boards. And I had to develop an objective for every
4  advisory board, specific strategies. I had to provide
5  a detailed outline of status of each program. That in
6  and of itself is standard. I mean I have no problem
7  with that.
8           But it was -- the terms and requirements for
9  the scope of the transition plan and the details, which
10  include, as noted in this next paragraph, number 40, to
11  create comprehensive individualized profiles on over 50
12  physicians, specifically forbidden to use the help of
13  an agency, Discovery, which created the data base, and
14  had been hired to do this for us. And I had to create
15  charts for every physician on every program that they
16  had ever done for Exanta, every publication, the title,
17  the journal it appeared in, the date, their role with
18  the team, areas of expertise, the institutions that
19  they taught at. I mean highly detailed profiles that I
20  had to create one by one. I felt that was uncalled
21  for. It was unnecessary. And especially onerous.
22      Q    In Paragraph 42, you say that in response to
23  the, quote, unrelenting pressure, unquote, you promised
24  to return three weeks early.

Page 250

1           What pressure were you referring to?
2      A    Jane Hellen and Susan Broadway had made
3  comments at various times about the amount of time I
4  would be out. Jane Hellen directly said that six weeks
5  is a long time. Susan had made that comment to me.
6  And then Jane came to me and said she was looking at
7  her staffing needs and she wasn't going to retain me
8  now.
9           And the -- so those comments and then the,
10  you know, very aggressive and difficult requirements
11  that they outlined for me, that I had to accomplish
12  before I left and other comments made me extremely
13  anxious and I felt that if I took the whole six weeks,
14  there was not a doubt in my mind I was not going to
15  have a job when I returned.
16      Q    Even though Jane Hellen told you that you
17  would, correct?
18      A    She stated that in a very sarcastic manner.
19      Q    Didn't she say don't worry, you'll have a
20  job when you get back, or words to that effect?
21      A    She did say that.
22      Q    How was that sarcastic?
23      A    Well, she said it in the context of, you
24  know, these almost unachievable expectations and

Page 251

1  requirements for me to accomplish before I left on
2  medical leave under the umbrella of a threat of not
3  keeping me and her statement to me that she wasn't
4  going to keep me now for 2004, now that she was looking
5  at her staffing needs, that, you know, six weeks was a
6  long time to be out.
7           So it was very -- she said it very
8  sarcastically. And, in fact, you know, my job wasn't
9  there, really, when I got back.
10      Q    Well, you knew there was going to be some
11  change in the structure before you left, didn't you?
12      A    Yes. And that wasn't my concern. I wasn't
13  concerned about that.
14      Q    By the way, this statement you say Jane
15  Hellen made that she wasn't going to retain you, did
16  you ever put that in any of your many memos?
17      A    Not that I can recall.
18      Q    Why not?
19      A    I don't know. It most appropriately would
20  have gone in the memo where I outlined to her the five
21  areas of performance deficiency she cited to me after I
22  told her I was going out for leave. Because it was
23  right after that that she told me she was looking at
24  her staffing needs for 2004 and she needed people who

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

B111

Farrell                                    v.                    AstraZeneca Pharmaceuticals, LP
Marybeth Farrell                    C.A. # 04-285 KAJ                        January 25, 2005

Page 252

1  were going to be here and that she could depend on. I
2  don't know why I didn't put it in.
3    Q    Now, it's true, isn't it, that you had no
4  contact whatsoever with Susan Broadway while you were
5  out on leave?
6    A    I believe that is correct, yes.
7    Q    So at least while you were out on leave, she
8  exerted no pressure on you, is that correct?
9    A    Correct.
10   Q    And while you were out on leave, you
11 called -- you called Jane Hellen several times or more
12 than several times, I guess?
13   A    Yes.
14   Q    And, in fact, you volunteered to work from
15 home, didn't you?
16   A    Yes.
17   Q    In Paragraph 54, you say that, as a result
18 of your hastened return, you suffered damage to your
19 vertebrae, right?
20   A    Yes.
21   Q    Do you blame AstraZeneca for that?
22   A    Well, I discussed it with my back specialist
23 and he said that the problems I was having were most
24 likely caused by my reaching for something or turning

Page 253

1  or putting some kind of a stress on the back before my
2  back really had healed.
3    Q    That could happen anywhere, couldn't it?
4    A    Can you explain that question?
5    Q    Well, you said it was caused by reaching or
6  you did a gesture, sort of turning. That kind of
7  gesture could have taken place anywhere, couldn't it?
8  It doesn't have to be at work?
9    A    Well, the point was that I was supposed to
10 be having six weeks of bedrest and that didn't happen.
11 And, as a result, when I went back, I started getting
12 the back spasms and, you know, the numbing in my leg.
13 I mean the back pain just became unbearable.
14   Q    Even while you were home, you weren't in bed
15 all the time, were you?
16   A    The first couple weeks, I was, until I went
17 into work. I mean I -- yeah, I was pretty much
18 sleeping. I mean certainly the first two weeks. The
19 third week, I was getting up a little bit and trying to
20 move around. But it was very painful.
21   Q    Weren't you sending e-mails and
22 communicating by telephone?
23   A    Yes.
24   Q    And you were doing that voluntarily, weren't

Page 254

1  you?
2    A    Yes.
3    Q    Look at Paragraph 57. You said that you had
4  been promised a promotion to Band V, right?
5    A    Yes.
6    Q    Have we already covered everything relating
7  to that?
8    A    You mean in our previous session?
9    Q    Right.
10   A    As best I can recall, yes.
11   Q    And was it Renee Valles that you say was the
12 person that promised you the promotion initially?
13   A    Yes.
14   Q    And then when you raised the issue, other
15 people said they would try to help?
16   A    Yes.
17   Q    And we covered that, I think?
18   A    Yes.
19   Q    All right. By the way, you said that a
20 doctor told you about that your back problem stemmed
21 from the various movements that you described. Which
22 doctor was that?
23   A    Peter Vitanzo at the Rothman Institute.
24   Q    And he is what, an orthopedic surgeon?

Page 255

1    A    Yes.
2    Q    A back specialist?
3    A    Back specialist. I think one of his other
4  specialties is like sports injuries.
5    Q    The operation that you underwent was a
6  removal of some cysts in your ovary, wasn't it?
7    A    The uterus, yes.
8    Q    It had nothing to do with your back, did it?
9    A    No. Well, actually, one of the cysts was on
10 top of my uterus. It was the size of a grapefruit,
11 according to my surgeon. And it was -- I don't know.
12 I mean it was high. I don't know if it was like near
13 my spine or what. But it was apparently pretty big.
14   Q    Was the removal of the cyst related to your
15 back problem?
16   A    No. Not at all.
17   Q    In Paragraph 64, you say you were removed
18 from your office and placed in a cubicle in mid
19 September.
20   A    Um-hmm.
21   Q    Were there any other Band IV employees in
22 offices at that point or were you the only one?
23   A    I don't know the answer to that question.
24   Q    Well, how about your peers, the other

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

B112

Farrell                              v.                    AstraZeneca Pharmaceuticals, LP
Marybeth Farrell          C.A. # 04-285 KAJ                       January 25, 2005

Page 256

1   people, I guess Louise Colburn and --
2      A    Denise Quigley-Barrett or Barrett-Quigley.
3      Q    Were they in cubicles?
4      A    Louise Colburn was in an office and Denise
5   Quigley was in a cubicle.
6      Q    And Louise, do you know if she was a Band
7   IV?
8      A    I don't know.
9      Q    How did you come to have an office in the
10  first place?
11     A    Well, we covered this a bit last time. And
12  I would say, you know, again, that when we were moving
13  into the new building, because Debbie Brangman had
14  followed through on Renee Valles' promise to promote me
15  to Band V, had obtained signoff and approval by Jane
16  Hellen, and Scott Bolenbough, from what I understood,
17  and was told by Debbie Brangman, that she told me or I
18  said to her, I understand that moving into the new
19  building, the Band IVs don't get offices like we do
20  over here and I would have to be in a cubicle and
21  that's unacceptable for me to be able to conduct my
22  job. Because I, you know, hold a lot of conference
23  calls, you know, people in my office, I'm working with
24  scientists to go over data and slides. And it was

Page 257

1   not -- it would not work for me to be in a cubicle with
2   the amount of, you know, conference calls in
3   particular.
4          And I said, since the Band V has been
5   approved, I'd like you to work with whoever is doing
6   the assignments for the offices and make sure that I
7   get put into an office because, you know, I'm a Band V.
8      Q    And who was doing the assignments? Was it
9   Ann Cobuzzi?
10     A    Ann Cobuzzi.
11     Q    Is that the pronunciation?
12     A    Yes.
13     Q    C-o-b-u-z-z-i?
14     A    Yes.
15     Q    And was there an empty office available at
16  that time?
17     A    Are you referring to when I was moved into a
18  cubicle?
19     Q    When you went into the office.
20     A    When I went in first?
21     Q    When you went into your office, yeah.
22     A    I don't know the answer to that question. I
23  can only say that they put me in an office.
24     Q    And when you moved from the office to the

Page 258

1   cubicle, who moved into your office?
2      A    The new finance person. I can't remember
3   her name. What's her name? I don't recall her name.
4      Q    Any idea what band she was in?
5      A    She was probably at least a VI. Well, if
6   she was a VI, she would have an office window. But we
7   were really short on space. So she might have been a
8   VI.
9      Q    Did you speak to Ann Cobuzzi before you
10  moved to the cubicle?
11     A    Yes.
12     Q    And what was discussed?
13     A    Ann had come to me early September and said,
14  sorry, we are moving you into a cubicle, we need the
15  space, you know, office space is tight and everything.
16  And I said, you know, why all of a sudden am I being
17  now put into a cubicle? And she just said, we need the
18  space. And she said, don't worry, it usually takes
19  about a month, three or four weeks for this to go
20  through. So I just want to let you know.
21         And then I got a memo from her, an e-mail,
22  on September 11. I think it was on a Thursday. I'm
23  not positive. And she told me that this had gone
24  through, like this was really fast for one of these

Page 259

1   things to go through. And that I would be required to
2   be packed and gone, my office had to be vacated close
3   of business September 18.
4          So I went back to her and said, I'm going to
5   be out of town on company business managing our faculty
6   training program in Chicago September 17, 18 and 19.
7   She said, well, then you've got to do it before you
8   leave. It was so busy. We had so many programs going
9   on and that program was in particular very, very
10  time-consuming.
11         And I said, well, who is available to help
12  me? And she said, you have to do it yourself. And the
13  technical people -- technical support people would move
14  my computer.
15         So I think it was the 15th. I don't know if
16  I was flying out on the 16th. I can't remember
17  exactly. But, at any rate, I spent several hours at
18  the end of the workday packing up my office and I had
19  to move everything myself into a cubicle.
20     Q    When did you first speak to Ann Cobuzzi?
21  When did she come to you and either say or
22  communicate to you that you were going to have to move?
23     A    She sent me the e-mail on the 11th.
24     Q    The e-mail saying what?

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

B113

Farrell                                    v.                    AstraZeneca Pharmaceuticals, LP
Marybeth Farrell                    C.A. # 04-285 KAJ                          January 25, 2005

Page 260

1   A     That it's called an ISURF, I-S-U-R-F.  What
2   that acronym means, I don't know.  But it stands for
3   the request to move office space and that it had been
4   approved already and that --
5        Q     But I thought you said she came to you
6   before that?
7        A     Oh, she did, yes.  I'm trying to think.  It
8   was within that preceding week, as best I can recall.
9   So she may have come to me say September 5th or 4th,
10  the end of that previous week.
11       Q     All right.  In Paragraph 70, you talk about
12  your computer docking station being vandalized.
13       A     Um-hmm.
14       Q     When did that occur?
15       A     That happened on -- I think it was January
16  9th.
17       Q     And what is it that happened?
18       A     I came into work in the morning and when I
19  went into my office space/cubicle, my computer, the
20  monitor was there.  But the docking station, which is
21  the piece that holds down the laptop and connects it
22  into the system, had been it looked like someone took
23  either a hammer or something very -- perhaps a hammer
24  and smashed it up.  It was smashed and kind of

Page 261

1   scattered on my desk.
2        Q     Broken into pieces?
3        A     Yes.
4        Q     Okay.  Was this a company computer or your
5   personal computer?
6        A     It was a company computer.
7        Q     And what's that got to do with the FMLA
8   claim or this case?  It's in here.  I'm just asking
9   why.
10       A     Well, I have a hard time understanding how
11  that type of vandalism can occur in a company with such
12  high security as they have at AstraZeneca.
13             Secondly, the security people that I
14  reported it to, I requested an investigation and they
15  refused to conduct one, which I found highly unusual.
16       Q     Who did you report to?
17       A     I reported it to SIRTS.  It's a web site.
18  It's called S-I-R-T-S.  That's the web site.  And then
19  you put it through AstraZeneca security.  So it's a
20  security department and then you have to go into this
21  web site to register like any kind of a security issue
22  or concern.
23       Q     Did you speak to anyone face-to-face or on
24  the telephone about it?

Page 262

1   A     I spoke with -- I believe it was two
2   individuals on the telephone.  But no -- the only one
3   face-to-face is when I went to get my administrative
4   coordinator, Clarice, to help me file this complaint or
5   register this complaint on the security site.
6        Q     When were you actually terminated?
7        A     January 24, 2004.
8        Q     And were you given a written explanation of
9   the reasons why you were being terminated?
10       A     Well, subsequent to the actual termination
11  date, it was about a week later, AstraZeneca mailed me
12  the summary of why I had failed the performance
13  improvement plan and, therefore, was terminated.
14       Q     I'm handing you 1510 to 13.  Is that what
15  you're referring to?
16       A     Yes.  Um-hmm.
17       Q     Did you sign it?
18       A     No, I did not.
19             She says that I failed the performance
20  improvement plan.  I have to ask you to help me out
21  here.  Because there were conversations that you were
22  having about the termination date.  Because I went
23  there that Monday or that Friday and apparently someone
24  left a message on my answering machine late at night

Page 263

1   or in the evening or that afternoon preceding and said
2   that I wasn't to come into work and I went in and my
3   badge didn't work.  So security came and let me in.
4   And then they took me down to their office and gave me
5   a temporary badge.  So I went up to my office or
6   cubicle and was working on some projects and Georgina
7   Austin-Jones came and said, I need to talk to you.  I
8   said, okay.  And she took me down the hall to a
9   conference room.  And she said, you have been
10  terminated.  And she said, you have to leave the
11  building immediately.  And so I said, okay.
12       Q     When was that?
13       A     That was on -- we spoke January 24th.
14       Q     Had you already received this document by
15  that time or not?
16       A     No.  I received it about a week later via
17  Fed Ex at home.
18       Q     You received it at home?
19       A     At home.  Um-hmm.
20       Q     How long had you been living in that house?
21       A     I think it's almost five years.
22       Q     And do you sometimes receive unsolicited
23  letters in the mail at your house?
24       A     Yes.

23 (Pages 260 to 263)

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

B114

Farrell                                    v.                    AstraZeneca Pharmaceuticals, LP
Marybeth Farrell                    C.A. # 04-285 KAJ                        January 25, 2005

Page 264

1   Q    Like we all do?
2   A    Sure. Yeah.
3   Q    And do you sometimes throw that sort of
4  thing away?
5   A    Yes.
6   Q    Do you sometimes misplace letters?
7   A    Well, can you explain the question a little
8  better? Are you referring to like important documents
9  or, you know, sort of like the unsolicited, you know,
10 what we call junk mail things?
11  Q    Well, without being able to necessarily tell
12 one from the other, if it's in an envelope, are there
13 sometimes letters that turn out to be important that
14 you perhaps didn't think were important and you
15 misplaced them or threw them away?
16  A    I keep all of my mail in two piles on the
17 kitchen counter. One is in a basket and that's for all
18 the essentials, you know, bills that must be paid.
19 Then there is a second pile behind that that are the,
20 you know, sort of like the organizations that I want to
21 send a contribution to or other things. There might
22 be, you know, if there are events or, you know, like
23 community things.
24       I mean I generally go through every piece of

Page 265

1  mail and, you know, I'll open it. If it's not
2  something I'm interested in, then I'll throw it right
3  out. But I keep these two piles.
4        So I got -- I usually open all my mail. I
5  mean I don't know that there is anything that I don't
6  open.
7   Q    Well, you claim that you did not receive a
8  COBRA notice, right?
9   A    Um-hmm.
10  Q    Is it possible that you mistakenly threw
11 away the COBRA notice?
12  A    I was checking the mail every day waiting
13 for that COBRA notice. Because I was very anxious
14 about getting my medical insurance. And I would have
15 to say it would be very unlikely that that could have
16 occurred.
17  Q    So you knew there was a COBRA notice coming?
18  A    Well, I knew that AstraZeneca was required
19 to provide me with that. I'm trying to think if I
20 asked anybody about it. I can't remember if I
21 specifically asked anyone.
22  Q    When you didn't get it and you were waiting
23 for it, wouldn't it make sense for you to check and
24 find out where it was?

Page 266

1   A    I didn't know how long it would take for
2  them to send it to me. I wasn't aware of how long my
3  medical coverage would be extended. I wasn't given any
4  information when I was let go. I was just escorted out
5  of the building on that day by Georgina Austin-Jones.
6        So she was my HR contact and I had already
7  asked her earlier for information on my benefits, my
8  pension. And she didn't know any of the information
9  and couldn't help me.
10       So I didn't feel that she would help me.
11 And I thought, well, I'll just wait for the COBRA
12 notice. So I was waiting.
13  Q    And when it didn't show up, you didn't do
14 anything?
15  A    Well, I had secured employment beginning
16 March 1 and, you know, at that point, I thought, well,
17 I'll just be on -- I'll get on the insurance from my
18 new employer. And then I found out that they have a 60
19 day waiting period. So it wouldn't be effective until
20 May.
21       So I didn't -- I wasn't really even sure who
22 to call and I just -- no, I didn't bother calling back
23 to AstraZeneca.
24  Q    By the way, after your docking station was

Page 267

1  damaged, did you get another docking station?
2   A    Yes. They replaced it immediately. They
3  sent people up and replaced it.
4   Q    Okay.
5        (A brief recess was taken.)
6  BY MR. SANDLER:
7   Q    I hand you what's marked P51. This is a
8  letter that you appeared to have sent to your
9  therapist, Dr. Lewis?
10  A    Um-hmm.
11  Q    And apparently you misplaced his bill, is
12 that right?
13  A    Yes, I apparently did. I thought I had
14 thrown it out.
15  Q    And you explained that you were under stress
16 in August 2004 as sort of a way to explain how that
17 happened, is that correct?
18  A    Um-hmm.
19  Q    Yes?
20  A    Yes.
21  Q    And what was the cause of that stress?
22  A    Well, there was several causes. I had
23 started a new job, a second new job.
24  Q    At Glaxo?

B115

Page 268

1    A    At Glaxo, yes. And this lawsuit. I can't
2  remember exactly if I was trying to organize
3  information. But that has been very stressful.
4         Yes. I say here recent weeks. I think
5  those would probably be the two big things.
6    Q    Were you under even more stress in February
7  and March of 2004 right after your termination, or at
8  least as much?
9    A    Not really. Because I was at home all day.
10  I didn't have to work. You know, I was looking for a
11  position. So even though I was very stressed out from
12  my experience at AstraZeneca and the development of,
13  you know, the lawsuit against AstraZeneca, I was at
14  home. I wasn't, you know, I mean at that time I
15  commuted to Glaxo. I was going up 202. It was taking
16  me, if I left in rush hour, about an hour and 40
17  minutes each way. So just getting my routine down and
18  trying to get readjusted.
19    Q    When did you start at Burson Marsteller?
20    A    March.
21    Q    March 1st?
22    A    Um-hmm.
23    Q    But that wasn't stressful?
24    A    It was stressful, yes.

Page 269

1    Q    All right. My question was, weren't you
2  under at least as much stress in February and March of
3  2004?
4    A    Yes.
5    Q    So couldn't you have misplaced the COBRA
6  notice just like you misplaced Dr. Lewis' invoice?
7    A    I was, you know, literally checking the
8  mailbox every day looking for information on COBRA.
9  Had I received it, I would have responded immediately
10  because of my concern about not having medical
11  coverage. So I think it's very unlikely. I mean I did
12  not open -- I don't recall seeing any piece of mail. I
13  did not open any correspondence that had information on
14  COBRA benefits. So I think it's extremely unlikely
15  that I would have misplaced it.
16    Q    Were you looking for something with an
17  envelope from AstraZeneca?
18    A    I wasn't sure who it would be coming from.
19    Q    But, nevertheless, you made no follow-up
20  inquiry when you didn't get the COBRA notice, correct?
21    A    Correct. I didn't know how long it would
22  take to get the COBRA.
23    Q    Did you ask your lawyer?
24    A    I can't recall.

Page 270

1    Q    And I think we talked last time about
2  whatever costs you incurred during the time you were
3  uninsured. Do you remember what the bottom line number
4  was?
5    A    We discussed approximately three thousand
6  dollars.
7    Q    Under count four, page 12 of the complaint.
8  I'm sorry, not page 12. I'm wrong. Page 14.
9    A    Okay.
10    Q    You make a claim based on something called
11  the Implied Covenant of Good Faith and Fair Dealing.
12  And it basically is an allegation that the company
13  manipulated your records in order to terminate you.
14    A    Um-hmm.
15    Q    Is your claim that the concerns expressed to
16  you in April and May of 2003 were inconsistent with
17  your previous performance reviews?
18    A    Yes.
19    Q    Now, we have talked about this already. But
20  let me come back to it.
21         I have shown you some documents that were
22  dated before your FMLA request arose. And, again,
23  assuming these dates are correct, I realize that you
24  dispute that, but assuming they are correct, would you

Page 271

1  agree that there are documents that show that your
2  performance was questionable before the FMLA arose?
3    A    I don't know how to answer that. Because
4  those e-mails are -- I mean it's almost -- they are
5  incredible. There are no specific things, deficiencies
6  cited. Nothing was ever said to me.
7    Q    All right. Let's start with -- and these
8  are -- we have already referred to these. I'll hand
9  you one. D170 and 171. This is the thing we have
10  touched on before and where both Deb Brangman and Jane
11  Hellen expressed reconsideration about your proposed
12  promotion. They are having reservations, they say.
13         Do you recall that?
14    A    I recall reading this, yes.
15    Q    And I take it you questioned the accuracy of
16  the date or the existence of this as a legitimate
17  e-mail; is that what you're saying?
18        MR. LaROSA: Let me just clarify something.
19  She said I recall seeing this. Are you saying you
20  recall seeing this at day one of the deposition?
21        THE WITNESS: At day one of the deposition
22  the first time.
23        MR. LaROSA: Just so the record is clear.
24        MR. SANDLER: Do you want to read the

25 (Pages 268 to 271)

B116

Page 272

1   question back?
2         (The reporter read back the pending
3   question.)
4         MR. LaROSA: You can answer that.
5         THE WITNESS: Yes.
6   BY MR. SANDLER:
7   Q    And what's your basis for that?
8   A    Well, on February 12th, the date of Jane
9   Hellen's presumed e-mail letter to Debbie Brangman
10  about any performance issues, she sent me an e-mail
11  congratulating me, good job, exclamation point, on a
12  project that I was working on.
13  Q    So you think those two things are
14  inconsistent?
15  A    Yes.
16  Q    Anything else?
17  A    Anything else about what?
18  Q    Any other reason why you don't think that's
19  a legitimate, accurate date?
20  A    It doesn't make sense. In light of the
21  activities -- first of all, in light of my performance
22  review of 2002.
23        Secondly, in light of what was actually
24  going on in January up to February 12th in particular,

Page 273

1   for this e-mail. If you look at the calendars for the
2   team and the activities, we were having cleanout days
3   to move into the new building in January and February.
4   The last week of January, I was traveling with Brian
5   Martin, Susan Broadway, Louise Colburn and Sherry
6   Kirkendall to obtain medical education programs for
7   self-development in Dallas, Texas.
8         What else was going on? We were having
9   training on the PRISM System. P-R-I-S-M. There is
10  another recordkeeping program we got training on. We
11  were working on trying to rescue the key opinion leader
12  data base development from Louise Colburn. So this
13  doesn't make sense.
14  Q    Well, the last time we went over some
15  feedback forms from 2003. I'm sorry, 2002. And in
16  Brian Martin's, for example, he said he was looking for
17  more clear, concise and focused communications. Brian
18  Catone said more timely communication and expressed --
19  I think we talked about this concern about scheduling
20  conflicts. Jane Hellen said fewer e-mails and more
21  focused communications, better understanding.
22        There was a repeated expression of concern
23  about your focus and your communications. Would you
24  agree with that?

Page 274

1   A    No.
2   Q    You don't agree that those things were said
3   or you don't agree that they were accurate?
4   A    They were not communicated to me.
5   Q    Okay. I thought you said that you saw some
6   of the feedback forms in 2002?
7   A    Some of them.
8   Q    You just don't remember those?
9   A    Well, if you read my performance review for
10  2002, I am specifically lauded for having excellent
11  communication skills. I was given a rating of
12  excellent for my communication abilities.
13  Q    So that's what you're hanging your hat on,
14  is it?
15  A    Well, my performance review was an
16  accounting of how I was performing and, according to
17  that record, I was doing very, very well in these areas
18  and others.
19  Q    Look at Paragraph 94(ii) of the complaint.
20  It says, on May 6, 2003, you were issued a short term
21  improvement plan. Do you see that?
22  A    I'm sorry, what page are you on?
23  Q    Page 14. 94(ii).
24  A    Oh, I see. Okay.

Page 275

1         Yes.
2   Q    What is that? Is that accurate?
3   A    Yes. It was May 5, May 6, Susan Broadway
4   typed out the short term improvement plan items, which
5   had been revised from -- somewhat from the initial
6   discussion.
7   Q    Was that a formal improvement plan like a
8   performance improvement plan or is this just an effort
9   to give you some feedback about concerns she had?
10  A    This was an effort to communicate areas of
11  improvement for me.
12  Q    Okay. In Paragraph 95, it says that your
13  termination violated public policy.
14        Do you see that?
15  A    Um-hmm.
16  Q    What public policy was violated?
17  A    Can I ask --
18  Q    Well, to the extent that you know. I mean
19  if Mr. LaRosa was a witness, he could testify. But
20  you're the witness so you have to testify.
21        MR. LaROSA: He is asking you as much as you
22  know. Whatever you know.
23        THE WITNESS: Well, public policy in the
24  sense of broader regulations, federal policies, Family

Page 276

1   Medical Leave Act.
2   BY MR. SANDLER:
3       Q    That's what you're talking about, you think?
4       A    I think, yes.
5       Q    Okay. Who is Robert McCleary?
6       A    He is a friend of mine.
7       Q    What does he know about the case, if
8   anything?
9       A    Well, when, particularly in the summer of
10  2003, I would go over to his house. Usually after
11  work. And he, you know, would listen and give me moral
12  support.
13      Q    Did he work for AstraZeneca?
14      A    No.
15      Q    What were you telling him?
16      A    I would tell him what happened that day.
17      Q    Who is Renata Mizlowski?
18      A    She is the director of medical affairs for
19  the gastrointestinal group at AstraZeneca.
20      Q    What does she know about the case?
21      A    I met with her several times seeking her
22  advice on how to handle various situations that were
23  emerging.
24      Q    Such as what?

Page 277

1       A    Well, the criticisms right before I went out
2   on medical leave. Then the action plan. In
3   particular, I didn't know anything about -- I had never
4   heard of an action plan. And I wanted to get her view
5   about what they were and explain my situation to her to
6   see what her thoughts were. You know, did she have any
7   experience with this sort of thing, does she know
8   anybody that had experience. Things like that. So
9   basically seeking advice and sharing and discussing
10  what was going on with her.
11      Q    What was going on with her?
12      A    I mean --
13      Q    You mean what was going on with you?
14      A    Correct.
15      Q    Sorry.
16      A    I'm sorry.
17      Q    What did she say?
18      A    Well, she couldn't believe the way I was
19  being treated. I think she, you know, stated that she
20  thought the events and actions by the Exanta team were
21  regrettable at best and that, you know, she asked me
22  was I going to human resources and utilize whatever was
23  available in the company to help me.
24      Q    This is based on what you told her was

Page 278

1   happening?
2       A    That's correct.
3       Q    Who is Marion Farrell? Is that your mother?
4       A    That's my mother.
5       Q    Who is Rose White?
6       A    Rose White? She was the -- I'm not sure
7   exactly. The finance director essentially for the
8   Exanta team.
9       Q    And what does she know about the case?
10      A    Well, she took over from a gentleman named
11  John Liano the responsibility for updating monthly the
12  Exanta team budget and reporting -- sending the reports
13  out to the team. And I met with her at least twice and
14  brought my budgets with the 1.55 million that I had
15  e-mailed to Susan and Brian and asked her why were
16  these repeatedly not being included in the budget
17  reports. And --
18      Q    Did she tell you that you're not doing it
19  right?
20      A    No. No, she did not. She told me that they
21  were included in the update. Susan Broadway would
22  gather all the updates from the promotion and the
23  medical education, professional education managers and
24  then she would put those into a report to Rose. Then

Page 279

1   we took that over and we were putting them in
2   ourselves.
3           So I was doing that. But because the
4   reports weren't made -- there are only certain
5   junctures, every so many weeks, when you can actually
6   change the set totals. So because Susan had included
7   this in the rollup for everyone. Even though I was
8   still entering the numbers, this total number wouldn't
9   change until we got to one of those milestone times
10  when they could actually change those figures.
11      Q    When did Rachel Bevis take over from Debbie
12  Brangman?
13      A    Let's see. I went to see her in August,
14  September. I would have to say April of 2003.
15  Possibly somewhere around there.
16      Q    Who is Tom Gangnon or Gagnon?
17      A    Gagnon. Tom is the senior strategist on the
18  Exanta team.
19      Q    What's he know about the case?
20      A    I don't -- I have never discussed the case
21  with him at all.
22      Q    How about Linda McCormick? Who is that?
23      A    Linda McCormick is a field -- well, she is a
24  product development scientist or a PDS out in the

27 (Pages 276 to 279)

B118

Page 280

1  field.
2  Q   Is that one of the people you mentioned
3  before?
4  A   Yes.
5  Q   When did you first begin looking for another
6  job outside AstraZeneca?
7  A   As best I can recall, after I was put on the
8  action plan and realized that by virtue of the
9  outrageous false allegations they were making about me
10  and their dismissal of all of the evidence and
11  documentation that was showing that I was meeting the
12  plans, the action plans, sometime in September of 2003,
13  as best I can recall, I decided to see if there were
14  openings elsewhere in the company.  And I posted for
15  two jobs in regulatory affairs.
16  Q   How about outside?
17  A   I didn't start looking outside -- I started
18  looking at some web sites, like Flip Dog.  I'm trying
19  to think exactly when I posted my resume' and
20  everything.
21      It may have been that fall but it wasn't
22  really until Christmas holiday, 2003, at the end of the
23  year, that I actually proactively was sending resumes'
24  out to people.  So sometime late in 2003.

Page 281

1  Q   What were the two jobs that you posted for
2  internally?
3  A   They were promotional regulatory affairs
4  manager jobs.  And the jobs basically were to serve as
5  a consultant to brand teams on compliance with federal
6  regulations, AstraZeneca policy on how to conduct
7  medical coding and promotion activities, which I had
8  done as a senior field PREP manager for GINCD, brand
9  teams and field sales forces.  So I had the training
10  and the expertise and I enjoyed that.  So I thought I'd
11  like to get into regulatory affairs.
12  Q   Did anything come of either of those
13  postings?
14  A   No.  I never even received a response.
15  Q   Who is Kevin Wright?
16  A   Kevin Wright?  Is it W-r-i-g-h-t?
17  Q   Yes.
18  A   Oh, he is with an agency I think it's called
19  Marcus Associates.  A head hunter.
20  Q   Did you communicate with him about a job?
21  A   Yes.
22  Q   When was that?
23      Or let me ask you, was it in June of 2003?
24  A   It could well have been.  I honestly don't

Page 282

1  know.  Because I typically got e-mail and calls from a
2  number of head hunters and it's very possible that I
3  did, yes.
4  Q   Did you respond and look into that position?
5  A   It's possible I did.
6  Q   Okay.  So you were looking earlier than you
7  said before?
8  A   Yes, apparently so.
9  Q   All right.  Who is David Walsh?
10  A   David Walsh is a friend.  He is a friend.
11  Q   Was he looking for a job?
12  A   Yes, he was.
13  Q   And did you send him some information about
14  a job?
15  A   Yes, I did.  I was trying to help him get a
16  job at AstraZeneca.
17  Q   And who is Lindsay Harris?
18  A   Lindsay Harris?  I think she is a head
19  hunter.
20  Q   Did you communicate with her?
21  A   As best I recall, yes, I did.
22  Q   How about Steven Kaplan?
23  A   I'm sorry, who?
24  Q   Steven Kaplan.

Page 283

1  A   At the moment, I can't recall that name.
2  But it's very possible that I did.
3  Q   How about Steven Pace?
4  A   Yes, I recall that name.
5  Q   Who is he?
6  A   I think he is a head hunter also.
7  Q   And did you communicate with him about a
8  job?
9  A   As best as I can recall, yes, I did.
10  Q   Was that around November of 2003?
11  A   I don't recall specifically.  But it could
12  have been.
13  Q   Who is Ted Trondsen?
14  A   Ted Trondsen.
15  Q   T-r-o-n-d-s-e-n.
16  A   Ted Trondsen.  I can't recall right now.
17  Q   If you sent a resume' to Steven Pace as a
18  result of a telephone conversation with Ted Trondsen,
19  would that refresh your recollection?
20  A   Somewhat.
21  Q   What do you recall?
22  A   I'm trying to recall what kind of a position
23  it was.  Gosh.  Medical education.  To be honest, right
24  now, I can't recall.

28 (Pages 280 to 283)

B119

Page 284

1    Q    How about Catherine Kunz, K-u-n-z, who is
2  she?
3    A    Catherine Kunz? Oh, she was a head hunter.
4    Q    Another head hunter?
5    A    Um-hmm.
6    Q    And in early 2004, what jobs were you
7  actively pursuing?
8    A    In early 2004?
9    Q    Yeah.
10   A    Well, I was employed at Burson Marsteller
11 and I had gotten --
12   Q    I'm talking about before you became employed
13 by Burson Marsteller, let's say in January of 2004,
14 what were your -- where were you looking while you were
15 still employed by AstraZeneca?
16   A    I was looking a lot of places. I had posted
17 my resume' on several web sites. I subscribed to
18 geoweb.com, which customizes a search in a particular
19 geographic region by criteria. For example, whether
20 it's a marketing or public relations, you know, type of
21 position. I had sent my work out to or a resmume' out
22 to Burson Marsteller, to Ketchum in New York, public
23 relations. And, oh, I posted on a number of web sites,
24 pharmaceutical company web sites.

Page 285

1    Q    Was there a job in New Jersey that you were
2  looking at?
3    A    Yes.
4    Q    What was that?
5    A    That was a -- basically to oversee a medical
6  education company's work for pharmaceutical companies.
7  So to be essentially the medical education vendor to
8  someone who did what I did at AstraZeneca.
9    Q    What was the name of that company?
10   A    It was -- I can't recall right now.
11   Q    In any event, you did get a job at Burson
12 Marsteller as of March 1st, right?
13   A    Yes, I did.
14   Q    At I think you said $165,000?
15   A    Yes.
16   Q    And when did you leave and begin at Glaxo?
17   A    June 1.
18   Q    So you just worked two months at Burson
19 Marsteller?
20   A    Almost three. I left at the end of May.
21 I'm sorry. March, April, May. Yeah, at the end of
22 May.
23   Q    I'm sorry. Okay.
24       And at Glaxo, you're making what, one

Page 286

1  thirty-five a year?
2    A    Yes.
3    Q    When did you begin seeing Dr. Roberta Loft?
4    A    It was either October or November 2003.
5  Wait. Yes. 2003. October/November 2003.
6    Q    Had you ever consulted a psychiatrist
7  before?
8    A    Years earlier, yes.
9    Q    And who was that?
10   A    It was around the time of the breakup with
11 the individual at AstraZeneca or Zeneca that I had been
12 involved with for several years. And it was at the
13 University of Pennsylvania.
14   Q    In Philadelphia?
15   A    Yes.
16   Q    Who is Linda Bracken?
17   A    She is a licensed clinical social worker and
18 was -- I went to her for several years. She was a
19 therapist.
20   Q    When did you go to her?
21   A    After I moved back to Delaware. When
22 Wesley, my former husband, and I were going through all
23 the discussions about getting divorced. So I would say
24 '95, '96. I went off and on to her over a period of

Page 287

1  years.
2    Q    All right. What was the name of the
3  psychiatrist at Penn?
4    A    I don't recall it right at this moment.
5    Q    Male or female?
6    A    It was a female.
7    Q    And did you go to any other behavioral
8  health providers, either psychiatrists, psychologists,
9  or other kinds of therapists?
10   A    Well, there was some other -- it was a
11 psychologist, I think, at the University of
12 Pennsylvania that I went to once or twice. But I
13 didn't think that it was a useful -- it was useful.
14 So, no. That was it.
15   Q    Were you referred by the psychiatrist at
16 Penn or is this an independent connection that you
17 made?
18   A    I'm pretty sure it was by the psychiatrist.
19   Q    Had you taken medication before for a
20 psychiatric problem, before seeing Dr. Loft?
21   A    Well, when I went to Penn, she prescribed
22 like an anti-anxiety drug.
23   Q    Do you remember which one?
24   A    No, I can't recall which one it was.

29 (Pages 284 to 287)

B120

Page 288

1   Q   How long did you take it?
2   A   Maybe a month or two.
3   Q   Why did you stop?
4   A   Well, it really stemmed around some of the
5   issues relative to this individual that I was involved
6   with and --
7   Q   Charlie?
8   A   Uh-huh. Harassment.
9   Q   So did you stop because things calmed down?
10  A   For a while, they did, yes.
11  Q   Did you start taking the pills again?
12  A   As best I can recall, no, I didn't. And if
13  I did, it might have been, you know, once -- one pill
14  or something like that. But as I recall, I never even
15  finished the prescription.
16  Q   Now, you're not making a claim in this case
17  for emotional distress damages, are you?
18  A   Am I making a claim? Can I ask John?
19  John, can you clarify that for me?
20  MR. LaROSA: Maybe we can represent for the
21  record that there is no emotional distress damages
22  under the FMLA. I think we are all in agreement that
23  we are not making that claim.
24  MR. SANDLER: Okay.

Page 289

1   BY MR. SANDLER:
2   Q   All right. Let me turn to the Dr. Lewis
3   notes. I'll hand you -- I have put them in
4   chronological order. So that it actually runs
5   backwards from 534 to 523. I'm just going to ask you
6   some questions about those notes.
7   A   Um-hmm.
8   Q   First of all, how did you get to Dr. Lewis?
9   I think you may have said this already.
10  A   He was recommended to me by a friend.
11  Q   Anna Hamilton?
12  A   Um-hmm. Yes.
13  Q   And did you find his sessions helpful?
14  A   Some yes, some no.
15  Q   Did he seem to have an accurate perception
16  of your problems?
17  A   Sometimes. Not all the time.
18  Q   Did you discuss your various issues with
19  him?
20  A   Yes.
21  Q   And at the first session, did you give Dr.
22  Lewis a history of what you thought was relevant?
23  A   Yes, as best I can recall.
24  Q   And you mentioned at some point you told him

Page 290

1   about Charlie, correct?
2   A   Correct.
3   Q   What's Charlie's last name?
4   A   Lucas.
5   Q   And was he a lawyer?
6   A   Yes, he is.
7   Q   Was he in the legal department?
8   A   Yes.
9   Q   At AstraZeneca?
10  A   He was the general counsel.
11  Q   Who was the general counsel while you were
12  there?
13  A   Charlie Lucas.
14  Q   I'm sorry. Towards the end.
15  A   Charlie lost his job at the merger. Well,
16  he was -- became like, I don't know, like a senior
17  counsel and then Glenn Engelmann took over the job as
18  general counsel.
19  Q   How old was Charlie Lucas?
20  A   He was like 48 in early 1996. Or 49. So he
21  is in his, what, mid to late fifties now.
22  Q   And was his boss Alan Milbauer?
23  A   No, he and Alan were peers.
24  Q   On the first page, you mentioned, there is

Page 291

1   references to Alan. I take it that's Alan Milbauer?
2   A   Yes.
3   Q   And what were you telling Dr. Lewis about
4   Alan Milbauer?
5   A   Let me take a look at these notes.
6   Q   Sure. Take your time.
7   A   Okay.
8   Q   I'm looking right now at the first page.
9   A   Okay. Well, it's inaccurate here. He says
10  Charlie's boss. That's not true.
11  Q   It appears to say that Alan Milbauer let you
12  go and returned you back to marketing. Do you see
13  that?
14  A   Well, I moved over into the marketing group
15  at the merger.
16  Q   And it says Alan in a position of power,
17  feels personal. Is that what that says?
18  A   Yes.
19  Q   What was that about?
20  A   I'm not sure what he really means by that,
21  to be honest with you. Other than this speaks to what
22  we were talking about earlier today in regard to the
23  harassment discussion that I had with Steve Lampert
24  and, you know, a little bit with Alan Milbauer. I mean

30 (Pages 288 to 291)

B121