14   A.   Correct.
15   Q.   But you had never had any experience with this
16   type of situation?
17   A.   No, I had not.  No, neither of us had, which is
18   why we sought a lot of direction from human resources
19   and our legal counsel once we were made aware Marybeth
20   had obtained legal counsel.
21   Q.   Who replaced Miss Farrell as PREP manager, Band
22   IV, for the Exanta team after she was discharged?
23   A.   We did not replace Marybeth with a Band IV PREP
24   manager.  We had Louise Colburn, who is a PREP
0089
1   manager.  During Marybeth's tenure, Denise
2   Quigley-Barrett was hired and Susan Shaffer was hired,
3   both of which were in cubes.
4   Q.   How long had Louise Colburn been employed by
5   AstraZeneca?
6   A.   Louise was -- I believe that Louise was hired
7   in 2001.
8   Q.   And she was a PREP manager or a senior PREP
9   manager?
10   A.   I believe she was a senior PREP manager.
11   Q.   And are you saying that she took over some of
12   Miss Farrell's work?
13   A.   We distributed Miss Farrell's work amongst the
14   three other PREP managers, Louise, Denise, and Susan.
15   Q.   And Louise Colburn, she's never requested any
16   FMLA leave; is that correct?
17   A.   That's correct.
18   Q.   And she's never requested any disability leave;
19   is that correct?
20   A.   That's correct.
21   Q.   And Louise Colburn has never requested any
22   medical leave; is that correct?
23   A.   That's correct.
24   Q.   And Louise Colburn has never requested any sick
0090
1   leave; is that correct?
2   A.   I am not certain.
3   Q.   How about Denise Quigley-Barrett, she's never
4   requested any FMLA leave; is that correct?
5   A.   Correct.
6   Q.   How about Susan Shaffer, she's never requested
7   any FMLA leave; is that correct?
8   A.   That's correct, that I am aware.

9   Q.  And as far as Louise Colburn, she's never
10  requested -- you already answered that.
11          As far as Denise Quigley-Barrett, she's
12  never requested any disability leave; is that correct?
13   A.  That's correct.
14   Q.  And she's never requested any medical leave; is
15  that correct?
16   A.  That's correct, as far as I know.
17   Q.  And Susan Shaffer has never requested any FMLA
18  leave; is that correct?
19   A.  As far as I know, no.
20   Q.  And Susan Shaffer has never requested any
21  disability leave; is that correct?
22   A.  As far as I know, no.
23   Q.  And Susan Shaffer has never requested any sick
24  leave; is that correct?
0091
1   A.  I am not certain.
2   Q.  How about Denise Quigley-Barrett, has she ever
3  requested any sick leave?
4   A.  I am not certain.
5   Q.  And Louise Colburn has never filed a complaint
6  of retaliation with AstraZeneca's human resources; is
7  that correct?
8   A.  That's correct.
9   Q.  How about Denise Quigley-Barrett, has she ever
10  filed a complaint of retaliation with AstraZeneca's
11  human resources?
12   A.  That's correct, as far as I know.
13   Q.  As far as you know, she has not?
14   A.  Correct.
15   Q.  And Susan Shaffer has not filed a complaint of
16  retaliation with AstraZeneca's human resources?
17   A.  I am not certain.  As far as I know, no, but I
18  am not on the team anymore so I wouldn't know.
19   Q.  And Louise Colburn, she's never filed a
20  complaint with human resources that her FMLA rights
21  were violated; is that correct?
22   A.  As far as I know, that's correct.
23   Q.  And Denise Quigley-Barrett has never filed a
24  complaint that her FMLA rights have been violated; is
0092
1  that correct?
2   A.  As far as I know, that's correct.
3   Q.  And Susan Shaffer has not filed a complaint

 4   with AstraZeneca's human resources that her FMLA
 5   rights have been violated; is that correct?
 6    A.   As far as I know, that's correct.
 7    Q.   In fact, Louise Colburn, Denise Quigley, and
 8   Susan Shaffer have never filed any complaints with
 9   AstraZeneca's human resources at all; is that correct?
10    A.   As far as I am aware, that's correct.
11    Q.   In 2003 and 2004, AstraZeneca provided its
12   employees with group health insurance through Blue
13   Cross and Blue Shield of Delaware; is that correct?
14    A.   Yes.  That was one of the health plan options
15   available to employees at the time.
16    Q.   In mid February of 2004, AstraZeneca cancelled
17   its health insurance coverage of Miss Farrell; is that
18   correct?
19    A.   I am not certain of the date or the protocol
20   with when health insurance is cancelled after an
21   employee has left.
22    Q.   Well, I am not asking for protocol, but in
23   terms of what was done in Miss Farrell's case, do you
24   have any knowledge of that?
0093
 1    A.   That's my understanding, that her health
 2   insurance was stopped after she left.
 3    Q.   Well, she was fired; isn't that correct?
 4    A.   Yes.
 5    Q.   And the termination of her health insurance
 6   coverage was retroactive to the date of Miss Farrell's
 7   termination; is that correct?
 8    A.   I am not certain of the terms of her health
 9   insurance upon her termination.
10    Q.   But you did hear that it was, the termination
11   was made retroactive?
12    A.   I had heard that her health insurance was
13   terminated.  I don't know the specifics as to whether
14   it was retroactive or the dates for when it was made.
15    Q.   Where did you hear that from?
16    A.   It would either have to have been either Susan
17   or Georgina or our legal counsel.  I don't recall who
18   had told me that.
19    Q.   Did you hear from Miss Broadway or Georgina
20   Austin-Jones that AstraZeneca did not notify
21   Miss Farrell that it was terminating her health
22   insurance coverage?
23    A.   I was not given any of the details surrounding

24  either the termination dates or procedures as to who
0094
1  told her and when and how. I thought that was all
2  laid out in a letter to her as to what the dates were
3  for her termination, for her -- the final payment of
4  her salary, health insurance, etcetera.
5    Q.  But you didn't receive a copy of that letter,
6  did you?
7    A.  No.
8    Q.  So you don't know whether or not that type of
9  letter exists?
10   A.  I don't know. I only assumed that it would be
11  standard procedure that we would be communicating with
12  employees that had been terminated in letters.
13   Q.  Focusing on health insurance coverage, who, in
14  terms of this standard procedure, who would be
15  communicating with Miss Farrell or a terminated
16  employee --
17   A.  Usually it's human resources.
18   Q.  So if somebody was communicating with her, it
19  would be Georgina Austin-Jones in this case?
20   A.  I believe so, yes.
21   Q.  So any communications from human resources
22  about termination of health insurance coverage would
23  have come from Georgina-Austin Jones?
24   A.  Yes, I believe so. Or human resources.
0095
1    Q.  And there is nobody else at AstraZeneca other
2  than Georgina Austin-Jones that would be able to
3  answer these questions about health insurance
4  benefits?
5    A.  Human resources, I would think, should be able
6  to answer it. It would be the benefits -- I believe
7  it would be human resources, either Georgina or
8  Georgina's supervisor.
9    Q.  Who is that?
10   A.  I don't know right now who Georgina's
11  supervisor is.
12   Q.  Aside from Miss Farrell, have any other
13  employees been terminated under you?
14   A.  No.
15   Q.  Aside from Miss Farrell, have any other
16  employees been terminated under Ms. Broadway?
17   A.  No.
18   Q.  Aside from Miss Farrell, have any other

19  employees under you had their employment end either
20  voluntarily, through retirement, taking another job,
21  or any other circumstances?
22  A.  Yes.  Yes.
23  Q.  Have any of those employees who have separated
24  from the company had occasion to exercise their rights
0096
1  under Cobra for health insurance?
2  A.  Not that I am aware.
3  Q.  Aside from human resources, is there any other
4  department or any other person at AstraZeneca that
5  would deal with health insurance coverage for former
6  employees?
7  A.  The health insurance is handled by benefits
8  administration through the department, and I don't
9  know who that person or persons would be specifically.
10         MR. LaROSA:  Why don't we take five
11  minutes.  I think we are almost finished.
12         (Recess taken.)
13  BY MR. LaROSA:
14  Q.  Just a few more questions.
15  A.  Okay.
16  Q.  Regarding Louise Colburn, has she ever been
17  placed on a short-term improvement plan?
18  A.  Not to my knowledge, no.
19  Q.  Has Miss Colburn ever been placed on an action
20  plan?
21  A.  Not to my knowledge, no.
22  Q.  Has she ever been placed on a PIP?
23  A.  Not to my knowledge.
24  Q.  She was never denied a promotion; is that
0097
1  correct?
2  A.  Denied a promotion?
3  Q.  That she sought?
4  A.  We had -- "we," being myself, Patty Torr, and
5  David McNinch had considered Louise Colburn for a
6  promotion to Susan Broadway's position, and I found
7  out later that Louise had wanted to be promoted but we
8  did not feel, at the time, that her skills were such
9  that she was capable of taking the position that Susan
10  Broadway was put into.
11         So --
12  Q.  Can you just tell me what Susan Broadway's
13  position was?

14    A.   Her most current position, I have to recall the
15   title, brand communications leader.
16    Q.   That was the position that Miss Colburn would
17   have liked to have been considered for?
18    A.   Yes.
19    Q.   With regard to Denise Quigley-Barrett, has she
20   ever been placed on a short-term improvement plan?
21    A.   Not to my knowledge, no.
22    Q.   And she's never been placed on an action plan
23   either; is that correct?
24    A.   That's correct, that I know.
0098
1    Q.   And she's not been placed on a PIP; is that
2   correct -- never been placed on a PIP; is that
3   correct?
4    A.   That's correct, as far as I know.
5    Q.   And she's never been denied a promotion; is
6   that correct?
7    A.   As far as I know, no.
8    Q.   And Susan Shaffer has never been placed on a
9   short-term improvement plan; is that correct?
10    A.   Correct.
11    Q.   Susan Shaffer has never been placed on an
12   action plan; is that correct?
13    A.   As far as I know.  While I was there, no.
14    Q.   Susan Shaffer has never been placed on a PIP?
15    A.   As far as I know, no.
16    Q.   And Susan Shaffer has never been denied a
17   promotion; is that correct?
18    A.   I am not certain.  Not while I was there, she
19   was not.
20        MR. LaROSA:  I have no further questions.
21   BY MR. SANDLER:
22    Q.   I have a few.  I want to clarify some
23   nomenclature first of all.  We talked in this case
24   about an action plan, and was it your recollection
0099
1   that there was a formal action plan for Miss Farrell?
2    A.   Yes.
3    Q.   And was that in -- sometime in the summer of
4   2003?
5    A.   That's correct.
6    Q.   And was that after she came back from FMLA
7   leave?
8    A.   That's correct.  I believe so.

B202

9    Q.  And was it several months afterwards?
10    A.  I think Marybeth came back on June 23rd is the
11   date that I recall, and her action plan started on or
12   around August.  I don't know the exact date.
13    Q.  Okay.
14    A.  So she -- we had discussed that once she
15   returned from her FMLA, we did not want to then
16   immediately, the next day, just start with an action
17   plan.  We wanted to give her some time to acclimate,
18   to get back to her work, and to re-familiarize herself
19   with the projects and the work that needed to be done.
20    Q.  Now, there has been also reference to something
21   called the performance improvement plan, and I thought
22   you said that that came after the action plan; is that
23   correct?
24    A.  Correct.
0100
1    Q.  And there has been also thrown around the term
2   called "short-term improvement plan," I believe it was
3   called.
4        Was there something that was done at the
5   time Ms. Farrell was going out on FMLA leave?
6    A.  Prior to Marybeth going out, Susan and I
7   discussed -- Susan was asked to put together a
8   transition plan, which was essentially just a plan to
9   delegate Marybeth's work and to provide an outline as
10   to what she was in the middle of, what needed to be
11   done, what the milestones were, etcetera, so that
12   other PREP managers could pick up the work and do the
13   job for whatever period of time Marybeth was going to
14   be out.
15    Q.  And was that designed to discipline Marybeth
16   Farrell in any way?
17    A.  No.  No.
18    Q.  Was it designed to focus on her performance?
19    A.  No.  It was -- it would have been asked of any
20   employee before they were to leave for any extended
21   period of time to put together an outline of what
22   their responsibilities were, what their job was, and
23   -- so that others could do the work.
24    Q.  Okay.
0101
1    A.  If we had the luxury of the time with which the
2   employee could write that up and provide it.
3    Q.  I am jumping ahead in time.

4    A.   Okay.

5    Q.   There was some question or questions about a

6  supposed -- some damage that was done to her computer

7  docking station, I guess, in January of 2004.

8    A.   Mm-hmm.

9    Q.   Is it correct that you are not aware that an

10  investigation was done or not done?

11    A.   I am not aware whether an investigation was or

12  was not done.  I --

13    Q.   Fine.  And you mentioned that there were

14  several other people who were, I guess, peers of

15  Marybeth Farrell, at least functional peers, who were

16  in cubicles rather than offices?

17    A.   Correct.

18    Q.   Who, in particular?

19    A.   Amongst her peers was Susan Shaffer, who was a

20  Band V employee, who is a pharm. D that was hired

21  during Marybeth's tenure, she was in a cubicle.

22  Another peer of Marybeth's was Denise Quigley-Barrett,

23  she was in a cubicle.

24    Q.   Is it Barrett-Quigley?

0102

1    A.   Barrett-Quigley, excuse me.  I don't recall her

2  band, but she was also in a cubicle.  And there were

3  other members of the Exanta team that were Band IV and

4  V that were in cubicles; specifically, John Miller,

5  Cheryl Umbles, Karen Macphail, Christy Hedstrom, to

6  name a few.

7          During the time that we needed to move

8  Marybeth, we had a Band VII doctor come onto the team

9  and we needed office space for him, and we were in the

10  middle of writing the NDA and we had a senior medical

11  writer who was -- had to work with our clinical team

12  and we needed an office for him.  And because of

13  confidentiality reasons, they could not be in a

14  cubicle because the material they were working on was

15  a material valued to the company, so they had to have

16  an office.

17    Q.   Speaking of Christy Hedstrom, had she returned

18  to the United States from Sweden?

19    A.   Yes.  Christy was working on the Exanta team in

20  Mondal and was -- we brought her on and hired her in

21  the U.S. to work when her husband was -- when her and

22  her husband moved over to the States -- back to the

23  States.

B204

24    Q.  Did she participate by teleconference sometimes

0103

1   when she was in Sweden in meetings?

2    A.  Yes.

3    Q.  Miss Farrell says that one time there was a

4   meeting in which she was participating, Christy

5   Hedstrom was participating by teleconference?

6    A.  Mm-hmm.

7    Q.  And you started the meeting by saying, quote,

8   "Does everyone have their blanky"?; do you remember

9   such a comment?

10    A.  I don't remember any comment like that.

11    Q.  Did you intend any such comment to be critical

12   of Miss Hedstrom for taking leave?

13        MR. LaROSA:  Objection.

14        MR. SANDLER:  You can answer.

15        THE WITNESS:  No.

16   BY MR. SANDLER:

17    Q.  Let me go back to the latter part of 2002 and

18   the early part of 2003.

19        Let me ask you, first of all, when does

20   the 2002 evaluation actually get prepared?

21    A.  We begin the preparation of the performance

22   plans towards the end of the year in the last quarter.

23   Usually, traditionally, it's in October and November

24   and December, and the reason why there is such a

0104

1   period of time, long period of time is that we ask the

2   360 degree evaluation be done by other colleagues and

3   we ask the employee to provide the names of

4   individuals that they would like us to obtain feedback

5   from.  And in Marybeth's case, she wanted Brian

6   Katona, Jane Clark -- let's see, those two for sure,

7   to provide feedback.  I am missing the other one.  I

8   believe it was Denise.  And it generally takes some

9   time --

10    Q.  Denise who?

11    A.  Denise Barrett -- no.  I am sorry.  It wasn't

12   Denise because she wasn't even there yet.  It was

13   Brian and Jane Clark and I don't recall the other two

14   people, but there were four.

15    Q.  Okay.

16    A.  And it takes time to get those evaluations

17   back.

18    Q.  There was feedback from the vendors she worked

B205

19  with?
20    A.  Yes.  I am sorry.  We also got feedback --
21  well, yes, we got feedback from Discovery
22  International, and I personally spoke with Christine
23  Lutze from Discovery International on several
24  occasions by telephone regarding Marybeth's
0105
 1  performance.  At the advisory board meeting in
 2  November, which I had previously mentioned was rather
 3  loosely run, I was concerned about how things were
 4  going.  And having had extensive experience with
 5  Discovery International, I knew that they ran a very
 6  tight ship.  They were exceptional at running these
 7  types of meetings.  Probably some of the best in the
 8  industry.  And it was not up to their standards
 9  either.
10          And I called Christine Lutze from
11  Discovery International and I asked her what the
12  situation was?  And she verbalized that they were
13  having a lot of difficulty in working with Marybeth.
14  And that difficulty included, you know, last minute
15  phone calls, requests for information, quick
16  turnaround times, lack of decision-making, and
17  protracted periods of time, and I -- I chalked it up
18  to Marybeth being new, it was her first foray into
19  executing meetings of this type.  And I had asked
20  Christine if she could please make sure to be patient
21  with Marybeth to put her best people on these meetings
22  so that we could be sure that we had a safety net
23  around Marybeth so that even if she wasn't quite up to
24  capacity, the end result would not show unfavorably
0106
 1  upon AstraZeneca.
 2          So, at any rate, the period when we sought
 3  feedback on the employees was during the October,
 4  November, December time period.
 5    Q.  And did you also give feedback as far as this
 6  evaluation process?
 7    A.  Yes.
 8    Q.  And how would you characterize your approach to
 9  the feedback of Marybeth Farrell at that time?
10    A.  Well, in my opinion at the time, and as is --
11  you can see reflected in the performance review, there
12  were certain areas where Marybeth did very well and I
13  actually held out hope that she would do well.  She

14  had -- she was only in the job for six months, seven
15  months. It usually takes new team members about six
16  months in order to really learn. And we were entering
17  a very critical pre-launch phase, so my evaluation of
18  Marybeth was, at the time, mixed.
19        And I felt, gave her the benefit of the
20  doubt that even though these -- the meeting in
21  November and some of the smaller behaviors weren't
22  exactly where I wanted to see it, I asked Brian
23  Martin, her then supervisor, to work closely with her.
24        And Marybeth quickly assimilated into the
0107
1  team, which is reflected in the performance review.
2  She worked very long hours. She came in early. She
3  stayed late. She appeared to be putting in a
4  tremendous amount of effort.
5   Q.  Okay.
6   A.  And at the time, her attitude was very good,
7  very willing to learn, very open. And, so, I held out
8  a lot of hope that Marybeth would do well and be
9  successful in her role.
10   Q.  Jumping forward for just a second, did her
11  attitude continue the same as you just observed or did
12  it change in the latter part of 2003?
13   A.  Absolutely changed in the latter part of 2003.
14  And I guess I would characterize it that Marybeth had
15  very little to no self-awareness that when you would
16  have a conversation with her, her take away and her
17  understanding would be very different from what you
18  either said or talked about with her. And I had an
19  experience where Marybeth went to my supervisor to
20  talk about her performance difficulties, I believe it
21  was in April, and my supervisor even mentioned that,
22  you know, it's amazing how two people can have the
23  same conversation with completely different take
24  aways.
0108
1   Q.  That was her perception?
2   A.  That's Patty Torr's perception.
3   Q.  Is she the same person as Patty McDonald?
4   A.  Yes, Patty McDonald, I am sorry. Patty was
5  married in the course of the year.
6        And Marybeth just refused to admit that
7  anything she was -- at least verbally, she refused to
8  admit that she was doing anything wrong. But in some

B207

9  of the follow-up memos and e-mails that went back and
10  forth, she said, "Yes, I will work on this and I am
11  committed improving this and so on," so it was a very
12  -- it was just odd, and especially towards the end,
13  her attitude became belligerent, I would say.
14  Q.  And you also mentioned that at the beginning,
15  she worked hard?
16  A.  Yes.
17  Q.  Did that continue at the end?
18  A.  No, it did not.  Susan had a great amount of
19  difficulty in, you know, even having Marybeth show up
20  to work.  We eventually decided to pull her entry and
21  exit reports from security to find out if she was even
22  in the office because Marybeth would not come in, she
23  would not call, she would show up late for meetings or
24  not at all.
0109
1          I received a phone call from Discovery
2  International, Marybeth was running one of the
3  teleconferences with a thought leader and she
4  literally jumped off the phone very abruptly and left
5  the building.
6  Q.  Let's go back to the beginning of the year.
7          Let me hand you what is bates numbered at
8  the bottom D171, and it's an e-mail from you to Debbie
9  Brangman.  Let me just read it.  It says, "Debbie, I
10  have been seriously reconsidering the proposed
11  promotion for Marybeth.  This sends a terrible mixed
12  message for her and the rest of the team.  Can we not
13  promote her and explain the reasons for needed
14  development?  I also think that H.R. would question
15  our justifying this."  Signed Jane.
16          Do you see that?
17  A.  Yes.
18  Q.  And there is a response from Debbie Brangman.
19  "Hi, after our conversation, I am having reservations
20  as well.  I haven't started any paperwork.  I will
21  give you a call."  Signed Debbie.  Those were the same
22  day, February 12th, 2003.
23          And then on the 14th, you responded, "Can
24  you please plan some meetings to discuss performance
0110
1  with Marybeth ASAP?  I would like to get started with
2  this.  Do you contact H.R. or should I"?
3          Right?

4   A.  Correct.
5   Q.  Tell me about that.  What was taking place at
6   that time?
7   A.  Well, that was in the February time frame
8   before we had given -- before Debbie had given
9   Marybeth her 2002 performance evaluation.  And we
10  also, running parallel to this, was the office move
11  where we had the Band IV/Band V situation.
12          Marybeth let it be known that she wanted
13  to be promoted to a Band V and that when she was
14  interviewing for the position, the functional manager,
15  who was, at the time, Renee Valles, V-a-l-l-e-s, had,
16  apparently, told Marybeth that the job would be
17  changed from a Band IV to a Band V, without my knowing
18  about that and never discussed.
19          Marybeth, during this February time frame,
20  beginning of the year, had sent me a message and said,
21  By the way, we will be moving.  I was told I would be
22  able to be a Band V.  I'd like to be a Band V.  And at
23  that point, I had some reservations, which I noted in
24  the message, and I talked about them with Deb Brangman
0111
1   in person in December or January at a cardiovascular
2   T.A. meeting at the Doubletree Hotel.
3           And after I talked with Deb, then she
4   agreed and Deb said that she thought that given the
5   performance evaluation, that Marybeth would be
6   reasonable.  And I -- I, at that time, said, "No, I
7   don't -- I don't agree with it."  The difficulty was
8   starting to emerge in January, February, and March,
9   and -- so I thought it sent a very bad mixed message
10  and I did not want to promote her at the time.
11  Q.  I am going to hand you again a series of bates
12  numbered documents, D175 to D181, and I am not going
13  to read it all, but just point to the last one, which
14  is -- it looks like the messages start in January,
15  January 30th, 2003, from Marypat Howard to Marybeth
16  Farrell, and on and on?
17  A.  Mm-hmm.
18  Q.  But the last one says, it's from you to Debbie
19  Brangman, and it says, "Debbie, this string of e-mails
20  highlights the significant deficiency we have with
21  Marybeth's work.  We are at risk for the advisory
22  board schedule and she is sitting on information or
23  not moving to meet deadlines.  Debbie, any help with

24   moving Marybeth along or formal performance plan ASAP.
0112
1   Thanks. " Signed Jane.
2           Can you talk about that situation?
3    A.  Yes.  This relates to the -- let's see.  It
4   relates to both the -- okay.  This is for the
5   Cardiology Advisory Board and the time line for having
6   that meeting take place was slipping and the deadlines
7   were missing -- or being missed, and I had asked Brian
8   Martin to move Marybeth along, who was her supervisor
9   at the time, and he was not having much success
10  either.
11          And after he sent me this e-mail, I sent a
12  message back to Debbie Brangman again requesting,
13  which was her role as a functional manager, to assist
14  with training and development of PREP managers, and
15  that, you know, again, I was having -- we were having
16  difficulty with Marybeth and could Debbie please
17  intervene at this point?
18   Q.  Then I am going to hand you D174, which is two
19  e-mails, one from Marybeth to Debbie Brangman and
20  Brian Martin about a meeting that took place the
21  previous day and listing two seminars or courses, as
22  she calls them, that she wanted to enroll in, and then
23  a message from you to Debbie Brangman, which, the next
24  day, of March 12th, saying, "Can you fill me in on how
0113
1   this meeting went"?
2           What's that about?
3    A.  I believe that this was the time period where
4   Debbie Brangman and Brian Martin presented Marybeth's
5   performance review for 2002 to her.  And as suggested,
6   in the review, I -- in the development -- in the
7   summary and developmental areas, I -- we had -- Brian
8   and I had outlined and is written that Marybeth should
9   consider some training in presentation skills and in
10  publications planning and development.
11          And, so, Marybeth is requesting to do
12  that, and then I sent a message back to Debbie asking
13  her how the meeting went with Marybeth.
14   Q.  And why did you do that?
15   A.  I was not at the meeting and I wanted to find
16  out what Marybeth's reaction was and how the
17  presentation of her performance review went.
18   Q.  And then here is D185, which is an e-mail dated

B210

19   March 17th from Debbie Brangman to Scott Bolenbaugh,
20   Jane Hellen, Brian Martin, and Deborah Kauffman about
21   Marybeth Farrell, and she says, "I would like to get
22   everyone in the room to discuss the evolving situation
23   with Marybeth Farrell.  Thanks for your help in making
24   this meeting."  Signed Debbie.  And then you respond,
0114
1   "Where is Scott's office"?
2        What is that about?
3   A.   Well, at the time in speaking with Debbie, it
4   was not -- not progressing along with Marybeth, and in
5   speaking with Debbie, she had said that she had talked
6   with Marybeth but Marybeth was not taking
7   accountability for her actions.  And, so --
8   Q.   What was she doing?
9   A.   Blaming other people for everything that was
10   going wrong.
11   Q.   Okay.
12   A.   Beginning to again.  And so Debbie wanted to
13   seek some assistance from her boss, who is Scott
14   Bolenbaugh at the time, and so that was the request
15   for that meeting and I had asked Debbie where Scott's
16   office was.  I had not previously met Scott and -- so
17   that was that.
18   Q.   Was a meeting held?
19   A.   The meeting was held with Scott Bolenbaugh,
20   with Debbie Brangman, and with Brian Martin and myself
21   to discuss Marybeth's performance and what we should
22   do about it, which was a discussion of, you know,
23   perhaps we -- we considered all options, putting her
24   on an action plan and not, and just seeing how she did
0115
1   for the first half of 2004.
2   Q.   And then what was the conclusion -- first half
3   of 2003?
4   A.   Excuse me, 2003.  2003.
5   Q.   What was the conclusion?
6   A.   And, unfortunately, during then that time or
7   soon thereafter, there was a reorganization with that
8   -- with Brian Martin's position, and we decided that
9   we would wait and help Marybeth as much as we could
10   and -- until the new brand communications leader came
11   into the role.  They had changed the requirements of
12   the job.
13        And that was the time period where Brian

14  Martin went to work on another brand in CNS and Susan
15  Broadway was promoted.
16    Q.  And I think you have already talked about what
17  happened the day Susan Broadway was promoted?
18    A.  Mm-hmm.
19    Q.  When was that?
20    A.  That was in April, April -- I believe it was
21  April 7th.
22    Q.  Then let's hold that thought, then.  This is
23  dated April 4th.  It's D209, and it's from Deborah
24  Kauffman to you.  And it says, "Jane, with the
0116
1  transition of individuals in the BCD role" -- what's
2  BCD?
3    A.  Brand communications director.
4    Q.  So that's the Brian Martin to Susan Broadway?
5    A.  Correct.
6    Q.  "I wanted to touch base with you regarding the
7  employees relations issue that has been discussed with
8  me in the PREP/promotion area and gain your
9  perspective.  I did talk to Susan about it briefly
10  yesterday and we both agreed it was an urgent
11  situation and it would be a good idea for you and I to
12  talk about it also.  Thanks for accepting my meeting
13  request on Monday."  Signed Deb Kauffman.
14       Do you know what's being referred to
15  there?
16    A.  Yes.  During this time, they changed the brand
17  communications role, and Susan had interviewed, Brian
18  Martin had interviewed.  It was required that people
19  re-interview and that the decision as to which
20  individual got that role was with H.R. and myself and
21  Patty McDonald Torr, and, as well as other individuals
22  on the -- in Scott Bolenbaugh's group.  And I was
23  concerned that whoever got that position, and I had
24  spoken with Deb Kauffman about it, that whoever got
0117
1  that position would have to deal with the situation
2  with Marybeth and that it was going to be -- it was
3  going to be difficult, that she was -- at the time,
4  she was not performing and not acknowledging her --
5  not having accountability for her actions and doing a
6  lot of blaming.  And that was acknowledgment by Deb
7  Kauffman that the new director or leader would have to
8  deal with that.

B212

9    Q.   And on the day that Susan Broadway's promotion
10   to that position was announced, what happened with
11   respect to Marybeth Farrell?
12   A.   Well, we -- I announced to the team that
13   Marybeth -- excuse me, that Susan was going to be
14   promoted and that Brian was going to be working on
15   another team and some of the changes in the role of
16   the brand communications director or leader, and that
17   went fine.  And then after that meeting, after we
18   disbursed, I went to my office briefly to grab a file
19   because I had another meeting and Marybeth came into
20   my office and she said that she was surprised about
21   Susan being promoted and that she felt that she should
22   have been promoted to that position.
23        And I told her that before she would be
24   considered for a promotion, she needed to demonstrate
0118
1    that she could execute the responsibilities at her
2    current position, within her current position, and
3    then she would be considered like any other team
4    member.  And that, currently, her name was not
5    included as a potential candidate for a promotion
6    because she was not showing that she could do her job
7    in her current capacity.
8        And that meeting, unfortunately, was very
9    brief because I had to go off to a meeting.  And
10   Marybeth said, "Well, okay." And I said, "Well, we
11   need to talk about this some more and we need to work
12   with Susan Broadway now," and that was it.
13   Q.   Ms. Farrell acknowledged that she did go in and
14   complain, or she didn't say complain, she said she
15   expressed surprise about Susan Broadway being
16   promoted.
17   A.   Mm-hmm.
18   Q.   And she said that in response, that all you
19   said was, quote, Advisory boards are more than picking
20   out napkin colors, period, unquote.
21        First of all, do you recall saying that,
22   and, second of all, is that all you said?
23   A.   No.  I don't recall saying that at that
24   particular meeting.  I was very, very clear with
0119
1    Marybeth that she had not demonstrated to me, in 2003,
2    that she could do the job that was outlined for her
3    and that she needed to do that, and she wasn't.

B213

4    Q.  Let me show you D219 and D244.  One is a memo
5    from you to Marybeth Farrell dated April 7th, which
6    is, I guess, is about the same time as the promotion
7    was announced, asking her how she is progressing with
8    an action list.
9         Do you recall that?
10   A.  Yes.
11   Q.  And she responded, apparently, and I am not
12   going to go over all that, but then you responded to
13   her on April 10th, saying, "Marybeth, I was thinking
14   of more depth," etcetera.
15        Do you recall that exchange of e-mails?
16   A.  Yes.
17   Q.  What was that all about?
18   A.  The Cardiology Advisory Board had to be
19   cancelled because of Marybeth's inability to get the
20   meeting planned and execute it.  And we had had a
21   meeting about that.  And at the meeting, I asked
22   Marybeth to please take some notes and some take away
23   actions as to what we were going to do differently to,
24   No. 1, avoid this situation again in the future so we
0120
1    wouldn't have this happen again and secure the plans
2    for the rest of the advisory boards for the year.  So
3    Marybeth took some notes on that meeting.  And I asked
4    her to please follow-up by a certain date.
5         And in the meantime, I wanted to make sure
6    that she was tracking.  And, so, when I received this
7    e-mail, it appeared to me, again, from reading it and
8    from talking with Brian Martin, that Marybeth had
9    taken the action items but had delegated most if not
10   all of the action items to Discovery International.
11   She was not doing the work herself and did not seem to
12   grasp what needed to be done.  And so I was asking her
13   to please provide more depth and show me that she knew
14   what she was working -- instead of a to do list, which
15   included delegation, I wanted to know that -- where
16   she was.  I wanted more detail.
17   Q.  And showing you D257 and 8, which is the same
18   exchange you have just been testifying about, which
19   you have sent to Susan Pritchard, and you say, "Susan,
20   received from MB last week.  Please follow-up as you
21   see necessary.  I am waiting for Brian to give me the
22   specifics for performance.  I expect we will have to
23   handle this when I return.  Hate to delay any further,

24  but... Thanks, Jane"?
0121
1    A.  Mm-hmm.
2    Q.  What was that about?
3    A.  Again, it relates back to the advisory boards
4    asking Marybeth for more in depth and specifics as to
5    how she was going to improve the planning in the
6    future.  And Marybeth responded back, she agreed that
7    it was important to track them.  And I was copying, at
8    the time, both Susan Pritchard, who is now Susan
9    Broadway, and Christine Lutze, from Discovery, so that
10   they all knew where things were.  And Marybeth had
11   sent me this responding e-mail, and I sent a note back
12   to Susan that we would need to follow-up and that we
13   would need to handle the situation.
14         I, unfortunately, had to leave on -- I was
15   on vacation April 14th through 19th, and Marybeth --
16   excuse me, Susan and Brian would need to continue to
17   follow-up with Marybeth.
18   Q.  I am going to show you D260, which is an e-mail
19   exchange between Marybeth Farrell and Louise Colburn,
20   and you are copied on it, among others, and the last
21   note is from Louise Colburn to Susan Pritchard dated
22   April 15th, and it says, "We go round and round."
23         Do you know what that means?
24   A.  Yes.  Again, this relates back to asking
0122
1    Marybeth to put an action plan together around the
2    advisory boards and her not taking responsibility or
3    accountability for doing her work.  Louise was the
4    PREP manager that sat next to her, and Louise was
5    complaining that Marybeth was not understanding what
6    she had to do and that Marybeth would ask her frequent
7    questions that were the same questions that -- so,
8    frequently, Louise had to give Marybeth a lot of
9    lists.  And part of that was do so because Louise kind
10   of was to keeper, if you will, and she tried to manage
11   closely the advisory lists and our thought leader
12   lists, and instead of Marybeth just asking for this
13   list of thought leaders for an upcoming meeting, you
14   know, she sent more string of e-mails to Louise and
15   Louise is just getting fed up and we go round and
16   round.  Things don't get done.
17   Q.  All of the things we have just been talking
18   about, since I started asking you questions, relate to

19  times before you were even aware that Marybeth Farrell
20  was going out on FMLA leave; is that correct?
21     A.  That's correct.
22     Q.  Other than a couple things where we jumped
23  forward to later in the year?
24     A.  Correct.
0123
 1     Q.  Here is D319, which is dated May 1, and it's an
 2  e-mail from you to Susan Pritchard Broadway, and it
 3  says, "Marybeth and I discussed the performance of her
 4  work on advisory boards on March 14th. This was the
 5  date that we cancelled the Cardiology Advisory Board.
 6  We also briefly discussed her performance and
 7  development on the date of the quarterly team meeting,
 8  March 29? after your promotion and flowers went out."
 9         Was that the date, the 29th, or was it
10  another date that the announcement was made?
11     A.  March 14th was the date when we cancelled the
12  advisory board and Marybeth also and I discussed that
13  this was Susan's promotion. I believe I was wrong on
14  the date. I think that was April 7th.
15     Q.  But in any event, there were two discussions
16  that you are flagging?
17     A.  Yes.
18     Q.  In which performance problems with Marybeth
19  Farrell were discussed by you with her?
20     A.  By me with her. And not including discussions
21  that Marybeth would have had with Brian Martin or
22  Debbie Brangman.
23     Q.  Then you go on and say, "I'd like to be present
24  when you," meaning, I guess, Susan Broadway, "have
0124
 1  your discussions with Marybeth in order to keep her
 2  focused on her work, not the competency of others."
 3         What did you mean by that?
 4     A.  Well, as was alluded to in the previous memo
 5  from Louise, Marybeth would frequently blame others
 6  and -- for her inability to get her duties done and
 7  her job done and she would deflect a lot and -- at
 8  that point. And, so, I wanted to be sure that when
 9  Susan met with Marybeth, that -- and we talked about
10  her performance, that I be there because I just wanted
11  -- I just wanted to be there.
12         I just wanted to be careful that Susan was
13  clear and that Marybeth understood that we had

14  concerns over her performance, and it was not others,
15  but it was her, and that she had control over -- of
16  these aspects of her job and she -- she needed to take
17  action and to do her job.
18    Q.  And finally, D339, there is an e-mail from
19  Marybeth Farrell to Deborah Kauffman with a copy to
20  Patty McDonald, and then an e-mail the same date from
21  Patty McDonald.  Marybeth Farrell's e-mail talks about
22  her surprise at the issues Susan Pritchard Broadway
23  had raised and she says that they weren't consistent
24  with her performance issue.
0125
1    A.  Mm-hmm.
2    Q.  And then Patty McDonald, I think you testified
3  before that Patty McDonald had mentioned an instance
4  where, you know, the, quote, take away that the two
5  people had were different.  Is that the e-mail that
6  you were referring to?
7    A.  Yes.  That's the e-mail that I was referring to
8  -- this highlights a couple things.  It highlights
9  that, you know, Susan would say, Okay, I will meet
10  with you and I will take -- and provide copies,
11  provide sequence of events and people that are
12  responsible, and Marybeth went to go and talk to
13  Patty, and Patty was aware of this, as she mentions.
14  Patty reflects that, to date, Jane feels there is a
15  gap in Marybeth's performance, and that Patty said
16  that it's amazing that two people can have the same
17  conversation and get different take aways.
18          In Marybeth's situation, Patty felt, and I
19  agreed, that Marybeth was over her head in her current
20  role on the team and was not self-aware to understand
21  the deficiencies and her limitations, and that we
22  would try and assist her.
23    Q.  In other words, when you say "self-aware," what
24  do you mean?
0126
1    A.  I mean just understanding what she is competent
2  of doing and not competent at doing.  And if she
3  cannot do the job, ask for help.  And that's what I
4  meant by self-aware of her abilities and limitations.
5    Q.  Final question.  When I showed documents, these
6  documents, documents that had dates on them from
7  before the FMLA leave to Miss Farrell, she
8  acknowledged that, Well, if they were correct -- if

9  the dates were correct, then it does show that there
10  were concerns about her performance before the FMLA
11  leave.
12    A.  Mm-hmm.
13    Q.  But she said that she couldn't believe that
14  those dates were correct; they must have been, you
15  know, backdated or just falsely prepared.
16        Do you know of any of these e-mails or any
17  other e-mails or any other documents in this case that
18  were prepared and backdated or otherwise generated for
19  the purpose of simply creating a record?
20    A.  No.  The e-mail system is such that you can't
21  write an e-mail, send it, and then change the date.
22  They are actual e-mails.  I never changed any dates on
23  any e-mails.  And as I mentioned, I don't even think
24  it's possible to do so.
0127
1    Q.  Okay.
2    A.  And I would just reiterate that, you know,
3  Marybeth's performance is her performance for 2002,
4  and these documents refer to Marybeth's performance,
5  which was deteriorating in 2003, and my efforts and
6  Brian Martin and Susan Broadway and Debbie Brangman
7  and Deb Kauffman in trying to discuss it with Marybeth
8  at varying times and to help her so that we would not
9  have to get to any kind of an action plan, a formal
10  action plan or anything else.
11        And this was all in January through the
12  very first part of May.
13        MR. SANDLER:  Nothing further.  Your
14  witness.
15        MR. LaROSA:  Nothing further.
16        (The deposition was concluded at 1:25
17  p.m.)
18        - - - - -
19
20
21
22
23
24
0128
1              INDEX TO TESTIMONY
2
  JANE K. HELLEN                    PAGE

B218

3

Examination by Mr. LaRosa          2
4    Examination by Mr. Sheldon          98
5

          - - - - -

6
7          INDEX TO EXHIBITS
8

               PAGE

9

     Hellen Exhibit No. 1 was marked for identification...
10    .................................................. 62
11    ERRATA SHEET......................................129
12    CERTIFICATE OF REPORTER...........................130
13
14
15
16
17
18
19
20
21
22
23
24
0129
 1
 2
 3
 4          REPLACE THIS PAGE
 5          WITH THE ERRATA SHEET
 6          AFTER IT HAS BEEN
 7          COMPLETED AND SIGNED
 8          BY THE DEPONENT.
 9
10
11
12
13
14
15
16
17
18

```
19
20
21
22
23
24
0130
 1            Jane K. Hellen
 2
 3  State of Delaware )
                     )
 4  New Castle County )
 5        CERTIFICATE OF REPORTER
 6     I, Renee A. Meyers, Registered Professional
    Reporter and Notary Public, do hereby certify that
 7  there came before me on the 15th day of February,
    2005, the deponent herein, JANE K. HELLEN, who was
 8  duly sworn by me and thereafter examined by counsel
    for the respective parties; that the questions asked
 9  of said deponent and the answers given were taken down
    by me in Stenotype notes and thereafter transcribed
10  into typewriting under my direction.
11     I further certify that the foregoing is a true
    and correct transcript of the testimony given at said
12  examination of said witness.
13     I further certify that I am not counsel,
    attorney, or relative of either party, or otherwise
14  interested in the event of this suit.
15
16            Renee A. Meyers
              Certification No. 106-RPR
17            (Expires January 31, 2005)
18
19  DATED:  February 16, 2005
20
21
22
23
24
```

B220



**WILCOX & FETZER LTD.**

In the Matter Of:

# Farrell
v.
# AstraZeneca Pharmaceuticasl, L.P.

## C.A. # 04-285 KAJ

-----------------------------------------------------------------------

Transcript of:

# Susan P. Broadway

March 24, 2005

-----------------------------------------------------------------------

Wilcox & Fetzer, Ltd.
Phone:  302-655-0477
Fax:  302-655-0497
Email:  lhertzog@wilfet.com
Internet:  www.wilfet.com

Page 1

```
           IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF DELAWARE
MARYBETH FARRELL,            )
                             )
     Plaintiff,              )
                             )
     v.                      )  C.A. No. 04-285 KAJ
                             )
ASTRAZENECA                  )
PHARMACEUTICALS, L.P.,       )
                             )
     Defendant.              )
```

Deposition of SUSAN P. BROADWAY taken pursuant to notice at the Law Office of John M. LaRosa, 2 East 7th Street, Suite 302, Wilmington, Delaware, beginning at 1:30 p.m., on Thursday, March 24, 2005, before Kimberly A. Hurley, Registered Merit Reporter and Notary Public.

APPEARANCES:

```
          JOHN M. LaROSA, ESQUIRE
          LAW OFFICE OF JOHN M. LaROSA
            2 East 7th Street - Suite 302
            Wilmington, Delaware 19801
            for the Plaintiff
          SHELDON N. SANDLER, ESQUIRE
          YOUNG CONAWAY STARGATT & TAYLOR, LLP
            1000 West Street - 17th Floor
            Wilmington, Delaware 19801
            for the Defendant
```

```
              WILCOX & FETZER
   1330 King Street - Wilmington, Delaware 19801
                (302) 655-0477
```

B222

Farrell
Susan P. Broadway

v.

C.A. # 04-285 KAJ

AstraZeneca Pharmaceuticasl, L.P.
March 24, 2005

Page 2

1     SUSAN P. BROADWAY,
2        the witness herein, having first been
3        duly sworn on oath, was examined and
4        testified as follows:
5   BY MR. LaROSA:
6     Q.   Hello. My name is John LaRosa. I represent the
7   plaintiff, Marybeth Farrell, in this case.
8         Will you state your full name, please.
9     A.   Susan Broadway.
10    Q.   What is your current home address?
11    A.   806 Princeton Road, Wilmington, 19807.
12    Q.   Are you married?
13    A.   Yes.
14    Q.   Have you ever had your deposition taken before?
15    A.   No.
16    Q.   After I ask the questions and you answer them
17  today, you will have the opportunity to review the
18  answers you gave to see if the reporter made any
19  technical mistakes.
20        Do you understand that?
21    A.   Yes.
22    Q.   Also, if I ask a question today and you don't
23  understand, please ask me to repeat it and I will be glad
24  to rephrase it. Okay?

Page 3

1     A.   Okay.
2     Q.   Also, if you don't know the answer to something,
3   we don't want you to guess. So it's acceptable to say "I
4   don't know" and I'll try and move on to another question.
5         Is that fair?
6     A.   Yes.
7     Q.   Are you under any medications or substances that
8   would prevent you from remembering accurately or
9   testifying truthfully today?
10    A.   No.
11    Q.   Also, we have to take turns speaking because the
12  court reporter cannot record two people at once. So
13  please wait until I finish the question to answer and
14  I'll try let you finish your answer before I ask my
15  next question.
16        Is that fair?
17    A.   Fine.
18    Q.   Also, if you need any breaks, let me know.
19    A.   Okay.
20    Q.   There's water here for you. I see you have
21  coffee.
22    A.   Good.
23    Q.   Have you met with any attorneys at any time to
24  discuss the facts of this case?

Page 4

1     A.   Outside of John and Sidney.
2         MR. SANDLER: Sheldon.
3     Q.   Just John and Sheldon Sandler. John from
4   AstraZeneca?
5     A.   Yes.
6     Q.   Approximately how many times did you meet with
7   them?
8     A.   Twice.
9     Q.   Did you meet with both of them both times or two
10  separate meetings with each of them?
11    A.   As best I can recall, I think we met once for me
12  to give them --
13        MR. SANDLER: You don't have to say what
14  went on.
15        THE WITNESS: Twice.
16    Q.   Approximately how long was that first meeting?
17    A.   I don't know.
18    Q.   Was it less than an hour, more than an hour?
19    A.   Less than an hour.
20    Q.   How about the second meeting?
21    A.   Half-hour.
22    Q.   Besides the attorneys, have you met with anyone
23  else from AstraZeneca to discuss the facts of this case?
24    A.   No.

Page 5

1     Q.   Will you state your date of birth.
2     A.   October 9th, '72.
3     Q.   Regarding your educational background, did you
4   graduate from high school.
5     A.   Yes.
6     Q.   Did you go to college?
7     A.   Yes.
8     Q.   Did you complete an undergraduate degree?
9     A.   Yes.
10    Q.   What is your undergraduate degree in?
11    A.   Bachelor's in marketing.
12    Q.   Did you go to graduate school?
13    A.   Yes.
14    Q.   Did you receive a graduate degree?
15    A.   Yes.
16    Q.   What is your graduate degree?
17    A.   I have an M.B.A. in finance.
18    Q.   Do you have any other postundergraduate degrees?
19    A.   Yes. I have completed other course work for a
20  Master's degree for public health and bioethics.
21    Q.   Do you have that Master's degree?
22    A.   No, not yet.
23    Q.   When did you begin working for AstraZeneca?
24    A.   September 2001.

2 (Pages 2 to 5)

B223

Farrell                                          v.                    AstraZeneca Pharmaceuticasl, L.P.
Susan P. Broadway                          C.A. # 04-285 KAJ                           March 24, 2005

Page 6

1    Q.  What was your role at that time?
2    A.  Senior PREP manager.
3    Q.  How long did you hold that role?
4    A.  A year and a half.  April 2003.
5    Q.  Did you receive a new role in April 2003?
6    A.  Yes.  Brand communications leader.
7    Q.  Was that for the Exanta team?
8    A.  Yes.  Both of them were for Exanta.
9    Q.  Is that your current role?
10   A.  No.
11   Q.  When did you transition to a new role?
12   A.  In December of 2004.
13   Q.  What role did you begin at that time?
14   A.  Brand leader, Toprol XL, T-o-p-r-o-l, X-L, and
15   Atacand.
16   Q.  Prior to AstraZeneca where were you working?
17   A.  Aventis Pharmaceuticals.
18   Q.  Where is that?
19   A.  Bridgewater, New Jersey.
20   Q.  Do you remember the approximate months you were
21   working there?
22   A.  I worked there from July of 2000 to August of
23   2001.
24   Q.  What was your role?

Page 7

1    A.  Brand manager, Lovenox, L-o-v-e-n-o-x.
2    Q.  Prior to that job in Bridgewater where did you
3    work?
4    A.  DuPont Pharmaceuticals.
5    Q.  Do you remember the approximate months you
6    worked there?
7    A.  May of 1994 -- no.  July of 1994 until June of
8    2000.
9    Q.  What was your role for DuPont?
10   A.  I was in sales, public relations, and marketing.
11   My last role when I left was as brand manager.
12   Q.  Prior to DuPont where did you work or were you
13   in school?
14   A.  That was my first job out of college.
15   Q.  Are you considered a manager at AstraZeneca?
16   A.  Yes.  Let me clarify what you mean by "manager."
17   Manager of people or manager of product?
18   Q.  Of people.
19   A.  Not in my current role.
20   Q.  How about as brand communications leader?
21   A.  Yes.
22   Q.  That was the role you were in from approximately
23   April 2003 to approximately December of 2004?
24   A.  Yes.

Page 8

1    Q.  Were you on the Exanta team when
2    Marybeth Farrell began working on the Exanta team?
3    A.  Yes.
4    Q.  Was that in approximately May of 2002?
5    A.  Approximately, as I recall, yes.  Spring.
6    Q.  Was she a senior PREP manager band 4 for the
7    Exanta team?
8    A.  No.  She was a PREP manager band 4.
9    Q.  How does one get the designation of senior PREP
10   manager versus PREP manager?
11   A.  There are certain criteria for each role and
12   competencies that you would hold and that you would
13   exhibit on the job.
14   Q.  What types of competencies would a senior PREP
15   manager have that a PREP manager would not have?
16   A.  It's really the level of competency that you
17   would have.  So there are about 10 to 12 competencies for
18   PREP and senior PREP and then it just is your depth
19   within those that designates your job.
20       For instance, one competency is your
21   ability to share your knowledge and mentor others.  As a
22   band 4 that's not really a requirement.  As a band 5 and
23   a band 5 senior, you would need to be exhibiting the
24   ability to be helping others along in your same position,

Page 9

1    be a role model in your position, be able to mentor other
2    people.  So it's the same competency in your depth within
3    there.
4    Q.  I'm asking you not about the distinction between
5    band 4 and band 5 but the distinction between a senior
6    PREP manager and just a nonsenior PREP manager.
7    A.  Yes.  But that distinction goes together.
8    Band 4 is always PREP.  Band 5 can be either PREP or
9    senior PREP.
10   Q.  So you're saying nobody has the title of senior
11   PREP manager band 4?
12   A.  Correct.
13   Q.  Once you become a senior PREP manager, you
14   become a band 5; is that what you're saying?
15   A.  You can be promoted as a band 5 PREP manager and
16   then within band 5 you can also be promoted again to
17   senior PREP manager.  But a senior PREP manager is always
18   a band 5, yes; whereas, a PREP manager could be a band 5
19   or a band 4.
20   Q.  Do you know what her role was prior to being on
21   the Exanta team?
22   A.  Yes.
23   Q.  What was that?
24   A.  She was a field PREP manager.

3 (Pages 6 to 9)

B224

Page 10

1    Q.   Was that associated with a brand or a team, if
2  you know?
3    A.   I'm not sure specifically which one.  I know she
4  previously had worked with other brands at AstraZeneca.
5  I think she was cardiovascular when she was a field PREP
6  which would be a field of the cardiovascular marketing.
7  But I'm not sure.
8    Q.   Is that part of the marketing group?
9    A.   No.  Field PREP is part of the field
10  organization, sales, operations.
11    Q.   That field PREP manager position, that's not a
12  band 4 position, is it?
13    A.   I don't know.
14    Q.   Isn't it something lower than a band 4?
15    A.   I don't know.
16    Q.   Is there such thing as a band 3?
17    A.   I don't know.
18    Q.   You never heard anybody designated a band 3 at
19  AstraZeneca?
20    A.   Sure, there's band 3.  I thought you were asking
21  specifically to field PREP.
22    Q.   In general I'm asking.  Are there band 3s?
23    A.   Yes.  I think there's bands 1 through 9.
24    Q.   Also, if we see the name Susan Pritchard on a

Page 11

1  document, that's referring to, as well, Susan Broadway?
2    A.   Yes.
3          MR. LaROSA:  I'd like to show you a
4  document which I'll ask to be marked Deposition
5  Exhibit 1.
6          (Broadway Deposition Exhibit No. 1 was
7  marked for identification.)
8  BY MR. LaROSA:
9    Q.   Have you seen this document before?
10    A.   I believe this is an e-mail from me or a meeting
11  request from me to Marybeth.
12    Q.   You sent this to Marybeth Farrell on April 11th,
13  2003?
14    A.   I'm sure I sent it before April 11th.  The
15  meeting is requested for April 11th.
16    Q.   Do you remember when you sent this?
17    A.   No, I don't.
18    Q.   Would you have sent in 2003 or in 2002?
19    A.   Yes.  At some point in the week or two prior to
20  this I requested the meeting with Marybeth.
21    Q.   So it's sometime in April of 2003 or late March?
22    A.   Sure.  In that time period I would assume.
23    Q.   You say you'd "love to have more insight from
24  Ms. Farrell on our path forward."  Were you looking for

Page 12

1  insight from her?
2    A.   Yes.  This is when I started my new role and was
3  Marybeth's manager, as well as the rest of the PREP and
4  senior PREP managers on the team, and I had individual
5  one-on-one discussions with each of them to guide
6  the new team and get their thoughts as we moved forward
7  as a new group together.
8    Q.   This e-mail is not addressed to everybody on the
9  group.  This is addressed to Ms. Farrell, correct?
10    A.   Yes.  I would have sent each person an
11  individual e-mail just like this.  This one was to
12  Marybeth looking to talk with her about her thoughts on
13  the team as we transitioned to a new group where I was
14  her manager.
15    Q.   Do you recall sending any other specific e-mails
16  to anyone else?
17    A.   Yes.  Everyone on my team.
18    Q.   You were not expressing any concerns to
19  Ms. Farrell about her performance at this time, were you?
20    A.   Not at this time.
21    Q.   Isn't it true that prior to May 5th, 2003,
22  Ms. Farrell had never received any written disciplinary
23  action from you?
24    A.   Written, yes.  Verbal, no.

Page 13

1    Q.   She had received verbal discipline from you
2  prior to May 5th, 2003?
3    A.   I'm sorry.  No for both of those questions.  No
4  disciplinary discussions or actions were taken in May or
5  April.  It was performance-related discussions that
6  occurred in April and May.
7    Q.   Isn't it true that prior to April of 2003
8  Ms. Farrell had never asked for one day of sick leave for
9  the year that she had been a part of the Exanta team?
10    A.   I can't comment.  I was not her manager at that
11  point.
12    Q.   So you don't know?
13    A.   I don't know.
14    Q.   Isn't it true that on April 22nd, 2003,
15  Ms. Farrell requested leave to seek medical treatment to
16  remove three abdominal and uterine tumors?
17    A.   I am not -- I don't recall that exact day.
18  Marybeth told me at some point in late April that she
19  would be going out on medical leave.  I did not know the
20  nature of the leave or her condition.
21    Q.   Did you know she was going to have surgery?
22    A.   Yes.
23    Q.   Did you know it was nonelective surgery?
24    A.   No.

4 (Pages 10 to 13)

B225

Farrell
Susan P. Broadway

v.

C.A. # 04-285 KAJ

AstraZeneca Pharmaceuticasl, L.P.
March 24, 2005

Page 14

1    Q.   Did you know that her doctor had advised her to
2  take six weeks of bedrest after this surgery?
3    A.   Again, Marybeth told me that she needed to have
4  a surgery. I didn't know anything about for what, and
5  she worked through medical for -- with her doctor and our
6  medical of what she was going to have and how long to get
7  off. She told me she was going to be requesting the
8  leave which she needed a surgery and then medical sent me
9  an e-mail of her approved time periods.
10   Q.   Did she tell you she was going to be out for a
11 certain amount of time?
12   A.   I'm sure she did. Well, the e-mail would have
13 been from medical, yes.
14   Q.   When she told you she was going to have surgery,
15 you didn't ask her how long she was going to be out?
16   A.   No. I didn't ask any questions about that.
17   Q.   Weren't you her manager?
18   A.   Yes.
19   Q.   Weren't you concerned about how long she was
20 going to be out and you wouldn't have her working for
21 you?
22   A.   Medical would let me know how long she's going
23 to be out.
24   Q.   So you weren't concerned at all?

Page 15

1    A.   I was concerned for her that she's going out. I
2  wasn't concerned that she's going to be out for a period
3  of time. I wouldn't say concerned. Medical would let me
4  know how long she has approved for being out. We don't
5  discuss conditions or those kind of personal, private
6  health things. So she told me she would be requesting
7  medical leave. I told her to go through medical. She
8  went through medical. Medical sent me an e-mail and then
9  we go from there. I made arrangements.
10   Q.   Do you think that's personal and private, not
11 the nature of the surgery, but the amount of time
12 somebody's going to be out of work?
13   A.   No, but I don't think -- that's what medical has
14 to tell me, not Marybeth telling me. Medical has to
15 approve what any employee wants to take. So until
16 medical tells you how long you're going to be out, that's
17 when I got all the information.
18   Q.   Mrs. Farrell completed the proper paperwork for
19 FMLA leave?
20   A.   I assume so. I'm not involved in the paperwork
21 process. That's between her and medical.
22   Q.   When you say "medical," is that short for
23 medical department or some other term?
24   A.   Yes. AstraZeneca medical department. You have

Page 16

1  to contact someone there, request things, they have you
2  sign paperwork, and then they approve you for a certain
3  time period.
4    Q.   To the best of your knowledge, nobody ever
5  raised any issue about her not completing the proper
6  paperwork for FMLA leave; is that correct?
7    A.   Not that I'm aware of.
8    Q.   You didn't raise any issue with her about not
9  completing the proper paperwork for FMLA leave?
10   A.   No.
11   Q.   On April 28, 2003, you and Ms. Hellen expressed
12 concern about Ms. Farrell's performance regarding
13 projects in 2002; is that correct?
14   A.   Again, the approximate time period. I can't
15 recall the exact date, but, yes, in April.
16   Q.   April of '03?
17   A.   Yes.
18   Q.   Again, this was not disciplinary action against
19 her.
20   A.   Correct.
21   Q.   This was just verbal performance concerns that
22 you and Ms. Hellen shared with Ms. Farrell?
23   A.   Performance discussions, yes.
24   Q.   These concerns were not expressed on

Page 17

1  Ms. Farrell's 2002 evaluation; is that correct?
2    A.   I did not do her 2002 evaluation.
3    Q.   So you don't know?
4    A.   I don't know.
5    Q.   At that time that you and Ms. Hellen had this
6  performance discussion with Ms. Farrell, isn't it true
7  that Ms. Hellen told her she wasn't sure if she would
8  retain Ms. Farrell in 2004?
9    A.   That comment never occurred in front of me.
10   Q.   But you do know that she said that comment?
11   A.   No, I do not.
12   Q.   Did you hear something to that effect from
13 someone else?
14   A.   No. As her manager, that was not a topic not
15 retaining her. No, we never had that discussion.
16   Q.   In April of 2003 didn't you tell Ms. Farrell
17 there was a lot of work to be done?
18   A.   I don't recall the context of such a comment.
19   Q.   After you had this performance discussion about
20 the 2002 projects, did you make any comment to the effect
21 that we have a lot of work to be done?
22   A.   My performance discussions with Marybeth would
23 have pertained to 2003, as well as 2002 may have been
24 some examples we were giving. But the discussions were

5 (Pages 14 to 17)

B226

Page 18

1 not solely about 2002 that I was having with Marybeth in
2 April. They would be regarding current performance, 2003
3 performance, and perhaps citing examples from late 2002.
4     Q.  Do you remember any comments to her about
5 there's a lot of work to be done?
6     A.  I did not.
7     Q.  In April of 2003, after you had this performance
8 discussion with her, did you ever ask Ms. Farrell if she
9 could return any earlier than six weeks?
10    A.  No.
11    Q.  On April 29th, 2003, did you give Ms. Farrell
12 the assignment of developing transition plans for her
13 colleagues to use to manage her programs while she was
14 out?
15    A.  In that general time period, yes.
16    Q.  That general time period being sometime in April
17 before she went out on leave?
18    A.  Yes.
19    Q.  Before she went out on leave, you gave her the
20 assignment of creating a profile on over 50 physicians;
21 is that correct?
22    A.  No.  I asked her to prepare a transition plan
23 for all of her projects that she was working on so
24 someone could understand where she had taken the project

Page 19

1 to date and what they needed to pick up on in order to
2 complete it, one of which were advisory boards that were
3 coming up in June and July, and I had asked her to give
4 us the background on who is invited and why they were
5 invited, why a particular physician was invited so that
6 someone picking up the project one understand why that
7 group of doctors had been pulled together.
8          So when you say "profile," I would say no,
9 I did not ask her to come up with a profile of physicians
10 that would include an entire background.  I asked her to
11 come up with information on why certain doctors were
12 selected for advisory boards so that someone could pick
13 up the advisory board project and work it.
14    Q.  What type of information would explain why
15 certain doctors were selected for advisory boards?
16    A.  For instance, if it was a cardiology advisory
17 board, this cardiologist was invited because he has ran
18 the competitive trials, he could give us insights into
19 trial programs, things of that nature.
20    Q.  Did Ms. Farrell seek to use the assistance of
21 secretaries or secretarial support to this project?
22    A.  I don't know how she went about starting the
23 project.
24    Q.  Did you tell her that she could not use

Page 20

1 secretarial support for that project?
2     A.  The context of this is that there were --
3 Marybeth had been using agencies to do all of the legwork
4 and I had asked Marybeth to give her insights into why
5 she had invited those physicians.  Not to delegate that
6 to someone else to come up with, because we needed to
7 know why -- what her thoughts were so we could move on.
8 She was the one in charge of the advisory boards and then
9 she was the one that would be out.  I needed to know why
10 she selected those particular physicians.
11    Q.  So you told her she couldn't use the outside
12 research agency for that project?
13    A.  I told her that I needed her insights as to why
14 certain physicians were selected.
15    Q.  So she should use her insights but not use the
16 outside research agency?
17    A.  Right, yes.  Well, outside research agency?  Do
18 you mean outside medical education agency?
19    Q.  I thought you referred to something a few
20 moments ago about an outside agency.
21    A.  Yes, but you said "research."  It's medical
22 education agencies that we would be using.  I was
23 thinking -- when you say "research," I'm thinking market
24 research.  And, yes, Marybeth should have compiled the

Page 21

1 information as to her insights on her own.  An agency
2 would not be needed for her insights.
3     Q.  You never gave this assignment to anyone else
4 before April of 2003; is that correct?
5     A.  No one outside of the transition plan, correct.
6     Q.  I guess we're talking about two different
7 things.  We're talking about a transition plan that you
8 had her prepare so that people could pick up the work
9 while she was gone and then I thought we were talking
10 about physician profiles that she was to give her own
11 input into why these physicians were speaking at the
12 advisory boards.
13    A.  That was in the context of transition.  It was
14 work that she had already completed, selecting physicians
15 for advisory boards that were coming up the very next
16 month in June.  I was just asking as part of the
17 transition plan please let us know why she selected
18 certain physicians and why they were coming so the person
19 who picked up that advisory board could run it
20 appropriately.  So it was not a separate project.  It was
21 part of the transition plan.
22    Q.  Do you recall those physician profiles, that one
23 component of what was her transition plan?
24    A.  Do I recall them being a part of the transition

6 (Pages 18 to 21)

B227

Page 22

1   plan?
2       Q.   No. I'm saying do you recall a physician
3   profile, what you were asking her to do or what do you
4   call that type of a task?
5       A.   As a part of giving a transition of each project
6   she was running to someone else, I asked her to comment
7   on the entire advisory board, give all the information
8   someone would need for an advisory board that you have
9   organized up until May that is going to be happening in
10  June, and that would include the attendees, they would
11  have already been invited, who did you invite and why.
12      Q.   But you never asked that same type of question
13  from any of your other PREP managers; is that correct?
14      A.   I did not have any other PREP manager leave the
15  team and transition projects to someone else.
16      Q.   Did you feel like Ms. Farrell was deserting the
17  team?
18      A.   No. She was returning.
19      Q.   Other PREP managers have used outside agencies
20  to develop such physician profiles; is that correct?
21      A.   No, they didn't develop such a profile. It was
22  a part of the transition plan and no one else had a
23  transition plan.
24      Q.   So because no one else had a transition plan,

Page 23

1   you're saying Ms. Farrell was the only one you gave this
2   type of an assignment to?
3       A.   Yes.
4       Q.   Eventually you placed Ms. Farrell on a
5   short-term improvement plan; is that correct?
6       A.   On an action plan? Yes.
7       Q.   On an action plan.
8            That was three days before she was
9   scheduled to go out on FMLA leave; is that correct?
10      A.   That is incorrect. That was in August of 2003
11  when she went on an action plan.
12      Q.   Isn't it true that three days before she was
13  scheduled to go out on FMLA leave Ms. Farrell was told by
14  you she would be going on a short-term improvement plan?
15      A.   No.
16      Q.   You had a discussion with her and Ms. Hellen on
17  May 6, 2003, regarding Ms. Farrell's performance,
18  correct?
19      A.   I don't recall the exact date. I had
20  discussions with Marybeth in April and May regarding
21  performance improvement, yes.
22      Q.   Speaking about May, focusing on May right now,
23  the May time period before she went out on leave for
24  surgery, you and Ms. Hellen had a discussion about

Page 24

1   Ms. Farrell's performance with her.
2       A.   Yes.
3       Q.   Did you discuss areas of performance for which
4   Ms. Farrell needed to improve in May of 2003? Was that
5   the nature of the discussion?
6       A.   In April and May I had discussions on -- with
7   Marybeth regarding performance in areas she could be
8   improving, and in May I would have had discussions on
9   what she could be doing in the two weeks before she went
10  out on leave with her transition plan, how she could
11  develop the transition plan, transition it to her peers.
12      Q.   These areas of improvement, were these areas
13  that Ms. Farrell met or exceeded expectations on her 2002
14  evaluation?
15      A.   I can't comment on the 2002 evaluation. I don't
16  recall it. I didn't give it.
17      Q.   Did you hear a comment made to Ms. Farrell in
18  May of 2003 to the effect of "Don't worry, Marybeth.
19  Your job will be here when you get back, really"?
20      A.   No, I did not.
21      Q.   Were you aware that after her surgery
22  Ms. Farrell attempted to work at home in May 2003?
23      A.   After her surgery she worked half days. I'm not
24  sure about working at home.

Page 25

1       Q.   She worked half days in the office?
2       A.   Yes. Not every day. She had -- she was
3   transitioning back to work and she came back a couple
4   days a week for half a day.
5       Q.   That wasn't immediately after the surgery; that
6   was a few weeks after the surgery?
7       A.   It was in June, as best as I can recall.
8       Q.   Was this considered working part-time? Was she
9   working part-time would you say or was it just called
10  half days?
11      A.   I don't know how they would specifically
12  designate that. She was working half days. I don't know
13  if that was considered part-time employment. I think she
14  just was transitioning back with half days. Marybeth had
15  called Jane Hellen and said she was feeling great and
16  wanted to come back to work and she then was told to
17  contact medical.
18      Q.   Were you a part of that conversation? Was that
19  a teleconference?
20      A.   No, it was not a teleconference. Marybeth
21  called Jane Hellen a few times while she was on leave.
22  She did not contact me.
23      Q.   When Ms. Farrell was working those half days to
24  try and transition back, isn't it true that she only

7 (Pages 22 to 25)

B228

Page 26

1   worked a few days back in the office and then had to
2   return to stay out of the office?
3       A.  Yes.  She said she was feeling much better and
4   wanted to come back to work.  She had it approved from
5   medical to transition to half days.  When she came back,
6   she went back out on leave.
7       Q.  Did you know that Ms. Farrell developed lower
8   back muscle spasms from sitting upright in her office
9   chair during the recommended bedrest period?
10      A.  I don't know the nature of her medical
11  conditions.  I know she said she had pain and had to go
12  back out on leave.
13      Q.  Do you remember if it was back pain or leg pain
14  or both?
15      A.  I don't specifically recall.  I know she had
16  said back pain at other time periods.  Later on.
17      Q.  On July 3rd, 2003, you gave Ms. Farrell a
18  midyear review of her performance; is that correct?
19      A.  In that time period, yes.  Midyear review's in
20  July.
21      Q.  Ms. Farrell received a negative review at that
22  time; is that fair to say?
23      A.  Ms. Farrell received performance feedback in
24  areas for improvement, yes.

Page 27

1       Q.  Were these areas that had previously been
2   discussed with her during the discussion of the action
3   plan?
4       A.  No, because the action plan did not come until
5   August.  They were performance issues that had been
6   discussed with her back in April and May and were areas
7   that she was focusing on for improvement.
8       Q.  These were consistent with the performance
9   concerns that were expressed to her in April and May of
10  2003?
11      A.  Yes.
12      Q.  That's when the performance discussions with her
13  began?
14      A.  From me, yes.
15      Q.  From you in April of 2003?
16      A.  Yes.  When I became her manager in April, I had
17  a few discussions.
18      Q.  You had a few discussions with her regarding
19  things other than performance?
20      A.  I'm not sure.
21      Q.  You said you had a few discussions with her in
22  April and May 2003.  They weren't related to her
23  performance problems?
24      A.  Just to clarify, I have had lots of discussions

Page 28

1   with her.  We worked together.  But I did have a few
2   performance areas discussions with her in April and May.
3   So feedback I had received, I had discussions with her on
4   performance-related areas.
5       Q.  That began in April of 2003?
6       A.  When I became her manager, yes.
7       Q.  In July of 2003 it was decided that she would
8   not be promoted to band 5; is that correct?
9       A.  No, there was no decision in July of 2003.
10  Marybeth came to me and told me she had received a packet
11  at home that had announced her promotion to band 5 and to
12  senior PREP manager, which would have been two increases
13  from a band 4 to a band 5 and then to a senior, and I
14  told her as her manager I had not -- I was not aware of
15  that, I did not have that promotion discussion with my
16  management, etcetera, and asked her to bring in any
17  paperwork she had.  It's not customary in how it's done.
18  You don't just receive paperwork for a promotion at home.
19          So that was the only discussion we had.
20  There was no real promotion -- what was in your question,
21  you said did you --
22      Q.  About promotion to band 5, about a decision that
23  she would not be promoted.
24      A.  So there was no decision because there was no

Page 29

1   discussion.  There was only Marybeth telling me -- there
2   was no discussion from management's perspective where we
3   were discussing and evaluating people and deciding on
4   promotions.  That never occurred.  The only occurrence in
5   July was that Marybeth told us she received paperwork and
6   we looked into the situation and told her that was not
7   paperwork for a promotion.
8       Q.  It was a mistake, the paperwork?
9       A.  It was Marybeth's mistake.  Apparently it was
10  paperwork regarding stock or something.  She never
11  produced the paperwork to me, so I can't comment on what
12  it was.  But she came back and clarified later that she
13  had misread the paperwork and that it was not what she
14  had originally thought in terms of a promotion.
15      Q.  This conversation you had with her about what
16  she thought was a promotion, was that in July of 2003?
17      A.  As best I can recall, yes, I believe it was in
18  July.
19      Q.  Was she later told by Deborah Brangman that she
20  would not be promoted to band 5?
21      A.  Not that she would not be promoted to band 5,
22  that she was not promoted at this time.  It was all part
23  of this discussion in that same time period.  She said to
24  us she got paperwork regarding a promotion.  I had to go

8 (Pages 26 to 29)

B229

Farrell                                v.                    AstraZeneca Pharmaceuticasl, L.P.
Susan P. Broadway                  C.A. # 04-285 KAJ                    March 24, 2005

Page 30

1  to my management -- and Debbie was her previous manager.
2  They went to her, etcetera, and everyone had the
3  discussion that the paperwork did not come out to her
4  house regarding a promotion.
5      Q.  I'm not asking you about the paperwork.  As far
6  as just verbal discussions, did Deborah Brangman tell her
7  that the reason she was not getting a promotion to band 5
8  was because of performance reasons?
9      A.  I was not part of a discussion with her and
10  Debbie Brangman.
11     Q.  So you don't know?
12     A.  I don't know.  As her manager, that was not a
13  discussion that happened.
14     Q.  An action plan is a form of disciplinary action
15  at AstraZeneca; is that correct?
16     A.  No.  An action plan is a performance-related
17  tool that specifically states what you need to focus on
18  areas for improvement and what you need to do to improve.
19  Performance management systems.
20     Q.  You said that the action plan that Ms. Farrell
21  was placed on did not come until August of 2003?
22     A.  Yes.
23     Q.  Did that action plan contain criticisms of
24  Ms. Farrell's performance in the area of, quote,

Page 31

1  understanding the critical data, end quote?
2      A.  The action plan would have encompassed areas for
3  improvement, including strategic direction and our
4  product data, clinical data.
5      Q.  Is that also an area of performance that's
6  covered in a PREP manager's annual evaluation?
7      A.  Yes.  Understanding that your product's clinical
8  information is critical to be able to do a PREP manager's
9  job.
10     Q.  Did the action plan also contain criticism of
11  Ms. Farrell's performance in the area of, quote, ability
12  to drive meetings and organize, end quote?
13     A.  The action plan is not a criticism document.  It
14  is a document that states performance and offers areas
15  for improvement and ways in which you can improve upon
16  those areas, specific ways to improve.
17     Q.  So we won't use the word "criticism" but
18  "concerns"?
19     A.  Yes.
20     Q.  Areas to focus on?
21     A.  The action plan outlined for Marybeth that she
22  needed to exhibit more understanding of the strategic
23  direction for a brand.
24     Q.  You keep coming back to strategic for the brand.

Page 32

1  I'm asking you about, quote, ability to drive meetings
2  and organize, end quote.  Do you remember that being part
3  of the performance discussion in conjunction with the
4  action plan in August of 2003?
5      A.  Organizational skills and ability to drive
6  meetings was an area that I had discussions with Marybeth
7  on, yes.
8      Q.  That area of performance is also covered in a
9  PREP manager's annual evaluation; is that correct?
10     A.  It is a part of the job, yes.  You need to be
11  able to run the meetings and you need to be an organized
12  manager.
13     Q.  That's given a rating on the evaluation, as
14  well?
15     A.  There's no specific rating for those components,
16  but it's a part of your overall jobs.
17     Q.  Not in terms of numeric rating, but in terms of
18  meets or exceeds expectations.
19     A.  It wouldn't be specifically pulled out.  It
20  would be part of your overall ability to function as a
21  PREP manager.  Those are parts of the competencies that
22  you would need to be exhibiting.
23     Q.  The discussion about the action plan in August
24  of 2003, did you discuss the area of, quote, ability to

Page 33

1  act as a content expert, end quote?
2      A.  Yes.
3      Q.  Is that an area of performance that's covered in
4  a PREP manager's annual evaluation?
5      A.  Again, it's a part of the overall job.  You
6  would need to be able to understand the content, your
7  clinical data content for your brand.  So it's not a line
8  item on an annual rating, but it is part of being able to
9  function as a PREP manager.
10     Q.  Deborah Brangman this morning told us something
11  about content experts, that physicians are supposed to be
12  content experts when they speak at advisory boards.  Do
13  you agree with that?
14     A.  Sure, yes.  They would need to be clinical data
15  experts when they speak at an advisory board.  They need
16  to know what they are presenting and answer questions on
17  it.
18     Q.  PREP managers wouldn't need to be experts?
19     A.  A PREP manager wouldn't be presenting at an
20  advisory board in front of customers or clinical data.
21  So it's a different context.  PREP managers would need to
22  understand how clinical data and content for the material
23  which they are putting together and medical directors
24  need to be content experts for the clinical data they are

9 (Pages 30 to 33)

B230

Farrell
Susan P. Broadway

v.
C.A. # 04-285 KAJ

AstraZeneca Pharmaceuticasl, L.P.
March 24, 2005

Page 34

1   presenting. It's not a direct comparison.
2       Q.   So it's not a comparison. It's not the same.
3   Okay. So the physicians have to be content experts.
4       A.   Physicians have to be clinical data experts for
5   presentation in front of customers. And PREP managers
6   need to be clinical data content experts for materials
7   that they are putting together for projects and programs
8   that they are in charge of. You need to understand the
9   clinical data in order to understand the strategic
10  direction that you're going to be driving with customers
11  in those directions. So, yes, PREP managers need to
12  be --
13      Q.   Understand the data?
14      A.   -- need to be content experts in a different
15  capacity than you're talking about when you're talking
16  about physician-led discussions in front of customers.
17      Q.   Is the same level of expertise needed for a
18  band 5 PREP manager as for a band 4 PREP manager?
19      A.   Band 4 and band 5 both need to be able to be
20  clinic -- both need to be able to understand the clinical
21  data associated with their brand. The level at which
22  they would need to have depth in that competency would be
23  different because they are different levels.
24      Q.   So a band 5 PREP manager would have a deeper

Page 35

1   understanding of clinical data?
2       A.   There would be a baseline. Everybody needs to
3   understand the clinical data. Everyone needs to
4   understand what your drug does in your clinical trials
5   and be able to talk to your data. But band 5 managers
6   would be more experienced, so they would have broader
7   depth in terms of comparisons to customers, other
8   therapeutic areas, things of that nature. Yes, the
9   longer you have been in the position, your expertise
10  increases.
11      Q.   I'm not asking about how long one has been in a
12  position. I'm asking band 4 position versus band 5
13  position. I think what you're telling me is that a
14  band 5 PREP manager does have more depth in their
15  understanding as a clinical data?
16      A.   They should, yes, and I'm telling you that they
17  both have a baseline with which they need to be operating
18  in order to be effective PREP managers in the first
19  place.
20      Q.   That's not what I'm asking, but I appreciate
21  that.
22           And the action plan in August of 2003 for
23  Ms. Farrell discussed the area of performance, quote,
24  ability to develop relationships with associations, and

Page 36

1   thought leaders, end quote. Do you recall --
2       A.   I believe so.
3       Q.   That's a requirement for a band 5 position;
4   isn't that correct?
5       A.   It's a requirement for band 4, as well as
6   band 5. Again, as I told you in the beginning, the
7   competencies are the same. It's the depth within those
8   competencies that are different.
9       Q.   That type of a competency would be discussed in
10  a PREP manager's annual performance evaluation, as well.
11  Maybe not on a line item, as you said, but it would be
12  something that would be covered in the performance
13  evaluation?
14      A.   Working with associations and customers, it
15  would be a requirement for all of PREP and senior PREP.
16  So, yes, it would be part of how they were evaluated at
17  the end of the year.
18      Q.   Is there also an area of performance called
19  budget management?
20      A.   Yes.
21      Q.   What does that mean to you, budget management?
22      A.   PREP and senior PREP managers are all handling
23  very large budgets and you need to be able to understand
24  AstraZeneca's financial systems and how your budget

Page 37

1   management needs to work on a monthly basis, accruals and
2   end-of-year close, quarter closes, etcetera. Also our
3   systems with which we track our budgets. And you need to
4   understand your bills that come from agencies and how you
5   go about paying that.
6           So budget management is just that,
7   understanding your finances that you're spending and how
8   the company needs to be tracking those dollars.
9       Q.   That's an area of performance budget management
10  that is covered in a PREP manager's annual evaluation; is
11  that correct?
12      A.   Absolutely.
13      Q.   The August 2003 action plan also focused on the
14  area of performance of Ms. Farrell with regard to, quote,
15  brand strategy, end quote?
16      A.   Yes.
17      Q.   Isn't that an area of performance that's covered
18  on a PREP manager's annual evaluation?
19      A.   Yes.
20      Q.   Ms. Farrell met or exceeded expectations in this
21  area, according to her 2002 evaluation?
22      A.   I didn't do her 2002 evaluation.
23      Q.   In August of 2003 you told Ms. Farrell that, if
24  her employment did not improve, her employment would be

10 (Pages 34 to 37)

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

B231

Farrell                                    v.                    AstraZeneca Pharmaceuticasl, L.P.
Susan P. Broadway              C.A. # 04-285 KAJ                          March 24, 2005

Page 38

1  terminated on September 30th, 2003?
2      A.   No.  The action plan end date was
3  September 30th, I believe, and, no, I did not say that.
4      Q.   But you did mention the possibility that her
5  employment could be terminated after the action plan?
6      A.   It's specifically stated in the action plan,
7  yes, that failure to comply with the action plan could
8  lead up to and including termination.  That's in the
9  evaluation.
10     Q.   Right.  I'm not asking you what is on the actual
11  documents, but you made that aware to her verbally, too,
12  did you not?
13     A.   I don't recall, but I would have, I'm sure,
14  discussed the entire plan, how we were going to try to
15  improve performance and went through the entire process
16  within AstraZeneca of what that entailed.
17     Q.   Isn't the action plan very serious in the sense
18  that, if you don't comply with it, if you fail to comply,
19  your employment can be terminated?
20     A.   It states that that is a possibility up to and
21  including termination, but an action plan is just the
22  first step.  You usually move on to a performance
23  improvement plan.
24     Q.   Assuming you successfully complete the action

Page 39

1  plan?
2      A.   No.  If you successfully complete the action
3  plan, you are off performance improvement plans in
4  general.  You would not move on to a PIP, performance
5  improvement plan.  If you do not successfully do the
6  action plan, then you move on to a PIP.
7      Q.   But it's also possible that you wouldn't even go
8  to the PIP; your employment could be terminated after the
9  action plan.  That's one possibility?
10     A.   That is a possibility, but that's not the usual
11  circumstance.
12     Q.   That's not the best-case scenario for the
13  employee?
14     A.   Or the company.
15     Q.   Would you agree?
16     A.   That's not the usual circumstance in that that's
17  not how it usually happens.  People who do not complete
18  the action plan usually move on to a PIP, giving them
19  another chance to improve.
20     Q.   But if it is possible that your employment could
21  be terminated after the action plan, wouldn't you as her
22  manager want to make her aware of that?
23     A.   Yes.
24     Q.   You did make her aware of that?

Page 40

1      A.   It's specifically stated in the plan itself.
2      Q.   You didn't mention it to her at all that she
3  could be terminated?
4      A.   I can't recall specifically reading that or
5  mentioning that statement, but I know that it's in the
6  plan that I gave her a copy of, yes.
7      Q.   Isn't it true that in August of 2003 Ms. Farrell
8  asked you that the action plan be reconsidered to reflect
9  the fact that she held a band 4 position?
10     A.   Yes.  But the action plan was for a band 4
11  position.  It was for Marybeth's position.
12     Q.   In September of 2003 Ms. Farrell was removed
13  from her office; is that correct?
14     A.   I don't recall the exact date, but band 5 and
15  above have offices and as our team expanded more people
16  came on to the team at higher bands, acquiring office
17  space, and Marybeth was a band 4 in an office because one
18  was available when we were a small team and that was an
19  option for us.  And then as the team got larger and more
20  people came on at higher bands, we needed to give them an
21  office and Marybeth had to move to the cubicle.
22     Q.   But all band 5s get offices?
23     A.   Yes.  Well, all band 5s are eligible for an
24  office, pending space.  We do have a lot of band 5s that

Page 41

1  are in cubes.  We have short space at AstraZeneca.
2      Q.   The space shortage, did this occur when you
3  moved into a new building?
4      A.   No.  When we first moved into the building, we
5  had a lot of space.  That's why Marybeth had originally
6  an office even though she was a band 4.  But as our team
7  grew, as we were getting closer to launch, the team was
8  growing, more people coming on, people came on at higher
9  bands, office space was required and at a band 4 in an
10  office we had to move her to a cube so that someone else
11  could have that office.  As a matter of fact, a band 6
12  has moved into it.
13     Q.   Who made that decision to move Marybeth Farrell
14  out of her office into a cubicle?  Did you make that
15  decision?
16     A.   No.
17     Q.   Did Jane Hellen make that decision?
18     A.   No.
19     Q.   Who made that decision?
20     A.   It was a decision between facilities and the
21  brand planning manager who allocates space.
22     Q.   Who's the brand planning manager?
23     A.   Ann Cobuzzi.
24     Q.   Can you spell her last name?

11 (Pages 38 to 41)

B232

Farrell                                          v.                          AstraZeneca Pharmaceuticasl, L.P.
Susan P. Broadway                        C.A. # 04-285 KAJ                              March 24, 2005

Page 42

1    A.  C-o-b-u-z-z-i.  Ann is the one who came and told
2    me that they had looked at the space as they were getting
3    new people coming on and they needed to move Marybeth out
4    of the office for this band 6 that was coming on.
5        Q.  No other band 4 team members had to move to
6    cubicles in 2003; isn't that correct?
7        A.  There were no other band 4 people in an office.
8        Q.  So Marybeth was the only band 4 that was removed
9    from an office?
10       A.  She was the only band 4 in an office.
11       Q.  Right.  That's not my question.  I'm asking you
12   was she the only band 4 that was removed from an office
13   in 2003?
14       A.  She was the only band 4 that moved from an
15   office into a cubicle in 2003 that I'm aware of.  I'm
16   only focusing on my team.
17       Q.  When you say "my team," you mean the Exanta
18   team?
19       A.  The people who directly reported to me, the PREP
20   and promotions managers.
21       Q.  That part of the Exanta team?
22       A.  Yes.
23       Q.  Were you aware that Ms. Farrell filed a
24   complaint with Human Resources on September 17th, 2003,

Page 43

1    that she was being retaliated against for exercising her
2    rights under the FMLA?
3        A.  I am not sure of the exact dates, but, yes, I
4    was told she had contacted HR.  HR came and contacted me,
5    yes.
6        Q.  Were you ever contacted by Keith Black?
7        A.  Yes.
8        Q.  What did Mr. Black say to you?
9        A.  He came to me in September and we just had a
10   discussion around Marybeth and performance and how things
11   had progressed and discussion.  He was looking into her
12   allegations.  I wasn't aware of what they exactly were.
13   So he met with me as part of that.
14       Q.  Isn't it true that in October of 2003 you told
15   Ms. Farrell that her execution of the requirements of the
16   action plan was unsatisfactory?
17       A.  Yes.  We had extended the action plan to October
18   and that's when we had our completion.  Originally it was
19   supposed to be September 30th.  So we had our discussion
20   in October, yes.  And she had not satisfactorily
21   completed the action plan.
22       Q.  Is that when you placed Ms. Farrell on 11-week
23   PIP?
24       A.  Yes.  As I recall, it was a week after I told

Page 44

1    her she had not satisfactorily completed the action plan,
2    we moved to a PIP the following week.  If it was
3    11 weeks, it extended from October into January.  So
4    whatever that time period was.
5        Q.  The PIP is more serious than an action plan; is
6    that correct?
7        A.  Yes.
8        Q.  In January of 2004 Ms. Farrell's computer
9    docking station at work was vandalized; is that correct?
10       A.  I'm not sure of the dates, and I am not sure
11   that anything was vandalized, but Marybeth said something
12   happened to her computer, yes, but I was not involved
13   with that.
14       Q.  I'm not accusing you of vandalism.
15       A.  No.  I mean I don't even know what happened to
16   the computer.  You are correct.  I didn't take it that
17   you thought I did the vandalism.  I take it that I'm not
18   sure I can comment on the computer.  I never saw it.  I
19   wasn't aware of it.  It was something that was handled
20   with Marybeth and she contacted whoever you contact, the
21   facilities.
22       Q.  So you didn't believe her when she reported
23   that?
24       A.  No, that's not what I'm saying.  You

Page 45

1    specifically asked me to comment on the date and the
2    vandalization.  I can't comment on that because I was
3    only told by Marybeth something happened and she
4    contacted facilities and I'm not aware of anything around
5    that.
6        Q.  And the PIP ended on January 5th, 2004; is that
7    correct?
8        A.  In that time period.  I don't remember the exact
9    date.
10       Q.  Sometime around January 14th, 2004, you provided
11   Ms. Farrell with a memorandum regarding PIP feedback
12   discussion?
13       A.  Sometime in January we closed out the PIP.  I
14   don't remember the exact date.
15       Q.  When you say you closed out the PIP, what did
16   you do to close it out?
17       A.  At the end of the performance improvement
18   plan -- at the beginning of it you set a time period.  At
19   the end of the time period you have a discussion around
20   each component in terms of did she satisfactorily
21   complete improvement in those performance-related areas.
22   So that's closing out.  Either you did or you didn't.
23       Q.  After the PIP was closed out, Ms. Farrell was
24   placed on a one-week leave during which time she was not

12 (Pages 42 to 45)

B233

Farrell                                      v.                    AstraZeneca Pharmaceuticasl, L.P.
Susan P. Broadway                    C.A. # 04-285 KAJ                          March 24, 2005

Page 46

1  to report to work; is that correct?
2     A.  Yes.  I don't recall the exact dates or time
3  frame if it was one week, but, yes, that was when really
4  John Bogan and others handled how that went.  I recall
5  when we finished the PIP she was on some sort of leave.
6     Q.  Who made the decision to place Ms. Farrell on
7  that one-week leave?
8     A.  I really don't recall.  At that point it's part
9  of a process.  More of HR.
10    Q.  Did you say John Bogan was a part of that?
11    A.  No.  I said more of an HR process.  Yes, at that
12  point I believe he had been contacted and come in, was
13  involved.
14    Q.  So AstraZeneca's in-house counsel made a
15  decision to put Mr. Farrell on one-week unpaid leave?
16    A.  No, I can't say that.  I don't know who made the
17  decision.  I was just stating that HR, legal process --
18    Q.  So it was a decision made by HR and legal?
19    A.  I don't know who made the decision.  I just know
20  it wasn't me.
21    Q.  Could it have been Jane Hellen?
22    A.  I doubt it.  If it had been Jane, I would have
23  been involved as her direct manager.  I doubt it.
24    Q.  So it wasn't made by anyone who was in the

Page 47

1  direct chain of command with regard to Marybeth Farrell
2  in terms of her direct manager?
3     A.  Right.  I believe it's part of the PIP process.
4     Q.  It's part of the PIP process to get --
5     A.  PIP is a process.  So as her manager, I wasn't
6  making -- I didn't make a decision on leave.  I merely
7  worked through the PIP plan with her and provided her the
8  feedback and then worked with HR on how you go about the
9  PIP process.
10    Q.  Are you saying it's part of the PIP process that
11  at some point HR and legal will step in and make the
12  decision as to leave or no leave after the PIP is
13  completed?
14    A.  The management makes a decision on whether or
15  not the PIP was completed satisfactorily or
16  unsatisfactorily and then it's part of the HR process of
17  the termination date selected at this date or not that
18  date.  Yes, I guess that's what I'm saying.
19    Q.  As the manager, are you saying yourself made the
20  decision that the PIP was not completed satisfactorily?
21    A.  Yes.
22    Q.  And then you turned it over to HR who selects
23  the term date?
24    A.  No, I'm not saying they arbitrarily select it.

Page 48

1  I'm saying that, yeah --
2     Q.  I'm not saying they arbitrarily select it,
3  either.
4     A.  I'm not sure I'm being very clear here.  What
5  I'm trying to say is we work through the PIP plan with HR
6  because it's a process of in terms of once someone has
7  not satisfactorily completed, I let HR know.  At that
8  point legal was already involved.  They were already
9  contacted from outside lawyers at that point.  They were
10  involved.  We worked through the PIP termination date was
11  this, and how it came to a one-week leave, I don't know who
12  made that decision.  I don't recall.
13    Q.  Do you get to make any input or recommendation
14  to HR as to what the next step should be as her direct
15  management?
16    A.  Yes.
17    Q.  What was your recommendation?
18    A.  Marybeth did not satisfactorily complete the
19  action plan, which led to the performance improvement
20  plan.  She did not satisfactorily complete the
21  performance improvement plan, which ends in termination.
22    Q.  So your recommendation was that her employment
23  should be terminated?
24    A.  My recommendation was that Marybeth was not

Page 49

1  satisfactorily functioning as a PREP manager on the
2  Exanta team and did not complete the PIP plan which left
3  in terms of termination, yes.
4     Q.  You recommended her employment should be
5  terminated?
6     A.  Yes.
7     Q.  Do you do that before or after she was placed on
8  the one-week leave of absence?
9     A.  I really don't recall.
10    Q.  Who replaced Ms. Farrell as PREP manager band 4
11  for the Exanta team after her employment was terminated?
12    A.  There wasn't -- the team was expanding and I
13  hired a new PREP manager in January of 2004,
14  Susan Schaeffer.
15    Q.  You say you hired her.  Was she an external
16  candidate?
17    A.  No, internal.
18    Q.  She had been working at AstraZeneca?
19    A.  Yes.  A long time.
20    Q.  How long had she been --
21    A.  I don't recall.  A few years.
22    Q.  She wasn't hired after Ms. Farrell was
23  discharged?
24    A.  I'm sorry.  She wasn't or was?

13 (Pages 46 to 49)

Wilcox & Fetzer, Ltd.            Professional Court Reporters            (302)655-0477

B234

Page 50

1    Q.   She wasn't hired by AstraZeneca to be an
2    employee of AstraZeneca?
3    A.   Oh, no.  She was already employed by
4    AstraZeneca.
5         MR. SANDLER:  Let him finish his questions
6    before you answer them.
7         THE WITNESS:  I'm sorry.
8    Q.   Susan Schaeffer has never requested FMLA leave;
9    is that correct?
10   A.   I'm not sure if that occurred prior to me
11   becoming her manager or after, but during the time period
12   I was her manager, no.
13   Q.   So to the best of your knowledge, she's never
14   requested FMLA leave?
15   A.   While I was her manager, no.
16   Q.   While you were not her manager you think she did
17   request FMLA leave?
18   A.   I would have no idea.
19   Q.   Susan Schaeffer's never requested any disability
20   leave from AstraZeneca; is that correct?
21   A.   Not while I was her manager.
22   Q.   Prior to you being her manager, do you know if
23   she requested any disability leave?
24   A.   I don't know.

Page 51

1    Q.   Susan Schaeffer's never requested any medical
2    leave from AstraZeneca; is that correct?
3    A.   Not while I was her manager.
4    Q.   Are you still her manager?
5    A.   No.
6    Q.   Prior to you being her manager, she never
7    requested any medical leave, as far as you know; is that
8    correct?
9    A.   I wouldn't be aware.  I don't know.  I wouldn't
10   be aware of those records.
11   Q.   Susan Schaeffer never requested any sick leave
12   while you were her manager; is that correct?
13   A.   I don't recall if she had sick days.  I'd have
14   to look at the records.
15   Q.   You don't recall her taking any sick leave?
16   A.   People took days sick, and I can't recall who or
17   when.
18   Q.   You don't recall Susan Schaeffer taking any?
19   A.   I don't specifically recall.  I'd have to look
20   at her record.
21   Q.   And Susan Schaeffer's never filed a complaint of
22   retaliation with AstraZeneca's Human Resources; is that
23   correct?
24   A.   Not that I'm aware of.

Page 52

1    Q.   Susan Schaeffer's never filed a complaint with
2    AstraZeneca's Human Resources that her FMLA's rights were
3    violated; is that right?
4    A.   Not that I'm aware of.
5    Q.   And Susan Schaeffer's never filed a complaint
6    with AstraZeneca's Human Resources at all, as far as you
7    know; is that correct?
8    A.   Not that I'm aware of.
9    Q.   How old is Susan Schaeffer?
10   A.   I don't know.
11   Q.   Do you know if she's younger than you?
12   A.   I don't know her age.  I don't know ages.  I'm
13   not aware of the ages of my direct reports.
14   Q.   Do you have any opinion one way or the other?
15   A.   In terms of is she older or younger than me?
16   Q.   Yes.
17   A.   I don't know.  I really don't.
18   Q.   In 2003 and 2004 AstraZeneca provided its
19   employees with group health insurance through Blue Cross
20   and Blue Shield of Delaware; is that correct?
21   A.   I don't know.
22   Q.   Did you have health insurance through
23   AstraZeneca in 2003 and 2004?
24   A.   In 2003.

Page 53

1    Q.   Do you know if that was through Blue Cross/Blue
2    Shield of Delaware?
3    A.   I really don't.
4    Q.   You don't recall?
5    A.   I don't recall.
6    Q.   In mid-February of 2004 AstraZeneca cancelled
7    its health insurance coverage of Ms. Farrell; is that
8    correct?
9    A.   I'm sorry.  Can you repeat that?
10   Q.   In mid-February of 2004, AstraZeneca cancelled
11   its health insurance coverage of Ms. Farrell; is that
12   correct?
13   A.   I don't know.
14        MR. LaROSA:  I have no further questions.
15        MR. SANDLER:  No questions.  We will read.
16        (Deposition concluded at 2:50 p.m.)
17        - - - - -
18
19
20
21
22
23
24

14 (Pages 50 to 53)

B235

Farrell
Susan P. Broadway

v.
C.A. # 04-285 KAJ

AstraZeneca Pharmaceuticasl, L.P.
March 24, 2005

---

Page 54

```
1         T E S T I M O N Y
2
3   DEPONENT:  SUSAN P. BROADWAY          PAGE
4
5   BY MR. LaROSA.............................. 2
6
7         E X H I B I T S
8
9   BROADWAY DEPOSITION EXHIBIT NO.        MARKED
10
11  1............................................ 11
12
13  ERRATA SHEET/DEPONENT'S SIGNATURE     PAGE 55
14
15  CERTIFICATE OF REPORTER              PAGE 56
16
17
18
19
20
21
22
23
24
```

---

Page 56

CERTIFICATE OF REPORTER

STATE OF DELAWARE)
                 )
NEW CASTLE COUNTY)

I, Kimberly A. Hurley, Registered Professional Reporter and Notary Public, do hereby certify that there came before me on the 24th day of March, 2005, the deponent herein, SUSAN P. BROADWAY, who was duly sworn by me and thereafter examined by counsel for the respective parties; that the questions asked of said deponent and the answers given were taken down by me in Stenotype notes and thereafter transcribed by use of computer-aided transcription and computer printer under my direction.

I further certify that the foregoing is a true and correct transcript of the testimony given at said examination of said witness.

I further certify that I am not counsel, attorney, or relative of either party, or otherwise interested in the event of this suit.

Kimberly A. Hurley
Certification No. 126-RPR
(Expires January 31, 2008)

DATED:

---

Page 55

REPLACE THIS PAGE

WITH THE ERRATA SHEET

AFTER IT HAS BEEN

COMPLETED AND SIGNED

BY THE DEPONENT

---

15 (Pages 54 to 56)

B236