10   A.   Yes.  All of my work was prior to coming here.

11   Q.   When did you first meet Marybeth Farrell?

12   A.   September 2003.

13   Q.   At that time, was she the senior professional

14   relations and education program manager for the Exanta

15   team?

16   A.   I don't believe so.  She was just a PREP

17   manager.

18   Q.   A PREP manager?  But she was not working as

19   part of the Exanta team at that time?

20   A.   She was working with the Exanta team.

21   Q.   Was she a Band IV PREP manager?

22   A.   Yes.

23   Q.   And you were working at AstraZeneca at the time

24   Miss Farrell's employment ended in January of last

0010

1   year?

2   A.   Yes.

3   Q.   Do you remember what her role was at the time

4   her employment ended?

5   A.   The same.

6   Q.   PREP manager?

7   A.   Mm-hmm.  Sorry.  Yes.

8   Q.   And she was a Band IV at that time?

9   A.   Yes.

10   Q.   Do you recall her ever being a, Miss Farrell

11   ever being a PREP manager for AstraZeneca's marketing

12   group?

13   A.   I don't understand the question.  Sorry.

14   Q.   I think you told me that, at one time,

15   Miss Farrell was working as a PREP manager, Band IV,

16   for the Exanta team, and I am asking if she ever had a

17   PREP manager role in the marketing group at

18   AstraZeneca?

19   A.   So she was in the marketing group?

20   Q.   I am asking if you ever recall that?

21   A.   Yes.

22   Q.   Was her job as PREP manager for the Exanta team

23   part of the marketing group?

24   A.   Yes.

0011

1   Q.   Do you recall her ever being in any position

2   lower than a PREP manager, Band IV, during the time

3   you worked with her?

4   A.   From the time I worked with her, no.

5   Q.   As a PREP manager at AstraZeneca, did
6   Miss Farrell receive annual evaluations?
7   A.   She would have done, to the best of my
8   knowledge.
9   Q.   I'd like to show you an AstraZeneca Performance
10  Evaluation.
11          Have you ever seen this document before?
12  A.   I don't remember.
13  Q.   Why don't you take a second to flip through.
14  There is about seven pages.
15  A.   I really don't know whether I ever looked at
16  this.
17  Q.   You don't recall seeing that document?
18  A.   (Witness nods.)
19  Q.   I will take it.  As an H.R. manager, do you
20  have any role in evaluating employees?
21  A.   Can you clarify what you mean?
22  Q.   As an H.R. manager at AstraZeneca here in the
23  U.S., do you ever participate in the evaluation
24  process of employees?
0012
1   A.   Of employees who are outside of H.R.?  I am
2   not --
3   Q.   Of any employees?
4   A.   On occasion, I am asked by employees to give
5   input to their manager, to give feedback on their
6   performance.
7   Q.   Are those only employees working in the human
8   resource department?
9   A.   No.  They might be people I have worked with
10  closely during the rest of -- during a period of time.
11  Q.   How about employees in the Exanta team, do you
12  ever give feedback on their performance?
13  A.   No.  I haven't done that.
14  Q.   How about PREP managers?
15  A.   Nope.
16  Q.   So, is it fair to say that you have never
17  participated in any employee evaluation of Marybeth
18  Farrell?
19  A.   I am not sure what you are asking.
20  Q.   In terms of either completing a formal
21  evaluation or this informal feedback, solicited
22  feedback that you talked about that you have given to
23  some employees?
24  A.   As part of the performance review process?

B278

0013
1    Q.  Yes.
2    A.  No.  That's an annual process.  No.
3    Q.  Isn't it true that prior to April of 2003,
4  Miss Farrell had never asked for any sick leave for
5  the year that she had been a part of the Exanta team?
6    A.  I really don't know.
7    Q.  Were you aware that Miss Farrell requested
8  leave in April of 2003, to seek medical treatment?
9    A.  Was I aware at what point?
10   Q.  At any point?
11   A.  I was aware later on.
12   Q.  When did you become aware of that?
13   A.  When she raised it as a concern.  It was -- it
14  would have been in September.
15   Q.  In September of 2003, you became aware -- you
16  said when she raised it --
17   A.  When Marybeth raised it.
18   Q.  -- as a concern.  How did she raise it as a
19  concern to you?
20   A.  She said that she thought that that had had an
21  impact on why she was on an action plan, or something
22  to that effect.
23   Q.  And what was your initial reaction to that
24  statement?
0014
1    A.  I arranged for Marybeth to meet with our
2  employment practices partner so he could investigate
3  her concerns.
4    Q.  Who was that?
5    A.  Keith Black.
6    Q.  Is an action plan a form of disciplinary action
7  at AstraZeneca?
8    A.  Not as I understand it to be.  Not really.
9    Q.  What do you understand an action plan to be?
10   A.  The formal process to start somebody to help
11  them improve their performance.
12   Q.  When Miss Farrell contacted you about this
13  complaint you mentioned earlier, how did that contact
14  take place?  Was it over the phone?  Was it an in
15  person meeting?
16   A.  As I recall, she actually contacted a
17  colleague, Deb Kauffman, and Deb was going to go on
18  holiday, so Deb and I both met with Marybeth and we
19  met face-to-face with her.

20    Q.  Do you recall what was said at that meeting?
21    A.  As I remember at the moment, Marybeth said she
22  was concerned that the action plan was a consequence
23  of her taking FMLA leave, and, also, she alleged there
24  was some link to a sexual harassment -- it wasn't a
0015
 1  formal complaint that she had made, but she had made a
 2  -- she had had a discussion with her manager some
 3  years previously about somebody else in the company
 4  and she thought it was linked to that event as well.
 5    Q.  So, there was two issues she was raising?
 6    A.  Yes.
 7    Q.  Was the second issue investigated?
 8    A.  When Keith and I met with Marybeth so that he
 9  could start the investigation, Marybeth did not want
10  to share who she felt was involved in the sexual
11  harassment part of her concerns, so she had implied
12  that she had had a consensual affair with somebody
13  years previously, this person had left the company,
14  but this person still had friends in the company.  But
15  she wouldn't share anymore information when we met
16  with Keith so he wasn't able to investigate.
17    Q.  So what was investigated, the FMLA retaliation
18  complaint?
19    A.  Yes.
20    Q.  Did you take part in the investigation or just
21  Keith Black?
22    A.  Keith did the investigation.
23    Q.  Nobody else?
24    A.  No.  Keith would keep me informed, but he did
0016
 1  the investigation.
 2    Q.  And what was the outcome of that investigation?
 3    A.  I believe it was that Keith found that there
 4  was no link between the FMLA leave and the action
 5  plan.
 6    Q.  Do you remember approximately when that was,
 7  the findings of this investigation came out?
 8    A.  I believe it was in October.  That's what I
 9  remember.
10    Q.  So was that a rather quick turnaround period
11  for an H.R. investigation, one month or so?
12    A.  I don't believe so, no.
13    Q.  Was that a rather long time for an
14  investigation?

B280

15    A.  No.  I don't -- I don't think so.

16    Q.  How long would an H.R. investigation normally

17  last?

18    A.  It entirely depends on the circumstances and

19  what you are trying to investigate.

20    Q.  For a retaliation type of a matter?

21    A.  Well, I would say it would depend how many

22  people were involved who you needed to speak to in

23  order to investigate the complaint.

24    Q.  Were you aware that in October of 2003,

0017

1  Miss Farrell was told that her execution of the

2  requirements of the action plan was unsatisfactory?

3    A.  Yes.

4    Q.  And that was after the human resources

5  investigation concluded; isn't that correct?

6    A.  I believe so.

7    Q.  Who was made aware of the findings of the

8  investigation other than Miss Farrell?

9    A.  I think Susan must have been made aware, Susan

10  Broadway, because she had been told not to take any

11  further action on the action plan until Keith had

12  concluded his investigation.

13    Q.  Who told her that?

14    A.  I am not sure.

15    Q.  Was it one of her managers or somebody in human

16  resources?

17    A.  Who told her?

18    Q.  Not to take any further action on the action

19  plan until the investigation was completed?

20    A.  It would have probably been Keith or I, but I

21  am not sure.

22    Q.  And why would someone in H.R. tell a manager

23  not to continue with an action plan while an

24  investigation was pending?

0018

1    A.  Because the investigation was around the action

2  plan.

3    Q.  Was regarding the merits of the action plan,

4  the legitimacy of the action plan?

5    A.  Well, it was regarding Marybeth's complaint

6  that the action plan was linked to the FMLA leave.

7    Q.  Were you aware that in October of 2003,

8  Miss Farrell was placed on an 11-week performance

9  improvement plan?

10   A.   I was aware she was put on a performance
11   improvement plan.  I am not sure of the 11 weeks.
12   Q.   Is it fair to say that a performance
13   improvement plan is more serious than an action plan?
14   A.   Yes.
15   Q.   Is it a performance improvement plan a form of
16   disciplinary action at AstraZeneca?
17   A.   Our disciplinary process is separate from our
18   performance management process.
19   Q.   So it's not part of the disciplinary process?
20   A.   They are separate processes.
21   Q.   So you are saying that they are separate.  Are
22   you saying that someone who is being disciplined, a
23   performance improvement plan would never be part of a
24   disciplinary action against the employee?
0019
1   A.   Somebody might be on a performance improvement
2   plan and also have disciplinary action taken against
3   them, but they would be for different things.
4   Q.   Were you aware that in January of 2004,
5   Miss Farrell's computer docking station network was
6   vandalized?
7   A.   Yes.
8   Q.   How did you become aware of that?
9   A.   Well, I don't remember.  I think maybe through
10   -- Marybeth alleged that to Susan and Susan would have
11   mentioned it, but I am not sure.
12   Q.   So you didn't speak to Marybeth directly about
13   that?
14   A.   I don't remember.
15   Q.   And you say Susan, you mean Susan Broadway?
16   A.   Yes.
17   Q.   Isn't it true that no investigation was done of
18   that incident?
19   A.   I don't remember.
20   Q.   You don't remember any investigation being done
21   on that incident?
22   A.   I don't remember what happened.
23   Q.   Miss Farrell's performance improvement plan
24   ended in January of 2004; is that correct?
0020
1   A.   I believe so.
2   Q.   And in January of 2004, after the performance
3   improvement plan ended, Miss Farrell was provided with
4   a memorandum regarding PIP feedback discussion; is

5   that correct?

6   A.  I don't remember.

7   Q.  Isn't it true that prior to her employment

8   ending, Miss Farrell was placed on a one-week leave

9   during which time she was not to report to work in

10  January of 2004?

11  A.  I believe so.

12  Q.  Who made the decision to place her on that

13  leave?

14  A.  I don't recall.

15  Q.  Is that the type of decision that would come

16  from human resources or from an employee's management?

17  A.  I don't believe it came from Susan's

18  management.

19  Q.  Susan's management?

20  A.  I am sorry, Marybeth's management.

21  Q.  You think it came from human resources?

22  A.  There was some discussion between human

23  resources and the legal department and I don't

24  remember who made the decision.

0021

1   Q.  But the decision to place her on a one-week

2   unpaid leave was made after this discussion between

3   human resources and the legal department?

4   A.  I am not -- I think so.

5   Q.  After Miss Farrell's employment ended, who

6   replaced her as a PREP manager on the Exanta team?

7   A.  I don't remember.

8   Q.  Do you think her position was left vacant or do

9   you think her position was filled?

10  A.  I am not sure.

11  Q.  In 2003 and 2004, AstraZeneca provided

12  employees with group health insurance through Blue

13  Cross and Blue Shield; isn't that correct?

14  A.  I have no idea.

15  Q.  Does your department not deal with employee

16  benefits such as health insurance?

17  A.  There is a benefits group within H.R. that

18  deals with that.

19  Q.  And you are not part of the benefits group?

20  A.  No.

21  Q.  Who is in charge of the benefits group?

22  A.  The head of compensation and benefits is

23  someone called George Murphy, I think his name is.

24  Q.  And where does he work?

0022
1    A.  At AstraZeneca.
2    Q.  In Delaware?
3    A.  In Delaware.
4    Q.  In Fairfax?
5    A.  Yes.
6    Q.  In mid February of 2004, AstraZeneca cancelled
7    its health insurance coverage of Miss Farrell; isn't
8    that true?
9    A.  I don't know.
10    Q.  Wouldn't it be unusual to terminate health
11    insurance coverage retroactive for an employee who has
12    been terminated by the company?
13    A.  I don't know.
14    Q.  Isn't it true that AstraZeneca did not provide
15    Miss Farrell with the option to continue her health
16    insurance at her own expense under Cobra?
17    A.  I don't know.
18    Q.  Since you seem to not know a lot about these
19    employee benefits questions, who at AstraZeneca would
20    be able to answer these types of questions?
21    A.  The healthcare provider would be somebody in
22    the benefits department.  The Cobra notice, I am -- I
23    am not sure, I think they would probably be processed
24    through benefits, but they could be processed through
0023
1    H.R. services.
2    Q.  Who is the head of H.R. services?
3    A.  I can't think of her name.  It's gone.  Sorry.
4    Q.  And who is the head of the benefits department?
5    A.  There is no current head of the benefits group.
6    George is the head of compensation and benefits, but
7    the person who handled benefits has just left.
8    Q.  I am going to show you this performance
9    evaluation again.  Let's have this marked as Exhibit
10    1.
11          (Austin-Jones Exhibit No. 1 was marked for
12    identification.)
13    BY MR. LaROSA:
14    Q.  This is Marybeth Farrell's performance
15    evaluation for 2002, which she received in March of
16    2003, that we have produced in this case.  It's
17    labeled P18 to P25.  I think you have testified
18    earlier that you are not sure if you have seen this
19    before.  You may or may not have seen this particular

20  evaluation before, but have you ever seen the form
21  before that is used here?
22    A.  Yes.
23    Q.  In terms of there is a section called, entitled
24  "Demographics" and then a section entitled "Goals" on
0024
 1  the first page; do you see that?
 2    A.  Yes.
 3    Q.  And then there is various categories of
 4  performance and something called "Competencies" on
 5  P21; do you see that?
 6    A.  Yes.
 7    Q.  And then there is, at the end, P24, there is a
 8  section called "Overall Evaluation," and then an
 9  "Overall Rating"; do you see that?
10    A.  Yes.
11    Q.  And as far as overall rating, are there four
12  different categories of overall rating?
13    A.  Yes.
14    Q.  What are the four categories that an employee
15  can fall into in terms of their overall rating on one
16  of these performance evaluations?
17    A.  Distinguished, excellent, good, or
18  unacceptable.
19    Q.  And can you read the definition for excellent,
20  an excellent overall rating?
21    A.  "Excellent:  Performance exceeded overall
22  expectations.  Exceeded most or some overall results
23  while maintaining effective relationships during the
24  past year.  Exceeded most or some goals.  Exceeded
0025
 1  most or some expectations related to cultural
 2  attributes and/or leadership capabilities behaviors.
 3  Contributed substantially to the success of the
 4  organization/unit."
 5    Q.  And can you read the definition for good
 6  overall rating?
 7    A.  "Performance met overall expectations.
 8  Achieved all, most, or some expected overall results
 9  during the past year.  Met all, most, or some goals.
10  Met all, most, or some expectations related to
11  cultural attributes and/or leadership capabilities
12  behaviors.  Made a contribution the success of the
13  organization/unit."
14    Q.  And we said there was a category called

B285

15   unacceptable. At the time Miss Farrell received this
16   review, her overall performance was not considered
17   unacceptable; is that true?
18      A.   She was given a good rating for 2002.
19      Q.   And under these different categories of
20   performance, it looks like there is an exceeded, a
21   met, and a did not meet under each category.
22          Do you see that?
23      A.   Yes.
24      Q.   Can you tell me about how many different
0026
1    categories Miss Farrell was rated as exceeded on this
2    particular evaluation for 2002?
3       A.   Eight.
4       Q.   And about how many different categories was she
5    considered as met expectations?
6       A.   Five.
7       Q.   And how many categories of performance was she
8    rated as did not meet expectations?
9       A.   None.
10      Q.   Have you ever completed this type of a form for
11   any employees in human resources?
12      A.   Not this form, U.S. form, no.
13      Q.   Based on the definitions you read to us for
14   excellent and for good overall ratings, how would you
15   rate someone who was ranked as exceeded expectations
16   in eight categories and five rated meets expectations
17   in five categories?
18      A.   Depends on which ratings they got exceeded,
19   sorry, on which objectives they got exceeded.
20      Q.   Are you saying that some of the objectives have
21   greater weight than others?
22      A.   In my view, yes, although I don't know about in
23   this case, but generally speaking.
24      Q.   With regards to the various categories of
0027
1    performance here, which ones do you think hold the
2    most weight?
3       A.   I don't know.
4       Q.   And when you read us these definitions of
5    excellent and good overall ratings, they don't talk
6    about certain categories having more weight than
7    others, do they?
8       A.   No.
9       Q.   And based on this definition of excellent that

10  you read for us, an excellent overall rating exceeding
11  most or some overall results while maintaining
12  effective relationships during the past year; exceeded
13  most or some goals; and exceeding most or some
14  expectations related to cultural attributes and/or
15  leadership capabilities behaviors; contributed
16  substantially to the success of the organization/unit,
17  isn't it fair to say that an employee who received
18  eight exceeds expectations out of 13 categories should
19  receive an excellent overall rating?
20    A.  I don't think you can generalize in that way.
21    Q.  Why do you say that?
22    A.  Because managers have a group of people they
23  have to rate as part of this process, and they can
24  only give so many people excellent and so many people
0028
1  good across -- across the board.  We have to come in
2  within a general distribution.  So you would be
3  comparing somebody to their peers as well as their own
4  performance when setting their overall rating.
5    Q.  And that's not true for each of these
6  categories, though, is it?
7    A.  I don't understand your question.
8    Q.  You are saying managers have to rate people
9  against their peers; is that true for the categories?
10    A.  It's true for the overall rating.
11        MR. SANDLER:  Mr. LaRosa, let me point out
12  that there is two page 5s in this document.
13        MR. LaROSA:  I am just seeing that myself.
14        MR. SANDLER:  P22 and P23.  So when you
15  count, you know, when you do the counting, you end up
16  counting two page 5s, so the conclusions are wrong
17  based on that.
18        MR. LaROSA:  Thanks for pointing that out,
19  Sheldon.  It looks like it should be six exceeds and
20  five meets expectations because P21 and P23 look like
21  they are the same page 5.
22  BY MR. LaROSA:
23    Q.  Does that change any of your answers as far as
24  meeting the definition of the overall rating of
0029
1  meeting an excellent overall rating being exceeding
2  most of the goals versus a good?
3    A.  I still think it depends on the weight of the
4  objectives.

5   Q.   And if I told you that Miss Farrell received
6   this 2002 evaluation on March 10th, 2003, would that
7   be unusual that an employee would receive the prior
8   year's evaluation in March of the following year?
9   A.   We normally give people their overall rating at
10  the end of February or March.
11  Q.   So, is it fair to say at the time that
12  Miss Farrell received this rating, that there were no
13  concerns with her performance expressed in this
14  evaluation?
15  A.   Expressed in this evaluation?  There are areas
16  for development expressed in this.
17  Q.   Yes.  But I suppose there is -- would you agree
18  there is probably areas for development in every
19  performance evaluation?  That's one of the --
20  generally, the employer wants the employee to continue
21  to improve and grow with the company, but in terms of
22  areas that did not meet expectations, there were no
23  areas where Miss Farrell was not meeting expectations?
24  A.   There were no objectives where she did not meet
0030
1   the rating.
2   Q.   So, having received this in March of 2003, an
3   employee who received this in March of 2003, would
4   have a not unsatisfactory or not meeting expectations
5   in any performance areas; is that fair to say?
6   A.   Well, this relates to the previous years's
7   performance.  And between the end of the previous year
8   and receiving this, three months would have
9   potentially past, or two months, so I don't know what
10  messages she was receiving from her managers during
11  that time.
12  Q.   So assuming she had received no messages from
13  her managers during those three months at the
14  beginning of 2003, would it be fair for an employee to
15  conclude that there are no problems with my
16  performance?
17  A.   So you are saying somebody receives a
18  performance review in March and their manager hasn't
19  given them any indication that there are any other
20  issues?
21  Q.   Yes.
22  A.   And they just receive a performance review?
23  Q.   Such as this one?
24  A.   With a good rating?  Then you would probably

0031
1  think there weren't big issues that you needed to
2  address.
3    Q.  Well, you would think there were no issues,
4  isn't that true?
5    A.  Well, you would think there were development
6  areas that you needed to work on.
7    Q.  But no big issues?
8    A.  Yes.  I assume so.
9    Q.  Does human resources deal with any of the
10  paperwork for FMLA leave?
11    A.  I believe the H.R. call center deals with that
12  paperwork.
13    Q.  And as far as you know, there were no issues
14  with Miss Farrell completing the proper paperwork for
15  FMLA leave; isn't that correct?
16    A.  I was in the U.K. at the time so I wouldn't
17  have been aware.
18    Q.  Are you familiar with the requirements for a
19  Band IV PREP manager versus a Band V PREP manager?
20    A.  What do you mean by "requirements"?
21    Q.  Do you know if there are any distinctions
22  between the two in terms of your expectations?
23    A.  We have a matrix which has been developed to
24  help describe how people develop.  Competence is
0032
1  expected at each level.
2    Q.  Is that something that's developed by human
3  resources?
4    A.  No.  It was developed by the leadership team of
5  that group.
6    Q.  And the group being the marketing group in this
7  case?
8    A.  It was the marketing communications team.
9    Q.  Were you aware that after her surgery,
10  Miss Farrell attempted to work at home in May of 2003?
11    A.  Well, again, I was in the U.K. at the time.
12    Q.  So you don't know?
13    A.  (Witness nods.)  I don't know why I would know.
14    Q.  One of the areas in this annual evaluation is
15  understanding the critical data.
16        Do you understand what that means in
17  relation to a PREP manager?
18    A.  Did you say critical data or clinical data?
19    Q.  Critical.

20    A.  I can see objective relating to clinical data.
21    Q.  What does that mean in relation to a PREP
22  manager?
23    A.  The clinical data?
24    Q.  Understanding the clinical data?
0033
1    A.  Well, I only have a general sense for this
2  because I have never performed that role.
3    Q.  Understood.  Can you just tell us what your
4  general sense is?
5    A.  Understanding what the clinical trials are
6  about in order to be able to inform the education.
7    Q.  To be able to inform the education?
8    A.  I am really not sure.
9    Q.  How about ability to drive meetings and
10  organize, do you know what that means in relation to a
11  PREP manager?
12    A.  Well, I assume it's talking about the different
13  types of meetings they are expected to facilitate.
14    Q.  Do you know what types of meetings those are?
15    A.  As I understand it, with key opinion leaders.
16    Q.  Can you give me an example of what a key
17  opinion leader is or who would be an opinion leader?
18    A.  Again, this is my general understanding,
19  somebody who is an expert in their field.  Normally a
20  medical expert.
21    Q.  So we are talking about doctors, pharmacists?
22    A.  Normally -- again, as I understand, it's
23  medical doctors.
24    Q.  What about ability to act as a content expert,
0034
1  what does that mean in relation to a PREP manager?
2    A.  I don't know.
3    Q.  Do you know if the PREP managers have any
4  responsibility for budget management?
5    A.  I believe so.
6    Q.  Can you explain what type of responsibilities
7  PREP managers have for budget management?
8    A.  As I understand it, there is a budget for PREP
9  work and the PREP managers need to ensure that the
10  work that they do is accounted for properly and comes
11  in within budget.
12    Q.  So, is it fair to say that they don't determine
13  budgets but they have to stay within budgets set by
14  someone else?

B290

15   A.  I don't know.
16   Q.  Do you know what the term "brand strategy"
17   means in relation to a PREP manager?
18   A.  I know what brand strategy means.
19   Q.  In general?
20   A.  In general terms, I think.
21   Q.  Can you --
22   A.  It talks about really what the strategy is for
23   that brand.
24   Q.  That brand of drug?
0035
1   A.  Yes.
2   Q.  Is that something that a PREP manager is
3   responsible for?
4   A.  They wouldn't be responsible for the creation
5   of the strategy.
6   Q.  But following the strategy?
7   A.  They would need to understand it.
8   Q.  Were you aware that Miss Farrell asked
9   Miss Broadway that her action plan be reconsidered to
10   reflect the fact that she held a Band IV position and
11   not Band V position?
12   A.  Yes.
13   Q.  And how did you learn of that?
14   A.  I think I saw some e-mail correspondence on
15   that.
16   Q.  And how did Miss Broadway respond to that
17   request?
18   A.  I think Susan felt that the action plan was
19   appropriate for a Band IV PREP manager.
20   Q.  Were you aware that Miss Farrell was placed in
21   a cubicle in September of 2003 for her workstation?
22   A.  I believe -- I have some recollection of
23   something about that.
24   Q.  What do you recall?
0036
1   A.  I think I just heard that she had moved from an
2   office to a cubicle.
3   Q.  And do you recall that happening with
4   Miss Farrell, in regards to Miss Farrell moving?
5   A.  Yes.
6   Q.  But you don't recall that in regards to anyone
7   else moving to a cubicle?
8   A.  People move all the time.
9   Q.  But you don't recall anyone else moving to a

10  cubicle at that time, do you?  This would be September
11  of 2003, when you were first coming to the U.S.?
12    A.  No.
13    Q.  No other Band IV team members had to move to
14  cubicles in 2003; isn't that correct?
15    A.  I don't know.
16        MR. LaROSA:  I have no further questions.
17  BY MR. SANDLER:
18    Q.  I just have a couple.  You were asked a
19  hypothetical question about what happens when someone
20  is given an evaluation and then they are not told that
21  there is any expectation or any performance issues,
22  and I think you said that, in fact, the typical
23  evaluation is given out three months after the year
24  for which the evaluation is given; is that correct?
0037
1    A.  It -- it's given between the end of February
2  and the beginning of March.
3    Q.  And if, in early 2003, there were concerns
4  expressed by Ms. Farrell's managers about her
5  performance, either directly to her or discussions
6  back and forth between the managers, about serious
7  deficiencies, would that have a bearing on the answer
8  that you gave if you were aware that, in fact, that
9  took place?
10        MR. LaROSA:  Objection.
11        MR. SANDLER:  You can answer.
12        THE WITNESS:  If there was discussion
13  about her performance, then she would -- then there
14  would be issues.
15  BY MR. SANDLER:
16    Q.  And, in fact, you mentioned that there were
17  some developmental issues that she needed to work on
18  in any event just based on the previous evaluation;
19  isn't that right?
20    A.  Yes.
21        MR. SANDLER:  Nothing further.
22        (The deposition was concluded at 3:45
23  p.m.)
24            - - - - -
0038
1            INDEX TO TESTIMONY
2
  GEORGINA L. AUSTIN-JONES              PAGE
3

B292

Examination by Mr. LaRosa              2
4    Examination by Mr. Sandler             36
5

- - - - -

6
7                     INDEX TO EXHIBITS
8
                              PAGE
9
     Austin-Jones Exhibit No. 1 was marked for
10   identification.................................. 23
11   ERRATA SHEET.......................................39
12   CERTIFICATE OF REPORTER............................40
13
14
15
16
17
18
19
20
21
22
23
24
0039
1
2
3
4               REPLACE THIS PAGE
5               WITH THE ERRATA SHEET
6               AFTER IT HAS BEEN
7               COMPLETED AND SIGNED
8               BY THE DEPONENT.
9
10
11
12
13
14
15
16
17
18
19

B293

20
21
22
23
24
0040
1   State of Delaware )
                      )
2   New Castle County )
3         CERTIFICATE OF REPORTER
4        I, Renee A. Meyers, Registered Professional
    Reporter and Notary Public, do hereby certify that
5   there came before me on the 14th day of February,
    2005, the deponent herein, GEORGINA AUSTIN-JONES, who
6   was duly sworn by me and thereafter examined by
    counsel for the respective parties; that the questions
7   asked of said deponent and the answers given were
    taken down by me in Stenotype notes and thereafter
8   transcribed into typewriting under my direction.
9        I further certify that the foregoing is a true
    and correct transcript of the testimony given at said
10  examination of said witness.
11       I further certify that I am not counsel,
    attorney, or relative of either party, or otherwise
12  interested in the event of this suit.
13
14                Renee A. Meyers
                  Certification No. 106-RPR
15                (Expires January 31, 2005)
16
17  DATED:  February 16, 2005
18
19
20
21
22
23
24

0001
1          IN THE UNITED STATES DISTRICT COURT
2              FOR THE DISTRICT OF DELAWARE
3
   MARYBETH FARRELL,              )
4                          )
          Plaintiff,     )
5                          )   Civil Action
   v.                       )   No. 04-285 KAJ
6                          )
   ASTRAZENECA PHARMACEUTICALS,  )
7  L.P., a Delaware corporation, )
                           )
8          Defendant.     )
9
            Deposition of RACHEL BEVIS taken pursuant
10  to notice at the law offices of The Neuberger Firm, P.A.,
    Two East Seventh Street, Suite 302, Wilmington, Delaware,
11  beginning at 2:00 p.m. on Thursday, April 7, 2005, before
    Kathleen White Palmer, Registered Merit Reporter and
12  Notary Public.
13
    APPEARANCES:
14
15       JOHN M. LaROSA, ESQUIRE
         LAW OFFICE OF JOHN M. LaROSA, ESQUIRE
16         Two East Seventh Street - Suite 302
           Wilmington, Delaware  19801
17        for the Plaintiff
18       SHELDON N. SANDLER, ESQUIRE
         YOUNG, CONAWAY, STARGATT & TAYLOR
19         1000 West Street
           The Brandywine Building - 17th Floor
20         Wilmington, Delaware  19899-0391
           for the Defendant
21
22
    -----------------------------------------------------
23           WILCOX & FETZER
       1330 King Street - Wilmington, Delaware 19801
24              (302) 655-0477
0002
1          RACHEL BEVIS,
2       the witness herein, having first been
3       duly sworn on oath, was examined and

4        testified as follows:
5    BY MR. LaROSA:
6        Q.   Hello.  My name is John LaRosa and I represent
7    Marybeth Farrell, who is the plaintiff in this case.
8                Will you state your full name, please?
9        A.   Rachel Daugherty Bevis.
10       Q.   What is your current home address?
11       A.   110 Marymet Farm Drive, Kennett Square,
12   Pennsylvania, 19348.
13       Q.   Are you married?
14       A.   Yes.
15       Q.   Have you ever had your deposition taken before?
16       A.   No.
17       Q.   After I ask the questions and you answer them
18   today, you'll have the opportunity to review the answers
19   you gave to see if the reporter made any technical
20   mistakes.  Do you understand that?
21       A.   Yes.
22       Q.   You have taken an oath to tell the truth and you
23   understand the significance of that; correct?
24       A.   Yes.
0003
1        Q.   If I ask you a question today and you don't
2    understand, please ask me to rephrase it and I'll be glad
3    to rephrase it.  Okay?
4        A.   Yes.
5        Q.   If you don't know the answer to something, I
6    don't want you to guess, so tell us you don't know and we
7    will accept that as your answer and I'll try and move on.
8    Okay?
9        A.   Yes.
10       Q.   Are you under any medications or substances that
11   would prevent you from remembering accurately or
12   testifying truthfully today?
13       A.   No.
14       Q.   Also we have to take turns speaking because the
15   court reporter cannot record two voices at once, so try
16   to let me finish my question before you give an answer
17   and I'll try and let you finish your answer before I go
18   on to the next question.
19                Do you understand that?
20       A.   Yes.
21       Q.   Also, if you need any breaks, let me know.
22                Do you understand that?
23       A.   Yes.

24    Q.  Is there any reason why you feel you might not
0004
1    be able to testify truthfully today?
2    A.  No.
3    Q.  Have you met with any attorneys at any time to
4    discuss the facts of this case?
5    A.  Yes.
6    Q.  How many times have you met with attorneys?
7    A.  Once.
8    Q.  Approximately how long did you meet with
9    attorneys?
10    A.  An hour, approximately, an hour to two hours.
11    Q.  Was anyone present besides the attorneys and
12    their staff?
13    A.  Yes.
14    Q.  Who else was present?
15    A.  A representative from --
16        MR. SANDLER:  That's staff.
17    Q.  Was the meeting with Mr. Sandler?
18        MR. SANDLER:  Two attorneys.
19    A.  Two attorneys.
20        MR. SANDLER:  They're staff.
21    Q.  Was anyone present from AstraZeneca other than
22    yourself?
23    A.  No.
24        MR. SANDLER:  The legal department.
0005
1    A.  Legal department.  One of the attorneys.  These
2    people I don't deal with normally, but one person I guess
3    was an AstraZeneca legal department employee and then the
4    staff.  So it was Sheldon, one person from our legal
5    department, and a staff.
6    Q.  Will you state your date of birth?
7    A.  12/14/1958.
8    Q.  Regarding your educational background, did you
9    graduate from high school?
10    A.  Yes.
11    Q.  Did you graduate from college?
12    A.  Yes.
13    Q.  What degree did you receive as an undergraduate?
14    A.  A bachelor of -- is it -- bachelor of arts.
15    Q.  What was your major?
16    A.  I think it was stated on my diploma as geography
17    and psychology.
18    Q.  Did you attend graduate school?

19    A.  Yes.
20    Q.  Where did you go to graduate school?
21    A.  University of Dallas.
22    Q.  Did you receive a graduate degree?
23    A.  Yes.
24    Q.  What degree did you receive?
0006
1    A.  An MBA.
2    Q.  Are you currently employed by AstraZeneca?
3    A.  Yes.
4    Q.  What is your current job title?
5    A.  Director of marketing communication.
6    Q.  What department for AstraZeneca does that fall
7  into?
8    A.  Medical and marketing communication.
9    Q.  Do you remember when you began that role?
10    A.  It was May of 2003.
11    Q.  When did you begin working for AstraZeneca?
12    A.  June of 1981.
13    Q.  Was it called AstraZeneca at that time?
14    A.  Zeneca.  No.  I'm sorry.  I misspoke.  It was
15  Stuart Pharmaceutical.
16    Q.  Can you spell Stuart?
17    A.  S-t-u-a-r-t.
18    Q.  What was your role at that time?
19    A.  Sales representative.
20    Q.  Approximately how long were you in that role?
21    A.  Approximately how long?  Approximately four
22  years.
23    Q.  What was your next role after sales rep?
24    A.  It was a training position.
0007
1    Q.  Was the company still called Stuart
2  Pharmaceutical?
3    A.  I believe.
4    Q.  You said that was approximately four years after
5  1981, so approximately 1985?
6    A.  I don't recall.
7    Q.  Was it sometime in the mid 1980s, would you say?
8    A.  Repeat your question.
9    Q.  Was it sometime in the mid 1980s?
10    A.  What was?
11    Q.  When you were working in the training position
12  that followed the sales rep position.
13    A.  Correct.  It was a training and recruiting

14   position out of the region.

15     Q.  What was your next role?

16     A.  District sales manager.

17     Q.  When did you begin that role?

18     A.  In the late '80s.

19     Q.  Was that for Stuart Pharmaceutical?

20     A.  Same parent company.  Had it changed names yet,

21   I do not recall the exact time we formally changed.

22     Q.  At some point the company formally changed

23   names?

24     A.  Right.  It was a parent of ICI and there was

0008

1    divisions of ICI, Stuart Pharmaceutical, and then we

2    became Zeneca, and then later became AstraZeneca.  So

3    we've gone through several transitions over a period of

4    my employment.

5      Q.  What was your next role after district sales

6    manager?

7      A.  I was a hospital district sales manager.

8      Q.  Was this also in the late 1980?

9      A.  Early 1990s.

10     Q.  What was your next role after that?

11     A.  Regional sales director.

12     Q.  Do you remember when that was?

13     A.  That was 1994.  I misspoke.  '95.  Let me think.

14   January '95.

15     Q.  What was your next position after regional sales

16   director?

17     A.  There were title changes, but the core of the

18   role remained the same and I did the same position in

19   various different sales forces until I moved into this

20   position.

21     Q.  In May of 2003?

22     A.  That's the effective date of the job.  I came

23   into the actual position, it was a relocation, so it was

24   sometime mid summer when I was effectively active on the

0009

1    job.

2      Q.  Mid summer of 2003?

3      A.  Correct.  Back and forth at that point.

4      Q.  Are you considered a manager at AstraZeneca?

5      A.  Director.

6      Q.  Was this position the same position you held in

7    August of 2003?

8      A.  Yes.

9    Q.   What were your job responsibilities in August of
10   2003?
11     A.   To make marketing better.
12     Q.   Did you have any other responsibilities?
13     A.   Functional.  In a matrix environment I had a
14   functional relationship across the grand communication
15   leaders and directors.  We were deployed to the brand
16   teams.
17     Q.   Can you explain what you mean by that,
18   "functional"?
19     A.   A functional relationship we would describe as I
20   would write the reviews for my direct reports, brand
21   communications leaders and directors.  So from a
22   leadership and development perspective, they were owned,
23   however, by the brand team.  As far as basically what to
24   do, our goal was to help them on the how to do it in
0010
1    order to be the best they could be within a matrixed
2    environment.
3      Q.   What was your job title immediately before you
4    became director of marketing communication?
5      A.   I was a regional sales director, which to your
6    previous question when I came into the role, I believe it
7    was a regional sales manager and then evolved with very
8    similar core responsibilities.
9           By the time I left through the mergers, I
10   believe it was titled regional sales director.  So there
11   had been some title changes, but the job was, in essence,
12   the same job.
13     Q.   Have you ever worked at the company's
14   headquarters in the marketing department?
15     A.   No.
16     Q.   Had you ever worked at the company's
17   headquarters in the medical and marketing communication
18   department?
19     A.   No.
20     Q.   Have you ever been responsible for national,
21   promotional, and medical educational programs for a
22   product at AstraZeneca?
23     A.   Repeat your question.
24     Q.   Have you ever been responsible for national,
0011
1    promotional, and medical educational programs for a
2    product at AstraZeneca?
3      A.   Prior to this position?

4    Q.  Yes.
5    A.  Implementation of those programs and input into
6  them. I'm not exactly sure how -- what you are asking.
7    Q.  You've been responsible for implementation and
8  input into --
9    A.  Previous to this role.
10    Q.  Did there come a time when you worked with
11  Marybeth Farrell at AstraZeneca?
12    A.  Only directly through Susan, so it was not
13  direct.  It was -- Susan reported to me.  Marybeth
14  reported to Susan.  And previous to this role, no, I had
15  no contact with her.
16    Q.  When you say "Susan," you're talking about Susan
17  Broadway?
18    A.  At the time it was Susan Pritchard.
19    Q.  Susan Pritchard to later became Susan Broadway?
20    A.  Correct.
21    Q.  What was your relationship to the EXANTA team?
22    A.  Susan Broadway was my direct report in a
23  functional relationship.
24    Q.  What was her relationship to the EXANTA team?
0012
1    A.  She was the brand communication leader on the
2  team.
3    Q.  Do you know what Ms. Farrell's role was in May
4  of 2002?
5    A.  I don't recall.
6    Q.  Do you remember at some point that she was a
7  senior professional relations and education programmer,
8  Band IV, for the EXANTA team?
9    A.  She was a Band IV promotions manager when I came
10  into this role.
11    Q.  Was that her role at the time her employment
12  ended?
13    A.  Correct.  She was not senior.  The correction to
14  the previous question is correct.  If it's not correct,
15  the above question.
16    Q.  Prior to the role you described that she had,
17  what was Miss Farrell's role?
18    A.  I don't recall.
19    Q.  Is it something that you knew at one time and
20  you don't recall, or you just do not know?
21    A.  I don't know.
22    Q.  Do you know if she ever worked for AstraZeneca's
23  marketing group?

24    A.  I don't know.
0013
1      Q.  Do you know if Ms. Farrell received an annual
2  evaluation on March 10, 2003?
3      A.  Our general practice is we do annual
4  evaluations.  I was not witness to it.  We have
5  evaluations annually.  She should have received one.
6      Q.  You said "our general practice is we do annual
7  evaluations."  Do the annual evaluations coincide with
8  the calendar year such as 2002, or are they by year
9  anniversary date?
10     A.  We do evaluations annually.  The evaluation
11  dates vary from year to year, so I can't speak for 2003.
12  Generally evaluations, input is given towards the end of
13  the year.  Evaluations are written in January, salaries
14  are figured, and verbal evaluations are given in late
15  winter, early spring.  So that is consistent with our
16  normal process.
17     Q.  So if she received a written evaluation for 2002
18  on March 10, 2003, that wouldn't be unusual for
19  AstraZeneca; correct?
20     A.  That would be standard.
21     Q.  Do the annual evaluations have overall ratings?
22     A.  Yes, they do.
23     Q.  Are you familiar with the categories of overall
24  rating?
0014
1      A.  They vary from year to year.  Over the years
2  the -- the last couple years, to my best recollection, is
3  we had goods, excellents, distinguisheds, and
4  unacceptables.
5      Q.  Which is the highest category of those four?
6      A.  Distinguished.
7      Q.  Followed by excellent, followed by good?
8      A.  Followed by unacceptable.
9          In 2003 I was not involved in -- in 2002,
10  for the March of 2003, I was not involved in the process.
11  So I cannot --
12     Q.  You were not involved in Ms. Farrell's 2002
13  annual evaluation which she received in March of 2003?
14     A.  No.
15     Q.  Isn't it true that prior to May 5th, 2003,
16  Miss Farrell had never received any written disciplinary
17  action from AstraZeneca?
18     A.  Repeat your question.

B302

19     Q.   Isn't it true that prior to May 5th, 2003,
20   Miss Farrell had never received any written disciplinary
21   action from AstraZeneca?
22     A.   It's prior to me being on the job. I don't
23   know.
24     Q.   You were not aware of any written disciplinary
0015
1   action taken against her before that time?
2     A.   I don't know.
3     Q.   Were you aware of Miss Farrell ever taking any
4   sick leave prior to April 2003?
5     A.   Repeat the question.
6     Q.   Were you aware of Miss Farrell ever taking any
7   sick leave prior to April of 2003?
8     A.   I was not in the position, again, until May.
9   Susan made me aware at some point, and I can't tell you
10   exactly when, and I don't know if you're referring to
11   medical leave or --
12     Q.   I'm not referring to medical leave at this
13   point. Just sick leave.
14     A.   I don't know.
15     Q.   Were you aware that in April of 2003
16   Miss Farrell requested leave to seek medical treatment to
17   remove three abdominal and uterine tumors?
18     A.   I was aware of it after the fact.
19     Q.   Do you remember when you became aware of it?
20     A.   I misspoke there. I was not aware of what the
21   situation was around the illness until you just explained
22   it to me. I was aware that she had a medical leave for
23   some sort of surgical procedure which we always honor
24   and accommodate routinely. So it was not something that
0016
1   would have stood out in any stretch.
2     Q.   If someone requested three weeks of medical
3   leave, would that be unusual?
4     A.   No.
5     Q.   If someone were to request six months of medical
6   leave, would that be unusual?
7     A.   Medical leave is always handled between the
8   physician and our medical department. And at their
9   advice, we always honor whatever that employee needs.
10   And it's based on their decisions and their policies. We
11   don't get involved.
12     Q.   Whose decisions?
13     A.   Our medical department and the physician that's

14   treating the patient.  And we certainly have people go on
15   medical leave on a routine basis and we support that in
16   every manner possible as well as, if necessary, family
17   leave after that.
18      Q.  Were you aware that on April 28th, 2003, Jane
19   Hellen and Susan Broadway expressed concerns about
20   Miss Farrell's performance?
21      A.  Repeat the question again.
22      Q.  Were you aware that on April 28th, 2003, Jane
23   Hellen and Susan Broadway expressed concerns about
24   Miss Farrell's performance?
0017
1      A.  At that time I wasn't in the position.
2      Q.  So your answer is no?
3      A.  If you're asking me on April 23rd did I know
4   that, I would not have known it.
5      Q.  Did you ever become aware of the fact that they
6   had expressed concerns about her performance?
7      A.  Yes.
8      Q.  In April of 2003?
9      A.  I understood that after I met Susan as one of my
10   new direct reports, at some point we reviewed her direct
11   reports, that there had been long-standing performance
12   issues and concerns around Marybeth which had
13   originated --
14      Q.  I'm not asking you --
15           MR. SANDLER:  Let her finish her answer.
16           MR. LaROSA:  She answered my question and
17   I'm not asking her to characterize the performance
18   issues.  I was asking her about April 28, 2003.
19           MR. SANDLER:  I'll ask you to permit her to
20   finish her answer.
21   BY MR. LaROSA:
22      Q.  Do you have anything else you want to add to
23   that?  I think you answered my question and then some.
24      A.  You asked me if I knew of the issue.  I said at
0018
1   that point I was not in the job.  You asked me if I had
2   known anything about the performance.  Yes.  After I came
3   into the position, as I reviewed everyone's direct
4   reports, I was informed that there was a long-standing
5   issue concerning the performance of Marybeth which had
6   been brought up as a concern over a very long period of
7   time.
8      Q.  But you had not come into the position until May

B304

 9  of 2003; correct?
10      A.  Correct.
11      Q.  And I asked you about May, the first week of May
12  2003.  That was before you had gone into your current
13  role; correct?
14      A.  Correct.
15      Q.  So at some point after you've come into your
16  current role in May of 2003 you had a
17  meeting with Susan Broadway?
18      A.  After I came into my role in May, in that early
19  summer, yes, I met with all my direct reports.
20      Q.  So at some point in the early summer of 2003 you
21  met with Susan Broadway?
22      A.  Correct.
23      Q.  In the early summer of 2003 that's when you
24  became aware that there was a performance issue with
0019
 1  Marybeth Farrell?
 2      A.  It's when I became aware of the issue.
 3      Q.  Yes.  That's what I'm asking you.
 4      A.  As soon after I took the position.
 5      Q.  But you wouldn't have learned it until you had a
 6  chance to meet with Susan Broadway; correct?
 7      A.  Correct.  I did not know any of these
 8  individuals.
 9      Q.  You are aware that these performance issues were
10  not expressed on Miss Farrell's 2002 evaluation; correct?
11      A.  I don't know that.
12      Q.  Have you ever seen Miss Farrell's 2002
13  evaluation?
14      A.  No.
15      Q.  Were you aware that Miss Farrell attempted to
16  return to work prior to the expiration of her six weeks
17  of medical leave?
18      A.  My recall through Susan was that she had asked
19  to come back early, that she was feeling great and ready,
20  but I believe she came back part-time at her request.
21  We -- again, the decision on medical leave is always
22  between the employee, their physician, and our health
23  department.
24      Q.  Does that mean that generally if an AstraZeneca
0020
 1  employee requests medical leave, that their supervisor
 2  will not encourage them to take less time than their
 3  doctor feels is necessary?

4    A.  Repeat the question.

5    Q.  You've told us some about AstraZeneca's medical

6  leave policy, and I'm asking you as an example if a

7  physician tells an employee they should be out for six

8  weeks of leave, does what you've told us about

9  AstraZeneca's medical leave policy mean that a supervisor

10  should not encourage the employee to come back sooner

11  than the recommended time period by the physician?

12    A.  Again, it's -- the decision -- we do not -- we

13  honor medical leaves.  If a physician and an individual

14  says they will be out and that's confirmed by medical,

15  through our medical department, it's not with that

16  manager directly, we try to serve as best we can the

17  request of that individual with the approval of the

18  physician.

19        And if the physician should say you need to

20  be out for six weeks, we certainly honor that.  If an

21  employee says -- I can speak personally, I've had medical

22  leaves -- I'm ready to come back, I want to come back, we

23  have them get confirmation with their physician that they

24  are ready to come back.  And when it's approved, then

0021

1  that individual can come back.

2        But there is certainly no pressure for that

3  individual to come back until they and their physician

4  feel that they are ready to come back.

5        And then we also offer the opportunity in

6  many cases for someone to come back part-time or with a

7  situation that can accommodate them if they're, for

8  instance, coming back early, whatever the case may be.

9    Q.  You said there's no pressure for them to come

10  back early.  Is that because that would violate

11  AstraZeneca's policy?

12    A.  We don't ask them to come back early because

13  they're on medical leave for a medical reason.  Under a

14  medical leave you are -- you need to recover so you can

15  come back to work healthy.  There would be no reason to

16  ask someone to come back.  Because the whole purpose of

17  honoring a leave is for them to be able to have their

18  medical condition treated.

19    Q.  Wouldn't you agree that if the leave meant that

20  the department was short staffed, that that would be a

21  reason to want someone to come back early?

22    A.  No.  We always accommodate leaves.  We routinely

23  accommodate extended, very extended maternity leaves and

B306

24  family medical leaves.  We will hire occasionally
0022
 1  agencies to do work.  We shift workloads to other
 2  individuals.  It's a routine practice.  We routinely have
 3  people out on medical leaves, for various different
 4  reasons for family leaves, and we accommodate them within
 5  our own capacities.
 6      Q.  There's been quite a few instances where people
 7  have gone out on maternity leave?
 8      A.  At the point of this I can't speak.  At the
 9  point of this situation I can tell you -- yes, people go
10  out on maternity leave.  I've been with the company for
11  many years.  I've had two children and gone on leave.
12  I've had two surgeries and gone on leaves.  I have
13  several individuals -- as you know, Susan Broadway is on
14  maternity leave and family leave at this very moment.
15  Leaves are part of life and we believe in work life
16  balance within the company.  That's what we support.
17      Q.  You've never reported to Jane Hellen; correct?
18      A.  Correct.
19      Q.  You never reported to Susan Broadway; correct?
20      A.  Correct.
21      Q.  Are you aware of anything called a physician
22  profile?
23      A.  No.
24      Q.  Have prep managers ever used outside research
0023
 1  agencies to assist them with preparing for seminars?
 2      A.  Have they ever?
 3      Q.  Yes.
 4      A.  I don't know.
 5      Q.  How many direct reports do you have?
 6      A.  Today?
 7      Q.  Yes.
 8      A.  It's changed.  It's changed within the last
 9  week, so I have approximately currently six today, six
10  direct reports.
11      Q.  How many did you have two weeks ago?
12      A.  I had seven -- well, it's in a time of flux
13  because we had changes, dramatic changes in our brand
14  teams, so there have been significant changes to the
15  immediate organization because of restructuring of brand
16  teams.
17      Q.  So you had seven, approximately, two weeks ago?
18      A.  It depends on how you -- people were put into a

19  strategic working group, two of my direct reports. So
20  people were put onto different working teams as the
21  EXANTA and IRESSA team were downsized due to changes in
22  our environment.
23    Q.  Did that result in less reports to you?
24    A.  Correct, from last year to this year.
0024
1    Q.  How about in the latter half of 2003, how many
2  direct reports did you have?
3    A.  I don't recall.
4    Q.  Do you think you had more than six?
5    A.  Yes.
6    Q.  Do you think you had more than eight?
7    A.  Yes.
8    Q.  Do you think you had more than ten?
9    A.  I don't have a work chart, so I wouldn't be
10  confident to say.  It was close to ten.
11    Q.  How about in 2004, do you remember how many
12  direct reports you had last year?
13    A.  It's been a -- there's been fluctuation in that
14  number based on the teams and the business needs.
15    Q.  Did you have more than eight direct reports in
16  2004?
17    A.  Did I have more than eight in 2004?  Throughout
18  2004, at the end of 2004 there was a change because,
19  again, the change in the teams.  I had approximately -- I
20  did probably have more than eight in 2004, for the
21  majority of 2004.
22    Q.  At AstraZeneca if an employee's performance
23  needs improvement, what is generally the first step that
24  a supervisor would take regarding that individual?
0025
1    A.  They would meet with them and discuss verbally
2  the need for improvement.  They would coach them and
3  point out areas for improvement.
4    Q.  That would be done before the employee would be
5  placed on an Action Plan?
6    A.  Correct.
7    Q.  An Action Plan would be implemented before a
8  Performance Improvement Plan would be implemented?
9    A.  Read the question again.
10    Q.  An Action Plan would be implemented before a
11  Performance Improvement Plan would be implemented?
12    A.  Yes.
13    Q.  Would a Performance Improvement Plan generally

B308

14  be implemented before an employee is terminated for poor
15  performance?
16      A.   Read the question again.
17      Q.   Would a Performance Improvement Plan generally
18  be implemented before an employee is terminated for poor
19  performance?
20      A.   Yes.
21      Q.   Would any other steps be taken aside from those
22  that you've mentioned before an employee is terminated
23  for poor performance?
24      A.   Those are the formal HR steps.  Obviously along
0026
 1  the way there would be ongoing meetings and coaching to
 2  support that individual to grow.  The desire behind these
 3  plans is obviously to give an individual an opportunity
 4  to grow and to be the best they can with support.
 5      Q.   But before any meetings would take place, would
 6  this verbal discussion or coaching take place with the
 7  individual as the initial step?
 8      A.   We coach all of our employees on a routine basis
 9  because our desire is to continue to grow and develop
10  individuals.  So that's an ongoing constant within the
11  organization.
12              And verbal discussions, formally and
13  informally, occur on an ongoing basis about performance
14  or lack thereof.
15      Q.   Verbal discussions with the individual?
16      A.   Correct.
17      Q.   Does AstraZeneca have anything called a
18  short-term improvement plan?  Are you familiar with that
19  term at all?
20      A.   No.  Restate that.  There were two questions
21  there.
22      Q.   I said:  Does AstraZeneca have anything called a
23  short-term improvement plan?
24      A.   I don't know that.
0027
 1              And then you followed that question --
 2      Q.   I said:  Are you familiar with that term?
 3      A.   No.
 4      Q.   So to the best of your knowledge, there is no
 5  short-term improvement plan at AstraZeneca?
 6      A.   We have a Performance Improvement Plan.  We have
 7  the performance Action Plan, if you will.
 8      Q.   You told us about the Action Plan and the PIP,

B309

9   the Performance Improvement Plan.
10          So to the best of your knowledge, there's
11  no such thing as a short-term improvement plan?
12      A.  Correct, to my knowledge.
13      Q.  Are performance reviews generally done on an
14  annual basis?
15      A.  Correct.
16      Q.  The annual review is generally presented to the
17  employee, did you say, sometime in the springtime or late
18  winter?
19      A.  In the experience I've had since I've been in
20  marketing, I can't speak to how marketing operated during
21  the reviews prior to me getting there, in the field, that
22  is correct.
23      Q.  You were not familiar with any mid-year reviews
24  at AstraZeneca in marketing?
0028
1       A.  Do we have mid-year reviews?  As I said,
2   coaching is an ongoing -- we don't rely on only an annual
3   review.  The whole perspective is an annual review should
4   be very little surprise in that we have ongoing coaching
5   and discussions all of the time.  And the real learnings
6   and the real improvement in growth and development
7   happens on an ongoing basis.
8           So, yes, we do a formal end-of-the-year
9   review, but we also have, depending on the manager,
10  quarterly or midyear updates against objectives on an
11  ongoing basis and reviews.  What she experienced, I can't
12  speak for.
13      Q.  Because if a midyear update or review was done,
14  that would be at the discretion of the manager?
15      A.  At this point in time, this is 2005, I know this
16  year there is an expectation that that is not at the
17  discretion of the manager that everybody gets midyear
18  updates.  Susan was extremely good about doing updates,
19  so I know she had ongoing discussions about performance
20  and I --
21      Q.  In 2003 that wasn't a mandatory requirement?
22      A.  I don't know.
23      Q.  Were you aware that in July of 2003 Miss Farrell
24  was told she would not be promoted to Band V?
0029
1       A.  She -- we -- there was no reason to do
2   promotions at that point or for her.  She was not -- we
3   did no promotions of Miss Farrell, did not evaluate her

B310

 4  for a promotion.
 5     Q.  Why not?
 6     A.  A, it wasn't a process at that point.  B, she
 7  was not -- she was not prepared to be a Band V.  There
 8  was no recommendation for her to be a Band V.
 9     Q.  Were you aware that she previously was
10  recommended to be a Band V in 2002?
11     A.  No.
12     Q.  Were you aware that Deborah Brangman had told
13  Miss Farrell she would not be promoted to Band V?
14     A.  No.
15     Q.  You said there was not a process, or there was
16  not a process at that time, speaking of July 2003.  Can
17  you explain what you mean by that?
18     A.  I came into the job in May and we formalized as
19  time went forward that we would review people annually.
20  And we did a formal process the following year, the
21  following June.
22     Q.  June of 2004?
23     A.  Correct.
24     Q.  Did you have the authority to promote
0030
 1  Miss Farrell?
 2     A.  No.
 3     Q.  Who did?
 4     A.  Again, there was not a formal process at that
 5  point.  That would have had to have been an agreement
 6  between Susan, the EXANTA leadership team, myself, my
 7  superior, and HR.  There was no such agreement.
 8     Q.  When you say "the EXANTA leadership team," does
 9  that include Jane Hellen?
10     A.  It would be input from Susan and Jane, myself as
11  the formal process played out, my leadership team because
12  we evaluate all prep and promo people.  At that time we
13  had promotions managers and professional education
14  managers within the group, and we consistently looked
15  across all of the teams across all of the brands for
16  consistent performance prior to any promotions.
17     Q.  Were you aware that in August of 2003
18  Miss Farrell was placed on an Action Plan?
19     A.  Yes.
20     Q.  Is that a form of disciplinary action at
21  AstraZeneca?
22     A.  It's an opportunity for an -- an Action Plan is
23  an opportunity for an individual to clearly understand

24  where their weaknesses are.  It's an excellent
0031
1   opportunity for someone to be able to be coached and
2   developed.  So hopefully their performance meets the
3   standards and the team expectations and, thus, they move
4   forward with a positive career path from that point
5   forward.  And that is our hope at any time we put someone
6   on an Action Plan.
7       Q.  You said an Action Plan is an excellent
8   opportunity.  So if an employee is told by their
9   supervisor they're being placed on an Action Plan, that
10  is a good thing for the employee?
11      A.  If their performance is not meeting the
12  requirements of the job, it is a very good way for an
13  employee to, if you will, get back on track, to have very
14  clear expectations set for them, to have coaching
15  provided for them.  Generally there's weekly meetings, so
16  they actually get additional support from their
17  leadership in order to help them improve.
18          So when I say it's an excellent
19  opportunity, it's an excellent opportunity for someone
20  who is not performing well to be able to be put back on
21  track.  And that is our hope and expectation when we put
22  someone on an Action Plan.
23      Q.  But isn't it also true that if the Action Plan
24  is unsuccessful, the employee could be placed on a
0032
1   Performance Improvement Plan?
2       A.  Correct.
3       Q.  Isn't it true that at the end of the Performance
4   Improvement Plan one of the possible outcomes is
5   termination of employment?
6       A.  If they do not bring their performance in line
7   with expectations, that is correct.
8       Q.  So isn't it fair to say that in addition to
9   being an excellent opportunity, an Action Plan could
10  result in termination of employment?
11      A.  If an Action Plan does not meet the expectations
12  at the end of that period, which our hope is given
13  additional guidance and direction that their performance
14  goes back on track, if they do not meet those
15  requirements, then they will be put on a Performance
16  Improvement Plan.
17          So then again, at that point we reclarify
18  expectations, again continue the coaching for another

B312

19  extended period of time, and at the conclusion of that
20  plan, if, once again, they have not met the expectations,
21  then it could or could not -- if they met expectations,
22  fully met those expectations, they'll be taken off the
23  performance plan.  If they have not met expectations, at
24  that point they could be terminated.
0033
 1      Q.  Were you aware that Miss Farrell received an
 2  overall rating of good for her 2002 evaluation?
 3      A.  I don't know that.
 4      Q.  When you met with Susan Broadway in the summer
 5  of 2003 and discussed Miss Farrell, did you discuss her
 6  2002 performance at all?
 7      A.  I don't recall.
 8      Q.  Were you aware that in August of 2003
 9  Miss Farrell asked Miss Broadway that the Action Plan be
10  reconsidered to reflect the fact that she held a Band IV
11  position and not a Band V position?
12      A.  Yes.
13      Q.  Were you aware in September of 2003 Miss Farrell
14  was removed from her office?
15      A.  I was not aware of it at the time.  That was
16  standard procedure in that Band IV positions generally
17  are in cubes, and as the corporate offices filled up
18  space, Band V and above, Band VIs, VVIs hold the office
19  spaces and generally we have all of the employees in
20  cubicles.  So that's -- there would be nothing that I
21  would know about that.  It would be the exception if it
22  was the other way around.
23      Q.  Isn't it true that Miss Farrell was the only
24  Band IV employee removed from her office?
0034
 1      A.  I doubt that.  I don't know.
 2      MR. SANDLER:  Just to clarify, you are
 3  talking about in the entire company or what?
 4      MR. LaROSA:  I'm talking at the Fairfax
 5  site.
 6      A.  I'm sure there were other individuals moved as
 7  we filled up the office space after the merger when the
 8  buildings were completed.  And it became apparent that
 9  even now many times band -- individuals that are moved
10  from a Band IV to a Band V, we have Band Vs that also
11  operate out of cubicles, so there is no association now
12  or guarantee that anyone would be provided an office.
13  And they try to at least have Band VIs and Band VIIs in

14  office space.
15        Beyond that, at this point in time we try
16  to do the best we can with our facilities.
17    Q.  Do you work out of a cubicle?
18    A.  No, I don't.
19    Q.  Have you ever been placed in a cubicle?
20    A.  No, I have not.  And I am at a Band VII.  Many
21  individuals -- many, many individuals do and we do not
22  consider that to be in any way, shape, or form a
23  hardship.
24    Q.  Does a Band VII make you immune from being
0035
1  placed in a cubicle?
2    A.  Not necessarily.  I'd be happy to be in the
3  building.
4    Q.  So your preference is to be in the building
5  regardless of whether you had a cubicle or an office?
6    A.  Correct.  I see that, as I would describe, as a
7  hygiene factor.  I worked in field offices.  I worked out
8  of a company car.  I worked out of a variety of
9  circumstances.  The environment there is extremely
10  pleasant and provides for all employees, individuals,
11  even in cubicles.  We keep enclave space so there's a
12  private place should they need to make a telephone call.
13  Obviously the entire BC is a very pleasant place to be.
14    Q.  I'm sorry.  What was that abbreviation?
15    A.  BC, the whole entire --
16        MR. SANDLER:  Business Center.
17    A.  Business Center, the USBC.  The Business Center
18  is a very pleasant accommodation of space and light for
19  all employees.
20    Q.  Can you name any other Band IV team members,
21  EXANTA team members who were moved to cubicles in 2003?
22    A.  I cannot.  I don't know.
23    Q.  Were you aware that Miss Farrell filed a
24  complaint with human resources on September 17, 2003,
0036
1  that she was being retaliated against for exercising her
2  FMLA rights?
3    A.  No, I was not at that time.
4    Q.  Were you ever contacted by Keith Black of human
5  resources regarding investigation into Miss Farrell's
6  complaints?
7    A.  I was copied on that from Keith Black.  I was
8  kept in the loop as a functional manager.  I do not

9  believe we had any personal conversations other than
10  e-mail.
11      Q.  Are any of those e-mails directed to you other
12  than the ones you said you were cc'd on?
13      A.  There may have been one e-mail where Keith
14  basically said hello because I had not had interactions
15  with him for a couple of years.  I think he said, Hello,
16  it's good to see your name again, and I think that's the
17  extent of it.  The conversation was not between he and I.
18  It was between he and Susan.  I was functional manager,
19  so I was kept in the loop and copied on some of the
20  messages.
21      Q.  Were you made aware of the outcome of his
22  investigation into Miss Farrell's complaints?
23      A.  I don't recall.
24      Q.  Did you learn anywhere what the outcome was of
0037
1  Miss Farrell's complaints and his investigation?
2      A.  I don't recall.
3      Q.  Were you aware that Miss Farrell was placed on
4  an 11-week Performance Improvement Plan in October of
5  2003?
6      A.  Yes.  I believe it was October.  I know she was
7  put on a Performance Improvement Plan, but I can't
8  confirm the exact date.
9      Q.  Is that a more serious form of discipline than
10  an Action Plan?
11      A.  As I described an Action Plan previously, I did
12  not describe that necessarily as a disciplinary action,
13  but an opportunity for improvement, just as I would look
14  at a Performance Improvement Plan, as it is stated, a
15  Performance Improvement Plan is an opportunity to improve
16  performance.  If performance does not improve, it can
17  lead to termination.  It is not stated as simply a
18  disciplinary action.
19      Q.  When you say it's not stated simply as a
20  disciplinary action, does that mean that it has
21  attributes of a disciplinary action and other attributes,
22  as well?
23      A.  It has the -- it has clear guidance for
24  improvement of performance.  There's no discipline
0038
1  involved in this.  At that point it is guidance for their
2  improvement so that they can perform the functions of the
3  job in the best manner possible.

4      If there's a blatant violation of policy
5  where it is not a performance issue, there can be
6  disciplinary action, which is very different than an
7  improvement plan. An improvement plan is in order to
8  help an employee improve their skills and the function
9  within the job.
10    Q.  Were you aware that Miss Farrell's computer
11  docking station at work was vandalized in January of
12  2004?
13    A.  No.
14    Q.  Were you aware that Miss Farrell was placed on a
15  one-week leave of absence in January of 2004 during which
16  time she was not to report to work?
17    A.  I don't recall the specifics.
18    Q.  I'm not asking you for specifics. I'm just
19  asking you: Do you recall her being placed on a one-week
20  leave of absence prior to being terminated?
21    A.  Vaguely.
22    Q.  Do you recall who made the decision to --
23    A.  No.
24        MR. SANDLER:  Let him finish before you
0039
1  answer.
2        THE WITNESS:  Oh, I'm sorry.
3        MR. SANDLER:  What was the question?
4    A.  Repeat the question.
5  BY MR. LaROSA:
6    Q.  Do you recall who made the decision to place
7  Miss Farrell on a one-week leave of absence prior to her
8  termination?
9    A.  No. Could you repeat that question?
10        MR. LaROSA:  Could you read the question
11  back?
12        (The reporter read from the record as
13  requested.)
14    A.  No.
15        MR. SANDLER:  Same answer?
16    A.  No, no.
17  BY MR. LaROSA:
18    Q.  Have you seen the name "Susan Schaffer"?
19    A.  Yes.
20    Q.  How long has Susan Schaffer been employed by
21  AstraZeneca?
22    A.  Don't recall.
23    Q.  Was she hired after Miss Farrell was fired?

24   A.  I don't recall.  She -- she's been hired, as I
0040
1  recall, since I came into this position.
2    Q.  When you came into the position, what was her
3  position?
4    A.  Repeat the question.
5    Q.  When you came into your current position, what
6  was Susan Schaffer's position at that time?
7    A.  I'm not sure she was even an employee.  That's
8  what I said.  Since the time -- since I've been in the
9  home office, I believe Susan came into that position
10  during that period of time, but I don't know when.
11    Q.  So Susan Schaffer began working for AstraZeneca
12  sometime after May of 2003?
13    A.  I believe.  Let me -- no, because I know now in
14  hindsight I can say I believe Susan Schaffer, if I think
15  about her background, I believe she came from a field
16  position.  I -- I believe she was an MIS in the field,
17  but I don't recall specifically.
18    Q.  So you don't recall when she began working for
19  AstraZeneca?
20    A.  Her original sign-on with AstraZeneca as a
21  company?  No.
22    Q.  Isn't it true that Miss Schaffer has never
23  requested any FMLA leave?
24    A.  I don't know.
0041
1    Q.  You're not aware of Susan Schaffer ever
2  requesting any disability leave; is that correct?
3    A.  I have no idea.
4    Q.  You're not aware of Miss Schaffer ever
5  requesting any medical leave; is that correct?
6    A.  I don't know.
7    Q.  You're not aware of Miss Schaffer ever filing a
8  complaint with AstraZeneca's human resources; is that
9  correct?
10    A.  I don't know.  I don't.
11    Q.  To the best of your knowledge, Susan Schaffer
12  has never filed a complaint that her FMLA rights have
13  been violated by AstraZeneca; is that correct?
14    A.  Again, I don't know.
15    Q.  In 2003 and 2004, AstraZeneca provided its
16  employees with group health insurance coverage through
17  Blue Cross/Blue Shield of Delaware; is that correct?
18    A.  There are multiple choices that you can pick

19  from for healthcare.
20     Q.  During those years, 2003 and 2004, was
21  Blue Cross/Blue Shield of Delaware one of the choices for
22  group health insurance coverage?
23     A.  I live in Pennsylvania, so I would not want to
24  speak for what the choices were for someone living in

0042
1  Delaware.
2     Q.  So you don't recall ever seeing that as a choice
3  on a form?
4     A.  It could very well be.  I believe I have
5  Blue Cross/Blue Shield now, today, 2005.  I can't
6  speak -- I can't recall what all the different plan
7  options were.  We certainly have health benefits that are
8  extremely -- what I consider to be extremely good, and we
9  have multiple options in how we choose our benefits.
10     Q.  Is it fair to say that AstraZeneca's health
11  benefits for its employees are as good or better than
12  options offered by its competitors?
13     A.  I don't work for a competitor.  I'm very pleased
14  with our benefits.
15     Q.  I am going to show you a document.
16        MR. LaROSA:  I ask if it could be marked as
17  Exhibit 1.
18        (Bevis Exhibit 1 was marked for
19  identification.)
20  BY MR. LaROSA:
21     Q.  Have you ever seen this document before?
22     A.  Yes.
23     Q.  What is that document?
24     A.  This is a working draft of a document in the

0043
1  summer of 2003 after I came in that we began to work on
2  as a leadership team in order to better define what the
3  competencies for growth and development for our team
4  would be.
5        And as you can see, it is a very
6  scratched-up version as we started to really put together
7  an opportunity for our prep and promo managers to have
8  guidance as far as their own personal development, to
9  help prepare them to be the very best that they could be
10  in the job, and to be able to put some vocabulary around
11  skills so people could coach effectively to make them the
12  very best that they could be and to be able to compete,
13  you know, for future positions, et cetera.

14    Q.   Why was it necessary to create that type of a
15  document in the summer of 2003?
16    A.   I came into this job as a functional manager.
17  My goal is to make this group the very best they can be,
18  to improve the way we market our products and improve the
19  skills and ability and leadership within my group.
20          Coming into a group of leaders, I was from
21  the sales force where we have competencies and vocabulary
22  around competencies that's used to help develop
23  employees.
24          So I felt it was a benefit for my direct
0044
1  reports to have a vocabulary of competencies to help
2  instill an environment of standing behind the growth and
3  development of all of their prep and promo managers, and
4  to help define what a vision of excellence really looks
5  like in a role so should they interview for future
6  positions, they are very well prepared against those
7  competencies with good examples in order to perform at
8  the best level they possibly can.
9          And this is an early draft version of this
10  which later developed into a level of a skilled,
11  competent -- a skilled and an expert within prep and
12  promo roles around vocabulary to talk about things that
13  they did within their positions and competencies.
14          That's what this is.  This is certainly a
15  working draft as we were trying to work out how this
16  should best be used.
17    Q.   You were involved in developing this document?
18    A.   Actually, the document we are looking at I think
19  here was a preliminary draft that I had inherited somehow
20  that somebody had.  And then as I began to work on it, it
21  evolved and continues to evolve, quite frankly, to help
22  individuals have a good grasp of how they can grow within
23  the position.  It's a developmental grid against
24  competencies.
0045
1    Q.   Were you considered a resource for brand teams
2  regarding how to interpret this document?
3    A.   This document was created by myself and my
4  leadership team.  So as a group, my leadership team and
5  myself worked together to build this document, if you
6  will.  And at this point this was an early phase of a
7  draft document.  So I don't know if I would even call it
8  a document.  It's something that we used to help put

9  vocabulary around, again, development so we could stand
10  as leaders to help stand behind our employees to help
11  them be the best they could be, and help define the broad
12  scope of areas that they could, in fact, develop within
13  this position to prepare them for future positions.
14     Q.  You are saying this is the version you inherited
15  in the summer of 2003?
16     A.  Parts of this.  I don't recall exactly what was
17  there and what wasn't, at what stage this was at.  It's
18  obviously clearly a working document that we were
19  developing.
20     Q.  Are prep managers typically not permitted to
21  utilize support from medical education agencies that they
22  hire for medical education programs?
23     A.  It depends on multiple factors.
24     Q.  Can you explain?
0046
1     A.  It's at the discretion of the team and budgets.
2  And beyond that, I can't really speak to it.  I'm not
3  that close to their interactions.
4     Q.  It looks like there's a category here called
5  "Budgets.  Ability to manage projects and budgets."  Do
6  you see that?
7     A.  Mm-hmm.
8     Q.  I'm sorry?
9     A.  I see this.  Is that what you are referring to?
10     Q.  Yes.  That column that says "Budgets"?
11     A.  Mm-hmm.
12     Q.  It looks like it's the fifth column from the
13  right.
14     A.  Mm-hmm.
15     Q.  I'm sorry.  Can you say yes or no?
16     A.  Yes.
17     Q.  Do managers ever use assistance from someone
18  such as an administrative coordinator to help keep
19  spreadsheets and computer records up-to-date on projects
20  and budgets?
21     A.  Don't know.
22     Q.  Is it typical for the company to deny managers
23  to use their administrative coordinators for duties which
24  are identified as administrative duties?
0047
1     A.  Repeat that question.
2     Q.  Is it typical for AstraZeneca to deny managers
3  the use of their administrative coordinators for

B320

4   administrative duties which in the plan are identified as
5   administrative duties?
6       A.  I don't know what you would identify as
7   "administrative duties."  I don't know that that's ever
8   been identified.  Our administrative coordinators do some
9   functions that vary by team, and I can't speak to what --
10  I've never seen it defined this is what they can do and
11  this is what they can't do, but it's a limited scope.
12      Q.  If their duties are of a limited scope, does
13  that mean they cannot participate in spreadsheets or
14  computer records?
15      A.  I don't know.
16      Q.  Looking at the second column from the right,
17  this banding criteria talks about the ability to develop
18  or drive scientific content for programs and for the
19  ability to discuss clinical data as well as competitive
20  data with clinicians in an educated manner.
21      A.  Can you point out what you are speaking of?
22      Q.  Directing your attention to the second column
23  from the right, is there two different --
24      A.  Here?
0048
1       Q.  Yes, the second vertical column.
2       A.  Okay.  The "Learning disciplines to develop the
3   respect of team members to function as content expert" --
4       Q.  Yes.  What does that column say with regard to
5   promotion managers, Band IV?
6       A.  At this point I did not look at this as fully
7   banding.  This was a competency grid.  It was a draft, a
8   working draft.  And as I stated previously, if you would
9   look at the version that evolved out of this, these are
10  listed as competent, next level being skilled, and the
11  next level being expert.
12          And again, this is a competency grid to
13  help show what "good" looks like in various different
14  skill areas to help broaden their view of all of the
15  different components of their position and the
16  competencies and where they can grow.
17      Q.  In August of 2003, did you ever meet with an
18  employee named Larry in your office to discuss the
19  discrepancies in the requirements of a Band IV prep
20  manager in the banded criteria?
21      A.  An employee named --
22      Q.  Larry.
23      A.  I don't recall.

B321

24    Q.  Subsequent to August 25th, 2003, do you recall
0049
1   an individual named Larry requesting a meeting with you
2   asking to review the plan requirements regarding the
3   banding problems that he had identified?
4     A.  No.
5     Q.  Do you recall any AstraZeneca employee named
6   Larry speaking with you since the time you've been in
7   your current role?
8     A.  There's a Larry Brock that was on, I believe,
9   the Crestor team.  I spoke to him, as I recall, at some
10  point about issues around the workload on the Crestor
11  team.  That's my only recall of our discussion.
12    Q.  Do you remember what year that was?
13    A.  No.
14    Q.  Was it this year?
15    A.  No.
16    Q.  Was it last year?
17    A.  I don't know.
18    Q.  Do you recall Susan Broadway ever discussing
19  with you her frustration about former brand promotion's
20  leader, Brian Martin?
21    A.  Repeat the question.
22    Q.  Do you ever recall discussing with Susan
23  Broadway her frustrations about the former brand
24  promotion's leader, Brian Martin?
0050
1     A.  No.
2    Q.  Do you ever recall an issue of Brian Martin
3  usurping many of the day-to-day responsibilities of the
4  prep managers?
5    A.  Repeat the question.
6    Q.  Do you ever recall an issue regarding Brian
7  Martin usurping many of the day-to-day responsibilities
8  of the prep managers?
9    A.  Brian Martin was a prep manager when I took the
10  role, so no.
11    Q.  Do you ever recall any issue regarding Brian
12  Martin usurping responsibilities of any of his coworkers?
13    A.  Repeat the question.
14    Q.  Do you ever recall the issue of Brian Martin
15  usurping the responsibilities of any of his coworkers?
16    A.  No.
17    Q.  Do you recall Susan Broadway ever bringing to
18  your attention any problems she had with Brian Martin?

19    A.  No.  Brian Martin was not on the EXANTA team at
20   that point when I came into the position.
21    Q.  I'm not asking you if he was still on the EXANTA
22   team. I'm asking you a more general question.
23         Do you recall any issues being brought to
24   your attention regarding Brian Martin --
0051
1    A.  No.
2    Q.  -- or his performance?
3    A.  No.
4    Q.  Are you aware that Susan Broadway represented to
5   this employee named Larry that you were responsible for
6   explaining the banding issues to him?
7    A.  Repeat the question.
8    Q.  Were you aware that Susan Broadway represented
9   to this employee named Larry that you were the one
10   responsible for explaining the banding issues to him?
11    A.  No.
12    Q.  Isn't it true that an employee named Larry in
13   August of 2003 indicated that he should be reinstated to
14   a Band V position that was promised to him?
15    A.  Don't recall.
16    Q.  Do you recall any employees indicating that they
17   should be placed in a Band V position that was promised
18   to them?
19    A.  Repeat the question.
20    Q.  Do you recall any individuals indicating that
21   they should be placed in a Band V position that was
22   promised to them?
23    A.  No.  There was debate on -- when I came into the
24   position where bands were, what should be required to
0052
1   move from a band.  It was a very foggy process at that
2   point.  Again, so it was a good opportunity to say let's
3   really talk about development. Let's not talk about
4   titles. Let's talk about performance. Let's not talk
5   about titles.  Band V, Band V seniors, they are lateral
6   moves. It's titling only. The core behind that was an
7   opportunity for people to grow within that job
8   description and that job, that role.
9    Q.  So in August of 2003, it was very foggy as to
10   what an employee needed to do to be promoted from a
11   Band IV to a Band V?
12    A.  Correct.  And so we started to -- some concepts
13   around what should the competencies be, what does "good"

14   look like, and let's, if you will, move the thinking, the
15   focus between a focus on titling to a focus on growth and
16   development, which would certainly serve all of these
17   individuals to a much greater extent than just focusing
18   simply on a title or a band change, a processing of
19   paperwork versus a true standing behind individuals for
20   their development.  And that was certainly, as a
21   functional manager, how do we make these people the best
22   they can be.
23      Q.  This clarification process, is this document
24   which you said is a working draft, is that part of the
0053
1   clarification process as far as --
2      A.  It was part of the clarification behind --
3   standing behind development and growth, and to change the
4   vocabulary and the thought process about how you grow and
5   develop versus how do you get a title because that's --
6   that's what was going to help them in the long run to the
7   greatest extent.
8           And we now have a formal review process
9   each summer.  And once a year we review individuals as a
10   team, a leadership team against competencies, skills,
11   abilities, and performance.
12           MR. SANDLER:  Can we take a short break?
13           (A recess was taken at this time.)
14   BY MR. LaROSA:
15      Q.  This clarification process that you were working
16   on, this draft document, was this part of the
17   clarification process as far as the distinction between
18   the responsibilities for a Band IV versus a Band V prep
19   manager?
20      A.  At this point in time it was a draft.
21      Q.  We are agreed it's a draft document we are
22   talking about, but I'm asking you:  The creation or
23   trying to create this type of a document, was that part
24   of the process to try and clarify what the distinction in
0054
1   the roles were between Band IV and Band V prep managers?
2      A.  It was a competency document.
3      Q.  It's a yes-or-no question.
4           Were you trying to clarify the distinction
5   between Band IV role and Band V role with this document,
6   or were you not trying to do that?
7      A.  At this point, no.
8      Q.  Later on at some point in time did you try to

9  clarify the difference between a Band IV and a Band V
10  prep manager?
11   A.  We tried to clarify competencies between skill,
12  advanced, and distinguished.
13   Q.  But isn't it true that I think from what you
14  were telling me earlier, too, that as someone's
15  competencies increase, they have a better chance of being
16  promoted to a Band V from a Band IV?
17   A.  Yes.
18   Q.  So wasn't it important for you to clarify what
19  level of competency one needed to be a Band V versus what
20  level of competency one needed to be a Band IV prep
21  manager?
22   A.  Repeat the question.
23        MR. LaROSA:  Could you repeat that, please?
24        (The reporter read from the record as
0055
1  requested.)
2   A.  I don't know.
3  BY MR. LaROSA:
4   Q.  You don't know if that was important or not?
5        MR. SANDLER:  You have to answer out loud.
6   A.  I don't know a piece of it.
7   Q.  You said you don't know a piece of it?
8   A.  I don't know -- the competencies, there's skills
9  and abilities on a job.  There's performance that play
10  into different banding.
11   Q.  So all three of those are factors that determine
12  one's band or one's eligibility to be promoted --
13   A.  Correct.
14   Q.  -- to a higher band?
15        Did you ever finalize this document?
16   A.  No.  It's a working document still.
17   Q.  It's still a work in progress?
18   A.  Yes.
19   Q.  Is this document talking about skills or
20  competencies or performance or all three?
21   A.  The core of this is competencies.
22   Q.  So is it fair to say that today in April of 2005
23  the distinction between the competencies for a Band IV
24  and a Band V prep manager at AstraZeneca still have not
0056
1  been finalized?
2   A.  Yes.
3        MR. LaROSA:  I have no further questions.

B325

4          MR. SANDLER: I have a few.
5   BY MR. SANDLER:
6       Q.  Who is Scott Bolenbaugh?
7       A.  My supervisor, functional and deployed.
8       Q.  So he's the only person you report to? Is that
9   another way of putting that?
10      A.  Correct.
11      Q.  Has that been the case since you arrived in your
12  current position?
13      A.  Correct.
14      Q.  Did you meet face-to-face with Marybeth Farrell
15  in the late summer or fall of 2003 when she was on the
16  Action Plan?
17      A.  Yes.
18      Q.  What took place?
19      A.  I was following up during the support period
20  while Susan was away, along with Jane Hellen, the best
21  that I recall, and we tried to support her and direct her
22  towards truly embracing the plan that she was under and
23  to continue to develop and grow her skills.
24          And for the most part, she wanted to debate
0057
1   whether or not she was being asked to do Band IV or
2   Band V work in her plan. And we clarified again that we
3   felt she was working under -- she needed to perform as a
4   Band IV and to please embrace the plan and develop,
5   continue to develop.
6       Q.  What was her seeming motivation in the meeting
7   with you?
8          (Interruption.)
9          MR. SANDLER: Why don't you read the
10  question back?
11         (The reporter read from the record as
12  requested.)
13      A.  It seemed to be arguing about the validity of
14  the plan, unwillingness to accept and to embrace the plan
15  and to grow in her skills. It seemed to be a debate
16  versus embracing improvement and getting feedback on
17  improvement at that point.
18  BY MR. SANDLER:
19      Q.  What was your understanding of the purpose of
20  the Action Plan on which she was placed?
21      A.  To be able to give her clear direction on what
22  she needed to do to be able to perform at the level she
23  was expected to perform at, and to be able to improve so

B326

24  she would be an effective employee for us.
0058
1     Q.  Did you try to explain to her that this wasn't
2  about whether she was expected to perform as a Band IV or
3  a Band V?
4     A.  The focus of the discussion was there's
5  competencies you can grow.  There's an opportunity for
6  you to embrace the direction that was given to you by
7  Susan in order to fully fulfill this role successfully,
8  and could we please embrace that and grow to have a
9  positive outcome.
10    Q.  At the end of the meeting, did she accept that
11  or not?
12    A.  She seemed to at the time of the meeting, that
13  she was appreciative and that she heard what I had said.
14  But as I recall, she followed up, again, saying she
15  didn't feel that she should embrace the plan or was the
16  plan valid.  It seemed to be a long debate about the plan
17  or the specifics on the plan versus just embracing the
18  opportunity to develop and grow.
19    Q.  This occurred afterwards, you say?
20    A.  Yes.  Afterwards there was continual -- she had
21  said something -- and I don't have specific recall, but
22  it was a dialogue of debate on a plan and details versus
23  just embracing the actions that we had set forth for her
24  to improve on.
0059
1     Q.  Did you ever learn or hear about anybody being
2  upset that Miss Farrell had taken FMLA leave?
3     A.  Never.
4     Q.  I notice that on this draft that Mr. LaRosa has
5  marked as an exhibit, on the left top it says "Banding
6  Criteria."
7     A.  Correct.
8     Q.  Where did that come from?
9     A.  This, as I said, was a draft document that came
10  to me as we began.  And as you noticed, a lot of it is
11  marked up.  So it may have been a preliminary discussion,
12  I don't know, or a template that had been used.  I don't
13  know.
14        Down the side it says "Promotion Managers,"
15  there's a prep and promo managers was a baseline
16  document.  There's V, there's not V -- it was just
17  something to get us started.  And it was revised.
18    Q.  Did the label "Banding Criteria" remain on the

B327

19  document as it evolved?
20      A.  I don't believe so.
21      Q.  As it evolved, what was the purpose of this
22  document?
23      A.  Again, it's competencies to have a productive
24  coaching dialogue to be able to help define a vision of
0060
 1  what "good" looks like.
 2      Q.  So there were various measures listed or areas
 3  of performance listed that people would be coached to
 4  improve on?  Is that the idea?
 5      A.  Correct.  To ensure that they developed across
 6  the grid.
 7      Q.  Was part of your role to assure consistency in
 8  the various teams for which you were responsible?
 9      A.  Absolutely.
10      Q.  Was that one of the reasons this document was
11  developed?
12      A.  To help to define across all brand teams a
13  consistent vocabulary of competencies and skill
14  development.
15              MR. SANDLER:  Nothing further.
16              MR. LaROSA:  I have nothing further.
17              MR. SANDLER:  We'll read.
18              (The deposition was then concluded at
19  3:50 p.m.)
20              - - - - -
21
22
23
24
0061
 1              INDEX TO TESTIMONY
 2
 3
    RACHEL BEVIS                    PAGE
 4
 5  Examination by Mr. LaRosa            2
    Examination by Mr. Sandler          56
 6
 7              - - - - -
 8
                INDEX TO EXHIBITS
 9
10  BEVIS EXHIBIT NO.:              PAGE

11
  1  A one-page copy of a document entitled "Promo"  42
12
13          - - - - -
14
15
16
17
18
19
20
21
22
23
24
0062
 1
 2
 3
 4
 5
 6
 7
 8             REPLACE THIS PAGE
 9
10            WITH THE ERRATA SHEET
11
12            AFTER IT HAS BEEN
13
14            COMPLETED AND SIGNED
15
16            BY THE DEPONENT.
17
18
19
20
21
22
23
24
0063
 1  State of Delaware )
 2          )
 3  New Castle County )
 4

5          CERTIFICATE OF REPORTER
6
7          I, Kathleen White Palmer, Registered Merit
    Reporter and Notary Public, do hereby certify that there
8   came before me on the 7th day of April, 2005, the
    deponent herein, RACHEL BEVIS, who was duly sworn by me
9   and thereafter examined by counsel for the respective
    parties; that the questions asked of said deponent and
10  the answers given were taken down by me in Stenotype
    notes and thereafter transcribed into typewriting under
11  my direction.
12          I further certify that the foregoing is a
    true and correct transcript of the testimony given at
13  said examination of said witness.
14          I further certify that I am not counsel,
    attorney, or relative of either party, or otherwise
15  interested in the event of this suit.
16
17
18
19          Kathleen White Palmer, RPR, RMR
                Certification No. 149-RPR
20              (Expires January 31, 2008)
21
    DATED:  April 9, 2005
22
23
24



January 4, 2001

**Re: Special Achievement Award**

Dear Marybeth,

On behalf of the Nexium™ team, I would like to thank you for your contributions over the past several months.

Specifically, your extra effort put in over several weekends together with excellent on-site team facilitation has been pivotal to the success of our GI Consultant Program.

I hope you recognize the significant contribution you have made to the team, the GI Therapeutic area and ultimately to AstraZeneca. Marybeth, it has always been pleasure to work with you. With your experience and professionalism, I know that you will be highly appreciated in your new role within the skill center.

Yours Truly,

Paul Jansson
Product Manager, Nexium™

Cc.  Lisa Schoenberg
     Mark Mallon
     John Doyle

**AstraZeneca LP**
725 Chesterbrook Blvd   Wayne PA 19087-5677

**Tel**   610 695 1000
www.astrazeneca-us.com

P002

B331