IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MARYBETH FARRELL, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. NO. 04-285 KAJ |
| | : | |
| ASTRAZENECA PHARMACEUTICALS LP, | : | |
| a Delaware corporation, | : | |
| | : | |
| Defendant. | : | |

PLAINTIFF'S ANSWERING BRIEF
IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

THE NEUBERGER FIRM, P.A.
THOMAS S. NEUBERGER, ESQ. (#243)
STEPHEN J. NEUBERGER, ESQ. (#4440)
Two East Seventh Street, Suite 302
Wilmington, Delaware 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

LAW OFFICE OF JOHN M. LaROSA
JOHN M. LaROSA, ESQ. (#4275)
Two East 7th Street, Suite 302
Wilmington, Delaware 19801-3707
(302) 888-1290
JLR@LaRosaLaw.com

Dated:  May 17, 2005          Attorneys for Plaintiff

# TABLE OF CONTENTS

NATURE AND STAGE OF THE PROCEEDINGS....................................................1

SUMMARY OF ARGUMENT.............................................................................2

STATEMENT OF FACTS..................................................................................3

    I.     Parties..............................................................................................3

    II.    Plaintiff's Good Performance Record.................................................4

         A.    Good to Excellent Performance History.....................................4

         B.    Plaintiff's Imminent Promotion to Band V.................................5

         C.    Her Excellent Attendance Record...............................................5

    III.    Plaintiff's First Prima Facie Case: Defendant's Retaliation Against Plaintiff for Seeking FMLA Leave...............................................6

         A.    Plaintiff's Approved FMLA Leave............................................6

         B.    Defendant's Retaliatory Campaign of Adverse Employment Actions........6

             1.    April 28, 2003: Hellen's Initial Criticism of Plaintiff....................6

             2.    Early May of 2003: Broadway Parrots Hellens' Concerns, and Hellen Threatens Plaintiff's Job.........................7

             3.    May 5, 2003: Broadway Initiates 11 Item Short Term Improvement Plan.......................7

             4.    May 9, 2003 - June 20, 2003: Defendant Hastens Plaintiff's Doctor Prescribed Six Week Recovery Period.............................8

             5.    July 3, 2003: Plaintiff's Negative Mid-Year Review and Denied Promotion.........................8

             6.    July 29, 2003 - August 18, 2003: Broadway Places Plaintiff on an Action Plan.........................8

IV.   Plaintiff's Second Prima Facie Case: Defendant's Retaliation for Plaintiff's
      Opposition to Unlawful Practices..........................................................................9

      A.    September of 2003: Plaintiff Opposes Unlawful Practices to Human
            Resources........................................................................................................9

      B.    Broadway's Retaliatory Performance Improvement Plan and Discharge
            of Plaintiff......................................................................................................10

            1.    October 2003 - January of 2004: Broadway's Retaliatory
                  Performance Improvement Plan...................................................10

            2.    January 24, 2004: Broadway Discharges Plaintiff........................11

V.    Fuentes Prong Two: The Weight of the Evidence Demonstrates Retaliation.......11

      A.    Manager's Awareness of Protected Activity...............................................11

      B.    Retaliatory Motive: Two Managers Admit They Need "Dependable"
            People and Are "Too Busy" to Let Plaintiff Take Off..............................12

      C.    Hellen and Broadway's Demonstrated Antagonism Toward Plaintiff......13

      D.    Comparative Treatment: Plaintiff Was Singled Out and Also Replaced
            with an Employee With No Known History of FMLA Leave or Whistle
            Blowing..........................................................................................................14

      E.    Unusually Suggestive Temporal Proximity Between Plaintiff's
            Protected Activities and Defendant's Adverse Actions.............................14

      F.    Hellen's Bias Against Employees on FMLA Leave...................................15

      G.    Other Disparate Treatment of Plaintiff: Defendant Reduces the Size of
            Plaintiff's Office and Vandalizes Her Workstation...................................15

            1.    Defendant Moves Plaintiff from an Office to a Cubicle...............15

            2.    Defendant Vandalizes Plaintiff's Computer Docking Station and
                  Refuses to Investigate...................................................................16

      H.    Violation of Policies and Procedures Regarding FMLA...........................16

VI.   Fuentes Prong One: Weakness, Incoherencies, Implausibilities, Inconsistencies,
      and Contradictions Demonstrate that Defendant's Stated Reasons for Its
      Actions are a Pretext for Retaliation....................................................................16

A.  Plaintiff's Alleged Pre-Existing Performance Problems Are Self-Serving and of Questionable Authenticity....................................................16

B.  Hellen's Characterization of Plaintiff's Alleged Poor Performance Record Also is Refuted by the 2002 Evaluation.......................................17

1.  Cancellation of the April 25-27th Cardiology Advisory Board....17

2.  Delay in the Advisory Board Time Lines......................................18

3.  Weak Strategic Content Leadership.............................................18

4.  Not Managing Internal Processes..................................................19

C.  Broadway Sets Plaintiff Up to Fail............................................................19

1.  Job Description for Plaintiff's Band 4 and Level 5.......................20

2.  Broadway Forbids Plaintiff to Utilize Medical Education Agency and Administrative Staff..................................................20

3.  Broadway's Falsified Budget Reports Intentionally Omitting Plaintiff's Data.............................................................................20

D.  Miscellaneous Pretextual Performance Issues..........................................21

1.  Concern About Plaintiff's Focus and Communications...............21

2.  Unprepared for Promotion...........................................................22

3.  Attitude Problem..........................................................................21

E.  Plaintiff Never Admitted to Any Alleged Performance Deficiencies At Her Deposition....................................................................................22

STANDARD OF REVIEW..............................................................................................22

ARGUMENT.....................................................................................................................23

I.  PLAINTIFF HAS ESTABLISHED TWO PRIMA FACIE FMLA RETALIATION CLAIMS......................................................................................23

A.  Plaintiff Has Engaged in Multiple FMLA Protected Activities...............24

B.  Plaintiff Also Was Subject to Adverse Employment Action Subsequent

         To the Protected Activity.........................................................................25

    C.    A Causal Link is Easily Proven......................................................27

II.   DEFENDANT'S LEGITIMATE NON-DISCRIMINATORY REASONS FOR
      ITS ADVERSE ACTIONS ARE PRETEXTUAL................................................28

    A.    Plaintiff's Ultimate Burden............................................................28

         1.    Prong 1 - Defendant's Abundant Weaknesses, Implausibilities,
               Inconsistencies, Incoherencies and Contradictions Support the
               Plaintiff's Case............................................................................29

         2.    Prong 2 - The Factfinder Also Can Infer That Discrimination
               Was More Likely Than Not A Motivating Or Determinative
               Cause of the Adverse Employment Actions.................................31

III.  DEFENDANT BREACHED THE IMPLIED COVENANT OF GOOD FAITH
      AND FAIR DEALING BY MANIFPULATING AND FALSIFYING
      PLAINTIFF'S EMPLOYMENT RECORDS TO CREATE FICTITIOUS
      GROUNDS TO DISCHARGE HER AND BY VIOLATING THE PUBLIC
      POLICY FURTHERED BY THE FMLA...........................................................32

    A.    Defendant Manipulated Plaintiff's Employment Records to Create
          Fictitious Grounds for Termination of her Employment Based on
          Alleged Performance Issues............................................................33

    B.    Defendant's Termination of Plaintiff's Employment Also Violated
          Public Policy..................................................................................33

IV.   DEFENDANT VIOLATED PLAINTIFF'S COBRA RIGHTS BY NOT
      OFFERING TO EXTEND HER HEALTH INSURANCE COVERAGE............34

CONCLUSION.................................................................................................35

## TABLE OF AUTHORITIES

<u>**Cases**</u>                                                                                                           <u>**Page**</u>

<u>Anderson v. Liberty Lobby, Inc.,</u> 477 U.S. 242 (1986)...................................................................23

<u>Andrews v. City of Phila,</u> 895 F.3d 1469 (3d Cir. 1990................................................................28

<u>Bray v. Marriott Hotels,</u> 110 F.3d 986 (3d Cir. 1997)..........................................................29, 30

<u>Collins v. State of Ill.,</u> 830 F.2d 692 (7th Cir. 1987).................................................................27

<u>Conshenti v. Public Serv. Elec. & Gas Co.,</u>  364 F.3d 135 (3d Cir. 2004).................................25

<u>EEOC v. Wyeth Pharmaceutical,</u> 2004 WL 503417 (E.D.Pa. Mar. 11, 2004)..........................26

<u>E.I. DuPont de Nemours & Co. v. Pressman,</u> 679 A.2d 436 (Del. Supr. 1996).....................34, 35

<u>Fuentes v. Perskie,</u> 32 F.3d 759 (3d Cir. 1994)............................................................29, 31, 32

<u>Furnco Constr. Corp. v Waters,</u> 438 U.S. 567 (1978).................................................................32

<u>Horowitz v. Federal Kemper Life Assurance Co.,</u> 57 F.3d 300 (3d Cir. 1995)...........................23

<u>Jalil v. Avdel Corp.,</u> 873 F.2d 701 (3d Cir. 1989)......................................................................24

<u>Jones v. School Dist. of Phila.,</u> 198 F.3d 403 (3d Cir. 1999).....................................................27

<u>Kachmar v. SunGard Data Systems,</u> 109 F.3d 173 (3d Cir. 1997)..............................................28

<u>Keller v. Orix Credit Alliance, Inc.,</u> 130 F.3d 1101 (3d Cir. 1997) (en banc)...............29, 30, 32

<u>King v. Preferred Tech. Group,</u> 166 F.3d 887 (7th Cir. 1999)..............................23, 24, 25, 31

<u>Lamb-Bowman v. Delaware State Univ.,</u> 152 F.Supp.2d 553 (D.Del. 2001).............................23

<u>Lord v. Souder,</u> 748 A.2d 393 (Del. Supr. 2000).......................................................................33

<u>McQueeney v. Wilmington Trust Co.,</u> 779 F.2d 916 (3d Cir. 1985)...........................................31

<u>Merrill v. Crothall-American Inc.,</u> 606 A.2d 96 (Del. Supr. 1992).......................................33, 34

<u>Mroczek v. Bethlehem Steel Corp.,</u> 126 F.Supp.2d 379 (E.D. Pa. 2001)...................................26

<u>Potenza v. City of New York,</u> 365 F.3d 165 (2d Cir. 2004)....................................................24, 29

<u>Price v. Delaware Dept. of Correction,</u> 40 F.Supp.2d 544 (D. Del. 1999)................................27

**Cases**                                                                                                       **Page**

Ray v. Henderson, 217 F.3d 1234 (9th Cir. 2000)..................................................................27

Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133 (2000)........................................30, 31

Robinson v. City of Pittsburgh, 120 F.3d 1286 (3d Cir. 1997)...............................................27

Robinson v. Southeastern Pennsylvania Trans. Auth., 982 F.2d 892 (3d Cir. 1993)................28

Rodriguez v. Board of Ed., 620 F.2d 362 (2d Cir. 1980)........................................................27

Saint Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993)....................................................30, 31

Sarsha v. Sears, Roebuck & Co., 3 F.3d 1035 (7th Cir. 1993)................................................23

Schoonejongen v. Curtiss-Wright Corp., 143 F.3d 120 (3d Cir. 1998).................................24

Shearin v. E.F. Hutton Group, Inc., 652 A.2d 578 (Del. Ch. 1994)......................................35

Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061 (3d Cir. 1996)............. 30, 31, 32

Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981)..............................................30

Torre v. Casio, Inc., 42 F.3d 825 (3d Cir. 1994).....................................................................27

Weston v. Pennsylvania, 251 F.3d 420 (3d Cir. 2001)............................................................29

Woodson v. Scott Paper Co., 109 F.3d 913 (3d Cir. 1997).....................................................24


**Constitutions, Statutes, and Rules**

29 U.S.C. § 2601(a) (4)...........................................................................................................35

29 U.S.C. § 2601(b) (2)...........................................................................................................35

29 U.S.C. § 2612(a) (1) (D).....................................................................................................24

29 U.S.C. § 2615(a) (1)............................................................................................................24

29 U.S.C. § 2615(a) (2)............................................................................................................25

29 U.S.C. § 2615(b)..................................................................................................................25

29 U.S.C. § 2617(a) (1) (A) (i-ii).......................................................................................25, 26

**Constitutions, Statutes, and Rules**                                                          **Page**

29 U.S.C. § 2617(a) (1) (A) (iii)................................................................................................26

29 U.S.C. § 2617(a) (1) (B)........................................................................................................26

Family and Medical Leave Act of 1993 ("FMLA")................................................................passim

Fed.R. Civ.P. 56(c)....................................................................................................................23

Pub. L. No. 99-272, 100 Stat. 82........................................................................................35, 36

**Other Authorities**

2 RESTATEMENT OF CONTRACTS § 205 (1981)...................................................................33

## NATURE AND STAGE OF THE PROCEEDINGS

This is a case of retaliation under the Family and Medical Leave Act of 1993 ("FMLA"), in which two of Defendant's managers retaliated against Plaintiff, after she sought six weeks of FMLA leave for abdominal and uterine tumors, by encouraging her to shorten her doctor prescribed six week FMLA leave, threatening to fire her, criticizing her performance, and giving her a short term improvement plan. When she returned from surgery, they gave her a negative mid-year review, denied her a previously promised promotion, and placed her on an Action Plan. When she filed an FMLA retaliation complaint, they rejected the complaint, and placed her on a Performance Improvement Plan ("PIP") the same day. The same month the PIP expired, they fired her. All of these adverse actions were taken against Plaintiff in retaliation for exercising her FMLA rights.

Plaintiff filed this Complaint on May 5, 2004. After discovery, the principal witnesses include:

1.  Jane Hellen ("Hellen at __; B___"), former EXANTA Brand Director, to whom Plaintiff initially reported in 2002, and to whom she first disclosed she needed FMLA leave for surgery in April of 2003. Hellen at 7, Pl. at 149; B66, 152.

2.  Susan Broadway ("Broadway at __; B___"), former direct report to Hellen as EXANTA Brand Communications Leader, who became Plaintiff's direct supervisor in April of 2003, gave her a short term improvement plan days before her surgery in May of 2003, and placed her on an Action Plan after she returned from FMLA leave. Pl. at 41, 192, 275, Broadway at 6; B39, 97, 117, 245.

3.  Debbie Brangman ("Brangman at __; B___"), former Skill Center Marketing Director, who gave Plaintiff a good annual evaluation on March 10, 2003, and along with Hellen supported Plaintiff for promotion to Band V in 2002. Brangman at 6, 9-10, 27, 40; B245-46, 250, 253.

4.  Georgina Austin-Jones ("Austin-Jones at ___; B___"), Senior Human Resources Partner. Austin-Jones at 5; B275.

5.  Rachel Bevis ("Bevis at ___; B___."), Director of Marketing Communication. Bevis at 6; B298.

Defendant moved for summary judgment on May 2, 2004. This is Plaintiff's Answering Brief and Appendix in opposition to Defendant's Motion for Summary Judgment.

## SUMMARY OF ARGUMENT

Plaintiff certainly can establish a prima facie case of retaliation under the FMLA. She engaged in FMLA protected activity first on April 22, 2003, by informing her Brand Director Jane Hellen that she would need six weeks of FMLA leave for non-elective surgery. Immediately, Hellen discouraged her from taking the doctor prescribed six weeks. Six days later, she first criticized her performance. Then on May 2nd she threatened not to retain Plaintiff in 2004. On May 5th, Plaintiff's direct supervisor Susan Broadway gave her an 11 item short term improvement plan three days before her surgery. After Plaintiff returned full-time on June 20th, Broadway gave her a negative mid-year review on July 3rd, and placed her on an Action Plan on August 19th. After Plaintiff filed an FMLA retaliation complaint with HR on September 17th, Broadway escalated her Action Plan to a Performance Improvement Plan the same day HR rejected the complaint! The PIP ended in January of 2004, and Broadway fired Plaintiff the same month.

Plaintiff was qualified for her position after more than nine years of continuous service, and had received a good review just the month prior to seeking the FMLA leave. Defendant also replaced her with an employee with no known history of FMLA leave. The sole, motivating, or determinative reason for terminating Plaintiff was retaliation for her protected activity in seeking FMLA leave and filing a retaliation complaint.

By a preponderance of the evidence under prong two of Fuentes, the natural probative force or weight of the evidence demonstrates discrimination. There is much circumstantial evidence of retaliation including (1) Hellen and Broadway's awareness of Plaintiff's protected activity, (2) these two managers openly admitting that they were "too busy" for Plaintiff to be sick, (3) their retaliatory motive to only retain "dependable" people during a "busy time" where they had "a lot of work" to do, (4) their demonstrated antagonism toward Plaintiff that only surfaced after she sought leave, (5) Broadway's comparative treatment in replacing Plaintiff with an employee with no known history of leave, (6) the very suggestive and close temporal sequence

of events in which the pattern of antagonism began the day Plaintiff sought leave, (7) Hellen's

bias against employees on FMLA leave, (8) Defendant's disparate treatment of Plaintiff in

moving her to a cubicle, vandalizing her workstation and refusing to investigate the vandalism,

and (9) Hellen's violation of Defendant's policies and procedures in balking at Plaintiff's notice

of need for six weeks of leave.  This circumstantial evidence allows a jury to infer that retaliation

was more likely than not a motivating or determinative cause of the adverse employment actions.

Also under a Fuentes's prong one analysis, a jury can choose to disbelieve any non-

discriminatory reason offered by Defendant because Plaintiff can demonstrate weaknesses,

implausibilities, inconsistencies, incoherencies, or contradictions in Defendant's stated reasons.

Instead, a jury can find that the reason Defendant instructed her to submit a resignation letter was

her FMLA protected activity.

Also, Defendant breached the implied covenant of good faith and fair dealing by

falsifying and manipulating Plaintiff's employment records to create fictitious performance

grounds for termination.  It also violated the public policy favoring job security for employees

with serious medical conditions embodied in the FMLA by terminating Plaintiff's employment.

Finally, Defendant violated Plaintiff's rights under COBRA by retroactively terminating

her health insurance coverage and denying her the option to continue her health insurance at her

expense.

**STATEMENT OF FACTS**

**I.  Parties.**  Plaintiff Marybeth Farrell was a 44 year old white female who was employed

continuously by Defendant and its predecessor for over nine years.  Complaint and Answer at ¶ 2;

B1, 19.  In April of 2002, she became Senior Professional Relations and Education Program

Manager Band IV for the EXANTA Team.  Farrell ("Pl.") at 36, 169-170, Hellen at 10; B38, 71-

72, 153.  Defendant AstraZeneca Pharmaceuticals LP ("AstraZeneca") is a Delaware corporation

with more than 500 employees.  Complaint and Answer at ¶ 3; B1, 19.  Its principal place of

3

business is in Wilmington.  Id.[1]

**II.  Plaintiff's Good Performance Record.**

**A.  Good to Excellent Performance History**.  Plaintiff's performance record reveals she was a good to excellent employee.  She was "very exacting in [her] work[,]" and "a perfectionist." Pl. at 72; B47.  Her 1999 performance review for then Zeneca Pharmaceuticals was excellent.  P38; B352.  Her 2000 review gave her an overall rating of good.  D139; B413.  On January 24, 2001, she received a Special Achievement Award for her "excellent on-site team facilitation," her "extra effort," and the "significant contribution" she made to AstraZeneca.  P2; B331.  On her 2001 review dated January 2002, Plaintiff was rated excellent.  P29, Pl. at 75; B48, 343.[2]

On March 10, 2003, Plaintiff received her 2002 performance evaluation.  Hellen at 16-17, P18; B157.  At the time she received her 2002 review, she met or exceeded expectations in all of the areas of goals and competencies.  Hellen at 23, P18-25; B160, 333-39. Hellen, deployed manager Brian Martin, functional manager Debbie Brangman, and four of Plaintiff's colleagues had input into the ratings on her 2002 evaluation.  Hellen at 20-21; B159.  For the ten categories on the evaluation, Plaintiff exceeded expectations in six categories and met expectations in the other four.  Hellen at 18, P18-25; B158, 333-39.[3]  Her overall rating was good.  Pl. at 75-76; B48.

Even after her supervisors later began criticizing her performance, Plaintiff excelled.

---

[1]  The company is broken into therapeutic areas, including cardiovascular, gastrointestinal, central nervous system, and oncology.  Hellen at 13-14; B155.  Cardiovascular has a marketing group which includes the different cardiovascular products, EXANTA, Crestor, Toprol, and Atacand.  Hellen at 14; B155-56.  The EXANTA Team's Executive Director was Patty Torr who had five direct reports including Brand Director Jane Hellen.  Hellen at 14-15; B156.  Plaintiff became the Senior Professional Relations and Education Program ("PREP") Manager, Band IV for the EXANTA Team in May of 2002.  Hellen at 10; B153.  This was her role at the time her employment ended.  Hellen at 10; B153.

[2]  This is consistent with Defendant's normal process in which evaluations are written in January. Bevis at 13; B302.

[3]  For each category of performance, an employee can receive one of three ratings: did not meet, met, or exceeded expectations.  Hellen at 17; B157.  In none of the categories was Plaintiff rated as not meeting expectations.  Hellen at 18, P18-25; B158, 333-39.

Her August 8-9, 2003 Anticoagulation Clinic Advisory Board Meeting received an overall rating of excellent from 83% of the attendees.  P83; B361.  Further, her November 6-8, 2003 Hematology Advisory Board Meeting was rated excellent by 100% of its attendees.  P90; B368.

    **B.  Plaintiff's Imminent Promotion to Band V.**  In addition to exceeding most expectations in her 2002 evaluation, Plaintiff also was considered promotable to a Band V position.  Indeed, when Plaintiff was offered the opportunity to join the EXANTA Team in the Spring of 2002, her then manager Renee Valles "intimated" that she was going to be promoted.  Brangman at 42; B254.  After Plaintiff accepted the offer, Valles even promised to promote her to a Band 5 position within six months.  Pl. at 80-81; B49.[4]

    In December of 2002, Hellen and functional manager Debbie Brangman discussed that Plaintiff probably would be promoted to Band V.  Brangman at 26-27; B250.  Both thought Plaintiff could be promoted and supported the promotion of Plaintiff to Band V.  Brangman at 40, 44; B253-54.  In December of 2002, Plaintiff even was told that her Band V promotion was approved by Hellen and Brangman and would be announced shortly.  Complaint at ¶ 16; B3.  Based on the positive 2002 review and the feedback that Brangman had received from Hellen, Brian Martin, and several other people, including the 360 degree feedback on her performance review, it seemed Plaintiff was ready to be promoted to Band V in December of 2002.  Brangman at 27-28, 44-45; B250, 254.  So Hellen asked Brangman to get an office for Plaintiff in their new location because she probably would be promoted in the near future, and Brangman did that.  Brangman at 45; B254.

    **C.  Her Excellent Attendance Record.**  Aside from seeking six weeks of approved FMLA leave in May of 2003, Plaintiff had an excellent attendance record.  She never requested FMLA leave at AstraZeneca prior to 2003.  Pl. at 44; B40.  At the end of 2002, she had 6 days of unused vacation.  D2191; B421.  Aside from funeral leave, Plaintiff had no sick leave during her

---

[4]  Band V employees are eligible for stock options which Band IV employees are not.  Pl. at 81; B49.

5

first year with the EXANTA Team.  Hellen at 26-27; B162.

**III.  Plaintiff's First Prima Facie Case: Defendant's Retaliation Against Plaintiff for Seeking FMLA Leave.**

**A.  Plaintiff's Approved FMLA Leave.**  In early 2003, her OB/GYN Susan Gorondy felt Plaintiff needed surgery to remove three large cysts and her uterus.  Pl. at 147-48; B66.  Plaintiff did not want to have the surgery, but she concluded there were no other options for her at the time.  Pl. at 125, 148; B60, 66.[5]  So on April 22, 2003, Plaintiff first told Jane Hellen that she needed non-elective surgery which would require her to be out of the office for six weeks.  Pl. at 125, 149; B60, 66.  Hellen responded that "six weeks is a long time." Pl. at 126, 152-53, 179-180, Hellen at 28; B61, 67, 93-94, 163.  She contacted the Health Services Department regarding approval and completed the proper FMLA paperwork.  Hellen at 29, Broadway at 16, Pl. at 126-27, 149; B61, 66, 226.  Her medical leave was authorized.  Pl. at 126-27, 149; B61, 66.

**B.  Defendant's Retaliatory Campaign of Adverse Employment Actions.**

**1.  April 28, 2003: Hellen's Initial Criticism of Plaintiff.**  Just days later, on April 28, 2003, Jane Hellen provided Plaintiff with negative feedback about her performance.  Pl. at 121; B59.[6]  This was less than a week after Plaintiff informed her she would need six weeks of FMLA leave for surgery!

**2.  Early May of 2003: Broadway Parrots Hellens' Concerns, and Hellen Threatens**

---

[5]  Previously, Plaintiff had consulted Dr. Duque who also told her she needed the surgery.  Pl. at 149; B66.

[6]  Though Defendant argues that Plaintiff had performance issues as early as December of 2002, Plaintiff's good 2002 evaluation was dated January 22, 2003.  P18; B333.  On March 10, 2003, Brangman did not criticize Plaintiff but rather conveyed recommendations to her for some of her 2003 developmental goals.  D173; B415.  On April 11, 2003, Broadway wrote Plaintiff that she would "love to have more insight from you on our path forward and get your suggestions for transitions." P4, Broadway at 11; B225, 332.  Broadway did not express any concerns to Plaintiff about her performance at this time.  Broadway at 12; B225.  No disciplinary actions were taken against Plaintiff in April or May of 2003.  Broadway at 13; B225.  Rachel Bevis, who became Broadway's functional manager in May of 2003, did not become aware of any performance issue with Plaintiff until early Summer of 2003.  Bevis at 18-19; B305.

**Plaintiff's Job.**  The first time Broadway talked to her about what she perceived as Plaintiff's deficiency was May 1, 2003.  Pl. at 120, P104; B59, 374.[7]  In May, Hellen and Broadway also jointly met with Plaintiff about their alleged concerns with her performance.  Pl. at 132; B62.  On May 2, 2003, Hellen told Plaintiff she would not keep her on staff in 2004, for core alleged deficiencies for which she had just received contradictory outstanding performance evaluations from her just a month earlier.  P240, Pl. at 140; B64, 409.  Than as a smoking gun as to her real motive and as direct evidence of illicit motivation, Hellen said, 'I need to have people that I can count on right now because we are moving into *a very busy time* as a team.'  Pl. at 181, 251-52; B94, 111-112 (emphasis added).

**3.  May 5, 2003: Broadway Initiates 11 Item Short Term Improvement Plan.**  Hellen and Broadway also developed short term improvement items for Plaintiff before she went out on medical leave.  Pl. at 198, P106; B98, 375.  On May 5th, Broadway gave Plaintiff a list of 11 items for her to work on before her departure for surgery on May 8th.  P106; B375.  She also asked Plaintiff to develop a short-term and a long term improvement plan for several issues in areas where Brian Martin had assumed responsibilities from Plaintiff.  P170; B385.  Hellen and Broadway also told her they would have long term improvement items for her when she returned from leave.  Pl. at 198, P106; B98, 375.  There was no warning that this would advance to an Action Plan.  Pl. at 199; B98.  Prior to May of 2003, there was no performance improvement plan.  Hellen at 24-25; B161.

**4.  May 9, 2003 - June 20, 2003: Defendant Hastens Plaintiff's Doctor Prescribed Six**

---

[7]  Initially at deposition, Broadway testified that she and Hellen had performance discussions with Plaintiff in April of 2003, but she could not provide an exact date of such a discussion.  See Broadway at 16; B226.  If Broadway did meet with Plaintiff regarding performance issues, it was on April 28th because Hellen testified that on that date, she and Broadway expressed concerns to Plaintiff about her performance regarding projects in 2003.  Hellen at 29-30; B164.  At an April 11, 2003 meeting, Susan Broadway did not make suggestions to Plaintiff about how she could improve her performance or talk to her about what she perceived as Plaintiff's deficiency.  Pl. at 119-120; B59.  No concerns or negative performance issues were mentioned at that time.  P144; B382.  Later, Broadway recanted her April statement by testifying that she had discussions with Plaintiff regarding performance improvement in April *or May*.  See Broadway at 23; B228.

**Week Recovery Period.**  Plaintiff worked until May 8th and had surgery on May 9th.  Pl. at 155; B68.  She was in Christiana Hospital for several days.  Pl. at 155; B68.  After her first week at home, Plaintiff called Hellen and was very worried about her job because of the things Hellen and Broadway had said to her before she left.  Pl. at 155-56; B68.  Plaintiff told Hellen she was willing to work at home until she could come into the office.  Pl. at 156; B68.

As she had told Hellen in response to her 'Six weeks is a long time comment,' Plaintiff returned after the third week of the doctor prescribed six week recovery.  Pl. at 161; B69.  But at the end of the first day, she began having lower back spasms and considerable lower back pain that worsened.  Pl. at 161; B69.  After working two half days her first week back, three half days the next week, and then one half day in the following week, the pain became so bad that Plaintiff told Broadway she couldn't stay and went back on full-time medical leave.  Pl. at 161, Broadway at 26; B69, 229.  Eventually, Plaintiff returned to work full-time on June 20th.  Pl. at 163; B70.

**5. July 3, 2003: Plaintiff's Negative Mid-Year Review and Denied Promotion.**  Prior to 2003, Plaintiff did not receive mid-year reviews.  Pl. at 43; B44.  However, after returning from FMLA leave in late June, Broadway gave Plaintiff a negative mid-year review on July 3, 2003.  Complaint at ¶ 56, Pl. at 43; B8 40.  In it, Broadway gave Plaintiff performance feedback in areas of improvement.  Broadway at 26; B229.  Also in July, Brangman told her that her previously promised Band V promotion was now denied.  Complaint at ¶ 57, Pl. at 84; B8,50 .

**6. July 29, 2003 - August 18, 2003: Broadway Places Plaintiff on an Action Plan.**  On July 29, 2003, Broadway decided to place Plaintiff on an Action Plan.  A99.  Broadway informed her of this on August 18th, less than two months after she returned from FMLA leave.  Hellen at 43-44, Pl. at 197, Broadway at 23, 30, Bevis at 30; B172-73, 98, 228, 230, 311.  The Plan covered Plaintiff's performance in the areas of understanding clinical data, ability to drive meetings and organize, and ability to act as a content expert.  Broadway at 30-33; B230.  Because all of these areas are addressed in a PREP Manager's annual evaluation, they previously had been addressed in Plaintiff's good 2002 evaluation.  Broadway at 30-33, P18-25;

8

B230, 333-39.   So Plaintiff refused to sign the Action Plan.  Pl. at 200; B99.  She was confused,

disappointed in AstraZeneca, and dismayed that they would do something like that when she had

not done anything wrong, and she communicated this several times in memos.  Pl. at 200, 310;

B99, 126.  Defendant consistently refused to acknowledge all the program achievements and

milestones that Plaintiff met to actually fulfill the terms of the Action Plan and the PIP.  Pl. at

310; B126.  Instead, in October of 2003, Broadway told Plaintiff that she had not satisfactorily

completed the Action Plan.  Broadway at 43, Pl. at 215; B233, 102.

### IV.  Plaintiff's Second Prima Facie Case: Defendant's Retaliation for Plaintiff's Opposition to Unlawful Practices.

#### A.  September of 2003: Plaintiff Opposes Unlawful Practices to Human Resources.

After Hellen and Broadway's initial criticisms, threat of termination, short term improvement

plan, negative mid-year review, and Action Plan, Plaintiff contacted Jane Hellen's boss, Patty

McDonald, then head of the Hemostasis area.  Pl. at 138-39; B64.  McDonald told her to

document what was happening and to call Human Resources.  Pl. at 139; B64.  So in September

of 2003, Plaintiff contacted Human Resources' Deb Kauffman.  Austin-Jones at 13-14; B279.[8]

That month, Kauffman and Senior Human Resources Partner Georgina Austin-Jones met with

Plaintiff.  Austin-Jones at 14; B279.  Plaintiff told Austin-Jones she was concerned that the

Action Plan was a consequence of her taking FMLA leave in April of 2003.  Austin-Jones at 13-

14; B279.  Plaintiff then filed a complaint with Human Resources on September 17, 2003, stating

that she was being retaliated against for previously exercising her FMLA rights.  Broadway at 42-

43; B233.

An HR investigation by Keith Black was completed on October 21, 2003.  A139.  This

was not a rather long time for an investigation.  Austin-Jones at 16; B280-81.  Black did not find

---

[8]  Previously Plaintiff sought her assistance even before she went out on medical leave.  Pl. at 138; B64.  She told Kauffman she "was very concerned about [the] sudden emergence of all kinds of criticisms after [she] had just gotten a very good performance review . . . ." Pl. at 138; B64.

against his employer.  A139.

According to Hellen, *after* the investigation was concluded, Hellen, Broadway, and Austin-Jones told Plaintiff that her execution of the requirements of the Action Plan was unsatisfactory.  Hellen at 82, Austin-Jones at 16-17; B193, 281.  But Broadway's PIP to Plaintiff is actually dated the same day! A141.

It was not surprising that Black rejected Plaintiff's complaints because he had been consulted by Broadway and Deb Kauffman in their creation of Plaintiff's Action Plan in August! See A105.  After he rejected Plaintiff's retaliation complaint, Black also advised Broadway regarding her denial of compensatory time for Plaintiff.  D716; B418.  So naturally he supported management actions in which he had played a role!

**B.  Broadway's Retaliatory Performance Improvement Plan and Discharge of Plaintiff.**

**1.  October 2003 - January of 2004: Broadway's Retaliatory Performance Improvement Plan.**  At the end of the Action Plan, Broadway placed Plaintiff on an 11 week Performance Improvement Plan.  Broadway at 43, Pl. at 216; B103.[9]  A PIP is more serious than an Action Plan.  Austin-Jones at 18; B282.  If the criteria of a PIP are not met, the employee is generally terminated.  Hellen at 65; B183-84.  Plaintiff also refused to sign the PIP.  Pl. at 223; B104.

Despite her misgivings about it, Plaintiff "made every effort" to meet the requirements of the PIP.  Pl. at 223; B104.  But again, AstraZeneca consistently refused to acknowledge all the program achievements and milestones that Plaintiff met to actually fulfill the terms of the Action Plan and the PIP.  Pl. at 310; B126.  Instead, Broadway decided that the PIP was not completed satisfactorily.  Broadway at 47; B234.  The PIP ended in January of 2004.  Austin-Jones at 19-20; B282.

---

[9]  After an Action Plan, the PIP is the next step to "assist" employees in their performance if they fail the Action Plan.  Pl. at 216; B103.

**2. January 24, 2004: Broadway Discharges Plaintiff.**  In mid-January of 2004, Broadway, Austin-Jones, and Defendant's legal counsel placed Plaintiff on a one-week leave during which time she was not to report to work.  Hellen at 87; B196.  Broadway decided to terminate Plaintiff's employment.  Def. Op. Brf. at 22, Broadway at 49; B234.  Plaintiff's employment was terminated on January 24, 2004.  Pl. at 262; B114.

She went into work on a Monday or Friday and was working on some projects.  Pl. at 262-63; B114.  Unknown to her, someone apparently had left a message on her answering machine late at night.  Pl. at 262-63; B114.  Georgina Austin-Jones took her down a hall to a conference room and said, 'You have been terminated.  You have to leave the building immediately.' Pl. at 263; B114.  A week later, AstraZeneca sent a FedEx to Plaintiff's home summarizing why she allegedly had failed the Performance Improvement Plan.  Pl. at 262; B114.[10]

**V.  Fuentes Prong Two: The Weight of the Evidence Demonstrates Retaliation.**

**A.  Manager's Awareness of Protected Activity.**  Both Hellen and Broadway were aware of plaintiff's protected activity before they began criticizing her performance and taking other retaliatory employment actions against her.  On April 22, 2003, Plaintiff told Jane Hellen she needed to have leave to have surgery.  Pl. at 154; B68.[11]  Hellen was the first person at AstraZeneca who Plaintiff told that she needed surgery.  Pl. at 149; B66.  Then less than a week later on April 28th, Hellen provided Plaintiff with negative feedback about her performance.  Pl. at 121; B59.[12]  Also in late April, Plaintiff told Broadway that she would be going out on FMLA

---

[10]  Unfortunately, Defendant never gave Plaintiff her COBRA notice by FedEx, mail, or other means.  See Argument Part V infra.

[11]  Hellen and Broadway also were aware that Plaintiff thought she was being retaliated against for exercising her FMLA rights.  Hellen at 81, Broadway at 42-43; B192-93, 233.

[12]  Though Defendant argues that Plaintiff had performance issues as early as December of 2002, Plaintiff's good 2002 evaluation was dated January 22, 2003.  P18; B18.  On March 10, 2003, Brangman did not criticize Plaintiff but rather conveyed recommendations to her for some of her 2003 developmental goals.  D173; B415.  On April 11, 2003, Broadway wrote Plaintiff that she would "love to

leave for surgery.  Broadway at 13; B225.  Then Broadway talked to her about what she

perceived as Plaintiff's deficiency for the first time on May 1, 2003.  Pl. at 120, P104; B59, 374.

     **B.  Retaliatory Motive: Two Managers Admit They Need "Dependable" People And
Are "Too Busy" To Let Plaintiff Take Off.**  Defendant's management acknowledged that it had

a motive to replace an employee like Plaintiff with health issues who needed FMLA leave.  Prior

to going out on medical leave, Plaintiff told Hellen the reason for her medical leave was to

remove three abdominal and uterine tumors.  Hellen at 27; B163.  She also told Hellen that her

doctor advised her she would require six weeks of bed rest after surgery.  Hellen at 28; B163.

     Hellen was surprised and said words to the effect of, "Oh my gosh.  Six weeks.  That's a

long time.  Are you sure you're going to be out the whole six weeks? We are very busy." Pl. at

126, 152-53, 179-180, Hellen at 28; B61, 67, 93-94, 163.  So Plaintiff replied, "I realize the team

is very busy.  I'm going to do everything I can to come back earlier[,]" and told her the surgery

was scheduled for May 9th.  Pl. at 126, 153-54, P135; B61, 67-68, 381.

     Hellen's initial reaction caused Plaintiff some concern.  Pl. at 178; B93.  So rather than

defend her need for leave, Plaintiff agreed that six weeks is a long time and said she didn't think

she would have to take six weeks.  Pl. at 179; B93.  Plaintiff also offered to work at home, told

Hellen she could e-mail her at home, and offered to call in and do teleconferences to keep

projects moving.  Pl. at 181; B94.

     Later in early May before Plaintiff went out on leave, Broadway made a similar

comment.  Pl. at 164; B70.  She said, "Oh, that's a long time.  We're really busy[.]"  Pl. at 164;

B70.  Plaintiff replied, "Well, I told Jane that I'm going to try to come back as soon as possible.  I

hope not to be out for six weeks."  Pl. at 164; B70.

     Then on May 2, 2003, Hellen came into Plaintiff's office and told her that she was

---

have more insight from you on our path forward and get your suggestions for transitions." P4, Broadway
at 11; B225, 332.  Broadway did not express any concerns to Plaintiff about her performance at this time.
Broadway at 12; B225.  No disciplinary actions were taken against Plaintiff in April or May of 2003.
Broadway at 13; B225.

looking at staffing and head count for 2004, and that she had performance issues with her and that she didn't think she would retain her.  Pl. at 181-82, 244, 250, P240; B94, 110-111, 409.  Hellen said, 'I need to have people that I can count on right now because we are moving into a very busy time as a team.'  Pl. at 181, 251-52; B94, 111-112.

Plaintiff was stunned and very upset.  Pl. at 179; B93.  She asked Hellen if she did or said anything to offend her.  Pl. at 180; B94.  Hellen callously replied, 'It's professional, not personal.'  Pl. at 180; B94.  At the time, there were no concerns about Plaintiff's performance.  Pl. at 244; B110.  So it was very clear to Plaintiff that all the actions Hellen and Broadway took were driven by Plaintiff's need to be out six weeks.  Pl. at 221, 244-45; B104, 110.

Then the day before Plaintiff's surgery, Hellen very sarcastically told Plaintiff that she would have a job when she returned.  Pl. at 250; B111.  She said this in the context of almost unachievable expectations and requirements for Plaintiff to accomplish before she left on medical leave and "under the umbrella of a threat of not keeping [Plaintiff] for 2004, now that she was looking at her staffing needs.  Pl. at 250-51; B111.  There was not a doubt in Plaintiff's mind that if she took the whole six weeks, she would not have a job when she returned.  Pl. at 250; B111.  In fact, Plaintiff's job really wasn't there when she got back.  Pl. at 251; B111.

**C. Hellen and Broadway's Demonstrated Antagonism Toward Plaintiff.**  There also is evidence of demonstrated antagonism by Hellen and Broadway toward Plaintiff.  Broadway and Hellen directed performance criticisms at Plaintiff after she sought FMLA leave on April 28, 2003.  For the five months in 2002, that she reported directly to her, Plaintiff got along great with Jane Hellen and thought very highly of her.  Pl. at 38; B39.  Even after Hellen became her second level report, Plaintiff still got along fine with her.  Pl. at 38, 143; B39, 65.  But after Plaintiff sought medical leave, Hellen became "unreasonable".  Pl. at 143; B65.  For the first time on April 28, 2003, Hellen provided Plaintiff with negative feedback about her performance.  Pl. at 121; B59.  The first time Broadway talked to her about what she perceived as Plaintiff's deficiency was May 1, 2003.  Pl. at 120; B59.  Again on May 2, 2003, Hellen said she would not keep

13

Plaintiff on staff in 2004, for core alleged deficiencies for which she had just received outstanding performance evaluations by her a month earlier. Pl. at 140, P240; B64, 409. When Hellen suggested that Plaintiff was not going to be there on the EXANTA Team, Plaintiff knew she was on her own to seek another position within or outside of the company. Pl. at 196; B98.[13]

**D. Comparative Treatment: Plaintiff Was Singled Out and Also Replaced with an Employee With No Known History of FMLA Leave or Whistle Blowing.** In January of 2004, Broadway hired a new PREP manager, Susan Schaeffer who had been employed at AstraZeneca for a few years. Broadway at 49-50; B234-35. As far as Broadway and Hellen knew, Schaeffer never requested FMLA leave, disability leave, or sick leave. Broadway at 50-51, Hellen at 90; B235, 197. Moreover, Broadway and Hellen were not aware of Schaeffer ever filing a complaint regarding violation of her FMLA rights, retaliation, or any other matter with HR. Broadway at 51-52, Hellen at 91-92; B198-99, 235. In contrast, Plaintiff requested FMLA leave and filed an FMLA retaliation complaint with HR. See Parts III.A and IV.A supra. Moreover, she was the first person placed on an Action Plan and the first person placed on a PIP under Hellen or Broadway. Hellen at 83-84; B194. Furthermore, no other employees have been terminated under Hellen or Broadway. Hellen at 95; B200.

**E. Unusually Suggestive Temporal Proximity Between Plaintiff's Protected Activities and Defendant's Adverse Actions.** There is unusually suggestive temporal proximity between Plaintiff's protected activities and Defendant's adverse actions. Hellen's unprecedented performance criticisms of Plaintiff began on April 28, 2003, just six days after she informed her she would need FMLA leave. See Part III.A.1 supra. In the following ten days between the initial criticisms and Plaintiff's leave, Broadway also criticized Plaintiff, and Hellen threatened her job for 2004. Then while Plaintiff was on leave and hospitalized after surgery, Hellen and Broadway planned to place Plaintiff on an Action Plan. Though Defendant argues that several

---

[13] Plaintiff internally posted for two promotional regulatory affairs manager jobs, but she never even received a response. Pl. at 281; B119.

months lapsed between Plaintiff's June 20th return from FMLA leave and the August 18th Action

Plan, Hellen acknowledges that an Action Plan was discussed while Plaintiff was on leave:

> [W]e had discussed that once [Plaintiff] returned from her FMLA, we did
> not want to then immediately, the next day, just start with an action plan.
> We wanted to give her some time to acclimate, to get back to her work,
> and to re-familiarize herself with the projects and the work that needed to
> be done.

Hellen at 99; B203.  There also is suggestive temporal proximity between Plaintiff's FMLA

retaliation complaint to Human Resources on September 17, 2003, and the October 21st PIP.

Broadway at 42-43; B233.  An HR investigation by Keith Black also was completed on October

21, 2003.  A139.  Then Broadway's PIP to Plaintiff is dated the same day! A141.

**F.  Hellen's Bias Against Employees on FMLA Leave.**  There also is evidence that

Hellen had a bias against employees on FMLA leave.  Plaintiff was in the room with her during a

teleconference with global EXANTA team member Christy Hedstrom, who had just had a baby.

Hellen rolled her eyes and very sarcastically remarked, "Does everyone have their blankie?" Pl. at

39; B39.  Hedstrom seemed embarrassed by Hellen's remark.  Pl. at 39; B39.

**G.  Other Disparate Treatment of Plaintiff: Defendant Reduces the Size of**
**Plaintiff's Office and Vandalizes Her Workstation.**

**1.  Defendant Moves Plaintiff from an Office to a Cubicle.**  Defendant moved Plaintiff

from an office to a cubicle.  When Plaintiff worked for Debbie Brangman in 2002, she had an

office.  Brangman at 37; B252.  In the Delaware Corporate Center and initially in the 1800

Concord Pike location, Plaintiff had an office.  Brangman at 37; B252.

Then in early September of 2003, Brand Planning Manager Ann Cobuzzi told Plaintiff

she would be moved from her office into a cubicle allegedly because office space was tight.  Pl. at

258; B113.  Among all of Broadway's PREP and Promotion Managers on the EXANTA Team,

Plaintiff was the only Band IV that moved from an office into a cubicle in 2003.  Broadway at 42;

B233.  No other Band IV PREP managers have been moved into cubicles in the new building.

Hellen at 79; B191.

15

Plaintiff had to vacate her office by close of business on September 18th.  Pl. at 259; B113.  When Plaintiff asked her who would help her, Cobuzzi told her she would have to do it herself.  Pl. at 259; B113.  Plaintiff was placed in a cubicle because Defendant did not keep its promise to promote her to Band V.  Pl. at 80; B49.

**2.  Defendant Vandalizes Plaintiff's Computer Docking Station and Refuses to Investigate.**  Then just weeks before she was discharged, Plaintiff's computer was vandalized on January 9, 2004.  Pl. at 260, Austin-Jones at 19; B114, 282.  The docking station, which holds down the laptop and connects it to the system, looked like someone had taken a hammer and smashed it and scattered the pieces on her desk.  Pl. at 260-61; B114.  Plaintiff reported it to security and requested an investigation, but they refused to do one.  Pl. at 261; B114.

**H.  Violation of Policies and Procedures Regarding FMLA.**  There also is evidence that Defendant violated its own policies and procedures regarding FMLA.  Defendant's policy states "if the physician should say you need to be out for six weeks, [Defendant] certainly honor[s] that."  Bevis at 20; B306.  Yet Hellen's reaction was to state that six weeks was a long time and we are very busy.  According to Bevis, however, Defendant supports work life balance and the fact that leaves are part of life.  But Bevis never reported to Hellen or Broadway.  Bevis at 22; B307.

**VI.  Fuentes Prong One: Weakness, Incoherencies, Implausibilities, Inconsistencies, and Contradictions Demonstrate that Defendant's Stated Reasons for Its Actions are a Pretext for Retaliation.**  Throughout the Action Plan process, the PIP and the treatment of Plaintiff after she announced she was going out on six weeks medical leave, AstraZeneca operated in an untruthful and unethical manner.  Pl. at 243; B109.

**A.  Plaintiff's Alleged Pre-Existing Performance Problems Are Self-Serving and of Questionable Authenticity.**  Defendant alleges that Plaintiff actually had performance problems prior to her April 22, 2002 request for FMLA leave.  Defendant claims that Hellen e-mailed

Brangman on February 12, 2003 about having reservations on promoting Plaintiff.  Hellen at 109, D171; A47, B208.  But this is **inconsistent** with Defendant's procedures because any alleged performance problems would not have been first discussed among Plaintiff's managers as the fabricated e-mails suggest.  Rather, verbal discussions with the individual about her performance or lack thereof first occurs on an ongoing basis.  Bevis at 26; B309.  Thus, "the *first* step is tell [an employee] verbally that there are issues." Brangman at 31; B251 (emphasis added).  Then before you get to the action plan, you can put something in writing directed *to the employee* to inform her of her performance issues.  Brangman at 32; B251 (emphasis added). So if there were legitimate performance concerns with Plaintiff in February of 2002, such verbal and written communications would have been directed to Plaintiff.  But neither of these things were done in Plaintiff's case.  Rather, the alleged pre-existing e-mail exchanges among managers, including the February 12th e-mail, began before Plaintiff was informed of any issues.  Thus, their authenticity is questionable and **implausible**!

    **B.  Hellen's Characterization of Plaintiff's Alleged Poor Performance Record Also Is Refuted by the 2002 Evaluation.**  Defendant's alleged poor performance record also is **contradicted** by and **inconsistent** with Plaintiff's written 2002 evaluation.  On April 28, 2003, Hellen and Broadway raised four different areas of concern about Plaintiff.  Pl. at 181; B94.  After her conversation with Hellen about the performance areas in late April, Plaintiff sent her a memo outlining each of the areas and her response to them.  Pl. at 188; B96.  Previously for these four performance categories, Plaintiff had received the rating of exceeds expectations and/or excellent just a month earlier on her review.  Pl. at 181, P186-87; B94-95, 391-92.  The four categories are as follows:

    **1.  Cancellation of the April 25-27th Cardiology Advisory Board.**  The first false claim was cancellation of the April 25-27th cardiology advisory board.  Pl. at 182; B94.  At her deposition, Hellen alleged that the Cardiology Board had to be canceled because of

Plaintiff's inability to get the meeting planned and execute it.  Hellen at 30-31, 119; B164-65, 214.  But initially, the EXANTA Team did not have a database of key opinion leaders to invite to advisory boards and special events.  Pl. at 61; B44.  Previously in December of 2002, PREP Manager Louise Colburn was in charge of developing a list of physicians to have as a database to invite to the program.  However, she was way behind schedule on the project which was supposed to be done in November or December.  Pl. at 182-83; B94.  Plaintiff then went to her supervisor Brian Martin and offered to help.  But Martin told her not to develop a separate list of physicians and to wait for Colburn.  Pl. at 183, P171-72; B94, 386-87.  So originally Jane Hellen did not blame Plaintiff for the advisory board being canceled.  Pl. at 121; B59.  Hellen's April 28th accusation **contradicts** her earlier position on the subject.

 **2.  Delay in the Advisory Board Time Lines.**  The second issue was delay in the April Advisory Board time lines.  Pl. at 183; B94.  Here the process to actually schedule advisory boards took three and a half months.  Pl. at 183-84; B94.  After selecting geographic locations and cities where Hellen and Patty McDonald wanted them, getting hotel availabilities and looking at all the holidays, Plaintiff had the plan prepared by late November or early December.  Pl. at 184; B94.  Then Martin got involved and said he did not like the hotels or the cities selected.  Pl. at 184; B94.  So he basically threw out the plan, designated new cities, and made Plaintiff redo everything.  Pl. at 184; B94.  By February, Plaintiff had new locations secured and the schedules of the Team's scientists and strategists re-aligned.  Pl. at 185; A45, B94.  On February 12, 2003, Hellen praised Plaintiff's efforts in doing so.  See A45.  So Hellen's subsequent blaming of Plaintiff for the delay after she requested leave is **weak** and **implausible**.

 **3.  Weak Strategic Content Leadership.**  Hellen criticized Plaintiff for weak strategic content leadership.  Pl. at 185; B95.  Again, the language in Plaintiff's review is **contradictory** and states that she did a terrific job of providing leadership to the team on strategy and strategic content for the team's programs.  Pl. at 185; B95.  Defendant suggests Plaintiff should have

developed strategy for the team's programs.  But both Hellen and Brangman admitted at deposition that a Band IV employee such as Plaintiff is *not responsible* for developing brand strategy.  Hellen at 70, 73, Brangman at 35-36; B186, 188, 252.  Someone higher up such as a brand strategist or brand director develops brand strategy.  Brangman at 36; B252.  Moreover, Plaintiff met expectations of planning and executing brand strategy at her meetings in 2002.  Hellen at 74; B189.  So this criticism also is **contradicted** by Hellen and Brangman's own deposition testimony.

**4.  Not Managing Internal Processes.**  Finally, Hellen said Plaintiff was not managing internal processes well.  Pl. at 185; B95.  But Plaintiff explained to her that there was **contradictory** specific language in her review that acknowledged that Plaintiff had done a great job of being innovative and championing programs and streamlining processes.  Pl. at 185, P18-25; B95, 333-39.

**C.  Broadway Sets Plaintiff Up to Fail.**  Broadway also set Plaintiff up to fail by giving her tasks and restrictions that were **inconsistent** with her job and **contradicted** by Defendant's practices.

**1.  Job Description for Plaintiff's Band 4 and Level 5.**  Broadway's Action Plan treated Plaintiff as a Band V rather than a Band IV employee.  Pl. at 211, P189-191; B101, 393-95.[14]  There were "disconnects between what was required in the action plan and the actual job requirements that were required in the action plan and the actual job requirements that were required by the company for that position at that band level." Pl. at 192; B97.  For example, Broadway set unreasonable requirements for Plaintiff which included acting as a consultative scientific expert.  Pl. at 133; B62.  Key opinion leaders are medical experts in their field.  Austin-Jones at 33; B290.  Also, Band V PREP managers should have more depth in their understanding of critical data than Band IV PREP managers.  Broadway at 35, P97; B231, 373.

---

[14]  Plaintiff was a Band IV PREP manager.  Austin-Jones at 9; B277.

In August of 2003, Plaintiff asked Broadway to reconsider the Action Plan to reflect the fact that she just held a Band IV position.  Hellen at 75-76, Broadway at 40, Austin-Jones at 35; B189-190, 232, 291.  Broadway felt that the Action Plan was appropriate for a Band IV PREP manager.  Austin-Jones at 35; B291.  But the plan for Plaintiff's improvement had "nothing to do with [her] actual position." Pl. at 193; B97.  So Broadway's Action Plan requirements were **inconsistent** with Plaintiff's actual job requirements.

**2.  Broadway Forbids Plaintiff to Utilize Medical Education Agency and Administrative Staff.**  Broadway also told Plaintiff she was not supposed to use agency resources to develop the PREP strategic plan.  Pl. at 129; B61.  However, other PREP managers and promotion managers were allowed and, in fact did utilize agency resources to develop strategic plans for the exact same assignment.  Pl. at 129; B61.

After Plaintiff announced she was going out on medical leave, Broadway told her she was requesting information and assistance from her medical education agency that she should be doing herself.  Pl. at 73-74; B47-48.  So Broadway forbade Plaintiff from using her administrative assistant or the help of an outside agency to do her work prior to leave even though her job posting acknowledges that PREP Managers work with Medical Affairs.  Pl. at 248, Hellen at 39, P96; B111,169, 372.  Further, Brangman admitted that creating the physician profiles is a collaborative process.  Brangman at 20; B248.  Brangman admitted that Defendant uses outside research agencies called medical communication companies to help create physician profiles.  Brangman at 19, P96; B248, 372.  So Broadway's insistence that Plaintiff did not need this resource to do her work is **contradicted** by Brangman's testimony.

**3.  Broadway's Falsified Budget Reports Intentionally Omitting Plaintiff's Data.**
Broadway also falsified concerns about Plaintiff's performance and the EXANTA Team's monthly budget reports.  Pl. at 243, P195-96; B109, 396-97.  Alleged complaints or concerns with Plaintiff's performance were never discussed with her prior to seeing them in her

performance review.  Pl. at 247; B110.  Also, Broadway repeatedly and erroneously accused

Plaintiff of not having entered the $ 1.55 million into the budget that would cover her programs.

Pl. at 207; B100.  This is **contradicted** by the fact that for several months, Plaintiff provided her

with e-mails with the attached budget submissions that Plaintiff submitted consistently from

February 21, 2003.  Pl. at 207-08; B100-101.  Yet Broadway always neglected to include

Plaintiff's budget updates to the Finance Department and then would accuse Plaintiff of not

submitting her numbers and causing the whole team to be off budget.  Pl. at 207-08; B100-101.

Broadway obviously excluded Plaintiff's updates to put Plaintiff in a false light. Pl. at 244; B110.

> **D.  Miscellaneous Pretextual Performance Issues.**

> **1.  Concern About Plaintiff's Focus and Communications.**  Defendant alleges Plaintiff

had problems focusing and communicating.  But concerns about Plaintiff's focus and

communications were never mentioned to her.  Pl. at 274; B117.  Moreover, this is **contradicted**

by her 2002 review and comments by her peers.  In that review, Plaintiff was specifically lauded

for having excellent communication skills.  Pl. at 274; B117.  In January of 2002, a peer also

acknowledged that Plaintiff "is a very good communicator." D2641; B426.

> **2.  Unprepared for Promotion.**  Bevis testified that Plaintiff was not prepared to be a

Band V in July of 2003.  Bevis at 29; B311.  This is **contradicted** by the testimony of Brangman

that she, Hellen, Martin, and Plaintiff's peers felt she was ready to be promoted seven months

earlier in December of 2002.  Brangman at 27-28, 40, 44-45; B250, 253-54.

> **3.  Attitude Problem.**  According to Hellen, after she returned from leave, Plaintiff's

attitude was becoming increasingly negative.  Hellen at 57-58; B179-180.  After she returned

from medical leave, Plaintiff was told that she should not blame other people for things that were

her responsibility.  Pl. at 106; B56.  This is **inconsistent** with Plaintiff's personality as

acknowledged by Hellen who admitted her attitude was not a problem in 2002.  Hellen at 59;

B180.

**E.  Plaintiff Never Admitted to Any Alleged Performance Deficiencies At Her**

**Deposition.**  Though Defendant cited a bagful of performance reasons for its actions, throughout

her two day deposition, Plaintiff never admitted to any of the alleged performance deficiencies

propounded by Defendant.  Rather, she denied such issues were raised with her prior to

requesting FMLA leave and asserted they did not exist before or after her leave.

- Defense counsel: "[W]as [there] a discussion earlier [on or about March 13,

  2003,] with Jane Hellen about your performance?"

  Plaintiff: "[T]hat discussion did not occur." Pl. at 135; B63.

- Defense counsel: "Do you remember Brian Martin having a discussion with you

  along th[e] lines [of taking ownership of follow-up items and actively managing

  projects outside of e-mail delegation, etc.] in 2002[?]"

  Plaintiff: "Not that I can recall, no." Pl. at 135; B63.

- Defense counsel: "This purports to be a document that Susan Broadway prepared

  as a list of items that she discussed with you. . . . And then she also has here your

  comments in response to the conversation that she had with you. . . . "

  Plaintiff: "That's not my reaction." Pl. at 135-36; B63.

Thus, Defendant's allegations are **inconsistent** with and **contradicted** by Plaintiff's deposition

testimony.  Here the jury must assess the credibility of the witnesses.

## STANDARD OF REVIEW

Summary judgment shall only be granted if the "pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue of material fact and that the moving party is entitled to judgment as a matter of

law." Fed.R. Civ.P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).  "This

standard is applied with added rigor in employment discrimination cases, where intent and

credibility are crucial issues." Sarsha v. Sears, Roebuck & Co., 3 F.3d 1035, 1038 (7th Cir. 1993);

King v. Preferred Tech. Group, 166 F.3d 887, 890 (7th Cir. 1999) (FMLA retaliation).  "[I]n

discrimination cases, the court's role is 'to determine whether, upon reviewing all the facts and inferences to be drawn therefrom in the light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff.'" Lamb-Bowman v. Delaware State Univ., 152 F.Supp.2d 553, 557-58 (D.Del. 2001) (Title VII retaliation) (citing Fed.R.Civ.P. 56(c)).  Facts are "material," and disputes "genuine," where "evidence exists from which a rational person could conclude that the position of the person with the burden of proof is correct." Horowitz v. Federal Kemper Life Assurance Co., 57 F.3d 300, 302, n.1 (3d Cir. 1995).

"The moving party bears the burden of proving that no genuine issue of material fact exists." Lamb-Bowman, 152 F.Supp.2d at 558 (citing Fed.R.Civ.P. 56(c)).  "The court will 'view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion.'" Id, at 557-58.  Summary judgment is defeated "where an issue of material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility." Schoonejongen v. Curtiss-Wright Corp., 143 F.3d 120, 130 (3d Cir. 1998).  "When a record contains evidence demonstrating not only that the legitimate, non-discriminatory reason for the adverse employment decision may be false, but also that the explanation may be mendacious, the grant of an employer's motion for summary judgment is inappropriate." King, 166 F.3d at 890.

## ARGUMENT

### I.    PLAINTIFF HAS ESTABLISHED TWO PRIMA FACIE FMLA RETALIATION CLAIMS.

Plaintiff has established two prima facie claims of retaliation under the FMLA. She can prove that she was retaliated against first for attempting to exercise her right to FMLA by informing Hellen and Broadway that she would be out six weeks on FMLA leave and second for filing with HR an FMLA retaliation complaint.   To establish a *prima facie* case of retaliation, a plaintiff ordinarily must show: (1) that she engaged in protected conduct; (2) that she was subject

to an adverse employment action subsequent to such activity; and (3) that a causal link exists

between the protected activity and the adverse action.  See Jalil v. Avdel Corp., 873 F.2d 701,

708 (3d Cir. 1989); Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997).  A plaintiff

alleging FMLA retaliation "must establish that: 1) [s]he exercised rights protected under the

FMLA;[15] 2) [s]he was qualified for h[er] position; 3) [s]he suffered an adverse employment

action; and 4) the adverse employment action occurred under circumstances giving rise to an

inference of retaliatory intent." Potenza v. City of New York, 365 F.3d 165, 168 (2d Cir. 2004);

accord, King, 166 F.3d at 892 (holding that to establish a prima facie case of retaliatory *discharge*

under the FMLA, a plaintiff must show that (1) plaintiff engaged in a protected activity, (2) the

employer took adverse employment action against the employee, and (3) there is a causal

connection between the employee's protected activity and the employer's adverse employment

action; Conshenti v. Public Serv. Elec. & Gas Co.,  364 F.3d 135 (3d Cir. 2004) (holding that to

establish a prima facie case of retaliation under the FMLA, a plaintiff must show that (1) she took

an FMLA leave, (2) she suffered an adverse employment decision, and (3) the adverse decision

was causally related to her leave).

    **A.  Plaintiff Engaged in Multiple FMLA Protected Activities.**  Plaintiff has engaged in

multiple FMLA protected activities.  For example, under the FMLA, it is "unlawful for any

employer to discharge or in any other manner discriminate against any individual for *opposing*

*any practice* made unlawful by . . . subchapter [I]." 29 U.S.C. § 2615(a) (2) (emphasis added).

Specifically, it is

        unlawful for any person to discharge or in any other manner discriminate
        against any individual because such individual (1) has filed any charge,

---

[15]  Generally under subchapter I of the FMLA, employees are "entitled to a total of 12 workweeks of leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a) (1) (D). Furthermore, it also is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under . . . subchapter [I]." 29 U.S.C. § 2615(a) (1).

or has instituted or caused to be instituted any proceeding, under or
related to . . .  subchapter [I]; (2) has given, or is about to give, any
information in connection with any inquiry or proceeding relating to any
right provided under . . . subchapter [I]; or (3) has testified, or is about to
testify, in any inquiry or proceeding relating to any right provided under .

. . subchapter [I].

29 U.S.C. § 2615(b).[16]  Thus as with Title VII retaliation cases, the filing of an internal complaint

is sufficient to show that a plaintiff has engaged in a protected activity.  EEOC v. Wyeth

Pharmaceutical, 2004 WL 503417, at *2 (E.D.Pa. Mar. 11, 2004); Mroczek v. Bethlehem Steel

Corp., 126 F.Supp.2d 379, 387 (E.D. Pa. 2001).

Here, Plaintiff informed Hellen she would need six weeks of FMLA leave for non-

elective surgery on April 28, 2003.  She went out for surgery on May 9, 2003.  Then she filed an

FMLA retaliation complaint with HR on September 17, 2003.  Thus, Plaintiff engaged in multiple

protected activities under the FMLA.

**B.  Plaintiff Also Was Subject To Adverse Employment Action Subsequent To**

**The Protected Activity.**  Plaintiff also was subject to a series of adverse employment actions

subsequent to invoking her FMLA protected right to take six weeks of medical leave.  29 U.S.C.

---

[16]  An FMLA plaintiff may seek both legal and equitable relief.  Regarding legal relief,

> [a]ny employer who violates section 2615 of th[e FMLA] shall be liable
> to any eligible employee affected (A) for damages equal to (i) the
> amount of (I) any wages, salary, employment benefits, or other
> compensation denied or lost to such employee by reason of  the
> violation; or (II) in a case in which wages, salary, employment benefits,
> or other compensation have not been denied or lost to the employee, any
> actual monetary losses sustained by the employee as a direct result of the
> violation, such as the cost of providing care, up to a sum equal to 12
> weeks of wages or salary for the employee; [and] (ii) the interest on the
> amount described in clause (i) calculated at the prevailing rate[.]

29 U.S.C. § 2617(a) (1) (A) (i-ii).  Furthermore, the employer also may be held liable for "liquidated
damages equal to the sum of the amount described in [§ 2617(a) (1) (A)](i) and the interest described in
[§ 2617(a) (1) (A)](ii) . . . ." 29 U.S.C. § 2617(a) (1) (A) (iii).  An FMLA plaintiff's equitable remedies
include "employment, reinstatement, and promotion." 29 U.S.C. § 2617(a) (1) (B).

§ 2615(b).  Here, Hellen on April 22nd immediately balked at Plaintiff's request for six weeks,  on

April 28th criticized her performance, and on May 2nd quickly threatened not to retain her in

2004.  Then Broadway gave her an 11 item short term improvement plan just days before her

surgery.  This all hastened Plaintiff's recovery period and led her to attempt an unsuccessful early

return to work after just three weeks.

Less than a month after returning full time on June 20th, Broadway gave Plaintiff her first

negative mid-year review on July 3rd, and decided on July 29th to placed her on an Action Plan

which began August 18th.  When Plaintiff filed an FMLA retaliation complaint with HR on

September 17th, it was denied on October 21st, and Broadway escalated Plaintiff's Action Plan to

a PIP the same day! When the PIP ended in January, Plaintiff was discharged.

Though Defendant mis-characterizes the adverse action as merely a January 24th

discharge nine months after Plaintiff sought leave, all of the actions beginning with Hellen's

immediate balking at the six weeks and performance criticisms and culminating in discharge all

constitute tangible adverse employment actions.

A job termination is the penultimate adverse action.  All that is necessary under the law

for an adverse action is that the discriminatory or "retaliatory conduct must be serious and

tangible enough to alter [the] employee's compensation, terms, conditions, or privileges of

employment," Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300 (3d Cir. 1997), or to "deprive

or tend to deprive [the employee] of employment opportunities or otherwise adversely affect his

status as an employee." Id. at 1297 (internal bracketing omitted); Price v. Delaware Dep't of

Correction, 40 F.Supp.2d 544, 552 (D. Del. 1999).[17]

---

[17]  Adverse action may be decreasing an employee's earning potential and causing "significant disruption in h[er] working conditions." Id. at 153.  The law is clear that adverse action is a very broad umbrella which covers a multitude of sins.  See e.g. Jones v. School Dist. of Phila., 198 F.3d 403, 412 (3d Cir. 1999) (adverse action when teacher involuntarily transferred to a less desirable assignment and lost the opportunity to do the job he "sought most"); Torre v. Casio, Inc., 42 F.3d 825, 831 n.7 (3d Cir. 1994) (transfer to a dead-end job); see also Rodriguez v. Board of Ed., 620 F.2d 362, 364-66 (2d Cir. 1980) (adverse action where transfer radically changed nature of employee's work and resulted in "severe

Certainly Plaintiff has met any of these tests.  She was fired.  In the retaliation context, adverse employment action is "any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the charging party or others from engaging in protected activity." Ray v. Henderson, 217 F.3d 1234, 1242-43 (9th Cir. 2000).  As the Seventh Circuit observed, "[o]ne does not have to be an employment expert to know that an employer can make an employee's job undesirable or even unbearable without money or benefits ever entering into the picture." Collins v. State of Ill., 830 F.2d 692, 703 (7th Cir. 1987).  Surely, Hellen's suggestion to Plaintiff to shorten her doctor prescribed six week leave on April 22nd and threat on May 2, 2003, to discharge her were each reasonably likely to deter Plaintiff or others from engaging in FMLA protected activity.

**C.  A Causal Link Is Easily Proven.**  There also is sufficient evidence to establish a causal link between the protected activities and adverse actions.  Generally, the causal link between protected activity and adverse action can be shown either 1) through the temporal proximity between the two events or 2) through circumstantial evidence of a pattern of antagonism following the protected activity.  Robinson v. Southeastern Pennsylvania Trans. Auth., 982 F.2d 892, 895-96 (3d Cir. 1993).   However, "[t]hese are not the exclusive ways to show causation, as the proffered evidence, looked at as a whole, may suffice to raise the inference." Kachmar v. SunGard Data Systems, 109 F.3d 173, 177 (3d Cir. 1997); see Andrews v. City of Phila., 895 F.3d 1469, 1484 (3d Cir. 1990) (a play cannot be understood without viewing all of its scenes).

On our record, there is extremely close timing between Plaintiff's April 22nd notice of leave and Hellen's immediate suggestion to curtail her doctor prescribed six weeks of recovery.  Six days later, Hellen first directed performance criticism to Plaintiff orally.  Then May 2nd, a

---

professional trauma.") (internal ellipses omitted).

week before Plaintiff even left for surgery, Hellen threatened not to retain her in 2004.  Also, there is extremely close timing between Plaintiff's June 20th full-time return from leave and Broadway's July 3rd negative mid-year review which supported her July 29th decision to place Plaintiff on an Action Plan.  Then after Plaintiff filed her FMLA retaliation complaint on September 17th, Defendant rejected the complaint a month later on October 21st, and Broadway escalated the Action Plan to a PIP the same day! Then eight days after the PIP ended on January 16th, Defendant discharged Plaintiff on January 24, 2004.

Moreover, the record evidence as a whole more than suffices to raise the inference of discrimination.  A litany of specific categories of evidence proving causation is set out above. See Statement of Facts Parts V and VI supra.

## II.    DEFENDANT'S LEGITIMATE NON-DISCRIMINATORY REASONS FOR ITS ADVERSE ACTIONS ARE PRETEXTUAL.

Once a plaintiff makes out a prima facie case of retaliation under the FMLA, the usual burden shifting framework is implicated.  See Weston v. Pennsylvania, 251 F.3d 420, 432 (3d Cir. 2001); Potenza, 365 F.3d at 168.  Here Defendant's legitimate, non-discriminatory reason for its adverse actions against Plaintiff, her allegedly rapid declining performance after more than nine years, is pretextual.  So we are dealing with a classic credibility case.

**A.  Plaintiff's Ultimate Burden.**  "[T]o defeat summary judgment when the defendant answers the . . . prima facie case with legitimate, non-discriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer[s]'[] articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer[s]'[] action." Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994); Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061, 1067 (3d Cir. 1996).  Here, Plaintiff can proceed under either of the two prongs found in Fuentes, 32 F.3d at 764, and which were

reaffirmed twice by the Third Circuit en banc in <u>Sheridan</u>, 100 F.3d at 1067, and in <u>Keller v. Orix Credit Alliance, Inc.</u>, 130 F.3d 1101, 1108 (3d Cir. 1997) (en banc).

      **1. Prong 1 - Defendant's Abundant Weaknesses, Implausibilities, Inconsistencies, Incoherencies and Contradictions Support the Plaintiff's Case.** Under prong one, plaintiff proceeds with a "credibility" or "unworthy of credence" case. <u>Bray v. Marriott Hotels</u>, 110 F.3d 986, 990 (3d Cir. 1997). Here "plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence.'" <u>Sheridan</u>, 100 F.3d at 1072; <u>Bray</u>, 110 F.3d at 990; <u>Keller</u>, 130 F.3d at 1108-09 (emphasis added).

      The district court's role here is limited. "The role of determining whether the inference of discrimination is warranted must remain within the province of the jury, because a finding of discrimination is at bottom a determination of intent." <u>Sheridan</u>, 100 F.3d at 1071.

> In making that finding, the jury must perform its traditional function of assessing the weight of the evidence, the credibility of the witnesses through observation of both direct testimony and cross-examination at trial, and the strength of the inferences that can be drawn from the elements of the prima facie case and the evidence that undermines the employer's proffered reasons for its actions. This is uniquely the role of the factfinder, not the court.

<u>Id.</u> at 1071-72.

      All the trial court must determine is "whether the plaintiff has cast sufficient doubt upon the employer's proffered reasons to permit a reasonable factfinder to conclude that the reasons are incredible . . . ." <u>Id.</u> at 1072. "But once the court is satisfied that the evidence meets this threshold requirement, it may not pretermit the jury's ability to draw inferences from the testimony, including the inference of intentional discrimination drawn from an unbelievable reason proffered by the employer." <u>Id.</u>

It is a "mistaken assumption" that the prima facie case presumption "drops from the case . . . [and that] the underlying facts lose their probative value." Sheridan, 100 F.3d at 1069 (internal punctuation omitted).[18]  "In deciding the 'ultimate question' of whether the employer unlawfully discriminated . . . the factfinder's disbelief of the reasons put forward by the defendant . . . may, together with the elements of the prima facie case, suffice to show intentional discrimination." Id. at 1066 (quoting Saint Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993) (cited in King v. Preferred Tech. Group, 166 F.3d 887, 894 (7th Cir. 1999) (FMLA retaliation))).  In other words, "if the plaintiff has pointed to evidence sufficiently to discredit the defendant's proffered reasons, . . . the plaintiff need not also come forward with additional evidence of discrimination beyond his or her prima facie case." Fuentes, 32 F.3d at 764; Sheridan, 100 F.3d at 1071.  Rather, "no additional proof of discrimination is required." Hicks, 509 U.S. at 511; Sheridan, 100 F.3d at 1066, 1071.

"It is the jury's determination that the reason given was pretextual together with the evidence that supported the prima facie case that will sustain a finding of intentional discrimination . . .." Sheridan, 100 F.3d at 1071.  "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 147 (2000)  The "trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." Id.  This is because "[r]esort to a pretextual explanation is, like flight from the scene of a crime, evidence indicating consciousness of guilt, which is, of course, evidence of illegal conduct." Sheridan, 100 F.3d at 1069.

---

[18]  "[T]he trier of fact may still consider the evidence establishing the plaintiff's prima facie case and inferences properly drawn therefrom on the issue of whether the defendant's explanation is pretextual." Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 143 (2000) (internal punctuation omitted) (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 255 n.10 (1981)).

An important factor in the present case is the fact that the employer has created false evidence to overcome the obstacle created by plaintiff's last positive written employment evaluation. Regarding the effect of the falsity of a defendant's stated reason or other evidence, the Third Circuit has said, "a party's *falsehood* . . . in the preparation and presentation of his cause, his fabrication or suppression of evidence by bribery or spoilation, is receivable against him as an indication of his consciousness that his case is a weak or unfounded one; and from that consciousness may be inferred the fact itself of the cause's lack of truth and merit." Sheridan, 100 F.3d at 1069 (emphasis added) (citing McQueeney v. Wilmington Trust Co., 779 F.2d 916, 921-22 (3d Cir. 1985)). Importantly, there the en banc court also declared "[w]e routinely expect that a party give honest testimony in a court of law; there is no reason to expect less of an employer charged with unlawful discrimination." Sheridan, 100 F.3d at 1069.

"Thus, when all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts only with some reason, based his decision on an impermissible consideration . . . ." Sheridan, 100 F.3d at 1069 (emphasis added) (citing Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577 (1978)). Specifically, "[t]he factfinder's disbelief of the reasons put forward by the defendant . . . may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination." Id.

Here, there are abundant weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the defendants' version of the case, such that a reasonable fact finder could find it unworthy of belief. Fuentes, 32 F.3d at 765. They are discussed above in the Statement of Facts, Part VI above. Thus, the prima facie showing, when joined with disbelief, permits the jury to return a verdict of retaliation. Sheridan, 100 F.3d at 1071.

### 2. Prong 2 - The Factfinder Also Can Infer That Discrimination Was More

31

**Likely Than Not A Motivating Or Determinative Cause Of The Adverse Employment Actions.** The second prong of <u>Fuentes</u> requires evidence that "allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action[s]." <u>Fuentes</u>, 32 F.3d at 762; <u>Keller</u>, 130 F.3d at 1111. Here, the weight of the evidence, including Hellen and Broadway's awareness of Plaintiff's protected activity, the direct evidence that they as managers were too busy to let Plaintiff be sick, their retaliatory motive to only retain "dependable" people during a "busy time" where they had "a lot of work" to do, their demonstrated antagonism toward Plaintiff that only surfaced after she sought leave, Broadway's comparative treatment in replacing Plaintiff with an employee with no known history of leave, the very suggestive temporal sequence of events, in which the pattern of antagonism began the day Plaintiff sought leave, Hellen's bias against employees on FMLA leave, Defendant's disparate treatment of Plaintiff in moving her to a cubicle and vandalizing her workstation and refusing to investigate the vandalism, and Hellen's violation of Defendant's policies and procedures in balking at Plaintiff's notice of need for six weeks of leave allows a jury to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment actions. <u>See</u> <u>Statement of Facts</u>, Part V above.

III.    **DEFENDANT BREACHED THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING BY MANIPULATING AND FALSIFYING PLAINTIFF'S EMPLOYMENT RECORDS TO CREATE FICTITIOUS GROUNDS TO DISCHARGE HER AND BY VIOLATING THE PUBLIC POLICY FURTHERED BY THE FMLA.**

Defendant also breached the implied covenant of good faith and fair dealing because it manipulated and falsified Plaintiff's employment records to create fictitious grounds to discharge her, and its termination of Plaintiff's employment was a violation of the public policy furthered by the FMLA. "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement." 2 RESTATEMENT (SECOND) OF CONTRACTS § 205 (1981). The proposition that contracts include a covenant of good faith and fair dealing "is not a

32

concept strange to Delaware law." Merrill v. Crothall-American Inc., 606 A.2d 96, 101 (Del.

Supr. 1992). The covenant of good faith "protects employees from receiving under the contract

less than what was bargained for." Id. at 102. In Delaware, actionable good faith and fair dealing

claims exist where the employer falsified or manipulated employment records to create fictitious

grounds for termination or where the termination violated public policy. Lord v. Souder, 748

A.2d 393, 400 (Del. Supr. 2000).

### A. Defendant Manipulated Plaintiff's Employment Records to Create Fictitious Grounds for Termination of Her Employment Based on Alleged Performance Issues.

Defendant manipulated Plaintiff's employment records to create fictitious grounds for termination

of her employment based on alleged performance issues. An employer acts in bad faith if it is

intentionally deceptive. Merrill, 606 A.2d at 102. "One method of analyzing the Covenant is to

ask what the parties likely would have done if they had considered the issue involved." E.I.

DuPont de Nemours and Co. v. Pressman, 679 A.2d 436, 443 (Del. Supr. 1996).

If Defendant's management, including Hellen and Broadway, had really considered

Plaintiff an employee with performance issues dating back to December of 2002, they would not

have given Plaintiff a good evaluation on March 10, 2003. Nor would they have waited until

August to place her on an Action Plan. Instead, after Plaintiff sought FMLA leave, Hellen and

Broadway manipulated and falsified Plaintiff's employment records to create the fictitious

performance grounds for her termination. See Statement of Facts Part VI supra. Among other

things, Broadway falsified budget reports. See Statement of Facts Part VI.C.3 supra. Also, on

April 28th, Hellen manipulated Plaintiff's employment record by manufacturing four performance

issues that were not raised on her evaluation the prior month. See Statement of Facts Part VI. B

supra. Thus, Defendant breached the implied covenant of good faith and fair dealing.

### B. Defendant's Termination of Plaintiff's Employment Also Violated Public Policy.

Defendant's termination of Plaintiff's employment also was a breach of the implied

covenant of good faith and fair dealing because it violated public policy.  "In Pressman, th[e Delaware Supreme] Court held that a plaintiff must satisfy a two-part test to demonstrate a breach of the covenant of good faith and fair dealing under the public policy category: (i) the employee must assert a public interest recognized by some legislative, administrative or judicial authority and (ii) the employee must occupy a position with responsibility for advancing or sustaining that particular interest." E.I. DuPont de Nemours and Co. v. Pressman 679 A.2d 436, 444 (Del. 1996); see e.g., Shearin v. E.F. Hutton Group, Inc., 652 A.2d 578, 587-89 (Del. Ch. 1994) (holding that attorney fired for refusing to violate her ethical duties has a cause of action).  Here, more than a decade ago, Congress found there was "inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods." 29 U.S.C. § 2601(a) (4).  Thus, it enacted the FMLA "to entitle employees to take reasonable leave for medical reasons[.]" Id. at § 2601(b) (2).  In so doing, Congress recognized the public interest in providing job security for individuals like Plaintiff.  Further, as an employee covered under the FMLA, Plaintiff occupied a position with responsibility for sustaining that interest.  But Defendant's termination of Plaintiff's employment violated the public policy embodied in the FMLA that favors job security for individuals with serious health conditions.  Therefore, it breached the implied covenant of good faith and fair dealing.

## IV.    DEFENDANT VIOLATED PLAINTIFF'S COBRA RIGHTS BY NOT OFFERING TO EXTEND HER HEALTH INSURANCE COVERAGE.

Finally, Defendant violated Plaintiff's rights by not offering her COBRA after she was discharged.  Pub. L. No. 99-272, 100 Stat. 82.  Here, Plaintiff's health insurance was stopped after her employment ended.  Hellen at 93; B199.  After she was discharged, Defendant was required by federal law to provide Plaintiff with the option under COBRA to continue her health insurance at her expense.  Pub. L. No. 99-272, 100 Stat. 82, Complaint at ¶ 106; B16.  However, Defendant maliciously denied her her COBRA rights, thus depriving her of needed health insurance in violation of federal law.  Complaint at ¶ 107; B16.  Plaintiff wasn't given any

information regarding her health insurance coverage when she was let go. Pl. at 266; B115. She asked her HR contact Georgina Austin-Jones for information about her benefits, and she could not help her. Pl. at 266; B115.

Plaintiff knew Defendant was required to provide her with a COBRA notice, and she was anxious about getting her medical insurance. Pl. at 265; B115.[19] So she checked the mail every day waiting for her COBRA notice. Pl. at 265; B115. Plaintiff never had any known problems of receiving mail at her home address. Pl. at 19; B34. Yet Plaintiff did not receive a COBRA notice. Pl. at 265; B115 Therefore, Defendant violated Plaintiff's rights under COBRA, Pub. L. No. 99-272, 100 Stat. 82. Complaint at ¶ 109; B16.

## CONCLUSION

For all of the foregoing reasons, Defendant's Motion for Summary Judgment should be denied.

---

[19] Plaintiff's out-of-pocket expenses for not being covered by health insurance, including physical therapy and prescriptions, total approximately $3,000. Pl. at 25, 270, 312; B35, 116, 127.

THE NEUBERGER FIRM, P.A.

/s/ Thomas S. Neuberger
THOMAS S. NEUBERGER, ESQ. (#243)
STEPHEN J. NEUBERGER, ESQ. (#4440)
Two East Seventh Street, Suite 302
Wilmington, DE 19801-3707
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

LAW OFFICE OF JOHN M. LaROSA

/s/ John M. LaRosa
JOHN M. LaROSA, ESQ. (# 4275)
Two East Seventh Street, Suite 302
Wilmington, DE 19801-3707
(302) 888-1290
JLR@LaRosaLaw.com

Dated: May 17, 2005                    Attorneys for Plaintiff

36

**Westlaw Download Summary Report for BADER, JOHN 4219366**

Date/Time of Request:              Monday, May 16, 2005 17:22:00 Eastern
Client Identifier:                 FARRELL
Database:                          DCT
Citation Text:                     Not Reported in F.Supp.2d
Lines:                             216
Documents:                         1
Images:                            0

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson, West and their affiliates.

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1
2004 WL 503417 (E.D.Pa.)
**(Cite as: 2004 WL 503417 (E.D.Pa.))**


**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.


United States District Court,
E.D. Pennsylvania.
EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION, Plaintiff,
and
Danita KENT-BYRD, Plaintiff-Intervenor,
v.
WYETH PHARMACEUTICAL, Defendant.
**No. Civ.A. 03-2967.**

March 11, 2004.
Jacqueline H. McNair, Judith A. O'Boyle, Terrence R.
Cook, Equal Employment Opportunity Commission,
Philadelphia District Office, Philadelphia, PA, for
Plaintiff.

Carmen L. Rivera Matos, Law Offices of Carmen R.
Matos, Doylestown, PA, for Intervenor Plaintiff.

Erin M. O'Neill, John E. Quinn, Reed Smith LLP,
Philadelphia, PA, for Defendant.

*MEMORANDUM*

BUCKWALTER, J.

 **\*1** Presently before the Court is Defendant Wyeth
Pharmaceutical's Motion for Summary Judgment,
Plaintiff Equal Employment Opportunity Commission's
and Plaintiff-Intervenor Danita Kent-Byrd's Opposition
thereto and Defendant's Reply Brief in Support of its
Motion. For the reasons set forth below, Defendant's
motion is granted in part and denied in part.

I. BACKGROUND

 During the summer of 2001, Defendant Wyeth
Pharmaceutical ("Wyeth") had two vacant positions for

Senior Credit Analysts in its Treasury, Credit and
Accounts Receivable Department ("Credit
Department"). Wyeth decided to fill those positions by
promoting two internal Credit Analysts. In September
2001, after reviewing the credentials of every Credit
Analyst within the Credit Department, David
Nemeth--the head of the Credit Department--selected
two candidates for the promotions--Michael Lorek
(Caucasian) and Michelle Clegg (Caucasian).
Plaintiff-Intervenor Kent-Byrd ("Kent-Byrd")--an
African-American--is a Credit Analyst and was
considered for the promotion, but Nemeth ultimately
decided not to choose her.

 After being denied the promotion, Kent-Byrd
complained to Wyeth that she should have been
promoted over Clegg. Kent-Byrd filed an internal
Assurance of Fair Treatment complaint with Wyeth,
alleging that she was denied the promotion because of
her race. After an investigation, a case summary was
prepared and Wyeth informed Kent-Byrd that there was
no merit to her claims and that the promotion decisions
were appropriate.

 Kent-Byrd alleges that in or around February, 2002,
Wyeth began to retaliate against her for making
discrimination allegations. Specifically, Kent-Byrd
claims that her immediate supervisor--Brad
Lucas--started to criticize her for arriving late to work.

 On or around May 7, 2003, Plaintiff Equal
Employment Opportunity Commission ("EEOC") filed
a complaint in this Court, alleging violations of Title
VII of the Civil Rights Act of 1964 and Title I of the
Civil Rights Act of 1991. On or around August 6, 2003,
Kent-Byrd filed an intervenor complaint raising the
same claims as EEOC and raising a separate claim that
Wyeth retaliated against her for filing an internal
discrimination complaint. Kent-Byrd also asserted her
claims under the Pennsylvania Human Relations Act.

II. STANDARD OF REVIEW

 A motion for summary judgment will be granted where
all of the evidence demonstrates "that there is no

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2004 WL 503417 (E.D.Pa.)

(Cite as: 2004 WL 503417 (E.D.Pa.))

Page 2

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Since a grant of summary judgment will deny a party its chance in court, all inferences must be drawn in the light most favorable to the party opposing the motion. *U.S. v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).

**\*2** The ultimate question in determining whether a motion for summary judgment should be granted is "whether reasonable minds may differ as to the verdict." *Schoonejongen v. Curtiss-Wright Corp.,* 143 F.3d 120, 129 (3d Cir.1998). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248.

III. DISCUSSION

A. Retaliation Claim

Kent-Byrd alleges that Wyeth retaliated against her after she filed an internal complaint alleging racial discrimination. Specifically, Kent-Byrd claims that "Defendant subjected Ms. Kent-Byrd to retaliatory actions by the Regional Credit Manager, Brad Lucas, when he confronted her about her arrival and departure time." (Intervenor Compl. ¶ 27.) "Ms. Kent-Byrd admitted to occasionally being 5-10 minutes late but Ms. Kent-Byrd was the only employee confronted on this matter, although she was not the only employee who arrived a few minutes late to work." (*Id.*)

In order to establish a prima facie case of illegal retaliation, a "plaintiff must show: (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Fogleman v. Mercy Hospital, Inc.,* 283 F.3d 561, 567-68 (3d Cir.2002).

Kent-Byrd has shown that she engaged in a protected employee activity--filing an internal Assurance of Fair Treatment Complaint. Kent-Byrd has not, however, presented any evidence that she suffered an adverse action after or contemporaneous with her protected employee action. Kent-Byrd's sole allegation is that in February, 2002 her supervisor verbally confronted her regarding her tardiness. (Intervenor Compl. ¶ 27.) Kent-Byrd admitted, however, that she never suffered any adverse employment action. During her deposition, Kent-Byrd testified as follows:

Q: Now, as a result of Brad Lucas speaking with you in the beginning of February 2002 regarding your attendance, did you receive any form of disciplinary action?

A: No

(Kent-Byrd Tr. at 127-28.)

Oral reprimands, without anything more, are not enough to constitute an adverse employment action. *Weston v. Pennsylvania,* 251 F.3d 420, 431 (3d Cir.2001)(holding that two written reprimands merely placed in an employee's personnel file do not materially change the terms and conditions of employment to create an adverse employment action). Plaintiff has not shown any evidence that she suffered any type of adverse employment action, and Plaintiff has not shown that genuine issues of fact exist for trial. Accordingly, summary judgment is granted to Wyeth regarding this claim. [FN1]

FN1. Kent-Byrd has also failed to establish causation. Kent-Byrd admitted during her deposition that she was repeatedly late for work. In fact, during January, 2002--the month before her oral reprimands--Kent-Byrd admitted that she was likely late for work over 2/3 of the days. (Def.'s Br. at 28; *See* Intervenor Compl. ¶ 27.) Kent-Byrd has not presented any evidence of a causal connection between the oral reprimands and her discrimination claim. Rather, the evidence shows that the reprimands were a direct result of Kent-Byrd's repeated tardiness.

In her opposition brief, Plaintiff alleges for the first time that she suffered additional retaliatory adverse

Not Reported in F.Supp.2d
2004 WL 503417 (E.D.Pa.)
**(Cite as: 2004 WL 503417 (E.D.Pa.))**

Page 3

employment actions. Specifically, Plaintiff alleges the following: (1) her supervisor criticized her work performance; (2) she received a rating of "3" which stands for "Solid Performer" during her performance review for 2003; [FN2] (3) she received a smaller raise at the end of 2003 than she did in 2002; [FN3] and (4) she was removed from working on a large account.

> FN2. Kent-Byrd began working at Wyeth in 1998 and received a rating of "3" or "Solid Performer" every year of her employment. It is undisputed that her rating did not decline after she complained of discrimination.

> FN3. Despite receiving a raise at the end of 2003, Kent-Byrd alleges that she suffered an adverse employment action because her *pay increase* was .05% lower than her pay increase from the year before. Kent-Byrd received a 2.50% increase for 2003 compared to a 2.55% increase for 2002. (Def.'s Reply Br. at 19.) Kent-Byrd has supplied no authority stating that a pay increase is actually an adverse employment action. Regardless, the Court does not find that a minuscule decline (.05%) in pay increase amounts to an adverse employment action.

**\*3** Kent-Byrd's bald allegations, however, fail as a matter of law because she cannot assert new claims for the first time in her opposition brief. None of these claims were included in her EEOC charge or her complaint in this Court. Kent-Byrd had ample opportunity to amend her complaint but failed to do so. Furthermore, Wyeth went through the entire discovery period without knowing of these claims. Discovery is now closed, and Wyeth cannot be expected to defend against claims that were never raised prior to Kent-Byrd's opposition brief.

Additionally, Kent-Byrd's new claims would fail regardless of her failure to properly raise them. Kent-Byrd has failed to show any evidence or authority that would enable her to survive summary judgment. Kent-Byrd's new allegations are unsupported by evidence, and Kent-Byrd has failed to show that any genuine issues of fact exist for trial.

B. Discrimination Claim

When a plaintiff alleges discrimination regarding the denial of a promotion, the plaintiff must carry the burden of establishing a prima facie case. "Thus, the plaintiff must establish that he or she (1) belongs to a protected category; (2) applied for and was qualified for a job in an available position; (3) was rejected; and (4) after the rejection the position remained open and the employer continued to seek applications from persons of plaintiff's qualifications for the position." *Bray v. Marriott Hotels,* 110 F.3d 986, 990 (3d Cir.1997). If the plaintiff meets these requirements, then the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the decision to deny plaintiff the promotion. *Id.* If the employer meets its burden, "then the plaintiff must produce evidence from which a reasonable factfinder could conclude either that the [employer's] proffered justifications are not worthy of credence or that the true reason for the employer's act was discrimination." *Id.*

In the instant case, the parties do not dispute whether Kent-Byrd can establish a prima facie case or whether Wyeth offered a legitimate, nondiscriminatory reason for its decision. Rather, the parties dispute whether Kent-Byrd can establish that Wyeth's proffered legitimate nondiscriminatory reason is pretext for discrimination. In an effort to show pretext, Kent-Byrd spends a significant portion of her brief raising a series of issues that she argues shows Wyeth's proffered reason is "inconsistent, implausible and unworthy of credence." (Pl.'s Br. at 23.)

In analyzing each of the issues raised by Kent-Byrd, the Court cannot find as a matter of law that Kent-Byrd proved pretext or that Wyeth proved the absence of pretext. The Court does find, however, that Kent-Byrd has satisfied her burden of showing that genuine issues of fact exist regarding "pretext." Accordingly, summary judgment cannot be granted to Wyeth concerning this issue.

IV. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is granted in part and denied in part.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                          Page 4
2004 WL 503417 (E.D.Pa.)
**(Cite as: 2004 WL 503417 (E.D.Pa.))**


An appropriate order follows.

*ORDER*

   **\*4** AND NOW, this 11th day of March, 2004, upon
consideration of Defendant Wyeth Pharmaceutical's
Motion for Summary Judgment (Docket No. 13),
Plaintiff Equal Opportunity Commission's and
Plaintiff-Intervenor Danita Kent-Byrd's Opposition
thereto (Docket No. 15) and Defendant's Reply Brief
(Docket No. 16), it is hereby ORDERED that
Defendant's Motion for Summary Judgment is
GRANTED in part and DENIED in part. With regard
to Plaintiff-Intervenor's retaliation claims, Defendant's
motion is GRANTED and judgment in entered on
behalf of Defendant and against Plaintiff-Intervenor.
With regard to all other claims, Defendant's motion is
DENIED.

   2004 WL 503417 (E.D.Pa.)

   **Motions, Pleadings and Filings (Back to top)**

• 2004 WL 1496556 (Trial Motion, Memorandum and
Affidavit) Memorandum (Mar. 11, 2004)


• 2004 WL 1496557 (Trial Motion, Memorandum and
Affidavit) Plaintiff Intervenor's Surreply in Opposition
to Defendant's Motion for Summary Judgement (Mar.
10, 2004)


• 2003 WL 23640050 (Trial Pleading) Answer and
Affirmative Defenses of Defendant Wyeth
Pharmaceuticals, Inc. to Plaintiff's Complaint (Jun. 12,
2003)


• 2:03CV02967 (Docket)
                              (May. 07, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **MARYBETH FARRELL,** | : |
| | : |
| **Plaintiff,** | : |
| | : |
| v. | : **CIVIL ACTION NO. 04-285 KAJ** |
| | : |
| **ASTRAZENECA PHARMACEUTICALS LP,** | : |
| **a Delaware corporation,** | : |
| | : |
| **Defendant.** | : |

## CERTIFICATE OF SERVICE

I, John M. LaRosa, Esquire, being a member of the Bar of this Court, do hereby certify

that on May 17, 2005, I electronically filed this **PLAINTIFF'S ANSWERING BRIEF IN**

**OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** and the

appendix thereto with the Clerk of the Court using CM/ECF which will send notification of such

filing to the following:

> Sheldon N. Sandler, Esquire
> **YOUNG CONAWAY STARGATT & TAYLOR LLP**
> The Brandywine Building, 17th Floor
> 1000 West Street
> P.O. Box 391
> Wilmington, Delaware 19801-0391
> ssandler@ycst.com


> **/s/ John M. LaRosa**
> **JOHN M. LaROSA, ESQ. (#4275)**

cc:     Thomas S. Neuberger, Esquire
        Stephen J. Neuberger, Esquire
        Ms. Marybeth Farrell

Attorney Files/John's Files/Client Files/Farrell/Pleadings/Motions and Briefing/Summary Judgment/Answering Brief 5