IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MARYBETH FARRELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No.04-285-KAJ |
| | ) | |
| ASTRAZENECA PHARMACEUTICALS, | ) | |
| LP, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S REPLY BRIEF
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Sheldon N. Sandler, Esquire (No. 245)
Teresa A. Cheek, Esquire (No. 2657)
The Brandywine Building, 17th Floor
1000 West Street
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6673
Facsimile: (302) 576-3330
Attorneys for Defendant

Dated: May 24, 2005

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................ ii

ARGUMENT .................................................................................................... 1

I.    Plaintiff Has Failed Utterly To Prove Her Claim That The E-mails
      And Other Documents Showing That AZ's Ongoing Concerns
      About Her Performance Problems Predated Her FMLA Leave
      Request Were "Fabricated. .................................................................... 2

      A.    Jane Hellen Was Not Biased Against Employees on FMLA
            Leave. ........................................................................................... 4

      B.    Plaintiff's Performance Problems Predated Her FMLA
            Leave ............................................................................................ 5

      C.    Hellen and Broadway Were Not Antagonistic Toward
            Plaintiff. ....................................................................................... 9

      D.    Plaintiff's FMLA Leave Was A Non-Event That Happened
            To Occur In The Middle Of Ongoing Efforts To Improve
            Her Performance. ........................................................................ 10

      E.    Temporal Proximity Is Lacking. ................................................. 11

      F.    There Is No Proof Of A Causal Relationship Between The
            Performance Actions And The FMLA Leave. ............................. 12

      G.    Plaintiff Knew In Early 2003 That She Was Not Being
            Promoted. .................................................................................... 12

      H.    Moving Plaintiff To A Cubicle Was Not Retaliatory. ................. 14

      I.    There Is No Support in the Record for Plaintiff's Other
            Claims. ........................................................................................ 14

II.   Plaintiff's Termination Was The Only Tangible Adverse
      Employment Action ............................................................................ 15

III.  Plaintiff's Self-Serving Statements Cannot Prevent Summary
      Judgment. ........................................................................................... 17

IV.   Plaintiff's Implied Covenant Claims Fail. .......................................... 18

V.    Plaintiff's COBRA Notice Was Mailed In Compliance With
      COBRA ............................................................................................... 19

CONCLUSION ............................................................................................. 20

WP3:1114377.2                                                              057159.1004

## TABLE OF AUTHORITIES

<u>Page</u>

## Cases

*Andrews v. City of Philadelphia*,
  895 F.3d 1469 (3d Cir. 1990)..................................................................... 4

*Annett v. University of Kansas*,
  371 F.3d 1233 (10th Cir. 2004)................................................................. 17

*Ayres v. Jacobs & Crumpler, P.A.*,
  C.A. No. 96 C-07-258 (WTQ),
  1996 Del. Super. LEXIS 565 (Dec. 31, 1996) ........................................ 19

*Burlington Indus. v. Ellerth*,
  524 U.S. 742(1998) .................................................................................. 15

*Collier v. Target Stores Corp.*,
  2005 U.S. Dist. LEXIS 6262
  (D. Del. April 13, 2005) ...................................................................... 15, 16

*Drainer v. O'Donnell*,
  C.A. No. 94C-08-062, Alford, J.,
  1995 Del. Super. LEXIS 229 (May 30, 1995) ........................................ 19

*Finch v. Hercules Inc.*,
  809 F. Supp. 309 (1992) ........................................................................... 19

*Igwe v. DuPont*,
  2005 U.S. Dist. LEXIS 1254,
  (D. Del. Jan. 24, 2005) ............................................................................. 16

*Johnson v. Washington M.A.T.A.*,
  883 F.2d 125 (D.C. Cir. 1989). ................................................................ 18

*Mills v. First Fed. Sav. & Loan Ass'n*,
  83 F.3d 833 (7th Cir. 1996) ...................................................................... 17

*Ray v. Henderson*,
  217 F.3d 1234 (9th Cir. 2000)................................................................... 17

*Robinson v. City of Pittsburgh,*,
  120 F.3d 1286 (3d Cir. 1997).................................................................... 16

*Ruff v. Partner's Liquidating Trust*,
  2001 U.S. Dist. LEXIS 11683,
  (N.D. Ill. Aug. 8, 2001) ........................................................................... 18

WP3:1114377.2    057159.1004

*Schuster v. Derocili*,
    775 A.2d 1029 (Del. 2001) ............................................................................ 19

*Sempier v. Johnson & Higgins*,
    45 F.3d 724 (3d Cir. 1995) ............................................................................ 17

*Sullivan v. Standard Chlorine of Delaware, Inc.*,
    845 F. Supp. 167, 175 (D. Del. 1994),
    *aff'd without op.*, 1995 U.S. App. LEXIS 5122 (3d Cir. 1995) ............................................. 17

*Weston v. Pennsylvania*,
    251 F.3d 420 (3d Cir. 2001 ............................................................................ 16

*Williams v. Caruso*,
    966 F. Supp. 287 (1997) ............................................................................ 19

## Other Authorities

Senate Bill No. 154 ............................................................................ 19

## ARGUMENT

Plaintiff's brief substitutes heat for light. She throws around words like "fabricated," "untruthful" and "unethical" to describe AstraZeneca's ("AZ" hereinafter) purported actions, but the "evidence" she relies on falls far short of establishing the validity of her charges. In this Reply Brief we will show that these slanderous and empty words are outrageous misstatements. Plaintiff would have the Court believe that more than two dozen people, managers, co-workers, Human Resource professionals and vendors, all conspired for over twelve months to fire her because she took off for six weeks to have a hysterectomy.

She asks the Court to deny summary judgment despite the fact that from the beginning of her assignment as an Exanta team member, she was given constructive criticism that involved many of the same issues about which she had been criticized in previous assignments. Jane Hellen gave her the benefit of the doubt in 2002 since she was learning a new job, C50-52, but as her problems intensified in early 2003, it became apparent that addressing Plaintiff's performance was an urgent issue. AZ followed its normal, multi-step, progressive performance improvement policies, starting with an Action Plan and then, when Plaintiff's performance did not improve, a Performance Improvement Plan. Plaintiff does not deny that these policies were followed and does not claim that AZ skipped any steps or short-circuited the process in order to "get her." She simply accuses large numbers of people of being dishonest, wrong and malevolent, all because she took some time off to have a hysterectomy. She never adequately answers the question of why all these people would turn on her and commit such egregious violations of the law in order to retaliate against her merely because she took time off for an operation, or because she later filed an internal complaint of retaliation. The only reasonable conclusion is that it did not happen; there was no retaliation.

Plaintiff's modus operandi in conducting this case has been for Plaintiff's counsel to attempt to put words in witnesses' mouths during depositions and then to regurgitate

mischaracterized versions of their testimony in her brief, along with citations to Plaintiff's self-serving, unsworn Complaint and her deposition testimony, and to claim this establishes a material dispute of fact.[1] The Court will note that Plaintiff has submitted no affidavits or other witness testimony in support of her claims, and the only documents she points to are her own lengthy e-mails and a few mildly laudatory comments in her file of the sort that can be found in any employee's personnel file.

A review of Plaintiff's testimony shows that Plaintiff's previously-identified deficiency of "listening but not understanding" has been carried over to this case, in spades. She denies things that are thoroughly documented, and mistakes benign expressions of concern for her health for threats to her job. As discussed in III, *infra*, simply making self-serving statements and denials is insufficient to overcome summary judgment, despite Plaintiff's legally unsupported argument to the contrary. Plaintiff's Answering Brief ("AB") 22. Nor can she overcome summary judgment by disagreeing with and challenging AZ's business decisions. AZ's Opening Brief ("OB") 33.

**I.    Plaintiff Has Failed Utterly To Prove Her Claim That The E-mails And Other Documents Showing That AZ's Ongoing Concerns About Her Performance Problems Predated Her FMLA Leave Request Were "Fabricated.**

Plaintiff has charged that a host of documents demonstrating AZ's managers were concerned about her performance long before she requested FMLA leave were "fabricated." AB16-17, 31. Plaintiff's sole "proof" for making the outrageous claim that AZ "created false evidence," AB31, is her theory that the proper procedure for dealing with performance problems would have been to first have an oral discussion with the problem employee and then put something in writing to the employee (i.e., follow a progressive personnel management policy),

---

[1] As one of many possible examples that could be cited, counsel repeatedly identified Plaintiff as a "Senior" PREP Manager during depositions, despite knowing she was not, C39, 46-47, 65, 77-78, 82, and then identified her as such in her Answering Brief. AB3. Plaintiff's Performance Evaluations, Employee Change Notices and even Plaintiff's correspondence and e-mails show that Plaintiff's title was "PREP Manager" from May 2002 through January 2004. A38; C8, 12, 13, 15.

**before** the managers talked or write to one another about how to address the performance problems. AB17. Therefore, since AZ's documents show that her managers consulted with each other via e-mail before the date on which, according to Plaintiff, anyone spoke to her, Plaintiff's loopy conclusion is that the authenticity of the e-mail exchanges "is questionable and implausible!" [sic]. *Id.* There is no support in either the record or common sense for this offensive leap of logic. Plaintiff's theory would preclude managers from talking to each other to coordinate their efforts to assist subordinates with performance problems. The e-mails and other documents predating Plaintiff's FMLA leave request were not "fabricated." C62a; 75.

Plaintiff's performance problems were not new in 2003. She asks the Court to conclude that not only Jane Hellen, Deborah Brangman, Susan Broadway, Deborah Kauffman, Brian Martin, and the peers and vendors with whom she worked on the Exanta team, but also Amy Renk Haines and the persons who provided feedback about her a year before, who certainly had no ax to grind and who raised remarkably similar problems to those that concerned the Exanta team, were lying.  Her request should be rejected.  Moreover, the feedback from vendors and peers in late 2003 absolutely excoriated Plaintiff; it is plain that at that time she was not even trying to perform her job but instead attempting to build a legal case. She left AZ with no alternative other than termination.

The reason Plaintiff received a "Good" (far from stellar) review for 2002 was that she was learning a new job, and was given the benefit of the doubt. Nevertheless, Plaintiff was told in connection with her 2002 evaluation that she needed to work on her strategic planning and leadership skills and she agreed to do so. A48. In 2003, since Plaintiff had been in the job for more than six months, the expectation was that she should be performing her job adequately without being given any special "slack," but as numerous documents demonstrate, she was instead losing ground.

Plaintiff cites *Andrews v. City of Philadelphia*, 895 F.3d 1469 (3d Cir. 1990), AB27, for the proposition that "a play cannot be understood without viewing all of its scenes." AZ agrees. AZ also agrees that Plaintiff's claim that AstraZeneca has "created false evidence" is an important factor in the case. AB31. AZ submits that since Plaintiff has failed utterly to prove that claim, her case must fail. When we view all of the "scenes" in the case at bar, we see an employee with ongoing performance problems who is simply unwilling to acknowledge her deficiencies. Instead, she blames others in an attempt to deflect all criticism. She now tries to blame AZ for her termination rather than her own poor performance, by seizing on her FMLA leave, an unrelated event that arose in the midst of her performance problems.

### A.    Jane Hellen Was Not Biased Against Employees on FMLA Leave.

To explain her obviously friendly and cooperative relationship with Jane Hellen during her leave, Plaintiff now claims she was, in essence, so worried about her job that she was "sucking up" to Hellen by offering to return early. AB12. She does not deny that when she had a lengthy conversation with Hellen about her medical condition, Hellen told her to focus on recovery and not to worry about her job. Furthermore, Plaintiff fails to address the fact that her doctor approved her return to work.

No reasonable jury could conclude that Hellen's statement, "Six weeks is a long time," was indicative of retaliatory motive. Hellen was surprised to hear that an apparently healthy employee was going to be out for medical reasons for six weeks and reacted with normal human concern. A280-81. When the following "scenes" are viewed, including the subsequent conversation when Plaintiff revealed to Hellen the details of her medical problem and cried about the fact that she would not be able to have children, and Hellen answered reassuringly and encouraged her to focus on overcoming her medical condition, the picture becomes clearer. A285. When one considers Plaintiff's continuing warm relationship with Hellen, as evinced by her repeated e-mails and calls to Hellen during her convalescence, A286; C28-29, the picture is

4

complete. There is no room in that picture for Plaintiff's illogical speculation that Jane Hellen, the person in whom she felt most comfortable confiding, had suddenly decided to turn on and terminate her for taking an FMLA leave.

Plaintiff also argues that Hellen was biased in general against employees on FMLA leave, and to support her charge, gives only one remarkably odd example. AB15. She claims she was present during a teleconference in early 2003 when Hellen remarked: "[d]oes everyone have their blankie." Plaintiff says an employee named Christy Hedstrom, "who had just had a baby," "seemed embarrassed" by the remark. *Id.* Plaintiff also said Hedstrom was participating by telephone, but she does not say how she could tell that Ms. Hedstrom was embarrassed. *Cf.* A298. Plaintiff has invented or misperceived the sparse evidence she offers to shore up her case. She has no support in the record other than her own assertions.

### B.     Plaintiff's Performance Problems Predated Her FMLA Leave

Plaintiff's answering brief displays a remarkable propensity for ignoring all unfavorable facts and documents, much as Plaintiff herself did in the final year of her employment with AZ. She has not even tried to rebut the facts that show that her performance problems predated her FMLA leave, relying only on her baseless claim that all evidence that demonstrates her performance failures was "fabricated."

Plaintiff's problems on the Exanta team began at least as far back as November 2002, six months before her leave request. Plaintiff's supervisor, Brian Martin, attended meetings for which she was responsible, which were run poorly, and on November 25, 2002 he had a discussion with Plaintiff about the advisory board strategy for 2003. A25; 366-67. Following the meeting, Martin sent Plaintiff an e-mail message instructing her to prepare a template or standard operating procedure for advisory board meetings, "to ensure that all are of the highest in quality." A25. When Jane Hellen also expressed dissatisfaction with the "loosely run" Chicago Advisory Board meeting for which Plaintiff was responsible, Plaintiff took "copious notes." A289-90. Around the

same time, one of the strategists with whom Plaintiff worked, Jane Clark, provided year-end performance feedback on Plaintiff implying that Plaintiff's sloppy planning for Advisory Boards needed to be improved. Clark, who commented that she thought the items had already been discussed with Plaintiff, suggested that in the future, when setting up Ad Boards Plaintiff should:

> work closely with the appropriate strategist prior to setting up the Advisory Board to ensure their availability. Include the strategist in the planning portion for the Advisory Board (suggested doctors, etc.). Have the program details completed (breakouts, etc.) at least a week ahead of the program so that everyone that needs to participate knows what their responsibilities are.

A33.

Plaintiff has also failed to address the following events, all of which preceded her request for FMLA leave:

- **January, 2003** – Brian Martin expressed his concern to Deborah Brangman about Plaintiff's performance. Brangman also became concerned about Plaintiff's performance after a communication meeting.  A339-40; C74-5.

- **February, 2003** – Martin told Brangman he was growing even more worried about Plaintiff's performance. Even after a vendor and Martin had prepared a template with step-by-step plans and a timeline for developing Advisory Boards for Plaintiff's use, Plaintiff had difficulty making decisions. A339-40.

- **February, 2003** – Hellen told Brangman that Plaintiff was performing at a much lower level than she had in 2002. A341.

- **February 12, 2003** – Hellen sent Brangman an e-mail stating that she was seriously reconsidering Plaintiff's promotion. Hellen suggested that they not promote Plaintiff and explain to her why she needed improvement. Brangman replied that she was having reservations as well. A46; 303-05.

- **February 14, 2003** – Hellen sent an e-mail to Brangman asking her to set up a meeting to discuss Plaintiff's performance. A47; 303-05.

- **March 5, 2003** – Martin forwarded to Hellen a series of e-mail messages about the specialty board invitee lists and asked Hellen if she wanted him to help. A50-56.

- **March 5, 2003** – Hellen forwarded the e-mail string to Brangman and wrote that they highlighted the "significant deficiency" with Plaintiff's work. Hellen stated the advisory board schedule was at risk because Plaintiff was sitting on information and not meeting deadlines. Hellen asked Brangman for help to move Plaintiff along or "place her on a performance improvement plan asap." A50-56.

- **March 2003** – Martin told Brangman that Plaintiff's workload was lighter than her peers' workload. C73-4.

- **March 10, 2003** – Brangman presented Plaintiff with her 2002 Performance Evaluation and told Plaintiff to consider taking courses on strategic planning, leadership skills and public speaking. Concerns about Plaintiff's performance were discussed with her before and during this meeting. A38-44, 327-28; C66-67, 72-74.

- **March 11, 2003** – Plaintiff sent an e-mail to Brangman and Martin thanking them for their recommendations and requested permission to take two development courses. A48.

- **March 14, 2003** – The April Cardiology Advisory Board meeting had to be cancelled. Hellen discussed Plaintiff's performance with her. C17; A50-57, 78, 282-83, 311.

- **March 17, 2003** – Brangman sent an e-mail to Bolenbaugh, Hellen, Martin and Kauffman requesting a meeting "to discuss the evolving situation with Marybeth Farrell." A58.

- **March 18, 2003** – Brangman, Bolenbaugh, Hellen, Martin and Kauffman met to discuss Plaintiff. A58; 306-7.

- **March, 2003** – Brangman became the Brand Communications Director for Iressa. C64.

- **March, 2003** – Martin returned to the Seroquil marketing team. A307.

- **April 1, 2003** – Hellen announced Broadway's promotion to Martin's former position. After the meeting, Plaintiff went to Hellen's office and said she felt she was better qualified for the position than Broadway. Hellen told her she would not be promoted until she demonstrated that she could do her job. A309-11; C20-22; 57-58.

- **April 4, 2003** – Kauffman e-mailed Hellen a message saying she wanted to discuss the situation with Plaintiff, which had been put on hold during Martin's transition into a different position. Kauffman said she and Broadway agreed the situation was urgent.  Hellen discussed the situation with Kauffman. A59; 307-09.

- **April 7, 2003** – Hellen e-mailed Plaintiff, asking how she was progressing with the action list from the March 14, 2003 meeting and suggesting that she take on several of the items herself instead of delegating them. A62.

- **April 10, 2003** – Hellen e-mailed Plaintiff that she wanted "more depth" in her weekly updates, and outlined the specific information she needed. C3.

- **April 11, 2003** – Broadway met with Plaintiff and afterwards, Plaintiff sent her an e-mail with her revised objectives that included more autonomy and responsibility in connection with advisory board planning and "responsibility for total project management for the advisory boards including directly obtaining the necessary inputs from team members such as medical directors, and other issues we discussed." Plaintiff said she "welcome[d] assuming a greater degree of autonomy, responsibility and accountability for managing the Advisory Boards & investigators that you discussed." A66.

- **April 14, 2003** –  Hellen said she was waiting for Martin to give her "the specifics for [plaintiff's] performance" and that she hated to delay addressing the problem, but they would have to handle it when Hellen returned from vacation. A67.

- **April 15, 2003** – Louise Colburn, a peer of Plaintiff, sent Broadway an e-mail referring to going "round and round" with Plaintiff. C4. Colburn complained that Plaintiff did not understand her job. A313-14. Plaintiff testified that she got along well with

7

Colburn and had no reason to think that Colburn would try to harm her professionally. C24.

- **April 28, 2003** – Kauffman contacted Broadway to discuss her concern that no action was occurring with Farrell. Broadway told Kauffman that Farrell would be "out for a few weeks for a medical." Broadway stated that she would only discuss the work that Farrell would need to complete or transition before her surgery and would discuss the other performance issues upon her return. A71-72; 370.

The discussions about Plaintiff's performance issues that occurred both before she left for FMLA leave and after she returned grew out of the events described above, all of which were conveniently overlooked in Plaintiff's brief. Plaintiff's brief also failed to address her worsening job performance after her return from FMLA leave and the intransigent manner in which she dealt with her managers' efforts to help her improve her performance.

Plaintiff has admitted that she complained to Jane Hellen when Susan Broadway was promoted in early April and that Hellen gave her a negative response about her own performance, albeit one that was less detailed than Hellen recalled. A309-12; C20-24.

Plaintiff tries to dispute AstraZeneca's reason for blaming her for the Cardiology Advisory Board cancellation, an event she admitted was "not insignificant," C18-19, but she can not refute the fact that she was indeed blamed in mid-March, weeks before she asked for FMLA leave. The question is not whether AZ was correct in holding her responsible (though it plainly was correct) but whether, in fact, in February and March 2003, Hellen imposed that responsibility on Plaintiff and concluded that Plaintiff's mishandling of the advisory board planning process illustrated a "significant deficiency" in Plaintiff's performance. Plaintiff has done nothing to call that conclusion into question.

Plaintiff claims that Hellen thought she was doing a good job, based on Hellen's February e-mail, AB18, in which Hellen simply says two words, "good job," in response to an e-mail from Plaintiff about changing an Advisory Board meeting date, but Plaintiff omits the fact that in March and April, pre-FMLA leave, Hellen did blame her for the cancellation of that very Advisory Board and told her not to try and shift the blame to others. C48-49.

8

**C.    Hellen and Broadway Were Not Antagonistic Toward Plaintiff.**

Plaintiff claims Hellen and Broadway were antagonistic toward her after she requested FMLA leave. Her only explanation for why they would suddenly turn on her is that they were busy. AB32. She says she got along fine with Jane Hellen until the FMLA leave. AB13. As stated above, the truth is that Plaintiff continued to get along well with Hellen, confiding in her even after the disclosure of her ailment and communicating with Hellen instead of Broadway while out on leave. There is simply no support for her claim that her relationship with Hellen turned sour as the result of her leave. Hellen was on record as having performance concerns about Plaintiff six months before the leave, and Hellen continued to press for improvement after the leave, following the same performance improvement process that had been discussed earlier in the year.

Plaintiff claims Hellen told her shortly after the FMLA leave was announced that she was not being retained. AB13. Aside from the fact that no reasonable juror could believe that a manager would volunteer to a subordinate for no reason at all that she was going to be terminated (and both Hellen and Broadway deny Hellen said it, C53; 79), the subsequent frustrating seven-month effort to help Plaintiff improve her performance disproves any supposed non-retention plan.

Moreover, on May 8, Plaintiff told Deborah Kauffman she felt good about her meeting with Hellen the previous day and that Hellen's expectations and scheduling issues were reasonable and that she felt she could meet all of the short-term objectives. A87.

As for Plaintiff's relationship with Susan Broadway, Plaintiff clearly resented Ms. Broadway after her promotion and reported to her only reluctantly. Plaintiff's attitude became negative after Broadway's promotion, and her attitude became progressively worse during the balance of the year. A287-89.

Plaintiff accuses Broadway of falsifying her record by withholding budget information, AB21, but it was not Broadway's job to enter Plaintiff's budget information into the "Delta"

9

budget system; according to Plaintiff's deposition testimony, that was Cindy Hassrick's job. C35.

Hassrick told Broadway in performance feedback in December 2003 that she had spent a

significant amount of time sitting with Plaintiff to enter managed markets tactics and dollars into

the budget, that Plaintiff did not have any insights into budget matters, and that Hassrick had had

to correct Plaintiff's entries into the system. A172-73. Other employees also noted that Plaintiff

did not know how to handle the budget system and had fouled up the process by improper entries.

C9; A176, 184, 204. No reasonable jury could believe this charge based on the record evidence.

> **D.     Plaintiff's FMLA Leave Was A Non-Event That Happened To
> Occur In The Middle Of Ongoing Efforts To Improve Her
> Performance.**

Plaintiff requested FMLA leave in late April for surgery after consulting two doctors, Dr.

Duque on January 20 (C1) and Dr. Gorondy on March 19, 2003 (C2). C25-27. Her request was

approved on May 1. A79. Steps were taken to assure that her assigned work could continue to be

done by others while she was out, and her leave began. She continued to correspond with Jane

Hellen while she was out, and she returned when her doctor said she could do so. Preexisting

performance concerns, C54-56; 66-67, 69-70, were placed on hold while Plaintiff was on leave.

No one ever said anything negative about FMLA leave in general or about Plaintiff having taken

leave. Her leave was a non-event in the middle of an effort to address Plaintiff's performance

deficiencies.

Various managers met to discuss the performance concerns well before the FMLA leave

was requested, but there was a hiatus after Brian Martin was reassigned and Susan Broadway took

his place, although discussions among the managers continued. When Plaintiff requested FMLA

leave, everything stopped until the leave was over. The fact that an FMLA leave intervened in the

middle of efforts to address performance problems did not make the pre-existing problems

disappear. Plaintiff had no more rights after the leave than she did before it. She was still expected

to do her job, and she was not doing it satisfactorily. Plaintiff claims AZ's actions after the leave

057159.1004

was requested were retaliatory, but ignores Deborah Kauffman's file note that at the time, Plaintiff told her the short term objectives she was asked to work on, which were merely designed to assure that work could continue on her assignments while she was on leave, were appropriate. A88; C59.

When Rachel Bevis, who had moved from an AZ site in Texas and taken over from Deborah Brangman as Plaintiff's functional manager, met with Susan Broadway in early summer, Broadway told Bevis that Plaintiff's performance issues were long-standing in nature. C83-84.

### E. Temporal Proximity Is Lacking.

To prove retaliation by the use of temporal proximity, the timing must be "unusually suggestive." There is no such proximity here. Plaintiff's managers were addressing her performance problems before she requested FMLA leave, and stopped while she was on leave, except for items relating to the transition while she was out. Afterwards, when Plaintiff came back and still did not perform satisfactorily, her managers returned to the normal personnel management approach that was being discussed before the FMLA leave intervened and she was put on an Action Plan in August, two months after the end of her leave.

Plaintiff says Hellen provided negative feedback for the first time on April 28. AB13. This is simply not true; Hellen expressed dissatisfaction to Plaintiff directly as early as December 2002, again expressed concern in mid-March, before the FMLA leave was requested, on the day the Cardiology Advisory Board was cancelled, and told Plaintiff yet again she needed to improve on the day Susan Broadway was promoted. C20-22; A309-11, 314-15; A78. Hellen's preexisting concerns about Plaintiff's performance are thoroughly documented in other communications. A307-09.

Plaintiff also tries to draw improper conclusions from the timing of the PIP, AB10, but the timing of the PIP is legitimate and does not suggest bias. Plaintiff made her internal complaint while the Action Plan was pending and the closing out of the Action Plan was suspended until

11

Keith Black of Human Resources finished his investigation of her charges. After he concluded his investigation, the Action Plan was closed out and the PIP implemented. C40-44; 80; A139.

**F.    There Is No Proof Of A Causal Relationship Between The Performance Actions And The FMLA Leave.**

Plaintiff for the most part ignores the crucial issue of causal relationship. She claims that all of the pre-leave evidence of performance concerns was fabricated, implicating a host of people. If the Court agrees, by all means there should be a trial in this case. But if the Court does not agree, the case should be dismissed, since, aside from the claim of fabrication, the documentary and testimonial proof that these performance concerns predated and were unrelated to the FMLA leave is undisputed. A261-2.

Plaintiff's performance problems were mentioned by virtually everyone that dealt with her. She stubbornly refused to address or even acknowledge these concerns, and did everything she could to challenge her managers' efforts to help her improve. For example, she insisted that she was improperly being held to Band V standards in the Action Plan and PIP. AB19. She says she spoke to Rachel Bevis about the issue because Bevis was knowledgeable about the various band levels, but when Bevis told Plaintiff that she was mistaken in her assertion and should focus on achieving the Action Plan rather than nitpicking the details, Plaintiff turned a deaf ear. C33-34; 88-89. Farrell refused to sign the PIP and was generally obnoxious and uncooperative for the next 11 weeks. OB17-22.

Plaintiff also argues that she was the only employee that Hellen and Broadway terminated, but in the absence of evidence that any other employee reporting to Hellen and/or Broadway had similar performance issues and was not terminated, her argument is unpersuasive.

**G.    Plaintiff Knew In Early 2003 That She Was Not Being Promoted.**

Plaintiff continues to insist that Deborah Brangman told her in July 2003 that she was not being promoted. Brangman moved to another Brand team in March 2003 and had nothing more to

12

do with Plaintiff. C64, 70-71. This unsupported claim is inconsistent with all other promotion-related testimony.

It should be recalled, first, that it was Plaintiff, herself, who claimed she had been told by her then-supervisor, Renee Valles, that she would be promoted. Brangman testified that she thought it very unusual that the first time she met Plaintiff, she was already campaigning for a promotion. A338. By February 2003, Hellen, Brangman and Martin were in agreement that Plaintiff was not promotable and was a performance problem. *Cf.*AB5. Brangman told Plaintiff about her 2003 performance concerns at the March meeting where her 2002 evaluation was discussed, and there are numerous e-mails from that period confirming the managers' concerns. And in early April 2003, Plaintiff was not promoted, Susan Broadway was. When Plaintiff complained about it, Jane Hellen told her she needed to do a better job at her current level before she would be promoted. All that occurred before the FMLA leave issue arose.

Plaintiff was not told in July by Brangman or anyone else that she would not be promoted. AB8. The only thing that occurred in July was that Plaintiff made the bizarre claim that she had received a package at home telling her she had been promoted, but she now admits that she misread the mailing. C30-31, 36-37; A351-52. Perhaps she is twisting that event in order to stretch the earlier rejection for promotion to a time after her FMLA leave. There is no other explanation for this unsupported claim.

Contrary to Plaintiff's mystifying assertion, AB21, Rachel Bevis' testimony that Plaintiff was not promotable to Band V in July 2003 is not inconsistent with the tentative promotion plans in December 2002. As the documents and testimony make clear, the decisionmakers had second thoughts about promoting Plaintiff in early 2003, and their conclusion was reinforced by Plaintiff's continuing deficient performance as the months passed.

H.     **Moving Plaintiff To A Cubicle Was Not Retaliatory.**

Plaintiff claims that placing her in a cubicle was retaliatory, AB15, but as a Band IV employee, Plaintiff was supposed to be in a cubicle, not an office. She got an office for a period of time beginning in 2002 by following the same strategy as with her "promotion" - she pushed for it. Since an office was available at the time, Jane Hellen arranged for her to have an office. Plaintiff was the only Band IV Exanta employee who had an office at that time. B192. Everyone else was already in a cubicle. Even Band V employees were moved to cubicles later, B192, C85-87, so it is not even true that if Plaintiff had been promoted she would necessarily have been in an office, as she claims at AB16. She was moved to a cubicle because higher band level persons moved to the building and needed offices. The move had nothing to do with her FMLA leave.

I.     **There Is No Support in the Record for Plaintiff's Other Claims.**

Plaintiff now says that AstraZeneca "vandalize[d]" her computer docking station. As is uniformly true for all of her claims, there is no support for this assertion. If her docking station was damaged, AZ had nothing to do with it. On January 9, 2004, Plaintiff gave her administrative assistant instructions to report damage to her docking station, C14, and the docking station was repaired. This is nothing more than another example of Plaintiff grossly exaggerating and distorting events to try to place blame on AZ. In any event, damage to a computer docking station owned by AZ, and an alleged failure to investigate it, are not adverse employment actions vis a vis Plaintiff, as discussed in II, *infra*.

Plaintiff claims other employees could use agency resources while she was forbidden from doing so. AB20. Plaintiff's Action Plan addressed three areas: administrative duties, communication and customer programs. Nothing in the plan said that Plaintiff was forbidden to use administrative staff and resources to do her job. The Action Plan said that Plaintiff should communicate with others and accept accountability for her own responsibilities rather than

14

blaming agencies or staff for her failure to accomplish her tasks. A101-03. Plaintiff's unsupported

assertion is the only evidence that this was the case.

There is nothing inconsistent about AZ saying that Plaintiff's attitude was acceptable in

2002, but that it became unacceptable as time went on in 2003. AB21. The validity of AZ's

opinion is borne out by Plaintiff's own increasingly uncooperative and insulting e-mails. Jane

Hellen traced the change to Susan Broadway's promotion, to which Plaintiff reacted negatively.

The PIP does not say Plaintiff must act as a scientific expert, just that she must understand

clinical data well enough to have educated conversations with other team members. A141-45.

Finally, Plaintiff's meeting with Jane Hellen's manager, Patty McDonald, was another

instance where Plaintiff heard what she wanted to hear rather than what was said. C60-62.

> I did not imply in anyway I wanted to be kept up to speed on this .
> . . I did not recommend weekly record keeping.  Interesting how 2
> people can have the same conversation and get slightly different
> takeaways."

C5. Ms. McDonald astutely concluded that "I think she is in over her head in her
current role on this team but is not sel[f]-aware of her limitations. ..."

## II.    Plaintiff's Termination Was The Only Tangible Adverse Employment Action.

Plaintiff complains about various actions taken against her but the only one that would, if

proven, constitute an adverse employment action cognizable under the FMLA was her termination

in January 2004, nearly eight months after she returned from FMLA leave:

> A tangible employment action constitutes a significant change in
> employment status, such as hiring, firing, failing to promote,[2]
> reassignment with significantly different responsibilities, or a
> decision causing a significant change in benefits.

*Burlington Indus. v. Ellerth*, 524 U.S. 742, 761 (1998).

In *Collier v. Target Stores Corp.*, 2005 U.S. Dist. LEXIS 6262, *21-*22 (D. Del. April 13,

2005), this Court addressed what constitutes an adverse employment action under the FMLA. The

Court pointed out that "the Third Circuit has not had the opportunity to explain what constitutes

---

[2] Plaintiff's failure to promote claim fails since it predated her FMLA leave.

an adverse employment action under the FMLA. However, several Third Circuit opinions have

examined the meaning of 'adverse employment actions' under Title VII, the ADA, and the

ADEA." The Court went on to observe that:

> The Third Circuit has found that oral and written reprimands are
> insufficient to establish an adverse employment action. Robinson, 120
> F.3d at 1300 (finding that oral reprimands did not rise to the level of
> what Third Circuit cases have described as adverse employment
> action); *Weston v. Pennsylvania*, 251 F.3d 420, 431 (3d Cir. 2001)
> ("Weston failed to establish how these two [written] reprimands effect
> a material change in the terms or conditions of his employment. We
> cannot, therefore, characterize them as adverse employment actions.").
> Furthermore, "unnecessary derogatory comments" do not amount to
> adverse employment actions. *Robinson*, 120 F.3d at 1300 (3d Cir.
> 1997) (finding that "unnecessary derogatory comments" do not rise to
> the level of what Third Circuit cases have described as adverse
> employment actions).

*Collier v. Target Stores Corp.*, *id.* *18-*19. *And see Igwe v. DuPont*, 2005 U.S. Dist. LEXIS 1254

(D. Del. Jan. 24, 2005) (transfer to different position and placement on disciplinary probation

were not adverse actions). The Court in *Collier, *21-*22*, went on to discuss what actions do and

do not rise to the level of retaliation under the FMLA:

> Plaintiff has identified the following adverse employment actions: (1)
> Bellamy's "constant" harassment of plaintiff n5 (D.I. 52 at 18); (2)
> Bellamy's reference to plaintiff as "psycho" and "mental" in
> conversations with management level employees and a temporary
> pharmacist (id.); (3) Bellamy's "invasion of plaintiff's privacy" by
> having a camera installed to surveil plaintiff's work (id.); (4) the final
> warnings that plaintiff received (id. at 19); (5) the 2003 Evaluation,
> which was lower than the 2002 Evaluation (id.); (6) relieving plaintiff
> of her scheduling duties and her Committee position (id.); (7)
> instigation of a false incident report filed by Weber against plaintiff
> (id. at 19); n6 (8) plaintiff's constructive discharge (id.); (9) Thomas'
> call to plaintiff's home while she was on leave (id. at 20); and (10)
> verbal reprimands for alleged negative communications with Weber
> (id.). . . Of the adverse employment actions identified by plaintiff, only
> her claim of being constructively discharged is "serious and tangible
> enough" to be considered as altering plaintiff's terms, conditions or
> privileges of employment."

None of the alleged adverse actions Plaintiff points to, such as moving from an office to a

cubicle, being placed on an Action Plan or a PIP, and allegedly being encouraged to return

16

quickly from FMLA leave, rise to the level of an adverse employment action under the law in this Court and the Third Circuit. The case Plaintiff cites from the Ninth Circuit, *Ray v. Henderson*, 217 F.3d 1234 (9th Cir. 2000), is simply not apposite. In that case "the employer, in retaliation for Ray's complaints concerning management's treatment of women employees, eliminated employee meetings, eliminated its flexible starting time policy, instituted a 'lockdown' of the workplace, and **cut Ray's salary**." *Id*. at 1237. (emphasis added). No such tangible consequences ensued in this case until, after unsuccessfully trying to persuade Plaintiff to seriously focus on improving her performance, AZ had no alternative but to terminate her. That event, which was not causally connected to her FMLA leave in any event, was not temporally proximate to her leave.

### III.    Plaintiff's Self-Serving Statements Cannot Prevent Summary Judgment.

In a summary judgment context, the plaintiff cannot rely on her own perceptions of the reasons behind the decision, since this is not relevant to the inquiry. *See*, *Sempier v. Johnson & Higgins*, 45 F.3d 724, 731 (3d Cir. 1995) (citations omitted); *Sullivan v. Standard Chlorine of Delaware, Inc*., 845 F. Supp. 167, 175 (D. Del. 1994) ("merely reciting that [retaliation] was the reason for the decision does not make it so."), *aff'd without op*., 1995 U.S. App. LEXIS 5122 (3d Cir. 1995). *See also*, *e.g.*, *Mills v. First Fed. Sav. & Loan Ass'n*, 83 F.3d 833 (7th Cir. 1996) ("subjective beliefs of the plaintiff . . . are insufficient to create a genuine issue of fact"). As the Tenth Circuit stated recently, "[m]ere conjecture that [the defendant] acted with discriminatory reasons will not suffice to establish pretext." *Annett v. University of Kansas*, 371 F.3d 1233, 1241 (10th Cir. 2004).

When the rhetoric is filtered out, it can be seen that Plaintiff's case relies entirely on her own assertions. Especially where, as here, a plaintiff's claims and the inferences she seeks to draw from them do not hold up under logical analysis and can truly be characterized as absurd, summary judgment should follow.

17

> Judges may, under certain circumstances, lawfully put aside
> testimony that is so undermined as to be incredible. The removal
> of a factual question from the jury is most likely when a plaintiff's
> claim is supported solely by the plaintiff's own self-serving
> testimony, unsupported by corroborating evidence, and
> undermined either by other credible evidence, physical
> impossibility or other persuasive evidence that the plaintiff has
> deliberately committed perjury. (citations omitted).

*Johnson v. Washington M.A.T.A.*, 883 F.2d 125, 128 (D.C. Cir. 1989). Judge Mikva could have

been talking about the case at bar. *Accord Ruff v. Partner's Liquidating Trust*, 2001 U.S. Dist.

LEXIS 11683 (N.D. Ill. Aug. 8, 2001)("Self-serving statements are insufficient for purposes of

summary judgment."). Summary judgment should be granted on Plaintiff's FMLA retaliation

claim.

**IV.     Plaintiff's Implied Covenant Claims Fail.**

Just as Plaintiff's FMLA claim must fail, so must her implied covenant claim based on

falsification of records, for the simple reason that no records were falsified. At AB33, Plaintiff

says that if AZ thought she had performance issues relating back to December 2002, it would not

have given her a good evaluation in March 2003. But as explained by Ms. Brangman and Ms.

Hellen, the 2002 evaluation was based on her performance in 2002, when she was still learning

her new job and before serious performance issues began to surface, A290, and because Plaintiff

was given the benefit of the doubt during her first half-year in the position. Ms. Brangman made a

special point of discussing the 2003 performance problems when she met with Plaintiff in March

2003, C69-70; A341-2; and numerous documents from around that time make it clear that there

were serious performance concerns.

Plaintiff also says that if AZ thought she had performance issues relating back to

December 2002, it would not have waited until August to place her on an Action Plan. AB33. But

as early as February 2003, her managers discussed placing her on a performance plan of some

kind; the delay was due to changes in management personnel, and then to Plaintiff's leave. Of

course, if Plaintiff had been placed on an Action Plan in May, while she was out on leave, one can only imagine the intemperate verbiage that would have ensued.

The simplest answer to Plaintiff's public policy implied covenant claim is that since the FMLA has not been violated, no public policy cause of action exists. A second reason for rejecting this claim is that the recent amendment to the Delaware Discrimination law overturned *Schuster v. Derocili*, 775 A.2d 1029 (Del. 2001), which had rejected numerous cases holding that where there is a statutory remedy, it is the exclusive remedy. *Finch v. Hercules Inc.*, 809 F. Supp. 309 (1992); *Williams v. Caruso*, 966 F. Supp. 287 (1997); *Ayres v. Jacobs & Crumpler, P.A.*, C.A. No. 96 C-07-258 (WTQ), 1996 Del. Super. LEXIS 565 (Dec. 31, 1996); *Drainer v. O'Donnell,* C.A. No. 94C-08-062, Alford, J., 1995 Del. Super. LEXIS 229 (May 30, 1995).  See Synopsis to S.B. No. 154.  Plainly, the Delaware General Assembly desires the courts to return to the former doctrine, that where, as here, a statutory remedy exists, it constitutes the exclusive remedy.

**V.      Plaintiff's COBRA Notice Was Mailed In Compliance With COBRA.**

Plaintiff does not refute AZ's evidence that the COBRA notice was mailed, which she was required to do in order for her claim to succeed. Plaintiff's own testimony is that she already knew about her COBRA rights. AB35. If she was aware of COBRA and truly concerned, she could have called and asked about the whereabouts of the COBRA notice or what to do to obtain COBRA coverage. She was an educated, sophisticated person and was represented by counsel. It is not helpful to her case that she was "watching out" for the notice, since she has lost other important documents like her psychologist's invoice, and misinterpreted others, such as the purported "promotion" package. Summary judgment should be granted on this claim.

19

**CONCLUSION**

Plaintiff has stubbornly persisted in this frivolous litigation despite having been fortunate enough to obtain two other jobs in turn since leaving AstraZeneca, each of which paid her substantially more than what she was making at AstraZeneca and with comparable benefits. As a result, in addition to being unable to prove liability, she has sustained no damages compensable under the FMLA, a point made in AZ's opening brief and not responded to by Plaintiff in her brief. This case should never have been filed, and should be ended now, before more time is wasted and baseless charges of falsifying documents and undeserved claims of retaliation have to be further endured.

Respectfully submitted,

YOUNG CONAWAY STARGATT & TAYLOR, LLP

  /s/ Sheldon N. Sandler
Sheldon N. Sandler, Esquire (No. 245)
Teresa A. Cheek, Esquire (No. 2657)
The Brandywine Building, 17th Floor
1000 West Street, P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6673
Facsimile: (302) 576-3330
Attorneys for Defendant

Dated: May 24, 2005

## CERTIFICATE OF SERVICE

I hereby certify that on May 24, 2005, I electronically filed a true and correct copy of the foregoing **Defendant's Reply Brief in Support of Its Motion For Summary Judgment** with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

Thomas S. Neuberger,  Esquire          John M. LaRosa, Esquire
The Neuberger Firm                    Law Office of John M. LaRosa
Two East Seventh Street, Suite 302    Two East 7th Street, Suite 302
Wilmington, DE 19801-3707             Wilmington, DE 19801-3707

I further certify that on May 24, 2005**,**  I caused a copy of the foregoing **Defendant's Reply Brief in Support of Its Motion For Summary Judgment** to be served by hand-delivery on the following counsel of record:

Thomas S. Neuberger,  Esquire          John M. LaRosa, Esquire
The Neuberger Firm                    Law Office of John M. LaRosa
Two East Seventh Street, Suite 302    Two East 7th Street, Suite 302
Wilmington, DE 19801-3707             Wilmington, DE 19801-3707

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ *Sheldon N. Sandler*
Sheldon N. Sandler, Esquire (No. 245)
Teresa A. Cheek, Esquire (No. 2657)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware  19899-0391
Telephone: (302) 571-6673
Facsimile: (302) 576-3330
Email:  ssandler@ycst.com
Attorneys for Defendant

Dated:  May 24, 2005