1996 Del. Super. LEXIS 565, *

**CAROLINE P. AYRES, Plaintiff, v. JACOBS & CRUMPLAR, P.A.; ROBERT JACOBS, individually and as agent/senior partner; AND THOMAS C. CRUMPLAR, individually and as agent/senior partner, Defendants.**

**C.A. No. 96C-07-258-WTQ**

**SUPERIOR COURT OF DELAWARE, NEW CASTLE**

*1996 Del. Super. LEXIS 565*

**November 6, 1996, Submitted
December 31, 1996, Decided**

**SUBSEQUENT HISTORY: [*1]**

As Amended January 7, 1997. Released for Publication by the Court January 24, 1997.

**DISPOSITION:**

Defendants' Motion for Summary Judgment GRANTED in part, DENIED without prejudice in part.

**LexisNexis(R) Headnotes**

**COUNSEL:**

Caroline P. Ayres, pro se, Wilmington, Delaware.

Thomas Stephen Neuberger, Thomas S. Neuberger, P.A., Wilmington, Delaware, Attorney for Defendants.

**JUDGES:** William T. Quillen, J.

**OPINIONBY:** William T. Quillen

**OPINION:**

Defendants' Motion for Summary Judgment

William T. Quillen, J.

The following is the Court's decision on Defendants' Motion for Summary Judgment. For the reasons herein stated, Defendants' Motion is GRANTED in part and DENIED without prejudice in part.

*A. Facts*

This Court is the third court which thus far has had occasion to touch upon the facts and allegations pressed forth in this case. The facts and allegations are not new, but the federal and state actions have overlapped, so the

Court will attempt to unravel this tangled web. From the outset, it is clear that the only undisputed facts concerning the substance of the federal and state complaints are that Defendant Jacobs & Crumplar, P.A. hired Plaintiff Caroline Ayres ("Ayres"), an African-American woman, as an associate in December 1988, and that she worked [*2] for Jacobs & Crumplar, P.A. until August 1993. The intervening factual allegations are made by Ayres. According to Ayres, Robert Jacobs ("Jacobs") and Thomas Crumplar ("Crumplar") at the time of her hiring promised her that she would be "promoted" from associate to partner in two or three years, if her work has satisfactory. On at least two occasions, in January 1991 and March 1992, Ayres claims that Defendants Jacobs and Crumplar told her that her work was satisfactory and qualified her for partnership. It was not until January 1993, however, that she says defendants told her that the firm had decided to offer her membership as a partner, but that the offer would be announced in August 1993. Ayres says she accepted the promotion at the January meeting. In July of that same year, however, defendants held a meeting with Ayres in which they told plaintiff that she would not be promoted to partner and would instead be discharged on the ground that she was incapable of trying a case by herself.

On December 7, 1994, Ayres filed a *pro se* complaint in the federal District Court for the District of Delaware, in which she alleged a veritable host of unlawful activity by Jacobs & Crumplar, [*3] P.A., Robert Jacobs, Thomas Crumplar, and Douglas Canfield, n1 including racial and gender discrimination, assault and battery, retaliatory discharge, breach of implied covenant of good faith and fair dealing, breaches of contract, fraud in the inducement, economic duress, malicious conspiracy, defamation, wrongful termination, and the intentional and negligent infliction of emotional distress. The District Court issued a scheduling order on February 2, 1995. Discovery was scheduled over seven

months until stayed by the District Court on September 19, 1995 in order to consider the motion to dismiss. Plaintiff undertook little discovery, filing one set of interrogatories which was later withdrawn. The federal case docket reveals that over this seven month period Ayres initiated no requests for documents, took no depositions, never obtained any experts, and never served any subpoenas for records. *See* Defendants' App. at A47-A56, Docket No. 6; Defendants' Mot. to Stay Disc. at 2, Docket No. 5. The District Court found, in describing the pace at which plaintiff pursued her cause of action, that she "stonewalled quite a bit in this case." *See* Tr. of Proceedings before Latchum, J., **[*4]** *reproduced in* Defendants' App. at A85, Docket No. 6.

n1 Notice of dismissal with prejudice filed by plaintiff on August 5, 1996. Mr. Canfield is no longer a party to the case.

The District Court dismissed the complaint and entered judgment in favor of defendants on the ground of deficient service of process. Ayres had failed to obtain the District Court Clerk's signature on the summonses and have the seal of the court affixed, as required by *Rule 4 of the Federal Rules of Civil Procedure.* She claimed, instead, that "technical niceties of service of process" should be overlooked. *Ayres v. Jacobs & Crumplar, P.A., D. Del., C.A. No. 94-658, 1995 U.S. Dist. LEXIS 17712,* *4, Robinson, J. (Nov. 25, 1995).* The District Court found that Ayres failed to demonstrate good cause for her failure to comply with the federal rules, and, moreover, that "plaintiff has exhibited flagrant disregard for the rules." *Id.* at *11. Having received ample opportunity to correct her failure within the 120 day period as required by the federal rules, she did not **[*5]** do so. *Id.*

Ayres filed a timely appeal with the Third Circuit Court of Appeals. While a decision from the Third Circuit was pending, Ayres filed this action in Superior Court on July 25, 1996. Her state complaint dropped the gender discrimination charge and now numbers some fifteen counts, in roman numerals "I" through "XVII," skipping "VI" and "XII." A timely answer was filed by defendants. On August 26, 1996, defendants filed a Motion to Stay Discovery, which was granted by this Court on September 19, 1996 (Docket No. 9). They filed the present Motion on September 5, 1996. Before the scheduled date for oral arguments on this Motion, the Third Circuit Court of Appeals issued its decision on Ayres' appeal from the District Court's dismissal. *Ayres v. Jacobs & Crumplar, P.A., 3d Cir., 99 F.3d 565 (1996).* In affirming the District Court, the Circuit Court found that the District Court did not abuse its discretion in

holding that there did not exist good cause for failure to effect service within the 120 day period. *Id. at 568.* The Circuit Court also found that the unsigned summons did not confer personal jurisdiction over the defendants, and that defendants did not waive **[*6]** the defective service. *Id. at 570.*

In the present Motion, defendants argue that all of the counts in plaintiff's Complaint may be dismissed. They assert that Counts I-V, VII, IX, X, XI, XVI, and XVII are personal injury claims and therefore barred by a two year statute of limitations, while Counts VII, VIII, XIII, XIV, and XV are contract-based claims and are barred by the Statute of Frauds and the at-will doctrine of employment. Plaintiff disputes that any of the counts should be dismissed.

### B. The Standard for Summary Judgment

When considering a motion for summary judgment under Superior Court Civil Rule 56, n2 the Court's function is to examine the record to determine whether genuine issues of material fact exist. *Oliver B. Cannon & Sons, Inc. v. Dorr-Oliver, Inc., Del. Super., 312 A.2d 322, 325 (1973).* If, after viewing the record in a light most favorable to the non-moving party, the Court finds there are no genuine issues of material fact, summary judgment is appropriate. *Id.* The Court's decision must be based only on the record presented, including all pleadings, affidavits, depositions, admissions, and answers to interrogatories, not on what evidence is "potentially **[*7]** possible." *Rochester v. Katalan, Del. Supr., 320 A.2d 704 (1974).* All reasonable inferences must be drawn in favor of the non-moving party. *Sweetman v. Strescon Indus., Del. Super., 389 A.2d 1319 (1978).* Summary judgment will not be granted if the record indicates that a material fact is in dispute or if it seems desirable to inquire more thoroughly into the facts in order to clarify the application of law to the circumstances. *Ebersole v. Lowengrub, Del. Supr., 54 Del. 463, 180 A.2d 467 (1962).*

n2 Under Superior Court Civil Rule 12(b), a Motion to Dismiss for failure to state a claim upon which relief may be granted is converted to a Rule 56 Motion for Summary Judgment when defendant offers affidavits, depositions, and other matters outside of the pleadings, as defendants have done here. *See Shultz v. Delaware Trust Co., Del. Super., 360 A.2d 576, 578 (1976).*

### C. Counts I-IV - Civil Rights Violations

The first four counts of the Complaint allege a variety of racially discriminatory acts **[*8]** by defendants, all of which culminate in plaintiff's

invocation of *42 U.S.C. § 1981* as the jurisdictional basis for these counts. Section 1981 is one of the provisions within Title 42 that prohibits racial discrimination. In their Motion, defendants assert that, because the last wrongful act which allegedly occurred took place no later than August 30, 1993, the date of plaintiff's termination, Counts I-IV are time-barred because plaintiff failed to file her cause of action within the two-year statute of limitations for § 1981 claims.

In opposition, plaintiff raises three issues. Asserting there is no state precedent, plaintiff argues that this State's interpretation of the statute of limitations with regard to § 1981 claims need not be consistent with federal court interpretations. The second issue argued is that this State's statute of limitations for personal injuries is limited to injuries accompanied by force. The third is that the period of limitations in Delaware for breaches of employment contracts is three years. Arguing from these premises, plaintiff asserts that since she is seeking to recover for injuries resulting from a breach of contract, rather than an injury accompanied **[*9]** by force, the Court must apply Delaware's three year statute of limitations in order to be consistent with the State's intent to apply § 8119 only to personal injuries involving force.

There are several fatal errors in plaintiff's arguments. With regard to the first and third premises, it is true that § 1981 does not contain any express statute of limitations and that our state courts have apparently never ruled on the issue. It is equally true that the statute of limitations on actions for breach of contract are three years. See *10 Del. C. § 8106*. In Delaware, however, the federal courts, consistent with the general trend, have determined that § 1981 claims are most closely analogous to suits for personal injuries and are therefore governed by the two-year statute of limitations on personal injury actions in *10 Del. C. § 8119. See Cuffy v. Getty Ref. & Mktg. Co., D. Del., 648 F. Supp. 802, 807 (1986). See also Goodman v. Lukens Steel Co., 482 U.S. 656, 660-62, 96 L. Ed. 2d 572, 107 S. Ct. 2617 (1987)* (Pennsylvania); *Runyon v. McCrary, 427 U.S. 160, 181-82, 49 L. Ed. 2d 415, 96 S. Ct. 2586 (1976)* (Virginia); *Demery v. City of Youngstown, 6th Cir., 818* **[*10]** *F.2d 1257, 1260 (1987)* (Ohio); *Ortiz v. Morgenthau, S.D. N.Y., 772 F. Supp. 1430, 1432, aff'd, 962 F.2d 4 (1991)* (New York); *Van Pool v. City and County of San Francisco, N.D. Cal., 752 F. Supp. 915, 925, aff'd, 966 F.2d 503 (1990)* (California).

Notwithstanding the holding of the federal District Court in Delaware, the state courts have not ruled on whether *10 Del. C. § 8119's* two-year statute of limitation applies to § 1981 claims. As the Court noted at oral argument, however, it would be "screwy" to have our state court interpret a statute of limitations for a *federal* statute differently than the federal court in our state. Delaware courts have followed the interpretation of the federal courts with regard to § 1983 and applied the statute of limitations applicable to personal injury actions. *Marker v. Talley, Del. Supr., 502 A.2d 972, 975-76 (1985); Vanaman v. Palmer, Del. Super., 506 A.2d 190, 191 (1986).* This is consistent with the United States Supreme Court's holding in *Wilson v. Garcia* that a single statute of limitations should govern all suits under § 1983, and that since claims under § 1983 are in essence claims for personal injuries, **[*11]** the state statutes of limitations applicable to personal injuries should control. *471 U.S. 261, 276-79, 105 S. Ct. 1938, 85 L. Ed. 2d 254 (1985).*

More importantly, the United States Supreme Court, in the *Goodman* decision cited above, expressly approved the extension of *Wilson's* § 1983 ruling to § 1981. In so holding, the high court rejected an argument by appellants identical to the one advanced by Ayres here.

> [Appellant's] submission is that § 1981 deals primarily with economic rights, more specifically the execution and enforcement of contracts, and that the appropriate limitations period to borrow is the one applicable to suits for interference with contractual rights, which in Pennsylvania was six years.
>
> The Court of Appeals properly rejected this submission. Section 1981 has a much broader focus than contractual rights. The section speaks not only of personal rights to contract, but personal rights to sue, to testify, and to equal rights under all laws for the security of persons and property; and all persons are to be subject to like punishments, taxes, and burdens of every kind. . . . Insofar as it deals with contracts, it declares the personal right to make and enforce contracts, a right, **[*12]** as the section has been construed, that may not be interfered with on racial grounds. The provision asserts, in effect, that competence and capacity to contract shall not depend upon race. It is thus part of a federal law barring racial discrimination, which, as the Court of Appeals said, is a fundamental injury to the individual rights of a person. . . . Wilson's characterization of § 1983 claims is thus equally appropriate here. That § 1981 has far-

reaching economic consequences does not change this conclusion...

*Goodman, 482 U.S. at 661.*

Although the United States Supreme Court and the District Court of Delaware have endorsed use of personal injury statutes of limitations with respect to § 1981, plaintiff argues that our personal injury statute of limitations is inapplicable to this case because it is limited to personal injuries accompanied by force. Such an assertion ignores both the text of the statute and settled law in this jurisdiction. *Title 10, Section 8119 of the Delaware Code* states the following:

> No action for the recovery of damages upon a claim for alleged personal injuries shall be brought after the expiration of 2 years from the date upon which **[*13]** it is claimed that such alleged injuries were sustained...

This section covers *all* actions for the recovery of damages upon a claim for personal injuries, whatever the nature of the personal injury and "regardless of the theoretical basis underlying the requested remedy." *Johnson v. Hockessin Tractor, Inc., Del. Supr., 420 A.2d 154, 156 (1980).* It is the plaintiff's "characterization of her injuries, rather than the nature of her underlying cause (or form of action) or its theoretical basis, [that] is controlling." *Cole v. Delaware League for Planned Parenthood, Del. Supr., 530 A.2d 1119, 1123 (1987). See also Patterson v. Vincent, Del. Super., 44 Del. 442, 61 A.2d 416, 418 (1948)* (construing Rev. Code 1935, § 5133, the predecessor to *10 Del. C. § 8119*). It is not limited to personal injuries caused in any particular manner. *Natale v. Upjohn Co., 3d Cir., 356 F.2d 590, 590-91 n.1 (1966).* In fact, the cases Ayres cites in support of her argument address *10 Del. C. §§ 8106* and 8106A, which defined, in part, the statute of limitations in civil actions under the prior enactments of the Code, and which are now codified at Sections 8106 and 8107. *See* **[*14]** *Hood v. McConemy, D. Del., 53 F.R.D. 435, 443-44 (1971); Bradford Inc. v. Travelers Indem. Co., Del. Supr., 301 A.2d 519, 524 (1972).* It is well-settled today that § 8119's two-year limitation governs in all cases where recovery is sought for personal injuries, superseding § 8106's three-year limitation in cases in which both could be deemed applicable. *Nationwide Ins. Co. v. Rothermel, Del. Supr., 385 A.2d 691, 693 (1978); Heritage v. Board of Educ., D. Del., 447 F. Supp. 1240, 1242-43 (1978).* Plaintiff's argument in this regard, to the extent that it seeks to make use of either Section 8106 or

8107 of Title 10, ignores the plainly settled case law of this jurisdiction: *all* personal injury suits have a two-year statute of limitations. *See also* Parts F and G, *infra.*

In light of the United States Supreme Court's apparent approval of applying personal injury statutes of limitation to § 1981 claims, of the federal District Court's application of the two year limitation of *10 Del. C. § 8119* to § 1981 claims, and of the interest in maintaining a uniform application of § 1981 in Delaware's federal and state courts, this Court holds that *10 Del. C. §* **[*15]** *8119* is applicable to all actions brought in this Court pursuant to *42 U.S.C. § 1981.* Since all of the acts alleged in Counts I-IV occurred no later than August 30, 1993, and this action was not filed until July 25, 1996, barring some other avenue of relief, Counts I-IV are time-barred by § 8119.

### D. Savings Clause

Perhaps recognizing that she would have an uphill battle in convincing the Court not to apply *10 Del. C. § 8119* to *42 U.S.C. § 1981* claims, Ayres argues that even if there is a two-year statute of limitation, the one-year savings clause of *10 Del. C. § 8118* would operate to allow her cause of action to survive. The statute is designed to mitigate against the harsh result of the statute of limitations defense.

> If in any action duly commenced within the time limited therefor in this chapter, the writ fails of a sufficient service or return by any unavoidable accident, or by any default or neglect of the officer to whom it is committed; or if the writ is abated, or the action otherwise avoided or defeated by the death of any party thereto, or for any matter of form; or if after a verdict for the plaintiff, the judgment shall not be given for the plaintiff **[*16]** because of some error appearing on the face of the record which vitiates the proceedings; or if a judgment for the plaintiff is reversed on appeal or a writ of error; a new action may be commenced, for the same cause of action, at any time within one year after the abatement or other determination of the original action, or after the reversal of the judgment therein.

*10 Del. C. § 8118(a).* So long as the plaintiff meets the conditions of the statute, she has the absolute right to bring a new action, without leave of court. *Gosnell v. Whetsel, Del. Supr., 57 Del. 241, 198 A.2d 924, 927 (1964).* The commencement of a suit in Delaware's

federal court is equivalent to one brought in state court for purposes of applying this statute. *Frombach v. Gilbert Assoc., Del. Supr., 236 A.2d 363, 365 (1967), cert. denied, 391 U.S. 906, 88 S. Ct. 1655, 20 L. Ed. 2d 419 (1968)* (assuming without deciding); *Howmet Corp. v. City of Wilmington, Del. Super., 285 A.2d 423, 426 (1971).*

Ayres asserts that § 8118 is applicable to her case because "the original action was timely filed in Federal Court, but was dismissed without prejudice for defective service." Such description may accurately describe the result's **[*17]** legal effect, *see F.R.C.P. 4(m)*, but it is not very helpful in determining if this "defective service" case fits within the statutory categories of "any unavoidable accident or by any default or neglect of the officer to whom it is committed. . . ." Notwithstanding its remedial purpose, the Court does not believe that the savings clause applies in this case. Section 8118 generally applies to defects caused by unavoidable accident or by the default or negligence of some third party, usually the officer to whom service is entrusted. *Giles v. Rodolico, Del. Supr., 51 Del. 143, 140 A.2d 263, 267 (1958); Bros v. Wilkins, Del. Super., 50 Del. 475, 134 A.2d 636, 638 (1957).* Section 8118 applies when a party plaintiff, *through no fault of her own*, finds that her cause of action is barred by the statute of limitation because of a lapse of time. *Giles, 140 A.2d at 267; Leavy v. Saunders, Del. Super., 319 A.2d 44, 46-47 (1974).*

Here, the failure in service was the fault of no one but Ayres herself. Neither the Circuit nor District Courts found excusable neglect or good cause. Moreover, the District Court found that plaintiff had exhibited a "flagrant disregard of the **[*18]** rules." The Court Clerk for the District Court put Ayres on notice that she had a defect in service, yet she failed to correct it. Her only explanation for such failure was that she did not think it necessary to observe such "technical niceties" of service. Such actions do not meet the letter or spirit of *10 Del. C. § 8118*. Consistent with the case law of this jurisdiction, the Court holds that plaintiff has not persuaded this Court that the failure of effective service was the fault of anyone but herself, and, therefore, the savings clause for lack of sufficient service does not operate to save Counts I-IV.

### E. Continuing Violation Doctrine

Plaintiff's next attempt to save her racial discrimination causes of action involves the continuing violation doctrine. The general theory behind the doctrine is that a plaintiff may recover for acts barred by the applicable limiting statute if she can show a "continuing violation." *Jones v. Merchants Nat'l Bank & Trust Co., 7th Cir., 42 F.3d 1054, 1058 (1994).* n3 A

continuing violation "is occasioned by continual unlawful acts, not by continual ill effects from an original violation." *Ward v. Caulk, 9th Cir., 650 F.2d 1144, 1147* **[*19]** *(1981). See also Sandutch v. Muroski, 3d Cir., 684 F.2d 252, 254 (1982)* (citing *Ward*). In other words, there must be a present violation of which to complain. *United Air Lines, Inc. v. Evans, 431 U.S. 553, 558, 52 L. Ed. 2d 571, 97 S. Ct. 1885 (1971).* The doctrine is applicable to claims brought pursuant to *42 U.S.C. § 1981. Berry v. E.I. duPont de Nemours & Co., D. Del., 625 F. Supp. 1364, 1376 (1985).*

> n3 Delaware courts also apply the doctrine. *See, e.g., Hampden Pk. Prop. Owners' Ass'n v. Gramkow, Del. Ch., C.A. No. 1186, 1988 Del. Ch. LEXIS 91, Berger, V.C. (June 27, 1988), Boney v. City of Dover, C.A. No. 91 C-05-189, 1994 Del. Super. LEXIS 412, Babiarz, J. (Jan. 25, 1994).* There appears to be, however, no reported decision that explains the doctrine with respect to the statute of limitations.

Ayres argues that the continuing violation doctrine is applicable to her case because defendants continue to discriminate against her with regard to her pension and health insurance benefits **[*20]** after her termination in August 1993. The Court finds her argument unpersuasive. By way of further explanation, it is useful to refer to the *Jones v. Merchant National Bank & Trust Company* decision, in which the Seventh Circuit cogently outlined three different theories upon which the continuing violation doctrine may rest.

> The first theory encompasses decisions, usually relating to hiring and promotions, where the employer's decision-making process takes place over a period of time, making it difficult to determine the actual date of the allegedly discriminatory act. . . .

> The second continuing violation theory involves an employer's express, openly espoused policy that is alleged to be discriminatory. . . .

> Finally, a plaintiff can show a continuing violation where an employer covertly follows a practice of discrimination over a period of time. In such a case, the plaintiff can only realize that she is a victim of discrimination after a series of discrete acts has occurred. The limitations period begins to run when the plaintiff gains such insight. . . . However,

if the plaintiff knew, or "with the exercise of reasonable diligence would have known after each act that it **[\*21]** was discriminatory and had harmed" her, she must sue over that act within the relevant statute of limitations.

*Jones v. Merchant Nat'l Bank & Trust Co., 42 F.3d at 1058.* Neither of the first two theories applies here, since Counts I-IV cite specific instances of allegedly discriminatory conduct and because Ayres does not claim that Jacobs & Crumplar, P.A. had an express or clearly conveyed policy of some sort that discriminated against African-Americans. Plaintiff's Complaint must proceed on the third theory.

The Seventh Circuit's analysis with regard to the third theory is particularly persuasive and quite fatal to plaintiff's cause of action in Counts I-IV. There is nothing in the record to suggest that she did not or could not know of the alleged acts of discrimination until after they occurred. There is no doubt that Ayres knew or had reason to know at the date of her termination the significance of the unlawful acts she alleges against defendants. Ayres admits in her Complaint that the offensive statements caused her much pain and distress at the time that they allegedly were made. In short, even assuming, arguendo, that her health benefits and pension claims constitute **[\*22]** a continuing offense, a highly doubtful proposition, given her discharge from employment, they bear no relation to the offenses alleged in Counts I-IV. Since the limitations period begins to run when the plaintiff gains the insight that she is a victim of discrimination, it appears that the period in this case began to run no later than August 30, 1993, the date of the termination of her employment. Since neither the continuing violation doctrine nor the savings clause discussed in Part E, *supra,* does not sustain Counts I-IV of Ayres' Complaint, these counts are time-barred by the application of *10 Del. C. § 8119,* and summary judgment is appropriate and granted. IT IS SO ORDERED.

*F. Counts XI, XVI, & XVII - Defamation, Intentional & Negligent*

*Infliction of Emotional Distress*

Counts XI, XVI, & XVII allege various defamatory acts and other acts that either intentionally or negligently caused Ayres emotional distress. Defendants argue that, because these claims seek damages for personal injuries, they must be brought within two years of the date of injury. *10 Del. C. § 8119.* Defamation and the intentional and negligent infliction of emotional distress **[\*23]** are classic examples of the types of personal injuries covered by § 8119. *See, generally, DeMoss v. News-Journal Co., Del. Supr., 408 A.2d 944, 944-45 (1979)* (holding that the two year statute of limitations applies to actions for defamation); *Lankford v. Scala, Del. Super., C.A. No. 94 C-04-023, Lee, J., 1995 Del. Super. LEXIS 115* at *14 (Feb. 28, 1995) (applying the two-year statute of limitations to the intentional infliction of emotional distress); *Avallone v. Wilmington Medical Ctr., Inc., D. Del., 553 F. Supp. 931, 937 (1982).* Plaintiff does not dispute this. Instead, she asserts that these counts are not time-barred because these offenses have continued up to the present day. In opposing the Motion, she alleges in her response that defendants have made additional defamatory statements in 1996. She cites Exhibit A of her response, her own affidavit, to support her assertion.

There are several problems with plaintiff's argument. Defense counsel, during plaintiff's deposition, asked her if she had any additional evidence regarding her defamation claim. To that point in time, the only testimony Ayres had given concerned defamatory statements allegedly occurring prior to **[\*24]** her termination. Plaintiff indicated that she did not have any such additional evidence, even though there were seven months of discovery, in the federal gestation of this case, in which she could conceivably have obtained it. Instead, Ayres now alleges that there were new defamatory acts. She submits an affidavit, dated the same day and submitted at the same time as her response, 10:49 p.m. the night before oral argument. The Court assumes she intends for this document to bolster the assertions in that response. The affidavit is not formally notarized in the traditional form, as it contains an illegible signature by the supposedly-notarizing party with no name printed beneath the signature to identify said party or the party's office. Although the Court has some concerns as to the form of the affidavit, the Court will, in light of the fact that plaintiff is a member of the Bar of this State, assume for purposes of this Motion that the affidavit is not invalid for reasons of form..

The Court does find, however, that the affidavit is invalid because it does not meet the requirements of Superior Court Civil Rule 56(e).

> Supporting and opposing affidavits shall be made on personal **[\*25]** knowledge, shall set forth such facts as would be admissible in evidence and shall show affirmatively that the affiant is competent to testify to the matters stated therein.

Super. Ct. Civ. R. 56(e). The affidavit only alleges that one of the defendants contacted her former husband and accused her of committing adultery while still married.

Insofar as it concerns Counts XI, XVI, and XVII, the affidavit is not based on personal knowledge. To be based on personal knowledge, plaintiff would have to have been present at the time the conversation took place and actually heard the exchange herself, which she evidently did not. If it were based on personal knowledge, plaintiff should have been a little more specific as to when this occurred, instead of saying "in or about 1996." See, generally, *Monsanto Co. v. Aetna Casualty & Surety Co., Del. Super., C.A. No. 88 C-JA-118, Ridgely, P.J., 1993 Del. Super. LEXIS 462* at *7-8 (Dec. 21, 1993) (holding ineffective an affidavit whose declarant was not competent to testify to the matters therein).

The affidavit is defective because it does not set forth such facts as would be admissible in evidence. The allegations in the affidavit lack [*26] foundational proof. They are hearsay not within a recognized exception and consequently render the affidavit ineffective. See, e.g., *Continental Cas. Co. v. Ocean Accident & Guar. Corp., Del. Super., 58 Del. 338, 209 A.2d 743, 747 (1965)* (holding that on a request for summary judgment a court need not give effect to an affidavit based on hearsay). Ayres is attempting to offer what is, at best, second-hand information in an attempt to prove the truth of the matter asserted. Delaware Rule of Evidence 802 and Superior Court Civil Rule 56(e) prohibit this.

The Court cannot accept the allegations made in the Ayres affidavit. Since Ayres has failed to produce any admissible evidence to contradict her admissions made during deposition, the Court finds that the claims for defamation and the intentional and negligent infliction of emotional distress in Counts XI, XVI, and XVII are, like Counts I-IV, time-barred by *10 Del. C. § 8119*. Summary judgment is therefore granted. IT IS SO ORDERED.

### G. Counts V, IX, & X - Fraud in the Inducement, Economic Duress,

### and Malicious Conspiracy

Ayres also alleges that defendants' conduct constituted fraud in the inducement (Count V), economic [*27] duress (Count IX), and malicious conspiracy (Count X). She alleges, with respect to Count V, that defendants fraudulently induced her to undertake and remain in employment with Jacobs & Crumplar, P.A. by misrepresenting to Ayres that she would be offered partnership when they never had any intention of extending such an offer. As a result of defendants' conduct, Ayres alleges that she has suffered and will continue to suffer injuries, including substantial economic loss, pain, and suffering. With respect to Count IX, plaintiff alleges that defendants intentionally and maliciously caused her "economic duress" because they tied her economic "gain and survival" to the receipt of "unfair, harassing, and discriminatory" treatment. As a result of such conduct, Ayres suffered embarrassment, anxiety, economic loss, humiliation, extreme emotional distress, and pain and suffering. Finally, Count X alleges that defendants intentionally and maliciously engaged in a conspiracy to bring about plaintiff's "disgrace, humiliation and ruin" in causing her wrongful discharge and depriving her of her "right to employment." As a result of the alleged conduct, Ayres suffered embarrassment, anxiety, [*28] stress, pain and suffering, extreme emotional distress, and substantial economic loss.

Counts V, IX, and X all appear to be personal injury claims. However these counts may be worded, they essentially sound in tort and assert personal injury types of damages. The two-year statute of limitations of *10 Del. C. § 8119* consequently applies. *See Cole v. Delaware League for Planned Parenthood, Del. Supr., 530 A.2d 1119, 1123 (1987)* (holding, *inter alia,* that § 8119 applies when plaintiff seeks injuries to the person rather than to property). Since all of these alleged offenses occurred during plaintiff's employment with Jacobs & Crumplar, P.A., the statute of limitations began to run no later than the last day of her employment with the firm, August 30, 1993. Since this action was filed more than two years after that date, these counts are barred by the statute of limitations of *10 Del. C. § 8119*. Summary judgment is granted. IT IS SO ORDERED.

### H. Counts VIII, XIII, XIV & XV - Breach of Contract

### Count VII - Breach of the Implied Covenant of Good Faith and Fair Dealing

In addition to the foregoing alleged offenses, Ayres also asserts that defendants breached [*29] a variety of contractual obligations with her. Count VIII alleges breach of contract for employment; Count XIII alleges breach of contract for promotion; Count XIV alleges breach of contract for partnership; and Count XV alleges a claim for a wrongful/bad faith termination. Both parties during summary judgment proceedings have argued all four counts together, and have treated them as though they were a single contractual claim. In addition, Ayres has included Count VII, a separately-alleged breach of the covenant of good faith and fair dealing.

The defendants have raised the defense of the Statute of Frauds, *6 Del. C. § 2714*. In pertinent part, the Statute of Frauds requires certain formalities in the execution of contracts that come within its provisions:

> *No action shall be brought to charge any person* upon any agreement made upon

consideration of marriage, or upon any contract or sale of lands, tenements, or hereditaments, or any interest in or concerning them, or *upon any agreement that is not to be performed within the space of one year from the making thereof* or to charge any person to answer for the debt, default, or miscarriage, of another, in any sum of the **[*30]** value of $ 25 and upwards, *unless the contract is reduced to writing, or some memorandum, or notes thereof are signed by the party to be charged therewith,* or some other person thereunto by him lawfully authorized in writing.

*6 Del. C. § 2714(a)* (emphasis added). The section does not apply to contracts, including those of indefinite duration, that can by any possibility be performed within one year, even if such performance is highly unlikely. In other words, there must be no possibility of performance within one year. *Haveg Corp. v. Guyer, Del. Supr., 58 Del. 535, 211 A.2d 910, 912 (1965).*

Notwithstanding the strictures of the statute, there are two exceptions. The first is written in subsection (a) of § 2714. A collection of several writings, only one of which contains the signature of the party to be charged, can satisfy the Statute of Frauds. *Abramson v. Delrose, Inc., D. Del., 132 F. Supp. 440, 442 (1955). See also Hessler, Inc. v. Farrell, Del. Supr., 226 A.2d 708, 712 (1967).* "The memorandum may consist of several writings if one of the writings is signed and the writing in the circumstances clearly indicate that they relate to the same transaction." **[*31]** *Restatement (Second) of Contracts § 132* (1981). For an employment contract, the writings must identify, with some moderate degree of precision, such items as subject matter, duration, job description, and hours of employment. *Lindsey v. M.A. Zeccola & Sons, Inc., 3d Cir., 26 F.3d 1236, 1239 (1994).*

The second "well-rooted" exception to the "absolute command" of the statute is the equitably-derived principle that a partly-performed oral contract may be enforced by an order for specific performance upon proof by clear and convincing evidence of actual part performance. *Shepherd v. Mazzetti, Del. Supr., 545 A.2d 621, 623 (1988).* Part performance acts as a substitute for a writing on the theory that it constitutes substantial evidence that a contract actually existed. *Quillen v. Sayers, Del. Supr., 482 A.2d 744, 747 (1984).* There is, however, some authority for the proposition that the partial performance exception does not apply to

employment contracts with fixed durations exceeding one year. n4

> n4 The Third Circuit Court of Appeals has expressed concern that allowing partial performance in such a context would allow "any employee who claims an oral employment contract for a term in excess of one year to avoid the Statute of Frauds without written proof of the contract's duration." *Lindsey, 26 F.3d at 1243.* It is unnecessary in this case for the Court to decide whether partial performance applies in this context as a matter of state law, since, as will be shown, the Statute of Frauds does not apply to any of the contracts at issue.

**[*32]**

In defendants' Motion, in addition to their aforementioned defense based on the Statute of Frauds, defendants assert that plaintiff has failed to overcome the presumption that employment relationships are at-will, meaning that an employee could quit or be fired at any time. For her part, Ayres responds by arguing that defendants converted her at-will employment to one terminable only for cause when they promised her that she would become a partner in two of three years if her work was satisfactory. This later matures, it is alleged, into an agreement for partnership.

The Court's view is that it seems desirable to inquire more thoroughly into the facts to clarify the application of law to the circumstances of the contract claims. While the Court has some doubt that there is independent legal merit in any of the counts other than Count XIV, it seems wise to withhold judgment on Counts VII, VIII, and XIII, since they all serve to support Count XIV, at least by way of pleading evidentiary background. In particular, it is not clear to the Court precisely what happened in the January 1993 meeting and what conversations, actions, and documentation preceeded and followed that alleged conversation. **[*33]** But the plaintiff does have a difficult row to hoe and some preliminary exploration might be helpful.

As to the question of at-will status, Delaware does have a strong and "heavy presumption that a contract for employment, unless otherwise expressly stated, is at-will in nature, with duration indefinite." *Merrill v. Crothall-American, Inc., Del. Supr., 606 A.2d 96, 102 (1992).* This is an old and established principle of Delaware law. See. e.g., *Greer v. Arlington Mills Mf'g Co., Del. Super., 17 Del. 581, 43 A. 609, 610 (1899).* Statements and conduct by employers can alter the at-will status of the employment relationship, provided such a change is stated with a reasonable degree of specificity. *Merrill,*

*606 A.2d at 102. See also Peterson v. Beebe Medical Center, Inc., Del. Supr., No. 565, 1992, 1993 Del. LEXIS 142, *2, Moore, J. (March 24, 1993) (ORDER) (holding that employer's statement to employee that "we trust you will be here until you retire" did not alter at-will status); Edwards v. Lutheran Social Servs. of Dover, Inc., Del. Super., C.A. No. 83 C-JN-22, 1987 Del. Super. LEXIS 1129,* Ridgely, J. (April 8, 1987) (ORDER) at 4 (holding that employer's expressing hope that hiree would be working with the agency for **[*34]** a long time did not alter at-will status). At Ayres' deposition, she said she did not consider herself bound to work for a fixed term, and she actively sought other employment while working for Jacobs & Crumplar, P.A. *Cf. Heideck v. Kent General Hosp., Del. Supr., 446 A.2d 1095, 1096 (1982)* (holding that similar statements by the plaintiff in that case pointed to at-will status).

Delaware recognizes a limited implied covenant of good faith and fair dealing as an exception to the weighty presumption of the doctrine of at-will employment. *E.I. duPont de Nemours & Co. v. Pressman, Del. Supr., 679 A.2d 436 (1996).* Although Ayres addressed the covenant in a separate count of her Complaint (Count VII), the covenant is inextricably related to the contract for employment. *Id. at 440.*

In the *Pressman* decision, the Delaware Supreme Court examined the implied covenant and its relationship to the doctrine of at-will employment. The Supreme Court stated that the covenant constrains the at-will doctrine in very limited categories; finding, in essence, three exceptions to the doctrine. The first is a public policy exception, whether conceived of independently as a tort or arising **[*35]** from the covenant itself. This exception requires a clear mandate of public policy, a public interest recognized by some legislative, administrative, or judicial authority. *Id. at 441-42* (citing *Shearin v. E.F. Hutton Group, Inc., Del. Ch., 652 A.2d 578, 587-89 (1994)).* The second occurs when the employer misrepresents "some important fact, most often the employer's present intentions, and the employee relies thereon either to accept a new position or remain in a present one." Id. at 442. The third exception applies "when an employer uses its 'superior bargaining power [to]. . . deprive the employee of compensation that is clearly identifiable and is related to the employee's past service." *Id.* (quoting *Magnan v. Anaconda Indus., Inc., Conn. Supr., 193 Conn. 558, 479 A.2d 781, 788 (1984)).*

In some respects, Subparts (a)-(c) of Paragraph 59 of Count VII of the Complaint, plaintiff's claim for breach of the covenant of good faith and fair dealing, merely echoes her discrimination claims, already dismissed by this opinion. It would obviously destroy the public policy of the limitations period on the tort claims to permit them to be restated as implied common law contract **[*36]** claims. n5 Personal injuries are governed by a two-year statute of limitations. *10 Del. C. § 8119.* Actions based upon a claim for wrongful termination of an employment contract are governed by the three year statute of limitations in *10 Del. C. § 8106*, *Goldman v. Braunstein's, Inc., Del. Supr., 240 A.2d 577, 578 (1968)*, which apparently includes actions for breach of the implied covenant of good faith and fair dealing. *Shearin, 652 A.2d at 589.* Were this Court to recognize racial discrimination as an exception under the covenant, it would allow a plaintiff to escape the established two-year personal injury statute of limitations on racial discrimination claims in employment, e.g., § 1981 and § 1983 claims, simply by couching her allegations of racial discrimination in terms of a breach of an implied contractual obligation.

> n5 *See, e.g., Cole, 530 A.2d at 1123; Johnson v. Hockessin Tractor; Inc., Del. Supr., 420 A.2d 154, 156 (1980)* (holding that *10 Del. C. § 8119* applies whenever a plaintiff alleges a personal injury, regardless of the basis of the underlying remedy); *Heritage v. Board of Educ., D. Del., 447 F. Supp. 1240, 1242-43 (1978)* (holding that the Delaware limitations scheme is based on the particular injury suffered, not on the type of action instituted).

**[*37]**

In particular, it would be counter-productive to recognize a broader common law exception to the at-will doctrine when there exist elaborate statutory schemes at both the federal and state levels that address this same public policy concern. *See 42 U.S.C. § § 1981* et seq.; *19 Del. C. § § 710-718. See also Finch v. Hercules, Inc., D. Del., 809 F. Supp. 309, 312 (1992)* (indicating same belief under the covenant in Delaware with regard to age discrimination); *Blum v. Witco Chem. Corp., 3d Cir., 829 F.2d 367, 377 (1987)* (holding the same under the covenant in New Jersey with regard to age discrimination); *Bruffett v. Warner Comm., Inc., 3d Cir., 692 F.2d 910, 920 (1982)* (holding the same under the covenant in Pennsylvania with regard to discrimination on the basis of disability). Since both the federal and state governments have enacted statutory procedures for dealing with the type of racial discrimination alleged by Ayres, it seems neither desirable nor wise to upset the balance deliberately created by the federal and state anti-discrimination statutes as they have been construed. n6 Therefore, Subparagraphs (a), (b), and (c) of Paragraph 59 of the Complaint are dismissed **[*38]** on summary judgment. IT IS SO ORDERED.

n6 The Court reaches this conclusion notwithstanding the Delaware Supreme Court's implicit approval of the public policy exception in *Monge v. Beebe Rubber Company, N.H. Supr., 114 N.H. 130, 316 A.2d 549 (1974)*, in which the New Hampshire Supreme Court held that the employer breached the covenant when it terminated an employee for refusing to submit to her employer's sexual demands. *See Pressman, 679 A.2d at 441-42*. While the Delaware Supreme Court's implicit approval of the *Monge* decision gives pause, in light of the available federal and state remedies for sexual harassment, it should be noted that the Supreme Court carefully noted the public policy exception could be "conceived of independently as a tort or as arising from the covenant. . . ." This dual conception leaves open the issue of the statute of limitations as a second policy question and, in this Court's judgment, permits reliance, as the better choice, on the same two year limitations period.

**[*39]**

Plaintiff alleges that she performed all the stipulations, conditions, and agreements required of her in order to be offered partnership status. While the Court does not foreclose the other contract claims, it seems to the Court that the appropriate date of formation of this alleged contract for partnership was in January 1993, when defendants allegedly told plaintiff that they had decided to offer her a partnership interest in the firm and that they would announce the partnership in August 1993. While the prior relationship provides evidentiary background, this January 1993 date provides an allegation of a specific statement of intent and neither a Statute of Frauds nor a statute of limitations problem. The contract, if made in January, specifically called for performance to occur within seven months and is therefore not within the Statute of Frauds. Since a breach of contract of this nature is not a personal injury, its statute of limitations is three years, which plaintiff has met. See *10 Del. C. § 8106*.

In the absence of statutory defenses, the issue is whether an offer for partnership was made and accepted, and whether the resulting contract was breached, causing injury **[*40]** to plaintiff. Taking the facts in a light most favorable to the non-moving party, it appears that plaintiff has alleged sufficient facts which, if proven, would support a claim for breach of contract for partnership and injury to plaintiff. Discovery has been stayed pending the outcome of this Motion. There may be evidence which supports her allegation that an offer for partnership was made and accepted and resulted in a binding contract. Exhibits B and C to Ayres' response to

this Motion are two electronic mail messages in which partnership is discussed. While the Court is troubled by the seeming lack of foundational proof for these electronic mail messages, it is not prepared to state, at this stage of the proceedings, that they are invalid, or that they do not raise the possibility that evidence to support her allegation could be found during discovery.

As for demonstrating injury, plaintiff alleges that she reasonably relied, to her detriment, upon defendants' statements at the January 1993 meeting. She offers Exhibit E, which appears to be a letter, dated July 27, 1993, from Ayres to Dean Michael Goldberg of the Widener University School of Law in which she tells Dean Goldberg **[*41]** that she is looking forward to teaching on an adjunct basis in the fall. She mentions having previously turned down an opportunity to teach at the school on a full-time basis because she was to become a partner with Jacobs & Crumplar, P.A. in August 1993. Like the electronic mail messages, the Court is concerned about the offer of proof here. This letter is neither the actual offer of employment from the law school nor her actual rejection. It is simply a letter in which she tells Dean Goldberg that such an offer was made. For purposes of summary judgment, however, the Court will accept that the letter at least raises the possibility that evidence regarding detrimental reliance may be found during discovery.

In light of the foregoing analysis, the Court will deny, without prejudice, defendants' Motion for Summary Judgment with respect to the contract claims. n7 Should discovery subsequent to this decision make it apparent that there is no genuine issue of material fact with regard to this claim, defendants will be permitted to file a motion for summary judgment at a later time.

n7 So as to give the parties some guidance for proceedings subsequent to this decision, the Court notes that plaintiff's attempt to recover punitive damages for the breach of contract for partnership may not be permissible under Delaware law. See *Pressman, 679 A.2d at 444-48.*

**[*42]**

While the Court has let all of the contract claims stand, this decision, as the Court sees it, primarily permits Ayres to pursue her claim of breach of contract for partnership. The Court previously granted a Motion to Stay Discovery pending the outcome of this Motion for Summary Judgment. The stay will be lifted so as to permit the case to go forward on the remaining counts.

1996 Del. Super. LEXIS 565, *

By way of conclusion, it appears to the Court, after a review of the record, a study of the applicable law, and upon further reflection on the arguments advanced by both parties, that it should make the following rulings as a matter of law: Defendants' Motion for Summary Judgment is hereby GRANTED with respect to Counts I-V, IX-XI, XVI, and XVII. IT IS SO ORDERED. Defendants' Motion for Summary Judgment is DENIED without prejudice with respect to Counts VII, VIII, and XIII-XV, except that it is GRANTED as to that portion of Count VII contained in Subparagraphs (a), (b), and (c) of Paragraph 59 of the Complaint. IT IS SO ORDERED. The stay of discovery is hereby lifted. IT IS SO ORDERED.

2005 U.S. Dist. LEXIS 6262, *

**MICHELLE COLLIER, Plaintiff, v. TARGET STORES CORPORATION, Defendant.**

**Civ. No. 03-1144-SLR, Consolidated**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2005 U.S. Dist. LEXIS 6262*

**April 13, 2005, Decided**

**LexisNexis(R) Headnotes**

**COUNSEL:** **[*1]** William D. Fletcher, Esquire and Noel E. Primos, Esquire of Schmittinger & Rodrigues, P.A., Dover, Delaware, for Plaintiff.

Sherry Ruggiero Fallon, Esquire of Tybout, Redfearn & Pell, Wilmington, Delaware, for Defendant.; Of Counsel: Abbey G. Hairston, Esquire of Seyfarth Shaw, L.L.P., Washington, District of Columbia.

**JUDGES:** ROBINSON, Chief Judge.

**OPINIONBY:** Sue L. Robinson

**OPINION:**

**MEMORANDUM OPINION**

Dated: April 13, 2005

Wilmington, Delaware

**ROBINSON, Chief Judge**

**I. INTRODUCTION**

On December 17, 2003 plaintiff Michele Collier instituted this litigation against defendant Target Stores Corporation, alleging in her complaint: (1) violation of the *Family and Medical Leave Act* ("FMLA"); (2) breach of the implied covenant of good faith and fair dealing; (3) violation of *19 Del. C. § 709*; and (4) slander. (D.I.1) On July 12, 2004, plaintiff filed a second lawsuit against defendant, alleging the same set of facts as in the first lawsuit, but including a new claim for alleged violation of the *Americans with Disabilities Act* ("ADA"). Based on a stipulation by the parties (D.I. 30), this court consolidated the two lawsuits, thereby adding **[*2]** plaintiff's ADA claim to the present matter. This court has jurisdiction over plaintiff's FMLA and ADA claims under *28 U.S.C. § 1331* and over plaintiff's breach of the implied covenant of good faith and fair dealing, violation of *19 Del. C. § 709*, and slander claims under *28 U.S.C. § 1367(a)*. Presently before the court is defendant's motion for summary judgment. (D.I. 46) For the reasons set forth below, the court grants defendant's motion for summary judgment against plaintiff's ADA, breach of implied covenant of good faith and fair dealing, slander, and *19 Del. C. § 709* claims, but denies defendant's motion for summary judgment against plaintiff's FMLA claim.

**II. BACKGROUND**

In March 2001, defendant opened a new store in Dover, Delaware (the "Dover Store"). (D.I. 48, ex. 1 at A3) In addition to selling goods to the general public, the Dover Store also offered a pharmacy. Plaintiff was hired by defendant as Head Pharmacist in the Dover Store in December of 2000. (D.I. 1 at 2; D.I. 47 at 3) At or around the same time, Ellicia Weber ("Weber") was transferred to the Dover Store **[*3]** as a part-time pharmacist. (D.I. 48 at A14-A15, A182) The pharmacy staff at the Dover Store included plaintiff, Weber, and pharmacy technicians. (D.I. 47 at 4-5; .D.I. 48 at A8-A9) At all times relevant to this action, plaintiff was supervised by Area Pharmacy Manager Michael Thomas ("Thomas"), Store Team Leader James Bellamy ("Bellamy"), and Regional Human Resources Director Todd Landis ("Landis"). (D.I. 48 at A4, A172, A282-A283)

During 2001, Bellamy and Thomas noted that plaintiff and Weber were having problems getting along. (D.I. 48 at A6-A14, A187-A189) On February 26, 2002, plaintiff submitted her resignation to Bellamy and Thomas. (D.I. 48 at A270) Thomas asked plaintiff to withdraw her resignation and she agreed. (D.I. 48 at A208-A210)

In March 2002, plaintiff became aware that Weber had incorrectly filed a Class II narcotic prescription. (D.I. 48 at A18-A20, A191) Specifically, a customer received

a generic prescription but did not like the medication and returned it to the pharmacy. Weber accepted the medication, which was a violation of Delaware law. (D.I. 46 at A18-A20, A192) Plaintiff reported the misfiling of the prescription to the Delaware State Board of Pharmacy **[*4]** (the "State Board"). (D.I. 48 at A298) Despite investigating the complaint, the State Board took no formal action against either Weber or defendant regarding this incident. (D.I. 48 at A196-A197)

In late March of 2002, plaintiff experienced migraine headaches and sought FMLA leave from April 3 through April 22. (D.I. 48 at A127-A128, A207) Neither Bellamy nor Landis were aware of the reason why plaintiff sought leave. (D.I. 48 at A39-A43, A301-A302) Thomas was aware that plaintiff's leave was taken due to stress, but was not told that the stress was work related. (D.I. 48 at A207-A208) Plaintiff sought an extension of her FMLA leave up through May 13, 2002, which defendant approved. (D.I. 48 at A271-A272) In seeking the extended period of leave, plaintiff released her medical history to defendant. (D.I. 48 at A273) Plaintiff's physician filled out a statement indicating that plaintiff suffered from "major depression" and "generalized anxiety." (D.I. 48 at A274) Plaintiff's physician had begun treating her for anxiety attacks in May 1998. (D.I. 48 at A275)

While plaintiff was on leave, Thomas telephoned her at home. (D.I. 48 at A211-A212, A277) Since defendant had a policy of not **[*5]** contacting employees on leave, plaintiff filed a complaint regarding this call. (D.I. 48 at A214, A277-A278; D.I. 53 at B37)

Although plaintiff was scheduled to return to work on May 13, 2002, she did not report for work or provide notice from her doctor of the need for additional leave. On May 13, Thomas sent an email to Landis inquiring whether he could "act fast and consider [plaintiff] a no show and abandoned her job[.]" (D.I. 53 at B1) Defendant contacted plaintiff and requested that she provide additional information to support her need for more leave.

On May 16, 2002, while plaintiff was still on leave, Thomas sent an email to Landis inquiring whether he could remove plaintiff from the Pharmacy Third Party Committee (the "Committee"), n1 "as she has been unavailable to the team for many weeks." (D.I. 48 at A280) On May 18, 2002, Landis responded by indicating that he supported removing plaintiff's Committee responsibilities. (D.I. 48 at A279)

n1 The Pharmacy Third Party Committee was responsible for marketing to help drive pharmacy sales, and to help pharmacists at other

stores with third-party (i.e., insurance) billing questions. (D.I. 47 at 8; D.I. 52 at 7)

**[*6]**

On May 24, 2002, plaintiff sent an email to Thomas confirming that she would not be back to work until June 24, 2002. (D.I. 48 at A335; D.I. 53 at B38) On June 7, 2002, defendant issued a new policy on pharmacy lunch breaks. The policy required that pharmacists remain in the store during their lunch period. (D.I. 48 at A340-A349) This policy was published on defendant's intranet and Weber informed plaintiff of the policy change when plaintiff returned to work on June 24, 2002. (D.I. 48 at A136)

On July 23, 2002, Thomas verbally reprimanded plaintiff for allegedly not using "FFF" ("Fast, Fun, and Friendly") communications with Weber. (D.I. 48 at A350) In an August 17, 2002 email, plaintiff confirmed that she was still having trouble communicating with Weber. (D.I. 48 at A351-A352)

In October 2002, plaintiff closed the pharmacy during her lunch break in order to fill a prescription at another pharmacy. n2 In so doing, plaintiff violated defendant's policy on pharmacy lunch breaks. When plaintiff returned to the pharmacy, she was questioned by Rod Rodriguez ("Rodriguez"), Assets Protection Team Leader. (D.I. 48 at A232-A235) Thomas was present when Rodriguez confronted plaintiff about **[*7]** violating the store's policy. (D.I. 48 at A232)

n2 Defendant had a policy forbidding pharmacists from filling their own prescriptions. (D.I. 53 at B41)

Before any final decision was made regarding possible sanctions for plaintiff's violation of the pharmacy lunch break policy, plaintiff sought and obtained a second FMLA leave of absence. On October 10, 2002, plaintiff's doctor provided defendant with a note indicating that plaintiff needed two weeks of leave due to the "situation and stress work represents." (D.I. 48 at A355) On October 14, 2002 Thomas sent an email to Landis stating plaintiff's leave of absence would "take her up to [her requested] vacation [time] (convenient)[.] It will be forever before we can address her!" (D.I. 53 at B3) On October 23, 2002, plaintiff's doctor provided additional information to support her request for leave extended beyond October 26, 2002 to November 23, 2002. (D.I. 48 at A356) Plaintiff then sought leave through January 1, 2003. (D.I. 48 at A358) Defendant approved **[*8]** these requests. (D.I. 48 at A357-A358)

2005 U.S. Dist. LEXIS 6262, *

During plaintiff's second FMLA leave, Landis contacted her concerning certain checks she had presented to defendant which allegedly were returned for insufficient funds. (D.I. 48 at A376) Defendant classifies an employee's issuance of a dishonored check as a minor offense. (D.I. 48 at A373-A374) When plaintiff investigated the matter, she found that two of the checks were not accepted by defendant's bank because they had been presented electronically. (D.I. 48 at A376)

Plaintiff returned to work on January 6, 2003, on a reduced work schedule of four hours per day for three to four days per week. (D.I. 48 at A377) Even though this reduced work schedule continued up until plaintiff ceased working for defendant, she continued to be paid as a full-time employee. n3 (D.I. 48 at A321-A322; A377-A381)

n3 Plaintiff contests this statement, alleging that she returned to full-time status before she ceased working for defendant. However, plaintiff fails to point to any evidence to support her position. In contrast, defendant points to several notes from plaintiff's psychiatrist from January 27, 2003 through plaintiff's last day working for defendant which only allowed plaintiff to work part-time. (D.I. 48 at A378-A381)

[*9]

Sometime after plaintiff's return from her second FMLA leave, defendant installed a camera over the pharmacy so that activities of the pharmacy employees could be observed. (D.I. 48 at A64-A82, A147, A388-390; D.I. 53 at B14)

On January 24, 2003, Bellamy and Landis met with plaintiff and provided her with two final warnings - one related to the passing of bad checks and the other related to violation of the policy regarding pharmacy lunch breaks. (D.I. 48 at A382-A384)

In February 2003, defendant issued an evaluation of plaintiff's 2002 work performance (the "2003 Evaluation"). (D.I. 52 at 13; D.I. 53 at B6-B12) Plaintiff received an overall score of sixty-nine, which translated to "Satisfactory." (D.I. 53 at B7) In plaintiff's only previous evaluation (the "2002 Evaluation"), she received a score in the eighties, which corresponded to "Excellent." (D.I. 53 at B7 , B98)

In May 2003 plaintiff filed an incident report on Weber when Weber issued a medication with an improperly high dosage. (D.I. 48 at A82-A83, A151-A154)

While plaintiff continued to work on a reduced schedule, Weber was charged with creating the work schedule for the pharmacy technicians. (D.I. 48 at A95, A157-A159, [*10] A245) One of the technicians complained to plaintiff about her schedule and plaintiff changed the schedule without consulting with Weber. (D.I. 48 at A157) On May 12, 2003, Thomas met with plaintiff and informed her that she was to leave the scheduling to Weber. (D.I. 48 at A391)

On June 2, 2003, plaintiff submitted her two weeks' notice. (D.I. 48 at A394-A395) Bellamy accepted her resignation and advised her that she need not report to work, but would be paid for the two weeks. (D.I. 48 at A97-A98, A161-A162, A328)

### III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. The moving party bears the burden of proving that no genuine issue of material fact exists. See *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)*. "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence [*11] exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995)* (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita, 475 U.S. at 587* (quoting *Fed. R. Civ. P. 56(e))*. The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995)*. The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. See *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*. If the nonmoving party fails to make a sufficient showing on an essential element [*12] of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. See *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*.

### IV. DISCUSSION

## A. The Family and Medical Leave Act

Congress enacted the FMLA to help working men and women balance the conflicting demands of work and personal life. *29 U.S.C. § 2601(b)(1)*. The FMLA provides that "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period for one or more of the following: . . . (D) Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee." *29 U.S.C. § 2612*. The FMLA also provides for "intermittent" leave, which allows an employee to take such leave intermittently when medically necessary. *29 U.S.C. § 2612(b)*.

There are two types of claims an employee can bring against an employer under the FMLA, "interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act, see *29 U.S.C. § 2615* [*13] *(a)(1)*, and retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act, see *29 U.S.C. § 2615(a)(1) & (2)*; *29 C.F.R. § 825.220(c)* ('An employer is prohibited from discriminating against employees . . . who have used FMLA leave.')." *Strickland v. Water Works & Sewer Bd., 239 F.3d 1199, 1206-07 (11th Cir. 2001)*; see also *Bachelder v. Am. W. Airlines, Inc., 259 F.3d 1112, 1122 (9th Cir. 2001)*; *Thomas v. Pearle Vision, Inc., 251 F.3d 1132, 1139 (7th Cir. 2001)*; *Peter v. Lincoln Technical Inst., Inc., 255 F. Supp. 2d 417, 438 (E.D. Pa. 2002)*; *Marrero v. Camden County. Bd. of Social Servs., 164 F. Supp. 2d 455, 463 (D.N.J. 2001)*.

Retaliation claims under the FMLA are analyzed under the burden shifting framework of *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973)*. *Bearley v. Friendly Ice Cream Corp., 322 F. Supp. 2d 563, 571 (M.D. Pa. 2004)*; *Baltuskonis v. US Airways, Inc., 60 F. Supp. 2d 445, 448 (E.D. Pa. 1999)*; [*14] *Lepore v. LanVision Sys., Inc., 113 Fed. Appx. 449, No. 03-3619, 2004 WL 2360994, at *3 (3d Cir. 2004)*. McDonnell Douglas sets forth a three-step analysis for retaliation claims. First, the plaintiff must establish a prima facie case of retaliation. A prima facie case of retaliation under the FMLA is established by showing: (1) plaintiff availed herself of a protected right under the FMLA; (2) plaintiff suffered an adverse employment action; and (3) there was a causal connection between the employee's protected activity and the employer's adverse employment action. *Conoshenti v. Pub. Serv. Elec & Gas Co., 364 F.3d 135 (3d Cir. 2004)*; *Bearley, 322 F. Supp. 2d at 571*; *Baltuskonis, 60 F. Supp. 2d at 448*. "After establishing a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its adverse employment action." *Bearley, 322 F. Supp. 2d at 571*; see also *Baltuskonis, 60 F. Supp. 2d at 448*. "Finally, if a legitimate non-discriminatory reason is provided, the plaintiff must present evidence to show that the defendant's proffered reasons were not its true [*15] reasons, but were merely a pretext for its illegal action." *Baltuskonis, 60 F. Supp. 2d at 448*; see also *Bearley, 322 F. Supp. 2d at 571*. In order to survive summary judgment, a plaintiff must "either (i) discredit[] the [defendant's] proffered reasons . . . , or (ii) adduce evidence . . . that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Torre v. Casio, 42 F.3d 825, 830 (3d Cir. 1994)* (discussing McDonnell Douglas shifting burden in an *Age Discrimination in Employment Act ("ADEA")* case).

Third Circuit opinions that have dealt with the FMLA have only involved termination of the plaintiff. *Conoshenti v. Pub. Serv. Elec & Gas Co., 364 F.3d 135 (3d Cir. 2004)*; *Rinehimer v. Cemcolift, Inc., 292 F.3d 375 (3d Cir. 2002)*; *Chittister v. Dep't of Cmty. & Econ. Dev., 226 F.3d 223 (3d Cir. 2000)*; *Churchill v. Star Enters., 183 F.3d 184 (3d Cir. 1999)*; *Victorelli v. Shadyside Hosp., 128 F.3d 184 (3d Cir. 1997)*; *Lepore v. LanVision Sys., Inc., 113 Fed. Appx. 449, No. 03-3619, 2004 WL 2360994,* [*16] *at *3 (3d Cir. 2004)*; *Conroy v. Twp. of Lower Merion, 77 Fed. Appx. 556, No. 02-3217, 2003 WL 22121002 (3d Cir. 2003)*; *Katekovich v. Team Rent a Car of Pittsburgh, Inc., 36 Fed. Appx. 688, No. 00-2389, 2002 WL 1288766 (3d Cir. 2002)*; *Barcola v. Interim Healthcare Servs., 31 Fed. Appx. 791, No. 01-1993, 2002 WL 463286 (3d Cir. 2002)*. Thus, the Third Circuit has not had the opportunity to explain what constitutes an adverse employment action under the FMLA. However, several Third Circuit opinions have examined the meaning of "adverse employment actions" under Title VII, the ADA, and the ADEA.

In order for retaliatory conduct to rise to the level of an adverse employment action under Title VII, it "must be serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment . . . ." *Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300-01 (3d Cir. 1997)*. "An adverse employment action necessarily encompasses all tangible employment actions such as 'hiring, firing, failing to promote, reassignment or a decision causing a significant change in benefits.'" *Sherrod v. Phila. Gas Works, 57 Fed. Appx. 68, No. 02-2153, 2003 WL 230709, *4 (3d Cir. 2003)* [*17] (citing *Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 141 L. Ed. 2d 633, 118 S. Ct. 2257 (1998)*); see also *Abramson v. William Paterson Coll., 260 F.3d 265, 288 (3d Cir. 2001)* (finding termination of employment is clearly an adverse employment action). Constructive discharge is also an adverse employment action. n4 *Goss v. Exxon Office Sys. Co., 747 F.2d 885*

*(3d Cir. 1984)*. Paying an individual a lower salary for discriminatory reasons can also be an adverse employment action. *Sherrod, 57 Fed. Appx. 68, 2003 WL 230709 at \*4* (citing *Stanziale v. Jargowsky, 200 F.3d 101, 105 (3d Cir. 2000))*. Job transfers, even without loss of pay or benefits, may, in some circumstances, constitute an adverse employment action. *Jones v. Sch. Dist. of Phila., 198 F.3d 403, 412 (3d Cir. 1999)* (finding that each of two separate transfers, the first depriving a teacher of the opportunity to teach physics and the second placing the teacher in a "difficult school," constituted adverse employment actions); *DiIenno v. Goodwill Indus., 162 F.3d 235, 236 (3d Cir. 1998)* ("Transfer to a job that an employer knows an employee cannot do may constitute **[\*18]** adverse employment action for purposes of Title VII retaliation action."); *Torre, 42 F.3d at 831 n.7* (finding that transfer to a dead end job because of age may constitute an adverse employment action for ADEA claim); see also *McGrenaghan v. St. Denis Sch., 979 F. Supp. 323 (E.D. Pa. 1997)* (finding an adverse employment action under the ADA where transfer resulted in "significantly diminished job responsibilities.").

> n4 Under Title VII, an employer constructively discharges an employee if "the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." *Goss v. Exxon Office Sys. Co., 747 F.2d 885, 888 (3d Cir. 1984).*

The Third Circuit has found that oral and written reprimands are insufficient to establish an adverse employment action. *Robinson, 120 F.3d at 1300* (finding that oral reprimands did not rise to the level of what Third Circuit cases have described as **[\*19]** adverse employment action); *Weston v. Pennsylvania, 251 F.3d 420, 431 (3d Cir. 2001)* ("Weston failed to establish how these two [written] reprimands effect a material change in the terms or conditions of his employment. We cannot, therefore, characterize them as adverse employment actions."). Furthermore, "unnecessary derogatory comments" do not amount to adverse employment actions. *Robinson, 120 F.3d at 1300 (3d Cir. 1997)* (finding that "unnecessary derogatory comments" do not rise to the level of what Third Circuit cases have described as adverse employment actions).

The Third Circuit also has not had the opportunity to discuss causation, the third step in the McDonnell Douglas burden shifting framework, for a FMLA claim. Once again, the Third Circuit's analysis of causation under Title VII, the ADA, and the ADEA provides

helpful guidance. Cases examining causation under Title VII, the ADA, and the ADEA have often focused on the "temporal proximity between the employee's protected activity and the adverse employment action, because this is an obvious method by which a plaintiff can proffer circumstantial evidence 'sufficient to raise the inference **[\*20]** that her protected activity was the likely reason for the adverse action.'" *Kachmar v. SunGard Data Sys., Inc., 109 F.3d 173, 177 (3d Cir. 1997)* (citing *Zanders v. Nat'l R.R. Passenger Corp., 898 F.2d 1127, 1135 (6th Cir.1990))*. In *Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989)*, the Third Circuit found that where an alleged retaliatory action occurred two days after the plaintiff engaged in a protected activity, the plaintiff demonstrated a causal link. However, the Third Circuit has subsequently limited the applicability of Jalil:

> We believe that, if Jalil is to be interpreted as holding that timing alone can be sufficient [to establish causation], that holding must be confined to the unusually suggestive facts of Jalil. Thus, even if timing alone can prove causation where the discharge follows only two days after the complaint, the mere fact that the adverse employment action occurs after a complaint will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events.

*Robinson, 120 F.3d at 1302*; see also *Weston, 251 F.3d at 431 n.5*. **[\*21]**

### B. FMLA Analysis

With respect to the FMLA, plaintiff only alleges a retaliation claim against defendant. (D.I. 1 at 6; D.I. 52 at 16) There is no dispute that the first element of a prima facie case of retaliation has been established. Plaintiff and defendant are in agreement that on two separate occasions, plaintiff took leave under the FMLA. (D.I. 47 at 7, 11; D.I. 52 at 7, 9).

Plaintiff has identified the following adverse employment actions: (1) Bellamy's "constant" harassment of plaintiff n5 (D.I. 52 at 18); (2) Bellamy's reference to plaintiff as "psycho" and "mental" in conversations with management level employees and a temporary pharmacist (id.); (3) Bellamy's "invasion of plaintiff's privacy" by having a camera installed to surveil plaintiff's work (id.); (4) the final warnings that plaintiff received (id. at 19); (5) the 2003 Evaluation, which was lower than the 2002 Evaluation (id.); (6) relieving plaintiff of her scheduling duties and her Committee position (id.); (7) instigation of a false incident report filed by Weber against plaintiff (id. at

19); n6 (8) plaintiff's constructive discharge (id.); (9) Thomas' call to plaintiff's home [*22] while she was on leave (id. at 20); and (10) verbal reprimands for alleged negative communications with Weber (id.).

> n5 Plaintiff described "constant" harassment as including "a two and one-half hour meeting in January 2003 (soon after plaintiff had returned from taking her second FMLA leave), when Bellamy called plaintiff a 'b--ch' and told plaintiff that she was "nasty" and ruined [Bellamy's] life and career, as well as instructed other employees to ostracize plaintiff." (D.I. 52 at 18)

> n6 The court finds this allegation is not supported by the record. See D.I. 53 at B54.

Of the adverse employment actions identified by plaintiff, only her claim of being constructively discharged is "serious and tangible enough" to be considered as altering plaintiff's terms, conditions or privileges of employment. *Robinson, 120 F.3d at 1300-01.* n7 Moreover, the court finds that plaintiff has adduced minimally sufficient evidence n8 to support the inference that she was in fact constructively [*23] discharged and that there is a causal connection between her discharge and her FMLA leave, when considering the totality of the circumstances described by plaintiff during her employment in 2002-2003.

> n7 Third Circuit caselaw indicates that derogatory statements and verbal reprimands do not amount to adverse employment actions. *Robinson, 120 F.3d at 1300; Weston, 251 F.3d at 431.* Similarly, such conduct as a single telephone call in violation of company policy and the installation of surveillance cameras in the general work place do not constitute tangible alterations in plaintiff's conditions or privileges of employment. There is no evidence of record that plaintiff's 2003 Evaluation had a tangible effect on her compensation. Finally, there is no convincing evidence of record that the scheduling duty and the Committee position were significant enough responsibilities among those plaintiff held as Head Pharmacist that relieving her of these duties while she was on leave constituted an adverse employment action. Of course, this conduct may be considered in evaluating plaintiff's claim of constructive discharge. [*24]

> n8 In addition to her allegations in this regard, plaintiff has presented two affidavits of Joan Siler, a former Target employee, in support of her allegations. (D.I. 57, 59) To the extent that Ms. Siler avers to her knowledge of facts, the affidavits shall be considered by the court for purposes of the motion practice. To the extent Ms. Siler draws legal conclusions from these facts, the court has not considered such. Defendant's motion to strike (D.I. 60) is granted in this regard, but otherwise denied, as Ms. Siler was sufficiently identified through discovery. Plaintiff's motion for leave to file (D.I. 64) is granted, consistent with the above.

Having demonstrated a prima facie case of retaliation under the FMLA, it is defendant's burden to articulate a legitimate, nondiscriminatory reason for the employment action. In this regard, defendant denies the allegations that derogatory comments were made and argues in large measure that it was justified in its responses to plaintiff's job performance as Head Pharmacist. Especially in light of defendant's arguments that plaintiff's 2003 Evaluation [*25] and the change in her job responsibilities were due, at least in part, to her long absences from work (when she happened to be on FMLA leave), the court declines to make the credibility determinations a jury should make under these circumstances, and concludes that there are genuine issues of material fact that preclude the entry of a summary judgment in favor of defendant.

## C. Americans with Disabilities Act

The ADA prohibits discrimination by an employer against a "qualified individual." *42 U.S.C. § 11112 (2003).* To establish a prima facie case, a plaintiff must demonstrate that: (1) she has a disability within the meaning of the statute; (2) she is otherwise qualified to perform the essential functions of the job, with or without accommodations by the employer; and (3) as a result of her disability, she has suffered an adverse employment action. See *Williams v. Phila. Hous. Auth. Police Dep't, 380 F.3d 751 (3d Cir. 2004); Shaner v. Synthes, 204 F.3d 494, 500 (3d Cir. 2000); Deane v. Pocono Med. Ctr., 142 F.3d 138, 142 (3d Cir. 1998).*

The ADA defines a disability as: "(A) a physical or mental impairment [*26] that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (c) being regarded as having such an impairment." *42 U.S.C. § 12102(2) (2003).* In the present case, plaintiff claims relief under the third classification of covered individuals, namely, those who are regarded as having a substantially limiting impairment. n9 (D.I. 52 at 24) To be "disabled" under the

"regarded as" portion of the ADA's definition of disability, plaintiff must demonstrate either that: (1) although she had no impairment at all, defendant erroneously believed that she had an impairment that substantially limited major life activities; or (2) she had a non-limiting impairment that the defendant mistakenly believed limited a major life activity. See *Sutton v. United Air Lines, Inc., 527 U.S. 471, 489, 144 L. Ed. 2d 450, 119 S. Ct. 2139 (1999)*; *Tice v. Ctr. Area Transp. Auth., 247 F.3d 506, 514 (3d Cir. 2001).*

n9 Plaintiff concedes that, given the current state of ADA law, it would be difficult for her to establish that she has a physical or mental impairment that substantially limits one or more of her major life activities. (D.I. 52 at 24) According to plaintiff, her "life history since her constructive discharge by defendant has exhibited an improvement of her mental health. Thus, given the apparent non-permanence of her mental impairment, it is unlikely that she could establish an actual substantial limitation of one or more of her major life activities due to the impairment." (Id.)

**[*27]**

Plaintiff claims that defendant, through its agent Bellamy, regarded plaintiff as having a disability. (Id.) Specifically, plaintiff states, "Bellamy constantly referred to plaintiff as 'psycho' and 'mental' both with management-level employees and with those assigned to substitute for plaintiff during her periods of leave." n10 (Id.) Plaintiff claims that "it is certainly plausible that Bellamy regarded plaintiff as having a severe mental impairment, and that this constituted at least a partial and substantial motivation in the numerous and adverse employment actions . . . that Bellamy took against plaintiff." (D.I. 52 at 24)

n10 Bellamy, however, denies having ever made such statements. (D.I. 53 at B100-B101) Furthermore, Jane Webb testified in her deposition that she never heard Bellamy refer to plaintiff as "psycho" or "mental." (D.I. 57, ex. 23)

The record does not support plaintiff's position in this regard. The Siler affidavits, plaintiff's sole source of evidence that Bellamy made these statements **[*28]** (D.I. 52 at 10), classified Bellamy's statements as "derogatory," suggesting that Bellamy did not genuinely believe that plaintiff suffered a mental impairment. (D.I. 53 at B13) Indeed, the record, seen in a light most

favorable to plaintiff, indicates that Bellamy expressed frustration and anger over plaintiff's FMLA leave, that plaintiff was getting paid to sit at home during the holidays while other employees were working, and that plaintiff was abusing the system for reasons that had nothing to do with a valid medical condition. (D.I. 59) Consequently, the record demonstrates that if Bellamy did refer to plaintiff as "psycho" and "mental," he did so disparagingly, and did not believe that plaintiff suffered a serious mental impairment. As a result, the court grants defendant's motion for summary judgment with respect to plaintiff's ADA claim.

### D. Implied Covenant of Good Faith and Fair Dealing

Under the common law, an employee is considered "at-will" and may be dismissed from employment at any time without cause and regardless of motive. See *Merrill v. Crothall-Am., Inc., 606 A.2d 96 (Del. Super. 1992).* Delaware law, however, has evolved from the harshness **[*29]** of the "employment-at-will" doctrine. It now recognizes a limited implied covenant of good faith and fair dealing exception to protect at-will employees from wrongful termination. Id. Nevertheless, the Delaware Supreme Court has limited the application of this exception to four narrowly defined categories: (1) where the termination violated public policy; (2) where the employer misrepresented an important fact and the employee relied thereon either to accept a new position or to remain in her present one; (3) where the employer used its superior bargaining power to deprive an employee of clearly identifiable compensation related to the employee's past services; and (4) where the employer falsified or manipulated employment records to create fictitious grounds for termination. *Lord v. Souder, 748 A.2d 393, 400 (Del. 2000)* (citing *E.I. Dupont de Nemours & Co. v. Pressman, 679 A.2d 436, 442-44 (Del. Super. 1996))*. "Plaintiff's breach [of implied covenant of good faith and fair dealing] claim rests squarely under the first category, the public policy exception." (D.I. 52 at 25) The court, therefore, focuses its analysis solely on whether defendant's **[*30]** alleged constructive discharge of plaintiff violated public policy.

To demonstrate a breach of the covenant of good faith and fair dealing under the public policy category, an employee must satisfy a two-part test: (1) the employee must assert a public interest recognized by some legislative, administrative, or judicial authority; and (2) the employee must occupy a position with responsibility for advancing or sustaining that particular interest. *Lord, 748 A.2d at 401* (citing *Pressman, 679 A.2d at 441-42*). The parties agree for purposes of this motion that plaintiff was in a position with responsibility for ensuring that defendant's pharmacy operated in compliance with Delaware law, thereby satisfying the

second prong of the two-part test. (D.I. 47 at 28; D.I. 52 at 26) Consequently, the court need only decide the first prong, namely, whether defendant terminated plaintiff's employment in violation of a clearly mandated public policy recognized by some legislative, administrative or judicial authority. (D.I. 47 at 28-29; D.I. 2 at 26)

Plaintiff claims she was subjected to severe harassment in retaliation for reporting to the State Board that Weber **[*31]** accepted a returned generic narcotic medication and substituted a brand-name narcotic medication without contacting the physician for the issuance of a new prescription. (D.I. 52 at 26) Plaintiff claims the following acts were harassment: (1) Thomas telling her that she should have pushed the medication to the back of the safe rather than reporting the problem to the State Board (D.I. 53 at B33-B34); (2) Thomas telling plaintiff that she handled the situation improperly (id. at 835); (3) Thomas telling plaintiff that he was not disturbed by Weber's failure to know all of Delaware's pharmacy laws (id. at B86); (4) Thomas removing plaintiff from the Committee (id. at B38-B39); (5) Thomas verbally reprimanding plaintiff for negative communications with Weber (id. at B2, B88-B89); (6) Thomas' email expressing a desire to "act fast and consider [plaintiff] a no show and abandoned her job[]" (id. at B1). Plaintiff claims these activities amounted to constructive discharge in violation of public policy. Even assuming that these acts amount to harassment, plaintiff has not produced any evidence that she experienced this harassment because she fulfilled her responsibilities **[*32]** pursuant to Delaware law. Consequently, plaintiff has failed to show she was terminated in violation of public policy.

### E. Slander and *19 Del. C. § 709*

Plaintiff claims that defendant violated *19 Del. C. § 709* n11 by providing false and misleading information to prospective employers of plaintiff. (D.I. 1 at 8) Plaintiff also claims that defendant slandered plaintiff by making false oral statements to plaintiff's potential employers. (D.I. 1 at 9; D.I. 52 at 28)

> n11 According to *19 Del. C. § 709*:
> An employer or any person employed by the employer who discloses information about a current or former employee's job performance to a prospective employer is presumed to be acting in good faith; and unless a lack of good faith is shown, is immune from civil liability for such disclosure or its consequences . . . the presumption of good faith may

> be rebutted upon a showing that the information of good faith by such employer was knowingly false, was deliberately misleading or was rendered with malicious purpose . . . .

Plaintiff does not provide, and the court is unaware of, any precedent applying *19 Del. C. § 709*. Consequently, it remains unclear what plaintiff's burden of proof is under *19 Del. C. § 709*.

**[*33]**

After plaintiff ceased working for defendant, she completed two rounds of interviews with a prospective employer, the Delaware Hospital for the Chronically Ill ("DHCI"). (D.I. 53 at B56) According to plaintiff, DHCI initially expressed interest in hiring plaintiff, but this interest abruptly ended after representatives of DHCI spoke with a male member of management at the Dover Store. (Id.) Plaintiff claims to have subsequently spoken with two male managers at the Dover Store other than Bellamy, and each of these male managers stated they had not been contacted by a representative of DHCI. (Id.) Plaintiff surmises that "Bellamy was likely the only other male manager at the Dover Store." (D.I. 52 at 28) However, plaintiff admits that she is not certain, one way or the other, whether Bellamy provided any information to DHCI and, if he did, what information has provided. (D.I. 53 at B56) Consequently, plaintiff has failed to establish a genuine issue of material fact for both her slander and her *19 Del. C. § 709* claims. See, e.g., *Layfield v. Beebe Med. Ctr., Inc., 1997 Del. Super. LEXIS 472, No. 95C-12-007, 1997 WL 716900, *7 (Del. Super. Ct. 1997)* ("Plaintiff **[*34]** fails to identify a specific false or defamatory communication made by any Beebe employee to a third party. . . . Simply alleging that there is circumstantial evidence of defamation is insufficient to overcome Beebe's motion for summary judgment, because plaintiff must allege specific facts which demonstrate a genuine issue of material fact."). Defendant's motion to dismiss plaintiff's slander and *19 Del. C. § 709* claims is granted.

### V. CONCLUSION

For the reasons set forth above, the court grants defendant's motion for summary judgment against plaintiff's ADA, breach of implied covenant of good faith and fair dealing, slander, and *19 Del. C. § 709* claims. The court denies defendant's motion for summary judgment against plaintiff's FMLA claim. An appropriate order shall issue.

### ORDER

2005 U.S. Dist. LEXIS 6262, *

At Wilmington this 13th day of April, 2005, consistent with the memorandum opinion issued this same date;

IT IS ORDERED that:

1. Defendant's motion for summary judgment against plaintiff's ADA, breach of implied covenant of good faith and fair dealing, slander, and *19 Del. C. § 709* claims (D.I. 46) is granted. **[*35]**

2. Defendant's motion for summary judgment against plaintiff's FMLA claim (D.I. 46) is denied.

United States District Judge

1995 Del. Super. LEXIS 229, *

**DENISE DRAINER, Plaintiff, v. FRANK O'DONNELL (Dismissed) WILLIAM GARRETT, TICOR TITLE INSURANCE COMPANY, AND RICHARD YERGER, Defendants.**

**C.A. No. 94C-08-062**

**SUPERIOR COURT OF DELAWARE, NEW CASTLE**

*1995 Del. Super. LEXIS 229*

**February 24, 1995, Submitted
May 30, 1995, Decided**

**SUBSEQUENT HISTORY: [*1]**

Released for Publication by the Court June 7, 1995.

**DISPOSITION:**

GRANTED IN PART, DENIED IN PART.

**LexisNexis(R) Headnotes**

**COUNSEL:**

Michael P. Maguire, Esq., Wilmington, DE. Attorney for Plaintiff.

Benton J. Mathis, Jr., Esq. of Drew, Eckl and Farnham, Atlanta, Ga. Attorney for Defendants Richard Yerger and Ticor Insurance Company.

Dale R. Dube, Esq., of Bayard, Handelman and Murdoch, P.A., Wilmington, DE. Attorney for Defendants Richard Yerger and Ticor Insurance Company.

Ransford B. Palmer, Jr., Esq., Christiana Executive Campus, Newark, DE. Attorney for Defendant William Garrett.

**JUDGES:** Haile Alford, J.

**OPINIONBY:** Haile Alford

**OPINION:**

**OPINION AND ORDER**

UPON DEFENDANTS' MOTIONS TO DISMISS.

ALFORD, J.

Defendants William Garrett (hereinafter "Garrett"), Richard Yerger (hereinafter "Yerger"), and Ticor Title Insurance Company (hereinafter "Ticor"), (hereinafter collectively referred to as "Defendants"), all move separately to dismiss the complaint of Denise Drainer (hereinafter "Drainer") pursuant to Superior Court Civil Rule 12(b) alleging, *inter alia,* (i) lack of subject matter jurisdiction; and (ii) failure to state a claim for which relief may be granted. This is the Court's decision on Defendants' [*2] motions to dismiss.

**BACKGROUND**

Drainer worked at the law firm of O'Donnell and Garrett in Wilmington, Delaware, for approximately two and one-half years. Drainer worked almost exclusively for Garrett as a legal secretary. At the time, Yerger was president of Ticor, which provided title insurance for some of the law firm's clients.

Drainer, a married woman, alleges in her complaint that, on or about August 16, 1993, Yerger circulated a story asserting Drainer had traveled with him earlier that month to the Bahamas for a vacation. He allegedly stated that while on vacation, Drainer's "breasts had become sunburned and that he had taken nude pictures of her on the beach." Drainer categorically denies accompanying Yerger on vacation. Drainer further alleges that she was confronted about the story a few days later by another secretary at the law firm, as well as by two Ticor employees.

According to Drainer's complaint, she reported the situation to Garrett immediately upon hearing the rumor; and Garrett failed to properly address the problem. Therefore, she tendered her resignation in September, 1993.

On August 5, 1994, Drainer filed a civil complaint alleging "harassment" against [*3] Garrett and his partner Frank O'Donnell, n1 Yerger and Ticor. The

complaint further alleges mental distress and physical injury resulting from the "harassment". Drainer demands compensatory damages, including approximately $ 8,000 in lost wages from Defendants, and punitive damages against Yerger and Ticor.

n1 Frank O'Donnell was dismissed by stipulation on December 22, 1994.

Garrett filed a motion to dismiss the complaint on September 26, 1994, while Yerger and Ticor filed their respective motions to dismiss the complaint on November 17, 1994. On December 6, 1994, Drainer amended her complaint to include allegations of slander *per se.*

### STANDARD - MOTION TO DISMISS

The Court will not dismiss a complaint unless the allegations fail to articulate a claim under any reasonably conceivable set of circumstances susceptible of proof under the complaint." *Browne v. Robb, Del. Supr., 583 A.2d 949, 950 (1990); Spence v. Funk, Del. Supr., 396 A.2d 967, 968 (1978); Towe v. Justis Bros., Inc., Del.* **[*4]** *Super., 290 A.2d 657, 658 (1972).* In assessing the complaint, the Court must accept all of its allegations as true. *Spence v. Funk, 396 A.2d at 968;* Q-Tone Broadcasting, Co. v. Musicradio of Maryland, Inc., Del. Super., C.A. No. 93C-09-021, Silverman, J. (August 22, 1994). The Delaware Supreme Court has held that a complaint may not be dismissed unless "it is clearly without merit, which may be either be a matter of law or of fact." *Diamond State Tel. Co. v. University of Delaware, Del. Supr., 269 A.2d 52, 58 (1970).*

### SEXUAL HARASSMENT

Hostile work environment-type sexual harassment has been recognized by the federal courts as a form of employment discrimination. *Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); Powell v. Las Vegas Hilton Corp., 841 F.Supp. 1024, 1028 (D. Nev. 1992);* Lehmann v. Toys ' R' Us, Inc., 132 N.J. 587, 626 A.2d 445, 454 (N.J. 1993). Verbal conduct of a sexual nature made because of an employee's sex, which is so pervasive or severe that it creates an intimidating or hostile work environment, has been defined as an example of hostile work environment sexual harassment. *Meritor Savings Bank,* **[*5]** *477 U.S. at 65-66.* It has been held that an employer may be liable for sexual harassment of its employees by non-employees. *Powell v. Las Vegas Hilton Corp., 841 F.Supp. 1024.*

The Delaware Legislature has adopted an employment discrimination statute almost identical to the federal statute. n2 *19 Del.C. § 711;* Cannon v. State of Delaware, 523 F.Supp. 341 (D. Del. 1981). Delaware has not recognized a common law cause of action for employment discrimination, including sexual harassment. *Wright v. ICI Americas Inc., 813 F.Supp. 1083, 1091 (D.Del. 1993); Chalawsky v. Sun Refining and Marketing Co., Inc., 733 F.Supp. 791, 799 (D.Del. 1990);* Brett v. Berkowitz, Del. Super., C.A. No. 91C-12-251, Lee, J. (April 13, 1995), Mem. Op. at 8-10.

n2 Delaware's Employment Discrimination Statute provides in pertinent part:

It is an unlawful employment practice to "hire, discharge ... or otherwise to discriminate against any individual" due to "race, marital status, color, age, religion, sex or national origin". *19 Del.C. § 711(a)(1).*

**[*6]**

Delaware's employment discrimination statute outlines specific procedures that must be followed to assert an employment discrimination claim. Judicial review is only available after a Delaware Department of Labor Review Board (hereinafter "Board") hearing. *Wright v. ICI, 813 F.Supp. at 1090-1091, citing 19 Del.C. § 712.* Drainer's claim never went beyond the initial stages. In any event, had Drainer appealed an unfavorable decision of the Board, the Court of Chancery would have had jurisdiction. n3 Thus, the Court does not have subject matter jurisdiction over this or any sexual harassment claim. *Wright v. ICI Americas, 813 F.Supp. at 1090-1091, n.11.*

n3 *19 Del.C. § 712(h)* provides, in pertinent part:

Any party, other than a member of the Department, respondent or intervenor "aggrieved by an order of the review board . . . may obtain judicial review, and the review board may obtain an order of the Court of Chancery for enforcement of its order. The proceeding for review or enforcement is initiated by filing a petition in the Court of Chancery . . . within 30 days after a copy of the order of the review board is received, unless the Department is the petitioner."

**[*7]**

### SLANDER

A defamatory statement is one that tends to damage another's reputation in the entire community. *Spence v. Funk, 396 A.2d at 969;* Q-Tone Broadcasting Co., *supra,* at 3. Slander, or oral defamation, is typically not actionable without proof of specific monetary injury, or special damages, unless the defamation rises to the level of slander *per se.* n4 Id. One who slanderously "imputes serious sexual misconduct to another" may be liable without proof of special harm. *Restatement (Second) of Torts, § 574* (1976). The function of the court is to determine whether the statement is capable of carrying a defamatory meaning. Whether the statement was understood in a defamatory manner by its recipient is a question for the jury. Ronald RE v. Horstmann, Del. Super., CA. No. 83C-FE-82, Poppiti, J. (August 11, 1987); *MacDonough v. A. S. Beck Shoe Corporation, Del. Super., 40 Del. 318, 10 A.2d 510, 513 (1939).*

> n4 Delaware has recognized the following four categories of slander *per se:* defamation that imputes to another (i) a crime; (ii) a loathsome disease; (iii) misconduct affecting one's business, trade or profession; and (iv) unchastity, or serious sexual misconduct., *Spence v. Funk, 396 A.2d at 969, n.1.*

**[*8]**

Drainer alleges that the aforementioned statement by Yerger imputes unchastity to her, in that the statement implies that she, a married woman, accompanied Yerger on a vacation and was involved in a sexual relationship with him. Yerger argues that the alleged statement was not defamatory because a defamatory meaning can only be derived when said statement is expanded by innuendo. The Court finds that Yerger's statement implies serious sexual misconduct on Drainer's part, and is therefore capable of carrying a defamatory meaning that is slanderous *per se.*

Yerger next argues that the alleged statement expressed opinion rather than fact, and is therefore not actionable. The Court finds this argument to be totally without merit.

## EMOTIONAL DISTRESS

To establish a cause of action for intentional infliction of emotional distress, a plaintiff must allege that, as a result of a defendant's extreme and outrageous conduct, he or she suffered severe emotional distress. The plaintiff need not allege accompanying bodily harm. *Cummings v. Pinder, Del. Supr., 574 A.2d 843, 845 (1990);* Brett v. Berkowitz, Del. Super., C.A. No. 91C-12-251, Lee, J. (April 13, 1995), Mem. Op. at **[*9]** 10. However, when the gravamen or significant portion of a

complaint "sounds in defamation", no independent action for intentional infliction of emotional distress will lie. *Barker v. Huang, Del. Super., 610 A.2d 1341, 1350-51 (1992).* The rationale for this rule is to preclude one from reviving a defective defamation claim by pleading it as a claim for intentional infliction of emotional distress. Id. Therefore, Drainer may not simultaneously allege slander and intentional infliction of emotional distress.

Negligent infliction of emotional distress has been defined as outrage, resulting from the negligence of another, suffered by a person within the immediate zone of danger of the negligent act. *Robb v. Pennsylvania Railroad, Del. Supr., 58 Del. 454, 210 A.2d 709, 714-715 (1965); G. D. Searle & Co., Del. Super., 484 A.2d 527, 531 (1984).* Physical injury resulting from the emotional distress is required. Id. Drainer's allegations of "sleeplessness and nausea" caused by emotional distress resulting from Yerger's alleged rumor sufficiently allege negligent infliction of emotional distress.

## WORKMEN'S COMPENSATION

Garrett argues that Drainer's claims are barred **[*10]** by Delaware's Workmen's Compensation Act (hereinafter. the "Act"), *19 Del.C. § 2301-2397.* The Act provides the exclusive remedy for employees suffering personal injury arising out of and in the course of employment. *19 Del.C. § 2304*; *Battista v. Chrysler Corp., Del. Super., 454 A.2d 286, 289 (Del. Super. 1982). Mental trauma has been held to be compensable under the Act. Ramey v. Delaware Materials, Inc., Del. Supr., 399 A.2d 205 1979); Battista v. Chrysler Corp., 454 A.2d at 289.* In Battista, the employee's claim was for intentional infliction of emotional distress. However, the Court finds that it makes no difference whether mental trauma is caused by negligent or intentional infliction of emotional distress. Therefore, Drainer's claims against Garrett for intentional and negligent infliction of emotional distress are barred by the Act.

Harm resulting from defamation has been held to be an injury to reputation, and not a personal injury within the meaning of the Act. *Mergenthaler v. Asbestos Corp. of America, Del. Supr., 480 A.2d 647, 650 (1984); Battista v. Chrysler, 454 A.2d at 289.* Thus, Drainer's claim for slander is not barred.

## RESPONDEAT **[*11]** SUPERIOR

Ticor argues that Drainer's complaint fails to state a cause of action against it based on respondeat superior in that the complaint as amended merely alleges that Yerger made the statements while he was employed by Ticor. Ticor argues that the allegations made are insufficient to support a claim for employer liability. In response, Drainer argues that the issue must be decided by a jury

1995 Del. Super. LEXIS 229, *

armed with the knowledge of Yerger's job responsibilities.

An employer will be liable for the tortious acts of an employee under respondeat superior if those acts are performed within the scope of employment. Conduct is within the scope of employment if it (i) is of the type the employee was hired to perform; (ii) takes place "within the authorized time and space limits"; and (iii) is at least partially motivated by a purpose to serve the employer. *Wilson v. Joma, Inc., Del. Supr., 537 A.2d 187, 189 (1988); Draper v. Olivere Paving & Construction Co., Del. Supr., 54 Del. 433, 181 A.2d 565, 570 (1962), citing* the *Restatement, Second, Agency §  228.* The question of whether conduct is within the scope of employment is generally a question for the jury, unless the facts are so **[*12]** clear that they must be decided as a matter of law. *Draper, 181 A.2d at 569.* In the instant case, viewing Drainer's allegations in the light most favorable to her, the complaint fails to allege conduct on Yerger's part that could be deemed to be within the scope of employment.

Therefore, the Court finds that Drainer failed to state an actionable claim against Ticor.

**CONCLUSION**

For the aforementioned reasons, Ticor's motion to dismiss is **GRANTED**; Defendants' motions to dismiss the sexual harassment claims are **GRANTED**; and Garrett's motion to dismiss the negligent infliction of emotional distress claim is **GRANTED**.

As to Drainer's claim for negligent infliction of emotional distress, Yerger's motion to dismiss is **DENIED**. Defendants' motions to dismiss the slander and intentional infliction of emotional distress claims are **GRANTED IN PART AND DENIED IN PART**, in that Drainer must amend her complaint in order to elect either slander or intentional infliction of emotional distress.

**IT IS SO ORDERED.**

Haile Alford

J.

2005 U.S. Dist. LEXIS 1254, *

**GODWIN J. IGWE, Plaintiff, v. E.I. DUPONT DE NEMOURS AND CO., INC., Defendant.**

**Civil Action No. 03-839 JJF**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2005 U.S. Dist. LEXIS 1254*

**January 24, 2005, Decided**

**DISPOSITION:** Defendant's motion for summary judgment was granted. Judgment was entered.

**LexisNexis(R) Headnotes**

**COUNSEL:** **[*1]** Darryl K. Fountain, Esquire, Wilmington, Delaware, for Plaintiff.

Wendy K. Voss, Esquire, and Suzanne M. Hill, Esquire, of POTTER ANDERSON & CORROON LLP, Wilmington, Delaware. Evelyn H. Brantley, Esquire, of E.I. DU PONT DE NEMOURS AND COMPANY, Wilmington, Delaware, for Defendant.

**JUDGES:** Farnan, District Judge.

**OPINIONBY:** JOSEPH J. FARNAN, JR.

**OPINION:**

### MEMORANDUM OPINION

January 24, 2005
Wilmington, Delaware

**Farnan, District Judge.**

Presently before the Court is Defendant E.I. DuPont de Nemours & Company Incorporated's ("DuPont") Motion for Summary Judgment (D.I. 23). For the reasons discussed, the Court will grant DuPont's motion.

### BACKGROUND

Plaintiff Godwin J. Igwe, an African-American male of Nigerian descent, began his work with DuPont as a Senior Research Engineer in March of 1992. In January of 1998, DuPont eliminated Mr. Igwe's position and transferred him to its Corporate Information Science Group ("CIS"). There, Mr. Igwe became a Senior Information Scientist, a job which required him to learn new skills, but kept him at the same salary level.

At CIS, Mr. Igwe reported to Marsha Lee, who eventually became dissatisfied with Mr. Igwe's work performance. **[*2]** In September of 1999, Ms. Lee expressed to Mr. Igwe her disappointment and placed him on Written Corrective Action. Ms. Lee's dissatisfaction continued and on March 3, 2002, she placed Mr. Igwe on probation. Mr. Igwe was informed that the probationary period would extend for up to twelve months, and that he would be terminated if, during that time, he failed to demonstrate improvement. A few days later, on March 7, 2002, Mr. Igwe injured his neck in DuPont's library and left work on disability leave. Mr. Igwe was eventually approved for permanent disability status and, in October of 2002, DuPont terminated his employment. DuPont continues to pay Mr. Igwe disability compensation and provide him benefits programs.

On August 26, 2003, Mr. Igwe filed his Complaint against DuPont (D.I. 1). On March 3, 2004, Plaintiff filed his Amended Complaint (D.I. 3, 4). The Amended Complaint states four causes of action. Count I alleges discrimination on the basis of race and national origin in violation of *Title VII of the Civil Rights Act of 1964* and *42 U.S.C. § 1981*. Count II alleges retaliatory demotion in violation of Title VII. Count III alleges violation of the *Thirteenth* **[*3]** *Amendment*. Count IV alleges defamation in violation of Delaware state law.

### STANDARD OF REVIEW

*Rule 56(c) of the Federal Rules of Civil Procedure* provides that a party is entitled to summary judgment if a court determines from its examination of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law." *Fed.R.Civ.P. 56(c)*.

To defeat a motion for summary judgment, *Rule 56(c)* requires the non-moving party to show that there is more than "some metaphysical doubt as to the material

2005 U.S. Dist. LEXIS 1254, *

facts ... In the language of the Rule, the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)* (quoting *Fed.R.Civ.P. 56(c)*). However, the mere existence of some evidence in support of the nonmovant will not be sufficient **[*4]** to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the nonmovant on that issue. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*. Thus, if the evidence is "merely colorable, or is not significantly probative," summary judgment may be granted. Id.

## DISCUSSION

### A. Claim One: Employment Discrimination

In Title VII employment discrimination actions, courts apply the McDonnell Douglas burden shifting analysis. *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973)*. Under McDonnell Douglas, a plaintiff has the initial burden to establish a prima facie case of discrimination. *Id. at 802*. Once a plaintiff succeeds in establishing his or her prima facie case, the burden shifts to the defendant employer to proffer some legitimate non-discriminatory rationale for his or her action. Id. If the employer provides the court with a non-discriminatory rationale for his or her employment decision, the burden again shifts to the plaintiff to demonstrate, by a preponderance of the evidence, that the employer's rationale is pretextual. *Id. at 804*. **[*5]**

The Third Circuit has recognized that the elements of the prima facie case will vary from case to case because of differing fact scenarios. *Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 352 (3d Cir.1999)* (citing *McDonnell Douglas, 411 U.S. at 802 n. 13, 93 S. Ct. 1817*). In the instant action, to establish his prima facie case of discrimination, Mr. Igwe must provide evidence that (1) he is a member of a protected class; (2) he is qualified for the sought after position; (3) he suffered adverse employment action; and (4) similarly situated non-members of the protected class were treated more favorably than he, or the circumstances of his termination give rise to an inference of race discrimination. *Pivirotto, 191 F.3d at 356*.

### 1. Member of a Protected Class

It is not disputed that Plaintiff, an African-American male of Nigerian descent, is a member of a protected class.

### 2. Qualified

Mr. Igwe contends that he was qualified for a promotion, a transfer, and a bonus or raise. He contends he was qualified for a promotion because (1) he worked at DuPont for over ten years and received "glowing evaluations and award nominations" **[*6]** (D.I. 28, Ex. 1, at 1) and (2) DuPont promotion guidelines required that he receive a raise. Mr. Igwe contends he was qualified for a transfer because "he applied for more than a dozen other postings in the company...." Id.

In response, DuPont contends that Mr. Igwe's only evidence in support of his right to a promotion are two documents which do not apply to his job classification. Further, DuPont contends that Mr. Igwe fails to allege specific facts to support his arguments for a transfer, bonus, or raise.

The Court concludes that Mr. Igwe has failed to set forth specific facts showing he was qualified for the sought after positions. Mr. Igwe's contentions consist almost entirely of unsupported, conclusory arguments. Mr. Igwe fails to identify any specific, available opportunities for a promotion, transfer, bonus, or raise. Mr. Igwe's only specific facts are two documents outlining promotion guidelines for research and development professionals. (D.I. 26 at A518-19.) Mr. Igwe, however, was a CIS employee, not a research and development professional, and thus the promotion guidelines were inapplicable. For these reasons, the Court concludes that Mr. Igwe has not met his burden **[*7]** and thus does not present a genuine issue for trial with respect to the second prong of the prima facie case.

### 3. Adverse Employment Action

Mr. Igwe contends that he was subject to three types of adverse actions: (1) denial of a promotion, transfer, bonus, or raise; (2) disciplinary probation for up to twelve months (D.I. 26 at A509-12); and (3) his original transfer to CSI, which he contends limited his abilities. (D.I. 28, Ex. 2, at 2 P 7). In response, DuPont contends that these actions did not cause a significant change in Mr. Igwe's employment status.

The United States Supreme Court has defined an adverse employment action as a "significant change in employment status, such as hiring, firing, failing to promote, reassignment, or a decision causing a significant change of benefits." *Burlington Indus. Inc. V. Ellerth, 524 U.S. 742, 761, 141 L. Ed. 2d 633, 118 S. Ct. 2257 (1998)*. In this case, the Court concludes that Mr. Igwe has failed in his burden to establish an adverse employment action. As noted previously, Plaintiff has failed to set forth specific facts regarding a promotion, transfer, bonus, or raise. Further, the Court finds that Mr. Igwe has not alleged specific facts **[*8]** to support a finding that Mr. Igwe experienced a significant change in his benefits. Mr. Igwe asserts he was placed on

disciplinary probation, but does not offer evidence to show how this action significantly changed his benefits. Further, it appears that, despite being on probation, Mr. Igwe enjoyed the same compensation, benefits, and core job duties that he had as a Senior Research Engineer. (D.I. 26 at A380, A560, A572).

Likewise, Mr. Igwe does not specify how his transfer to CIS significantly changed his benefits. Instead, Mr. Igwe states in a conclusory fashion that "a limitation was placed on my ability, talent, professionalism, and my accomplishments dismissed. It was like a nurse being transferred to a nurse aid assignment ... (D.I. 28, Ex. 2, at 2 P 7.) Such unsupported assertions do not constitute "specific facts" as required by *Rule 56(e)*.

*4. Discrimination*

Mr. Igwe contends that similarly situated non-members of his class were treated more favorably. He further contends that the circumstances surrounding DuPont's conduct towards him raise an inference of racial discrimination. In response, DuPont contends that Mr. Igwe has failed to support his contentions **[*9]** with specific facts.

The Court finds that Plaintiff has failed to set forth specific facts sufficient to support the fourth element of the *McDonnell Douglas* prima facie test. Mr. Igwe does not identify a person or group of persons that were similarly situated to him but more favorably treated. Further, Mr. Igwe does not allege circumstances raising an inference of racial discrimination. Instead, Mr. Igwe asks the Court to assume that, because he was Nigerian and allegedly maltreated, he was a victim of race discrimination. *Rule 56(e)*, however, requires "specific facts showing that there is a genuine issue for trial." Mr. Igwe has set forth no such facts and thus has failed to meet the fourth element of the prima facie test.

In sum, because Mr. Igwe has not demonstrated that a genuine issue of material fact exists for elements two, three, and four of the *McDonnell Douglas* prima facie case, the Court will grant DuPont's motion on Mr. Igwe's racial and national origin discrimination claim.

**B. Claim Two: Retaliatory Demotion**

Mr. Igwe contends that DuPont subjected him to a retaliatory demotion in violation of *42 U.S.C. § 1981* by (1) incorrectly **[*10]** identifying him as an Information Scientist, rather than a Senior Information Scientist, on DuPont's website and (2) transferring him to CIS.

To establish a claim for retaliatory demotion, a plaintiff must first prove a prima facie case of retaliation by demonstrating that (1) he engaged in protected activity, (2) he suffered an adverse employment action,

and (3) there is a causal link between the protected activity and the adverse employment action. *Sarullo v. U.S. Postal Serv., 352 F.3d 789, 800 (3d Cir. 2003)*.

The Court finds that Plaintiff has failed to establish that he was engaged in a protected activity. Further, as the Court discussed previously, Mr. Igwe's arguments in support of a finding of an adverse employment action are not supported by specific facts. Because Mr. Igwe has not established a protected activity or an adverse action, Mr. Igwe has failed to demonstrate a causal link between the two. For these reasons, the Court will grant DuPont's motion on Mr. Igwe's retaliatory demotion claim.

**C. Claim Three: *Thirteenth Amendment***

By his Complaint, Plaintiff contends that DuPont violated his "rights and privileges as guaranteed by the *Thirteenth* **[*11]** *Amendment to the United States Constitution*." (3 D.I. P 43.)

The *Thirteenth Amendment* prohibits slavery and involuntary servitude. The Court finds that Mr. Igwe has failed to demonstrate with specific facts his allegation that DuPont violated the *Thirteenth Amendment*. For this reason, the Court will grant DuPont's motion on Mr. Igwe's *Thirteenth Amendment* claim.

**D. Claim Four: Defamation or Libel**

In support of his claim for libel, Mr. Igwe claims that DuPont's website "intentionally publicly designated [Mr. Igwe] as an Information Scientist instead of Senior Information Scientist." (D.I. 28, Ex. 1, at 6-7.) Mr. Igwe contends that the inaccurate designation "humiliated him" and "damaged his reputation and standing, causing him to be denied projects for Senior Information Scientist[s]." (D.I. 28, Ex. 1, at 7.)

It is undisputed that Delaware law controls this libel claim. Delaware defines libel as "a false and defamatory statement of fact concerning the plaintiff made in an unprivileged publication to a third party." *Ramunno v. Cawley, 705 A.2d 1029, 1035 (Del. 1998)* (citing *Spence v. Funk, 396 A.2d 967, 969 (Del. 1978)).* **[*12]** To be defamatory, a statement must "tend[] so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Ramunno, 705 A.2d at 1035*.

The Court finds that Plaintiff has not demonstrated sufficient evidence regarding how his designation on the DuPont website as an "Information Scientist" lowered him in the estimation of the community or deterred people from associating with him. Mr. Igwe alleges in a conclusory fashion that the inaccurate designation "humiliated him" and "damaged his reputation and standing ..." (D.I. 28, Ex. 1, at 7.) Further, while Mr.

Case 1:04-cv-00285-KAJ        Document 50-2        Filed 05/24/2005        Page 28 of 50

Page 4
2005 U.S. Dist. LEXIS 1254, *

Igwe contends that the misrepresentation caused him to be denied projects, he has not cited any specific projects which he was denied. For these reasons, the Court concludes that Summary Judgment on the issue of defamation and libel is appropriate.

**CONCLUSION**

For the reasons discussed, the Court will grant Defendant's Motion For Summary Judgment (D.I. 23) in all respects.

An appropriate Order will be entered.

**O R D E R**

At Wilmington, this 24 day of January 2005, for the reasons set forth in the Memorandum **[*13]** Opinion issued this date;

IT IS HEREBY ORDERED that:

1) Defendant E.I. DuPont de Nemours & Company Incorporated's Motion for Summary Judgment (D.I. 23) is **GRANTED.**

January 24, 2005
DATE

JOSEPH J. FARNAN, JR.

UNITED STATES DISTRICT JUDGE

**JUDGMENT IN A CIVIL CASE**

For the reasons stated in the Court's Memorandum Opinion and Order issued on January 24, 2005;

IT IS ORDERED AND ADJUDGED that judgment be and is hereby entered in favor of Defendant E.I. DuPont de Nemours & Company Incorporated and against Plaintiff Godwin J. Igwe.

JOSEPH J. FARNAN, JR.

UNITED STATES DISTRICT JUDGE.

2001 U.S. Dist. LEXIS 11683, *

GEORGE RUFF, ET AL., Plaintiff, v. PARTNER'S LIQUIDATING TRUST, Defendants.

No. 00 C 7337

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

*2001 U.S. Dist. LEXIS 11683*

August 7, 2001, Decided
August 8, 2001, Docketed

DISPOSITION:    [*1]    Trust's motion to strike paragraphs 11-13 of plaintiffs' 56.1(A) statement of facts and paragraph 3 of Callaghan's Hochberg's, Lager's and Ruff's affidavits denied. Plaintiffs' motion for summary judgment on complaint denied. Trust's motion for partial summary judgment and for summary judgment on third-party complaint granted in part and denied in part. Third-party defendants' motion for summary judgment on third-party complaint denied.

LexisNexis(R) Headnotes

COUNSEL:    For GEORGE RUFF, DENNIS CALLAGHAN, SCOTT L LAGER, MITCHELL HOCHBERG, STEPHEN BERINI, JACK A SHAFFER, plaintiffs: John A. Sopuch, J. Jeffrey Nouhan, Bart Higgins, Sopuch, Nouhan, Higgins & Arnett, LLP, Chicago, IL.

For PARTNERS LIQUIDATING TRUST, defendant: Timothy Michael Block, Robins, Kaplan, Miller & Ciresi, Chicago, IL.

For PARTNERS LIQUIDATING TRUST, third-party plaintiff: Timothy Michael Block, Robins, Kaplan, Miller & Ciresi, Chicago, IL.

For NEIL HANSEN, LEONARD LEVINE, third-party defendants: Thomas John Verticchio, Sheryl Lynn Jaffee, Patzik, Frank & Samotny, Ltd., Chicago, IL.

For PARTNERS LIQUIDATING TRUST, counter-claimant: Timothy Michael Block, Robins, Kaplan, Miller & Ciresi, Chicago, IL.

For GEORGE RUFF,    [*2]    DENNIS CALLAGHAN, SCOTT L LAGER, MITCHELL HOCHBERG, STEPHEN BERINI, JACK A SHAFFER, counter-

defendants: John A. Sopuch, J. Jeffrey Nouhan, Bart Higgins, Sopuch, Nouhan, Higgins & Arnett, LLP, Chicago, IL.

JUDGES:    Suzanne B. Conlon, United States District Judge.

OPINIONBY:    Suzanne B. Conlon

OPINION:

MEMORANDUM OPINION AND ORDER

George Ruff, Dennis Callaghan, Scott L. Lager, Mitchell Hochberg, Stephen Berini, Jack A. Shaffer, and Allen R. Seeland (collectively "plaintiffs") sue Partners Liquidating Trust ("the "Trust") for declaratory relief as to the nature and extent of their liability under seven promissory notes ("the notes") allegedly assigned to the Trust (Counts I-V). n1 The Trust counterclaims and sues Neil Hansen and Leonard Levine (collectively "third-party defendants") for the principal due on the notes, interest, attorneys fees, and costs. The parties filed cross motions for summary judgment, pursuant to *Fed.R.Civ.P. 56*. Plaintiffs move for summary judgment on the complaint. The Trust moves for partial summary judgment on Counts I, II, and V, plaintiffs' affirmative defenses, and the third-party complaint. n2 Third-party defendants move for summary judgment on the third-party    [*3]    complaint. The Trust further moves to strike paragraphs 11-13 of plaintiffs' Local Rule 56.1 Statement of Facts ("Pl. Facts") and paragraph 3 of Callaghan's Hochberg's, Lager's, and Ruff's affidavits, pursuant to *Fed.R.Civ.P. 56(e)*.

n1 Count VI requests attorneys fees and costs.

n2 The Trust's motion for summary judgment as to its burden of proof is denied. The court discusses the applicable law in this opinion.

## BACKGROUND

### I. The parties

All facts are undisputed unless otherwise noted. The Trust is a Delaware trust domiciled in Delaware. During all relevant times, VMS was a sponsor of syndicated real estate limited partnerships. VMS attracted investors by creating tax advantages in real estate investments. In the mid-1980s, VMS was divided into five principal entities: VMS Realty Partners, Chicago Wheaton Partners, VMS Realty Investment, Ltd., VMS Realty Investors, and VMS Financial Services.

Robert Van Kampen, Peter Morris, and Joel Stone were VMS founders and acted as principals [*4] of various VMS entities. All plaintiffs and third-party defendants except Shaffer were executives and employees of VMS entities. Shaffer, an outside broker and advisor, was involved in VMS deals. n3

n3 The parties dispute the nature and extent of plaintiffs' and third-party defendants' responsibilities pertaining to their employment with VMS entities.

### II. Creation of VMS III

VMS Mortgage Company I ("VMS I") and VMS Mortgage Company II ("VMS II") were subsidiaries of VMS Realty Partners. On December 21, 1984, VMS I and II created VMS Mortgage Company III ("VMS III"), pursuant to a partnership agreement. The creation of VMS III enabled VMS and its principals to preserve certain tax advantages.

VMS principals subsequently sought plaintiffs' and third-party defendants' assistance in developing VMS III. On December 31, 1984, VMS I and II amended the VMS III partnership agreement to include plaintiffs, third-party defendants, and one other individual as partners. The amended partnership agreement names [*5] VMS II as managing partner and grants the company power to "execute, acknowledge and deliver any and all instruments necessary to effectuate" any of its powers. The Trust's Local Rule 56.1 Statement of Facts ("Def. Facts"), Ex. C.

The VMS III partners agreed to contribute $ 20,000 of their personal funds and sign $ 1,180,000 promissory notes payable to VMS III. In return, they would acquire a 5% interest in the company individually and 50% collectively. The notes provided in part that the "payee shall have partial recourse at all times to the assets of the Maker, to the maximum extent of ten percent of the outstanding balance of principal and accrued and unpaid interest; otherwise this Note shall be non-recourse." *Id.* at Ex. A1-A9. The notes further provided that "all decisions of the Partners shall be made by consent of Partners owning at least 51% of all of the Interests." *Id.* at Ex. C. The final relevant portion of the note reads:

> This Note may be transferred and pledged without consent of the Maker. In the event this Note is transferred, assigned, or pledged, Maker hereby waives, as against any such transferee, assignee, or pledgee, any defenses and counterclaim [*6] of every kind and description that Maker may have against the Payee. Maker hereby waives demand for payment, notice of non-payment, presentment, notice of dishonor, protest, notice of protest, notice of acceleration, or any other notice.

Pl. Facts Appendix ("Pl. Appdx."), Ex. A.

### III. Second amendment to partnership agreement

On September 25, 1985, VMS I and II amended the December 1984 partnership agreement and made the new agreement retroactive to the inception of VMS III. Pursuant to the agreement, VMS III would redeem 50% of VMS I and II in order to admit the individual partners into VMS III. The agreement further provided that in consideration of redemption, VMS III would distribute the partners' cash contributions and transfer the notes to VMS I and II. VMS II signed the agreement. The parties dispute whether plaintiffs and third-party defendants knew about this agreement when they signed the notes. As VMS III partners, plaintiffs and third-party defendants received K-1 forms allocating profits. However, they did not receive cash payments.

### IV. Termination of employment and "hold harmless" agreements

On December 8, 1986, Hochberg entered into a termination [*7] of employment agreement with Stone. The agreement stated, "The following constitutes the current agreement in connection with your employment with VMS Realty Partners and supersedes all other prior agreements or understandings . . ." Pl. Appdx., Ex. 9(B).

Ruff and Callaghan entered into termination of employment agreements with Morris and Stone in 1987. The agreements provide releases from "any and all

claims or demands of any nature whatsoever relating to [their] employment with VMS . . ." *Id.* at Exs. 8 (B) and 11(B). The termination agreements further stated that they "supersede all prior understandings and agreements between the parties including but not limited to any and all partnership agreements in which VMS or a VMS affiliate and the Employee are partners." *Id.*

On March 30, 1990, Stone and Morris issued Lager a hold harmless letter. Section A of the letter read as follows:

> VMS and its Affiliated Entities . . . agree and do hereby indemnify and hold you harmless, to the full extent permitted by law, from and against any and all losses, claims, damages, liabilities, judgments, fines, penalties, amounts paid in settlements . . . and expenses . . . incurred **[*8]** by you in connection with any action, claim, suit, or other proceeding . . . against you . . . [including those] brought by one or more of the security holders of VMS or of any of the Affiliated Entities or Funds . . . in any way relating to, your serving as a director, officer, or in a similar capacity of VMS or of any of the Affiliated Entities or Funds . . .

*Id.* at Ex. 32(E).

The parties dispute whether Stone gave Bernini a release in his severance agreement. Plaintiffs cannot find a copy of the agreement. The parties further dispute whether Stone and Van Kampen orally released Seeland from note indebtedness when his employment with VMS terminated.

## V. Wrap Loan Corporation

On July 31, 1987, VMS III partners consented in writing to assignment of their individual partnership interests to Wrap Loan Corporation ("Wrap Loan"). As a result, Wrap Loan became a 50% partner in VMS III. Each former VMS III partner received stock certificates granting them five shares of Wrap Loan. The confidential offering memorandum stated in part:

> The Directors of Wrap Loan Corporation are . . . hereby soliciting subscriptions for 50 shares . . . from the ten individuals **[*9]** listed in Appendix A hereto ("the Partners"), each of whom is a general partner of VMS Mortgage Company III, an Illinois general partnership . . . Each Note of a subscribing Partner will be fully non-recourse to the Company (which will

not assume any personal liability thereon), while each subscribing Partner will continue to remain personally liable for a maximum of 10 percent of the outstanding balance of principal and accrued and unpaid interest thereon.

The Trust's Local Rule 56.1 Statement of Additional Facts ("Def. Add. Facts"), P 100; The Trust's Response to Plaintiffs' 56.1 Facts ("Def. Fact Resp."), Ex. 2. The subscription agreement signed by the partners provides that "subscriber has received, reviewed, and understands the Memorandum and all of the Exhibits thereto . . ." Def. Fact Resp., Ex. 1A-1G.

## VI. Termination of the VMS HI partnership

VMS I, VMS II, and Wrap Loan executed an agreement terminating the VMS III partnership "as of December 31, 1984." The agreement provides that "all assets, if any, of the Partnership have been distributed." Def. Fact Resp., PP 56-57; Ex. 6.

## VII. Creditor Repayment Agreement

In 1990, VMS met with creditors **[*10]** in an effort to avoid bankruptcy. On March 31, 1992, VMS partners and VMS principal entities n4 entered into the "Creditor Repayment Agreement" ("CRA") with their creditors in exchange for mutual releases. n5 The following parties are released:

> Each of the VMS Partners and their respective Associates . . . from any and all claims whatsoever which any of the VMS Releasing Partners may have had, presently have or in the future may have against the Creditor Released Parties which arise, have arisen or may hereinafter arise in whole or in part out of or on account of such Creditor's Existing Indebtedness, whether known or unknown and if unknown, whether or not the unknown matter would have been material to . . . the decision to enter into this Release or the Creditor Repayment Agreement.

Second Amended Complaint ("Am. Cmplt."), Ex. 8. Undefined terms in the mutual releases have the meaning ascribed to CRA terms. The CRA defines "associates" as directors, officers, employees, agents and advisors.

> n4 The CRA defines "VMS partners" as Van Kampen, Morris Stone, XCC Investment Corp., Brewster Realty, Inc., Van

2001 U.S. Dist. LEXIS 11683, *

Kampen/Morris/Stone, Inc., Residential Equities, Ltd., VMS Financial Guarantee Partners, and VMS Realty Guarantee Partners. "VMS principal entities" are VMS Realty Partners, Chicago Wheaton Partners, VMS Realty Investments, Ltd., VMS Realty Investors, VMS Financial Services, VMS Financial Guarantee Limited Partnership, and VMS Realty Guarantee Limited Partnership. [*11]

n5 The CRA created three tiers for over 400 VMS entities. Tier I consisted of named VMS partners plus four additional corporations and two additional partnerships. Tier 2 was made up of VMS principal entities. Tier 3, entitled "VMS entities," included VMS partners and principal entities, VMS Mortgage Companies I, II, and III, and VMS Realty, Inc. Tier 3 representatives did not sign the CRA or the mutual releases.

The CRA includes non-recourse provisions. Specifically, the agreement provides:

"No recourse (including, without limitation, recourse under any deficiency judgment) shall be had against the Non-Recourse Parties . . . or any of their respective assets," and "each VMS Partner, with respect to Partner Indebtedness, hereby waives the right to seek or assert (A) any respective assets, (B) a judgment against any Non-Recourse Parties or any of their respective assets, (C) any other legal action against any Non-Recourse Parties or any of their respective assets, except for the right to realize upon . . . assets of the VMS Principal Entities . . . .

Pl. Appdx. at p. 93. "Non-recourse [*12] parties" are defined as "any VMS Partner or any affiliates or associates of any VMS partner or principal entity." Id. at p. 94.

In November 1993, the Fifth Amendment to the CRA was executed. The amendment created the Trust for the benefit of creditors. The amendment purported to transfer VMS III assets, including the notes, to the Trust. Stone signed the amendment and was listed as one of the VMS creditors receiving rights under the agreement. Levine served as settlor for the Trust and represented the entities that served as trustee. The notes and other assets were transferred to the Trust in bulk.

## VIII. Plaintiffs' declaratory judgment motion

Plaintiffs seek declaratory judgments that: (1) the recourse provision under the notes was limited to plaintiffs' interests in VMS III and their rights under the partnership agreement (Count I); (2) the note obligations of Ruff, Callaghan, and Berini were released by termination of employment agreements and the note obligations of Seeland were released by an oral agreement with Van Kampen and Stone (Count II); (3) plaintiffs' note obligations were released by the CRA's mutual releases (Count III); (4) the Trust waived its rights [*13] to assert liability against the CRA's non-recourse parties (Count IV); and (5) the Trust is the holder of the notes (Count V). n6

n6 Count V further seeks a judgment that the statute of limitations bars VMS I's and II's claim against VMS III pertaining to assignment of the notes. Plaintiffs did not address this request in their summary judgment motion.

## DISCUSSION

## I. Motion to strike

Summary judgment affidavits must set forth admissible facts and be based on personal knowledge. *Fed.R.Civ.P. 56(e)*. Paragraph 3 of Callaghan's affidavit asserts he was "an officer with or advisor to, or . . . provided employment services to, various VMS entities." Plaintiffs' Appdx., Ex. 8 at P 3. Hochberg's, Lager's, and Ruff's affidavits make similar statements. *Id.*, Exs. 9-11 and 32 at P 3. The Trust asserts these statements should be stricken as vague and conclusory allegations in a case "where the exact name and position of the employee in a certain Company are critical . . ." Def. Fact Resp., P 11. [*14]

It is true that conclusory allegations are insufficient support for a summary judgment motion. *Korotko-Hatch v. John G. Shedd Aquarium, 65 F. Supp. 2d 789, 801 (N.D. Ill. 1999).* However, a motion to strike is disfavored and will only be granted "if the complained of materials are essentially unsupported by the record." *Architectural Iron Workers Local No. 63 Welfare Fund et al. v. United Contractors, Inc., 46 F. Supp. 2d 769, 770 (N.D. Ill. 1999).* The Trust fails to cite supporting authority for striking disputed evidence on vagueness or conclusory grounds. Although affiants' statements are vague, they are technically supported by the record. *See* Pl. Facts, PP 11-13. The Trust does not dispute that affiants were advisors or officers of VMS Realty Partners and VMS Realty Inc. Def. Fact Resp., P 11.

The consequence of submitting vague and conclusory testimony is that the evidence will be insufficient for prevailing on a summary judgment motion. The question of whether plaintiffs offer sufficient support to establish affiants were officers, advisors, or employees of specific VMS entities must be resolved after consideration of the entire record. Accordingly, **[\*15]** the Trust's motion to strike portions of plaintiffs' affidavits and corresponding statement of facts is denied.

## II. Summary judgment standard

Summary judgment is appropriate when the moving papers and affidavits show there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*; *King v. National Human Resource Committee, Inc., 218 F.3d 719, 723 (7th Cir. 2000); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986);* Once a moving party has met its burden, the non-moving party must go beyond the pleadings and set forth specific facts showing there is a genuine issue for trial. *Fed. R. Civ. P. 56(e); Silk v. City of Chicago, 194 F.3d 788, 798 (7th Cir. 1999).* The court considers the record as a whole and draws all reasonable inferences in the light most favorable to the party opposing the motion. *Bay v. Cassens Transport Co., 212 F.3d 969, 972 (7th Cir. 2000).* A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Insolia v. Philip Morris, Inc., 216 F.3d 596, 599 (7th Cir. 2000);* **[\*16]** *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).*

## III. Applicable law

The Trust asserts the right to enforce the notes as a holder in due course. A holder in due course takes the instrument: (1) for value; (2) in good faith; and (3) without notice the instrument is overdue, dishonored, or subject to any defense or claim. *Uniform Commercial Code ("UCC") § 3-302*; *Northwestern National Insurance Company of Milwaukee, Wisconsin v. Lutz, 71 F.3d 671, 674-75 (7th Cir. 1996).* "A holder in due course takes the instrument free of all defenses and claims except the so-called 'real' defenses" listed in *UCC, § 3-305. Bank of North Carolina v. Rock Island Bank, 630 F.2d 1243, 1248 (7th Cir. 1980).* However, any defenses the maker has against the holder rather than the notes themselves may still be asserted. *810 ILCS 5/3-305(b).*

It is undisputed plaintiffs signed the notes and the Trust currently holds them. Under these circumstances, the Trust is entitled to recover unless plaintiffs establish a defense. *UCC § 3-308; Bank of North Carolina, 630*

*F.2d at 1247.* n7 Plaintiffs **[\*17]** must establish a defense by a preponderance of the evidence. *Bank of North Carolina, 630 F.2d at 1247.* The burden shifts to the Trust to establish holder in due course status once plaintiffs establish a defense. *Id.*

n7 In *Bank of North Carolina,* the court refers to *UCC § 3-307. UCC § 3-308* was formerly *UCC § 3-307.*

### A. Plaintiffs' motion for summary judgment

Plaintiffs move for summary judgment because that they were discharged from their note obligations. "A person entitled to enforce an instrument, with or without consideration, may discharge the obligation of a party to pay the instrument (i) by an intentional voluntary act, such as surrender of the instrument to the party, destruction . . . cancellation . . . or the addition of words to the instrument . . . or (ii) by agreeing not to sue or otherwise renouncing rights against the party by a signed writing." *810 ILCS § 5/3-604* (2001). *See also Holman v. Simborg, 152 Ill. App. 3d 453, 504 N.E.2d 967, 969, 105 Ill. Dec. 682 (Ill. App. Ct. 1987)* **[\*18]** ("a release is a relinquishment of a right which may be given gratuitously or for inadequate consideration . . .").

#### 1. Execution of the notes

Plaintiffs contend their note obligations were discharged by VMS upon execution of the notes. They offer evidence to show Morris, Stone, and Levine told plaintiffs they would not be personally liable on the notes. Pl. Facts at P 21. However, the notes unambiguously state that the payee will have partial recourse to plaintiffs' assets. Parol evidence of a prior or contemporaneous agreement may not be used to alter the meaning of an unambiguous contract. *Grun v. Pneumo Abex Corporation, 163 F.3d 411, 420 (7th Cir. 1999).* Plaintiffs' motion for summary judgment on Count I must be denied. n8

n8 The Trust's Statute of Frauds and *810 ILCS § 5/3-604* arguments are moot.

#### 2. Severance and "hold harmless" agreements

Plaintiffs contend their obligations were released by various severance and "hold harmless" agreements. They offer evidence to show Ruff **[\*19]** and Callaghan entered into agreements with Stone that discharged them from "any and all claims or demands of any nature whatsoever relating to their employment with VMS . . . ." Pl. Facts at P 30. The agreements "supersede all prior

2001 U.S. Dist. LEXIS 11683, *

understandings and agreements between the parties including but not limited to any and all partnership agreements in which VMS or a VMS affiliate and the employees are partners . . ." *Id.* at P 31. Plaintiffs present evidence Hochberg entered into a termination agreement with VMS Realty Partners that "supersedes all other prior agreements and understandings, whether oral or in writing." *Id.* at P 28. Additionally, plaintiffs offer evidence to show Lager's note obligations were released by an agreement to hold him harmless for claims related to his services for VMS or any of the "affiliated entities or funds." n9 Plaintiffs' 56.1 Additional Facts ("Pl. Add. Facts"), P 141.

> n9 Plaintiffs make this argument in their response to the Trust's motion for summary judgment. For purposes of clarity, the court will address the argument in this section of the decision.

**[*20]**

The Trust asserts the actual language of the agreements shows plaintiffs were only released from their obligations in connection with VMS Realty Partners and not VMS III. When a summary judgment motion depends on contract interpretation, the court must determine "(1) if the contract is ambiguous or unambiguous and (2) if it is ambiguous, whether after consideration of the extrinsic evidence, there are any triable issues of fact." *Hickey v. A.E. Staley Manufacturing*, 995 F.2d 1385, 1389 (7th Cir. 1993).

It is undisputed Hochberg's agreement only released all prior agreements "in connection with [his] employment with VMS Realty Partners." Similarly, VMS Realty Partners is the only VMS entity to sign Callaghan's and Ruffs agreements. However, it is also undisputed VMS III was a subsidiary of VMS Realty Partners. Plaintiffs argue the releases are general and cover VMS Realty Partners subsidiaries.

The court finds the agreements are ambiguous on their face. They do not identify VMS I, II, or III as parties to the agreement. Furthermore, the agreements do not state that releasing obligations incurred while working for the principal company operates to release obligations **[*21]** incurred in connection with subsidiaries. *See Lumpkin v. Envirodyne Industries, Inc.*, 933 F.2d 449, 456-57 (7th Cir. 1991) (contract is ambiguous when it does not provide that naming subsidiaries releases the parent). "A party releases only those other parties whom he intends to release." *Id.* at 457. Neither party presents evidence of the parties' intent in signing the releases.

The court finds additional ambiguities in the agreements. First, Lager's, Ruff's and Callaghan's agreements refer to VMS and its affiliates. It is unclear from the face of the agreement which entities constitute VMS and VMS affiliates. Second, Lager's release is limited to claims arising from his service as a director or officer or a person acting in "a similar capacity" to a director or officer. It is unclear whether Lager's VMS work responsibilities qualify him as a person acting in "a similar capacity" to an officer or director. Finally, Ruff's and Callaghan's releases are limited to the "employee's employment with VMS." It is unclear whether VMS III note investments fall within the scope of employment.

The parties present conflicting evidence to clarify these ambiguities. **[*22]** Plaintiffs offer evidence to show they acted in the scope of their VMS Realty Partners employment when they signed the notes and made investments in VMS III. Pl. Facts. at PP 16, 22. However, as discussed above, there are issues of material fact as to whether employment with VMS Realty Partners is covered by the agreements.

The Trust offers evidence the termination agreements did not cover VMS III. Specifically, plaintiffs signed a "Warranty Assignment of Partnership Interest and Agreement to Make Payments" after the termination agreements were executed. Def. Add. Fact at P 88. The Trust asserts this evidence shows plaintiffs retained their VMS III partnership status after the agreements were signed. However, plaintiffs offer evidence that at the time they signed this warranty assignment they no longer possessed partnership interests. They merely signed this document to eliminate "phantom income" from their individual income tax returns. Pl. Resp. to Def. Add. Facts at P 88. The conflicting evidence regarding the coverage of Ruff's, Callaghan's, Lager's, and Hochberg's termination agreements is a disputed issue of material fact.

Plaintiffs offer further evidence that Stone released **[*23]** Berini from his note obligations by way of a termination agreement. Berini's termination agreement cannot be found. Therefore, plaintiffs rely solely on Berini's testimony. Pl. Facts, P 34. Self-serving statements are insufficient for purposes of summary judgment. *Shank v. William R. Hague, Inc.*, 192 F.3d 675, 681-82 (7th Cir. 1999). In addition, Stone's testimony contradicts Berini's contention that a termination agreement released his note obligations. Def. Resp. to Pl. Facts, P 34.

Plaintiffs present evidence Stone orally released Seeland from his note obligations when his employment with VMS terminated. Pl. Facts at PP 26-27. The Trust contends this evidence is barred by the parol evidence rule. The Trust misapplies the rule. The rule provides

evidence of a contemporaneous or prior oral agreement may not be used to vary or contradict an unambiguous written contract. *Brooklyn Bagel Boys, Inc. v. Earthgrains Refrigerated Dough Products, Inc., 212 F.3d 373, 380 (7th Cir. 2000).* Subsequent oral modifications to written agreements are permissible. *R.T. Hepworth Company v. Dependable Insurance Company, Inc., 997 F.2d 315, 317 (7th Cir. 1993).* **[*24]**

The Trust contends evidence regarding Seeland's agreement is barred by the statute of frauds. Agreements that cannot be performed within one year are barred by the statute of frauds unless they are in writing. A promise to release a debt cannot be performed within a year. *See, e.g., United Municipal Leasing Corporation v. Lexington Corporate Properties, Inc., 1996 U.S. Dist. LEXIS 17121,* No. 95 C 3212, *1996 WL 672253,* at *8 (N.D. Ill. November 18, 1996) (internal citations omitted). Therefore, Stone's release must be in writing to be admissible. Plaintiffs' motion for summary judgment on Count II must be denied.

### 3. CRA non-recourse and mutual release provisions

Plaintiffs contend they were released by the CRA's non-recourse and mutual release provisions. The mutual release provisions apply to VMS partners and their associates. The non-recourse provisions apply to VMS partners and associates and affiliates of a VMS partner or principal entity. Plaintiffs offer evidence to show they qualify as associates of VMS partners. Pl. Facts at PP 12-13. The Trust challenges the evidence on vagueness grounds. As discussed above, vague and conclusory allegations are insufficient support for a summary **[*25]** judgment motion. *Korotko-Hatch v. John G. Shedd Aquarium, 65 F. Supp. 2d 789, 801 (N.D. Ill. 1999).* In an effort to show they were associates, plaintiffs merely provide conclusory allegations they were either "an officer of or advisor to, and/or provided employment services for" VMS partners. Pl. Facts at PP 12-13. There are no statements detailing the actual services plaintiffs provided and to whom they were provided. *See* Local Rule 56.1(a)(3) (summary judgment motions must include statement of facts showing the moving party is entitled to judgment as a matter of law). It is not the court's responsibility to search the record for facts supporting these conclusory allegations. Accordingly, plaintiffs' motion for summary judgment on Counts III-V is denied. n10

N10 Summary judgment on Count V is denied because the Trust's status as holder in due course cannot be challenged until plaintiffs have established a defense by a preponderance of the evidence.

### B. The Trust's motion for partial summary **[*26]** judgment on the complaint

The Trust asserts plaintiffs' defenses in Count I and II fail as a matter of law. For the reasons discussed in Section A, the Trust's motion for summary judgment is granted on Count I. The motion is granted on Count II only as it pertains to Bernini and Seeland.

The Trust asserts it can prove its status as a holder in due course and, thus, summary judgment must be granted in its favor on Count V and plaintiffs' affirmative defenses that are not directly related to the Trust. n11

n11 In the reply brief, the Trust requests summary judgment in its favor on all defenses. The Trust may not change its summary judgment requests at this stage. *Kauthar SDN BHD v. Sternberg, 149 F.3d 659, 668 (7th Cir. 1998)* (new arguments raised in a reply brief are waived). The court will limit its analysis to the Trust's original requests.

### 1. Validity of transfer

Plaintiffs contend VMS II, while acting as VMS III's managing partner, invalidly transferred the notes from VMS III to **[*27]** VMS I and II. They offer evidence to show the partnership agreement precluded this action without approval of 51% of the partners. Pl. Fact Resp. at P 29. The Trust offers evidence to show the managing partner had the power to "administer" the notes and to take actions to "enforce its rights as the holder of the notes." *Id.* The partnership agreement is ambiguous in regard to whether the managing partner was granted the power to transfer the notes.

The Trust offers undisputed evidence to show plaintiffs believed the managing partner had the power to transfer the notes. Specifically, Lager signed a document on behalf of Wrap Loan Corporation stating that all VMS III assets had been distributed. *Id.* at PP 56-57. Plaintiffs do not challenge Lager's authority to bind the rest of them. In addition, they do not dispute the Trust's description of their notes as VMS III assets. Based on this evidence, no reasonable jury could find that the transfer of the notes from VMS III was invalid. n12

n12 The Trust's estoppel arguments are addressed in Section C below.

**[*28]**

## 2. The Trust's status as a holder in due course

Plaintiffs contend that even if the transfer were valid, VMS III did not take the notes as a holder in due course. Therefore, subsequent transferees are not holders in due course. *See 810 ILCS 5/3-203(b)* (transferee has the same rights as its predecessor in interest, including any right as a holder in due course). Plaintiffs' argument is based on a misunderstanding of the holder in due course rule. As the initial payee, VMS III cannot acquire holder in due course status. *See e.g., Resolution Trust Corporation v. Juergens, 965 F.2d 149, 152 (7th Cir. 1992)* (different rules govern defenses for original payee and subsequent holders).

Plaintiffs contend VMS I and II were not holders in due course and, thus, neither is the Trust. To establish that VMS I and II did not have notice of defenses, the Trust relies on the undisputed fact that the notes contained defense waiver clauses. However, the Trust fails to offer any case law supporting the proposition that a waiver clause precludes a defense based on release from the waiver clause. n13 Thus, the Trust's status as a holder in due course cannot be resolved by summary **[\*29]** judgment unless plaintiffs cannot prove any defense. As discussed above, there are genuine issues of material fact as to whether some plaintiffs were released by termination and "hold harmless" agreements. Furthermore, the Trust has not moved for summary judgment as to whether plaintiffs were released by the CRA's fifth amendment. n14 Accordingly, the Trust's motion for summary judgment on its status as a holder in due course must be denied.

> n13 Plaintiffs' argument regarding *810 ILCS 5/3-302(c)(ii)* is moot.

> n14 Plaintiffs' arguments regarding fraudulent inducement are addressed in Section C.

## C. Third-party defendant's motion for summary judgment

Third-party defendants move for summary judgment on the third-party complaint. They offer evidence to support three defenses and to show the Trust is not a holder in due course. The court need not address arguments regarding the Trust's status as a holder in due course because they fail to establish any defenses as a matter of law.

### 1. The CRA

Third-party **[\*30]** defendants assert their note obligations were released by the CRA's mutual releases and non-recourse provisions. As discussed above, the

release provisions apply to VMS partners and their associates. The non-recourse parties include VMS partners, their associates, and affiliates of a VMS partner or principal entity.

### a. The mutual releases

Third-party defendants assert they were associates of VMS partners. They offer evidence to show they acted as agents and advisors for Van Kampen, Morris, and Stone. Third-party defendants' 56.1 Statement of Facts ("Third-party Facts") at PP 10-13, 15-16, 19-22. Hansen advised Van Kampen as to whether VMS transactions would pose a risk to Van Kampen personally. *Id.* at P 20. Hansen regularly advised Van Kampen, Stone, and Morris on whether and how each VSM non-hotel acquisition would benefit them personally. Levine advised Stone on VMS' tax problems and recommended the creation of VMS III. *Id.* at PP 27-34. In addition, Levine was an agent of five other VMS partners. *Id.* at P 17.

The Trust offers evidence to counter third-party defendants' claims regarding their employment status. First, the Trust offers evidence that third-party defendants **[\*31]** merely gave advice to VMS principal entities through individual partners. The Trust's 56.1 Statement of Facts Opposing Third-party Defs.' Motion For Summary Judgment ("Trust Fact Resp.") at P 10. Second, the Trust contends the advisors referenced in the CRA included lawyers and accountants involved in the CRA's negotiating and structuring. This fact will not be considered by the court. The Trust does not provide a supporting citation to the record. *See* Local Rule 56.1(b)(3)(B). The Trust also points to undisputed evidence that third-party defendants were not specifically named in the release. The Trust cites *Stro-Wold Farms v. Finnell, 211 Ill. App. 3d 113, 569 N.E.2d 1156, 155 Ill. Dec. 545 (Ill. App. Ct. 1991)* for the proposition that a party may not be released unless specifically named. However, this case addressed releases in the context of a settlement agreement and, thus, is not applicable.

The Trust further contends that even if the Fifth Amendment's transfer of note obligations conflicts with the release provisions of the original CRA, the amendment is controlling. The Trust cites *Boatmen's National Bank of St. Louis v. Smith, 835 F.2d 1200, 1203 (7th Cir. 1996)* and *Robinson v. United States, 408 F. Supp. 132, 136-37 (N.D. Ill. 1976)* **[\*32]** for the proposition that specific provisions in a document control over general provisions. These cases are not applicable. They address general and specific provisions in the same document rather than two documents executed at different times. Based on the evidence presented, there are genuine issues of material fact as to

whether third-party defendants' note obligations were released.

*b. Non-recourse provisions*

The CRA provides that no recourse will be taken against any non-recourse party "except for the right to realize upon . . . assets of the VMS principal entities." *Id.* at P 53. Third-party defendants offer evidence to show they qualify as non-recourse parties because they were associates of a VMS principal entity, namely VMS Realty Partners. *Id.* at PP 14, 53-56.

The Trust does not dispute third-party defendants were associates of a VMS principal entity. Instead, the Trust asserts the non-recourse principal entity exception is applicable because the notes were assets of VMS Realty Partners. Specifically, the Trust asserts that because VMS I and II held the notes and were owned by VMS Realty Partners, the assets were owned by VMS Realty Partners. The Trust offers **[*33]** the VMS partnership agreement to show that VMS I and II were owned by VMS Realty Partners. The Trust's Additional 56.1 Third-party Facts ("Trust Add. Facts") at PP 118-120. Third-party defendants dispute this evidence on the grounds that the agreement detailed ownership in 1987, not 1993 when the Fifth Amendment was signed. Furthermore, third-party defendants offer evidence to show the notes were held by VMS III, not a VMS principal entity. *Id.* at PP 54-55.

The Trust offers further evidence that the Fifth Amendment recognized Levine as one of the note makers and provided that these notes would be transferred to the Trust. Pl. Appdx., Ex. 22 at 002103. The Trust asserts the fact that Levine signed the Fifth Amendment shows his understanding the notes were still actionable. However, this evidence does not conclusively establish that Levine agreed to waive the binding effect of the mutual releases and non-recourse provisions. The Fifth Amendment does not specifically waive the releases and non-recourse provisions. There are genuine issues of material fact pertaining to whether third-party defendants' note liability is waived by the CRA. Accordingly, third-party defendants are not **[*34]** entitled to summary judgment based on this defense.

**2. Fraudulent inducement**

Both plaintiffs and third-party defendants assert a defense based on fraudulent inducement. Fraudulent inducement may invalidate a contract. *Regensburger v. China Adoption Consultants, Ltd., 138 F.3d 1201, 1207 (7th Cir. 1998).* To establish fraudulent inducement, plaintiffs must show: (1) they were victims of an intentional false representation of a material fact; (2) the representation was made for the purpose of inducing

plaintiffs to act; and (3) they reasonably relied upon the statements to their detriment. *Id.*

Plaintiffs and third-party defendants offer evidence they would not have signed the notes but for Stone's and Morris' representations that their liability under the notes would be limited to their initial $ 20,000 investment. Third-party Facts at PP 33-34, 36-37, 39-41; Pl. Add. Facts at PP 69, 71. "A party who could have discovered the fraud by reading the contract, and in fact had an opportunity to do so, cannot later be heard to complain that the contractual terms bind her." *Id.* The clear language of the notes provides that plaintiffs and third-party defendants **[*35]** would be subject to liability up to ten percent of the principal and unpaid interest. Plaintiffs' and third-party defendants' reliance on promises of no personal liability cannot be considered reasonable. *Id.* Their citations to *Dellcar & Co. v. Hicks, 685 F. Supp. 679, 682 (N.D. Ill. 1988)* and similar cases do not warrant a different result. These cases address the parol evidence rule rather than reasonable reliance.

**3. Estoppel**

Plaintiffs and third-party defendants assert a defense of estoppel on the same grounds they assert a fraudulent inducement defense. Reasonable reliance is an element of an estoppel defense. *Federal Deposit Insurance Corporation v. Rayman, 117 F.3d 994, 1000 (7th Cir. 1997).* Accordingly, for the reasons discussed under the fraudulent inducement section, this defense is insufficient for purposes of avoiding note liability.

**D. The Trust's motion for summary judgment on the third-party complaint** The Trust moves for summary judgment on third-party defendants' affirmative defenses. For the reasons discussed above, the motion is granted with respect to the estoppel and fraudulent inducement defenses and denied as **[*36]** it pertains to the release defenses.

In regard to the settlement agreement and unclean hands defenses, the Trust merely rests on its alleged status as a holder in due course. As discussed in Section B, there are genuine issues of material fact as to whether the Trust can establish its status as a holder in due course. Accordingly, its motion for summary judgment on these defenses must be denied.

The only remaining defense asserted by third-party defendants is invalid transfer of the notes. *See* Trust Facts at PP 28-32. For the reasons discussed in Section B(1), the partnership agreement is ambiguous. To establish that third-party defendants recognized VMS III's authority to transfer the notes, the Trust offers evidence they confirmed in 1994 that VMS III had transferred the notes. Specifically, Lager signed a document on behalf of Wrap Loan corporation stating

that all VMS III assets had been distributed. Third-party Facts at PP 58-60. Counter-defendants offer evidence that Lager, Levine, and Hansen did not consider the notes to be assets. Third-party Defs. Response to the Trust's 56.1 Facts ("Third-party Resp. Facts"), PP 60-61. The notes were merely part of a plan to obtain **[*37]** tax benefits for VMS. *Id.* at PP 58-59, 81-92.

The Trust offers further evidence to establish third-party defendants are estopped from asserting invalidity because they knew about the transfer, but did not object. Specifically, they point to documents showing the notes were transferred. *Id.* at PP 33-35, 39-44, 46-47, 49-51. In response, third-party defendants present evidence they did not actually receive copies of these documents. Third-party Resp. Facts, PP 33, 37, 41-47, 49-51. The Trust further asserts that even if they did not receive a copy of these documents, third-party defendants had a duty as VMS III partners to review financial statements to discover this information. Third-party defendants counter with evidence that the purported transfer did not actually occur until November 17, 1993 and that they objected to the transfer soon after this date. Third-party Facts at PP 33, 123-24, 128-29. Third-party defendants

present sufficient evidence to withstand summary judgment on the invalidity defense.

**CONCLUSION**

The Trust's motion to strike paragraphs 11-13 of plaintiffs' 56.1(A) statement of facts and paragraph 3 of Callaghan's Hochberg's, Lager's, and Ruff's **[*38]** affidavits is denied. Plaintiffs' motion for summary judgment on the complaint is denied. The Trust's motion for partial summary judgment is granted on Count I and Count II of the complaint to the extent it pertains to Bernini and Seeland. The motion is denied in all other respect as to the complaint. The Trust's motion for summary judgment on the third-party complaint is granted with respect to the fraudulent inducement and estoppel defenses. The motion is denied in all other respects. Third-party defendants' motion for summary judgment on the third-party complaint is denied.

ENTER:

Suzanne B. Conlon

United States District Judge

August 7, 2001

1995 U.S. App. LEXIS 5122, *

**FRANCIS S. SULLIVAN; WALLY E. MURRAY v. STANDARD CHLORINE OF
DELAWARE, INC.; Francis S. Sullivan, Appellant**

**No. 94-7220**

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

*1995 U.S. App. LEXIS 5122*

**February 16, 1995, Submitted Pursuant to Third Circuit LAR 34.1(a)
February 24, 1995, Decided**

**NOTICE: [*1]** RULES OF THE THIRD CIRCUIT
COURT OF APPEALS MAY LIMIT CITATION TO
UNPUBLISHED OPINIONS. PLEASE REFER TO
THE RULES OF THE UNITED STATES COURT OF
APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** On Appeal from the United States
District Court for the District of Delaware. (D.C. Civil
No. 92-cv-00734). District Judge: Hon. Joseph J.
Longobardi.

**JUDGES:** Before: STAPLETON and COWEN, Circuit
Judges, and HUYETT, * District Judge

 * Honorable Daniel H. Huyett, 3rd, United States
District Judge for the Eastern District of Pennsylvania,
sitting by designation.

**OPINIONBY:** ROBERT E. COWEN

**OPINION:**

 Affirmed.

**⟲Back**                    ## *Senate Bill # 154*

| | |
|---|---|
| **Primary Sponsor:** | Marshall |

**Additional Sponsor:** Lofink

| | |
|---|---|
| **Introduced on :** | 06/12/2003 |
| **Long Title:** | AN ACT TO AMEND TITLE 19 OF THE DELAWARE CODE RELATING TO **DISCRIMINATION** IN EMPLOYMENT. |

**Synopsis:**   This bill eliminates the Equal Employment Review Board, and creates a corresponding Delaware Right to Sue in Superior Court after exhausting Administrative remedies. This bill confirms that Chapter 7 is the exclusive and sole remedy for employment **discrimination** claims, requiring initial processing of all such claims with the Department of Labor for review and action. This bill effectively re-establishes the exclusive remedy put in question by the decision in Schuster v. Derocili, 775 A. 2d 1029 (2001).
Some definitions have been added to section 710, specifically new terms such as "No Cause Determination"; "Reasonable Cause Determination"; "Charging Party"; "Respondent"; "Delaware Right to Sue Notice"; "Mediation"; and "Conciliation". Sections 712, 714 and 715 have been repealed in their entirety and rewritten to accomplish the goals of initially pursuing informal methods of resolution through mediation and conciliation and then permitting civil actions in Superior Court.
☐

| | |
|---|---|
| **CoSponsors:** | { NONE...} |
| **Current Status:** | Signed **On** 07/12/2004 |
| **Volume Chapter** | 74:356 |

**Fiscal Note:** Not Required

| | |
|---|---|
| **Date Governor acted:** | 07/12/2004 |
| **Full text of Legislation: (in HTML format)** | **Legis.html** |
| **Full text of Legislation: (in MS Word format)** | **Legis.Doc**   (You need Microsoft Word to see this document ) |

| | |
|---|---|
| **Committee Reports:** | Senate Committee report 05/12/04 03:59 pm F=0 M=3 U=0-----⟶🗎 |
| | House Committee Report 06/22/04 F=0 M=5 U=0---->🗎 |
| **Voting Reports:** | Senate vote: () Passed 6/10/2004 4:58:12 PM------->🗎 |
| | House vote: () Passed 6/24/2004 7:24:29 PM------->🗎 |

**Actions History:**

Jun 24, 2004 - Passed by House of Representatives
Jun 22, 2004 - Reported Out of Committee (LABOR) with 5 On Its Merits
Jun 16, 2004 - Introduced and Assigned to Labor Committee in House
Jun 10, 2004 - Passed by Senate
May 12, 2004 - Reported Out of Committee (SMALL BUSINESS) with 3 On Its Merits
Jun 12, 2003 - Assigned to Small Business committee in Senate



SPONSOR: Sen. Marshall & Rep. Lofink

DELAWARE STATE SENATE

142nd GENERAL ASSEMBLY

SENATE BILL NO. 154

AN ACT TO AMEND TITLE 19 OF THE DELAWARE CODE RELATING TO DISCRIMINATION IN EMPLOYMENT.

BE IT ENACTED BY THE GENERAL ASSEMBLY OF THE STATE OF DELAWARE (Two-thirds of all members elected to each house thereof concurring therein):

1        Amend Subchapter II of Chapter 7, Title 19 of the Delaware Code, "Discrimination in Employment" by striking

2    said Subchapter in its entirety and substituting in lieu thereof the following:

3        "Subchapter II. Discrimination in Employment.

4    § 710. Definitions.

5        For the purposes of this subchapter:

6            (1) 'Age' as used in this subchapter means the age of forty (40) or more years of age.

7            (2) 'Employee' means an individual employed by an employer, but does not include:

8                a. Any individual employed in agriculture or in the domestic service of any person,

9                b. Any individual who, as a part of that individual's employment, resides in the personal

10   residence of the employer,

11               c. Any individual employed by said individual's parents, spouse or child, or

12               d. Any individual elected to public office in the State or political subdivision by the qualified voters

13   thereof, or any person chosen by such officer to be on such officer's personal staff, or an appointee on the policy making

14   level or an immediate advisor with respect to the exercise of the constitutional or legal powers of the office. The exemption

15   set forth in the preceding sentence shall not include employees subject to the merit service rules or civil service rules of the

16   State government or political subdivision.

17               (3) 'Employer' means any person employing four (4) or more employees within the State at the time

18   of the alleged violation, including the State or any political subdivision or board, department, commission or school

SD : FJM : kbs
0211420018

19    district thereof.

20         (4) 'Employment agency' means any person regularly undertaking with or without compensation to

21    procure employees for an employer or to procure for employees opportunities to work for an employer and includes

22    an agent of such a person.

23         (5) 'Genetic information' for the purpose of this chapter means the results of a genetic test as defined

24    in § 2317(a)(3) of Title 18.

25         (6) 'Job related and consistent with business necessity' means the condition in question renders the

26    individual unable to perform the essential functions of the position that such individual holds or desires. This

27    includes situations in which the individual poses a direct threat to the health or safety of himself/herself or others in

28    the workplace.

29         (7) 'Labor organization' includes any organization of any kind, any agency or employee

30    representation committee, group, association or plan so engaged in which employees participate and which exists for

31    the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of

32    pay, hours or other terms or conditions of employment, any conference, general committee, joint or system board or

33    joint council so engaged which is subordinate to a national or international labor organization.

34         (8) 'Person' includes 1 or more individuals, labor unions, partnerships, associations, corporations,

35    legal representatives, mutual companies, joint-stock companies, trusts, unincorporated organizations, trustees,

36    trustees in bankruptcy or receivers.

37         (9) 'Religion' as used in this Subchapter includes all aspects of religious observance and practice, as well

38         as belief, unless an employer demonstrates that the employer is unable to reasonably accommodate an employee's

39         or prospective employee's religious observance or practice without undue hardship on the conduct of the

40         employer's business.

41         (10) 'Secretary' means the Secretary of the Department of Labor or the Secretary's designee.

42         (11) 'Charging Party' means any individual or the Department who initiates proceedings by the filing

43    of a verified Charge of Discrimination, and who preserves a cause of action in Superior Court by exhausting the

44    administrative remedies pursuant to the provisions of §714.

45         (12) 'Respondent' means any person named in the Charge of Discrimination, including but not

46    limited to employers, employment agencies, labor organizations, joint labor-management committees, controlling

SD : FJM : kbs
0211420018

47    apprenticeship or other training programs including on-the-job training programs.

48            (13) 'Mediation' for the purposes of this chapter refers to an expedited process for settling

49    employment disputes with the assistance of an impartial third party prior to a full investigation.

50            (14) 'Conciliation' for the purposes of this chapter refers to a process which requires the appearance

51    of the parties after a full investigation resulting in a final determination of reasonable cause.

52            (15) 'No Cause Determination' means that the Department has completed its investigation and found

53    that there is no reasonable cause to believe that an unlawful employment practice has occurred or is occurring.  A no

54    cause determination is a final determination ending the administrative process and provides the Charging Party with

55    a corresponding Delaware Right to Sue Notice.

56            (16) 'Reasonable Cause Determination' means that the Department has completed its investigation

57    and found reasonable cause to believe that an unlawful employment practice has occurred or is occurring.  A

58    reasonable cause determination requires the parties' good faith efforts in conciliation.

59            (17) 'Delaware Right to Sue Notice' for the purposes of this chapter refers to a final

60    acknowledgement of the Charging Party's exhaustion of the administrative remedies provided herein and written

61    notification to the Charging Party of a corresponding right to commence a lawsuit in Superior Court.

62    § 711.  Unlawful employment practices; employer practices.

63        (a) It shall be an unlawful employment practice for an employer to:

64            (1) Fail or refuse to hire or to discharge any individual or otherwise to discriminate against any

65    individual with respect to compensation, terms, conditions or privileges of employment because of such individual's

66    race, marital status, genetic information, color, age, religion, sex or national origin; or

67            (2) Limit, segregate or classify employees in any way which would deprive or tend to deprive any

68    individual of employment opportunities or otherwise adversely affect the individual's status as an employee because

69    of such individual's race, marital status, genetic information, color, age, religion, sex or national origin.

70        (b) It shall be an unlawful employment practice for an employment agency to fail or refuse to refer for

71    employment or otherwise to discriminate against any individual because of race, marital status, genetic information,

72    color, age, religion, sex or national origin or to classify or refer for employment any individual on the basis of race,

73    marital status, genetic information, color, religion, age, sex or national origin.

74        (c) It shall be an unlawful employment practice for a labor organization to:

SD : FJM : kbs
0211420018

75          (1) Exclude or expel from its membership or otherwise to discriminate against any individual because

76   of race, marital status, genetic information, color, age, religion, sex or national origin;

77          (2) Limit, segregate or classify its membership or to classify or fail or refuse to refer for employment

78   any individual in any way which would deprive or tend to deprive any individual of employment opportunities or

79   would limit such employment opportunities or otherwise adversely affect the individual's status as an employee or as

80   an applicant for employment because of such individual's race, marital status, genetic information, color, age,

81   religion, sex or national origin; or

82          (3) Cause or attempt to cause an employer to discriminate against an individual in violation of this

83   section.

84      (d) It shall be an unlawful employment practice for any employer, labor organization or joint labor-

85   management committee controlling apprenticeship or other training or retraining, including on-the-job training

86   programs, to discriminate against any individual because of race, marital status, genetic information, color, age,

87   religion, sex or national origin in admission to or employment in any program established to provide apprenticeship

88   or other training.

89      (e) It shall be an unlawful employment practice for an employer, employment agency, labor union or joint

90   labor-management committee controlling apprenticeship or other training or retraining, including on the job training

91   programs to intentionally collect, directly or indirectly, any genetic information concerning any employee or

92   applicant for employment, or any member of their family, unless:

93          (1) It can be demonstrated that the information is job related and consistent with business necessity;

94   or

95          (2) The information or access to the information is sought in connection with the retirement policy or

96   system of any employer or the underwriting or administration of a bona fide employee welfare or benefit plan.

97       (f) It shall be an unlawful employment practice for any employer, employment agency, labor organization

98   or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job

99   training programs, to discharge, refuse to hire or otherwise discriminate against any individual or applicant for

100  employment or membership on the basis of such person's race, marital status, color, age, religion, sex or national

101  origin, because such person has opposed any practice prohibited by this subchapter or because such person has

102  testified, assisted or participated in any manner in an investigation, proceeding, or hearing to enforce the provisions

Page 4 of 10

SD : FJM : kbs
0211420018

103    of this subchapter.

104        (g) Notwithstanding any other provision of this subchapter:

105            (1) It shall not be an unlawful employment practice for an employer to hire and employ employees,

106    for an employment agency to classify or refer for employment any individual, for a labor organization to classify its

107    membership or to classify or refer for employment any individual or for an employer, labor organization or joint

108    labor-management committee controlling apprenticeship or other training or retraining programs to admit or employ

109    any individual in any such program on the basis of religion, genetic information, age, sex or national origin in those

110    certain instances where religion, genetic information, age, sex or national origin is a bona fide occupational

111    qualification reasonably necessary to the normal operation of that particular business or enterprise; and

112            (2) It shall not be an unlawful employment practice for a school, college, university or other

113    educational institution or institution of learning to hire and employ employees of a particular religion if such school,

114    college, university or other educational institution or institution of learning is, in whole or in substantial part, owned,

115    supported, controlled or managed by a particular religion or by a particular religious corporation, association or

116    society or if the curriculum of such school, college, university or other educational institution or institution of

117    learning is directed toward the propagation of a particular religion.

118        (h) Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice

119    for an employer to apply different standards of compensation or different terms, conditions or privileges of

120    employment pursuant to a bona fide seniority or merit system or a system which measures earnings by quantity or

121    quality of production or to employees who work in different locations, provided that such differences are not the

122    result of an intention to discriminate because of race, marital status, genetic information, color, age, religion, sex or

123    national origin, nor shall it be an unlawful employment practice for an employer to give and to act upon the results of

124    any professionally developed ability test provided that such test, its administration or action upon the results is not

125    designed, intended or used to discriminate because of race, marital status, genetic information, color, religion, age,

126    sex or national origin.

127        (i) Nothing contained in this subchapter as it applies to discrimination because of age or sex shall be

128    interpreted to affect or interfere with the retirement policy or system of any employer or the underwriting or

129    administration of a bona fide employee welfare or benefit plan, provided that such policy, system or plan is not

130    merely a subterfuge to evade the purpose of this subchapter.

SD : FJM : kbs
0211420018

131        (j)(1) Nothing in this subchapter shall be construed to prohibit compulsory retirement of any employee who

132    has attained 65 years of age, and who, for the 2-year period immediately before retirement, is employed in a bona

133    fide executive or a high policy-making position, if such employee is entitled to an immediate nonforfeitable annual

134    retirement benefit from a pension, profit sharing, savings or deferred compensation plan, or any combination of such

135    plans, of the employer of such an employee, which equals, in the aggregate, at least $44,000.

136        (2) In applying the retirement benefit test of paragraph (1) of this subsection, if any such retirement

137    benefit is in a form other than a straight life annuity (with no ancillary benefits), or if employees contribute to any

138    such plan or make rollover contributions, such benefit shall be adjusted in accordance with regulations prescribed by

139    the Secretary, United States Department of Labor, pursuant to 29 U.S.C. § 631(c)(2), so that the benefit is the

140    equivalent of a straight life annuity (with no ancillary benefits) under a plan to which employees do not contribute

141    and under which no rollover contributions are made.

142        § 712. Enforcement provisions; powers of the Department; administrative process.

143        (a) The Department of Labor is empowered, as hereinafter provided, to prevent any person from

144    engaging in any unlawful employment practice as set forth in §§ 711, 723 and 724 of this title. In connection with the

145    performance of its duties, the Department may:

146        (1) investigate employment practices by permitting the Department to enter any place of

147    employment at reasonable times; inspect and copy records or documents in the possession of the employer, the

148    employment agency or labor organization; administer oaths, certify to official acts, take and cause to be taken depositions

149    of witnesses; issue subpoenas compelling the attendance and testimony of witnesses and the production of papers, books,

150    accounts, payrolls, documents, and records;

151        (2) make, revise or rescind such rules or regulations necessary or appropriate to administer or

152    enforce this chapter in accordance with the provisions of 29 Del. C. § 10161 (b) of the Delaware Code;

153        (3) commence civil actions in Superior Court for violations of this chapter, any published

154    regulations or for civil penalties provided herein.

155        (b) The Department shall have jurisdiction over all cases arising under this chapter, affording review

156    and oversight of employment practices in Delaware.  The Department shall endeavor to eliminate unlawful discrimination

157    in employment through its administrative process set forth below.  This subchapter shall afford the sole remedy for claims

158    alleging a violation of this chapter to the exclusion of all other remedies.  Upon termination of the administrative process

SD : FJM : kbs
0211420018

159  by the Department, the Charging Party may institute a civil action in Superior Court of the State of Delaware pursuant to

160  §§ 714,715.

161         (c) The administrative process requires the following:

162              (1) Statute of limitation and filing procedure. Any person claiming to be aggrieved by a

163  violation of this chapter shall first file a Charge of Discrimination within 120 days of the alleged unlawful employment

164  practice or its discovery, setting forth a concise statement of facts, in writing, verified and signed by the Charging Party.

165  The Department shall serve a copy of the verified Charge of Discrimination upon the named Respondent by certified mail.

166  The Respondent may file an answer within twenty (20) days of its receipt, certifying that a copy of the answer was mailed

167  to the Charging Party at the address provided.

168              (2) Preliminary findings and recommendations. The Department shall review the submissions

169  within sixty (60) days from the date of service upon the Respondent and issue preliminary findings with

170  recommendations. The preliminary findings may recommend: (i) dismissing the Charge unless additional information is

171  received which warrants further investigation; (ii) referring the case for mediation requiring the parties' appearance; or

172  (iii) referring the case for investigation

173              (3) Final determinations upon completion of investigation. After investigation, the Department

174  shall issue a Determination of either "Reasonable Cause" or "No Reasonable Cause" to believe that a violation has

175  occurred or is occurring. All cases resulting in a "Reasonable Cause" Determination will require the parties to appear for

176  compulsory conciliation. All cases resulting in a "No Cause" Determination will receive a corresponding Delaware Right

177  to Sue Letter.

178              (4) Confidentiality of the Department's process. The Department shall not make public the

179  charge of discrimination or information obtained during the investigation of a charge. This provision does not apply to

180  disclosures made to the parties, their counsel, or witnesses where disclosure is deemed necessary or appropriate. Nothing

181  said or done during and as a part of the mediation or conciliation efforts may be made public by the Department, its

182  officers or employees or used by any party as evidence in a subsequent proceeding without the written consent of the

183  persons concerned.

184              (5) End of administrative process. In all cases where the Department has dismissed the

185  Charge, issued a No Cause Determination or upon the parties failed conciliation efforts, the Department shall issue a

186  Delaware Right to Sue Notice, acknowledging the Department's termination of the administrative process. Once the

Page 7 of 10

SD : FJM : kbs
0211420018

187 Department has issued its preliminary findings pursuant to subsection (2), the Department, in its discretion, may grant a

188 Delaware Right to Sue Notice to a Charging Party.

189 § 713. Civil action by the Attorney General; complaint.

190   (a) Whenever the Attorney General has reasonable cause to believe that any person or group of persons is

191 engaged in a pattern or practice of resistance to the full enjoyment of any of the rights secured by this subchapter or

192 subchapter III of this chapter and that the pattern or practice is of such a nature and is intended to deny the full

193 exercise of the rights herein described, the Attorney General may bring a civil action in the Court of Chancery by

194 filing with it a complaint:

195    (1) Signed by the Attorney General (or in the Attorney General's absence the Chief Deputy Attorney

196 General);

197    (2) Setting forth facts pertaining to such pattern or practice; and

198    (3) Requesting such relief, including an application for a permanent or temporary injunction,

199 restraining order or other order against the person or persons responsible for such pattern or practice, as the Attorney

200 General deems necessary to insure the full enjoyment of the rights herein described.

201   (b) The Court of Chancery shall have jurisdiction over proceedings brought pursuant to this section.

202 § 714 Civil action by the Charging Party; Delaware Right to Sue Notice; election of remedies.

203  (a)  A Charging Party may file a civil action in Superior Court, after exhausting the administrative remedies

204 provided herein and receipt of a Delaware Right to Sue Notice acknowledging same.

205  (b)  The Delaware Right to Sue Notice shall include authorization for the Charging Party to bring a civil

206 action under this Chapter in Superior Court by instituting suit within ninety (90) days of its receipt or within ninety (90)

207 days of receipt of a Federal Right to Sue Notice, whichever is later.

208  (c)  The Charging Party shall elect a Delaware or federal forum to prosecute the employment discrimination

209 cause of action so as to avoid unnecessary costs, delays and duplicative litigation. A Charging Party is barred by this

210 election of remedies from filing cases in both Superior Court and the federal forum  If the Charging Party files in

211 Superior Court and in a federal forum, the Respondent may file an application to dismiss the Superior Court action under

212 this election of remedies provision.

213 § 715 Judicial remedies; civil penalties.

214   Superior Court shall have jurisdiction over all proceedings brought by the Charging Party pursuant to § 714.

SD : FJM : kbs
0211420018

215  Superior Court may excuse a Charging Party who has complied with the compulsory conciliation provisions of this

216  chapter from the compulsory arbitration provisions of Superior Court rule.

217  (a)  Superior Court shall have the authority to provide the following relief, including but not limited to: (1)

218  order the Respondent to cease and desist or modify its existing employment policies; (2) order the Respondent to hire,

219  reinstate or promote the Charging Party; (3) order the payment of compensatory damages, including but not limited to

220  general and special damages, punitive damages when appropriate, not to exceed the damage awards allowable under Title

221  VII of the Civil Rights Act of 1964, as amended, provided that for the purposes of this subchapter, employers with 4-14

222  employees shall be treated under Title VII's damage award as an employer having under 50 employees; and (4) order the

223  costs of litigation and reasonable attorney's fees to the prevailing party.

224  (b)  In any action brought by the Department for violation of the retaliation provision of section 711(f), the

225  Court shall fine the employer not less than $1,000 nor more than $5,000 for each violation, in addition to any liability for

226  damages.

227  § 716. Posting of notices; penalties.

228  (a) Every employer, employment agency and labor organization, as the case may be, shall post and keep

229  posted in conspicuous places upon its premises where notices to employees, and applicants for employment are

230  customarily posted, a notice to be prepared or approved by the Department setting forth excerpts from or summaries

231  of the pertinent provisions of this subchapter and subchapter III of this chapter and information pertinent to the filing

232  of a complaint.

233  (b) A willful violation of this section shall be punishable by a fine of not more than $100 for each separate

234  offense.

235  § 717. Veterans' special rights or preference.

236  Nothing contained in this subchapter or subchapter III of this chapter shall be construed to repeal or modify

237  any state or local law creating special rights or preferences for veterans.

238  § 718. Short title, effective date, savings clause.

239  (a) This subchapter may be cited as the "Discrimination in Employment Act."

240  (b) This Act shall become effective sixty (60) days after its enactment into law.

241  (c) This Act does not affect any cause of action or the remedy provided therefor if such cause of action accrued

242  and suit was instituted thereon prior to the effective date of this Act

Page 9 of 10

SD : FJM : kbs
0211420018

<u>SYNOPSIS</u>

This bill eliminates the Equal Employment Review Board, and creates a corresponding Delaware Right to Sue in Superior Court after exhausting Administrative remedies. This bill confirms that Chapter 7 is the exclusive and sole remedy for employment discrimination claims, requiring initial processing of all such claims with the Department of Labor for review and action. This bill effectively re-establishes the exclusive remedy put in question by the decision in <u>Schuster v. Derocili</u>, 775 A. 2d 1029 (2001).

Some definitions have been added to section 710, specifically new terms such as "No Cause Determination"; "Reasonable Cause Determination"; "Charging Party"; "Respondent"; "Delaware Right to Sue Notice"; "Mediation"; and "Conciliation". Sections 712, 714 and 715 have been repealed in their entirety and rewritten to accomplish the goals of initially pursuing informal methods of resolution through mediation and conciliation and then permitting civil actions in Superior Court.

Author: Senator Marshall

SD : FJM : kbs
0211420018