IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MARYBETH FARRELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No.04-285-KAJ |
| | ) | |
| ASTRAZENECA PHARMACEUTICALS, | ) | |
| LP, | ) | |
| | ) | |
| Defendant. | ) | |

**APPENDIX TO DEFENDANT'S REPLY BRIEF
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Sheldon N. Sandler, Esquire (No. 245)
Teresa A. Cheek, Esquire (No. 2657)
The Brandywine Building, 17th Floor
1000 West Street
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6673
Facsimile: (302) 576-3330
Attorneys for Defendant

Dated: May 24, 2005

057159 1004

# TABLE OF CONTENTS

Page

Farrell January 2003 Calendar ................................................................................C1

Farrell March 2003 Calendar ................................................................................C2

Hellen Email re: Weekly Status Reports dated April 10, 2003 ........................C3

Colburn Email re: Pharmacy Lists dated April 15, 2003 ................................C4

McDonald Email re: Update Information dated May 5, 2003 ........................C5

Farrell Letter to Correnti dated August 6, 2003 ..............................................C6

Transcript of White Voicemail Message dated November 6, 2003..................C9

Emails re: ASH Rooms ........................................................................................C10

Farrell Email re: Pharmacy Ad Board dated November 17, 2003 ................C13

Farrell Handwritten Note re: Docking Station dated January 9, 2004..........C14

Farrell Employee Change Notice dated January 27, 2004..............................C15

Excerpts from the deposition transcript of MaryBeth Farrell
dated December 9, 2004 and January 25, 2005 ................................................C16

Excerpts from the deposition transcript of Georgina Austin-Jones
dated February 14, 2005 ......................................................................................C38

Excerpts from the deposition transcript of Jane Hellen
dated February 15, 2005 ......................................................................................C45

Excerpts from the deposition transcript of Deborah Brangman
dated March 24, 2005 ..........................................................................................C63

Excerpts from the deposition transcript of Susan Broadway
dated March 24, 2005 ..........................................................................................C76

Excerpts from the deposition transcript of Rachel Bevis
dated April 7, 2005 ..............................................................................................C81

*M. Farrell 2003 Calendars*   *P.4, #'s*

# January 2003

| Monday | Tuesday | Wednesday | Thursday | Friday | Sat/Sun |
|---|---|---|---|---|---|
| | | **1** A2 HOLIDAY | **2** | **3** | **4 / 5** |
| **6** 8:30am 830-1CHBBuddy Field Workshop Bld. A in Chesterbrook (USCB Meeting A-3E (26) | **7** CLEAN OUT DAYS 9:00am 9amAgency Planning Mtg (War Room(7) 3:00pm 3-4HotelDuPont | **8** 5:00pm 5pmAnnMck (@ufta) 6:30pm Danielle 6:30pm | **9** 10:00am 10amExanta KOL Application (JUSUW Meeting DCC2-W2-532 (6)) 3:00pm 3pmExanta Commercial Team Mtg. (JUSUW Meeting | **10** 8:30am 8:30amACT Dates Planning (War Room) 11:00am 11amACS Advisory Board Meeting DCC2-E3-851 (6-8)) | **11 / 12** 9:00am 9amWdnr 2:00pm 2pmHY |
| **13** 9:00am 9amPost ACS – International A 9:30am 9:30Buddy/FieldMeetin (JUSUW Meeting 1:00pm 1pmReview documents at Sue's 3:30pm 3:30-5Clinic | **14** 7:00am 7amUnion park Board meeting 2003 9:00am 9amUnIAF Advisory 10:30am 10:30Market Development 3:30pm 3:30-5:30Message Testing-Phase I ( | **15** AGENCY DAYS (Sheraton Suites, Wilmington) DCC2 Clean Out Day (DCC2) | **16** 10:00am 10amExanta Stiles, Wilmington) 1:00pm 1pmRetail/Pharmacy Customer Field Advisory Board (call in) | **17** 9:00am 9amCoag Clinic Workstream – objectives & metrics for 2003 (JUSUW Meeting DCC2-W3-461 (12-14)) | **18 / 19** 10:30am 10:30DrMumma (2543 Stoney Batter Road) MallonReception (Brantwed) |
| **20** 4:00pm 4pmDrDedeuw 5:00pm 5:15pmDrCluque | **21** 1:00pm 1pmViewPoint Requirements for Advisory Boards ( 4:00pm 4pmChestbrook PREP/PROMO Project Mgmt. Needs for 200 7:00pm 7pmLessonOnIsFord | **22** 9:00am 9-12Prism Training Class (Training DCC2-W1-453 (12) 2:00pm 2pmOut of officeDr/pers.1/2day 5:00pm 5pm-9Market Research-Exanta | **23** VACATION 9:30am Canceled: Planning meeting 1 for VTE-International Adviso 3:00pm 3-4Exanta Commercial Team Mtg. (JUSUW Meeting | **24** | **25 / 26** 7:00pm 7pmGeorgetowndime (Brantwyn) |
| **27** 9:00am Prep/Promo Mtg (JUSUW Meeting 9:30am Canceled: ACCME sessions (war room) 12:00pm 12-E2-071 (DCC2 E2-071 (Wilmingt 4:00pm 4-5Coag Clinic | **28** 9:00am 9-12Buddy/FieldFexanta Meeting with Buddy Field (JUSUW Meeting DCC2-E3-851 (6-8) 3:00pm 3pmshuttlehome | **29** P-DIACCME –Dallas ObjectivesDueBRANGWAN | **30** 8:00am Critical Care Ad Board (The Vault @ Boudroux Restaurant, 3:00pm CV Seating Plans for USBC Unveiled (CB Cafeteria AND DCC2 | **31** | |

Farrell, Marybeth

10/27/2003

# March 2003

| Monday | Tuesday | Wednesday | Thursday | Friday | Sat/Sun |
|---|---|---|---|---|---|
| | | | | | **March 1** — New York/D.Mallon 10:30am 10:45BeauxVisages / **2** New York/D.Mallon |
| **3** 8:30am Hold for unpacking; 10:00am 10:15EXANTATeamMt (Knuckle Area, 4th); 11:00am Canceled: Mtg to review prospective; 6:30pm Collier'sWineTasting | **4** 5:30pm 5:30HBAPhilaMarriott | **5** 8:30am Canceled: Workshop with Buddy Feld (JJSUW Meeting Alpocas A3B-221 (14')); 11:00am FitnessCtrOpening | **6** 11:00am 2003 Advisory Board Invitee's (Mandatory); 12:00pm KWilliams & Advocacy Devmnt (TBD); 3:00pm Exanta Commercial; 6:30pm DrNamey--Murphy | 11:30am BHallLongAppt. | **8** |
| | | | | | **9** |
| **10** 9:00am Updated: ACT update @ ACC (C4C - 222); 12:00pm FitnessCtrOrientation; 1:00pm 2002 Performance Review (Debbie's; 3:30pm Planning Meeting for | **11** 8:00am MrTozzi+MrPSnt HS 3:30pm READALOUD Training w/Team (Brandywine Valley Baptist Church); 7:00pm PD1 Meeting | **12** 8:30am CVTownHall Meeting (USBC Auditorium (Brandywine)); 5:30pm HBASODee'sUnivPhila | **13** 6:00pm WaltWagner (7 Rockford Road) | 8:00am 8amDrMumma | **15** |
| | | | | | **16** |
| **17** 5:30pm 5PatsdInner | **18** 2:00pm Ad&ioConfCall; 4:00pm VTE Ad board Boston June 18/19 (my office); 5:00pm MessTesting (Dial In computer David Gln | **19** Personal Day; 8:00am DrGonondy; 12:30pm AlliedLock&Verizon | **20** 3:00pm Exanta Commercial Team Mtg. (JJSUW Meeting Chesapeake C4A-111 (2B)); 5:30pm Danielle; 6:00pm JMcgha | 2:00pm BVisages | **22** 10:00am -1Verizon; 7:00pm AHamilton (Toscana) |
| | | | | | **23** |
| **24** 7:30am CarperBrkfast; 11:00am Updated: ACC review; 12:00pm Advisory Board List; 1:00pm Updated: Close of the; 2:00pm TGDiscovery Conf More Items... | **25** 9:00am ACT Meeting (JJSUW Meeting Chesapeake; 10:00am Market Development Workstream Meeting; 2:00pm Advisory Boards; 4:00pm SPORTIF | **26** 7:00pm PDIGreenbergY'house (2323 Fells Lane off Faulkland Road) | **27** 5:00pm BettyMichaelChrist | 5:00pm KellyDeepBlue | **29** ACC Chicago 12:00pm 12pmACCStaff |
| | | | | | **30** ACC Chicano |
| **31** 7:30am Carper/breakfast | | | | | |

Farrell, Marybeth

10/27/2003

| | |
|---|---|
| **From:** | Hellen, Jane |
| **Sent:** | Thursday, April 10, 2003 8:20 AM |
| **To:** | Farrell, Marybeth; 'Christine Lutze (E-mail)' |
| **Cc:** | Pritchard, Susan S |
| **Subject:** | RE: Weekly Status Reports |

Marybeth,

I was thinking of more depth. For each meeting, what are the specific objectives per audience, the data they will discuss, the strategic direction/key messages we need to communicate. More than the logistical information, what are the suggested faculty, their role and per agenda item, what are the objectives. Lets take it deeper than the slides provided. In addition, what is the timeline you're following for agenda development, faculty recruitment and PRA approval for each meeting.

Thanks

Jane

> -----Original Message-----
>
> | | |
> |---|---|
> | **From:** | Farrell, Marybeth |
> | **Sent:** | Tuesday, April 08, 2003 9:44 AM |
> | **To:** | Christine Lutze (E-mail) |
> | **Cc:** | Hellen, Jane; Pritchard, Susan S |
> | **Subject:** | Weekly Status Reports |
> | **Importance:** | High |
>
> Christine:
>
> The Exanta team will need weekly status reports that capture project activities and status of action items. We consider this an important priority and will need initiation of the report this week. Please call me to discuss particulars about length, scope, day to issue.
>
> Thank you.
>
> Marybeth

1

D244

| From: | Colburn, Louise |
|---|---|
| Sent: | Tuesday, April 15, 2003 9:29 AM |
| To: | Pritchard, Susan S |
| Subject: | FW: Pharmacy Lists |

We go 'round and 'round!

**Louise Colburn**
Senior Professional Relations & Education Manager
AstraZeneca LP
phone- 302-885-4364
fax-   302-886-7586
e-mail- louise.colburn@astrazeneca.com

-----Original Message-----
| From: | Farrell, Marybeth |
|---|---|
| Sent: | Tuesday, April 15, 2003 9:25 AM |
| To: | Maldow, Harvey E; Martin, Brian |
| Cc: | Hellen, Jane; Colburn, Louise |
| Subject: | RE: Pharmacy Lists |

Harvey:

Please include Louise Colburn on all correspondence and lists of KOLs.  We should set up a conference call with Louise to discuss what additional information, coag clinic pharmacists names the database might need.

Thanks

Marybeth Farrell

-----Original Message-----
| From: | Maldow, Harvey E |
|---|---|
| Sent: | Monday, April 14, 2003 4:47 PM |
| To: | Martin, Brian |
| Cc: | Farrell, Marybeth; Hellen, Jane |
| Subject: | RE: Pharmacy Lists |

Brian:

Sorry for the delay in responding but I met with Al Hanson and Jim Demuth (University of Wisconsin) on Friday.  They have an extensive list of pharmacists that participate in coagulation clinics around the country.

If you can provide me with some of the demographics that you are looking for I will ask them for recommendations

Regards,

*Harvey Maldow R.Ph., M.S*

Director, Pharmacy Affairs
AstraZeneca
1800 Concord Pike
PO Box 15437
Wilmington, De 19850-5437
(302) 886-7876  fax (302) 886-7714

7

**D260**

**C4**

**Kauffman, Deborah**

| | |
|---|---|
| **From:** | McDonald, Patricia (EXANTA) |
| **Sent:** | Monday, May 05, 2003 5:40 PM |
| **To:** | Kauffman, Deborah |
| **Subject:** | FW: Update Information |

I provided overall feedback that the team needed her in a postion to take on more workload and that she needs to clearly understand what she needs to deliver on through Susan. To date, jane feels there is a gap. I did not imply in anyway I wanted to be kept up to speed on this- I clearly said she needed to understand what is being asked of her by Susan/jane and that she should take the initiative to make sure she understands through varies methods (meetings if appropriate). I advised her to consult frequently with her team and Susan to ensure she was working on the right path and not wait until deadline to try and gain support. The way to do this I informed MaryBeth was to be ahead of the game on her deliverables. I did not recommend weekly record keeping. Interesting how 2 people can have the same conversation and get slightly different takeaways. I think she is in over her head in her current role on this team but is not sel- aware of her limitations, However, I believe she plans to create paperwork to try and hold her spot.

-----Original Message-----
| | |
|---|---|
| **From:** | Farrell, Marybeth |
| **Sent:** | Monday, May 05, 2003 2:51 PM |
| **To:** | Kauffman, Deborah |
| **Cc:** | McDonald, Patricia (EXANTA) |
| **Subject:** | Update Information |

Debbie:

I wanted to let you know that I met with Jane Hellen Friday afternoon, May 2, for approximately 30 minutes. I conveyed to her in followup to my email of May 1 my surprise at Susan Pritchard's comments to me on May 1 regarding my performance as a PREP manager on the Exanta team, as the matters which Susan raised did not comport with my recent Performance Review (March 10, 2003). I am awaiting Susan's written summary of the points raised; I am developing a summary of the conversation I had with Jane Hellen on May 2 and will provide you with a copy of each.

Jane said that she spoke to Susan and instructed Susan to discuss with me the performance issues that she (Jane) had identified. This session was scheduled on April 30 and held May 1. I am awaiting Susan's written summary of the points raised; I am developing a summary of the conversation I had with Jane Hellen on May 2, which will include memos and correspondence around the projects and materials in question indicating the sequence of events and persons responsible. I will provide you with a copy of these materials.

I spoke this morning with Patty McDonald, executive director of commercial operations/EXANTA, about the conversations I had last week with both Susan and Jane. Patty recommended that I implement record-keeping mechanisms such as weekly status meetings with both Jane Hellen and Susan Pritchard, to utilize company resources to assist me such as Human Resources, and to keep her apprised. I will schedule the status meetings and keep you updated as well.

I would like to arrange a time to meet with you to discuss this further.

Thank you very much.

Marybeth Farrell
Exanta PREP Manager
ext. 5-1854

1

**D340**

6 August 2003
AstraZeneca Contact:  Marybeth Farrell


Deborah Correnti, RN
Academy for Healthcare Education
330 Madison Avenue, 21st Floor
New York, NY  10017


Dear Ms  Correnti:

AstraZeneca LP ("AstraZeneca") is pleased to inform you that the request of the Academy for Healthcare
Education (Academy) for a medical educational grant (the "Grant") has been approved, subject to its
acceptance of the terms and conditions of this Letter Agreement, in the amount of $230,050 to support a
satellite symposium at the 2003 MidYear Meeting of the American Society of Health-System Pharmacists
(ASHP) , tentatively entitled "Anticoagulation in the Treatment of Atrial Fibrillation and Venous
Thromboembolism: Update on New Data and New Agents," as well as an online module based upon the
symposium (collectively, the "Program) to be conducted by the Academy  The Academy understands and
agrees that the following terms and conditions shall apply to the Grant:

_Use of Grant_

The Academy will use the Grant solely for the Program and any amounts not used to support the Program
in accordance with the terms and conditions of this Letter Agreement will be promptly refunded to
AstraZeneca

_Compliance with FDA Policy Statement and ACCME Standards_

The Program, whether or not offered for continuing medical education credit, will be educational and non-
promotional in nature and will be planned, designed and implemented in accordance with the U S  Food
and Drug Administration's Guidance on Industry-Supported Scientific and Educational Activities ("Policy
Statement") and the Accreditation Council for Continuing Medical Education Standards for Commercial
Support of Continuing Medical Education ("ACCME Standards")  We will provide copies of the Policy
Statement and ACCME Standards at your request

The Policy Statement and the ACCME Standards require, among other things, that (i) the Academy
conduct the Program independently and without control or influence by AstraZeneca over the Program's
planning content (including the selection of speakers or moderators); or execution; (ii) the Program be free
of commercial bias for or against any product; (iii) AstraZeneca may provide names of suggested speakers
only in writing and in response to the Academy's inquiry and only as one of a number of sources for such
suggestions; (iv) the Academy make meaningful disclosure of AstraZeneca's support of the Program and
any prior relationship between the Academy and AstraZeneca, and the relationship, if any, between
AstraZeneca and the speakers selected by the Academy; and (v) AstraZeneca not engage in, and the
Academy not permit, any other sponsor to engage in promotional activities in or near the Program room or
advertise its products in any materials disseminated as part of the Program

In addition, the Academy is required by the Policy Statement and the ACCME Standards to ensure that any
product discussions at the Program be objective, balanced and scientifically rigorous  This includes a
balanced discussion of each product and of treatment alternatives, that limitations on data be disclosed, that

D443

unapproved uses be identified as such, and that for live presentations there be opportunities for questioning or debate.

*Compliance with Other Guidelines and Federal and State Anti-Kickback Laws*

In accordance with AstraZeneca policies, the AMA Guidelines on Gifts to Physicians from Industry and the ACCME Standards, the Grant will not be used to subsidize the cost of travel, lodging, registration fees, honoraria, personal expenses for attendees or their spouses, or for meals or social events other than those modest meals or events intended to facilitate discussion and held as part of the Program. If the Academy is funding these types of expenses or activities, AstraZeneca requires that the Program materials clearly state that the Grant is for the educational portion of the Program only, so that no one will incorrectly assume that AstraZeneca funds are being used to support such expenses or activities. The Academy confirms that this Grant is not being provided by AstraZeneca, nor accepted by the Academy, as an inducement to purchase, prescribe, or recommend an AstraZeneca product, nor as part of the contracting process.

*Third Party Approvals and Releases*

The parties understand that the Academy, in the exercise of its independent judgment, might use copyrighted sources for Program materials and that AstraZeneca has no control over the Academy in this regard. Therefore, the Academy agrees to obtain all consents, authorizations, approvals and releases that may be necessary for the production of the Program and any materials prepared in connection with the Program. The Academy will be solely responsible for any claims, actions, damages or expenses, including reasonable attorneys' fees, that may arise in any manner out of or in connection with the Academy's failure to secure such consents, authorizations, approvals or releases or otherwise in connection with the Program.

*Cancellation*

The parties understand that the pharmaceutical industry is highly regulated and that, although the Academy may not be subject to those regulations, AstraZeneca is. AstraZeneca's duties under applicable law can change from time-to-time and are subject to circumstances beyond AstraZeneca's control. As a result, it is necessary for AstraZeneca to reserve the right to terminate this Letter Agreement, upon written notification to the Academy, whenever it determines that such termination is in AstraZeneca's best interests in this or any other regard. Payment will be made by AstraZeneca to the Academy for all expenses reasonably incurred pursuant to this Letter Agreement prior to the date of termination (provided that such expenses cannot be canceled or recovered by the Academy from third parties) less any payments made by AstraZeneca to the Academy pursuant to this Letter Agreement; provided, however, that no such payment will be made if AstraZeneca determines that the Academy has breached any of the terms and conditions set forth herein. In no event will any such payment exceed the total Grant amount, and payment under this paragraph will be contingent upon receipt of proof satisfactory to AstraZeneca that such expenses have been incurred and are not cancelable or recoverable. If the Grant amounts previously advanced by AstraZeneca exceed the amount due to the Academy under this paragraph, the Academy will promptly refund the difference to AstraZeneca.

*Miscellaneous*

This Letter Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and all prior agreements with respect thereto are superseded hereby. No amendment or modification of this Letter Agreement will be binding unless in writing and duly executed by both parties. This Letter Agreement is for the sole benefit of the parties hereto, and will be governed by the laws of the State of Delaware without giving effect to choice of law doctrines.

We are sending this Letter Agreement in duplicate. If the Academy agrees with the above conditions, please sign, date and return one copy of this Letter Agreement to confirm our legally binding agreement. The Grant cannot be provided until we have received the signed Letter Agreement. In accordance with the Policy Statement and ACCME Standards, please confirm the date, time, and location of the Program(s)

**D444**

being supported by the Grant in the space provided below. We suggest that you retain the other copy for your files.

Payment Terms: 1/3 upon approval, 1/3 upon implementation, 1/3 upon reconciliation

We appreciate the opportunity to support your education endeavor

Sincerely,

Marybeth Farrell
AstraZeneca
Professional Relations and Education Manager


ACKNOWLEDGED, AGREED AND CONFIRMED:


By: _____

Name: ____Marybeth Farrell_____

Title: ____Professional Relations and Education Manager____

Date: _____

Date and Time of Program(s): ___December 2003, date and time tbd___

Location of Program(s): _____New Orleans, LA_____

_____

Payee: ____Academy for Healthcare Education_____

Tax ID: ___13-3108337_____

**D445**

*Transcript of call from R. White (Finance)*

November 6, 2003

Hey Susan its Rose. its Thursday the 6th at noon and I just wanted to let you know I went into DeLTA to check out the    for some reason the amounId are still not right for in there for PREP. I did notice that MBF put all her stuff in billions. you are supposed to put your numbers in thousands and if you put it in like say for example 75 million should be put in there as 75 not 75000 so that would come out as 75 billion. So I've left her a voice mail to tell her that she needs to change or adjust all her numbers in there before the 17th, but I wanted to make you aware of the situation. Ok, it you have questions, please call at 55396.

D769

C9

| | |
|---|---|
| **From:** | Luhowy, Lisa |
| **Sent:** | Friday, November 14, 2003 9:28 AM |
| **To:** | Farrell, Marybeth |
| **Cc:** | Ouchterlony, Christina; Hellen, Jane; Torr, Patricia M (EXANTA); McNinch, David |
| **Subject:** | RE: ASH Rooms |

Christina and Marybeth -

Thanks for helping to clarify this. I think that b/c Patty works closely w/ the Global as well as being US - logistics like this get confusing. I just spoke with Patty, and I know this will probably mess things up entirely. but she now wants to stay at the Marriott - as well as Jane and David.

My apologies, Christina - I was just doing what I was told. Marybeth, can you please provide me w/ confirmation #'s for the Marriott? Also, please contact Christina directly and let her know the 3 people you will be placing in the Hilton, in lieu of Patty, Jane, and David

Kind regards,

    -----Original Message-----
    **From:** Farrell, Marybeth
    **Sent:** Friday, November 14, 2003 7:42 AM
    **To:** Luhowy, Lisa
    **Subject:** FW: ASH Rooms
    **Importance:** High

    Lisa:

    Your call about where Patty, Jane & David staying at ASH. Let me know if I can help. You could tell Christina I will substitue 3 other US people in the Aiport Hilton since they have to stay there anyway, and we haven't yet paid for those rooms. I think P/J/D will be better off in the main hotel where all the meetings and events will be occurring

    Marybeth

        -----Original Message-----
        **From:** Ouchterlony, Christina
        **Sent:** Friday, November 14, 2003 6:37 AM
        **To:** Farrell, Marybeth; Luhowy, Lisa; Copeland, Danita
        **Subject:** RE: ASH Rooms
        **Importance:** High

        Dear all,

        This is confusing. I have blocked and paid rooms for Patty McDonald. Jane Hellan, Peter Langmuir and David on request from Lisa at the Hilton Airport/Harbour Island hotel. As you can imagine it is a bit late to cancel the rooms, and no refund is being made. Please advise **by return email** how you want to proceed!

        Kind regards,
        Christina

            -----Original Message-----
            **From:** Farrell, Marybeth
            **Sent:** torsdag, november 13, 2003 19:28
            **To:** Luhowy, Lisa; Copeland, Danita
            **Cc:** Ouchterlony, Christina
            **Subject:** RE: ASH Rooms

            Lisa:

            The U S team is being handled by Danita; the Global team by Christina. Danita has rooms for our management at the Marriott which the preferred meeting/host hotel. No need for them to stay out at the airport.

1

**D826**

**C10**

Please work only with Danita Copeland for the U S team's reservations and cancel those booked through Christina. Let me know if you have any questions. Thanks!

Marybeth

-----Original Message-----
| | |
|---|---|
| From: | Luhowy, Lisa |
| Sent: | Thursday, November 13, 2003 1:26 PM |
| To: | Farrell, Marybeth; Copeland, Danita |
| Cc: | Ouchterlony, Christina |
| Subject: | RE: ASH Rooms |

Danita and Marybeth -

Just a little confused w/ the room situation. Danita - are you working with Christina Ouchterlony on the rooms? I see you have rooms for Patty Torr and Jane Hellen, but I believe Christina is taking care of Patty Torr, Jane Hellen, and David McNinch. They should all be staying at the Hilton San Diego Airport Harbor Island

If anyone could help clarify - I would greatly appreciate it.

Many thanks,

-----Original Message-----
| | |
|---|---|
| From: | Farrell, Marybeth |
| Sent: | Wednesday, November 12, 2003 1:46 PM |
| To: | Abens, Michael; Quigley, Denise Barrett; Clark, Jane A; Gagnon, Tom; Ginkel, David; Hauch, Ole; Hellen, Jane; Jacobson, Joyce; Katona, Brian; Kim, Jennifer; Kuykendall, Sherry; Luhowy, Lisa; Madford, Ellen; Massie, David A; Torr, Patricia M (EXANTA); McNinch, David; Miller, John P (CV Marketing); Morin, Faye; Broadway, Susan P; Sapp, Clarice; Selling, Nancy; Shields, Joe; Shields, Maureen; Taylor, Doris; Watson, Rosa C; Weiner, Joyce; Wygant, Gail; Burton, Emily; Chelune, Peter; Ryan, Debbie; Griffin, James; Larimer, David; McCormick, Linda; Meyer, John (EXANTA); Schott, Cecilia; von Hennigs, Irene; Walters, Debra; Witt, Matthew; Colburn, Louise; Shields, Maureen; Sapp, Clarice; Taylor, Doris; Booker, Janice M |
| Cc: | Copeland, Danita |
| Subject: | ASH Rooms |
| Importance: | High |

Team: ASH Rooms Update

If you are attending ASH this year, you must email Danita Copeland to book a hotel room. The U.S. team has 55 rooms blocked. To date, we have heard from only 8 U.S. team members regarding room reservations -- about half the number of people who responded 'yes' to the ASH Symposium meeting invitation.

Email Danita as soon as possible please! It won't be any fun to arrive in San Diego and have nowhere to stay. Send Danita your arrival and departure information by the close of business this coming Monday, November 17, to assist us with planning. We will be releasing rooms that are not reserved prior to ASH.

Those for whom Danita has rooms booked are:
Susan Broadway
Ole Hauch
Jane Hellen
Joyce Jacobson
Patty McDonald Torr
David Massie
Joyce Weiner
Matt Witt

Again, a synopsis of our activities for your planning:

| | |
|---|---|
| Symposium | December 5, 12:30 pm - 3:25 pm |
| | San Diego Marriott Ballrooms A & D |
| EXULT B Oral Presentation | Afternoon of December 7. Time and location to be announced. |
| Plenary Session | December 7, 1:15 pm - 3:45 pm |

2

**D827**

**C11**

Ximelagatran          San Diego Convention Center Halls F & G
Dr. Ginsberg Presentation

I will be sending out a comprehensive ASH overview within the next week to apprise everyone of the latest updates on our activities since my August review of events

Thank you.

Regards,

Marybeth Farrell
Professional Relations and Education Manager, EXANTA
AstraZeneca
1800 Concord Pike
PO Box 15437
Wilmington, DE  19850-5437
Phone: 302/885-1854
email:  marybeth.farrell2@astrazeneca.com

3

**D828**

**C12**

**From:**          Farrell, Marybeth
**Sent:**          Monday, November 17, 2003 8:46 AM
**To:**            Maldow, Harvey E
**Subject:**       Pharmacy ad board

Harvey:

What is the status of the AZ pharmacy ad board for 2004?  EXANTA would like to nominate one or two speakers  Please advise  Thanks

Marybeth Farrell
Professional Relations and Education Manager, EXANTA
AstraZeneca
1800 Concord Pike
PO Box 15437
Wilmington, DE  19850-5437
Phone: 302/885-1854
email:  marybeth.farrell2@astrazeneca com

1

**D853**

**C13**

NOTE TO
my Secretary

P. 2, #6

Friday, 1-9-04

Clarice: Please do ASAP     8:07
a.m.

— Go To Intranet

— On "Search" Box on Screen    ☐
Type in: SiRTS

— Type in a Report of Vandalism
To My Docking Station. It
has been Pulled out/~~~~~~ Ripped out
of Base. I reported this to Help Desk
and they Are sending a new one. I
Reported this to Control Room/Security.
They Told me to do the "Sirts"
Report. Type out A copy of the report for Me. thanks
Marybeth

P280

**C14**

AstraZeneca    Employee Change Notice (ECN)    Page 1 of 2    Date Printed: 01/27/2004

| Employee ID | Employee Name | Salary/Wage Roll | Adj Svc Dt | Benefit Svc Dt | Vested Svc Dt | Req # | Sex | Birthdate | EEO Group | Citizen Of |
|---|---|---|---|---|---|---|---|---|---|---|
| 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 | Farrell, MaryBeth | 34406 | 07/07/94 | | | | F | 06/04/59 | White | USA |

| Company | Dept ID | Business Level 1 | Business Level 2 | Position Reports To | Red/Temp | FT/PT | Shift | Employee Class | Hrs/Week |
|---|---|---|---|---|---|---|---|---|---|
| ASM | A221S81044 | ASCOMMERCL | ASCOMMERCE | 00051499 | R | F | N | All Other | 37.5 |

Current Job Information

| Client/Co | Cost Center | Job Code | Job Family | Position # | Expected LOA Return Dt | Rate | Factor |
|---|---|---|---|---|---|---|---|
| 42/00 | 2300581044 | 200452 | 200131 | 00008959 | 06/23/03 | 0.000 | 0.000 |

Employment History

| Type | Actn | Reason | Eff Date | Position Title | Job Code | Position Name | Organization Name | Emp Cls | Pyl Gd | Bdgn Gd | FLSA | Salary | % Inc | Amt Inc | $ MRP | Perf Rtg |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. | TER | Discharge | 01/24/04 | PREP | Mgr-HealthProfe | MHC Central Promotion | All Other | 204 | E | 94,062.472 | 0.000 | 0.000 | 118 | | |
| 2. | REL | Rtn Frm Lv | 01/21/04 | PREP | Mgr-HealthProfe | MHC Central Promotion | All Other | 204 | E | 94,062.472 | 0.000 | 0.000 | 118 | | |
| 3. | PLA | PdSuprvCh | 01/19/04 | PREP | Mgr-HealthProfe | MHC Central Promotion | All Other | 204 | E | 94,062.472 | 0.000 | 0.000 | 118 | | |
| 4. | REL | Rtn Frm Lv | 06/23/03 | PREP | Mgr-HealthProfe | MHC Central Promotion | All Other | 204 | E | 94,062.472 | 0.000 | 0.000 | 118 | | |
| 5. | PLA | Pd Redhire | 06/09/03 | PREP | Mgr-HealthProfe | MHC Central Promotion | All Other | 204 | E | 94,062.472 | 0.000 | 0.000 | 118 | | |
| 6. | REL | Rtn Frm Lv | 06/02/03 | PREP | Mgr-HealthProfe | MHC Central Promotion | All Other | 204 | E | 94,062.472 | 0.000 | 0.000 | 118 | | |
| 7. | PLA | ShrtTmLOA | 05/09/03 | PREP | Mgr-HealthProfe | MHC Central Promotion | All Other | 204 | E | 94,062.472 | 0.000 | 0.000 | 118 | | |
| 8. | REL | Re-Org | 04/01/03 | PREP | Mgr-HealthProfe | MHC Central Promotion | All Other | 204 | E | 94,062.472 | 0.000 | 0.000 | 118 | | |
| 9. | PAY | Update | 03/01/03 | PREP | Mgr-HealthProfe | MHC Central Promotion | All Other | 204 | E | 94,062.472 | 0.000 | 0.000 | 118 | | |
| 10. | PAY | Merit | 03/01/03 | PREP | Prof Relations & Edu | MHC Central Promotion | All Other | 204 | E | 94,062.472 | 0.000 | 1,844.052 | 115 | Good | |
| 11. | PAY | Update | 05/01/02 | PREP | Prof Relations & Edu | MHC Central Promotion | All Other | 204 | E | 92,218.110 | 0.000 | 0.000 | 118 | | |
| 12. | PAY | Lateral | 05/01/02 | PREP | Prof Relations & Edu | MHC Central Promotion | All Other | 204 | E | 92,218.110 | 2.052 | 0.000 | 115 | | |
| 13. | PAY | Merit | 03/01/02 | Sr Field PREP Partne | Field Professional Ed | All Other | 204 | E | 89,218.110 | 3.987 | 2,500.003 | 112 | Exc | |
| 14. | POS | Re-Org | 03/01/02 | Sr Field PREP Partne | Field Professional Ed | All Other | 204 | E | 86,350.107 | 3.900 | 3,367.667 | 112 | Good | |
| 15. | PAY | Re-Org | 03/01/01 | Sr Field PREP Partne | MHC Field Promotion | All Other | 204 | E | 86,350.440 | 4.333 | 1,586.440 | 108 | Good | |
| 16. | POS | Re-Org | 01/01/01 | Sr Field PREP Partne | MHC Field Promotion | All Other | 204 | E | 86,354.000 | 0.000 | 0.000 | 127 | Retire | |

Current Control Information (HR use only)

| PayGroup | Salary Plan Scale |
|---|---|
| SSM | PP1  PPMS |

Approvals:

1.                                2.

3.                                4.

Other Earnings

| Earn Type | Pay End Dt | Amount | Earn Type | Start Dt | End Dt | Freq | Amount |
|---|---|---|---|---|---|---|---|
| 1. AZIP/Yr Yr | 03/07/03 | 21,675.02 | | | | | |
| 2. AZIP/Yr Yr | 03/13/04 | 14,713.18 | | | | | |
| 3. AZIP/Yr Yr | 03/13/01 | 9,171.15 | | | | | |
| 4. RecS00Acvr | 12/28/00 | 2,000.00 | | | | | |
| 5. HRCP Bonus | 03/07/00 | 14,500.00 | | | | | |

Explanations

D1825

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE


MARYBETH FARRELL,                    )
                                     )
            Plaintiff,               )
                                     )
v.                                   )        Civil Action No.
                                     )          04-285 KAJ
ASTRAZENECA PHARMACEUTICALS, LP,     )
                                     )
            Defendant.               )


        Deposition of MARYBETH FARRELL taken
pursuant to notice at the offices of Young Conaway
Stargatt & Taylor, LLP, The Brandywine Building, 17th
Floor, 1000 West Street, Wilmington, Delaware,
beginning at 9:30 a.m. on Thursday, December 9, 2004,
before Ann M. Calligan, Registered Merit Reporter and
Notary Public.


            WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
            (302) 655-0477



WILCOX & FETZER LTD.

C16

1      Q.   And is it correct that the cancellation was

2    discussed at a meeting on March 14, 2003, that Jane

3    Helen attended?

4      A.   As best I can recall, yes.

5      Q.   What was the reaction of the people at the

6    meeting to the cancellation?

7      A.   I don't recall at this time.

8      Q.   Did Jane Helen talk with you on the same day

9    that it was announced that the meeting was going to be

10   cancelled about the fact that it had been cancelled?

11     A.   She expressed her disappointment.

12     Q.   What did she say?

13     A.   I don't recall her exact words, but as best as

14   I can remember, she said, "I don't like to cancel

15   advisory boards."  And I said, "Neither do I."

16     Q.   Did you say anything more than that?

17     A.   As best I can recall the conversation, I said

18   to her, "It's a shame that the list of KOLs from which

19   we would draw the pool of advisors to invite wasn't

20   completed in December like it was supposed to be to

21   give us timely advance to plan the meeting."  But it

22   was issued the end of February.  That's an unrealistic

23   demand for an advisory board to be planned for the

24   invitees, for cardiologists.

1    Q.    Well, did you have some problems with him that

2    were sufficiently serious that it got into your

3    performance review or into written documents?

4    A.    Not that I recall.

5    Q.    I hand you D 114 and 115 and direct your

6    attention in particular to the last paragraph on 115.

7              In that paragraph, aren't you blaming Joel

8    Tau for some problems that you had?

9    A.    Joel Tau was in charge of issues management.

10   Q.    And you're blaming him for some problems there?

11   A.    I'm not blaming Joel for -- I mean this is so

12   long ago.  It's hard for me to -- Joel was obstructing

13   progress with the issues management function after he

14   lost leadership of it, and I was put in charge of it.

15   I went to Alan Milbauer to ask his help, and he went

16   and talked to Joel.  I mean, it was a difficult

17   situation.  It was sort of -- Joel initially had been

18   in charge of it.

19   Q.    Was it viewed as an important occurrence when

20   the cardiology ad board to the Exanta project was

21   cancelled?

22   A.    Important occurrence relative to what?

23   Q.    Well, relative to anything.  You've got the

24   whole launch that you're working on, and the

**W&F**

WILCOX & FETZER LTD.

**C18**

Marybeth Farrell - Sandler                    109

1   cardiology ad board is cancelled.  Is that regarded as

2   significant?

3      A.   Well, we had several additional cardiology ad

4   boards planned for later that year.  So I would say it

5   was not insignificant.

6      Q.   Okay.  Fair enough.

7              I'm going to hand you D 175 through D 181.

8   Take time to read them, a series of e-mails.  I guess

9   they start January '03 and they run through March 5th

10  of '03.

11             Let me know when you're finished.

12     A.   Did you want me to read through the whole

13  thing?

14     Q.   It might be a good -- I mean unless you're

15  comfortable just answering --

16     A.   No.  I wasn't sure what you were specifically

17  asking about.

18     Q.   Take your time.

19     A.   Mm-hmm.

20             Okay.

21     Q.   All right.  The last e-mail in the group is

22  dated March 5th, '03, and it was from Jane Helen to

23  Debby Brangman, correct?

24     A.   Correct.

1    A.    I doubt very much that e-mail was sent on

2    March 5.

3    Q.    If it was -- and let's assume for the moment

4    that it was -- would you agree that your supervisors

5    were concerned about your performance in early March?

6    A.    According to this, it appears that that would

7    be so.

8    Q.    And you say you doubt that it was sent.  Are

9    you saying that it was prepared afterwards or

10   something?

11   A.    Well, I'm surprised to see this because, when I

12   met with Debby Kaufman in August, to express my

13   concerns to her about work deficiencies raised with me

14   in April, end of April, she had no knowledge of any

15   problems with me and stated that to me.

16   Q.    Well, this was to Debby Brangman, not Debby

17   Kaufman.

18   A.    Well, Debby Brangman never indicated any

19   problems either, so...

20   Q.    Now, Susan Broadway's promotion was announced

21   on April 1, 2003, correct?

22   A.    As best I recall, yes.

23   Q.    And were you annoyed that she got the promotion

24   rather than you?

Marybeth Farrell - Sandler                    112

```
 1      A.    No.
 2      Q.    Did you speak to Jane Helen that day about the
 3   promotion?
 4      A.    Yes.
 5      Q.    And where did that conversation take place?
 6      A.    In Jane's office.
 7      Q.    And did you seek her out for the purpose of
 8   having the conversation?
 9      A.    Yes.
10      Q.    And what was said?
11      A.    As best I can recall, I told Jane that I was
12   surprised Susan was put in that position.  There were
13   others on the team who were much better qualified, had
14   much more experience than Susan.
15      Q.    You?
16      A.    Me among others.
17      Q.    Did Jane Helen tell you that you needed to
18   perform better in your current job before you could
19   expect to be promoted?
20      A.    As best I can recall, Jane was behind her desk
21   standing and sort of pacing about.  She seemed a bit
22   agitated and said some vague comment about, "Well,
23   advisory boards are more than picking out napkin
24   colors," which I didn't understand.  So I left her
```

1    office.

2        Q.    Did she say that you needed to perform better

3    in your current job before you can expect to be

4    promoted?

5        A.    Not that I can recall.

6        Q.    Was the comment about advisory boards being

7    about doing more than -- say again what she said.

8        A.    Words to the effect of, "Well, advisory boards

9    are more than about picking out napkin colors."

10       Q.    Was that directed to you, to what you had been

11   doing?

12       A.    I don't know.

13       Q.    You were responsible for some advisory boards,

14   weren't you?

15       A.    Me and others on the team, yeah.

16       Q.    Before Susan Broadway's April 1st promotion,

17   had Jane Helen said anything to you about your

18   delegating workload?

19       A.    No.

20       Q.    She didn't tell you you should be doing things

21   yourself instead of delegating it to others?

22       A.    No.

23       Q.    What's Discovery International?

24       A.    They were our medical education agency for

1      Q.    Would you agree that, at least based on this

2    e-mail, she thinks she discussed your performance and

3    she thinks she blamed you on March 14?

4      A.    According to this document, yes.

5      Q.    And she also said that she briefly discussed

6    your performance and development basically the day

7    that Susan Broadway's promotion was announced.  I take

8    it that means when you spoke with her in her office.

9      A.    Okay.

10     Q.    Would you agree with that characterization?

11     A.    No.

12     Q.    And you testified before that you expressed

13   upset that you or another more experienced person

14   wasn't promoted rather than Susan Broadway and her

15   response was --

16     A.    I did not express upset.  I expressed surprise.

17     Q.    Okay.  Surprise.

18     A.    That someone of Susan's skill level would be

19   put in that position.

20     Q.    And Jane Helen's response was directed to the

21   fact that the -- I'm paraphrasing, but essentially

22   advisory boards are more complex than simply ordering

23   flowers or whatever it was?

24     A.    I specifically expressed surprise to Jane that

1    Susan had been put in the position because there were

2    many others on the team that were much more qualified

3    for that position, and then she expressed the remark

4    about the napkin colors.

5        Q.    How did you get along with Louise Colburn?

6        A.    Fine.

7        Q.    Did you have any problems at all with her

8    before you went on medical leave?

9        A.    Not that I can recall.

10       Q.    Do you know of any reason why she would try to

11   harm you professionally?

12       A.    No.

13       Q.    Do you know that she complained about you in

14   April 2003?

15       A.    No.

16       Q.    Do you recall a series of e-mails about Jane

17   Helen's desire to have weekly status reports prepared

18   for the Exanta project?

19       A.    I would have to ask you to be more specific.

20   I'm not sure what you're talking about.

21       Q.    Weekly status reports that capture project

22   activities and status of action items?

23       A.    It could refer to any number of things because

24   Discovery had been asked by Brian Martin to initiate

1     you for sending an e-mail in a situation where she had

2     agreed to help you out and speak at an advisory board

3     at the last minute and then you sent an e-mail in

4     which you were critical of her, or at least she

5     perceived that you were critical of her.

6                     Are you drawing a blank on that?  You

7     don't remember that or...

8     A.    I can't -- I don't recall.

9     Q.    Now, let's go back to the operation that you

10    had.  Who is your doctor, Dr. Gorondy?

11    A.    Susan Gorondy.

12    Q.    Is she an OB/GYN?

13    A.    Yes.

14    Q.    And when did you first learn that you -- did

15    she recommend that you have an operation?

16    A.    She presented me with my options.  She

17    recommended the surgery, and I told her I wanted to

18    investigate other options.

19    Q.    What was entailed in the surgery?

20    A.    I had three large cysts on my uterus.

21    Q.    What did she recommend?  What was the surgery

22    going to be?

23    A.    Removing the cysts and then also my uterus.

24    Q.    And what did you do about checking out



1    alternatives?

2        A.    I talked to friends.  I reviewed information

3    she had given me.  There was a procedure, freezing

4    called cryon.  I looked into several different -- I

5    may have done a web search.

6        Q.    And then you concluded what, that you needed

7    the surgery?

8        A.    Well, she felt I had to have the surgery.  I

9    did not want to have the surgery, so I was trying to

10   find other options.

11       Q.    But what did you finally conclude?

12       A.    I had the surgery.

13       Q.    So you there were no other options; you

14   concluded there were no other options?

15       A.    To the best of my knowledge, there were no

16   other options for me at that time.

17       Q.    Did you talk to any other physicians, get a

18   second opinion?

19       A.    Not subsequent to Dr. Gorondy.

20       Q.    How about before Dr. Gorondy?

21       A.    Yes.

22       Q.    Which doctor?

23       A.    She's in Trolley Square.  The name escapes me.

24   She's from Thailand or the Philippines.  I can't think

1    of her name right now.  But it will come to me.

2        Q.    Dr. Duque-Salva?

3        A.    Pardon me?

4        Q.    Dr. Duque-Salva?

5        A.    Dr. Duque.  That's her, yes.

6        Q.    So you went to her first and then you went to

7    Dr. Gorondy?

8        A.    Correct.

9        Q.    What did Dr. Duque tell you, same thing as

10   Dr. Gorondy?

11       A.    She felt that surgery was going to be needed.

12       Q.    So once you concluded that there were no other

13   realistic options, who's the first person you told at

14   AstraZeneca?

15       A.    I believe it was Jane Helen.

16       Q.    And you contacted health services at some

17   point?

18       A.    Yes.

19       Q.    And you requested benefits under the short-term

20   disability policy, is that right?

21       A.    Yes.

22       Q.    Before you notified AstraZeneca, what period of

23   time are we talking about?  When did this thing first

24   manifest itself?  How did it come up?

Marybeth Farrell - Sandler                         156

1    of the things she and Susan had said to me before I

2    left, and I told her that I was willing to work from

3    home until I could come into the office.  And she

4    responded that, on a leave of this nature, she wasn't

5    sure if I was allowed to do that, if I could do that.

6    And I think she said, "I'll keep it in mind if there's

7    anything I could send you," words to that effect.

8        Q.    Did she say anything about your condition?

9        A.    She asked me how I was doing.

10       Q.    Did she say anything reassuring?

11       A.    As best I can recall she said, you know, "I

12   hope you feel better," words to that effect.

13       Q.    Did you speak to her again while you were out

14   on the leave?

15       A.    Yes.  I called her a couple of times while I

16   was out.

17       Q.    For what purpose?

18       A.    To say hello, and to ask her if she would send

19   me some work to do, and to apprise her of my progress.

20       Q.    What did she say?

21       A.    She basically didn't -- there wasn't anything

22   at that time that she could e-mail to me, like to send

23   home for me to do.  And that's pretty much it.

24       Q.    Did you have access to e-mail at home?

1    A.    Yes.

2    Q.    Did you send her any e-mails?

3    A.    Yes, I did.

4    Q.    How many?

5    A.    At least one.  Not a lot of e-mails.  I may

6    have sent her a couple of e-mails just to touch base.

7    Q.    Did she send you any e-mails?

8    A.    To be honest, I can't recall.

9    Q.    How about Susan Broadway, did you speak with

10   Susan Broadway while you were on leave?

11   A.    I don't believe so.

12   Q.    Hand you D 383.  Is that an e-mail that you

13   sent to Jane Helen while you were on leave?

14   A.    Yes.

15   Q.    You say, "Thank you very much for your words of

16   encouragement."  What words were you referring to?

17   A.    When she would say, you know, "I hope you feel

18   better," words to that effect.

19   Q.    You volunteered to help out, correct?

20   A.    Yes.

21   Q.    Before you went out on leave, did you make some

22   arrangements for the work that you had to be done --

23   A.    Yes.

24   Q.    -- while you were away?

1     Q.   So you had a reporting relationship with her,

2     is that right?

3     A.   In the reorganized structure, Susan Broadway

4     had a reporting relationship with Rachel Bevis.  I did

5     not have a direct reporting relationship/

6     Q.   You just reported to one person, Susan

7     Broadway, directly?

8     A.   In terms of direct reporting, yes.  It was

9     different than under the previous structure.  PREP

10    managers used to report in to, say, a Rachel Bevis.

11    Now we went to a leader.

12    Q.   By the way, was it Denise Barrett that was the

13    new PREP manager?

14    A.   Denise Barrett Quigley was the new PREP

15    manager, and then there was another one hired

16    subsequent to that.

17    Q.   I hand you D 421 and 2.  It looks like the note

18    at the bottom from Susan Pritchard Broadway to various

19    people announces Denise Barrett's joining the Exanta

20    team on June 30th.

21    A.   Okay.

22    Q.   So is that when she joined the team?

23    A.   According to this memo, it was about that time.

24    Q.   And then the same day you reply -- and I guess

1   this is on a different subject -- that you received a

2   package last month at your home that your banding and

3   title upgrades have been approved, correct?

4   A.    That's correct.

5   Q.    Tell me about that.  What was that all about?

6   A.    I had received a package which -- it was

7   advising me of changes and stock availabilities or

8   something to that effect.  And I thought it was the

9   notice for the banding increase and title upgrades.

10  And it turned out that was incorrect, which is what I

11  later learned from Debby Brangman.

12  Q.    Were you asked to bring the package in to work?

13  A.    Susan might have asked me to bring it in.  She

14  wasn't familiar with it, or to recheck it and let her

15  know.

16  Q.    Did you bring it in?

17  A.    No.  I don't believe I did.

18  Q.    Do you still have it?

19  A.    I honestly don't know.  I would have to check.

20  It could be -- it could be there.

21  Q.    At home?

22  A.    Yes.  At home with my other files.

23  Q.    How did you learn that you were mistaken in

24  your interpretation of the document?

175

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MARYBETH FARRELL,                    :

             Plaintiff    :

    vs.                              :    C.A. No. 04-285 KAJ

ASTRAZENECA PHARMACEUTICALS,:
LP,

             Defendant

       Deposition of MARYBETH FARRELL taken
pursuant to notice at the law offices of Young,
Conaway, Stargatt & Taylor, LLP, The Brandywine
Building, 1000 West Street, 17th Floor, Wilmington,
Delaware, beginning at 9:47 a.m., on Tuesday, January
25, 2005, before Allen S. Blank, Registered Merit
Reporter and Notary Public.

VOLUME II

APPEARANCES:

    JOHN M. LaROSA, ESQUIRE
    LAW OFFICE OF JOHN M. LaROSA
    Two East 7th Street, Suite 302
    Wilmington, DE 19801-3707

        For - Plaintiff

    SHELDON N. SANDLER, ESQUIRE
    YOUNG, CONAWAY, STARGATT & TAYLOR, LLP
    The Brandywine Building
    1000 West Street, 17th Floor
    Wilmington, DE 19899-0391

        For - Defendant

-----------------------------------------------------------

WILCOX & FETZER, LTD.
1330 King Street - Wilmington, DE 19801
(302) 655-0477



**WILCOX & FETZER LTD.**

**C32**

MARYBETH FARRELL

1    D498 and 9?

2         A    Yes.

3         Q    Okay.  I hand you Bates number D502, and ask

4    you what that is?

5         A    Um-hmm.  This is a summary of a meeting that

6    I had on August 25 with Rachel Bevis, who was the

7    replacement to Debbie Brangman as the skills center

8    director.  And because of my complaints about the

9    errors in the action plan, Band IV versus Band V, as

10   best I recall, Susan Broadway said to me, I would need

11   to talk to Rachel Bevis because Rachel had been

12   involved apparently with that -- I can't say that she

13   said Rachel would be involved with the plan.

14        She said, I need to go talk to Rachel about

15   my concerns of Band IV versus Band V in the action

16   plan.  So I called Rachel and made an appointment and

17   reviewed with her the grid, the chart, as I state here,

18   for Band V and Band IV.  And despite that the grid

19   clearly states Band V requirements, which are in my

20   action plan, she refused to admit that it was a Band V

21   description in my action plan.  So I didn't get

22   anywhere in terms of having her be reasonable or

23   amenable to modifying the action plan to be accurate to

24   a Band IV.

MARYBETH FARRELL

1        I also reviewed with her several, you know,

2   we had a general discussion about the action plan, my

3   disappointment that this had happened, my surprise with

4   it and reviewed some of the areas that had been

5   identified for improvement on my part.

6        And so in responding to her, for example,

7   that I was supposed to be a consultative scientific

8   expert, I had -- I updated her, as I state in this

9   memo, a leader for the scientist, the product develop

10  scientist, Deborah Walters, and outlined for her the

11  actions I initiated to improve my scientific expertise.

12        So it's basically a summary of that

13  discussion.

14   Q    Okay.  You seemed very focused on making the

15  distinction between Band IV and Band V.  That's my

16  observation from what you said.

17        Were you concerned that you would not be

18  able to perform at a Band V level if the action plan

19  was, in fact, a Band V action plan?

20   A    No.  In fact, at some point, I sent a memo,

21  I believe, as best I can recall, to Susan stating that

22  since I already was performing all of the

23  responsibilities of the Band V, that upon my successful

24  completion of the action plan, I should be reinstated

**W&F**
WILCOX & FETZER LTD

MARYBETH FARRELL

1      Q      Who is Cindy Hassrick?

2      A      Cindy Hassrick is the managed markets or was

3   the managed markets -- let's see.  Michael was the

4   director or executive director.  She was like the

5   manager for managed markets.  So she reported in to

6   Mike Abens.

7      Q      She is an AstraZeneca employee?

8      A      Yes.

9      Q      Did she have any particular reason to

10  criticize you, that you know of?

11     A      We worked together on these programs.  She

12  was in charge of the system in Delta, doing all the

13  budget.  No, I would say -- no.

14     Q      How about Louise Colburn?  You worked with

15  her?  She was a peer, as I understand it?

16     A      Um-hmm.

17     Q      Did she have any particular problem with you

18  that you are aware of?

19     A      No, not that I am aware of.

20     Q      How about Gwen Farber Quigley?  She was also

21  a peer.  Any particular problem with her?

22     A      No.

23     Q      Who is Fran King?

24     A      Fran King.  I think -- Fran.  I believe she

MARYBETH FARRELL

1     A     I think the pension issue needs to be

2   determined.

3     Q     Yeah.  Okay.

4           And you feel that two female supervisors,

5   one of whom you say you got along well with all along

6   and the other of whom you say you got along with well

7   when she was your peer, would take this action against

8   you simply because you took off for a legitimate family

9   medical leave request for six weeks?

10    A     Yes.

11    Q     That's your contention?

12    A     Yes.

13          MR. SANDLER:  Okay.  Let me take two

14  minutes, one minute.

15          (A brief recess was taken.)

16  BY MR. SANDLER:

17    Q     At the last session, you said that there

18  were some certain documents that you thought you had at

19  home and so we followed up and Mr. LaRosa sent us a

20  couple of documents but also said he couldn't find a

21  couple and I just wanted to make sure I'm clear on

22  that.

23          One of them was the issue on this

24  performance issue.  You had said you thought you might

**W&F**

**C36**

MARYBETH FARRELL

1    have the package that you received at home that you

2    said indicated that you were getting promoted.  And you

3    couldn't find that, is that right?

4         A    That's correct.

5         Q    Okay.  That's just nowhere to be found?

6         A    That's correct.  As best I can recall, I

7    threw it out after I learned it wasn't the -- didn't

8    have the stock information in there because I had been

9    promoted into a Band V, which would have given me stock

10   options and that sort of thing.  So I don't believe I

11   kept it.

12        Q    All right.  And you also said, when I showed

13   you Brian Catone's feedback form and you said you had a

14   document that didn't have the timely communication

15   reference?

16        A    Um-hmm.

17        Q    But you are wrong about that?

18        A    I could not locate that.

19        Q    Let me hand you D 567.  In paragraph three,

20   there is a sentence that says, approximately a week and

21   a half prior to April 22nd, on the mornings of April

22   11th, 2003, you met with Susan Pritchard, et cetera,

23   right?  Do you see that?

24        A    Yes.

**W&F**

**C37**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MARYBETH FARRELL,              )
                              )
        Plaintiff,       )
                              )
v.                         )   Civil Action No.
                              )   04-285
ASTRAZENECA PHARMACEUTICALS, L.P.,)
                              )
        Defendant.       )

        Deposition of GEORGINA L. AUSTIN-JONES taken
pursuant to notice at the Law Offices of JOHN M.
LaROSA, 2 East 7th Street, Wilmington, Delaware,
beginning at 2:35 p.m. on Monday, February 14, 2005,
before Renee A. Meyers, Registered Professional
Reporter and Notary Public.


APPEARANCES:

        JOHN M. LaROSA, ESQ.
        LAW OFFICE OF JOHN M. LaROSA
          2 East 7th Street
          Wilmington, Delaware  19801
          for the Plaintiff,

        SHELDON SANDLER, ESQ.
        RICHARDS, LAYTON & FINGER
          One Rodney Square
          Wilmington, Delaware  19801
          for the Defendant.

              WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
             (302) 655-0477



WILCOX & FETZER LTD.

```
 1        A.    I was thinking I graduated ten years later than
 2   I did.
 3        Q.    How about any jobs in training, when was your
 4   first job where you had experience in training?
 5        A.    1991.
 6        Q.    And who did you work for then?
 7        A.    It was called, I think, Kathy Parker Training.
 8   I can't be absolutely sure that that's the name.
 9        Q.    Was that in Great Britain?
10        A.    Yes.  All of my work was prior to coming here.
11        Q.    When did you first meet Marybeth Farrell?
12        A.    September 2003.
13        Q.    At that time, was she the senior professional
14   relations and education program manager for the Exanta
15   team?
16        A.    I don't believe so.  She was just a PREP
17   manager.
18        Q.    A PREP manager?  But she was not working as
19   part of the Exanta team at that time?
20        A.    She was working with the Exanta team.
21        Q.    Was she a Band IV PREP manager?
22        A.    Yes.
23        Q.    And you were working at AstraZeneca at the time
24   Miss Farrell's employment ended in January of last
```

1    A.    I arranged for Marybeth to meet with our

2    employment practices partner so he could investigate

3    her concerns.

4    Q.    Who was that?

5    A.    Keith Black.

6    Q.    Is an action plan a form of disciplinary action

7    at AstraZeneca?

8    A.    Not as I understand it to be.  Not really.

9    Q.    What do you understand an action plan to be?

10    A.    The formal process to start somebody to help

11    them improve their performance.

12    Q.    When Miss Farrell contacted you about this

13    complaint you mentioned earlier, how did that contact

14    take place?  Was it over the phone?  Was it an in

15    person meeting?

16    A.    As I recall, she actually contacted a

17    colleague, Deb Kauffman, and Deb was going to go on

18    holiday, so Deb and I both met with Marybeth and we

19    met face-to-face with her.

20    Q.    Do you recall what was said at that meeting?

21    A.    As I remember at the moment, Marybeth said she

22    was concerned that the action plan was a consequence

23    of her taking FMLA leave, and, also, she alleged there

24    was some link to a sexual harassment -- it wasn't a

1   formal complaint that she had made, but she had made a

2   -- she had had a discussion with her manager some

3   years previously about somebody else in the company

4   and she thought it was linked to that event as well.

5       Q.   So, there was two issues she was raising?

6       A.   Yes.

7       Q.   Was the second issue investigated?

8       A.   When Keith and I met with Marybeth so that he

9   could start the investigation, Marybeth did not want

10  to share who she felt was involved in the sexual

11  harassment part of her concerns, so she had implied

12  that she had had a consensual affair with somebody

13  years previously, this person had left the company,

14  but this person still had friends in the company.  But

15  she wouldn't share anymore information when we met

16  with Keith so he wasn't able to investigate.

17      Q.   So what was investigated, the FMLA retaliation

18  complaint?

19      A.   Yes.

20      Q.   Did you take part in the investigation or just

21  Keith Black?

22      A.   Keith did the investigation.

23      Q.   Nobody else?

24      A.   No.  Keith would keep me informed, but he did



1    the investigation.

2        Q.    And what was the outcome of that investigation?

3        A.    I believe it was that Keith found that there

4    was no link between the FMLA leave and the action

5    plan.

6        Q.    Do you remember approximately when that was,

7    the findings of this investigation came out?

8        A.    I believe it was in October.  That's what I

9    remember.

10       Q.    So was that a rather quick turnaround period

11   for an H.R. investigation, one month or so?

12       A.    I don't believe so, no.

13       Q.    Was that a rather long time for an

14   investigation?

15       A.    No.  I don't -- I don't think so.

16       Q.    How long would an H.R. investigation normally

17   last?

18       A.    It entirely depends on the circumstances and

19   what you are trying to investigate.

20       Q.    For a retaliation type of a matter?

21       A.    Well, I would say it would depend how many

22   people were involved who you needed to speak to in

23   order to investigate the complaint.

24       Q.    Were you aware that in October of 2003,

**W&F**

1    Miss Farrell was told that her execution of the

2    requirements of the action plan was unsatisfactory?

3       A.    Yes.

4       Q.    And that was after the human resources

5    investigation concluded; isn't that correct?

6       A.    I believe so.

7       Q.    Who was made aware of the findings of the

8    investigation other than Miss Farrell?

9       A.    I think Susan must have been made aware, Susan

10   Broadway, because she had been told not to take any

11   further action on the action plan until Keith had

12   concluded his investigation.

13      Q.    Who told her that?

14      A.    I am not sure.

15      Q.    Was it one of her managers or somebody in human

16   resources?

17      A.    Who told her?

18      Q.    Not to take any further action on the action

19   plan until the investigation was completed?

20      A.    It would have probably been Keith or I, but I

21   am not sure.

22      Q.    And why would someone in H.R. tell a manager

23   not to continue with an action plan while an

24   investigation was pending?

1    A.    Because the investigation was around the action

2    plan.

3    Q.    Was regarding the merits of the action plan,

4    the legitimacy of the action plan?

5    A.    Well, it was regarding Marybeth's complaint

6    that the action plan was linked to the FMLA leave.

7    Q.    Were you aware that in October of 2003,

8    Miss Farrell was placed on an 11-week performance

9    improvement plan?

10    A.    I was aware she was put on a performance

11    improvement plan.  I am not sure of the 11 weeks.

12    Q.    Is it fair to say that a performance

13    improvement plan is more serious than an action plan?

14    A.    Yes.

15    Q.    Is it a performance improvement plan a form of

16    disciplinary action at AstraZeneca?

17    A.    Our disciplinary process is separate from our

18    performance management process.

19    Q.    So it's not part of the disciplinary process?

20    A.    They are separate processes.

21    Q.    So you are saying that they are separate.  Are

22    you saying that someone who is being disciplined, a

23    performance improvement plan would never be part of a

24    disciplinary action against the employee?

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


MARYBETH FARRELL                 )
                                 )   Civil Action No.
            Plaintiff,           )   04-285 KAJ
                                 )
v.                               )
                                 )   TRIAL BY JURY OF
ASTRAZENECA PHARMACEUTICALS LP,)    TWELVE DEMANDED
                                 )
            Defendant.           )

            Deposition of JANE K. HELLEN taken
pursuant to notice at the LAW OFFICE of JOHN M.
LaROSA, 2 East 7th Street, Wilmington, Delaware,
beginning at 9:37 a.m. on Tuesday, February 15, 2005,
before Renee A. Meyers, Registered Professional
Reporter and Notary Public.

APPEARANCES:

            JOHN M. LaROSA, ESQ.
            LAW OFFICE OF JOHN M. LaROSA
              2 East 7th Street, Suite 302
              Wilmington, Delaware  19801
              for the Plaintiff,

            SHELDON N. SANDLER, ESQ.
            YOUNG CONAWAY STARGATT & TAYLOR LLP
              1000 West Street, 17th Floor
              Wilmington, Delaware  19899
              for the Defendant.

ALSO PRESENT:  JOHN J. BOGAN, ESQ.




            WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
            (302) 655-0477



Jane K. Hellen

1    Q.    Can you spell that?

2    A.    C-u-l-v-e-r Personnel in San Diego, California.

3    Q.    Approximately what years were you working

4    there?

5    A.    Not a full year.  1982, after I graduated from

6    college, for a few short months, I worked at Culver.

7    Q.    What was your role there?

8    A.    I was a sales consultant.

9    Q.    Can you tell me what that means in one or two

10   sentences?

11   A.    I was a personnel advisor or a consultant to

12   assist people in obtaining jobs in sales rep.

13   positions with key accounts.

14   Q.    And are you currently a manager at AstraZeneca?

15   A.    I am -- I am a director is my title, so yes --

16   I am sorry.  I don't understand what you mean.

17   Q.    Do you consider yourself in management?

18   A.    Yes.

19   Q.    Marybeth Farrell became the senior professional

20   relations and education program manager, Band IV, for

21   the Exanta team in May of 2002; is that correct?

22   A.    Yes.

23   Q.    And that was her role at the time her

24   employment ended; is that correct?

**W&F**

**C46**

Jane K. Hellen                                11

1      A.    Yes.

2      Q.    And prior to being senior professional

3   relations and education program manager, Band IV, for

4   the Exanta team --

5               MR. SANDLER:  Excuse me.  I don't think

6   that's what you said she was.  I think you said

7   professional, not senior.

8               MR. LaROSA:  I think I said senior

9   professional relations and education program manager.

10              (The reporter read back as requested.)

11              MR. SANDLER:  Is that correct?

12              THE WITNESS:  I am not sure.  I know she

13  was a Band IV and she was a professional relations and

14  education manager.  I do not recall that she was a

15  senior or not, although I have seen that in some of

16  the documents.

17  BY  MR. LaROSA:

18     Q.    So, at some point, she became a senior

19  professional relations and education program manager,

20  according to the documents you have seen?

21     A.    That was on some of the documents that -- her

22  title was a senior, but I don't recall what documents

23  I saw that on.  It was my understanding Marybeth was a

24  professional relations and education manager, a Band



C47

1    correct?

2       A.    I am not sure it was just performance in 2002

3    but rather 2003.

4       Q.    You think it was just with projects in 2003?

5       A.    Yes.

6       Q.    What, specifically, did you express concern to

7    her about at that time?

8       A.    That the -- a very important meeting that

9    Marybeth was responsible for planning had to be

10   cancelled at the last minute because the invitation

11   process and the meeting process had not been followed,

12   and it was brought to my attention that we were going

13   to have to cancel this meeting at the last minute;

14   that the 2003 plans for other meetings, what were

15   called advisory boards, that those plans were delayed

16   and not -- the planning was behind the time lines.

17      Q.    Anything else?

18      A.    That Marybeth was having difficulty working

19   with our vendor partner, called Discovery

20   International, and that Marybeth was using excessive

21   e-mails with our physicians and our co-workers to

22   complete the work that was to be done.

23      Q.    The first thing you told us about was a meeting

24   on advisory board that might have to be cancelled.



Jane K. Hellen                                                    31

1          Can you tell us what advisory board you

2    are referring to?

3    A.    It was a cardiology advisory board.  It was

4    scheduled to take place in April.

5    Q.    2003?

6    A.    Of 2003.  And in the beginning of two -- and in

7    January and February, when it should have been

8    planned, apparently, Marybeth was having difficulty

9    planning the meeting, and we found out, in March, that

10   the meeting would have to be cancelled because we did

11   not -- she did not give enough lead time to send the

12   invitations out to the physicians that were to be

13   invited.

14   Q.    Do you remember where this advisory board was

15   to take place?

16   A.    I don't recall.

17   Q.    And sending out the invitations to the

18   physicians, that was a function that was to be taken

19   care of by Brian Martin?

20   A.    No.  That was Marybeth's responsibility with

21   Discovery International.

22   Q.    The second thing you told us about was an

23   advisory board that was being delayed.

24          Do you remember, was that another



Jane K. Hellen

1       Can you explain what that means to use

2   excessive e-mails to get your work done?

3       A.    Yes.  We frequently, when we work in -- at the

4   time, in the capacity, do need to use voice mail,

5   e-mail, face-to-face meetings, and our clinical group,

6   which included three physicians, were the study leads

7   for our clinical trials.

8       Marybeth Farrell needed to act -- interact

9   with all of them in order to line up their work and

10  plan their participation in the advisory boards.

11      The one clinician in particular had come

12  to me and said that it was very difficult working with

13  the PREP managers because there were a lot of

14  confusing, long string e-mails, and this particular

15  clinician could not keep track of all of it and needed

16  more concise, direct instruction.

17      Q.    And that person did not name Marybeth Farrell

18  specifically; correct?

19      A.    That person -- I don't recall.  However,

20  Marybeth Farrell was the PREP manager in charge of the

21  advisory board meetings, so I assumed that she was

22  referring to Marybeth.  That was Marybeth's

23  responsibility.

24      Q.    Did Marybeth have these same responsibilities



1    for planning advisory boards and making the annual

2    plan for the advisory boards, did she have those same

3    responsibilities in 2002?

4        A.    In 2002, Marybeth Farrell was employed under my

5    employment for seven months.  She was under my direct

6    supervision for three of those seven months.  And

7    during that time, Marybeth Farrell was, essentially,

8    learning, on the job, the product information, reading

9    sales -- reading -- excuse me, reading binders,

10   product binders, clinical study information.  So, much

11   of Marybeth Farrell's work in 2002 entailed training

12   and learning of the -- the product -- the clinical

13   trials, and Marybeth Farrell also was responsible for

14   an advisory board meeting that did take place in

15   December.

16       Q.    So she planned an advisory board meeting that

17   took place in December of 2002?

18       A.    Yes.

19       Q.    And these types of concerns that you had in

20   April of 2003, were not expressed on her evaluation

21   for 2002; is that correct?

22       A.    That's incorrect.  In the evaluation and

23   performance summary of her performance review, I

24   mentioned that Marybeth needed to expand her



1    understanding of the therapeutic area and the clinical

2    trial data.  I -- it was explained that Marybeth

3    needed to increase her strategic focus and knowledge

4    of the brand messages; that she needed to understand

5    other marketing disciplines where she was working,

6    publications, the product development scientists, and

7    the strategist roles; and she needed courses in

8    strategic planning, leadership skills, and public

9    speaking.

10       Q.   But everything you have just read to us doesn't

11   sound like it's talking about planning and advisory

12   board meeting; is that accurate?

13       A.   These are some of the activities that go into

14   planning an advisory board meeting.  She is the

15   interface and a contact with many of our investigators

16   and our customers, and she needs to understand the

17   therapeutic area and the clinical trial data when she

18   is talking with these customers.  Somebody that is

19   planning advisory boards needs to understand the

20   strategic focus and the direction that the brand is

21   going.  Someone that is planning advisory boards needs

22   to have a speaking and a working level knowledge of

23   the publications that are being referred to.

24              So, much of the content and the discussion



C52

Jane K. Hellen

1    that goes into planning and executing an advisory

2    board are included in these particular competencies

3    that are mentioned here in the appraisal, in the

4    review.

5            But, specifically, Did you accurately or

6    successfully conduct one advisory board meeting in

7    December in Chicago in 2002?, that is not here.  But

8    the competencies that are needed to do that are in

9    here.

10   Q.   And based on these issues that you were

11   bringing to her attention on April 28th of 2003, isn't

12   it true that you advised Miss Farrell that you were

13   not sure if you would retain her in 2004?

14   A.   That's untrue.

15   Q.   What did you say about the prospects of

16   retaining her in 2004?

17   A.   I didn't say anything about retaining or not

18   retaining her.

19   Q.   In April of 2003, after you expressed these

20   concerns, you and Miss Broadway expressed these

21   concerns, did you tell Miss Farrell there was a lot of

22   work to be done?

23   A.   In the year of 2003, that there was a lot of

24   work to be done?

1    Exanta and the team.

2        Q.    And that was your message to her approximately

3    a day before she went out for surgery?

4        A.    Yes.

5        Q.    And isn't that inconsistent with the message

6    that you and Miss Broadway had for her in April of

7    2003, when the action plan was being initiated?

8            MR. SANDLER:    Objection to the

9    characterization that the action plan was being

10   initiated then.  You can answer it.

11           MR. LaROSA:    That's a good objection, so

12   let me rephrase my question.

13   BY MR. LaROSA:

14       Q.    Isn't that inconsistent with the message that

15   you and Miss Broadway were giving to Miss Farrell in

16   April of 2003, when you expressed concern with these

17   various areas of performance for 2003?

18       A.    The discussion that Susan and I -- and I also

19   had with Marybeth, in April, about her performance,

20   had nothing to do with whether she would or would not

21   go out on leave.  The concern I expressed with

22   Marybeth before she left was concern for her health.

23       Q.    And from what you have told us here, you are

24   saying that -- is it fair to say what you told her a



1    day before she went out on surgery -- out on FMLA

2    leave for surgery was that her health should be her

3    priority?

4        A.    Absolutely.

5        Q.    And that wasn't what her priority should have

6    been in April of 2003, when you were expressing these

7    other concerns about areas of performance; correct?

8        A.    In April of 2003, during the normal day-to-day

9    and during -- Marybeth and I had a one-on-one meeting

10   in April and I told Marybeth that her performance

11   needed to improve and she needed to meet the

12   requirements of a PREP manager, and the discussion

13   that we had, Susan Broadway and I had with Marybeth,

14   had nothing to do with -- it had to do with her

15   performance from January through April and May of

16   2003.

17            During that period of time, an advisory

18   board had to be cancelled, her advisory board plans

19   for the year had been delayed, and her performance was

20   not -- not meeting the expectations that we had had

21   for her.  And that was the course of that -- those

22   discussions.

23            The interaction I had with Marybeth before

24   she went out on leave was focused on Marybeth's health

Jane K. Hellen

1    and why she was going out on leave.

2        Q.    And after her surgery, Miss Farrell attempted

3    to work at home in May of 2003; is that correct?

4        A.    Marybeth, while she was on leave, called me to

5    tell me, several days after the surgery, that it went

6    fine.  And then she subsequently called me and asked

7    if she could do -- she offered to do some work from

8    home, and I told her that that would not be necessary,

9    that we could not ask her to do any work while she was

10   off on leave, but Marybeth said she was bored and she

11   wanted to do some work.  She offered to help.  And I

12   declined the offer nicely.

13       Q.    And Miss Farrell returned to AstraZeneca to

14   work part time during the fourth week of her recovery;

15   is that correct?

16       A.    Marybeth -- I believe Marybeth returned to work

17   in June, mid June.

18       Q.    The first time she returned to work, it was to

19   try and work part time; right?  Not full days?

20       A.    That's what I understand, yes.

21       Q.    And you understand that that was at a time

22   period prior to the six weeks?

23       A.    That was Marybeth's decision to do that.

24       Q.    But I am not asking whose decision it was.  I

1        Q.    And you are not talking about her blaming

2    others for her responsibilities there?

3        A.    No, I am not.  It was the -- it was -- that

4    particular meeting took place in December.  It was one

5    of the first, if not the first meeting that Marybeth

6    Farrell was responsible for, and this was written

7    prior to the December advisory board meeting.

8        Q.    So these evaluations are written prior to the

9    end of the year?

10       A.    Most of the evaluations are -- the evaluation

11   process begins in the end of the year, October,

12   November.  During that time, the 360 degree feedback

13   is obtained and usually the performance evaluations

14   are completed before the end of the year, before

15   people go out on break or leave.

16       Q.    And when are the evaluations usually shared

17   with the employee?

18       A.    Anywhere from -- anywhere within the first

19   quarter of the year, depending upon the schedule of

20   the deployed manager and the functional manager.  So,

21   for instance, with my direct reports, as well as my

22   own, the evaluations were shared in February and

23   March.

24       Q.    In July of 2003, you told Miss Farrell she

1    would not be promoted to Band V; is that correct?

2        A.   I told Marybeth in April that she would not be

3    promoted until she demonstrated that she could do her

4    job at the current level she was responsible for.

5        Q.   Was that in late April of 2003?

6        A.   No.   That was in early April.   I believe it was

7    April 7th, 14th, somewhere in there.   It was on the

8    same date, again, that we announced Susan Broadway's

9    promotion.

10              MR. SANDLER:   Do you need to take a break

11   or anything?

12              MR. LaROSA:   We can take a break.   Do you

13   want to take five minutes?

14              (Recess taken.)

15              (Hellen Exhibit No. 1 was marked for

16   identification.)

17   BY MR. LaROSA:

18       Q.   Who told Miss Farrell she would not be promoted

19   to a Band V role?  Anyone other than yourself?

20       A.   I believe that Debbie Brangman, her functional

21   manager, had also told her that she would not,

22   although I was not in that meeting.

23       Q.   Do you remember when that was, approximately?

24       A.   I do not.



C58

1    Q.   And there has been also thrown around the term

2    called "short-term improvement plan," I believe it was

3    called.

4              Was there something that was done at the

5    time Ms. Farrell was going out on FMLA leave?

6    A.   Prior to Marybeth going out, Susan and I

7    discussed -- Susan was asked to put together a

8    transition plan, which was essentially just a plan to

9    delegate Marybeth's work and to provide an outline as

10   to what she was in the middle of, what needed to be

11   done, what the milestones were, etcetera, so that

12   other PREP managers could pick up the work and do the

13   job for whatever period of time Marybeth was going to

14   be out.

15   Q.   And was that designed to discipline Marybeth

16   Farrell in any way?

17   A.   No.  No.

18   Q.   Was it designed to focus on her performance?

19   A.   No.  It was -- it would have been asked of any

20   employee before they were to leave for any extended

21   period of time to put together an outline of what

22   their responsibilities were, what their job was, and

23   -- so that others could do the work.

24   Q.   Okay.

Jane K. Hellen

1    Q.    Here is D319, which is dated May 1, and it's an

2    e-mail from you to Susan Pritchard Broadway, and it

3    says, "Marybeth and I discussed the performance of her

4    work on advisory boards on March 14th. This was the

5    date that we cancelled the Cardiology Advisory Board.

6    We also briefly discussed her performance and

7    development on the date of the quarterly team meeting,

8    March 29? after your promotion and flowers went out."

9           Was that the date, the 29th, or was it

10   another date that the announcement was made?

11   A.    March 14th was the date when we cancelled the

12   advisory board and Marybeth also and I discussed that

13   this was Susan's promotion. I believe I was wrong on

14   the date. I think that was April 7th.

15   Q.    But in any event, there were two discussions

16   that you are flagging?

17   A.    Yes.

18   Q.    In which performance problems with Marybeth

19   Farrell were discussed by you with her?

20   A.    By me with her. And not including discussions

21   that Marybeth would have had with Brian Martin or

22   Debbie Brangman.

23   Q.    Then you go on and say, "I'd like to be present

24   when you," meaning, I guess, Susan Broadway, "have



1   your discussions with Marybeth in order to keep her

2   focused on her work, not the competency of others."

3           What did you mean by that?

4   A.   Well, as was alluded to in the previous memo

5   from Louise, Marybeth would frequently blame others

6   and -- for her inability to get her duties done and

7   her job done and she would deflect a lot and -- at

8   that point.  And, so, I wanted to be sure that when

9   Susan met with Marybeth, that -- and we talked about

10  her performance, that I be there because I just wanted

11  -- I just wanted to be there.

12           I just wanted to be careful that Susan was

13  clear and that Marybeth understood that we had

14  concerns over her performance, and it was not others,

15  but it was her, and that she had control over -- of

16  these aspects of her job and she -- she needed to take

17  action and to do her job.

18  Q.   And finally, D339, there is an e-mail from

19  Marybeth Farrell to Deborah Kauffman with a copy to

20  Patty McDonald, and then an e-mail the same date from

21  Patty McDonald.  Marybeth Farrell's e-mail talks about

22  her surprise at the issues Susan Pritchard Broadway

23  had raised and she says that they weren't consistent

24  with her performance issue.

Jane K. Hellen                                            125

1        A.    Mm-hmm.

2        Q.    And then Patty McDonald, I think you testified

3    before that Patty McDonald had mentioned an instance

4    where, you know, the, quote, take away that the two

5    people had were different.  Is that the e-mail that

6    you were referring to?

7        A.    Yes.  That's the e-mail that I was referring to

8    -- this highlights a couple things.  It highlights

9    that, you know, Susan would say, Okay, I will meet

10   with you and I will take -- and provide copies,

11   provide sequence of events and people that are

12   responsible, and Marybeth went to go and talk to

13   Patty, and Patty was aware of this, as she mentions.

14   Patty reflects that, to date, Jane feels there is a

15   gap in Marybeth's performance, and that Patty said

16   that it's amazing that two people can have the same

17   conversation and get different take aways.

18             In Marybeth's situation, Patty felt, and I

19   agreed, that Marybeth was over her head in her current

20   role on the team and was not self-aware to understand

21   the deficiencies and her limitations, and that we

22   would try and assist her.

23       Q.    In other words, when you say "self-aware," what

24   do you mean?

Jane K. Hellen                                    127

1    Q.    Okay.

2    A.    And I would just reiterate that, you know,

3    Marybeth's performance is her performance for 2002,

4    and these documents refer to Marybeth's performance,

5    which was deteriorating in 2003, and my efforts and

6    Brian Martin and Susan Broadway and Debbie Brangman

7    and Deb Kauffman in trying to discuss it with Marybeth

8    at varying times and to help her so that we would not

9    have to get to any kind of an action plan, a formal

10   action plan or anything else.

11           And this was all in January through the

12   very first part of May.

13           MR. SANDLER:  Nothing further.  Your

14   witness.

15           MR. LaROSA:  Nothing further.

16           (The deposition was concluded at 1:25

17   p.m.)

18                 - - - - -

19

20

21

22

23

24

W&F

C62a