# APPENDIX – PART 2

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MARYBETH FARRELL,                )
                                 )
       Plaintiff,                )
                                 )
       v.                        )   C.A. No. 04-285 KAJ
                                 )
ASTRAZENECA                      )
PHARMACEUTICALS, L.P.,           )
                                 )
       Defendant.                )

              Deposition of DEBORAH J. BRANGMAN taken
pursuant to notice at the Law Office of John M. LaRosa,
2 East 7th Street, Suite 302, Wilmington, Delaware,
beginning at 9:30 a.m., on Thursday, March 24, 2005,
before Kimberly A. Hurley, Registered Merit Reporter and
Notary Public.

APPEARANCES:

          JOHN M. LaROSA, ESQUIRE
          LAW OFFICE OF JOHN M. LaROSA
            2 East 7th Street - Suite 302
            Wilmington, Delaware 19801
            for the Plaintiff

          SHELDON N. SANDLER, ESQUIRE
          YOUNG CONAWAY STARGATT & TAYLOR, LLP
            1000 West Street - 17th Floor
            Wilmington, Delaware 19801
            for the Defendant

                    WILCOX & FETZER
        1330 King Street - Wilmington, Delaware 19801
                    (302) 655-0477



WILCOX & FETZER LTD.

C63

1      Q.    Was that with another team?

2      A.    That was over -- it was a different role.  I

3  actually had the same people, most of the same people,

4  some new people were added, but I only -- instead of

5  working on the business side, I only worked on their

6  career development.  It's what we call the skill center.

7      Q.    Approximately what dates did you hold that role?

8      A.    About July 2002 through March 2003.  Sometime in

9  March.  I was transitioning in March.

10     Q.    What role did you transition into in March of

11  2003?

12     A.    I became brand communications director for

13  Iressa, I-r-e-s-s-a.

14     Q.    These are all pharmaceutical products?

15     A.    Yes.

16     Q.    How long were you in that role?

17     A.    Until a week ago.

18     Q.    So that would take us into March of '05?

19     A.    Uh-huh.

20     Q.    What is your current role?

21     A.    I don't have a title yet.  I switched roles.  I

22  am in what's called our strategic resource group.

23  Basically I'm an internal consultant, so I work on

24  different projects around the company.

**W&F**

C64

1    Q.    Did you work with Marybeth Farrell during her

2    time at AstraZeneca?

3    A.    Yes.

4    Q.    Was she a senior professional relations and

5    education program manager band 4 for Exanta?

6    A.    She was a band 4.  I'm not sure if she was PREP

7    or promo was her title.  I believe it was PREP.  If you

8    could ask that question again.

9    Q.    You said you think she was a band 4 PREP?

10            MR. SANDLER:  Could you read the question

11   back?

12            (The reporter read back as instructed.)

13   BY MR. LaROSA:

14   Q.    You believe she was a band 4 PREP manager; is

15   that what you're saying?

16   A.    Yes.

17   Q.    Can you tell me what PREP stands for?

18   A.    Professional Relations and Education --

19   Education and -- what's the other --

20   Q.    Is it Professional Relations and Education

21   Programs?

22   A.    Programs, yes.

23   Q.    Was she a senior PREP manager, do you recall?

24   A.    No.  No, I do not believe she was a senior.

**W&F**

1    evaluation rated her as meet expectations in the other

2    four categories?

3        A.    Yes.

4        Q.    Her overall rating in this evaluation is good;

5    is that correct?

6        A.    Yes.

7        Q.    So at the time Ms. Farrell received this review,

8    her overall performance was not unacceptable; is that

9    correct?

10        A.    Yes.

11        Q.    Each performance area is rated as exceeded

12    expectations, met expectations, or did not meet

13    expectations?

14        A.    Yes.

15        Q.    At the time she would have received this review,

16    none of her performance areas were considered not meeting

17    expectations; is that correct?

18        A.    Yes.

19        Q.    At the time she received this review, she met or

20    exceeded expectations in all of the 10 performance

21    categories; is that correct?

22        A.    Yes.

23        Q.    She was rated as exceeds expectations in more

24    performance areas than meets expectations; is that

1   correct?

2       A.    If this is correct, yes.

3       Q.    So at the time Ms. Farrell received this

4   performance evaluation, there were no concerns with her

5   performance; is that correct?

6       A.    There were no concerns that were voiced to me.

7   Well, you said at the time she got this review.  This

8   review was given in March.  So if this review is

9   written -- the feedback I got for this review, the

10  feedback was written in December.  So there was a gap of

11  time there.  At the time I gave her this review, there

12  were -- there had been voices concerned about 2004 from

13  January on.

14              MR. SANDLER:  '3.

15              THE WITNESS:  '3, excuse me.  '3.  So this

16  reflects only 2002, but I gave it to her into the first

17  quarter of 2003.  So it depends on how your question --

18      Q.    In terms of concerns about her performance at

19  that point, there were no concerns expressed to her at

20  that point in March of 2003; is that correct?

21      A.    I believe we had expressed some concerns by

22  then.

23      Q.    Were those concerns expressed in writing?

24              MR. SANDLER:  To Ms. Farrell do you mean?

1    being considered for promotion to a band 5 position?

2        A.    Yes.

3        Q.    Was that around December of 2002?

4        A.    Yes.

5        Q.    At that time did you discuss this band 5

6    promotion for Ms. Farrell, did you discuss that with

7    Jane Hellen, H-e-l-l-e-n?

8        A.    Yes.

9        Q.    At that point was it the feeling that

10   Ms. Farrell should be promoted to a band 5 position?

11       A.    At that point, yes, there was discussion that

12   she would probably be promoted.  It wasn't a guarantee.

13   There was discussion between --

14       Q.    I'm not asking you about guarantees.  I

15   understand nothing is guaranteed in the world of

16   employment.  But did you express the opinion to

17   Jane Hellen that she should be promoted to band 5?

18       A.    Based on the feedback that the team gave me --

19   remember I was only a functional manager, so my job was

20   to collect information from people on the team.  And

21   based on the feedback that I had gotten and her review,

22   which was positive, it seemed like she was ready to be

23   promoted to a 5.

24       Q.    Her 2002 review was positive?



1      A.    Yes.

2      Q.    At that point in December 2002 it seemed like

3   she was ready to be promoted to band 5?

4      A.    Uh-huh.

5      Q.    I'm sorry?

6      A.    Yes.

7      Q.    Eventually, in the summer of 2003, Ms. Farrell

8   was told she would not be promoted to band 5; isn't that

9   correct?

10     A.    I don't know when she was told that.

11     Q.    But at some point she was told that?

12     A.    As far as I know, I would say yes.  I don't know

13  that.

14     Q.    You're not sure if she was ever told that?

15     A.    She moved on.  In the summer she didn't report

16  to me.

17     Q.    Isn't it true that you told her she would not be

18  promoted to band 5?

19     A.    To the best -- I don't remember -- are you

20  saying in the summer I told her?

21     Q.    I'm not asking you about the time frame now

22  because you said you're not sure about the time frame.

23     A.    During her review I shared with her that there

24  had been some performance issues since January that I had

1    heard that were expressed to me and that she needed to

2    address those issues.  Then I was moving off, so I didn't

3    have a lot of discussion with her, but she was aware of

4    the performance issues, and I did share that there were

5    some concerns by the brand team which was in March.

6        Q.    This was during the midyear review?

7        A.    This was really the 2002 review, but I took that

8    opportunity to share with her that, while this was 2002,

9    there were concerns about her performance in the first

10   quarter.

11       Q.    When you met with her about the 2002 review, you

12   weren't discussing the band 5 promotion at all?

13       A.    No.  We were talking about just her review.

14       Q.    But isn't it true that later in the year you as

15   a communications director told her she would not be

16   getting the promotion to band 5 because of performance

17   reasons?  Do you recall that?

18       A.    No.  Because once she didn't report to me, I

19   would have no reason -- I don't know why she would bring

20   it up with me even at that point.

21       Q.    I'm not suggesting that she brought it up.  I'm

22   suggesting that you were the one that had to be the

23   messenger to say that "You're not going to be promoted to

24   band 5."  I'm not suggesting it was your decision, but

Deborah J. Brangman                                    30

```
 1   you were the one that had to tell her "You're not going
 2   to be getting the band 5 promotion because of performance
 3   reasons."
 4             Do you recall any kind of conversation like
 5   that with her?
 6      A.   The conversation I recall was during the last
 7   time when I was really her manager, which was this
 8   review.
 9             MR. SANDLER:  Referring to Exhibit 1.
10             THE WITNESS:  Exhibit 1.  At the end of the
11   meeting I said, "This was a good 2002, but there are some
12   performance issues in 2003."  And I know --
13      Q.   I'm asking you only about --
14             MR. SANDLER:  Can you let her finish?
15             MR. LaROSA:  I want her to answer my
16   question.
17             MR. SANDLER:  She's answering your
18   question.
19             MR. LaROSA:  No.  She's talking about this
20   meeting.  I'm talking about a discussion regarding
21   promotion to band 5.
22   BY MR. LaROSA:
23      Q.   Do you recall any discussions to band 5?
24      A.   I don't recall after that.  I tend to doubt -- I
```

W&F

C71

1      Q.    Did you also hear from Jane Hellen that she was

2    having concerns about promoting Marybeth?

3      A.    Yes.   We had a face-to-face conversation, I

4    don't remember exactly which, where she said Marybeth

5    wasn't performing the way she had in 2002.   And it was

6    such a dramatic change that she was having concerns in

7    general about her performance and she e-mailed me that

8    she was having concerns about do we promote her based

9    on -- because right now she wasn't performing at a level

10   that she deserved to be promoted.   That was in February.

11   Then she sent me an e-mail saying that -- to that effect.

12     Q.    I think you said you met with Ms. Farrell in

13   March to give her the 2002 evaluation?

14     A.    Uh-huh.

15     Q.    Yes?

16     A.    Yes.

17     Q.    Was there some concern about the fact that the

18   evaluation itself was a good evaluation, not an excellent

19   but a good, but, nevertheless, you didn't have the kinds

20   of concerns that you've just talked about?

21     A.    Yes.   And I looked at it.   I did wrestle with it

22   because -- but the reality is that was the feedback she

23   got for 2002.   This fairly reflected -- this Exhibit 1

24   fairly reflected the feedback that I was given about her

1    performance.

2              So it was fair for her to get this review;

3    however, in January her performance changed and that's

4    why I shared with her at the review -- when it was over,

5    I said, "This is a good review, but there are some

6    performance issues that you need to be aware of and that

7    you're going to have to address."  I did not bring up the

8    promotion during that discussion.

9         Q.   So if Ms. Farrell testified that you never did

10   tell her about performance issues, you would disagree

11   with that?

12        A.   I would disagree with that.

13        Q.   You did tell her during the review --

14        A.   I told her there were definite performance

15   issues.  I don't have exact dates, but I believe I told

16   her before this, as well, that there were performance

17   issues.  I was aware that the brand team had shared their

18   concerns prior to that, as well.  I believe that

19   Brian Martin had told her like "Keep moving, Marybeth.

20   You need to keep this project going."  That he wasn't

21   happy that it wasn't moving forward.

22        Q.   How many things did she have?

23        A.   I'm not aware of the exact number of things.  I

24   know that her workload probably, just from some of the

 1   grumblings I heard, was probably a little less than some

 2   people.  My understanding was the only thing she had at

 3   that point was that ad board.  If you looked at other

 4   people's plates, other people had five balls in the air

 5   and kind of juggling to keep them all up there.  My

 6   understanding from the brand team was that her workload

 7   was lighter than other people's.

 8        Q.    Who on the brand team --

 9        A.    Brian Martin shared that with me.  And he was

10   her deployed manager.  He gave out work assignments.

11        Q.    Was there also a time when Ms. Farrell was asked

12   by Buddy Feld to describe something at a meeting?

13        A.    Yes.

14        Q.    What was that about?

15        A.    This was a meeting -- we had done a Myers Briggs

16   exercise for the team where you look at personality types

17   and we shared in the first meeting what those personality

18   types mean, and in the second meeting we were looking at

19   what are some of the things that you missed based on your

20   kind of personality type, what are the things you don't

21   see, what are the land mines based on who you are.

22              And Marybeth was clearly not interested in

23   the meeting, not participating, sort of just clearly

24   annoyed to be there.  And at one point Buddy, which is

W&F

C74

1    had apparently had expressed to her that he had concerns

2    about her performance before he moved off and she didn't

3    report to him anymore, and he was aware of all of the

4    issues with the ad board in particular and he was just

5    surprised that she would pick him.

6        Q.    You have seen various e-mail exchanges between

7    you and Jane Hellen and Susan Broadway and others about

8    the concerns with Marybeth Farrell's performance?

9        A.    Yes.

10       Q.    Can you think of any way the dates of those

11   e-mails could have been manipulated in some way?

12       A.    Absolutely not.  They're just printouts of

13   things that were in the computer.  I have no -- I can't

14   even begin to imagine how you would manipulate the dates.

15       Q.    From your recollection, were the dates of the

16   e-mails accurate?

17       A.    Yes.

18              MR. SANDLER:  I have nothing further.

19              MR. LaROSA:  I have nothing further.

20              (Deposition concluded at 10:55 a.m.)

21              -  -  -  -  -

22

23

24



IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MARYBETH FARRELL,              )
                              )
     Plaintiff,                )
                              )
     v.                        )  C.A. No. 04-285 KAJ
                              )
ASTRAZENECA                    )
PHARMACEUTICALS, L.P.,         )
                              )
     Defendant.                )

          Deposition of SUSAN P. BROADWAY taken
pursuant to notice at the Law Office of John M. LaRosa,
2 East 7th Street, Suite 302, Wilmington, Delaware,
beginning at 1:30 p.m., on Thursday, March 24, 2005,
before Kimberly A. Hurley, Registered Merit Reporter and
Notary Public.

APPEARANCES:

          JOHN M. LaROSA, ESQUIRE
          LAW OFFICE OF JOHN M. LaROSA
            2 East 7th Street - Suite 302
            Wilmington, Delaware 19801
            for the Plaintiff

          SHELDON N. SANDLER, ESQUIRE
          YOUNG CONAWAY STARGATT & TAYLOR, LLP
            1000 West Street - 17th Floor
            Wilmington, Delaware 19801
            for the Defendant



1      Q.    Were you on the Exanta team when

2   Marybeth Farrell began working on the Exanta team?

3      A.    Yes.

4      Q.    Was that in approximately May of 2002?

5      A.    Approximately, as I recall, yes.  Spring.

6      Q.    Was she a senior PREP manager band 4 for the

7   Exanta team?

8      A.    No.  She was a PREP manager band 4.

9      Q.    How does one get the designation of senior PREP

10  manager versus PREP manager?

11     A.    There are certain criteria for each role and

12  competencies that you would hold and that you would

13  exhibit on the job.

14     Q.    What types of competencies would a senior PREP

15  manager have that a PREP manager would not have?

16     A.    It's really the level of competency that you

17  would have.  So there are about 10 to 12 competencies for

18  PREP and senior PREP and then it just is your depth

19  within those that designates your job.

20              For instance, one competency is your

21  ability to share your knowledge and mentor others.  As a

22  band 4 that's not really a requirement.  As a band 5 and

23  a band 5 senior, you would need to be exhibiting the

24  ability to be helping others along in your same position,

**W&F**

**C77**

Susan P. Broadway
9

1   be a role model in your position, be able to mentor other

2   people.  So it's the same competency in your depth within

3   there.

4       Q.    I'm asking you not about the distinction between

5   band 4 and band 5 but the distinction between a senior

6   PREP manager and just a nonsenior PREP manager.

7       A.    Yes.  But that distinction goes together.

8   Band 4 is always PREP.  Band 5 can be either PREP or

9   senior PREP.

10      Q.    So you're saying nobody has the title of senior

11  PREP manager band 4?

12      A.    Correct.

13      Q.    Once you become a senior PREP manager, you

14  become a band 5; is that what you're saying?

15      A.    You can be promoted as a band 5 PREP manager and

16  then within band 5 you can also be promoted again to

17  senior PREP manager.  But a senior PREP manager is always

18  a band 5, yes; whereas, a PREP manager could be a band 5

19  or a band 4.

20      Q.    Do you know what her role was prior to being on

21  the Exanta team?

22      A.    Yes.

23      Q.    What was that?

24      A.    She was a field PREP manager.

**W&F**

V
R
**C78**

1  to contact someone there, request things, they have you

2  sign paperwork, and then they approve you for a certain

3  time period.

4      Q.   To the best of your knowledge, nobody ever

5  raised any issue about her not completing the proper

6  paperwork for FMLA leave; is that correct?

7      A.   Not that I'm aware of.

8      Q.   You didn't raise any issue with her about not

9  completing the proper paperwork for FMLA leave?

10     A.   No.

11     Q.   On April 28, 2003, you and Ms. Hellen expressed

12  concern about Ms. Farrell's performance regarding

13  projects in 2002; is that correct?

14     A.   Again, the approximate time period.  I can't

15  recall the exact date, but, yes, in April.

16     Q.   April of '03?

17     A.   Yes.

18     Q.   Again, this was not disciplinary action against

19  her.

20     A.   Correct.

21     Q.   This was just verbal performance concerns that

22  you and Ms. Hellen shared with Ms. Farrell?

23     A.   Performance discussions, yes.

24     Q.   These concerns were not expressed on

1   that she was being retaliated against for exercising her

2   rights under the FMLA?

3       A.   I am not sure of the exact dates, but, yes, I

4   was told she had contacted HR.  HR came and contacted me,

5   yes.

6       Q.   Were you ever contacted by Keith Black?

7       A.   Yes.

8       Q.   What did Mr. Black say to you?

9       A.   He came to me in September and we just had a

10  discussion around Marybeth and performance and how things

11  had progressed and discussion.  He was looking into her

12  allegations.  I wasn't aware of what they exactly were.

13  So he met with me as part of that.

14      Q.   Isn't it true that in October of 2003 you told

15  Ms. Farrell that her execution of the requirements of the

16  action plan was unsatisfactory?

17      A.   Yes.  We had extended the action plan to October

18  and that's when we had our completion.  Originally it was

19  supposed to be September 30th.  So we had our discussion

20  in October, yes.  And she had not satisfactorily

21  completed the action plan.

22      Q.   Is that when you placed Ms. Farrell on 11-week

23  PIP?

24      A.   Yes.  As I recall, it was a week after I told

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MARYBETH FARRELL,                )
                                 )
              Plaintiff,          )
                                 )     Civil Action
v.                               )     No. 04-285 KAJ
                                 )
ASTRAZENECA PHARMACEUTICALS,      )
L.P., a Delaware corporation,    )
                                 )
              Defendant.          )


              Deposition of RACHEL BEVIS taken pursuant
to notice at the law offices of The Neuberger Firm, P.A.,
Two East Seventh Street, Suite 302, Wilmington, Delaware,
beginning at 2:00 p.m. on Thursday, April 7, 2005, before
Kathleen White Palmer, Registered Merit Reporter and
Notary Public.


APPEARANCES:


        JOHN M. LaROSA, ESQUIRE
        LAW OFFICE OF JOHN M. LaROSA, ESQUIRE
          Two East Seventh Street - Suite 302
          Wilmington, Delaware  19801
          for the Plaintiff

        SHELDON N. SANDLER, ESQUIRE
        YOUNG, CONAWAY, STARGATT & TAYLOR
          1000 West Street
          The Brandywine Building - 17th Floor
          Wilmington, Delaware  19899-0391
          for the Defendant


------------------------------------------------------
                  WILCOX & FETZER
   1330 King Street - Wilmington, Delaware 19801
                  (302) 655-0477



Rachel Bevis

1    A.    She was the brand communication leader on the

2  team.

3    Q.    Do you know what Ms. Farrell's role was in May

4  of 2002?

5    A.    I don't recall.

6    Q.    Do you remember at some point that she was a

7  senior professional relations and education programmer,

8  Band IV, for the EXANTA team?

9    A.    She was a Band IV promotions manager when I came

10  into this role.

11    Q.    Was that her role at the time her employment

12  ended?

13    A.    Correct.  She was not senior.  The correction to

14  the previous question is correct.  If it's not correct,

15  the above question.

16    Q.    Prior to the role you described that she had,

17  what was Miss Farrell's role?

18    A.    I don't recall.

19    Q.    Is it something that you knew at one time and

20  you don't recall, or you just do not know?

21    A.    I don't know.

22    Q.    Do you know if she ever worked for AstraZeneca's

23  marketing group?

24    A.    I don't know.

Rachel Bevis
17

1       A.    At that time I wasn't in the position.

2       Q.    So your answer is no?

3       A.    If you're asking me on April 23rd did I know

4    that, I would not have known it.

5       Q.    Did you ever become aware of the fact that they

6    had expressed concerns about her performance?

7       A.    Yes.

8       Q.    In April of 2003?

9       A.    I understood that after I met Susan as one of my

10   new direct reports, at some point we reviewed her direct

11   reports, that there had been long-standing performance

12   issues and concerns around Marybeth which had

13   originated --

14      Q.    I'm not asking you --

15            MR. SANDLER:   Let her finish her answer.

16            MR. LaROSA:    She answered my question and

17   I'm not asking her to characterize the performance

18   issues.  I was asking her about April 28, 2003.

19            MR. SANDLER:   I'll ask you to permit her to

20   finish her answer.

21   BY MR. LaROSA:

22      Q.    Do you have anything else you want to add to

23   that?  I think you answered my question and then some.

24      A.    You asked me if I knew of the issue.  I said at

W&F

1   that point I was not in the job.  You asked me if I had

2   known anything about the performance.  Yes.  After I came

3   into the position, as I reviewed everyone's direct

4   reports, I was informed that there was a long-standing

5   issue concerning the performance of Marybeth which had

6   been brought up as a concern over a very long period of

7   time.

8       Q.   But you had not come into the position until May

9   of 2003; correct?

10      A.   Correct.

11      Q.   And I asked you about May, the first week of May

12  2003.  That was before you had gone into your current

13  role; correct?

14      A.   Correct.

15      Q.   So at some point after you've come into your

16  current role, at some point in May of 2003 you had a

17  meeting with Susan Broadway?

18      A.   After I came into my role in May, in that early

19  summer, yes, I met with all my direct reports.

20      Q.   So at some point in the early summer of 2003 you

21  met with Susan Broadway?

22      A.   Correct.

23      Q.   In the early summer of 2003 that's when you

24  became aware that there was a performance issue with

1    Q.    Were you aware that Miss Farrell received an

2    overall rating of good for her 2002 evaluation?

3    A.    I don't know that.

4    Q.    When you met with Susan Broadway in the summer

5    of 2003 and discussed Miss Farrell, did you discuss her

6    2002 performance at all?

7    A.    I don't recall.

8    Q.    Were you aware that in August of 2003

9    Miss Farrell asked Miss Broadway that the Action Plan be

10   reconsidered to reflect the fact that she held a Band IV

11   position and not a Band V position?

12   A.    Yes.

13   Q.    Were you aware in September of 2003 Miss Farrell

14   was removed from her office?

15   A.    I was not aware of it at the time.  That was

16   standard procedure in that Band IV positions generally

17   are in cubes, and as the corporate offices filled up

18   space, Band V and above, Band VIs, VVIs hold the office

19   spaces and generally we have all of the employees in

20   cubicles.  So that's -- there would be nothing that I

21   would know about that.  It would be the exception if it

22   was the other way around.

23   Q.    Isn't it true that Miss Farrell was the only

24   Band IV employee removed from her office?



1      A.    I doubt that.  I don't know.

2            MR. SANDLER:  Just to clarify, you are

3   talking about in the entire company or what?

4            MR. LaROSA:  I'm talking at the Fairfax

5   site.

6      A.    I'm sure there were other individuals moved as

7   we filled up the office space after the merger when the

8   buildings were completed.  And it became apparent that

9   even now many times band -- individuals that are moved

10  from a Band IV to a Band V, we have Band Vs that also

11  operate out of cubicles, so there is no association now

12  or guarantee that anyone would be provided an office.

13  And they try to at least have Band VIs and Band VIIs in

14  office space.

15           Beyond that, at this point in time we try

16  to do the best we can with our facilities.

17     Q.    Do you work out of a cubicle?

18     A.    No, I don't.

19     Q.    Have you ever been placed in a cubicle?

20     A.    No, I have not.  And I am at a Band VII.  Many

21  individuals -- many, many individuals do and we do not

22  consider that to be in any way, shape, or form a

23  hardship.

24     Q.    Does a Band VII make you immune from being

W&F

1  placed in a cubicle?

2      A.    Not necessarily.  I'd be happy to be in the

3  building.

4      Q.    So your preference is to be in the building

5  regardless of whether you had a cubicle or an office?

6      A.    Correct.  I see that, as I would describe, as a

7  hygiene factor.  I worked in field offices.  I worked out

8  of a company car.  I worked out of a variety of

9  circumstances.  The environment there is extremely

10  pleasant and provides for all employees, individuals,

11  even in cubicles.  We keep enclave space so there's a

12  private place should they need to make a telephone call.

13  Obviously the entire BC is a very pleasant place to be.

14      Q.    I'm sorry.  What was that abbreviation?

15      A.    BC, the whole entire --

16              MR. SANDLER:  Business Center.

17      A.    Business Center, the USBC.  The Business Center

18  is a very pleasant accommodation of space and light for

19  all employees.

20      Q.    Can you name any other Band IV team members,

21  EXANTA team members who were moved to cubicles in 2003?

22      A.    I cannot.  I don't know.

23      Q.    Were you aware that Miss Farrell filed a

24  complaint with human resources on September 17, 2003,

W&F

1   whether or not she was being asked to do Band IV or

2   Band V work in her plan.  And we clarified again that we

3   felt she was working under -- she needed to perform as a

4   Band IV and to please embrace the plan and develop,

5   continue to develop.

6       Q.    What was her seeming motivation in the meeting

7   with you?

8                   (Interruption.)

9                   MR. SANDLER:  Why don't you read the

10  question back?

11                  (The reporter read from the record as

12  requested.)

13      A.    It seemed to be arguing about the validity of

14  the plan, unwillingness to accept and to embrace the plan

15  and to grow in her skills.  It seemed to be a debate

16  versus embracing improvement and getting feedback on

17  improvement at that point.

18  BY MR. SANDLER:

19      Q.    What was your understanding of the purpose of

20  the Action Plan on which she was placed?

21      A.    To be able to give her clear direction on what

22  she needed to do to be able to perform at the level she

23  was expected to perform at, and to be able to improve so

24  she would be an effective employee for us.

Rachel Bevis

1    Q.   Did you try to explain to her that this wasn't

2    about whether she was expected to perform as a Band IV or

3    a Band V?

4    A.   The focus of the discussion was there's

5    competencies you can grow.  There's an opportunity for

6    you to embrace the direction that was given to you by

7    Susan in order to fully fulfill this role successfully,

8    and could we please embrace that and grow to have a

9    positive outcome.

10   Q.   At the end of the meeting, did she accept that

11   or not?

12   A.   She seemed to at the time of the meeting, that

13   she was appreciative and that she heard what I had said.

14   But as I recall, she followed up, again, saying she

15   didn't feel that she should embrace the plan or was the

16   plan valid.  It seemed to be a long debate about the plan

17   or the specifics on the plan versus just embracing the

18   opportunity to develop and grow.

19   Q.   This occurred afterwards, you say?

20   A.   Yes.  Afterwards there was continual -- she had

21   said something -- and I don't have specific recall, but

22   it was a dialogue of debate on a plan and details versus

23   just embracing the actions that we had set forth for her

24   to improve on.

## CERTIFICATE OF SERVICE

I hereby certify that on May 24, 2005, I electronically filed a true and correct copy of the

foregoing **Appendix to Defendant's Reply Brief in Support of Its Motion For Summary**

**Judgment** with the Clerk of the Court using CM/ECF, which will send notification that such

filing is available for viewing and downloading to the following counsel of record:

Thomas S. Neuberger, Esquire          John M. LaRosa, Esquire
The Neuberger Firm                    Law Office of John M. LaRosa
Two East Seventh Street, Suite 302    Two East 7th Street, Suite 302
Wilmington, DE 19801-3707             Wilmington, DE 19801-3707

I further certify that on May 24, 2005, I caused a copy of the foregoing **Appendix to**

**Defendant's Reply Brief in Support of Its Motion For Summary Judgment** to be served by

hand-delivery on the following counsel of record:

Thomas S. Neuberger, Esquire          John M. LaRosa, Esquire
The Neuberger Firm                    Law Office of John M. LaRosa
Two East Seventh Street, Suite 302    Two East 7th Street, Suite 302
Wilmington, DE 19801-3707             Wilmington, DE 19801-3707

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Sheldon N. Sandler*
Sheldon N. Sandler, Esquire (No. 245)
Teresa A. Cheek, Esquire (No. 2657)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6673
Facsimile: (302) 576-3330
Email: ssandler@ycst.com
Attorneys for Defendant

Dated: May 24, 2005

WP3:1108396 1                                                    057159 1004