IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MARYBETH FARRELL,                    )
                                     )
            Plaintiff,               )
                                     )
      v.                             )        Civil Action No. 04-285-KAJ
                                     )
ASTRAZENECA PHARMACEUTICALS          )
LP,                                  )
                                     )
            Defendant.               )
                                     )

**MEMORANDUM OPINION**

Thomas S. Neuberger, Esq., Stephen J. Neuberger, Esq., The Neuberger Firm, P.A., 2 East Seventh St., Suite 302, Wilmington, Delaware 19801; John M. LaRosa, Esq., Law Office of John M. LaRosa, 2 East Seventh St., Suite 302, Wilmington, Delaware 19801; Counsel for Plaintiff.

Sheldon N. Sandler, Esq., Teresa A. Cheek, Esq., Young Conaway Stargatt & Taylor, LLP, The Brandywine Building, 17th Floor, 1000 West St., P.O. Box 391, Wilmington, Delaware 19899; Counsel for Defendant.

September 2, 2005
Wilmington, Delaware

JORDAN, District Judge

I.    INTRODUCTION

Before me is a motion for summary judgment (Docket Item ["D.I."] 37; the

"Motion") filed by defendant AstraZeneca Pharmaceuticals, LP ("AstraZeneca").  The

Complaint by Marybeth Farrell ("Farrell") alleges that AstraZeneca retaliated against her

because she requested medical leave.  (D.I. 1 at ¶¶ 26-33; 88.)  She asserts claims

under the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 et. seq.,

and claims for breach of the implied covenant of good faith and fair dealing under

Delaware law and for a violation of her rights under the Consolidated Omnibus Budget

Reconciliation Act ("COBRA"), Pub. L. No. 99-272.  (D.I. 1 at ¶¶ 88, 90, 92, 94-97, 107.)

Jurisdiction over the FMLA and COBRA claims is proper under 28 U.S.C. §

1331.  Supplemental jurisdiction exists over the implied covenant of good faith and fair

dealing claim under 28 U.S.C. § 1367.  For the reasons that follow, I will deny summary

judgment on the FMLA claims and on the breach of the implied covenant of good faith

and fair dealing claim.  However, I will grant summary judgment for AstraZeneca on

Farrell's claim that her rights under COBRA were violated.

II.    BACKGROUND[1]

A.    Performance Issues and FMLA Leave

Marybeth Farrell was hired by AstraZeneca's corporate predecessor in February

of 1994, and continued to be employed by AstraZeneca until her employment was

terminated on January 24, 2004.  (D.I. 1 at ¶ 12.)  The events relevant to the instant

action began in April of 2002, when Farrell moved to the position of Band IV PREP

---

[1]The following rendition of background information does not constitute findings of
fact and is cast in the light most favorable to the non-moving party.

Manager for the Exanta Team.[2] (D.I. 38 Appendix at A240.) In this position, Farrell was supervised by Brian Martin, Jane Hellen, Deborah Brangman, and Susan Broadway.[3] (*Id*. at A240-41, A307-09.)

Farrell's first several months on the Exanta team passed without apparent incident. In her 2002 performance review, her first in her position on the Exanta team, she was rated overall as "good,"[4] having met or exceeded expectations in all categories. (D.I. 38 Appendix at A38-44.) This review was prepared by her supervisors, and was based on written feedback collected from her peers. (D.I. 48 at B159.) Furthermore, AstraZeneca discussed promoting Farrell at the end of 2002. (*Id*. at B250.) Farrell claims that she was told in December of 2002 that her promotion had been approved, and that its announcement was imminent. (*Id*. at B3, B50, B250.)

_____

[2] PREP stands for Professional Relations and Education Program. (D.I. 38 at 3.) As a PREP Manager, Farrell's job was to "work with medical professionals to develop and implement educational programs that supported the Exanta marketing team...". (*Id*. at 3.) When Farrell was assigned to this team, Astra Zeneca was in the process of launching Exanta, a new blood thinning drug. (*Id*.) Farrell's job responsibilities included working with internal and external customers, planning, developing and implementing educational programs, building relationships with individuals in the medical community, and planning and conducting advisory board meetings with these individuals. (*Id*., D.I. 38 Appendix at A60.) "Band IV" refers to a position grading system. (D.I. 38 Appendix at A345.) PREP Managers could be classified as either Band IV or Band V, depending on their level of competency. (*Id*.) For example, a Band V employee would be expected to mentor others and share his or her knowledge, while a Band IV employee would not. (*Id*. at A345-46.)

[3] In April of 2003, Farrell's department was restructured. (D.I. 38 Appendix at A307-309.) At that time, Susan Broadway was promoted to the position of Band V Senior PREP Manager and became Farrell's supervisor. (*Id*., D.I. 48 at B71.)

[4]The scale on which Farrell and all other AstraZeneca employees were ranked was, from highest to lowest, Distinguished, Excellent, Good, Unacceptable. (D.I. 38 Appendix at A43-44.)

In February or March of 2003, Farrell's doctor informed her that she required surgery. (D.I. 48 at B66.) In late April of 2003, Farrell requested, and was granted, leave under the FMLA. (D.I. 38 Appendix at A79.) Farrell's leave request was granted by the AstraZeneca Health Services Department on May 1, 2003, and her six weeks of leave was to begin on May 9, 2003. (*Id.*) She was slated to return to work on or about June 20, 2003. (*Id.*)

Farrell claims that, when she told Jane Hellen in late April that she would require six weeks of medical leave, Hellen reacted with surprise, saying, "six weeks is a long time." (D.I. 48 at B60-61, B163.) Farrell asserts that prior to her request for leave, she had never received any negative feedback about her performance.[5] (*Id.* at B59-60.) However, on April 28, 2003, less than a week after being informed of Farrell's leave request, Hellen criticized Farrell's performance. (*Id.*) Susan Broadway met with Farrell just a few days later and, according to Farrell, expressed for the first time that she too had concerns with Farrell's performance. (*Id.* at B59.)

Broadway met with Farrell on several more occasions in early May 2003 to review Farrell's performance issues, to discuss short term goals for Farrell to complete prior to her FMLA leave, and to discuss long term goals for Farrell upon her return to work. (D.I. 38 Appendix at A77, A82-84.) On May 9, 2003, Farrell went on medical leave. (*Id.* at A81.) With her doctor's permission, Farrell returned to work, part time,

---

[5] Farrell contends that all of AstraZeneca's evidence of problems with her performance in late 2002 and early 2003 was fabricated. (*Id.* at A198.) Evidence in the record to the contrary includes the August 18, 2003 memorandum establishing an "action plan" for the improvement of Farrell's performance. (D.I. 38 at A101-03.) That memorandum begins with a statement that performance concerns had been addressed to Farrell since at least April 11, 2003, before her leave request. (*See id.* at A101.)

3

on June 3. (*Id*. at A91-93.) She returned to full-time work on June 20, 2003. (D.I. 48 at B70.) Farrell contends that she returned to work before she felt ready because she was afraid that she would lose her job if she did not. (D.I. 48 at B68-70.) According to Farrell, Hellen implied that she might not be retained for the year 2004 because of what Farrell termed "alleged performance deficiencies." (*Id*. at B64.)

Upon her return to work, Farrell claimed that she had been sent a package at home informing her that she had been promoted to Band V Senior PREP manager. (D.I. 38 Appendix at A96-98.) However, she later admitted that she had misread the correspondence from AstraZeneca. (D.I. 48 at B71.)

On July 3, 2003, Farrell received a negative mid-year review from her supervisors. (D.I. 48 at B40.) Farrell asserts that 2003 was the only year in which she received a mid-year review. (*Id*.) Subsequently, AstraZeneca took formal steps to address concerns regarding Farrell's performance. (D.I. 38 Appendix at A101-03.) The first step was placing Farrell on an "Action Plan" on August 18, 2003.[6] (*Id*.) Farrell made an internal complaint on September 17, 2003, asserting that she had been placed on the Action Plan in retaliation for her taking FMLA leave. (*Id*. at A124, A272-74.) AstraZeneca Human Resources completed their investigation of this complaint on October 21, 2003, finding in favor of AstraZeneca. (*Id*. at A139.) Farrell's managers delayed closing the Action Plan from the originally stated date of September 30, 2003, until October 21, 2003, when the investigation was completed. (*Id*. at A146-149.)

---

[6] The stated purpose of an Action Plan is to help employees improve their performance. (D.I. 38 Appendix at A272.) It is not designed as a disciplinary measure. (*Id*.)

4

Upon review of Farrell's performance, AstraZeneca found that she had not satisfactorily completed the program set out in the plan. (*Id.*)

AstraZeneca next created a "Performance Improvement Plan" for Farrell on October 27, 2003.[7] (*Id.* at A141-45.) She was told that failure to meet the requirements of this plan could result in the termination of her employment. (*Id.* at A142.) At the end of the twelve-week Performance Improvement Plan, AstraZeneca found that Farrell's performance had in fact worsened rather than improved. (*Id.* at A358-60.) Farrell's employment was terminated on January 24, 2004. (D.I. 48 at B114.)

Many of the facts regarding Farrell's performance are highly disputed by the parties. Although Farrell claims that her performance was never criticized until after she requested leave, AstraZeneca alleges that the problems with Farrell's performance began as early as December of 2002. (D.I. 38 Appendix at A289-90.) AstraZeneca claims that Farrell was only rated "good" in her 2002 performance evaluation because she was new to her job, and therefore was given the benefit of the doubt. (D.I. 38 Appendix at A300-301.) Additionally, AstraZeneca cites a number of emails, meetings and discussions from February and March of 2003 in which Farrell's managers discussed her poor performance. (D.I. 38 Appendix at A46-49, A50-59, A66-68, A309-10, A327-28, A341-42.) Further, although AstraZeneca agrees that Farrell's supervisors discussed promoting her in late 2002 or early 2003, it alleges that

---

[7] A Performance Improvement Plan is a more serious measure than an Action Plan. (D.I. 48 at B282.) However, a Performance Improvement Plan, like an Action Plan, is not supposed to be a disciplinary measure. (*Id.*)

5

discussion was stopped in early 2003 because of Farrell's poor performance. (*Id.* at A46.) On March 17, 2003, AstraZeneca contends that Deborah Brangman organized a meeting with several supervisors, including Jane Hellen and Brian Martin, to discuss "the evolving situation with Marybeth Farrell." (*Id.* at A58.)

AstraZeneca also alleges that Farrell's early return from her FMLA leave was totally voluntary. (*Id.* at A90.) AstraZeneca cites a May 19, 2003 email from Farrell to Hellen, in which Farrell stated that she felt better. (*Id.*) In that email, Farrell "offer[ed] [her] services to ... the team to help out however [she] [could] with any kind of follow up calls, emails, drafting of letters/materials...". (*Id.*) AstraZeneca also claims that Farrell's performance continually declined after she returned from her FMLA leave, that she reacted with hostility to the imposition the Action Plan and the Performance Improvement Plan, and that it received negative feedback from customers and other employees about Farrell's attitude and performance. (D.I. 38 Appendix at A100-103, A116-118, A141-149, A172-92, A193-197, A202-05.)

### B.    COBRA Notice

As is required by COBRA, Farrell expected to receive notice of her benefits in the mail. (D.I. 48 at 115.) AstraZeneca notified Benefit Concepts, its benefits administrator, of Farrell's termination, and Benefit Concepts generated and mailed a COBRA notification to Farrell at her last known address on February 2, 2004. (D.I. 38 Appendix at A383-87.) Farrell claims, however, that she never received the COBRA notice from AstraZeneca. (D.I. 48 at B115.) At the expiration of the COBRA period, as is its standard practice, Benefit Concepts sent another letter to Farrell at the same

6

address informing her that she was no longer eligible for COBRA benefits. (D.I. 38 Appendix at A383-87.) Farrell received and responded to this letter. (*Id.*)

## III.    STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Celotex v. Catrett*, 477 U.S. 317, 323 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995). However, a court should not make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

## IV.    DISCUSSION

### A.    AstraZeneca's Motion for Summary Judgment on the FMLA Retaliation Claims

With respect to each of the three counts that refer to Farrell's FMLA claims, summary judgment is denied. The material facts that bear on these claims are highly disputed, making these claims inappropriate for disposition on summary judgment.

To establish a prima facie case of retaliation under the FMLA, a plaintiff must show each of three factors: (1) plaintiff took FMLA leave; (2) plaintiff suffered an adverse employment action; and (3) the adverse decision was causally related to the leave or protected activity. *See Conoshenti v. Public Service Elec. & Gas Co.*, 364 F.3d 135, 146-47 (3d Cir. 2004). Farrell clearly satisfies the first two prongs of the above test, as Farrell took FMLA leave in May and June of 2003, and was terminated in January of 2004. However, the parties dispute the facts with regard to whether Farrell's termination and denial of promotion were causally related to her FMLA leave.

AstraZeneca claims that Farrell's performance was the reason for her termination and the denial of her promotion. In support of this, AstraZeneca cites emails sent between Farrell's supervisors regarding her performance and records of meetings in which her performance was discussed. (D.I. 38 Appendix at A 46-49, A 50-59, A66-68.) AstraZeneca also claims that Farrell was made aware of problems with her performance prior to her request for leave. (*Id.* at A48, A327-28, A341-42.) However, Farrell argues that she was unaware of any problems with her performance until after she requested leave. (D.I. 48 at B59-60.) She also claims that the emails cited by AstraZeneca were fabricated to give support to AstraZeneca's claim that she

8

was having performance problems before she requested leave. (D.I. 38 Appendix at A198.) Further, the parties dispute the reason that Farrell returned from her leave early, why she was denied a promotion, and the quality of her performance when she returned from leave. (D.I. 38 Appendix at A46, A90, A116-118; D.I. 48 at B64, B68-70, B250.) As a determination of the causality of Farrell's termination necessarily requires me to weigh Farrell's credibility against the evidence produced by AstraZeneca, this claim is not appropriate for summary judgment. *See Reeves*, 530 U.S. at 150.

## B.    AstraZeneca's Motion for Summary Judgment on the Breach of the Implied Covenant of Good Faith and Fair Dealing Claim

Summary judgment is also inappropriate on plaintiff's claim of breach of the implied covenant of good faith and fair dealing, again because material facts are in dispute. Every employment contract under Delaware law "includes an implied covenant of good faith and fair dealing." *Merrill v. Crothall-American, Inc.*, 606 A.2d 96, 101 (Del. 1992). This covenant is breached where there is "an aspect of fraud, deceit or misrepresentation" in the contract. *Id*.

In the employment context, a claim for breach of the implied covenant of good faith and fair dealing can arise in four ways: "(i) where the termination violate[s] public policy; (ii) where the employer misrepresent[s] an important fact and the employee relie[s] 'thereon either to accept a new position or remain in a present one'; (iii) where the employer use[s] its superior bargaining power to deprive an employee of clearly identifiable compensation related to the employee's past service; and (iv) where the employer falsifie[s] or manipulate[s] employment records to create fictitious grounds for termination." *Lord v. Souder*, 748 A.2d 393, 400-01 (Del. 2000). Here, Farrell alleges

9

that AstraZeneca breached the implied covenant of good faith and fair dealing

because her termination violated public policy and because AstraZeneca falsified her

employment records.

While Farrell claims that her records were falsified and that Hellen and

Broadway lied about her performance issues, AstraZeneca maintains that the records

are, in fact, genuine. Further, Farrell's argument that her firing violated public policy

only stands if she was, in fact, terminated as a result of her FMLA leave. Like Farrell's

retaliation claims, a finding that AstraZeneca did not breach the implied covenant of

good faith and fair dealing would require me to weigh evidence and make credibility

determinations. Consequently, this claim is not appropriate for summary judgment.

*See Reeves*, 530 U.S. at 150.

### C.    AstraZeneca's Motion for Summary Judgment on the COBRA Claim

Summary judgment against Farrell is warranted, however, on her COBRA claim.

Employers are required to notify employees of their COBRA rights upon termination.

29 U.S.C. § 1166. To meet this notice requirement, an employer must make a good

faith attempt to notify the beneficiaries, but is not required to ensure that notice is

actually put in the possession of the beneficiary. *DiSabatino v. DiSabatino Bros., Inc.*,

894 F. Supp. 810, 817 (D. Del. 1995). Generally, mailing a notice to an employee's

last known address constitutes a good faith effort at notification; no requirement has

been imposed on the employer to ensure that the notice was received. *See, e.g.,*

*Vanderhoof v. Life Extension Institute*, 988 F. Supp. 507, 518 (D.N.J. 1997) (finding

that defendant's mailing of COBRA notice satisfied requirement); *Truesdale v. Pacific*

10

*Holding Co./Hay-Adams Div.*, 778 F. Supp. 77, 81 (D.D.C. 1991) (finding that notice mailed to the proper address is considered received).

Here, the facts are not in dispute. AstraZeneca, through its health care plan administrator, Benefit Concepts, mailed a COBRA notice to Farrell at her last known address. (D.I. 38 Appendix at A383-87.) As evidence that this mailing took place, AstraZeneca presents both the affidavit of Diana Andrade, a Client Specialist of Benefit Concepts, and two computer printouts from Farrell's file. (*Id.*) Andrade, in her affidavit, lays out the procedure followed by Benefit Concepts in the mailing of COBRA notices, and describes how the computer tracking system produces a COBRA notice and notes the date that it was sent. (*Id.* at A383-84.) Further, AstraZeneca produced the computer printout stating that Farrell's COBRA notice was sent to her last known address on February 2, 2004, and that it was never returned from the post office as undeliverable. (*Id.* at A386.) Additionally, AstraZeneca produced a printout showing the dates that the first and second notices were sent. (*Id.* at A387.) Farrell concedes that she received and responded to the second notice. (*Id.* at A385, ¶ 9.)

Farrell's only argument is that she never received the first COBRA notice and that, therefore, she was deprived of her rights. However, AstraZeneca had no duty to ensure that Farrell received her notice. It was only required to make a good faith effort to notify her of her rights. *See DiSabatino*, 894 F. Supp. at 817. AstraZeneca, through Benefit Concepts, made such a good faith effort. Summary judgment will therefore be granted to AstraZeneca on this claim.

11

## V.    CONCLUSION

Accordingly, AstraZeneca's motion for summary judgment (D.I. 37) with respect to the COBRA claim will be granted, and AstraZeneca's motion for summary judgment with respect to all other claims will be denied.   An appropriate order will follow.