Search - 6 Results - avecia and stepler
Case 1:04-cv-00285-KAJ   Document 77-2   Filed 11/11/2005   Page 1 of 7
Page 1 of 7

Source: Legal > Cases - U.S. > Federal Court Cases, Combined [i]
Terms: **avecia and stepler** (Edit Search | Suggest Terms for My Search)

⇱Select for FOCUS™ or Delivery
☐

*2005 U.S. App. LEXIS 22157, \**

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; LISA **STEPLER** v. **AVECIA,** INC.; Lisa **Stepler,** Appellant

No. 04-3396

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

2005 U.S. App. LEXIS 22157

July 12, 2005, Argued
October 13, 2005, Filed

**NOTICE:** [\*1] RULES OF THE THIRD CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE. Dist. Court Civil Action No. 03-CV-00320. District Judge: The Honorable Susan L. Robinson. **Stepler** v. **Avecia** Inc., 2004 U.S. Dist. LEXIS 14955 (D. Del., July 19, 2004).

**CASE SUMMARY**

**PROCEDURAL POSTURE:** Plaintiff former employee appealed from a judgment of the United States District Court for the District of Delaware dismissing her claim for intentional infliction of emotional distress (IIED) and granting summary judgment in favor of defendant former employer on the employee's retaliation claim under Title VII of the Civil Rights Act of 1964 and wrongful termination claim under Delaware law.

**OVERVIEW:** The employee alleged that this case should have been analyzed under the Price Waterhouse framework. The court found that the employee's Title VII claims must be analyzed under the McDonnell Douglas burden-shifting framework. Next, the court found that a reasonable jury considering the evidence in the light most favorable to the employee-- including the employee's performance reviews, management's increased scrutiny of her, the tension with her co-workers, the memorandum of April 23, 2001, and the termination letter -- could conclude that there was a causal link between the employee's protected activities and the employer's decision to fire her. Next, the court agreed with the district court's analysis that the employee's IIED claim was barred. The court reasoned that for a complaint to survive a motion to dismiss, there must be more than a mere allegation that there was an intentional injury; there must be facts alleged which, if true, show deliberate intent to bring about an injury.

**OUTCOME:** The court affirmed the dismissal of the IIED claim and the entry of summary judgment in favor of the employer on the wrongful termination claim. However, the court reversed the entry of summary judgment in favor of the employer on the retaliation claim and remanded for further proceedings.

**CORE TERMS:** termination, retaliation, prima facie case, summary judgment, fictitious, fired, fair dealing, intentional infliction of emotional distress, wrongful termination, protected activity, general rule, covenant, entry of summary judgment, protected activities, employment decision, sexual harassment, exclusive remedy, direct evidence, reasonable jury, public interest, first category, false reason, sole remedy, work time, re-establishes, behavioral, harassment, manipulate, subjected, proffered

## LexisNexis(R) Headnotes ♦ Hide Headnotes

Labor & Employment Law > Discrimination > Disparate Treatment > Burden Shifting Analysis

**HN1** Under the Price Waterhouse framework, the burden of production and the risk of non-persuasion are shifted to the defendant, and the defendant must show that even if discrimination was a motivating factor in the adverse employment decision, it would have made the same employment decision regardless of its discriminatory animus. This framework only applies, however, where the employee can show direct evidence that an illegitimate criterion was a substantial factor in the decision. More Like This Headnote

Labor & Employment Law > Discrimination > Title VII

**HN2** 42 U.S.C.S. § 2000e-2(m) does not reach retaliation claims. More Like This Headnote

Labor & Employment Law > Discrimination > Retaliation

**HN3** Under the McDonnell Douglas framework, a plaintiff is first required to make out a prima facie case of retaliation by establishing (1) that she engaged in a protected activity, (2) that she suffered an adverse employment action, and (3) that there was a causal link between her protected activity and the adverse employment action. If plaintiff successfully made out a prima facie case, defendant has to point to evidence in the summary judgment record that was sufficient, if believed, to support a finding that plaintiff was not discharged because of her protected activity. If defendant meets this burden, plaintiff is required to prove that unlawful retaliation was a determinative cause of her firing. More Like This Headnote

Labor & Employment Law > Employment Relationships > At-Will Employment

**HN4** The general rule in Delaware is that employees are employed "at will" and may be dismissed at any time without cause. The general rule does not apply, however, in the following four situations: (i) where the termination violated public policy; (ii) where the employer misrepresented an important fact and the employee relied thereon either to accept a new position or remain in a present one; (iii) where the employer used its superior bargaining power to deprive an employee of clearly identifiable compensation related to the employee's past service; and (iv) where the employer falsified or manipulated employment records to create fictitious grounds for termination. More Like This Headnote

Labor & Employment Law > Employment Relationships > At-Will Employment
Labor & Employment Law > Wrongful Termination > Public Policy

**HN5** In order to make out a claim of a public policy violation, a plaintiff must satisfy a two-part test: (i) the employee must assert a public interest recognized by some legislative, administrative or judicial authority and (ii) the employee must occupy a position with responsibility for advancing or sustaining that particular interest. More Like This Headnote

Torts > Business & Employment Torts > Wrongful Termination

**HN6** In 2004 the Delaware legislature amended Del. Code Ann. tit. 19, § 710 et seq.,

which prohibits discrimination in employment practices, in order to clarify that this statute was the "sole remedy" for an aggrieved employee to the exclusion of all other remedies. Del. Code Ann. tit. 19, § 712(b) (2005).  More Like This Headnote

Labor & Employment Law > Employment Relationships > At-Will Employment

HN7 If the employer did not actually falsify or manipulate employment records, then it does not matter if the employer gave a false rationale for termination.  More Like This Headnote

Workers' Compensation & SSDI > Administrative Proceedings

HN8 Under Delaware law, the general rule is that the worker's compensation administrative process is the exclusive remedy for an employee who suffers a work-related accident causing personal injury or death. Del. Code Ann. tit. 19, § 2304 (2005). However, the Delaware Supreme Court has held that claims that involve a true intent by the employer to injure the employee fall outside of the Workers' Compensation Act and remain separately actionable as common law tort claims. Thus, for a complaint to survive a motion to dismiss, there must be more than a mere allegation that there was an intentional injury; there must be facts alleged which, if true, show deliberate intent to bring about an injury. In other words, an employee must allege facts that, if true, would show that the employer intended to injure her. It would not be enough to allege facts showing that the employer intended to do an action and that the worker was injured as a result of that action. Specific intent is required.  More Like This Headnote

**COUNSEL:** PHILLIP B. BARTOSHESKY (ARGUED), Biggs and Battaglia, Wilmington, Del., Counsel for Appellant.

GINGER D. SCHRODER (ARGUED), Schroder, Joseph & Associates LLP, Buffalo, N.Y.; JENNIFER C. JAUFFRET, Richards, Layton & Finger, Wilmington, DE, Counsel for Appellee.

**JUDGES:** Before: ALITO, BECKER, and GREENBERG, Circuit Judges.

**OPINION:** OPINION OF THE COURT

PER CURIAM:

Lisa **Stepler,** a former laboratory technician for **Avecia,** Inc. ("**Avecia**") sued **Avecia** for retaliation under Title VII of the Civil Rights Act of 1964, wrongful termination under Delaware law, and intentional infliction of emotional distress under Delaware law. The District Court dismissed **Stepler's** claim for intentional infliction of emotional distress and granted summary judgment in favor of **Avecia on Stepler's** retaliation and wrongful termination claims. We affirm the dismissal **[*2]** of the claim for the intentional affliction of emotional distress and the entry of summary judgment in favor of **Avecia** on the wrongful termination claim. However, we reverse the entry of summary judgment in favor of **Avecia** on the retaliation claim and remand for further proceedings.

I.

**Stepler** asserts that this case should have been analyzed under the framework of Price Waterhouse v. Hopkins, 490 U.S. 228, 104 L. Ed. 2d 268, 109 S. Ct. 1775 (1989). n1 HN1 Under that framework, the "burden of production and the risk of non-persuasion are shifted to the defendant," and the defendant must show "that even if discrimination was a motivating factor in the adverse employment decision, it would have made the same employment decision regardless of its discriminatory animus." Armbruster v. Unisys Corp.,

32 F.3d 768, 778 (3d Cir. 1994). This framework only applies, however, where the employee can show "*direct evidence* that an illegitimate criterion was a substantial factor in the decision." Price Waterhouse, 490 U.S. at 276 (O'Connor, J., concurring in the judgment) (emphasis added); see also Walden v. Georgia-Pacific Corp., 126 F.3d 506, 513 (3d Cir. 1997). [*3] We have carefully considered the evidence on which **Stepler** relies in this case, and while the question is close we conclude that she did not meet the "direct evidence" standard.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 HN2 42 U.S.C. § 2000e-2(m) does not reach retaliation claims. Woodson v. Scott Paper Co., 109 F.3d 913, 934 (3d Cir.), cert. denied, 522 U.S. 914, 139 L. Ed. 2d 230, 118 S. Ct. 299 (1997).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

**Stepler's** Title VII claims must be analyzed under the burden-shifting framework established by McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973), and its progeny. HN3 Under this framework, **Stepler** was first required to make out a prima facie case of retaliation by establishing (1) that she engaged in a protected activity, (2) that she suffered an adverse employment action, and (3) that there was a causal link between her protected activity and the adverse employment action. Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 (3d Cir. 2000). If **Stepler** [*4] successfully made out a prima facie case, **Avecia** had to point to evidence in the summary judgment record that was sufficient, if believed, to support a finding that **Stepler** was not discharged because of her protected activity. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-507, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993). If **Avecia** met this burden, **Stepler** was required to prove that unlawful retaliation was a determinative cause of her firing. See McDonnell Douglas, 411 U.S. at 802-803.

**Stepler** clearly satisfied the first two prongs of the prima facie case standard. Her complaints about a hostile work environment and retaliation were protected activities, and her firing by **Avecia** obviously was an adverse employment action. Whether she proffered sufficient evidence to meet the third prong of the prima facie case standard is less clear due to the gap of almost one year between her initial complaint and her termination, but a gap of this magnitude is not conclusive and can be outweighed by a "pattern of harassment" or a "pattern of antagonism" in the intervening period. See Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997); see also [*5] Robinson v. Southeastern Pennsylvania Transp. Auth., 982 F.2d 892, 894-95 (3d Cir. 1993). A reasonable jury considering the evidence in the light most favorable to **Stepler** -- including **Stepler's** performance reviews, management's increased scrutiny of her, the tension with her co-workers, the memorandum of April 23, 2001, and the termination letter -- could conclude that there was a causal link between **Stepler's** protected activities and **Avecia's** decision to fire her. We thus conclude that **Stepler** made out a prima facie case.

**Avecia's** proffered reasons for **Stepler's** termination were poor work performance and disruptive behavior, but a reasonable jury considering the evidence in the light most favorable to **Stepler,** and drawing all inferences in **Stepler's** favor, could conclude otherwise. Particularly noteworthy are the references in both the April 23 memo and the May 4, 2001, termination letter to **Stepler's** "intense focus upon alleged harassment [and] retaliation." App. 264, 371.

III.

Conversely, there are no issues of fact precluding summary judgment in favor of **Avecia on Stepler's** state law claim for breach of the covenant of good faith and fair dealing.

HN4 The general **[*6]** rule in Delaware is that employees are employed "at will" and may be dismissed at any time without cause. See Merrill v. Crothall-American, Inc., 606 A.2d 96, 103 (Del. 1992). The general rule does not apply, however, in the following four situations:

> (i) where the termination violated public policy;
>
> (ii) where the employer misrepresented an important fact and the employee relied "thereon either to accept a new position or remain in a present one";
>
> (iii) where the employer used its superior bargaining power to deprive an employee
>
> of clearly identifiable compensation related to the employee's past service; and
>
> (iv) where the employer falsified or manipulated employment records to create fictitious grounds for termination.

Lord v. Souder, 748 A.2d 393, 400 (Del. 2000) (citing E.I. DuPont de Nemours and Co. v. Pressman, 679 A.2d 436, 442-44 (Del. 1996)). **Stepler** claims that **Avecia's** actions fit into either the first or fourth category. She contends that the first category fits because being fired for opposition to sexual harassment and retaliation violates public policy, and she argues that the fourth **[*7]** category fits because she was subjected to false criticisms of her work in her performance evaluation, false claims that she was using work time to study, and false claims that she was fired for behavioral and performance issues.

HN5 In order to make out a claim of a public policy violation, a plaintiff must satisfy a two-part test: "(i) the employee must assert a public interest recognized by some legislative, administrative or judicial authority and (ii) the employee must occupy a position with responsibility for advancing or sustaining that particular interest." Lord, 748 A.2d at 401 (citing Pressman, 679 A.2d at 441-42). To satisfy the first part, **Stepler** relies on the Delaware Supreme Court's decision in Schuster v. Derocili, 775 A.2d 1029 (Del. 2001), which recognized a cause of action for breach of the covenant of good faith and fair dealing where the employee alleged that she was terminated following sexual harassment in the workplace. But HN6 in 2004 the Delaware legislature amended 19 Del. C. § 710 et seq., which prohibits discrimination in employment practices, in order to clarify that this statute **[*8]** was the "sole remedy" for an aggrieved employee "to the exclusion of all other remedies." 19 Del. C. § 712(b) (2005). In fact, the synopsis of the Senate Bill expressly states disagreement with the Delaware Supreme Court's decision in Schuster:

> This bill confirms that Chapter 7 is the exclusive and sole remedy for employment discrimination claims, requiring initial processing of all such claims with the Department of Labor for review and action. This bill effectively re-establishes the exclusive remedy put in question by the decision in Schuster v. Derocili, 775 A.2d 1029 (2001).

Delaware Bill Summary, 2004 Reg. Sess. S.B. 154. Moreover, when the bill is read in light of the sponsor statement, which "confirms" and "re-establishes" the pre-existing rule "put in question by" Schuster, it is clear that the 2004 Amendment is meant to be retroactive. Thus **Stepler** has not asserted a recognized public interest, and **Avecia's** actions do not fit into the first category.

Nor do they fit into the fourth category: falsification or manipulation of employment records to create fictitious grounds for termination. Even if we assume **[*9]** that **Stepler** was subjected to false criticisms of her work performance and false claims that she was using work time to study, there is no evidence that these particular criticisms and claims were the grounds for **Stepler's** termination. And even if we assume that **Avecia** falsely claimed that **Stepler** was fired for behavioral and performance issues, this is not the kind of falsehood specified in the fourth category, which provides that an employer violates the covenant of good faith and fair dealing when it "falsifie[s] or manipulate[s] employment records to create fictitious grounds for termination." Lord, 748 A.2d at 400. **HN7** If the employer did not actually falsify or manipulate employment records, then it does not matter if the employer gave a false rationale for termination. See Williams v. Caruso, 966 F. Supp. 287, 291 (D. Del. 1997) ("Nothing in Pressman suggests an employer who gives an employee a false reason for termination is subject to liability under the implied covenant of good faith and fair dealing. Pressman only held culpable the manufacture of grounds for dismissal, not the statement of a false reason for dismissal.") **[*10]** (emphasis in original); see also Geddis v. University of Delaware, 40 Fed. Appx. 650, 654 (3d Cir. 2002) (unpublished) (noting that the employee did not claim his supervisor "intentionally created 'fictitious negative information' about him in order to get him fired" and thus the conduct at issue did not fit the fourth Pressman category) (quoting Schuster, 775 A.2d at 1040).

IV.

**HN8** Under Delaware law, the general rule is that the worker's compensation administrative process is the exclusive remedy for an employee who suffers a work-related accident causing personal injury or death. See 19 Del. Code Ann. § 2304 (2005). However, the Delaware Supreme Court has held that "claims that involve a true intent by the employer to injure the employee fall outside of the Workers' Compensation Act and remain separately actionable as common law tort claims." Rafferty v. Hartman Walsh Painting Co., 760 A.2d 157, 159 (Del. 2000) (emphasis added); see also Showell v. Langston, 2003 Del. Super. LEXIS 95, No. Civ. A. 02C-01-016, 2003 WL 1387142, at *3 (Del. Super. Mar. 05, 2003) (citing Rafferty). Thus, "for a complaint **[*11]** to survive a motion to dismiss, there must be more than a mere allegation that there was an intentional injury; there must be facts alleged which, if true, show deliberate intent to bring about an injury." Rafferty, 760 A.2d at 160. In other words, an employee must allege facts that, if true, would show that the employer intended to injure her. It would not be enough to allege facts showing that the employer intended to do an action and that the worker was injured as a result of that action. Specific intent is required.

**Stepler** cites Rafferty and argues that her claim for intentional infliction of emotional distress is not barred. In a Memorandum Order of April 28, 2004, the District Court rejected **Stepler's** argument. We agree with the District Court's analysis.

We therefore affirm the District Court's order of summary judgment in favor of **Avecia on Stepler's** claims under Delaware law, but we reverse the District Court's order granting summary judgment in favor of **Avecia on Stepler's** retaliation claim, and we remand the case for further proceedings.

Source: Legal > Cases - U.S. > **Federal Court Cases, Combined** [i]
Terms: **avecia and stepler**  (Edit Search | Suggest Terms for My Search)
View: Full
Date/Time: Friday, November 11, 2005 - 7:20 AM EST

* Signal Legend:
- Warning: Negative treatment is indicated
- Questioned: Validity questioned by citing refs
- Caution: Possible negative treatment
- Positive treatment is indicated
- Citing Refs. With Analysis Available
- Citation information available
* Click on any *Shepard's* signal to *Shepardize*® that case.

About LexisNexis | Terms and Conditions

Copyright © 2005 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

GSK PDP – Development Plan

## Part F: Periodic Reviews of Development Plan

| Periodic Review Date(s) | Summary Comments on Development |
|---|---|
| | Employee's Comments: |
| | Manager's Comments: |

## Part G: Annual Review of Development Plan

**Employee's Overall Development Summary**

Learning GSK processes is an ongoing activity as I engage in various activities and must utilize the supporting internal systems. Bernie and I discussed the priority of becoming fully familiar and proficient with the GSK budget and finance processes and systems, along with learning important supporting other processes.

Additionally, we discussed some of my customers' needs and adjustments that I need to make to accommodate individual customers' styles and needs. In particular, we discussed the large volume of both new information and workload in my new role over the past 6 months. At times, due either to workload or to multi-tasking, I have conveyed to some the impression that I am not truly interested or that they do not have my undivided attention. I do not recall that this has ever resulted in my not providing customers with accurate services or feedback. To correct this perception however, I will reduce multi-tasking and will make a greater effort to engage more demonstrably. We also discussed my orientation of focusing on outcomes and deadlines versus the needs of some customers for greater sensitivity to feelings, and my need to ensure immediate response on information requests from Corporate Communications and Investor Relations. I take these comments constructively and seriously and will adjust accordingly.

**Manager's Overall Development Summary**

Marybeth has made progress in gaining a working knowledge of the compounds and products in the pipeline and the related disease states. She has also gained familiarity with GSK processes and developed a strong network of contacts within the company.

During our PDP review, we discussed several areas for development suggested by customers and other stakeholders which can help Marybeth enhance her performance even further. These included greater emphasis on active listening to ensure accurate understanding of customer needs; increased sensitivity for co-workers to avoid conflicts; improved responsiveness to requests from Corporate Communications and Investor Relations to help them meet their tight timelines; greater understanding of the budget and finance process; and better facility with technologies needed to do her job and ensure accessibility especially while abroad. By addressing these areas of development, Marybeth will deliver an even higher level of customer satisfaction.

My manager and I have discussed this annual development review and jointly prepared this document. My signature does not necessarily signify agreement or disagreement.

Employee's Signature: _____ Date: Feb. 11, 2005

Manager's Signature: _____ Date: _____



**Bernadette A Mansi/PharmRD**
07-Feb-2005 11:18

Global Commercial Strategy   Renaissance RN0315   US
610-787-3024 (8-275); Fax 610-787-7069
To  Gary 5 Davies/CORP/GSK@GSK
cc
bcc
Subject  Update



Gary,

I just wanted to update you on my meeting with Marybeth on Friday. I covered a few key areas.

- **Focus and the impact on Efficiency and Productivity.** I used the three press releases (▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓) to illustrate the areas that need improvement. I told her that I never wanted to see the activities of the prior week repeated. And, in the interest of process improvement, I was going to go over expectations. Also, that I had discussed this with you and you stressed the need for improved focus in what she was doing/delivering.

  *Process: I reminded her how you had rolled the process out to her last year and even provided her with a laminated card as a memory jogger. I also pointed out that the process clearly includes ABPI approval so there isn't any reason she shouldn't have known this was required. Also, there isn't any reason for the fire drill that took place this week. She came up with several excuses but they weren't consistent.

  *List of Reviewers: I stressed that by not knowing who was supposed to approve materials, she was complicating and delaying the approval process. Also, by not knowing the functions of the people on the list (thinking people were in GCS when they were in COE, thinking people were in EU Legal when they were in US Legal, etc.) she wouldn't be assured of having appropriate sign off. I told her at the least, she could look these people up on Peopleview and see their positions. Also, I stressed that she can't address their questions if she doesn't know their functions or perspective.

  *Responsibility: I stressed that all of these activities were her responsibility not ours and that she has to own this process. Also, that she has to be familiar enough with the press release to be able to respond to questions. She is too removed from what is going on.

  She gave me several excuses regarding the fact that she hadn't done an ▓▓▓press release and the approval came in earlier than planned. She also said she should have familiarized herself with the process and she didn't. And, she said that with PN writing the release and given the complex nature of the release, she wasn't on top of it. She said she would do better in the future.

- **Lack of Responsiveness:** I stressed the importance of getting back to people in a timely fashion and answering their questions. I used the example of the Admin and not registering her guests with security. She received two emails requesting this information and never responded. I told her that Monica is trying to help her and she is creating these problems by not responding.

  She said that she wants to see a copy of Monica's job description because she said Monica is refusing to do things for her. I know this isn't the case.

  She said she had too many things to do re: pipeline chart, etc. I told her this was top priority. And,

then I confirmed that she doesn't have any press releases for a few months so this was the time to get organized.

I tried to hit all the hot topics without overwhelming her. She said she is still interested in Al's job and that she believes she is qualified.

All we can do is reinforce these messages with day-to-day examples and coaching.

Bernie



| | |
|---|---|
| Bernadette A Mansi/PharmRD | Global Commercial Strategy  Renaissance RN0315  US 610-787-3024 (8-275); Fax 610-787-7069 |
| 02-Aug-2005 21:15 | To  Marybeth M Farrell/GMS/GSK@GSK |
| | cc |
| | bcc |
| | Subject  Follow Up |



Marybeth,

As discussed during our recent 1:1, it is important that you and AP come to an understanding regarding issues raised yesterday on the ▓▓▓▓ press activities as well as feedback he provided regarding your performance. If you haven't already done so, I would advise you to schedule a 1:1 with him asap to address the key issues. And, you have requested the opportunity from Al to provide feedback on performance for his team, in particular AP.

To facilitate a meaningful discussion, I have summarized below AP's feedback and expectations:

1) On the positive side, he felt you were making an effort to work together and to improve your listening skills.

2) Key areas where improvement is needed in performance are as follows:

- Organization (eg, meeting preparation, sending out agendas and materials in advance vs. just in time to allow reviewers time to prepare for the meeting and to enhance meeting productivity, ensuring all IT systems are up and running at the meeting start time, allowing the PR agency to take notes so you can facilitate the meeting, budgets, etc.)

- Leadership of meeting (taking responsibility for directing the meetings, having the relevant information, time management, bringing the team to resolution in a timely fashion)

- Product Knowledge (Getting up to speed on the product and data to contribute greater value during meetings. This was also raised by other stakeholders as an area where you could contribute greater value.)

- Accountability for projects and budgets (Doesn't feel he understands the status of the fact sheets and where the PR budget for last year and this year has been spent or will be spent. He's not clear on what the deliverables are that he can expect for the allocated budget.)

- IT skills (Need to get working knowledge of Sametime and other IT systems to streamline meeting efficiency)

Several of these items are reflected in the Development section of your current PDP.

3) What he's expecting to receive from you and these mostly center around budget transparency and accountability. These requests are quite reasonable.

- Accounting for the £▓▓▓▓ allocated for PR for last year. He would like an accounting of the deliverables in writing.

- Accounting of the £█████ allocated for PR this year. He wants to know in writing exactly how this money will be spent and what will be delivered.

- Accounting of what happened to the ███████ Fact Sheets. And he is expecting to see final, approved Fact Sheets by August 15th.

4) You need to agree on what level of spend he is planning for the ███████ press/issues management materials and exact deliverables given it is my understanding this isn't in the current PR. budget.

5) You need to agree on a mutually satisfactory working relationship to ensure that things go smoothly in the future. In other words, what can each of you do to increase interactions, trust and productivity.

Marybeth, I know that we all want to ensure a productive working relationship going forward so I feel it is very important that we invest the time to get these issues addressed asap.

Thanks for your help.
Bernie



**Bernadette A Mansi/PharmRD**

16-Aug-2005 20:24

Global Commercial Strategy   Renaissance RN0315   US
610-787-3024 (8-275); Fax 610-787-7069
To   Bernadette A Mansi/PharmRD/GSK@GSK

cc

bcc

Subject  Note to File

Yesterday, I sent Marybeth my comments on her PDP. Every effort was made to present a balanced point of view. I included what she had done well as well as areas for improvement based on feedback from stakeholders and my own observations. The first version of the PDP she provided to me was sloppy. She used tracked changes for some reason; items were deleted that shouldn't have been; and other items were included as accomplishments that hadn't been accomplished. I pointed these out to Marybeth and the revised version was improved, but didn't address all issues raised previously.

Upon seeing my PDP comments, Marybeth immediately sent me an email about how she was "shocked (!) to read that my performance in not in line with expectations for a C3." Before I had a chance to read her email, she came down to my office and said she wanted to talk to me. She wanted to know where this was coming from. I had told her this in her six-month review, but she didn't seem to take it in.

I told her that I had had feedback from numerous customers and that these comments were reflected in her PDP. I said that as her Manager it was my job to manage her performance and that I wouldn't be doing my job and, in fact, I'd be doing her a disservice, if I didn't point out these issues raised by her customers and observed by me. I said I can tell her she is doing a good job but that wasn't true and it wasn't helping her. That as long as she didn't look inside herself and take some responsibility for her performance, she wasn't going to advance in the company.

She said she felt the feedback had a harsh tone. I told her I did my best to present a balanced point of view. She wanted to know why it was in writing in her PDP.

She said that she couldn't believe that after all she did, the long hours she worked, including working on her vacation and getting up at 3:00 am for TCs, that I was telling her this. Again, she said she was doing an excellent job. She said she was delivering all the projects on time and they were very well done so how could this be true. I said there was a significant gap between her perception of how she was doing and that of myself and her customers. I told her that I didn't want to be cruel and hadn't mentioned this in the past, but one customer said her performance was "5" on a scale of 1 to 10. She was shocked by this.

I told her that it wasn't just about what she did, but about how she got the job done. Her customers didn't feel she was getting the job done as efficiently as possible and she was relying on others to get the job done. She said she doesn't rely on anyone. This isn't true. She also said she was rewriting all of the agency's materials. I said if this is true, why are we using them? She said well now they are up to speed, so this isn't the case.

I told her that her customers felt that she didn't add value to the meetings she attended because she didn't have the depth of product knowledge. She said she always answers PR questions that are raised.

I told her that the feedback is consistent across customers and was observed by me and she needs to accept that this is how she is being perceived. She has to take ownership of the problem. Otherwise, we are never going to fix it and move on. And, she is going to meet with customer dissatisfaction and this is frustrating for all of us. I told her that AP and Mark are both good people and readily give praise to other team members. Therefore, I feel the feedback is genuine and it is consistent with that received from others and observed by me.

I told her that Al was aware of the performance issues since people had brought these to his attention

and since she asked to give feedback on AP. She said, "Does Al think I have performance issues?" I said yes due to feedback he's received. I told her that feedback on her performance was also discussed during the talent review. She was quite shocked that others had issues with her performance.

I said I knew that she was a good person and that she was working hard, but that she needs to figure out what her customers need and adjust how she is working to meet their needs.

She asked me if I was angry with her for something. Since I had just provided feedback on the ▓▓▓ factsheets, she thought this was it.

I said no, I was just providing feedback on her performance. And, the ▓▓▓ factsheets were an example of where I had asked her to provide references and she sent two of the factsheets out without references and asked people to provide her with references. This wasn't appropriate. This was her job. She said at AZ, she had people to do the references. She's been here a year and should know that she is required to do the references. Then she said, you told me one time that someone asked you to do references and you said this wasn't our job. This applied to referencing someone else's document, not our own documents.

Also, the thrombosis factsheet wasn't the same quality as the ACS factsheet. It didn't address the key questions media would have and it wasn't referenced. If she obtained the information from the Resource Kit, then she should have had references. She said the information wasn't referenced in the Resource Kit.

She reiterated again how she had never heard this feedback while working at AZ and she did work for the CEO and the Board. She has outstanding experience. She said the environment at GSK was very strange. She felt she was being insulted.

She said she couldn't believe I said she wasn't organized. She said she was extremely organized. I used the example of the PDP. I said that I requested all PDPs be sent to me a week in advance of the PDP review meeting. I checked my email the day before and she hadn't sent it in so I cancelled and rescheduled the meeting. She sent it in late that evening. She said I was on vacation. I told her I was checking email. I said when I received the PDP, she used tracked changes, deleted things that shouldn't have been deleted and couldn't explain why, had included things as accomplishments that she didn't do. When I asked her to revise the document, she made some of the revisions, but not all of them. She said that we didn't really review all of the document so she forgot to make the changes. I said this wasn't true. I told her the discussion we had around the one point that wasn't changed.

She kept referring back to prior comments from AP. I told her that the comments were based on feedback from several stakeholders and myself not just AP and that I hadn't included any comments for behavior that I hadn't observed myself. She said that the comments in the PDP were only from the memo on AP. I told her this wasn't true and that the first comment was from Corporate Communications and comments from others had been included as well.

I told her the quality of her work wasn't where it should be. I used the examples of the PPAR issues management materials that were poorly put together. She said she was under a tight deadline and just wanted to put something together for review.

She kept asking who gave feedback. I told her others in the department (eg, Monica). I told her that Monica said she was complaining about AP in the hallway and she said this was one time and she didn't say anything. I told her that this wasn't true. Monica said she had been complaining about Mark in the open and she wasn't comfortable about this either. She said she wanted to provide feedback on Monica. She couldn't understand why people were giving feedback on her. I told her in many cases it was unsolicited because people had issues with her. And, the reason they didn't go to her was because they felt she was too emotional and sensitive.

I raised the issue of timeliness. She said she met all of her deadlines. I said this wasn't true. I told her

that Corporate Communications said she was late in notifying them about one of the ▓▓▓ releases. And, they felt that she needed to improve her relationship with Regulatory so she could have timely access to information. She said this was Regulatory's issue. She'd done all she could to get the information.

I told her that she frequently doesn't understand what is being asked of her and as a result, repeated requests are required for materials. She said this isn't true.
I told her Gary said that he can send out the same request to 10 people and she is the only one who doesn't understand his instruction. She said he isn't clear.
She said this may have been true six months ago, but it isn't true now. I said I went back over the emails of the past six months in doing her PDP and this is true.

I told her that sometimes she doesn't comprehend what her customers want. Again, she denied this. I used the example of the slides she was preparing for the ▓▓▓ Commercial Matrix Team. AP asked her to do a presentation. She showed me the slides. I told her this wasn't what he wanted. She insisted she spoke to him and this was what he wanted. When she sent them to him, he said this wasn't what he wanted and she had to do them over again. This took a lot of everyone's time. She said he changed his mind.

She said that we are picking on very small things. I told her these were just examples and there were other examples. She said she couldn't believe that I said her performance wasn't at the C3 level. I told her she didn't meet the criteria of a C3 based on the performance I've observed. If she was performing at the C3 level, then I wouldn't need to spend so much time addressing these issues.

I told her that she needed to meet with her customers as we had agreed previously and find out what they wanted and address any issues with them that were impacting her performance, but that she had to take responsibility for fixing her performance. I told her I was willing to partner with her on this but she had to acknowledge the issues and address them.

In the end, I don't feel she was taking in what I was saying. She kept referring to how hard she worked and how she delivered a high level of quality work on time.

September 12, 2005

Ms. Bernadette Mansi
Director, Scientific Communication Strategy
Global Commercial Strategy–Cardiovascular & Metabolism
GlaxoSmithKline

Dear Bernadette:

I am submitting my resignation, effective immediately. This job has not been a good fit and I think my health would be better served working elsewhere.

Very Truly Yours,

*Marybeth Farrell*

Marybeth Farrell