LAW OFFICE
OF
JOHN M. LaROSA
TWO EAST 7TH STREET, SUITE 302
WILMINGTON, DELAWARE 19801-3707

PHONE: (302) 888-1290
FAX: (302) 655-9329

LICENSED IN DE, PA, AND NJ
INTERNET: WWW.LAROSALAW.COM

November 18, 2005,

**VIA CM/ECF AND U.S. MAIL**
The Honorable Kent A. Jordan
Lock Box 10
United States District Court
District of Delaware
Wilmington, DE 19801

RE:   Marybeth Farrell v. AstraZeneca Pharmaceuticals, LP, C.A. No. 04-285 KAJ
       Plaintiff's Response in Opposition to Defendant's Motion for a
       Second Postponement Of the Trial and for Permission to File a
       Second Motion for Summary Judgment

Dear Judge Jordan:

Please accept this letter as Plaintiff's Response in Opposition to Defendant's Motion for a Second Postponement of the Trial and for Permission to File a Second Motion for Summary Judgment.[1] In addition to being unusual, Defendant's Motion misstates Plaintiff's case and should be denied. Plaintiff already has produced sufficient evidence for this Court to rule that there is a genuine issue of material fact as to whether she was discharged for a retaliatory reason in violation of the FMLA. Our case is based on a significant amount of circumstantial evidence of a retaliatory motive by Defendant's decisionmakers. Defendant simply seeks a second bite at the summary judgment apple and to postpone for a second time Plaintiff's inevitable day in court.

Though discovery originally ended on March 31, 2005, this Court previously granted Defendant an additional three weeks to take a 30(b)(6) deposition of GSK and to re-depose

---

[1] In addition to the reasons set forth below, Defendant's Motion should be denied because it violates Local Rule 7.1.1 because it does not contain the statement required to be filed with non-dispositive motions, and Defendant did not attempt to reach agreement with counsel on the matters set forth in its non-dispositive motion.

The Honorable Kent A. Jordan
November 18, 2005,
Page 2

Plaintiff on the issue of mitigation. Farrell v. AstraZeneca Pharmaceuticals, LP, No. 04-285 (KAJ), Telephone Conference Transcript at 8, ll. 5-9 (D.Del. Oct. 19, 2005)(Ex. A). In so doing, Your Honor reasoned that "the burden [of proof on the issue of mitigation] is on [Defendant] and I would be remiss I think as a judicial officer if I were to deny [Defendant] evidence which I think is clearly material and relevant to an issue *on which they've got the burden of proof.*" Id. (emphasis added). But Defendant now attempts to parlay the Court's Order allowing Defendant additional discovery on the issue of *mitigation* into an opportunity to re-brief its previously denied motion for summary judgment on the *liability* issue of the cause of Plaintiff's termination. Unlike mitigation, liability, of course, is an issue on which Plaintiff will have the burden of proof at trial and on which the Court already found a genuine issue of material fact.

In denying Defendant's summary judgment motion, this Court held that because "a determination of the causality of Farrell's termination necessarily requires me to weigh Farrell's credibility against the evidence produced by AstraZeneca, [Plaintiff's FMLA retaliation] claim is in appropriate for summary judgment." Farrell v. AstraZeneca Pharmaceuticals, LP, No. 04-285 (KAJ), Mem. Op. at 9 (D.Del. Sept. 2, 2005)(citing Reeves v. Sanderson Plum. Prods, Inc., 530 U.S. 133, 150 (2000)(Ex. B)). Now Defendant again asks the Court again to usurp the jury's role and make a credibility determination. Plaintiff already demonstrated to the Court's satisfaction that a jury can find that the reason Defendant discharged her was her FMLA protected activity. Under prong two of Fuentes, the natural probative force of Plaintiff's evidence demonstrates discrimination. Specifically, there is much circumstantial evidence of retaliation including (1) Jane Hellen and Susan Broadway's awareness of Plaintiff's protected activity, (2) these two managers openly admitting that they were "too busy" for Plaintiff to be sick, (3) their retaliatory motive to only retain "dependable" people during a "busy time" where they had "a lot of work" to do, (4) their demonstrated antagonism toward Plaintiff that only surfaced after she sought leave, (5) Broadway's comparative treatment in replacing Plaintiff with an employee with no known history of leave, (6) the very suggestive and close temporal sequence of events in which the pattern of antagonism began the day Plaintiff sought leave, (7) Hellen's bias against employees on FMLA leave, (8) Defendant's disparate treatment of Plaintiff in moving her to a cubicle, vandalizing her workstation and refusing to investigate the vandalism, and (9) Hellen's violation of Defendant's policies and procedures in balking at Plaintiff's notice of need for six weeks of leave. This circumstantial evidence allows a jury to infer that retaliation was more likely than not a motivating or determinative cause of the adverse employment actions. See Pl. Summary Judgment Ans. Brf., Statement of Facts, Part V at 11-16 (Ex.C).

Also, under a Fuentes prong one analysis, a jury can choose to disbelieve any non-discriminatory reason offered by Defendant because Plaintiff demonstrated weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in Defendant's stated reasons, including (1) Plaintiff's positive 2002 evaluation, (2) Broadway setting Plaintiff up to fail by

The Honorable Kent A. Jordan
November 18, 2005,
Page 3

giving her tasks and restrictions that were inconsistent with her job and contradicted by Defendant's practices, and (3) the absence of an initial verbal discussion with Plaintiff with performance issues prior to alleged communications between her managers. Pl. Summary Judgment Ans. Brf., Statement of Facts, Part VI at 16-22 (Ex.C). In essence, Defendant's Motion asks the Court to forget and ignore all of the evidence Plaintiff previously presented in defeating its original summary judgment motion.

Finally, Plaintiff would be disadvantaged by an additional delay of her day in court. Her trial date already was postponed once from its original October 3, 2005 date. A second postponement and additional briefing naturally would result in an increase in time and expense for all parties involved. Moreover, judicial economy is not served by allowing Defendant to re-brief summary judgment which in turn would require the Court to spend additional time revisiting the issue on which it already has ruled.

For all of the foregoing reasons, Defendant's Motion should be denied.

Very truly yours,

*John M. LaRosa*

John M. LaRosa

cc:   Clerk, U.S. District Court (via CM/ECF)
      Sheldon N. Sandler, Esquire (via CM/ECF)
      Thomas S. Neuberger, Esquire (via CM/ECF)
      Ms. Marybeth Farrell (via U.S. mail)

Attorney Files/John's Files/Client/Farrell/Correspondence/Judge Jordan 3

**EXHIBIT A**

**EXHIBIT A**

1

```
 1            IN THE UNITED STATES DISTRICT COURT

 2            IN AND FOR THE DISTRICT OF DELAWARE

 3                         - - -

 4   MARYBETH FARRELL         :  CIVIL ACTION
                              :
 5        Plaintiff,          :
                              :
 6   v                        :
                              :
 7   ASTRAZENECA PHARMACEUTICALS, LP,:
                              :
 8                            :
          Defendant.          :  NO. 04-285 (KAJ)
 9
                           - - -
10
               Wilmington, Delaware
11         Wednesday, October 19, 2005 at 4:04 p.m.
               TELEPHONE CONFERENCE
12
                           - - -
13
     BEFORE:    HONORABLE KENT A. JORDAN, U.S.D.C.J.
14
                           - - -
15   APPEARANCES:

16
          LAW OFFICE OF JOHN M. LaROSA
17          BY:  JOHN M. LaROSA, ESQ.

18              Counsel for Plaintiff

19
          YOUNG CONAWAY STARGATT & TAYLOR, LLP
20          BY:  SHELDON N. SANDLER, ESQ.
```

21        Counsel for Defendant

22

23

24            Brian P. Gaffigan
            Registered Merit Reporter

25

8

1      MR. SANDLER: Thank you.

2      THE COURT: I'm denying the motion to quash. I

3  think that it's certainly coming late in the game, something

4  I'm not happy about. But I think, Mr. LaRosa, your point

5  is exceedingly well taken that the burden is on them and I

6  would be I think remiss as a judicial officer if I were to

7  deny them evidence which I think is clearly material and

8  relevant to an issue on which they've got the burden of

9  proof. If they want to come in and talk about mitigation,

10 it seems a bad move by me to say, yes, well, now I'm not

11 going to let you find out about what has been going on with

12 facts that were only revealed to you a month ago.

13     So I'm going to let this discovery occur but I

14 want a time line, a deadline on this because the discovery,

15 it's got to be over. I mean the plaintiff is right, we

16 can't keep the discovery ball in the air forever. And I'm

17 assuming the defense doesn't want it in the air forever.

18     So how long will it take you, assuming you get

19 reasonable cooperation, to get this done and wrapped

20 completely, Mr. Sandler?

**EXHIBIT B**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MARYBETH FARRELL, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>ASTRAZENECA PHARMACEUTICALS )<br>LP, )<br>)<br>Defendant. )<br>) | Civil Action No. 04-285-KAJ |

**MEMORANDUM OPINION**

---

Thomas S. Neuberger, Esq., Stephen J. Neuberger, Esq., The Neuberger Firm, P.A., 2 East Seventh St., Suite 302, Wilmington, Delaware 19801; John M. LaRosa, Esq., Law Office of John M. LaRosa, 2 East Seventh St., Suite 302, Wilmington, Delaware 19801; Counsel for Plaintiff.

Sheldon N. Sandler, Esq., Teresa A. Cheek, Esq., Young Conaway Stargatt & Taylor, LLP, The Brandywine Building, 17th Floor, 1000 West St., P.O. Box 391, Wilmington, Delaware 19899; Counsel for Defendant.

---

September 2, 2005
Wilmington, Delaware

was having performance problems before she requested leave. (D.I. 38 Appendix at A198.) Further, the parties dispute the reason that Farrell returned from her leave early, why she was denied a promotion, and the quality of her performance when she returned from leave. (D.I. 38 Appendix at A46, A90, A116-118; D.I. 48 at B64, B68-70, B250.) As a determination of the causality of Farrell's termination necessarily requires me to weigh Farrell's credibility against the evidence produced by AstraZeneca, this claim is not appropriate for summary judgment. See Reeves, 530 U.S. at 150.

> B. **AstraZeneca's Motion for Summary Judgment on the Breach of the Implied Covenant of Good Faith and Fair Dealing Claim**

Summary judgment is also inappropriate on plaintiff's claim of breach of the implied covenant of good faith and fair dealing, again because material facts are in dispute. Every employment contract under Delaware law "includes an implied covenant of good faith and fair dealing." Merrill v. Crothall-American, Inc., 606 A.2d 96, 101 (Del. 1992). This covenant is breached where there is "an aspect of fraud, deceit or misrepresentation" in the contract. Id.

In the employment context, a claim for breach of the implied covenant of good faith and fair dealing can arise in four ways: "(i) where the termination violate[s] public policy; (ii) where the employer misrepresent[s] an important fact and the employee relie[s] 'thereon either to accept a new position or remain in a present one'; (iii) where the employer use[s] its superior bargaining power to deprive an employee of clearly identifiable compensation related to the employee's past service; and (iv) where the employer falsifie[s] or manipulate[s] employment records to create fictitious grounds for termination." Lord v. Souder, 748 A.2d 393, 400-01 (Del. 2000). Here, Farrell alleges

9

**EXHIBIT C**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MARYBETH FARRELL, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : C.A. NO. 04-285 KAJ |
| | : |
| ASTRAZENECA PHARMACEUTICALS LP, | : |
| a Delaware corporation, | : |
| | : |
| Defendant. | : |

**PLAINTIFF'S ANSWERING BRIEF
IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

THE NEUBERGER FIRM, P.A.
THOMAS S. NEUBERGER, ESQ. (#243)
STEPHEN J. NEUBERGER, ESQ. (#4440)
Two East Seventh Street, Suite 302
Wilmington, Delaware 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

LAW OFFICE OF JOHN M. LaROSA
JOHN M. LaROSA, ESQ. (#4275)
Two East 7th Street, Suite 302
Wilmington, Delaware 19801-3707
(302) 888-1290
JLR@LaRosaLaw.com

Dated: May 17, 2005        Attorneys for Plaintiff

Plaintiff had to vacate her office by close of business on September 18th. Pl. at 259; B113. When Plaintiff asked her who would help her, Cobuzzi told her she would have to do it herself. Pl. at 259; B113. Plaintiff was placed in a cubicle because Defendant did not keep its promise to promote her to Band V. Pl. at 80; B49.

**2. Defendant Vandalizes Plaintiff's Computer Docking Station and Refuses to Investigate.** Then just weeks before she was discharged, Plaintiff's computer was vandalized on January 9, 2004. Pl. at 260, Austin-Jones at 19; B114, 282. The docking station, which holds down the laptop and connects it to the system, looked like someone had taken a hammer and smashed it and scattered the pieces on her desk. Pl. at 260-61; B114. Plaintiff reported it to security and requested an investigation, but they refused to do one. Pl. at 261; B114.

**H. Violation of Policies and Procedures Regarding FMLA.** There also is evidence that Defendant violated its own policies and procedures regarding FMLA. Defendant's policy states "if the physician should say you need to be out for six weeks, [Defendant] certainly honor[s] that." Bevis at 20; B306. Yet Hellen's reaction was to state that six weeks was a long time and we are very busy. According to Bevis, however, Defendant supports work life balance and the fact that leaves are part of life. But Bevis never reported to Hellen or Broadway. Bevis at 22; B307.

**VI. Fuentes Prong One: Weakness, Incoherencies, Implausibilities, Inconsistencies, and Contradictions Demonstrate that Defendant's Stated Reasons for Its Actions are a Pretext for Retaliation.** Throughout the Action Plan process, the PIP and the treatment of Plaintiff after she announced she was going out on six weeks medical leave, AstraZeneca operated in an untruthful and unethical manner. Pl. at 243; B109.

**A. Plaintiff's Alleged Pre-Existing Performance Problems Are Self-Serving and of Questionable Authenticity.** Defendant alleges that Plaintiff actually had performance problems prior to her April 22, 2002 request for FMLA leave. Defendant claims that Hellen e-mailed

16

Brangman on February 12, 2003 about having reservations on promoting Plaintiff. Hellen at 109, D171; A47, B208. But this is **inconsistent** with Defendant's procedures because any alleged performance problems would not have been first discussed among Plaintiff's managers as the fabricated e-mails suggest. Rather, verbal discussions with the individual about her performance or lack thereof first occurs on an ongoing basis. Bevis at 26; B309. Thus, "the *first* step is tell [an employee] verbally that there are issues." Brangman at 31; B251 (emphasis added). Then before you get to the action plan, you can put something in writing directed *to the employee* to inform her of her performance issues. Brangman at 32; B251 (emphasis added). So if there were legitimate performance concerns with Plaintiff in February of 2002, such verbal and written communications would have been directed to Plaintiff. But neither of these things were done in Plaintiff's case. Rather, the alleged pre-existing e-mail exchanges among managers, including the February 12th e-mail, began before Plaintiff was informed of any issues. Thus, their authenticity is questionable and **implausible!**

**B. Hellen's Characterization of Plaintiff's Alleged Poor Performance Record Also Is Refuted by the 2002 Evaluation.** Defendant's alleged poor performance record also is **contradicted** by and **inconsistent** with Plaintiff's written 2002 evaluation. On April 28, 2003, Hellen and Broadway raised four different areas of concern about Plaintiff. Pl. at 181; B94. After her conversation with Hellen about the performance areas in late April, Plaintiff sent her a memo outlining each of the areas and her response to them. Pl. at 188; B96. Previously for these four performance categories, Plaintiff had received the rating of exceeds expectations and/or excellent just a month earlier on her review. Pl. at 181, P186-87; B94-95, 391-92. The four categories are as follows:

**1. Cancellation of the April 25-27th Cardiology Advisory Board.** The first false claim was cancellation of the April 25-27th cardiology advisory board. Pl. at 182; B94. At her deposition, Hellen alleged that the Cardiology Board had to be canceled because of

17

Plaintiff's inability to get the meeting planned and execute it. Hellen at 30-31, 119; B164-65, 214. But initially, the EXANTA Team did not have a database of key opinion leaders to invite to advisory boards and special events. Pl. at 61; B44. Previously in December of 2002, PREP Manager Louise Colburn was in charge of developing a list of physicians to have as a database to invite to the program. However, she was way behind schedule on the project which was supposed to be done in November or December. Pl. at 182-83; B94. Plaintiff then went to her supervisor Brian Martin and offered to help. But Martin told her not to develop a separate list of physicians and to wait for Colburn. Pl. at 183, P171-72; B94, 386-87. So originally Jane Hellen did not blame Plaintiff for the advisory board being canceled. Pl. at 121; B59. Hellen's April 28th accusation **contradicts** her earlier position on the subject.

      **2. Delay in the Advisory Board Time Lines.** The second issue was delay in the April Advisory Board time lines. Pl. at 183; B94. Here the process to actually schedule advisory boards took three and a half months. Pl. at 183-84; B94. After selecting geographic locations and cities where Hellen and Patty McDonald wanted them, getting hotel availabilities and looking at all the holidays, Plaintiff had the plan prepared by late November or early December. Pl. at 184; B94. Then Martin got involved and said he did not like the hotels or the cities selected. Pl. at 184; B94. So he basically threw out the plan, designated new cities, and made Plaintiff redo everything. Pl. at 184; B94. By February, Plaintiff had new locations secured and the schedules of the Team's scientists and strategists re-aligned. Pl. at 185; A45, B94. On February 12, 2003, Hellen praised Plaintiff's efforts in doing so. See A45. So Hellen's subsequent blaming of Plaintiff for the delay after she requested leave is **weak** and **implausible.**

      **3. Weak Strategic Content Leadership.** Hellen criticized Plaintiff for weak strategic content leadership. Pl. at 185; B95. Again, the language in Plaintiff's review is **contradictory** and states that she did a terrific job of providing leadership to the team on strategy and strategic content for the team's programs. Pl. at 185; B95. Defendant suggests Plaintiff should have

18

developed strategy for the team's programs. But both Hellen and Brangman admitted at deposition that a Band IV employee such as Plaintiff is *not responsible* for developing brand strategy. Hellen at 70, 73, Brangman at 35-36; B186, 188, 252. Someone higher up such as a brand strategist or brand director develops brand strategy. Brangman at 36; B252. Moreover, Plaintiff met expectations of planning and executing brand strategy at her meetings in 2002. Hellen at 74; B189. So this criticism also is **contradicted** by Hellen and Brangman's own deposition testimony.

    **4. Not Managing Internal Processes.** Finally, Hellen said Plaintiff was not managing internal processes well. Pl. at 185; B95. But Plaintiff explained to her that there was **contradictory** specific language in her review that acknowledged that Plaintiff had done a great job of being innovative and championing programs and streamlining processes. Pl. at 185, P18-25; B95, 333-39.

    **C. Broadway Sets Plaintiff Up to Fail.** Broadway also set Plaintiff up to fail by giving her tasks and restrictions that were **inconsistent** with her job and **contradicted** by Defendant's practices.

    **1. Job Description for Plaintiff's Band 4 and Level 5.** Broadway's Action Plan treated Plaintiff as a Band V rather than a Band IV employee. Pl. at 211, P189-191; B101, 393-95.[14] There were "disconnects between what was required in the action plan and the actual job requirements that were required in the action plan and the actual job requirements that were required by the company for that position at that band level." Pl. at 192; B97. For example, Broadway set unreasonable requirements for Plaintiff which included acting as a consultative scientific expert. Pl. at 133; B62. Key opinion leaders are medical experts in their field. Austin-Jones at 33; B290. Also, Band V PREP managers should have more depth in their understanding of critical data than Band IV PREP managers. Broadway at 35, P97; B231, 373.

---

[14] Plaintiff was a Band IV PREP manager. Austin-Jones at 9; B277.

In August of 2003, Plaintiff asked Broadway to reconsider the Action Plan to reflect the fact that she just held a Band IV position. Hellen at 75-76, Broadway at 40, Austin-Jones at 35; B189-190, 232, 291. Broadway felt that the Action Plan was appropriate for a Band IV PREP manager. Austin-Jones at 35; B291. But the plan for Plaintiff's improvement had "nothing to do with [her] actual position." Pl. at 193; B97. So Broadway's Action Plan requirements were **inconsistent** with Plaintiff's actual job requirements.

**2. Broadway Forbids Plaintiff to Utilize Medical Education Agency and Administrative Staff.** Broadway also told Plaintiff she was not supposed to use agency resources to develop the PREP strategic plan. Pl. at 129; B61. However, other PREP managers and promotion managers were allowed and, in fact did utilize agency resources to develop strategic plans for the exact same assignment. Pl. at 129; B61.

After Plaintiff announced she was going out on medical leave, Broadway told her she was requesting information and assistance from her medical education agency that she should be doing herself. Pl. at 73-74; B47-48. So Broadway forbade Plaintiff from using her administrative assistant or the help of an outside agency to do her work prior to leave even though her job posting acknowledges that PREP Managers work with Medical Affairs. Pl. at 248, Hellen at 39, P96; B111, 169, 372. Further, Brangman admitted that creating the physician profiles is a collaborative process. Brangman at 20; B248. Brangman admitted that Defendant uses outside research agencies called medical communication companies to help create physician profiles. Brangman at 19, P96; B248, 372. So Broadway's insistence that Plaintiff did not need this resource to do her work is **contradicted** by Brangman's testimony.

**3. Broadway's Falsified Budget Reports Intentionally Omitting Plaintiff's Data.** Broadway also falsified concerns about Plaintiff's performance and the EXANTA Team's monthly budget reports. Pl. at 243, P195-96; B109, 396-97. Alleged complaints or concerns with Plaintiff's performance were never discussed with her prior to seeing them in her

20

performance review. Pl. at 247; B110. Also, Broadway repeatedly and erroneously accused Plaintiff of not having entered the $ 1.55 million into the budget that would cover her programs. Pl. at 207; B100. This is **contradicted** by the fact that for several months, Plaintiff provided her with e-mails with the attached budget submissions that Plaintiff submitted consistently from February 21, 2003. Pl. at 207-08; B100-101. Yet Broadway always neglected to include Plaintiff's budget updates to the Finance Department and then would accuse Plaintiff of not submitting her numbers and causing the whole team to be off budget. Pl. at 207-08; B100-101. Broadway obviously excluded Plaintiff's updates to put Plaintiff in a false light. Pl. at 244; B110.

### D. Miscellaneous Pretextual Performance Issues.

**1. Concern About Plaintiff's Focus and Communications.** Defendant alleges Plaintiff had problems focusing and communicating. But concerns about Plaintiff's focus and communications were never mentioned to her. Pl. at 274; B117. Moreover, this is **contradicted** by her 2002 review and comments by her peers. In that review, Plaintiff was specifically lauded for having excellent communication skills. Pl. at 274; B117. In January of 2002, a peer also acknowledged that Plaintiff "is a very good communicator." D2641; B426.

**2. Unprepared for Promotion.** Bevis testified that Plaintiff was not prepared to be a Band V in July of 2003. Bevis at 29; B311. This is **contradicted** by the testimony of Brangman that she, Hellen, Martin, and Plaintiff's peers felt she was ready to be promoted seven months earlier in December of 2002. Brangman at 27-28, 40, 44-45; B250, 253-54.

**3. Attitude Problem.** According to Hellen, after she returned from leave, Plaintiff's attitude was becoming increasingly negative. Hellen at 57-58; B179-180. After she returned from medical leave, Plaintiff was told that she should not blame other people for things that were her responsibility. Pl. at 106; B56. This is **inconsistent** with Plaintiff's personality as acknowledged by Hellen who admitted her attitude was not a problem in 2002. Hellen at 59; B180.

21

**E. Plaintiff Never Admitted to Any Alleged Performance Deficiencies At Her Deposition.** Though Defendant cited a bagful of performance reasons for its actions, throughout her two day deposition, Plaintiff never admitted to any of the alleged performance deficiencies propounded by Defendant. Rather, she denied such issues were raised with her prior to requesting FMLA leave and asserted they did not exist before or after her leave.

- Defense counsel: "[W]as [there] a discussion earlier [on or about March 13, 2003,] with Jane Hellen about your performance?"
  Plaintiff: "[T]hat discussion did not occur." Pl. at 135; B63.

- Defense counsel: "Do you remember Brian Martin having a discussion with you along th[e] lines [of taking ownership of follow-up items and actively managing projects outside of e-mail delegation, etc.] in 2002[?]"
  Plaintiff: "Not that I can recall, no." Pl. at 135; B63.

- Defense counsel: "This purports to be a document that Susan Broadway prepared as a list of items that she discussed with you. . . . And then she also has here your comments in response to the conversation that she had with you. . . . "
  Plaintiff: "That's not my reaction." Pl. at 135-36; B63.

Thus, Defendant's allegations are **inconsistent** with and **contradicted** by Plaintiff's deposition testimony. Here the jury must assess the credibility of the witnesses.

## STANDARD OF REVIEW

Summary judgment shall only be granted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R. Civ.P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). "This standard is applied with added rigor in employment discrimination cases, where intent and credibility are crucial issues." Sarsha v. Sears, Roebuck & Co., 3 F.3d 1035, 1038 (7th Cir. 1993); King v. Preferred Tech. Group, 166 F.3d 887, 890 (7th Cir. 1999) (FMLA retaliation). "[I]n

22