# YOUNG CONAWAY STARGATT & TAYLOR, LLP

BRUCE M. STARGATT
BEN T. CASTLE
SHELDON N. SANDLER
RICHARD A. LEVINE
RICHARD A. ZAPPA
FREDERICK W. IOBST
RICHARD H. MORSE
DAVID C. MCBRIDE
JOSEPH M. NICHOLSON
CRAIG A. KARSNITZ
BARRY M. WILLOUGHBY
JOSY W. INGERSOLL
ANTHONY G. FLYNN
JEROME K. GROSSMAN
EUGENE A. DIPRINZIO
JAMES L. PATTON, JR.
ROBERT L. THOMAS
WILLIAM D. JOHNSTON
TIMOTHY J. SNYDER
BRUCE L. SILVERSTEIN
WILLIAM W. BOWSER
LARRY J. TARABICOS
RICHARD A. DILIBERTO, JR.
MELANIE K. SHARP
CASSANDRA F. ROBERTS

RICHARD J A. POPPER
TERESA A. CHEEK
NEILLI MULLEN WALSH
JANET Z. CHARLTON
ROBERT S. BRADY
JOEL A. WAITE
BRENT C. SHAFFER
DANIEL P. JOHNSON
CRAIG D. GREAR
TIMOTHY JAY HOUSEAL
BRENDAN LINEHAN SHANNON
MARTIN S. LESSNER
PAULINE K. MORGAN
C BARR FLINN
NATALIE WOLF
LISA B. GOODMAN
JOHN W. SHAW
JAMES P HUGHES, JR.
EDWIN J. HARRON
MICHAEL R. NESTOR
MAUREEN D. LUKE
ROLIN P BISSELL
SCOTT A. HOLT
JOHN T DORSEY
M BLAKE CLEARY

THE BRANDYWINE BUILDING
1000 WEST STREET, 17TH FLOOR
WILMINGTON, DELAWARE 19801

P.O. BOX 391
WILMINGTON, DELAWARE 19899-0391

(302) 571-6600
(800) 253-2234 (DE ONLY)
FAX: (302) 571-1253

110 WEST PINE STREET
P O. BOX 594
GEORGETOWN, DELAWARE 19947
(302) 856-3571
(800) 255-2234 (DE ONLY)
FAX: (302) 856-9338

WWW YOUNGCONAWAY.COM

DIRECT DIAL: 302-571-6673
DIRECT FAX: 302-576-3330
ssandler@ycst.com

ATHANASIOS E. AGELAKOPOULOS
JOSEPH M. BARRY
SEAN M. BEACH
DONALD J. BOWMAN, JR.
TIMOTHY P. CAIRNS
KARA HAMMOND COYLE
CURTIS J CROWTHER
MARGARET M. DIBIANCA
ERIN EDWARDS
KENNETH J. ENOS
IAN S. FREDERICKS
JAMES J. GALLAGHER
DANIELLE GIBBS
SEAN T. GREECHER
STEPHANIE L. HANSEN
DAWN M. JONES
RICHARD S. JULIE
KAREN E KELLER
JENNIFER M. KINKUS
EDWARD J. KOSMOWSKI
JOHN C KUFFEL

TIMOTHY E. LENGKEEK
ANDREW A. LUNDGREN
MATTHEW B. LUNN
JOSEPH A. MALFITANO
ADRIA B. MARTINELLI
MICHAEL W. MCDERMOTT
MARIBETH L. MINELLA
EDMON L. MORTON
D. FON MUTTAMARA-WALKER
JENNIFER R. NOEL
JOHN J. PASCHETTO
ADAM W. POFF
SETH J. REIDENBERG
FRANCIS J. SCHANNE
MICHELE SHERRETTA
MICHAEL P STAFFORD
JOHN E. TRACEY
MARGARET B. WHITEMAN
CHRISTIAN DOUGLAS WRIGHT
SHARON M. ZIEG

SPECIAL COUNSEL
JOHN D. MCLAUGHLIN, JR.
ELENA C NORMAN (NY ONLY)
PATRICIA A WIDDOSS

OF COUNSEL
STUART B. YOUNG
EDWARD B. MAXWELL, 2ND

November 21, 2005

**BY CM/ECF**

The Honorable Kent A. Jordan
Lock Box 10
United States District Court
District of Delaware
Wilmington, DE 19801

   Re:  **Marybeth Farrell v. AstraZeneca Pharmaceuticals, LP**
      **Civil Action No.04-285 KAJ**

Dear Judge Jordan:

  This letter is in response to Mr. LaRosa's letter opposing Defendant's request to file a second motion for summary judgment and for a postponement of the trial. His letter is noteworthy as much for what it does not say as for what it does say. In my first letter, I pointed out that as a result of Plaintiff having quickly obtained other jobs where she has earned a higher salary and with equivalent or similar benefits, Plaintiff sustained no damages. Mr. LaRosa's letter is silent on that point. I am enclosing Defendant's expert report, which confirms that Plaintiff has incurred no damages. *And see, Blum v. Witco Chem. Corp.*, 29 F.3d 367 at 373,375 (3d Cir. 1987).

  "Damages under the FMLA are limited to lost or denied wages, salary, benefits, or other compensation. . . . If there have been no such losses, damages are limited to actual monetary losses such as the cost of care." *Montgomery v. The State of Maryland*, 72 Fed. Appx. 17, 2003 U.S. App. LEXIS 15068, **5 (4th Cir. July 30, 2003). Emotional distress, nominal damages, out of pocket expenses and consequential damages are not covered under the FMLA. *Id.* "Once it becomes clear that a plaintiff can recover nothing but a symbolic victory in that the defendant violated a statute, the lawsuit should be terminated. This is especially true for a remedial statute

YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Honorable Kent A. Jordan
November 21, 2005
Page 2

such as the FMLA . . .". *Dawson v. Leewood Nursing Home, Inc.*, 14 F. Supp.2d 828 (E.D. Va. 1998). *Accord, Lapham v. Vanguard Cellular Systems, Inc.*, 102 F.Supp. 2d 266, 269-70 (M.D. Pa. 2000)(granting second motion for summary judgment, holding that "[The FMLA] simply leaves no room for recovery when an employee does not sustain economic loss during the period of his or her employment" and citing case holding that where no damages are recoverable "it would be highly unjust to the defendant and a waste of judicial resources to allow the case to proceed to trial merely so that the plaintiff can recover her attorneys' fees, which she would not have incurred if she had not pursued this claim.")

   Nor does Mr. LaRosa respond to my discussion of the Third Circuit's decision in *Equal Employment Opportunity Commission v. Avecia, Inc.*, 2005 U.S. App. LEXIS 22157 (3d Cir. Oct. 13, 2005). Presumably, he has conceded, as he should, that Plaintiff's implied covenant claim has been eliminated by that decision.

   Mr. LaRosa's letter lists a series of trivial allegations as "evidence of retaliation," claims to which Your Honor, with good reason, attached no weight in your Opinion.[*] *See*, Defendant's Reply Brief, pp. 12-15 for a discussion of these claims. The crux of the Court's holding is contained on pp. 8 and 9 of the slip opinion. Plainly, the "material dispute" on which the Opinion focused directly implicates Plaintiff's performance, her claim that she was "unaware of any problems with her performance before she requested leave," and her assertion that Defendant's preexisting documents were "fabricated."

   The inquiry into Plaintiff's subsequent identical modus operandi at GlaxoSmithKline, denying or mischaracterizing the very same performance problems, is highly relevant on this issue, and allows her denials of performance problems and claims of fabricated documents in this case to be viewed in a vastly different light. When I requested permission to reopen discovery to take the two depositions, in both my letter of October 14, p.2, and my letter of November 3, p.3, I stated that the aim of the depositions was to explore issues relating to both liability and

---

[*] Much of what is claimed is simply missing entirely from the record and the rest is grossly distorted. Hellen and Broadway never said they were too busy for Plaintiff to be sick or that they wanted "dependable" people during a busy time, and there is no credible evidence that Hellen was biased against people who took leave. The suggestion that a "pattern of antagonism" surfaced only after the FMLA request underscores the importance of revisiting whether any reasonable jury would believe the preexisting documents were "fabricated."

YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Honorable Kent A. Jordan
November 21, 2005
Page 3

damages. I did so at the depositions without objection. In a case where no reasonable jury would find liability and no damages claim can be presented in good faith, it is submitted that judicial economy argues strongly against proceeding with the time and expense of a trial.

                              Respectfully submitted,

                              /s/   Sheldon N. Sandler
                              Sheldon N. Sandler, Esquire (No. 245)

SNS:sde
Enclosure
cc:    Clerk, U.S. District Court (by hand delivery)
       Thomas S. Neuberger, Esquire (by CM/ECF)
       John M. LaRosa, Esquire (By CM/ECF)
       John J. Bogan, Esquire (by U.S. mail)

THE CENTER FOR FORENSIC
# ECONOMIC STUDIES

November 18, 2005

Sheldon Sandler, Esquire
Young Conway Stargatt & Taylor
Brandywine Building
1000 West St., 17th Floor
Wilmington, DE 19801

**Re: *Marybeth Farrell v. AstraZeneca***
Our File #: *1752*

Dear Mr. Sandler:

At your request, we have provided our preliminary assessment of the economic loss to Marybeth Farrell as a result of her separation of employment on January 24, 2004.

## I. DOCUMENTS REVIEWED

The following documents in the above-captioned matter have been reviewed:

- Deposition Testimony of Marybeth Farrell, dated December 9, 2004, pages 20-21
- Report of Thomas C. Borzilleri, Ph.D., dated January 31, 2005
- AstraZeneca documents, Bates Stamped P547 to P590
- GlaxoSmithKline documents, Bates Stamped P601 to P670
- GlaxoSmithKline Benefits Enrollment Guide, Bates Stamped P593 to P595
- GlaxoSmithKline cash balance pension plan
- GlaxoSmithKline retirement savings plan
- 2003 Tax Return for Marybeth Farrell, Bates Stamped
- 2003 W-2 Wage and Tax Statement for Marybeth Farrell, Bates Stamped P597
- Deposition transcript of Marybeth Farrell - November 10, 2005, excerpted pages.
- Deposition transcript of Bernadette Mansi - November 17, 2005, excerpted pages.

In addition to the foregoing, we have relied upon various professional and governmental publications as are more fully cited herein.

---

This report has been prepared for the use of counsel in the instant matter. Any other transmission, copy, or utilization of this report or material contained herein is prohibited without the written consent of the Center for Forensic Economic Studies.

1608 WALNUT STREET, EIGHTH FLOOR, PHILADELPHIA, PENNSYLVANIA 19103-5407 (215) 546-5600 FAX (215) 732-8158
ONE PENN PLAZA, SUITE 3600, 250 WEST 34TH STREET, NEW YORK, NEW YORK 10119-0002 (212) 873-5855
1725 "I" STREET, NW, SUITE 300 WASHINGTON, DC 20006 (202) 530-8808
cfes@cfes.com ⋅ www.cfes.com

## II. INTRODUCTION AND BACKGROUND

Marybeth Farrell was born on June 4, 1959. On February 7, 1994, she was hired by AstraZeneca ("AZ"). On January 24, 2004, her employment with AZ ended. At the time of her separation, she was 44.6 years old.

According to Ms. Farrell's deposition testimony, her annual base pay at the time of her separation from AZ was $94,000. Her testimony also indicates that she received annual bonuses, and that her highest bonus was between $22,000 and $25,000. Ms. Farrell's 2003 <u>W-2 Wage and Tax Statement</u> from AZ reflects gross earnings in the amount of $114,988.

Subsequent to her separation from AZ, Ms. Farrell secured employment with Burson Marsteller on March 1, 2004 as their director of health care practice, earning $165,000 in salary, with the opportunity to receive bonus income. In June of 2004, Ms. Farrell secured employment with GlaxoSmithKline ("GSK") as director of global public relations for cardiovascular, earning $135,000 in salary, with the opportunity to receive bonus income. She received a bonus of $19,261 in March of 2005 and a salary increase to $138,380 effective on April 1, 2005. After leaving GSK in September of 2005, Ms. Farrell secured employment with the public relations firm Dorland Global Health Communications with a salary of $140,000 with potential bonuses of up to 50% of salary.

## III. ANALYSIS OF ECONOMIC LOSS

We have examined the benefits and compensation documents provided to us in the instant matter, as well as the testimony of the plaintiff. Based upon this information, we make the following observations with respect to Ms. Farrell's alleged economic loss:

1. The value of Ms. Farrell's compensation at any of the three jobs she held since leaving AZ equals or exceeds that which she was receiving from AZ. Therefore, as a result of her separation from AZ, Ms. Farrell's potential lifetime earnings have increased considerably.

2. Any pension loss that Ms. Farrell may have incurred as a result of her separation from AZ are of a significantly lower order of magnitude than her earnings gains. According to AZ documents, Ms. Farrell's *calculated* deferred pension benefit starting in 2024 will be $1,179.73 per month. An *estimate* by the AZ benefits administrator assuming, among other things, that had Ms. Farrell remained employed to normal retirement in 2024, her pension benefit would have been $91,300 per year. Based on these two figures an annual difference of $77,143 in 2024 dollars can be imputed. In current dollars (discounted to present value using a rate of 4.75%), the difference is $31,943. Ms. Farrell's compensation at Burson Marsteller was at least $50,000 more than her salary and bonus from AZ.

Ms. Farrell's bonuses from AZ were about 22% of salary. Assuming similar bonuses from GSK[1], her cash compensation at GSK becomes commensurate with her compensation at Burson Marsteller. As noted earlier, Ms. Farrell recently changed employers. Her compensation potential (including bonus) at Dorland Global is $210,000 — well in excess of her compensation at AZ.

3. As an employee at GSK, Ms. Farrell participated in both the cash balance pension plan and the retirement savings plan. The cash balance plan is funded by GSK at 5% of earned income plus interest credits based on long term treasury bonds. The retirement savings plan includes a 100% employer match to contributions up to 4% of compensation plus a 2% contribution to the stock ownership account regardless of employee contributions. The retirement savings plan contributions are invested in any of 26 portfolios.

4. The average yield on ten year treasuries over the last ten years was 5.42%. This rate was used to calculate interest on both pension plans as well as present value on the annuity calculations. Assuming 4% growth in GSK compensation, these plans would fund an annuity of $79,606 starting in the year 2024 to Ms. Farrell's statistical life expectancy in the year 2041. As noted earlier, the claimed AZ pension loss in 2024 dollars is $77,143. Therefore, it must be concluded that the GSK pension is at least equivalent to the AZ plan. These calculations are detailed in Table One.

5. We have not reviewed any benefit documents from Dorland Global. Ms. Farrell indicated in deposition that there is a 401(k) retirement savings plan and a pension plan. Given her cash compensation, it is likely that the Dorland benefits package is comparable to those at GSK. Even if it is determined that the Dorland retirement/pension benefits are not commensurate to those at GSK, this potential diminution is not attributable to AZ as her separation from GSK was unrelated to her separation from AZ.

6. The results of our analyses clearly indicate that Ms. Farrell has not incurred any economic loss as a result of her employment separation from AZ.

---

[1] After less than a year of employment, Ms. Farrell received a bonus from GSK in March of 2005 of $19,261. Annualized, this bonus exceeds her historical bonuses from AZ as a percentage of salary.

## IV. CRITIQUE OF THE REPORT OF THOMAS C. BORZILLERI, PH.D.

We reviewed the report of Thomas C. Borzilleri, Ph.D. in the instant matter. In his report, Dr. Borzilleri calculates the present value of the difference between Ms. Farrell's post-separation AZ pension benefit, and the pension she would have received had she remained employed with AZ for another 20 years, until her retirement in 2024.[2]

It is important to note that there are a number of assumptions implicit in Dr. Borzilleri's calculations not the least of which is that Ms. Farrell would have remained employed by AZ (but for the separation in 2004) for an additional 20 years. Just as important, Dr. Borzilleri assumes that from the date of separation until retirement in 2024, Ms. Farrell, despite a six figure salary, will never accrue pension benefits from post-separation employment.

It is instructive to make a distinction between Dr. Borzilleri's pension calculations, as described above, and an analysis of economic loss, which would include a calculation of pension loss. If Dr. Borzilleri had wanted to calculate an economic loss of pension benefits, he would have had to consider the value of Ms. Farrell's (GSK) pension benefits as an offset to the computed AZ pension differential, which he does not.

Either the Plaintiff did not inform Dr. Borzilleri regarding the details of the GSK pension plans or he chose to ignore them. In fact, Ms. Farrell's mitigating income is not mentioned in his report at all. In either case, the Borzilleri report is incomplete and is not probative relative to alleged damages and the calculations presented in his report should not be interpreted as a measure of economic loss in any respect.

---

[2] As noted earlier, the estimate of pension benefit at normal retirement was an estimate from the AZ benefits administrator based on a number of assumptions not articulated or tested in any way by the Borzilleri report.

Page 4

## V.  CONCLUSION

Ms. Farrell has not experienced an economic loss as a result of her separation from AZ. On the contrary, any analysis of economic loss would reach the conclusion that Ms. Farrell is better off with her current GSK compensation package than she would have been had she remained employed with AZ.

Sincerely,

The Center for Forensic Economic Studies

Jerome M. Staller, Ph.D.
President

Brian P. Sullivan, Ph.D.
Vice President

Pia DiGirolamo
Economist

BPS/PD/dra

| Year | Age | Base Salary | Bonus | Total Comp | 6% RSP Contribs | 5.42% ROI | 5% CBPP Contribs | 5.42% ROI |
|---|---|---|---|---|---|---|---|---|
| 2004 | 45 | 78,750 | 17,561 | 96,311 | 5,779 | 16,607 | 4,816 | 13,839 |
| 2005 | 46 | 138,150 | 30,807 | 168,957 | 10,137 | 27,635 | 8,448 | 23,030 |
| 2006 | 47 | 143,676 | 32,040 | 175,716 | 10,543 | 27,263 | 8,786 | 22,719 |
| 2007 | 48 | 149,423 | 33,321 | 182,744 | 10,965 | 26,896 | 9,137 | 22,413 |
| 2008 | 49 | 155,400 | 34,654 | 190,054 | 11,403 | 26,534 | 9,503 | 22,111 |
| 2009 | 50 | 161,616 | 36,040 | 197,656 | 11,859 | 26,176 | 9,883 | 21,814 |
| 2010 | 51 | 168,081 | 37,482 | 205,563 | 12,334 | 25,824 | 10,278 | 21,520 |
| 2011 | 52 | 174,804 | 38,981 | 213,785 | 12,827 | 25,476 | 10,689 | 21,230 |
| 2012 | 53 | 181,796 | 40,541 | 222,336 | 13,340 | 25,133 | 11,117 | 20,944 |
| 2013 | 54 | 189,068 | 42,162 | 231,230 | 13,874 | 24,794 | 11,561 | 20,662 |
| 2014 | 55 | 196,631 | 43,849 | 240,479 | 14,429 | 24,460 | 12,024 | 20,383 |
| 2015 | 56 | 204,496 | 45,603 | 250,098 | 15,006 | 24,131 | 12,505 | 20,109 |
| 2016 | 57 | 212,676 | 47,427 | 260,102 | 15,606 | 23,806 | 13,005 | 19,838 |
| 2017 | 58 | 221,183 | 49,324 | 270,506 | 16,230 | 23,485 | 13,525 | 19,571 |
| 2018 | 59 | 230,030 | 51,297 | 281,327 | 16,880 | 23,169 | 14,066 | 19,307 |
| 2019 | 60 | 239,231 | 53,349 | 292,580 | 17,555 | 22,857 | 14,629 | 19,047 |
| 2020 | 61 | 248,800 | 55,482 | 304,283 | 18,257 | 22,549 | 15,214 | 18,791 |
| 2021 | 62 | 258,752 | 57,702 | 316,454 | 18,987 | 22,245 | 15,823 | 18,537 |
| 2022 | 63 | 269,102 | 60,010 | 329,112 | 19,747 | 21,945 | 16,456 | 18,288 |
| 2023 | 64 | 279,867 | 62,410 | 342,277 | 20,537 | 21,650 | 17,114 | 18,041 |
| 2024 | 65 | 118,510 | 26,428 | 144,938 | 8,696 | 8,696 | 7,247 | 7,247 |
| | | | | TOTAL | | 491,329 | | 409,441 |
| | | | | Annuity in 2024 dollars | | $43,421.60 | | $36,184.67 |
| | | | | | | TOTAL ANNUITY | | $79,606.28 |