IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MARYBETH FARRELL,                          )
                                           )
                    Plaintiff,             )
                                           )
          v.                               )     C.A. No. 04-285-KAJ
                                           )
ASTRAZENECA PHARMACEUTICALS,               )
LP,                                        )
                                           )
                    Defendant.             )

## DEFENDANT'S OPENING BRIEF IN SUPPORT OF ITS RENEWED MOTION FOR SUMMARY JUDGMENT

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Sheldon N. Sandler, Esquire (No. 245)
The Brandywine Building, 17th Floor
1000 West Street
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6673
Facsimile: (302) 576-3330
Attorneys for Defendant

Dated: December 7, 2005

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................. iii

NATURE AND STAGE OF THE PROCEEDINGS ........................... 1

FACTUAL BACKGROUND ............................................................ 2

ARGUMENT ................................................................................... 8

I.      PLAINTIFF HAS NO DAMAGES CLAIM. ........................... 8

        A.      Plaintiff's Far Greater Earnings From Subsequent
                Employment Have Cancelled Out Her Pension Loss
                Claim. .......................................................................... 8

        B.      Plaintiff's Voluntary Resignation From GSK Cut Off
                Any Front Pay Claim. ................................................... 9

II.     ASTRAZENECA IS ENTITLED TO JUDGMENT AS A
        MATTER OF LAW ON PLAINTIFF'S IMPLIED
        COVENANT CLAIMS. ........................................................ 13

        A.      The Third Circuit Has Eliminated Plaintiff's Covenant
                Case. ........................................................................... 13

        B.      Plaintiff's Own Emails Confirm The Preexisting
                Performance Problems That Others Discussed. ............ 15

III.    THERE IS NO BASIS FOR PLAINTIFF'S FMLA
        RETALIATION CLAIM. ...................................................... 18

        A.      Analytical Framework for FMLA Retaliation Claims ...... 18

        B.      Plaintiff's Documented Performance Deficiencies
                Predated Her FMLA Leave ........................................... 19

        C.      The Passage of Time Destroys The Claim of a Causal
                Link ............................................................................ 21

        D.      Plaintiff's Other "Evidence" Is Meritless. .................... 27

                1.      Plaintiff Knew In Early 2003 That She Was Not
                        Being Promoted. .............................................. 27

                2.      Moving Plaintiff To A Cubicle Was Not
                        Retaliatory. ..................................................... 28

3.    There Is No Support in the Record for Plaintiff's
Other Claims. ......................................................................................28

4.    Plaintiff's Termination Was The Only Tangible
Adverse Employment Action. ...........................................................30

CONCLUSION ..................................................................................................34

ii

# TABLE OF AUTHORITIES

Page

**Cases**

*Barbour v. Medlantic Mgmt. Corp.*,
  952 F. Supp. 857 (D.D.C. 1997) ................................................................. 9

*Bates v. Board of Educ.*,
  C.A. No. 97-394-SLR,
  2000 U.S. Dist. LEXIS 4873 (D. Del. 2000) ................................................. 12

*Billet v. CIGNA Corp.*,
  940 F.2d 812 (3d Cir. 1991) ....................................................................... 26

*Blum v. Witco Chem. Corp.*,
  829 F.2d 367 (3d Cir. 1987) ............................................................ 8, 11, 13

*Brady v. Thurston Motor Lines*,
  753 F.2d 1269 (4th Cir. 1985) ..................................................................... 9

*Burlington Indus. v. Ellerth*,
  524 U.S. 742(1998) .................................................................................... 31

*Caufield v. The Center Area Sch. Dist.*,
  No. 04-2538, 2005 U.S. App. LEXIS 9278,
  (3d Cir. May 20, 2005) ............................................................................... 10

*Chandler v. Specialty Tires of Am. (Tenn.), Inc.*,
  283 F.3d 818 (6th Cir. 2002) ....................................................................... 22

*Clancy v. Preston Trucking Co., Inc.*,
  967 F. Supp. 806 (D. Del. 1997) .................................................................. 18

*Clark Co. Sch. Dist. v. Breeden*,
  522 U.S. 268 (2001) .................................................................................... 22

*Collier v. Target Stores Corp.*,
  Civ. No. 03-1144-SLR, 2005 U.S. Dist. LEXIS 6262
  (D. Del. April 13, 2005) ............................................................................... 31

*Conner v. Schnuck Markets, Inc.*,
  121 F.3d 1390 (10th Cir. 1997) .................................................................... 22

*Conoshenti v. Pub. Serv. Elec. & Gas Co.*,
  364 F.3d 135 (3d Cir. 2004) ........................................................................ 18

*D'Amico v. Compass Group USA, Inc.*,
   198 F. Supp. 2d 18 (D. Mass. 2002) ................................................................. 23

*Dawson v. Leewood Nursing Home, Inc.*,
   14 F. Supp. 2d 828 (E.D. Va. 1998) ................................................................. 10

*DiFederico v. Rolm Co.*,
   201 F.3d 200 (3d Cir. 2000) ................................................................. 19

*Duvall v. Polymer Corp.*,
   C.A. No. 93-CV-3801, 1995 U.S. Dist. LEXIS 14413
     (E.D. Pa. October 2, 1995) ................................................................. 26

*Edwards v. Concord EFS, Inc.*,
   C.A. No. 03-99-GMS, 2004 U.S. Dist. LEXIS 13942,
     (D. Del. July 20, 2004) ................................................................. 26

*EEOC v. Delight Wholesale Co.*,
   973 F.2d 664 (8th Cir. 1992) ................................................................. 9

*Equal Employment Opportunity Commission v. Avecia, Inc.*,
   No. 64-3396, 2005 U.S. App. LEXIS 22157,
     (3d Cir. Oct. 13, 2005) ................................................................. 13, 34

*Ezold v. Wolf, Block, Schorr & Solis-Cohen*,
   983 F.2d 509 (3d Cir. 1992) ................................................................. 25

*Farrell v. AstraZeneca Pharmaceuticals LP*,
   C. A. No. 04-285-KAJ, 2005 U.S. Dist. LEXIS 18866,
     (D. Del. Sept. 2, 2005) ................................................................. 10

*Fuentes v. Perskie*,
   32 F.3d 759 (3d Cir. 1994) ................................................................. 18, 19, 25

*Gearhart v. Sears, Roebuck & Co., Inc.*,
   27 F. Supp. 2d 1263 (D. Kan. 1998) ................................................................. 22

*Great-West Life & Annuity Ins. Co. v. Knudson*,
   534 U.S. 204 (2002) ................................................................. 13

*Hawkins v PepsiCo Inc*,
   203 F.3d 274 (4th Cir. 2000) ................................................................. 26

*Igwe v. DuPont*,
   C.A. No. 03-839-JJF, 2005 U.S. Dist. LEXIS 1254,
     (D. Del. Jan. 24, 2005) ................................................................. 31

*Johnson v. Spencer Press of Me., Inc.*,
  364 F.3d 368 (1st Cir. 2004) .......................................................................................... 12, 32

*Jones v. Sch. Dist. Of Phila.*,
  198 F.3d 403 (3d Cir. 1999) .......................................................................................... 26

*Kachmar v. Shurgard Data Sys., Inc.*,
  109 F.3d 173 (3d Cir. 1997) .......................................................................................... 21, 22

*Kautz v. Met-Pro Corporation*,
  412 F.3d 463 (3d Cir. 2005) .......................................................................................... 24, 26

*Keeshan v. Home Depot, U.S.A., Inc.*,
  C.A. No. 00-529
  2001 U.S. Dist. LEXIS 3607 (E.D. Pa. March 27, 2001) .............................................. 21

*Keller v. Orix Credit Alliance, Inc.*,
  130 F.3d 1101 (3d Cir. 1997) ........................................................................................ 18

*Kolb v. Goldring, Inc.*,
  694 F.2d 869 (1st Cir. 1982) .......................................................................................... 11, 12

*Krouse v. Amer. Sterilizer Co.*,
  126 F.3d 494 (3d Cir. 1997) .......................................................................................... 21

*Lepore v. LanVision Sys.*,
  No. 03-3619, 2004 U.S. App. LEXIS 21742,
  (3d Cir. Sept. 28, 2004) ................................................................................................. 18

*Lloyd v. Wyoming Valley Health Care Sys., Inc.*,
  994 F. Supp. 288 (M.D. Pa. 1998) ................................................................................ 11

*Maxfield v. Sinclair International*,
  766 F.2d 788 (3d Cir. 1985) .......................................................................................... 12

*Miller v. Ashcroft*,
  No. 1:01-CV-00-441, 2003 U.S. App. LEXIS 20099,
  (3d Cir. Sept. 30, 2003) ................................................................................................. 27

*Mills v. First Fed'l Sav. & Loan of Belvidere*,
  83 F.3d 833 (7th Cir. 1996) .......................................................................................... 25

*Montgomery v. Md.*,
  No. 02-1998, 2003 U.S. App. LEXIS 15068,
  (4th Cir. July 30, 2003) ................................................................................................. 8

*Panto v. Palmer Dialysis Center/Total Renal Care*,
    C.A. No. 01-6013, 2003 U.S. Dist. LEXIS 5663
    (E.D. Pa. Apr. 7, 2003) ................................................................................................................... 21

*Patten v. Zeneca, Inc.*,
    C.A. No. 94C-07-180-WTQ,
    1996 Del. Super. LEXIS 86,
    Del. Super. (Feb. 13, 1996) ........................................................................................................ 14

*Phillips v. DaimlerChrysler Corp.*,
    C.A. No. 01-247-JJF,
    2003 U.S. Dist. LEXIS 23941
    (D. Del. March 27, 2003) ............................................................................................................ 23

*Pivirotto v. Innovative Sys., Inc.*,
    191 F.3d 344 (3d Cir. 1999) ...................................................................................................... 19

*Quiroga v. Hasbro, Inc.*,
    934 F.2d 497 (3d Cir. 1991) ...................................................................................................... 19

*Richmond v. Oreok*,
    12 F.3d 205 (10th Cir. 1997) ..................................................................................................... 22

*Riseman v. Advanta Corp.*,
    98-CV-6671,2001 U.S. Dist. LEXIS 15760,
    (E.D. Pa. Sept. 12, 2001) .......................................................................................................... 13

*Robinson v. City of Pittsburgh,*,
    120 F.3d 1286 (3d Cir. 1997) .................................................................................................... 31

*Rodriguez v. Taylor*,
    569 F.2d 1231 (3d Cir. 1977) .................................................................................................... 11

*Santiago-Negron v. Castro-Davila*,
    865 F.2d 431 (1st Cir. 1989) ..................................................................................................... 12

*Schoch v. First Fidelity Bancorporation*,
    912 F.2d 654 (3d Cir. 1990) ...................................................................................................... 19

*Schuster v. Derocili*,
    775 A.2d 1029 (2001) ................................................................................................................ 13

*Smith v. Allen Health Systems, Inc.*,
    302 F.3d 827 (8th Cir. 2002) ................................................................................................ 22, 23

*Spencer v. Wal-Mart Stores, Inc.*,
    C.A. No. 03-104-KAJ, 2005 U.S. Dist. LEXIS 4373,
    (D. Del. March 11, 2005) ........................................................................................................... 12

*Starceski v. Westinghouse Elec. Corp.*,
   54 F.3d 1089 (3d Cir. 1995) ................................................................................. 13

*Torre v. Casio*,
   42 F.3d 825 (3d Cir. 1994)( ........................................................................... 18, 19

*Van Slyke v. Northrop Grumman Corp.*,
   115 F. Supp. 2d 587 (D. Md. 2000),
   *aff'd*, No. 00-2349, 2001 U.S. App. LEXIS 19279
   (4th Cir. Aug. 27, 2001) ................................................................................. 26

*Watlington v. Univ. of Puerto Rico*,
   751 F. Supp. 318 (D.P.R. 1990) ....................................................................... 12

*Weston v. Pa.*,
   251 F.3d 420 (3d Cir. 2001 ............................................................................. 31

*Williams v. Cerberonics, Inc.*,
   871 F.2d 452 (4th Cir. 1989) ........................................................................... 26

## NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff filed this action alleging retaliation under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.* and other related claims, against Defendant AstraZeneca Pharmaceuticals, LP ("AZ") on May 5, 2004. In addition to her retaliation claim, Plaintiff alleged that AZ violated the provision of the Consolidated Omnibus Budget Reconciliation Act ("COBRA") that requires employee medical insurance benefit plan administrators to issue a COBRA election notice to allow the recipient an opportunity to continue coverage under the plan. 29 C.F.R. § 2590.606-4. Finally, Plaintiff claimed that AZ breached the implied covenant of good faith and fair dealing ("the covenant") by falsifying and manipulating its records regarding Plaintiff's employment in order to create fictitious grounds to terminate her. In the alternative, Plaintiff asserted that AZ breached the covenant by terminating her employment in violation of public policy, *viz*, the FMLA.

AZ filed an Answer asserting that the actions it took were due to Plaintiff's performance deficiencies and were completely unrelated to her FMLA leave, and that it mailed a timely COBRA notice to her last known address. The parties took discovery and on May 2, 2003, AZ filed a motion for summary judgment, which was subsequently briefed. On September 2, 2005, the Court granted Defendant's motion with respect to the COBRA claim, but denied the balance of the motion.

After leaving AZ, Plaintiff worked at several other jobs. On September 12, 2005, Plaintiff voluntarily resigned from her job at GlaxoSmithKline ("GSK") and after Defendant sought and was granted permission to redepose Plaintiff and her GSK supervisor, Defendant moved to postpone the scheduled trial and for permission to renew its motion for summary judgment. The Court granted that motion. This is Defendant's opening brief in support of its renewed motion for summary judgment.

## FACTUAL BACKGROUND

The factual background is set out in detail in Defendant's opening brief in support of its initial motion for summary judgment. In this brief, we will pick up the story after Plaintiff was terminated on January 23, 2004.

### Plaintiff Quickly Obtains Equivalent Employment

On February 4, 2004, eight business days after her termination, Burson Marsteller Public Relations ("BMPR") made a formal offer of employment to Plaintiff. AA96-100. On Monday, March 1, 2004, Plaintiff began working for BMPR in New York City as Director of the Health Care Practice. AA170. Her salary there was $165,000 per year (compared to $94,000 per year at AZ) with equivalent benefits. AA170-71. She worked at BMPR until June 2004, when she resigned, allegedly due to the long commute, and began working immediately for GlaxoSmithKline ("GSK") in King-of-Prussia, Pennsylvania as Director of Global Public Relations-Cardiovascular. AA171. Her starting salary at GSK was $135,000 per year with a bonus opportunity (she later received a 2004 bonus of $19,200). AA170; 191. Her employment benefits at GSK were, in general, equivalent to her benefits at AZ. AA171a. Her pension at GSK was slightly better than at AZ. AA291.

### Plaintiff's Performance Problems At GSK Were Identical To Those At AZ, And Her Reaction Was The Same

Plaintiff's performance problems at GSK were virtually identical to those alleged by AZ. At GSK, she reported to Bernadette Mansi at its King of Prussia, PA site and also to Gary Davies, who was located in the UK. AA185. She worked with several internal customers in King of Prussia as well as having responsibilities to Mr. Davies. AA186-87.

Plaintiff had a year end review at GSK in early 2005 (AA112-28) and a mid-year review in August 2005 (AA134-46). She was told that she was not performing at the standard that was expected for her job level. AA214-15, 230, 232, 235. Ms. Mansi received complaints about various aspects of Plaintiff's performance "somewhere between weekly and monthly." AA101; 215, 223. At various times, her GSK supervisors identified the following problems with Plaintiff's performance:

- Plaintiff did not "actively listen" and as a result, would make mistakes and provide incorrect information in response to requests. AA122, 127; 101; 223-23.

- Plaintiff failed to "focus." AA110; 108.

- Plaintiff lacked product knowledge. AA142; 131; 236; 249.

- Plaintiff did not pay attention at meetings, and did not contribute and "add value." AA142; 131; 243.

- Plaintiff was not good at budget management and did not keep her internal customers informed about the status of their budgets and expenditures. AA142; 131.

- Plaintiff did not respond to requests in a timely fashion, and had to be prodded repeatedly for needed information. AA127; 142; 110; 226; 238-39.

- Plaintiff was not thorough in her planning. AA131-32.

- Plaintiff was told to take courses in listening, time management and effective meeting management, in all of which she was deficient. AA156-57.

- Plaintiff tried to get others to do the projects that had been assigned to her, and then tried to blame the others when problems arose. AA160-61; 225; 236.

- Plaintiff refused to take responsibility for her shortcomings and insisted unrealistically and inaccurately that she was doing "an outstanding job." AA149-51; 234; 202-23.

- Plaintiff misread or misunderstood written and oral communications. AA106-07.

- Plaintiff was disorganized. AA237-38.

- Plaintiff sent hostile emails and left hostile phone messages that caused consternation among her supervisors and co-workers. AA154-55; 227.

- Plaintiff hung up abruptly on a co-worker. AA162-63; 247.

- At times Plaintiff could not be located during the work day. AA158; 212-13; 244-45.

- Plaintiff's co-workers described her as aggressive and having "an edge." AA101; 104; 129; 215.

- Plaintiff complained about her co-workers and Mr. Davies. AA154-55; 216.

- Plaintiff bypassed people whom she should have involved in matters, and did not address work requests and issues from them. AA218a.

- Plaintiff's quality of work needed improvement (number of significant errors). AA158.

At AZ, Plaintiff was, as she put it, "alleged" (AA192) to have the following strikingly similar performance deficiencies:

- Not "actively listening" and lacking "listening skills." AA1; 9; 269; 192; 199.

- Failing to respond to repeated requests for information in a timely fashion. AA78-79; 81; 86; 3; 6; 193; 194.

- Poor communication skills. AA84; 86; 88-89; 74; 6; 9; 91; 15; 269.

- Lack of organization. AA41; 66; 78-80; 87-88; 76; 67; 91; 13.

- Lack of product knowledge. AA11; 15-16; 36; 41; 83; 87; 9; 23; 67; 200-01.

- Trying to shift responsibility to others rather than being accountable. AA41-43; 44; 45; 47-49; 72-73; 92; 40; 200-01.

- Lack of understanding of the budget process and ineffective management of her budget responsibilities. AA41; 52; 56; 72; 74; 76-77; 67-69; 90; 40; 195.

- Not being prepared for meetings. AA32; 84-85; 88-89; 67; 70; 13; 269; 200-01.

- Sending excessive and overly aggressive emails that provoked other employees. AA11; 196-97.

- Inability to get along with co-workers and others. AA15; 61; 64; 87-89; 76-77.

- Being told to take courses in strategic planning, leadership skills and public speaking to address some of her performance deficiencies. AA15; 32; 82; 23.

Plaintiff's response to GSK's effort to correct her deficiencies in performance was similar to her response at AZ. Consistent with her modus operandi, Plaintiff disputed and tried to justify or explain away all of her identified GSK performance deficiencies. AA220-21; 232-33. She denied having any performance problems, insisted that her performance was "excellent," offered inconsistent excuses that did not "line up from one time to another," AA224; 230-31, claimed others were at fault rather than her, said the examples given were trivial, and steadfastly ignored GSK's efforts to get her to view her problems realistically. AA224-25; 230-31; 239-40; 133. Instead of acknowledging her problems, she "didn't hear" them and said she was "shocked," AA147-148 and "stunned" to learn that she had performance issues. AA149-51. Characteristically, she responded by demanding the right to provide feedback about the persons who had criticized her. AA228-29; 233; 130; 198-99. She continually insisted, erroneously, that her problems all related to one person, A.P. Singh, one of her internal customers, and ignored Ms. Mansi's repeated explanations that she had, herself, observed all of the problems she had listed, and had received similar complaints from all of Plaintiff's co-workers, not just one. AA230-31; 239-40; 248. Remarkably, Plaintiff also claimed she had never received any similar complaints at AZ. AA150; 237.

At her initial depositions, when Plaintiff was confronted with the documents discussing her identical performance deficiencies at AZ which predated her FMLA leave

request, she stated that she doubted very much the emails were sent on those dates. AA174-75. Her basis for that statement was her assertion that one of her supervisors never indicated there were any problems. AA174-75. When asked about that contention at her recent deposition, she said only that, in her view, "the facts don't support the allegations." Questioned whether she was "just saying you disagree with what's said in the documents," her response was "No. I'm saying that it's incorrect, erroneous and, **in some cases,** fabricated." AA206. (emphasis added).

On two occasions, one formal and the other informal, Plaintiff sought to move to other positions at GSK, but she was viewed as not qualified for one and GSK declined to move a person who was not performing competently to the other. AA209-11.

In 2005, Plaintiff's annual salary at GSK was increased to $138,380. AA190. She received a raise because, as at AZ after she began working with the Exanta team, she was given "the benefit of the doubt" regarding her performance issues, which were "written off to [her] being new to the job." AA250. In March 2005, she received an annual bonus of $19,200. AA191. This bonus was lower than that paid to her peers, in recognition of her performance deficiencies. AA251.

**Plaintiff Resigns Voluntarily From GSK And
Once Again Obtains Equivalent Employment, At Dorland Global**

Plaintiff worked at GSK until September 12, 2005, when she resigned suddenly and voluntarily after taking two weeks off for an ear problem and personal emergency. She went to work on September 12th, cleaned out her office, and left a letter saying she had resigned "effective immediately." AA168; 217-18; 246. At the time, GSK was in the process of preparing a written verbal warning for her, the first step in GSK's formal coaching and counseling process. AA164-67. Plaintiff began working a month later for Dorland Global, a

public relations firm in Philadelphia. AA183. Her salary at Dorland is $140,000 and she is eligible for a bonus of up to $70,000. AA183-84; 188-89. In his letter of November 2, 2005, Plaintiff's counsel represented to the Court that in her current position, Plaintiff "does not have a pension." AA286. At her recent deposition, Plaintiff testified that she does have a pension plan at Dorland Global as well as a 401K plan. AA189-90. Documents supplied subsequently show that Dorland has a 401k deferred savings plan whereby the employee may contribute pretax dollars, to which the company will contribute a 5% match. AA295-334.

## ARGUMENT

### I.    PLAINTIFF HAS NO DAMAGES CLAIM.

#### A.    Plaintiff's Far Greater Earnings From Subsequent Employment Have Cancelled Out Her Pension Loss Claim.

"Damages under the FMLA are limited to lost or denied wages, salary, benefits, or other compensation." *Montgomery v. Md.*, No. 02-1998, 2003 U.S. App. LEXIS 15068, at *5 (4th Cir. July 30, 2003). Emotional distress, nominal damages, out of pocket expenses and consequential damages are not covered under the FMLA. *Id.*

Plaintiff claims that she lost potential pension money when she was terminated by AZ. Her expert witness was asked to subtract what she was entitled to in pension at the time she left AZ from what she would have earned in pension if she had worked at AZ till the end of her work life. Apparently, Plaintiff did not ask her expert witness to assess the impact of her subsequent earnings on her damages claim, since he did not do so. Because she was earning considerably more in salary and bonus in each of her three subsequent jobs than she had at AZ, that difference in salary alone would have fully offset any potential lost pension monies over her work life. AA290-91.

But additionally, at BMPR and GSK she also had the right to similar retirement benefits. If she had remained at GSK, at the end of her work life she would have had an annuity worth $2,463 more per year than if she had remained at AZ. *Id.* So Plaintiff has suffered no pension loss as a result of leaving AZ, *id*, and therefore, there is no basis for her to proceed with her FMLA front pay damages claim. *Montgomery, id. Accord, Blum v. Witco Chem. Corp.*, 829 F.2d 367, 375 (3d Cir. 1987) ("pension benefits received from a subsequent employer are simply another form of earned income, which, of course, may be set off from a front pay award consistent with plaintiff's duty to mitigate damages.")

The Third Circuit has held that while lost pension benefits are recoverable as front pay under some circumstances,

> such benefits may not be available where an award would make a plaintiff more than whole, such as where a plaintiff has found subsequent employment at a greatly increased salary that would offset any loss of pension benefits, or where defendant can prove that the new employer's pension plan would provide plaintiff with approximately the same benefit he lost due to the defendant's discriminatory firing.

*Id.* at 373. In this case Plaintiff was fortunate enough to find jobs that met both of the above criteria, greatly increased salaries and approximately the same benefits. Summary judgment should be granted on Plaintiff's front pay claim.

### B. Plaintiff's Voluntary Resignation From GSK Cut Off Any Front Pay Claim.

Since Plaintiff voluntarily resigned from GSK and thereby deprived herself of a higher salary than she had been making at AZ as well as a slightly better pension, her entitlement to front pay was cut off. A plaintiff must use reasonable diligence in mitigating her damages, not only by seeking other employment but also by making a reasonable effort to maintain that employment once obtained. *EEOC v. Delight Wholesale Co.*, 973 F.2d 664, 670 (8th Cir. 1992) (plaintiff who voluntarily quit for personal reasons did not mitigate her damages); *Barbour v. Medlantic Mgmt. Corp.*, 952 F. Supp. 857, 864-5 (D.D.C. 1997) (voluntary resignation constituted a lack of reasonable diligence). *Accord, Brady v. Thurston Motor Lines*, 753 F.2d 1269, 1277 (4th Cir. 1985) (holding that a plaintiff has a duty to "make reasonable and good faith efforts to maintain that job once accepted").

In his letter to the Court of November 2, 2005, Plaintiff's counsel stated that "Plaintiff agreed that because [Plaintiff] left GSK for personal reasons, any subsequent lost wages and benefits are attributable to her, and she bears the brunt of that loss." Therefore, since it is

undisputed that Plaintiff voluntarily resigned from GSK, Plaintiff's claim of front pay, *i.e.*, her claim of lost pension money, was lost as of the date of her voluntary resignation. *Caufield v. The Center Area Sch. Dist.*, No. 04-2538, 2005 U.S. App. LEXIS 9278, at *14 (3d Cir. May 20, 2005) ("When an employer successfully proves a failure to mitigate . . . any front-pay award will be foreclosed."). In *Caufield*, the Third Circuit observed that a "finding that Appellant failed to mitigate her damages . . . completely bar[s] any claim for forward pay." *Id.* at *12.

And in any event, as discussed above, since Plaintiff's earnings at BMPR and GSK were greater than what she would have earned if she had remained at AZ, she had no front pay damages claim even before she resigned. For the reasons stated, summary judgment should be granted on Plaintiff's front pay claim. *Dawson v. Leewood Nursing Home, Inc.*, 14 F. Supp. 2d 828, 832 (E.D. Va. 1998) (holding that damages are a necessary element of an FMLA case and "once it becomes clear that a plaintiff can recover nothing but a symbolic victory in that the defendant violated a statute, the lawsuit should be terminated. This is especially true for a remedial statute such as the FMLA . . .").

### C. Plaintiff Has No Claim For Medical Bills.

Plaintiff claims she is owed medical bills in the amount of $3,000. That claim depended entirely on Plaintiff's cause of action alleging that she failed to receive a COBRA notice and because of that, did not continue her health insurance coverage. However, it is the law of the case that Plaintiff was sent a proper COBRA notice. *Farrell v. AstraZeneca Pharmaceuticals LP*, C. A. No. 04-285-KAJ, 2005 U.S. Dist. LEXIS 18866, at *17-18 (D. Del. Sept. 2, 2005). Therefore, she can not claim damages because she failed to obtain COBRA coverage and summary judgment should be granted on her claim for medical bills.

**D. Plaintiff's Back Pay Claim Was Fully Offset By Her Interim Earnings.**

Plaintiff claims she lost salary, wages or back pay in the amount of $9,214.70. The FMLA follows the same damages model as the Age Discrimination In Employment Act ("ADEA"), and both, in turn, are based on the Fair Labor Standards Act. *Lloyd v. Wyoming Valley Health Care Sys., Inc.*, 994 F. Supp. 288, 292 (M.D. Pa. 1998). The Third Circuit and other courts have held repeatedly under the ADEA that an employee's earnings from subsequent employment may be offset against any back pay claimed. *Rodriguez v. Taylor*, 569 F.2d 1231, 1243 (3d Cir. 1977) (rejecting argument that ADEA does not permit set-offs, and stating that "[t]he make-whole relief objective is common to both Title VII and ADEA and will be effectuated only if back pay awards are reduced to reflect alternate source earnings."); *Blum*, 829 F.2d at 374, n.4 (A plaintiff's "new salary will be deducted from the old to avoid a windfall award."). *Accord, Kolb v. Goldring, Inc.*, 694 F.2d 869, 872 (1st Cir. 1982) (holding, in an ADEA case, that "cases like this one call for a simple tabulation of 'items of pecuniary or economic loss such as wages, fringe, and other job-related benefits.' (*H.R. Rep. No. 950, 95th Cong., 2d Sess. 13*) . . . From these must be subtracted post-termination economic benefits.").

In this case, five weeks after she left AZ, Plaintiff began working at BMPR, earning $165,000 per year instead of $94,000. AA170-71. Thus, each month she worked at BMPR, she was earning $5,916.66 more than she had at AZ. So in the three months that she remained at BMPR, she earned $17,749.99 more than if she had remained at AZ. Therefore, she more than offset her alleged back pay loss (as well as her medical expenses) during that short time.

In *Maxfield v. Sinclair International*, 766 F.2d 788, 796 (3d Cir. 1985), an ADEA case, the Third Circuit cited the *Kolb* case, and pointed out that there, "plaintiff had succeeded in finding alternate employment two months after his discharge, and plaintiff was held entitled to collect backpay during the period it took for his salary at his new job to exceed that which he would have earned at his old job." *Kolb, 694 F.2d at 874.* In the present case, there was no waiting period, Plaintiff's salary at her new job exceeded her salary at her old job from the outset. Therefore, there was a complete offset of back pay. *Accord, Watlington v. Univ. of Puerto Rico*, 751 F. Supp. 318 (D.P.R. 1990) (back pay calculation includes wages and fringe benefits "less the amounts the plaintiff actually earned after the discriminatory action.").

Plaintiff is not entitled to assert a back pay claim since the amounts she earned after the allegedly retaliatory action far exceeded her claimed loss of pay.

### E. Plaintiff Is Not Entitled To A Jury Trial.

If the Court were to permit this case to proceed to trial in order to allow Plaintiff to seek to recover $9,214.70 in back pay, that trial should be a nonjury trial. This Court has held that "'the determination of back pay is for the court and, therefore, equitable in nature.'" *Spencer v. Wal-Mart Stores, Inc.*, C.A. No. 03-104-KAJ, 2005 U.S. Dist. LEXIS 4373, at *5-7 (D. Del. March 11, 2005) (citing *Bates v. Board of Educ.*, C.A. No. 97-394-SLR, 2000 U.S. Dist. LEXIS 4873 (D. Del. 2000)). "Where only reinstatement and back pay are requested or if they are the only issues, in addition to liability, remaining in the case then both reinstatement and back pay shall be for the court." *Johnson v. Spencer Press of Me., Inc.*, 364 F.3d 368, 380 n.7 (1st Cir. 2004)(citing *Santiago-Negron v. Castro-Davila*, 865 F.2d 431, 441 (1st Cir. 1989). *And see, Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S.

204, 214 n.2 (2002) (back pay is a form of restitution and "since restitution is an equitable remedy a jury is not required for the award of back pay.").

In her Complaint, Plaintiff also requested reinstatement. At this stage, it is unclear whether Plaintiff would be willing, in good faith, to assert that she would like to be reinstated, in light of the fact that she has accused her former employer of falsifying and manipulating records and in light of the fact that she is earning far more in her current job than she would at AZ.[1] However, if she persists in making that claim, "it is for the court to decide whether reinstatement is feasible ..." *Riseman v. Advanta Corp.*, 98-CV-6671, 2001 U.S. Dist. LEXIS 15760 at *33 (E.D. Pa. Sept. 12, 2001) (*citing Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1103 (3d Cir. 1995)); *and see Blum,* 829 F.2d at 374.

## II.    ASTRAZENECA IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON PLAINTIFF'S IMPLIED COVENANT CLAIMS.

### A.    The Third Circuit Has Eliminated Plaintiff's Covenant Case.

By virtue of its decision in *Equal Employment Opportunity Commission v. Avecia, Inc.*, No. 64-3396, 2005 U.S. App. LEXIS 22157, at *7-10 (3d Cir. Oct. 13, 2005), the Third Circuit has eliminated Plaintiff's implied covenant of good faith and fair dealing claims. There, the Court recognized that the Delaware General Assembly had reestablished the exclusive remedy approach followed by the Delaware state and federal courts prior to the Delaware Supreme Court's decision in *Schuster v. Derocili*, 775 A.2d 1029 (2001). *Id.* Under that approach, both Delaware and federal employment protection statutes were recognized to be the exclusive remedy, and a plaintiff could not double up by invoking an

---

[1] The fact that she resigned voluntarily from subsequent employment, and, as discussed above, her greater earnings eliminated any front pay claim she might have had in lieu of reinstatement, may make that question academic.

implied covenant claim based on a statute, such as the FMLA, as a violation of public policy. *See id.*, (collecting cases).

Plaintiff's "false-records" covenant claim must also fail after the *Avecia* case. The court there explained that even if false criticisms, such as the alleged fabricated documents, existed, there is no basis for a covenant claim if these supposedly fabricated documents were not the grounds for termination. Here, Plaintiff was terminated nine months after she requested FMLA leave, because she failed to meet the requirements of an Action Plan and a Performance Improvement Plan. Although she disagreed with the criticisms and comments contained in the two documents, there is not a shred of proof that they were "fabricated."

In *Avecia*, the Court also pointed out the difference between an employer's giving a false reason for a termination, which is not actionable under the covenant, and falsifying records to create fictitious grounds for termination. Even if Plaintiff contends that AZ's stated reason for terminating her, deficient performance, is false and the real reason is because she took FMLA leave, the Third Circuit has held that this is not a violation of the implied covenant. *See id.*

In a similar case, *Patten v. Zeneca, Inc.*, C.A. No. 94C-07-180-WTQ, 1996 Del. Super. LEXIS 86, Del. Super. (Feb. 13, 1996), Patten claimed that his employer's explanation for his termination was false and deceptive and that his termination therefore violated the implied covenant. He explained at deposition that he was told that he had been fired because of inappropriate behavior at a meeting, but he did not agree that his behavior at the meeting had been inappropriate. *Id.* at *4. The Superior Court held that an employee's subjective disagreement with his employer's perception of and opinions about his conduct

did not provide an adequate factual predicate for a claim of breach of the covenant. *Id.* at *6-7. The same is true here.

Moreover, Plaintiff cannot establish that any of the documents discussing Plaintiff's poor performance were false or fraudulent. She is simply claiming, without any other support in the record, that because "the facts don't support the allegations," they must be fraudulent. AA204-05. Indeed, in her recent deposition, she retreated to a slightly more equivocal position, saying the documents are "incorrect, erroneous and, in some cases, fabricated." AA205. Her statements are nothing more than biased speculation, with absolutely no evidentiary basis.

### B.    Plaintiff's Own Emails Confirm The Preexisting Performance Problems That Others Discussed.

As they have testified and as their email correspondence and Plaintiff's own emails show, Plaintiff's managers did in fact have concerns about Plaintiff's performance problems in the first quarter of 2003 as well as throughout the remainder of the year. There is no evidence that Ms. Broadway manufactured the records that detail Plaintiff's poor performance. Many individuals provided documented criticism of Plaintiff throughout her period of employment with the Exanta team, including her co-workers, Faye Morin, Louise Colburn, Cindi Hassrick and Denise Barrett-Quigley, her supervisors, Jane Hellen, Brian Martin, and Deborah Brangman, and vendors who worked with her, Mike Zilligen of GMR, Denise Walters of QED, Christina Lutze, Fran King and MaryPat Howard of Discovery, and Robin Moisa of IMPACT. Ms. Hellen and Ms. Brangman both testified that the dates on the email correspondence discussing concerns about Plaintiff's performance were accurate and not manipulated in any way. AA257; 267.

And Plaintiff's own emails are consistent with what was contained in the emails that Plaintiff claims were fabricated. On March 11, 2003 Plaintiff sent an email to Deborah Brangman and Brian Martin that followed up Plaintiff's review meeting the previous day and mentioned two courses, "Thought Leader and Publication Planning Development" and "Public Presentations for the Professional" that she proposed taking to further her "2003 developmental goals." AA33. At the meeting during which the 2002 review was administered, Ms. Brangman had discussed Plaintiff's 2003 performance problems. And the review, itself, suggested taking courses such as the ones Plaintiff proposed in her email ("strategic planning, leadership skills and public speaking").

The string of emails from AA25 to AA31 ending with Jane Hellen's March 5 comment that these emails "highlight the significant deficiency we have with Marybeths work" is plainly related to Ms. Hellen's subsequent email to Plaintiff of April 7, inquiring about whether Plaintiff was making any progress on a list Plaintiff had sent a month before, at the time the Cardiology Ad board had to be cancelled. AA34. Ms. Hellen's April 7 email shows her obvious concern ("By item, how are you progressing with this action list") and when Plaintiff responded by sending an email to a vendor asking for a weekly status report, Hellen's response was again consistent with the previous emails reflecting concern about Plaintiff's performance ("I was thinking of more depth."). AA35.

When Plaintiff responded to that email, Ms. Hellen forwarded her response to Susan Broadway, asked her to follow up, and referred back to Plaintiff's performance problems and how to deal with them. AA37.

In April 2003, before she knew that Plaintiff had requested FMLA leave, Ms. Broadway prepared bullet points outlining Plaintiff's performance deficiencies, which she

derived from her own observations as Plaintiff's peer and conversations with Plaintiff's supervisors. The bullet points touched on virtually all of the problems mentioned elsewhere, and Ms. Broadway had several conversations in April with Plaintiff in which the subjects covered in the bullet points were reviewed. Ms. Broadway mentioned Plaintiff's need to improve her participation in team meetings, adhere to project deadlines, stop overusing e-mail, increase her product knowledge, remember things she was told, communicate better, be prompt and prepared for meetings, and take accountability for her projects. AA38-39; 335-38.

Plaintiff's email to Susan Broadway on April 11, AA40, referring to the conversation they had that day, shows clearly that the concerns Plaintiff claims were never mentioned before she requested FMLA leave, were, in fact, discussed with her at that meeting. It is apparent from Plaintiff's email that many of the items in Ms. Broadway's bullet points were reviewed with her. Plaintiff said she was revising her 2003 objectives regarding "accountability and leadership," including "responsibility for total project management including directly obtaining the necessary inputs from team members . . .," and "more focus on overall budget management and process improvements."

Plaintiff was terminated only after months of diligent efforts to try and help her improve, a job her supervisor, Susan Broadway, at times found "draining" because of Plaintiff's unbending hostility. Defendant decided reasonably and correctly at the end of the PIP that Plaintiff's performance had not improved. That decision set in motion the AZ process for termination. Summary judgment should be granted on Plaintiff's implied covenant claim.

III.    **THERE IS NO BASIS FOR PLAINTIFF'S FMLA RETALIATION CLAIM.**

    A.    **Analytical Framework for FMLA Retaliation Claims**

Plaintiff claims AZ gave her negative performance evaluations and otherwise retaliated against her, denied her a previously promised promotion, and terminated her in January 2004 in retaliation for taking medical leave under the Family and Medical Leave Act in May and June 2003 or for complaining in September 2003 about retaliation for exercising her FMLA rights. AZ agrees that Plaintiff was entitled to and did properly exercise her right to leave under the FMLA. However, AZ denies that any of the actions about which Plaintiff is complaining were motivated by retaliatory animus.

To establish a *prima facie* case of retaliation under the FMLA, a plaintiff must show: (1) she took an FMLA leave, (2) she suffered an adverse employment action, and (3) a causal relationship between her leave and the adverse action. *Lepore v. LanVision Sys.*, No. 03-3619, 2004 U.S. App. LEXIS 21742, at *9 (3d Cir. Sept. 28, 2004), *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 147 (3d Cir. 2004). If a plaintiff establishes a *prima facie* case, the burden shifts to the defendant employer, which must then articulate a legitimate, non-retaliatory reason for the adverse action. *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1008 (3d Cir. 1997) (*en banc*). The employer's burden is "relatively light" because it is a burden of producing an explanation, not persuasion that the explanation is true. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994); *see also Clancy v. Preston Trucking Co., Inc.*, 967 F. Supp. 806, 810 (D. Del. 1997) (the employer "need not 'persuade' the fact finder that the reason offered was its true reason; it must merely 'articulate' such a reason.").

Once the employer articulates a nonretaliatory reason for the termination, the plaintiff must persuade the jury to (i) disbelieve the articulated reason; and (ii) believe that retaliation was more likely than not the real reason for the termination. *Torre v. Casio*, 42 F.3d 825 (3d

Cir. 1994)citing *Fuentes*, 32 F.2d at 764); *DiFederico v. Rolm Co.*, 201 F.3d 200, 206 n.3 (3d

Cir. 2000) ("[w]hile our opinions . . .do sometimes use terms like 'a motivating factor' . . . it

is preferable, in a pretext case analysis, to speak either in terms of 'determinative' . . . or 'real

reason'"); *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 348 n. 1 (3d Cir. 1999).

Significantly for this case, the Third Circuit has said that a plaintiff may not "rest upon mere

allegations, general denials, or . . . vague statements." *Quiroga v. Hasbro, Inc.*, 934 F.2d 497,

500 (3d Cir. 1991); *Schoch v. First Fidelity Bancorporation*, 912 F.2d 654, 657 (3d Cir.

1990).

**B.     Plaintiff's Documented Performance Deficiencies Predated
          Her FMLA Leave**

Plaintiff cannot satisfy the third leg of her *prima facie* case, as there is no evidence

showing a causal relationship between an adverse employment action and her FMLA leave.

Nor can Plaintiff show that the reason Defendant proffered for Plaintiff's termination, her

nonperformance, was a pretext for retaliation. There is indisputable evidence that AZ had

significant concerns with Plaintiff's performance long before she requested FMLA leave in

late April 2003, and efforts to address Plaintiff's performance problems continued in a

consistent fashion after she returned from FMLA leave.

Brian Martin and Jane Hellen were unhappy with Ad Boards that Plaintiff conducted in

late 2002. Co-worker Jane Clark's 2002 feedback form indicated similar problems,

suggesting that Plaintiff needed to work more closely with others in setting up the Ad Boards

and needed to have the details completed "at least a week or so ahead of the program." AA13.

Brian Martin's 2002 feedback form talked about the need for Plaintiff to provide "clear,

concise, and focused communications at all times (i.e., e-mail) with customers both internally

and externally," to increase her "knowledge base" and to "work to ensure good, close working

relationships with all on the PREP and PROMO teams." AA15. Sloppy and slow planning of Ad Boards, poor subject knowledge, unclear communications, and not being a good team player were all subjects that were also mentioned in the supposedly "fabricated" emails. Plaintiff has not alleged that the 2002 feedback forms were "fabricated." Persons who worked with her also complained that Plaintiff did not listen carefully and understand what they told her, AA269, which echoed Amy Renk Haines' comment in Plaintiff's 2001 evaluation, and the problems Plaintiff had later at GSK.

Concerns reached Jane Hellen early in 2003 that Plaintiff was creating a bottleneck by not acting promptly on Ad Board issues, and instead was delegating many items and sitting on responses. By February 12, 2003, any thought of promoting Plaintiff had been set aside. Indeed, by February and March 2003, Plaintiff's performance failures had escalated to the point where AZ was forced to cancel a Cardiology advisory board meeting for which she was responsible and other advisory board meetings were in jeopardy. Supervisors' meetings were convened in March to address Plaintiff's performance issues. AA272-73. When Deborah Brangman met with Plaintiff in March to administer her 2002 evaluation, which, itself, was only one level above "unacceptable," Ms. Brangman was sufficiently alarmed about the dip in Plaintiff's performance that she spoke with Plaintiff about her concerns. AA263-64. And not only was the promotion Plaintiff had sought earlier rejected in February 2003, but also in early April 2003, when a supervisory position became available Plaintiff was not selected. Instead one of her peers, Susan Broadway, was chosen, and when Plaintiff, in a good example of her failure to "hear" what was said, complained that she should have been chosen instead, Ms. Hellen told her she needed to perform better in her current position.

Clearly, AZ's significant concerns with Plaintiff's performance predated her FMLA leave request and Plaintiff's own emails from that period, discussed above, corroborate that fact. Plaintiff's supervisors believed that the situation had already reached an urgent stage by the time Plaintiff first informed AZ that she needed an FMLA leave. Plaintiff can not make out a prima facie case, and is certainly unable to prove that her termination was in retaliation for engaging in a protected activity.

### C.    The Passage of Time Destroys The Claim of a Causal Link

In determining whether a plaintiff has demonstrated retaliation under the FMLA, courts will examine the temporal proximity between the employee's protected activity and the adverse employment action because a correlation between the two is an obvious method by which the plaintiff can demonstrate circumstantially that the "protected activity was the likely reason for the adverse action." *Kachmar v. Shurgard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997); *Panto v. Palmer Dialysis Center/Total Renal Care*, C.A. No. 01-6013, 2003 U.S. Dist. LEXIS 5663, at *22 (E.D. Pa. April 7, 2003) ("'[a] causal connection between an employee's protected activity and an adverse employment action by her employer may be inferred if the events occurred close in temporal proximity to each other'" but seven months is too long a time to create inference).

To establish such an inference, it is not enough that the events at issue are proximate in time to one another. Instead, their timing must be "unusually suggestive of a retaliatory motive before a causal link will be inferred." *Krouse v. Amer. Sterilizer Co.*, 126 F.3d 494, 503-504 (3d Cir. 1997); *see also Keeshan v. Home Depot, U.S.A., Inc.*, C.A. No. 00-529, 2001 U.S. Dist. LEXIS 3607, at *43-44 (E.D. Pa. March 27, 2001) (temporal proximity not established where four month gap separated protected activity and adverse action and "no

evidence of discriminatory conduct or animus by the [d]efendants" existed); *Richmond v. Oreok*, 12 F.3d 205, 209 (10th Cir. 1997) (3-month period insufficient to suggest causation).

The temporal proximity between an employer's knowledge of the protected activity and the claimed adverse action must be "very close" to suggest causation. *See Clark Co. Sch. Dist. v. Breeden*, 522 U.S. 268, 273 (2001); *Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1395 (10th Cir. 1997) ("Unless the termination is very closely connected in time to the protected conduct, the plaintiff will need to rely on additional evidence beyond mere temporal proximity to establish causation."). In *Kachmar*, the court observed that "it is causation, not temporal proximity itself, that is an element of plaintiff's *prima facie* case, and temporal proximity merely provides an evidentiary basis from which an inference can be drawn," and that "causation... is highly context-specific." 109 F.3d at 178.

It is also important to distinguish between the use of temporal proximity to establish a causal inference at the *prima facie* and pretext stages of analysis. *See e.g., Gearhart v. Sears, Roebuck & Co., Inc.*, 27 F. Supp. 2d 1263, 1276 (D. Kan. 1998) (temporal proximity sufficient to create inference of retaliation at *prima facie* stage insufficient to create inference of pretext); *Chandler v. Specialty Tires of Am. (Tenn.), Inc.*, 283 F.3d 818, 826 (6th Cir. 2002) (holding that while "[p]roximity in time can raise a *prima facie* case of retaliatory discharge ... proximity alone may not survive summary judgment"); *Smith v. Allen Health Systems, Inc.*, 302 F.3d 827, 834 (8th Cir. 2002) (holding that while temporal proximity between FMLA leave and discharge was sufficient for *prima facie* case of retaliation, it did not support an inference of pretext because the employer's performance problems/concerns were communicated to employee prior to any protected activity under the FMLA).

At the pretext stage, courts have been unwilling to infer retaliatory animus even in situations where an employee's descent into performance problems began in close proximity to his request and/or use of FMLA leave, absent other evidence of retaliation. *See D'Amico v. Compass Group USA, Inc.*, 198 F.Supp. 2d 18 (D. Mass. 2002) (plaintiff did not establish pretext where plaintiff had received over 13 years of positive employment evaluations and promotions, began receiving poor performance evaluations within weeks of returning from a two-week FMLA leave, and resigned after a salary reduction twelve months after returning from leave).

In addition, "evidence that the employer had been concerned about a problem before the employee engaged in the protected activity undercuts the significance of the temporal proximity" between the protected activity and an adverse employment action. *Smith*, 302 F.3d at 834. Finally, this Court has specifically stated that a plaintiff may not rely solely on temporal proximity at the pretext stage of the analysis. *Phillips v. DaimlerChrysler Corp.*, C.A. No. 01-247-JJF, 2003 U.S. Dist. LEXIS 23941, at *23-34 (D. Del. March 27, 2003) ("Plaintiff relies solely on the temporal proximity between his application and the transfer, which is insufficient to establish a causal connection.").

Here, there is strong evidence of previous concerns about Plaintiff's performance, a documented series of problems during the five months before she asked for FMLA leave, including Plaintiff's own emails acknowledging some of the meetings and the issues raised at the meetings. *See*, II B, *supra*. There is a glaring disconnect between her managers' repeatedly expressed concerns with various aspects of her performance (all of which had surfaced previously and would appear again at GSK), and Plaintiff's ostrich-like denials and blame-shifting.

And there is no evidence that her FMLA leave request was viewed by AZ with anything other than sympathy and caring concern. Indeed, the pending attempts to address Plaintiff's performance problems came to a screeching halt when she asked for FMLA leave. Plaintiff can point to no pattern of antipathy toward FMLA leaves in general or leave-related hostility directed toward her. Her managers had all taken leaves themselves and they all recognized the importance AZ placed on allowing people to take approved leaves without negative ramifications. Her claim is based on nothing more than her own inability to honestly acknowledge her performance problems and instead to blame others, a pattern that continued during her employment at GSK.

At her initial depositions, Plaintiff conceded that if the various AZ email documents she was shown had the correct dates on them, her problems predated her request for FMLA leave. AA177-78; 181. However, she insisted blindly that the documents must have been made up, refusing to admit any performance problems on her part. But as in *Kautz v. Met-Pro Corporation*, 412 F.3d 463, 475 (3d Cir. 2005), she makes this claim "without coming forth with specific evidence contradicting the testimony." She makes that bald assertion of fabrication solely because she says the documents are incorrect or erroneous. In other words, she says they were made up because she disagreed with their content. *Id.*

The record shows that Ms. Hellen and other managers had discussed placing Plaintiff on a formal Performance Improvement or Action Plan as early as February 2003 (two months before Plaintiff announced she was taking FMLA leave). Plaintiff was not placed on a formal Action Plan until three months after her leave began. AA53-55. She was not terminated until January 23, 2004, over nine months after she requested FMLA leave. Her supervisors

continually attempted to work with Plaintiff to improve her performance, but were met with hostility and baseless accusations rather than cooperation.

Plaintiff is unable to point to any credible evidence to support her claim that her termination was a pretext for retaliation, relying instead on her own faulty recollections and distortions. *See Mills v. First Fed'l Sav. & Loan of Belvidere*, 83 F.3d 833, 845 (7th Cir. 1996).

In evaluating Plaintiff's performance during 2003, Ms. Broadway used AZ's standard 360-degree review process. She obtained information from many sources, including Plaintiff's co-workers and the vendors that interacted with Plaintiff. Uniformly, they were critical of Plaintiff's performance. A similar process was used at GSK, with the same results. There, too, her supervisors, co-workers and customers all criticized Plaintiff's performance, and she responded by attacking them and refusing to acknowledge any problems.

Plaintiff's case consists only of her own denials that she had performance problems and her continual claims that if anything went wrong, it was the fault of other people. Her managers and co-workers at AZ thought otherwise.

Plaintiff's disagreement with the opinions of her managers regarding her poor performance is not enough for a reasonable jury to find that AZ's decisions regarding Plaintiff were motivated by a desire for retaliation. *See Fuentes*, 32 F.3d at 765 ("To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent); *Ezold v. Wolf, Block, Schorr & Solis-Cohen,* 983 F.2d 509, 527 (3d Cir. 1992) ("barring discrimination, a company has the right to make business judgments on employee

status, particularly when the decision involves subjective factors deemed essential to certain positions'") (quoting *Billet v. CIGNA Corp.*, 940 F.2d 812, 825 (3d Cir. 1991)); *Van Slyke v. Northrop Grumman Corp.*, 115 F. Supp. 2d 587 (D. Md. 2000), *aff'd*, No. 00-2349, 2001 U.S. App. LEXIS 19279 (4th Cir. Aug. 27, 2001) (plaintiff's and her husband's opinions regarding her qualifications were insufficient to establish pretext); *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 (4th Cir. 1989) ("plaintiff's own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate nondiscriminatory reasons for an adverse employment action"); *Hawkins v PepsiCo Inc*, 203 F.3d 274, 281 (4th Cir. 2000) ("no court sits to arbitrate mere differences of opinion between employees and their supervisors"); *Duvall v. Polymer Corp*, C.A. No. 93-CV-3801, 1995 U.S. Dist. LEXIS 14413, at *19 (E.D. Pa. Oct. 2, 1995) ("plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is not whether the employer was wise, but whether discrimination motivated the employer's actions").

The Third Circuit has said that it "will not second guess the method an employer uses to evaluate its employees." *Kautz, id.*, 412 F.3d at 468. This is what Plaintiff is asking the Court to do. At the pretext stage, Plaintiff must prove not only that the reason given was false but also that the real reason was her having taken FMLA leave. *Edwards v. Concord EFS, Inc.*, C.A. No. 03-599-GMS, 2004 U.S. Dist. LEXIS 13942, at *15 (D. Del. July 20, 2004) (to prove pretext, a plaintiff must prove the employer's reasons were "false and that the real reason for the employment decision was discriminatory."). The Third Circuit has said that it must not only be shown that the reason was "merely wrong, but . . . so plainly wrong that it cannot have been the employer's real reason." *Jones v. Sch. Dist. Of Phila.*, 198 F.3d 403, 413 (3d Cir. 1999). Plaintiff is unable to do so.

Plaintiff's termination in January 2004, and the events leading up to it, were motivated only by her deficient performance and by her unwillingness to acknowledge and try to correct those performance problems. There is no evidence on which a reasonable juror could rely to conclude that AZ's stated explanation for Plaintiff's termination was false and pretextual.

Plaintiff is relying on nothing more than speculation when she says she was terminated in retaliation for taking FMLA leave. Her own perceptions about the adequacy of her performance are irrelevant. *Miller v. Ashcroft,* No. 1:01-CV-00-441, 2003 U.S. App. LEXIS 20099, at *20 (3d Cir. Sept. 30, 2003). Plaintiff's FMLA leave was completely unrelated to her termination, which resulted from performance problems that were similar to those she had in her previous position at AZ, and virtually identical to those she had subsequently at GSK. AZ is entitled to summary judgment.

**D.    Plaintiff's Other "Evidence" Is Meritless.**

**1.    Plaintiff Knew In Early 2003 That She Was Not Being Promoted.**

Plaintiff insists that she was denied a promotion after requesting FMLA leave. This unsupported claim is inconsistent with all other promotion-related testimony. Plaintiff was not told in July by Deborah Brangman or anyone else that she would not be promoted. AA259-62; 253-54. Indeed, Ms. Brangman had moved to another Team in March and had no further contact with Plaintiff. Brangman, *id.* The only thing that occurred after her leave request was that Plaintiff made the bizarre claim that she had received a package at home telling her she had been promoted, which she later admitted was a misreading of the documents on her part. Perhaps she is twisting that event in order to stretch the earlier rejection for promotion to a time after her FMLA leave arose. There is no other explanation for this unsupported claim.

### 2.    Moving Plaintiff To A Cubicle Was Not Retaliatory.

Plaintiff claims that placing her in a cubicle was retaliatory, but as a Band IV employee, Plaintiff was supposed to be in a cubicle, not an office. She got an office for a period of time beginning in 2002 because an extra office was available at the time, so Jane Hellen arranged for her to have it. Plaintiff was the only Band IV Exanta employee who had an office at that time. Everyone else was already in a cubicle. Even Band V employees were moved to cubicles later, so it is not even true that if Plaintiff had been promoted she would necessarily have been in an office. She was moved to a cubicle because higher band level persons moved to the building and needed offices. The move had nothing to do with her FMLA leave.

### 3.    There Is No Support in the Record for Plaintiff's Other Claims.

Plaintiff's other claims fall into two categories, those that are completely unsupported by anything in the record, and those that grossly distort the record testimony. For example, Plaintiff says that AstraZeneca "vandalize[d]" her computer docking station. On January 9, 2004, Plaintiff gave her administrative assistant instructions on how to prepare a report of damage to her docking station. AA95. Plaintiff wrote "I reported this to Help Desk and they are sending a new one." *Id.* That is the extent of the record on the issue. AZ had nothing to do with damaging her docking station. This is an example of Plaintiff grossly exaggerating and distorting events to try to place blame on AZ. In any event, damage to a computer docking station owned by AZ, and an alleged failure to investigate it, are not adverse employment actions.

There is no credible evidence in the record that Jane Hellen was biased against employees on FMLA leave, only Plaintiff's mischaracterization of Hellen's expression of

concern to her, and an alleged comment Plaintiff says Hellen made during a teleconference (supposedly saying to a group that included an employee who had a baby "does everyone have their blankie."). AA172-73. Plaintiff said the person to whom she claims the comment was directed, whom she identified as Christy Hedrickson, "seemed to be very embarrassed." But since, according to Plaintiff, Ms. Hedrickson was participating by telephone while the others were in a conference room, it is hard to imagine how Plaintiff could have known the reaction of Ms. Hedrickson. AA255. Even taken at face value, Plaintiff's conclusion that the comment is evidence of Ms. Hellen's antipathy toward FMLA leaves is farfetched to say the least. She is grasping at straws.

Nor is there any evidentiary support for Plaintiff's assertion that her managers said they were "too busy" for her to be sick or that Hellen "balked" at the leave request. In fact, since Plaintiff was so unproductive, the fact that she was out for six weeks did not have a negative impact at all. Plaintiff's leave request was promptly processed and granted, and Plaintiff's own emails show that she maintained a cordial relationship with Jane Hellen during her leave and was appreciative of Hellen's encouragement during her leave. All that Plaintiff offers in support is her own revisionist history.

Farrell's sole effort to support her outrageous claim that Defendant falsified evidence has been that supposedly, the proper procedure for dealing with performance problems would have been to first have an oral discussion with the employee and then put something in writing to the employee; in other words to follow progressive discipline. From this garden variety personnel practice, Farrell reached the twisted conclusion that her managers should not have talked to each other first about the existing performance problem, and therefore, since the managers communicated among themselves by email about their concerns before

speaking to Farrell, the "alleged pre-existing e-mail exchanges . . . authenticity is questionable and implausible! (sic)." Plaintiff's Answering Summary Judgment Brief, p. 17.

There is not the slightest hint of any support in the record for this breathtaking and offensive leap of logic. No reasonable jury would believe that a company would have a policy whereby supervisors could not communicate with each other before taking steps to improve a subordinate's performance, and AZ had no such policy.[2] The e-mails and other preexisting documents were not "fabricated." AA256; 266.

Finally, Plaintiff's meeting with Jane Hellen's manager, Patty McDonald, was another illustration of Plaintiff hearing what she wanted to hear rather than what was said. Ms. McDonald told Plaintiff she "needed to understand what is being asked of her" and said the team needed her "to take on more workload" and that she should not "wait until deadline to try and gain support."

> I did not imply in anyway I wanted to be kept up to speed on this . . . I did not recommend weekly record keeping. Interesting how 2 people can have the same conversation and get slightly different takeaways.

Ms. McDonald astutely concluded that "I think she is in over her head in her current role on this team but is not sel[f]-aware of her limitations, However, I believe she plans to create paperwork to try and hold her spot." AA46.

### 4. Plaintiff's Termination Was The Only Tangible Adverse Employment Action.

Plaintiff complains about various actions taken against her but the only one that would, if proven, constitute an adverse employment action cognizable under the FMLA was her termination in January 2004, nine months after she requested FMLA leave:

---

[2] Plaintiff's supervisors at GSK followed the very same approach, discussing her performance problems among themselves and with Human Resources representatives before speaking to her. AA241-42; 250.

> A tangible employment action constitutes a significant change in
> employment status, such as hiring, firing, failing to promote,
> reassignment with significantly different responsibilities, or a decision
> causing a significant change in benefits.

*Burlington Indus. v. Ellerth*, 524 U.S. 742, 761 (1998).

In *Collier v. Target Stores Corp.*, Civ. No. 03-1144-SLR, 2005 U.S. Dist. LEXIS

6262, at *21-22 (D. Del. April 13, 2005), this Court addressed what constitutes an adverse

employment action under the FMLA. The Court pointed out that "the Third Circuit has not

had the opportunity to explain what constitutes an adverse employment action under the

FMLA. However, several Third Circuit opinions have examined the meaning of 'adverse

employment actions' under Title VII, the ADA, and the ADEA." The Court went on to

observe that:

> The Third Circuit has found that oral and written reprimands are
> insufficient to establish an adverse employment action. Robinson, 120
> F.3d at 1300 (finding that oral reprimands did not rise to the level of
> what Third Circuit cases have described as adverse employment
> action); *Weston v. Pa.*, 251 F.3d 420, 431 (3d Cir. 2001) ("Weston
> failed to establish how these two [written] reprimands effect a material
> change in the terms or conditions of his employment. We cannot,
> therefore, characterize them as adverse employment actions.").
> Furthermore, "unnecessary derogatory comments" do not amount to
> adverse employment actions. *Robinson*, 120 F.3d at 1300 (3d Cir.
> 1997) (finding that "unnecessary derogatory comments" do not rise to
> the level of what Third Circuit cases have described as adverse
> employment actions).

*Collier*, 2005 U.S. Dist. LX 6262, at *18-19. *And see Igwe v. DuPont*, C.A. No. 03-839-JJF,

2005 U.S. Dist. LEXIS 1254 (D. Del. Jan. 24, 2005) (transfer to different position and

placement on disciplinary probation were not adverse actions). The Court in *Collier* went on

to discuss what actions do and do not rise to the level of retaliation under the FMLA:

> Plaintiff has identified the following adverse employment actions: (1)
> Bellamy's "constant" harassment of plaintiff (2) Bellamy's reference
> to plaintiff as "psycho" and "mental" in conversations with
> management level employees and a temporary pharmacist; (3)

> Bellamy's "invasion of plaintiff's privacy" by having a camera
> installed to surveil plaintiff's work; (4) the final warnings that
> plaintiff received; (5) the 2003 Evaluation, which was lower than the
> 2002 Evaluation; (6) relieving plaintiff of her scheduling duties and
> her Committee position; (7) instigation of a false incident report filed
> by Weber against plaintiff; (8) plaintiff's constructive discharge; (9)
> Thomas' call to plaintiff's home while she was on leave; and (10)
> verbal reprimands for alleged negative communications with Weber .
> . . ." Of the adverse employment actions identified by plaintiff, only
> her claim of being constructively discharged is "serious and tangible
> enough" to be considered as altering plaintiff's terms, conditions or
> privileges of employment."

2005 U.S. Dist. LX 6262, at *21, 22. (internal citations omitted).  None of the alleged adverse

actions Plaintiff points to, such as moving from an office to a cubicle, being placed on an

Action Plan or a PIP, and allegedly being encouraged to return quickly from FMLA leave, rise

to the level of an adverse employment action under the settled law of this Court and the Third

Circuit.

When the rhetoric is filtered out, it can be seen that Plaintiff's case relies entirely on

her own assertions, none of which are supported by any other witness or document.

Especially where, as here, a plaintiff's claims and the inferences she seeks to draw from them

do not hold up under logical analysis, summary judgment is appropriate.

> Judges may, under certain circumstances, lawfully put aside testimony
> that is so undermined as to be incredible. The removal of a factual
> question from the jury is most likely when a plaintiff's claim is
> supported solely by the plaintiff's own self-serving testimony,
> unsupported by corroborating evidence, and undermined either by
> other credible evidence, physical impossibility or other persuasive
> evidence that the plaintiff has deliberately committed perjury.
> (citations omitted).

*Johnson v. Wash. M.A.T.A.*, 883 F.2d 125, 128 (D.C. Cir. 1989).  The judge could have been

describing this case.  The evidence resulting from Plaintiff's experience at GSK serves to

underline the paucity of credible evidence in this case and more clearly reveals Plaintiff to be

a person who is incapable of acknowledging her shortcomings and who will go to extremes

to shift blame to others. The "facts" she points to are not material facts, they are nothing but her own denials and distortions. Such bootstrapping efforts do not create a material dispute of fact. Summary judgment should be granted and the case dismissed.

## CONCLUSION

Plaintiff's subsequent employment at positions with higher salaries and equivalent benefits means that she sustained no damages, and her voluntary resignation from GSK cut off any claim of front pay that she otherwise had.

Plaintiff's claims of breach of the implied covenant of good faith and fair dealing have been eliminated by the Third Circuit's decision in *EEOC v. Avecia, Inc.*

Plaintiff relies solely on her unsupported claim that her performance was good and therefore the documents discussing her deficiencies must be fabrications. The evidence to the contrary is overwhelming. By the time she reached the bottom of her downward performance spiral, some co-workers expressed the view that her continued presence on the team was hurting its ability to achieve its goals. Plaintiff's subsequent identical performance problems at GSK, and her identical response to them, serve further to belie her fabrication claim. And there is no evidence that AZ resisted the granting of FMLA leave. To the contrary, Plaintiff's managers had virtually all taken leaves without incident. Summary judgment should be granted to Defendant.

Respectfully submitted,

YOUNG CONAWAY STARGATT & TAYLOR, LLP

 /s/ Sheldon N . Sandler
Sheldon N. Sandler, Esquire (No. 245)
 The Brandywine Building, 17th Floor
1000 West Street, P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6673
Facsimile: (302) 576-3330
Attorneys for Defendant

Dated: December 7, 2005

## CERTIFICATE OF SERVICE

I hereby certify that on December 7, 2005, I electronically filed a true and correct

copy of **Defendant's Opening Brief In Support Of Its Renewed Motion For Summary**

**Judgment** with the Clerk of the Court using CM/ECF, which will send notification that such

filing is available for viewing and downloading to the following counsel of record:

John M. LaRosa, Esquire
Law Office of John M. LaRosa
Two East 7th Street, Suite 302
Wilmington, DE 19801-3707

Thomas S. Neuberger, Esquire
Stephen J. Neuberger, Esquire
The Neuberger Firm
Two East Seventh Street, Suite 302
Wilmington, DE 19801-3707

I further certify that on December 7, 2005, I caused a copy of Defendant's Trial Brief

to be served by hand-delivery on the following counsel of record:

John M. LaRosa, Esquire
Law Office of John M. LaRosa
Two East 7th Street, Suite 302
Wilmington, DE 19801-3707

Thomas S. Neuberger, Esquire
Stephen J. Neuberger, Esquire
The Neuberger Firm
Two East Seventh Street, Suite 302
Wilmington, DE 19801-3707

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ Sheldon N. Sandler
Sheldon N. Sandler, Esquire (No. 245)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email: ssandler@ycst.com
Attorneys for Defendant

Dated: December 7, 2005