Get a Document - by Citation - 1995 U.S. Dist. LEXIS 14413

Case 1:04-cv-00285-KAJ    Document 83-3    Filed 12/07/2005    Page 1 of 39
Page 1 of 22

Service: **Get by LEXSEE®**
Citation: **1995 us dist lexis 14413**

*1995 U.S. Dist. LEXIS 14413, ***

CHARLES D. DUVALL, Plaintiff vs. THE POLYMER CORPORATION, NAAMLOZE VANNOOTSCHAP DSM and JERRY THURSTON, Defendants

CIVIL ACTION No. 93-CV-3801

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

1995 U.S. Dist. LEXIS 14413

September 28, 1995, Decided
October 2, 1995, FILED, ENTERED

**CORE TERMS:** termination, prima facie case, summary judgment, terminated, pension, age discrimination, vesting, eliminated, determinative, at-will, deposition, salary, discharged, downsizing, hardship, retirement, younger, protected class, pension benefits, hired, duty, proffered, interpersonal, burden of production, specific intent, salaried employees, skills, nondiscriminatory reason, employment contract, nonmoving party

**COUNSEL:** **[*1]** For CHARLES D. DUVALL, PLAINTIFF: JOHN W. ROLAND, ANDREW NEWMAN HOWE, ROLAND AND SCHLEGEL, READING, PA.

For THE POLYMER CORPORATION, NAAMLOZE VENNOOTSCHAP DSM, JERRY THURSTON, DEFENDANTS: G. THOMPSON BELL, III, LINDA A. MC KAY, JAY R. WAGNER, STEVENS & LEE, READING, PA.

**JUDGES:** JUDGE E. MAC TROUTMAN

**OPINIONBY:** E. MAC TROUTMAN

**OPINION: MEMORANDUM**

The above captioned matter is now before the Court on the motion of Defendants Polymer Corporation, Naamloze Vennootschap DSM and Jerry Thurston for Summary Judgment. This action arises from the termination of the Plaintiff, Charles Duvall, from his employment at the Polymer Corporation, Reading, in February of 1993. Plaintiff's complaint, filed on or about July 15, 1993, against the Polymer Corporation, DSM,(Polymer's parent corporation), and Jerry Thurston, head of the Reading Division, states four separate and distinct claims: (1) violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621, ("ADEA"); (2) violation of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq.; (3) breach of an implied employment contract and (4) promissory estoppel. This Court has jurisdiction pursuant to 28 U.S.C. **[*2]** § 1331. For the reasons which follow, we will grant the motion for summary judgment on all four counts.

**I. BACKGROUND**

In April of 1989, Plaintiff Charles Duvall (hereinafter "Duvall") was hired by the Polymer Corporation, a subsidiary of Naamloze Vennootschap DSM (hereinafter "DSM"), as Vice President of Finance. He was 49 years old at the time of hiring. In accepting the position, plaintiff and his wife were obligated to move from Texas to Berks County, Pennsylvania. Duvall's three children remained in Texas. His starting salary was $ 90,000.

Get a Document - by Citation - 1995 U.S. Dist. LEXIS 14413

Case 1:04-cv-00285-KAJ    Document 83-3    Filed 12/07/2005    Page 2 of 39

Page 2 of 22

During his tenure at Polymer, Duvall was praised for his work ethic and strong character. His responsibilities were broad including, inter alia, overseeing business planning for the entire corporation, supervising accounting, and forecasting expenditure impact on product lines and manufacturing. In fulfilling his responsibilities, Duvall supervised the work of numerous subordinates.

Despite Duvall's overall reputation as goal oriented and diligent, he was plagued by difficulties in his relationships with co-workers. n1 Within his first year at Polymer, tensions surfaced between himself and Len de Romph, the then Vice President [*3] of Polymer. In October of 1989, Duvall received a memo from de Romph regarding what de Romph perceived as an attitude problem on Duvall's part. n2 Despite the acrimonious nature of the memo, it sparked considerable improvement in Duvall and de Romph's working relationship. n3

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 Former Vice President of Human Resources at Polymer, Larry Shoe testified that Mr. Duvall " is not going to win any personality awards as far as getting along with people." (Shoe Deposition, p. 46). "Chuck could be abrasive, you know, no doubt about it." (Shoe Deposition, p. 50).

n2 The memo states:

I resent your way of advising me and others. I do not accept a lack of respect for others to buy in on the idea. You have to learn to be a team player and accept that you are not in charge. This is your biggest problem area and needs immediate correction. (Duvall Exhibit 5).

n3 "...the most remarkable change I have probably ever seen in my life in the relationship between those two people." (Deposition of Larry Shoe, pg. 77)

"We got to a point where the working relationship improved considerably." (Deposition of Len de Romph, pg. 24).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - [*4]

In February of 1990, Duvall alleges he received an offer of employment from Dell Computer Corporation, a relatively young corporation in Austin, Texas. (Deposition of Duvall ("Duvall Dep." at 78-79). Acceptance of the offer would have allowed Duvall to return to Texas with his family. The Dell Computer offer included a salary of $ 105,000, plus a bonus, a 401K Plan, and a significant stock option for Dell stock. (Duvall Dep. at 89.) In view of such an attractive offer, along with his desire to return to Texas, Duvall elected to accept the offer and submitted a letter of resignation to Polymer on or about March 29, 1990. The overall reaction to Duvall's resignation was disappointment. As a result, strong efforts were made to retain Duvall n4 . On April 3, 1990, Mr. Jerry Thurston, the President of Polymer, met with Duvall and outlined a proposal for Mr. Duvall to remain at Polymer. The proposal contained the following inducements:

1. Promotion to Senior Vice President and Chief Financial Officer;

2. An additional $ 10,000 raise in addition to the $ 15,000 raise Mr. Duvall had already been

Get a Document - by Citation - 1995 U.S. Dist. LEXIS 14413                    Page 3 of 22

Case 1:04-cv-00285-KAJ    Document 83-3    Filed 12/07/2005    Page 3 of 39

promised at that time;

3. An additional $ 7000 bonus;

4. Eligibility to participate in an **[*5]** anticipated bonus plan to be installed by Mr.Thurston;

5. An additional one week vacation.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -


n4 Subsequent to Duvall's letter of resignation, Larry Shoe, Vice President of Human Resources at that time, had several discussions with Mr. Duvall, at Mr. Duvall's home, inquiring about the possibility of Mr. Duvall staying at Polymer. (Duvall Dep. pp. 106-107). Mr. Shoe had learned that Mr. Duvall was disappointed that Dell did not offer a retirement plan. (Shoe Dep. pp 74-76). Mr. Shoe, in turn told Mr. Thurston that in his opinion, Polymer's pension plan would be a major factor in Mr. Duvall's decision. (Thurston Dep. pp.94-95; Shoe Dep. pp. 88-90).

Furthermore, following Duvall's decision to remain with Polymer, Mr. Hillege sent this message to Duvall stating:

> Dear Chuck,
> I know that the last weeks have been very straining for you and your family.
> We did put a lot of pressure on you.
> But of course DSM does not want to loose her assets.
> I am very glad with the decision you took and I am sure that you will not regret.
>
> J.W. Hillege


(Duvall Dep. pp. 146-47; Duvall Dep. Exhibit 10; Hillege Dep. pp. 58-62).


- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*6]**

In addition to these strong incentives, Larry Shoe, at that time Vice President of Human Resources, had calculated for Mr. Duvall a valuation of Mr. Duvall's anticipated salary and pension benefits on an annual basis until Mr. Duvall's anticipated retirement. (Duvall Dep. at 123-125; Deposition of Larry Shoe "Shoe Dep." at 103-107). However, as alleged by both Shoe and Thurston, it was made clear to Mr. Duvall by Mr. Shoe that the projected valuation was based on assumptions about employment durations and salary increases, not guarantees. (Shoe Dep. at 107). (Thurston Dep. at 102). n5

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -


n5 "I told him [Shoe] he could make those calculations and be sure that Mr. Duvall understood that the assumptions based on service and salary were just those assumptions, and they were not commitments or guarantees." (Thurston Dep. at 102).


- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

Get a Document - by Citation - 1995 U.S. Dist. LEXIS 14413

Case 1:04-cv-00285-KAJ   Document 83-3   Filed 12/07/2005   Page 4 of 22
Page 4 of 39

The efforts to retain Duvall proved successful and Mr. Duvall, then age 50, accepted Polymer's offer and turned down the Dell Computer offer, believing that he would remain with DSM [*7] and Polymer until his retirement. n6 Despite Mr. Duvall's subjective belief that his alliance with DMS and Polymer was permanent, he concedes that no one explicitly guaranteed him employment for a specific amount of time. (Duvall Dep. at 184-87). n7

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n6 I felt I had an implied agreement, that I had made my commitment, . . . I had a good, bona fide, hard offer in my hand, . . . It was one in which security is the issue and security is what's being thrown at you, there is     in my mind there was an implication that I had employment for     till I retired. And that's the commitment that I made in my mind to them. (Duvall Dep. at 127.)

n7 Upon questioning by counsel for Defendants, Duvall responded in the following manner:

Q. " Did you say to Mr. Thurston, I'm not going to stay unless you promise to me that I won't be terminated until I vest in the retirement plan and my normal retirement age at the year 2004?"

A. " No. I wish I had."

(Duvall Dep. at 186).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

Upon accepting the offer to remain [*8]  at Polymer, Duvall took on the duties of Polymer's Chief Financial Officer ("CFO"). n8 In the fall of 1990, Duvall was appointed as Business Manager of its Custom Components and Hose business units. (Deposition of Thurston "Thurston Dep." at 146). n9 In December of 1991, Thurston evaluated Duvall's performance as CFO and Business Manager in Custom Components and Hose. Overall Duvall received a satisfactory review and received a merit increase in pay. The commentary section described Duvall as, "dependable, dedicated, committed manager." (Duvall Dep. Exhibit 11). Notwithstanding these positive comments, the evaluation contained strong criticism of Duvall's communication and interpersonal skills. n10

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n8 His responsibilities included overseeing: Polymer's financing needs; bookkeeping; internal reporting; tax requirements; insurance; external reporting; budgeting; and cash needs. (Thurston Dep. at 138-40; Duvall Dep. Ex. 15).

n9 Mr. Thurston stated that he appointed this position to Mr. Duvall because he felt Mr. Duvall was "someone who could take over that position and give it leadership." (Thurston Dep. p. 147). [*9]

n10 The evaluation stated Duvall was

"intimidating and dictatorial with subordinates. Needs to change command and

Get a Document - by Citation - 1995 U.S. Dist. LEXIS 14413

Case 1:04-cv-00285-KAJ    Document 83-3    Filed 12/07/2005    Page 5 of 39

Page 5 of 22

control approach. Needs to soften approach with own organization. Needs to make extra effort to welcome help from the rest of organization." (Duvall Dep. Exhibit 11; Thurston Dep. at 161-68).

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

In late March of 1992, Polymer's corporate structure underwent major changes. Polymer decided to merge Custom Components with its Shapes unit. n11 As a result of the merger, Duvall's position as Business Manager of Custom Components was eliminated. Furthermore, by the fall of 1992, Duvall's role in the Finance Department had been significantly curtailed by Jerry Thurston due to problems in Duvall's interpersonal relationships with his co-workers. n12 As of late October 1992, Duvall no longer functioned as CFO. (Duvall Dep. at 169). Moreover, Duvall admits feeling that by mid-September 1992, his position as Business Manager of Hose seemed tenuous as well.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n11 The merger was part of Polymer's overall decision to restructure the company from a "business unit" dominated organization to a "classical functional organization." [*10]

n12 Mr. Thurston testified that,

> I told him [Duvall] that he had already alienated all his peers in middle management of the company by his dictatorial and intimidating, defensive, territorial approach; and that I was going to take him out of the mainstream of the company in order to try to let the dust settle so that hopefully we could put it back on the right track.

> I told him that eventually that the financial department would also have to be downsized; that I had not come to a final conclusion, but it was my opinion that with all the tasks that had been shifted out of the financial department, that it needed less people.

> And I told him that I was concerned about his position long-term, and that I was going to do everything I could to find him a position either in Polymer or DSM. But I was concerned about the long term validity of him as an employee of Polymer.

(Thurston Dep. at 177-78).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

By the end of 1992, Polymer decided to eliminate the Business Manager of Hose position. Although the Hose department was retained, all resources were now directed towards sales.

Case 1:04-cv-00285-KAJ    Document 83-3    Filed 12/07/2005    Page 6 of 39

Page 6 of 22

(Hillege Dep. **[*11]** at 81-83). John Fisher, the Hose Sales Manager at the time, was appointed to head the sales unit. Mr. Hillege alleges that the job was offered to Mr. Fisher over Mr. Duvall because Mr. Duvall had no prior experience in sales, and Mr. Fisher already performed these functions in the unit. (Hillege Dep. at 81-83).

Moreover, further downsizing in the Finance Department resulted in the elimination of many functions formerly allocated to the CFO. Not only was the CFO position eliminated, but the Controller function, held by one Mr. Hostetter, had been eliminated as well. The remaining tasks within the Finance Department were allocated to Mr. Carlson and Mr. Hums, who formerly had reported to Mr. Duvall. (Thurston Dep. at 185-87; Hillege Dep. at 84-86; Gremmen Dep. at 45-46, 56).

In late October 1992, Mr. Duvall was given notice that his employment with Polymer was terminated. As a result of the termination of his employment, Duvall asserts two claims arising under federal law, specifically, under the Age Discrimination in Employment Act, (ADEA), 29 U.S.C. § 621, (Count I) and under the Employees Retirement Income Security Act, (ERISA), 29 U.S.C. § 1001 (Count II). Furthermore, Duvall **[*12]** asserts two claims arising under the common law of Pennsylvania, breach of implied contract,(Count III) and estoppel (Count IV).

## II. STANDARDS FOR SUMMARY JUDGMENT

Summary judgment shall be granted when there are no genuine issues of material fact in dispute and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby Inc., 477 U.S. 242, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). In evaluating whether there are any disputed issues and whether they are both genuine and material, the Court must consider the facts in the light most favorable the party opposing summary judgment and all reasonable inferences must be drawn in favor of the nonmoving party. Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 637 (3d Cir. 1993); Gray v. York Newspapers , Inc., 957 F.2d 1070, 1077 (3d Cir. 1992).

In order to obtain summary judgment, the moving party must, on the basis of pleadings, depositions, answers to interrogatories, and admissions on file, demonstrate an absence of issues of material fact in dispute. **[*13]** Fed.R.Civ.P. 56(c). Once the moving party has satisfied this requirement, the burden shifts to the nonmoving party to present evidence that there is a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Furthermore, the nonmoving party is required to identify specifically the evidence upon which a verdict in its favor may be based. Childers v. Joseph, 842 F.2d 689 (3d Cir. 1987). Moreover, where the nonmoving party bears the burden of proof on an issue, it must identify evidence which suffices to establish every element essential to the claim. Celotex, 477 U.S. 317, 91 L. Ed. 2d 265, 106 S. Ct. 2548; Financial Services Corp., 812 F.2d 141 (3d Cir. 1987). When the record is such that it would not support a rational finding that an essential element of the nonmoving party's claim or defense exists, summary judgment must be entered for the moving party. Celotex, 477 U.S. at 322.

## III. AGE DISCRIMINATION CLAIMS

Under the ADEA it is unlawful for an employer to discriminate against an individual in hiring, discharge, compensation, terms, conditions, or privileges of employment on the basis of age. An age discrimination claim may be established **[*14]** by either direct or indirect evidence. Torre v. Casio, Inc., 42 F.3d 825 (3d Cir. 1994). Evidence is direct where, if believed by the trier of fact, proves the existence of the fact at issue without inference or presumption. Id.; Earley v. Champion Int'l Corp., 907 F.2d 1077, 1081 (11th Cir. 1990). Evidence is not direct, when the trier of fact must infer discrimination from actions and statements by the employer. Torres, 42 F.3d at 828. n13

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n13 When the evidence offered to prove the employer discriminated is direct, the shifting-burden analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), does not apply. Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 105 S. Ct. 613, 83 L. Ed. 2d 523 (1983); Gavalik v. Continental Can Co., 812 F.2d 834, 853 (3d Cir. 1987).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

When attempting to establish an age discrimination claim by indirect evidence, a plaintiff's claim must be assessed using the shifting burden analysis developed for proof of **[*15]** discrimination claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq.. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973); McKenna v. Pacific Rail Service, 32 F.3d 820 (3d Cir. 1994). In order to make out a prima facie case under the shifting burden analysis, the plaintiff in an age discrimination case must show: (1) that he belongs to the protected class, i.e., is older than forty; (2) was qualified by training and experience for the position at issue; (3) was not hired or was dismissed despite his or her qualifications; (4) was ultimately replaced, or the position was filled, by a person sufficiently younger to permit an inference of age discrimination. Gray v. York Newspapers, Inc., 957 F.2d 1070 (3d Cir. 1992). Once the plaintiff proves a prima facie case, and thereby creates an inference of age discrimination, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse action. Id. n14 The defendant must set forth reasons for its actions, through introduction of admissible evidence, which would support a finding that unlawful discrimination **[*16]** was not the cause of the employment action. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 252-53, 101 S. Ct. 1089, 1093-94, 67 L. Ed. 2d 207 (1981); See Chipollini v. Spencer Gifts, Inc., 814 F.2d 893, 897-98 (3d Cir.) (in banc), cert. dismissed, 483 U.S. 1052, 108 S. Ct. 26, 97 L. Ed. 2d 815 (1987); Turner v. Schering-Plough Corp., 901 F.2d 335 (3d Cir. 1990). Defendant's burden is one of production only, not persuasion. " The employer need not prove that the tendered reason actually motivated its behavior, as . . . the ultimate burden of proving intentional discrimination rests with the plaintiff. Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994). If the employer successfully rebuts the prima facie case, the inference of age discrimination dissipates and drops from the case. The plaintiff then has the burden of proving, by a preponderance of the evidence, that the employer's proffered reason is pretextual and that unlawful discrimination was the reason underlying the adverse employment action. Gray, 957 F.2d 1070; Torre, 42 F.3d 825. It is essential to remember that the burden to persuade the trier of fact that age was a determinative factor **[*17]** in the termination decision remains with the plaintiff at all times. Turner, 901 F.2d at 342.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n14 Under the McDonnell Douglas scheme, "establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee." Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981). " To establish a presumption is to say that a finding of the predicate fact (here, the prima facie case) produces a conclusion in the absence of explanation". St. Mary's Honor Center v. Hicks, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993) (quoting 1 D. Louisell & C. Mueller, Federal Evidence § 67, p. 536 (1977).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

Get a Document - by Citation - 1995 U.S. Dist. LEXIS 14413

Case 1:04-cv-00285-KAJ    Document 83-3    Filed 12/07/2005    Page 8 of 39

Page 8 of 22

At trial, the plaintiff must convince the fact-finder "both that the reason was false, and that discrimination was the real reason." St. Mary's Honor Ctr. v. Hicks, 125 L. Ed. 2d 407, 113 S. Ct. 2742, 2752. The factfinder, however, may decide for the plaintiff if the employer's proffered legitimate, nondiscriminatory reason is rejected, since discrimination may then be inferred from [*18] the allegations of discrimination in plaintiff's prima facie case. Sempier v. Johnson & Higgins, 45 F.3d 724 (3d Cir. 1995).In order to prevail, it is not necessary that the plaintiff demonstrate that an illegitimate factor was the sole reason for the termination, but that it was a "determinative factor." See, Hazen Paper Co. v. Biggins, 113 S. Ct. at 1706.

In order to successfully withstand a summary judgment motion, a plaintiff may either (i) discredit the proffered reasons, either circumstantial or directly, or (ii) adduce evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." Sempier, 45 F.3d at 731 quoting Fuentes, 32 F.3d at 764. Thus, to defeat a summary judgment motion by discrediting a defendant's proffer of a nondiscriminatory reason, a plaintiff who has made a prima facie showing of discrimination need only present evidence establishing a reasonable inference that the employer's proffered explanation is unworthy of credence, thus raising an inference that the employer did not act for the asserted nondiscriminatory reasons. Fuentes v. Perskie, 32 F.3d 759 [*19] (3d Cir. 1994); Sempier v. Johnson & Higgins, 45 F.3d 724 (3d Cir. 1995). Moreover, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is not whether the employer was wise, but whether discrimination motivated the employer's actions. Fuentes, 32 F.3d at 765. A plaintiff may do so by showing evidence of inconsistencies that could support an inference that the employer did not act for its stated reasons. Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 638 (3d Cir. 1993); Sempier, 45 F.3d 724.

The Third Circuit has stated that while this standard places a difficult burden on the plaintiff, "it arises from an inherent tension between the goal of all discrimination law and our society's commitment to free decision-making by the private sector in economic affairs." Fuentes, 32 F.3d at 765 quoting Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 531 (3d Cir. 1992).

This Court concludes that Duvall has not sufficently met his burden to overcome the motion for summary judgment on the ADEA claim. Although he has established a prima facie case, he has produced no real evidence to [*20] refute Defendants' legitimate reasons for his termination and produced insufficient evidence that discrimination was more likely than not a determinative cause of the adverse employment action.

A. The Prima Facie Case

Our initial focus is whether the Plaintiff has established a prima facie case. As stated previously, in order for a plaintiff to make out a prima facie case, a discharged employee must show the following elements: (1) that he belongs to a protected class, i.e., is older than forty; (2) was qualified by training and experience for the job from which he was discharged; and (3) was replaced by a person sufficiently younger to permit an inference of age discrimination. Turner v. Schering-Plough Corp., 901 F.3d 335, 342 (3d Cir. 1990) citing Sorba v. Pennsylvania Drilling Co., 821 F.2d 200, 202 (3rd Cir. 1987), cert denied, 484 U.S. 1019, 108 S. Ct. 730, 98 L. Ed. 2d 730 (1988). When the case involves a reduction in force, or plant closing, such that plaintiff's job is eliminated and, therefore, no replacement is required, the second and third elements of the prima facie case are merged and modified. Here the plaintiff must show: (1) membership in the protected [*21] class, and (2) discharge from a job in which plaintiff was qualified while other workers not in the protected were retained. Healy v. New York Ins. Co., 860 F.2d 1209, 1214 n.1 (3d Cir. 1988), cert denied 490 U.S. 1098, 104 L. Ed. 2d 1004, 109 S. Ct. 2449, (1989); Billet, 940 F.2d at 816

Get a Document - by Citation - 1995 U.S. Dist. LEXIS 14413

Case 1:04-cv-00285-KAJ    Document 83-3    Filed 12/07/2005    Page 9 of 39
Page 9 of 22

n.3; Capik v. E.R. Carpenter Co., Inc., 1991 U.S. Dist. LEXIS 18285, 1991 WL 269999 (E.D. Pa). Rather, in job elimination cases such as the one before us, the plaintiff must show that similarly situated younger employees were treated more favorably. Hill v. Bethlehem Steel Corp., 729 F. Supp. 1071, 1075 n.6 (E.D. Pa. 1989) aff'd 902 F.2d 1560 (3d Cir. 1990).

The Court concludes, for the purposes of the instant motion, that Duvall has established a prima facie case, and therefore, a presumption of age discrimination. Plaintiff was 52 at the time of his terminations and therefore a member of the ADEA protected class (over age forty). Duvall was terminated from an executive position, for which he was qualified. Two younger employees, not within the protected class, Mr. Carlson and Mr. Hums, who had previously reported to the Plaintiff, were retained in their financial positions, with Mr. Carlson [*22] receiving some of the Plaintiff's former duties in finance. This assertion is sufficient to give rise to an inference of discrimination. " The prima facie case under the McDonnell Douglas- Burdine pretext framework is not intended to be onerous." Sempier, 45 F.3d at 728.

B. Defendant's Proffered Legitimate Nondiscriminatory Reason.

Having concluded that the Plaintiff has established the elements of a prima facie case, the burden of production now shifts to Defendants to articulate a legitimate, nondiscriminatory reason for dismissing Duvall. The Defendants' proffered reason for Duvall's termination are: (1) Polymer's corporate reorganization eliminated substantially all of his job functions; and (2) Duvall was not qualified to fill any management level position available following the reorganization.

As evidence of their first articulated reason, the Defendants have come forth with an abundance of deposition testimony which demonstrates that significant downsizing within Polymer occurring between late 1991 and early 1993 essentially eliminated most of Duvall's duties. n15 They assert that as a result of restructuring, there were not enough functions left in the Finance [*23] Department to justify a position at Duvall's level. Theodorus Gremmen, a chief executive for DSM stated, " I think what happened was that since the acquisition, the tasks within Polymer was substantially reduced because of restructuring, because of less figures, basically there was no need for a high financial officer. (Deposition of Theo Gremmen at 45). The remaining responsibilities within the Finance Department were allocated to existing staff members, Mr. Carlson and Mr. Hums. n16 Defendants correctly submit that they had no duty to terminate the younger employees within the department in order to preserve a position for the Plaintiff. See Capik v. E.R. Carpenter Company, Inc., 1991 U.S. Dist. LEXIS 18285, 1991 WL 269999 (E.D. Pa.); Naas v. Westinghouse Electric Corporation, 818 F. Supp. 874, 878 (W.D. Pa. 1993).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n15 Between late 1991 and early 1993, the following changes occurred in Polymer's Finance Department:

- Polymer transferred or sold all of its subsidiaries, which formerly reported to Polymer's CFO, to its divisional headquarters in Belgium.

- Polymer hired controllers to do accounting for other DSM companies, for which Polymer had provided accounting for in the past.

- A separate DSM company took over responsibility for treasury and cash management functions for all DSM companies in North America.

- DSM began to take care of all of Polymer's cash needs, eliminating need to deal directly

Get a Document - by Citation - 1995 U.S. Dist. LEXIS 14413

Case 1:04-cv-00285-KAJ    Document 83-3    Filed 12/07/2005    Page 10 of 39

Page 10 of 22

with third parties for loans.

- At least one significant financial management initiative formerly under Duvall's control was fully implemented and integrated into the company, no longer requiring substantial attention. (Thurston Dep. at 185-187; Deposition of Jan Hillege at 84-86; Deposition of Theo Gremmen at 45-46). **[*24]**

n16 At the time of the downsizing, Mr. Carlson was age 40 and Mr. Hums was in his thirties.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

The Defendants further assert that Duvall was not qualified to fill any suitable position available subsequent to the corporation's restructuring. Defendants allege that the only position which became available after Duvall's termination and was at a level comparable to Duvall's former positions was that of Director of Manufacturing at Polymer. Mr. Thurston maintains that in considering Duvall he concluded that this position required a manager with a technical degree. Duvall had no such technical background. In addition, Thurston contends that he felt the Plaintiff's interpersonal skills were still somewhat lacking and rendered Duvall unsuitable for this position. Accordingly, Polymer hired Dick Sakolich, who has a degree in chemical engineering, to fill the position.

We conclude that the Defendants have met their burden of production by articulating a legitimate reason for discharging Plaintiff, i.e. downsizing of the corporation which essentially eliminated any position for which Duvall was qualified. **[*25]** As stated previously, Defendant's burden is a not a heavy one and the burden of proving intentional discrimination always rest with the plaintiff. See Fuentes, 32 F.3d at 763. Thus, the presumption of age discrimination is removed. The burden now shifts back to Plaintiff to show why Defendants' reasons are not worthy of credence.

C. Analysis of Plaintiff's Evidence of Pretext

Since Defendants have offered a legitimate reason for terminating the Plaintiff and, therefore, met its burden of production, Plaintiff, in order to survive summary judgment, must either (i) discredit the proffered reasons, either circumstantially or directly, or (ii) adduce evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action. See Fuentes, 32 F.3d at 764. As the following discussion will show, Plaintiff has neither offered sufficient evidence to cast doubt on defendants' legitimate stated reasons for his termination, nor offered any evidence which proves that discrimination was more likely than not a determinative factor.

Our initial inquiry is whether Duvall has offered any evidence to cast doubt **[*26]** on Defendants' first articulated reason, that the restructuring/downsizing of the corporation virtually eliminated Duvall's job functions. Duvall does not dispute that the company underwent major structural changes between 1991 and 1993. However, Duvall disputes Defendants' claim that all of his job functions had been eliminated following restructuring, contending that his job functions had not been eliminated, but rather that the duties he had performed were delegated to Ken Carlson. Thus, according to Duvall, Carlson replaced Duvall in the Finance Department.

Duvall's contention that Carlson took over his job functions in Finance is lacking in evidentiary support. Mr. Carlson testified that Duvall had supervised many of the tasks that Carlson presently performed. (Deposition of Ken Carlson, "Carlson Dep." at 76). This not the same as saying that Carlson took over Duvall's old duties.

Get a Document - by Citation - 1995 U.S. Dist. LEXIS 14413

Case 1:04-cv-00285-KAJ    Document 83-3    Filed 12/07/2005    Page 11 of 39

Page 11 of 22

Moreover, Duvall points to no evidence that contradicts Mr. Thurston's testimony that corporate downsizing had eliminated many of the major financial functions formerly allocated to Duvall. (See F.N. 15, supra). Furthermore, when questioned during his deposition, Duvall concedes that he **[*27]** does not know whether Defendants' claim, regarding the elimination of his job functions, is true or not. (Duvall Dep. at 62). Thus, Duvall has failed to prove that Defendants' first articulated reason is unworthy of credence.

Turning now to Duvall's arguments contesting Defendants' second articulated reason, that Duvall was not qualified for any management level positions available following his termination, Duvall offers the testimony of former Chief Executive Officer, Len de Romph. It is his opinion that Mr. Duvall would have been qualified for most positions at Polymer following the reorganization. (Dep. of de Romph at 11-12).

This Court concludes that such evidence is entirely irrelevant because Mr. de Romph was no longer employed by DSM at the time of the reorganization and therefore would have no real insight in to whether the Plaintiff was truly qualified for any available positions within the company at that time. Furthermore, the Plaintiff admits that he knows of no one position available for which he was qualified following his termination. (Duvall Dep. at 210).

As a further attempt to illustrate inconsistencies and implausibilities in the Defendants' proffered reasons, **[*28]** the Plaintiff disputes the Defendants' allegations regarding his lack of interpersonal skills. Plaintiff contends that a genuine issue exists as to whether interpersonal skills were a pretextual reason to remove Mr. Duvall from his duties and later terminate him. The Plaintiff argues that there is insufficient evidence in the record to support Defendants' contentions in this regard.

Plaintiff's argument has questionable relevance because Defendants do not assert Plaintiff's lack of personal skills as one of their reasons for terminating Mr. Duvall. Nonetheless, to the extent that Plaintiff's record of poor interpersonal relationships played a role in Polymer's decision to limit his job functions in the Finance Department prior to his termination, we will address this argument.

There is concrete evidence to suggest Mr. Duvall had difficulties in his relationship with co-workers. Mr. Duvall himself testified that he had been aware of this problem and had contacted William Carothers, the acting Human Resource Manager. n17 Carothers conducted an informal survey of Duvall's co-workers, confirming that all of them found Duvall to be difficult. n18 Thus, it is apparent that Mr. Thurston's **[*29]** decision to curtail Duvall's duties due to Duvall's lack of interpersonal skills was a legitimate business decision that was validly based. Mr. Duvall may feel that this decision was wrong, but that does not mean the decision was a pretext for discrimination. See Fuentes, 32 F.3d at 765. Moreover, Duvall's own opinion of himself is not entirely indicative of the issue. As the Third Circuit stated in the Billet case, an employee's own view of his performance is not at issue; what matters is the perception of the decision maker. Billet v. Cigna Corp., 940 F.2d 812, 825 (3d Cir. 1991); See also Burdine, 450 U.S. at 259, 101 S.ct at 1097 ("The fact that a court may think that the employer misjudged the qualifications of the applicant does not in itself expose him to Title VII liability"). Thurston's decision was a legitimate business decision. "Barring discrimination, a company has the right to make business judgments on employee status, particularly when the decision involves subjective factors deemed essential to certain positions." Billet, 940 F.2d at 825. (citing, Healy v. New York Life Ins. Co., 860 F.2d 1209 (3d Cir. 1988).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n17 Duvall testified that, " He [Carothers] said that he felt my intensity came across too

Get a Document - by Citation - 1995 U.S. Dist. LEXIS 14413

Case 1:04-cv-00285-KAJ    Document 83-3    Filed 12/07/2005    Page 12 of 39

Page 12 of 22

strong, the fact that I was trying so hard, and that I needed to back off a bit." (Duvall Dep. at 156). **[*30]**


n18 Carothers testified that the general consensus on Duvall was that he was overbearing, domineering, and did not take time to listen to others. (Carothers Dep. at 28).


- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

Additionally, as evidence that age discrimination was a motivating factor in the termination decision, the plaintiff submits there is statistical evidence which raises an inference that the Defendants had a preference for retaining younger employees and treating them more favorably. n19

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -


n19 Plaintiff states that evidence exists which proves that from the period of January 1, 1990, through March 31, 1993, involuntary terminations of Polymer salaried employees over forty years of age exceeded the number of voluntary terminations of employees under the age of forty. Also, Plaintiff submits evidence which demonstrates while in 1990 the number of Polymer salaried employees over forty exceeded the number of salaried employees under forty, in 1993 the number of salaried employees over forty years of age was less than the number of employees under the age of forty.


- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*31]**

Statistics are most often used as evidence of age discrimination in a disparate impact case under Title VII 42 U.S.C § 2000e. n20 Here, Duvall is alleging an individual treatment case, not a disparate impact one. However, the Third Circuit recently held that employment discrimination plaintiffs are not precluded from introducing statistical evidence as circumstantial evidence of discrimination in a disparate treatment case. Abrams v. Lightolier, Inc., 50 F.3d 1204 (3d Cir. 1995). In Abrams, the Court approved the use of statistical evidence as collateral evidence by plaintiff to support his claim of disparate treatment. Abrams, 50 F.3d at 1217.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -


n20 To demonstrate disparate impact, plaintiff must show that Employer's facially neutral policy had a "significantly discriminatory impact" upon members of plaintiff's protected class.


- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

Nevertheless, the numbers offered by Duvall do not reflect any significant statistical disparity. Over a four year period, Polymer terminated only six more "over forty" employees **[*32]** than "under forty" employees. Out of a total of 54 terminations over a four year period, that represents an average difference of only 1.5 terminations per year. (Carouther's Deposition Ex. 1). This is statistically insufficient to raise an inference of discriminatory intent. See Kittredge v. Parker Harrifin Corp., 597 F. Supp. 605, 610 (W.D. Mich. 1984) ("large statistical discrepancies are required before the courts will attach any real significance to statistical evidence").

Moreover, the method of the statistical analysis is somewhat questionable. Duvall offers corporate-wide statistics on terminations, rather than limiting the statistics to terminations at Duvall's executive level. The Supreme Court has held that "it is clear that 'where special qualifications are required to fill particular jobs, comparisons to the general population may have little probative value." City of Richmond v. J.A. Croson Co., 488 U.S. 469, 501, 109 S. Ct. 706, 726, 102 L. Ed. 2d 854 (1989).

Additionally, as evidence that discrimination played a determinative role in the termination decision, Duvall argues that evidence exists on the record that Defendant Jerry Thurston repeatedly referred [*33] to a group of younger salaried employees as "young turks". n21 Plaintiff argues that in context, the term favorably connoted a hard-working group of energetic young executives. However, there is no evidence to establish any sort of nexus between the comment and Mr. Duvall's termination. The usage of this terminology alone is not sufficient to infer age discrimination. See Tenthoff v. McGraw-Hill, Inc., 808 F. Supp. 403, 407 (E.D. Pa. 1992) aff'd, 981 F.2d 1248 (3d Cir. 1992) (employer's comments that a certain employee was "acting like an old man" and another was "acting like an old woman" were insufficient evidence of discrimination to withstand summary judgment motion where the comments did not relate to terminated employee); Turner v. North American Rubber, Inc., 979 F.2d 55, 59 (5th Cir. 1992) (manager's references to younger employees as "three young tigers" is insufficient evidence of age to state a prima facie case).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n21 Thurston described the connotation behind the term as, " It was more behavioral of the way these people behaved than it was anything else. They were challenging everything. They were breaking down the traditions of the company. They asking why we did things in a certain way and they were basically challenging us to change. ... But sometimes their mannerisms of doing that came across as difficult to deal with." (Thurston Dep at 229, 231).

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - [*34]

Plaintiff has failed to offer any legitimate evidence which either serves to discredit Defendants' proffered reasons or raise an inference that age discrimination played a determinative role in the termination decision. He offers nothing which undermines Defendants' contention that after the downsizing, his job functions were eliminated. Furthermore, nothing in this record indicates that Defendants' perception that the Plaintiff was unqualified for any positions following the reorganization, was not a legitimately based business decision and therefore was pretextual. Duvall, himself, cannot point to a specific position he was qualified for following the reorganization. Moreover, as stated previously, a company has the right to make business judgments on employee status. Billet, 940 F.2d at 825. (citing Healy v. New York Life Ins. Co., 860 F.2d 1209 (3d Cir. 1988).

It appears we are left only with Duvall's subjective belief that age and salary are connected and that he was terminated because Defendants did not want to pay his salary. n22 However, this contention does not create an inference that age was a determinative factor in his termination. See Hazen Paper Co. v. Biggins, [*35] 507 U.S. 604, 113 S. Ct. 1701, 1705-06, 123 L. Ed. 2d 338 (1993). In Hazen Paper, the Supreme Court held that there is no ADEA violation when the factor motivating that termination is any reason other than age. Id. at 1706. The Supreme Court, concluded, as a matter of law, that Plaintiff's termination in order to prevent his pension benefits from vesting did not state a claim under the ADEA. Id. This is true despite the fact that pension status and age are often positively correlated. Id. In addition, in the present case, Duvall's high salary was not so much a reflection of his age, but a result of Defendants' efforts to retain him when he decided to accept the Dell offer.

Get a Document - by Citation - 1995 U.S. Dist. LEXIS 14413

Case 1:04-cv-00285-KAJ    Document 83-3    Filed 12/07/2005    Page 14 of 39

Page 14 of 22

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n22 As your experience grows, so grows your salary. I believe it was my experience that they needed the two and a half years before when they made all the promises to me. At that point in time the experience had a relationship to age. They were the ones that paid me the money, gave me the additional monies and so forth and so on, which was also relative to experience and age. So in that respect, I would tend to think that since the money and the age and the experience are all rolled into one, when you basically tell me that you're making too much money and it's the same person that gave you the money, he;s basically saying in some way that your age is a factor, I guess. (Duvall Dep. at 64).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*36]**

Finally, as stated by the Third Circuit, "merely citing that age was the reason for the decision does not make it so." Billet v. Cigna Corp., 940 F.2d 812, 827 (3d Cir. 1991) Conclusory allegations, insinuation or innuendo do not satisfy the Plaintiff's burden of presenting rebuttal evidence. Solt v. Alpo Pet Foods, Inc., 837 F. Supp. 681 (E.D. Pa. 1993), aff'd 30 F.3d 1488 (1994); Naas v. Westinghouse Elec. Corp., 818 F. Supp. 874, 877 (W.D. Pa. 1993). Plaintiff's evidence, viewed in a light most favorable to him, is wholly insufficient to establish a genuine issue of material fact as to the credibility of defendants' legitimate, nondiscriminatory reasons for terminating Duvall. Consequently, plaintiff has not met his burden under the ADEA and defendants' motion for summary judgment on this claim will be granted.

## IV. The ERISA Claim

ERISA section 510 prohibits employers from making adverse employment decisions with specific intent to interfere with an employee's attainment of rights under an ERISA plan. n23 29 U.S.C. § 1140; Turner v. Schering-Plough Corp., 901 F.2d at 347; Gavalik v. Continental Can Co., 812 F.2d 834, 851 (3d Cir.) cert. denied **[*37]** 484 U.S. 979, 108 S. Ct. 495, 98 L. Ed. 2d 492 (1987). Section 510 was designed primarily to prevent "unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights. West v. Butler, 621 F.2d 240, 245 (6th Cir. 1980). The discharged employee must demonstrate that the desire to reduce pension benefits was a "determinative factor" in the employer's decision. Turner, 901 F.2d at 347. Where proof exists of a loss of pension benefits as a consequence of termination, and not a motivating factor behind termination, there is no ERISA cause of action under § 510. Gavalik, 812 F.2d at 851.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n23 Section 510 provides in pertinent part:

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan ... or for the purpose of interfering with the attainment of any right to which such participant may become entitled to under the plan... 29 U.S.C. § 140

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*38]**

Where the specific intent to discriminate against those nearing pension eligibility can be proved only circumstantially, the shifting of the burdens analysis developed in the Title VII cases is utilized. Gavalik, 812 F.2d at 852; see also Dillon v. Coles, 746 F.2d 998, 1003 (3d Cir. 1984) ("In most employment discrimination cases direct evidence of the employer's motivation is unavailable or difficult to acquire...."). As in the context of employment discrimination under Title 7, employees alleging discrimination under ERISA bear the burden of making out a prima facie case of discrimination. See Gavalik, 812 F.2d at 852 citing McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973) and Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). The nature of the plaintiff's burden of proof at the prima facie stage is de minimis. Dister v. Continental Group, Inc., 859 F.2d 1108, 1114 (2nd Cir. 1988). The Plaintiff meets his burden by showing that (1) he belonged to a protected class, (2) he was qualified for the position involved, and (3) was discharged under circumstances that provide **[*39]** some basis for believing that the prohibited intent was present. Turner, 901 F.2d at 347.

Once Plaintiff has established his prima facie case by a preponderance of the evidence, the burden of production shifts to defendants to show a legitimate nondiscriminatory purpose for their actions. Hendricks v. Edgewater Steel Company, 898 F.2d 385 (3d Cir. 1990); Gavalik, 812 F.2d at 853. If the company articulates a legitimate reason, the burden is on the employee to show that the reason was pretextual. Id.

Applying these standards in the ERISA context, it appears that Duvall has established a prima facie case sufficient to withstand summary judgment. Duvall, as a potential recipient of a pension, was in the protected class. We have previously found that he was qualified for position from which he was terminated. (See ADEA discussion, supra) Accordingly, it is necessary to see if Duvall has offered any evidence concerning the circumstances of his termination which "make the likelihood of pension-based animus greater in this case than in every case in which an employee is discharged by an employer with an ERISA plan." See Turner, 901 F.2d at 347.

Duvall alleges that **[*40]** evidence exists on the record that shows he was discharged under circumstances that provide some basis for believing that the requisite prohibited intent was present. He points to the fact that Defendants terminated him within one year of his pension vesting. (Duvall Dep. at 191-193). Additionally, Duvall alleges that Polymer terminated a greater percentage of salaried employees over forty years than those under forty years. Plaintiff also alleges his friend Larry Shoe, former Director of Human Resources, told him that Polymer terminated 30 to 40 people 40 years or older, "a lot just before they vested." (Duvall Dep. at 144).

This evidence is sufficient to create an inference that the prohibited intent was in fact present. (See Dister v. Continental Group, Inc., 859 F.2d 1108 (2nd Cir. 1988) (Court concluded that Plaintiff established an inference of discrimination under § 510 where employee was discharged four months and seven days before vesting of his pension). See also, Turner, 901 F.2d at 348. (We do not rule out the possibility that an employee with a vested pension can establish a prima facie case by showing a pension reduction of such size that it might reasonably **[*41]** be considered to have motivated the discharge..."). Hence, Duvall has established a prima facie case.

The burden of production now shifts to Defendants to articulate a legitimate nondiscriminatory reason for the discharge. See Burdine, 450 U.S. at 254-56, 101 S. Ct. at 1094-95. As discussed in the ADEA section, the Defendants submit that Mr. Duvall was terminated because 1) corporate downsizing eliminated substantially all his job functions, and 2) there were no positions for which Mr. Duvall was qualified following the downsizing. This Court has concluded that these are legitimate nondiscriminatory reasons and any inference of age discrimination drops from the case.

Once the employer has articulated a legitimate nondiscriminatory reason for the adverse employment action, the employee has the burden of persuasion on the issue of whether an intent to interfere with rights secured under ERISA played a determinative role in the decision to take the action. See <u>Turner, 901 F.2d at 347.</u> Having carefully reviewed the record, we find insufficient evidence to establish the prohibited intent. There is no evidence which supports a reasonable inference that Defendants' reason for discharging **[*42]** Duvall was unworthy of credence or that Defendant was otherwise motivated by a discriminatory purpose.

In an attempt to demonstrate the presence of the prohibited intent, Duvall first offers the same arguments and evidence used to challenge Defendants' proffered reasons for his termination in connection with the ADEA claim. We have previously concluded that such arguments are not persuasive. (See ADEA discussion, supra). In addition to these arguments, Duvall offers the evidence used in his prima facie case under ERISA § 510 claim, which was discussed above and which we will now address.

Focusing initially on Duvall's contention that he was only one year from the vesting of his pension, this Court concludes that although such evidence was sufficient to create an inference of discrimination for the prima facie case, it is wholly insufficient alone to establish the existence of a prohibited specific intent. As such this contention alone cannot defeat summary judgment. See, <u>Hendricks, 898 F.2d 385</u> (The Third Circuit held that employee terminated 11 months prior to vesting of his pension failed to make out a prima facie case under § 510).

Turning our focus to Duvall's **[*43]** allegations that Polymer terminated a large number of employees over forty years of age, just prior to vesting of their benefits, we find that this contention lacks evidentiary support. It is unclear from the record when any of these employees' pensions were supposed to vest. Furthermore, Mr. Shoe, himself, testified that to his knowledge Polymer had never considered an employee's vesting when making a termination decision. (Shoe Dep. at 30). n24 Moreover, age and vesting of pension benefits do not correlate in this case since Polymer's pension plan provided for vesting after five years of employment.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n24 Counsel for Defendants- "Were there any terminations that you signed off during 1990 or 1991 in which you thought the company was motivated by a desire to keep someone from vesting in the pension plan?"

Mr. Shoe- "No." (Shoe Dep. at 30).

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Duvall has failed to offer any additional substantial evidence in his prima facie case which establishes the existence of a specific intent by Defendants to **[*44]** interfere with pension benefits. Duvall simply argues that he believes Polymer terminated him one year prior to vesting in order to save money. n25 but admits that this belief is a result of his own speculative search for a reason for his termination.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

Get a Document - by Citation - 1995 U.S. Dist. LEXIS 14413

Case 1:04-cv-00285-KAJ    Document 83-3    Filed 12/07/2005    Page 17 of 39

Page 17 of 22

n25 Duvall testified as follows,

My feelings were very strong that when they were trying to cut costs, they were looking at things like pensions, they were looking at things like salaries, they were looking at these things, and that most definitely the ability to sever me before my pension hit was advantageous to them. (Duvall Dep. at 192).

I've given this a great, great deal of thought. I had been made some really wonderful promises two and a half years before, and I felt like I had performed very well. And I guess when you go through a situation like this, you constantly find yourself asking, why did this happen. I don't know. (Duvall Dep. at 61).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Duvall's own speculation, however, is not enough to establish the existence of the prohibited intent. **[*45]** See, Beckwith v. International Mill Services, Inc., 617 F. Supp. 187, 190 (E.D. Pa. 1985) (court held that discharged employees, who stated during their deposition that they had no proof other than their own beliefs that they were terminated to save money vis-a-vis the vesting of their pension benefits, failed to state a claim under 29 U.S.C.A. § 1140). Moreover, the mere fact that Defendants did in fact save money because Duvall's pension did not vest, in and of itself, does not establish specific intent. See, Conkwright v. Westinghouse Electric Corp., 933 F.2d 231, 239 (4th Cir. 1991). (Standing alone, Plaintiff's allegation that the Defendants save pension costs cannot survive summary judgment). Any time an employee is discharged, there is the possibility that a company will save money if the employee's pension has not yet vested. As stated previously, the plaintiff must offer evidence which "makes the likelihood of pension-based animus greater in this case than in every case in which an employee is discharged by an employer with an ERISA plan. Turner, 901 F.2d at 347. In the present case, Duvall has failed to point to any evidence on the record to support **[*46]** the contention that Polymer had the specific intent of terminating him in order to deny him his pension. Accordingly, Defendants' motion for summary judgment on the ERISA § 510 claim is granted.

## V. The Breach of Implied Employment Contract Claim

Duvall next alleges that Defendants promised him employment until his retirement and that his termination constituted a breach on an implied employment contract. (See Complaint para. 30-32, 64-68).

The law in Pennsylvania is clear that, as a general rule, employees are at-will, absent a contract, and may be terminated at any time, for any reason or for no reason. See Stumpp v. Stroudsburg Municipal Authority, 540 Pa. 391, 1995 WL 297093 (PA.); Geary v. United States Steel Corp., 456 Pa. 171, 319 A.2d 174 (1974); Fawcett v. Monongahela Ry. Co., 391 Pa. 134, 137 A.2d 768 (1958); Krajsa v. Keypunch, Inc., 424 Pa. Super. 230, 622 A.2d 355 (1993). In Pennsylvania, a contract of employment which does not specify a definite duration of employment is presumed to be terminable at the will of either party. Chadwick v. Capital Advisors, Inc., 1992 U.S. Dist. LEXIS 8842, 1992 WL 121616, * 6 (E.D. Pa. 1992) (citing, Monkelis v. Scientific Systems Services **[*47]** Inc., 677 F. Supp. 378, 381 (W.D. Pa. 1988) (citing Geary v. United States Steel Corp., 456 Pa. 171, 175, 319 A.2d 174, 176 (1974). The rationale underlying the employment at-will doctrine is that the decision to dismiss an employee is best left to management, without intrusive judicial scrutiny of the decision. Veno

v. Meredith, 357 Pa. Super. 85, 96, 515 A.2d 571, 577 (1986).

The clearest exception to the rule of employment-at-will is where the employer and employee have entered into a valid contract which expresses or implies a definite term of employment and forbids discharge in the absence of just cause. Dutka v. Coopers & Lybrand, 1992 U.S. Dist. LEXIS 8842, 1993 WL 142902 (E.D. Pa.); Rutherford v. Presbyterian-University Hospital, 417 Pa. Super. 316, 612 A.2d 500, 503 (1992). The intention to overcome the at-will presumption must be very apparent. Veno, 357 Pa. at 99 and 515 A.2d at 578; Martin v. Capital Cities Media, Inc., 354 Pa. Super. 199, 511 A.2d 830 (1986) (The court held that the modification of an "at-will" relationship to one that can never be severed without "just cause" is such a substantial modification that a very clear statement of an intention to **[*48]** modify is required).

The at-will presumption can only be overcome by clear and specific evidence showing the parties intended their contract to extend a certain period or by evidence showing the employee gave the employer additional consideration other than the services for which he was hired. Schoch v. First Fidelity Bancorporation, 912 F.2d 654, 660 (3d Cir. 1990); Scott v. Extracorporeal, Inc., 376 Pa. Super. 90, 545 A.2d 334, 338-339 (1988); Gorwara v. AEL Industries, Inc., 784 F. Supp. 239, 243 (E.D. Pa. 1992).

The burden of overcoming the at-will presumption is on the employee, Nix, 408 Pa. Super. 369, 596 A.2d 1132, 1135, and the burden of proof for establishing an implied contract is just as weighty for the Plaintiff as the burden for establishing an express contract. Schleig v. Communications Satellite Corp., 698 F. Supp. 1241, 1246 (M.D. Pa. 1988); DiBonaventura v. Consolidated Rail Corp., 372 Pa. Super. 420, 539 A.2d 865, 867 (1988). In cases involving implied contracts of employment, the case will not reach the jury unless it can be clearly shown that the plaintiff and the employer intended to form a contract. DiBonaventura, 539 A.2d at 868 **[*49]** (Citing Greene v. Oliver Realty, Inc., 363 Pa. Super. 534, 526 A.2d 1192, 1200 (1987)).

In the present case, Duvall alleges that a contract of employment existed between him and Defendants because they had made him "repeated and extensive promises. . . regarding long-term employment security and employment at Polymer or within the DSM organization." (Plaintiff's brief p. 47). In his complaint Duvall alleges that Defendants expressly promised that his employment would be secure until retirement and that his pension would be secure. (Complaint para.31, 64-70). He also alleges in his complaint that Defendants promised him that other career opportunities would be made available to him near Texas, close to his children. (Complaint, para. 33). Duvall asserts that Defendants made these promises in March of 1990 in order to entice him to remain at Polymer after he accepted the offer from Dell Computers. n26

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n26 In the Plaintiff's complaint, Duvall alleges that he informed Polymer in order for him to revoke his acceptance of the Dell Computer offer and remain with Defendant Polymer, he would expect to be employed by Defendant Polymer through the vesting of his pension benefits and his projected retirement in May 2004. (Complaint 27-29).

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*50]**

Notwithstanding the allegations in his complaint, Duvall concedes in his deposition testimony, that despite all the incentives and vague allusions of future security that Defendants offered him, they never actually made any promises which guaranteed him long term security at Polymer. (See F.N. 5 supra).

Duvall fails to show by "clear and precise evidence" that both parties intended to be bound for a specific duration. Chadwick v. Capital Advisors, Inc., 1992 U.S. Dist. LEXIS 8842, 1992 WL 121616 at *6; see also Shriver v. Cichelli, 1992 U.S. Dist. LEXIS 19511, 1992 WL 350226 at *3. Vague promises and aspirational representations made by an employer have no legal significance. Schleig, 698 F. Supp. at 1246; see also Clay v. Advanced Computer Applications, 370 Pa. Super. 497, 511, 536 A.2d 1375 (1986) rev'd in part on other grounds 522 Pa. 86, 559 A.2d 917 (1989). Duvall cites no evidence to suggest that Defendants offered him anything other than vague hopes of a long future together. This is not enough to establish a clear intention that both parties expected to be bound for a specific duration. See Borell v. Weinstein Supply Corp., 1994 WL 530102, *5 (E.D. Pa. 1994) ("a promise of employment until **[*51]** retirement does not state a sufficiently definite term to overcome the at-will presumption"). In Veno v. Davies, the Pennsylvania Superior Court refused to find a binding employment contract based upon defendant's representation that:

> We are both the same age, we are both going to retire together, we are not making a lot now, but we'll make it later on. I want you to raise your children here. I want them to go the school. I want to retire together.

Veno v. Meredith, 357 Pa. Super. at 100. The court concluded this representation was "broad" and "vague" and did not suggest the parties contemplated a definite duration for the employment. Id. at 101. Moreover, the court found the statements to have an aspirational quality to them, which merely manifested an employer's hope that the employee will remain until his retirement. Id.

In the present case, Duvall offers nothing more than vague promises. There was no express contract which restricted Defendants' ability to discharge. Furthermore, there was not a reasonable understanding to that effect.

Duvall also contends that he gave Defendants sufficient additional consideration in that he underwent a substantial **[*52]** hardship for reasons other than the mere performance of services for which he was hired. He asserts specifically that he gave up his employment with Dell Computer Company in Austin, Texas, where he and his wife had resided for many years and where his children lived. Duvall further maintains that Defendants knew and understood the substantial hardship that Duvall underwent by foregoing the Dell Computer offer in Texas and remaining in Texas.

When there is sufficient additional consideration, an employee should not be subject to discharge without just cause for a reasonable time period. Darlington, 350 Pa. Super. at 199-200, 504 A.2d at 314. A reasonable time period should be commensurate with the hardship the employee has endured or the benefit he has conferred. Veno, 357 Pa. Super. at 102, 515 A.2d at 580.

Additional consideration is narrowly defined. See, Gorwara v. AEL Industries, Inc., 784 F. Supp. 239 (E.D. Pa. 1992). In Darlington v. General Electric, 350 Pa. Super. at 201. 504 A.2d at 315, the court stated:

> Additional consideration exists when an employee affords his employer a

Case 1:04-cv-00285-KAJ    Document 83-3    Filed 12/07/2005    Page 20 of 39

Get a Document - by Citation - 1995 U.S. Dist. LEXIS 14413    Page 20 of 22

substantial benefit other than the services which the employee is **[\*53]** hired to perform, or when the employee undergoes a substantial hardship other than the services which he is hired to perform.
'If the circumstances are such that a termination of the relation by one party will result in great hardship or loss to the other, as they must have known it would when they made the contract, this is a factor of great weight in inducing a holding that the parties agreed upon a specific period.' A. Corbin, Corbin on Contracts § 684 (1960).

Generally, an employee undergoes a substantial hardship when he must move his family to take the new position. Darlington, 350 Pa. Super. 183, 504 A.2d 306, 315 (1986); Cashdollar v. Mercy Hospital of Pittsburgh, 406 Pa. Super. 606, 595 A.2d 662, 665 (1991) (court found the existence of a substantial hardship where plaintiff gave up a $ 82,000 per year job and uprooted his pregnant wife and child, only to be terminated after 16 working days).

Duvall alleges that foregoing the employment opportunities at Dell, along with not returning to Texas with his children constituted a substantial hardship. However, the instant case is distinguishable from cases in which courts have found the existence of substantial **[\*54]** hardship. When Duvall chose to remain at Polymer and forego the Dell offer, he did not have to move and uproot his family. Nor was he terminated within a few days or months after he decided to stay.

Moreover, the facts of the instant case are analogous to the facts of Borell v. Weinstein Supply Corp., 1994 WL 530102 (E.D. Pa.), in which the court granted summary judgment for the defendant. In Borell, the plaintiff, after holding several positions with the defendant, left to work for another employer. Id. at \*1. Shortly thereafter, the defendant successfully enticed the plaintiff to return with promises to pay plaintiff an increased salary "until plaintiff retired." Id. Less than six years later, the defendant fired the plaintiff at age 55.

In Borell, the court granted summary judgment against the plaintiff. First, the court concluded that the employer's promise of employment till retirement was too broad to create an express or implied employment contract for a specific duration. Moreover, the fact that the plaintiff left his new job in order to return to the old one did not constitute sufficient additional consideration. Similar to Duvall, the plaintiff in **[\*55]** Borell simply chose to forego a new career opportunity in exchange for the defendant's promises of increased compensation. Id. See also Moore v. Bally Block Company, 1994 WL 248138 (Momtg. Co. Ct. Com. Pl. 1994) aff'd 1994 WI 547684 (Pa. Super. 1994) (The court held that plaintiff's decision to sell his home in Maine at a loss, reject the offer from the other potential employer, and move to Pennsylvania and build a home, were simply career choices similar to those "employees make everyday notwithstanding a volatile employment market").

Additionally, numerous other courts have held that rejection of specific offers from other employers in order to remain with the defendant employer does not constitute additional consideration. See Schleig, 698 F. Supp. at 1246 (court held that plaintiff's rejection of job offers from other employers in order to remain with defendant employer did not make his case "any more compelling"); Veno, 357 Pa. Super. at 101 (fact that he refused other jobs in order to remain with defendant is merely a manifestation of his preference to remain with defendant and in no way suggests he had a reasonable belief that he could be fired only for cause **[\*56]** - - employee did not provide additional consideration.)

It is apparent that Duvall simply made a reasoned career choice of accepting the financial incentives with Polymer, rather than going with Dell. This decision does not reflect any sort of additional consideration. Duvall has failed to adduce sufficient evidence that he was anything other than a typical at-will employee.

Based on the foregoing discussion, we conclude that Duvall was merely an at-will employee, had no employment contract with Defendants, either express or implied, for a term of years or otherwise, and he was therefore terminable at the will of Defendants. Accordingly, summary judgment will be granted on this claim.

## VI. The Promissory Estoppel Claim

Finally, we consider Duvall's contention that he is entitled to relief against Defendants under the equitable doctrine of promissory estoppel.

It is settled law in Pennsylvania that equitable estoppel has been affirmatively rejected as an exception to the at-will employment rule. See Stummp, 1995 WL 297093, *2 (Pa.); Paul v. Lankenau Hospital, 524 Pa. 90, 569 A.2d 346 (1990). An employee may be discharged with or without cause, and Pennsylvania law **[\*57]** does not prohibit firing an employee for relying on an employer's promise. Paul, 524 Pa. at 95, 569 A.2d at 348.

Thus, all actions based upon a theory of estoppel as an exception to the at-will doctrine are precluded. Therefore, the Court will grant Defendants' motion for summary judgment on the promissory estoppel count of the complaint.

## VII. Conclusion

For the reasons discussed above, this Court concludes that Defendants' motions for summary judgment should be granted on all four counts.

## ORDER

**AND NOW**, this 28th day of September, 1995, upon consideration of defendants' motion for summary judgment on all counts of plaintiff's complaint (Doc. #20), defendants' memorandum of law in support thereof, plaintiff's response thereto, and all other relevant matters of record, it is hereby ordered, adjudged and decreed that the motion is **GRANTED.**

**IT IS FURTHER ORDERED** judgment is entered in favor of all defendants and against plaintiff on all counts of the complaint.

E. Mac Troutman, J.S.

Service: **Get by LEXSEE®**
Citation: **1995 us dist lexis 14413**
View: Full
Date/Time: Tuesday, November 22, 2005 - 2:35 PM EST

\* Signal Legend:
- Warning: Negative treatment is indicated
[Q] - Questioned: Validity questioned by citing refs
⚠ - Caution: Possible negative treatment
- Positive treatment is indicated
- Citing Refs. With Analysis Available
- Citation information available
\* Click on any Shepard's signal to Shepardize® that case.

Case 1:04-cv-00285-KAJ   Document 83-3   Filed 12/07/2005   Page 22 of 39
Page 22 of 22

Get a Document - by Citation - 1995 U.S. Dist. LEXIS 14413

About LexisNexis | Terms and Conditions

Copyright © 2005 LexisNexis, a division of Reed Elsevier Inc  All rights reserved

LEXSEE 2004 U.S. DISTRICT LEXIS 13942

**RHONDA I. EDWARDS, Plaintiff, v. CONCORD EFS, INC., JOANNE FREIDEL, and MARY BERGES, Defendants.**

**Civil Action No. 03-599 GMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2004 U.S. Dist. LEXIS 13942*

**July 20, 2004, Decided**

**DISPOSITION:** [*1]  Summary judgment was granted granted in part and denied in part.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendants, an employer and two supervisors, filed a motion for summary judgment in the United States District Court for the District of Delaware in plaintiff employee's suit alleging race and gender discrimination, retaliation, violation of equal rights, a common law breach of the covenant of good faith and fair dealing contract claim, and a Delaware common law conspiracy claim.

**OVERVIEW:** Defendants argued that the employee failed to meet the McDonnell Douglas burden-shifting regimen. The federal district court held that the employee failed to establish a prima facie case for her race discrimination claim. Essentially, the employee argued that she was disciplined more harshly for an error than similarly situated white employees. However, the other employees received permission to make exceptions to the hiring policy, while the employee did not. There were triable issues as whether the employee's firing was pretextual. The employee was fired just days after her last complaint about racial discrimination in hiring, over two months after the error for which she was allegedly fired. In view of Fed. R. Civ. P. 8(a)'s liberal notice pleading requirements, the civil conspiracy claim was considered. There were triable issues as to the civil conspiracy claim as to whether the reason for firing the employee was pretextual and as to whether the supervisors unlawfully acted in furtherance of a conspiracy. Finally, the same triable issues present in the retaliation claim were present in the covenant of good faith and fair dealing claim.

**OUTCOME:** Defendants' summary judgment was granted as to the Title VII race discrimination claim and the § 1981 claim as it related to racial discrimination. Defendants' summary judgment motion was denied on the remaining claims.

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Summary Judgment Standard*
[HN1] The trial court may grant summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

*Civil Procedure > Summary Judgment > Summary Judgment Standard*
[HN2] The trial court may grant summary judgment only if the moving party shows that there are no genuine issues of material fact that would permit a reasonable jury to find for the non-moving party. A fact is material if it might affect the outcome of the suit. An issue is genuine if a reasonable jury could possibly find in favor of the non-moving party with regard to that issue.

2004 U.S. Dist. LEXIS 13942, *

***Civil Procedure > Summary Judgment > Summary Judgment Standard***
[HN3] In deciding a summary judgment motion, the trial court must construe all facts and inferences in the light most favorable to the non-moving party.

***Labor & Employment Law > Discrimination > Racial Discrimination > Enforcement***
[HN4] Under the McDonnell Douglas burden shifting framework, a plaintiff must first establish a prima facie case by demonstrating that she is a member of a protected class. She must then establish that she was qualified for an employment position, but was not hired or was fired from the position under circumstances that give rise to an inference of unlawful discrimination. When the plaintiff establishes this prima facie showing, the burden shifts to the defendant to articulate one or more legitimate, non-discriminatory reasons for its employment decision. If the defendant produces one or more legitimate reasons, the presumption of discrimination is rebutted. The plaintiff must then prove that the employer's reasons were pretextual-that is, that they are false and that the real reason for the employment decision was discriminatory.

***Labor & Employment Law > Discrimination > Racial Discrimination > Enforcement***
***Evidence > Relevance > Circumstantial & Direct Evidence***
[HN5] Circumstantial evidence of discrimination may include evidence that the employer treated other, similarly situated persons out of his protected class more favorably. In determining whether similarly situated nonmembers of a protected class were treated more favorably than a member of the protected class, the focus is on the particular criteria or qualifications identified by the employer as the reason for the adverse action.

***Labor & Employment Law > Discrimination > Racial Discrimination > Enforcement***
***Civil Procedure > Summary Judgment > Summary Judgment Standard***
[HN6] To survive summary judgment on a racial discrimination claim based on harsher discipline, the plaintiff must point to evidence from which a factfinder could reasonably infer that the plaintiff satisfied the criterion identified by the employer or that the employer did not actually rely upon the stated criterion.

***Labor & Employment Law > Discrimination > Retaliation***
[HN7] To establish a prima facie case of retaliation, a plaintiff must show that: (1) she engaged in a protected employee activity; (2) the employer took an adverse employment action after or contemporaneous with the protected activity; and (3) a causal link exists between the protected activity and the adverse action.

***Labor & Employment Law > Discrimination > Retaliation***
[HN8] Once a plaintiff establishes a prima facie case of retaliation, the employer must proffer a legitimate, non-discriminatory reason for the adverse action. The burden then shifts back to the plaintiff to show that the proffered reason is pretext.

***Labor & Employment Law > Discrimination > Retaliation***
[HN9] Informal protests against discrimination, including verbal complaints to management, may be considered protected activities for purposes of a retaliation claim.

***Labor & Employment Law > Discrimination > Retaliation***
[HN10] The ultimate determination of causation for purposes of a retaliation claim depends on how proximate the events actually were, and the context in which the issue arose.

***Labor & Employment Law > Discrimination > Title VII***

2004 U.S. Dist. LEXIS 13942, *

*Labor & Employment Law > Discrimination > Retaliation*
[HN11] Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e*, and *42 U.S.C.S. § 1981* retaliation claims are analyzed under the same substantive standard.


*Torts > Multiple Defendants > Conspiracy*
[HN12] Under Delaware law, a civil conspiracy requires three elements: (1) an agreement between two or more individuals; (2) an unlawful act done to further the conspiracy; and (3) damages to the plaintiff.


*Contracts Law > Contract Interpretation > Good Faith & Fair Dealing*
*Labor & Employment Law > Discrimination > Racial Discrimination > Other Laws*
[HN13] Under Delaware law, an employer breaches the covenant of good faith and fair dealing when he fires and employees in violation of some public policy.


*Labor & Employment Law > Discrimination > Retaliation*
*Labor & Employment Law > Discrimination > Racial Discrimination > Other Laws*
[HN14] Under Delaware law, a plaintiff can maintain a common law claim for breach of the covenant of good faith and fair dealing due to discriminatory conduct or retaliation for reporting discriminatory conduct.

**COUNSEL:** For RHONDA I. EDWARDS, plaintiff: Victor F. Battaglia, Sr., Biggs & Battaglia, Wilmington, DE.

For CONCORD EFS INC., JOANNE FREIDEL, MARY BERGES, defendants: David H. Williams, Morris, James, Hitchens & Williams, Wilmington, DE.

**JUDGES:** Gregory M. Sleet, United States District Judge.

**OPINIONBY:** Gregory M. Sleet

**OPINION:**

**MEMORANDUM**

**I. INTRODUCTION**

On June 24, 2003, the plaintiff, Rhonda I. Edwards ("Edwards"), filed the above-captioned action against her employer, Concord EFS, Inc. ("Concord") and supervisors, Joanne Freidel ("Friedel") and Mary Berges ("Berges"), alleging race and gender discrimination under to *42 U.S.C. § 2000e-2*, retaliation pursuant to *42 U.S.C. § 2000e-3*, violation of equal rights pursuant to *42 U.S.C. § 1981*, federal civil conspiracy claims under *42 U.S.C. § 1985* and *§ 1986*, a state law employment discrimination claim pursuant to 10 Del. C. § 701, *et seq.*, and a common law breach of the covenant of [*2] good faith and fair dealing contract claim.

On April 8, 2004, the defendants filed a motion for summary judgment. Edwards subsequently conceded that her sex discrimination claim could not survive the motion, dropped her state law claim pursuant to 10 De. C. § 701, *et seq.* for lack of a private right of action for damages under that statute, and also dropped her federal civil conspiracy claims pursuant to *sections 1985* and *1986* because those claims are based on the same set of facts as her action under Title VII and *42 U.S.C. § 1981*. In place of her federal civil conspiracy claim, Edwards asserts a Delaware common law conspiracy claim in her answering brief in opposition to the defendant's motion for summary judgment.

On June 24, 2004, the court held oral argument on the defendants' motion for summary judgment with regard to Edwards' race discrimination claim, retaliation claim, *section 1981* claim, Delaware common law civil conspiracy claim, and breach of covenant of good faith and fair dealing claim. Having considered the parties' arguments and submissions, the court will grant summary judgment in favor of the defendants on the Title VII race discrimination [*3] claim, but it will deny summary judgment on the remaining claims. The reasons for the court's ruling are set forth below.

2004 U.S. Dist. LEXIS 13942, *

## II. STANDARD OF REVIEW

[HN1] The court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c); see also Boyle v. County of Allegheny, Pennsylvania, 139 F.3d 386, 392 (3d Cir. 1998).* Thus, [HN2] the court may grant summary judgment only if the moving party shows that there are no genuine issues of material fact that would permit a reasonable jury to find for the non-moving party. *See Boyle, 139 F.3d at 392.* A fact is material if it might affect the outcome of the suit. *Id.* (citing *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)).* An issue is genuine if a reasonable jury could possibly find in favor of the non-moving party with regard to that issue. *Id.* [HN3] In deciding the motion, the court must construe [*4] all facts and inferences in the light most favorable to the non-moving party. *Id.; see also Assaf v. Fields, 178 F.3d 170, 173-174 (3d Cir. 1999).* With these standards in mind, the court will describe the facts that led to the present motion.

## III. BACKGROUND

### A. Edwards' Job Responsibilities

Concord is a financial services company. Edwards, who is African-American, began employment at Concord in 1997 as an Administrative Assistant in the Customer Service Department. In 1999, she became an HR Assistant in the Human Resources Department. As an HR Assistant, Edwards was responsible for assisting Recruiters with all aspects of hiring, such as processing new hire paperwork, including pre-employment drug testing. During her tenure as an HR Assistant, Edwards processed paperwork for at least 50 new hires.

In March 2001, Edwards was promoted to Recruiter in the HR Department. As a Recruiter, Edwards' responsibility was to fill open positions in the various departments at Concord. The process worked as follows. A Recruiter would receive a requisition that a manager in a particular department needed to fill certain positions. The Recruiter then would place [*5] newspaper ads or other advertisements, attend job fairs or do whatever was necessary to find suitable employees. After identifying candidates, the Recruiter would review their resumes, and if a candidate was qualified, submit his or her resume to the hiring manger. If the hiring manager was interested, he or she would instruct the Recruiter to schedule an interview. If the hiring was for the Customer Service Department, the candidate was required to appear and pass a written test before going through the interview process.

If the hiring manager wanted to bring the employee on board, he would send the Recruiter a Concord Offer Request Form ("Offer Request Form") asking that an offer be made to the potential candidate. The Offer Request Form would show when the candidate would start employment and name any current employee entitled to a hiring bonus for referring the candidate. The Offer Request Form also has three signature lines, one for "Approval of Hiring Manager," one for "Approval of Second Level Manager," and one for "Approval of Human Resources." At the bottom of the Offer Request Form there is a note that states, "Offer of employment outside of standard hiring guidelines will [*6] require a third level of signature."

After receiving an Offer Request Form for a candidate, the Recruiter would then make a verbal offer and tell the candidate that she would have to pass a background screen and drug test. The same day the verbal offer was made, the Recruiter would send an offer packet to the prospective employee by overnight mail (or the candidate would come in to pick up the packet). Once the candidate signed the offer, the Recruiter then gave the paperwork to an HR Assistant and informed the employee that she had forty-eight hours to appear at one of the listed laboratories to submit a sample for drug screening. The letter given to prospective employees would state that the background check could take five to seven days to complete and that the offer was conditional upon a successful background check and negative drug test results. Under normal circumstances, the drug test results would be received two business days after the sample was given by the candidate. At all relevant times, it was the policy of Concord that an applicant may not start employment without successfully completing a drug screen and background check.

### B. Edwards Complains to Her Supervisors [*7] About Discriminatory Practices

At the time Edwards was promoted to Recruiter, Therese Williams was the Director of Staffing and Training and Edwards' supervisor. Later, in May 2001, Berges replaced Williams and became Edwards' supervisor. Friedel is Berges' supervisor in the Human Resources Department. Friedel was one of the people who recommended Edwards for promotion to her position as a Recruiter.

2004 U.S. Dist. LEXIS 13942, *

After her promotion to Recruiter, Edwards began to bring to the attention of Berges and Friedel instances where she perceived that employees and prospective employees were being treated differently because of race. For example, she notified Berges and Friedel that a current white employee, Mr. Lichman, had received a referral bonus for referring a white prospective employee but that a current black employee, Ms. Kinslow had not received a referral bonus for referring a prospective black employee under similar circumstances. She also told Berges and Friedel that an exception to the hiring policy concerning relatives had been made for a white employee, Ms. Besak, but not for a black employee, Mr. Ross. After Edwards raised these concerns, her relationship with Berges and Friedel became [*8] strained. The last time Edwards complained to her supervisors about racial inequities in hiring was in mid September of 2001.

## C. The Hiring and Termination of Krista Mann

From February of 2001 through the end of the year, the need for employees was very great, and Recruiters at Concord were extremely busy. By July of 2001, the Customer Service Department had developed an urgent need to hire permanent employees. Accordingly, Edwards scheduled ten interviews (including that of a prospective employee Krista Mann) for the week of July 9 in order to fill the training class which was to begin on Monday July 16, 2001. Mann took the written test and interviewed on July 9, 2001. On July 10, 2001, the hiring manager for Customer Service Department, Greg Kaznowsky, completed an Offer Request Form authorizing Edwards to make an offer of employment to Mann. Mann's Offer Request Form indicated a start date of July 16, 2001, i.e., the date of the training class for the Customer Service Department. The Offer Request Form was signed by Kaznowsky, Chuck Cluff, a higher level manager in the Customer Service Department, and also by Berges.

Because of the time constraints, Edwards asked Mann to [*9] come pick up her paperwork instead of using overnight mail. Mann came in to pick up the paperwork on July 11, 2001. While at the office, she signed the offer letter and informed Edwards that she would not be able to provide a sample for the drug test until Thursday, July 12, 2001, still within the criteria of the offer which requires a drug test within forty-eight hours.

When the results of Mann's drug test had not been reported by Friday, July 13, 2001, Edwards called the upper level manager of the Customer Service Department, Joseph Biener, and told him that Mann's background check would not be complete in time to start her in the July 16th training class. Edwards did not tell Mr. Biener, however, that it was the drug test results that had not been received. (Edwards Dep. at 95:8-19). Biener instructed Edwards to start Mann in the training program on Monday, July 16, 2001, and said that if there were any problems, he would cover her. Biener denies having had any such conversation with Edwards. Biener is not Edwards' supervisor.

Edwards contacted Mann and asked her if there was any reason why she would not have passed the drug test. When Mann responded, "no," Edwards told her that [*10] she could start on July 16, 2001. Edwards did not tell Berges, or any other supervisor in the HR Department, that she allowed Mann to begin work without having received her drug screen results.

Mann started employment on July 16, 2001. On July 17, 2001, her drug screen came back positive. Edwards confronted Mann and told her that she could no longer work at Concord and had security escort Mann from the premises. Edwards then went to HR Assistant Jamie Fairchild and requested that she send a letter to Mann rescinding the offer of employment. Edwards also instructed HR Assistant Lisbeth Fiesler to process the paperwork which would ensure the individual who referred Mann, Yvette Walker, would not receive a referral bonus.

Edwards then called Biener and told him that Mann did not pass the background check. Edwards told Biener that he should process the paperwork to make sure that Mann was officially terminated from employment. A Recruiter does not have the authority to terminate an employee in the Customer Service Department, and Edwards was aware of this policy. It is the responsibility of a manager in the Customer Service Department to process termination paperwork for employees and [*11] trainees of that department. At no point did Edwards tell Berges, or any other supervisor in the HR Department, about Mann's drug screen results and termination.

## D. Edwards' Termination

Biener did not process the termination, and Mann ended up getting paid for three weeks of work even though she was only at Concord for a day and a half. On or about September 20, 2001, Concord's payroll department notified the Human Resources Department that Mann had remained on the payroll for several weeks after her termination. Initially, Ms. Hamilton, the Employee Relations Representative, spoke with Edwards about the situation, and later Berges did the same. Edwards explained to both of them what happened, claiming that Biener told her it was alright to start Mann's training without the results of the drug screen. After consulting with Biener and then again amongst each other, Hamilton, Berges, and Friedel decided to terminate Edwards and did so on September 20, 2001. They told Edwards that she

was being fired because she had violated Concord's hiring and termination policies with respect to the recruitment and termination of Mann.

### E. Concord's Disciplinary Procedures

Concord's [*12] disciplinary procedures are outlined in the Associates' Reference Guide to Human Resources Policies and Procedures, which provides a four-step process for corrective action. The document goes on to provide for "accelerated corrective action, up to and including termination," which may be "used when one or more corrective action steps are bypassed," and then explicitly states that "Concord retains the **unconditional** right to determine the circumstances in which accelerated corrective action will be used." Edwards never had any corrective employment action taken against her during her tenure at Concord.

### F. Treatment of Similarly Situated Employees

Edwards admits that she did make a mistake with regard to the Krista Mann incident, (Edwards Dep. at 173:17-18), and concedes that disciplinary action may have been warranted (Edwards Dep. at 171:7-8). She contends, however, that she was disciplined too harshly for her mishap, particularly when compared to other similarly situated white Recruiters. In support of this assertion, Edwards reports instances where two white Recruiters, Tina Akin and Derek Studer, made exceptions to the hiring policy by starting employees in training [*13] before receiving drug screen results. While working in her previous position as an HR Assistant, Edwards recalls being asked by the former Director of Staffing and Training in the HR Department, Williams, to input data for two different recruits of Akin to start before the drug tests results were returned. When Edwards inquired, Williams informed her that they were making an exception. Later, Edwards remembers a similar incident where one of Studer's recruits was allowed to start before the drug test. Studer, however, had received Friedel's permission to start the employee without having received the drug screening results.

### G. Greg Kaznowsky

Greg Kaznowsky was a Manager in the Customer Service Department during the time Edwards worked for Concord. Kaznowsky reports that, about a month before Edwards was fired, Biener asked him to compile a list of complaints regarding Edwards' failure to return phone calls, even though it appeared this was not, in fact, a problem..

After Edwards' termination, the Delaware Department of Labor Unemployment Board (the "Board") held a hearing on her claim. Kaznowsky was scheduled to testify at that hearing, and Hamilton and Berges approached him [*14] to ascertain what he would say. He recounted being in Biener's office on July 13, 2001, and hearing Biener tell Edwards on speaker phone to do whatever she had to do to fill the training class on July 16, 2001, and that he would "cover her back." Berges and Hamilton then told Kaznowsky that his recollection was not consistent with the position the company was taking and asked him to testify as if he did not remember what Biener said. Kaznowsky never testified before the Board.

## IV. DISCUSSION

### A. Racial Discrimination Claim

In the absence of any direct evidence of racial discrimination, Edwards attempts to prove through indirect evidence, that the defendants' actions were racially motivated pursuant to the *McDonnell Douglas* burden shifting framework. *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973).* [HN4] Under *McDonnell Douglas*, a plaintiff must first establish a prima facie case by demonstrating that she is a member of a protected class. She must then establish that she was qualified for an employment position, but was not hired or was fired from the position "under circumstances that give rise to an inference of unlawful [*15] discrimination." *See Waldron v. SL Industries, Inc., 56 F.3d 491, 494 (3d Cir. 1995).* When the plaintiff establishes this prima facie showing, the burden shifts to the defendant to articulate one or more legitimate, non-discriminatory reasons for its employment decision. *Id.* If the defendant produces one or more legitimate reasons, the presumption of discrimination is rebutted. The plaintiff must then prove that the employer's reasons were pretextual-that is, that they are false and that the real reason for the employment decision was discriminatory. *Id.*

Edwards' claim fails under the burden-shifting regimen of *McDonnell Douglas*, as she cannot establish a prima facie case of race discrimination. Although Edwards is a member of a protected class and was qualified for the Recruiter position she held, the circumstances surrounding her dismissal do not give rise to an inference of unlawful discrimination. As an initial matter, Edwards admits that she made a mistake warranting discipline with regard to the Krista Mann situation. Indeed, it was Concord's policy that no candidate may begin employment until the HR Department has been

2004 U.S. Dist. LEXIS 13942, *

notified that she passed [*16] the drug screen. The note on the standard Offer Request Form explicitly requires the approval of a third level supervisor before any exception to this policy may be made. Berges, not Beiner, was Edwards' supervisor. Edwards allowed Mann to begin employment at Concord before having received Mann's drug screen results and without notifying Berges of this fact. Not only did Edwards fail to obtain approval from her supervisor, Berges, before deviating from the hiring policy, but she never told Berges of the Krista Mann hiring and termination situation until they confronted her about it two months after the incident.

In view of her violation of the hiring policy and in combination with Concord's unconditional discretion to bypass progressive discipline, the crux of Edwards' position is that she was disciplined more harshly than other similarly situated, white Recruiters. [HN5] Circumstantial evidence of discrimination may include evidence "that the employer treated other, similarly situated persons out of his protected class more favorably." *Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994).* "In determining whether similarly situated nonmembers of a protected class were treated [*17] more favorably than a member of the protected class, the focus is on the particular criteria or qualifications identified by the employer as the reason for the adverse action." *Simpson v. Kay Jewelers, Div of Sterling, Inc., 142 F.3d 639, 647 (3d Cir. 1998)* (citing *Ezold v. Wolf, Block, Schorr and Solis-Cohen, 983 F.2d 509, 528 (3d Cir. 1993)).* [HN6] To survive summary judgment, "the plaintiff must point to evidence from which a factfinder could reasonably infer that the plaintiff satisfied the criterion identified by the employer or that the employer did not actually rely upon the stated criterion." *Simpson 142 F.3d at 639* (citing *Fuentes, 32 F.3d at 767)).*

Edwards fails to point to any concrete examples or instances in which any other Recruiters committed a violation of the hiring policy without prior approval from one of their supervisors. Edwards admits that Williams asked her to input the data for Akin's excepted recruits and thereby confirms that Williams, the then relevant supervisor, knew of and approved the exception to the hiring policy. In Studer's case, he also had advance permission from an HR Department supervisor, [*18] Friedel. The fact that Akin and Studer received permission from their supervisors to make exceptions to the hiring policy stands in sharp contrast to the conduct of Edwards, who never asked or informed her supervisors before deviating from the policy. In this regard, Edwards is not similarly situated to Akin or Studer. In the absence of further evidence, Edwards cannot establish a prima facie case that her termination occurred under circumstances giving rise to an inference of racial discrimination. The court will grant summary judgment to the defendants on Edwards' Title VII race discrimination claim and in part on her *section 1981* claim as it relates to racial discrimination.

**B. Retaliation Claim**

In contrast, the court finds disputed issues of material fact so as to preclude summary judgment on Edwards's retaliation claim. [HN7] To establish a prima facie case of retaliation, a plaintiff must show that: (1) she engaged in a protected employee activity; (2) the employer took an adverse employment action after or contemporaneous with the protected activity; and (3) a causal link exists between the protected activity and the adverse action. *Weston v. Commonwealth of Pa., 251 F.3d 420, 430 (3d Cir. 2001);* [*19] *Childress v. Dover Downs, Inc., 2000 U.S. Dist. LEXIS 4881, No. 98-206-SLR, 2000 WL 376419, at *11 (D. Del. Mar. 31, 2000), aff'd without op., 263 F.3d 157 (3d Cir. 2001).* [HN8] Once a plaintiff establishes a prima facie case, the employer must proffer a legitimate, non-discriminatory reason for the adverse action. *Weston, 251 F.3d at 430.* The burden then shifts back to the plaintiff to show that the proffered reason is pretext. *Id.*

Edwards has adduced sufficient evidence to support a prima facie case of retaliation. She clearly suffered an adverse employment action in that she was fired from her job. Moreover, [HN9] informal protests against discrimination, including verbal complaints to management, may be considered protected activities. *See Abramson v. William Paterson College, 260 F.3d 265, 287-88 (3d Cir. 2001)* (citing *Barber v. CSX Distrib. Servs., 68 F.3d 694, 701-02 (3d Cir. 1995)* (citing *Summer v. U.S. Postal Servs., 899 F.2d 203, 209 (2d Cir. 1990))).* Edwards claims she complained to Berges and Friedel about racial discrimination in hiring on at least two occasions. Such incidents, if believed, could [*20] sustain a jury finding that Edwards engaged in protected activity. Edwards also sets forth sufficient evidence to create an issue of material fact on the causation element of her prima facie case, in that she was terminated just days after her last complaint to her supervisors but over two months after the incident for which she was allegedly fired. *See Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 (3d Cir. 2000)* (finding that [HN10] the ultimate determination of causation depends on "how proximate the events actually were, and the context in which the issue [arose]").

Although the defendants can certainly set forth a legitimate reason for Edwards' termination--that she violated Concord's hiring policy--the court nonetheless finds disputed issues of fact with regard to whether or not this reason is pretextual. Specifically, Kaznowsky testified that Biener, a member of Concord's management, asked him to fabricate complaints about Edwards. According to Kaznowsky, Berges, another management employee at Concord, also pres-

2004 U.S. Dist. LEXIS 13942, *

sured him to lie in the hearing before the Board. If believed, Kaznowsky's testimony, in conjunction with Edwards' claim that her relationship with [*21] Friedel and Berges became strained after her complaints, would create a genuine issue of material fact as to the defendants' true motive in terminating Edwards. Kaznowsky's credibility is an issue for the jury to decide, and not appropriate for determination on summary judgment. Given that Title VII [HN11] and section 1981 retaliation claims are analyzed under the same substantive standard, the court will also deny summary judgment on both of these counts.

### C. Civil Conspiracy Claim

The defendants argue that Edwards is barred from now bringing a civil conspiracy claim in lieu of her original *section 1985* and *1986* claims. In view of the *Federal Rules of Civil Procedure Rule 8(a)*'s liberal notice pleading requirements, the court does not agree and with defendants and will consider Edwards' civil conspiracy claim. The court determines that there are genuine issue of material fact with regard to the civil conspiracy claim.

Edwards claims that Berges and Friedel had an agreement to unlawfully fire her due to her complaints about racial discrimination. [HN12] Under Delaware law, a civil conspiracy requires three elements: (1) an agreement between two or more [*22] individuals; (2) an unlawful act done to further the conspiracy; and (3) damages to the plaintiff. *See Capano Mgmt. Co. v. Transcontinental Ins. Co., 78 F. Supp. 2d 320, 331 (D. Del. 1999); S&R Assocs., LP v. Shell Oil Co., 725 A.2d 431, 440 (Del. 1998)*. Sufficient facts exist to support a claim that Berges and Friedel had an agreement, in that, at the very least, they met on September 20, 2001 and discussed Edwards' termination. As already noted, there exist genuine issues of material fact as to whether the defendants' proffered reason for terminating Edwards is really a pretext for retaliation. In this regard, the court also finds a disputed issue of material fact as to whether Berges and Friedel unlawfully acted in furtherance of a conspiracy. Finally, given that Edwards was terminated from her job, she could certainly establish damages. The court therefore will deny summary judgment on Edwards' civil conspiracy claim.

### D. Breach of the Covenant of Good Faith and Fair Dealing

Edwards argues that because her termination was due to the defendants' retaliation, it was in violation of public policy and therefore breaches the covenant of good [*23] faith and fair dealing. [HN13] Under Delaware law, an employer breaches the covenant of good faith and fair dealing when he fires and employees in violation of some public policy. *Schatzman v. Martin Newark Dealership, Inc., 158 F. Supp. 2d 392, 398 (D. Del. 2001); Schuster v. Derocili, 775 A.2d 1029, 1039 (Del. 2001)*. Furthermore, it is clear [HN14] under Delaware law that a plaintiff can maintain a common law claim for breach of the covenant due to discriminatory conduct or retaliation for reporting discriminatory conduct. *See Schatzman, 158 F. Supp. 2d at 399*. Again, because the court has found genuine issues of material fact on Edwards' retaliation claim, it finds the same with regard to whether or not the defendants violated public policy in terminating Edwards. The court therefore will deny summary judgment on the breach of the covenant of good faith and fair dealing claim.

## V. CONCLUSION

Because the facts show that Edwards violated Concord's hiring policy and in the absence of any evidence that she was disciplined more harshly than similarly situated employees, Edwards cannot demonstrate that she was terminated under circumstances [*24] that give rise to an inference of unlawful discrimination. In this regard, Edwards cannot establish a prima facie case of race discrimination, and the court therefore will grant summary judgment on this claim. Nevertheless, as set forth above, the court finds genuine issues of material fact with regard to Edwards' remaining claims and will deny summary judgment on them accordingly.

Date: July 20, 2004

Gregory M. Sleet

United States District Court Judge

### ORDER

For the reasons set forth in the court's memorandum issued contemporaneously herewith, IT IS HEREBY ORDERED that:

2004 U.S. Dist. LEXIS 13942, *

1. The Defendants' Motion for Summary Judgment (D.I. 30) is GRANTED IN PART and DENIED IN PART.

2. Counts One, Four, Five and Six of the plaintiff's complaint (D.I. 1) are DISMISSED.

3. Count Three of the complaint is dismissed IN PART, as it relates to racial discrimination.

4. The plaintiff is granted leave to refile her complaint to properly allege a common law civil conspiracy count.

Dated: July 20, 2004

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

100AE9

********** Print Completed **********

Time of Request:    December 07, 2005   01:17 PM EST

Print Number:       1861:74221353
Number of Lines:    382
Number of Pages:

Send To:  ERACE, SHARON
          YOUNG CONAWAY STARGATT & TAYLOR
          1000 N WEST ST FL 17
          WILMINGTON, DE 19899

Service: Get by LEXSEE®
Citation: 2005 us app lexis 22157

*2005 U.S. App. LEXIS 22157, ***

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; LISA STEPLER v. AVECIA, INC.; Lisa
Stepler, Appellant

No. 04-3396

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

2005 U.S. App. LEXIS 22157

July 12, 2005, Argued
October 13, 2005, Filed

**NOTICE: [*1]** RULES OF THE THIRD CIRCUIT COURT OF APPEALS MAY LIMIT CITATION
TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT
OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF DELAWARE. Dist. Court Civil Action No. 03-CV-00320. District Judge: The
Honorable Susan L. Robinson. Stepler v. Avecia Inc., 2004 U.S. Dist. LEXIS 14955 (D. Del.,
July 19, 2004)

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff former employee appealed from a judgment of the
United States District Court for the District of Delaware dismissing her claim for intentional
infliction of emotional distress (IIED) and granting summary judgment in favor of
defendant former employer on the employee's retaliation claim under Title VII of the Civil
Rights Act of 1964 and wrongful termination claim under Delaware law.

**OVERVIEW:** The employee alleged that this case should have been analyzed under the
Price Waterhouse framework. The court found that the employee's Title VII claims must be
analyzed under the McDonnell Douglas burden-shifting framework. Next, the court found
that a reasonable jury considering the evidence in the light most favorable to the
employee-- including the employee's performance reviews, management's increased
scrutiny of her, the tension with her co-workers, the memorandum of April 23, 2001, and
the termination letter -- could conclude that there was a causal link between the
employee's protected activities and the employer's decision to fire her. Next, the court
agreed with the district court's analysis that the employee's IIED claim was barred. The
court reasoned that for a complaint to survive a motion to dismiss, there must be more
than a mere allegation that there was an intentional injury; there must be facts alleged
which, if true, show deliberate intent to bring about an injury.

**OUTCOME:** The court affirmed the dismissal of the IIED claim and the entry of summary
judgment in favor of the employer on the wrongful termination claim. However, the court
reversed the entry of summary judgment in favor of the employer on the retaliation claim
and remanded for further proceedings.

**CORE TERMS:** termination, retaliation, prima facie case, summary judgment, fictitious, fired,
fair dealing, intentional infliction of emotional distress, wrongful termination, protected

activity, general rule, covenant, entry of summary judgment, protected activities, employment decision, sexual harassment, exclusive remedy, direct evidence, reasonable jury, public interest, first category, false reason, sole remedy, work time, re-establishes, behavioral, harassment, manipulate, subjected, proffered

### LexisNexis(R) Headnotes ◆ Hide Headnotes

Labor & Employment Law > Discrimination > Disparate Treatment > Burden Shifting Analysis
*HN1* Under the Price Waterhouse framework, the burden of production and the risk of non-persuasion are shifted to the defendant, and the defendant must show that even if discrimination was a motivating factor in the adverse employment decision, it would have made the same employment decision regardless of its discriminatory animus. This framework only applies, however, where the employee can show direct evidence that an illegitimate criterion was a substantial factor in the decision. More Like This Headnote

Labor & Employment Law > Discrimination > Title VII
*HN2* 42 U.S.C.S. § 2000e-2(m) does not reach retaliation claims. More Like This Headnote

Labor & Employment Law > Discrimination > Retaliation
*HN3* Under the McDonnell Douglas framework, a plaintiff is first required to make out a prima facie case of retaliation by establishing (1) that she engaged in a protected activity, (2) that she suffered an adverse employment action, and (3) that there was a causal link between her protected activity and the adverse employment action. If plaintiff successfully made out a prima facie case, defendant has to point to evidence in the summary judgment record that was sufficient, if believed, to support a finding that plaintiff was not discharged because of her protected activity. If defendant meets this burden, plaintiff is required to prove that unlawful retaliation was a determinative cause of her firing. More Like This Headnote

Labor & Employment Law > Employment Relationships > At-Will Employment
*HN4* The general rule in Delaware is that employees are employed "at will" and may be dismissed at any time without cause. The general rule does not apply, however, in the following four situations: (i) where the termination violated public policy; (ii) where the employer misrepresented an important fact and the employee relied thereon either to accept a new position or remain in a present one; (iii) where the employer used its superior bargaining power to deprive an employee of clearly identifiable compensation related to the employee's past service; and (iv) where the employer falsified or manipulated employment records to create fictitious grounds for termination. More Like This Headnote

Labor & Employment Law > Employment Relationships > At-Will Employment
Labor & Employment Law > Wrongful Termination > Public Policy
*HN5* In order to make out a claim of a public policy violation, a plaintiff must satisfy a two-part test: (i) the employee must assert a public interest recognized by some legislative, administrative or judicial authority and (ii) the employee must occupy a position with responsibility for advancing or sustaining that particular interest. More Like This Headnote

Torts > Business & Employment Torts > Wrongful Termination
*HN6* In 2004 the Delaware legislature amended Del. Code Ann. tit. 19, § 710 et seq., which prohibits discrimination in employment practices, in order to clarify that this statute was the "sole remedy" for an aggrieved employee to the exclusion of all other remedies. Del. Code Ann. tit. 19, § 712(b) (2005). More Like This Headnote

Labor & Employment Law > Employment Relationships > At-Will Employment

*HN7* If the employer did not actually falsify or manipulate employment records, then it does not matter if the employer gave a false rationale for termination. More Like This Headnote

Workers' Compensation & SSDI > Administrative Proceedings

*HN8* Under Delaware law, the general rule is that the worker's compensation administrative process is the exclusive remedy for an employee who suffers a work-related accident causing personal injury or death. Del. Code Ann. tit. 19, § 2304 (2005). However, the Delaware Supreme Court has held that claims that involve a true intent by the employer to injure the employee fall outside of the Workers' Compensation Act and remain separately actionable as common law tort claims. Thus, for a complaint to survive a motion to dismiss, there must be more than a mere allegation that there was an intentional injury; there must be facts alleged which, if true, show deliberate intent to bring about an injury. In other words, an employee must allege facts that, if true, would show that the employer intended to injure her. It would not be enough to allege facts showing that the employer intended to do an action and that the worker was injured as a result of that action. Specific intent is required. More Like This Headnote

**COUNSEL:** PHILLIP B. BARTOSHESKY (ARGUED), Biggs and Battaglia, Wilmington, Del., Counsel for Appellant.

GINGER D. SCHRODER (ARGUED), Schroder, Joseph & Associates LLP, Buffalo, N.Y.; JENNIFER C. JAUFFRET, Richards, Layton & Finger, Wilmington, DE, Counsel for Appellee.

**JUDGES:** Before: ALITO, BECKER, and GREENBERG, Circuit Judges.

**OPINION:** OPINION OF THE COURT

PER CURIAM:

Lisa Stepler, a former laboratory technician for Avecia, Inc. ("Avecia") sued Avecia for retaliation under Title VII of the Civil Rights Act of 1964, wrongful termination under Delaware law, and intentional infliction of emotional distress under Delaware law. The District Court dismissed Stepler's claim for intentional infliction of emotional distress and granted summary judgment in favor of Avecia on Stepler's retaliation and wrongful termination claims. We affirm the dismissal **[*2]** of the claim for the intentional affliction of emotional distress and the entry of summary judgment in favor of Avecia on the wrongful termination claim. However, we reverse the entry of summary judgment in favor of Avecia on the retaliation claim and remand for further proceedings.

I.

Stepler asserts that this case should have been analyzed under the framework of Price Waterhouse v. Hopkins, 490 U.S. 228, 104 L. Ed. 2d 268, 109 S. Ct. 1775 (1989). n1 *HN1* Under that framework, the "burden of production and the risk of non-persuasion are shifted to the defendant," and the defendant must show "that even if discrimination was a motivating factor in the adverse employment decision, it would have made the same employment decision regardless of its discriminatory animus." Armbruster v. Unisys Corp., 32 F.3d 768, 778 (3d Cir. 1994). This framework only applies, however, where the employee can show "*direct evidence* that an illegitimate criterion was a substantial factor in the decision." Price Waterhouse, 490 U.S. at 276 (O'Connor, J., concurring in the judgment)

(emphasis added); see also Walden v. Georgia-Pacific Corp., 126 F.3d 506, 513 (3d Cir. 1997). **[\*3]**  We have carefully considered the evidence on which Stepler relies in this case, and while the question is close we conclude that she did not meet the "direct evidence" standard.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 *HN2* 42 U.S.C. § 2000e-2(m) does not reach retaliation claims. Woodson v. Scott Paper Co., 109 F.3d 913, 934 (3d Cir.), cert. denied, 522 U.S. 914, 139 L. Ed. 2d 230, 118 S. Ct. 299 (1997).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Stepler's Title VII claims must be analyzed under the burden-shifting framework established by McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973), and its progeny. *HN3* Under this framework, Stepler was first required to make out a prima facie case of retaliation by establishing (1) that she engaged in a protected activity, (2) that she suffered an adverse employment action, and (3) that there was a causal link between her protected activity and the adverse employment action. Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 (3d Cir. 2000). If Stepler **[\*4]** successfully made out a prima facie case, Avecia had to point to evidence in the summary judgment record that was sufficient, if believed, to support a finding that Stepler was not discharged because of her protected activity. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-507, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993). If Avecia met this burden, Stepler was required to prove that unlawful retaliation was a determinative cause of her firing. See McDonnell Douglas, 411 U.S. at 802-803.

Stepler clearly satisfied the first two prongs of the prima facie case standard. Her complaints about a hostile work environment and retaliation were protected activities, and her firing by Avecia obviously was an adverse employment action. Whether she proffered sufficient evidence to meet the third prong of the prima facie case standard is less clear due to the gap of almost one year between her initial complaint and her termination, but a gap of this magnitude is not conclusive and can be outweighed by a "pattern of harassment" or a "pattern of antagonism" in the intervening period. See Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997); see also **[\*5]** Robinson v. Southeastern Pennsylvania Transp. Auth., 982 F.2d 892, 894-95 (3d Cir. 1993). A reasonable jury considering the evidence in the light most favorable to Stepler -- including Stepler's performance reviews, management's increased scrutiny of her, the tension with her co-workers, the memorandum of April 23, 2001, and the termination letter -- could conclude that there was a causal link between Stepler's protected activities and Avecia's decision to fire her. We thus conclude that Stepler made out a prima facie case.

Avecia's proffered reasons for Stepler's termination were poor work performance and disruptive behavior, but a reasonable jury considering the evidence in the light most favorable to Stepler, and drawing all inferences in Stepler's favor, could conclude otherwise. Particularly noteworthy are the references in both the April 23 memo and the May 4, 2001, termination letter to Stepler's "intense focus upon alleged harassment [and] retaliation." App. 264, 371.

III.

Conversely, there are no issues of fact precluding summary judgment in favor of Avecia on Stepler's state law claim for breach of the covenant of good faith and fair dealing.

*HN4* The general **[*6]** rule in Delaware is that employees are employed "at will" and may be dismissed at any time without cause. See <u>Merrill v. Crothall-American, Inc., 606 A.2d 96, 103 (Del. 1992)</u>. The general rule does not apply, however, in the following four situations:

(i) where the termination violated public policy;

(ii) where the employer misrepresented an important fact and the employee relied "thereon either to accept a new position or remain in a present one";

(iii) where the employer used its superior bargaining power to deprive an employee

of clearly identifiable compensation related to the employee's past service; and

(iv) where the employer falsified or manipulated employment records to create fictitious grounds for termination.

<u>Lord v. Souder, 748 A.2d 393, 400 (Del. 2000)</u> (citing <u>E.I. DuPont de Nemours and Co. v. Pressman, 679 A.2d 436, 442-44 (Del. 1996)</u>). Stepler claims that Avecia's actions fit into either the first or fourth category. She contends that the first category fits because being fired for opposition to sexual harassment and retaliation violates public policy, and she argues that the fourth **[*7]** category fits because she was subjected to false criticisms of her work in her performance evaluation, false claims that she was using work time to study, and false claims that she was fired for behavioral and performance issues.

*HN5* In order to make out a claim of a public policy violation, a plaintiff must satisfy a two-part test: "(i) the employee must assert a public interest recognized by some legislative, administrative or judicial authority and (ii) the employee must occupy a position with responsibility for advancing or sustaining that particular interest." <u>Lord, 748 A.2d at 401</u> (citing <u>Pressman, 679 A.2d at 441-42</u>). To satisfy the first part, Stepler relies on the Delaware Supreme Court's decision in <u>Schuster v. Derocili, 775 A.2d 1029 (Del. 2001)</u>, which recognized a cause of action for breach of the covenant of good faith and fair dealing where the employee alleged that she was terminated following sexual harassment in the workplace. But *HN6* in 2004 the Delaware legislature amended <u>19 Del. C. § 710 et seq.</u>, which prohibits discrimination in employment practices, in order to clarify that this statute **[*8]** was the "sole remedy" for an aggrieved employee "to the exclusion of all other remedies." <u>19 Del. C. § 712(b)</u> (2005). In fact, the synopsis of the Senate Bill expressly states disagreement with the Delaware Supreme Court's decision in Schuster:

This bill confirms that Chapter 7 is the exclusive and sole remedy for employment discrimination claims, requiring initial processing of all such claims with the Department of Labor for review and action. This bill effectively re-establishes the exclusive remedy put in question by the decision in <u>Schuster v. Derocili, 775 A.2d 1029 (2001)</u>.

Delaware Bill Summary, 2004 Reg. Sess. S.B. 154. Moreover, when the bill is read in light of

the sponsor statement, which "confirms" and "re-establishes" the pre-existing rule "put in question by" Schuster, it is clear that the 2004 Amendment is meant to be retroactive. Thus Stepler has not asserted a recognized public interest, and Avecia's actions do not fit into the first category.

Nor do they fit into the fourth category: falsification or manipulation of employment records to create fictitious grounds for termination. Even if we assume **[*9]** that Stepler was subjected to false criticisms of her work performance and false claims that she was using work time to study, there is no evidence that these particular criticisms and claims were the grounds for Stepler's termination. And even if we assume that Avecia falsely claimed that Stepler was fired for behavioral and performance issues, this is not the kind of falsehood specified in the fourth category, which provides that an employer violates the covenant of good faith and fair dealing when it "falsifie[s] or manipulate[s] employment records to create fictitious grounds for termination." Lord, 748 A.2d at 400.*HN7* If the employer did not actually falsify or manipulate employment records, then it does not matter if the employer gave a false rationale for termination. See Williams v. Caruso, 966 F. Supp. 287, 291 (D. Del. 1997) ("Nothing in Pressman suggests an employer who gives an employee a false reason for termination is subject to liability under the implied covenant of good faith and fair dealing. Pressman only held culpable the manufacture of grounds for dismissal, not the statement of a false reason for dismissal.") **[*10]** (emphasis in original); see also Geddis v. University of Delaware, 40 Fed. Appx. 650, 654 (3d Cir. 2002) (unpublished) (noting that the employee did not claim his supervisor "intentionally created 'fictitious negative information' about him in order to get him fired" and thus the conduct at issue did not fit the fourth Pressman category) (quoting Schuster, 775 A.2d at 1040).

IV.

*HN8* Under Delaware law, the general rule is that the worker's compensation administrative process is the exclusive remedy for an employee who suffers a work-related accident causing personal injury or death. See 19 Del. Code Ann. § 2304 (2005). However, the Delaware Supreme Court has held that "claims that involve a true intent by the employer to injure the employee fall outside of the Workers' Compensation Act and remain separately actionable as common law tort claims." Rafferty v. Hartman Walsh Painting Co., 760 A.2d 157, 159 (Del. 2000) (emphasis added); see also Showell v. Langston, 2003 Del. Super. LEXIS 95, No. Civ. A. 02C-01-016, 2003 WL 1387142, at *3 (Del. Super. Mar. 05, 2003) (citing Rafferty). Thus, "for a complaint **[*11]** to survive a motion to dismiss, there must be more than a mere allegation that there was an intentional injury; there must be facts alleged which, if true, show deliberate intent to bring about an injury." Rafferty, 760 A.2d at 160. In other words, an employee must allege facts that, if true, would show that the employer intended to injure her. It would not be enough to allege facts showing that the employer intended to do an action and that the worker was injured as a result of that action. Specific intent is required.

Stepler cites Rafferty and argues that her claim for intentional infliction of emotional distress is not barred. In a Memorandum Order of April 28, 2004, the District Court rejected Stepler's argument. We agree with the District Court's analysis.

We therefore affirm the District Court's order of summary judgment in favor of Avecia on Stepler's claims under Delaware law, but we reverse the District Court's order granting summary judgment in favor of Avecia on Stepler's retaliation claim, and we remand the case for further proceedings.

* Signal Legend:
- Warning: Negative treatment is indicated
Q - Questioned: Validity questioned by citing refs
- Caution: Possible negative treatment
- Positive treatment is indicated
A - Citing Refs. With Analysis Available
- Citation information available
* Click on any *Shepard's* signal to *Shepardize*® that case.

About LexisNexis | Terms and Conditions

Copyright © 2005 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.