Source: Legal > Cases - U.S. > Federal Court Cases, Combined ⓘ
Terms: **farrell w/3 astrazeneca** (Edit Search | Suggest Terms for My Search)

*2005 U.S. Dist. LEXIS 18866, \**

MARYBETH **FARRELL,** Plaintiff, v. **ASTRAZENECA** PHARMACEUTICALS LP, Defendant.

Civil Action No. 04-285-KAJ

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

2005 U.S. Dist. LEXIS 18866

September 2, 2005, Decided

**DISPOSITION: [\*1]** AstraZeneca's motion for summary judgment (D.I. 37) with respect to COBRA claim granted, and AstraZeneca's motion for summary judgment with respect to all other claims denied.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff, former employee filed suit alleging that defendant, her former employer, retaliated against her because she requested medical leave. She asserted claims under the Family and Medical Leave Act of 1993 (FMLA), 29 U.S.C.S. § 2601 et seq., the Consolidated Omnibus Budget Reconciliation Act (COBRA), Pub. L. No. 99-272, and state law. The employer moved for summary judgment.

**OVERVIEW:** Summary judgment was inappropriate as to the FMLA claims. The employer claimed that the employee's performance was the reason for her termination and the denial of her promotion. The employee argued that she was unaware of any problems with her performance until after she requested leave, and that emails cited by the employer were fabricated to give support to the employer's claim that she was having performance problems. Additionally, summary judgment was inappropriate on the employee's claim of breach of the implied covenant of good faith and fair dealing. While the employee claimed that her records were falsified and that the employer lied about her performance issues, the employer maintained that the records were genuine. A finding that the employer did not breach the implied covenant of good faith and fair dealing would have required the court to weigh evidence and make credibility determinations. Summary judgment against the employee was warranted on her COBRA claim because the employer had mailed notice to the employee's last known address, which constituted a good faith effort at notification. The employer had no duty to ensure that the employee received her notice.

**OUTCOME:** The employer's motion for summary judgment was granted with respect to the COBRA claim granted, and denied with respect to all other claims.

**CORE TERMS:** summary judgment, notice, termination, implied covenant, fair dealing, action plan, supervisor, email, team, mailing, last known, terminated, promotion, moving party, credibility, notify, weigh, return to work, manager, retaliation, mailed, Consolidated Omnibus Budget Reconciliation Act, violated public policy, genuine issue, material fact, beneficiary, falsified, causally, breached, genuine

### LexisNexis(R) Headnotes ◆ Hide Headnotes

Civil Procedure > Summary Judgment > Summary Judgment Standard 🔲
*HN1*⬇A court shall grant summary judgment only if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  More Like This Headnote

Civil Procedure > Summary Judgment > Burdens of Production & Proof
*HN2* On a motion for summary judgment, the moving party bears the burden of proving that no genuine issue of material fact exists.  More Like This Headnote

Civil Procedure > Summary Judgment > Summary Judgment Standard
*HN3* For summary judgment purposes, facts that could alter the outcome are "material," and disputes are "genuine" if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct.  More Like This Headnote

Civil Procedure > Summary Judgment > Burdens of Production & Proof
*HN4* If the moving party has demonstrated an absence of material fact on a motion for summary judgment, the nonmoving party then must come forward with specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56 (e).  More Like This Headnote

Civil Procedure > Summary Judgment > Summary Judgment Standard
*HN5* On a motion for summary judgment, the court will view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion. However, a court should not make credibility determinations or weigh the evidence.  More Like This Headnote

Labor & Employment Law > Discrimination > Retaliation
Labor & Employment Law > Leaves of Absence > Family & Medical Leave
*HN6* To establish a prima facie case of retaliation under the Family and Medical Leave Act of 1993 (FMLA), 29 U.S.C.S. § 2601 et seq., a plaintiff must show each of three factors: (1) the plaintiff took FMLA leave; (2) the plaintiff suffered an adverse employment action; and (3) the adverse decision was causally related to the leave or protected activity.  More Like This Headnote

Contracts Law > Types of Contracts > Employment Contracts
Contracts Law > Contract Interpretation > Good Faith & Fair Dealing
*HN7* Every employment contract under Delaware law includes an implied covenant of good faith and fair dealing. This covenant is breached where there is an aspect of fraud, deceit or misrepresentation in the contract.  More Like This Headnote

Contracts Law > Types of Contracts > Employment Contracts
Contracts Law > Contract Interpretation > Good Faith & Fair Dealing
*HN8* In the employment context, a claim for breach of the implied covenant of good faith and fair dealing can arise in four ways: (i) where the termination violates public policy; (ii) where the employer misrepresents an important fact and the employee relies thereon either to accept a new position or remain in a present one; (iii) where the employer uses its superior bargaining power to deprive an employee of clearly identifiable compensation related to the employee's past service; and (iv) where the employer falsifies or manipulates employment records to create fictitious grounds for termination.  More Like This Headnote

Insurance Law > Group Policies > Employment Termination
Pensions & Benefits Law > Consolidated Omnibus Budget Reconciliation Act of 1986 (COBRA)

*HN9* Employers are required to notify employees of their Consolidated Omnibus Budget Reconciliation Act, Pub. L. No. 99-272, rights upon termination. 29 U.S.C.S. § 1166. To meet this notice requirement, an employer must make a good faith attempt to notify the beneficiaries, but is not required to ensure that notice is actually put in the possession of the beneficiary. Generally, mailing a notice to an employee's last known address constitutes a good faith effort at notification; no requirement has been imposed on the employer to ensure that the notice was received. More Like This Headnote

**COUNSEL:** Thomas S. Neuberger, Esq., Stephen J. Neuberger, Esq., The Neuberger Firm, P.A., Wilmington, Delaware; John M. LaRosa, Esq., Law Office of John M. LaRosa, Wilmington, Delaware, for Plaintiff.

Sheldon N. Sandler, Esq., Teresa A. Cheek, Esq., Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware, for Defendant.

**JUDGES:** Kent A. Jordan, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** Kent A. Jordan

**OPINION: MEMORANDUM OPINION**

**JORDAN, District Judge**

### I. INTRODUCTION

Before me is a motion for summary judgment (Docket Item ["D.I."] 37; the "Motion") filed by defendant AstraZeneca Pharmaceuticals, LP ("AstraZeneca"). The Complaint by Marybeth **Farrell ("Farrell")** alleges that **AstraZeneca** retaliated against her because she requested medical leave. (D.I. 1 at PP26-33; 88.) She asserts claims under the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 et. seq., and claims for breach of the implied covenant of good faith and fair dealing under Delaware law and for **[*2]** a violation of her rights under the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), Pub. L. No. 99-272. (D.I. 1 at PP88, 90, 92, 94-97, 107.)

Jurisdiction over the FMLA and COBRA claims is proper under

LEXSEE 2005 U.S. DISTRICT LEXIS 1254

**GODWIN J. IGWE, Plaintiff, v. E.I. DUPONT DE NEMOURS AND CO., INC., Defendant.**

Civil Action No. 03-839 JJF

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2005 U.S. Dist. LEXIS 1254*

**January 24, 2005, Decided**

**DISPOSITION:** Defendant's motion for summary judgment was granted. Judgment was entered.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant employer filed a motion for summary judgment on plaintiff employee's action for race and national origin discrimination in violation of Title VII of the Civil Rights Act of 1964 and *42 U S C S § 1981,* retaliation, a violation of U.S. Const. amend. XIII, and defamation in violation of Delaware law.

**OVERVIEW:** The employee, an African-American male of Nigerian descent, was transferred to another position. He was terminated after his supervisor became dissatisfied with his performance. The court granted the employer summary judgment on the employee's claims. The court held that the employee failed to demonstrate that a genuine issue of material fact existed for a prima facie case of employment discrimination because promotion guidelines for positions other than the employee's did not show that he was qualified for the positions he sought or that there opportunities available; he kept the same salary and benefits and did not suffer adverse employment action; and he identified no one who was similarly situated but more favorably treated. The court concluded that the claims that the employer incorrectly identified his position on its website did not establish a causal link between a protected activity and adverse action in order to prove retaliatory demotion or establish that he was lowered in the estimation of the community in order to prove libel. The court held that the employee failed to demonstrate with specific facts his U.S. Const. amend. XIII claim.

**OUTCOME:** The court granted the motion and entered judgment in favor of the employer and against the employee.

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Summary Judgment Standard*
[HN1] Fed. R. Civ. P. 56(c) provides that a party is entitled to summary judgment if a court determines from its examination of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof*
[HN2] To defeat a motion for summary judgment, Fed. R. Civ. P. 56(c) requires the non-moving party to show that there is more than some metaphysical doubt as to the material facts. In the language of Rule 56(c), the non-moving party must come forward with specific facts showing that there is a genuine issue for trial. However, the mere existence of some evidence in support of the nonmovant will not be sufficient to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the nonmovant on that issue. Thus, if the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

Case 1:04-cv-00285-KAJ     Document 83-4     Filed 12/07/2005     Page 5 of 41

Page 2
2005 U.S. Dist. LEXIS 1254, *

*Labor & Employment Law > Discrimination > Disparate Treatment > Burden Shifting Analysis*
[HN3] In employment discrimination actions under Title VII of the Civil Rights Act of 1964, courts apply the McDonnell Douglas burden shifting analysis. Under McDonnell Douglas, a plaintiff has the initial burden to establish a prima facie case of discrimination. Once a plaintiff succeeds in establishing his or her prima facie case, the burden shifts to the defendant employer to proffer some legitimate non-discriminatory rationale for his or her action. If the employer provides the court with a non-discriminatory rationale for his or her employment decision, the burden again shifts to the plaintiff to demonstrate, by a preponderance of the evidence, that the employer's rationale is pretextual.

*Labor & Employment Law > Discrimination > Racial Discrimination > Coverage & Definitions*
[HN4] The Third Circuit recognizes that the elements of the prima facie case will vary from case to case because of differing fact scenarios. To establish a prima facie case of race discrimination, a plaintiff must provide evidence that (1) he is a member of a protected class; (2) he is qualified for the sought after position; (3) he suffered adverse employment action; and (4) similarly situated non-members of the protected class were treated more favorably than he, or the circumstances of his termination give rise to an inference of race discrimination.

*Labor & Employment Law > Discrimination > Actionable Discrimination*
[HN5] The United States Supreme Court defines an adverse employment action as a significant change in employment status, such as hiring, firing, failing to promote, reassignment, or a decision causing a significant change of benefits.

*Labor & Employment Law > Discrimination > Retaliation*
[HN6] To establish a claim for retaliatory demotion, a plaintiff must first prove a prima facie case of retaliation by demonstrating that (1) he engaged in protected activity, (2) he suffered an adverse employment action, and (3) there is a causal link between the protected activity and the adverse employment action.

*Constitutional Law > Involuntary Servitude*
[HN7] U.S. Const. amend. XIII prohibits slavery and involuntary servitude.

*Torts > Defamation & Invasion of Privacy > Libel*
[HN8] Delaware defines libel as a false and defamatory statement of fact concerning the plaintiff made in an unprivileged publication to a third party. To be defamatory, a statement must tend to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.

**COUNSEL:** [*1]  Darryl K. Fountain, Esquire, Wilmington, Delaware, for Plaintiff.

Wendy K. Voss, Esquire, and Suzanne M. Hill, Esquire, of POTTER ANDERSON & CORROON LLP, Wilmington, Delaware. Evelyn H. Brantley, Esquire, of E.I. DU PONT DE NEMOURS AND COMPANY, Wilmington, Delaware, for Defendant.

**JUDGES:** Farnan, District Judge.

**OPINIONBY:** JOSEPH J. FARNAN, JR.

**OPINION:**

### MEMORANDUM OPINION

January 24, 2005
Wilmington, Delaware

**Farnan, District Judge.**

2005 U.S. Dist. LEXIS 1254, *

Presently before the Court is Defendant E.I. DuPont de Nemours & Company Incorporated's ("DuPont") Motion for Summary Judgment (D.I. 23). For the reasons discussed, the Court will grant DuPont's motion.

### BACKGROUND

Plaintiff Godwin J. Igwe, an African-American male of Nigerian descent, began his work with DuPont as a Senior Research Engineer in March of 1992. In January of 1998, DuPont eliminated Mr. Igwe's position and transferred him to its Corporate Information Science Group ("CIS"). There, Mr. Igwe became a Senior Information Scientist, a job which required him to learn new skills, but kept him at the same salary level.

At CIS, Mr. Igwe reported to Marsha Lee, who eventually became dissatisfied with Mr. Igwe's work performance. [*2] In September of 1999, Ms. Lee expressed to Mr. Igwe her disappointment and placed him on Written Corrective Action. Ms. Lee's dissatisfaction continued and on March 3, 2002, she placed Mr. Igwe on probation. Mr. Igwe was informed that the probationary period would extend for up to twelve months, and that he would be terminated if, during that time, he failed to demonstrate improvement. A few days later, on March 7, 2002, Mr. Igwe injured his neck in Du-Pont's library and left work on disability leave. Mr. Igwe was eventually approved for permanent disability status and, in October of 2002, DuPont terminated his employment. DuPont continues to pay Mr. Igwe disability compensation and provide him benefits programs.

On August 26, 2003, Mr. Igwe filed his Complaint against DuPont (D.I. 1). On March 3, 2004, Plaintiff filed his Amended Complaint (D.I. 3, 4). The Amended Complaint states four causes of action. Count I alleges discrimination on the basis of race and national origin in violation of *Title VII of the Civil Rights Act of 1964* and *42 U.S.C. § 1981*. Count II alleges retaliatory demotion in violation of Title VII. Count III alleges violation of the *Thirteenth* [*3] *Amendment*. Count IV alleges defamation in violation of Delaware state law.

### STANDARD OF REVIEW

[HN1] *Rule 56(c) of the Federal Rules of Civil Procedure* provides that a party is entitled to summary judgment if a court determines from its examination of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law." *Fed.R.Civ.P. 56(c)*.

[HN2] To defeat a motion for summary judgment, *Rule 56(c)* requires the non-moving party to show that there is more than "some metaphysical doubt as to the material facts ... In the language of the Rule, the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)* (quoting *Fed.R.Civ.P. 56(c)*). However, the mere existence of some evidence in support of the nonmovant will not be sufficient [*4] to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the nonmovant on that issue. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*. Thus, if the evidence is "merely colorable, or is not significantly probative," summary judgment may be granted. Id.

### DISCUSSION

### A. Claim One: Employment Discrimination

[HN3] In Title VII employment discrimination actions, courts apply the McDonnell Douglas burden shifting analysis. *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973)*. Under McDonnell Douglas, a plaintiff has the initial burden to establish a prima facie case of discrimination. *Id. at 802*. Once a plaintiff succeeds in establishing his or her prima facie case, the burden shifts to the defendant employer to proffer some legitimate non-discriminatory rationale for his or her action. Id. If the employer provides the court with a non-discriminatory rationale for his or her employment decision, the burden again shifts to the plaintiff to demonstrate, by a preponderance of the evidence, that the employer's rationale is pretextual. *Id. at 804* [*5].

[HN4] The Third Circuit has recognized that the elements of the prima facie case will vary from case to case because of differing fact scenarios. *Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 352 (3d Cir. 1999)* (citing *McDonnell Douglas, 411 U.S. at 802 n. 13, 93 S. Ct. 1817*). In the instant action, to establish his prima facie case of discrimination, Mr. Igwe must provide evidence that (1) he is a member of a protected class; (2) he is qualified for the sought after position; (3) he suffered adverse employment action; and (4) similarly situated non-members of the protected class were treated more favorably than he, or the circumstances of his termination give rise to an inference of race discrimination. *Pivirotto, 191 F.3d at 356*.

2005 U.S. Dist. LEXIS 1254, *

### 1 Member of a Protected Class

It is not disputed that Plaintiff, an African-American male of Nigerian descent, is a member of a protected class.

### 2 Qualified

Mr. Igwe contends that he was qualified for a promotion, a transfer, and a bonus or raise. He contends he was qualified for a promotion because (1) he worked at DuPont for over ten years and received "glowing evaluations and award nominations" [*6] (D.I. 28, Ex. 1, at 1) and (2) DuPont promotion guidelines required that he receive a raise. Mr. Igwe contends he was qualified for a transfer because "he applied for more than a dozen other postings in the company...." Id.

In response, DuPont contends that Mr. Igwe's only evidence in support of his right to a promotion are two documents which do not apply to his job classification. Further, DuPont contends that Mr. Igwe fails to allege specific facts to support his arguments for a transfer, bonus, or raise.

The Court concludes that Mr. Igwe has failed to set forth specific facts showing he was qualified for the sought after positions. Mr. Igwe's contentions consist almost entirely of unsupported, conclusory arguments. Mr. Igwe fails to identify any specific, available opportunities for a promotion, transfer, bonus, or raise. Mr. Igwe's only specific facts are two documents outlining promotion guidelines for research and development professionals. (D.I. 26 at A518-19.) Mr. Igwe, however, was a CIS employee, not a research and development professional, and thus the promotion guidelines were inapplicable. For these reasons, the Court concludes that Mr. Igwe has not met his burden [*7] and thus does not present a genuine issue for trial with respect to the second prong of the prima facie case.

### 3 Adverse Employment Action

Mr. Igwe contends that he was subject to three types of adverse actions: (1) denial of a promotion, transfer, bonus, or raise; (2) disciplinary probation for up to twelve months (D.I. 26 at A509-12); and (3) his original transfer to CSI, which he contends limited his abilities. (D.I. 28, Ex. 2, at 2 P 7). In response, DuPont contends that these actions did not cause a significant change in Mr. Igwe's employment status.

[HN5] The United States Supreme Court has defined an adverse employment action as a "significant change in employment status, such as hiring, firing, failing to promote, reassignment, or a decision causing a significant change of benefits." *Burlington Indus. Inc. V. Ellerth, 524 U.S. 742, 761, 141 L. Ed. 2d 633, 118 S. Ct. 2257 (1998)*. In this case, the Court concludes that Mr. Igwe has failed in his burden to establish an adverse employment action. As noted previously, Plaintiff has failed to set forth specific facts regarding a promotion, transfer, bonus, or raise. Further, the Court finds that Mr. Igwe has not alleged specific facts [*8] to support a finding that Plaintiff experienced a significant change in his benefits. Mr. Igwe asserts he was placed on disciplinary probation, but does not offer evidence to show how this action significantly changed his benefits. Further, it appears that, despite being on probation, Mr. Igwe enjoyed the same compensation, benefits, and core job duties that he had as a Senior Research Engineer. (D.I. 26 at A380, A560, A572).

Likewise, Mr. Igwe does not specify how his transfer to CIS significantly changed his benefits. Instead, Mr. Igwe states in a conclusory fashion that "a limitation was placed on my ability, talent, professionalism, and my accomplishments dismissed. It was like a nurse being transferred to a nurse aid assignment ... (D.I. 28, Ex. 2, at 2 P 7). Such unsupported assertions do not constitute "specific facts" as required by *Rule 56(e)*.

### 4 Discrimination

Mr. Igwe contends that similarly situated non-members of his class were treated more favorably. He further contends that the circumstances surrounding DuPont's conduct towards him raise an inference of racial discrimination. In response, DuPont contends that Mr. Igwe has failed to support his contentions [*9] with specific facts.

The Court finds that Plaintiff has failed to set forth specific facts sufficient to support the fourth element of the *McDonnell Douglas* prima facie test. Mr. Igwe does not identify a person or group of persons that were similarly situated to him but more favorably treated. Further, Mr. Igwe does not allege circumstances raising an inference of racial discrimination. Instead, Mr. Igwe asks the Court to assume that, because he was Nigerian and allegedly maltreated, he was a victim of race discrimination. *Rule 56(e)*, however, requires "specific facts showing that there is a genuine issue for trial." Mr. Igwe has set forth no such facts and thus has failed to meet the fourth element of the prima facie test.

2005 U.S. Dist. LEXIS 1254, *

In sum, because Mr. Igwe has not demonstrated that a genuine issue of material fact exists for elements two, three, and four of the *McDonnell Douglas* prima facie case, the Court will grant DuPont's motion on Mr. Igwe's racial and national origin discrimination claim.

## B. Claim Two: Retaliatory Demotion

Mr. Igwe contends that DuPont subjected him to a retaliatory demotion in violation of *42 U S C § 1981* by (1) incorrectly [*10] identifying him as an Information Scientist, rather than a Senior Information Scientist, on DuPont's website and (2) transferring him to CIS.

[HN6] To establish a claim for retaliatory demotion, a plaintiff must first prove a prima facie case of retaliation by demonstrating that (1) he engaged in protected activity, (2) he suffered an adverse employment action, and (3) there is a causal link between the protected activiety and the adverse employment action. *Sarullo v. U.S. Postal Serv., 352 F 3d 789, 800 (3d Cir. 2003).*

The Court finds that Plaintiff has failed to establish that he was engaged in a protected activity. Further, as the Court discussed previously, Mr. Igwe's arguments in support of a finding of an adverse employment action are not supported by specific facts. Because Mr. Igwe has not established a protected activity or an adverse action, Mr. Igwe has failed to demonstrate a causal link between the two. For these reasons, the Court will grant DuPont's motion on Mr. Igwe's retaliatory demotion claim.

## C. Claim Three: *Thirteenth Amendment*

By his Complaint, Plaintiff contends that DuPont violated his "rights and privileges as guaranteed by the *Thirteenth* [*11] *Amendment to the United States Constitution.*" (3 D.I. P 43.)

[HN7] The *Thirteenth Amendment* prohibits slavery and involuntary servitude. The Court finds that Mr. Igwe has failed to demonstrate with specific facts his allegation that DuPont violated the *Thirteenth Amendment.* For this reason, the Court will grant DuPont's motion on Mr. Igwe's *Thirteenth Amendment* claim.

## D. Claim Four: Defamation or Libel

In support of his claim for libel, Mr. Igwe claims that DuPont's website "intentionally publicly designated [Mr. Igwe] as an Information Scientist instead of Senior Information Scientist." (D.I. 28, Ex. 1, at 6-7.) Mr. Igwe contends that the inaccurate designation "humiliated him" and "damaged his reputation and standing, causing him to be denied projects for Senior Information Scientist[s]." (D.I. 28, Ex. 1, at 7.)

It is undisputed that Delaware law controls this libel claim. [HN8] Delaware defines libel as "a false and defamatory statement of fact concerning the plaintiff made in an unprivileged publication to a third party." *Ramunno v. Cawley, 705 A.2d 1029, 1035 (Del. 1998)* (citing *Spence v. Funk, 396 A.2d 967, 969 (Del. 1978)).* [*12] To be defamatory, a statement must "tend[] so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Ramunno, 705 A 2d at 1035.*

The Court finds that Plaintiff has not demonstrated sufficient evidence regarding how his designation on the Du-Pont website as an "Information Scientist" lowered him in the estimation of the community or deterred people from associating with him. Mr. Igwe alleges in a conclusory fashion that the inaccurate designation "humiliated him" and "damaged his reputation and standing ..." (D.I. 28, Ex. 1, at 7.) Further, while Mr. Igwe contends that the misrepresentation caused him to be denied projects, he has not cited any specific projects which he was denied. For these reasons, the Court concludes that Summary Judgment on the issue of defamation and libel is appropriate.

## CONCLUSION

For the reasons discussed, the Court will grant Defendant's Motion For Summary Judgment (D.I. 23) in all respects.

An appropriate Order will be entered.

## ORDER

At Wilmington, this 24 day of January 2005, for the reasons set forth in the Memorandum [*13] Opinion issued this date;

IT IS HEREBY ORDERED that:

1) Defendant E.I. DuPont de Nemours & Company Incorporated's Motion for Summary Judgment (D.I. 23) is **GRANTED.**

January 24, 2005
DATE

JOSEPH J. FARNAN, JR.

UNITED STATES DISTRICT JUDGE

**JUDGMENT IN A CIVIL CASE**

For the reasons stated in the Court's Memorandum Opinion and Order issued on January 24, 2005;

IT IS ORDERED AND ADJUDGED that judgment be and is hereby entered in favor of Defendant E.I. DuPont de Nemours & Company Incorporated and against Plaintiff Godwin J. Igwe.

JOSEPH J. FARNAN, JR.

UNITED STATES DISTRICT JUDGE.

Service: **Get by LEXSEE®**
Citation: **2001 U.S. Dist. LEXIS 3607**

*2001 U.S. Dist. LEXIS 3607, \*; 143 Lab. Cas. (CCH) P34,248;*
*11 Am. Disabilities Cas. (BNA) 1509; 6 Wage & Hour Cas. 2d (BNA) 1621*

MICHAEL J. KEESHAN, Plaintiff, v. THE HOME DEPOT, U.S.A., INC., MICHAEL RIZK and
GREGG SMITH, Defendants.

CIVIL ACTION NO. 00-529

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2001 U.S. Dist. LEXIS 3607; 143 Lab. Cas. (CCH) P34,248; 11 Am. Disabilities Cas. (BNA)
1509; 6 Wage & Hour Cas. 2d (BNA) 1621

March 27, 2001, Decided

**DISPOSITION:** [\*1] Motion GRANTED.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Defendant former employer moved for summary judgment in
plaintiff former employee's action alleging violation of the Americans with Disabilities Act,
42 U.S.C.S. § 12101 et seq., the Family and Medical Leave Act, 29 U.S.C.S. § 2601 et
seq., the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. § 951 et seq., and state
law defamation.

**OVERVIEW:** Plaintiff former employee brought an action against defendant former
employer alleging violation of the Americans with Disabilities Act (ADA), 42 U.S.C.S. §
12101 et seq., the Family and Medical Leave Act (FMLA), 29 U.S.C.S. § 2601 et seq., the
Pennsylvania Human Relations Act (PHRA), 43 Pa. Cons. Stat. § 951 et seq., and state law
defamation, following his termination. Defendant moved for summary judgment, claiming
that plaintiff failed to prove prima facie violations of the ADA, FMLA, PHRA, and that its
allegedly defamatory statements were true. The court granted summary judgment for
defendant, holding that plaintiff failed to establish his prima facie case of discrimination
under the ADA due to his inability to prove a disability, and he failed to show defendant's
reason for termination was pretextual. The court further held that plaintiff failed to show
prima facie violations of the FMLA or PHRA, and that defendant's allegedly defamatory
statements were true.

**OUTCOME:** Summary judgment was granted for defendant former employer because
plaintiff former employee failed to prove prima facie violations of the Americans with
Disabilities Act, the Family and Medical Leave Act, the Pennsylvania Human Relations Act,
or state law defamation.

**CORE TERMS:** voucher, petty cash, termination, retaliation, store manager, summary
judgment, prima facie case, terminated, fifty-five, work week, disability, defamation, pretext,
reasonable accommodation, defamation claim, non-discriminatory, causal connection, theft,
fraudulent act, full-time, accommodation, slander, defamatory, temporal proximity,
defamatory statement, retaliatory, burden-shifting, discriminatory, preponderance, survive

**LexisNexis(R) Headnotes** ♦ Hide Headnotes

Civil Procedure > Summary Judgment > Summary Judgment Standard 

*HN1* ⤲ Summary judgment is appropriate when, after considering the evidence in the light most favorable to the nonmoving party, no genuine issue of material fact remains in dispute and the moving party is entitled to judgment as a matter of law. The inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.  More Like This Headnote

Civil Procedure > Summary Judgment > Burdens of Production & Proof 🔲
*HN2* ⤲ On a motion for summary judgment, the moving party carries the initial burden of demonstrating the absence of any genuine issues of material fact. Once the moving party has produced evidence in support of summary judgment, the nonmovant must go beyond the allegations set forth in its pleadings and counter with evidence that demonstrates there is a genuine issue of fact for trial.  More Like This Headnote

Civil Procedure > Summary Judgment > Summary Judgment Standard 🔲
*HN3* ⤲ Summary judgment must be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  More Like This Headnote

Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions 🔲
*HN4* ⤲ The Americans with Disabilities Act, 42 U.S.C.S. § 12101 et seq., prohibits discrimination against qualified individuals with a disability by covered entities. 42 U.S.C.S. § 12112(a).  More Like This Headnote

Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions 🔲
*HN5* ⤲ In order to establish a prima facie case of discrimination under the Americans with Disabilities Act (ADA), 42 U.S.C.S. § 12101 et seq., a plaintiff must be able to establish that (1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination.  More Like This Headnote |
*Shepardize:* Restrict By Headnote

Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions 🔲
*HN6* ⤲ See 42 U.S.C.S. § 12112.

Labor & Employment Law > Discrimination > Disability Discrimination > Other Laws 🔲
*HN7* ⤲ The legal analysis for an Americans with Disabilities Act, 42 U.S.C.S. § 12101 et seq., claim is identical to that of a claim submitted under the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. § 951 et seq.  More Like This Headnote

Labor & Employment Law > Discrimination > Disparate Treatment
Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions 🔲
*HN8* ⤲ The McDonnell Douglas burden-shifting framework applies to disparate treatment and retaliation claims under the Americans with Disabilities Act, 42 U.S.C.S. § 12101 et seq. The McDonnell Douglas framework consists of three stages: the plaintiff must first establish a prima facie case of discrimination; then, once the prima facie case is established, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection. Finally, should the defendant carry this burden, the plaintiff then must have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. Although the burden of production may shift, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with

the plaintiff.  More Like This Headnote | *Shepardize:* Restrict By Headnote

Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions 🔳
*HN9* ↓ The Americans with Disabilities Act, 42 U.S.C.S. § 12101 et seq., defines disability
as: (A) a physical or mental impairment that substantially limits one or more of the
major life activities of an individual; (B) a record of such an impairment; or (C) being
regarded as having such an impairment. 42 U.S.C.S. § 12102(2); 29 C.F.R. § 1630.2
(g)(1999).  More Like This Headnote | *Shepardize:* Restrict By Headnote

Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions 🔳
*HN10* ↓ The court is guided by the regulations issued by the Equal Employment Opportunity
Commission to implement the Americans with Disabilities Act, 42 U.S.C.S. § 12101
et seq.  More Like This Headnote

Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions 🔳
*HN11* ↓ A qualified individual, as defined by the Americans with Disabilities Act, 42 U.S.C.S.
§ 12101 et seq., is a person who, with or without reasonable accommodation, can
perform the essential functions of the employment position that such individual
holds or desires. 42 U.S.C.S. § 12111(8). The applicable regulations divide this
inquiry into two prongs: (1) whether the individual has the requisite skill,
experience, education and other job requirements of the position and (2) whether
the individual, with or without reasonable accommodation can perform the essential
functions of the position. 29 C.F.R. § 1630.2(m).  More Like This Headnote |
*Shepardize:* Restrict By Headnote

Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions 🔳
*HN12* ↓ The term "essential functions" is defined to include the fundamental job duties of a
particular position. 29 C.F.R. § 1630.2(n)(1). The determination of whether a
certain function is essential is factual and made on a case-by-case basis. 29 C.F.R.
§ 1630.2(n). Some evidence which determines whether a job function is essential
includes: the employer's judgment as to what functions of a job are essential; the
amount of time spent on the job performing the particular function; the
consequences of not requiring the job holder to perform the function; and the
number of other employees available among whom the performance of a particular
function may be distributed.  More Like This Headnote

Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions 🔳
*HN13* ↓ Evidence of whether a particular function is essential includes the employer's
judgment as to which functions are essential. 29 C.F.R. § 1630.2(n)(3)
(i).  More Like This Headnote

Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions 🔳
Civil Procedure > Summary Judgment > Burdens of Production & Proof 🔳
*HN14* ↓ In order to make a prima facie case of disability discrimination to defeat a motion
for summary judgment, the plaintiff bears the burden of establishing that he can
perform the essential functions of his position with reasonable accommodation.
Reasonable accommodations does not mean eliminating an essential function of the
job, or requiring an employer to restrict a person's job duties to those which the
individual can perform.  More Like This Headnote

Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions 🔳
*HN15* ↓ By requesting an employer to do away with the requirements of a job, the
accommodation sought is an exception from the rule and deletion of an element of
the job. The Americans with Disabilities Act, 42 U.S.C.S. § 12101 et seq., does not

mandate that the employer create a light duty or new permanent
position. More Like This Headnote

Labor & Employment Law > Discrimination > Disparate Treatment
Civil Procedure > Summary Judgment > Summary Judgment Standard
**HN16** At the summary judgment stage, with regard to the third step of the McDonnell
Douglas tripartite analysis, a plaintiff may defeat a motion for summary judgment
by pointing to some evidence, direct or circumstantial, from which a factfinder
would reasonably either: (1) disbelieve the employer's articulated legitimate
reasons; or (2) believe that an invidious discriminatory reason was more likely than
not a motivating or determinative cause of the employer's
action. More Like This Headnote

Labor & Employment Law > Discrimination > Disparate Treatment
**HN17** In order for a plaintiff to rebut a defendant's proffered reason, he cannot simply
show that the employer's decision was wrong or mistaken. Rather, he must
demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or
contradictions in the defendant's proffered legitimate reasons for its action that a
reasonable factfinder could rationally find them unworthy of credence, and hence
infer that the defendant did not act for the asserted non-discriminatory
reasons. More Like This Headnote

Labor & Employment Law > Discrimination > Retaliation
Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions
**HN18** An individual who is adjudicated not to be a qualified individual with a disability may
still pursue a retaliation claim under the Americans with Disabilities Act, 42 U.S.C.S.
§ 12101 et seq. More Like This Headnote

Labor & Employment Law > Discrimination > Retaliation
Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions
**HN19** In order to establish a prima facie case of retaliation under the Americans with
Disabilities Act (ADA), 42 U.S.C.S. § 12101 et seq., a plaintiff must show (1)
protected employee activity; (2) adverse action by the employer either after or
contemporaneous with the employee's protected activity; and (3) a causal
connection between the employee's protected activity and the employer's adverse
action. Similar to claims of disparate treatment under the ADA, the McDonnell
Douglas burden-shifting framework applies to ADA retaliation
claims. More Like This Headnote | *Shepardize:* Restrict By Headnote

Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Enforcement
Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions
**HN20** A plaintiff must first file a charge of discrimination with the Equal Employment
Opportunity Commission (EEOC) and receive a right-to-sue letter in order to sue an
employer under the Americans with Disabilities Act (ADA), 42 U.S.C.S. § 12101 et
seq. The scope of the civil complaint is accordingly limited by the charge filed with
the EEOC and the investigation which can reasonably be expected to grow out of
that charge. In order to decipher whether a plaintiff is required to exhaust her
administrative remedies, it must be determined whether the acts alleged in the
subsequent suit are fairly within the scope of the prior EEOC complaint, or the
investigation arising therefrom. More Like This Headnote

Labor & Employment Law > Leaves of Absence > Family & Medical Leave
**HN21** Under 29 U.S.C.S. § 2615(a)(2), it is unlawful for any employer to discharge or in
any other manner discriminate against any individual for opposing any practice

made unlawful by this subchapter. The proper analysis for 29 U.S.C.S. § 2615(a)(2) claims is the McDonnell Douglas burden shifting approach. In order to prove a prima facie case of retaliation under the Family and Medical Leave Act (FMLA), 29 U.S.C.S. § 2601 et seq., a plaintiff must show: (1) he is protected under the FMLA, (2) he suffered an adverse employment action and (3) a causal connection exists between the adverse decision and plaintiff's exercise of his or her FMLA rights.  More Like This Headnote | Shepardize: Restrict By Headnote

Labor & Employment Law > Leaves of Absence > Family & Medical Leave
HN22⊥Pursuant to the Family and Medical Leave Act (FMLA), 29 U.S.C.S. § 2601 et seq., an eligible employee shall be entitled to a total of 12 work weeks of leave during any 12-month period because of a serious health condition that makes the employee unable to perform the functions of the position of such employee. 29 U.S.C.S. § 2612(a)(1)(D). Under the FMLA, an eligible employee is a person who has been employed for at least 12 months by the employer with respect to whom leave is requested under section 2612 of this title; and for at least 1,250 hours of service with such employer during the previous 12-month period. An employee who takes FMLA leave shall be entitled, on return from such leave, to be restored by the employer to the previous position or to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment.  More Like This Headnote | Shepardize: Restrict By Headnote

Labor & Employment Law > Leaves of Absence > Family & Medical Leave
HN23⊥29 U.S.C.S. § 2615(a)(2) applies to claims of retaliation and discrimination under the Family and Medical Leave Act, 29 U.S.C.S. § 2601 et seq.  More Like This Headnote

Labor & Employment Law > Discrimination > Retaliation
HN24⊥It is established that a causal connection between an employee's protected activity and an adverse action by his employer may be inferred if the events occurred close in temporal proximity to each other. However, even if timing alone could ever be sufficient to establish a causal link, the timing of the alleged retaliatory action must be unusually suggestive of retaliatory motive before a causal link will be inferred. If temporal proximity is lacking, the mere passage of time is not legally conclusive proof against retaliation. In the case where temporal proximity is absent, a plaintiff can establish a causal link if able to prove that the employer engaged in a pattern of antagonism in the intervening period.  More Like This Headnote | Shepardize: Restrict By Headnote

Torts > Defamation & Invasion of Privacy > Defamation Actions
HN25⊥Defamation is fundamentally a state cause of action, even though a defamation suit has profound U.S. Const. amend. I implications. Pennsylvania has a flexible approach to choice of law which combines the "most significant relationship" analysis of Restatement (Second) of Conflict of Laws with governmental interests analysis.  More Like This Headnote

Torts > Defamation & Invasion of Privacy > Defamation Actions
HN26⊥A statement is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him. In deciding whether a statement is defamatory, a court must examine the meaning of the allegedly defamatory statement in context, and must evaluate the effect it is fairly calculated to produce, the impression it would naturally engender, in the minds of the average persons among whom it is intended to circulate. In order to have a claim of defamation, a statement must be capable of a defamatory meaning, it is not enough that a statement be embarrassing or annoying.  More Like This Headnote

Torts > Defamation & Invasion of Privacy > Defamation Actions
**HN27** Under Pennsylvania law, the elements of a prima facie case of defamation are: (1) the defamatory character of the communication; (2) its publication by the defendant; (3) its application to the plaintiff; (4) its understanding by the recipient of its defamatory meaning; (5) the understanding by the recipient of it as intended to be applied to the plaintiff; (6) special harm resulting to the plaintiff from its publication; and (7) abuse of a conditionally privileged occasion. When applicable to the defense, the defendant has the burden of proving: (1) the truth of the defamatory communication; (2) the privileged character of the occasion on which it was published; or (3) the character of the subject matter of defamatory comment as of public concern.  More Like This Headnote

Torts > Damages
**HN28** In Pennsylvania, the term "special damages" includes such actual and concrete damages capable of being estimated in money.  More Like This Headnote

Torts > Defamation & Invasion of Privacy > Slander
**HN29** In Pennsylvania, a plaintiff is not required to prove special harm in a claim for defamation where the spoken words constitute slander per se. Slander per se consists of four categories of words imputing: (1) criminal offense, (2) loathsome disease, (3) business misconduct, or (4) serious sexual misconduct. A statement constitutes slander per se as an accusation of criminality when it charges either directly or indirectly the commission of a specific offense punishable by imprisonment.  More Like This Headnote

Torts > Defamation & Invasion of Privacy > Slander
**HN30** A statement is per se slanderous as an accusation of business misconduct if one who publishes a slander that ascribes to another conduct, characteristics or a condition that would adversely affect his fitness for the proper conduct of his lawful business, trade or profession, or of his public or private office, is subject to liability without proof of special harm.  More Like This Headnote

Torts > Defamation & Invasion of Privacy > Defamation Actions
**HN31** It is for the court to determine whether the statement at issue is capable of a defamatory meaning.  More Like This Headnote

Torts > Defamation & Invasion of Privacy > Defamation Actions
**HN32** Truth is an absolute defense to defamation in Pennsylvania. The truth required to avoid liability for defamation is not complete truth, but rather substantial truth. Although there is no set formula for substantial truth, proof of substantial truth must go to the gist or sting of the alleged defamatory matter. In determining whether substantial truth is a defense to a defamation claim, the test is whether the alleged libel as published would have a different effect on the mind of the reader from which the pleaded truth would have produced.  More Like This Headnote

**COUNSEL:** For MICHAEL J. KEESHAN, PLAINTIFF: DOLORES M. TROIANI, PAOLI, PA USA.

For THE HOME DEPOT U.S.A., INC., MICHAEL RIZK, GREGG SMITH, DEFENDANTS: MELISSA C. ANGELINE, MORGAN, LEWIS & BOCKIUS, PHILA, PA USA.

**JUDGES:** Robert F. Kelly, J.

**OPINIONBY:** Robert F. Kelly

Case 1:04-cv-00285-KAJ    Document 83-4    Filed 12/07/2005    Page 16 of 41
Page 7 of 16

**OPINION: MEMORANDUM**

ROBERT F. KELLY, J.

MARCH 27, 2001

Before this Court is the Motion for Summary Judgment filed by Defendants, the Home Depot, U.S.A., Inc. ("Home Depot"), Michael Rizk ("Mr. Rizk") and Gregg Smith ("Mr. Smith") (collectively referred to as "Defendants"). Michael Keeshan ("Mr. Keeshan") brought this action against the Defendants seeking relief under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq., the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951 et seq., and Pennsylvania law of Defamation. n1 For the reasons set forth below, the Motion is granted.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 The Court has jurisdiction over Mr. Keeshan's ADA and FMLA claims pursuant to 28 U.S.C. section 1331. The Court has supplemental jurisdiction over Mr. Keeshan's PHRA claim and defamation claim pursuant to 28 U.S.C. section 1367.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[*2]

**I. BACKGROUND**

The facts relevant to this discussion, and viewed in the light most favorable to Mr. Keeshan, are as follows. Mr. Keeshan began working as a salesperson for Home Depot in April, 1991. (Compl., P 10.) In 1993 Mr. Keeshan was promoted to the position of Assistant Store Manager. n2 (Id.) He remained an Associate Store Manager until his termination on June 16, 1998. (Id.) Beginning in 1996, Mr. Keeshan experienced difficulties with his back that restricted his movements at work. (Compl., P 11.) In 1997, these back difficulties cumulated into a medical diagnosis of a left posterior disc herniation and bilateral spondylolysis. (Id.) On November 7, 1997, Mr. Keeshan under went corrective surgery on his back. n3 (Id.)

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n2 There is a discrepancy regarding when Mr. Keeshan was promoted to Assistant Store Manager. Mr. Keeshan's Complaint states that "he was promoted to the position of Assistant Store Manager in 1993." (Compl., P 10.) Whereas in Mr. Keeshan's deposition and Defendants' Motion for Summary Judgment, it appears as if Mr. Keeshan was promoted to Assistant Store Manager in 1994. (Keeshan Dep. at 14-16; Defs.' Mot. for Summ. J., P 7.) The exact date that Mr. Keeshan was promoted to Assistant Store Manager is not in dispute and is immaterial, therefore, the Court will rely upon the 1993 date cited in Mr. Keeshan's Complaint. [*3]

n3 Specifically, Mr. Keeshan's back surgery included a laminectomy with excision of HNP and spinal fusion at L5-S1. (Compl., P 11.)

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Prior to his surgery, on or about November 3, 1997, Mr. Keeshan applied for FMLA leave for the period between November 10, 1997 and February 15, 1998. (Defs.' Mot. for Summ. J., P 10.) Mr. Keeshan's request for FMLA leave was approved by Home Depot and such leave went into effect on November 10, 1997. (Id.) Even though Mr. Keeshan's FMLA was exhausted as of February 16, 1998, Home Depot extended Mr. Keeshan's leave by one week, whereby Home Depot continued to pay Mr. Keeshan his full salary until his return on February 23, 1998. (Id. P 20.) Upon Mr. Keeshan's return to work, Mr. Keeshan's doctor restricted the number of hours he was permitted to work and prohibited him from lifting or stooping. (Compl., P 11.)

Initially, Mr. Keeshan worked on a part-time basis for several months. (Defs.' Mot. for Summ. J., P 23.) He was given reduced hours and was assigned to one department, in comparison to his normal two department assignment, and he was able to request **[*4]** assistance whenever he needed help lifting. (Id. PP 23, 24.) On or about May 11, 1998, Mr. Keeshan gave Rebecca Stauffer, a Loss Prevention Supervisor for Home Depot, a copy of a May 4, 1998 note from his doctor limiting the maximum hours Mr. Keeshan could work to forty hours and prohibiting Mr. Keeshan from any lifting. (Id. P 30.) Although the doctor's note restricted Mr. Keeshan's hours to a forty hour work week maximum, Home Depot scheduled him to work in excess of forty hours. n4 (Compl., P 12.)

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n4 The standard work week for an Assistant Store Manager is fifty-five hours per week. (Defs.' Mot for Summ. J., P 26; Keeshan Dep. at 127.) Mr. Rizk, Mr. Keeshan's supervisor, claims that he scheduled Mr. Keeshan for the standard fifty-five hour Assistant Store Manager work week because he did not see the doctor's note and because Mr. Keeshan had told him that he could work full-time, but with some lifting restrictions. (Id. P 30.) Mr. Rizk assumed that full-time meant the standard fifty-five hour full-time work week of an Assistant Store Manager. (Id.)

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*5]**

During Mr. Keeshan's return to Home Depot, he was accused of violating company policy on three separate occasions. (Defs.' Mot. for Summ. J., PP 28, 29, 33-40.) The first incident occurred on March 7, 1998, when Mr. Keeshan stopped two customers and caused them to be searched for shoplifting. (Id. P 28.) As a result of this conduct, Home Depot was contacted by an attorney representing the two customers and Home Depot paid a cash settlement. (Id.) On March 16, 1998, Mr. Keeshan was given an Associate Performance Notice involving this shoplifting incident stating that he had violated a Home Depot policy and exposed Home Depot to potential liability. (Id. P 28.) Mr. Keeshan was given a second Associate Performance Notice for a March 21, 1998 incident, when he failed to open a Home Depot store on time. (Keeshan Dep. at 187.) On that date, Mr. Keeshan was scheduled to open the store at 4:45 a.m. (Id. at 188, 189.) Mr. Keeshan was unaware that he was scheduled to work on that date, and as a result the store was opened two hours late. (Id.; Defs.' Mot. for Summ. J., P 29.)

Lastly, on June 16, 1998, Home Depot terminated Mr. Keeshan's employment on the premise that he **[*6]** fraudulently submitted a petty cash voucher for travel expenses he did not incur and for which he lacked approval. n5 (Defs.' Mot. for Summ. J., P 40.) On June 1, 1998, Mr. Keeshan was temporarily assigned to the Home Depot store in Bethlehem, Pennsylvania. (Defs.' Mot. for Summ. J., P 33.) On his way to work, Mr. Keeshan mistakenly drove to the Reading, Pennsylvania store, and as a result, he drove additional miles than

were necessary and incurred a toll that he would not normally incur during his regular commute. (Id.)

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n5 Mr. Keeshan provides the Court with very little factual detail about the petty cash voucher incident in his Complaint and in his Response to Defendants' Motion for Summary Judgment. Therefore, the Court has analyzed all of the evidence provided, in a light most favorable to the Plaintiff, in order to provide an accurate factual account of the petty cash voucher incident.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Once he reached the Bethlehem store, Mr. Keeshan obtained a petty cash voucher for reimbursement of the twenty-seven **[*7]** dollars he had expended and sought a signature of approval in order to receive his funds. n6 (Defs.' Mot. for Summ. J., PP 34-36.) At the time of this incident, Home Depot had a policy that only Store Managers could approve petty cash vouchers. n7 Mr. Keeshan requested a signature of approval on his petty cash voucher from Mark Boehm ("Mr. Boehm"), then Assistant Manager of the Bethlehem store. n8 (Boehm Dep. at 13, 14.) Mr. Boehm refused to sign the "approved by" line of Mr. Keeshan's voucher because he was an Assistant Store Manager and, according to Home Depot's policy, only Store Managers had authority to approve employee cash reimbursements. (Id. at 14.) However, Mr. Boehm agreed to sign the "issued by" line of the voucher, and explained to Mr. Keeshan that he did not approve the twenty-seven dollar reimbursement. (Id.)

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n6 Home Depot has a policy of reimbursing company-related travel expenses to its employees. (Defs.' Mot. for Summ. J., Ex. 7.) The policy states that "only mileage driven in excess of the associate's normal commuting to work is reimbursable." (Id.)

n7 Through the evidence presented to the Court, including depositions, incident reports written by Home Depot employees at the time of the petty cash voucher incident, and Associate Incident Reports written about the incident, the Court finds that the store manager approval policy was in place in this geographic area and that Mr. Keeshan was aware of the policy at the time of this incident. See Defs.' Mot. for Summ. J., Exs. 20, 21, 22, 23; Keeshan Dep. at 195-200; McAlister Dep. at 35-54; Boehm Dep. at 15-27; Belanger Dep. at 10-14; Smith Dep. at 37-49; Wernicki Dep. at 22; Dupreay Dep. at 17-19; and Rizk Dep. at 60-63. **[*8]**

n8 It is disputed whether Mr. Keeshan requested an approval signature for the petty cash voucher from Brian McAlister ("Mr. McAlister"), a District Manager. Mr. Keeshan denies that he requested Mr. McAlister's signature. (Keeshan Dep. at 195.) However, Mr. McAlister has testified that Mr. Keeshan requested his signature and he denied the request, explaining to Mr. Keeshan the policy that such voucher requires a Store Manager's approval. (McAlister Dep. at 45, 46.) Mr. McAlister further states that Mr. Keeshan told him that he was aware of the policy and when questioned about his knowledge, he reiterated back to Mr. McAlister that Store Managers had to sign petty cash vouchers. (Id.)

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Nonetheless, Mr. Keeshan presented the voucher to Richard Belanger ("Mr. Belanger"), who, at that time, worked in the store's bookkeeping department and had authority to issue reimbursement of properly authorized petty cash vouchers from the vault. (Belanger Dep. at 10.) The regular practice was once Mr. Belanger received a cash voucher with the "approved by" line signed by a store manager, he would sign or initial **[*9]** the "issued by" line of the voucher and pay the employee. (Id. at 10, 11.) In this case, Mr. Belanger assumed that Mr. Boehm had approved the voucher, but had signed the incorrect line, so he initialed the "approved by" line and paid Mr. Keeshan. (Id. at 11-14.)

Subsequently, Mr. Smith, then Regional Loss Prevention Supervisor, looked into Mr. Keeshan's June 1, 1998 petty cash voucher. (Defs.' Mot. for Summ. J., P 38.) Mr. Smith investigated the circumstances of the petty cash voucher incident and determined that Mr. Keeshan had not obtained the proper approval for payment of the voucher. (Id. P 39.) Mr. Smith reported his findings to Mr. McAlister, Mr. Rizk and Amy Booe ("Ms. Booe"), a Human Resources Manager. (Id.) On June 16, 1998, Mr. Keeshan met with Mr. Smith and Mr. Rizk about the petty cash voucher. (Compl., P 14.) At this meeting, Mr. Keeshan explained his version of the events. (Defs.' Mot. for Summ. J., P 40.) In this same meeting, after Mr. Keeshan's explanation, Mr. Smith called Mr. McAlister and/or Ms. Booe and the parties decided to terminate Mr. Keeshan's employment for fraudulent submission of a petty cash voucher for travel expenses not incurred and **[*10]** for which he lacked approval. (Id.) As a result, Mr. Keeshan was immediately terminated on June 16, 1998. (Id.)

Also on or about June 16, 1998, Mr. Keeshan contacted Carol Freitag ("Ms. Freitag"), then Home Depot's Vice-President of Human Resources for the Northeast Region, about his termination. (Defs.' Mot. for Summ. J., P 42.) Ms. Freitag promptly investigated the facts surrounding Mr. Keeshan's termination and concurred with managements' decision to terminate Mr. Keeshan based on a fraudulent act involving the petty cash voucher. (Id. P 43.) On June 22, 1998, at the conclusion of her investigation, Ms. Freitag telephoned Mr. Keeshan and informed him of her conclusion. (Id. P 46.) Ms. Freitag then sent Mr. Keeshan a letter dated June 30, 1998, which outlined her reasons for supporting his termination. (Id.)

On or about September 1, 1998, Mr. Keeshan filed a charge of employment discrimination against Home Depot with the Pennsylvania Human Relations Commission ("PHRC"), which was dual filed with the Equal Employment Opportunity Commission ("EEOC"). n9 (Compl., PP 7,8.) After investigation, the EEOC dismissed Mr. Keeshan's claim, determining that he did not **[*11]** have a claim under the ADA. (Defs.' Mot. for Summ. J., P 52.) On November 4, 1999, the EEOC issued Mr. Keeshan a right-to-sue letter. (Compl., P 9.) Mr. Keeshan filed this lawsuit on January 28, 2000. (See Compl.) The Defendants filed this Motion for Summary Judgment on October 16, 2000.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n9 Defendants note that Mr. Keeshan did not contact the Equal Employment Opportunity Commission ("EEOC")at any time during his employment with Home Depot. (Defs.' Mot. for Summ. J., P 32.) Defendants further note that, prior to his termination, Mr. Keeshan did not contact anyone in Home Depot's human resources department or legal department to complain about unfair treatment or failure to accommodate his work restrictions. (Id. P 31.)

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

## II. STANDARD OF REVIEW

"*HN1*Summary judgment is appropriate when, after considering the evidence in the light most favorable to the nonmoving party, no genuine issue of material fact remains in dispute and 'the moving party is entitled to judgment as a matter of law.'" Hines v. Consol. Rail Corp., 926 F.2d 262, 267 (3d Cir. 1991) **[\*12]** (citations omitted). The inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-252, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). *HN2*The moving party carries the initial burden of demonstrating the absence of any genuine issues of material fact. Big Apple BMW, Inc. v. BMW of North Am., Inc., 974 F.2d 1358, 1362 (3d Cir. 1992), cert. denied, 507 U.S. 912, 122 L. Ed. 2d 659, 113 S. Ct. 1262 (1993). Once the moving party has produced evidence in support of summary judgment, the nonmovant must go beyond the allegations set forth in its pleadings and counter with evidence that demonstrates there is a genuine issue of fact for trial. 974 F.2d at 1362-63. *HN3*Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). **[\*13]**

## III. DISCUSSION

### A. ADA and PHRA Claims

Mr. Keeshan's ADA and PHRA claims are based on his back surgery and the restrictions that resulted therefrom. (See Compl.) In his Complaint, Mr. Keeshan argues that his "disabilities and/or perceived disabilities were a determinative factor in connection with Defendants discharge of [Mr. Keeshan] from employment" and that such "actions of Defendants were discriminatory and violate the ADA." (Compl., PP 27, 28.) *HN4*The ADA prohibits discrimination against qualified individuals with a disability by covered entities. n10 Tedeschi v. Sysco Foods of Phila., Inc., 2000 U.S. Dist. LEXIS 12994, No 99-3170, 2000 WL 1281266, at \*3 (E.D. Pa. Sept. 1, 2000) (citing 42 U.S.C. § 12112(a)). *HN5*In order to establish a prima facie case of discrimination under the ADA, a plaintiff must be able to establish that "(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination." n11 Shaner v. Synthes, 204 F.3d 494, 500 (3d Cir. 2000) **[\*14]** (citing Gaul v. Lucent Techs., Inc., 134 F.3d 576, 580 (3d Cir. 1998); Deane v. Pocono Med. Ctr., 142 F.3d 138, 142 (3d Cir. 1998)).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n10 *HN6*The ADA reads, in pertinent part, as follows:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112.

n11 The Court's analysis of the ADA claim applies equally to Mr. Keeshan's PHRA claim because "[HN7]the legal analysis for an ADA claim is identical to that of a claim submitted under the PHRA." Tedeschi v. Sysco Foods of Phila., Inc., 2000 U.S. Dist. LEXIS 12994, No. 99-3170, 2000 WL 1281266, at *3 n.3 (E.D. Pa. Sept. 1, 2000)(citing Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996)).


- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -


[HN8]The burden-shifting framework [*15] of McDonnell Douglas applies to disparate treatment and retaliation claims under the ADA. 204 F.3d at 500 (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973); See also Walton v. Mental Health Ass'n of Southeastern Pa., 168 F.3d 661, 667-68 (3d Cir. 1999)(citations omitted)). The McDonnell Douglas framework consists of three stages: the plaintiff must first establish a prima facie case of discrimination; then, once the prima facie case is established, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Id. (quoting McDonnell Douglas, 411 U.S. at 802). "Finally, should the defendant carry this burden, the plaintiff then must have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." 204 F.3d at 500 (citing Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981)). Although "the burden of production may shift, 'the ultimate burden of [*16] persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" 204 F.3d at 500 (quoting Texas Dep't of Cmty. Affairs, 450 U.S. at 252-53).

## 1. Prima Facie Case Under the ADA

### a. Disability

The first element of Mr. Keeshan's prima facie case of discrimination under the ADA requires him to prove that he is disabled under the terms of the ADA. [HN9]The ADA defines disability as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2); 29 C.F.R. § 1630.2(g)(1999). n12 Mr. Keeshan argues that he meets all three requirements for being disabled under the ADA, while Defendants argue that Mr. Keeshan was not disabled. The evidence presented to the Court is not sufficient to either prove or disprove whether Mr. Keeshan is disabled under the ADA. However, this issue is not dispositive of the Defendants' Motion for Summary Judgment because Mr. Keeshan cannot establish his [*17] prima facie case of discrimination under the ADA due to his inability to prove that he was a qualified individual under the Act, and because he cannot produce sufficient evidence of pretext to rebut Defendants' legitimate non-discriminatory reason for his termination.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -


n12 Since the ADA fails to define many of the Act's pertinent terms, "[HN10]we are guided by the Regulations issued by the Equal Employment Opportunity Commission ("EEOC") to implement Title I of the Act." Taylor v. Phoenixville Sch. Dist., 113 F. Supp. 2d 770, 773 n.1 (E.D. Pa. Sept. 19, 2000)(quoting Deane, 142 F.3d at 143 n.4 (citing 42 U.S.C. § 12102(2) and 29 C.F.R. § 1630.2)).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

**b. Qualified Individual**

Since factual issues exist pertaining to Mr. Keeshan's claim of disability under the ADA, the Court will examine whether Mr. Keeshan is a "qualified individual" under the ADA. *HN11*⚡A qualified individual, as defined by the ADA, is a person "who, with or without reasonable **[*18]** accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C § 12111(8). "The applicable regulations divide this inquiry into two prongs: (1) whether the individual has the requisite skill, experience, education and other job requirements of the position and (2) whether the individual, with or without reasonable accommodation can perform the essential functions of the position." Taylor v. Phoenixville Sch. Dist., 113 F. Supp. 2d 770, 775 (E.D. Pa. Sept. 19, 2000)(citing 29 C.F.R. § 1630.2(m)). In this case, there is no dispute that Mr. Keeshan possesses the prerequisite skill and experience necessary for his position, therefore, the Court's analysis centers on whether Mr. Keeshan could perform the essential functions of his job, with or without reasonable accommodation, after he returned to work following back surgery.

**1. Essential Functions and Reasonable Accommodation**

*HN12*⚡The term "essential functions" is "defined to include the 'fundamental job duties' of a particular position." Blackwell v. City of Phila., 2000 U.S. Dist. LEXIS 6420, No. 99-0015, 2000 WL 572706, **[*19]** at *3 (E.D. Pa. May 10, 2000)(citing 29 C.F.R. § 1630.2(n)(1)). The determination of whether a certain function is essential is factual and made on a case-by-case basis. Id. (citing 29 C.F.R. § 1630.2(n)). Some evidence which determines whether a job function is essential includes:

> the employer's judgment as to what functions of a job are essential; the amount of time spent on the job performing the particular function; the consequences of not requiring the job holder to perform the function; and the number of other employees available among whom the performance of a particular function may be distributed.

Id. at *3 (citing 42 U.S.C. § 12111(8)(listing factors); 29 C.F.R. § 1630.2(n)(3)(same)).

Defendants contend that Mr. Keeshan is not a qualified individual under the ADA because his forty hour work week restriction prohibits him from performing "an essential function of his job, i.e., working a 55-hour workweek, with or without reasonable accommodation." (Defs.' Mot. for Summ. J. at 36.) Specifically, Defendants argue that the job of an Assistant Store **[*20]** Manager requires a fifty-five hour work week, twenty-four hour availability for emergencies, a flexible work schedule requiring availability for work any day of the week, daytime and evening availability, and working the hours necessary to complete projects given by the Store Manager. (Defs.' Mot. for Summ. J. at 36)(citing Keeshan Dep. at 127; Ex. 17 Job Profile for a Supervisor/Manager). From Home Depot's Job Profile, it appears that Assistant Store Managers have more responsibility and are expected to be more flexible and available than other lower level employees. n13 (Defs.' Mot. for Summ. J., Ex. 17.)

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n13 The Court is able to rely on Home Depot's Job Profile because "*HN13*⚡evidence of whether a particular function is essential includes . . . the employer's judgment as to which

Get a Document - by Citation - 143 Lab. Cas. (CCH) P34,248
Case 1:04-cv-00285-KAJ    Document 83-4    Filed 12/07/2005    Page 23 of 41
Page 14 of 16

functions are essential." 29 C.F.R. section 1630.2(n)(3)(i).

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

Mr. Keeshan argues that a fifty-five hour work week is not an essential job function of an Assistant Store Manager. (Pl.'s Resp. Defs.' Mot. for Summ. **[*21]** J. at 36.) Mr. Keeshan further argues that full-time employment is forty hours per week, that no evidence exists that he was unavailable for emergencies, and that the issue of whether a fifty-five hour work week is an essential job function of an Assistant Store Manager is a genuine issue of material fact which must be determined by the jury. n14 (Pl.'s Resp. Defs.' Mot. for Summ. J. at 36-37.) Although Mr. Keeshan argues that full-time is a forty hour work week, he admits that he was required to work fifty-five hour work weeks as an Assistant Store Manager. (Keeshan Dep. at 127.) In his deposition, when questioned about work hours, Mr. Keeshan stated that "there are no 8-hour days. . . . Home Depot is 11-hours. It's a 55-hour workweek." (Keeshan Dep. at 127, 13-16.) Moreover, in Mr. Keeshan's Response to Defendants' Motion for Summary Judgment he further admits "that the employees were forced to work a 55 hour week." (Pl.'s Resp. Defs.' Mot. for Summ. J., P 26.) In further support that fifty-five hour work weeks were required of Assistant Store Managers, Mr. Keeshan also testified that he was asked to work more than forty hours because his reduced hours were putting additional strain **[*22]** on other Assistant Store Managers who had to work seventy-to-ninety hours per week. (Keeshan Dep. at 120.) n15

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n14 Mr. Keeshan bases his argument that full time hours for Assistant Store Managers is forty hours on Home Depot's Job Profile. (Defs.' Mot. for Summ. J., Ex. 17.) This premise is flawed because the Profile indicates that full-time employee hours of forty hours applies to Department Supervisors, not Assistant Store Managers. Id.

n15 Mr. Keeshan testified that Mr. Rizk told him that two other Home Depot Assistant Store Managers were working between seventy-to-ninety hours per week and that "he needed me to work more hours." (Keeshan Dep. at 120-123.)

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

In addition to Mr. Keeshan's testimony, Mr. Rizk's testimony also lends support to the fifty-five hour work week requirement of Assistant Store Managers. In his deposition, Mr. Rizk, who scheduled Mr. Keeshan's work hours, expresses that Store Managers and Assistant Store Managers have a work week of fifty-five hours. (Rizk Dep. at 16-17.) In fact, **[*23]** Mr. Rizk states that when Mr. Keeshan told him that he could return full-time, he assumed that full-time meant the fifty-five hours required of Assistant Store Managers, not forty hours. (Id. at 16-53.) Thus, Mr. Rizk's testimony supports the finding that fifty-five hour work weeks are an essential function of Mr. Keeshan's job as an Assistant Store Manager.

In Simmerman v. Hardee's Food Sys., Inc., the United States District Court for the Eastern District of Pennsylvania found that working a minimum of fifty hours a week was an essential function of the job of General Manager at Hardee's. 1996 U.S. Dist. LEXIS 3437, No. 94-6906, 1996 WL 131948, at *8 (E.D. Pa. Mar. 22, 1996), aff'd, 118 F.3d 1578 (3d Cir. 1997). In Simmerman, plaintiff took a leave of absence from his position as General Manager at a Roy Rogers Restaurant due to his clinical depression. n16 Id. at *1. Upon his return to work, plaintiff informed Hardee's that he required several accommodations because of his alleged disability. Id. Specifically, plaintiff's medical restrictions required that he work a maximum of

forty hours a week, work only the day shift, and that he be assigned to a restaurant **[*24]** outside of the Philadelphia area. Id. Hardee's terminated plaintiff on the premise that his physician's medical release did not permit him to fully resume his work duties. Id. Hardee's later told plaintiff to disregard the termination and they offered him a position as a Crew Supervisor, which plaintiff accepted. Id. Plaintiff filed suit against Hardee's on the basis that Hardee's discriminated against him because of his alleged disability by terminating him, by failing to accommodate his disability and by not reinstating him to his former position of General Manager. Id. In the end, the Court found that plaintiff was not a qualified individual under the ADA because "a minimum fifty-hour work week and the flexibility to work some nights constitute 'major parts' of the position; [and] their elimination is not a reasonable accommodation under the ADA." 1996 U.S. Dist. LEXIS 3437, *30, Id. at *9 (citing Rucker v. City of Phila., 1995 U.S. Dist. LEXIS 11104, No. 94-0364, 1995 WL 464312, at *3 (E.D. Pa. July 31, 1995), aff'd, 85 F.3d 612 (3d Cir. 1996)). In its opinion, the Court stated that **[HN14]** "in order to make a prima facie case to defeat a motion for summary judgment, 'plaintiff bears the burden **[*25]** of establishing that he can perform the essential functions of his position with reasonable accommodation.'" Id. at *8 (citing Rucker, 1995 WL 464312, at *2 (citation omitted)). The Court also stated that "'reasonable accommodations' does not mean eliminating an essential function of the job," Rucker, 1995 WL 464312 at *3, "or requiring an employer to restrict a person's job duties to those which the individual can perform." Id. at *8 (citing Russell v. Southeastern PA Transp. Auth., 1993 U.S. Dist. LEXIS 12358, No. 91-5177, 1993 WL 346058, at *6 (E.D. Pa. Sept. 8, 1993)(citation omitted)). The Court went on to note "that the requirement that [plaintiff] work no more than forty hours a week and not work nights was 'entirely antithetical to the job' of General Manager," and "that if [plaintiff] were allowed to work only forty hours a week and not work nights, he would have been something other than a General Manager." 1993 U.S. Dist. LEXIS 12358, *20-22, Id. at *8-*9. Based on the above, the Court concluded "that working a minimum of fifty hours a week and maintaining scheduling flexibility to work some nights were essential functions of the job of General Manager at Hardee's." **[*26]** 1993 U.S. Dist. LEXIS 12358, *20, Id. at *8.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n16 Roy Roger Restaurants were purchased by Hardee's Food Systems, Inc. in April 1990. Simmerman v. Hardee's Food Sys., Inc., 1996 U.S. Dist. LEXIS 3437, No. 94-6906, 1996 WL 131948, at *1 n. 1 (E.D. Pa. Mar. 22, 1996).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

The Court went on to hold that plaintiff could not fulfill the essential functions of a General Manager no matter what Hardee's did if he could not spend fifty hours on the job and work nights. Id. The Court stated that **[HN15]** "by requesting an employer to do away with the requirements of a job, "the accommodation sought is an exception from the rule and deletion of an element of the job." Furthermore, the Court stated that "the ADA does not mandate that the employer create a 'light duty' or new permanent position." Id. at *9 (quoting Howell v. Michelin Tire Corp., 860 F. Supp. 1488, 1492 (M.D. Ala. 1994)). As a result, the Court granted summary judgment on plaintiff's claim in favor of Hardee's because plaintiff "was not capable of performing the essential functions **[*27]** of a General Manager, with or without reasonable accommodation." Id.

Likewise, Mr. Keeshan's claim is unable to survive Defendants' Motion for Summary Judgment because he is unable to prove that he was capable of performing the essential functions of an Assistant Store Manager, with or without reasonable accommodation. Similar to the Court's finding in Simmerman, a fifty-five hour work week and availability were essential functions of Mr. Keeshan's job of Assistant Store Manager. Simmerman, 1996 WL 131948. This decision is based on: (1) the testimony given by Mr. Keeshan that Assistant

Store Manager work weeks are fifty-five hours and that his absence was putting a strain on fellow Assistant Store Managers; (2) Mr. Rizk's testimony about scheduling Assistant Store Managers for fifty-five hour work weeks; (3) Home Depot's Job Profile showing the heightened responsibilities and availability required of Assistant Store Managers; and (4) the ruling in Simmerman. Id. Therefore, the Court finds that fifty-five hour work weeks and availability are essential elements to being a Home Depot Assistant Store Manager.

In his Response to Defendants' Motion for [*28] Summary Judgment, Mr. Keeshan argues "that having told [Mr. Keeshan] that they would accommodate him . . . and having represented in writing that accommodations for part-time work would be made, Defendants are now estopped from asserting this defense." (Pl.'s Resp. Defs.' Mot. for Summ. J. at 37.) As in Simmerman, requiring Home Depot to schedule Mr. Keeshan for a forty hour maximum work week is not a reasonable accommodation when a fifty-five hour work week and availability are essential functions of the job of Assistant Store Manager. Simmerman, 1996 WL 131948. Thus, if Home Depot was required to give Mr. Keeshan a forty hour work week as a reasonable accommodation, then Home Depot would be forced to eliminate an essential function of the job of an Assistant Store Manager and would be forced to restrict Mr. Keeshan's job duties to those which he could perform. Under Simmerman, this result would be an undue burden on Home Depot and would be analogous to an unreasonable accommodation under the ADA because "the accommodation sought is an exception from the rule and deletion of an element of the job." Id. at *8. Also, as noted in Simmerman, if Mr. Keeshan [*29] was scheduled for forty hour work weeks and allowed limited availability, he would be performing a job other than that of an Assistant Store Manager. Id. Because fifty-five hour work weeks and flexible availability are essential job functions of an Assistant Store Manager, and because Mr. Keeshan fails to prove his burden that he can perform these requisite job functions, with or without reasonable accommodation, he fails to prove that he is a qualified individual under the ADA. Therefore, Mr. Keeshan fails to prove a prima facie case of discrimination under the ADA and the Defendants' Motion for Summary Judgment on this Count is granted.

## 2. McDonnell Douglas Analysis

As noted earlier, the McDonnell Douglas burden-shifting analysis applies to discrimination claims under the ADA. In this case, such analysis further supports Defendants' Motion for Summary Judgment because even if Mr. Keeshan was able to prove his prima facie discrimination case under the ADA, his claim would still fail under the McDonnell Douglas framework. Mr. Keeshan fails to satisfy the third part of the McDonnell Douglas analysis because he does not prove, by a preponderance of the evidence, that the [*30] legitimate non-discriminatory reason offered by the Defendants for his termination is not the true reason for his termination, but is pretext for discrimination. HN16 At the summary judgment stage, with regard to the third step of the McDonnell Douglas tripartite analysis,

a plaintiff may defeat a motion for summary judgment . . . by pointing 'to some evidence, direct or circumstantial, from which a factfinder would reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'

Shaner, 204 F.3d at *501 (quoting Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994);

Source: Legal > / . / > 3rd Circuit - US Court of Appeals Cases [i]
Terms: fmla and retaliation (Edit Search | Suggest Terms for My Search)

✦Select for FOCUS™ or Delivery
☐

*113 Fed. Appx. 449, \*; 2004 U.S. App. LEXIS 21742, \*\**

JANE LEPORE, Appellant v. LANVISION SYSTEMS, INC.

No. 03-3619

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

113 Fed. Appx. 449; 2004 U.S. App. LEXIS 21742

September 28, 2004, Submitted Under Third Circuit L.A.R. 34.1(a)
October 19, 2004, Filed

**NOTICE:** **[\*\*1]** RULES OF THE THIRD CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** On Appeal from the United States District Court For the Eastern District of Pennsylvania. (Civ. No. 00-cv-04144). District Judge: Honorable Petrese B. Tucker. Lepore v. Lanvision Sys., 2003 U.S. Dist. LEXIS 15555 (E.D. Pa., July 31, 2003)

**DISPOSITION:** Affirmed.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff employee appealed a grant of summary judgment in favor of defendant employer by the United States District Court for the Eastern District of Pennsylvania on the employee's claims of sex and/or pregnancy discrimination.

**OVERVIEW:** Prior to the employee's maternity leave, she had a discussion with the national sales director about her upcoming childbirth and issues related to childcare. The employee admitted that the discussion was non-discriminatory, but was "dumbfounded" that the director discourage her from returning to work. While on leave, the employee was terminated as part of a company-wide downsizing. The appellate court held that the employee failed to make out a prima facie case of gender and pregnancy discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. 2000e et seq., the Family and Medical Leave Act, 29 U.S.C.S. 2601 et seq., and the Pennsylvania Human Relations Act, Pa. Stat. Ann. tit. 43, § 951 et seq. Neither of the two similarly-situated male specialists was retained. One of them transferred out of direct sales before the employee left for maternity leave and before the reduction in force and the other was laid off as part of the reduction in force. The employee offered no evidence that the reduction in force was pretextual.

**OUTCOME:** The grant of summary judgment was affirmed.

**CORE TERMS:** reduction in force, prima facie case, retaliation, protected class, summary judgment, transferred, childcare, maternity, prima facie, termination, motive, discriminatory, terminated, team, similarly situated, conversation, mixed, direct evidence, non-

discriminatory, pregnancy, worksite, hurdle, prong, discrimination case, headquarters, undisputed, workforce, seniority, assigned, leader

## LexisNexis(R) Headnotes ✦ Hide Headnotes

Civil Procedure > Summary Judgment > Standards of Review

*HN1* Appellate courts exercise plenary review over a district court's grant of summary judgment and apply the same standard as the district court, i.e., whether there are any genuine issues of material fact such that a reasonable jury could return a verdict for the plaintiff. Fed. R. Civ. P. 56(c)  More Like This Headnote

Civil Procedure > Summary Judgment > Summary Judgment Standard

*HN2* One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupportable claims or defenses.  More Like This Headnote

Labor & Employment Law > Discrimination > Title VII
Evidence > Procedural Considerations > Burdens of Proof

*HN3* In order to make out a prima facie case of discrimination in a reduction in force case arising under Title VII, a plaintiff must show that (1) she is a member of a protected class, (2) she was qualified for the position in question, (3) she was terminated, and (4) individuals not within the protected class were retained. Once the prima facie case is successfully made, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for the plaintiff's termination. If the defendant meets this burden, the plaintiff must then prove that the defendant's reason was a pretext for a discriminatory motive.  More Like This Headnote

Labor & Employment Law > Discrimination > Title VII
Civil Procedure > Appeals > Standards of Review > Standards Generally

*HN4* Discrimination claims arising under the Pennsylvania Human Relations Act, Pa. Stat. Ann. tit. 43, § 951 et seq., are governed by the same legal standard as that applied to Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq.  More Like This Headnote

Labor & Employment Law > Discrimination > Title VII

*HN5* In a reduction in force case under Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq., persons outside the protected class are those employees who are "similarly situated," that is, they work in the same area in approximately the same position.  More Like This Headnote

Labor & Employment Law > Discrimination > Title VII
Evidence > Procedural Considerations > Burdens of Proof

*HN6* In a claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq., a plaintiff attempting to prove discrimination by direct evidence faces a "high hurdle." Specifically, the evidence must demonstrate that the decision makers placed substantial negative reliance on an illegitimate criterion in reaching their decision.  More Like This Headnote

Labor & Employment Law > Discrimination > Disparate Treatment > Burden Shifting Analysis
Labor & Employment Law > Leaves of Absence > Family & Medical Leave
Evidence > Procedural Considerations > Burdens of Proof

*HN7* To establish a prima facie case of **retaliation** under the Family and Medical Leave Act (**FMLA**), 29 U.S.C.S. § 2601 et seq., a plaintiff must show that (1) she took an **FMLA** leave, (2) she suffered an adverse employment decision, and (3) the adverse

decision was causally related to her leave. Once a plaintiff makes out a prima facie case, the usual McDonnell Douglas burden shifting framework is implicated.  More Like This Headnote | _Shepardize: Restrict By Headnote_

Labor & Employment Law > Leaves of Absence > Family & Medical Leave

HN8 Pursuant to 29 U.S.C.S. § 2611(2)(B)(ii), the Family and Medical Leave Act (**FMLA**), 29 U.S.C.S. § 2601 et seq., does not cover an employee who is employed at a worksite at which an employer employs less than 50 employees if the total number of employees working within 75 miles of that worksite is less than 50.  More Like This Headnote | _Shepardize: Restrict By Headnote_

**COUNSEL:** For JANE LEPORE, Appellant: Michael J. Wietrzychowski, Cureton Caplan, Delran, NJ.

For LANVISION SYS INC, Appellee: Alan J. Hartman, David W. Burleigh, Deters, Benzinger & Lavelle, Cincinnati, OH.

**JUDGES:** Before: ROTH, BARRY, and GARTH, Circuit Judges.

**OPINIONBY:** Garth

**OPINION:**

 [*450]  Garth, Circuit Judge:

Appellant Jane Lepore appeals from the District Court's grant of summary judgment in favor of Appellee LanVision Systems, Inc. ("LanVision") on Lepore's claims of sex and/or pregnancy discrimination and **retaliation.** The District Court had jurisdiction pursuant to 28 U.S.C. § 1331. We have jurisdiction pursuant to 28 U.S.C. § 1291. We will affirm.

I.

Because we write solely for the benefit of the parties, we recount the facts and procedural history only as they are relevant to the following discussion.  [**2]

LanVision is a software developer with its headquarters located in Cincinnati, Ohio. Jane Lepore began working for LanVision at its headquarters on July 8, 1996, as a Project Manager. In February 1997, LanVision reorganized and Lepore was transferred to Indirect Sales as an Application Specialist. Several months later, Lepore assisted her supervisor, Paul Burke, in the search for two additional application specialists to join the Indirect Sales team . That search resulted in the hiring of Nick Jovings and Mark Zajicek.

As a result of a second reorganization, in April 1998, the Indirect Sales team was dissolved and Lepore, Jovings and Zajicek were transferred to Direct Sales. Lepore retained her position as Application Specialist and began reporting to Larry Smeage, the National Director of Sales. One  [*451]  month later, Jovings left Direct Sales and was assigned to Professional Services.

Lepore was pregnant and nearing her due date when she was transferred. Smeage assigned Lepore to work under Terry Costello, a Direct Sales team leader, for the interim period before her maternity leave was to commence. Prior to Lepore's leave, Smeage and Lepore had a discussion about Lepore's upcoming  [**3]  childbirth and issues related to childcare. Smeage conveyed his wife's difficulty with leaving her child and returning to work, and in particular their difficulties in finding childcare. According to Smeage, "basically [he] let her

[Lepore] know that as far as childcare, and so on, that she may want to look into that . . . proactively, since she - you know, part of her job is to be on the road traveling." Smeage Dep. at 18. After Lepore told Smeage that she had already arranged for childcare, Smeage responded "I don't know, you might change your mind after having your first baby, you might not want to come back to work." *Id.* at 204-205. Lepore testified that she did not believe Smeage's raising the childcare issue was discriminatory, but that she "was dumbfounded that he would discourage [her] . . . ." *Id.* at 205-206.

Lepore went on medical leave on May 11, 1998. She gave birth on May 21, 1998, at which time her maternity leave officially began. During her leave, Lepore moved to Philadelphia, Pennsylvania with her husband and child. Lepore's statutorily-mandated 12-week maternity leave expired on July 21, 1998. Lepore informed Terry Costello that she did not intend to **[**4]** return to work until August 12, 1998, taking a combination of paid and unpaid leave for the remaining period.

Adopting a program of company-wide downsizing, between February 1, 1998 and January 31, 1999, LanVision reduced its workforce from 123 to 75 employees through terminations and resignations. In particular, management decided to keep only one Application Specialist in the Direct Sales group. Smeage chose to keep Terry Costello, the team leader. Lepore testified that Costello was the right person to retain because of her seniority and experience. *See* Lepore Dep. at 294. On August 6, 1998, Smeage informed Lepore that she had been terminated. LanVision laid off 12 percent of its workforce during that time. Zajicek transferred to Professional Services on the West Coast for one month until he too was laid off in September 1998.

## II.

The District Court granted summary judgment in favor of LanVision. First, it found that Lepore failed to make out a *prima facie* case of gender and pregnancy discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, the Family and Medical Leave Act ("**FMLA**"), 29 U.S.C. § 2601 **[**5]** *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951 *et seq.*, in connection with her termination by LanVision. The District Court determined that Lepore was terminated as part of a corporate reorganization that included a reduction in force, and that no similarly situated individuals outside the protected class were retained.

Second, the District Court rejected Lepore's **FMLA** claim for LanVision's failure to reinstate her upon her return from maternity leave, finding that Lepore failed to satisfy her evidentiary burden of demonstrating either discriminatory intent or **retaliation.**

*HN1*We exercise plenary review over the District Court's grant of summary judgment and apply the same standard as the District Court, i.e., whether there are any **[*452]** genuine issues of material fact such that a reasonable jury could return a verdict for the plaintiff. *Fed. R. Civ. P.* 56(c); *Debiec v. Cabot Corp.*, 352 F.3d 117, 128 n. 3 (3d Cir. 2003) (citation omitted). *HN2*"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupportable claims or defenses **[**6]** . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). Applying that standard here, we conclude that the District Court properly granted summary judgment in favor of LanVision.

## A. Title VII and PHRA

*HN3*In order to make out a *prima facie* case of discrimination in a reduction in force case arising under Title VII, a plaintiff must show that (1) she is a member of a protected class, (2) she was qualified for the position in question, (3) she was terminated, and (4) individuals

not within the protected class were retained. *In re Carnegie Center Assocs.*, 129 F.3d 290, 294-95 (3d Cir. 1997) (citation omitted). Once the *prima facie* case is successfully made, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for the plaintiff's termination. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973). If the defendant meets this burden, the plaintiff must then prove that the defendant's reason was a pretext for a discriminatory [**7] motive. *Burdine*, 450 U.S. at 254. *HN4*Claims arising under the PHRA are governed by the same legal standard as that applied to Title VII. *See Gomez v. Allegheny Health Servs.*, 71 F.3d 1079, 1083-84 (3d Cir. 1995) (citations omitted).

The central issue here is whether Lepore satisfied the fourth prong of the *prima facie* case, that is, whether she demonstrated that individuals not within the protected class were retained. *HN5*In a reduction in force case, the persons outside the protected class are those employees who are "similarly situated," that is, they work in the same area in approximately the same position. *See Anderson v. CONRAIL*, 297 F.3d 242, 249-50 (3d Cir. 2002).

Lepore points to Jovings and Zajicek as the retained individuals outside the protected class. She claims that these "two male peers with less seniority and experience . . . were retained" while she was terminated. Lepore Br. at 7. We agree with Lepore that the comparison to Jovings and Zajicek was proper. We conclude, however, that neither of those individuals was retained and therefore Lepore fails to make a successful *prima facie* case.

As [**8] to Jovings, it is undisputed that he transferred out of Direct Sales before Lepore left for maternity leave and before the August 1998 reduction in force. With respect to Zajicek, while it is true that he transferred to Professional Services for one month, it is undisputed that he was laid off in September 1998 as part of the same reduction in force that resulted in Lepore's termination. Because Lepore cannot point to any similarly situated employees outside of the protected class who were retained, the District Court correctly concluded that Lepore failed to establish a *prima facie* discrimination case.

In the alternative, Lepore argues that she has produced direct evidence of discrimination and that therefore we should also analyze her claim under the mixed motives analysis set forth in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 276, 104 L. Ed. 2d 268, 109 S. Ct. 1775 (1989). *HN6*A plaintiff attempting to prove discrimination by direct evidence faces a "high hurdle." *Connors v. Chrysler Financial Corp.*, 160 F.3d 971, 976 (3d Cir. 1998). Specifically, [*453] the evidence must demonstrate that the "decision makers placed substantial negative reliance on an illegitimate criterion [**9] in reaching their decision." *Id.* In putting forth her mixed motives claim, Lepore relies mainly on her childcare conversation with Smeage, a conversation she admitted was not discriminatory. Furthermore, Lepore offers no evidence that "addresses directly the reasons for implementing the [reduction in force]." *Anderson*, 297 F.3d at 249. Based on the foregoing, we find Lepore has not cleared the high evidentiary hurdle of *Price Waterhouse*. Her mixed motives claim was therefore properly rejected.

**B. FMLA**

*HN7*To establish a *prima facie* case of **retaliation** under the **FMLA**, a plaintiff must show that (1) she took an **FMLA** leave, (2) she suffered an adverse employment decision, and (3) the adverse decision was causally related to her leave. *Conoshenti v. Public Svce. Electric & Gas Co.*, 364 F.3d 135 (3d Cir. 2004). Once a plaintiff makes out a *prima facie* case, the usual *McDonnell Douglas*, see *supra*, burden shifting framework is implicated. *See Weston v. Pennsylvania*, 251 F.3d 420, 432 (3d Cir. 2001).

The District Court found that Lepore successfully made out a *prima facie* case under the **FMLA**. However, [**10] in its analysis, it appears to have confused the requirements for a

*prima facie* **retaliation** case with those for a *prima facie* discrimination case. Consequently, on appeal, the parties argue at length about whether the temporal proximity of Lepore's termination to the end of her maternity leave satisfies the causal connection prong of a *prima facie* **retaliation** case. We need not decide that here, however, because even assuming *arguendo* that Lepore made out a *prima facie* **retaliation** case, summary judgment was still proper.

In response to Lepore's claim of **retaliation,** LanVision proffers the reduction in force as its legitimate, non-discriminatory business reason for terminating her. Lepore offers no evidence that the reduction in force was pretextual. Indeed she offers no evidence that directly addresses the decision to implement the reduction in force in any way. Lepore's only evidence is her conversation with Smeage which, as we noted above, Lepore herself admitted was not discriminatory. Consequently, Lepore fails to carry her burden of proof on her **FMLA retaliation** claim and summary judgment was properly awarded. n1

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 Like the District Court below, we need not address LanVision's contention that the **FMLA** is inapplicable *HN8* under 29 U.S.C. § 2611(2)(B)(ii) (**FMLA** does not cover an employee who is employed at a worksite at which the employer employs less than 50 employees if the total number of employees working within 75 miles of that worksite is less than 50) because Lepore's **FMLA** claim fails on the merits.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[\*\*11]**

III.

LanVision moved to impose costs and sanctions on Lepore, or, in the alternative, to dismiss Lepore's appeal, claiming that Lepore engaged in an undue pattern of delay. We will deny both motions.

IV.

Accordingly, we will AFFIRM the judgment of the District Court.

Source:  Legal > / ... / > 3rd Circuit - US Court of Appeals Cases [i]
Terms:  fmla and retaliation  (Edit Search | Suggest Terms for My Search)
View:  Full
Date/Time:  Monday, August 22, 2005 - 5:12 PM EDT

* Signal Legend:
🌀 -  Warning: Negative treatment is indicated
[Q] -  Questioned: Validity questioned by citing refs
⚠ -  Caution: Possible negative treatment
✛ -  Positive treatment is indicated
Ⓐ -  Citing Refs. With Analysis Available
ⓘ -  Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case.

About LexisNexis | Terms and Conditions

Case 1:04-cv-00285-KAJ    Document 83-4    Filed 12/07/2005    Page 32 of 41

Copyright © 2005 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

Service: **Get by LEXSEE®**
Citation: **2003 us app lexis 20099**

*76 Fed. Appx. 457, \*; 2003 U.S. App. LEXIS 20099, \*\**

SAMUEL L. MILLER, Appellant v. JOHN ASHCROFT, Attorney General; DEPARTMENT OF JUSTICE, Federal Bureau of Prisons

No. 02-4028

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

76 Fed. Appx. 457; 2003 U.S. App. LEXIS 20099

September 11, 2003, Submitted Under Third Circuit LAR 34.1(a)
September 30, 2003, Filed

**NOTICE:** **[\*\*1]** RULES OF THE THIRD CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA. D.C. Civil No. 01-cv-01829. Magistrate Judge: The Honorable J. Andrew Smyser.

**DISPOSITION:** Affirmed.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff, a federal employee, filed suit alleging that his demotion and one-day disciplinary suspension were the result of racial discrimination and unlawful retaliation, and that the demotion and suspension breached the settlement agreement of a prior discrimination action. A magistrate judge for the U.S. District Court for the Middle District of Pennsylvania granted of defendant employer's motion for summary judgment. The employee appealed.

**OVERVIEW:** The magistrate judge did not abuse his discretion in denying the employee's motions concerning discovery and motion deadlines, including the denial of the employee's motion for an extension of time to file an opposition to the employer's summary judgment motion and his motion to file a brief nunc pro tunc. Counsel for the employee was well aware that the employer's dispositive motion was due on September 1, 2002, had been properly served with the motion on September 3, and had failed to appear at a scheduled hearing on his own earlier motion for a separate extension two weeks earlier. Accordingly, the magistrate judge properly treated the employer's statement of facts in support of its motion as admitted, and correctly held that the employer had established valid, non-discriminatory reasons for the employee's suspension and demotion. The employee had failed to complete several work tasks by established deadlines and had failed to properly perform other specified tasks. Moreover, the employer presented evidence that the employee's performance had failed to improve after he was given six months to meet defined minimal performance standards.

**OUTCOME:** The judgment of the district court was affirmed.

**CORE TERMS:** discovery, deadline, summary judgment motion, summary judgment, demotion, suspension, extension of time, non-discriminatory, reconsideration, abuse of

Case 1:04-cv-00285-KAJ    Document 83-4    Filed 12/07/2005    Page 34 of 41

discretion, motion to compel, nunc pro tunc, manager, motion to strike, failure to file, interrogatories, dispositive, proffered, settlement agreement, matter of law, local rules, retaliation, one-day, prima facie case, defense counsel, properly served, supervisor, late-filed, unopposed, motion to compel discovery

### LexisNexis(R) Headnotes ◆ Hide Headnotes

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion
Civil Procedure > Magistrates > Trial by Consent & Appeal
*HN1* An appellate court's review of a magistrate judge's denial of motions to extend the discovery deadline, to compel discovery, for an extension of time to file his opposition to the summary judgment motion, to allow late filed opposition, to strike defendants' summary judgment motion, and for reconsideration of the grant of summary judgment, are reviewed for abuse of discretion. More Like This Headnote

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion
Civil Procedure > Trials > Judicial Discretion
*HN2* Matters of docket control and conduct of discovery are committed to the sound discretion of the trial court. More Like This Headnote | *Shepardize: Restrict By Headnote*

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion
*HN3* Under the abuse of discretion standard, the appellate court will not interfere with a trial court's control of its docket except upon the clearest showing that the procedures have resulted in actual and substantial prejudice to the complaining litigant. Likewise, a trial court's conduct of discovery procedures will be affirmed absent a demonstration that the court's action made it impossible to obtain crucial evidence, and implicit in such a showing is proof that more diligent discovery was impossible. More Like This Headnote

Civil Procedure > Pleading & Practice > Pleadings > Time Limitations
*HN4* See U.S. Dist. Ct., M. D. Pa., R. 7.6.

Civil Procedure > Summary Judgment > Supporting Papers & Affidavits
Civil Procedure > Summary Judgment > Summary Judgment Standard
*HN5* Even though U.S. Dist. Ct., M.D. Pa., R. 7.6 and 56.1 provide that a summary judgment motion is to be considered unopposed and its statement of material facts admitted where a responsive brief is not timely filed, a magistrate judge is still required to find that the undisputed facts warranted judgment as a matter of law. Fed. R. Civ. P. 56. In other words, a magistrate judge must determine that the deficiencies in the opponent's evidence designated in or in conjunction with the motion entitle the moving party to judgment as a matter of law. More Like This Headnote

Labor & Employment Law > Discrimination > Disparate Treatment > Burden Shifting Analysis
Civil Procedure > Appeals > Standards of Review > De Novo Review
*HN6* An appellate court's review of the application of the McDonnell Douglas analysis is plenary. More Like This Headnote

Labor & Employment Law > Discrimination > Disparate Treatment > Burden Shifting Analysis
*HN7* It is well understood that under McDonnell Douglas, the plaintiff bears the burden of adducing sufficient evidence to establish a prima facie case of discrimination. If he succeeds, the burden shifts to the defendant to show a legitimate, non-discriminatory reason for the adverse employment action. If the defendant makes such a showing, the plaintiff must adduce sufficient evidence to allow a reasonable

jury to infer that the defendant's stated reason for the adverse action was a pretext for unlawful discrimination. More Like This Headnote

Labor & Employment Law > Discrimination > Disparate Treatment > Burden Shifting Analysis
Civil Procedure > Summary Judgment > Burdens of Production & Proof
HN8 To avoid summary judgment in an employment discrimination action, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action. More Like This Headnote

**COUNSEL:** For Samuel L. Miller, Appellant: Robert S. Mirin, Ahmad Law Offices, Harrisburg, PA.

For ATTY GEN USA, Attorney General, DEPT OF JUSTICE, Federal Bureau of Prisons, Appellees: Joseph J. Terz, Office of United States Attorney, Harrisburg, PA.

**JUDGES:** Before: ALITO, BARRY, and AMBRO, Circuit Judges.

**OPINIONBY:** Maryanne Trump Barry

**OPINION:**

[*457]  BARRY, Circuit Judge

Appellant Samuel Miller is an African-American employee of the federal Bureau of Prisons (BOP). Miller alleges that his January 2, 2000 demotion from the position of case manager to that of corrections officer, and the one-day disciplinary suspension [*458] imposed March 8, 1999, were the result of racial discrimination and unlawful retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981. [**2] Miller further alleges that his demotion and suspension breached the settlement agreement which resolved his prior employment discrimination action against the BOP.

Miller now appeals the Magistrate Judge's October 2, 2002 grant of the BOP's motion for summary judgment. n1 Miller's challenge is founded largely upon his contention that the Magistrate Judge abused his discretion in denying various motions made by Miller concerning discovery and motion deadlines. In essence, Miller argues that because these motions were denied, he was unable to file a timely response to the BOP's summary judgment motion, and that the Magistrate Judge thus erred in considering that motion unopposed.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n1 The parties in this case consented to conduct the case before a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c)(1).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

We have jurisdiction over the appeal pursuant to 28 U.S.C. §§ 636(c)(3) and 1291. We conclude that the Magistrate Judge did not abuse his discretion in denying [**3] Miller's motions concerning discovery and motion deadlines, including the denial of Miller's motion for an extension of time to file an opposition to the BOP's summary judgment motion and his motion to file a brief *nunc pro tunc*. Accordingly, the Magistrate Judge properly treated the

BOP's statement of facts in support of its motion as admitted, and correctly held that the BOP had established valid, non-discriminatory reasons for Miller's suspension and demotion. We will, therefore, affirm.

I.

Miller started work as a corrections officer at the maximum security prison operated by the BOP in Lewisburg, Pennsylvania in March of 1987. In 1989, he applied for a promotion to the position of case manager. When he was not promoted, he filed an administrative complaint contending that he had been passed over due to his race and physical condition (Miller is a diabetic). As a result of that complaint, Miller was made a case manager trainee in 1992. When the BOP ultimately decided not to promote him to that position, Miller filed an employment discrimination lawsuit in federal court in 1993. After a jury found in his favor, the BOP entered into a settlement agreement with him which **[\*\*4]** mandated, *inter alia*, his promotion to case manager.

In his current complaint, Miller alleges that soon after he was promoted, his supervisors at the Lewisburg prison treated him unfavorably in comparison to his co-workers in retaliation for his success in his first lawsuit and because of his race. According to the complaint, his supervisors subjected him to "hyper-scrutiny" and "micro-management" as well as disparate application of work and leave rules. The complaint alleges that this disparate treatment culminated in the events that resulted in his one-day suspension and ultimate demotion.

Miller filed the complaint on September 19, 2001 and, after some preliminary delays in scheduling a case management conference, the Magistrate Judge entered a case management order on February 22, 2002. The order provided that all discovery was to be complete by July 1, 2002, and that the deadline for dispositive motions was August 1, 2002. The order also expressly cautioned the parties that "extensions of the discovery period will be **[\*459]** granted only when good cause arises and application is timely made," and explained that "good cause shall be found only when new circumstances have occurred **[\*\*5]** that could not reasonably have been anticipated and that are of an extraordinary nature."

As the discovery deadline neared, the BOP moved for a one-month extension of that deadline due to defense counsel's illness and time spent preparing for trial in an unrelated case. The Magistrate Judge granted this consent motion on July 2, 2002, set a new discovery deadline of August 1, 2002, and extended the deadline for dispositive motions to September 1, 2002.

On July 25, 2002, one week before the revised discovery deadline, Miller moved for a one-month extension. In the motion, counsel alleged that he had served discovery requests and interrogatories in late April 2002, but that the BOP had only responded on July 24, 2002 despite counsel's repeated inquiries in late May. Counsel further alleged that the defendants' responses to his interrogatories were insufficient to allow him to determine which individuals he needed to depose in advance of trial. In response, defense counsel alleged that Miller's discovery requests were not properly served until June 26, 2002, and denied having been contacted by counsel in late May. Further, defense counsel contended that his response to Miller's discovery **[\*\*6]** requests was complete, and noted that the joint case management plan filed by the parties on December 28, 2001 had identified four individuals that Miller could have deposed. Defense counsel also emphasized that Miller had already received most of the document discovery he had requested, as well as affidavits from most of the relevant witnesses, during the course of administrative proceedings before the Equal Employment Opportunity Commission (EEOC) prior to filing the complaint.

On August 1, 2002, the Magistrate Judge issued an order, faxed to the parties, scheduling a hearing on Miller's motion for an extension for 1:30 pm on August 6, 2002. The day after Miller's counsel failed to appear for the scheduled hearing, an order was entered denying

Miller's motion. Two weeks later, on August 21, 2002, Miller filed a motion to compel discovery pursuant to F.R. Civ. P. 37, which essentially reiterated the reasons he had given in his July 25 motion to extend the discovery deadline. Miller's motion to compel failed to comply with several local rules of the Middle District of Pennsylvania: it did not state whether defense counsel consented to the motion, **[\*\*7]** it did not contain a certification that counsel had made an attempt to resolve the dispute without court intervention, and it was not accompanied by a supporting brief. See M.D. Pa. R. 7.1, 7.5 & 26.3.

On September 3, 2002, the BOP filed a motion for summary judgment. n2 The statement of material facts in support of the motion set forth the circumstances of Miller's one-day suspension and subsequent demotion. According to the local rules, Miller's opposition to the motion was due on September 23, 2002. n3 The day *after* his opposition was due, on September 24, 2002, Miller moved for a five-week extension of time in which to file opposition papers. In the motion, counsel stated that **[\*460]** he had mistakenly believed that the relevant rules gave him 23 days, instead of 18, to file opposition. He further stated that had been out of the office for two weeks before the BOP's motion was filed and had been ill for three days after it was filed.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n2 Because the September 1, 2002 deadline for dispositive motions fell on a Sunday, and the following Monday, September 2, was a federal holiday, the September 3 filing was timely. **[\*\*8]**

n3 Local Rule 7.6 requires that opposition to a motion be filed within fifteen days of service of the movant's brief, F.R. Civ. P. 6(e) added three days to this period, and Miller had two extra days because the due date fell on a Saturday.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

Three days later, on September 27, 2002, the Magistrate Judge denied Miller's motion for an extension of time to respond. On September 30, 2002, Miller's counsel moved for reconsideration of that denial, simply reiterating his contentions in the original motion for an extension, and adding only that he had also been occupied with moving plans and that the associate working on Miller's opposition had unexpectedly accepted employment elsewhere. That same day, Miller also filed a response to the BOP's statement of undisputed facts along with various exhibits, but no supporting brief.

The very next day, Miller filed yet another motion, this time to strike the BOP's motion for summary judgment. The motion to strike essentially argued that the BOP's failure to timely and fully respond to Miller's interrogatories warranted **[\*\*9]** the sanction he was seeking. Miller also filed a brief in opposition to the summary judgment motion, along with a motion for an extension of time to file the brief *nunc pro tunc.*

On October 2, 2002, the Magistrate Judge granted the BOP's summary judgment motion as to Miller's discrimination claims and dismissed Miller's claim based on breach of the settlement agreement for lack of subject matter jurisdiction. In his opinion, the Magistrate Judge treated the BOP's statement of material facts and exhibits in support of the motion for summary judgment as uncontested due to Miller's failure to file a timely opposition. The Magistrate Judge thus held that Miller had failed to establish a prima facie case of racial discrimination or retaliation, and that, in any event, the BOP had shown legitimate, non-discriminatory reasons for suspending and demoting Miller based upon his refusal to follow

orders and his consistently poor job performance. The Magistrate Judge also explained that Miller's motion to compel, which was still pending, was deemed withdrawn due to his failure to file a supporting brief. On the next day, October 3, 2002, the Magistrate Judge issued separate orders summarily **[\*\*10]** denying Miller's pending motions for reconsideration of his motion for an extension of time to file opposition to the summary judgment motion, and his motion for leave to file an opposition brief *nunc pro tunc*.

On October 11, 2002, Miller moved for reconsideration of the grant of summary judgment. On November 22, 2002, the Magistrate Judge denied that motion as well as Miller's earlier motion to strike. The Magistrate Judge noted that Miller had not presented any newly discovered evidence, and concluded that "the plaintiff failed to timely oppose the motion for summary judgment and we conclude that we did not commit error in holding the plaintiff to the consequences of that failure." As to the motion to strike, he concluded that Miller's allegations of the BOP's insufficient discovery responses should have been presented in a timely and properly briefed motion to compel.

## II.

On appeal, Miller argues that the Magistrate Judge's denial of his numerous motions, particularly those motions seeking to file a late response to the BOP's summary judgment motion or requesting that the Magistrate Judge consider his late-filed response and exhibits, effectively denied him his day **[\*\*11]** in court. Miller contends that his late-filed opposition to the summary judgment motion and supporting exhibits **[\*461]** indicate the existence of triable issues of fact which would have precluded the grant of summary judgment. He insists that, in these circumstances, the Magistrate Judge's refusal to grant an extension of time or to consider his late-filed opposition, especially where the lateness of the filing would have resulted in no prejudice to the defendants, constitutes reversible error.

As Miller concedes, however, *HN1* our review of the Magistrate Judge's denial of each of his motions - to extend the discovery deadline, to compel discovery, for an extension of time to file his opposition to the summary judgment motion, to allow him to file a late opposition, to strike defendants' summary judgment motion, and for reconsideration of the grant of summary judgment - is for abuse of discretion. See <u>In re Fine Antitrust Litig., 685 F.2d 810, 817 (3d Cir. 1982)</u> ("Appellants have a heavy burden to bear . . . as *HN2* matters of docket control and conduct of discovery are committed to the sound discretion of the trial court."); see also, e.g., <u>Welch & Forbes, Inc. v. Cendant Corp. (In re Cendant Corp. Prides Litig.), 235 F.3d 176, 181 (3d Cir. 2000)</u> **[\*\*12]** (motion for reconsideration); <u>Armstrong v. Dwyer, 155 F.3d 211, 214 (3d Cir. 1998)</u> (motion to compel discovery). *HN3* Under the abuse of discretion standard, "we will not interfere with a trial court's control of its docket 'except upon the clearest showing that the procedures have resulted in actual and substantial prejudice to the complaining litigant.' <u>In re Fine Antitrust Litig., 685 F.2d at 817</u> (quoting <u>Eli Lilly & Co. v. Generix Drug Sales, Inc., 460 F.2d 1096, 1105 (5th Cir. 1972)</u>). Likewise, a trial court's conduct of discovery procedures will be affirmed "absent 'a demonstration that the court's action made it impossible to obtain crucial evidence, and implicit in such a showing is proof that more diligent discovery was impossible. '" <u>Id. at 818</u> (quoting <u>Eli Lilly & Co., 460 F.2d at 1105</u>).

After a thorough review of the record and careful consideration of Miller's arguments, we conclude that he has not carried his "heavy burden" of showing that the Magistrate Judge abused his discretion in denying Miller's myriad motions filed in an attempt to overcome what appears to be counsel's lack of diligence in prosecuting **[\*\*13]** the case. At the outset, concerning discovery, we note that Miller has never - not in his various motions nor in his briefs on appeal - effectively refuted the BOP's contentions that he did not properly serve his discovery requests and interrogatories until June 26, 2002 and that it fully responded to his requests on July 24, 2002. Miller also has not refuted the BOP's contention that he learned

the identities of relevant witnesses and received most of the relevant documents over the course of the EEOC investigation. Finally, Miller has not explained why he failed to depose the four key witnesses identified by the BOP in the joint case management plan filed by the parties or why he never inspected the relevant documents also identified therein.

Ultimately, Miller fails to identify a single relevant witness or document that was not identified or made available to him at some point either before or during the discovery period, a failure no doubt aggravated by his counsel's failure to attend the hearing on his July 25, 2002 motion for an extension of the discovery deadline. The Magistrate Judge's denial of Miller's motions based upon the BOP's allegedly dilatory discovery responses - **[\*\*14]** his July 25, 2002 motion to extend the discovery deadline, his August 21, 2002 motion to compel, and his October 1, 2002 motion to strike defendants' summary judgment motion - was not an abuse of discretion. If Miller was deprived of any crucial evidence in this case, it was surely not attributable to the Magistrate Judge's denial of his motions **[\*462]** but, rather, to counsel's lack of diligence.

Turning to the Magistrate Judge's denial of Miller's motions seeking relief from his failure to file a timely opposition to the BOP's motion for summary judgment, we likewise discern no abuse of discretion. Miller was properly served with the summary judgment motion on September 3, 2002. Local Rule 7.6 provides that $^{HN4}$⚓"any party opposing any motion shall file a responsive brief, together with any opposing affidavits, deposition transcripts or other documents within fifteen days after service of the movant's brief." Thus, after adding the three additional days provided by F.R. Civ. P. 6(e) and accounting for the fact that September 21 fell on a Saturday, Miller's opposition was due on September 23, 2002. Miller filed his motion for an extension of time to submit **[\*\*15]** an opposition on September 24, 2002, the day *after* his opposition itself was due.

Even if we accept as true the multitude of excuses proffered by Miller's counsel for his failure to file a timely opposition - that counsel had miscalculated the deadline, had been ill for three days after the motion was filed, and had been unable to contact opposing counsel after he realized his mistake on September 20 - counsel failed to explain why he could not have at least requested an extension at some point during the twenty days *before* the filing deadline. In these circumstances, where counsel was well aware that the BOP's dispositive motion was due on September 1, 2002, had been properly served with the motion on September 3, and where counsel had failed to appear at a scheduled hearing on his own earlier motion for a separate extension two weeks earlier, the Magistrate Judge's denial of Miller's motion for an extension does not amount to an abuse of discretion. It follows from this conclusion that it was also well within the Magistrate Judge's discretion to deny Miller's subsequent September 30, 2002 motion for reconsideration and October 1, 2002 motion for leave to file an opposition **[\*\*16]** *nunc pro tunc*. Each of these motions simply asked the Magistrate Judge to reconsider his earlier denial of an extension, without proffering any additional arguments or new reasons.

Our holding that the Magistrate Judge did not abuse his discretion in denying Miller's motions, however, does not end our inquiry. $^{HN5}$⚓Even though the applicable local rules provide that a summary judgment motion is to be considered unopposed and its statement of material facts admitted where a responsive brief is not timely filed, see M.D. Pa. R. 7.6 & 56.1, the Magistrate Judge was still required to find that the undisputed facts warranted judgment as a matter of law. See Fed. R. Civ. P. 56; Lorenzo v. Griffith, 12 F.3d 23, 28, 29 V.I. 380 (3d Cir. 1993); Anchorage Assocs. v. Virgin Island Board of Tax Review, 922 F.2d 168, 175 (3d Cir. 1990). In other words, the Magistrate Judge "must determine that the deficiencies in the opponent's evidence designated in or in conjunction with the motion entitle the moving party to judgment as a matter of law." Anchorage Assocs., 922 F.2d at 175.

It is clear from the Magistrate Judge's **[\*\*17]** written opinion, however, that he did not grant the BOP's motion for summary judgment solely because it was unopposed, but properly

analyzed the motion under the familiar burden-shifting analysis applicable to discrimination claims established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973). HN6 Our review of the application of the McDonnell Douglas analysis is plenary. Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994).

HN7 It is well understood that under McDonnell Douglas, the plaintiff bears the burden [*463] of adducing sufficient evidence to establish a prima facie case of discrimination. If he succeeds, the burden shifts to the defendant to show a legitimate, non-discriminatory reason for the adverse employment action. If the defendant makes such a showing, the plaintiff must adduce sufficient evidence to allow a reasonable jury to infer that the defendant's stated reason for the adverse action was a pretext for unlawful discrimination. See McDonnell Douglas, 411 U.S. at 803-04; Fuentes, 32 F.3d at 763.

Because the evidence submitted in support of the summary judgment motion [**18] primarily focused on the reasons for suspending and demoting Miller, we will assume for the sake of this appeal that Miller would have been able to establish a prima facie case of discrimination if he had timely filed an opposition to the BOP's motion. Moving to the second step of the McDonnell Douglas analysis, then, the record is clear that the BOP proffered legitimate, non-discriminatory reasons for Miller's suspension and demotion. As to the suspension, the affidavits submitted by the BOP clearly establish that on July 22, 1998, internal affairs investigator Robby Wilson explained to Miller that he was not at that time under investigation for misuse of sick leave and would have plenty of time to prepare for such an investigation if one was initiated. The affidavit of Miller's supervisor, Anthony Alexander, explains that he suspended Miller for one day because, despite being informed that he was not under investigation, Miller refused to return to work for over an hour and repeatedly insisted that he be given emergency administrative leave to prepare for the investigation.

The evidence also establishes non-discriminatory reasons for Miller's ultimate demotion. A March 25, 1999 letter [**19] from Alexander to Miller clearly explained that Miller had failed to complete several work tasks by established deadlines and had failed to properly perform other specified tasks. The letter also set forth a "performance improvement plan" which outlined the work performance improvements that Miller had to make to retain his job. A subsequent September 22, 1999 letter from Associate Warden Sniezek to Miller in turn clearly explained that Miller's performance had failed to improve and detailed as examples numerous work assignments that he had failed to complete, assignments long overdue, or completed assignments rife with errors. In light of these painstakingly specified performance deficiencies, Snizek recommended Miller's demotion.

This detailed documentation showing that Miller's job performance problems continued even after he was given six months to meet defined minimal performance standards convincingly establishes a non-discriminatory reason or reasons for his demotion. Because Miller failed to timely submit anything which could show that these documented non-discriminatory reasons for the suspension and termination were pretextual, the Magistrate Judge correctly concluded that [**20] the federal defendants were entitled to judgment as a matter of law. Moreover, after reviewing the limited evidence Miller submitted in support of his untimely opposition to the summary judgment motion, we conclude that it is insufficient, in any event, to allow a reasonable jury to find that the BOP's stated reasons for the suspension and demotion were pretextual. HN8 "To avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action." [*464] Fuentes, 32 F.2d at 764. Miller's evidence, consisting almost entirely of his own uncorroborated allegations of disparate treatment, simply does make the requisite showing.

We will affirm the October 2, 2002 order of the Magistrate Judge granting the motion for summary judgment and dismissing the complaint. n4

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -


n4 We note that the Magistrate Judge also properly dismissed Miller's discrimination claim under 42 U.S.C. § 1981 as preempted by Title VII, see Brown v. General Serv. Administration, 425 U.S. 820, 835, 48 L. Ed. 2d 402, 96 S. Ct. 1961 (1976), and his breach of contract claim for lack of jurisdiction. In any event, Miller has waived these claims by failing to challenge them on appeal.


- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - [**21]

/s/ Maryanne Trump Barry

Circuit Judge


Service: **Get by LEXSEE®**
Citation: **2003 us app lexis 20099**
View: Full
Date/Time: Tuesday, November 22, 2005 - 2:38 PM EST

* Signal Legend:
- Warning: Negative treatment is indicated
[Q] - Questioned: Validity questioned by citing refs
⚠ - Caution: Possible negative treatment
✛ - Positive treatment is indicated
ⓐ - Citing Refs. With Analysis Available
ⓘ - Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case.


About LexisNexis | Terms and Conditions


Copyright © 2005 LexisNexis, a division of Reed Elsevier Inc  All rights reserved