Bernadette A
Mansi/PharmRD
17-Aug-2005 09:07

Global Commercial Strategy    Renaissance RN0315    US
610-787-3024 (8-275); Fax 610-787-7069

To    Gary 5 Davies/CORP/GSK@GSK

cc    Marybeth M Farrell/GMS/GSK@GSK

bcc

Subject    re: my PDP

Gary,

I did convey to Marybeth both positive and negative feedback you shared. And, I did specify that the area for improvement was regarding timeliness on regulatory milestone press releases and coordination with Regulatory. I stressed that she needs to work to improve these relationships so she can obtain the access she needs to information.

I also mentioned that I had gone through emails for the past six months and on occasion you had sent requests out for materials where you stated that Marybeth was the only one who didn't understand what you were requesting. I was using this as an example along with other examples that perhaps she wasn't clear on what her customers wanted and might be misinterpreting what was required.

Bernie

Gary 5 Davies/CORP

Gary 5 Davies/CORP
17-Aug-2005 04:00

Product Communications    GSK House - CS12 49    +44 20
8047 5503

To    Marybeth M Farrell/GMS/GSK@GSK

cc    Bernadette A Mansi/PharmRD/GSK@GSK

Subject    re: my PDP

Marybeth

I'm surprised by this comment as in the telephone discussion I had with Bernie prior to your review I told her that this area had certainly improved and that you were meeting deadlines for corporate requests. Perhaps there is some confusion in that I said that (as an area for improvement) it is the CV therapy area that seems to continue to have problems being ahead of the game with getting press releases coordinated with regulatory events - most recent example, which I'm sure you will remember, being the coordination of the ▓▓▓▓▓▓▓▓▓▓▓ approval which we found had been approved the previous Thursday and was being announced on the following Monday/Tuesday. Happy to discuss this aspect with Bernie and/or yourself.

Kind regards,
Gary.

Gary Davies

**AA152**

Director, Product Communications

☎:    + 44 (0)20 8047 5503
✉:    + 44 (0)20 8047 7897
💻:    gary.5.davies@gsk.com

CS12, 980 Great West Road
Brentford
Middlesex
TW8 9GS.
Switch Board Tel No: 020 8047 5000
Marybeth M Farrell/GMS/GSK



**Marybeth M
Farrell/GMS/GSK**
16-Aug-2005 19:41

To  Gary 5 Davies/CORP/GSK@GSK

cc

Subject  re: my PDP

Gary:

I wanted to ask for some clarification about problems you have experienced with me over the past 6 months.  In my PDP review today, Bernadette said that your input included that when you send out documents or requests, I "always" am the one you have problems getting information requested.

I am really quite stunned to hear this.  We talk monthly, and I always ask you if you are having any problems with me. The last six months you have consistently said there were no problems you wanted to raise to my attention.  Overall, I have to say I disagree with the harshness of the criticisms of me in my PDP (not that they were all by you).  I told Bernadette I feel it is quite unfair.

If you could please provide examples of the incidents where you did not receive requested information over the past six months it will help me to work on these areas.

Thanks very much.

Marybeth

**AA153**

Bernadette A
Mansi/PharmRD
17-Aug-2005 20:40

Global Commercial Strategy   Renaissance RN0315   US
610-787-3024 (8-275); Fax 610-787-7069
To   bernadette mansi

cc

bcc

Subject   Note to File

Following yesterday's meeting, Marybeth called last night and left a message saying she called
AP and left a message and will meet with hiim in the morning . And she's given a lot of thought
to the feedback I gave her. She wants this to work. She wants to clear up the problems she
has and get this on the right track. And AP has been great. She's asked him to help her. She is
very committed to this and she wants me to know that. She thanked me for my support. She
said she recognizes the problems and she's going to fix them.

When I logged on to my computer, there was a hostile email she's sent to Gary Davies asking
him for clarification on feedback he'd given on her. She misquoted my comments to her on
what Gary said regarding her performance and said that she felt the feedback she'd been
given was harsh and not fair.

I sent a follow up email clarifying what I had said during the feedback session.

That afternoon, she stopped by to tell me she'd set up 1:1 meetings with Mark and AP.  She
also showed me an email she'd sent to AP called "Reflection". She said that she shouldn't
have sent the email to AI asking to give feedback on AP. She said he has always been quite
approachable and she should have just gone to him to give feedback.

I told her that I had spoken to her before about the need to avoid emotional reactions that get
her into trouble. Also, if she doesn't want to be perceived as an emotional person, she needs
to put some distance between her and the situation, take some time to think about what she
wants to say and remove the emotion from her communications. This will avoid problems.

She said she realized that if she didn't fix things, she could lose her job and she didn't want
that to happen. Also, she wanted to talk about how she could stay in the company if things
didn't work out because she wants to stay with GSK.

She said I was "great" and she tells everyone how great I am.

I told her that I had asked for feedback from her customers and people should feel like they
aren't going to be attacked if they provide feedback on her.  I want to create an open and
respectful environment where people can provide feedback without fear of being attacked.  I
told her I had only asked for feedback from her customers. However, others had provided
unsolicited feedback on her.

I also told her that I am not the enemy. I am trying to help her improve her performance so she
can succeed in the company and have better working relationships. I also told her that I want
to avoid the frustration created by her doing all the hard work and not meeting customer
needs.

I also said that she has told me on numerous occasions that she doesn't want to receive hostile emails and she doesn't want people using "tone" or "attitude" with her and yet this is exactly what she has been doing in the past few days to AP, me, Gary, etc. I said think about how this feels. She said she shouldn't have written to Gary in that way. She was just frustrated.

I told her that we agreed months ago that she was going to set up the 1:1 meetings with her customers. It was in her PDP plan and a lot of this could have been avoided if she had done this. She agreed.

I pointed out AP's recent email stating deadlines she'd missed and said this is how AP measures success and could she see this from his point of view. Also, I referred to the ▬▬▬ factsheets. I told her it would have been helpful to tell AP how things had changed and how she was moving forward. I said she needs to keep her customers updated on projects and progress as well as budgets.

We agreed that we needed to move forward in a positive direction. I said I would work with her to achieve these goals which I felt were doable and she would complete the agreed actions.

**AA155**



Bernadette A
Mansi/PharmRD
18-Aug-2005 20:38

Global Commercial Strategy    Renaissance RN0315    US
610-787-3024 (8-275); Fax 610-787-7069
To    Marybeth M Farrell/GMS/GSK@GSK

cc

bcc    Albert 2 Gianchetti/DEV/PHRD/SB_PLC@GSK; Bob B
Kirkpatrick/PharmRD/GSK@GSK

Subject    Follow Up

Marybeth,

I am very pleased that you have expressed your firm commitment to addressing areas for improvement
in your performance raised during your six-month PDP review. And, I am committed to assisting you in
this regard.

Since I feel that we may have lost some momentum in completing 2005 PDP actions related to
development objectives and these actions will assist you in improving performance, I have drafted an
action plan which I feel will be helpful.  Some of these actions have been initiated in the past few days so
I feel we are on the right track.

- Set up monthly meetings with key stakeholders to agree:
    o Preferred communication and work style
    o Areas for improvement
    o Key priorities/requirements/deliverables
    o Expectations regarding projects/budgets, accountability

- Following each of these meetings, please prepare a short email summarizing the key points agreed
  which should form a "contract" with the customer and copy me on these emails.

- I believe you have set these meetings up with AP and Mark and this is great. I would also suggest
  setting up meetings with Carol as well.

- Also, Stacie Halbert is taking over Project Leadership for▆▆▆ from Pascale. This is a good
  opportunity for a fresh start. I would suggest setting up a meeting with Stacie and telling her what
  you do, etc. Also, she may be able to assist you with regulatory liaison.

**Scheduling Courses as follows:**

- In your development plan, we talked about courses in Listening, Lotus Notes, PowerPoint and Time
  Management.  If you haven't scheduled these, I would suggest doing so asap. If you have scheduled
  them, please let me know which courses you will be taking and the dates of these courses.

- One more course you may find valuable is Effective Meeting Management.

- I don't want to inundate you with courses, but I think these would prove useful in addressing the
  issues we discussed.

- To aid in listening, I would suggest not bringing your laptop to meetings as previously noted and
  avoid doing work for another product/area while attending meetings since this gives the impression
  that the meeting doesn't warrant your full attention.

**Budget Accountability**

I would suggest setting up a budget tracking sheet for each product area and indicate the budget
allocated for PR and issues management. Then, include a break down of spend. This should be shared

**AA156**

with the Product Directors at your regular 1:1 meetings so they know where their money is being spent and exactly how much money is available.

**Proofreading**

To avoid errors in materials being circulated, I would take extra time with proofreading.

As I said, I feel together we can address the issues raised and ensure a positive and productive working environment. I know that making changes is never easy and I appreciate the steps you've taken to date since I know they will yield the results you want.

Bernie



Bernadette A
Mansi/PharmRD

27-Aug-2005 15:26

Global Commercial Strategy    Renaissance RN0315    US
610-787-3024 (8-275); Fax 610-787-7069

To    Marybeth Farrell

cc

bcc    Albert 2 Gianchetti/DEV/PHRD/SB_PLC@GSK; Bob B
       Kirkpatrick/PharmRD/GSK@GSK

Subject    Follow Up

Marybeth,

As you are aware, given the tremendous potential impact of the emerging ▇▇▇▇data on both ▇▇▇▇
and GSK, we are under a great deal of pressure to pull out all stops in order to fully maximize the data in
the very short time leading up to ESC. As you know, Al has assigned this the highest priority. To meet
expectations, we need to work to the best of our ability and as a team. Given your significant role in this
activity, this is your opportunity to demonstrate your capabilities.

I am writing because I wanted to provide some additional feedback on events of the week that concern
me and areas where change is required to deliver on the ▇▇▇▇objectives. My goal is to provide
specific feedback to improve performance going forward.

1) Work Hours: I noticed that you did not arrive at work on Friday until after 10:00 and I did not receive
any phone call or message saying you would be late. Since I left you phonemails and emails and there
were urgent actions that had to be completed, AP and I had to take over these duties. In the future, I
would expect you to be at work by 9:00 and if there are critical reasons why this isn't possible, you should
call Monica and me.

2) At about 1:45 on Friday, you left me a message presumably from your car saying that you weren't
feeling well and were going home. You didn't say whether you would be logging on at home and since I
didn't receive any emails all afternoon, I am assuming you didn't log on. I am not expecting you to work
if you are sick and you know I have been more than flexible with your time. However, given the
workload, I would have preferred that you stopped by my office (I was in my office) and discussed what
work was outstanding and how we might cover it.

Instead, given the timelines, I had to enlist Barb's help and, along with AP, we worked until 8:00 Friday
night to ensure that the urgent actions were completed in time. Materials needed to be proofed for the
printer; we needed to liaise with Corporate Communications and Ketchum regarding scheduling
interviews with US media and Salim; we had to liaise with Ketchum to obtain the press release to ensure
delivery to Salim on Monday; we had to review the media poster, etc. On your phonemail message, you
said that there was an email saying that they needed the press release by Friday and this just wasn't
possible. Salim said that he needed to see the press release and he had to have it by Monday since this
was the only time he had to look at it. This meant GSK needed it by Friday. Therefore, we didn't have
much choice in the matter. We had to find a way to make this happen. AP has distributed the release
and arranged a TC for Monday morning. We also liaised with Corporate Comms and Ketchum to ensure
we would be ready to schedule media interviews Monday afternoon.

3) Quality of work: I received a message from Ketchum saying that ▇▇▇▇ materials were going to
print today. Upon reviewing these materials, I found a number of significant errors both factual and style
in the materials, and some of the reference information was incomplete and had to be corrected. The
materials were not in shape to be going to the printer and we would have been embarrassed if they had
been printed. Instead, Barb and I had to re-proof all materials. I would have expected you to ensure that
these materials had been carefully checked for accuracy prior to Ketchum sending anything to the
printer. This was an issue that was raised during your PDP review.

I don't mind stepping in to assist you on this important project; however, I have urgent priorities within the

**AA158**

same timeframe that need attention. Therefore, I need you to stay on top of your responsibilities and do them in an efficient and timely manner.

Thanks for your cooperation.

Bernie



**Marybeth M Farrell/GMS**
29-Aug-2005 05:47

To  Bernadette A Mansi/PharmRD/GSK@GSK

cc

bcc

Subject  Re: Follow Up

Bernie:

My apologies for not stopping by on Friday before I left, I will do so in the future.  Thank you for filling in while I was ill, I have been running a fever over the weekend and infection appears to be going into my inner ear.

Ketchum wasn't authorized to print the fact sheets until everyone's final comments integrated and proofed; thank you, and Barb, for doing these.

I will revise my commuting schedule. I thought we had agreed I could come in after rush hour to avoid the 1.5- 2-hour drive to arrive by 9; however I am happy to amend this.

Regards,

Marybeth

Bernadette A Mansi/PharmRD



**Bernadette A Mansi/PharmRD**
27-Aug-2005 15:26

Global Commercial Strategy   Renaissance RN0315   US
610-787-3024 (8-275); Fax 610-787-7069

To  Marybeth Farrell

cc

Subject  Follow Up

Marybeth,

As you are aware, given the tremendous potential impact of the emerging ███████ data on both ██████ and GSK, we are under a great deal of pressure to pull out all stops in order to fully maximize the data in the very short time leading up to ESC. As you know, Al has assigned this the highest priority.  To meet expectations, we need to work to the best of our ability and as a team.  Given your significant role in this activity, this is your opportunity to demonstrate your capabilities.

I am writing because I wanted to provide some additional feedback on events of the week that concern me and areas where change is required to deliver on the ███████ objectives. My goal is to provide specific feedback to improve performance going forward.

1) Work Hours: I noticed that you did not arrive at work on Friday until after 10:00 and I did not receive any phone call or message saying you would be late.  Since I left you phonemails and emails and there were urgent actions that had to be completed, AP and I had to take over these duties.  In the future, I would expect you to be at work by 9:00 and if there are critical reasons why this isn't possible, you should call Monica and me.

**AA160**

2) At about 1:45 on Friday, you left me a message presumably from your car saying that you weren't feeling well and were going home. You didn't say whether you would be logging on at home and since I didn't receive any emails all afternoon, I am assuming you didn't log on. I am not expecting you to work if you are sick and you know I have been more than flexible with your time. However, given the workload, I would have preferred that you stopped by my office (I was in my office) and discussed what work was outstanding and how we might cover it.

Instead, given the timelines, I had to enlist Barb's help and, along with AP, we worked until 8:00 Friday night to ensure that the urgent actions were completed in time. Materials needed to be proofed for the printer; we needed to liaise with Corporate Communications and Ketchum regarding scheduling interviews with US media and Salim; we had to liaise with Ketchum to obtain the press release to ensure delivery to Salim on Monday; we had to review the media poster, etc. On your phonemail message, you said that there was an email saying that they needed the press release by Friday and this just wasn't possible. Salim said that he needed to see the press release and he had to have it by Monday since this was the only time he had to look at it. This meant GSK needed it by Friday. Therefore, we didn't have much choice in the matter. We had to find a way to make this happen. AP has distributed the release and arranged a TC for Monday morning. We also liaised with Corporate Comms and Ketchum to ensure we would be ready to schedule media interviews Monday afternoon.

3) **Quality of work:** I received a message from Ketchum saying that ▉▉▉▉ materials were going to print today. Upon reviewing these materials, I found a number of significant errors both factual and style in the materials, and some of the reference information was incomplete and had to be corrected. The materials were not in shape to be going to the printer and we would have been embarrassed if they had been printed. Instead, Barb and I had to re-proof all materials. I would have expected you to ensure that these materials had been carefully checked for accuracy prior to Ketchum sending anything to the printer. This was an issue that was raised during your PDP review.

I don't mind stepping in to assist you on this important project; however, I have urgent priorities within the same timeframe that need attention. Therefore, I need you to stay on top of your responsibilities and do them in an efficient and timely manner.

Thanks for your cooperation.

Bernie



Bernadetti Mansi + Gary Davies (Mgrs.)                    9-8-05

Marybeth Farrell   1 yr w/ GSK   May '05
Director Product Public Relations

MANSI
EXHIBIT NO. 3
KWP 11-7-05

• Dropped the ball on very big project.

◦ Press Release can only be reviewed by
        investigators on Mon by 1:45

◦ Left voicemail for BM basically stating
        the Press Release was not going
        to be completed

◦ Left message for Product Director AP.

◦ Al Giancetti — extremely frustrated
        by recent events.

⟹ She Believes she's doing a "great job"

◦ Feedback from  Superiors
                 Peers        ) has not been
                 Subordinates    positive

◦ Has had multiple conflicts w/ employees
        has a tendency to yell.

                                            **AA162**

⟹ Continues making mistakes in her work product

9-8-05

- Marybeth Farrell :

Repeatedly "berates" customers & co-workers
  verbally — extremely loudly — in public
  places that inappropriate

---

Conversation w/ Bob Kirkpatrick                    9-9-05

- Marybeth spoke w/ BK wk of 9/5

- Marybeth will be "shocked" by the warning

- Continues to focus on budget issue w/ AP

- Tends to ramble & being scattered on
     all over the place

- BK stated to her that he had been having
     conversation w/ BM re: her performance
     specifically her "judgement"

- MF ended the call abruptly

**AA163**



**Leon 2 Jones/PharmRD**
12-Sep-2005 10:40

R&D Human Resources    Office # 23-1067B, mailcode:
UW2314   610-270-5829
To  Bernadette A Mansi/PharmRD/GSK@GSK

cc  Gary 5 Davies/CORP/GSK@GSK

bcc

Subject  Re: Verbal Warning Letter



Bernadette,

I reviewed the document and think it looks great.  I incorporated a few minor changes please review before finalizing.



Farrell VerbalWarningLetter 9.16.05.doc

Regards,

Leon Jones, Jr.
GlaxoSmithKline, Research & Development
Human Resources Manager
GCS, WWBD, DR, GR, CIP
leon.2.jones@gsk.com
Tel: 610-270-5829
Fax: 610-270-6176

**AA164**

 GlaxoSmithKline

DATE:        September 16, 2005

TO:          Marybeth Farrell                    cc Albert Gianchetti
                                                    Leon Jones
                                                    Bob Kirkpatrick

FROM:        Bernadette Mansi
             Gary Davies

SUBJECT:     **VERBAL WARNING**

*This memo is a written confirmation of the verbal warning you received informing you of required performance improvement and to outline specific areas where improvement is required. This letter will not be placed in your official employee file unless you fail to improve your performance and receive additional discipline*

As discussed during our previous meetings, in your six month review (PDP) and in correspondence dated August 18th, 27th, and 30th, your performance is unsatisfactory, for the following reasons. And, Improvement has not been made since PDP feedback was given on August 16th.

> **Formatted: Strikethrough**
>
> **Deleted: i**

You have not met minimal performance levels for the C3 job grade of Director, Product Public Relations in the following areas.

- Leadership
- Sense of Urgency
- Accountability for Projects & Budgets
- Quality/Accuracy
- Product Knowledge
- Interpersonal Skills
- Organization
- IT Skills

The following outlines specific areas where improvement is required and will be evaluated during your verbal warning period to measure your improvement.

> **Formatted: Strikethrough**

**Demonstrated ability to independently perform the following functions:**

- **Leadership**—Assume proactive leadership role in developing, initiating and implementing strategic PR and issues management plans to support Commercial objectives, including development of materials, negotiating agreement among matrix team members on scenarios, messages and plans, and meeting management   Lead the PR agency in development of high quality materials that reflect brand strategy and messages and are delivered on time and within budget.

> **Formatted: Strikethrough**

# AA165

M. Farrell
Sept. 16, 2005
Page 2

- **Sense of Urgency—** Be clear about what you have to achieve, by when and what the priorities are. Provide timely support for Product team, corporate and local market communications staff (including routine reports). Act decisively to ensure achievement of assigned projects. Understand and respond quickly to customer/client needs with accurate and meaningful responses. Proactively anticipate and plan how to overcome possible obstacles in development and approval of materials. Rapidly change plans when data or actions require it. Alert appropriate team members in advance if there is an issue with on time delivery of materials. Ensure thorough understanding of relevant processes (eg, approval process). Ensure all communications are distributed in sufficient time to allow for local staff to translate, distribute, absorb and utilize information.

- **Accountability for Projects & Budgets—**Accept full accountability for all assigned projects and budgets, including all steps required to ensure timely delivery of high quality PR and issues management materials. Ensure all projects are delivered within assigned budget; advise Product Directors of budget issues and options in advance of spend to facilitate timely decision making and obtain advance approval for any excesses. Provide PDs with full monthly reporting on budgets and forecasted spend vs. actual spend.

**Quality/ Accuracy**

- **Content—**Ensure all materials are: of high quality; reflect strategic direction and Commercial objectives; and are focused, clear and accurate. Plan and review materials with consideration of what corporate/local communications staff or media are likely to find truly of value.

- **Reviewer Input/Follow Up—**Proactively solicit and accurately interpret and integrate reviewer input into materials in a timely manner per departmental SOPs. Resolve outstanding viewpoints and address sensitivities (e.g., legal and regulatory). Assume accountability for obtaining all necessary approvals for PR materials and finalizing them in a timely fashion, including ABPI approval and quotes used in press releases.

- **Editing—**Edit documents to ensure incorporation of reviewer comments, as well as appropriate data/statistics, quotes, reference citations. Assume responsibility for ensuring materials are appropriately referenced, including use of uniform style.

- **Proofreading—**Proofread documents for consistency and accuracy in terms of editorial content, grammar, spelling, style and technical information prior to putting into circulation. Ensure all materials are free of typographical or factual errors.

- **Product Knowledge—**Take steps to expand working Product Knowledge on assigned cardiovascular products to enhance quality of materials and reduce reliance on other matrix team members.

- **Interpersonal Skills—**Treat all team members with appropriate respect and courtesy. Listen actively and attentively. Ask questions - to clarify and check understanding. Avoid multitasking in meetings as it can interfere with listening/interpretation of information and sends the wrong message. Take time to consider feedback prior to reacting. Avoid immediate and emotional reactions.

**AA166**

M. Farrell
Sept. 16, 2005
Page 3

- **Organization**—Ensure appropriate systems are in place to track deadlines and report on projects and progress; and capture and record reviewer comments and approvals. Also, ensure appropriate preparation prior to meetings to facilitate timely input by team and meeting flow, and ensure accurate and timely meeting reporting. Ensure appropriate planning to deliver high quality documents for performance and development in a timely manner.

- **IT Skills**—Ensure working knowledge of all IT systems required to do your job (Lotus Notes, PowerPoint, Word, Sametime) and streamline efficiency.

You have been given until October 31st to demonstrate immediate and sustained improvement. We will have a follow-up, evaluation meeting before that date. If there is no improvement or if your performance deteriorates further prior to at the end of this period, you may receive a written warning or be separated from employment with GSK. Should your performance improve and, at a later date, the same or similar problems occur, the company may immediately place you on written warning or separate you from employment. I suggest you review the company's corrective action policy outlined on the GSK Intranet.

The issues outlined in this letter as well as in our performance discussions are confidential and should not be discussed with your peers, subordinates or customers.

If you have any questions concerning this verbal warning, please feel free to discuss them with your Human Resource Manager, or us. Remember that the company maintains a confidential employee assistance plan and you are always able to discuss issues with their staff.

Marybeth, we want your continued commitment to put in the required effort to improve. This can not be a temporary improvement. Marybeth, you have our support and we will help in any way we can. We trust that you can improve your performance, and we look forward to a very productive working relationship.

> **Formatted:** Strikethrough

> **Deleted:**

**AA167**

September 12, 2005

Ms. Bernadette Mansi
Director, Scientific Communication Strategy
Global Commercial Strategy–Cardiovascular & Metabolism
GlaxoSmithKline

Dear Bernadette:

I am submitting my resignation, effective immediately.  This job has not been a good fit and I
think my health would be better served working elsewhere.

Very Truly Yours,

Marybeth Farrell

**AA168**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MARYBETH FARRELL,                    )
                                     )
                Plaintiff,           )
                                     )
v.                                   )    Civil Action No.
                                     )       04-285 KAJ
ASTRAZENECA PHARMACEUTICALS, LP,     )
                                     )
                Defendant.           )


            Deposition of MARYBETH FARRELL taken
pursuant to notice at the offices of Young Conaway
Stargatt & Taylor, LLP, The Brandywine Building, 17th
Floor, 1000 West Street, Wilmington, Delaware,
beginning at 9:30 a.m. on Thursday, December 9, 2004,
before Ann M. Calligan, Registered Merit Reporter and
Notary Public.


                WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801
                (302) 655-0477



1    Q.    Where?

2    A.    GlaxoSmithKline.

3    Q.    Where is that located?

4    A.    I'm in the King of Prussia offices.

5    Q.    When did you obtain that employment?

6    A.    In June of '04, this year.

7    Q.    What's your job title?

8    A.    Director of global public relations for

9    cardiovascular.

10   Q.    After you left AstraZeneca did you have another

11   job before that job?

12   A.    Yes, I did.

13   Q.    What was that?

14   A.    Burson Marsteller public relations in New York.

15   Q.    What was your position there?

16   A.    Director of the health care practice.

17   Q.    When did you get that job?

18   A.    The offer was made to me, I believe, in early

19   February, and I started March 1.

20   Q.    When did you leave AstraZeneca?

21   A.    Toward the end of January '03.  I'm sorry.

22   '04.

23   Q.    What's your salary at Glaxo?

24   A.    135,000 annually.



1    Q.    What was it at Burson?

2    A.    165 annually.

3    Q.    How about at AstraZeneca?

4    A.    Was it 94 approximately plus bonus?

5          I also will get a bonus at Glaxo, but I

6    don't know what it will be.

7    Q.    What was it typically at AstraZeneca?

8    A.    I think my last one was $25,000, 22,000.

9    Q.    Is that the highest bonus you received?

10   A.    Yes.

11   Q.    Would you have gotten a bonus at Burson also?

12   A.    Yes.

13   Q.    Had you worked for Burson before?

14   A.    Yes.  I worked in their Washington, D.C.

15   office.

16   Q.    But not for Glaxo?

17   A.    No.

18   Q.    How did you obtain the Glaxo position?

19   A.    I got a call from head hunter, and that was how

20   I learned about it.

21   Q.    When was that call received?

22   A.    March or April I believe.

23   Q.    While you were working at Burson?

24   A.    Yes.



1    Q.    When you got to New York, how did you get to

2    your office?

3    A.    I took a cab.

4    Q.    Where was the office?

5    A.    On Park Avenue.

6    Q.    And what cross street?

7    A.    19th.

8    Q.    Were you going to Penn Station?

9    A.    Yes.

10   Q.    Are the benefits you're receiving currently at

11   Glaxo similar to the benefits you were receiving at

12   AstraZeneca?

13   A.    Yes.

14   Q.    Is that also true with Burson?

15   A.    Yes.

16   Q.    Was there any time when you were without health

17   insurance?

18   A.    Yes.

19   Q.    When?

20   A.    From cancellation of my AstraZeneca policy

21   after -- shortly after I left, I believe sometime in

22   February, it was cancelled until I went to Burson,

23   March -- March.  In May.  I'm sorry.  March.

24             I'm sorry.  No.  No.  It is May because

1    Q.    How about after she became a second level

2    report, did things change or did you still get along

3    with her?

4    A.    I still got along with her, but Brian Martin

5    was brought in for us to report in to directly.  So I

6    didn't see her as much.

7    Q.    Did you ever hear Jane Helen criticize people

8    because they took medical or family leave?

9    A.    She made a comment in a meeting teleconference

10   we were having --

11              MR. NEUBERGER:  Go ahead.

12   A.    -- with Christy Hedrickson who was on the

13   global Exanta team.  And Christy had just had a baby.

14   And when she came on the line, Jane rolled her eyes,

15   and said, "Oh, does everyone have their blankie?"

16   Very sarcastically.  And everyone started laughing.

17   And Christy seemed to be very embarrassed.  I couldn't

18   believe Jane said that, actually.

19   Q.    When was that?

20   A.    It was in early 2003 as best as I can recall

21   right now.

22   Q.    You say that this was during a telephone

23   conversation?

24   A.    Mm-hmm.

1    Q.    Were you on the phone or were you there in

2    person?

3    A.    There were several of us in a conference room

4    around a table, and there was a speaker phone in the

5    middle of the table.

6    Q.    So tell me first who was there in the room.

7    A.    Obviously Jane Helen, myself.  Jane Clark might

8    have been there.  Susan Broadway was there.  David

9    McNinch might have been there.

10                    That's all I can recall right now.

11    Q.    Who was on the telephone?

12    A.    Christy.

13    Q.    Any other remarks made by Jane Helen that

14    suggested to you that she was criticizing people for

15    taking medical or family leave?

16    A.    Not that I can recall right now.

17    Q.    When did you first meet Susan Broadway?

18    A.    After I started on the Exanta team.

19    Q.    Was she already on the team?

20    A.    She was already on the team.

21    Q.    You didn't know her before that?

22    A.    No.

23    Q.    And for a period of time you and Susan Broadway

24    were peers, is that correct?



1      Q.    And in that e-mail, Jane Helen says there was

2    a, quote, significant deficiency with your work,

3    unquote?

4      A.    She states that in this, right?

5              MR. NEUBERGER:  Did you see that?

6      A.    According to this, yes.

7      Q.    They said you are not moving to meet deadlines

8    and you are sitting on information, correct?

9      A.    Yes.

10     Q.    And in fact, she mentions the possibility of a

11   formal performance plan in the e-mail, doesn't she?

12     A.    Yes.

13             MR. NEUBERGER:  Wait a minute.  Maybe I'm

14   missing this.  I'm just confused.  Is this on

15   page 175?

16             THE WITNESS:  Yes.  Very first one Jane

17   Helen, March 5.

18             MR. SANDLER:  It starts, "Debby, this

19   string of..."

20             MR. NEUBERGER:  I got you.  I didn't see

21   that last sentence.

22   BY MR. SANDLER:

23     Q.    So do you have any explanation?  I mean, do you

24   think that that e-mail was sent on March 5?

1    A.   I doubt very much that e-mail was sent on

2    March 5.

3    Q.   If it was -- and let's assume for the moment

4    that it was -- would you agree that your supervisors

5    were concerned about your performance in early March?

6    A.   According to this, it appears that that would

7    be so.

8    Q.   And you say you doubt that it was sent.  Are

9    you saying that it was prepared afterwards or

10   something?

11   A.   Well, I'm surprised to see this because, when I

12   met with Debby Kaufman in August, to express my

13   concerns to her about work deficiencies raised with me

14   in April, end of April, she had no knowledge of any

15   problems with me and stated that to me.

16   Q.   Well, this was to Debby Brangman, not Debby

17   Kaufman.

18   A.   Well, Debby Brangman never indicated any

19   problems either, so...

20   Q.   Now, Susan Broadway's promotion was announced

21   on April 1, 2003, correct?

22   A.   As best I recall, yes.

23   Q.   And were you annoyed that she got the promotion

24   rather than you?

**W&F**

WILCOX & FETZER LTD.

**AA175**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MARYBETH FARRELL,                    :

                Plaintiff     :

     vs.                      :   C.A. No. 04-285 KAJ

ASTRAZENECA PHARMACEUTICALS,:
LP,

                Defendant

        Deposition of MARYBETH FARRELL taken
pursuant to notice at the law offices of Young,
Conaway, Stargatt & Taylor, LLP, The Brandywine
Building, 1000 West Street, 17th Floor, Wilmington,
Delaware, beginning at 9:47 a.m., on Tuesday, January
25, 2005, before Allen S. Blank, Registered Merit
Reporter and Notary Public.

                VOLUME II

APPEARANCES:

     JOHN M. LaROSA, ESQUIRE
     LAW OFFICE OF JOHN M. LaROSA
     Two East 7th Street, Suite 302
     Wilmington, DE 19801-3707

        For - Plaintiff

     SHELDON N. SANDLER, ESQUIRE
     YOUNG, CONAWAY, STARGATT & TAYLOR, LLP
     The Brandywine Building
     1000 West Street, 17th Floor
     Wilmington, DE 19899-0391

        For - Defendant

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

            WILCOX & FETZER, LTD.
      1330 King Street - Wilmington, DE 19801
                (302) 655-0477



MARYBETH FARRELL

1    A    Which documents are you referring to?

2    Q    Well, there is the February documents, the

3  e-mail exchange between Jane Hellen and Debbie Brangman

4  in which they both said that they are having second

5  thoughts about your promotion because of your

6  performance.  Do you remember that?

7    A    I do recall seeing that, yes.  You showed

8  that to me last time.

9    Q    And there were some other similar documents.

10  And I think when I asked you about them, you told me

11  you had some doubts that the dates on these documents

12  were correct?

13    A    Yes.

14    Q    All right.  Assuming for the moment that

15  those dates are correct, and I realize that you don't

16  think they are, but assuming for the moment that they

17  are, would you agree that there were concerns expressed

18  about your performance, if those dates were correct,

19  before the FMLA issue surfaced?

20        MR. LaROSA:  Objection.  It calls for

21  speculation.  But you can answer.

22        THE WITNESS:  I can answer?

23        MR. LaROSA:  Yes.

24        THE WITNESS:  I have serious doubt that

MARYBETH FARRELL

1    those e-mails are authentic.  But if we are to suspend

2    that, if they were, it would appear they would be true.

3    But I can't imagine what the ground would be for such

4    concerns.

5    BY MR. SANDLER:

6        Q      And why would you think people would make

7    that up?

8        A      Well, throughout the action plan process and

9    the performance improvement plan process and certainly

10   just the treatment of me after I announced I was going

11   out on six weeks medical leave, and as I stated in a

12   number of memos to Susan or Jane or Georgina

13   Austin-Smith, or Jones, and others, AstraZeneca was

14   operating in an untruthful and unethical manner.  So it

15   would not surprise me that, given what I have witnessed

16   there over that seven, eight months -- actually, it was

17   a little more than that.  That they would be capable of

18   creating fictitious documents.  Because, in fact, Susan

19   Broadway did falsify some documents.

20       Q      What documents did she falsify?

21       A      The budget reports.

22       Q      What budget reports?

23       A      For the Exanta team.  The monthly budget

24   reports.  She received my information.  She created an

MARYBETH FARRELL

1   updated document that excluded my updates and put it

2   forward as a truthful reflection of information and, in

3   fact, it is not.

4        Q    Did she falsify anything else?

5        A    Yes.

6        Q    What else?

7        A    Various concerns about my performance.

8        Q    The things we have already discussed, that

9   you disagree with?

10       A    Um-hmm.  Yes.

11       Q    All right.  Why do you think these two

12  individuals, Susan Broadway and Jane Hellen, took all

13  the actions that they did simply because you took a

14  short period of FMLA leave?  Was it that serious a

15  thing in their mind?

16       A    Well, in the comments made to me by both of

17  those individuals, and in particular Jane Hellen's

18  reaction when I told her I would be going out on six

19  weeks' medical leave, and her subsequent remark that

20  she would -- she was reviewing staffing for the next

21  year and didn't think she was going to retain me, it

22  appeared to me that, yes, they were -- their actions

23  and, in fact, my -- there were no concerns about my

24  performance expressed at all.  So it's very clear to me

MARYBETH FARRELL

1    it was driven by my need to be out for six weeks.

2        Q    You saw the feedback forms from the previous

3    year, didn't you?

4        A    Some of them, yes.

5        Q    I mean we discussed them the last time.

6    There were some negative remarks in some of those

7    feedback forms, weren't there?

8        A    I guess areas for improvement were

9    recommendations.

10       Q    And that coupled with the concern in

11   February, assuming that those dates were correct, would

12   indicate that there were reasons totally unrelated to

13   your FMLA leave for viewing you as someone who is

14   having problems; isn't that a fair assumption?

15       A    No.  I disagree with that.  I disagree

16   because the comments --

17       Q    You're looking at your attorney.

18       A    Because I answered the question and now I'm

19   giving -- I am rambling on here.

20            I disagree because the recommendations for

21   areas for improvement, which everyone solicits at a

22   review time, were essentially washed clean in my

23   overall review that was presented to me for the year.

24   And anything considered significant was put in that

MARYBETH FARRELL

1    question back?

2                (The reporter read back the pending

3    question.)

4                MR. LaROSA:  You can answer that.

5                THE WITNESS:  Yes.

6    BY MR. SANDLER:

7        Q     And what's your basis for that?

8        A     Well, on February 12th, the date of Jane

9    Hellen's presumed e-mail letter to Debbie Brangman

10   about any performance issues, she sent me an e-mail

11   congratulating me, good job, exclamation point, on a

12   project that I was working on.

13       Q     So you think those two things are

14   inconsistent?

15       A     Yes.

16       Q     Anything else?

17       A     Anything else about what?

18       Q     Any other reason why you don't think that's

19   a legitimate, accurate date?

20       A     It doesn't make sense.  In light of the

21   activities -- first of all, in light of my performance

22   review of 2002.

23                Secondly, in light of what was actually

24   going on in January up to February 12th in particular,



**WILCOX & FETZER LTD.**

In the Matter Of:

# Farrell

v.

# AstraZeneca Pharmaceuticals, L.P.

C.A. # 04-285 KAJ

_____

Transcript of:

Marybeth Farrell

November 10, 2005

_____

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

1           MARYBETH FARRELL,

2     the witness herein, having first been

3     duly sworn on oath, was examined and

4     testified as follows:

5   BY MR. SANDLER:

6     Q.    State your name, please.

7     A.    Mary Beth Farrell.

8     Q.    Are you presently employed?

9     A.    Yes, I am.

10    Q.    Where are you employed?

11    A.    In Philadelphia.

12    Q.    For what company?

13    A.    Dorland Global, public relations.

14    Q.    Spell the first name.

15    A.    D-O-R-L-A-N-D.

16    Q.    Where in Philadelphia?

17    A.    What do you want, the address?

18    Q.    Yes.

19    A.    1 South Broad Street.

20    Q.    Since when have you been employed there?

21    A.    Just in the last couple weeks.

22    Q.    Approximately when did you begin?

23    A.    October 17th.

24    Q.    What's your salary there?

Marybeth Farrell

1   A.   140,000.

2   Q.   And before that, were you employed by

3   GlaxoSmith-Kline for a period of time?

4   A.   Yes, I was.

5   Q.   When did you begin at GlaxoSmithKline?

6   A.   I believe it was June 1, 2004.

7   Q.   When did you last work or what's the effective

8   date of your separation from GlaxoSmithKline?

9   A.   From September 2005.  I am not sure if it was

10  the 3rd.

11  Q.   Could it have been the 12th?

12  A.   It could have been the 12th.

13  Q.   What was your job there?

14  A.   I was director of global product public

15  relations for cardiovascular.

16  Q.   Were you interviewed for that position?

17  A.   Yes.

18  Q.   Was that sometime in 2004?

19  A.   Yes.

20  Q.   Do you recall what month?

21  A.   Let me see:  January, February, March, April.

22  It may have been in May.  I think it was May.

23  Q.   Who interviewed you?

24  A.   I interviewed with human resources and then --

**AA184**

Page 5

1   A.   Yes.

2   Q.   So that if you got in late, would you just stay

3   late?

4   A.   Yes.

5   Q.   Who were your immediate supervisors?

6   A.   Bernadette Nancy.  I also interviewed with Gary

7   Davies.  Sorry.  Gary Davies is head of product public

8   relations and communications for corporate media in

9   the U.K.  I reported directly to him and directly to

10  Bernadette here in the U.S.

11  Q.   Was he present for an interview or did you do

12  that on the phone?

13  A.   We did it on the phone, yeah.

14  Q.   What was Ms. Mansi's position?

15  A.   She's director of global scientific commercial

16  strategy for cardiovascular and metabolics.

17  Q.   And you had a direct reporting relationship

18  with both of those folks.  Is that right?

19  A.   Yes.

20  Q.   Which one did you see more often?

21  A.   Bernadette; because she was in the U.S.

22  Q.   Where was her office located relative to yours?

23  A.   I was up on the 5th floor and she was on the

24  3rd floor.

**AA185**

1    Q.   Did you actually see Mr. Davies on occasion?

2    A.   Yes.  We would have PR director meetings two to

3    three times a year, and they would be in Philadelphia

4    or over in the U.K.  So I would always see him at

5    those.  Those lasted a couple days.  Then sometimes,

6    he would come over here just to visit.

7    Q.   Did you travel to the U.K. for other trips?

8    A.   Yes.  I was over there on some brand work for

9    some of our compounds in development.  So if I was

10   there, I would try to stop in and see him.

11   Q.   But it's fair to say that you dealt more

12   directly on a day-to-day basis with Ms. Manci.  Is

13   that right?

14   A.   Yes.

15   Q.   Did you communicate regularly with Mr. Davies

16   by e-mail or telephone?

17   A.   Yes.  Glaxo has a policy where everyone is

18   required to have one-to-one status update meetings.

19   So I would have that with Gary every month by phone

20   and then with Bernadette in person.  That's just to

21   review programs and projects you are working on and

22   address any issues that might be, you know, raised

23   since the last meeting of any kind.

24   Q.   Did you have certain internal customers that

**AA186**

Marybeth Farrell

Page 7

1    you worked with regularly?

2    A.    Yes.

3    Q.    Who are they?

4    A.    The head -- the commercial leader for

5    atherosclerosis compounds in development, and his name

6    was Mark Schwartz.  And the other lead commercial

7    director for thrombosis, for Arixtra, and his name was

8    Arvinder Singh.

9    Q.    Was there somebody named Carol Harvey?

10   A.    Carol Harvey was head of the odiparcil group,

11   yes.  We had very little interaction.  But, yes, she

12   was one of my customers as well.  Also, for awhile, I

13   was working directly doing initiatives with Lawson

14   McCartney, who was senior vice-president for worldwide

15   R & D.

16   Q.    Was there somebody Pascale that you worked with

17   also?

18   A.    Pascale was a member of the Arixtra team.

19   Q.    Is that his last name or first name?

20   A.    Well, it's actually a her.

21   Q.    It's a her?

22   A.    It's a her, yes.  Pascale -- what's her last

23   name?  Something French.  I don't remember her name.

24   Q.    Okay.  So who did she report to?

**AA187**

Marybeth Farrell

Page 36

1    A.    Yes.

2    Q.    Or is it public?

3    A.    Privately owned.

4    Q.    Who are the primary owners?

5    A.    Harry and Rita Sweeney.

6    Q.    Where are they located?

7    A.    They're Philadelphia.  They're there.

8    Q.    Did you say your base salary at Dorland is

9    140,000?

10   A.    140,000, mm-hmm.

11   Q.    Is that the same at Glaxo?

12   A.    Slightly more.

13   Q.    Slightly more?

14   A.    A little bit more.

15   Q.    Do they pay bonuses at Dorland?

16   A.    Yes.

17   Q.    How does that work?

18   A.    It's based on your billings, whether or not you

19   meet your financial targets.  So that's the core part

20   of it.  And then the overall performance of the

21   agency.

22   Q.    Is there a range or a percentage of your salary

23   that is considered for bonus purposes?

24   A.    They will provide bonuses up to half of your

Marybeth Farrell

1    annual salary, which I thought was incredibly generous

2    for an agency.  That doesn't mean I am going to get

3    that, but.

4    Q.    But you have a potential to get as much as

5    another $70,000?

6    A.    Possibly.

7    Q.    If my math is correct.

8    A.    Yes.

9    Q.    What other benefits do you receive?

10    A.    They have a health plan, 401(k).

11    Q.    Do they have a pension plan?

12    A.    I think they do.  I really don't recall like

13    reading anything about it in the information packet or

14    anything signing off on it, so I probably have to do a

15    little more work on that.

16    Q.    Is it your impression that the benefits package

17    at Dorland is comparable to the benefits package at

18    Glaxo?

19    A.    No, I don't think it's as generous.

20    Q.    In what way isn't it as generous?

21    A.    They have some kind of a pension plan, but the

22    vesting is a longer period of time, and -- I don't

23    know.  It just didn't seem that impressive in terms of

24    a pension plan.  I'll be honest with you.

**AA189**

Marybeth Farrell

Page 38

1    Q.    Do you have documents describing the benefits

2    package at Dorland?

3    A.    Yes, I do.

4    Q.    Did you bring them with you?

5    A.    No.

6            MR. SANDLER:  Can we get with those?

7            MR. NEUBERGER:  Off the record.

8            (Discussion off the record.)

9            MR. NEUBERGER:  We'll obtain whatever

10   documents she has been given by them, and we'll

11   produce those.

12           MR. SANDLER:  Thank you.

13           MR. NEUBERGER:  Yes.

14   BY MR. SANDLER:

15   Q.    Now, moving back to your salary at Glaxo.  Did

16   you receive a raise at Glaxo at some point?

17   A.    Yes.

18   Q.    Was your starting base salary 135,000 at Glaxo?

19   A.    Yes, it was.

20   Q.    And did you receive a raise in April of 2005 to

21   an annualized salary of $138,380?

22   A.    Yes.

23   Q.    Glaxo also paid bonuses.  Correct?

24   A.    Yes.  Correct.

**AA190**

Marybeth Farrell

Page 39

1    Q.    Did you receive a bonus or raise in March 2005?

2    A.    Yes.

3    Q.    Was that bonus 19,200 --

4    A.    19, yeah.

5    Q.    19,261 is what I had.

6    A.    Yes.

7    Q.    Are you aware that that bonus was less than

8    what some of your peers had received?

9    A.    No.

10   Q.    And is it correct that your analyzed earnings

11   at Glaxo, including the bonus in 2005, would have been

12   over $155,000?

13   A.    Annualized?

14   Q.    138 plus 19.

15   A.    Well, I started there in June.  So you are

16   saying to --

17   Q.    Oh.  If you had worked a year.  Annualized.

18   A.    Then that put together would make sense.

19   Q.    There was a pension plan at Glaxo.  Correct?

20   A.    Yes.

21   Q.    And in order to vest in that plan, you had to

22   work a year at Glaxo.  Is that right?

23   A.    Yes.

24   Q.    And did you participate in the pension plan?

**AA191**

1    send back --

2      Q.   Well, without --

3      A.   Exactly what he wanted.

4      Q.   Without explaining that --

5            MR. NEUBERGER:  Wait a minute.  Let her

6    answer the question.

7            Finish what you were going to say,

8    Marybeth.

9      A.   Okay.  It was one isolated incident.  And he

10   acknowledged that.  I said to Bernadette, "I don't

11   think this is fair to put this in my review.  It makes

12   it sound like I'm not listening all the time.  And

13   it's because this media distribution list became such

14   a, you know, an issue."  But that's the only thing he

15   was referring to.

16     Q.   Okay.  Didn't you receive similar comments at

17   AstraZeneca about not listening?

18     A.   They alleged that.

19     Q.   Yes.  I am not asking you to agree with it.  I

20   am just asking if that was the comment or were those

21   comments made.  You said they alleged that.  Correct?

22     A.   Mm-hmm.

23     Q.   All right.  Following -- well, in the course of

24   the preparation of the -- do they call it a PDP, the

**AA192**

Marybeth Farrell

Page 47

```
 1    Q.    Did she also say that at least what other

 2   people said was that in some cases you weren't

 3   listening?

 4    A.    It really was more that I was very stressed

 5   out.

 6    Q.    Did she say that?  Whether or not you agree

 7   with it, did she say it in the third sentence?

 8    A.    Yes, she does say that in here.

 9    Q.    Did she also say you didn't respond to requests

10   for information?

11    A.    She does state that in there.

12    Q.    Did you agree with those two comments?

13    A.    Yes.  I was very distracted, extremely

14   distracted.  That's not something I disagree with in

15   that.

16    Q.    Okay.  And did AstraZeneca also say there were

17   times when you didn't respond to repeated requests for

18   information in a timely fashion?

19    A.    I disagree with what they said, but, yes, they

20   did.

21    Q.    I know you disagree with what -- right.

22    A.    They said it.  They alleged it.

23    Q.    Were you told by Bernadette Manci at times you

24   didn't exhibit a sense of urgency in getting things
```

**AA193**

Marybeth Farrell

Page 61

1    until Friday, you are in hot water with this guy.

2    That's what I learned.  That was his work style.

3       Q.    You were told similar things at AstraZeneca,

4    weren't you?

5       A.    Of getting back to people in a timely fashion?

6       Q.    Yeah.  That you weren't responding in a timely

7    way to people when they asked you to do things.

8       A.    I can only recall that specifically from that

9    vendor, one of the vendors, which was -- that's -- I

10   don't want to say laughable, but it's inaccurate.

11      Q.    But you were told that.  Whether you agree with

12   it --

13      A.    It was alleged.

14      Q.    It was alleged.

15      A.    Yeah.

16      Q.    Okay.  She also says in here, Ms. Manci also

17   says that you were -- that you said you were "still

18   interested in A's job."  Is that the job you had

19   mentioned at the beginning of the deposition?

20      A.    Oh., Al's job.

21      Q.    I'm sorry.  Al's job, right.

22      A.    She's still interested in Al's job, and she

23   believes she's qualified.  Yes, indeed.  Because at

24   this point -- yeah.

**AA194**

Marybeth Farrell

Page 63

1    A.    Yes, relative to the Gary Davis media list.

2    Q.    And increase sensitivity for coworkers to avoid

3    conflicts?

4    A.    Yes, relative to the edge that I had,

5    apparently.

6    Q.    And improve responsiveness?

7    A.    Yes.   Corporate communications, investor

8    relations.   Those were the assignments that came out

9    from Gary when the deadline wasn't really the

10   deadline.

11   Q.    And greater understanding of the budget and

12   finance process?

13   A.    Yeah.   Just as a general, you know, area to

14   learn more about because I really did not know

15   everything after a couple of months.

16   Q.    Was that also, the budget process, was that

17   also something that was alleged that you didn't have

18   much of an understanding of at AstraZeneca?

19   A.    Well, they alleged that, but that was untrue in

20   that case.   In this case, it is true.

21   Q.    Did you also have a problem with your horse

22   during 2005?

23   A.    Yes.

24   Q.    Did you take several days off from work to

**AA195**

1    do.  I want you to make a presentation about what is

2    public relations at GSK and explain to them all the

3    other compounds you represent and what you are

4    responsible for.  Not just Arixtra.  I have 23 others.

5    And all them won't work on one.  Just Arixtra.

6              So I made a presentation about what is PR.

7    I reported to U.K., corporate media, investor

8    relations and global commercial strategy, Okay, to

9    show how these things tie together.  I get the calls

10   from corporate media or investor relations saying,

11   Where is this in development?  When is this data

12   coming out?  What happened here?  And they want the

13   answers instantly.  So I have to go track down these

14   people who get upset with me.  It's like, Why do you

15   need it so urgently?  Why didn't you plan?"  I said,

16   Because I have Gary Davies on the phone, or someone

17   from investor relations, and they want this

18   information immediately.  They told me who has got

19   this and what the answer is.

20             So that whole thing, people didn't know

21   what I did.  So I made a presentation.  This is what

22   public relations is.  This is how we work.  We were

23   trying to create synergy and understanding.

24   Q.   Do you recall also that it was alleged by

**AA196**

Marybeth Farrell

Page 69

1    AstraZeneca that you were sending e-mails that were

2    creating problems and the response was you were told

3    not to send so many e-mails and not to send e-mails

4    that were aggressive or overly aggressive?

5    A.    No.    There was one e-mail to Sunita Sheth --

6    Q.    Again -- go ahead.    Sorry.

7    A.    -- where I was asking her to fill in on an

8    advisory board meeting.    It was late notice.    Because

9    the calendar had been changed by Brian Martin.    She

10   took offense to that e-mail.    I think she called Jane

11   Helen or she called Brian Martin.    And the whole

12   commercial team was flooding our medical directors

13   with e-mails.    We were all told, stop the e-mails.

14   They all had to go through Brian at that point.    Yeah.

15   But that was one incident.

16   Q.    Now, the midyear review in 2005.    Was there

17   not?

18   A.    Mm-hmm.

19   Q.    Yes?

20   A.    Yes.

21           (Farrell Deposition Exhibit No. 3-13 was

22   marked for identification.)

23   BY MR. SANDLER:

24   Q.    Looking at Exhibit 13, that appears to be an

1   e-mail or a memo from Bernadette Manci to Mark.  I'll

2   assume that's Mark Schwartz.  Does that look like

3   that's who that is?

4       A.   Yes.

5       Q.   Asking for feedback for your midyear review.

6   Is that right?

7       A.   Apparently so.  Although I had interaction with

8   him almost not at all for several months prior to

9   that.

10      Q.   She asks him if there has been an improvement

11  in your performance in various ways.  Is that right?

12      A.   Mm-hmm.

13      Q.   Yes?

14      A.   Yes, mm-hmm.

15      Q.   Is that when -- is it about that time that you

16  asked for permission to submit feedback on Mark

17  Schwartz and Carol Harvey and A.P. Singh?

18      A.   Let me think when I did that.  I don't think it

19  was in July.  It was around the time of the A.P. Singh

20  Sunday night misunderstanding, overreaction, you know,

21  comments, retractions.  I said, It would be helpful

22  if, you know, for me, working with him, if we could

23  just -- you know, if you are not sure about something,

24  ask questions before overreacting.  But I think that

**AA198**

1    was in August.

2    Q.    Did you have a one-on-one meeting with

3    Ms. Manci in early August to discuss various

4    complaints or problems between you and A. P. Singh?

5    A.    Probably, yes.

6                (Farrell Deposition Exhibit No. 3-14 was

7    marked for identification.)

8    BY MR. SANDLER:

9    Q.    This appears to be a summary -- well, it's

10   actually an e-mail to you summarizing what Ms. Manci

11   says was discussed at a meeting during a recent one-on

12   one, she says?

13   A.    Okay.  This is when the whole thing was ...

14   Q.    She says that Mr. Singh felt that you were

15   making an effort to improve your listening skills.

16   Correct.  Do you see number 1 there?

17   A.    Correct, mm-hmm.

18   Q.    That was another problem that was alleged at

19   AstraZeneca, your listening skills.  Correct?

20   A.    They're entirely different situations.

21   Q.    But that was alleged, wasn't it?

22   A.    They alleged that.

23   Q.    Yes.  Then she mentioned your organization is

24   an area where improvement was still needed.  Correct?

1    Q.    Looking again at Farrell 14, the bullet points

2    that Mrs. Manci reviewed with you, she also talks

3    about your needing to take leadership of meetings,

4    take responsibility for directing the meetings,

5    et cetera.

6    A.    That was A. P. Singh.

7    Q.    She did say that, but you say it was because of

8    something A. P. Singh said?

9    A.    Exactly.

10   Q.    And also she mentions product knowledge?

11   A.    A. P. Singh.  It's all out of this one meeting

12   and incident from the budget memo, which he later

13   apologized for and tried to recant this.  He said this

14   in a moment of anger, and he admitted it.

15   Q.    She also mentions accountability for projects

16   and budgets.  Correct?

17   A.    Yes.

18   Q.    Aren't these also things that were also alleged

19   by AstraZeneca?  Again, I understand you don't agree

20   that it's correct, but weren't they all alleged by

21   AstraZeneca?

22   A.    These were all withdrawn, though, because they

23   were initiated in different contexts.

24   Q.    But were they alleged by AstraZeneca, these

Page 76

1   charges?

2   A.   Well, these are typical things a PR manager

3   would do.

4   Q.   Is that a yes or a no?

5   A.   I would say similar things were alleged.

6           (Farrell Deposition Exhibit No. 3-15 was

7   marked for identification.)

8   BY MR. SANDLER:

9   Q.   Farrell 15 appears to be an e-mail you sent to

10  Bernadette Manci responding to her memo.  Correct?

11  A.   Correct.  Budget memo and the nonsense that

12  followed, yes.

13          (Farrell Deposition Exhibit No. 3-16 was

14  marked for identification.)

15  BY MR. SANDLER:

16  Q.   And in response to your memo that Ms. Manci

17  sent you Farrell 16, which is a short memo.

18  A.   Mm-hmm.

19  Q.   Yes.

20  A.   Yes.

21  Q.   Doesn't she say in that memo she was not

22  talking about just one situation, but about expecting

23  certain minimal performance standards for the future?

24  A.   She says, "What's provided goes beyond the

Page 80

1              THE WITNESS:  Oh.

2              MR. NEUBERGER:  You are asking her

3    questions on a document she has never seen before.

4    We're going a step beyond that.

5              MR. SANDLER:  She's already said Al

6    Gianchetti had, basically, said keep everything as is

7    and don't change the document or don't change the --

8              THE WITNESS:  That's what Bernadette Manci

9    told me.

10             MR. SANDLER:  That's the answer.

11   Bernadette Manci told her.

12             MR. NEUBERGER:  That's all I was looking

13   for, some personal knowledge.

14             MR. SANDLER:  That's fine.  That's fine.

15   BY MR. SANDLER:

16     Q.   Now, she says that you continued to insist that

17   you were doing an excellent job.  Did you do that?

18     A.   You know, I really am not going to comment on

19   this memo.

20     Q.   Well, why don't you answer my question?  Did

21   you --

22             MR. NEUBERGER:  Marybeth, just focus on

23   his question.  We'll get done here.  What's your

24   question?

**AA202**

Page 81

1    Q.   The question is:  Did you continue to insist

2    that you were doing an excellent job?

3    A.   Yes, because I was.

4    Q.   Look on the second page, the fifth paragraph

5    down.  Did you say that you had never heard this

6    feedback while working at AstraZeneca?

7    A.   What feedback?

8              MR. NEUBERGER:  Is this a thrombosis

9    paragraph or the one below?

10             MR. LaROSA:  Fifth full paragraph.

11             MR. NEUBERGER:  Fifth full paragraph.

12   Q.   I'll read it.  "She reiterated again" -- you

13   reiterated again -- "how she had never heard this

14   feedback while working at AstraZeneca, and she did

15   work for the CEO and the board."  Do you recall saying

16   that?

17   A.   No, I don't.  I do recall telling her that I

18   said that I felt --

19             MR. NEUBERGER:  Marybeth.  He asked you a

20   question.  We don't want to know something else.

21   Okay?

22

23   BY MR. SANDLER:

24   Q.   You can answer.  What do you recall?  You can

Marybeth Farrell

Page 91

1    A.    No, not at all.

2    Q.    Refusal to take accountability for project

3    related issues?

4    A.    No.  Uh-uh.

5    Q.    So none of these things are anything that

6    AstraZeneca mentioned?

7    A.    Those are AstraZeneca.

8    Q.    None of these things are things that Glaxo

9    mentioned?

10   A.    No.  Not in that way at all, no.

11   Q.    But would you agree that these things were all

12   alleged by AstraZeneca?

13   A.    They were alleged by AstraZeneca.

14   Q.    Yeah.  And having heard what was alleged by

15   Glaxo, some of which you agreed with, some of which

16   you dispute, do you still contend the documents in

17   AstraZeneca were fabricated?

18   A.    Yes, I do.

19   Q.    And when you say fabricated, do you mean they

20   were literally made up from scratch?

21   A.    Correct.

22   Q.    What's your basis for that contention?

23   A.    The facts don't support the allegations.  There

24   is no factual basis for the claims they made against

1    me.

2    Q.    Are you just saying you disagree with what's

3    said in the documents?

4    A.    No.    I'm saying that it's incorrect, erroneous

5    and, in some cases, fabricated.

6    Q.    And fabricated how?

7        MR. NEUBERGER:    Wait a minute.    This was

8    all covered at the first deposition. This deposition

9    is not for the purpose of going back and revisiting

10   what was covered at the first deposition and the

11   briefing at the summary judgment hearing.    We're going

12   beyond it.

13   Q.    One other question, and that is:    Are you

14   saying that the documents did not exist at the time

15   you went on FMLA leave?

16       MR. NEUBERGER:    I object to that.    I

17   direct her not to answer.    This is beyond mitigation

18   of damages.    This is liability.

19       MR. SANDLER:    Well, I mean --

20       MR. NEUBERGER:    You had your chance.    You

21   took two days for deposition.

22       MR. SANDLER:    Our opportunity for this

23   deposition included liability, not just mitigation of

24   damages.    But you are directing her not to answer.

1         MR. NEUBERGER:  I am directing her not to

2    answer, yes.

3         MR. SANDLER:   Take a break.

4         MR. NEUBERGER:  Yeah.  Go ahead.

5         (Recess taken.)

6    BY MR. SANDLER:

7     Q.   Just a couple more questions and we'll be

8    finished.  We've gone over a number of documents today

9    that were generated by Glaxo, and you have expressed

10   strong disagreement with a lot of what was contained

11   in those documents.  Is that fair to say?

12    A.   Not necessarily what's said in them, but the

13   context that you were trying to put them in.  For

14   example, the claims or the allegations were in fact

15   made about not driving to meetings and not being

16   organized by A. P. Singh, and it drew out of those

17   couple of days in August, which he recanted.

18         MR. NEUBERGER:  Okay.  You've explained

19   that already.  That's fine.

20    A.   Okay.  Yes.

21    Q.   Take a look at Farrell 18 again, the third

22   paragraph.  You keep talking about A. P. Singh.  But

23   she keeps saying that the feedback was from numerous

24   customers.  And there is a strong disagreement there.

**AA206**