IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


MARYBETH FARRELL,                )
                                 )
            Plaintiff,           )
                                 )        Civil Action
v.                               )        No. 04-285-KAJ
                                 )
ASTRAZENECA PHARMACEUTICALS,)
LP,                              )
                                 )
            Defendant.           )


        Deposition taken pursuant to Federal Rule
of Civil Procedure 30(b)(6) of GLAXOSMITHKLINE taken by
and through BERNADETTE A. MANSI pursuant to notice at the
law offices of Dechert, LLP, 2929 Arch Street, 21st
Floor, Philadelphia, Pennsylvania, beginning at
10:10 a.m. on Monday, November 7, 2005, before Kathleen
White Palmer, Registered Merit Reporter and Notary
Public.


APPEARANCES:


        JOHN M. LaROSA, ESQUIRE
        LAW OFFICE OF JOHN M. LaROSA
          Two East 7th Street - Suite 302
          Wilmington, Delaware  19801-3707
          for the Plaintiff

        SHELDON N. SANDLER, ESQUIRE
        YOUNG, CONAWAY, STARGATT & TAYLOR
          1000 West Street
          The Brandywine Building - 17th Floor
          Wilmington, Delaware  19899-0391
          for the Defendant

------------------------------------------------------
                WILCOX & FETZER
   1330 King Street - Wilmington, Delaware 19801
                   (302) 655-0477



AA207

1    Q.    Is it paid out based on a calendar year or --

2    A.    It's paid in March, yes, every March.

3    Q.    Based on the previous calendar year?

4    A.    Correct.

5    Q.    So then her annualized 135, you would add to it

6    another $19,000?

7    A.    Yes.

8    Q.    So $154,000 was basically her earnings for the

9    first year?

10   A.    Well, she wasn't there a full year.

11   Q.    But annualized?

12   A.    Basically.

13   Q.    Did she also have an opportunity to participate

14   in a pension plan of some kind?

15   A.    You are eligible for a retirement plan and a

16   pension plan after one year of service and she was only

17   there a year in June, so June she would have been

18   eligible.

19   Q.    You say that the plan that she was eligible for

20   immediately.  How did that work?  Was that a 401(k)?

21   A.    That's a 401(k).

22   Q.    Did the company match any contributions that she

23   made?

24   A.    I don't recall offhand, but I believe there is a

1    matching program.

2       Q.    Do you know whether she participated in that

3    401(k)?

4       A.    I believe she did.

5       Q.    I think today you've supplied an SPD, a summary

6    plan description, for each of the plans?

7       A.    HR has, yes.

8              MS. RYAN:   The matching is in her offer

9    letter, too.

10      Q.    So the two documents that I'm looking at, one

11   says "Cash Balance Pension Plan"?

12      A.    That's what you're eligible for after a year.

13      Q.    The other says "Retirement Savings Plan."   Is

14   that the 401(k)?

15      A.    Yes.

16      Q.    Do you recall approximately when Ms. Farrell

17   began active work for Glaxo?

18      A.    I believe it was June 1st.

19      Q.    Of 2004?

20      A.    '4.

21      Q.    Did she ever post for any other position?

22      A.    Within the company?

23      Q.    Yes.

24      A.    I'm aware she's had discussions with other

Bernadette A. Mansi                    12

1    people.  I don't know if she formally posted.

2        Q.    And what positions did she have discussions

3    about?

4        A.    A -- I'm sorry.  That's not true.  She also

5    posted for another PR position in the company.  She had

6    discussions regarding a commercial position and she

7    formally applied for an oncology public relations

8    position.

9        Q.    When did she do the latter?

10        A.    The oncology position?

11        Q.    Yes.

12        A.    I'm not aware.  I was only aware after she left

13    that she was interviewing for it.

14        Q.    I see.

15                    Had a decision been made on whether or not

16    she would get the position at the time she left?

17        A.    I believe she interviewed -- had the interview

18    after she resigned, so I don't know.

19        Q.    So I take it she wasn't hired for that position?

20        A.    No.

21        Q.    The other position which you mentioned she had

22    discussions about, what was that?

23        A.    A commercial position that she was interested

24    in.

1    Q.    Not a public relations position?

2    A.    No.

3    Q.    Who did she have those discussions with?

4    A.    With my boss.

5    Q.    Who is that?

6    A.    Albert Gianchetti.

7    Q.    What was the outcome of those discussions?

8    A.    He didn't feel she was qualified for that

9 position.

10    Q.    I take it that you're familiar with the reason

11 or reasons why Mrs. Farrell left GlaxoSmithKline?

12    A.    I know what was expressed in her resignation

13 letter.

14    Q.    You are familiar with the events leading up to

15 her submission to that resignation letter?

16    A.    I am.

17    Q.    Are you familiar with her performance as an

18 employee?

19    A.    I am.

20    Q.    Parenthetically, is there anything contained in

21 her resume or in her representations as to her

22 qualifications that contributed to her leaving Glaxo?

23    A.    I'm not sure I understand the question.

24    Q.    I'll try to rephrase it.

1       A.    Ten minutes, 15 minutes.

2       Q.    You take the King of Prussia exit?

3       A.    Yes.

4       Q.    Was there any expectation about how many hours

5   she was supposed to work per week?

6       A.    No.  I mean, there's the standard hours of the

7   company, which are 35 for her position.

8       Q.    Were there any complaints or issues about her

9   punctuality in arriving for work?

10      A.    On occasion I did -- I did comment on it to her.

11  One occasion, in particular, I can think of.

12      Q.    Tell me about that.

13      A.    She didn't come in till after ten and it was --

14  you know, there was a lot going on that day and there

15  were a lot of priorities and things.  And then she left

16  at 1:45 saying she didn't feel well.  So that wasn't a

17  problem if she didn't feel well, but she needs to be in

18  much earlier given we were in a crisis situation.

19      Q.    Were there any issues relating to her

20  whereabouts during the workday?

21      A.    Sometimes we didn't know where she was.

22      Q.    Was that unusual for the people you supervised?

23      A.    Yes.

24      Q.    Did you discuss that with her?



AA212

1    A.    We did on occasion.  We told her that we needed

2    to know where she was and she needed to be contactable.

3    Q.    Did she have any health problems?

4    A.    The only health problem that I was aware of was

5    a sinus infection.  She had recurring sinus infections.

6    Q.    No back problems?

7    A.    Not that I'm aware of.

8    Q.    Did she miss time from work on occasion?

9    A.    Yes.

10    Q.    For what reasons?

11    A.    Usually it was the sinus problem, allergy-type

12    thing.

13    Q.    Did she ever request FMLA leave?

14    A.    No.

15    Q.    Or other kinds of disability leave?

16    A.    No.

17    Q.    Was she evaluated at any time while she was at

18    Glaxo?

19    A.    Evaluated in what way?

20    Q.    Well, let me back up.

21          Do you have some sort of a formal system of

22    evaluating employees?

23    A.    Performance?

24    Q.    Yes.

1    A.    Yes.

2    Q.    How does that work?

3    A.    We have yearly evaluations and -- versus your

4  performance -- versus your objectives for the year, and I

5  do semiannual evaluations, as well.

6    Q.    Is that something that you do because you want

7  to do them, or is that also required by the company?

8    A.    It's not required by the company.  It's

9  something I do because I feel that if you can't -- if you

10  have objectives and you don't review them throughout the

11  whole year and you don't meet them, then it's not

12  helpful.

13    Q.    So it's more helpful to let people know how they

14  are doing as they go along?

15    A.    Exactly.

16    Q.    Did you do both of those things in connection

17  with Ms. Farrell's employment?

18    A.    Absolutely.

19    Q.    How would you characterize her performance

20  evaluations?

21    A.    Characterize in what way?

22    Q.    Did she meet expectations?  Was she failing to

23  meet them?  Was she exceeding them?

24    A.    She did not meet expectations for her job level.

Bernadette A. Mansi                          18

1        Q.    We'll talk in more detail, but I'm just looking

2    for some general overview at this point.

3                    How did Ms. Farrell get along with her

4    supervisors; namely, you, Mr. Davies, and any other

5    supervisors?

6        A.    There were -- there were issues related to

7    performance, you know.  There were times when it was

8    fine.  There were times when it wasn't.

9        Q.    How about with her coworkers?

10       A.    There were interpersonal issues with coworkers.

11       Q.    Such as what?

12       A.    She tended to be aggressive and sometimes they

13   described her as having an edge.

14       Q.    How frequent were these comments or -- well,

15   would you characterize them as complaints by the

16   coworkers?

17       A.    Yes.

18       Q.    How frequent were they?

19       A.    Pretty frequently.

20       Q.    More than monthly?

21       A.    Yes.

22       Q.    Weekly?

23       A.    Somewhere between weekly and monthly.

24       Q.    Okay.  Fair enough.

1              Were there any other complaints about

2    Ms. Farrell other than that she had an edge and was

3    aggressive?

4         A.    Complaints about performance.

5         Q.    All right.  And we'll talk more about that.

6         A.    Yes.

7         Q.    Did she have any complaints about her coworkers?

8         A.    Yes.

9         Q.    What were her complaints?

10        A.    She felt that they weren't clear in their

11   communication, that they -- that they didn't communicate

12   appropriately, that they were being aggressive with her.

13   Things like that.

14        Q.    How about complaints about her managers, did you

15   hear any complaints of that kind?

16        A.    She complained to me about her other manager.

17        Q.    About Mr. Davies?

18        A.    Mm-hmm.

19        Q.    What did she say about Mr. Davies?

20        A.    She felt that he was not being clear to her with

21   communication and that, you know, he -- he was demanding,

22   things like that.

23        Q.    Did you ever hear from Mr. Davies that she was

24   complaining about you to him?

```
 1       A.    No.

 2       Q.    When did you learn that she was resigning from

 3  Glaxo?

 4       A.    The day that she resigned.

 5       Q.    How did you learn?

 6       A.    Via e-mail.  I was away on a business trip.

 7       Q.    Via e-mail from whom?

 8       A.    From her.

 9       Q.    Saying what?

10       A.    That she felt that -- she was resigning

11  effective immediately because she felt that it was not a

12  good fit and that it would be better for her health if

13  she left.

14       Q.    Did you know what she was referring to when she

15  said it was not a good fit?

16       A.    Only that there had been performance issues.

17       Q.    Did you know what she was referring to when she

18  said it would be better for her health?

19       A.    No.

20       Q.    Did you or anybody else at Glaxo tell her that

21  if she didn't resign, she'd be terminated?

22       A.    No.

23       Q.    So she resigned voluntarily?

24       A.    Yes.
```



**AA217**

1    Q.    Was an exit interview conducted with her?

2    A.    No.

3    Q.    Is that usually done when someone leaves?

4    A.    Yes.

5    Q.    Why wasn't one done with her?

6    A.    Because she vacated the premises immediately

7    before I returned.

8    Q.    Was there any effort to follow up with her?

9    A.    Not by myself.  Human resources was going to

10   follow up and I guess I heard they were unable to reach

11   her.

12   Q.    Did Ms. Farrell make any internal complaints of

13   discrimination while she was at Glaxo?

14   A.    No.

15   Q.    Did she make any other internal complaints,

16   formal complaints, either to you or to HR?

17   A.    Not that I'm aware of.

18   Q.    Did you ever hear that Ms. Farrell had another

19   job subsequent?  That when she left Glaxo, she had

20   another job?

21   A.    Only -- only through other people, but I have

22   not heard directly.

23   Q.    What did you hear through other people?

24   A.    I heard that she had gone to an agency.

Bernadette A. Mansi                    27

1    and then following that she recommended and put forth a

2    press release on something.  And so he said this doesn't

3    agree with the strategy.

4        Q.    I see.  Did she explain why she did that?

5        A.    I don't recall what the explanation was.

6        Q.    He says that she seems to regularly refer up to

7    senior management.  What is that about?

8        A.    She managed -- she worked essentially toward two

9    senior management and in some cases did not address

10   issues and work requests from other people.  She took

11   care of senior management, essentially.

12       Q.    The vernacular, it was the impression that she

13   was just sucking up?

14       A.    Not sucking up.  That she was bypassing people

15   when she should have been involving people at other

16   levels.

17       Q.    When senior management is referred to, is that

18   management above Mr. Davies and you?

19       A.    Yes.

20       Q.    So is it fair to infer that she wasn't allowing

21   you and Mr. Davies to participate in some things that she

22   was engaged in that you thought she should have?

23       A.    It was more Mr. Davies and other product

24   managers that she wasn't involving.

1    Q.   Also it says she was not actively listening to

2    instructions.  What does that refer to?

3    A.   He would request materials, information, things

4    from her and she would not deliver what he requested or

5    would deliver the wrong information.

6    Q.   Did you receive feedback from other people in

7    order to prepare the PDP?

8    A.   I did.

9    Q.   Was that also produced?

10   A.   No.  It was oral feedback.

11   Q.   What was the feedback that you received orally?

12        First of all, who did you get it from and

13   what was it?

14   A.   People spontaneously provided me with feedback

15   on Marybeth because there were issues related to

16   performance and around the same things:  not listening,

17   aggressive behavior, not -- not having that sense of

18   urgency, those kinds of issues.

19   Q.   When you say "not having that sense of urgency,"

20   can you elaborate on that?

21   A.   Not delivering things when they are requested

22   and without repeated subsequent requests.

23   Q.   Did you prepare the PDP?

24   A.   I did.



1      A.    Yes.

2      Q.    I notice at the top there are dates.  If I put

3    those in chronological order, will that help?

4      A.    They're for two years there, so one batch is for

5    one year.

6              MS. RYAN:   I think you have them in reverse

7    chron. there.

8              MR. SANDLER:   Reverse chron.

9              MS. RYAN:   Most recent first.

10   BY MR. SANDLER:

11     Q.    When we get to the final version and the

12   exchange of views about what should be in it, what were

13   the significant issues that were discussed?

14     A.    On which year?

15     Q.    I'm talking about the first year.  We are going

16   to go chronologically.

17     A.    The first year the issues were related to

18   performance -- I mean -- I'm sorry.  Not performance.

19   Listening, attention to detail, great sensitivity to

20   coworkers to avoid conflict, those were the key.

21   Urgency, I think, was also one for the first year.

22     Q.    Did she agree with those characterizations or

23   did she dispute them?

24     A.    She disputed them and asked for feedback,

Bernadette A. Mansi                    31

1   further feedback as to where they came back.

2       Q.   What was your response to that?

3       A.   There's an e-mail detailing my response and why

4   I wrote what I did.

5       Q.   I notice periodically in the documents that she

6   would send e-mails when she was out of the office saying

7   that she liked to work from home this day or this part of

8   a day.

9            Was there any issue involving that, the

10  fact that she was working from home a lot or saying she

11  was working from home a lot?

12      A.   No, I never had -- my team has a lot of

13  flexibility in terms of working, where they work.  So the

14  only issue is if -- they need to be contactable.

15      Q.   Was she?

16      A.   Not always.

17      Q.   I direct your attention to the January 20th

18  e-mail from her to you.

19      A.   From this year?

20      Q.   Here it is.

21      A.   Yeah.

22      Q.   Why don't you find it in yours?

23      A.   Okay.  Yes.

24      Q.   She sends you an e-mail with a question about a

Bernadette A. Mansi                    32

1    comment, "increased sensitivity to coworkers to avoid

2    conflicts," et cetera.

3               Did you discuss that with her and did she

4    respond?

5        A.    Yes.  That was in the PDP document and I

6    discussed it and put it in writing as to why I did that.

7        Q.    If you go back a couple more, actually it's the

8    same date, January 20th, there's an e-mail from you to

9    her.

10       A.    That's why.

11       Q.    Your response?

12       A.    That was my explanation, yes.

13       Q.    You said you received several unsolicited

14   comments throughout the year from people --

15       A.    Yes, that's correct.

16       Q.    -- saying she wasn't easy to work with?

17       A.    Mm-hmm.

18       Q.    Yes?

19       A.    Yes.

20       Q.    You said that in some cases she wasn't

21   listening; correct?

22       A.    That's correct.

23       Q.    In some cases she didn't respond to repeated

24   requests for information in a timely fashion; is that

Bernadette A. Mansi                    33

1   correct?

2       A.    That's correct.

3       Q.    It looks like your concern was that by her

4   conduct she was communicating to these people that she

5   really didn't care about them or what they were up to?

6       A.    That's correct.

7       Q.    You said you ordinarily would dismiss one or two

8   comments of that nature, but you said you received

9   several from peers as well as subordinates that are

10  consistent?

11      A.    That's correct, yes.

12      Q.    When you say "several," we talked before about

13  somewhere between one a week and one a month?

14      A.    Yeah.

15      Q.    Yes?

16      A.    Frequent.  They were frequent.

17      Q.    Her response, which I think is on the next

18  document, would you say that's a guarded response?

19      A.    Yes.

20      Q.    Did you talk with her anymore about that?

21      A.    I did.

22      Q.    What did she say?

23      A.    She didn't feel that it was justified at first

24  and then she, when I gave her specific examples, felt

W&F

AA223

1    was a meeting specific to the event.

2        Q.    Can you go over what was discussed in that

3    e-mail?

4        A.    There were a number of issues where I had raised

5    with her where she needed to improve performance.    The

6    first was focus on and the impact on efficiencies and

7    productivity.    I used specific examples of press releases

8    that she was responsible for and what had happened with

9    those and what our expectations were going forward.    I

10   reviewed the process for approval.

11               I reviewed the list of reviewers with her,

12   as well, since she had issues with not being clear on

13   that.    I stressed responsibility and the need for her to

14   take responsibility with all these activities since that

15   was part of her job.    Again, I addressed lack of

16   responsiveness to people in their requests.    And those

17   were the key areas.

18       Q.    In connection with the discussion about process,

19   you say that she came up with several excuses, but they

20   weren't consistent.    What are you referring to there?

21       A.    I don't recall what the specifics were of that.

22   I do know that she frequently had excuses for why she

23   didn't do things that didn't necessarily match.

24       Q.    Didn't make sense?



1    A.    No.  And didn't always line up from one time to

2    another.

3    Q.    I see.  So you mean the excuse one time would

4    respond to that one thing, but the next excuse would be

5    inconsistent with the first one?

6    A.    Right.

7    Q.    Under "List of Reviewers," are you saying that

8    she didn't have some knowledge that she should have had?

9    A.    Correct.

10   Q.    You conclude that section by saying "she can't

11   address their questions if she doesn't know their

12   functions or perspective"?

13   A.    Correct.

14   Q.    Under "Responsibility" you make the comment

15   "these activities were her responsibility not ours,"

16   et cetera.  What are you referring to there?

17   A.    She sometimes didn't take accountability for her

18   own responsibilities and felt that it was other people's

19   responsibilities to do things that were in her job

20   description.

21   Q.    Did she give you excuses about that, as well?

22   A.    Correct.

23   Q.    Then you talked about lack of responsiveness as

24   you described?

Bernadette A. Mansi                    39

1    A.    Correct.

2    Q.    There also seems to be some kind of a problem

3  between her and somebody named Monica.  What was that

4  about?

5    A.    Monica is my administrative assistant and she

6  would send repeated requests to Marybeth for information

7  to do something that she had asked -- that Marybeth had

8  asked her to do, and Marybeth repeatedly did not respond

9  to the request for information.  So Monica couldn't do

10  her job.

11    Q.    You say that Marybeth asked for a copy of

12  Monica's job description because Monica is refusing to do

13  things for her and you say "I know this isn't the case."

14    A.    That's correct.

15    Q.    What was that about?

16    A.    I don't recall the specific incident.  I just

17  recall that we had had a discussion about it and Monica

18  had provided me with an example that I gave to Marybeth.

19    Q.    Marybeth also said that she had too many things

20  to do.  Was that accurate?

21    A.    She had -- she had, you know, a busy job.

22    Q.    Was she busier than other people, than her

23  peers?

24    A.    I wouldn't say she was busier than her peers.

Bernadette A. Mansi                                40

```
 1      Q.    Over time, was she actually less busy than her
 2   peers?
 3      A.    No.
 4      Q.    Looking at the next document, which is an e-mail
 5   from Marybeth Farrell to you dated February 18, she's
 6   apologizing for yesterday morning?
 7      A.    I don't recall the specifics.  I believe she
 8   left me a phone message that was kind of hostile.  I
 9   don't recall the specifics.  I just remember that was the
10   situation.
11      Q.    The next document is dated March 10th and then
12   again to you.  She says she "stopped in AP's office and
13   told him I was very sorry I apparently had offended or
14   irritated some team members," et cetera.  What was that
15   about?
16      A.    She was responsible for getting approvals from
17   people.  Sometimes she would take an aggressive approach
18   with them and they didn't understand the -- what she
19   needed -- what she was trying to do in terms of timing.
20   She didn't give people context for why she needed what
21   she did and she got somewhat aggressive, and they were
22   offended by her tone.
23      Q.    Who is A.P.?
24      A.    A.P. is one of the product directors, Arvinder
```



Bernadette A. Mansi                                43

1     Q.    So that e-mail to Mark Schwartz and his response

2   were in connection with your midyear review?

3     A.    Correct.

4     Q.    Did you get similar feedback from other people?

5     A.    Yes, I did.

6     Q.    Was that --

7     A.    Not in writing.

8     Q.    Oral?

9     A.    Oral.

10    Q.    From whom?

11    A.    Again, I would receive unsolicited feedback from

12  other peers of hers and administrative assistants, as

13  well as supervisors.

14    Q.    Look at the next document, which is dated

15  August 1 from Ms. Farrell to Al Gianchetti?

16    A.    Correct.

17    Q.    What is that?

18    A.    When I -- during the PDP discussion when I gave

19  her feedback from several people, she got very upset and

20  said that this was not accurate and that she felt she

21  should give feedback on the people who gave feedback on

22  her.  So she went to my boss and asked if she could give

23  feedback on his direct reports.

24    Q.    Was that an unusual response?

Bernadette A. Mansi                    44

1       A.    Extremely unusual.

2       Q.    How did you regard that?

3       A.    I felt that it would be viewed as retaliatory

4  since they had given feedback on her that was perceived

5  as negative.

6       Q.    Would that have been disruptive to your work

7  force?

8       A.    No.   Just a request.

9       Q.    What was the response to her request?

10       A.    My supervisor thought it was very unusual, but

11  said that she's welcome to give feedback on any of his

12  direct reports at any time.

13       Q.    Is that the next e-mail?

14       A.    No.

15       Q.    Well, the second of it, the bottom of it.

16       A.    I don't think we have the same e-mail.   That's

17  not here.

18            MS. RYAN:   It's the next one.

19       A.    Oh.

20       Q.    Okay.

21       A.    Yes.

22            MR. LaROSA:   Which e-mail are we talking

23  about?

24            MR. SANDLER:   It's an e-mail dated --

W&F

1    Q.    Then you go on and list various other things

2    where she needs to improve; is that correct?

3    A.    Correct.

4    Q.    You say at the end that you told her that

5    basically she's not performing up to expectations for her

6    position?

7    A.    That's correct.

8    Q.    What was her response to that?

9    A.    She became quite agitated and aggressive.

10   Q.    Can you provide any detail about what she said

11   or did?

12   A.    She said that she was an outstanding employee

13   and that she had always delivered the highest quality

14   information and that her work product was excellent and

15   that she totally disagreed with this.  And she tried to

16   say that it was all related to one person and one

17   misunderstanding and wasn't really listening to the

18   bigger picture.

19   Q.    Who did she say it involved?

20   A.    Arvinder P. Singh.

21   Q.    That wasn't correct?

22   A.    I tried to explain to her that I did not include

23   any information in this review that I had not observed

24   myself so that, you know, I wasn't going to just put this

Bernadette A. Mansi                                    49

```
 1    off on other customers.  Customer feedback as well as

 2    things I had observed.

 3        Q.    What was her response to that?

 4        A.    She disagreed.

 5        Q.    Was she, in your view, seeing things

 6    realistically or not?

 7        A.    No.

 8        Q.    She was not?

 9        A.    No.

10        Q.    Look at the August 2nd e-mail to Ms. Farrell

11    from you about, you say, during a recent one on one, do

12    you see where that starts?

13        A.    Correct.

14        Q.    What was that?

15        A.    I had given her feedback that A.P. had given me

16    on her, and she got quite upset over the feedback.  And I

17    told her that she and he needed to come to an

18    understanding of what it was that his expectations were,

19    where she wasn't delivering on those expectation, and try

20    to put together a summary of the areas as I understood

21    them from him as to what areas she needed to work on.

22    And I felt that she needed to negotiate a contract with

23    him as to what would be delivered and what specific areas

24    that he felt she was deficient in.
```

1    thought it was the note to the file.

2        Q.    The second page looks like an e-mail that you

3    sent to her maybe enclosing the PDP?

4        A.    The PDP would be attached to that with my

5    comments.

6        Q.    That's what prompted her e-mail?

7        A.    Correct.  And it's this information here.

8        Q.    Which is in Mansi 2?

9        A.    Correct.

10       Q.    She says she is shocked that you say her

11   performance isn't in line with expectations?

12       A.    Correct.

13       Q.    Were you surprised that she was shocked?

14       A.    Yes, given that we had the face-to-face

15   conversation about it.

16       Q.    She goes on and talks about things that she says

17   are inconsistent with your characterization of her

18   performance; is that correct?

19       A.    What she's saying?

20       Q.    Yes.

21       A.    Do I agree with what she's saying or --

22       Q.    First of all, it looks like she is disputing

23   some of the things that you said; correct?

24       A.    Correct.

Bernadette A. Mansi                    53

1       Q.    Do you agree with those?

2       A.    I don't agree with what she -- no, I don't agree

3    with what she says.

4       Q.    Where is she wrong?

5       A.    I tried to present a very balanced view point on

6    her performance, where she did well and where I felt

7    there were areas for improvement, and she didn't hear the

8    areas for improvement piece accurately.  And that's --

9    that's what I disagree with.

10      Q.    The next document dated August 16th also is a

11   note to the file.  It looks like you prepared that; is

12   that correct?

13      A.    Correct.

14      Q.    Why did you do that?

15      A.    Because I sensed that there were performance

16   issues coming.

17      Q.    What did you do in that document?

18      A.    I recounted the conversation that she and I had

19   and the feedback that she had given me via e-mail and in

20   person.

21      Q.    Did you try to provide a full picture of both

22   what she said as well as what you said?

23      A.    Yes, I did.

24      Q.    And believed?

Bernadette A. Mansi                                55    .

1      A.    So multiple versions of that document had to be

2    generated.

3      Q.    That's the document or the documents that were

4    produced today?

5      A.    Some of them.

6      Q.    In the second paragraph you say that you had

7    already told her some things that she was complaining

8    about, but she didn't seem to take it in, quote.  In the

9    second paragraph.

10     A.    Yes.  She just came and reacted again in person

11   in my office.

12     Q.    The third paragraph, you end it by saying:

13   "That as long as she didn't look inside herself and take

14   some responsibility for her performance, she wasn't going

15   to advance in the company."

16            What are you referring to there?

17     A.    Well, she didn't take any responsibility for any

18   of these comments from any of the customers and any of

19   the feedback, and felt that -- she just kept saying over

20   and over she did an outstanding job and that that was her

21   response.

22            So my feeling was, I said even if you took

23   10 percent of the responsibility to improve, then you

24   could work better with your customers.  But if you don't



1   think that any of what your customers are saying, it's

2   never going to get better. And if you don't have

3   customer relationships, you can't go anywhere.

4       Q.   If you don't think anything that your customers

5   are saying is correct -- you left out something there.

6       A.   No. I'm sorry. If you don't -- if you don't

7   think their feedback about you is correct, if any of the

8   feedback is accurate --

9       Q.   Then you can't improve?

10      A.   -- you can't improve because you need to be able

11  to work with your customers.

12      Q.   You also say in the next paragraph she thought

13  the feedback had a harsh tone?

14      A.   Correct.

15      Q.   Did you agree with that?

16      A.   No. I'm sure that it's not easy to be heard, to

17  be told that you're not performing at expectations.

18      Q.   So the harshness was just because of that?

19      A.   It's the nature of what was being said I think

20  was harsh.

21      Q.   The tone was not harsh?

22      A.   No.

23      Q.   Then in the next paragraph is her insistence

24  that she was doing an excellent job and talking about

Bernadette A. Mansi                                    58

1       Q.    In the next paragraph you say she was relying on

2   others to get the job done.

3       A.    Correct.

4       Q.    What was that about?

5       A.    She didn't -- she didn't take responsibility for

6   getting product knowledge that she needed to do the job

7   responsibly.  And she also would go to other people and

8   ask for them to give her the information and help her.

9   When they helped her, she didn't take the information and

10  use it.  And then when the final product wasn't

11  satisfactory, she tried to blame the people who tried to

12  help her.

13      Q.    You also said that you told her that customers

14  felt she didn't add value to meetings she attended

15  because she didn't have the depth of product knowledge?

16      A.    That's accurate.

17      Q.    You attempted to assure her that this just

18  wasn't coming from one person, but was consistent?

19      A.    Absolutely.

20      Q.    Apparently she asked you if Al thinks that she

21  had performance issues?

22      A.    Correct.

23      Q.    Did he?

24      A.    Yes.

Bernadette A. Mansi

1   that.  And she never understood this piece, despite the

2   fact that she had been there for a while and we had this

3   issue a number of times.

4            And so she kept saying that at AstraZeneca

5   she had people to do this for her and she never had to do

6   this herself, so she didn't think this was part of her

7   job.  But it clearly was part of her job and it had been

8   communicated.

9      Q.   You say in the next paragraph that she said that

10  she had never heard this feedback while working at

11  AstraZeneca?

12     A.   That's correct.

13     Q.   She also said that she worked for the CEO and

14  the board; is that right?

15     A.   That's what she said.  She did work for them

16  versus worked for them.

17     Q.   I'm sorry.  I mischaracterized it.  Yes.

18            She disputed your conclusion that she

19  wasn't organized; is that correct?

20     A.   Correct.

21     Q.   Did you think she was extremely organized as she

22  said?

23     A.   No.

24     Q.   Did you give her examples of why you concluded

Bernadette A. Mansi                    61

1    that she wasn't organized?

2        A.    I did.

3        Q.    What were the examples?

4        A.    About tracking reviewer comments, responding to

5    people's requests for information, IT issues that she

6    had, losing documents, things like that.

7        Q.    You said that the quality of her work wasn't

8    where it should be?

9        A.    Correct.

10       Q.    You gave examples of things that she had put

11   together that were, quote, poorly put together, unquote?

12       A.    Correct.

13       Q.    You also said that you raised the issue of

14   timeliness and she disputed that?

15       A.    Correct.

16       Q.    Tell me about that.

17       A.    I told her about getting timely review of

18   materials and providing timely response to people and

19   providing response to administrative requests for

20   information.  I gave her examples of those things.  She

21   said she felt she was timely.

22       Q.    What was your response?

23       A.    I just said, you know, I'm giving you examples

24   that you're not.

 1      Q.    You said that she frequently doesn't understand

 2   what is being asked of her?

 3      A.    That's correct.

 4      Q.    As a result she repeats requests for materials?

 5      A.    She doesn't repeat requests, but people repeat

 6   their request to her.

 7      Q.    I'm sorry.  Okay.  So people come back to her

 8   and repeatedly ask her for things?

 9      A.    Correct.

10      Q.    She disagreed with that?

11      A.    I don't recall if she specifically disagreed

12   with that.

13      Q.    It says she said this isn't true.

14      A.    Okay.  I guess I said that.

15      Q.    You gave the example of the Gary Davies e-mail?

16      A.    Correct.

17      Q.    The one where he says everybody else understood

18   except she didn't?

19      A.    Correct.

20      Q.    Little bit further down you say that her

21   response was that you were just picking on very small

22   things?

23      A.    That's correct.

24      Q.    Did you agree with that?

1      A.    No.

2      Q.    They weren't very small things?

3      A.    No.  She kept -- she kept thinking it was all

4  linked to one specific incident with A.P., and I kept

5  trying to say this is broader than him, that there's

6  other examples.  And I gave her other examples, but she

7  kept honing in on that one thing.

8      Q.    In that last paragraph you say:  "In the end, I

9  don't feel she was taking in what I was saying"?

10      A.    That's correct.

11      Q.    So she just was in denial?

12      A.    Yes.  She was not accepting it.

13      Q.    What happened after that?

14      A.    Which e-mail are we referring to?

15      Q.    It appears that, looking at the next series of

16  e-mails, the second page, it looks like Marybeth Farrell

17  sent an e-mail to Mr. Davies?

18      A.    Correct.

19      Q.    He responded and then you responded to

20  Mr. Davies?

21      A.    Right.

22      Q.    Tell me about that.

23      A.    She sent an e-mail to him saying that she was,

24  you know, surprised by the PDP comments and she misquoted

Bernadette A. Mansi                64

1  me by saying that I said she always is the person who has

2  problems getting information.  So she was essentially

3  challenging him and said she wanted to know -- wanted him

4  to provide specific examples.

5      Q.    Okay.

6      A.    So then he came back and he said that he felt he

7  had given, you know -- he said that she had improved in

8  certain areas and that perhaps Marybeth's confusion came

9  in because he was referring specifically to problems with

10  getting press releases coordinated with regulatory events

11  and then he gave examples.

12              And then I explained that she misunderstood

13  what I told her and tried to explain what the specifics

14  were.

15      Q.    The next e-mail dated August 17th is from you to

16  Mr. Davies?

17      A.    Yes.

18      Q.    Why did you send that?

19      A.    I believe because we had contacted HR in terms

20  of moving forward with issues related to performance to

21  discuss it with HR.  Since he was her other supervisor, I

22  wanted him to be aware of this.

23      Q.    What is it that you were contemplating doing?

24      A.    Meeting with HR to discuss performance

**W&F**

1    management steps.

2         Q.    What does that mean?

3         A.    Essentially determining whether or not we were

4    going to go to verbal warning, which is the first step in

5    the performance management process.

6         Q.    All right.  Looking at an e-mail dated

7    August 17th that she sent to A.P., what's that about?

8         A.    This is part of this ongoing back and forth

9    between her and A.P. on these issues that they had

10   between them.  And she decided that she felt after

11   further reflection that she made a mistake in essentially

12   asking to give feedback on A.P. to A.P.'s boss.

13        Q.    Who was A.P.'s boss?  Mr. Gianchetti?

14        A.    Yes.

15        Q.    There's a note to file that I guess you

16   prepared --

17        A.    Correct.

18        Q.    -- dated August 17th?

19        A.    That's correct.

20        Q.    Why did you prepare that?

21        A.    Because after making several phone calls to

22   people about the situation, how she wanted another job,

23   how she was upset and things like that, she then decided

24   that having given this more consideration, she wants this

Bernadette A. Mansi                69

1    Q.    Now, you also have a comment about how she

2  conducted herself at meetings.

3    A.    Yes.

4    Q.    Tell me about that.

5    A.    I had received specific feedback from one of the

6  product directors that Marybeth would bring her laptop to

7  his meeting and she would do work for other products

8  during his meeting.  And when he called upon Marybeth to

9  ask her for input on his product, she didn't know what he

10 was talking about.  And so she said, "I'm sorry.  I

11 wasn't listening.  I was working on something else."  And

12 he was quite annoyed by that.

13           And I felt that if you have a listening

14 problem, that you should just focus on the task at hand

15 and not be multitasking.  And that was the point.

16   Q.    Was that something that you only heard once, or

17 was that an ongoing problem, her conduct at meetings?

18   A.    No.  I had heard it more than once and observed

19 it myself.

20   Q.    What did you observe?

21   A.    Her not paying attention to what was going on

22 and trying to multitask.

23   Q.    Did you ever see her filing her nails?

24   A.    No.

**W&F**

**AA243**

1    So I heard about that.

2        Q.    Were you chastised about it?

3        A.    Well, people were surprised that she would be

4    presenting at a meeting and I wouldn't know about it,

5    so...

6        Q.    Was it embarrassing for you?

7        A.    Well, I would prefer not to have had it happen.

8        Q.    What did she say in response?

9        A.    She said that it had all happened very quickly.

10   And I believe she sent an e-mail to that request.  She

11   said that -- she said she was sorry and that A.P. had

12   requested this on the day before and that it had all

13   happened very quickly.

14       Q.    Going to an e-mail to her from you dated

15   August 27th, do you have that?

16       A.    To her from me?

17       Q.    Yes.

18       A.    Yes.

19       Q.    Why did that get generated?

20       A.    We were in the middle of a very -- a very

21   high-profile project that had to be completed in a very

22   tight time frame.  And Marybeth -- this was the day that

23   she came in late and left early and didn't get to the

24   actions that were to be completed and left without

Bernadette A. Mansi                    72

1    telling me where she was going or what the follow-up plan

2    was for these actions.

3                And also there's work issues with materials

4    that had to go to the printer that were not ready and

5    were factually and otherwise incorrect.

6        Q.    Was she having health issues at that time?

7        A.    She had an earache that she left for.

8        Q.    Okay.

9        A.    And that was not the issue.  I would have been

10   happy to take over.  The issue was she just left and

11   called from the cell phone to say:  I'm on my way home

12   and this won't be getting done.

13       Q.    So she sort of left you in the lurch?

14       A.    Yes.

15       Q.    Based on a couple of e-mails that she sent in

16   the next few days, it appeared that she was having

17   difficulty in functioning because she was dizzy; is that

18   right?

19       A.    She had an ear -- earache, which in her e-mails

20   says went to vertigo.

21       Q.    What impact did that have on your ability to get

22   work done?

23       A.    A significant impact.  I had to bring in other

24   people to get this work done.

1  United States, or was he coming specifically for --

2      A.    I believe he may have been there for another

3  purpose.  I'm not sure.

4      Q.    Tell me what happened.

5      A.    Marybeth had been out for a week with the ear

6  problem.  She subsequent to that called in for -- out for

7  another week to say that she had a family -- I'm not sure

8  if it was a family -- she had an emergency that she

9  needed to be out for a week for, and so she was out a

10  whole week.

11              And then I was scheduled to leave for a

12  business trip to Greece and we agreed that on the 16th we

13  would have the meeting.  Marybeth was sent an e-mail

14  invitation to the -- what was called a performance review

15  meeting.  And she came in on the 12th, which is the first

16  time she had been in for two weeks, and that was the day

17  that she sent me the e-mail and resigned.

18      Q.    There is a document which I guess is a final

19  version of the verbal warning?

20      A.    Yes, but Marybeth never received that because we

21  didn't have the meeting.

22      Q.    I understand.  But this sets out the concerns

23  that you had that were going to be communicated in the

24  verbal warning?

1    Mr. Jones that he had been having a conversation with you

2    about --

3         A.    No.   He told Marybeth.

4         Q.    Oh, okay.   Right.   Told Marybeth that he had

5    been having conversations with you about her

6    performance --

7         A.    Correct.

8         Q.    -- and specifically her, quote, judgment?

9    That's what he says?

10        A.    Correct.

11        Q.    What does that refer to, "judgment"?

12        A.    Just judgment issues that -- you know, things

13   that she had done where we didn't feel she exercised the

14   best judgment related to the specific project she was

15   working on.

16        Q.    It also says that she ended the call abruptly?

17        A.    Correct.

18        Q.    What did that mean?

19        A.    She hung up.

20        Q.    She hung up on him?

21        A.    He said she ended it abruptly.   He said she

22   could be conceived the sense that she hung up.

23               MR. SANDLER:   Why don't you mark this as 4?

24               (Mansi Exhibit 4 was marked for

1    identification.)

2    BY MR. SANDLER:

3        Q.    Is that an e-mail you sent to Mr. Kirkpatrick

4    about Ms. Farrell?

5        A.    Correct.  He referred the case to Leon.

6        Q.    You say she's "a good person but she refuses to

7    acknowledge that she has performance issues despite

8    customer feedback and 1:1 meetings on the issue"?

9        A.    Correct.

10       Q.    You say:  "There is a considerable gap between

11   her perception of her performance and that of her

12   customers and myself.  And, she has excuses for all

13   issues raised and refuses to take any responsibility for

14   addressing the issue."

15       A.    Correct.

16       Q.    So would it be fair to say that she ignored

17   unfavorable facts, unfavorable comments?

18       A.    I wouldn't say she ignored them.  I'd say she

19   refused them.

20       Q.    Denied them?

21       A.    In most cases, disagreed with them.

22       Q.    Is it correct that she was involved or

23   responsible for meetings that were run poorly?

24       A.    Correct.

1      Q.   Was she sloppy in her planning?

2      A.   I guess the word I'd use is not thorough.

3      Q.   Did she have trouble working with the customers

4   with whom she was supposed to work?

5      A.   She had interpersonal skills -- interpersonal

6   issues.

7      Q.   Did she have difficulty making decisions?

8      A.   I don't think I observed that.

9      Q.   Was she slow to process things?

10     A.   She didn't always take on board what you were

11  telling her.

12     Q.   Did she have trouble meeting deadlines?

13     A.   Yes.

14     Q.   Did she sort of create a bottleneck as far as

15  getting things done because of her activities?

16     A.   Things that -- some things that she was

17  responsible for did not get done in time -- in a timely

18  fashion.

19     Q.   Did that create problems for others?

20     A.   Yes.

21     Q.   Did she lack depth in her knowledge?

22     A.   Product knowledge?

23     Q.   Yes.

24     A.   Yes.

1       A.    Correct.   That's routine.

2       Q.    So basically everything we talked about today

3   was coaching and counselling or routine performance

4   feedback?

5       A.    Correct.   With the exception of the meeting that

6   I had with HR which initiates the process.

7       Q.    Okay.   And she was never aware of that meeting?

8       A.    No.

9       Q.    Is there anything called a final warning or last

10   chance at GSK or anything like that?

11      A.    Not that I'm aware of.

12              MR. LaROSA:   I have no further questions.

13   BY MR. SANDLER:

14      Q.    Does the fact that Ms. Farrell received a pay

15   increase indicate that her performance was satisfactory?

16      A.    At the time that she received it, she was very

17   new and so that would not have been uncommon to get a pay

18   increase.

19      Q.    No matter what her performance was as long as it

20   wasn't --

21      A.    Wasn't, you know -- most of the performance

22   issues were written off to being new to the job.  It was

23   only after time had passed that we realized that the

24   performance issues continued.

Bernadette A. Mansi                    88

1      Q.    Is that true also of the bonus that she

2   received?

3      A.    The bonus that she received comparable to her

4   peers was not -- I had another direct report doing a

5   similar job.  His IPM was 120.  Marybeth's was 100.  So

6   that was indicative of the performance.

7      Q.    So she received a lower bonus than normal?

8      A.    The minimal bonus.

9      Q.    She received a minimal bonus?

10     A.    I would categorize it as that.

11              MR. SANDLER:  Okay.

12              MR. LaROSA:  Can I just follow up on that?

13   BY MR. LaROSA:

14     Q.    I thought you had told us before that her bonus

15   was based on a 100 percent factor?

16     A.    Correct.

17     Q.    What are the ranges?  I guess somebody can get a

18   120?  What do they range from?

19     A.    It's up to the manager and their manager.  It

20   has to be agreed.  It doesn't go up much beyond like 125,

21   130, whatever.  That's pretty much the ceiling.

22     Q.    130 is about the ceiling?

23     A.    Is what I've observed.  It's very individual

24   within departments.

**W&F**

**AA251**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


MARYBETH FARRELL                    )
                                    )   Civil Action No.
            Plaintiff,              )   04-285 KAJ
                                    )
v.                                  )
                                    )   TRIAL BY JURY OF
ASTRAZENECA PHARMACEUTICALS LP,)        TWELVE DEMANDED
                                    )
            Defendant.              )

            Deposition of JANE K. HELLEN taken
pursuant to notice at the LAW OFFICE of JOHN M.
LaROSA, 2 East 7th Street, Wilmington, Delaware,
beginning at 9:37 a.m. on Tuesday, February 15, 2005,
before Renee A. Meyers, Registered Professional
Reporter and Notary Public.

APPEARANCES:

            JOHN M. LaROSA, ESQ.
            LAW OFFICE OF JOHN M. LaROSA
              2 East 7th Street, Suite 302
              Wilmington, Delaware  19801
              for the Plaintiff,

            SHELDON N. SANDLER, ESQ.
            YOUNG CONAWAY STARGATT & TAYLOR LLP
              1000 West Street, 17th Floor
              Wilmington, Delaware  19899
              for the Defendant.

ALSO PRESENT:  JOHN J. BOGAN, ESQ.




            WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
            (302) 655-0477



WILCOX & FETZER LTD.

AA252

1      Q.   And you are not talking about her blaming

2   others for her responsibilities there?

3      A.   No, I am not.   It was the -- it was -- that

4   particular meeting took place in December.   It was one

5   of the first, if not the first meeting that Marybeth

6   Farrell was responsible for, and this was written

7   prior to the December advisory board meeting.

8      Q.   So these evaluations are written prior to the

9   end of the year?

10     A.   Most of the evaluations are -- the evaluation

11  process begins in the end of the year, October,

12  November.   During that time, the 360 degree feedback

13  is obtained and usually the performance evaluations

14  are completed before the end of the year, before

15  people go out on break or leave.

16     Q.   And when are the evaluations usually shared

17  with the employee?

18     A.   Anywhere from -- anywhere within the first

19  quarter of the year, depending upon the schedule of

20  the deployed manager and the functional manager.   So,

21  for instance, with my direct reports, as well as my

22  own, the evaluations were shared in February and

23  March.

24     Q.   In July of 2003, you told Miss Farrell she

1    would not be promoted to Band V; is that correct?

2      A.    I told Marybeth in April that she would not be

3    promoted until she demonstrated that she could do her

4    job at the current level she was responsible for.

5      Q.    Was that in late April of 2003?

6      A.    No.   That was in early April.   I believe it was

7    April 7th, 14th, somewhere in there.   It was on the

8    same date, again, that we announced Susan Broadway's

9    promotion.

10            MR. SANDLER:   Do you need to take a break

11   or anything?

12            MR. LaROSA:   We can take a break.   Do you

13   want to take five minutes?

14            (Recess taken.)

15            (Hellen Exhibit No. 1 was marked for

16   identification.)

17   BY MR. LaROSA:

18     Q.    Who told Miss Farrell she would not be promoted

19   to a Band V role?   Anyone other than yourself?

20     A.    I believe that Debbie Brangman, her functional

21   manager, had also told her that she would not,

22   although I was not in that meeting.

23     Q.    Do you remember when that was, approximately?

24     A.    I do not.



1    when she was in Sweden in meetings?

2       A.    Yes.

3       Q.    Miss Farrell says that one time there was a

4    meeting in which she was participating, Christy

5    Hedstrom was participating by teleconference?

6       A.    Mm-hmm.

7       Q.    And you started the meeting by saying, quote,

8    "Does everyone have their blanky"?; do you remember

9    such a comment?

10      A.    I don't remember any comment like that.

11      Q.    Did you intend any such comment to be critical

12   of Miss Hedstrom for taking leave?

13              MR. LaROSA:  Objection.

14              MR. SANDLER:  You can answer.

15              THE WITNESS:  ,No.

16   BY MR. SANDLER:

17      Q.    Let me go back to the latter part of 2002 and

18   the early part of 2003.

19              Let me ask you, first of all, when does

20   the 2002 evaluation actually get prepared?

21      A.    We begin the preparation of the performance

22   plans towards the end of the year in the last quarter.

23   Usually, traditionally, it's in October and November

24   and December, and the reason why there is such a

1       A.    Mm-hmm.

2       Q.    And then Patty McDonald, I think you testified

3   before that Patty McDonald had mentioned an instance

4   where, you know, the, quote, take away that the two

5   people had were different.  Is that the e-mail that

6   you were referring to?

7       A.    Yes.  That's the e-mail that I was referring to

8   -- this highlights a couple things.  It highlights

9   that, you know, Susan would say, Okay, I will meet

10  with you and I will take -- and provide copies,

11  provide sequence of events and people that are

12  responsible, and Marybeth went to go and talk to

13  Patty, and Patty was aware of this, as she mentions.

14  Patty reflects that, to date, Jane feels there is a

15  gap in Marybeth's performance, and that Patty said

16  that it's amazing that two people can have the same

17  conversation and get different take aways.

18              In Marybeth's situation, Patty felt, and I

19  agreed, that Marybeth was over her head in her current

20  role on the team and was not self-aware to understand

21  the deficiencies and her limitations, and that we

22  would try and assist her.

23      Q.    In other words, when you say "self-aware," what

24  do you mean?

Jane K. Hellen                                126

1      A.    I mean just understanding what she is competent

2   of doing and not competent at doing.  And if she

3   cannot do the job, ask for help.  And that's what I

4   meant by self-aware of her abilities and limitations.

5      Q.    Final question.  When I showed documents, these

6   documents, documents that had dates on them from

7   before the FMLA leave to Miss Farrell, she

8   acknowledged that, Well, if they were correct -- if

9   the dates were correct, then it does show that there

10   were concerns about her performance before the FMLA

11   leave.

12      A.    Mm-hmm.

13      Q.    But she said that she couldn't believe that

14   those dates were correct; they must have been, you

15   know, backdated or just falsely prepared.

16             Do you know of any of these e-mails or any

17   other e-mails or any other documents in this case that

18   were prepared and backdated or otherwise generated for

19   the purpose of simply creating a record?

20      A.    No.  The e-mail system is such that you can't

21   write an e-mail, send it, and then change the date.

22   They are actual e-mails.  I never changed any dates on

23   any e-mails.  And as I mentioned, I don't even think

24   it's possible to do so.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MARYBETH FARRELL,          )
                           )
    Plaintiff,             )
                           )
    v.                     )  C.A. No. 04-285 KAJ
                           )
ASTRAZENECA                )
PHARMACEUTICALS, L.P.,     )
                           )
    Defendant.             )

          Deposition of DEBORAH J. BRANGMAN taken
pursuant to notice at the Law Office of John M. LaRosa,
2 East 7th Street, Suite 302, Wilmington, Delaware,
beginning at 9:30 a.m., on Thursday, March 24, 2005,
before Kimberly A. Hurley, Registered Merit Reporter and
Notary Public.

APPEARANCES:

        JOHN M. LaROSA, ESQUIRE
        LAW OFFICE OF JOHN M. LaRosa
          2 East 7th Street - Suite 302
          Wilmington, Delaware 19801
          for the Plaintiff

        SHELDON N. SANDLER, ESQUIRE
        YOUNG CONAWAY STARGATT & TAYLOR, LLP
          1000 West Street - 17th Floor
          Wilmington, Delaware 19801
          for the Defendant



1      A.    Yes.

2      Q.    At that point in December 2002 it seemed like

3  she was ready to be promoted to band 5?

4      A.    Uh-huh.

5      Q.    I'm sorry?

6      A.    Yes.

7      Q.    Eventually, in the summer of 2003, Ms. Farrell

8  was told she would not be promoted to band 5; isn't that

9  correct?

10     A.    I don't know when she was told that.

11     Q.    But at some point she was told that?

12     A.    As far as I know, I would say yes.  I don't know

13 that.

14     Q.    You're not sure if she was ever told that?

15     A.    She moved on.  In the summer she didn't report

16 to me.

17     Q.    Isn't it true that you told her she would not be

18 promoted to band 5?

19     A.    To the best -- I don't remember -- are you

20 saying in the summer I told her?

21     Q.    I'm not asking you about the time frame now

22 because you said you're not sure about the time frame.

23     A.    During her review I shared with her that there

24 had been some performance issues since January that I had

1   heard that were expressed to me and that she needed to

2   address those issues.  Then I was moving off, so I didn't

3   have a lot of discussion with her, but she was aware of

4   the performance issues, and I did share that there were

5   some concerns by the brand team which was in March.

6        Q.    This was during the midyear review?

7        A.    This was really the 2002 review, but I took that

8   opportunity to share with her that, while this was 2002,

9   there were concerns about her performance in the first

10  quarter.

11       Q.    When you met with her about the 2002 review, you

12  weren't discussing the band 5 promotion at all?

13       A.    No.  We were talking about just her review.

14       Q.    But isn't it true that later in the year you as

15  a communications director told her she would not be

16  getting the promotion to band 5 because of performance

17  reasons?  Do you recall that?

18       A.    No.  Because once she didn't report to me, I

19  would have no reason -- I don't know why she would bring

20  it up with me even at that point.

21       Q.    I'm not suggesting that she brought it up.  I'm

22  suggesting that you were the one that had to be the

23  messenger to say that "You're not going to be promoted to

24  band 5."  I'm not suggesting it was your decision, but

1    you were the one that had to tell her "You're not going

2    to be getting the band 5 promotion because of performance

3    reasons."

4              Do you recall any kind of conversation like

5    that with her?

6       A.    The conversation I recall was during the last

7    time when I was really her manager, which was this

8    review.

9              MR. SANDLER:  Referring to Exhibit 1.

10              THE WITNESS:  Exhibit 1.  At the end of the

11    meeting I said, "This was a good 2002, but there are some

12    performance issues in 2003."  And I know --

13       Q.    I'm asking you only about --

14              MR. SANDLER:  Can you let her finish?

15              MR. LaROSA:  I want her to answer my

16    question.

17              MR. SANDLER:  She's answering your

18    question.

19              MR. LaROSA:  No.  She's talking about this

20    meeting.  I'm talking about a discussion regarding

21    promotion to band 5.

22    BY MR. LaROSA:

23       Q.    Do you recall any discussions to band 5?

24       A.    I don't recall after that.  I tend to doubt -- I

1    just don't recall it.

2        Q.    You don't recall having any further discussions

3    with her about a promotion to band 5 because eventually

4    you were no longer her manager?

5        A.    Yes.

6        Q.    An action plan is a form of disciplinary action

7    at AstraZeneca; is that correct?

8        A.    Yes.  Well, no.  I think it's a plan to improve

9    your performance.  It's not meant to be discipline.  It's

10   to help you do what you're supposed to do.

11       Q.    Is that the first step that's taken when there's

12   a performance issue?

13       A.    Yes.  Well, sorry, no.  I'm answering too fast.

14   I think the first step is to tell someone verbally that

15   there are issues.  The first step is to verbally discuss

16   that --

17       Q.    In terms of --

18       A.    -- and give people a chance to improve.

19       Q.    In terms of written steps, is that the first

20   written step to put somebody on an action plan?

21       A.    I believe it is.

22       Q.    There are no other types of written

23   documentation that you would do before the action plan?

24       A.    I think you certainly have every -- there's not

1    Q.    Did you also hear from Jane Hellen that she was

2  having concerns about promoting Marybeth?

3    A.    Yes.  We had a face-to-face conversation, I

4  don't remember exactly which, where she said Marybeth

5  wasn't performing the way she had in 2002.  And it was

6  such a dramatic change that she was having concerns in

7  general about her performance and she e-mailed me that

8  she was having concerns about do we promote her based

9  on -- because right now she wasn't performing at a level

10  that she deserved to be promoted.  That was in February.

11  Then she sent me an e-mail saying that -- to that effect.

12    Q.    I think you said you met with Ms. Farrell in

13  March to give her the 2002 evaluation?

14    A.    Uh-huh.

15    Q.    Yes?

16    A.    Yes.

17    Q.    Was there some concern about the fact that the

18  evaluation itself was a good evaluation, not an excellent

19  but a good, but, nevertheless, you didn't have the kinds

20  of concerns that you've just talked about?

21    A.    Yes.  And I looked at it.  I did wrestle with it

22  because -- but the reality is that was the feedback she

23  got for 2002.  This fairly reflected -- this Exhibit 1

24  fairly reflected the feedback that I was given about her

1  performance.

2          So it was fair for her to get this review;

3  however, in January her performance changed and that's

4  why I shared with her at the review -- when it was over,

5  I said, "This is a good review, but there are some

6  performance issues that you need to be aware of and that

7  you're going to have to address."  I did not bring up the

8  promotion during that discussion.

9      Q.    So if Ms. Farrell testified that you never did

10  tell her about performance issues, you would disagree

11  with that?

12      A.    I would disagree with that.

13      Q.    You did tell her during the review --

14      A.    I told her there were definite performance

15  issues.  I don't have exact dates, but I believe I told

16  her before this, as well, that there were performance

17  issues.  I was aware that the brand team had shared their

18  concerns prior to that, as well.  I believe that

19  Brian Martin had told her like "Keep moving, Marybeth.

20  You need to keep this project going."  That he wasn't

21  happy that it wasn't moving forward.

22      Q.    How many things did she have?

23      A.    I'm not aware of the exact number of things.  I

24  know that her workload probably, just from some of the

1    grumblings I heard, was probably a little less than some

2    people.  My understanding was the only thing she had at

3    that point was that ad board.  If you looked at other

4    people's plates, other people had five balls in the air

5    and kind of juggling to keep them all up there.  My

6    understanding from the brand team was that her workload

7    was lighter than other people's.

8        Q.    Who on the brand team --

9        A.    Brian Martin shared that with me.  And he was

10   her deployed manager.  He gave out work assignments.

11       Q.    Was there also a time when Ms. Farrell was asked

12   by Buddy Feld to describe something at a meeting?

13       A.    Yes.

14       Q.    What was that about?

15       A.    This was a meeting, -- we had done a Myers Briggs

16   exercise for the team where you look at personality types

17   and we shared in the first meeting what those personality

18   types mean, and in the second meeting we were looking at

19   what are some of the things that you missed based on your

20   kind of personality type, what are the things you don't

21   see, what are the land mines based on who you are.

22             And Marybeth was clearly not interested in

23   the meeting, not participating, sort of just clearly

24   annoyed to be there.  And at one point Buddy, which is

1   not unusual for anyone to do, asked if she could help

2   just capture some of the thoughts, and she was very

3   hostile towards him.  She wrote down like two things and

4   sort of just threw it away.  She sort of shoved it aside

5   and -- she didn't say anything.  She just didn't do it.

6   And he commented later, "I can't believe she was so

7   hostile."  Everyone sort of saw it.

8            So it's just corporate etiquette.  He

9   wasn't asking her to be the secretary or to just take

10  notes or anything like that.  It was very often in all of

11  these meetings, I did it this week, you're putting notes

12  on the board, capturing for later discussion so that when

13  you come back, you can capture those thoughts and make

14  sure you discuss them later in the day.

15       Q.    Approximately when did this incident occur?

16       A.    It was in February.

17       Q.    2003?

18       A.    2003.  I believe.

19       Q.    You mentioned that Marybeth Farrell called

20  Brian Martin at some point and asked him to be a, quote,

21  character witness?

22       A.    That's what Brian told me, yes.

23       Q.    Was he surprised about that?

24       A.    Yes, he was.  Because he had had so many -- he

1   had apparently had expressed to her that he had concerns

2   about her performance before he moved off and she didn't

3   report to him anymore, and he was aware of all of the

4   issues with the ad board in particular and he was just

5   surprised that she would pick him.

6       Q.    You have seen various e-mail exchanges between

7   you and Jane Hellen and Susan Broadway and others about

8   the concerns with Marybeth Farrell's performance?

9       A.    Yes.

10      Q.    Can you think of any way the dates of those

11  e-mails could have been manipulated in some way?

12      A.    Absolutely not.  They're just printouts of

13  things that were in the computer.  I have no -- I can't

14  even begin to imagine how you would manipulate the dates.

15      Q.    From your recollection, were the dates of the

16  e-mails accurate?

17      A.    Yes.

18                 MR. SANDLER:  I have nothing further.

19                 MR. LaROSA:  I have nothing further.

20                 (Deposition concluded at 10:55 a.m.)

21                 -   -   -   -   -

22

23

24

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MARYBETH FARRELL,                    )
                                     )
                Plaintiff,           )
                                     )
        v.                           )   C.A. No.04-285-KAJ
                                     )
ASTRAZENECA PHARMACEUTICALS, )
LP,                                  )
                                     )
                Defendant.           )

**AFFIDAVIT OF BRIAN MARTIN**

STATE OF DELAWARE              )
                              )   SS:
COUNTY OF NEW CASTLE          )

I, Brian Martin, being duly sworn according to law, depose and say as follows:

1.      I am employed by Defendant AstraZeneca Pharmaceuticals, LP ("AZ").

2.      I make this affidavit based on my own personal knowledge.

3.      From June 2002 until the beginning of April 2003, I was the direct supervisor of

Plaintiff Marybeth Farrell ("Plaintiff").

4.      One of Plaintiff's responsibilities as a PREP Manager was planning and conducting

advisory board meetings. I attended two meetings in late 2002 for which Plaintiff was the

responsible PREP Manager. As her supervisor, I received some negative feedback about

Plaintiff's performance in connection with those meetings. One of the meetings was a Cardiology

Ad Board meeting in Chicago that Jane Hellen, to whom I reported, attended. Ms. Hellen told me

she was not happy with the way that meeting, for which Plaintiff was responsible, was conducted.

5.      On November 25, 2002, I had a discussion with Plaintiff about the advisory board

strategy for 2003. I followed up on the meeting by sending Plaintiff an email message instructing

**AA268**

her to prepare a template or standard operating procedure for advisory board meetings, which has been numbered D1863 in this litigation. A true and correct copy of the email is attached to this affidavit. I instructed Plaintiff to prepare a template that would provide her with step-by-step instructions and timelines for planning and implementing advisory board meetings.

6.    I imposed the template requirement on Plaintiff because of concerns about her not adequately preparing for and conducting advisory board meetings. The areas I described for inclusion in the template were all items in which Plaintiff's performance had been deficient. I was trying to be tactful and I hoped that once Plaintiff developed the template, future advisory board meetings would run smoothly.

7.    I also received complaints from persons who worked with Ms. Farrell that she did not listen carefully and did not understand what was said. Jane Clark, the Cardiology Strategist, told me she had long meetings with Ms. Farrell to inform her of developments and the next day, Ms. Farrell would ask the same questions that Ms. Clark had covered the previous day. Tom Gagnon, the Orthopedic Strategist, and Faye Morin, the Treatment Strategist, made similar complaints.

8.    Ms. Farrell had problems in communicating clearly and in a way that both she and the other party understood. One time, Ms. Farrell blew up at Faye Morin due to a miscommunication by Ms. Farrell. Another time Plaintiff insulted and angered one of AZ's physicians, Sunita Sheth. Dr. Sheth, who was very busy, was asked by Plaintiff at the last minute to speak at an Ad Board, and agreed. Later, Ms. Farrell sent an email criticizing Dr. Sheth for not attending a pre-meeting session. Dr. Sheth was livid, and said she had agreed to help by speaking at the Ad Board but her schedule did not permit her attendance at the pre-meeting session. I had

**AA269**

to apologize to her and cautioned Plaintiff against sending emails of that nature. Plaintiff did not seem to understand why her email caused the reaction that it did.

9.    I had also received complaints that Plaintiff was using excessive emails to communicate with the physicians and her co-workers and vendors. Sometimes she would send copies of emails to people when it was not necessary. Vendors complained that Plaintiff had been sending out confusing and contradictory emails and not responding promptly to questions from them.

10.    By March 2003, discussions were taking place between Jane Hellen, Deborah Brangman and me, among others, about how to deal with Plaintiff's performance deficiencies, including her lack of clear communications, her failure to recall things that she was asked to do, her relying too much on vendors to do things that managers normally did, her failure to direct the vendors properly and her failure to complete tasks assigned to her on time or at all.

_____
Brian Martin

SWORN TO AND SUBSCRIBED before me, a Notary Public for the State and County aforesaid, this ___ day of ~~April,~~ May 2005.

Notary Public:_____

My Commission Expires: __6 - 18 - 06____

NOELLE M. CARR
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires June 18, 2006

**AA270**

From:        Martin, Brian
Sent:        Tuesday, December 03, 2002 2:48 PM
To:          Farrell, Marybeth
Subject:     2003 Advisory Board Template (Standard Operating Procedure)


As per our conversation, in my office on November 25th we have now finalized the area of focus and number of advisory board for 2003. As we all know we need to standardize our processes for operating these types of meetings to ensure that all are of the highest in quality. At this time in our 2003 planning it is very important Marybeth that you deliver this template prior to dealing with any other advisory board issues. This template needs to be complete or near completion before 2003 as a priority. Much of the work involving this template can be completed by your vendor of choice (Discovery or Simpson Healthcare) both have stated they have similar projects completed or on the way for other teams. Among other things, this template will facilitate a better line of communication with internal and external teams. I have attended a couple advisory boards this year and many questions come from these meetings regarding the teams preparation for them, strategy, objectives, agenda etc..These  processes you are creating will answer most of the questions.

As with the rest of the PREP and Promo team you will be paired with a product strategist for each meeting i.e.: ( Tom for Ortho, Jane for Cardio, Faye for VTE etc). Each product strategist will be responsible to provide you with the overall strategy for each meeting, the objectives and assist with the formulation of the agenda. As mentioned above,a lot of the unanswered questions can be thought out and answered in your template. For example, are the biographies of moderators and chairperson enclosed in the participants binder? Have we identified the members of the commercial team who will represent the EXANTA team at the PRA review for advisory boards? At what point should we schedule a PRA review of an Ad board (three weeks, four weeks,five weeks prior to date of program) and what is to be reviewed at this meeting i.e. amenities, agenda, PRA advisory board template ?  What commercial and or medical teams are needed to select chairpersons for the various Ad boards?  Are debrief's scheduled on site or immediately following the meeting back in Wilmington and whom should be present? Should all presenters and moderators receive an on-site copy of both their presentations and the moderators guides in their welcome packets?

Some of the information you will need will come from other team members such as medical or publications and I would like to be the conduit for these communications. If I can help you in this process, please feel free to contact me !

Brian C. Martin
AstraZeneca LP
Brand Promotions Leader
CV  TA  Hemostasis Marketing
*EXANTA*
302-886-2148
302-886-7586 fax

D1863

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MARYBETH FARRELL,                    )
                                      )
                    Plaintiff,        )
                                      )
        v.                            )    C.A. No.04-285-KAJ
                                      )
ASTRAZENECA PHARMACEUTICALS,         )
LP,                                   )
                                      )
                    Defendant.        )

**AFFIDAVIT OF DEBORAH KAUFFMAN**

STATE OF DELAWARE                    )
                                      )    SS:
COUNTY OF NEW CASTLE                 )

I, Deborah Kauffman, being duly sworn according to law, do depose and say as follows:

1.      I am employed by Defendant AstraZeneca Pharmaceuticals, LP ("AZ").

2.      I make this affidavit based on my own personal knowledge.

3.      In 2003, I was working for AZ as a Human Resources Manager. On March 18, 2003, Deborah Brangman contacted me about performance concerns that she and others had involving Plaintiff MaryBeth Farrell ("Plaintiff"). I spoke with Ms. Brangman and Brian Martin in my office about Plaintiff's performance problems shortly thereafter.

4.      Shortly afterwards, on or about April 1, there was a reorganization and Brian Martin, who had been Plaintiff's supervisor on the Exanta team, was transferred to another team, Seroquel and Susan Broadway was promoted to replace him. I continued to monitor the situation, and on April 3, shortly after she was promoted, I spoke to Susan Broadway briefly about the situation, which we both agreed was urgent. On April 4, 2003, I sent an email to Jane Hellen

**AA272**

inquiring about the status of the situation involving Plaintiff. That email, numbered D209 for purposes of this litigation, is attached as Exhibit A.

5.    On April 28 I contacted Susan Broadway, to express concern that no action was occurring in connection with Plaintiff's performance problems. As is my usual practice, I prepared notes regarding my contact with Ms. Broadway. A true and correct copy of my notes is numbered D305 for purposes of this litigation, and is attached to this affidavit as Exhibit B. On the same day, I spoke to Ms. Broadway and learned that Plaintiff had just informed her that she would be out a few weeks for a medical leave. A true and correct copy of my notes from my conversation with Ms. Broadway is numbered D303-304 for purposes of this litigation, and is attached to this affidavit as Exhibit C. Ms. Broadway and I reviewed the issues and decided that any detailed discussion of Plaintiff's performance would have to wait until after Plaintiff's leave ended. Ms. Broadway did not react negatively to the fact that Plaintiff was taking FMLA leave.

6.    On May 8, Plaintiff met with me to review her situation. A true and correct copy of my notes from my conversation with Plaintiff is numbered D379-381 for purposes of this litigation, and is attached to this affidavit as Exhibit D. Plaintiff told me and I noted that Plaintiff "felt her short term objectives were appropriate - what you would give to anyone who would be out on leave or out of the office."

7.    I met with Plaintiff again on August 21 and I reviewed the Action Plan process with Plaintiff thoroughly. A true and correct copy of my notes from my conversation with Plaintiff is numbered D494-497 for purposes of this litigation, and is attached to this affidavit as Exhibit E. Plaintiff, as she often did, misunderstood what I told her and asked the same questions repeatedly.

Deborah Kauffman

**AA273**

SWORN TO AND SUBSCRIBED before me, a Notary Public for the State and County aforesaid, this __2__ day of May, 2005.

Notary Public: _Kimberly Kapp_

My Commission Expires: _June 18, 2007_

KIMBERLY KAPP
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires June 18, 2007

**AA274**

**Kauffman, Deborah**

From:          Kauffman, Deborah
Sent:          Friday, April 04, 2003 9:33 AM
To:            Hellen, Jane
Subject:       ER Issues


Jane,
With the transition of individuals in the BCD role I wanted to touch base with you regarding the employee relations issue
that has been discussed with me in the prep/promo area and gain your perspective. I did talk to Susan about it briefly
yesterday and we both agreed it was an urgent situation and it would be a good idea for you and I to talk about it also.
Thanks for accepting my meeting request on Monday.
Deb Kauffman
Human Resources
AstraZeneca Pharmaceuticals
302-886-4309 office
302-561-4731 cell

Exhibit A

**AA275**

4/28
mtg Susan P
contacted Susan re my concern
that no action was occurring w/
May beth

4/28

Susan - feedback

Uses Ad board template & does not work independently

~~Notices~~

All her work is Ad boards & typical prep duties have been dispersed to other prep members.

Susan showed me numerous examples of "Mary Betts non responsiveness to emails (from Jane Hellena) & lack of understanding and/or following directions

Susan had just had her first staff mtg before I arrived — told all she would be meeting w/ everyone indiv to discuss goals, assignments + work load.

Mary beth just told Susan she would be out a few weeks for a medical. Susan therefore will meet w/ Marybeth at this point only to discuss work. to

be completed /transitioned during her medical leave.

Susan will hold the full discussion until her return.

A detailed discussion will be held regarding May Belt's performance issues & the work she will be assigned & the work she should be assigned.

~~She w~~

If / Since she is unable to accomplish a reduced workload as compared to ~~peers~~ Susan will share what she is not performing + the level she will need to get to

Susan + I will work together to draft / review this for May Belt

Work assignments / perf will also be reviewed w/ other team members

D304

5/8/03

Deb + M.B Farrell.

She wanted to meet up me to touch base on the situation.

She met w/ Jane yesterday feels good about the meeting feels she understant Janes expecatoins & the expectations + scheduling issues she want addressd are resonable

All M.B want is to be treated fairly. I assured her she would be

She feels the issues being addressed w/ her are a profile b/c Brian Martin did not do his part

We both agreed w/ Brian in a new role this should not be an issue + she will have a fresh start.

Exhibit D

D379

**AA279**

She felt she met all of the short term obj. she had been given w/ the exception one was returned 8:00am vs 7:00 deadlines. I told her if the tardeness was an isolated incident I am sure it wasn't an issue.

She felt her short term objectives were appropriate + what you would give to anyone who would be out on leave of out of the office.

I told her she needed to focus on her medical leave now. She said the situation has her being v. emotional this week + she wasn't sure she should be in today. I asked if she was caught up/done + she said yes + she was thinking of leaving early + I encouraged her to do this.

I stressed that it was my understanding that Susan was meeting/ w/ her when

D380

tion to assess work load/objject
~~& that would~~
She agreed Susan was doing this
We reviewed what the HR action plan Pilase
~~She~~
to I told her that it seems
approp from my persp Susan
not provide her w/ new or
revised assignents (the process she
is doing w/ all) until MB
returns from leave. I also remind
M.B another prep person would
be hired + likely be here when
she returned

I inquired about her relationship
w/ Susan how had it been as
a peer. M.B said good ~~some~~
~~reason~~

I told her when she recieves her
assignments/goals upon her next
return w/ she feels they aren't
fair to contact me.

She again said she felt good now
about everything

**AA281**                            **D381**

Notes M.B. Farrell.            8/21/03

cited problems

Vendor at Fays mtg she believes
this is the catalyst for Action
Plan in her opinion
Case study monitor diff of opinion

- asked me to read meo
- She wants the Action plan
  redrafted against Band 4
  position (see her attached list)

  asked if possible I told her
  I had never seen this don but
  yes it was theoretically possible
  to make changes to the action
  plan CMgr mks changes) However
  I cautioned her even if this
  was done it is very possible
  sufficient areas of improvement
  would be needed for band 4 —

  Also cautioned her to ensure she
  has a correct understanding of
  rules of each band - She need
  to talk to Susan + Rachel
  re this

Exhibit E

**AA282**

**D494**

She asked many + repeated questions re the standard perf imp. sequence. I told her it was Action plan → PIP → term. I also stressed an Action Plan had prudently 3 outcomes, end of plan w/ improvement, extension of plan, move to a PIP. Termination could also occur as outlined in plan but usually first three outcomes occur.

I cautioned her all of our employment were employer at will + expl this also cautioned her there are items any employee could get term for at any time whether or not they are on an Action plan or PIP - misconducted.

I went over the 2 area above again + again.

I stressed she needed to take full advantage of her weekly mtg w/ Susan & I to gain a clear

AA283                                    D495

understanding of what success would look like/consist of.

I encouraged her to retain a positive + professional attitude during the process

She asked that a HR person sit in on each of her weekly mtgs w/ Susan b/c she stated Susan told her she was hostile when they last spoke.
I told M.B. HR did not usually sit in for this type of mtg. I also told her M.B. was out for 3 weeks in Sept I would have to give some thought as to who could do this while.

I told her although I would be out of the office there would be someone covering for me. after discussing this a bit further She seemed to relieved my involvement or at least leave it unresolved

D496

for now

She left w/her next action
to meet with Rachel R

She asked if she should send the
memo she should w/ me via
hard copy. I told her that
was her decision

D. Kauffman