LAW OFFICE
OF
JOHN M. LAROSA
TWO EAST 7TH STREET, SUITE 302
WILMINGTON, DELAWARE 19801-3707

PHONE: (302) 888-1290

FAX:    (302) 655-9329

LICENSED IN DE, PA, AND NJ

INTERNET: WWW.LAROSALAW.COM

November 2, 2005,

**VIA CM/ECF AND HAND DELIVERY**
The Honorable Kent A. Jordan
Lock Box 10
United States District Court
District of Delaware
Wilmington, DE 19801

RE:    **Marybeth Farrell v. AstraZeneca Pharmaceuticals, LP**
       **Civil Action No. 04-285 KAJ**
       **Request to Vacate Depositions**

Dear Judge Jordan:

Due to changed circumstances, I request that the court revisit this recent teleconference and that there be a second teleconference because Plaintiff has abandoned her earlier theory.

Defendant requested additional discovery to learn why Plaintiff left GSK and what pension she is making now with her current employer. Reasoning that Defendant has the burden of proof on mitigation, the Court held that such evidence was material and relevant to the issue of mitigation. Farrell v. AstraZeneca Pharmaceuticals, LP, No. 04-285 (KAJ), Telephone Conference Transcript at 8, ll. 5-9 (D.Del. Oct. 19, 2005). Thus, the Court granted Defendant three weeks to take a 30(b)(6) deposition of GSK and to re-depose Plaintiff on the issue of mitigation.

Afterwards, Plaintiff agreed that because she voluntarily left GSK and obtained subsequent employment from an employer without a pension, she is not entitled to seek future pension losses based on her current position which does not have a pension. Rather, because she left GSK for personal reasons, any subsequent lost wages and benefits are attributable to her, and she bears the brunt of that loss.

**AA286**

The Honorable Kent A. Jordan
November 2, 2005,
Page 2

Indeed, "[Pension] benefits may not be available where . . . defendant can prove that the new employer's pension plan would provide plaintiff with approximately the same benefit [s]he lost due to the defendant's discriminatory firing." Blum v. Witco Chemical Corp., 829 F.2d 367, 373 (3d Cir. 1987).

Here during the initial discovery period, Defendant learned that Plaintiff obtained an "equivalent pension" at GSK. Farrell v. AstraZeneca Pharmaceuticals, LP, No. 04-285 (KAJ), Telephone Conference Transcript at 6, l. 2 (D.Del. Oct. 19, 2005). Therefore, Defendant already has the information it needs to prove any offset of future losses.

So at the recent teleconference, defense counsel admitted it was "perfectly content with the situation [prior to Plaintiff's leaving GSK]" because it contends Plaintiff is "way ahead of the game[]" based on the pension she acquired at GSK. Id. at 5, l. 24 to 6, l. 5.

So, in an effort to narrow the issues, Plaintiff offered to stipulate that the mitigation of damages issue would only be based on her wage and pension earnings at GSK and not on her earnings at her current position which does not include a pension, if Defendant would vacate the depositions of GSK and Plaintiff.

In this way, Plaintiff seeks to simplify her case by narrowing the damages and mitigation issues. Thus, the facts that Plaintiff voluntarily left GSK and has a current job that has no pension are no longer relevant and would be taken out of the case.

But defense counsel has refused to agree to these terms and insists on pursuing the depositions which currently are scheduled for Monday, November 7th and Thursday, November 11th.

Accordingly, Plaintiff now requests that the mitigation issue be properly narrowed to exclude evidence of why Plaintiff left GSK and other information from Plaintiff's employment at GSK unrelated to her earnings, and that the depositions be vacated.

The Honorable Kent A. Jordan
November 2, 2005,
Page 3


Very truly yours,

John M. LaRosa

cc:    Clerk, U.S. District Court (via hand delivery)
       Sheldon N. Sandler, Esquire (via fax and U.S. mail)
       Thomas S. Neuberger, Esquire (via hand delivery)
       Ms. Marybeth Farrell (via U.S. mail)

Attorney Files/John's Files/Client/Farrell/Correspondence/Judge Jordan 2

**AA288**

THE CENTER FOR FORENSIC
# ECONOMIC STUDIES

November 18, 2005

Sheldon Sandler, Esquire
Young Conway Stargatt & Taylor
Brandywine Building
1000 West St., 17th Floor
Wilmington, DE 19801

**Re: *Marybeth Farrell v. AstraZeneca***
Our File #: *1752*

Dear Mr. Sandler:

At your request, we have provided our preliminary assessment of the economic loss to Marybeth
Farrell as a result of her separation of employment on January 24, 2004.

## I.    DOCUMENTS REVIEWED

The following documents in the above-captioned matter have been reviewed:

- Deposition Testimony of Marybeth Farrell, dated December 9, 2004, pages 20-21
- Report of Thomas C. Borzilleri, Ph.D., dated January 31, 2005
- AstraZeneca documents, Bates Stamped P547 to P590
- GlaxoSmithKline documents, Bates Stamped P601 to P670
- GlaxoSmithKline Benefits Enrollment Guide, Bates Stamped P593 to P595
- GlaxoSmithKline cash balance pension plan
- GlaxoSmithKline retirement savings plan
- 2003 Tax Return for Marybeth Farrell, Bates Stamped
- 2003 W-2 Wage and Tax Statement for Marybeth Farrell, Bates Stamped P597
- Deposition transcript of Marybeth Farrell - November 10, 2005, excerpted pages.
- Deposition transcript of Bernadette Mansi - November 17, 2005, excerpted pages.

In addition to the foregoing, we have relied upon various professional and governmental
publications as are more fully cited herein.

---

This report has been prepared for the use of counsel in the instant matter. Any other transmission, copy, or utilization of this report or material contained herein is prohibited without the written consent of the Center for Forensic Economic Studies

1608 WALNUT STREET, EIGHTH FLOOR, PHILADELPHIA, PENNSYLVANIA 19103-5407  (215) 546-5600  FAX (215) 732-8158
ONE PENN PLAZA SUITE 3600, 250 WEST 34TH STREET, NEW YORK, NEW YORK 10119-0002  (212) 873-5855
1725 "I" STREET, NW  SUITE 300 WASHINGTON, DC 20006  (202) 530-8808
cfes@cfes.com  OR www.cfes.com

**AA289**

## II. Introduction and Background

Marybeth Farrell was born on June 4, 1959. On February 7, 1994, she was hired by AstraZeneca ("AZ"). On January 24, 2004, her employment with AZ ended. At the time of her separation, she was 44.6 years old.

According to Ms. Farrell's deposition testimony, her annual base pay at the time of her separation from AZ was $94,000. Her testimony also indicates that she received annual bonuses, and that her highest bonus was between $22,000 and $25,000. Ms. Farrell's 2003 W-2 Wage and Tax Statement from AZ reflects gross earnings in the amount of $114,988.

Subsequent to her separation from AZ, Ms. Farrell secured employment with Burson Marsteller on March 1, 2004 as their director of health care practice, earning $165,000 in salary, with the opportunity to receive bonus income. In June of 2004, Ms. Farrell secured employment with GlaxoSmithKline ("GSK") as director of global public relations for cardiovascular, earning $135,000 in salary, with the opportunity to receive bonus income. She received a bonus of $19,261 in March of 2005 and a salary increase to $138,380 effective on April 1, 2005. After leaving GSK in September of 2005, Ms. Farrell secured employment with the public relations firm Dorland Global Health Communications with a salary of $140,000 with potential bonuses of up to 50% of salary.

## III. Analysis of Economic Loss

We have examined the benefits and compensation documents provided to us in the instant matter, as well as the testimony of the plaintiff. Based upon this information, we make the following observations with respect to Ms. Farrell's alleged economic loss:

1. The value of Ms. Farrell's compensation at any of the three jobs she held since leaving AZ equals or exceeds that which she was receiving from AZ. Therefore, as a result of her separation from AZ, Ms. Farrell's potential lifetime earnings have increased considerably.

2. Any pension loss that Ms. Farrell may have incurred as a result of her separation from AZ are of a significantly lower order of magnitude than her earnings gains. According to AZ documents, Ms. Farrell's *calculated* deferred pension benefit starting in 2024 will be $1,179.73 per month. An *estimate* by the AZ benefits administrator assuming, among other things, that had Ms. Farrell remained employed to normal retirement in 2024, her pension benefit would have been $91,300 per year. Based on these two figures an annual difference of $77,143 in 2024 dollars can be imputed. In current dollars (discounted to present value using a rate of 4.75%), the difference is $31,943. Ms. Farrell's compensation at Burson Marsteller was at least $50,000 more than her salary and bonus from AZ.

Ms. Farrell's bonuses from AZ were about 22% of salary. Assuming similar bonuses from GSK[1], her cash compensation at GSK becomes commensurate with her compensation at Burson Marsteller. As noted earlier, Ms. Farrell recently changed employers. Her compensation potential (including bonus) at Dorland Global is $210,000 — well in excess of her compensation at AZ.

3.  As an employee at GSK, Ms. Farrell participated in both the cash balance pension plan and the retirement savings plan. The cash balance plan is funded by GSK at 5% of earned income plus interest credits based on long term treasury bonds. The retirement savings plan includes a 100% employer match to contributions up to 4% of compensation plus a 2% contribution to the stock ownership account regardless of employee contributions. The retirement savings plan contributions are invested in any of 26 portfolios.

4.  The average yield on ten year treasuries over the last ten years was 5.42%. This rate was used to calculate interest on both pension plans as well as present value on the annuity calculations. Assuming 4% growth in GSK compensation, these plans would fund an annuity of $79,606 starting in the year 2024 to Ms. Farrell's statistical life expectancy in the year 2041. As noted earlier, the claimed AZ pension loss in 2024 dollars is $77,143. Therefore, it must be concluded that the GSK pension is at least equivalent to the AZ plan. These calculations are detailed in Table One.

5.  We have not reviewed any benefit documents from Dorland Global. Ms. Farrell indicated in deposition that there is a 401(k) retirement savings plan and a pension plan. Given her cash compensation, it is likely that the Dorland benefits package is comparable to those at GSK. Even if it is determined that the Dorland retirement/pension benefits are not commensurate to those at GSK, this potential diminution is not attributable to AZ as her separation from GSK was unrelated to her separation from AZ.

6.  The results of our analyses clearly indicate that Ms. Farrell has not incurred any economic loss as a result of her employment separation from AZ.

---

[1] After less than a year of employment, Ms. Farrell received a bonus from GSK in March of 2005 of $19,261. Annualized, this bonus exceeds her historical bonuses from AZ as a percentage of salary.

## IV.    CRITIQUE OF THE REPORT OF THOMAS C. BORZILLERI, PH.D.

We reviewed the report of Thomas C. Borzilleri, Ph.D. in the instant matter. In his report, Dr. Borzilleri calculates the present value of the difference between Ms. Farrell's post-separation AZ pension benefit, and the pension she would have received had she remained employed with AZ for another 20 years, until her retirement in 2024.[2]

It is important to note that there are a number of assumptions implicit in Dr. Borzilleri's calculations not the least of which is that Ms. Farrell would have remained employed by AZ (but for the separation in 2004) for an additional 20 years. Just as important, Dr. Borzilleri assumes that from the date of separation until retirement in 2024, Ms. Farrell, despite a six figure salary, will never accrue pension benefits from post-separation employment.

It is instructive to make a distinction between Dr. Borzilleri's pension calculations, as described above, and an analysis of economic loss, which would include a calculation of pension loss. If Dr. Borzilleri had wanted to calculate an economic loss of pension benefits, he would have had to consider the value of Ms. Farrell's (GSK) pension benefits as an offset to the computed AZ pension differential, which he does not.

Either the Plaintiff did not inform Dr. Borzilleri regarding the details of the GSK pension plans or he chose to ignore them. In fact, Ms. Farrell's mitigating income is not mentioned in his report at all. In either case, the Borzilleri report is incomplete and is not probative relative to alleged damages and the calculations presented in his report should not be interpreted as a measure of economic loss in any respect.

---

[2] As noted earlier, the estimate of pension benefit at normal retirement was an estimate from the AZ benefits administrator based on a number of assumptions not articulated or tested in any way by the Borzilleri report.

## V.    CONCLUSION

Ms. Farrell has not experienced an economic loss as a result of her separation from AZ. On the contrary, any analysis of economic loss would reach the conclusion that Ms. Farrell is better off with her current GSK compensation package than she would have been had she remained employed with AZ.

Sincerely,

The Center for Forensic Economic Studies

Jerome M. Staller, Ph.D.
President

Brian P. Sullivan, Ph.D.
Vice President

Pia DiGirolamo
Economist

BPS/PD/dra

| TABLE ONE -- Marybeth Farrell GSK Pension Valuation | | | | | | | |
|---|---|---|---|---|---|---|---|
| Year | Age | Base Salary | Bonus | Total Comp | 6% RSP Contribs | 5.42% ROI | 5% CBPP Contribs | 5.42% ROI |
| 2004 | 45 | 78,750 | 17,561 | 96,311 | 5,779 | 16,607 | 4,816 | 13,839 |
| 2005 | 46 | 138,150 | 30,807 | 168,957 | 10,137 | 27,635 | 8,448 | 23,030 |
| 2006 | 47 | 143,676 | 32,040 | 175,716 | 10,543 | 27,263 | 8,786 | 22,719 |
| 2007 | 48 | 149,423 | 33,321 | 182,744 | 10,965 | 26,896 | 9,137 | 22,413 |
| 2008 | 49 | 155,400 | 34,654 | 190,054 | 11,403 | 26,534 | 9,503 | 22,111 |
| 2009 | 50 | 161,616 | 36,040 | 197,656 | 11,859 | 26,176 | 9,883 | 21,814 |
| 2010 | 51 | 168,081 | 37,482 | 205,563 | 12,334 | 25,824 | 10,278 | 21,520 |
| 2011 | 52 | 174,804 | 38,981 | 213,785 | 12,827 | 25,476 | 10,689 | 21,230 |
| 2012 | 53 | 181,796 | 40,541 | 222,336 | 13,340 | 25,133 | 11,117 | 20,944 |
| 2013 | 54 | 189,068 | 42,162 | 231,230 | 13,874 | 24,794 | 11,561 | 20,662 |
| 2014 | 55 | 196,631 | 43,849 | 240,479 | 14,429 | 24,460 | 12,024 | 20,383 |
| 2015 | 56 | 204,496 | 45,603 | 250,098 | 15,006 | 24,131 | 12,505 | 20,109 |
| 2016 | 57 | 212,676 | 47,427 | 260,102 | 15,606 | 23,806 | 13,005 | 19,838 |
| 2017 | 58 | 221,183 | 49,324 | 270,506 | 16,230 | 23,485 | 13,525 | 19,571 |
| 2018 | 59 | 230,030 | 51,297 | 281,327 | 16,880 | 23,169 | 14,066 | 19,307 |
| 2019 | 60 | 239,231 | 53,349 | 292,580 | 17,555 | 22,857 | 14,629 | 19,047 |
| 2020 | 61 | 248,800 | 55,482 | 304,283 | 18,257 | 22,549 | 15,214 | 18,791 |
| 2021 | 62 | 258,752 | 57,702 | 316,454 | 18,987 | 22,245 | 15,823 | 18,537 |
| 2022 | 63 | 269,102 | 60,010 | 329,112 | 19,747 | 21,945 | 16,456 | 18,288 |
| 2023 | 64 | 279,867 | 62,410 | 342,277 | 20,537 | 21,650 | 17,114 | 18,041 |
| 2024 | 65 | 118,510 | 26,428 | 144,938 | 8,696 | 8,696 | 7,247 | 7,247 |
| | | | | TOTAL | | 491,329 | | 409,441 |
| | | | Annuity in 2024 dollars | | | $43,421.60 | | $36,184.67 |
| | | | | | | TOTAL ANNUITY | | $79,606.28 |

# DORLAND Salaried Employees Benefits Synopsis
Refer to insurance brochures and the Dorland employee handbook for more details.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## HEALTH INSURANCE
Dorland pays for employees basic medical and dental coverage from first day of employment. Employee can choose to buy-up medical and/or dental plans and pay the cost difference through pre-tax payroll deductions.

## MEDICAL

| AETNA | BASIC | QPOS Option | |
| --- | --- | --- | --- |
| www.AETNA.com | | In Network | Out of Network |
| Deductible | -- | N/A | $200/$600 |
| Coinsurance | -- | N/A | 80% |
| Annual Out-of-Pocket Max | N/A | N/A | $1000/$3000 |
| Maximum Lifetime Benefit | N/A | N/A | $1,000,000 |
| Primary Care copay | $10 /visit | $10 /visit | 80% |
| Specialist Care copay | $15 /visit | $15 /visit | 80% |
| Inpatient Hospital Serv | $0 copay | $0 copay | 80% |
| Outpatient Surgery | $0 copay | $0 copay | 80% |
| Emergency Room copay | $50 | $50 | $50 |
| Prescriptions copay * | $10/$20 g/b | $10/$20 g/b | |
| Mental Health Inpatient | No copay 35 days | No copay 35 days | 80% after ded. 30 days |
| Mental Health Outpatient | $25 copay/visit 20 visits | $25 copay/visit 20 visits | 50% after ded 60 visits |
| Routine Eye Exam copay | $15 | $15 | Not covered |
| Chiropractic Care copay | $15,1-20 Visits | $15,1-20 Visits | 80% |
| Pediatric Prev. Dental Exam | $5 copay | $5 copay | Not covered |
| Rx Lens Reimbursement | $35 every 24 months | | |

*includes diabetic supplies and contraceptive ride. Mail order with scripts 31+days.

## DENTAL

| AETNA | BASIC | PPO Option | |
| --- | --- | --- | --- |
| | | In Network | Out of Network |
| Deductible for II & III* | N/A | $50 | $100 |
| Max Annual Benefit | | $2,000 | $1,500 |
| I: Preventive Serv. ** | $2 copay | 100% | 80% |
| II: Restorative Serv. | At Aetna discounted rates | 80% | 70% |
| III. Major Serv. | | 50% | 40% |
| IV. Orthodontic Serv. | | $1000;50% | $750;50% |

* 3-month carryover    **2x each calendar year

## 401k DEFERRED SAVINGS PLAN
The Dorland qualified 401k plan allows employees to contribute a portion of their pay pre-tax. Salaried employees become eligible to participate immediately from the first day of employment. Employees contribute in whole percentages from 1% to a maximum of 15% of their salary. Maximum yearly contribution for year 2005 is $14,000.00 (IRS). No employee may contribute more than the federal limit. Beginning the 1st month following 90 day probationary period, Dorland will make matching contributions of $0.50 for each dollar of the first 5% of eligible pay an employee contributes.

Employees are 100% vested in their contributions and investment earnings. As for employer contributions, vesting begins at 20% on the employees' first-year anniversary, increasing in 20% increments until the fifth year of employment (100%).

New employees can rollover their funds from their previous qualified program into the Dorland investment program at any time.

## DISABILITY PROGRAMS -- Fully paid by Dorland which means that benefits received are taxable.
Short-Term Disability (STD) — Dorland self-insures this benefit which covers thirteen weeks' leave. Percentage of pay is based on length of service. Benefits continue during STD. Includes maternity leave. Refer to the employee handbook for more details.
Long-Term Disability Insurance (LTD) — Dorland pays 100% of the cost of LTD insurance. This coverage begins with the fourteenth week (which follows after STD) when necessary.

## LIFE and AD&D INSURANCE
Dorland pays 100% of the cost for life and accidental death and dismemberment insurance in the amount of two times your base salary, to a maximum coverage of $500,000.

## NEW EMPLOYEE FINDER'S FEE
$1500 will be awarded for a referral leading to the hire of a salaried full-time employee.

## AMERICAN EXPRESS CORPORATE CARD
Those employees who travel are eligible to enroll in the AMEX Corp Card program. AMEX bases eligibility on employees credit history. Billing is directly to employee's home address. Employees must complete Dorland expense reports to be reimbursed.

Travelers have $350,000 business travel insurance and $100,000 personal travel insurance.

## PAYROLL
Employees are paid semi-monthly (i.e., the last working day on or before the fifteenth, and the last working day of the month). Direct deposit to your checking, savings, or investment accounts is available upon employment. Non-exempt employees are eligible for overtime.

## PROFESSIONAL DEVELOPMENT
Requests are to be made in writing prior to signing up for a course. Each participant must sign the Training Expense Reimbursement Agreement. Refer to Handbook for conditions of reimbursement.

## BENEFIT TIME
Carryover time is not allowed. Vacation and personal time is prorated your first year.
**Vacation** — Two weeks vacation the first year of employment and three weeks after completing five years of service. Four weeks vacation after completing ten years of service.
**Personal** — Three days each year.
**Illness** — Five days each year.

## HOLIDAYS
Nine 1/2 are scheduled each year. Refer to the yearly schedule.

## DEATH IN THE FAMILY
If a death in your immediate family or household occurs, a period of up to three days may be granted with pay.

## COBRA -- federal regulated
Provides for continuation coverage to those who might otherwise lose coverage because of certain qualifying events.

## FAMILY MEDICAL LEAVE ACT ~ federal regulated
The FMLA leave gives eligible employees the right to take unpaid leave (or paid leave under certain circumstances) for a period of up to 12 work weeks in any 12-month period for any of 4 specified reasons.

over

**AA295**

**LifeBalance 800-854-1446**
A comprehensive employee assistance program (EAP), through the Unum
Insurance/A.A.A.A., that offers assessment, counseling and referral services for a
wide range of personal, family and work-related issues.

**FSA, Transit and Aflac Supplemental Insurance Programs —**
Employees are eligible to enroll after the 90 day probationary period. Five
Supplement Insurance programs are currently available. FSA accounts include
Unreimbursed Medical, Dependent Care and Transit programs.

**In-House Fitness Programs – Philadelphia**
There are 4 programs an employee can choose from: Sculpt & Tone,
Abs Workout, Yoga and Pilates. Each program runs for 12 weeks
and is fully paid for by the employee. Cost is different for each
program.

04/04

over

**AA296**



## DORLAND CORPORATION
### PROFIT SHARING/TAX-DEFERRED SAVINGS PLAN
### HIGHLIGHTS OF PLAN FEATURES

### ELIGIBILITY AND ENTRY

You are immediately eligible to join the 401(k) portion of the plan.

You will be eligible for the match and profit sharing portion of the plan if you:

- have obtained age 18
- have completed three months of service

Once you meet the eligibility requirements, you will enter the plan on the first day of the following month.

### EMPLOYEE 401(K) CONTRIBUTIONS

Your taxable income is reduced by the amount you contribute to the Plan. This lets you reduce your current income taxes. Your total contributions in 2005 may not be more than $14,000. Your maximum contribution percentage and/or dollar amount may also be limited by IRS regulations.

If you are age 50 or older, then you may elect to defer additional amounts to the plan. The maximum "catch-up contribution" that you can make in 2005 is $4,000.

### EMPLOYEE 401(K) CONTRIBUTIONS – CHANGES

You may stop making contributions as of the first day of any month. You may change your level of contribution twice each Plan Year at any time.

### EMPLOYER CONTRIBUTIONS

The Employer will match 50% of eligible contributions made to the Plan. Eligible contributions are those not exceeding 5% of your eligible compensation. You must be employed by the Employer on the last day of the Plan Year in order to receive a matching contribution.

The Employer has the option to make Profit Sharing contributions to the Plan. If a Profit Sharing contribution is made, it will be allocated to all eligible employees employed by the Employer on the last day of the Plan Year.

### VESTING

You are always 100% vested in your Employee 401(k) contributions. The vesting schedule does not apply to these contributions.

You are vested in Employer contributions based on years of service as shown below:

| Years of service | Less Than 1 | 1 | 2 | 3 | 4 | 5 or more |
|---|---|---|---|---|---|---|
| Vesting Percentage | 0% | 20% | 40% | 60% | 80% | 100% |

### INVESTMENTS

You may invest your contributions and Employer contributions in any or all of the investment funds listed in the brochure titled "Your Investment Options".

Personalized investment advice is available through Morningstar® Advice Online(SM). For more information, refer to the brochure titled "Get Investment Advice," or logon to your Internet SAM account.

### INVESTMENT ELECTION CHANGES/TRANSFERS

You may change your investment elections and/or transfer between the investment funds at any time. Changes can be made by:

- Completing a Participant Investment Election Change form;
- Logging on to the web site at www.AAAAbenefits.com.

### DISTRIBUTION OPTIONS FROM THE PLAN

The normal times to access your accounts are termination of employment, age 59½, retirement, death or disability. Distributions generally may be rolled over to an IRA or another qualified plan.

The Plan provides for you to be able to access your accounts if you incur a financial hardship. See the Summary Plan Description for details.

### LOANS

Loans are available to plan participants. See the Summary Plan Description for Loan details.

### ROLLOVERS

The Plan accepts rollovers (distributions) from other qualified employer Plans and Rollover IRA's. Roth or Education IRA's cannot be rolled into this Plan.

*24The above is a brief review of certain plan features. It is not complete. It is not important that you read the Summary Plan Description.*
*It is also important that you read the "Your Investment Options" brochure and the investment fund prospectuses before making your investment decisions.*

# SUMMARY OF MATERIAL MODIFICATIONS

### for the

## Dorland Corporation Profit Sharing/Tax-Deferred Savings Plan

March 9, 2005

(1)     *General.* This is a Summary of Material Modifications regarding the Dorland Corporation Profit Sharing/ Tax-Deferred Savings Plan ("Plan"). This Summary of Material Modifications supplements the Summary Plan Description ("SPD") previously provided to you. You should retain this document with your copy of the SPD.

(2)     *Employer Information.* The legal name, address and Federal employer identification number of the Employer are:

Dorland Corporation                    EIN:  22-1929687

One South Broad, 11th Floor

Philadephia, PA  19107

(3)     *Summary Description of Modification.* The Employer has amended the Plan, effective with respect to distribution made on or after March 28, 2005, in the following respect:

**Involuntary cash-out threshold.** The Plan provides that if you terminate employment and your vested interest in the Plan [excluding amounts attributable to any rollovers you made into the Plan] does not exceed $5,000, then a lump sum distribution will be made to you as soon as administratively practicable following your termination of employment. The Employer has lowered this dollar threshold from $5,000 to $1,000 [in addition, rollover contributions (and earnings thereon) will now be taken into account in determining whether the $1,000 threshold has been exceeded]. You may elect whether to receive the distribution or to roll over the distribution to another retirement plan such as an individual retirement account ("IRA"). At the time of your termination of employment, the Plan Administrator will provide you with further information regarding your distribution rights.

**AA298**

**DORLAND CORPORATION
PROFIT SHARING/TAX-DEFERRED SAVINGS PLAN**

SUMMARY PLAN DESCRIPTION

**AA299**

# TABLE OF CONTENTS

## INTRODUCTION TO YOUR PLAN

## ARTICLE I
## PARTICIPATION IN THE PLAN

Am I eligible to participate in the Plan? ......................................................................... 1

When am I eligible to participate in the Plan? ................................................................. 2

When is my Entry Date? ..................................................................................................... 2

Does all my service with the Employer count for purposes of plan eligibility? ............. 2

What happens if I'm a participant, terminate employment and then I'm rehired? ......... 3

## ARTICLE II
## CONTRIBUTIONS

What kind of Plan is this? .................................................................................................. 3

Do I have to contribute money to the Plan in order to participate? ............................... 3

How much may I contribute to the Plan? ......................................................................... 4

How often can I modify the amount I contribute? ........................................................... 5

Will the Employer contribute to the Plan? ...................................................................... 5

What is the Employer matching contribution? ................................................................. 5

What is the Qualified Non-Elective Contribution and how is it allocated? .................... 6

What is the Employer discretionary profit sharing contribution? .................................. 6

How will the Employer discretionary profit sharing contribution be allocated to my
account? .............................................................................................................................. 6

What compensation is used to determine my Plan benefits? .......................................... 7

Is there a limit on the amount of compensation which can be considered? ................... 7

Are there limits on how much can be contributed to my account each year? ................ 7

May I "rollover" payments from other retirement plans or IRAs? ................................ 8

How is the money in the Plan invested? ........................................................................... 8

## ARTICLE III
## RETIREMENT BENEFITS

What benefits will I receive at normal retirement? ......................................................... 9

What happens if I leave the Employer's workforce before I retire? .............................. 9

What is my vested interest in my accounts? .................................................................... 9

How do I determine my Periods of Service for vesting purposes? ............................... 10

**AA300**

Does all my service count for vesting purposes? .......................................................... 10

As a veteran, will my military service count as service with the Employer? ............... 10

What happens to my non-vested account balance if I'm rehired? ............................... 10

What happens to the non-vested portion of a terminated participant's account? ................... 11

## ARTICLE IV
## DISABILITY BENEFITS

How is disability defined? ............................................................................................. 11

What happens if I become disabled? ............................................................................ 11

## ARTICLE V
## FORM OF BENEFIT PAYMENT

How will my benefits be paid? ...................................................................................... 12

May I delay the receipt of benefits? ............................................................................. 12

## ARTICLE VI
## DEATH BENEFITS

What happens if I die while working for the Employer? ............................................. 12

Who is the beneficiary of my death benefit? ............................................................... 13

How will the death benefit be paid to my beneficiary? .............................................. 13

When must the last payment be made to my beneficiary? ......................................... 13

What happens if I'm a participant, terminate employment and die before receiving all

my benefits? ..................................................................................................................... 14

## ARTICLE VII
## IN-SERVICE DISTRIBUTIONS

Can I withdraw money from my account while working? ........................................... 14

Can I withdraw money from my account in the event of financial hardship? ........... 14

What conditions must I satisfy to receive a hardship distribution? .......................... 15

## ARTICLE VIII
## TAX TREATMENT OF DISTRIBUTIONS

What are my tax consequences when I receive a distribution from the Plan? ............ 15

Can I reduce or defer tax on my distribution? ............................................................ 16

**AA301**

ARTICLE IX
HOURS OF SERVICE

What is an Hour of Service? ........................................................................................ 16

How are Hours of Service credited? ............................................................................ 17

ARTICLE X
LOANS

May I borrow money from the Plan? ............................................................................ 17

What are the loan rules and requirements? ................................................................ 17

ARTICLE XI
YOUR PLAN'S "TOP HEAVY RULES"

What is a "top heavy plan"? ........................................................................................ 18

What happens if the Plan becomes "top heavy"? ...................................................... 19

ARTICLE XII
PROTECTED BENEFITS AND CLAIMS PROCEDURES

Is my benefit protected? .............................................................................................. 19

Are there any exceptions to the general rule? ............................................................ 19

Can the Plan be amended? .......................................................................................... 19

What happens if the Plan is discontinued or terminated? ........................................ 20

How do I submit a claim for Plan benefits? ................................................................ 20

What if my benefits are denied? .................................................................................. 20

What is the Claims Review Procedure? ...................................................................... 21

What are my rights as a Plan participant? .................................................................. 23

What can I do if I have questions or my rights are violated? .................................... 25

ARTICLE XIII
GENERAL INFORMATION ABOUT THE PLAN

General Plan Information .............................................................................................. 25

Employer Information .................................................................................................... 26

Administrator Information .............................................................................................. 26

Trustee Information ...................................................................................................... 26

**AA302**

DORLAND CORPORATION
PROFIT SHARING/TAX-DEFERRED SAVINGS PLAN

SUMMARY PLAN DESCRIPTION

INTRODUCTION TO YOUR PLAN

Dorland Corporation Profit Sharing/Tax-Deferred Savings Plan ("Plan") has been adopted to provide you with the opportunity to save for retirement on a tax-deferred basis. This Summary Plan Description ("SPD") contains valuable information regarding when you may become eligible to participate in the Plan, your Plan benefits, your distribution options, and many other features of the Plan. You should take the time to read this SPD to get a better understanding of your rights and obligations in the Plan.

We have attempted to answer most of the questions you may have regarding your benefits in the Plan. If this SPD does not answer all of your questions, please contact the Administrator (or other plan representative). The name and address of the Administrator can be found in the Article of this SPD entitled "GENERAL INFORMATION ABOUT THE PLAN."

This SPD describes the Plan's benefits and obligations as contained in the legal Plan document, which governs the operation of the Plan. The Plan document is written in much more technical and precise language. If the non-technical language in this SPD and the technical, legal language of the Plan document conflict, the Plan document always governs. If you wish to receive a copy of the legal Plan document, please contact the Administrator.

This SPD describes the current provisions of the Plan which are designed to comply with applicable legal requirements. The Plan is subject to federal laws, such as ERISA (the Employee Retirement Income Security Act), the Internal Revenue Code and other federal and state laws which may affect your rights. The provisions of the Plan are subject to revision due to a change in laws or due to pronouncements by the Internal Revenue Service (IRS) or Department of Labor (DOL). We may also amend or terminate this Plan. If the provisions of the Plan that are described in this SPD change, we will notify you.

ARTICLE I
PARTICIPATION IN THE PLAN

**Am I eligible to participate in the Plan?**

Provided you are not an Excluded Employee, you are eligible to participate in the Plan once you satisfy the Plan's eligibility conditions described in the next question. Then, you may elect to have your compensation reduced by a specific percentage or dollar amount, and have that amount contributed to the Plan as a salary deferral contribution. You may also be entitled to receive contributions from us.

If you are a member of a class of employees identified below, you are an Excluded Employee for purposes of the Plan. The Excluded Employees are:

- leased employees.

1

**AA303**

- Any Employee compensated on an hourly basis, any individual who is covered by an independent contractor agreement with the Employer..

**When am I eligible to participate in the Plan?**

Provided you are not an Excluded Employee, you are eligible to participate in the Plan once you satisfy the Plan's eligibility conditions described in this section. Then, you may elect to have your compensation reduced by a specific percentage or dollar amount, and have that amount contributed to the Plan as a salary deferral contribution. You may also be entitled to receive contributions from us.

For salary reduction contributions, you will be eligible to participate in the Plan if you have completed One (1) Hour of Service and have also attained age 18.

For matching and discretionary profit sharing contributions, you will be eligible to participate in the Plan if you three (3) months and have also attained age 18.

You will have completed a Year of Service if, at the end of your first twelve consecutive months of employment with us, you have been credited with at least One (1) Hours of Service. If you have not been credited with One (1) Hours of Service by the end of your first twelve consecutive months of employment, you will have completed a Year of Service at the end of any following Plan Year during which you were credited with One (1) Hours of Service.

**When is my Entry Date?**

Provided you are not an Excluded Employee, you may begin participating under the Plan once you have satisfied the eligibility requirements and reached your "Entry Date." The following describes the specific Entry Date that applies under the Plan. In addition, special rules may apply if you terminate employment and are then rehired. If you have questions about the timing of your Plan participation, please contact the Administrator.

For salary reduction contributions, you can join the Plan on the day you meet the eligibility requirements.

For matching and discretionary profit sharing contributions, your Entry Date will be the first day of the month coinciding with or next following the date you satisfy the eligibility requirements.

**Does all my service with the Employer count for purposes of plan eligibility?**

In determining whether you satisfy the minimum service requirements to participate under the Plan, all service you perform for us will generally be counted. However there are some exceptions to this general rule.

Break in Service rules. If you terminate employment and are rehired, you may "lose" credit for prior service under the Plan's Break in Service rules. While these eligibility Break in Service rules may delay you from participating in the Plan, they will never cause you to lose any benefits to which you have already become entitled.

**AA304**

P718

For eligibility purposes, you will have a Break in Service if you complete less than 501 Hours of Service during the computation period used to determine whether you have a Year of Service. However, if you are absent from work for certain leaves of absence such as a maternity or paternity leave, you may be credited with 501 Hours of Service to prevent a Break in Service.

**Five-year Break in Service rule.** The five-year Break in Service rule applies only to totally non-vested (0% vested) participants. If you are totally non-vested in your account and you have five consecutive Breaks in Service (as defined above), all the service you earned before the 5-year period no longer counts for eligibility purposes. Thus, if you return to employment after incurring five consecutive Breaks in Service, you would have to resatisfy any minimum service requirements under the Plan.

If you are a veteran and are reemployed under the Uniformed Services Employment and Reemployment Rights Act of 1994, your qualified military service may be considered service with the Employer. If you may be affected by this law, ask your Administrator for further details.

**What happens if I'm a participant, terminate employment and then I'm rehired?**

If you are no longer a participant because you terminated employment, and you are rehired, then you will continue to participate in the Plan in the same manner as if your termination had not occurred provided your prior service had not been disregarded under the Break in Service rules.

**ARTICLE II**
**CONTRIBUTIONS**

**What kind of Plan is this?**

This Plan is a type of qualified retirement plan commonly referred to as a 401(k) Plan. As a participant under the Plan, you may elect to defer your compensation by a specific percentage or dollar amount and have that amount contributed to the Plan on a pre-tax basis as a salary deferral. You generally are not taxed on your salary deferrals until you withdraw those amounts from the Plan. In addition, we may make additional contributions to the Plan on your behalf. This Article describes the types of contributions that may be made to the Plan and how these monies will be allocated to your account to provide for your retirement benefit.

**Do I have to contribute money to the Plan in order to participate?**

No, you are not required to contribute any money in order to participate in our Plan. However, you may receive additional amounts if you defer.

3
**AA305**

**How much may I contribute to the Plan?**

As a participant, you may elect to defer a percentage of your compensation each year instead of receiving that amount in cash. However, your total deferrals in any taxable year may not exceed a dollar limit which is set by law. The limit is $13,000 (for 2004), $14,000 (for 2005), and $15,000 (for 2006). This limit may be increased after 2006 for cost of living changes. The Administrator will notify you of the maximum percentage you may defer. The amount you elect to defer, and any earnings on that amount, will not be subject to income tax until it is actually distributed to you. However, the amount you defer is counted as compensation for Social Security taxes.

If you are projected to attain age 50 before the end of a calendar year, then you may elect to defer additional amounts (called "catch-up contributions") to the plan as of the January 1st of that year. The additional amounts may be deferred regardless of any other limitations on the amount that you may defer to the plan. The maximum "catch-up contribution" that you can make in 2004 is $3,000. This amount is increased by $1,000 in each year after 2004 up to 2006, when the maximum is $5,000. After 2006, the maximum may increase for cost-of-living adjustments.

You should also be aware that each separately stated annual dollar limit (the annual deferral limit and the "catch-up contribution" limit) is a separate aggregate limit that applies to all such similar salary reduction amounts and "catch-up contributions" you may make under this Plan and any other cash or deferred arrangements (including tax-sheltered 403(b) annuity contracts, simplified employee pensions or other 401(k) plans in which you may be participating). Generally, if an annual dollar limit is exceeded, then the excess must be included in your income for the year. For this reason, it is desirable to request in writing that any such excess salary reduction amounts and "catch-up contributions" be returned to you. If you fail to request such a return, you may be taxed a second time when the excess amount is ultimately distributed from the Plan.

You must decide which plan or arrangement you would like to return the excess. If you decide that the excess should be distributed from this Plan, you must communicate this in writing to the Administrator no later than the March 1st following the close of the calendar year in which such excess deferrals were made. However, if the entire dollar limit is exceeded in this Plan or any other plan we maintain, then you will be deemed to have notified the Administrator of the excess. The Administrator will then return the excess deferral and any earnings to you by April 15th.

The Administrator will allocate the amount you elect to defer to an account maintained on your behalf. You will always be 100% vested in this account. This means that you will always be entitled to all amounts that you defer. This money will, however, be affected by any investment gains or losses. If there is an investment gain, then the balance in your account will increase. If there is an investment loss, then the balance in your account will decrease.

Distributions of amounts attributable to your salary deferrals are generally not permitted EXCEPT in the event of:

    (a)    death; or

    (b)    disability; or

P720

(c)     severance from employment; or

(d)     reasons of proven financial hardship (See the question entitled "Can I withdraw money from my account in the event of financial hardship?").

In the event you receive a hardship distribution from your deferrals to this Plan, you will not be allowed to make salary deferrals for a period of six (6) months after you receive the distribution.

In addition, if you are a highly compensated employee (generally owners or individuals receiving wages in excess of certain amounts established by law), a distribution of amounts attributable to your salary deferrals or certain excess contributions may be required to comply with the law. The Administrator will notify you when a distribution is required.

**How often can I modify the amount I contribute?**

The amount you elect to defer will be deducted from your pay in accordance with a procedure established by the Administrator. You may elect to defer your salary as of your Entry Date or on each payroll period. Such election will become effective as soon as administratively feasible. Your election will remain in effect until you modify or terminate it.

You may modify your salary deferral election on the first day of any twice each Plan Year at any time. You are permitted to revoke your election any time during the Plan Year. The modification will become effective as soon as administratively feasible.

**Will the Employer contribute to the Plan?**

Each year, in addition to depositing your salary deferrals, we may contribute to the Plan matching contributions, discretionary profit sharing contributions and Qualified Non-Elective Contributions.

**What is the Employer matching contribution?**

We will make a matching contribution equal to 50% of your salary deferrals.

In applying this matching percentage, however, salary deferrals for each year that exceed 5% of your compensation for such period will not be considered.

In order to share in the matching contribution you must satisfy the following conditions:

- If you are actively employed on the last day of the Plan Year, you will share if you completed at least One (1) Hours of Service during the Plan Year.

- If you terminate employment (not actively employed on the last day of the Plan Year), you will not receive a matching contribution regardless of the number of Hours of Service credited for the Plan Year.

5

**AA307**

- You will share in the matching contribution for the year regardless of the number of Hours of Service credited in the year of your death, disability or retirement.

## What is the Qualified Non-Elective Contribution and how is it allocated?

On behalf of each non-highly compensated participant, we may make a discretionary Qualified Non-Elective Contribution or "QNEC" contribution equal to a uniform percentage of your compensation, which percentage we will determine each year.

In order to share in the QNEC contribution you must satisfy the following conditions:

- If you are actively employed on the last day of the Plan Year, you will share if you completed at least One (1) Hours of Service during the Plan Year.

- If you terminate employment (not actively employed on the last day of the Plan Year), you will not receive a QNEC contribution regardless of the number of Hours of Service credited for the Plan Year.

- You will share in the QNEC contribution for the year regardless of the number of Hours of Service credited in the year of your death, disability or retirement.

## What is the Employer discretionary profit sharing contribution?

Each year, we may make a discretionary profit sharing contribution.

In order to share in the profit sharing contribution you must satisfy the following conditions:

- If you are actively employed on the last day of the Plan Year, you will share if you completed at least One (1) Hours of Service during the Plan Year.

- If you terminate employment (not actively employed on the last day of the Plan Year), you will not receive a discretionary profit sharing contribution regardless of the number of Hours of Service credited for the Plan Year.

- You will share in the discretionary profit sharing contribution for the year regardless of the number of Hours of Service credited in the year of your death, disability or retirement.

## How will the Employer discretionary profit sharing contribution be allocated to my account?

Any discretionary profit sharing contribution will be "allocated" or divided among participants eligible to share in the contribution for the Plan Year.

P722

Your share of any discretionary profit sharing contribution is determined by the following fraction:

$$\text{Discretionary Contribution} \quad X \quad \frac{\text{Your Compensation}}{\substack{\text{Total Compensation of All} \\ \text{Participants Eligible to} \\ \text{Share}}}$$

For example: Suppose the discretionary profit sharing contribution for the Plan Year is $20,000. Employee A's compensation for the Plan Year is $25,000. The total compensation of all participants eligible to share, including Employee A, is $250,000. Employee A's share will be:

$$\$20,000 \quad X \quad \frac{\$25,000}{\$250,000} \quad \text{or} \quad \$2,000$$

**What compensation is used to determine my Plan benefits?**

For the purposes of the Plan, compensation has a special meaning. Compensation is generally defined as your total compensation that is subject to income tax and paid to you by your Employer during the Plan Year.

The following adjustments to compensation will be made:

- bonuses will be excluded

- salary deferrals to this Plan or any other plan or arrangement (such as a cafeteria plan or qualified transportation fringe benefit) will be included

Special rules apply if you are only a participant in the Plan for a portion of the Plan Year. This will happen if, for any reason, you begin participating in the Plan as of a date other than the first day of the Plan Year.

For all Plan purposes, your compensation will be recognized only for the period in which you are actually a participant in the Plan.

**Is there a limit on the amount of compensation which can be considered?**

The Plan, by law, cannot recognize annual compensation in excess of $205,000 for the year beginning in 2004. This amount may be adjusted for cost of living increases.

**Are there limits on how much can be contributed to my account each year?**

Generally, the law imposes a maximum limit on the amount of contributions you may receive under the Plan. This limit applies to all contributions we make on your behalf, all contributions (excluding catch-up contributions) you make to the Plan, and any other amounts allocated to any of your accounts during the Plan Year, excluding earnings. Beginning in 2004,

P723

this total cannot exceed the lesser of $41,000 or 100% of your annual compensation. The dollar limit may be adjusted after 2004 for cost of living increases.

## May I "rollover" payments from other retirement plans or IRAs?

At the discretion of the Administrator, you may be permitted to deposit into the Plan distributions you have received from other plans and certain IRAs. Such a deposit is called a "rollover" and may result in tax savings to you. You may ask your prior plan administrator or trustee to directly transfer (a "direct rollover") to this Plan all or a portion of any amount which you are entitled to receive as a distribution from a prior plan. Alternatively, if you received a distribution from a prior plan, you may elect to deposit any amount eligible for rollover within 60 days of your receipt of the distribution. You should consult qualified counsel to determine if a rollover is permitted and in your best interest.

Your rollover will be placed in a separate account called a "rollover account." You will always be 100% vested in your "rollover account." This means that you will always be entitled to all of your rollover contributions. Rollover contributions will be affected by any investment gains or losses.

## How is the money in the Plan invested?

You will be able to direct the investment of your interest in the Plan. Your Employer has established participant direction procedures setting forth investment choices available to you, the frequency with which you can change your investment choices and instructions on how you can obtain other important information on directed investments available from the Administrator. You need to follow these procedures when you direct investments. You should review the information in these procedures carefully before you give investment directions.

The Plan is intended to comply with Section 404(c) of ERISA (the Employee Retirement Income Security Act). If the Plan complies with this Section, then the fiduciaries of the Plan, including the Employer, the Trustee and the Administrator, will be relieved of any legal liability for any losses which are the direct and necessary result of the investment directions that you give. Procedures must be followed in giving investment directions. If you fail to do so, then your investment directions need not be followed. You are not required to direct investments. To the extent you do not direct the investment of your applicable Plan accounts, then your accounts will be invested in accordance with the default investment alternatives as established under the Plan.

When you direct investments, your accounts are segregated for purposes of determining the earnings or losses on these investments. Your account does not share in the investment performance of other participants who have directed their own investments.

You should remember that the amount of your benefits under the Plan will depend in part upon your choice of investments. Gains as well as losses can occur. There are no guarantees of performance. The Employer, the Administrator, and the Trustee will not provide investment advice or guarantee the performance of any investment you choose.

**AA310**

P724

## ARTICLE III
## RETIREMENT BENEFITS

**What benefits will I receive at normal retirement?**

You will be entitled to all of your accounts under the Plan if you retire on or after your Normal Retirement Age. However, the actual payment of benefits may generally not begin until you have terminated employment and reached your Normal Retirement Date. In such event, a distribution will be made, at your election, as soon as administratively feasible. If you remain employed past your Normal Retirement Date, you may generally defer the receipt of benefits until your Late Retirement Date. In such event, benefit payments will begin as soon as feasible following your Late Retirement Date.

You will attain your Normal Retirement Age when you reach your 65th birthday. Your Normal Retirement Date is the date on which you attain your Normal Retirement Age.

Your Late Retirement Date is the date you choose to retire after first having reached your Normal Retirement Date.

**What happens if I leave the Employer's workforce before I retire?**

If your employment terminates for reasons other than death or disability, you will be entitled to receive only your "vested percentage" of your account balance. (See the question in this Article entitled "What is my vested interest in my accounts?".)

You may elect to have your vested benefit distributed to you as soon as administratively feasible following your termination of employment. However, if the value of your vested benefit (excluding amounts attributable to rollovers) is less than $5,000, a lump-sum distribution will be made to you within a reasonable time after you terminate employment regardless of whether you elect to receive it. (See the question in Article V entitled "How will my benefits be paid?" for a further explanation.)

**What is my vested interest in my accounts?**

You are always 100% vested in amounts attributable to your salary deferrals and QNEC contributions.

Your "vested percentage" in your account attributable to discretionary profit sharing and matching contributions is determined under the following schedule and is based on vesting Periods of Service. You will always, however, be 100% vested if you are employed on or after your Normal Retirement Age. (See the question in this Article entitled "What benefits will I receive at normal retirement?".)

| Vesting Schedule | |
| --- | --- |
| Periods of Service | Percentage |
| 1 | 20% |
| 2 | 40% |
| 3 | 60% |
| 4 | 80% |
| 5 | 100% |

**How do I determine my Periods of Service for vesting purposes?**

You will be credited with a Period of Service for each twelve month period you work for us. The Administrator will track your service and will credit you with a Period of Service in accordance with the terms of the Plan. If you have any questions regarding your vesting service, you should contact the Administrator.

**Does all my service count for vesting purposes?**

In calculating your vested percentage, all service you perform for us will generally be counted. However, there are some exceptions to this general rule.

Break in Service rules. If you terminate employment and are rehired, you may "lose" credit for prior service under the Plan's Break in Service rules.

For vesting purposes, you will have a Break in Service if you are not employed with us for a period of at least twelve consecutive months. However, if you are absent from work for certain leaves of absence such as a maternity or paternity leave, the twelve consecutive month period beginning on the first anniversary of your first day of such absence will not constitute a Break in Service.

Five-year Break in Service rule. The five-year Break in Service rule applies only to totally non-vested (0% vested) participants. If you are totally non-vested in your account and you have five consecutive Breaks in Service (as defined above), all the service you earned before the 5-year period no longer counts for vesting purposes. Thus, if you return to employment after incurring five consecutive Breaks in Service, you will be treated as a new employee (with no prior service) for purposes of determining your vested percentage under the Plan.

**As a veteran, will my military service count as service with the Employer?**

If you are a veteran and are reemployed under the Uniformed Services Employment and Reemployment Rights Act of 1994, your qualified military service may be considered service with the Employer. If you may be affected by this law, ask your Administrator for further details.

**What happens to my non-vested account balance if I'm rehired?**

If you have no vested benefit in your account balance when you leave, your account balance will be forfeited. However, if you return to service with the Employer before incurring five consecutive Breaks in Service, your account balance as of your termination date will be restored unadjusted for any gains or losses.

If you are partially vested in your account balance when you leave, the non-vested portion of your account balance will be forfeited on the earlier of the date:

(a)    of the distribution of your vested account balance, or

(b)    when you incur five consecutive Breaks in Service.

If you received a distribution of your vested account balance and are reemployed, you may have the right to repay this distribution. If you repay the entire amount of the distribution, we will restore your account balance with your forfeited amount. You must repay this distribution within five years from your date of reemployment, or, if earlier, before you incur five consecutive 1-Year Breaks in Service. If you were fully vested when you left, you do not have the opportunity to repay your distribution.

**What happens to the non-vested portion of a terminated participant's account?**

The non-vested portion of a terminated participant's account balance remains in the Plan and is called a forfeiture. Forfeitures may be used by the Plan for several purposes.

Any forfeitures will be added to any Employer discretionary profit sharing contributions.

However, any forfeitures attributable to matching contributions will be added to any Employer matching contributions and allocated as an additional matching contribution.

**ARTICLE IV**
**DISABILITY BENEFITS**

**How is disability defined?**

Under the Plan, disability is defined as a physical or mental condition resulting from bodily injury, disease, or mental disorder which renders you incapable of continuing any gainful occupation. Your disability will be determined by a licensed physician chosen by the Administrator. However, if your condition constitutes total disability under the federal Social Security Act, then the Administrator may deem that you are disabled for purposes of the Plan.

**What happens if I become disabled?**

If you become disabled while a participant, you will be entitled to 100% of your account balance. Payment of your disability benefits will be made to you as if you had retired. However, if the value of your disability benefit is less than $5,000, then a lump-sum distribution will be made to you within a reasonable time after you become disabled regardless of whether you elect to receive it. (See the question in Article V entitled "How will my benefits be paid?".)

11
**AA313**

## ARTICLE V
## FORM OF BENEFIT PAYMENT

**How will my benefits be paid?**

If your vested benefit in the Plan (excluding amounts attributable to rollovers) does not exceed $5,000, then your benefit will be distributed to you in a single lump-sum payment as soon as practicable following the event that entitles you to a distribution. If your vested benefit in the Plan (excluding amounts attributable to rollovers) exceeds $5,000, then you must consent to the distribution before it may be made. You may elect to receive a distribution in:

- a single lump-sum payment in cash

- installments over a period of not more than your assumed life expectancy (or the assumed life expectancies of you and your beneficiary)

- in partial withdrawals of at least $1,000

**May I delay the receipt of benefits?**

Yes, you may delay the receipt of benefits unless a distribution is required to be made, as explained earlier, because your vested benefit under the Plan (excluding amounts attributable to rollovers) does not exceed $5,000. However, if you elect to delay the receipt of benefits, there are rules which require that certain minimum distributions be made from the Plan. Generally, these minimum distributions must begin not later than the April 1st following the end of the year in which you reach age 70 1/2. However, if you are not a 5% owner, there are certain options available to you.

If you had already been receiving distributions as of January 1, 1996, because you had attained age 70 1/2, then you may elect to stop receiving distributions until your retirement. If you elect to suspend distributions, then distributions will not be required to begin again until April 1st of the calendar year following the year in which you retire.

If you had not begun receiving distributions as of January 1, 1996, because you had not attained age 70 1/2, then you may elect to postpone distributions until you retire or begin receiving distributions once you have reached age 70 1/2 even if you have not retired. You should see the Administrator if you think you may be affected by these rules.

## ARTICLE VI
## DEATH BENEFITS

**What happens if I die while working for the Employer?**

If you die while still employed by us, then 100% of your account balance will be used to provide your beneficiary with a death benefit.

P728

**Who is the beneficiary of my death benefit?**

If you are married at the time of your death, your spouse will be the beneficiary of the entire death benefit unless an election is made to change the beneficiary. IF YOU WISH TO DESIGNATE A BENEFICIARY OTHER THAN YOUR SPOUSE, YOUR SPOUSE MUST IRREVOCABLY CONSENT TO WAIVE ANY RIGHT TO THE DEATH BENEFIT. YOUR SPOUSE'S CONSENT MUST BE IN WRITING, BE WITNESSED BY A NOTARY OR A PLAN REPRESENTATIVE AND ACKNOWLEDGE THE SPECIFIC NON-SPOUSE BENEFICIARY.

If you are married and you change your designation, then your spouse must again consent to the change. In addition, you may elect a beneficiary other than your spouse without your spouse's consent if your spouse cannot be located.

If you are not married you may designate a beneficiary on a form to be supplied to you by the Administrator.

In the event no valid designation of beneficiary exists, or if the beneficiary is not alive at the time of your death, the death benefit will be paid in the following order of priority to:

(a)     Your surviving spouse;

(b)     Your children, including adopted children (and if a child is not living, that child's share will be distributed to that child's heirs);

(c)     Your surviving parents, in equal shares; or

(d)     Your estate.

**How will the death benefit be paid to my beneficiary?**

Unless you elected otherwise prior to your death, your beneficiary may elect to have the death benefit paid, unless otherwise provided in the next question, in:

- a single lump-sum payment in cash

- installments over a period of not more than the assumed life expectancy of your beneficiary

- partial withdrawals of at least $1,000

**When must the last payment be made to my beneficiary?**

Regardless of the method of distribution selected, if your designated beneficiary is a person (rather than your estate or some trusts) then minimum distributions of your death benefit will begin by the end of the year following the year of your death ("1-year rule") and must be paid over a period not extending beyond your beneficiary's life expectancy. If your spouse is the beneficiary, then under the "1-year rule," the start of payments will be delayed until the year in which you would have attained age 70 1/2 unless your spouse elects to begin distributions over

13

**AA315**

P729

his or her life expectancy before then. However, instead of the "1-year rule" your beneficiary may elect to have the entire death benefit paid by the end of the fifth year following the year of your death (the "5-year rule"). Generally, if your beneficiary is not a person, your entire death benefit must be paid under the "5-year rule."

Since your spouse has certain rights to the death benefit, you should immediately report any change in your marital status to the Administrator.

**What happens if I'm a participant, terminate employment and die before receiving all my benefits?**

If you terminate employment with us and subsequently die, your beneficiary will be entitled to the vested percentage of your remaining interest in the Plan at the time of your death.

**ARTICLE VII**
**IN-SERVICE DISTRIBUTIONS**

**Can I withdraw money from my account while working?**

Generally, you may receive a distribution from the Plan prior to your termination of employment if you satisfy certain conditions.

You may be entitled to receive a pre-retirement distribution if you have reached age 59 1/2. However, this distribution is not in addition to your other benefits and will therefore reduce the value of the benefits you will receive at retirement. This distribution is made at your election and will be made in accordance with the forms of distributions available under the Plan.

Also, the law restricts any pre-retirement distribution from certain accounts which are maintained for you under the Plan before you reach age 59 1/2. These accounts are generally the ones set up to receive your salary deferral contributions and other Employer contributions which are used to satisfy special rules for 401(k) plans.

You may generally request a pre-retirement distribution from your fully vested accounts in the Plan.

**Can I withdraw money from my account in the event of financial hardship?**

Yes, if you satisfy certain conditions. This hardship distribution is not in addition to your other benefits and will therefore reduce the value of the benefits you will receive at retirement.

You may request a hardship distribution from your vested accounts in the Plan.

In addition, there are restrictions placed on hardship distributions which are made from certain accounts. These accounts are generally the accounts which receive your salary deferral contributions and other Employer contributions which are used to satisfy special rules that apply to 401(k) plans. Generally, the only amounts that can be distributed to you on account of a hardship from these accounts are your salary deferrals. The earnings on your salary deferrals and special Employer contributions may not be distributed to you on account of a hardship. Ask the Administrator if you need further details.

14

**AA316**

**What conditions must I satisfy to receive a hardship distribution?**

A hardship distribution may be made to satisfy certain immediate and heavy financial needs that you have. A hardship distribution may only be made for payment of the following:

- Expenses for medical care (described in Section 213(d) of the Internal Revenue Code) previously incurred by you, your spouse or your dependent or necessary for you, your spouse or your dependent to obtain medical care;

- Costs directly related to the purchase of your principal residence (excluding mortgage payments);

- Tuition, related educational fees, and room and board expenses for the next twelve (12) months of post-secondary education for yourself, your spouse or dependent;

- Amounts necessary to prevent your eviction from your principal residence or foreclosure on the mortgage of your principal residence.

If you have one of the above expenses, a hardship distribution can only be made if you certify and agree that all of the following conditions are satisfied:

(a)    The distribution is not in excess of the amount of your immediate and heavy financial need. The amount of your immediate and heavy financial need may include any amounts necessary to pay any federal, state, or local income taxes or penalties reasonably anticipated to result from the distribution;

(b)    You have obtained all distributions, other than hardship distributions, and all nontaxable (at the time of the loan) loans currently available under all plans maintained by your Employer; and

(c)    That your salary deferrals will be suspended for at least six (6) months after your receipt of the hardship distribution.

## ARTICLE VIII
## TAX TREATMENT OF DISTRIBUTIONS

**What are my tax consequences when I receive a distribution from the Plan?**

Generally, you must include any Plan distribution in your taxable income in the year in which you receive the distribution. The tax treatment may also depend on your age when you receive the distribution. Certain distributions made to you when you are under age 59 1/2 could be subject to an additional 10% tax.

P731

**Can I reduce or defer tax on my distribution?**

You may reduce, or defer entirely, the tax due on your distribution through use of one of the following methods:

(a)    The rollover of all or a portion of the distribution to an Individual Retirement Account or Annuity (IRA) or another qualified employer plan. This will result in no tax being due until you begin withdrawing funds from the IRA or other qualified employer plan. The rollover of the distribution, however, MUST be made within strict time frames (normally, within 60 days after you receive your distribution). Under certain circumstances all or a portion of a distribution (such as a hardship distribution) may not qualify for this rollover treatment. In addition, most distributions will be subject to mandatory federal income tax withholding at a rate of 20%. This will reduce the amount you actually receive. For this reason, if you wish to rollover all or a portion of your distribution amount, the direct transfer option described in paragraph (b) below would be the better choice.

(b)    For most distributions, you may request that a direct transfer (sometimes referred to as a direct rollover) of all or a portion of a distribution be made to either an Individual Retirement Account or Annuity (IRA) or another qualified employer plan willing to accept the transfer. A direct transfer will result in no tax being due until you withdraw funds from the IRA or other qualified employer plan. Like the rollover, under certain circumstances all or a portion of the amount to be distributed may not qualify for this direct transfer. If you elect to actually receive the distribution rather than request a direct transfer, then in most cases 20% of the distribution amount will be withheld for federal income tax purposes.

WHENEVER YOU RECEIVE A DISTRIBUTION, THE ADMINISTRATOR WILL DELIVER TO YOU A MORE DETAILED EXPLANATION OF THESE OPTIONS. HOWEVER, THE RULES WHICH DETERMINE WHETHER YOU QUALIFY FOR FAVORABLE TAX TREATMENT ARE VERY COMPLEX. YOU SHOULD CONSULT WITH QUALIFIED TAX COUNSEL BEFORE MAKING A CHOICE.

## ARTICLE IX
## HOURS OF SERVICE

**What is an Hour of Service?**

You will be credited with an Hour of Service for:

(a)    each hour for which you are directly or indirectly compensated by your Employer for the performance of duties during the Plan Year;

(b)    each hour for which you are directly or indirectly compensated by the Employer for reasons other than the performance of duties (such as vacation, holidays, sickness, disability, lay-off, military duty, jury duty or leave of absence during the Plan Year); and

(c)    each hour for back pay awarded or agreed to by the Employer.

You will not be credited for the same Hours of Service both under (a) or (b), as the case may be, and under (c).

### How are Hours of Service credited?

You will be credited with your actual Hours of Service.

**ARTICLE X**
**LOANS**

### May I borrow money from the Plan?

Yes. You may request a participant loan using an application form provided by the Administrator. Your ability to obtain a participant loan depends on several factors. The Administrator will determine whether you satisfy these factors.

### What are the loan rules and requirements?

There are various rules and requirements that apply to any loan, which are outlined in this question. In addition, we have established a written loan program which explains these requirements in more detail. You can request a copy of the loan program from the Administrator. Generally, the rules for loans include the following:

- Loans are available to participants on a reasonably equivalent basis. Loans will be made to participants who are creditworthy. The Administrator may request that you provide additional information, such as financial statements, tax returns and credit reports to make this determination.

- All loans must be adequately secured. You must sign a promissory note along with a loan pledge. Generally, you must use your vested interest in the Plan as security for the loan, provided the outstanding balance of all your loans does not exceed 50% of your vested interest in the Plan. In certain cases, the Administrator may require you to provide additional collateral to receive a loan.

- You will be charged a reasonable rate of interest for any loan received from the Plan. The Administrator will determine a reasonable rate of interest by reviewing the interest rates charged for similar types of loans by other lenders.

- If approved, your loan will provide for level amortization with payments to be made not less frequently than quarterly. Generally, the term of your loan may not exceed five (5) years. However, if the loan is for the purchase of your principal residence, the Administrator may permit a longer repayment term. Unless approved by the Administrator, you must repay your loan through payroll deduction. If you have an unpaid leave of absence or go on military leave while you have an outstanding loan, please contact the Administrator to find out your repayment options.

- All loans will be considered a directed investment of your account under the Plan. All payments of principal and interest by you on a loan will be credited to your account.

17
**AA319**

- The amount the Plan may loan to you is limited by rules under the Internal Revenue Code. Any new loans, when added to the outstanding balance of all other loans from the Plan, will be limited to the lesser of:

  (a)    $50,000 reduced by the excess, if any, of your highest outstanding balance of loans from the Plan during the one-year period ending on the day before the date of the new loan over your current outstanding balance of loans as of the date of the new loan; or

  (b)    1/2 of your vested interest in the Plan.

- The maximum number of loans that you may have outstanding at any one time is three (3).

- If you fail to make payments when they are due under the terms of the loan, you will be considered to be "in default." The Administrator will consider your loan to be in default if any scheduled loan repayment is not made by the end of the calendar quarter following the calendar quarter in which the missed payment was due. The Plan would then have authority to take all reasonable actions to collect the balance owed on the loan. This could include filing a lawsuit or foreclosing on the security for the loan. Under certain circumstances, a loan that is in default may be considered a distribution from the Plan and could result in taxable income to you. In any event, your failure to repay a loan will reduce the benefit you would otherwise be entitled to from the Plan.

- If you become entitled to a distribution from the Plan (except in the case of an in-service distribution or a hardship distribution), your loan becomes due and payable in full immediately. You may repay the entire outstanding balance of the loan (including any accrued interest). If you do not repay the entire outstanding loan balance, your vested account balance will be reduced by the remaining outstanding balance of the loan.

The Administrator may periodically revise the Plan's loan policy. If you have any questions on participant loans or the current loan policy, please contact the Administrator.

## ARTICLE XI
## YOUR PLAN'S "TOP HEAVY RULES"

**What is a "top heavy plan"?**

A retirement plan that primarily benefits "key employees" is called a "top heavy plan." Key employees are certain owners or officers of your Employer. A plan is generally a "top heavy plan" when more than 60% of the plan assets are attributable to key employees.

Each year, the Administrator is responsible for determining whether the Plan is a "top heavy plan."

P734

**What happens if the Plan becomes "top heavy"?**

If the Plan becomes top heavy in any Plan Year, then non-key employees may be entitled to certain "top heavy minimum benefits," and other special rules will apply. These top heavy rules include the following:

- Your Employer may be required to make a contribution on your behalf in order to provide you with at least "top heavy minimum benefits."

- If you are a participant in more than one Plan, you may not be entitled to "top heavy minimum benefits" under both Plans.

## ARTICLE XII
## PROTECTED BENEFITS AND CLAIMS PROCEDURES

**Is my benefit protected?**

As a general rule, your interest in your account, including your "vested interest," may not be alienated. This means that your interest may not be sold, used as collateral for a loan (other than for a Plan loan), given away or otherwise transferred. In addition, your creditors may not attach, garnish or otherwise interfere with your account.

**Are there any exceptions to the general rule?**

There are two exceptions to this general rule. The Administrator must honor a "qualified domestic relations order." A "qualified domestic relations order" is defined as a decree or order issued by a court that obligates you to pay child support or alimony, or otherwise allocates a portion of your assets in the Plan to your spouse, former spouse, child or other dependent. If a qualified domestic relations order is received by the Administrator, all or a portion of your benefits may be used to satisfy the obligation. The Administrator will determine the validity of any domestic relations order received. You and your beneficiaries can obtain, without charge, a copy of the QUALIFIED DOMESTIC RELATIONS ORDER PROCEDURE from the Administrator.

The second exception applies if you are involved with the Plan's operation. If you are found liable for any action that adversely affects the Plan, the Administrator can offset your benefits by the amount that you are ordered or required by a court to pay the Plan. All or a portion of your benefits may be used to satisfy any such obligation to the Plan.

**Can the Plan be amended?**

Yes. We have the right to amend the Plan at any time. In no event, however, will any amendment authorize or permit any part of the Plan assets to be used for purposes other than the exclusive benefit of participants or their beneficiaries. Additionally, no amendment will cause any reduction in the amount credited to your account.

P735

**What happens if the Plan is discontinued or terminated?**

Although we intend to maintain the Plan indefinitely, we reserve the right to terminate the Plan at any time. Upon termination, no further contributions will be made to the Plan and all amounts credited to your accounts will become 100% vested. We will direct the distribution of your accounts in a manner permitted by the Plan as soon as practicable. (See the question in Article V entitled "How will my benefits be paid?" for a further explanation.) You will be notified if the Plan is terminated.

**How do I submit a claim for Plan benefits?**

Benefits will be paid to you and your beneficiaries without the necessity of formal claims. However, if you think an error has been made in determining your benefits, then you or your beneficiaries may make a request for any Plan benefits to which you believe you are entitled. Any such request should be in writing and should be made to the Administrator.

If the Administrator determines the claim is valid, then you will receive a statement describing the amount of benefit, the method or methods of payment, the timing of distributions and other information relevant to the payment of the benefit.

**What if my benefits are denied?**

Your request for Plan benefits will be considered a claim for Plan benefits, and it will be subject to a full and fair review. If your claim is wholly or partially denied, the Administrator will provide you with a written or electronic notification of the Plan's adverse determination. This written or electronic notification must be provided to you within a reasonable period of time, but not later than 90 days after the receipt of your claim by the Administrator, unless the Administrator determines that special circumstances require an extension of time for processing your claim. If the Administrator determines that an extension of time for processing is required, written notice of the extension will be furnished to you prior to the termination of the initial 90 day period. In no event will such extension exceed a period of 90 days from the end of such initial period. The extension notice will indicate the special circumstances requiring an extension of time and the date by which the Plan expects to render the benefit determination.

In the case of a claim for disability benefits, if disability is determined by a physician chosen by the Administrator (rather than relying upon a determination of disability for Social Security purposes), then instead of the above, the Administrator will provide you with written or electronic notification of the Plan's adverse benefit determination within a reasonable period of time, but not later than 45 days after receipt of the claim by the Plan. This period may be extended by the Plan for up to 30 days, provided that the Administrator both determines that such an extension is necessary due to matters beyond the control of the Plan and notifies you, prior to the expiration of the initial 45 day period, of the circumstances requiring the extension of time and the date by which the Plan expects to render a decision. If, prior to the end of the first 30-day extension period, the Administrator determines that, due to matters beyond the control of the Plan, a decision cannot be rendered within that extension period, the period for making the determination may be extended for up to an additional 30 days, provided that the Administrator notifies you, prior to the expiration of the first 30-day extension period, of the circumstances requiring the extension and the date as of which the plan expects to render a decision. In the case of any such extension, the notice of extension will specifically explain the standards on which

P736

entitlement to a benefit is based, the unresolved issues that prevent a decision on the claim, and the additional information needed to resolve those issues, and you will be afforded at least 45 days within which to provide the specified information.

The Administrator's written or electronic notification of any adverse benefit determination must contain the following information:

(a)    The specific reason or reasons for the adverse determination.

(b)    Reference to the specific Plan provisions on which the determination is based.

(c)    A description of any additional material or information necessary for you to perfect the claim and an explanation of why such material or information is necessary.

(d)    Appropriate information as to the steps to be taken if you or your beneficiary want to submit your claim for review.

(e)    In the case of disability benefits where disability is determined by a physician chosen by the Administrator:

(i)    If an internal rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination, either the specific rule, guideline, protocol, or other similar criterion; or a statement that such rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination and that a copy of the rule, guideline, protocol, or other similar criterion will be provided to you free of charge upon request.

(ii)    If the adverse benefit determination is based on a medical necessity or experimental treatment or similar exclusion or limit, either an explanation of the scientific or clinical judgment for the determination, applying the terms of the Plan to your medical circumstances, or a statement that such explanation will be provided to you free of charge upon request.

If your claim has been denied, and you want to submit your claim for review, you must follow the Claims Review Procedure in the next question.

**What is the Claims Review Procedure?**

Upon the denial of your claim for benefits, you may file your claim for review, in writing, with the Administrator.

(a)    YOU MUST FILE THE CLAIM FOR REVIEW NO LATER THAN 60 DAYS AFTER YOU HAVE RECEIVED WRITTEN NOTIFICATION OF THE DENIAL OF YOUR CLAIM FOR BENEFITS.

HOWEVER, IF YOUR CLAIM IS FOR DISABILITY BENEFITS AND DISABILITY IS DETERMINED BY A PHYSICIAN CHOSEN BY THE ADMINISTRATOR, THEN INSTEAD OF THE ABOVE, YOU MUST FILE THE

21

**AA323**

CLAIM FOR REVIEW NO LATER THAN 180 DAYS FOLLOWING RECEIPT OF NOTIFICATION OF AN ADVERSE BENEFIT DETERMINATION.

(b)    You may submit written comments, documents, records, and other information relating to your claim for benefits.

(c)    You may review all pertinent documents relating to the denial of your claim and submit any issues and comments, in writing, to the Administrator.

(d)    You will be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to your claim for benefits.

(e)    Your claim for review must be given a full and fair review. This review will take into account all comments, documents, records, and other information submitted by you relating to your claim, without regard to whether such information was submitted or considered in the initial benefit determination.

In addition to the Claims Review Procedure above, if your claim is for disability benefits and disability is determined by a physician chosen by the Administrator, then the Claims Review Procedure provides that:

(a)    Your claim will be reviewed without deference to the initial adverse benefit determination and the review will be conducted by an appropriate named fiduciary of the Plan who is neither the individual who made the adverse benefit determination that is the subject of the appeal, nor the subordinate of such individual.

(b)    In deciding an appeal of any adverse benefit determination that is based in whole or part on medical judgment, the appropriate named fiduciary will consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment.

(c)    Any medical or vocational experts whose advice was obtained on behalf of the Plan in connection with your adverse benefit determination will be identified, without regard to whether the advice was relied upon in making the benefit determination.

(d)    The health care professional engaged for purposes of a consultation under (b) above will be an individual who is neither an individual who was consulted in connection with the adverse benefit determination that is the subject of the appeal, nor the subordinate of any such individual.

The Administrator will provide you with written or electronic notification of the Plan's benefit determination on review. The Administrator must provide you with notification of this denial within 60 days after the Administrator's receipt of your written claim for review, unless the Administrator determines that special circumstances require an extension of time for processing your claim. If the Administrator determines that an extension of time for processing is required, written notice of the extension will be furnished to you prior to the termination of the initial 60 day period. In no event will such extension exceed a period of 60 days from the end of the initial period. The extension notice will indicate the special circumstances requiring an

22

**AA324**

extension of time and the date by which the Plan expects to render the determination on review. However, if claim relates to disability benefits and disability is determined by a physician chosen by the Administrator, then 45 days will apply instead of 60 days in the preceding sentences. In the case of an adverse benefit determination, the notification will set forth:

(a)    The specific reason or reasons for the adverse determination.

(b)    Reference to the specific Plan provisions on which the benefit determination is based.

(c)    A statement that you are entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to your claim for benefits.

(d)    In the case of disability benefits where disability is determined by a physician chosen by the Administrator:

    (i)    If an internal rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination, either the specific rule, guideline, protocol, or other similar criterion; or a statement that such rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination and that a copy of the rule, guideline, protocol, or other similar criterion will be provided to you free of charge upon request.

    (ii)    If the adverse benefit determination is based on a medical necessity or experimental treatment or similar exclusion or limit, either an explanation of the scientific or clinical judgment for the determination, applying the terms of the Plan to your medical circumstances, or a statement that such explanation will be provided to you free of charge upon request.

If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or Federal court. However, in order to do so, you must file the suit no later than 180 days after the Administrator makes a final determination to deny your claim.

**What are my rights as a Plan participant?**

As a participant in the Plan you are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 (ERISA). ERISA provides that all Plan participants are entitled to:

(a)    Examine, without charge, at the Administrator's office and at other specified locations, all documents governing the Plan, including insurance contracts and collective bargaining agreements, and a copy of the latest annual report (Form 5500 Series) filed by the Plan with the U.S. Department of Labor and available at the Public Disclosure Room of the Employee Benefits Security Administration.

(b)    Obtain, upon written request to the Administrator, copies of documents governing the operation of the Plan, including insurance contracts and collective bargaining

23

**AA325**

agreements, and copies of the latest annual report (Form 5500 Series) and updated summary plan description. The Administrator may make a reasonable charge for the copies.

(c)     Receive a summary of the Plan's annual financial report. The Administrator is required by law to furnish each participant with a copy of this summary annual report.

(d)     Obtain a statement telling you whether you have a right to receive a pension at Normal Retirement Age and, if so, what your benefits would be at Normal Retirement Age if you stop working under the Plan now. If you do not have a right to a pension benefit, the statement will tell you how many years you have to work to get a right to a pension. THIS STATEMENT MUST BE REQUESTED IN WRITING AND IS NOT REQUIRED TO BE GIVEN MORE THAN ONCE EVERY TWELVE (12) MONTHS. The Plan must provide this statement free of charge.

In addition to creating rights for Plan participants, ERISA imposes duties upon the people who are responsible for the operation of the Plan. The people who operate your Plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of you and other Plan participants and beneficiaries. No one, including your Employer or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a pension benefit or exercising your rights under ERISA.

If your claim for a pension benefit is denied or ignored, in whole or in part, you have a right to know why this was done, to obtain copies of documents relating to the decision without charge, and to appeal any denial, all within certain time schedules.

Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request a copy of Plan documents or the latest annual report from the Plan and do not receive them within 30 days, you may file suit in a Federal court. In such a case, the court may require the Administrator to provide the materials and pay you up to $110.00 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the Administrator.

If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or Federal court. In addition, if you disagree with the Plan's decision or lack thereof concerning the qualified status of a domestic relations order or a medical child support order, you may file suit in Federal court. You and your beneficiaries can obtain, without charge, a copy of the qualified domestic relations order ("QDRO") procedures from the Administrator.

If it should happen that the Plan's fiduciaries misuse the Plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a Federal court. The court will decide who should pay court costs and legal fees. If you are successful, the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees if, for example, it finds your claim is frivolous.

**AA326**

P740

**What can I do if I have questions or my rights are violated?**

If you have any questions about the Plan, you should contact the Administrator. If you have any questions about this statement or about your rights under ERISA, or if you need assistance in obtaining documents from the Administrator, you should contact the nearest office of the Employee Benefits Security Administration, U.S. Department of Labor, listed in the telephone directory or the Division of Technical Assistance and Inquiries, Employee Benefits Security Administration, U.S. Department of Labor, 200 Constitution Avenue, N.W., Washington, D.C. 20210. You may also obtain certain publications about your rights and responsibilities under ERISA by calling the publications hotline of the Employee Benefits Security Administration.

## ARTICLE XIII
## GENERAL INFORMATION ABOUT THE PLAN

There is certain general information which you may need to know about the Plan. This information has been summarized for you in this Article.

**General Plan Information**

The full name of the Plan is Dorland Corporation Profit Sharing/Tax-Deferred Savings Plan.

Your Employer has assigned Plan Number 001 to your Plan.

This Plan was originally effective on January 1, 1982. The amended and restated provisions of the Plan become effective on January 1, 2005.

Valuations of the Plan assets are generally made every business day. Certain distributions are based on the Anniversary Date of the Plan. This date is the last day of the Plan Year.

The Plan's records are maintained on a twelve-month period of time. This is known as the Plan Year. The Plan Year begins on January 1st and ends on December 31st.

The Plan and Trust will be governed by the laws of North Carolina to the extent not governed by federal law.

Benefits provided by the Plan are NOT insured by the Pension Benefit Guaranty Corporation (PBGC) under Title IV of the Employee Retirement Income Security Act of 1974 because the insurance provisions under ERISA are not applicable to this type of Plan.

Service of legal process may be made upon your Employer. Service of legal process may also be made upon the Trustee or Administrator.

**AA327**

P741

## Employer Information

Your Employer's name, address and identification number are:

Dorland Corporation
One South Broad, 11th Floor
Philadelphia, Pennsylvania 19107
22-1929687

The Plan allows other employers to adopt its provisions. You or your beneficiaries may examine or obtain a complete list of employers, if any, who have adopted the Plan by making a written request to the Administrator.

Another Employer who has adopted the provisions of the Plan is:

INRX, LLC
1600 Market Street
Philadelphia, Pennsylvania 19103
20-1723532

## Administrator Information

The Plan's Administrator is responsible for the day-to-day administration and operation of the Plan. For example, the Administrator maintains the Plan records, including your account information, provides you with the forms you need to complete for Plan participation, and directs the payment of your account at the appropriate time. The Administrator will also allow you to review the formal Plan document and certain other materials related to the Plan. If you have any questions about the Plan and your participation, you should contact the Administrator. The Administrator may designate other parties to perform some duties of the Administrator.

The Administrator has the complete power, in its sole discretion, to determine all questions arising in connection with the administration, interpretation, and application of the Plan (and any related documents and underlying policies). Any such determination by the Administrator is conclusive and binding upon all persons.

The name, address and business telephone number of the Plan's Administrator are:

Dorland Corporation
One South Broad, 11th Floor
Philadelphia, Pennsylvania 19107
(215) 625-0111

## Trustee Information

All money that is contributed to the Plan is held in a trust fund. The Trustee is responsible for the safekeeping of the trust fund and must hold and invest Plan assets in a prudent manner and in the best interest of you and your beneficiaries. The trust fund established by the Plan's Trustee will be the funding medium used for the accumulation of assets from which benefits will be distributed.

26

**AA328**

P742

The name and address of the Plan's Trustee is:

AAAA Retirement Fund for Member Agencies c/o AAAA Benefits, Inc.
201 McCullough Drive, Suite 100
Charlotte, North Carolina 28262

**AA329**

DORLAND CORPORATION
PROFIT SHARING/TAX-DEFERRED SAVINGS PLAN

COMMON QUESTIONS ABOUT OUR 401(k) PLAN

### Introduction

The following questions and answers highlight some of the important parts of our Plan. Remember, these are only highlights. The Summary Plan Description ("SPD") describes the Plan in much greater detail. If you have any questions about these highlights, the SPD, or the Plan, you should ask the Plan Administrator.

Q. Why are we sponsoring a 401(k) plan?

A. We are sponsoring this Plan so that you may save for retirement. You may also be entitled to contributions from us which will increase the amount available to you at your retirement. However, you must meet the eligibility rules in order to participate.

Q. Am I eligible to participate in the Plan?

A. Provided you are not an Excluded Employee, you are eligible to participate in the Plan once you satisfy the Plan's eligibility conditions described in the next question. Then, you may elect to have your compensation reduced by a specific percentage or dollar amount, and have that amount contributed to the Plan as a salary deferral contribution. You may also be entitled to receive contributions from us. However, individuals who become employees due to certain business transactions (such as the purchase of a business) will be excluded until the second Plan Year after the transaction takes place.

If you are a member of a class of employees identified below, you are an Excluded Employee for purposes of the Plan. The Excluded Employees are:

- leased employees.

- Any Employee compensated on an hourly basis, any individual who is covered by an independent contractor agreement with the Employer..

Q. When will I be eligible to participate in the Plan?

A. Provided you are not an Excluded Employee, you will be eligible to participate in the Plan once you satisfy the age and service requirements.

For salary reduction contributions, you will be eligible to participate in the Plan if you have completed One (1) Hour of Service and have also attained age 18.

For matching and discretionary profit sharing contributions, you will be eligible to participate in the Plan if you three (3) months and have also attained age 18.

You should review the Article in the SPD entitled "PARTICIPATION IN THE PLAN" for a further explanation of these eligibility requirements.

1

**AA330**

P744

Q. When is my Entry Date?

A. Provided you are not an Excluded Employee, you may begin participating in the Plan once you have satisfied the eligibility requirements and reached your "Entry Date."

For salary reduction contributions, you can join the Plan on the day you meet the eligibility requirements.

For matching and discretionary profit sharing contributions, your Entry Date will be the first day of the month coinciding with or next following the date you satisfy the eligibility requirements.

Q. Do I have to contribute money to the Plan in order to participate?

A. No, you are not required to contribute. However, our Plan is a 401(k) savings plan. That means that you may elect to have a portion of your current pay placed into a salary deferral account established for you in the Plan on a pre-tax basis. That amount may then grow tax-free each year from investment earnings. The Plan Administrator will provide you with a form and rules regarding how much you are permitted to save each year. You should also review the question entitled "How much may I contribute to the Plan?" found in Article II of the SPD.

You may receive additional amounts from us if you do contribute.

Q. When will I receive payments from the Plan?

A. The Plan is designed to encourage you to stay with us until retirement. Payment will generally occur at your Normal Retirement Date, unless you postpone your actual retirement. Your Normal Retirement Date is the date on which you attain your Normal Retirement Age. You will attain your Normal Retirement Age when you reach your 65th birthday.

Q. How much will I be paid when I retire?

A. The amount you are paid when you retire will be based upon the amount of money we have put into the Plan for you (including your salary deferrals), plus or minus any earnings or losses. You should review the Article in the SPD entitled "CONTRIBUTIONS" for an explanation of how we make contributions to the Plan and how they are shared by eligible employees.

**AA331**

P745

Q. How will payments be made when I retire?

A. If your vested benefit in the Plan (excluding amounts attributable to rollovers) does not exceed $5,000, then your benefit will be distributed to you in a single lump-sum payment as soon as practicable following the event that entitles you to a distribution. If your vested benefit in the Plan (excluding amounts attributable to rollovers) exceeds $5,000, then you must consent to the distribution before it may be made. You may elect to receive a distribution in:

- a single lump-sum payment in cash.

- installments over a period of not more than your assumed life expectancy (or your and your beneficiary's assumed life expectancies).

- in partial withdrawals of at least $1,000.

You should review the Article in the SPD entitled "FORM OF BENEFIT PAYMENT" for a further explanation of the rules associated with the payment of benefits.

Q. What if I stop working before I retire?

A. You are always 100% vested in amounts attributable to your salary deferrals and QNEC contributions.

If you stop working for us before retirement, your account attributable to discretionary profit sharing and matching contributions will be affected by the Plan's rules on "vesting." This means your account balance at the time you stop working that is attributable to those contributions is multiplied by your vesting percentage. The result is your vested benefit which, when added to the amounts that are always 100% vested as shown above, is what you will actually receive from the Plan. Your vesting percentage is dependent upon the number of Periods of Service you have worked for us and is based on the following schedule:

### Vesting Schedule

| Periods of Service | Percentage |
|:---:|:---:|
| 1 | 20% |
| 2 | 40% |
| 3 | 60% |
| 4 | 80% |
| 5 | 100% |

Q. If I stop working before retirement, when will my vested amount be paid?

A. If you stop working for us, your vested benefit will be paid at the earliest of your death, disability, or attainment of your Normal Retirement Date. You may elect, however, to have your vested amount paid as soon as possible following your termination of employment. If you stop working for us and your vested account balance (excluding amounts attributable to rollovers) is $5,000 or less, it will automatically be paid to you as soon as possible after your termination of employment.

3

**AA332**

Q.  What if I die before I retire?

A.  Your beneficiary will be entitled to 100% of your interest in the Plan upon your death. If you are single, you may name anyone you like to be your beneficiary. If you are married, your spouse is your beneficiary with respect to 100% of your death benefit unless you and your spouse name someone else as your beneficiary. You should review the question entitled "Who is the beneficiary of my death benefit?" in Article VI of the SPD.

Q.  Can I withdraw money from the Plan while I'm still working?

A.  The Plan is designed to pay benefits at retirement. However, while you are still working for us, you may withdraw money if you have reached age 59 1/2. This distribution is not in addition to your other benefits and will therefore reduce the value of the benefits you will receive at retirement.

In certain instances you may also receive an in-service distribution if you incur a financial hardship. This hardship distribution is not in addition to your other benefits and will therefore reduce the value of the benefits you will receive at retirement.

There are various rules and restrictions regarding withdrawing money from your accounts in the Plan while you are still employed. Please review the SPD for more information on these rules and restrictions.

NOTE: THESE QUESTIONS AND ANSWERS ARE NOT MEANT TO BE A SUBSTITUTE FOR A THOROUGH READING OF THE SUMMARY PLAN DESCRIPTION. THE PROVISIONS OF THE 401(k) PLAN ARE VERY COMPLEX. IT IS NOT POSSIBLE TO FULLY EXPLAIN ALL ASPECTS OF THE PLAN IN THESE SHORT QUESTIONS AND ANSWERS. YOU SHOULD ALWAYS CONSULT THE SUMMARY PLAN DESCRIPTION IF YOU HAVE ANY QUESTIONS ABOUT THE PLAN. IF, AFTER READING THE SUMMARY PLAN DESCRIPTION, YOU STILL HAVE QUESTIONS, YOU SHOULD CONTACT THE PLAN ADMINISTRATOR.

P747

# AAAA Retirement Performance

## MARCH 2005

| Strategy | Interest | Bond | Balanced | Equity Income | Index Equity | Growth Income Equity | Growth Equity | International Equity | International Growth Equity | Small Cap Equity-Core | Small/Mid Cap Equity | Technology Sector | Portfolio Funds | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | Conservative | Moderate | Aggressive |
| Fund | Stable Value Fund * | PIMCO Total Return Fund | Vanguard Wellington Balanced | Ameri-Stock Fund | Vanguard Index 500 | Fidelity Contra-Fund | ING Growth Fund | Templeton Foreign Series | Artisan Fund | T. Rowe Price Small Cap | Jennison US Emerging Growth A | Fidelity Technology | Portfolio A | Portfolio B | Portfolio C |
| Ticker | N/A | PTTRX | VWELX | AMSTX | VFINX | FCNTX | AEGRX | TFEDX | ARTIX | OTCFX | PEEAX | FSPTX | N/A | N/A | N/A |
| 1999 | 6.3% | -0.3% | 4.4% | 2.7% | 21.1% | 25.0% | 35.1% | 27.3% | N/A | 14.7% | 93.1% | 131.7% | 8.4% | 11.6% | 19.0% |
| 2000 | 6.2% | 12.9% | 10.4% | 20.5% | -9.1% | -6.8% | -12.5% | -5.9% | -10.6% | 16.5% | -13.5% | -32.5% | 6.1% | 6.1% | 0.6% |
| 2001 | 5.7% | 9.4% | 4.2% | 1.3% | -12.0% | -12.5% | -27.4% | -12.1% | -15.9% | 6.8% | -20.3% | -31.7% | 3.7% | 0.8% | -7.0% |
| 2002 | 5.2% | 10.2% | -6.9% | -16.0% | -22.1% | -9.6% | -29.1% | -14.8% | -18.9% | -14.2% | -33.5% | -37.8% | -0.6% | -10.9% | -21.1% |
| 2003 | 3.9% | 5.6% | 20.7% | 21.3% | 28.5% | 28.0% | 30.2% | 42.6% | 28.1% | 32.3% | 43.1% | 59.4% | 12.0% | 21.7% | 31.2% |
| 2004 | 3.4% | 5.1% | 11.1% | 5.5% | 10.7% | 15.1% | 7.1% | 21.2% | 17.8% | 18.8% | 19.3% | 0.4% | 6.7% | 10.5% | 13.9% |
| 3 month 2005 | 0.8% | -0.3% | -0.5% | -2.7% | -2.2% | 0.3% | -3.0% | 1.0% | -0.5% | -3.4% | -3.7% | -7.4% | 0.0% | -1.2% | -1.9% |
| 3-Year Return** | 4.4% | 6.6% | 6.4% | 0.5% | 2.6% | 9.1% | -0.7% | 12.8% | 6.7% | 7.7% | 5.6% | -0.1% | 5.1% | 5.2% | 5.1% |
| 5-Year Return** | 5.0% | 7.9% | 7.7% | 4.8% | -3.2% | 0.6% | -11.2% | 4.6% | -4.7% | 8.2% | -8.0% | -18.4% | 4.6% | 1.5% | -1.6% |
| 10-Year Return** | 6.1% | 8.0% | 11.4% | N/A | 10.7% | 13.2% | 7.8% | 10.3% | N/A | 13.6% | N/A | 11.3% | N/A | N/A | N/A |

*Annual Estimated return for the Stable Value Fund (Gartmore Morley Fund) in 2005 is 3.5%. **Year to date not annualized. All other rates are as reported in The Wall Street Journal.

The AAAA, not being tax experts, does not provide tax advice. The information in this newsletter, while believed to be correct, should not be relied on, as it represents only the AAAA's understanding of the tax laws and the tax rules applicable. Participants are urged to consult with their own tax advisors for information on the application of the tax laws to them. It is important to read the prospectus before investing.

**AA334**

AAAA Benefits

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MARYBETH FARRELL,                      )
                                       )
                    Plaintiff,         )
                                       )
            v.                         )    C.A. No. 04-285-KAJ
                                       )
ASTRAZENECA PHARMACEUTICALS, )
LP,                                    )
                                       )
                    Defendant.         )

## AFFIDAVIT OF SUSAN P. BROADWAY

STATE OF DELAWARE        :
                         : ss:
COUNTY OF NEW CASTLE    :

I, Susan P. Broadway, being duly sworn according to law, do hereby depose and say that:

1.    On April 7, 2003, my promotion to Brand Communications Leader for the Exanta Team was announced by Jane Hellen. I was informed of the promotion a few days earlier in April.

2.    As a result of my promotion, I became MaryBeth Farrell's Manager.

3.    Prior to my promotion, I worked with Ms. Farrell as a co-worker and peer on the Exanta Team and was familiar with her work performance.

4.    Attached as Exhibit A are notes that I prepared after becoming Ms. Farrell's manager, based on my own observations of her performance while we were peers and from conversations I had about Ms. Farrell's performance deficiencies with Jane Hellen, Brian

**AA335**

057159 1004

Martin and Deborah Brangman. I used those notes as the basis for several conversations I had with MaryBeth Farrell in April about the need for her to improve her performance. All of these notes and conversations relate to the time before Ms. Farrell requested FMLA leave.


SUSAN P. BROADWAY


SWORN TO AND SUBSCRIBED before me, a Notary Public for the State and County aforesaid, on this 2 day of December, 2005.


NOTARY PUBLIC

My Commission Expires:_____

Areas to Improve

- Increase the contribution at all team meetings (i.e , strategic understanding of Exanta and strategy as it relates to Ad Boards and/or Investigator meetings—this will in turn increase the team's confidence in your potential).
- Adherence to project deadlines (i.e., did not meet phasing deadline for April 7, 2003 by 10:00 AM to Brian Martin. Phasing was received by Susan Pritchard after 12:00 noon on April 7, 2003 and was not in requested template, which was sent out with the original e-mail).
- Over-utilization of company e-mail (i.e., team and non-team members are unnecessarily copied on e-mails which are not pertinent to them).
- Increase your personal knowledge of Exanta clinical studies/data (i.e., become intimate with study data so that you may spend more time interacting with KOLs at Ad Board Meetings, thus in turn KOLs will view you as a source of clinical information representing the Commercial team).
- Fully utilize the agreed upon Exanta Ad Board template (i.e., take each Ad Board and insert program date into electronic template and follow the timelines and procedures for carrying out each of the Ad Boards).
- Increase your ability to retain verbal directions and act upon them accordingly (i.e., remembering what was discussed about the Ad Board schedule and what format this should be in when sending to Debra Walters and the PDSs. Ad Board template was sent to Debra Walters along with the entire Market Development Workstream presentation)
- Consistently update agencies with any changes after internal meetings regarding Ad Boards (i.e., version control--keeping Discovery abreast of any changes for Ad Board programs after meeting with any of our internal team members and acting promptly on requests from Discovery).
- Moving forward with the basic implementation of projects (i e , as a PREP Manager within this organization, it is necessary for you to grasp the initial concept of a process or program and begin the work necessary to complete the program and working towards its completion without waiting for a consensus. Cardiology Ad Board originally scheduled for April had to be rescheduled. You stated that you were waiting for a sign-off from Brian Martin, which you never received, therefore, program stalled)
- Be prompt and well prepared for all meetings that you hold or attend as this reflects upon you and the Exanta team (i.e., December 7, 2002 you held an ACT Ad Board meeting in which the required participants were Group Director, Product Director, Brand Promotions Lead, Product Strategist, as well as having PDSs and agencies on-line via the phone. You arrived 20 minutes after the meeting was to begin without enough working copies for the invitees of your meeting)
- Understand that the full responsibility of Ad Boards and Investigator meetings lie solely with you (i.e , the success or failure of these projects remain completely within your jurisdiction. You agreed to take the role and responsibility of

**EXHIBIT A**

**D395**

**AA337**

successful implementation of high-quality Ad Board and Investigator meetings for the Exanta team and you will be held to this agreement).

-

## CERTIFICATE OF SERVICE

I hereby certify that on December 7, 2005, I electronically filed a true and correct copy of

**Appendix To Defendant's Opening Brief In Support Of Its Renewed Motion For Summary**

**Judgment** with the Clerk of the Court using CM/ECF, which will send notification that such

filing is available for viewing and downloading to the following counsel of record:

| | |
|---|---|
| John M. LaRosa, Esquire | Thomas S. Neuberger, Esquire |
| Law Office of John M. LaRosa | Stephen J. Neuberger, Esquire |
| Two East 7th Street, Suite 302 | The Neuberger Firm |
| Wilmington, DE 19801-3707 | Two East Seventh Street, Suite 302 |
| | Wilmington, DE 19801-3707 |

I further certify that on December 7, 2005, I caused a copy of Defendant's Trial Brief to

be served by hand-delivery on the following counsel of record:

| | |
|---|---|
| John M. LaRosa, Esquire | Thomas S. Neuberger, Esquire |
| Law Office of John M. LaRosa | Stephen J. Neuberger, Esquire |
| Two East 7th Street, Suite 302 | The Neuberger Firm |
| Wilmington, DE 19801-3707 | Two East Seventh Street, Suite 302 |
| | Wilmington, DE 19801-3707 |

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ Sheldon N. Sandler
Sheldon N. Sandler, Esquire (No. 245)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware  19899-0391
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email:  ssandler@ycst.com
Attorneys for Defendant

Dated:  December 7, 2005